

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

JMM:CNC
F.#2003R02020

*United States Attorney's Office*
*610 Federal Plaza*
*Central Islip, New York 11722-4454*

November 29, 2010

The Honorable Joanna Seybert
United States District Judge
Eastern District of New York
1034 Federal Plaza
Central Islip, New York 11722

            Re:   United States v. Christian Tarantino
                  Criminal Docket No. 08-655 (JS)

Dear Judge Seybert:

        The government respectfully submits this letter in connection with the upcoming trial in this case, scheduled to begin on February 1, 2011.  The government moves <u>in limine</u> to introduce evidence in its case-in-chief of other crimes and bad acts involving the defendant Christian Tarantino.  For the reasons set forth below, the Court should find that the below-detailed evidence is admissible as direct evidence of the charged offenses, background evidence of the charged offenses, and/or as "other crimes or acts" evidence pursuant to Rule 404(b) of the Federal Rules of Evidence.

        As set forth in more detail below, the government seeks to introduce evidence that: (1) in 1989, Tarantino trafficked in stolen fur coats with Vincent Gargiulo and others and was convicted in the District of New Jersey ("DNJ") in 1991 in connection with that crime; (2) in December 1993, Tarantino participated in the theft of over 200 leather and fur coats from a Filene's Basement store on Long Island with Louis Dorval and others and the subsequent attempts to sell the stolen fur coats in interstate commerce, acts for which Dorval was indicted in the DNJ, and was in flight from, just days before his murder, as charged in Count Two; (3) in or about 1993 and 1994, Tarantino was involved with Dorval and others in a number of robberies, including of jewelry stores, fur coats and automobiles, and narcotics trafficking, including a home invasion robbery of narcotics traffickers; (4) in July 2000, the defendant was serving a prison term related to a state charge arising out of his participation in the attempted robbery of an undercover narcotics officer, during which time he provided a buccal swab to

2

federal agents in connection with the matter under indictment here, and from which he was released from custody in or about August 30, 2000; and (5) in or about mid 1999 through early 2000, Tarantino aided and abetted an associate, John Goetz, in the distribution of the date-rape drug GHB, for which Goetz, and Goetz's then-girlfriend, Claudine Dematos, were prosecuted before this Court, beginning in April 2000, in <u>United States v. Ansaldi et al.</u>, 00-CR-0891(S-2)(JS).

As set forth in greater detail below, many of these uncharged crimes and other bad acts are directly relevant to the crimes charged in the Indictment and properly admissible under Federal Rule of Evidence 401, because they establish Tarantino's relationships with victims Dorval and Gargiulo and other co-conspirators; Tarantino's motivation for involving certain individuals as co-conspirators; Tarantino's consciousness of guilt; and certain specific facts that tend to establish Tarantino's guilt of the charged crimes. Other crimes and acts, as discussed below, are equally and properly admissible under Federal Rules of Evidence 403 and 404(b), because they establish Tarantino's identity as one of the speaker's in the audio recording surreptitiously made by Vincent Gargiulo (the "Gargiulo tape"); Tarantino's opportunity to commit the charged crimes; and Tarantino's modus operandi.

As further set forth below, because the uncharged crimes are of a less sensational nature than the charged crimes, and because the bulk of the evidence of the uncharged crimes will come from the same witnesses testifying about the charged crimes, evidence relating to the uncharged crimes will not be unduly prejudicial.

I.    <u>Applicable Law</u>

    A.    <u>Direct Evidence</u>

It is well established that evidence of uncharged criminal activity or bad acts is admissible independent of Federal Rule of Evidence 404(b) where it constitutes direct evidence of the crimes charged in the indictment. <u>See, e.g.</u>, <u>United States v. Carboni</u>, 204 F.3d 39, 44 (2d Cir. 2000); <u>United States v. Thai</u>, 29 F.3d 785, 812 (2d Cir. 1994); <u>United States v. Towne</u>, 870 F.2d 880, 886 (2d Cir. 1989). Additionally, when the indictment contains a conspiracy charge, uncharged acts may be admissible as direct evidence of the conspiracy itself. <u>See Thai</u>, 29 F.3d at 812. In <u>Towne</u>, the Second Circuit specifically identified three categories of uncharged criminal activity that constitute direct evidence of the charged offense. 870 F.2d at 886. The Court stated:

> [e]vidence of uncharged criminal activity is not
> considered 'other crimes' evidence under Fed. R.
> Ev. 404(b) if it 'arose out of the same
> transaction or series of transactions as the
> charged offense, if it [is] inextricably
> intertwined with the evidence regarding the
> charged offense, or if it is necessary to complete
> the story of the crime [on] trial.'

Id. (quoting United States v. Weeks, 716 F.2d 830, 832 (11th Cir.
1983)).

Moreover, the Second Circuit has held that the district
court may admit evidence that does not directly establish an
element of the crime in order to provide background for the
events alleged in the indictment. See, e.g., United States v.
Inserra, 34 F.3d 83, 89 (2d Cir. 1994) ("[E]vidence of other bad
acts may be admitted to provide the jury with the complete story
of the crimes charged by demonstrating the context of certain
events relevant to the charged offense."); United States v.
Coonan, 938 F.2d 1553, 1561 (2d Cir. 1991) ("Background evidence
may be admitted . . . to show the circumstances surrounding the
events or to furnish an explanation of the understanding or
intent with which certain acts were performed."). In Coonan, the
Second Circuit further reasoned that because the witnesses
participated in the criminal acts about which they testified, it
was appropriate for the government to elicit on direct
examination details damaging to the witnesses' credibility. Id.
As the Court explained, in this way, the government was able to
avoid the appearance that it was concealing impeachment evidence
from the jury. Id.

   B.   Federal Rule of Evidence 404(b)

Federal Rule of Evidence 404(b) provides in pertinent
part:

> Evidence of other crimes, wrongs, or acts is
> not admissible to prove the character of a
> person in order to show action in conformity
> therewith. It may, however, be admissible
> for other purposes, such as proof of motive,
> opportunity, intent, preparation, plan,
> knowledge, identity, or absence of mistake or
> accident....

See Fed. R. Evid. 404(b). In order for evidence of "other
crimes, wrongs, or acts" to be admissible, it must be (1) offered
for a proper purpose, (2) relevant and (3) substantially more

probative than prejudicial.  In addition, at the defendant's request, the district court should give the jury an appropriate limiting instruction.  United States v. Downing, 297 F.3d 52, 58 (2d Cir. 2002) (citing Huddleston v. United States, 485 U.S. 681, 691-92 (1988)).

The Court has broad discretion to admit "other act" evidence pursuant to Rule 404(b)[1] and should follow the "inclusionary" approach to "other act" evidence.  United States v. Pascarella, 84 F.3d 61, 69 (2d Cir. 1996); United States v. Harris, 733 F.2d 994, 1006 (2d Cir. 1984).  Thus, evidence of a defendant's uncharged bad acts is admissible under Rule 404(b), subject to the limitations of Rule 403, if that evidence is offered for "any purpose other than to show a defendant's criminal propensity."  United States v. Rouhani, 47 F.3d 539, 544 (2d Cir. 1995); see Inserra, 34 F.3d at 89 (under Rule 404(b), evidence offered for proper purpose should be admitted unless unfairly prejudicial).

Thus, the Second Circuit has approved of admitted evidence of other crimes to prove, for example, (1) a defendant's intent to commit or motivation for a proscribed act, United States v. Brand, 467 F.3d 179, 197 (2d Cir. 2006) (evidence that the defendant possessed child pornography admissible as proof that he intended to engage in illicit sexual conduct with a minor); United States v. Laflam, 369 F.3d 153, 156-57 (2d Cir. 2004) (evidence that the defendant was a drug user admissible as proof of motive to commit the charged bank robbery); (2) a defendant's capacity to commit the charged crime, see United States v. Zedner, 401 F.3d 36, 49-50 (2d Cir. 2005) (evidence of prior fraud admissible as proof of the defendant's "financial sophistication [and] his ability to execute complex schemes"), rev'd on other grounds 126 S. Ct. 1976 (2006); (3) the defendant's consciousness of guilt, see, e.g., United States v. Mickens, 926 F.2d 1323, 1328-29 (2d Cir. 1991); United States v. James, 2007 U.S. Dist. LEXIS 39585, *2-*5 (E.D.N.Y. May 31, 2007); (4) background evidence helpful to the jury's understanding of the complete story of the charged crimes, see United States v. Skowronski, 968 F.2d 242, 246 (2d Cir. 1992); United States v. Lasanta, 978 F.2d 1300, 1307 (2d Cir. 1992) (testimony from government witness concerning his involvement in drug transactions several years prior to commencement of charged conspiracy); United States v. Brennan, 798 F.2d 581, 590 (2d Cir.

---

[1] A 404(b) ruling will be affirmed on appeal unless the ruling constitutes an abuse of discretion.  See Inserra, 34 F.3d at 89.  "To find abuse, the appellate court must conclude that the district court acted arbitrarily and irrationally."  United States v. Pitre, 960 F.2d 1112, 1119 (2d Cir. 1992).

1986); and (5) the origin, nature and extent of the relationship among co-conspirators, see, e.g., United States v. Rosa, 11 F.3d 315, 334 (2d Cir. 1993) (evidence of prior crimes admissible "to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators"); United States v. Pitre, 960 F.2d 1112, 1119 (2d Cir. 1992) (evidence of prior crimes admissible to "help explain to the jury how the illegal relationship between participants in a crime developed"); United States v. Roldan-Zapata, 916 F.2d 795, 804 (2d Cir. 1990); Brennan, 798 F.2d at 590 (evidence of prior crimes admissible to show "how the illegal relationship between [the defendant and an accomplice witness] developed"); United States v. Kalaydjian, 784 F.2d 53, 56 n.3 (2d Cir. 1986).

        In general, "the government is required to establish only a similarity or some connection to establish that a prior act is relevant to one of the elements . . . of the crime charged." Brand, 467 F.3d at 197; United States v. Paulino, 445 F.3d 211, 223 (2d Cir. 2006). Moreover, evidence admissible pursuant to Rule 404(b) should not be excluded on grounds of unfair prejudice where the evidence does not "involve conduct more inflammatory than the charged crime[s]." Id.; United States v. Williams, 205 F.3d 23, 33-34 (2d Cir. 2000) (Rule 403 analysis favors admission where uncharged crimes "did not involve conduct more serious than the charged crime and the district court gave a proper limiting instruction"). Moreover, where evidence of the uncharged crimes comes from one of the witnesses who will testify about the more serious charged crimes, there is little danger that prejudice will result. See United States v. Mejia-Velez, 855 F. Supp. 607, 611 (E.D.N.Y. 1994) ("If the jury found these witnesses to be credible, the defendant[s] would be convicted even if the accomplices were not permitted to testify about [the uncharged crimes].").

## II. Background

        The Indictment charges Tarantino with participating in three related murders in or affecting the Eastern District of New York in 1994 and 2003. Count One of the Indictment charges that on June 23, 1994, Tarantino, together with others, including co-conspirator Louis Dorval, handcuffed and disabled the driver and armed guard employed by Mid-Island Check Cashing Corporation, an armored car business engaged in interstate commerce, in violation of Title 18, United States Code, Section 33. Indictment, ¶¶ 1-4, 17-18. In the course of attacking the armored car employees, Dorval shot and killed one of the guards, Julius Baumgardt, as he lay face down on the pavement. Id., ¶ 4. Eyewitnesses to the robbery reported that one of the assailants carried a handgun,

while a second assailant carried a pump-action shotgun.

Moments after Mr. Baumgardt was shot, Tarantino, Dorval and another individual fled from the immediate vicinity in a red Chevy Blazer SUV (the "Blazer") that had been stolen from a Chevrolet dealership in the winter of 1994.  The Blazer was one of two getaway cars used by Tarantino and his co-conspirators; it was abandoned only a few hundred yards from where Mr. Baumgardt was shot.  Among the forensic evidence retrieved from the Blazer were three human hair shafts.  Eyewitnesses identified the Blazer by Florida license plate number as it left the scene as contemporaneously recorded in a 911 call to police.

The day after Mr. Baumgardt's murder, detectives of the Nassau County Police Department ("NCPD") conducting a stolen automobile ring investigation obtained a search warrant for a storage unit in Farmingdale that was rented for Tarantino and his associates.  Within the storage unit, detectives found a stolen automobile, a canvas bag containing a loaded 9 mm Glock pistol, a loaded Mossberg 12-gauge shotgun with a pistol grip, two police radio scanners and four walkie talkies.  The white automobile found inside the storage unit had been reported stolen on or about June 21 or 22, 1994.

Count Two of the Indictment charges Tarantino with the August 12, 1994 obstruction of justice murder of Dorval, in violation of 18, United States Code, Sections 1512 and 2.  The government will prove at trial that Tarantino, together with others, killed Dorval to prevent him from potentially cooperating with federal authorities who were, at the time, seeking to arrest Dorval on racketeering charges filed in the DNJ.

Tarantino's criminal association with Dorval dated to at least 1993 and continued until Dorval's murder.  During that time, Tarantino, Dorval and others committed a number of crimes, including the burglary of a Filene's Basement store located in Manhasset, New York, which resulted in the theft of hundreds of fur and leather coats, and a series of narcotics transactions, including a home invasion robbery.  Id., ¶ 5.  Throughout the first part of 1994, United States Customs Service agents in New Jersey intercepted conversations with Dorval attempting to sell or "fence" the coats stolen by himself and Tarantino.  The Filene's Basement theft and subsequent conspiracy to sell in interstate commerce the stolen merchandise served as one of the racketeering acts for which Dorval was indicted, days before his murder, in United States v. Giampa et al., 94-CR-403 (AJL) (D.N.J.)(hereinafter "Giampa").  Leading up to this prosecution, Dorval was also intercepted discussing his ability to steal cars and obtain false identification documents.

In the Spring of 1994, Dorval jumped bail in an un-
related state larceny case then pending against him in Nassau
County.  Dorval secretly took up residence in an apartment in
Corona, Queens.  Witnesses will testify at trial that as few as
four people, including Tarantino, knew of Dorval's whereabouts at
this time, and that Dorval made it known that he intended to
remain a fugitive rather than return to jail.

Shortly after the June 23, 1994 murder of Mr.
Baumgardt, Dorval admitted to an associate (hereinafter referred
to as Cooperating Witness No. 1 ("CW-1")) that he killed Mr.
Baumgardt during a robbery planned and executed with Tarantino.
CW-1 will testify that Tarantino learned that Dorval told CW-1
about the armored car robbery and killing of Mr. Baumgardt during
a meeting, shortly after the armored car robbery, regarding the
sale of marijuana involving Tarantino, Dorval, an associate of
Tarantino's named Scott Mulligan, and CW-1.  Dorval was angry at
CW-1 for having mentioned the armored car robbery to Tarantino.

On August 10, 1994, Dorval and others were indicted in
the DNJ in Giampa.  Because Dorval was already a fugitive from
his Nassau County case, living in an undisclosed address in
Corona, Queens, he was not immediately arrested with other Giampa
defendants.  Upon learning of the indictment, Dorval announced
that he intended to flee the New York area.  Indictment, ¶ 7.
CW-1 will testify that Dorval arranged to meet Tarantino on or
about August 12, 1994 – when other witnesses will also say they
ceased receiving telephonic contact from Dorval – to sell him a
large quantity of cocaine then in Dorval's Corona apartment.  The
money from this sale was to be split between CW-1 and Dorval,
enabling Dorval to help finance his flight from prosecution in
Giampa.

However, on August 16, 1994, Dorval's body was found by
the U.S. Coast Guard stuffed inside a large plastic tool trunk
floating in the Atlantic Ocean off Long Island.  Dorval was
wearing leather gloves cut off at the fingers and construction or
hiking boots at the time of his death.  The cause of death was a
single gunshot to the head.

In July 2000, agents of the Federal Bureau of
Investigation ("FBI"), with the assistance of local law
enforcement officers, collected a buccal swab from Tarantino,
while he was incarcerated at the Willard Drug Treatment Center
("Willard") in Willard, New York, where he was completing a
prison term arising from a 1998 arrest and subsequent narcotics
conviction arising from his role, together with, among others,
co-defendant John Goetz, in the attempted robbery of an
undercover NCPD narcotics detective.  Tarantino was represented

in this state prosecution, and during the taking of the buccal
swab, by Melvyn K. Roth. Indictment, ¶ 11. Mr. Roth had
represented Tarantino in numerous prior criminal proceedings.
The defendant's discussion of Roth, often referred to as "Mel" by
the defendant, and his concerns about the federal government's
taking of the buccal swab, places in context Tarantino's
admissions as to his role in the killings of Baumgardt and Dorval
as revealed in the Gargiulo tape.[2] Notwithstanding Tarantino's
stated belief that the collection of a buccal swab was merely a
ruse by law enforcement to intimidate him or others into
cooperating in the years-long investigation into these murders,
the collection in fact led to a forensic match of mitochondrial
DNA between the defendant and one of the human hairs recovered
from the Blazer used as a getaway vehicle on June 23, 1994.

Tarantino was released from Willard on August 29, 2000.
On the Gargiulo tape, Tarantino tells Gargiulo that the July 2000

---

[2] For instance, at approximately 39 minutes into the
Gargiulo tape, the defendant ("CT") recounts, to Gargiulo ("VG"),
his initial reaction upon learning of the DNA subpoena from "Mel"
Roth as follows:

CT:    So the cops come upstate, you know.

VG:    Right. They go all the way upstate?

CT:    Yeah, 'bout four of them, right?
       So I get a phone call from --

VG:    Feds or state?

CT:    Both.

VG:    Together?

CT:    Yeah. So listen, so I go, ah -- I get a call from MEL,
       you know, fuckin', ah, KENNY comes to get me. I'm
       like, what the fuck, you know. *So MEL goes, CHRIS,
       listen, fuckin' U.S. Attorney wants to take DNA from
       you. You fuckin' botched the armored car up*, blah,
       blah, blah, blah, blah.

VG:    They didn't take it, did they?

CT:    Listen, *so I go, holy fuck; and I ain't giving it to
       them, you know?* He says this. *I ain't giving to them.
       I go, 'cause it'll come back, you know?* So, ah –

DNA collection by state and federal agents had occurred "[t]wo
months and change" earlier, placing the recording date in or
about September 2000.  See also Indictment, ¶ 13.  The defense
has already attempted to characterize the Gargiulo tape as the
product of blackmail in a pending motion to suppress, as opposed
to an effort by Gargiulo to obtain a recording exculpating
himself from any involvement in these crimes at a time in which
federal investigative efforts in this and collateral cases, such
as the Goetz prosecution, were causing concern to Tarantino and
others.

        In fact, Tarantino and Gargiulo had, at the time of the
making of the tape, an ongoing friendship and a deep level of
trust, laughing together several times during the recorded
conversation.  That trust, in fact, began at least as early as
1989, when the two were co-defendants in another federal case
involving the trafficking of stolen merchandise.  United States
v. Gargiulo et al., 90-CR-423(DRD)(D.N.J.).  Court records reveal
that Mr. Roth represented Tarantino in that matter.  This history
explains how Gargiulo understood who the defendant was referring
to when he said he got a telephone call from "Mel" informing him
about the DNA subpoena, or why Gargiulo later in the conversation
noted that Mr. Roth's son had recently become a member of the gym
that Gargiulo ran in Manhattan, with financial backing from
Tarantino, Mulligan and others.  It also explains the willingness
of Tarantino to discuss and implicate himself in the Baumgardt
and Dorval murders.  In fact, the closeness of the relationship
between Tarantino and Gargiulo was so deep that Tarantino was
willing to articulate his motivation for participating in the
killing of another individual, Greg Reiter, the son of a high-
ranking Gambino organized crime family associate, who disappeared
in October 1989 and is presumed dead.

        The following are portions of the conversation
pertaining to the murder of "Greg":

VG:  Since you came home, you know what happened – since I
     came home, I should say, I've been mad at you and
     blamed you for Greg.

CT:  Uh –

VG:  I am really mad.  I don't think he had to die.

CT:  I do.

VG:  I know you did, but I don't think he did.  He was -- he
     wasn't going to shoot you.  If he was going to shoot
     you or kill you, he would have told me.  That snap [UI]

snapping on you. * * *  It's because I had so much
built up anger, because of that it's – it's really bad.
I just feel so bad that I don't think he should have
died.

CT:  Oh, I do.

VG:  Why?

CT:  I'll tell you why. * * *

    While the government does not currently intend to offer
this portion of the Gargiulo tape at trial in its case-in-chief,
the remaining history between Tarantino and Gargiulo, based in
part on their participation in other crimes that are the subject
of this application, is crucial for the jury to understand in
assessing the relationship between the two men and the context of
Tarantino's numerous admissions.

    As to the obstruction of justice murder of Gargiulo
charged in Counts Three and Four, the government will present
evidence at trial that between December 2002 and August 2003 —
more than two years after surreptitiously recording Tarantino and
after the collapse of their business partnership — Gargiulo
informed Tarantino that he possessed the tape with its
incriminating admissions.  Indictment, ¶ 14.  Beginning in or
about May 21, 2003, Gargiulo offered to provide the recording to
the FBI in exchange for a reward leading to the conviction of
Tarantino and one of the John Doe individuals referenced in the
Indictment.  Id., ¶ 15.

    The government will establish at trial that in or about
August 2003, Tarantino hired an individual, whose identity is
known to the government and who had been an employee of
Tarantino's, to kill Gargiulo to obstruct the ongoing federal
investigation into the Baumgardt and Dorval murders.  On August
18, 2003, Gargiulo was shot in the head at point-blank range and
died almost instantly.

III. Argument

    A.  Evidence of Tarantino's 1990 Arrest and 1991
        Conviction in the DNJ for Possession
        and Sale of Stolen Goods is Admissible

    In or about September 1990, Tarantino, Gargiulo and
others were arrested in the DNJ for their involvement in a
conspiracy to possess and sell stolen fur coats.  The arrests
were the result of an undercover FBI operation.  On or about

November 9, 1989, Tarantino drove a van containing approximately 150 fur coats from New York to Union City, New Jersey.  The coats had been stolen from Fur Desire, Inc., located in Syosset, New York, on or about October 23, 1989.  Tarantino, Gargiulo and their co-defendants met with an undercover agent ("UC") and offered to sell the fur coats for $75,000.  After the UC agreed, Tarantino, Gargiulo and their co-defendants unloaded the fur coats from the van into the UC's office in Union City.  While the men were unloading the fur coats, the UC observed that Gargiulo had a sawed-off shotgun tucked into his pants.  Later that same day, agents observed a sawed-off shotgun between the two front seats of the red Chevrolet van.  Surveillance photographs of the November 9, 1989 meeting with the UC in Union City have been provided to Tarantino in the instant case as Rule 16 discovery.

On April 3, 1991, Tarantino pleaded guilty to knowingly possessing, selling and disposing of 146 fur coats of a value in excess of $500,000, which had been transported from New York to New Jersey after having been stolen, in violation of Title 18, United States Code, Sections 2315 and 2.  Tarantino was remanded on April 3, 1991, after entering his guilty plea.  As noted in the Judgment, dated July 17, 1991, Tarantino was sentenced to twenty-one (21) months' imprisonment and three (3) years of supervised release.  The Judgment further indicates that Tarantino was represented by Melvyn K. Roth, Esq.

While on supervised release, Tarantino provided several handwritten monthly supervision reports to his probation officer. The government obtained Tarantino's monthly supervision reports from the United States Probation Department in the DNJ and provided them to an FBI analyst for comparison to handwriting on page six of a pad of paper found in Dorval's Corona, Queens apartment after Dorval's death.  The handwriting on page six of the pad included a three-way division of $92,000, the approximate amount that was stolen during the June 23, 1994 robbery and murder of Mr. Baumgardt.  The FBI analyst reported that he observed "significant characteristics . . . to indicate Tarantino may have prepared the writing."

The government seeks to introduce at trial, in its case-in-chief, evidence that Tarantino and Gargiulo, together with others, participated in the sale of stolen fur coats to an undercover officer, as described above.  Such evidence is admissible as direct evidence of the crimes charged in the instant Indictment.  The fact that Tarantino and Gargiulo were co-conspirators and co-defendants in 1989 through 1991 is inextricably intertwined with the facts of the instant case, as it explains to the jury the nature of their relationship and why Tarantino would have confided in Gargiulo and discussed with

Gargiulo his participation in the armored car robbery and the murders of Baumgardt and Dorval, as Tarantino did in September 2000, when Gargiulo made the surreptitious recording. See, e.g., Rosa, 11 at 334 (evidence of prior crimes admissible "to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators"); Pitre, 960 F.2d at 1119 (evidence of prior crimes admissible to "help explain to the jury how the illegal relationship between participants in a crime developed").

Moreover, the fact that Melvyn Roth was Tarantino's attorney in the DNJ fur coat case is relevant to several other pieces of evidence the government will present at trial.  For instance, it supports the government's argument that it is in fact Tarantino speaking on the Gargiulo tape, as Tarantino mentions Roth's name several times during the conversation.  In addition, the monthly supervision reports Tarantino submitted to his probation officer while on supervised release for the 1991 DNJ conviction are relevant to the instant prosecution, as the handwriting on those reports was analyzed and compared to handwriting found in Dorval's apartment consistent with a three-way distribution of $92,000.

Therefore, the Court should admit evidence of Tarantino's 1990 arrest and 1991 conviction in the DNJ for possession and sale of stolen goods, including the fact that Gargiulo was Tarantino's co-defendant, as background evidence to the crimes charged in the instant Indictment.

B.    Tarantino's Participation in the 1993 Robbery of Fur Coats from Filene's Basement and the Subsequent Efforts to Sell Those Fur Coats Is Admissible

The government intends to present evidence at trial of Tarantino's involvement in the 1993 robbery of fur coats from a Filene's Basement store on Long Island and the attempts to sell those fur coats, including through a CI in New Jersey.  This evidence is admissible as direct evidence of the crime charged in Count Two of the Indictment, the obstruction of justice murder of Dorval.  The government's theory of the case is that Tarantino participated in Dorval's murder because he feared that Dorval, who was wanted by the federal authorities in connection with the Giampa case, would cooperate with the government and disclose Tarantino's involvement in numerous crimes, including the robbery of the fur coats from Filene's Basement, and the armored car robbery and murder of Mr. Baumgardt.

Moreover, that Tarantino and Dorval participated in the Filene's Basement robbery in December 1993 and the subsequent sale of the stolen fur coats constitutes direct evidence of Tarantino's involvement in the June 23, 1994 armored car robbery and murder of Mr. Baumgardt (Count One), as it explains the criminal nature of the relationship between Tarantino and Dorval and why Tarantino and Dorval would have participated in the armored car robbery together.  In addition, evidence of the December 1993 robbery of the fur coats from Filene's Basement further corroborates CW-1's anticipated testimony, discussed in more detail below, that in or about 1993 and 1994, Tarantino and Dorval engaged in numerous robberies and narcotics transactions together.

C.    Tarantino's Participation in Robberies and Narcotics Transactions with Dorval, CW-1 and Others Is Admissible As Direct Evidence of Counts One and Two or, in the Alternative, As "Other Crimes" Evidence, Pursuant to Rule 404(b)

The government anticipates that it will present evidence, including testimony of CW-1, establishing that, in or about 1993 and 1994, Tarantino, together with Dorval and others, was involved in a number of robberies, as well as narcotics transactions, including a home invasion robbery of narcotics dealers.

Evidence that Tarantino participated in and/or planned a number of robberies, including of fur coats, jewelry and automobiles, and narcotics transactions with Dorval is offered as direct evidence of Counts One and Two of the Indictment, as discussed further below.  Moreover, this evidence is background evidence, as it explains, among other things, the criminal nature of the relationship between Tarantino and Dorval; the trust that existed between Tarantino and Dorval and why they would have committed the June 23, 1994 armored car robbery together; why Dorval would have told Tarantino about his Corona, Queens apartment, where Dorval was hiding from law enforcement officers; why Dorval would have confided in Tarantino that he had been indicted in the DNJ and planned to flee; why Tarantino would have had an opportunity to murder Dorval; and how CW-1 was privy to some of the criminal activities of Dorval and Tarantino.

For instance, the government anticipates that CW-1 will testify about his participation in a home invasion robbery of narcotics traffickers with Tarantino, Dorval and another individual, in Queens, New York in or about December 1993.  Among other testimony, CW-1 will testify that, prior to the robbery, Tarantino and Dorval conducted surveillance of the owner of the

house over the course of several days.  CW-1 will further testify
that all four men carried firearms during the home invasion
robbery.  CW-1 will further describe how the men broke into the
residence and found a male and female in bed.  When the male and
female refused to tell the men where the narcotics and/or money
was kept, CW-1 and Dorval tied up the male, put him under a
running shower, and used a taser in an attempt to force him to
disclose the location of the narcotics and/or money.  The men
ultimately found heroin pellets and approximately $10,000 in
cash.

　　　　The proffered evidence provides background evidence of,
among other things, the criminal relationship among Tarantino,
Dorval and CW-1 and helps explain how CW-1 was privy to the
criminal activities of Dorval and Tarantino.  Moreover, the
government should be permitted to elicit testimony of the home
invasion robbery during the direct examination of CW-1 to avoid
the appearance that the government is concealing impeachment
evidence from the jury.  See Coonan, 938 F.2d at 1561.

　　　　Moreover, CW-1's testimony that Tarantino and Dorval
carried firearms during the home invasion robbery, which occurred
only a few months prior to the armored car robbery, is admissible
as proof of opportunity under Rule 404(b).  Eyewitnesses to the
armored car robbery reported that one of the assailants carried a
handgun, while a second assailant carried a pump-action shotgun.
In addition, the day after the armored car and Mr.
Baumgardt's murder, NCPD detectives seized a loaded 9 millimeter
Glock pistol and a loaded shotgun from a storage unit in
Farmingdale that was rented for Tarantino and his associates.
ATF records reveal that the 9mm Glock pistol found in the storage
unit was purchased by Dorval in Florida on February 28, 1994 and
that, on that same day, Dorval purchased a second 9 mm Glock
pistol and a .40 caliber Glock pistol.  A NCPD ballistics expert
concluded that the bullet removed from Baumgardt could have been
fired from a Glock.  Thus, the court should admit evidence of the
home invasion robbery both as background evidence to the crimes
charged in Counts One and Two, and as proof of opportunity,
pursuant to Rule 404(b).

　　　　Moreover, the proffered "other crimes" evidence should
not be excluded under Federal Rule of Evidence 403 because its
probative value substantially outweighs any prejudice to the
defendant.  The uncharged criminal activity does not involve
conduct that is any more "'sensational or disturbing'" than the
offenses charged.  Pitre, 960 F.2d at 1120.  Moreover, it was
Dorval and CW-1 who were involved in "tasing" the male occupant
of the house – not Tarantino.  Furthermore, any potential
prejudice can be effectively mitigated by a cautionary

instruction limiting the jury's consideration of the evidence to the purposes for which it is offered. See Williams, 205 F.3d at 34. Moreover, where evidence of the uncharged crimes comes from one of the witnesses who will testify about the more serious charged crimes, there is little danger that prejudice will result. See Mejia-Velez, 855 F. Supp. at 611.

The government anticipates that CW-1 will further testify that, during the home invasion robbery of the narcotics trafficker, the men used an automobile that Tarantino had stolen. In addition, CW-1 will testify that Dorval and Tarantino were involved in stealing cars and that they had warehouses "out east" where they stored stolen merchandise, such as fur coats and automobiles. Given that, on June 24, 1994, law enforcement officers found a stolen vehicle in the storage unit in Farmingdale, which also contained a loaded 9 millimeter Glock pistol and a loaded shotgun, along with police scanners and walkie-talkies, CW-1's testimony regarding Tarantino and Dorval's involvement in stealing cars should be admitted as direct evidence of the crime charged in Count One of the Indictment.

Moreover, in the recording made by Gargiulo, Tarantino admits that one of the cars used during the armored car robbery was stolen. The following are excerpts pertaining to the vehicles used during the armored car robbery:

CT:       I had the car [UI] -- the other half of the car. The car we drove up in, the car that we pulled up in. We changed tails over here, and we went to a different car and took off, so the [UI] car -- the car we pulled up in –

VG:       Right.

CT:       – they have it.

VG:       And -- and, then what, you didn't have a hat on? What kind of DNA is it, hair?

***

VG:       So you think they have evidence?

CT:       So listen. So we used the car all winter. And for the most part I did.

VG:       Oh, shit. There's no way ya fucked up.

CT:       Definitely, I know. That's what I said. I go, and I

went to the city with Mike.

VG:        Holy shit.

CT:        So listen.  I'm like, fuck, you know.  I'm shitting
           bullets.  We took a vacuum to the car, you know
           what I mean, right?

***

VG:        But even with just the car, [UI] explain everything
           [UI] fucking [UI] --

CT:        It's not enough, because who's to say -- listen, [UI] I
           was thinking about the other day.  I go, who's to say
           the car we pulled up in, did someone take our license
           plate down?  How do they know about this car that was
           found down there?  **Just 'cause it's a red stolen
           vehicle**, it could of been there for a month, you know,
           but – you know.  You know what I'm saying, like --

VG:        Right.

CT:        I go [UI] how do you know that wasn't the one we pulled
           up in?  Did somebody take the plate?  Did someone give
           a description of the plate? Like were you there at the
           time when I'm saying that I was there, you know what
           I'm saying?

VG:        Right.

       The government will introduce evidence that the red
Chevy Blazer found abandoned only a few hundred yards from where
Mr. Baumgardt was shot had been stolen from a Chevrolet
dealership on Long Island in the winter of 1994.  Thus, evidence
that Tarantino was involved in stealing cars during 1993 and 1994
serves as direct evidence that Tarantino participated in the June
23, 1994 armored car robbery and murder of Mr. Baumgardt.  In the
alternative, it is admissible pursuant to Rule 404(b) as evidence
of opportunity to commit the crime charged in Count One.

       Similarly, the government expects that CW-1 will
testify that Dorval told him that, in or about early June 1994,
Dorval, Tarantino and Mulligan broke into a Spy-Mart store in
Manhattan and stole bullet proof vests, police badges, scanners
and police-style radios.  Dorval further told CW-1, in sum and
substance, that some of those items were seized by police when
they raided a garage on Long Island and found stolen cars.  The
government's theory of the case is that the garage on Long Island

that Dorval referred to was the storage unit in Farmingdale searched by NCPD detectives on June 24, 1994. The proffered evidence is admissible as direct evidence of Tarantino's participation in the armored car robbery and Mr. Baumgardt's murder.

CW-1 will further testify that, in or about late January or early February 1994, CW-1 learned that Dorval, Tarantino and their associates robbed a fur coat store in Queens. During the robbery, Dorval, Tarantino and their associates stole, among other things, a number of "EEE" and bearer bonds. Dorval proposed that CW-1 cash the bonds, with the first $100,000 going to Dorval and Tarantino and the remainder to CW-1. CW-1 accepted the offer and began cashing the bonds with the assistance of co-conspirators, including an individual who worked at a bank. After one of CW-1's co-conspirators was arrested in connection with the bonds, CW-1 met with Dorval and Tarantino and the men decided that the bearer bonds should be returned to Dorval and Tarantino, while the "EEE" bonds would be given to another individual to cash. This evidence is direct evidence of the crimes charged, as it explains the relationships among Tarantino, Dorval and CW-1 and why CW-1 would be privy to certain information regarding the armored car robbery and the circumstances leading to Dorval's murder.

We anticipate that CW-1 will further testify that in 1994, Dorval advised CW-1 that Tarantino wanted CW-1's opinion regarding the risks involved in robbing a particular jewelry store in Garden City. CW-1 conducted surveillance of the jewelry store and subsequently met with Tarantino and Dorval to discuss how the robbery would be executed. At the meeting, during which Tarantino took out maps showing the jewelry store and the surrounding area, CW-1 advised Tarantino that he did not believe breaking into the jewelry store was a good idea given that the Garden City Police Department covered that area extensively. CW-1 is unaware of whether Tarantino and Dorval followed through on their plans to rob the jewelry store. This evidence, too, is admissible as direct evidence of Counts One and Two of the Indictment, as it explains the illegal nature of the relationship among Tarantino, Dorval and CW-1 and why CW-1 would be privy to certain information regarding the armored car robbery and the circumstances leading to Dorval's murder.

The government further expects that CW-1 will testify that, a few months before Dorval's death, Dorval told CW-1 that Dorval, Tarantino and Mulligan were contemplating killing an unnamed drug dealer. According to Dorval, the drug dealer would be shot in the head, the body would be put in a tool box and the tool box would be taken out and dumped in the ocean. Evidence

that Tarantino was part of a plan to kill a drug dealer in this
manner just months before Dorval's murder is admissible as direct
evidence of the crime charged in Count Two of the Indictment, as
that is precisely how Dorval was killed and how his body was
disposed of.

     In the alternative, this other bad acts evidence is
admissible, pursuant to Rule 404(b), as proof of Tarantino's
common scheme or plan.  Rule 404(b) permits evidence of similar
acts to prove a "signature crime," i.e., a modus operandi where
the crimes are "so nearly identical in method as to ear-mark them
as the handi-work of the accused." United States v. Mills, 895
F.2d 897, 907 (2d Cir. 1990), citing Weinstein & M. Berger,
Weinstein's Evidence, para. 404[16], at 404-127 (1985).  Here,
the similarities between the crime contemplated by Tarantino,
Dorval and Mulligan and the manner in which Dorval was killed and
his body disposed of are so similar and unique, that the evidence
is properly admissible under Rule 404(b).

     Moreover, this uncharged criminal activity does not
involve conduct that is any more "'sensational or disturbing'"
than the offenses charged, Pitre, 960 F.2d at 1120, and any
potential prejudice can be effectively mitigated by a cautionary
instruction limiting the jury's consideration of the evidence to
the purposes for which it is offered, see Williams, 205 F.3d at
34.  Moreover, where evidence of the uncharged crimes comes from
one of the witnesses who will testify about the more serious
charged crimes, there is little danger that prejudice will
result.  See Mejia-Velez, 855 F. Supp. at 611.

     CW-1 will further testify that he was involved in the
sale of approximately 40 pounds of marijuana to Dorval, Tarantino
and Mulligan shortly after the June 23, 1994 armored car robbery
and murder of Mr. Baumgardt.  CW-1 will testify that Dorval
admitted to CW-1 that Dorval committed an armored car robbery
with Tarantino, during which Dorval accidentally shot one of the
armored car guards.  In connection with the marijuana deal, CW-1
met with Dorval, Tarantino and Mulligan and received
approximately $40,000 in cash for the marijuana.  CW-1 noted that
the cash appeared to consist of new $20 bills.  It was in
connection with the marijuana deal that CW-1 mentioned to
Tarantino, while the men were at a pizzeria, that he knew about
the armored car robbery.  CW-1 will testify that Tarantino
appeared angry and denied participation in the armored car
robbery.  Dorval was very upset at CW-1 for disclosing to
Tarantino that CW-1 knew about the armored car robbery.

     Evidence that Tarantino was involved in a 40-pound
marijuana deal with Dorval, Mulligan and CW-1 shortly after the

armored car robbery and shooting of Mr. Baumgardt is direct
evidence of Counts One and Two of the Indictment, as the facts of
the marijuana deal are inextricably intertwined with the
circumstances surrounding CW-1 mentioning the armored car robbery
to Tarantino.  In fact, all of the criminal conduct jointly
undertaken by Tarantino, Dorval and CW-1 is relevant to explain
why Dorval would have confided in CW-1 and why CW-1 would have
mentioned his knowledge of the armored car robbery to Tarantino.
The fact that CW-1 disclosed to Tarantino his knowledge of the
armored car robbery is also relevant to CW-1's testimony that,
while on Fire Island after having learned on or about August 10,
1994 that he, Dorval and others were indicted in the DNJ, Dorval
contacted CW-1 and advised him that Dorval and Tarantino would
come to Fire Island on a private boat to pick up CW-1.  CW-1 will
testify that he declined the offer, as he was concerned for his
safety and feared that Tarantino intended to kill him.

          Similarly, CW-1 will testify that shortly before
Dorval's murder, Dorval advised CW-1 that Tarantino had a job for
them, which consisted of robbing a stockbroker in his Manhattan
home, where the stockbroker supposedly had $500,000.  CW-1 chose
not to participate, fearing that Tarantino might kill CW-1 due to
CW-1's knowledge of the armored car robbery and murder of Mr.
Baumgardt.  Evidence that Tarantino proposed the robbery of a
stockbroker to Dorval and CW-1 is inextricably intertwined with
events that occurred after Mr. Baumgardt's death (including CW-1
revealing to Tarantino that he knew about the armored car
robbery) and the events leading to Dorval's death.

          Finally, CW-1 will also testify that in 1993 and 1994,
he supplied Dorval with cocaine, which Dorval sold to his
customers.  Shortly before Dorval's murder, CW-1 invested
approximately $50,000 so that Dorval could buy several kilograms
of cocaine to resell for a profit.  CW-1 will testify that Dorval
gave one kilogram of cocaine to Tarantino, who provided the
cocaine to one of his associates.  After the DNJ indictment
became public and CW-1 learned that the authorities were looking
for him, CW-1 advised Dorval that he needed money immediately in
order to pay his attorney in the DNJ case and that Dorval should
sell the remaining kilograms of cocaine as soon as possible.
Dorval told CW-1 he would discuss the matter with Tarantino and
that he (Dorval) was not going to turn himself in, but, rather,
planned to flee to Florida.  Tarantino's involvement in a cocaine
transaction with Dorval and CW-1 shortly before Dorval's murder
is inextricably intertwined with the facts surrounding Dorval's
murder, as the discussions regarding disposing of the remainder
of the cocaine were some of the last discussions CW-1 had with
Dorval and indicate that Dorval and Tarantino were together
shortly prior to Dorval's disappearance.  In the alternative, the

evidence is admissible pursuant to Rule 404(b), as it shows that Tarantino would have had an opportunity to lure Dorval to his death under the guise of a cocaine transaction.

To the extent that the Court relies on Rule 404(b) to admit any of the above-discussed "other crimes" evidence offered by CW-1, the "other crimes" discussed are less sensational than the charged murders and the probative value of the evidence substantially outweighs the risk of undue prejudice.

D.    Tarantino's Aiding and Abetting the Distribution of GHB by Associate John Goetz, Scott Ansaldi and Claudine Dematos Is Admissible As Direct Evidence of Counts One and Two and As "Other Crimes" Evidencing Identity, Pursuant to Rule 404(b)

On July 31, 2000, just days after the FBI collected buccal swabs from Tarantino at Willard, this Office, in conjunction with the U.S. Drug Enforcement Administration, New York Police Department and Internal Revenue Service Criminal Investigation Division arrested and commenced the prosecution of John Goetz, Claudine Dematos, Scott Ansaldi and Rodney Dean Gates in connection with the internet sale of the date-rape drug gamma hydroxybutyric acid ("GHB") and its precursor, gamma butyrolactone ("GBL"). Defendants Gates and Ansaldi were convicted by a jury on June 6, 2002 following a four-week trial before Your Honor.

At their initial appearance in July 2000, defendants Ansaldi and Goetz (who died in May 2001 while awaiting trial on bail), were represented by Mr. Roth and Richard Librett, Esq., respectively. Dematos was represented by Mr. Kevin Keating.

At trial, the government is prepared to call witnesses and offer other evidence that during a portion of the conspiracy to distribute GHB, Tarantino allowed a business he owned with Scott Mulligan, named Liquid Labs, to be used to launder credit card receipts for the sale of GHB by Goetz and others. This particular act is in fact referenced by Tarantino on the Gargiulo tape in the context of further admissions regarding his role in the Baumgardt and Dorval murders.

While contending that he would never confess to the murders or cooperate and implicate others responsible, Tarantino speculates, not only who among his criminal associates might testify against him, but further makes clear his earlier admissions on the tape regarding his role in the Dorval and Baumgardt murders. For example, on the Gargiulo tape, Tarantino claimed that when law enforcement agents came to Willard to

collect his DNA, they asked if his attorney had explained the purpose of their visit.

"I go, why don't you tell me," Tarantino said, laughing.

In response to this show of bravado, Tarantino claimed that one of the agents said in substance: "Chris, just so you know, he goes, you don't want to be on the back of this train 'cause we're going to be arresting a lot of people.  He goes, you don't want to be in the caboose on this one." [3]

As the tape continues, Tarantino discussed the possible relation between the collection of his DNA and the recent arrest of Goetz and others.  "[T]he U.S. Attorney tells Mel and Rick Librett, don't take this case.  You're going to have a conflict of interest, meaning they are going to tie me and Scott [Mulligan] in with John [Goetz], which I think is implicating that there is a train which is great," Tarantino states.

VG:        They don't know if John had nothing to do with it, right?

CT:        Listen, no, man.  They knew JOHN had nothing to do with it.  They locked JOHN up for the GHB.

At this stage in the tape, the subject of the entire conversation, that is, the only "it" that Tarantino and Gargiulo have been speaking about, is the threat that the taking of the DNA might tie Tarantino to the killing of Baumgardt and/or Dorval.  However the arrest of Goetz and others poses a similar risk to Tarantino, who admits that he allowed Liquid Labs to be used for a small fee, and then found out that Goetz was making substantially larger profits on the GHB sales than Tarantino at first understood.

VG:        I knew you weren't happy with [Goetz] back then.

_____

[3]  It is at this point in the conversation that Gargiulo is heard stating, "I don't mean to sound fucked up, but I'm so glad I'm not involved in this one."  As the government has previously argued in response to the defendant's motion to suppress the Gargiulo tape, this self-exculpating statement by Gargiulo, which Tarantino did not dispute, and other similar statements, appear to have been the motivation behind Gargiulo's surreptitious recording at a time when, in fact, numerous mutual acquaintances of Tarantino and Gargiulo's were being arrested and prosecuted by federal authorities for a series of crimes.

CT:        Yeah, but I didn't want to bleed the kid, you know what
           I mean?   Then I go to the fuckin' wholesalers [UI],
           and I find out that he moves his three hundred cases.
           And I'm supposed to make X amount on a fuckin' pile.
           And it's like, twenty, thirty thousand out of my
           fucking pocket.   I'm fuckin' angry, you know.  I'm
           like -- I call him up.  I go, yeah, John I got great
           news.  I need fifty grand, or I'm going to get bubble
           Buzz.  I'm just going to take the fuckin' money.  I'm
           going to Black tack Jack his fuckin' ass, and that was
           going to be it.  You know SCOTT, more of a business
           man, right?

           Soon after, in another implicit reference to the
Baumgardt and Gargiulo murders, Gargiulo and Tarantino had the
following colloquy:

VG:        You didn't do anything with John [Goetz], did you?

CT:        Oh, yeah, I did.

VG:        John wasn't involved in this, was he?

CT:        No. * * *

           However, Tarantino immediately follows up by relaying
that he had been told that the prosecution of Goetz, Dematos and
Ansaldi was an effort to gain cooperators who might implicate him
or Mulligan in some chargeable crime.  Referring to what federal
agents supposedly told Goetz and Dematos, Tarantino said to
Gargiulo: "Tell us about Chris, and we'll let you go home.  They
told Claudine the same thing.  Tell us what the fuck you're doing
with these fuckin' guys."

VG:        Involved in the GHB?

CT:        Yeah.  We knew you fuckin' guys [UI] that she's like,
           listen, her lawyer is Kevin Keating, right out of Mel's
           office.

VG:        Kevin Keating?

CT:        Yeah, lucked out.  Right.  By accident purely, okay.
           Tells the cops, listen, we wouldn't let them get
           involved.  They tried to get involved.  We wouldn't let
           them get involved.  You're wrong, you know, and as far
           as Liquid Lab goes da, da, da and this is a fuckin' a
           girl pleading, so they knew they can't turn her, you
           know?  So that's good.

However, in the next breath, Tarantino returned to the collection of the buccal swab and, recognizing that the arrests of Goetz and others was not limited to an effort to charge him with aiding and abetting the distribution of GHB, added, "So I'm like -- when they first got arrested, I'm like [UI] it ain't that bad, you know; but the -- the DNA shit.  They took fuckin' seven guys' [DNA] shit."

Without admitting the testimony to explain Tarantino's role in aiding and abetting the distribution of GHB, the jury will be deprived of critical background and "the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense." Inserra, supra.  This is plainly the case here, in which the additional, implied admissions of the defendant as to the Baumgardt and Dorval matters, necessitate placing the statements, such as the ones above, in context.

Insofar as the defense may continue to portray Gargiulo's surreptitious recording as an act of blackmail that somehow mitigates the many admissions by the defendant on the tape, the defendant's discussion of the then-recent arrests of other associates, in conjunction with the taking of his DNA, offer a counter (and the government submits more accurate) inference, namely, that Gargiulo was motivated, in the midst of these arrests, to secure a record that could be used, if necessary, to avoid false accusations being leveled against him by Tarantino or others responsible for the crimes charged in this Indictment.  The government has previously argued this motive necessitates rejection of Tarantino's motion to suppress the Gargiulo tape. See Gov't's. Brief in Opposition at pp. 12-13, citing, inter alia, United States v. Cassiere, 4 F.3d 1006 (1st Cir. 1993)(tape was made "to prevent future distortions by a participant" to a crime).  Providing the context referenced above will similarly provide a jury with a complete, and undistorted picture from which to draw inferences regarding Tarantino's recorded admissions.

IV.  Conclusion

For the foregoing reasons, the government respectfully requests that the Court admit the proffered evidence as direct evidence of the charged offenses, background evidence of the

charged offenses, and/or as "other crimes or acts" evidence
pursuant to Rule 404(b) of the Federal Rules of Evidence.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney

By:  /s/_____
Carrie N. Capwell
James M. Miskiewicz
Assistant U.S. Attorneys
(631) 715-7836/7841

cc:  Counsel of Record (By ECF)