```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
UNITED STATES OF AMERICA,

                Plaintiff,

       -against-                    MEMORANDUM AND ORDER
                                    08-CR-655 (JS)

CHRISTIAN GEROLD TARANTINO,

                Defendant.
----------------------------------X
APPEARANCES:
For Plaintiff:     Carrie Nicole Capwell, Esq.
                   James M. Miskiewicz, Esq.
                   United States Attorneys Office
                   560 Federal Plaza
                   Central Islip, NY 11722

For Defendant:     Diarmuid White, Esq.
                   White & White
                   148 East 78 Street
                   New York, NY 10021

                   James R. Froccaro, Esq.
                   20 Vanderventer Ave., Suite 103W
                   Port Washington, NY 11050

                   Michael Rosen, Esq.
                   Law Office of Michael Rosen
                   61 Broadway, Suite 1105
                   New York, NY 10006
```

SEYBERT, District Judge:

    Pending before the Court is a Motion to Dismiss, pursuant to Fed. R. Crim. P. 12(b), coupled with other pre-trial motions, filed by Christian Tarantino ("Tarantino" or "Defendant").

    More specifically, Tarantino moves for: (1) the suppression of a conversation, surreptitiously recorded, in which he indirectly confesses to two of the murders charged in the

Indictment; (2) dismissal of Counts One and Two on account of statute of limitations problems; (3) dismissal of Count One due to the Government's failure to allege intent in connection with the Defendant's alleged participation in the killing of an armored car guard; (4) a limited bill of particulars; and (5) miscellaneous discovery requests.

I. <u>Motion to Suppress Pursuant to Title III of the Omnibus Crime Control and Safe Street Acts of 1968, 18 U.S.C. § 2511(1)</u>.

Tarantino moves to suppress an audiotape ("Gargiulo audiotape") on the theory that it violates 18 U.S.C. § 2510 <u>et seq.</u>, the federal wiretap law, otherwise known as "Title III". (An oral communication intercepted in violation of Title III may not be received in evidence at trial, at any hearing or grand jury proceeding. 18 U.S.C. § 2515.) More precisely, he invokes 18 U.S.C. § 2511(2)(d), which provides:

> "It shall <u>not</u> be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception <u>unless</u> such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."

(Emphasis added.)

The Gargiulo audiotape contains a conversation between the victim Vincent Gargiulo – at the time of the conversation a friend and business co-venturer of Tarantino – and Tarantino. In

2

it, Tarantino discusses, among other things, his participation in the 1994 murders of Julius Baumgardt and Louis Dorval with which he is presently charged; he also frets about the Government's taking of a buccal swab in July 2000. The Government reasons that the tape, which it obtained during its April 2004 investigation into Gargiulo's death, was created in September 2000 given that Tarantino stated that (a) the Baumgardt and Dorval murders took place "six coming up on seven" years prior to the conversation (*i.e.*, 1994) and (b) the buccal swab had been taken two months earlier (*i.e.*, July 2000).

In his initial memorandum in support of his motion to suppress the tape, Tarantino argued, first, that the Government bears the burden of proving that consent to intercept the conversation was obtained from Gargiulo and that the Government has not met that burden. The Government failed, Tarantino averred, to show that the tape had not been created by a third-party (say, the Government) unbeknownst to both Gargiulo and Tarantino. After receiving a pertinent FBI 302 report, and in his August 6th letter to the Court, Tarantino appears to have discarded this aspect of his brief. That is probably because in the 302 report Gargiulo explains to several Special Agents that *he* furtively recorded the conversation to gain "insurance" against Tarantino, who, according to Gargiulo in the tape, "ruined all the gyms" in connection with what "happened between me and you (Tarantino)." Draft Transcript,

Part II, p. 33. Moreover, in the tape Gargiulo confesses to Tarantino that "I've been mad at you (Tarantino) and blamed you for Greg . . . I am really mad. I don't think he had to die." Draft Trans., Part II, p. 34.

Gargiulo's secret "insurance" dovetails with Tarantino's second suppression argument. An interception such as the one made by Gargiulo is unlawful, and therefore forbidden in court, when it is "intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d). Tarantino therefore contends that the "ruined all the gyms" history, coupled with the fact that Gargiulo clandestinely recorded Tarantino confessing to two murders, Gargiulo's comment to the Special Agents that the purpose of the recording was to gain "insurance" against Tarantino, Gargiulo's remark that he was very mad at Tarantino, and above all Gargiulo's extortion attempt[1] on Tarantino using the audiotape, plainly shows that the tape was created "for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any State"; to wit, extortion or blackmail.

Noting that the Defendant bears the burden of proving by a preponderance of the evidence that the "primary motivation or a determining factor" in making the recording was to further a

---

[1] See, infra, page 7.

criminal or tortious act, the Government asserts that even though Gargiulo did threaten in 2003 to expose Tarantino with the tape if the latter failed to make payments, the deterioration in their relationship that prompted this threat was not manifest at the time of the tape's creation; their health-club partnership, the proximate cause of their falling out, failed two years <u>after</u> the recording was made. Rather, the tape reveals that Gargiulo's primary motivation for recording Tarantino was to clear Gargiulo's name by establishing that he was not involved in the 1994 murders. And the Government argues that such an interception to prevent future distortions by a participant is neither criminal nor tortious.

Yet, as Tarantino responds in his reply, the precedent on which the Government relies for the last point involves situations in which an accomplice or co-conspirator--people who have real grounds for believing that they are not free from suspicion--records a conversation. Not so, here. In any event, were Gargiulo suspected of being involved in the 1994 murders and concerned about clearing his name, why would he have attempted to <u>sell</u> the tape to the FBI? Why would Gargiulo dub the tape insurance "<u>against</u>" Tarantino if the primary motivation behind the tape's creation was to establish Gargiulo's innocence of a crime of which he was apparently never even suspected, still less accused?

Although the Second Circuit's gloss of 18 U.S.C. §

2511(2)(d) is not complicated, its application here requires close scrutiny. Under that provision, the interception of a conversation is unlawful when it is shown either (1) that the primary motivation, or (2) that a determinative factor in the actor's motivation for intercepting the conversation was to commit a criminal or tortious act. In re Double-Click, Inc. Privacy Litigation, 154 F. Supp. 2d 497, 515 (S.D.N.Y. 2001). Caselaw and legislative history instruct the Court that the "criminal" or "tortious" purpose requirement is narrowly construed to encompass only "a specific contemporary intention to commit a crime or tort." Id. The In re Double-Click court further elaborated that "courts applying § 2511(2)(d) have consistently ruled that a plaintiff cannot establish that a defendant acted with a "criminal or tortious purpose 'simply' by proving that the defendant [in fact did commit] any tort or crime." Id.

There are a number of clues in the briefs and affidavits that bear on Gargiulo's purpose in creating the recording. First, the FBI 302 report shows that Gargiulo told several Special Agents that the tape was his "insurance" against Tarantino. This statement is somewhat equivocal. For the "insurance" might work in a variety of ways, some of which might not be "criminal" or "tortious". For example, being of the impression that Tarantino was murderous (apart from the 1994 victims, Gargiulo believed that Tarantino killed a mutual acquaintance named Greg, which left

6

Gargiulo miffed and created bad blood between the two), Gargiulo may have intended to use the recording for personal protection against the risk that Tarantino would come after him. In that case, Gargiulo's purpose in the creation of the tape would not constitute blackmail (and therefore the tape would be admissible) since he would not be demanding anything in consideration for not handing the taped confession over to law enforcement--except for his life to which he was already entitled. On the other hand, he may have expected all along that the tape would yield monetary dividends either through the blackmail of Tarantino or its sale to law enforcement; and in fact Gargiulo attempted both of those actions. Indictment, ¶¶ 14-15. Only the first of those intents-- blackmailing Tarantino--would be criminal or tortious. True, Gargiulo first attempted to extract money from Tarantino with the tape before he went to the FBI, perhaps indicating that the blackmail inclination was stronger than the perfectly legal, ratting-out inclination. But the events were close in time; it is therefore difficult to say which event furnishes a clearer view of Gargiulo's motive at the time the tape was created. Anyway, both events probably[2] occurred three years after the recording of tape, rendering them less probative of Gargiulo's specific intent at the

---

[2] The Defendant disputes the Government's calculation that the tape was created in September 2000, but offers no explanation for his disagreement. The Court agrees with the Government's time frame.

7

time of creation.

But even if Gargiulo intended the tape to serve as a kind of financial insurance which could someday be employed to blackmail Tarantino, this does not satisfy In re Double-Click Privacy Litigation's requirement that a defendant prove "a specific contemporary intention to commit a crime or tort" by a preponderance of the evidence. If Gargiulo regarded the recording as a type of insurance against a rainy day, by definition he did not have a contemporary intention to commit a crime or tort. Instead, he had a contemporary intention to acquire the means necessary to commit a crime or tort should the need ever materialize.

And the three-year interim between the recording of the conversation and the extortion attempt strengthens the view that Gargiulo lacked the requisite contemporary intent to commit a crime or tort through the use of the interception.

Accordingly, Defendant's motion to suppress is DENIED.

II. Dismissing Count One for Failure to Allege Intent

Count One alleges that Tarantino "willfully and with reckless disregard for the safety of human life, disabled and incapacitated [armored-car guard] Julius Baumgardt and John Doe 1" and "lessened the ability of such persons to perform their duties", resulting in the death of Baumgardt. This charge flows from 18 U.S.C. § 33(a) paragraph three, which provides:

> "Whoever, with like intent, willfully disables or incapacitates any driver or person employed in connection with the operation or maintenance of the motor vehicle, or in any way lessens the ability of such person to perform his duties as such [shall be punished]."

(Emphasis added.)

The antecedent for "with like intent" lies in the first paragraph of 33(a), which reads:

> "Whoever willfully, with intent to endanger the safety of any person on board or anyone who he believes will board the same, **or** with reckless disregard for the safety of human life, damages, disables, destroys, tampers with, or places or causes to be placed any explosive or other destructive substance in, upon, or in proximity to, any motor vehicle . . . [shall be punished]."

(Emphasis added.)

The question thus becomes whether the phrase "with like intent" found in the third paragraph refers solely to the first paragraph's second clause--"with intent to endanger the safety of any person on board"--or to the first paragraph's second and third clause--"or with reckless disregard for the safety of human life." Tarantino contends that since §33(a) paragraph three seemingly demands that the Government allege intent to endanger the safety of any person ("with like intent"), Count One, alleging mere reckless disregard, must be dismissed.

In support of this argument he cites U.S. v. Jones, 308 F.3d 748, 750 (7th Cir. 2002), in which Judge Easterbrook observed:

9

"The indictment does not allege that Jones intended to endanger anyone's safety. Such intent is required for a violation of § 33(a)." The first problem with this citation is that the question presented to that court regarded 18 U.S.C. § 35(b), not § 33(a). The quote is <u>dicta</u>. The second is that the <u>dicta</u> seems to be incorrect, at least as far as paragraph one of § 33(a) is concerned. Again, that paragraph states: "Whoever willfully, with intent to endanger the safety of any person on board or anyone who he believes will board the same, <u>or with reckless disregard for the safety of human life</u> . . . damages . . . a motor vehicle. . .[shall be punished]." If the Government alleges the <u>mens rea</u> of reckless disregard for the safety of human life, it is not required to allege intent to endanger the safety of any person. The only real question, then, is whether that <u>mens rea</u> option ("intent" or "reckless disregard") somehow changes for purposes of the two following paragraphs.

It is true that the third paragraph's "with like intent" phrase could be considered ambiguous. Both parties agree it plainly refers back to the "intent to endanger the safety of any person" clause in the first paragraph; but does it for some reason refer exclusively to that clause and not to the "reckless disregard"clause? The Court is persuaded that it does not. It is unclear why a more burdensome <u>mens rea</u> requirement would exist for the injuries and harms described in the second and third

10

paragraphs; unclear why the destruction of garages and the incapacitation of drivers would be considered less socially pernicious than damage done to motor vehicles described in the first paragraph.

At the very least, the potential crimes encompassed by paragraph one and paragraph three are equally grave and involve virtually identical actus reus. There was therefore no discernable reason for Congress to create different mens rea requirements for them. Equally, there is no reason for the Court to read different mens rea requirements into them.

The Motion to Dismiss Count One is therefore DENIED.

III. Statute of Limitation Bars for Counts One and Two

Tarantino argues that since Counts One and Two charge violations on June 23, 1994 and August 12, 1994, respectively, both of which transpired before the Federal Death Penalty Act of 1994 became effective on September 13, 1994, neither offense was technically "punishable by death" even though the charging statute provides for the death penalty.

He thus argues that the offenses constitute "not capital" offenses for which indictment must be found within five years of their commission. 18 U.S.C. § 3282. (In contrast, the charging period for crimes "punishable by death" under 18 U.S.C. § 3281 is unlimited.) Yet Tarantino was indicted for Counts One and Two on September 23, 2008--more than five years after the alleged

11

violations.

The Second Circuit's decision in <u>United States v. Payne</u>, 591 F. 3d 46 (2d Cir. 2010) will not countenance the argument. There the defendant argued that the murder-in-aid-of-racketeering counts charged against him, whose statute provided for a potential death sentence, were "not punishable by death" for purposes of the statute of limitations since the Government declined to allege an aggravating factor required by the Federal Death Penalty Act. <u>Id.</u> at 57. This the court rejected with the following reasoning: It is not the potential severity of the punishment that is reflected by the unlimited charging period in 18 U.S.C. § 3281 but rather the <u>gravity of the alleged offense</u>. <u>Id.</u> at 58. Here, by extension of that rule, that the 1994 murders were allegedly committed during <u>Furman</u>'s death-penalty moratorium is of no moment, for the seriousness of the alleged offense does not change with the fluctuating constitutional status of the potential punishment. And the charging statute in question provides for the death penalty. 18 U.S.C. § 34.

Tarantino's distinction that the murders in <u>Payne</u> were committed after the September 13, 1994 effective date of the Federal Death Penalty Act is accurate so far as it goes. But it is also irrelevant. A ruling that Counts One and Two are time-barred following Tarantino's logic would fly straight in the face of the <u>Payne</u> court's holding that it is not the actual punishment but the

12

nature of the offense (and whether the charging statute provides for the death penalty) that is dispositive of whether it is "punishable by death" for purposes of § 3281 and § 3282.

This aspect of his motion is therefore DENIED.

IV. Request for a Bill of Particulars

The Indictment's four counts allege, among other things, that Tarantino acted "together with others" to commit each of the charges. Tarantino therefore requests that the Court compel the government to furnish him with the identities of these unindicted co-conspirators.

Tarantino argues that vital to meeting the charges against him that he conspired with or aided and abetted "others" are the identities of these individuals. Additionally, Count Four alleges that the Defendant acted with intent to prevent the attendance and testimony of Gargiulo in an official proceeding, "including, but not limited to" the Government Investigations. Accordingly, Tarantino requests that the Court require the Government to provide a bill of particulars detailing the unmentioned official proceedings. See, e.g., United States v. Davidoff, 845 F.2d 1151 (2d Cir. 1988) (holding that the district court exceeded its discretionary authority when it refused to require a bill of particulars identifying at least the victims of discrete extortionate schemes in a RICO prosecution).

A bill of particulars is appropriate to allow a defendant

13

"to identify with sufficient particularity the nature of the charge pending against him, thereby enabling [him] to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987). The decision whether to grant such a bill lies in the court's sound discretion. United States v. Nachamie, 91 F. Supp. 2d 565, 573 (S.D.N.Y. 2000). Bortnovsky and Nachamie are instructive. In both, the Government produced tens of thousands of documents during the discovery phases of complex RICO and fraud cases involving potentially thousands of fraudulent transactions with as many victims, leaving the defendants exposed to a significant risk of surprise at trial. Bortnovsky, 820 F.2d at 574; Nachmie, 91 F. Supp. 2d at 571. By contrast, the Government here has charged three discrete murders and one conspiracy to commit murder: That of Julius Baumgardt, armored-car guard for the Mid-Island Check-Cashing Corporation, on June 23, 1994 at the premises of Volt Information Systems, Inc.; that of Louis Dorval on August 12, 1994 whose body he allegedly packed into a trunk and sent off to sea; and that of Vincent Gargiulo on August 18, 2003 by a hit-man with whom Tarantino allegedly conspired together with others. It is therefore unclear in what way the nature of the charges are not already plain to the Defendant. It is also unclear how the nature of the allegation that the Defendant has murdered an armored-car

14

driver named Baumgardt at the premises of Volt Information Systems, Inc. on June 23, 1994 can somehow materially depend on the name of an unindicted co-conspirator.

Every factor that cut in favor of granting a bill of particulars in <u>Nachmie</u> is absent here. There, a large number of co-conspirators participated in a slew of interactions in an alleged conspiracy lasting for longer than three years. <u>Id.</u> In contrast, Tarantino's Indictment does not charge a long-running conspiracy; instead, it alleges one that lasted at most nine months ("in or about and between December 2002 and August 18, 2003" for the Garguilo murder). Judging by the face of the Indictment, it is not readily apparent precisely how many unindicted co-conspirators are in play, but certainly not a myriad.

Second, the <u>Nachmie</u> court found that there was no legitimate concern that disclosing the names of the unindicted co-conspirators would endanger those individuals or the Government's investigation. <u>Id.</u> at 573. This is to be starkly distinguished with Tarantino's case. Tarantino is charged, among other things, with murdering Gargiulo to prevent him from informing law enforcement about Tarantino's involvement in the 1994 murders. Indeed, the <u>Nachmie</u> court strongly implied that this factor was close to dispositive: "In short, this case charges Medicare fraud--<u>not narcotics trafficking or murder</u>--and defendants must be provided with the names of known unindicted co-conspirators."

15

(Emphasis added.)  Id.  (On this point, Tarantino suggests that in lieu of a blanket denial of the disclosure he seeks, the Government might seek a protective order as to any specific unindicted co-conspirator upon a showing that such disclosure would present a danger to that person.  This procedure seems neither necessary nor appropriate since the Government has already explained that it objects to the disclosure of the unindicted co-conspirators and offered the rationale that their lives would be at risk should Tarantino be made aware of their identities.)

Tarantino asserts that at least a bill should be granted regarding the allegation in Count Four that the Defendant acted with intent to prevent the attendance and testimony of another person in an official proceeding, "including, but not limited to, the Government Investigations."  This "but not limited to", Tarantino objects, unconstitutionally arms the Government with an opportunity to "fill in elements of its case with facts other than those considered by the grand jury." United States v. Walsh, 194 F.3d 37, 44 (2d Cir. 1999).  First, the rule Tarantino cites was considered by the Walsh court in the context of a defendant's attack on the sufficiency of an indictment on Fifth Amendment grounds.  Tarantino has not moved on these grounds but rather moves the Court for a bill of particulars.  Second, immediately following the above-quoted language in Walsh, the court noted that "we have consistently upheld indictments that 'do little more than to track

the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'" Id. at 44, quoting, United States v. Tramunti, 513 F.2d 1087, 1113 (2d Cir.), cert. denied, 423 U.S. 832, 96 S. Ct. 54, 46 L. Ed. 2d 50 (1975). Here, on all counts the indictment informs of the time and place of the alleged crimes. But, as in Walsh, the Tarantino Indictment goes above and beyond simply tracking the language of the statutes; for instance, it names the victims of the alleged murders and details facts of the investigations that were intentionally obstructed through the murders.

Accordingly, the request for a bill of particulars is DENIED.

V. Miscellaneous Discovery Requests

The Court will resolve all outstanding discovery requests and disputes separately.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: Central Islip, New York
December  15 , 2010