CNC/SCF
F.#2003R02020

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

                              08 CR 655 (JS)

    - against -

CHRISTIAN GEROLD TARANTINO,

                Defendant.

- - - - - - - - - - - - - - - - - X


GOVERNMENT'S MOTION AND MEMORANDUM
OF LAW IN SUPPORT OF ITS MOTION FOR AN ANONYMOUS JURY


                                      LORETTA E. LYNCH
                                      United States Attorney
                                      Eastern District of New York
                                      610 Federal Plaza
                                      Central Islip, New York 11722


Sean C. Flynn
Carrie N. Capwell
James M. Miskiewicz
Assistant U.S. Attorneys
    (Of Counsel)

<u>PRELIMINARY STATEMENT</u>

The government hereby moves this Court to empanel an anonymous jury at the trial of defendant Christian Gerold Tarantino (hereinafter "Tarantino").  Specifically, the government requests that the names, addresses and places of employment of the prospective jurors not be revealed to either the parties or their attorneys.  Further, the government requests that from the time each juror survives any challenges for cause and peremptory challenges until the end of the trial, the jurors be directed to park their vehicles in the federal employee parking lot in the rear of the courthouse, and to enter and exit the building through its rear entrance.  Such alternate access with allow the jury members to avoid coming in contact with members of the public and the press.

As set forth below, empaneling an anonymous jury and directing the jurors to park in the employee parking lot is warranted due to the serious nature of the crimes charged, which stem from Tarantino's participation in three separate murders spanning nine years.  Two of the charged murders were orchestrated in order to obstruct justice, specifically by killing individuals who Tarantino feared intended to, or could, provide material evidence to federal authorities concerning other crimes, including murders committed by Tarantino and his associates.  These procedures are further warranted by the significant media attention that the trial will likely attract.

Because, as alleged in the Indictment, the defendant has previously employed others to commit murder on his behalf, and because certain of his former associates remain at large, the defendant's current incarceration is no guarantee that he will not continue, in the face of a potential life sentence, to project violence and interference with the judicial process during this trial.  For these reasons, the proposed measures are necessary to assure the public's right to a fair trial by protecting the jury from interference.  As set forth below, those precautions will not deprive the defendant of his right to meaningful jury selection, nor diminish the presumption of innocence.

<u>BACKGROUND</u>

A.   <u>The Defendant Is A Dangerous Individual With A Demonstrated Penchant For Violently Interfering With The Judicial Process</u>

The Indictment charges Tarantino with participating in three related murders in or affecting the Eastern District of New York in 1994 and 2003.  Count One of the Indictment charges that on June 23, 1994, Tarantino, together with others, including co-conspirator Louis Dorval, handcuffed and disabled the driver and armed guard employed by Mid-Island Check Cashing Corporation, an armored car business engaged in interstate commerce, in violation of Title 18, United States Code, Section 33.  In the course of attacking the armored car employees, Dorval shot and killed one

3

of the guards, Julius Baumgardt, as he lay face down on the ground. Moments after Baumgardt was shot, Tarantino, Dorval and another individual fled from the immediate vicinity in a red Chevy Blazer SUV (the "Blazer") that had been stolen in the winter of 1994. The Blazer was one of two getaway cars used by Tarantino and the others; it was abandoned only a few hundred yards from where Baumgardt's body was found. Among the forensic evidence recovered from the Blazer were human hairs. Eyewitnesses identified the Blazer by its Florida license plate number as it left the scene, as contemporaneously recorded in a 911 call to police.

Count Two of the Indictment charges Tarantino with the August 12, 1994 obstruction of justice murder of Dorval, in violation of Title 18, United States Code, Sections 1512 and 2. Dorval was killed by Tarantino and others less than two months after the murder of Julius Baumgardt, and in order to prevent Dorval from cooperating with federal authorities who were, at the time, seeking to arrest Dorval on unrelated racketeering charges.[1]

Shortly after the June 23, 1994 murder of Baumgardt, Dorval admitted to an associate and cooperating witness (the

---

[1]    On August 10, 1994, Dorval and others were indicted on federal racketeering charges in the District of New Jersey in United States v. Giampa et al., 94-CR-403 (AJL). The charges included the interstate transportation of property stolen from a Filene's Basement department store by Dorval and Tarantino.

4

"CW") that he, Tarantino and a third individual had planned and executed the armored car robbery, and that Dorval had killed Baumgardt during the heist.  Tarantino subsequently learned that Dorval had implicated him in the Baumgardt murder to the CW.

In August 1994, after learning he had been indicted on federal racketeering charges in the Giampa case, Dorval announced that he intended to flee the New York area.  Dorval arranged to meet with Tarantino on or about August 12, 1994 in order to sell Tarantino a large quantity of cocaine that Dorval had in his possession, so that Dorval could use the funds for his potential flight from justice.  Subsequently, on August 16, 1994, while federal agents sought to arrest Dorval in connection with the Giampa indictment, Dorval's body was found by the United States Coast Guard stuffed inside a large plastic tool trunk floating in the Atlantic Ocean off Long Island.  Dorval had been shot once in the head at near point blank range.

Counts Three and Four of the Indictment, respectively, charge Tarantino with conspiracy to commit, and with committing the obstruction of justice murder of Vincent Gargiulo, in violation of Title 18, United States Code, Sections 1512 and 2. In or about September 2000, Gargiulo, a long-time friend and one-time co-defendant of Tarantino's, secretly recorded a conversation with Tarantino, in which Tarantino made statements linking himself to the murders of Baumgardt and Dorval.  One

5

especially pertinent portion of the recording begins with

Tarantino claiming "I love Mel [Roth]," an attorney who

represented Tarantino when he had previously provided a DNA

sample to federal authorities[2]:

| | |
|---|---|
| Tarantino: | . . . I get a call from Mel . . .  So Mel goes, "Chris, listen, fuckin' U.S. Attorney wants to take DNA from you.  You fuckin' botched the armored car up." |
| Gargiulo: | They didn't take it, did they? |
| Tarantino: | Listen, so I go, "holy fuck;" and "I ain't giving it to them," you know.  He says this. I ain't giving to them. I go, "cause it'll come back, you know?"  So ah — |
| Gargiulo: | From the car [unintelligible ("UI")]? |
| Tarantino: | Yeah.  Listen, I'll tell you about it.  Okay. Listen [UI] -- |

Tarantino then explained to Gargiulo how he had used

two getaway vehicles during the Baumgardt murder-robbery, and

that the stolen "red truck" left behind had been thoroughly

cleaned beforehand, presumably to try to prevent the recovery of

forensic evidence from the Blazer.

| | |
|---|---|
| Tarantino: | I had the car [UI] – the other half of the car.  The car we drove up in, the car that we |

---

[2]    In July 2000, the FBI collected a buccal swab from Tarantino, with the consent of his then-counsel Melvyn K. Roth, and pursuant to a Grand Jury subpoena issued in the Eastern District of New York.  The purpose of the swab, and dozens of others administered to individuals as part of the continuing Baumgardt and Dorval homicide investigations, was to attempt to compare DNA from known exemplars to the mitochondrial DNA isolated in one of the human hairs recovered from the Blazer used as a getaway vehicle on June 23, 1994.

6

                          pulled up in.  We changed tails over here,
and we went to a different car and took off,
so the [UI]  car – the car we pulled up in —

Gargiulo:        Right?

Tarantino:      – they have it.

      Tarantino further explained in the recording that the vehicle that "they [i.e., law enforcement] have," had been used by him "all winter," consistent with the fact that the Blazer had been reported stolen in January 1994.  On the Gargiulo tape, Tarantino continued that at some point "[w]e took a vacuum to the car" and "cleaned it for a couple of hours."  Tarantino appears to state this as part of a general doubt that any evidence could have been recovered from the Blazer and that the DNA collection by the government may have been a ruse to cause others to cooperate in the investigation.

      In explaining why he ultimately consented to give his DNA exemplar, Tarantino makes clear that the vehicle he is referring to is a "red stolen vehicle":

Tarantino:      It's not enough [a DNA match] because who's to say -- listen, [UI] I was thinking about the other day.  I go, who's to say the car we pulled up in, did someone take our license plate down?  How do they know about this car that was found down there?  Just 'cause it's a red stolen vehicle?  It could have been there for a month, you know, but – you know. You know what I'm saying, like –

During the recording made by Gargiulo, Tarantino discussed the possibility that the DNA sample collection was related to the murder of "Louie," the nickname used by Dorval:

| | |
|---|---|
| Gargiulo: | What about, remember the trunk thing?  You told me something, you squished your finger? |
| Tarantino: | Yeah [UI]. |
| Gargiulo: | There was no skin on that right? |
| Tarantino: | . . . I was in the middle of the fuckin' Atlantic Ocean, that body was found floating two days later or better.  There was one piece of skin on the fuckin' rocks, can't picture that floating – |
| Gargiulo: | –– With no hair on it –– |
| Tarantino: | –– No hair on it.  No fucking way. |
| Gargiulo: | Fish would eat it and stuff. |
| Tarantino: | No fuckin' way.  It would just float away.  You know what I mean?  It would of stayed jammed on a rock.  If it was here yeah, but in the water saltwater fuckin' two days no fuckin' way. |

The conversation then turned to Tarantino and Gargiulo speculating on the government's motive for resuming the investigation.

| | |
|---|---|
| Gargiulo: | What is it four or five years? |
| Tarantino: | Six, six coming up on seven. |

Tarantino's answer of "six coming up on seven" years is consistent with the Gargiulo audiotape having been made in September 2000.  More precisely, the buccal swab was recovered from Tarantino, while in jail, in July 2000.  At one point in the

8

recording, Gargiulo asked Tarantino how much time had elapsed since the sample was taken, Tarantino answered that the sample had been taken two months earlier.  Given that prison records show that Tarantino was not released until August 29, 2000, this statement clearly places the making of the tape in September 2000.

After discussing the taking of DNA exemplars from others, Tarantino and Gargiulo returned to the topic of the timing or motive for the government's DNA sample collection. Both suspected that the taking of DNA exemplars was a ruse to make Tarantino or his confederates "do something stupid." Gargiulo and Tarantino then clearly linked the Baumgardt and Dorval murders and Tarantino's role in both:

> Gargiulo:      The security guard is an innocent guy –
>
> Tarantino:     They --
>
> Gargiulo:      -- that's why they will never stop with this. This shit is going to go on for ten years.
>
> Tarantino:     So listen, – so – so, ah –
>
> Gargiulo:      Their interest in Louie –
>
> Tarantino:     Yeah.
>
> Gargiulo:      Him, they don't give a fuck about.  That's what, I mean.  They don't care about him.
>
> Tarantino:     Not anymore.
>
> Gargiulo:      No.
>
> Tarantino      Fuck them.

9

Gargiulo:        It's more the security guard.  That's really
                 bad, buddy.

Tarantino:       I know.

By December 2002, Gargiulo apparently began threatening that he would disclose evidence about Tarantino's involvement in the Baumgardt and Dorval murders unless Tarantino compensated Gargiulo for losses incurred as a result of the failure of a joint business venture.[3]  Gargiulo's recording and threats ultimately became common knowledge among a circle of Gargiulo friends and family, who were also acquainted with Tarantino.

Beginning in about May 2003, Gargiulo offered to provide the recording to the FBI in exchange for a reward. Subsequently, in or about August 2003, Tarantino hired one of his employees in the gym business to kill Gargiulo, in order to obstruct the ongoing federal investigation into the Baumgardt and Dorval murders.  At approximately, 6:45 a.m., Tarantino's paid assassin intercepted Gargiulo on the corner of West 30th Street and Broadway in Manhattan, as Gargiulo was walking to work at a

---

[3]    Starting in the mid-1990's Tarantino and other associates opened a number of fitness clubs in the New York metropolitan area currently known as Synergy Fitness ("Synergy"). On January 4, 2000, Gargiulo opened a health club named Body Sculpt in New York, New York.  The business was financed, in part, by Tarantino, who provided cash to purchase certain equipment.  Unlike Synergy, Body Sculpt was a failure, and an eviction notice was entered in February 2002 with respect to Gargiulo's fitness club.  According to others, Gargiulo eventually became convinced that Tarantino and others had somehow engineered the failure of Body Sculpt.

10

construction site.  Tarantino's associate shot Gargiulo in the
head at point blank range.  Gargiulo died instantly.[4]

B.    <u>The Defendant Has The Means To Interfere With The Jury</u>

As described above, Tarantino has demonstrated an
ability to accomplish his violent ends through associates and
subordinate co-conspirators, who have acted on his behalf.
Certain of Tarantino's known subordinates and associates remain
at liberty today.  Additionally, Tarantino is estimated to retain
significant wealth as he has continued to control an ownership
interest in the Synergy Fitness Clubs, and as he has retained no
less than three private criminal defense attorneys for the
pending trial in this matter.  Given Tarantino's relationships
with associates who remain at liberty, the mere fact that the
defendant is incarcerated will not prevent him or his
confederates from endeavoring to obstruct justice.

<u>ARGUMENT</u>

The Court should order an anonymous jury, and direct
that during the trial jurors park and enter the courthouse in the
rear of the building in order to ensure juror safety and the
integrity of the judicial process.  Indeed, even if the defendant

---

[4]    On or about April 6, 2004, law enforcement agents
investigating Gargiulo's murder received the micro-cassette
audiotape of the September 2000 recording of Tarantino and
Gargiulo.  The FBI's analysis of the audiotape subsequently
concluded that the audiotape contains one continuous recording
and has not been spliced or edited.

does not make attempts to intimidate or harm jurors, the
empaneling of an anonymous jury could only lessen the chance that
jurors would be concerned for their own safety and thus
distracted from the evidence.  The Court should protect the
defendant's right to an informed jury selection process and an
impartial jury through <u>voir</u> <u>dire</u>, including use of a
questionnaire, and a neutral instruction by the Court explaining
the procedures to be used.

I.    <u>Juror Anonymity Will Ensure An Impartial Jury</u>

        "[C]ourts must protect the integrity of criminal
trials" against jury tampering, "whether it emanate[s] from
defendants' enemies, from their friends, or from neither."
<u>United States v. Borelli</u>, 336 F.2d 376, 392 (2d Cir. 1964)
(Friendly, J.).  The Second Circuit routinely affirms district
courts' use of anonymous juries to protect the integrity of the
judicial process and ensure a fair, impartial jury for both
parties.  <u>See</u>, <u>e.g.</u>, <u>United States v. Gotti</u>, 459 F.3d 296, 345-46
(2d Cir. 2006); <u>United States v. Aulicino</u>, 44 F.3d 1102, 1116-17
(2d Cir. 1995); <u>United States v. Wong</u>, 40 F.3d 1347, 1376-77 (2d
Cir. 1994); <u>United States v. Paccione</u>, 949 F.2d 1183, 1191-93 (2d
Cir. 1991).

        In <u>Gotti</u>, the Second Circuit held that "a court may
order the empaneling of an anonymous jury upon (a) concluding
that there is strong reason to believe the jury needs protection,

and (b) taking reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected." Gotti, 459 F.3d at 345 (quoting Paccione, 949 F.2d at 1192) (internal quotation marks omitted).

In determining whether there is "strong reason" to believe that the jury needs protection, courts in this Circuit consider factors including (1) whether the defendant is dangerous, taking into account both the present charges and the defendant's criminal history, see, e.g., id. at 346 (noting pretrial detention due to dangerousness); Wong, 40 F.3d at 1377 (history of shootings); Paccione, 949 F.2d at 1192 (charged with murder and threats); United States v. Gammarano, 2007 U.S. Dist. LEXIS 52059, *18-*19 (E.D.N.Y. July 18, 2007) (despite little history of violence, charges included acts and threats of violence); United States v. Wilson, 493 F. Supp. 2d 397, 398, 399-400 (E.D.N.Y. 2006) (charged murders and participation in violent street gang); (2) whether the defendant has a history of interference with the judicial process, see, e.g., Gotti, 459 F.3d at 346 (allegations of grand jury witness tampering in indictment); Aulicino, 44 F.3d at 1116 (multiple attempts at witness tampering); Wong, 40 F.3d at 1376-77 (murder and shootings of potential witnesses); Paccione, 949 F.2d at 1192 (threatening phone call to witness and murder of a defendant); Gammarano, 2007 U.S. Dist. LEXIS at *19-*22 (possibility of

interference with judicial process by associates); <u>Wilson</u>, 493 F.
Supp. 2d at 400 (attack on corrections officer and assault of
individual cooperating with prison authorities in unrelated
case); (3) whether the defendant, by himself or through his
associates or criminal organization, has the means to interfere
with the judicial process, <u>see</u>, <u>e.g.</u>, <u>Gotti</u>, 459 F.3d at 346
(Gambino Crime Family); <u>Aulicino</u>, 44 F.3d at 1116 (defendant's
brother); <u>Wong</u>, 40 F.3d at 1376-77 (Green Dragons street gang);
<u>Paccione</u>, 949 F.2d at 1192 (Gambino Crime Family); <u>Gammarano</u>,
2007 U.S. Dist. LEXIS at *19-*22 (Gambino Crime Family); <u>Wilson</u>,
493 F. Supp. 2d at 399-400 (Stapleton Crew street gang); and (4)
the likelihood of media interest in the trial, <u>see</u>, <u>e.g.</u>, <u>Gotti</u>,
459 F.3d at 346; <u>Wong</u>, 40 F.3d at 1376-77; <u>Paccione</u>, 949 F.2d at
1193; <u>Gammarano</u>, 2007 U.S. Dist. LEXIS at *22-*23 ("Publicity
enhances the likelihood that jurors['] names will become public,
exposing them to intimidation or harassment.  Since it is
probable that the case will receive some media attention, jurors
may also feel compelled to make decisions on the basis of
concerns about public scrutiny or fear, rather than on the basis
of the evidence presented."); <u>United States v. Vario</u>, 943 F.2d
236, 240 (2d Cir. 1991)(pre-trial publicity can enhance the
possibility that jurors' names would become public and thus
expose them to intimidation by defendants' friends or enemies, or
harassment by the public).

14

Based upon the above factors, the government respectfully requests that this Court order an anonymous jury to protect the judicial process in this case. First, and as previously mentioned, the defendant is a dangerous person. Tarantino is charged with the murder of three separate individuals, all of whom were shot in the head at close range. The defendant's criminal history is further littered with arrests and convictions involving otherwise violent acts. Beginning in the late 1980's Tarantino was convicted of a series of violations for harassment, disorderly conduct and criminal trespass. Then, in 1991, Tarantino was convicted of grand larceny, and the federal crime of interstate transportation of stolen goods, for which he was sentenced to 21 months in prison. While serving that term, Tarantino was convicted of assaulting another inmate. Later, in 1998, and while on parole for another state conviction, Tarantino and an associate attempted to rob an undercover narcotics officer who was posing as a drug buyer. The plan involved the use of a handgun and chloroform to render the victim unconscious, but it was disrupted when the officer sensed the drug deal was about to turn violent. Tarantino ultimately pled guilty to the lesser charges of attempted criminal sale of a controlled substance and conspiracy.[5]

---

[5]     It was during his brief prison sentence on this charge that federal and state agents collected a buccal swab from the defendant, in July 2000.

Second, as set forth above, two of the three murders with which the defendant is charged were specifically aimed at obstructing the federal jurisprudential system by silencing potential witnesses against him and his co-conspirators.

Third, the defendant's propensity for employing others to commit violence on his behalf demonstrates that he will, unavoidably, have the means to interfere with the jury in this case. As noted above, the defendant has used the services of others to commit homicide on his behalf and certain of the defendant's known criminal associates remain at liberty. The defendant also has substantial monies to employ others to do his bidding.

It also bears note that in the aforementioned Gargiulo recording Tarantino specifically described his intent to disrupt the judicial proceedings, should he ever be charged with the Dorval or Baumgardt murders, in the hopes of securing a mistrial:

| Tarantino: | The feds. It's a joint investigation between the feds, you know. That's it. |
| Gargiulo: | It's got its pros and cons. I think you're better off with the feds. |
| Tarantino: | It's good and bad, you know. |
| Gargiulo: | Yeah. |
| Tarantino: | The problem is -- the problem is with the feds -- |
| Gargiulo: | [UI] |

Tarantino:    Probably not, because the feds, anything goes.  You get a trial, anything goes, you know.  And I don't have to do shit like I would act down, you know, try and get a mistrial fuckin' you know, whatever I would act out and take a shot 'cause I watch everybody else going to trial sitting there quietly fuckin' not gettin' anywhere, you know what I mean?

Gargiulo:     Right.  Did you see the one kid that represented himself?  The cops chasing him, shooting at him [UI] --

Tarantino:    No.

Gargiulo:     He's a cocky little kid.  He acted like his own lawyer.  I don't [UI] --

Tarantino:    Yeah, he got convicted of everything?

Gargiulo:     Yeah, but it was – looked like he was really going to walk from it.

Tarantino:    Yeah.

Gargiulo:     But yeah.  He actually – he reminded me of you.  He was hysterical, this kid.

Finally, this case is likely to receive significant media attention.  The case already received substantial publicity in the New York metropolitan area at the time of Tarantino's arrest.[6]  Given the coverage already received, it is expected

---

[6]    *See*, *e.g.*, *Fitness Owner Charged in '03 Murder*, ABC LOCAL NEWS (Sept. 24, 2008), available at http://abclocal.go.com/wabc/story?section=news/local&id=6411080; *NY Businessman Arrested for Slayings*, UPI.COM (Sept. 24, 2008, 3:25 PM), available at http://www.upi.com/Top_News/2008/09/24/NY-businessman-arrested-for-slayings/UPI-21601222284326/; *Long Island Gym Owner Arrested on 3 Murder Charges*, NY DAILY NEWS, Sept. 24, 2008, available at http://www.nydailynews.com/news/ny_crime/2008/09/24/2008-09-24_long_island_gym_owner_arrested_on_3_murd.html; Kenrick

that the upcoming trial will also receive significant press attention on Long Island and in the surrounding metropolitan area.

"[B]ecause fears of retaliation may affect the jury's ability to render an impartial verdict, justice requires that when a serious threat to juror safety reasonably is found to exist, precautionary measures must be taken."  <u>Wong</u>, 40 F.3d at 1376 (internal quotation marks omitted).  In this case, the threat to juror safety is serious, and the government

---

Koroliszyn and Dave Goldiner, *Owner of L.I. Gym Charged in 3 Slays*, NY DAILY NEWS, Sept. 24, 2008, available at http://www.nydailynews.com/news/ny_crime/2008/09/ 24/2008-09-24_owner_of_li_gym_charged_in_3_slays.html; Robert E. Kessler, *The Clues That Finally Paid Off*, NEWSDAY, Sept. 25, 2008, at A06, available at 2008 WLNR 18189838; Robert E. Kessler, *Cold Case: 3 Murder Counts*, NEWSDAY, Sept. 25, 2008, at A07, available at 2008 WLNR 18189843; Robert E. Kessler, *Dix Hills Man Arrested in 3 Homicides, May Face Death*, NEWSDAY, Sept. 25, 2008, available at 2008 WLNR 18194474; Bryan Hill, *Multi-Millionaire Arrested for Triple Murders*, PRIVATEOFFICER.COM (Sept. 25, 2008), available at http://privateofficernews.wordpress.com/2008/09/25/multi- millionaire-arrested-for-triple-murders-wwwprivateofficercom/; *N.Y. Man Arrested in Slayings From Heist*, THE NEW HAVEN REGISTER (Sept. 25, 2008), available at http://nhregister.com/articles/2008/09/25/news/a9-triple.txt; *N.Y. Gym Owner Charged With 3 Murders 9 Years Apart,* MAFIATODAY.COM (Sept. 25, 2008), available at http://mafiatoday.com/lucchese- family/ny-gym-owner-charged-with-3-murders-9-years-apart/; Robert E. Kessler, *Still Missing After Informant's Killing*, NEWSDAY, Sept. 26, 2008, at A18, available at 2008 WLNR 18294651; Robert E. Kessler, *Dix Hills: No Death Penalty Sought for Murder Suspect*, NEWSDAY, Apr. 1, 2010, at A24, available at 2010 WLNR 6709218.

respectfully requests that the Court take the requested

precautionary measures.

II.  The Use Of An Anonymous Jury Will Not Deprive The Defendant
     Of Meaningful Jury Selection Or Diminish The Presumption Of
     Innocence

        Once a district court determines that there is strong

reason to believe that the jury needs protection, it may empanel

an anonymous jury provided that it takes reasonable precautions

to minimize any potential prejudice therefrom.  See Thai, 29 F.3d

at 801; Amuso, 21 F.3d at 1264-65; Paccione, 949 F.2d at 1192;

Vario, 943 F.2d at 239; Tutino, 883 F.2d at 1132; Persico, 832

F.2d at 717-18; United States v. Thomas, 757 F.2d 1359, 1365 (2d

Cir. 1985).  A defendant has two legitimate concerns that are

potentially affected by a decision to empanel an anonymous jury:

(1) the right to make informed choices during the jury selection

process and (2) the right to be tried by jurors who are not

prejudiced by reason of their anonymity.  Both of these concerns

can be readily addressed.

     A.   Empaneling An Anonymous Jury Does Not Burden The
          Defendant's Ability To Make Informed Choices During
          Jury Selection

        Although a defendant has the right to a meaningful voir

dire of potential jurors, see Rosales-Lopez v. United States, 451

U.S. 182, 188 (1981), the decision as to the questions to be

asked in voir dire largely rests within the informed discretion

of the trial judge, see United States v. Silva, 715 F.2d 43, 50

(2d Cir. 1983) (finding that absent a clear abuse of discretion, trial court's ruling on questions to be asked will not be disturbed); <u>Barnes</u>, 604 F.2d at 137-40 (finding, "[a]s long as a defendant's substantial rights are protected by a <u>voir</u> <u>dire</u> designed to uncover bias as to issues in the case and as to the defendant himself, then reasonable limitations on the questioning should not be disturbed on appeal").  As one court has noted, "[t]he jury selection process (<u>voir</u> <u>dire</u>) is not a matter of constitutional dimension and the selection of an anonymous jury was implicitly held to be constitutional in <u>Barnes</u>."  <u>United States v. Gotti</u>, 777 F. Supp. 224, 227 (E.D.N.Y. 1991) (citation omitted).

The information that will be kept from the parties and counsel if this motion is granted is not meaningful to the jury selection process.  The names, home addresses and places of employment of the prospective jurors are not necessary when attempting to glean whether a juror can render a fair and impartial verdict.  Information regarding the general neighborhoods in which the prospective jurors live and the general nature of their work is sufficient.  The names of prospective jurors, to the extent they provide information about ethnicity, are not relevant to meaningful <u>voir</u> <u>dire</u>.  <u>See</u> <u>Georgia v. McCollum</u>, 505 U.S. 42 (1992) (applying rule articulated in <u>Batson</u>, prohibiting use of peremptory challenges in racially

20

discriminatory manner, to criminal defendants).  The common

practice in this district of extensive <u>voir</u> <u>dire</u>, including the

use of a questionnaire,[7] further acts to safeguard Tarantino's

rights.

> B.  The Court Can Explain The Reasons For Anonymity To
>     Prospective Jurors In Neutral Terms That Will
>     <u>Diminish The Risk Of Prejudice To The Defendant</u>

Numerous courts have recognized that where anonymity is

necessary, the jurors can receive an instruction from the court

explaining the measures in a neutral way to prevent the jury from

drawing any negative inference.  Although the due process clause

of the Fifth Amendment protects the presumption of innocence,

"there is no <u>per</u> <u>se</u> rule that it may not be burdened."  <u>Thomas</u>,

757 F.2d at 1364; <u>see also</u> <u>United States v. Scarfo</u>, 850 F.2d

1015, 1026 (3d Cir. 1988).  Here, the burden is slight compared

to the Court's interest in safeguarding the integrity of the

judicial process and can be alleviated through a proper jury

instruction.

Most commonly, courts have explained to jurors that

their privacy and identities need protection from the media and

the curious.  <u>See</u>, <u>e.g.</u>, <u>Thai</u>, 29 F.3d at 801; <u>Amuso</u>, 21 F.3d at

1265; <u>Tutino</u>, 883 F.2d at 1133.  In <u>United States v. Nelson</u>, No.

94 CR 823 (DGT) (E.D.N.Y.), for example, Judge Trager explained

---

[7]     By January 21, 2011, the United States intends to
submit a proposed juror questionnaire to the Court for its review
and consideration in this case.

the jurors' anonymity by telling prospective jurors that their
names, addresses and places of employment would be kept
confidential in order to protect their privacy from press
inquiries and others not connected to the case.  Another avenue
open to the Court is for it to explain to jurors that their
anonymity would allow them to feel more comfortable in giving
candid answers to the personal questions asked in <u>voir</u> <u>dire</u> and
in the jury questionnaires.  Either of these potential
alternatives would provide a credible explanation to prospective
jurors in this case.

  With respect to its directing the jurors to park and
enter the courthouse from the rear of the building, the
government proposes that the Court inform the jurors that such
measures are being taken in order to protect their privacy and to
ensure that the trial can proceed expeditiously.[8]  This
explanation has been routinely given in cases where
transportation to and from court is provided, <u>see</u>, <u>e.g.</u>, <u>United</u>
<u>States v. Nelson</u>, No. 94 CR 823 (DGT) (E.D.N.Y.); <u>United States</u>
<u>v. Orena</u>, No. 93 CR 1366 (ERK) (E.D.N.Y.); <u>United States v.</u>
<u>Malpeso</u>, No. 93 CR 1365 (RJD) (E.D.N.Y.); <u>United States v.</u>
<u>Cutolo</u>, No. 93 CR 1230 (EHN) (E.D.N.Y.); <u>United States v. Thai</u>,

---

[8]  The government has informed the United States Marshals
Service of its request for juror "parking sequestration."  The
Marshals Service has indicated that should the Court grant the
government's request, it can and will logistically support the
special parking and entrance accommodations.

22

No. 91 CR 838 (CBA) (E.D.N.Y.), and is equally appropriate in this case.

CONCLUSION

For the reasons set forth above, the government respectfully requests that its motion for an anonymous jury be granted. The government further respectfully requests that, during the trial and deliberations, the selected jurors be directed to park in the employee parking lot behind the courthouse and to enter and exit the building through the back entrance of the building.

Dated:    Central Islip, New York
          January 5, 2011

                              Respectfully submitted,

                              LORETTA E. LYNCH
                              United States Attorney
                              Eastern District of New York
                              610 Federal Plaza
                              Central Islip, New York 11722

Sean C. Flynn
Carrie N. Capwell
James M. Miskiewicz
Assistant U.S. Attorneys
    (Of Counsel)