

*U.S. Department of Justice*

*United States Attorney*
*Eastern District of New York*

JMM:CNC
F.#2003R02020

*United States Attorney's Office*
*610 Federal Plaza*
*Central Islip, New York 11722-4454*

January 31, 2011

**BY HAND & BY ECF**

James R. Froccaro, Jr., Esq.
20 Vanderventer Avenue, Ste. 103 West
Port Washington, New York 11050

> Re:   United States v. Christian Tarantino
>       Criminal Docket No. 08-655 (JS)

Dear Mr. Froccaro:

      Pursuant to Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure, we provide the following written summaries of testimony we expect the following experts to provide at trial.

**A.   Kenneth Marr**
    **Forensic Audio Examiner, FBI Laboratory**

    **1.   Audio Authenticity Examination**

      The government previously provided you with Kenneth Marr's résumé.  You have also previously received Mr. Marr's Report of Examination, dated May 23, 2005.  Enclosed please find documents labeled 3500-KM-1, which include work papers and raw data pertaining to Mr. Marr's authenticity examination (bates-numbered KM-000000001-131).  In sum and substance, Mr. Marr will testify, among other things, that, based on his audio authenticity examination, he found that the Radio Shack MC-90 audio microcassette (referred to as Q39 by the FBI Laboratory) that he examined in connection with this case contains no physical cuts or alterations.  Mr. Marr will further testify that, based upon his examination, he concluded that the designated area of Q39 is original, continuous and unaltered.  The "designated area" begins at counter approximately 609 (approximately at time 55:50) and runs to the end of the recording.

      Mr. Marr will testify that in conducting his testing of Q39, he used six (6) different categories of analysis.  As listed in his report, they were: critical listening, narrow-band

spectrum, magnetic development, spectrographic, physical inspection and high-resolution waveform.  Mr. Marr will explain what each category of analysis means, its purpose, value and his findings in this particular case based on each form of analysis.

Mr. Marr will explain that he began his examination with critical listening analysis.  During this category of analysis, Mr. Marr listened to the recording with head phones on the computer while watching a high-resolution waveform display across the computer screen.  While engaging in critical listening, Mr. Marr prepared a chronology of what he heard, including possible record events, background noises and the continuity of the context of the conversations (<u>see</u> KM-000000009-12).  During his analysis, Mr. Marr went back to these points to conduct additional testing.

Mr. Marr will further explain that during the physical inspection of Q39, the microcassette is placed in a small jig, which holds the plastic tape housing in a fixed position.  The magnetic tape is then taken out of the housing and routed through rollers, which hold the magnetic tape as it is manually advanced.  A high-intensity light is then shone through the magnetic tape.  Mr. Marr visually inspected the front and back of the magnetic tape from the beginning of the tape to the end of the tape, looking for damage to the tape, splices and tabs.  Mr. Marr found no evidence that the tape had been cut and spliced.  Mr. Marr found minor edge damage and occasional color discoloration, which is common and does not affect the authenticity of the tape.  In addition, the physical inspection of Q39 revealed a broken and missing housing post, which does not impede the tape's movement.

Mr. Marr will explain narrow-band spectrum analysis, including that during narrow-band spectrum analysis, the audio is displayed on a computer screen with the frequency on the horizontal and the intensity on the vertical.  The documents bates-labeled KM-0000000041-43 are narrow-band spectrum displays (also referred to as "FFT displays")  printed by Mr. Marr during his analysis of Q39.  Mr. Marr will testify, among other things, that one of the values of narrow-band spectrum analysis is to help identify when a tape is a copy.  One indication that an analog tape recording has been copied onto another analog tape is the presence of side-band tones.  Mr. Marr will explain what a side-band tone is and testify that he found no side-band tones during his analysis of the designated area of Q39.

During his testimony, Mr. Marr will also discuss high-resolution waveform analysis.  Mr. Marr will explain, among other things, that high resolution waveform provides a different type of display for viewing the same audio.  High resolution waveform

displays time on the horizontal and intensity on the vertical. The documents bates-labeled KM-0000000044-66 are high-resolution waveform displays printed by Mr. Marr during his analysis of Q39. High-resolution waveform analysis is particularly valuable in measuring differences in time between events and in attempting to identify record events. Mr. Marr will discuss what record events are and explain that they include, but are not limited to, overrecordings, stop/starts and end stops. Mr. Marr's use of high-resolution waveform analysis revealed overrecordings at times 00:11, 00:12 and 00:13 (before the designated area). An overrecording occurs when audio was recorded on a tape on one occasion and, at a later time, the same portion of the tape was used to record new audio information.

  Mr. Marr will also discuss magnetic development analysis. Among other things, Mr. Marr will explain that magnetic development analysis consists of removing the magnetic tape from the tape housing, positioning it flat on paper and applying drops of fero fluid onto the magnetic tape. When the fluid evaporates, the iron powder in the liquid aligns itself to the magnetic audio tracks on the tape. This allows the examiner to visually observe what the magnetic tracks look like on the tape. Magnetic development analysis is a powerful tool for analyzing analog audio tapes. The documents bates-labeled KM-0000000067-105 are photocopies of photographs, taken through a microscope, of different portions of the Q39 tape subjected to magnetic development. (A photo-quality set of these photographs is also enclosed, but this set is not bates-numbered). The photograph bates-numbered KM-000000068 shows a portion of the magnetic tape at approximately event 00:12. Mr. Marr will explain that at approximately 25.1 (as indicated on the numeric etchings on the glass plate under the tape)[1], magnetic development analysis shows that the height of the recorded information changes abruptly. Mr. Marr will testify that this abrupt change indicates that a different recorder was used beginning at approximately 25.1.

  The photograph bates-numbered KM-000000069 indicates that at approximately events 00:12 and 00:13 on the tape (marked on the ruler at approximately 26 to 27), the record head height gradually dipped and then rose again. Mr. Marr will explain that the changes in record head height on the Q39 recording indicate that it is an original recording and not a copy. The photograph bates-numbered KM-000000105, at approximately event 1:34:53, shows that the record head edgeline (the faint horizontal line on

---

[1] The distance between each number on the glass ruler (i.e., 24 to 25) is one-tenth of an inch.

4

top of the vertical stripes) ends at approximately 63.1 on the ruler, while the erase head edgeline (the faint horizontal line on top of the vertical stripes that is slightly higher than the record head edgeline) continues until approximately 63.6.  Mr. Marr will testify that event 1:34:53 is an end stop record event and no audio follows.  The recorder was forced to stop, as Side A was at the end of the magnetic tape.  Mr. Marr will further testify that this is an original end stop.  If Q39 were a copy, the record head edgeline and erase head edgeline would have continued from left to right at the same height, uninterrupted.

Mr. Marr will testify that his findings were reviewed by another qualified examiner, who agreed with Mr. Marr's findings.

   2.   **Audio Enhancement**

Enclosed please find Mr. Marr's Report of Examination, dated January 25, 2011, pertaining to the enhancement of the designated area of Q39.  The report, work notes and raw data are attached as 3500-KM-2 (bates numbered KM-000000132-144).  Mr. Marr will explain how he, working with two technicians of the FBI Audio, Visual and Image Analysis Unit, enhanced the aural intelligibility of the designated area of the audio recording marked Q39.  In sum and substance, Mr. Marr will testify that he began by digitizing the recording from the microcassette directly onto a computer.  Then, using a digital filter, Mr. Marr and the technicians removed the broadband noise on the recording.  They also used other digital filters to remove high frequency and low frequency sounds in the recording.  During the enhancement process, Mr. Marr and the technicians listened to the audio recording to ensure that they did not lose intelligibility while applying various filters.  Enclosed you will find an enhanced copy of the designated area of Q39, dated January 21, 2011.

B.   **Mark Basoa**
     **Firearms Examiner, NYPD (retired)**

Enclosed please find a copy of Mark Basoa's résumé.  On September 16, 2003, Detective Basoa examined a bullet fragment provided to him by the New York City Medical Examiner's Office in ME-03-4329 (deceased: Vincent Gargiulo).  Det. Basoa examined the fragment and described it in his report as one (1) defaced piece of copper-coated lead, weighing 32.8 grains.  Det. Basoa further determined that the bullet fragment was unsuitable for comparison testing.  You were previously provided with Det. Basoa's "Microscopic Analysis Report."  Enclosed please find Det. Basoa's "Inventory Notes" and "Bullet Notes."

**C.   Nicholas Mattia**
     <u>**Forensic Examiner, NCPD (retired)**</u>

The government previously provided you with Detective Nicholas Mattia's résumé.  Det. Mattia examined bullet jacket and core fragments provided to him by the Nassau County Medical Examiner's Office on June 24, 1994, in Case No. Hom-539-94 (deceased: Julius Baumgardt).  Det. Mattia determined that the fragments revealed class characteristics of a .40 caliber Smith & Wesson or 10 millimeter bullet.  Det. Mattia further determined, based on his examination, that the bullet fragments came from a Winchester Black Talon bullet.  Det. Mattia will explain that a Black Talon bullet is a jacketed hollow-point bullet with perforations designed to expose sharp points and teeth upon expansion.  Black Talon bullets have a coating which give them a black appearance.  At the time of the Baumgardt shooting, Black Talon bullets were manufactured exclusively by Winchester.

Det. Mattia further determined that the bullet jacket fragments revealed six right polygonal rifling characteristics. Det. Mattia will explain that six grooves in the barrel of the firearm which expelled the bullet examined by Det. Mattia caused the six hills and valleys, which slanted to the right, on the bullet jacket fragments.  Det. Mattia will explain the difference between polygonal rifling process and cut rifling process.  Det. Mattia will testify that in the Summer of 1994, only a few firearms manufacturers used a polygonal rifling process to manufacture the barrel of the firearm, and Glock was the most common of those manufacturers.  Det. Mattia concluded, through microscopic examination, that the bullet fragments failed to reveal sufficient rifling striation patterns for comparison purposes.  He further concluded that future comparison was precluded.

**D.   Paul Bigilin**
     <u>**Latent Fingerprint Examiner, NCPD**</u>

Enclosed please find the résumé and reports prepared by Detective Paul Bigilin in connection with fingerprint analysis he conducted on January 13, 2011.  (Bates-numbered PRINT000000001 – 23).  These documents also include copies of photographs, fingerprint lifts and an arrest fingerprint card for Louis Dorval.  Det. Bigilin will explain what a latent fingerprint is versus a known fingerprint, the process by which latent fingerprints are identified and "lifted" off of items, how fingerprints are compared and identified, and the basic factors used in fingerprint identification.  Det. Bigilin will further testify that he compared a CU-5 photograph, originally received at the Latent Fingerprint Section ("LFS") on September 1, 1994 in

6

connection with Homicide Case No. 94HS539 and RB24-94, against the fingerprints on an arrest fingerprint card in the name of Louis Dorval, Records Bureau Number 219249.  Det. Bigilin concluded that the latent impression on the CU-5 photograph matched the left index finger on Dorval's arrest fingerprint card.  Det. Bigilin further compared and identified the latent impression on a light bulb received by the LFS to the right thumb on the arrest fingerprint card of Dorval.

**E.   Robert Otero**
   **Latent Fingerprint Examiner, NYPD (retired)**

Enclosed please find Detective Robert Otero's résumé.  Det. Otero currently works as a Senior Fingerprint Expert with the Drug Enforcement Administration ("DEA").  Det. Otero will explain what a latent fingerprint is versus a known fingerprint, the process by which latent fingerprints are identified and "lifted" off of items, how fingerprints are compared and identified, and the basic factors used in fingerprint identification.  Det. Otero will further testify he compared latent fingerprint evidence recovered from the Vincent Gargiulo crime scene on August 18, 2003 – specifically, the lift of the "right thumb print from the exterior of glass picture from left phone booth on top of pay phone" and the lift of the "left thumb from exterior of phone handle - left side phone booth" to the arrest fingerprints of P.A. (see attached report for full name) and positively identified the latent impressions as the fingerprints of P.A.  You were previously provided with Det. Otero's reports of analysis.  Enclosed please find an unredacted copy of his report pertaining to P.A., as well as a one page document, entitled "Latent Print Examination, Certified Copy."

**F.   Dr. Stuart L. Dawson, M.D.**
   **Medical Examiner**

The government will seek to qualify Dr. Stuart L. Dawson as an expert in forensic pathology.  You have already been provided with a copy of Dr. Dawson's résumé.  Dr. Dawson, who was formerly employed by the Office of the Medical Examiner for Suffolk County, is expected to testify about the autopsy of Louis Dorval, consistent with the autopsy reports, notes and photographs previously produced for that murder.  Specifically, it is expected that Dr. Dawson will testify, among other things, that Dorval's death was caused by a single gunshot wound to the back of his head, and that upon its discovery the condition of Dorval's body indicated that Dorval had been murdered approximately three days prior.

**G.   Dr. Gerard Catanese, M.D.**
     **Medical Examiner**

The government will seek to qualify Dr. Gerard Catanese as an expert in forensic pathology.  You have already been provided with a copy of Dr. Dawson's résumé.  Dr. Catanese, who is employed by the Office of the Medical Examiner for Nassau County, is expected to testify about the autopsy of Julius Baumgardt, consistent with the autopsy report previously produced for that murder, and with the autopsy notes, photographs and other information contained on the enclosed compact disks labeled "Baumgardt Autopsy Photos from Nassau County Medical Examiner's File" and "Nassau County Medical Examiner's File – Julius Baumgardt," respectively.  Specifically, it is expected that Dr. Catanese will testify, among other things, that Mr. Baumgardt's death was caused by a single gunshot wound to the back of his head and brain.

**H.   Dr. John A. Hayes, Jr., M.D.**
     **Medical Examiner**

The government will seek to qualify Dr. John A. Hayes, Jr. as an expert in forensic pathology.  You have already been provided with a copy of Dr. Hayes' résumé.  Dr. Hayes, who is employed by the Office of the Chief Medical Examiner for the City of New York, is expected to testify about the autopsy of Vincent Gargiulo, consistent with the autopsy reports, notes and photographs previously produced for that murder.  Specifically, it is expected that, among other things, Dr. Hayes will testify that Gargiulo's death was caused by a single gunshot wound, which entered Gargiulo at the bridge of his nose and pierced both his skull and brain.

**I.   John R. Sardone**
     **Handwriting Expert, FBI Laboratory**

The government will seek to qualify John R. Sardone as an expert in forensic document examination.  Mr. Sardone is currently employed as a Documents Examiner in the Questioned Documents Unit of the Federal Bureau of Investigation's New York Field Office.  You have already been provided with a copy of Mr. Sardone's résumé.  It is expected that at trial Mr. Sardone will render an expert opinion concerning the authorship of certain numerals that were handwritten on a notepad found in a Corona, Queens apartment that was utilized by Louis Dorval at the time of his murder, in 1994.  Mr. Sardone's Report of Examination concerning this matter, dated July 30, 2008, has already been produced in a previous discovery disclosure.

It is expected that Mr. Sardone's ultimate expert opinion will be that while he was unable to reach a definite conclusion concerning whether or not Christian Tarantino prepared the numerals found on the notepad in Dorval's apartment, significant characteristics were observed when comparing that writing to other writings known to have been authored by Tarantino during the relevant time period to indicate that Tarantino may have prepared the handwritten numbers. In rendering that opinion, it is expected that Mr. Sardone will describe the methodology he employed in order to compare the handwriting contained on Q43.1 – a sheet of paper from the notepad found in Dorval's apartment in August 1994 – with various known writings authored by Christian Tarantino during various periods of time.

Among other things, it is expected that Mr. Sardone will describe the process by which he ascertained that Q43.1 and the known Tarantino writings were original documents, and that those documents were freely and naturally prepared. It is expected that Mr. Sardone will also describe the process by which he conducted a side-by-side comparison of Q43.1 and the known Tarantino writings. In conducting that comparison, Mr. Sardone evaluated the similarity and uniqueness of various features displayed in the respective handwritings, including: drag strokes contained in the writings; the evidence of pen pressures applied in the writings; the structure, size, slant, and shape of the characters contained in the writings; the speed with which the characters were written; and the interrelationship and configuration of the characters contained in the writings, among other characteristics.

**J.   Richard Lhota**
     **Handwriting Expert, NCPD (retired)**

The government will seek to qualify Richard Lhota as an expert in forensic document examination. Mr. Lhota was formerly employed as a Documents Examiner in the Scientific Investigation Bureau of the Nassau County Police Department. A copy of Mr. Lhota's curriculum vitae will be provided under separate cover. It is expected that at trial Mr. Lhota will render an expert opinion with respect to an indented writing analysis he performed on a notepad found in a Corona, Queens apartment that was utilized by Louis Dorval at the time of his murder, in 1994. Mr. Lhota's Report of Examination concerning this matter, dated October 5, 1994, has already been produced in a previous discovery disclosure. It is expected that Mr. Lhota's ultimate expert opinion will be consistent with the information contained in his Report of Examination, namely that one page of the notepad found in Dorval's apartment contained indented writing, and

included the word "chris."

In rendering that opinion, it is expected that Mr. Lhota will describe the methodology he employed in order to uncover the indented writing on the notepad found in Dorval's apartment. Among other things, it is expected that Mr. Lhota will describe the electrostatic detection process to which he submitted the notepad.

It is expected that, at trial, Mr. Lhota will explain that he placed the notepad found in Dorval's apartment in a humidity chamber in order to loosen the various fibers contained within the paper. It is also expected that Mr. Lhota will describe how the notepad was subsequently placed on an Electrostatic Detection Apparatus (ESDA), and a mylar sheet was spread over the bed of the ESDA and the notepad. After a vacuum suction is applied in order to fasten the mylar sheet and notepad to the ESDA, Mr. Lhota will describe how he used a device called a Corona to apply an electrical charge to the mylar sheet on top of the notepad. It is expected that Mr. Lhota will further explain that once the charge was applied, a solution containing a ink-like substance was poured over the mylar sheet. Because of the presence of the electrical charge, the ink-like substance was subsequently drawn to the indentations in the notepad. It is expected that Mr. Lhota will also explain that once the mylar sheet was peeled away from the ESDA, the sheet revealed ink-patterns consistent with where the indented writing was present on the notepad.

**K.   Robert Fram**
      **FBI Physical Scientist, Forensic Examiner (retired)**

The government previously provided you with Robert Fram's résumé. In August 1994, the Suffolk County Medical Examiner ("SCME") performed an autopsy of Louis Dorval, and recovered, <u>inter alia</u>, a blood sample mounted on a card, and a head hair. The head hair and blood card were transferred to FBI Scientific Analysis Section in Quantico, Virginia ("FBI-Quantico") in September 1994 and designated K1, for "known sample number one" and K2.

On June 23, 1994, Nassau Police Department Crime Scene Unit ("Nassau CSU") detectives recovered, inter alia, hairs from the stolen red Chevy Blazer that had been abandoned near Volt, immediately after Julius Baumgardt's murder. Among other trace evidence, the items included evidence mounted on a microscope slide that was designated by FBI-Quantico in 2002 as Questioned or Q30, for questioned item number 30. See photos at 3500-TEU-1. Another slide contained a head hair, body hair and animal hairs,

id., which was designated Q34.

On January 14, 2002, Trace Evidence Unit ("TEU") Physical Scientist, Forensic Examiner Robert Fram microscopically compared Q30, among other questioned samples, to K1, Dorval's known head hair. Fram will testify that both human and animal hairs consist of three morphological components: (1) the cuticle, or translucent outer layer; (2) the cortex; and (3) the medulla, or central, air-filled shaft. These components exhibit typical variations depending upon whether originating from animal or human hair and, as to the latter, whether body or head hair. Furthermore, among humans, head hairs exhibit structures and characteristics enabling trained forensics examiners to make racial identifications of the hairs' origin within one of three basic groups: (1) Caucasian (i.e., European), (2) Negroid (of African descent), or (3) Mongoloid (Asian and Native American). The method of typing hairs through forensic microscopy is set forth in 3500-TEU-2 and 3.

Applying these methods, Fram will testify that he concluded that the human head hairs contained within Q30 and Q34 were Caucasian head hairs ("COHH").

Fram further concluded that these COHH were "microscopically dissimilar" from Dorval's known head hair samples K1. Finally, Fram would testify that dissimilar microscopic appearances may be caused by, among other factors, the application of dye, such as hair coloring, between the time the first and second exemplar is obtained, as well as environmental factors, such as a hair's submergence in sea water over a period of time.

**L.   Sandra L. Koch**
    **FBI Physical Scientist, Forensic Examiner**

The government previously provided you with Sandra Koch's résumé. On July 30, 2010, FBI-Quantico TEU Physical Scientist, Forensic Examiner Sandra L. Koch removed the COHH which Fram previously identified on the slide designated Q34. The separation of the COHH was performed in conjunction with the analysis of additional exemplars obtained by the FBI and submitted to FBI-Quantico since the Tarantino indictment in 2008. The recovered COHH from Q30 was designated Q34.1.

**M.   Dr. Constance L. Fisher**
    **Mitochondrial DNA Unit, FBI Laboratory**

The government previously provided you with Dr. Constance Fisher's résumé. Dr. Fisher will testify that

Deoxyribo Nucleic Acid ("DNA") is a molecule found in most cells that has been determined to provide instructions for the replication of every components of the human body. DNA consists of two strands that form a twisted ladder whose "rungs" make pairs of "bases" designated G, C, A, T. The order of such bases can identify specific individuals or groups of individuals.

In the case of nuclear DNA, where individuals inherit DNA from both parents, the resulting nuclear DNA forms a string of bases unique to a specific individual.

Each cell also contains thousands of mitochondria, which control energy storage and usage. Each mitochondria within a person also exhibits a single mitochondrial DNA sequence of bases ("mtDNA"). Unlike nuclear DNA, mtDNA is inherited maternally and therefore may be shared by many persons within a population.

Dr. Fisher will further testify that whereas nuclear DNA may not be extracted from hairs, mtDNA may. As to each of the exemplars in this case, Dr. Fisher will testify that she first extracted mtDNA from cells within blood, saliva or hair exemplars. The extracted DNA was then copied or amplified through a process known as PCR, which is then used to determine order of bases (i.e., sequencing) of the mtDNA in the exemplars. The sequence of bases in known and questioned exemplars were then compared, and the relative frequency of the appearance of these mtDNA is then calculate through the application of a database of over 5,000 samples. Statistical rates of error are applied where no such mtDNA has ever been observed in the FBI's database.

In July 2000, Nassau CSU Detective Michael Bayzelewicz took a buccal swab from the defendant Tarantino at the Willard correctional facility. The buccal swab was then transferred to FBI-Quantico and designated K-17.

On March 27, 2002, Dr. Fisher reported that based on analyses of mitochondrial DNA sequences obtained from known and questioned samples analyzed up to that time, all Q samples could be excluded as originating from any of the K samples, with the exception of Tarantino's buccal swab K17, both of which contained the same mitochondrial DNA sequence. In sum, the mtDNA sequence obtained from COHH designated Q30 from the abandoned Chevy Blazer on June 23, 1994, see above, matched the mtDNA in the saliva sample obtained in July 2000 from the defendant.

On December 13, 2010, Dr. Fisher reported, <u>inter alia</u>, that mtDNA obtained from Dorval's dried blood card recovered by the SCME, (K2), bore the same mtDNA as the COHH recovered from

12

the Chevy Blazer by Nassau CSU on June 23, 1994, and separated from Q30 by FBI-Quantico TEU examiner Sandra Koch, when the single COHH was redesignated Q34.1.

In sum, two of the COHH (Q30 and Q34.1) recovered from the Chevy Blazer on June 23, 1994 bear the same mtDNA as two of the coconspirators responsible for the murder of Julius Baumgardt, *i.e.*, Tarantino (K17) and Dorval (K2).

The government reserves the right to call substitute expert witnesses, as well as to call additional expert witnesses, and will provide advance notice of any intent to do so.

                            Very truly yours,

                            LORETTA E. LYNCH
                            United States Attorney

                 By:  /s/Carrie N. Capwell
                      Carrie N. Capwell
                      James M. Miskiewicz
                      Sean C. Flynn
                      Assistant U.S. Attorneys
                      (631) 715-7836/7841

Enclosures as

cc:  Clerk of the Court (JS) (By ECF; without enclosures)
     Co-counsel (By ECF; without enclosures)