UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
UNITED STATES OF AMERICA,

     -against-                  <u>MEMORANDUM & ORDER</u>
                                     08-CR-655 (JS)


CHRISTIAN GEROLD TARANTINO,

                  Defendant.
----------------------------------X
APPEARANCES:
For the Government: James M. Miskiewicz, Esq.
                      Carrie Nicole Capwell, Esq.
                      Sean C. Flynn, Esq.
                      United States Attorney's Office
                      560 Federal Plaza
                      Central Islip, NY 11722

For Defendant:       Diarmuid White, Esq.
                      White & White
                      148 East 78 Street
                      New York, NY 10021

                      James R. Froccaro, Esq.
                      20 Vanderventer Ave., Suite 103W
                      Port Washington, NY 11050

                      Michael Rosen, Esq.
                      Law Office of Michael Rosen
                      61 Broadway, Suite 1105
                      New York, NY 10006


SEYBERT, District Judge:

      Pending before the Court is the Government's motion <u>in</u> <u>limine</u> to admit evidence of evidence of the Defendant Christian Tarantino's prior crimes and other bad acts in its case-in-chief. For the reasons that follow, that motion is GRANTED IN PART AND DENIED IN PART. Also pending is the Defendant's

request to preclude testimony from the Government's handwriting and ballistics experts. That motion is DENIED.

<u>BACKGROUND</u>

A short summary of the facts is sufficient to ground the discussion that follows. For a more detailed factual background, <u>see</u> the Court's March 4, 2011 Order. Briefly, the Defendant is charged with participating in three murders. Count One of the Indictment alleges that he and others participating in a 1994 armored car robbery. During the robbery, Louis Dorval, one of the Defendant's co-conspirators, shot and killed an armed guard. Count Two charges the Defendant with the obstruction-of-justice murder of Dorval. Counts Three and Four, respectively, charge him with the obstruction-of-justice murder and conspiring to commit the obstruction-of-justice murder of Vincent Gargiulo, the Defendant's former business partner and onetime criminal co-conspirator.

In prosecuting this case, the Government has relied heavily on a cooperating witness and on an audiotape that the Government maintains contains a secretly-recorded conversation between the Defendant and Gargiulo (the "Gargiulo Tape"). The cooperating witness, Gaetano "Guy" Fatato, was a criminal associate of both Dorval and Tarantino, and the Government anticipates that he will testify to two key points: <u>first</u>, that Dorval admitted to Fatato that Dorval and Tarantino participated

2

in the armored car robbery and second, that when he (Fatato) asked Tarantino about his involvement in the robbery, Tarantino became angry at Dorval for discussing the heist outside the group of robbers. The Gargiulo Tape also implicates Tarantino in the armored car robbery and the Dorval murder because, according to the Government, he can be heard discussing details of both crimes.

DISCUSSION

The Court first addresses the Government's motion to admit evidence of the Defendant's prior bad acts and then considers the Defendant's motion to preclude certain expert testimony.

## I. Uncharged Crimes and Prior Bad Acts

The Government contends that evidence that evidence of the Defendant's prior crimes and bad acts is admissible as direct evidence or background evidence of the crimes charged in the Indictment, and/or as "other crimes and acts" evidence admissible under Federal Rule of Evidence 404(b) ("Rule 404(b)"). Specifically, the Government seeks to introduce evidence that: (1) in 1989, Tarantino and Gargiulo trafficked in stolen fur coats and that Tarantino was convicted in 1991 in connection with that crime; (2) in December 1993, Tarantino and Dorval stole over 200 leather and fur coats from a Filene's Basement and that Dorval was indicted in connection with

attempts to fence these coats just days before his murder; (3) in 1993 and 1994, Tarantino, Dorval and others committed a number of robberies and drug deals; (4) in July 2000, the defendant was in prison on a state charge arising out of an attempted robbery of an undercover narcotics officer; and (5) in mid 1999 through early 2000, Tarantino helped an associate distribute the date-rape drug GHB. (Gov. Mot. at 1-2.) The evidence in each of these categories is addressed below.

A. Legal Standard

The Government argues that most of the evidence described in its motion is direct or background evidence that may be admitted without reference to Rule 404(b). It maintains, however, that all of the evidence described in its motion is nevertheless admissible as Rule 404(b) "other crimes" evidence. The Court addresses the legal standard for each theory in turn.

1. Direct or Background Evidence

Evidence of an uncharged crime or prior bad act is direct or background evidence--admissible apart from Rule 404(b)--of the charged crimes when the uncharged conduct "arose out of the same transaction or series of transactions of the charged offense, if it [is] inextricably intertwined with the evidence regarding the charged offense, or it is necessary to complete the story of the crime [on] trial." United States v. Towne, 870 F.2d 880, 886 (2d Cir. 1989) (quotations omitted);

see also United States v. Gonzales, 110 F.3d 936, 942 (2d Cir. 1997). To be admissible on this ground, the evidence need not directly establish an element of a charged crime as long as it provides background for the events charged in the Indictment. See United States v. Coonan, 938 F.2d 1553, 1561 (2d Cir. 1991); see also United States v. Gonzalez, 110 F.3d 936, 941 (2d Cir. 1997); United States v. Samet, 200 F. App'x 15, 21 (2d Cir. 2006) (summary order). Where the witnesses participated in the criminal acts about which they testify, this "background evidence" may include facts that the Government elicits to avoid the appearance that it was hiding impeachment evidence from the jury. Coonan, 938 F.2d at 1561 (2d Cir. 1991).

### 2. Federal Rule of Evidence 404(b)

Rule 404(b) provides in relevant part:

> **Other Crimes, Wrongs, or Acts**.--Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

FED. R. EVID. 404(b). Under this rule, courts should admit other crimes evidence that is offered for a proper purpose and relevant, and whose probative value is not substantially outweighed by its potential to prejudice the defendant.

Huddleston v. United States, 485 U.S. 681, 691-92 (1988); United States v. Di Geronimo, 598 F.2d 746, 753 (2d Cir. 1979). "In addition, . . . at the defendant's request, the district court should give the jury an appropriate limiting instruction." United States v. Downing, 297 F. 3d 52, 58 (2d Cir. 2002). Rule 404(b)'s list of proper purposes is non-exhaustive. Courts should apply an inclusionary approach to "other acts" evidence and admit evidence of uncharged crimes or prior bad acts, subject to Rule 403 balancing, in all situations where the evidence is offered "for any purpose other than to show a defendant's criminal propensity." United States v. Jaswal, 47 F.3d 539, 544 (2d Cir. 1995). Among the long list of purposes for which "other acts" evidence has been admitted is "to help explain how [an] illegal relationship between participants in [a] crime developed, or to explain the mutual trust that existed between coconspirators." United States v. Rosa, 11 F.3d 315, 334 (2d Cir. 1993); Unites States v. Pitre, 960 F.2d 1112, 1113 (2d Cir. 1992). Further, evidence admissible under this analysis should not be excluded on prejudice grounds where the evidence is not more inflammatory than the charged crimes. See, e.g., United States v. Paulino, 445 F.3d 211, 223 (2d Cir. 2006).

B. Application

The Court addresses in turn the five topics the

Government identified in its motion.

### 1. The 1990-1991 Fur Coat Scheme

The Government seeks to introduce evidence that the Defendant and Vincent Gargiulo, among others, were convicted in the District of New Jersey in connection with a scheme to traffic in stolen fur coats. More specifically, the Government wants to show that (i) the Defendant and Gargiulo offered to sell 150 coats, which had been stolen from a fur dealer in Syosset, New York, to an undercover FBI agent for $75,000; (ii) the FBI agent observed Gargiulo with a sawed-off shotgun; (iii) that the Defendant pleaded guilty in connection with this scheme and was represented at the time by Melvyn K. Roth, Esq.; and (iv) while on supervised release, the Defendant provided handwritten supervision reports. (Gov. Br. at 10-11.) The Defendant objects that certain details of this scheme are needlessly prejudicial. (Deft. Opp. at 3.)

The Court largely agrees with the Government that evidence of Tarantino's and Gargiulo's involvement in this scheme is admissible to show the nature of the relationship between the two men. In particular, it helps explain why Tarantino can be heard on the Gargiulo Tape confiding to his friend about the armored car robbery and the Dorval murder. Although the Government contends that evidence of the relationship between Tarantino and Gargiulo is direct evidence

7

of the charged crimes, the cases that address relationship evidence in the context of prior crimes analyze its admissibility under Rule 404(b). See Pitre, 960 F.2d 1112, 1119 (2d Cir. 1992); see also Rosa, 11 F.3d 315, 334 (2d Cir. 1993) (prior crimes evidence admissible under Rule 404(b) to "explain the mutual trust that existed between coconspirators"). In any event, the Court finds that all but one of the details about this crime are relevant and offered for a proper purpose, and that their probative value outweighs their prejudicial effect. Accordingly, they are admissible under Rule 404(b).

With one exception, the Defendant's objection that the details of this crime are needlessly prejudicial is unpersuasive. Details such as the number of stolen coats and the price at which Tarantino and Gargiulo offered to sell them to the FBI agent are necessary to tell the story behind this crime. Further, two additional details--that Tarantino was represented in this case by Mel Roth and that he provided handwriting samples while on supervised release--are particularly relevant to show that it is the Defendant's voice on the Gargiulo Tape and that handwritten notes dividing $92,000 (the purported take from the armored car robbery) are the Defendant's. As such, these two details are admissible independent of Rule 404(b) because they are "inextricably intertwined with the evidence regarding the charged offense."

8

Towne, 870 F.2d at 886.

With respect to evidence concerning the sawed-off shotgun, however, the Court agrees with the Defendant that its prejudicial impact outweighs its probative value. Considered against the rest of the evidence showing that Tarantino and Gargiulo trafficked fur coats, evidence that a shotgun was present at a sales meeting adds little to the idea that Tarantino and Gargiulo had a confidential relationship. More than anything, it tends to show the Defendant had a propensity for committing armed crimes.

Accordingly, the Government's request to introduce evidence that Tarantino and Gargiulo participated in the 1989-91 scheme to traffic stolen fur coats is granted in all respects except as to evidence of the sawed-off shotgun.

2. <u>1993 Filene's Basement Robbery</u>

The Government also wants to introduce evidence that the Defendant and Dorval stole fur coats from a Filene's Basement during a 1993 robbery and then tried to sell them on the black market. In the Government's view, this testimony is direct evidence of Count Two, the obstruction of justice murder of Dorval, because it tends to show that Tarantino murdered Dorval to prevent him from cooperating with investigators by describing Tarantino's involvement in several crimes, including this scheme. Further, the Government argues that this evidence

establishes the criminal relationship between Tarantino and Dorval, which in turn tends to establish Tarantino's involvement, with Dorval, in the armored car robbery. (Gov. Br. at 12.) The Defendant objects to this evidence only to the extent it includes needless detail. (Deft. Br. at 3.)

The Court agrees with the Government that this evidence is admissible. It is direct evidence of Count Two, because the fact that Dorval had damaging information on Tarantino is "necessary to complete the story of the crime [on] trial." Towne, 870 F.2d at 886. And, it is admissible "other crimes" evidence because it is relevant to show the criminal relationship between Tarantino and Dorval and its probative value is not substantially outweighed by its prejudicial effect.

### 3. Robberies and Drug Deals with Dorval and Fatato

The Government also seeks to offer evidence that the Defendant committed a number of robberies and drug deals with Dorval and Fatato, the Government's cooperating witness. These crimes, and the Defendant's specific objections to evidence concerning them, are discussed below. As an initial matter, the Court overrules, for now, the Defendant's objections that this evidence is inadmissible hearsay or needlessly cumulative. See United States v. Jamil, 707 F.2d 638, 643 (2d Cir. 1983). If appropriate, the Defendant may renew these objections during trial.

## a. 1993 Home Invasion

The Government seeks to introduce evidence that Tarantino, Dorval, Fatato and another individual committed a violent home invasion robbery in December 1993, including that Tarantino and Dorval conducted surveillance on the home, the robbers were armed, and Fatato and Dorval forced a victim into the shower and used a taser on him. (Gov. Br. at 14). Among other things, the Government argues that this is evidence of the criminal relationships between Tarantino, Dorval, and Fatato and that testimony concerning firearms and stolen cars is Rule 404(b) evidence admissible to prove "opportunity."

As with evidence described earlier establishing Tarantino's criminal relationships with Gargiulo and with Dorval, testimony that Tarantino, Dorval and Fatato committed a home invasion is probative of mutual trust among them. For example, it helps explain why Dorval would confide in Fatato about his role in the armored car robbery, and it helps explain why Fatato would thereafter attempt to discuss that robbery with Tarantino. This evidence is relevant and offered for a proper purpose, and its probative value outweighs its prejudicial impact. As such, it is admissible under Rule 404(b).

Three details of this crime merit further discussion. First, Fatato testified at the Mastrangelo hearing that he and Dorval forced a victim into the shower and used a taser on his

genitals. Notwithstanding the viciousness of this act, the Government will be permitted to elicit this testimony at trial because the Government has the right to defuse potentially harmful evidence on its direct case. See <u>Coonan</u>, 938 F.2d at 1561. In so ruling, the Court notes that the Defendant did not participate in this aspect of the home invasion. If, however, the Defense can commit beforehand that it will not probe this incident during his cross-examination, the Court will preclude the Government from eliciting this detail during its direct. In a related vein, there was testimony at the <u>Mastrangelo</u> hearing that the Defendant pistol-whipped a female victim during the robbery. This incident was not addressed by either party in their principal briefs, but the Court will entertain a supplemental request from the Defendant to preclude this testimony.

<u>Second</u> and <u>third</u>, the Defendant objects to testimony that the home invaders were armed and that they used stolen cars to carry out the crime. The Court agrees with the Government that that these details are Rule 404(b) "opportunity" evidence admissible to show that the Defendant is guilty of the armored car robbery. "Evidence showing that a defendant possessed a handgun prior to the charged crime is properly admitted to show access to such a weapon [under the opportunity exception to Rule 404(b)]." <u>United States v. Slaughter</u>, 248 F. App'x 210, 212 (2d

Cir. 2007); see also United States v. Zappola, 677 F.2d 264, 270 (2d Cir. 1982). By the same logic, evidence that Tarantino used a stolen car in the home invasion tends to show that he had the ability to steal cars. Each of these details is relevant because the Government anticipates that its witness will testify that the armored car robbers carried guns and fled the scene in a stolen vehicle. Accordingly, testimony that the Tarantino and others were armed during the home invasion and that they used stolen cars is admissible under Rule 404(b).

### b. Spy-Mart Robbery

The Government also seeks to introduce evidence that Dorval told Fatato that he, Tarantino and Scott Mulligan broke into a Spy-Mart store in June 1994 and stole police equipment, including badges and radios. (Gov. Br. at 16.) In the Government's view, this connects Tarantino to the armored car robbery and to a self-storage locker where police recovered other physical evidence. The Defendant's hearsay objection as to this evidence, (Deft. Opp. 5), is overruled in light of the Court's Mastrangelo decision. Dorval's statements about the Spy-Mart robbery are admissible as direct evidence of the charged crimes.

### c. Stolen Bonds

The Government also seeks to introduce testimony that the Defendant, Dorval, and their associates robbed another fur

coat store and stole "EEE" and bearer bonds, and that Fatato helped cash the stolen bonds. The Defendant objects that this evidence is cumulative to what the Government already plans to introduce. The Court finds that this evidence is admissible as, among other things, evidence of the criminal relationships among Tarantino, Dorval and Fatato. The Defendant's cumulativeness objection is overruled, but he may renew it at trial.

### d. Jewelry Store Robbery

Similarly, the Government's anticipated testimony that Tarantino, Dorval and Fatato contemplated robbing a jewelry store in Garden City, and that Fatato conducted surveillance on that store, is admissible as evidence of the criminal relationships among these men. The Defendant's cumulativeness objection is overruled for now.

### e. Planned Murder of an Unnamed Drug Dealer

The Government also seeks to introduce evidence that a few months before Dorval was murdered, Dorval, Tarantino and Mulligan contemplated killing an unnamed drug dealer by shooting him in the head, putting his body in a tool box, and dumping the body in the ocean. As with much of the evidence discussed already, the fact that Tarantino, Dorval and Mulligan contemplated killing a drug dealer is admissible to show the criminal relationship between these men. Further, the details of this plan are admissible as "signature crime" evidence

14

because the manner in which Tarantino and others contemplated killing the drug dealer is strikingly similar to the way Dorval was killed. <u>United States v. Mills</u>, 895 F.2d 897, 907 (2d Cir. 1990) (evidence of one crime may be used to prove a defendant committed the second crime "where the crimes are so nearly identical in method as to ear-mark them as the handiwork of the accused") (citations and quotations omitted). The Defendant protests that there is no evidence that Tarantino, as opposed to Dorval or Mulligan, conceived of the idea to put the drug dealer's body in a tool box and dump it at sea. As the Government points out, however, the Defendant cites no authority that "signature crime" evidence must be the product of the Defendant's original idea. (Gov. Reply at 7 n. 3.)

### f. <u>Further Drug Deals and a Planned Robbery</u>

The Government seeks to introduce testimony that Tarantino, Dorval, Fatato and others participated in or planned three other crimes. <u>First</u>, Fatato is expected to testify that he helped sell approximately forty pounds of marijuana to Tarantino, Dorval and Mulligan shortly before Dorval's death. <u>Second</u>, Fatato will testify that, shortly before Dorval's murder, Tarantino wanted his and Dorval's help with robbing a stockbroker in a Manhattan apartment. <u>Third</u>, Fatato will testify that, shortly before Dorval was killed, he provided several kilograms of cocaine to Dorval to re-sell at a profit.

Dorval, in turn, gave one kilogram to Tarantino. (See Gov. Br. at 19.) As with the other criminal activity jointly undertaken by Dorval, Tarantino and Fatato, evidence concerning these crimes demonstrates the criminal relationships between these men and is relevant to explain why Dorval would confide to Fatato about his participation in the armored car robbery and why Fatato would have discussed that robbery with Tarantino. The Defendant's cumulativeness objection is overruled for now. See Jamil, 707 F.2d 638, 643 (2d Cir. 1983).

### 4. July 2000 State Incarceration

The Government also seeks to introduce evidence that the Defendant was serving a state prison sentence for the attempted robbery of an undercover narcotics officer when an FBI agent and Nassau detectives traveled to the prison to obtain a buccal swab from the Defendant. (Gov. Br. 1-2, 7-8.) The Government does not specifically address this evidence in its motion, but the Defendant concedes that the taking of the buccal swab is relevant. (Deft. Opp. at 7.) In the Defendant's view, however, that "it was taken while he was serving a prison term for attempted robbery of an undercover narcotics officer is not." (Id. (citations omitted).) The Defendant's incarceration at the time the buccal swab was taken is relevant to the Government's theory of the context for the Gargiulo Tape. In that sense, then, the fact that Tarantino was in jail at the

time of the swab is "inextricably intertwined with the evidence regarding the charged offense" and thus admissible. <u>Towne</u>, 870 F.2d at 886. The precise nature of the crime that landed Tarantino in jail does little to give the Gargiulo Tape context, however, and the Court is sensitive to the Defendant's concern (raised elsewhere in his brief) that this type of evidence will have the prejudicial effect of portraying Tarantino as a career criminal. Accordingly, evidence that law enforcement officers took a buccal swab from the Defendant while he was serving a state sentence is admissible, but the fact that Tarantino was serving time for armed robbery of a narcotics officer is not.[1]

### 5. <u>Aiding and Abetting Distribution of GHB</u>

Finally, the Government seeks to introduce evidence that from approximately mid-1999 through early 2000, the Defendant aided and abetted John Goetz in distributing the date-rape drug gamma hydroxybutyric acid ("GHB"). The Government argues that this testimony is evidence is inextricably intertwined, and required to give context to, the Gargiulo Tape and, in the alternative, that it is identity evidence admissible under Rule 404(b). Generally speaking, the Government's theory is that the voices on the Gargiulo Tape discuss a federal takedown of a GHB ring that was unfolding at the time the FBI

---

[1] In its reply, the Government indicates that it no longer intends to introduce evidence that Tarantino was convicted of this attempted robbery. (Docket Entry 127 at 7.)

17

took the buccal swab.  Tarantino's role in the distribution ring was to permit Goetz and others to use one of his businesses, Liquid Labs, to launder proceeds from the GHB sales, and the voices on the Gargiulo Tape speculate that the GHB arrests were ultimately aimed at signing up witnesses to cooperate against Tarantino on the armored car robbery and the Dorval murder. According to the Government, this context is critical to the jury's understanding of the Gargiulo Tape.  The Court agrees with the Government that testimony concerning the GHB ring is admissible as evidence "inextricably intertwined with the evidence regarding the charged offense." Towne, 870 F.2d at 886; see also United States v. Quinones, 511 F.3d 289, 309 (2d Cir. 2007) (implied admission that the defendant had killed an informant was admissible notwithstanding the defendant's argument that it suggested that he was contemplating killing a second informant).  Further, the Court finds that the probative value of this evidence outweighs its prejudicial effect, in part because the Government has agreed not to refer to GHB as a "date-rape drug."  (Gov. Reply at 7.)

II. The Defendant's Daubert Motion

In its reply to the Government's motion, the Defendant argues that two Government witnesses, an FBI handwriting expert and a Nassau County Police Department ballistics expert, should be precluded pursuant to Federal Rule of Evidence 702 ("Rule

702") and <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993) and its progeny.

A. <u>Handwriting Evidence</u>

The Government plans to introduce testimony from an FBI handwriting analyst who examined handwritten notes, which were recovered from Dorval's apartment and appear to relate to the money stolen from the armored car. The Government anticipates that its analyst will testify that the Defendant's handwriting shares "significant characteristics" with the writing on the notepad, without necessarily offering an opinion that the notes are in fact the Defendant's. (<u>See</u> Docket Entry 126 at 4.) The Defendant urges the Court, in keeping with its Rule 702 gatekeeping function, to preclude testimony about what he calls "extremely sketchy findings." (Gov. Reply at 10.)

Subject to <u>voir</u> <u>dire</u> of the analyst's expert qualifications, the Court will permit the analyst to describe for the jury the similarities and differences between the Defendant's exemplar and the handwritten notes from Dorval's apartment. As one court in this District has noted, many courts have concluded that although handwriting analysis is not sufficiently reliable to permit an expert to give an authorship opinion, a handwriting expert may compare handwriting samples. <u>See</u> <u>United States v. Oskowitz</u>, 294 F. Supp. 2d 379, 384 (E.D.N.Y. 2003) (collecting cases). "This type of testimony may

be aggressively cross-examined about why some differences between the two samples are significant while other differences are not, and the jury can reach its own conclusion" about who made the notes.  Id.

In its reply, the Government reserves the right to offer an expert opinion that Tarantino authored the notes, and argues that there is no binding precedent in this Circuit holding that the field of handwriting analysis is per se too unreliable to permit an expert from offering an authorship opinion.  Although it finds the analysis in Oskowitz instructive, the Court does not now preclude the Government from offering such an opinion if it can satisfy the Daubert reliability inquiry.  Accordingly, the Defendant's request to preclude the Government's handwriting expert is denied, subject to further voir dire at trial of the expert's qualifications and methodologies.

B. Ballistics Testimony

The Court reaches a similar conclusion with respect to the Government's anticipated ballistics expert.  The Defendant argues that the expert's opinion that the bullet that killed the armored car guard "could have been fired" from a Glock is too inconclusive to tie the fatal bullet to Dorval's weapon.  (Deft. Reply at 10.)  Perhaps, but the Government only intends to use this testimony to show that the type of bullet that killed the

guard was capable of being fired from a Glock. (See Docket Entry 136 at 3.) In the context of other evidence connecting Dorval and Tarantino to Glock firearms, the ballistics evidence is relevant to help establish that Dorval and Tarantino participated in the heist. See FED. R. EVID. 401; United States v. Onumonu, 967 F.2d 782, 786 (2d Cir. 1992) (relevant expert testimony should be admitted unless it falls within a Rule 403 exception). Accordingly, the Defendant's request to preclude the Government's ballistics expert is denied, subject to further voir dire at trial of the expert's qualifications and methodologies.

## CONCLUSION

Based on the foregoing, the Government's motion in limine to admit evidence of uncharged crimes and prior bad acts is GRANTED IN PART AND DENIED IN PART. The Government may introduce evidence (1) that Tarantino and Gargiulo were involved in the 1989-91 scheme to traffic fur coats, except that it may not offer evidence about a sawed-off shotgun; (2) that in 1993 Tarantino and others stole fur coats from Filene's Basement and tried to sell them on the black market; (3) that Tarantino and others committed a home invasion robbery, including that they were armed and used stolen cars, except that it may not inquire into the taser incident if the Defendant agrees not to raise it during his cross-examinations and that the Court will entertain

21

a supplemental request from the Defendant to preclude testimony that he pistol-whipped one of the victims; (4) that Tarantino and others stole police equipment from a Spy-Mart store; (5) that Tarantino and others participated in a scheme to cash stolen bonds and that they contemplated robbing a jewelry store; (6) that Tarantino and others discussed killing an unnamed drug dealer by shooting him in the head, putting his body in a tool box, and dumping it at sea; (7) that Tarantino and others were involved in a marijuana transaction and a cocaine transaction and that they discussed robbing a stockbroker; (8) that Tarantino was serving a state prison sentence when his buccal swab was obtained, except that the Government may not introduce evidence that he was convicted of the attempted robbery of a narcotics officer; and (9) that Tarantino was involved with John Goetz and others in a scheme to distribute GHB, except that the Government may not refer to GHB as a "date-rape drug."

The Defendant's motion to preclude the Government's ballistics and handwriting expert testimony is DENIED.

SO ORDERED.

/s/ JOANNA SEYBERT_____
Joanna Seybert, U.S.D.J.

Dated:      March   23  , 2011
            Central Islip, New York