

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

NB:JMM

*United States Attorney's Office*
*610 Federal Plaza*
*Central Islip, New York 11722-4454*

March 14, 2012

The Honorable Joanna Seybert
United States District Court
Eastern District of New York
1034 Federal Plaza
Central Islip, New York 11722

    Re:  United States v. Christian Tarantino
           Criminal Docket No. 08-655(JS)

Dear Judge Seybert:

      The government submits this post-hearing brief in opposition to the defendant's motion to exclude that piece of evidence that has been previously termed the Gargiulo tape. The government incorporates by reference all previous arguments and authority cited in support of the Court's previous authenticity finding, and the Gargiulo tape's continued admission. This letter supplements those prior submissions by responding to the defendant's March 7, 2012 letter brief arguing in favor of exclusion.

**I.    The Defendant Has Failed To Establish Any Factual Basis Which Would Necessitate the Gargiulo Tape's Exclusion.**

      Since the so-called "over-recording" was discovered on the Gargiulo tape in late December 2011, the defendant has moved to exclude it on the claim that "there was an 'overrecord/discontinuity' in the designated area tape [sic] when [FBI audio analyst] Kenneth Marr did his analysis" in May 2005. (Doc. No. 327). From that central allegation, defense counsel for Tarantino has implied or alleged that the existence of the over-recording necessitates a finding not only of a lack of authenticity, but also that it had been "missed" by virtue of Marr's purported incompetence or as the result of a government cover-up or conspiracy. The defendant has avoided the obvious improbability that the government would intentionally damage its own evidence. Similarly, the defendant has never explained why, even conceding the existence of the 18-second over-recording, this Court's prior rulings on authenticity and admissibility should be reversed except to maintain, regardless of facts to the

contrary, that the over-recording had always existed and therefore the Court's prior rulings were premised on incorrect or concealed evidence. After nearly three days of testimony at the evidentiary hearing conducted between February 27 and 29, 2012, the defense utterly failed to present any evidence to support the claim that the over-recording had "always" existed, and that the Gargiulo tape should be excluded. Accordingly, the motion to exclude should be denied.

At the hearing, Marr testified that upon listening to the over-recording in or about January 2012, he concluded that the voice at approximately 1 hour, 29 minutes and 22 seconds from the beginning of the tape, see Government's Exhibit ("GX") 1, sounded like his voice. T. 47. Marr had no recollection as to when or how his voice could have been placed on the recording. T. 47-50. At best, Marr noted that during preparation for the Mastrangelo hearing conducted before this Court in February 2011, problems with a play-back machine occurred and that it was possible that the tape had been inserted into a smaller hand-held device that would have been capable of recording onto the tape notwithstanding the removal of so-called "safety-tabs." Id. (See also David Snyder regarding safety tabs. T. 402-403). Marr also testified, after listening to a digital copy of the Gargiulo tape he made from the original in January 2011, prior to his preparation for testimony, that the over-recording did not exist on the tape at that time. T. 141; GX 3.

Although much time was spent by the defense establishing what the government long ago conceded, namely that the Gargiulo tape presently has an approximate 18-second over-recording, neither defense witnesses Owen or Dotti could say when the over-recording occurred or if it was there when the tape was examined by Marr in 2005. T. 280, 337. Put another way, the defendant's two audio expert witnesses did not support defense counsel's written and oral claims that the over-recording existed at the time of Marr's forensic analysis. Most significantly, Tarantino's very first audio expert, Paul Ginsberg, testified that he digitally recorded the Gargiulo tape from the original on July 7, 2009, in the presence of prior counsel, Mr. David Ruhnke, Esq. T. 347-48. He then identified the CDs containing these duplicates, which had previously been sent to the Court, and which were admitted as GX 7A, 7B and 7C. T. 360, 362-63. None of those copies of the Gargiulo tape, as it sounded in July 2009, contains the over-recording.

Marr's willingness to admit that the male voice on the over-recording appeared to be his does not support the defendant's premise that the over-recording existed "when Kenneth

Marr did his analysis."  At best, the testimony supports the inference that the over-recording, on a relatively insignificant portion of a much longer conversation, may have been inadvertently caused by Mr. Marr, at the earliest, in or about January 2011.[1]  Not only does it follow that Marr did not "miss" the over-recording during his 2005 forensic analysis, the sum of the testimony adduced at the hearing falsified the defense claim that the over-recording had always existed and that therefore Marr was incompetent in his forensic analysis, or untruthful in his testimony at the Mastrangelo hearing and trial in 2011.  Accordingly, the motion to exclude should be denied.

**II.   The Government Has Met Its Burden Regarding Authenticity Notwithstanding Discovery of the Over-Recording.**

Federal Rule of Evidence Rule 901(a) requires the proponent of any evidence to submit "evidence sufficient to support a finding that the matter in question is what its proponent claims."  This requirement is satisfied "if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification."  5 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 901(a) [01], at 901-17 (1990).

As the defense contends, the Second Circuit has adopted a "clear and convincing" standard for authenticity of recorded evidence such as audio tapes "[r]ecognizing . . . that 'recorded evidence is likely to have a strong impression upon a jury and is susceptible to alteration.'"  United States v. Ruggiero, 928 F.2d 1289, 1303 (2d Cir. 1991) (quoting United States v. Fuentes, 563 F.2d 527, 532 (2d Cir. 1977)).

However, the defense's reliance on Fuentes and an earlier district court opinion, United States v. McKeever, 169 F.Supp. 426 (S.D.N.Y. 1958), rev'd on other grounds, 271 F.2d 669 (2d Cir. 1959), is misplaced.  As the Court noted in Fuentes:

> [T]his Circuit has never expressly adopted a rigid standard for determining the

---

[1] The government again does not concede it caused the over-recording, only that even if one assumes that government personnel may have caused the damage it does not support the motion to exclude.  To be sure, the testimony from defense expert, Tom Owen, was replete with inconsistencies, evasions and omissions, not the least of which being that he too used a hand-held recording device during his inspection on March 3, 2011. similar to the one that Marr described.

>admissibility of tape recordings. In
>McKeever, we cited with approval [the
>district court's] approach to the
>admissibility of the tape recordings on those
>facts, and we continue to regard the
>"elements" listed in [the McKeever] opinion
>as a valuable formulation of the factors a
>trial judge should consider in making an
>initial determination whether a sufficient
>foundation for the admissibility of the tape
>recordings has been established. However,
>the varying circumstances of particular cases
>in which one or another aspect of this
>problem may present itself militate against
>our adoption of inflexible criteria
>applicable to all cases.

Fuentes, 563 F.2d at 532.

A district court's rulings with respect to sufficiency of evidence of authenticity are reviewed under an abuse of discretion standard. United States v. Sovie, 122 F.3d 122, 127 (2d Cir. 1997); United States v. Morrison, 153 F.3d 34, 56 (2d Cir. 1998).

Morrison is especially instructive with respect to the pending claims regarding authenticity. There, the defendant moved to exclude a recording made by a non-law enforcement party, the investment concern Smith Barney, and "claim[ed] the tapes were edited or altered," on the basis of expert testimony "that there were anomalies, edits, and pauses on three of the tapes." Id. In affirming the district court's rejection of the motion to exclude, the Morrison Court continued:

>The Government rebutted with an expert who
>testified that nothing on the tapes indicated
>tampering. The contents of the conversations
>on the challenged tapes are coherent and flow
>logically, making it improbable that any
>material was deleted or added. We find that
>the Government presented sufficient evidence
>to support the authenticity of the tapes and
>that the district court committed no abuse of
>discretion by admitting them.

Id.

Marr has previously testified at the Mastrangelo

hearing and at trial that among other factors supporting his conclusion that the Gargiulo tape is genuine is that the conversation on the tape is coherent and flows logically. Trial transcript at 1682, 1685-1687. During the recent evidentiary hearing, Mr. Marr testified that notwithstanding the discovery of the 18-second over-recording, his opinion remains that the tape is authentic. T. 147.

Further supporting this conclusion was the testimony of fellow-FBI forensic examiner David Snyder. Snyder prepared a side-by-side comparison of different key portions of audio from the Gargiulo tape as it sounded in 2005, when analyzed by Marr, and after the discovery of the over-recording when the original was re-recorded by the FBI. T. 339-372; GX 6. Snyder then prepared comparative waveform analysis charts of the two duplicates, synchronized to selected portions of audio and the transcript of the tape. GX 1. In each instance, both the audio and waveform signature of these audio segments were identical, with only the conceded over-recording at approximately 1 hour and 29 minutes being different. T. 378-385.

Having failed to establish the factual premise of his motion to exclude, or to rebut the government's prior evidence of authenticity, Tarantino now seems to try to add a new theory for exclusion, namely, the existence of gaps in the chain of custody regarding the Gargiulo tape. This ground for exclusion must also fail. First, the factual issues of authenticity was previously and fully litigated through a combination of stipulations by the defendant and live testimony under cross examination. As such, the defendant should be precluded from re-litigating or re-arguing chain of custody issues because this issue is now law of the case. See Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816 (1988) (citing Arizona v. California, 460 U.S. 605, 618 (1983), and 1B James Wm. Moore et al., Moore's Federal Practice ¶ 0.404[1], p. 118 (1984)). In the absence of cogent and compelling reasons to revisit disputed facts, this Court is not precluded from adhering to its prior determinations as to those disputed facts. See United States v. Quintieri, 306 F.3d 1217, 1225 (2d Cir. 2002); see also United States v. Tenzer, 213 F.3d 34, 39 (2d Cir. 2000) (identifying reasons to revisit prior factual determinations as including "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice").

Beyond law-of-the-case, a claim that chain of custody concerns requires exclusion is also substantively and legally wrong. First, as a matter of law, the Court of Appeals, as stated in Morrison, has clearly rejected defects in chain of

custody as grounds for exclusion. "Breaks in the chain of custody do not bear upon the admissibility of evidence, only the weight of the evidence, and therefore do not provide us any basis for reversal. Id. (citing United States v. Ruggiero, 928 F.2d 1289, 1304 (2d Cir. 1991).

During the first trial, the defendant stipulated to the testimony of certain parties who handled the tape upon its receipt by law enforcement. Through counsel at the time, Tarantino stipulated to the anticipated chain of custody testimony of representatives of Carroll Audio, who made the first digital copy of the Gargiulo tape in April 2004 at the request of Special Agent Schelhorn, and who then returned the tape to the FBI, which maintained its custody until trial—the only exceptions being those dates when the tape was provided to defense experts Paul Ginssberg, Tom Owen and most recently, Norman Dotti. It was Carroll Audio's digital copy of the tape that was admitted and played for the jury at trial. Trial transcript at 3175; GX TDC-1.

Other chain of custody witnesses, including Detective Valentine Troll and Lieutenant James West of the NYPD, however, did testify at trial, and were cross-examined about their handling of the tape upon its receipt and their transferring custody to Agent Schelhorn. T. 415 (see also Trial Transcript at 1548-1550, 1558, 1563, 1574 and 1578). As for the tape's whereabouts prior to Mr. Gargiulo's murder, and its mailing to the NYPD, the government previously offered extensive evidence about the approximate date and location of the making of the tape, the identity of the speakers, and contemporaneous statements by Gargiulo prior to his death about his informing Tarantino, among others, of the existence of the recording.

Specifically, Detective Anthony Zacarese of the Nassau County Police Department and FBI Special Agent Schelhorn testified about certain references that Tarantino is heard making on the tape that comport exactly with statements and events occurring during their July 2000 collection of DNA from Tarantino. Gargiulo's life-long friend, and his brother William, both of whom knew the defendant since childhood, testified that they recognized the voices on the tape as those of Tarantino and Gargiulo. It must also be noted that the defendant names himself at one point during the tape. Tarantino also identified his attorney at the time of the taking of DNA as Melvyn K. Roth, Esq., a fact that would have been known to very few outside of the defendant himself, the government which served the subpoena seeking DNA exemplars upon Mr. Roth, and perhaps Nassau County District Attorney personnel whose prosecution of Tarantino led to

his incarceration at the time of the DNA collection. Defendant's implicit claims about a government conspiracy to fabricate the Gargiulo tape is absurd fiction, not evidence.

Gerrato also testified about his discussions with Gargiulo before his death in which Gargiulo told Gerrato of his making of the tape. Gerrato further testified that in or about late 2002, he encountered the defendant at a local pet store, at which time Tarantino stated that he was aware that Gargiulo was trying to "dry-rat" him regarding some criminal conduct. This was consistent with Gargiulo's statements to Agent Schelhorn in May 2003, when he stated that Tarantino, and others, knew of the existence of the tape and his plan to turn over the tape to the FBI if Tarantino and others did not compensate him for losses attributable to the Body-Sculpt gym that they had jointly owned.

In sum, the government previously established by clear and convincing evidence that the Gargiulo tape is what the government purports it to be, namely a recording of the defendant, the existence of which motivated Tarantino to kill Mr. Gargiulo in August 2003. For the foregoing reasons, the motion to exclude should be denied, and the Gargiulo tape should remain in evidence.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney

By: /s/
James M. Miskiewicz
Sean C. Flynn
Assistant U.S. Attorneys

cc: Defense counsel of record