

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

JMM:SCF
F.#2003R02020

*United States Attorney's Office*
*610 Federal Plaza*
*Central Islip, New York 11722-4454*

April 9, 2012

**By Hand and ECF**

The Honorable Joanna Seybert
United States District Judge
United States District Court
Eastern District of New York
1034 Federal Plaza
Central Islip, New York 11722

        Re:  United States v. Christian Tarantino
             Criminal Docket No. 08-655 (JS)

Dear Judge Seybert:

        The government respectfully submits this letter in
connection with the upcoming trial in this matter, which is
scheduled to begin on April 23, 2012 (hereinafter "Tarantino
II").  By way of this filing, the government renews and
supplements its prior notices to offer at trial evidence during
its case-in-chief of other crimes and acts involving the
defendant Christian Tarantino (hereinafter "defendant" or
"Tarantino").  As set forth more fully below, the Court should
find that the below-detailed evidence is admissible as directly
relevant to, and inextricably intertwined with, the murder of
Vincent Gargiulo, or alternatively, admissible pursuant to Rule
404(b) of the Federal Rules of Evidence.

**I.    This Court's March 23, 2011 Order Permitting the Government
       to Offer Evidence of Certain of the Defendant's Other Crimes
       and Bad Acts is the Law of the Case, and its Rulings Will Be
       Equally Applicable During the Coming Trial.**

        The majority of the evidence concerning the defendant's
other crimes and bad acts that the government will seek to
introduce at trial has already been ruled admissible by this
Court in its March 23, 2011 Memorandum and Order, which was
issued prior to the start of the previous trial that resulted in
the defendant's conviction on Counts One and Two of the
Indictment in this case (hereinafter "Tarantino I").  See
Memorandum and Order, United States v. Tarantino, 08 CR 655 (JS)

(E.D.N.Y. Mar. 23, 2011) (Docket entry No. 197) (hereinafter "Mar. 23, 2011 Order").

Indeed, by way of its Mar. 23, 2011 Order, the Court has ruled as admissible evidence that: (1) in 1989, Tarantino trafficked in stolen fur coats with Vincent Gargiulo and others and was convicted in District of New Jersey in 1991 in connection with that crime; (2) in December 1993, Tarantino, Scott Mulligan and others participated in a theft of over 200 leather and fur coats from a Filene's Basement department store on Long Island, and subsequently attempted to sell the stolen fur coats in interstate commerce through Louis Dorval; (3) in or about 1993 and 1994, Tarantino was involved with Scott Mulligan, Louis Dorval and others in a number of robberies, including jewelry stores, fur coats and automobiles, and narcotics trafficking; (4) in July 2000, the defendant was serving a prison sentence, during which time he provided a buccal swab to federal agents in connection with the federal investigation of the Baumgardt and Dorval murders, and from which he was released from custody on or about August 20, 2000; and (5) in or about mid-1999 through early 2000, Tarantino aided and abetted an associate, John Goetz, in the distribution of the date-rape drug GHB, for which Goetz and Goetz's then-girlfriend, Claudine Dematos, were prosecuted before this Court, beginning in April 2000, in <u>United States v. Ansaldi et al.</u>, 00 CR 891 (S-2) (JS).[1] <u>See</u> <u>generally</u> Mar. 23, 2011 Order.

These matters, which are discussed in the government's previous motions, remain relevant to the Gargiulo murder, as charged in Counts Three and Four of the pending Indictment. Evidence of Tarantino's 1989 trafficking in stolen furs establishes Tarantino's relationship with Gargiulo, and explains Tarantino's willingness to admit his involvement in the Baumgardt and Dorval murders to his friend and former criminal associate, as captured on Gargiulo's surreptitiously-made recording of the two men's conversation in or about September 2000. <u>See</u> Mar. 23, 2011 Order, at 7-9. Likewise, the defendant's participation in the Filene's Basement and other burglaries with Scott Mulligan, Gaetano Fatato, Dorval and others in 1993 and 1994, is admissible as evidence of the longstanding criminal relationship among the men. <u>See</u> Mar. 23, 2011 Order, at 9-16. Indeed, Scott Mulligan

---

[1] The government's arguments concerning the admissibility of evidence regarding each of these other crimes and bad acts is set out in its November 29, 2010 and December 15, 2011 motions filed with the Court. To the extent relevant, the government incorporates by reference the legal arguments raised in those submissions.

will testify at length during the pending trial about his two-decade-long criminal association with the defendant, which included their mutual involvement in the murders of Baumgardt and Dorval.

The fact of the defendant's incarceration in 2000 at the Willard Drug Treatment Campus, in Willard, New York, is also directly relevant and admissible during the coming trial. See Mar. 23, 2011 Order, at 16-17. The FBI's buccal swab collection from Tarantino while he was housed in that facility is discussed at length by the defendant on the Gargiulo recording, and is inextricably intertwined with the evidence of his obstruction of justice murder of Gargiulo because it establishes Tarantino's identity as one of the speaker's on the audio tape. Similarly, evidence of the defendant's involvement with John Goetz in the distribution of GHB from the mid-1990's through 2000 is also admissible because it is inextricably intertwined with the evidence of the charged offenses. Like the fact of the defendant's incarceration at the prison in Willard, Tarantino's involvement with Goetz and with selling GHB are among the many admissions that establish the defendant's identity as one of the parties speaking on the Gargiulo recording, for which Gargiulo was later murdered.

The government renews this notice solely for the convenience of the Court and opposing counsel, and to avoid delay during the pending re-trial. However, in renewing this notice, the government submits that the Court's prior admission of the items summarized above constitutes the law of this case and is not subject to re-litigation by the defendant. United States v. Plugh, 648 F.3d 118, 123 (2d Cir. 2011) (Absent "compelling reasons" to hold otherwise, "[a] Court will adhere to its own decision at an earlier stage of the litigation."). The Supreme Court has defined law of the case as a precept that "'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.' This rule of practice promotes the finality and efficiency of the judicial process by 'protecting against the agitation of settled issues.'" Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816 (1988) (citing Arizona v. California, 460 U.S. 605, 618 (1983), and 1B James Wm. Moore et al., Moore's Federal Practice ¶ 0.404[1], p. 118 (1984)).

In the absence of cogent and compelling reasons to revisit disputed issues, this Court is not precluded from adhering to its prior legal determinations as to those issues. See United States v. Quintieri, 306 F.3d 1217, 1225 (2d Cir. 2002). The exceptions to the law of the case doctrine are limited to an intervening change of controlling law, the

availability of new evidence, or the need to correct a clear error or to prevent a manifest injustice." Id; see also Wojchowski v. Daines, 498 F.3d 99, 106 (2d Cir. 2007).  None of these exceptions are applicable here.

## II.  Evidence of Additional Crimes and Bad Acts Involving the Defendant, Which Will Be Elicited from Government Witnesses Scott Mulligan, Craig Miller and Gregory Morgan is Properly Admissible During Tarantino II.

Because the Court is intimately familiar with the evidence of the defendant's participation in the murders of Julius Baumgardt, Louis Dorval and Vincent Gargiulo, having presided over a six-week trial and over three years of litigation in this case, the government will forego including an exhaustive recitation of background facts.  Since the defendant was found guilty by a jury of participating in the murders of Julius Baumgardt and Louis Dorval in Tarantino I, however, the government's investigation of the defendant and others has continued.  On December 23, 2011, the government arrested, Scott Mulligan (hereinafter "Mulligan"), the defendant's longtime friend and criminal associate.  Mulligan subsequently pled guilty on January 3, 2012 pursuant to a cooperation agreement with the government to participating in the June 23, 1994 murder of Julius Baumgardt, in violation of 18 U.S.C. §§ 33, 34 and 2.

Information provided by Mulligan has also led the government to other individuals with knowledge of the defendant's criminal undertakings, including Gregory Morgan (hereinafter "Morgan") and Craig Miller (hereinafter "Miller").  Morgan was arrested by the government on February 1, 2012, and charged with providing materially false statements to the Federal Bureau of Investigation, in violation of 18 U.S.C. § 1001(a)(2).  Morgan subsequently pled guilty to that charge on March 28, 2012, pursuant to a cooperation agreement with the government.

All three men will testify at trial.  The vast majority of the evidence to be elicited from these individuals – to include evidence of the defendant's other crimes and bad acts – is directly relevant to the charged offenses and properly admissible pursuant to Federal Rule of Evidence 401, because it either constitutes necessary background and completes the story of the crimes on trial; establishes Tarantino's relationships with co-conspirators; evidences Tarantino's consciousness of guilt; or provides certain specific facts that tend to establish Tarantino's guilt of the charged crimes.  Other evidence of the defendant's prior crimes and acts, as discussed below, are equally and properly admissible because it establishes

Tarantino's identity as one of the speakers on the Gargiulo recording; and Tarantino's motivation for killing Gargiulo.

**A.   Applicable Law**

**1.   Direct Evidence**

It is well established that evidence of uncharged criminal activity or bad acts is admissible independent of Federal Rule of Evidence 404(b) where it constitutes direct evidence of the crimes charged in the indictment.  See, e.g., United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000); United States v. Thai, 29 F.3d 785, 812 (2d Cir. 1994); United States v. Towne, 870 F.2d 880, 886 (2d Cir. 1989).  In Towne, the Second Circuit specifically identified three categories of uncharged criminal activity that constitute direct evidence of the charged offense.  870 F.2d at 886.  The Court stated:

> [e]vidence of uncharged criminal activity is not considered 'other crimes' evidence under Fed. R. Ev. 404(b) if it 'arose out of the same transaction or series of transactions as the charged offense, if it [is] inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime [on] trial.'

Id. (quoting United States v. Weeks, 716 F.2d 830, 832 (11th Cir. 1983)).  See also United States v. Senffner, 280 F.3d 755, 764 (7th Cir. 2002) ("[a]cts satisfy the inextricably intertwined doctrine if they complete the story of the crime on trial; their absence would create a chronological or conceptual void in the story of the crime; or they are so blended or connected that they incidentally involve, explain the circumstances surrounding, or tend to prove any element of, the charged crime"); United States v. Cooper, 482 F.3d 658, 663 (4th Cir. 2007).

Moreover, the Second Circuit has held that a district court may admit evidence that does not directly establish an element of the crime in order to provide background for the events alleged in the indictment.  See, e.g., United States v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994) ("[E]vidence of other bad acts may be admitted to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense."); United States v. Coonan, 938 F.2d 1553, 1561 (2d Cir. 1991) ("Background evidence may be admitted . . . to show the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed.").  In Coonan, the

Second Circuit further reasoned that because the witnesses participated in the criminal acts about which they testified, it was appropriate for the government to elicit on direct examination details damaging to the witnesses' credibility.  <u>See</u> <u>id</u>.  As the court explained, in this way, the government was able to avoid the appearance that it was concealing impeachment evidence from the jury.  <u>See id</u>.

### 2.   Federal Rule of Evidence 404(b)

Federal Rule of Evidence 404(b) provides in pertinent part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

<u>See</u> Fed. R. Evid. 404(b).  In order for evidence of "other crimes, wrongs, or acts" to be admissible, (1) it must be offered for a proper purpose, (2) it must be relevant to a disputed issue and (3) its probative value must not be substantially outweighed by the danger of unfair prejudice to the defendant.  <u>See</u> <u>United States v. McCallum</u>, 584 F.3d 471, 475 (2d. Cir 2009) (citing <u>Huddleston v. United States</u>, 485 U.S. 681, 691-92 (1988)).  In addition, at the defendant's request, the district court should give the jury an appropriate limiting instruction.  <u>Id</u>.

The Court has broad discretion to admit "other act" evidence pursuant to Rule 404(b)[2] and should follow the "inclusionary" approach to "other act" evidence, which has been adopted by the Second Circuit.  <u>United States v. Pascarella</u>, 84 F.3d 61, 69 (2d Cir. 1996); <u>United States v. Harris</u>, 733 F.2d 994, 1006 (2d Cir. 1984).  Thus, evidence of a defendant's uncharged bad acts is admissible under Rule 404(b), subject to the limitations of Rule 403, if that evidence is offered for "any purpose other than to show a defendant's criminal propensity."  <u>United States v. Rouhani</u>, 47 F.3d 539, 544 (2d Cir. 1995); <u>see</u>

---

[2]   A Rule 404(b) ruling will be affirmed on appeal unless the ruling constitutes an abuse of discretion.  <u>See</u> <u>Inserra</u>, 34 F.3d at 89.  "To find abuse, the appellate court must conclude that the district court acted arbitrarily and irrationally."  <u>United States v. Pitre</u>, 960 F.2d 1112, 1119 (2d Cir. 1992).

Inserra, 34 F.3d at 89 (under Rule 404(b), evidence offered for proper purpose should be admitted unless unfairly prejudicial).

Thus the Second Circuit has approved of admitted evidence of other crimes to prove, for example, (1) a defendant's intent to commit or motivation for a proscribed act, United States v. Brand, 467 F.3d 179, 197 (2d Cir. 2006) (evidence that the defendant possessed child pornography admissible as proof that he intended to engage in illicit sexual contact with a minor); United States v. Laflam, 369 F.3d 153, 156-57 (2d Cir. 2004) (evidence that the defendant was a drug user admissible as proof of motive to commit the charged bank robbery); (2) a defendant's capacity to commit the charged crime, see United States v. Zedner, 401 U.S. Dist. 36, 49-50 (2d Cir. 2005) (evidence of prior fraud admissible as proof of the defendant's "financial sophistication [and] his ability to execute complex schemes"), rev'd on other grounds 126 S. Ct. 1976 (2006); (3) the defendant's consciousness of guilt, see, e.g., United States v. Mickens, 926 F.2d 1323, 1328-29 (2d Cir. 1991); United States v. James, 2007 U.S. Dist. LEXIS 39585, at *2-*5 (E.D.N.Y. May 31, 2007); (4) background evidence helpful to the jury's understanding of the complete story of the charged crimes, see United States v. Skowronski, 968 F.2d 242, 246 (2d Cir. 1992); United States v. LaSanta, 978 F.2d 1300, 1307 (2d Cir. 1992) (testimony from government witness concerning his involvement in drug transactions several years prior to commencement of charged conspiracy); United States v. Brennan, 798 F.2d 581, 590 (2d Cir. 1986); and (5) the origin, nature and extent of the relationship among co-conspirators, see, e.g., United States v. Rosa, 11 F.3d 315, 334 (2d Cir. 1993) (evidence of prior crimes admissible "to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators"); Pitre, 960 F.2d at 1119 (evidence of prior crimes admissible to "help explain to the jury how the illegal relationship between participants in a crime developed"); United States v. Roldan-Zapata, 916 F.2d 795, 804 (2d Cir. 1990); Brennan, 798 F.2d at 590 (evidence of prior crimes admissible to show "how the illegal relationship between [the defendant and an accomplice witness] developed"); United States v. Kalaydjian, 784 F.2d 53, 56 n.3 (2d Cir. 1986).

In general, "the government is required to establish only a similarity or some connection to establish that a prior act is relevant to one of the elements . . . of the crime charged." Brand, 467 F.3d at 197; United States v. Paulino, 445 F.3d 211, 223 (2d Cir. 2006).  Moreover, evidence admissible pursuant to Rule 404(b) should not be excluded on grounds of unfair prejudice where the evidence does not "involve conduct more inflammatory than the charged crime[s]." Id; United States

v. Williams, 205 F.3d 23, 33-34 (2d Cir. 2000) (Rule 403 analysis favors admission where uncharged crimes "did not involve conduct more serious than the charged crime and the district court gave a proper limiting instruction").  Moreover, where evidence of the uncharged crimes comes from one of the witnesses who will testify about the more serious charged crimes, there is little danger that prejudice will result.  See United States v. Mejia-Velez, 855 F. Supp. 607, 611 (E.D.N.Y. 1994) ("If the jury found these witnesses to be credible, the defendant[s] would be convicted even if the accomplices were not permitted to testify about [the uncharged crimes].").

## III. Argument

**A.  Evidence of Tarantino's Participation in the June 23, 1994 Armored Car Robbery and Murder of Julius Baumgardt, and in the Subsequent Obstruction of Justice Murder of Louis Dorval is Relevant and Admissible During Tarantino II.**

During the pending trial, the government will call an assortment of witnesses who will provide evidence concerning the defendant's participation in the June 23, 1994 armored car robbery and murder of Julius Baumgardt, and the subsequent obstruction of justice murder of Louis Dorval.  Although Tarantino has already been convicted of participating in these crimes, evidence of the defendant's involvement in the prior murders is admissible and relevant to Tarantino's motive for later killing his longtime friend, Vincent Gargiulo.

As an initial matter, Tarantino's commission of the Baumgardt and Dorval murders relates directly to a legal element of 18 U.S.C. § 1512(a)(1), the statutory section that will be at issue in Tarantino II.[3]  Indeed, multiple courts have recognized

---

[3]    Title 18, United States Code, section 1512 provides, in pertinent part:

(a)(1) Whoever kills or attempts to kill another person, with intent to –

(A) prevent the attendance or testimony of any person in an official proceeding;

(B) prevent the production of a record, document, or other object, in an official proceeding; or

that a defendant's "motive" for obstructing justice, whether
through acts of murder or otherwise, is an affirmative legal
element of the crime.  See, e.g., United States v. Guadalupe, 402
F.3d 409, 412 (3d Cir. 2005); United States v. Rodriguez-Marrero,
390 F.3d 1, 13 (1st Cir. 2004) ("to establish a crime under [18
U.S.C. § 1512(a)(1)], the government must prove that . . . the
defendant was motivated by a desire to prevent the communication
between any person and law enforcement authorities concerning the
commission or possible commission of an offense . . . .").

        Here, in order to satisfy the elements of § 1512, the
government will be required to prove at trial that Tarantino's
murder of Gargiulo was motivated by a desire to prevent Gargiulo
from communicating to law enforcement information concerning
Tarantino's role in the Baumgardt and Dorval murders – federal
offenses for which the defendant has already been found guilty.
Consequently, under the "intrinsic evidence" doctrine recognized
by the Second Circuit, evidence of Tarantino's commission of the
prior murders is "inextricably intertwined" with the Gargiulo
homicide.  At the very least, Tarantino's guilt for the Baumgardt
and Dorval murders provides necessary "background" for the events
alleged in the indictment, the omission of which would leave a
chronological and conceptual void in the government's case.  In
that vein, proof of Tarantino's participation in, and ultimate
guilt for, the prior murders is admissible as direct evidence
during Tarantino II.

        Even if proof of Tarantino's guilt for the Baumgardt
and Dorval murders was deemed not inextricably intertwined with
the subsequent Gargiulo homicide, such evidence it still
admissible under Rule 404(b) as it provides clear "motive" for
Gargiulo's killing.  See, e.g., Laflam, 369 F.3d at 156-57
(evidence that the defendant was a drug user admissible as proof
of motive to commit the charged bank robbery).  Courts are nearly
unanimous in holding that when an individual is "charged with
obstruction of justice with respect to a given crime, evidence of
the underlying crime and the defendant's part in it is admissible
to show the motive for his efforts to interfere with the judicial
processes." United States v. Willoughby, 860 F.2d 15, 24 (2d

_____

                (C) prevent the communication by any person
                to a law enforcement officer or judge of the
                United States of information relating to the
                commission or possible commission of a
                Federal offense or a violation of conditions
                of probation, parole, or release pending
                judicial proceedings;

        shall be punished as provided in paragraph (3).

Cir. 1988).  See also United States v. Buffalino, 683 F.2d 639, 647 (2d Cir. 1982) (tape of extortion attempt admitted in prosecution stemming from attempt to kill person to whom threat was made); United States v. Knohl, 379 F.2d 427, 438-39 (2d Cir. 1967) (finding that evidence of other wrongful acts was relevant to establish knowledge and motive to tamper with witness); United States v. Portalla, 985 F.2d 621, 625 (1st Cir. 1993) (evidence of prior crimes admissible to prove defendant's motive for committing current assault and to show why victim refused to testify against him); United States v. Higgs, 353 F.3d 281, 312 (4th Cir. 2003) (defendant's unrelated bank fraud scheme and death threats to deter his partners from "snitching" on him were admissible in murder trial to show defendant's motive and intent to murder victim to keep her from implicating him in criminal activities); United States v. Benton, 637 F.2d 1052, 1056 (5th Cir. 1981) (evidence of Florida homicides introduced to show that defendant had reason for killing victim who might implicate him); United States v. Clark, 988 F.2d 1459, 1465 (6th Cir. 1993) (defendant's threats and plans to harm other witness were admissible to establish motive and intent to murder, in prosecution for murder of person defendant wanted to silence); United States v. Bowman, 720 F.2d 1103, 1104-05 (9th Cir. 1983) (defendant's prior conviction for assault of wife's relative held admissible to show motive of revenge in assault against wife, where defendant claimed self defense); United States v. Wilson, 160 F.3d 732, 745-46 (D.C. Cir. 1998) (recorded conversation between defendant's brother and government informant, whose murder resulted in instant prosecution, was relevant to show motive and was admissible, since court instructed jury to consider tape only for limited purpose of deciding motive).

It has long been the law in the Second Circuit that during a criminal trial involving allegations of obstruction of justice, the government is entitled to present detailed evidence concerning the defendant's underlying crimes so "that a jury may assess the intensity of [the defendant's] motive [to obstruct justice]."  United States v. Bradwell, 388 F.2d 619, 621 (2d Cir. 1968).  Moreover, such evidence should necessarily include "the nature of the [defendant's underlying] offense[s] . . . and the extent of the defendant's involvement" in those offenses.  Id (emphasis added).  Indeed, as this Court previously stated in its December 8, 2011 Memorandum and Order: "[t]here is no serious dispute that evidence of Tarantino's guilt on Counts One and Two is relevant to whether he killed Gargiulo with intent to prevent him from communicating with the FBI about the Baumgardt and Dorval murders."  Memorandum and Order, United States v. Tarantino, 08 CR 655 (JS) (E.D.N.Y. Dec. 8, 2011) (hereinafter, "Dec. 8, 2011 Order").

Some of the government's evidence concerning the defendant's participation in the Baumgardt and Dorval murders will come from Scott Mulligan, Craig Miller and Gregory Morgan. Mulligan, who has known and remained close to the defendant since the two were in high school, will testify at length concerning his mutual participation with the defendant and others in the Baumgardt and Dorval murders. Mulligan will provide the jury with the details of how he, the defendant, Louis Dorval and a fourth individual planned, carried out and attempted to evade prosecution for the Baumgardt murder between February and August 1994. The genesis of the armed robbery that resulted in Julius Baumgardt's death was a mutual acquaintance of both Mulligan and Tarantino – Gregory Morgan. For his part, Morgan will testify, among other matters, that he provided a "tip" to Mulligan in early 1994 concerning the delivery route and drop locations of an armored car service that frequented an office building, where Morgan had previously worked, located at 6851 Jericho Turnpike in Syosset, New York. Morgan will testify further that he provided this information to Mulligan knowing that he and Tarantino would attempt to steal money from the armored car, and expecting that he (Morgan) would be paid for the information he provided.

Mulligan will also recount, in detail, how he was involved with the defendant in planning the obstruction of justice murder of Louis Dorval. Although Mulligan was not present when Dorval was actually killed, he did assist the defendant in disposing of Dorval's body and heard the defendant admit his role in killing Dorval the day before the body was dumped.

Both Mulligan and Craig Miller will testify, among other matters, that on a day in August 1994, the defendant and Mulligan convinced Miller, who in 1994 was an acquaintance of theirs, to allow them to use a boat owned by Miller's family. Miller and Mulligan will both testify that on that day, Miller drove that boat – carrying Tarantino, Mulligan and a black "Tuff-bin" toolbox brought to the boat by Tarantino – some miles off the coast of Long Island so that Mulligan and Tarantino could dispose of it in the Atlantic Ocean. Mulligan will testify that the box he and Tarantino threw into the water that day contained the corpse of Louis Dorval. Much of Mulligan, Miller and Morgan's testimony will be corroborated by independent witnesses, physical and documentary evidence and the Gargiulo recording itself.

The detailed testimony of Morgan, Mulligan, Miller and others, as it relates to the defendant's commission of the Baumgardt and Dorval murders, is admissible as evidence. Because the government will be required to prove at trial that Tarantino

killed Gargiulo to prevent him from revealing information concerning Tarantino's commission of the Baumgardt and Dorval murders, the government is entitled to present to the jury the <u>totality</u> of the facts surrounding Tarantino's participation in those prior homicides.

Furthermore, both Miller and Mulligan will testify at trial about admissions the defendant made to each of them at various times between 2002 and 2005 concerning the Gargiulo recording and Gargiulo's murder.  Evidence concerning the nature of the relationship between Mulligan, Miller and Tarantino – to include acts they committed together – is relevant and helps to explain why the defendant would have confided in both men and discussed with them the existence of the Gargiulo recording, and Gargiulo's demise.

**B.   The Defendant's Theft of the 1994 Red Chevy Blazer Used by the Defendant and Others as the Assault Vehicle During the 1994 Syosset Armored Car Robbery and Murder of Julius Baumgardt.**

On June 23, 1994, Tarantino, Scott Mulligan, Louis Dorval and a fourth individual handcuffed and disabled the driver and armed guard employed by Mid-Island Check Cashing Corporation, an armored car business engaged in interstate commerce, in violation of Title 18, United States Code, Sections 33, 34 and 2. In the course of attacking the armored car employees, Dorval shot and killed one of the guards, Julius Baumgardt, as he lay face down on the pavement.  Eyewitnesses to the robbery reported that one of the assailants carried a handgun, while a second assailant carried a pump-action shotgun.  Moments after Mr. Baumgardt was shot, Tarantino, Dorval and another individual fled from the immediate vicinity in a 1994 red Chevy Blazer SUV (the "Blazer") that had been stolen from a Chevrolet dealership in the winter of 1994.  The Blazer was one of two getaway cars used by Tarantino and his co-conspirators; it was abandoned only a few hundred yards from where Mr. Baumgardt was shot.  Among the forensic evidence retrieved from the Blazer were three human hair shafts, which, through subsequent mitochondrial DNA analysis have been linked to Tarantino, Mulligan and Dorval, respectively. Eyewitnesses identified the Blazer by its Florida license plate number as it left the scene as contemporaneously recorded in a 911 call to police.

The government intends to introduce evidence at trial that the defendant and Scott Mulligan stole the Blazer from a car dealership in Hicksville, Long Island, in January 1994, and subsequently used the vehicle during a variety of commercial burglaries they committed on Long Island between January and June

1994.  At trial, Scott Mulligan will testify that in January 1994, he and the defendant drove together to the car dealership in Hicksville where the defendant broke into the Blazer, disabled the vehicle's steering column, and stole the SUV from the dealership's outdoor parking lot.

Evidence regarding Tarantino's theft of the Blazer is admissible at trial under a variety of theories.  First and foremost, it is inextricably intertwined with the evidence of the charged offense and provides background necessary to complete the story of the crime on trial.  See Towne, 870 F.2d at 886.  See also Senffner, 280 F.3d at 764 ("[a]cts satisfy the inextricably intertwined doctrine if they complete the story of the crime on trial; their absence would create a chronological or conceptual void in the story of the crime; or they are so blended or connected that they incidentally involve, explain the circumstances surrounding, or tend to prove any element of, the charged crime").  Tarantino and Mulligan's theft of the Blazer also helps to explain the criminal nature of the relationship between the two men.  See, e.g., Pitre, 960 F.2d at 1119 (evidence of prior crimes admissible to "help explain to the jury how the illegal relationship between participants in a crime developed").

Furthermore, Mulligan's testimony concerning he and Tarantino's theft of the Blazer establishes Tarantino's identity as one of the speakers on the Gargiulo recording.  Indeed, in the recording made by Gargiulo, Tarantino admits that one of the cars used during the armored car robbery was stolen:

> CT:  I had the car [UI] -- the other half of the car. The car we drove up in, the car that we pulled up in.  We changed tails over here, and we went to a different car and took off, so the [UI] car -- the car we pulled up in –
>
> VG:  Right.
>
> CT:  – they have it.
>
> VG:  And -- and, then what, you didn't have a hat on? What kind of DNA is it, hair?
>
> *     *     *
>
> VG:  So you think they have evidence?
>
> CT:  So listen.  So we used the car all winter.  And for the most part I did.

VG:   Oh, shit. There's no way ya fucked up.

CT:   Definitely, I know.  That's what I said.  I go, and went to the city with Mike.

VG:   Holy shit.

CT:   So listen.  I'm like, fuck, you know.  I'm shitting bullets.  We took a vacuum to the car, you know what I mean, right?

              *    *    *

VG:   But even with just the car, [UI] explain everything [UI] fucking [UI] --

CT:   It's not enough, because who's to say -- listen, [UI] I was thinking about the other day.  I go, who's to say the car we pulled up in, did someone take our license plate down?  How do they know about this car that was found down there?  **Just 'cause it's a red stolen vehicle,** it could of been there for a month, you know, but – you know.  You know what I'm saying, like --

VG:   Right.

CT:   I go [UI] how do you know that wasn't the one we pulled up in?  Did somebody take the plate?  Did someone give a description of the plate?  Like were you there at the time when I'm saying that I was there, you know what I'm saying?

VG:   Right.

Moreover, evidence concerning Tarantino's theft of the Blazer should not be excluded under Federal Rule of Evidence 403 because its probative value substantially outweighs any prejudice to the defendant.  The uncharged criminal activity does not involve conduct that is any more "'sensational or disturbing' than the Gargiulo murder, <u>Pitre</u>, 960 F.2d at 1120, and any potential prejudice can be effectively mitigated by a cautionary instruction limiting the jury's consideration of the evidence to the purposes for which it was offered, <u>see</u> <u>Williams</u>, 205 F.3d at 34.

C.    **Tarantino's Burglary of a Jewelry Store in Plainview, New York with Mulligan and others During the Winter of 1994**

Mulligan will testify at trial that between late-1993 and the spring of 1994, he, Tarantino and others committed a string of commercial burglaries on Long Island and in Queens, New York.  In its Mar. 23, 2011 Order this Court previously ruled that evidence concerning two of these burglaries – the December 1993 burglary of a Filene's Basement in Manhasset, and the 1994 burglary of furs coats and "EEE" and bearer bonds from a furrier in Queens – are admissible as evidence.  Additionally, Mulligan will testify that he, Tarantino and others stole various pieces of jewelry from a jewelry store in Plainview, New York in the winter of 1994.  The defendant, Mulligan and others used the Blazer as their method of transportation to and from the robbery site.  Like the Filene's Basement and Queens burglaries, evidence of Tarantino and Mulligan's participation in the burglary of the Plainview jewelry store is admissible as evidence in <u>Tarantino II</u>.

The fact that Mulligan and Tarantino were co-conspirators throughout 1993 and 1994 provides necessary background evidence and is inextricably intertwined with the facts of the instant case, as it helps explain to the jury the extremely close nature of their relationship and why Tarantino would have confided in Mulligan, in 2005, certain information concerning the Gargiulo recording and Gargiulo's murder.  <u>See</u>, <u>e.g.</u>, <u>Rosa</u>, 11 F.3d at 334 (evidence of prior crimes admissible "to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators"); <u>Pitre</u>, 960 F.2d at 1119 (evidence of prior crimes admissible to "help explain to the jury how the illegal relationship between participants in a crime developed").  Therefore, the Court should admit evidence of Tarantino and Mulligan's burglaries of Filene's Basement, the Queens-based furrier and the Plainview jewelry store as background evidence to the crimes charged in the instant indictment.[3]

_____

[3]    Evidence of Mulligan and Tarantino's longstanding criminal relationship further supports the government's argument that it is in fact Tarantino speaking on the Gargiulo tape, as Tarantino mentions Mulligan by his first name, "Scott," multiple times during the conversation.  Moreover, the government should be permitted to elicit testimony of the commercial burglaries during Mulligan's direct testimony in order to avoid the appearance that the government is concealing impeachment evidence

D.    **Mulligan and Tarantino's Storage of Stolen Property, Vehicles and Weapons at Craig Miller's Family's Farmingdale Warehouse**

Craig Miller will testify at trial that in August 1994 he piloted his family's boat, carrying Mulligan and Tarantino, some miles off the coast of Long Island, and watched as Tarantino and Mulligan dumped a black "Tuff-bin" toolbox into the Atlantic Ocean from the rear of the 35-foot boat.  As the toolbox entered the water its lid was open, and Miller saw a black sneaker and a gray sock protruding from within toolbox.  Almost 10-years later, in either 2003 or 2004, Miller was approached by Tarantino at Miller's parents' home in Merrick, New York.  Tarantino asked whether Miller had ever been approached by law enforcement regarding the events of August 1994.  According to Miller, Tarantino told him that he had a "problem" with a "guy," who recorded Tarantino on a tape.  Tarantino went on to tell Miller that on that tape Tarantino had mentioned Miller's first name, "Craig," but that it was unlikely Miller's identity would ever be discovered by law enforcement because Tarantino never mentioned Miller's last name on the recording.  Miller will testify that Tarantino then handed him a business card containing the name and phone number of an attorney, and told Miller that should he ever be contacted by police, he should call the number on the card.

Miller's relationship with Tarantino and Mulligan began in 1993.  Both Mulligan and Miller will testify at trial that between 1993 and 1994, Miller permitted the defendant, Mulligan and others to utilize a warehouse that Miller's family owned in Farmingdale, New York, so that the group could store merchandise that they stole during various commercial burglaries they committed on Long Island, and in Queens, during that time frame.  In some instances, Miller assisted Tarantino and Mulligan by locating buyers for the stolen property.  Miller will testify that between 1993 and 1994 he observed Tarantino and Mulligan store in his family's warehouse, among other things, stolen fur coats, electronic equipment, sporting goods and women's clothing.  Additionally, Miller will testify that during this period of time he recalls seeing bullet proof vests, police scanners, burglary tools and firearms in the area of his family's warehouse which Tarantino, Mulligan and others frequently used.

Mulligan and Miller will both testify that it was at this warehouse that the defendant and Mulligan routinely kept the 1994 Red Chevy Blazer, which was ultimately used as the assault vehicle during the June 23, 1994 armored car robbery and murder

from the jury.  <u>See</u> <u>Coonan</u>, 938 F.2d at 1561.

of Julius Baumgardt.  Mulligan will testify further that Miller's warehouse was used as both the embarkation and rendevous point where Mulligan, Tarantino, Louis Dorval and a fourth individual met both immediately before and after committing the armored car robbery.  Further, Mulligan will testify that the defendant informed him that it was at this warehouse where the defendant and another individual executed Louis Dorval by firing a bullet into the back of his head in August 1994.

Much like the evidence the government will offer at trial concerning the commercial burglaries Tarantino committed with Mulligan and others in 1993 and 1994, evidence regarding Tarantino and Mulligan's storage of stolen property at Miller's warehouse is admissible as direct evidence, which is inextricably intertwined with the charged offenses.  See Inserra, 34 F.3d at 89 ("[E]vidence of other bad acts may be admitted to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense."); Coonan, 938 F.2d at 1561 ("Background evidence may be admitted . . . to show the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed.").

Here, Mulligan and Miller's testimony concerning the defendant's use of Miller's Farmingdale warehouse helps to explain the nature of the relationship between the three men.  The fact that Miller knowingly permitted Mulligan and Tarantino to store large amounts of stolen property at his family's warehouse, and even assisted the group in fencing some of those goods also is inextricably intertwined with the charged offenses in that it helps explain why Tarantino and Mulligan would have requested to use Miller's boat to dump Dorval's body in the Atlantic Ocean;[4] and why Tarantino would have approached Miller in 2003 or 2004 and made admissions to him about his relationship with Gargiulo and the existence of the Gargiulo recording.

Moreover, evidence concerning Tarantino and Mulligan's storage of stolen property at Miller's warehouse should not be excluded under Federal Rule of Evidence 403 because its probative value substantially outweighs any prejudice to the defendant.  The uncharged criminal activity does not involve "'sensational or disturbing' conduct, and any potential prejudice can be effectively mitigated by a cautionary instruction limiting the

_____

[4]    Both Miller and Mulligan will testify that when Miller boarded his boat with Mulligan and Tarantino in August 1994 he did not know that the "Tuff-bin" toolbox contained a dead body.

jury's consideration of the evidence to the purposes for which it was offered.

### E.   The Defendant's Statements Concerning His Intent to Kill His Brother Steven Tarantino.

On February 2, 2007, the defendant's younger brother, Steven Tarantino (hereinafter "Steven"), was convicted of Enterprise Corruption in violation of New York Penal Law § 460.20(1) and sentenced to three-to-six years in prison.   In 2007, while Steven was incarcerated for that offense, members of the U.S. Attorney's Office and the FBI visited him both at Rikers Island, and at the Clinton Correctional Facility in Dannemora, New York.

Mulligan will testify that during the fall of 2007, the defendant became aware that his brother was providing the FBI information of his involvement in all three murders.  Mulligan will testify that during this period of time he met with the defendant at a Synergy gym in Levittown, New York.  The two proceeded to walk outside into a parking lot behind the fitness center and then through a residential neighborhood in Levittown. Mulligan will testify that during their walk, the defendant stated that, through his mother, he had learned that Steven was meeting with and providing information to Special Agent Robert Schelhorn of the FBI.  The defendant told Mulligan that he was attempting to have his mother coerce Steven into remaining quiet, however, the defendant harbored doubts about whether his mother would ultimately be successful.  After engaging in a verbal tirade about how his brother was a weak individual, who could easily be made a cooperating witness by the government, the defendant then expressed to Mulligan his intentions of assassinating Steven to prevent him from cooperating against him in connection with the Baumgardt, Dorval and Gargiulo murders.

The defendant's stated intention to murder his brother specifically to silence him is admissible at the pending trial as direct and highly probative evidence of his consciousness of guilt for the Baumgardt, Dorval and Gargiulo homicides.  It is the law in this and other circuits that statements by a defendant of his intention to obstruct justice by threatening or murdering potential witnesses in a criminal investigation provides clear and admissible evidence of that defendant's consciousness of guilt for the underlying crimes.  See, e.g., United States v. Tracy, 12 F.3d 1186, 1195 (2d Cir. 1993); United States v. Cirillo, 468 F.2d 1233, 1240 (2d Cir. 1972) (defendant's statements to another individual that he wanted to "get rid" of a potential witness against him in criminal case were admissible as for the purpose of demonstrating the defendant's consciousness of

guilt); <u>United States v. James</u>, No. 02 CR 778 (SJ), 2007 WL 1579978, at *1 (E.D.N.Y. May 31, 2007) (Evidence of defendant's plot to kill witnesses against him was admissible at trial on other murder charges as evidence of his consciousness of guilt, and not unfairly prejudicial); <u>Charles v. Fischer</u>, 516 F. Supp. 2d 210, 217 (E.D.N.Y. 2007) (ADS) (finding that testimony regarding alleged threat by the defendant to kill an individual if he "ratted" about a shooting was admissible as background information, and as evidence of consciousness of guilt); <u>United States v. Brazel</u>, 102 F.3d 1120, 1153 (11th Cir. 1997) (evidence that defendant threatened a witness is relevant to consciousness of guilt); <u>United States v. Mendoza</u>, No. 05-2054, 2007 WL 1575985, at *17 (10th Cir. June 1, 2007) (same); <u>United States v. Papia</u>, 560 F.2d 827, 843 (7th Cir. 1977) (Testimony that defendant offered witness money to murder principal prosecution witnesses was admissible to show consciousness of guilt); <u>United States v. Franks</u>, 511 F.2d 25, 36 (6th Cir. 1975) (evidence that defendant attempted to conspire to kill government witness, with proper cautionary instruction, was admissible as showing consciousness of guilt).

For example, in <u>United States v. Henley</u>, No. 08-5161, 2010 WL 2706276, at *5 (4th Cir. July 6, 2010), a defendant facing bank robbery charges made certain statements to his sister over a recorded jail telephone.  In response to inquiries from his sibling regarding the name of the law enforcement officer leading the investigation, the defendant responded: "Stacey Bradley . . . I'll kill that bitch."  <u>Id</u>. at *5.  The Fourth Circuit upheld the district court's admission of the statement during the defendant's bank robbery trial holding that the defendant's threat to kill the lead FBI agent in his case evidenced his consciousness of guilt for the underlying crimes. Such is the case here.  By telling Scott Mulligan that he intended to kill his younger brother, Steven Tarantino, because he feared his brother was providing information to the FBI about his participation in the Baumgardt, Dorval and Gargiulo murders, the defendant was clearly acknowledging his guilt for those crimes – evidence which is directly relevant and admissible with respect to the crimes charged here.

The defendant will almost certainly claim that permitting Mulligan to testify as to the defendant's intention of killing his brother in 2007 will prejudice him, arguing that the jury will find that he has a propensity to kill.  It bears note, however, that under Rule 403, "the question is not whether admission of uncharged acts is prejudicial . . . because all evidence admitted against a criminal defendant is meant to be prejudicial; rather it is whether admission is <u>unfairly</u> so."

United States v. Gotti, No. 02 CR 743 (RCC), 2004 WL 2423799, at
*5 (S.D.N.Y. Oct. 29, 2004) (citing United States v. Jimenez, 789
F.2d 167, 171 (2d Cir. 1986)).  See also United States v. Munoz,
36 F.3d 1229, 1233 (1st Cir. 1994) ("The damage done to the
defense is not the basis for exclusion; the question under Rule
403 is one of unfair prejudice – not of prejudice alone"); United
States v. Sebolt, 460 F.3d 910, 917 (7th Cir. 2006) (evidence
that defendant had history of child molestation was "highly
prejudicial," but it was not "unfairly prejudicial").

      In this situation any additional prejudice to Tarantino
from the introduction of Mulligan's testimony would be small, and
not unfair, when it is juxtaposed with the other crimes evidence
the jury would otherwise hear.  The Tarantino jury will hear
about much of Tarantino's criminal background.  They will see
photographs of Julius Baumgardt's lifeless body lying in front of
Volt Information Sciences in Syosset, Long Island on June 23,
1994.  They will see photographs of Louis Dorval's bloated and
deformed body stuffed into a tool box after the box was retrieved
from the Atlantic Ocean on August 16, 1994.  The jury will also
hear the Gargiulo recording, in which Tarantino discusses his
involvement in both prior murders.  Evidence of Tarantino's
statements to Mulligan about his brother will raise the prejudice
bar – but only slightly higher.  See, e.g., United States v.
Williams, 205 F.3d 23, 33-34 (2d Cir. 2000) (Rule 403 analysis
favors admission where uncharged crimes "did not involve conduct
more serious than the charged crime and the district court gave a
proper limiting instruction").

      Further, Rule 403 only requires that relevant evidence
be excluded if its danger for unfair prejudice "substantially
outweighs" its probative value.  Fed. R. Evid. 403.  Such is not
the case here.  The evidence of Tarantino's intention to kill his
brother is extremely probative of his involvement in the Gargiulo
and other murders.  Additionally, any prejudice that may be
occasioned the defendant by Mulligan's testimony can be
effectively mitigated by the issuance of a strong limiting
instruction by the Court, cautioning the jury not to consider the
testimony as evidence of the defendant's violent character, but
rather as proof of his consciousness of guilt.  And because it is
generally "presume[d] that the jury follows [the] instructions"
of the court, there can be a level of comfort that the defendant
will not be unfairly prejudiced in this instance.  See United
States v. Huong Thi Kim Ly, No. 08 CR 382 (SJ), 2011 WL 2984388,
at *8 (E.D.N.Y. July 22, 2011) (citing United States v. Sbhnani,
599 F.3d 215, 240 (2d Cir. 2010) and United States v. Stewart,
433 F.3d 273, 310 (2d Cir. 2006)).

**IV.**   <u>**Conclusion**</u>

   For the foregoing reasons, the government respectfully requests that the Court admit the proffered evidence as direct evidence of the charged offenses, background evidence of the charged offenses, and/or as "other crimes or acts evidence" pursuant to Federal Rule of Evidence 404(b).

         Respectfully submitted,

         LORETTA E. LYNCH
         United States Attorney


     By: <u>/s/        </u>
         Sean C. Flynn
         James M. Miskiewicz
         Assistant U.S. Attorneys
         (631) 715-7900

cc:  Counsel of Record (By ECF)