```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
UNITED STATES OF AMERICA,

         -against-                    MEMORANDUM & ORDER
                                      08-CR-0655 (JS)
CHRISTIAN GEROLD TARANTINO,

                Defendant.
----------------------------------X
APPEARANCES
For the Government: James M. Miskiewicz, Esq.
                    Sean C. Flynn, Esq.
                    United States Attorney's Office
                    610 Federal Plaza
                    Central Islip, NY 11722

For Defendant:      Frank Anthony Doddato, Esq.
                    Law Offices of Frank A. Doddato, PC
                    666 Old Country Road, Suite 501
                    Garden City, NY 11530

                    Stephen Rosen, Esq.
                    100 Almeria Avenue, Suite 205
                    Coral Gables, FL 33134
```

SEYBERT, District Judge:

    This Memorandum & Order memorializes the Court's on-the-record rulings on the Government's motion to admit evidence of Defendant Christian Tarantino's ("Tarantino" or the "Defendant") uncharged criminal activity and bad acts. (Docket Entry 347.)

## DISCUSSION[1]

Before turning to the specifics of the Government's motion, the Court begins with the general proposition that evidence of Tarantino's involvement in the armored car robbery (including the Baumgardt murder) and the murder of Louis Dorval is relevant, direct evidence of the alleged crimes that are the subject of the coming retrial. Tarantino is charged with committing and conspiring to commit the obstruction-of-justice murder of Vincent Gargiulo. The Government's theory is that Gargiulo secretly recorded Tarantino discussing his involvement in the armored car robbery and the Dorval murder and that Tarantino had Gargiulo killed to prevent him from selling the recording to the FBI.[2] Tarantino's involvement in the crimes mentioned on the Gargiulo Tape is therefore inextricably intertwined with the current prosecution, not least because it goes to Tarantino's alleged motive for killing Gargiulo. See generally United States v. Towne, 870 F.2d 880, 886 (2d Cir. 1989) (noting that evidence that is "inextricably intertwined"

---

[1] A discussion of the relevant legal framework is set forth in the Court's March 23, 2012 Order. (Docket Entry 197, March 23, 2011 Memorandum & Order (the "March 23 Order") 4-6.) Prior to the Defendant's first trial, the Court granted in part and denied in part the Government's request to admit certain evidence of Tarantino's uncharged criminal activity and bad acts.

[2] The recording will be referred to herein as the "Gargiulo Tape."

with evidence concerning the charged offense is direct evidence, not collateral "other crimes" evidence). Moreover, even if evidence of Tarantino's involvement in the armored car robbery or Dorval murder were not direct evidence of the crimes charged, it would be admissible as "motive" evidence under Federal Rule of Evidence 404(b). See United States v. LaFlam, 369 F.3d 153, 156 (2d Cir. 2004).

With that in mind, the Court turns now to the Government's motion.

I. The March 23 Order

Some, but not all, of the evidentiary rulings set forth in the March 23 Order carry over to the retrial. In its prior decision, the Court reached the following conclusion:

> The Government may introduce evidence that (1) Tarantino and Gargiulo were involved in the 1989-91 scheme to traffic fur coats, except that it may not offer evidence about a sawed-off shotgun; (2) in 1993 Tarantino and others [including Dorval] stole fur coats from Filene's Basement and tried to sell them on the black market; (3) Tarantino and others committed a home invasion robbery, including that they were armed and used stolen cars, except that it may not inquire into the taser incident if Defendant agrees not to raise it during cross-examinations and that the Court will entertain a supplemental request from Defendant to preclude testimony that he pistol-whipped one of the victims; (4) Tarantino and others stole police equipment from a Spy-Mart store; (5) Tarantino and others [including Dorval] participated in a scheme to cash stolen bonds and that they

3

> contemplated robbing a jewelry store; (6) Tarantino and others [including Dorval and Mulligan] discussed killing an unnamed drug dealer by shooting him in the head, putting his body in a tool box, and dumping it at sea; (7) Tarantino and others were involved in a marijuana transaction and a cocaine transaction and that they discussed robbing a stockbroker; (8) Tarantino was serving a state prison sentence when his buccal swab was obtained, except that the Government may not introduce evidence that he was convicted of the attempted robbery of a narcotics officer; and (9) Tarantino was involved with John Goetz and others in a scheme to distribute GHB, except that the Government may not refer to GHB as a "date-rape drug."

March 23 Order at 21-22. As to items (1), (2), (4), (5), and (8), these rulings remain an appropriate balance between probative value and prejudice.[3] Items (3), (7), and (9), on the other hand, appear to have significantly less probative value to the Government now than they had at the first trial, and they are excluded under Rule 403. The Court reserves judgment as to item (6) subject to an offer of proof from the Government as to Mulligan's testimony on this issue.

## II. New Evidence

The Government also seeks to admit evidence that was not covered by the March 23 Order: (1) new evidence concerning Tarantino's involvement in the armored car robbery and the Dorval murder; (2) evidence that Tarantino stole one of the

---

[3] As with all of the Court's rulings today, this decision is without prejudice to the Defendant's ability to renew his cumulativeness objection at trial.

vehicles used in the armored car robbery; (3) evidence that Tarantino and others burgled a jewelry store in early 1994; (4) evidence concerning Tarantino's relationship with Craig Miller; and (5) evidence that Tarantino discussed killing his brother, Steven Tarantino.[4]

   A.  New Evidence Concerning the Armored Car Robbery and the Dorval Murder

The Government's new evidence concerning Tarantino's involvement in the armored car robbery and the Dorval murder (see Gov. Br. 11-12) is admissible. Tarantino's participation in those crimes is relevant to his alleged motive for the Gargiulo murder, and the probative value of this evidence is not substantially outweighed by its prejudicial effect.

   B.  The Red Blazer

The Government may also offer evidence that Tarantino and Mulligan stole a 1994 red Chevy Blazer (the "Blazer") from a Long Island car dealership in January 1994 and then used the car in a series of burglaries. The Government asserts that the Blazer was one of the vehicles used in the armored car robbery, and evidence that Tarantino stole it is probative of Tarantino's involvement in the robbery. Evidence that Tarantino acted with Mulligan to steal the Blazer is admissible to explain the relationship between the two men, as it is evidence that the two

---

[4] The Government's letter brief details the substance of this new evidence.

subsequently used the Blazer in a series of burglaries.[5]  See, e.g., United States v. Pitre, 960 F.2d 1112, 1119 (2d Cir. 1992) ("other crimes" evidence may be offered "to help explain to the jury how the illegal relationship between participants in the crime developed").  Further, the probative value of this evidence is not substantially outweighed by its prejudicial effect.

    C.    <u>The Plainview Jewelry Story Burglary</u>

The Government also intends to offer evidence that Tarantino, Mulligan, and others stole jewelry from a store in Plainview, New York.  Among other things, this evidence is admissible to show the relationship between Tarantino and Mulligan and help explain why Tarantino would confide in Mulligan with details about the Gargiulo murder.  See, e.g., United States v. Rosa, 11 F.3d 315, 334 (2d Cir. 1993).  And, again, the probative value of this evidence is not substantially outweighed by its prejudicial effect.

    D.    <u>Tarantino's Relationship with Craig Miller</u>

Craig Miller will testify that he drove Tarantino and Mulligan out to sea in Miller's family's boat for the purpose of

---

[5] The Defendant argues that evidence concerning the Blazer should be excluded because Tarantino's identity as one of the voices on the Gargiulo Tape is no longer disputed. (Def. Opp. 1.) "Identity" is not the only purpose for which this evidence may properly be offered, and the Government may introduce it as evidence of Tarantino's involvement in the armored car robbery and his relationship with Mulligan.

6

dumping a black toolbox into the ocean.  Miller will also testify that, approximately ten years later, Tarantino approached Miller and explained that Tarantino "had a 'problem' with a 'guy,' who recorded Tarantino on a tape."  (Gov. Br. 16 (paraphrasing Miller's anticipated testimony).)  Tarantino said that he had mentioned Miller's first name on the recording but not his last name and, as a consequence, it was unlikely that Miller's identity would be discovered by law enforcement. Tarantino gave Miller a lawyer's business card and, in the unlikely event that Miller was contacted by police, Tarantino urged Miller to call the number on the card.

The Government seeks to introduce evidence of Tarantino and Miller's mutual criminal history to explain the relationship between the men and to help tell the story of the armored car robbery and the Dorval murder.  Among other things, the Government will offer evidence that Tarantino and Mulligan used Miller's family's warehouse at various times to store stolen property (which Miller sometimes helped Tarantino fence), the Blazer, and equipment that included police scanners and bullet-proof vests.  Additionally, Mulligan will testify that the warehouse was the rendezvous point for the armored car robbery and that Tarantino told him that the warehouse is where Dorval was executed.

The Court agrees that the Government's evidence

7

relating to Miller is necessary to tell the story of this case. Among other things, Miller's criminal relationship with Tarantino and Mulligan helps explain why Miller helped them dump the toolbox in the Atlantic and provides context for why the warehouse was the rendezvous point for the armored car robbery and the place of Dorval's murder. See, e.g., United States v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994) ("[E]vidence of other bad acts may be admitted to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense."). And, this evidence helps explain the relationship among these men such that Tarantino would confide in Miller the details of the Gargiulo Tape. See Pitre, 960 F.2d at 1119. Further, the probative value of this evidence is not substantially outweighed by its prejudicial effect.

E. Tarantino's Threats Concerning his Brother

Finally, the Government seeks to introduce testimony from Mulligan that Tarantino, upon learning that his brother Steven was meeting with the FBI, told Mulligan that he intended to kill Steven to prevent him from becoming a cooperating witness. (Gov. Br. 18.) The Government argues that this evidence is admissible to show Tarantino's consciousness of guilt as to the armored car robbery, the Dorval murder, and the Gargiulo murder. The Court agrees with the Defendant that the

8

prejudicial impact of this testimony substantially outweighs its probative value. It is therefore excluded.

Death threats, like other evidence, are subject to the usual Rule 403 balancing test. See United States v. Quinones, 511 F.3d 289, 309 (2d Cir. 2007). Nevertheless, courts are mindful that "the potential prejudice from death threats may be great" and may tend to "exclude death threats more frequently than other evidence." United States v. Qamar, 671 F.2d 732, 736 (2d Cir. 1982). Here, the Court concludes that the testimony that Tarantino planned to kill his own brother carries a special risk that the jury will mistake the alleged statement as evidence that Tarantino has a propensity for murder. Although probative of the Defendant's consciousness-of-guilt, this evidence is particularly inflammatory. Cf. Quinones, 511 F.3d at 309 (rejecting Rule 403 challenge where "threats were no more inflammatory than the charged murder itself"). Under the circumstances, a limiting instruction would not suffice to focus the jury on this piece of evidence's proper purpose. See United States v. Curley, 639 F.3d 50, 62 (2d Cir. 2011).

## CONCLUSION

The foregoing are the rulings of the Court. They are without prejudice to the Defendant's ability to renew a cumulativeness objection. The Court invites the Defendant to request limiting instructions where appropriate.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: April  27 , 2012
       Central Islip, New York