## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

**UNITED STATES OF AMERICA,**

**vs.**                                        **Case No. 08-CR-655(JS)**

**CHRISTIAN GEROLD TARANTINO,**

**Defendant.**

_____/

## RULE 33 POST-VERDICT MOTION FOR NEW TRIAL

Defendant Tarantino, by and through undersigned counsel, hereby timely files his post-verdict motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure (Fed.R.Crim.P.).  As grounds for the relief requested, Tarantino submits that (1) the government knowingly presented perjured testimony regarding a murder; (2) a new trial on Counts One and Two is required because a conflict of interest adversely affected the performance of first trial counsel; (3) a new trial is required because the trial court erred in allowing Manon Mulligan to give her testimony as secondary evidence of Gargiulo extortion letter with insufficient proof that the extortion letter was *lost*; (4) discovery violation merits post-trial relief; and (5) a new trial is required because the trial court erred in denying the defense motion to suppress illegal interception under 18 U.S.C. § 2511. The arguments presented *seriatim* entitle the defendant to a new trial as Tarantino has been denied fundamental constitutional and statutory rights.

1

## 1. THE GOVERNMENT KNOWINGLY PRESENTED PERJURED TESTIMONY REGARDING A MURDER.

During the retrial, the government called Scott Mulligan in part to provide his version of the 1994 murder of Louis Dorval.  The district court gave a limiting instruction that Mulligan´s testimony about prior murders was being offered in relation to whether Tarantino had any motivation to commit the alleged Gargiulo murder.  *See* Retrial, May 3, 2012, at p.1406 ("the only reason that the evidence is being submitted as to the two prior murders relate to what, if any, motivation there was for the defendant to commit this third murder that is alleged.").

The government team knew or should have known that the testimony of Mulligan was perjured.  Unlike the acceptance of responsibility by the Pistone brothers for the Dorval murder and the disposal of the corpse at sea *that was supported by forensic corroboration obtained by law enforcement*, the recently produced Mulligan version lacks any scientific corroboration.  Moreover, two Pistone brothers were sentenced to serve years in prison for the commission of the same murder and the disposal of the same corpse.

AUSA Miskiewicz and FBI case agent Schelhorn, fully knowing that they had previously investigated and prosecuted Joseph and Peter Pistone who entered guilty pleas accepting responsibility for the murder of Dorval and the disposal of his corpse at sea, presented the testimony of Mulligan who furnished an irreconcilably different version of the same murder.

The testimony of Mulligan identified the warehouse of Craig Miller as the location of the Dorval murder.  *See* Retrial, May 3, 2012, at p.1437 (AUSA Miskiewicz reminding Court and counsel that Miller´s warehouse is "the precise location where Dorval was killed.").  Under the factual basis offered by the Pistone brothers and accepted as true by the district court and the government during their plea colloquies and sentencing hearings, Joseph Pistone had shot Dorval in the head inside of a truck in the presence of his brother Peter who assisted in the disposal of the dead corpse at sea. Tarantino´s name was never even mentioned in that version of the murder. *See United States v. Pistone*, *et al*., Grand Jury, April 6, 2000 (testimony of FBI agent Schelhorn; AUSA Miskiewicz appearing for the government) (attached hereto as Exhibit A); *see id*. at pp.42-45 (same FBI case agent obtained forensic corroboration of the Pistone version of the murder).

In order to further illustrate that the government knowingly offered a "mutually exclusive" version of the Dorval murder through the testimony of Mulligan, it suffices to note that Mulligan implicated Tarantino as the actual triggerman, *see* Retrial, May 3, 2012, at p.1499 (Mulligan testifying that Tarantino told him he shot Dorval in the head in Miller´s warehouse), but never mentioned the Pistones during his retrial narrative of the murder, which offered an irreconcilable version with entirely different participants. *Compare United States v. Pistone*, *et al*., Grand Jury, April 6, 2000, *supra*. *with* Retrial, May 3-May 7, 2012, at pp.1489-1531 (mutually exclusive).

3

While Mulligan pinned the murder on Tarantino and its location at Craig Miller´s warehouse, the same case agent had previously testified that the same murder had been committed by Joseph Pistone ("Joe Baldy") in a 1990 Chevy Suburban that belonged to his then-girlfriend Michelle Fortus. Joseph was riding in the backseat with Dorval, his brother Peter Pistone was driving, and Robert Misseri occupied the truck´s front passenger seat. Peter heard the gunshot and then saw his brother Joseph holding a revolver with Dorval slumped over the backseat with his head in the cargo area. *See* Exhibit A at pp.24-26.

Mulligan testified that he assisted Tarantino in disposing of the body of Dorval.  According to Mulligan, Craig Miller drove his boat a few miles into the ocean, Mulligan and Tarantino slid the toolbox containing the body of Dorval into the water, and Tarantino shot holes in the bottom of the box so that it would sink.  *See* Retrial, May 3-May 7, 2012, at pp.1499-1531. On the other hand, the same case agent had previously testified that the same body was placed into a toolbox by Joseph Pistone and Robert Misseri and later taken by the Pistone brothers to their family boat.  Peter Pistone recalled that the truck tailgate straps broke under the weight of the body when they unloaded it from the truck.  They loaded the box onto the back of the Pistone family boat from where it was dumped overboard hours later when the Pistone brothers reached the high seas.  Peter Pistone shot the toolbox under his brother´s command.  *See* Exhibit A at pp.27-30.

The Pistone version was corroborated by the same case agent, who testified that the description of a revolver as the murder weapon matched ballistic test findings, the holes examined in the box containing the corpse were consistent with the bullet holes that had been shot by Peter Pistone, and an expert who examined the truck confirmed that the tailgate had been broken in the way that Peter Pistone described. *See* Exhibit A at pp.42-45. No such forensic corroboration was offered by the government in support of Mulligan´s "mutually exclusive" version of the Dorval murder.

In *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir.1991), the Second Circuit held that

> [w]hether the introduction of perjured testimony requires a new trial depends on the materiality of the perjury to the jury's verdict and the extent to which the prosecution was aware of the perjury. … Where the prosecution knew or should have known of the perjury, the conviction must be set aside " 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.' " *Perkins v. LeFevre*, 691 F.2d 616, 619 (2d Cir.1982) (*quoting United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976)); *see also Sanders v. Sullivan*, 863 F.2d 218, 225 (2d Cir.1988) (question is whether the jury's verdict "might" be altered); *Annunziato v. Manson*, 566 F.2d 410, 414 (2d Cir.1977). _Indeed, if it is established that the government knowingly permitted the introduction of false testimony reversal is "virtually automatic."_ *United States v. Stofsky*, 527 F.2d 237, 243 (2d Cir.1975) (*citing Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959)), *cert. denied*, 429 U.S. 819, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976).

(Emphasis added).  The district court discussed the disparate nature of the Pistone version in a pre-trial Order. *See* Doc. 205, March 27, 2011.

In order to accept the guilty pleas entered by the Pistone brothers accepting responsibility for the murder of Dorval and the disposal of his dead corpse at sea, both the district court and the government had to establish factual bases for the guilty pleas during the plea colloquies with the Pistones under Fed.R.Crim.P. 11.  *See* Composite Exhibit B. The entirely inconsistent account of the Dorval murder by accomplices Mulligan and Miller must also be discounted because they were neither charged for the murder nor face penal consequences for the murder. Unlike both Pistone brothers, who were sentenced to spend many years in prison based on their guilty pleas, neither Mulligan nor Miller face any prison exposure for the Dorval murder or the body disposal at sea.

Here, the "mutually exclusive" version of the murder offered by Mulligan at retrial without the scientific corroboration that supported the Pistone version "established that the government has knowingly permitted the introduction of false testimony[.]" *See Wallach*, *supra*. The conviction obtained at retrial must therefore be reversed because the perjured testimony falsely implicating Tarantino as the triggerman in the murder of Louis Dorval raises a "reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id*. [1]

---

[1]  The "Gargiulo tape" reference to the disposal of the Dorval corpse, even if not blustering, should have at most subjected Tarantino to be charged as "an accessory *after-the-fact*," which charge would have been barred by the five-year statute of limitations for non-capital offenses, 18 U.S.C. §3282.

**2. A NEW TRIAL ON COUNTS ONE AND TWO IS REQUIRED BECAUSE AN ACTUAL CONFLICT OF INTEREST ADVERSELY AFFECTED THE PERFORMANCE OF FIRST TRIAL COUNSEL.**

At the commencement of the retrial, the district court addressed an issue raised by a government motion concerning a "lost" extortion letter received by the spouse of Scott Mulligan that "at some point in time [ ] went to Mr. Froccaro who was representing Scott Mulligan." *See* Retrial, April 23, 2012, at p.6. Defense counsel alerted the district court about a "very difficult" conflict of interest caused by Froccaro having represented Mulligan and Tarantino "during the trial, and all through 2008". *Id*. at p.7. Defense counsel noted that Froccaro had failed to disclose to the Court that he represented Mulligan. Retrial counsel submitted that he could prove the joint representation "if Mr. Froccaro is brought in" for a hearing. *Id*.

The trial court asked government counsel when he had found out that Froccaro represented Mulligan. AUSA Flynn replied that the government "knew that all along." *Id*. at p.12. The government also confirmed that the joint representation was not a part of the *Curcio* hearing held to address Froccaro defending someone else [implicated in the murder of Dorval]. *Id*. *See* Doc. 189, March 3, 2011; Transcript, March 15, 2011 (*Curcio* hearing).

Defendant Tarantino requests a hearing to prove that Froccaro jointly represented Mulligan during the time leading up to his trial and during trial. Froccaro operated under an actual "benefactor" conflict of interest because Mulligan paid Froccaro approximately $150,000 to appear for Tarantino.

*See generally United States v. Locascio*, 6 F.3d 924, 932 (2d Cir.1993) ("Ethical considerations warn against an attorney accepting fees from someone other than the client.  As we stated in a different context, the acceptance of such benefactor payments may subject an attorney to undesirable outside influence and raises an ethical question as to whether the attorney's loyalties are with the client or the payor.  *In re Grand Jury Subpoena Served Upon John Doe*, 781 F.2d 238, 248 n. 6 (2d Cir.1985) (*en banc*)") (internal quotations omitted).  To obtain relief, "a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance."  *See Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980) (prejudice is presumed if defendant demonstrates that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance).  " '[T]he *[Cuyler v.] Sullivan* standard is not properly read as requiring inquiry into actual conflict as something separate and apart from adverse effect. An 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance.' "  *See Eisemann v. Herbert*, 401 F.3d 102, 107 (2d Cir. 2005) (*quoting Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002)).

The actual "benefactor" conflict of interest adversely affected the performance of Froccaro because the armed robber alleged to be Tarantino actually matched Mulligan´s description.  Frocarro failed to argue at the first trial that it could have been Mulligan instead of Tarantino.

Frocarro could have cross-examined the case agent and experts as to why Mulligan´s DNA had not been tested for a match, but he decided not to cast any suspicion on his "benefactor" client who was his payor.

If Froccaro had suggested that Mulligan, who was an owner of the Synergy gym, could have been the gym owner known as "Matty Roth" who ordered the Gargiulo murder according to the lookout hired for the murder, there is a reasonable probability that the hung jury would have acquitted at the first trial obviating the need for a retrial.

The "Gargiulo tape" reference to disposing the body of Dorval at sea would have supported a defense theory that Mulligan actually killed Dorval and that Tarantino was "an accessory *after-the-fact*" who did no more than assist in the disposal of the corpse. [2]  But for the divided loyalties of first trial counsel Froccaro, who was paid by Mulligan to appear for Tarantino, Tarantino could have been acquitted of the murder of Dorval (Count Two). Froccaro failed to raise any theory incriminating his "benefactor" Mulligan, who was "next on the chopping block" according to government counsel. *See* Trial, April 7, 2011, p.1627.  This statement at the first trial would have necessarily inhibited Frocarro, then simultaneously representing Mulligan, from making any argument that would incriminate his "benefactor" client.

---

[2]  As noted in footnote 1, *supra*., the "Gargiulo tape" should have at most subjected Tarantino to be charged as "an accessory *after-the-fact*," which lesser charge would have been barred by the five-year statute of limitations applicable to non-capital offenses, 18 U.S.C. §3282.

Finally, an unwaivable conflict of interest would manifest *if* Froccaro withheld, mishandled, or destroyed an extortion letter ostensibly authored by Gargiulo and received by Manon Mulligan in 2003 in order to protect Scott Mulligan, his client for more years than Tarantino.  *See* Point 3, *infra*.

Although a post-verdict motion challenging the convictions obtained at the first trial should have been filed within 14 days after the first verdict, Tarantino cannot be blamed for Froccaro's failure to raise his own conflict. *See* Rule 33, Fed.R.Crim.P., Advisory Committee Notes ("...if for some reason the defendant fails to file the underlying motion for new trial within the specified time, the court may nonetheless consider that untimely underlying motion if the court determines that the failure to file it on time was the result of excusable neglect.").

Although the government did not disclose its acquired knowledge of the actual conflict of interest pertaining to first trial counsel's simultaneous representation of Scott Mulligan, the government had acknowledged in its request for a *Curcio* hearing to address Froccaro's actual conflict of interest pertaining to his simultaneous representation of Sal Cutaia, also implicated in the Dorval murder by confidential sources, *see* Doc. 189, March 3, 2011, pp.2-3, that "[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat v. United States*, 486 U.S. 153, 160.  The appearance of fairness has been lost.

The simultaneous representation by Froccaro of three (3) defendants implicated in the same murder exacerbated by his receipt of benefactor fees from Mulligan does not comport with the prevailing ethical standards of the legal profession. *See Locascio*, *supra*. Under these unique circumstances, it cannot be argued that these tainted "legal proceedings appear fair to all who observe them." *Wheat*, *supra*., 486 U.S. at 160. Tarantino submits that *the government´s deliberate non-disclosure of the compounded conflict concealed an unwaivable conflict of interest. See United States v. Schwarz*, 283 F.3d 76, 95-96 (2d Cir. 2002) ("actual or potential conflict cannot be waived if, in the circumstances of the case, the conflict is of such a serious nature that no rational defendant would knowingly and intelligently desire that attorney's representation . . . the attorney must be disqualified, regardless of whether the defendant is willing to waive his right to conflict-free counsel."); *see also* Doc. 189, at p.3 (government *quoting Schwarz*).

By deliberate non-disclosure of the aggravated conflict of interest, the government deprived Tarantino of a meaningful *Curcio* waiver hearing when the district court should determine whether the defendant is prepared to knowingly and intelligently waive the presented conflict of interest and, if so, whether to accept such a waiver. The non-disclosure denied the right to consultation with independent counsel informed of all the material facts. *See United States v. Curcio*, 680 F.2d 881, 890 (2d Cir. 1982).

The government´s deliberate non-disclosure of the known conflict denied Tarantino due process as "the prescribed catechism" handed down in *Curcio* was circumvented by the concealment of an unwaivable conflict. *Id.* at 890.  The district court must grant the defendant a new trial as to Counts One and Two or, in the alternative, hold a hearing to fully address the contention that Tarantino is entitled to a new trial given the unwaivable, aggravated nature of the actual compounded three-party conflict that was exacerbated by the actual "benefactor" conflict of interest shown to have adversely affected Froccaro´s performance at the first trial.

### 3. ALLOWING MANON MULLIGAN TO GIVE TESTIMONY AS SECONDARY EVIDENCE OF GARGIULO EXTORTION LETTER REQUIRES A RETRIAL AS LETTER WAS NOT PROVEN "LOST"

Rules 1002 and 1004 of the Federal Rules of Evidence provide that the contents of a written document may be proven by secondary evidence if the original has been lost or destroyed and the loss or destruction is not the result of the proponent's bad faith.

The government sought a Court Order permitting the oral testimony of Manon Mulligan regarding the contents of a threatening extortion letter ostensibly authored by Vincent Gargiulo and addressed to Scott Mulligan, which letter the government contended Mrs. Mulligan received and read on January 23, 2003.  It claims that the letter "has been 'lost,' through no fault of the government, as defined by Federal Rule of Evidence 1004(1)."  *See* Doc. 357, Government Letter, April 20, 2012, at p.1.

The defendant concedes that the testimony of Mrs. Scott Mulligan concerning the threatening contents of an extortion letter sent by Gargiulo would be admissible as "secondary evidence" in lieu of a "lost" letter, ***provided*** that the prosecution could have first proven that the letter had actually been "lost," as represented.  *The trial court is reminded that the contents of the letter could also prove Gargiulo´s primary motivation to commit extortion in making the tape, which would require the suppression of the "Gargiulo tape" under Title III.  See* 18 U.S.C. § 2511(2)(d).

Because the "loss" of an extortion letter seeking $500,000 raises a reasonable suspicion that the Gargiulo extortion letter, if revealed *verbatim*, might contain language clearly evidencing that the tape was the lynchpin of a continuing, long-term extortion scheme requiring its suppression under 18 U.S.C. § 2511(2)(d), or show Mulligan´s sole motive to commit murder, the trial court should explore the questionable circumstances surrounding the claimed "loss" of the critical extortion letter.  The government failed to provide sufficient evidence of the postulated "loss," but the district court erroneously admitted the testimony as permissible "secondary evidence."

The prosecution failed to show that the testimony of Froccaro was unavailable and that only circumstantial evidence was available to prove the letter was lost. *See United States v. McGaughey*, 977 F.2d 1067, 1071 (7th Cir. 1992) ("Loss or destruction may sometimes be provable by direct evidence but more often the only available evidence will be circumstantial, usually taking the form that appropriate search for the document has been made without discovering it.").

"[I]n order for secondary evidence of the contents of the writings to be admissible, the proponent must make a threshold showing that those two elements, loss or destruction of the documents and the absence of bad-faith, have been met.  Whether the proponent has met the prerequisites for the use of secondary evidence is a preliminary question of law to be resolved

by the Court.  Federal Rule of Evidence 1008." *Remington Arms Co. v. Liberty Mut. Ins. Co*., 810 F.Supp. 1420, 1426 (D.Del. 1992).

   The district court erred in not compelling the testimony of Froccaro before Mrs. Mulligan was permitted to provide her oral testimony at trial as "secondary evidence" in lieu of the written contents of the extortion letter. Froccaro should have been called to testify at a preliminary hearing outside the presence of the jury to flesh out whether the extortion letter was lost, deliberately withheld, mishandled, destroyed, or never received by counsel. In order to show that the extortion letter has been "lost," the prosecution had to provide the testimony of Froccaro under the facts of this case where the extortion letter is of central importance, as it provided proof of motive. *Sylvania Elec. Products v. Flanagan*, 352 F.2d 1005, 1008  (1st Cir. 1965) ("There is no universal or fixed rule that determines the sufficiency of the proof required to show that a reasonable or diligent search has been made. Each case is governed in large measure by its own particular facts and circumstances. He who seeks to introduce secondary evidence must show that he has used all reasonable means to obtain the original, i.e., such search as the nature of the case would suggest.  The best evidence rule should not be applied as a mere technicality. But where the missing original writings in dispute are the very foundation of the claim, which is the situation in this case, more strictness in proof is required than where the writings are only involved collaterally.") (citations omitted).

There was no valid reason not to call Froccaro to appear at a hearing to establish whether he had ever received an extortion letter that originated from the spouse of his client Scott Mulligan.  Froccaro should have been compelled to testify so that the legal admissibility of secondary evidence (testimony of Mrs. Mulligan) could be decided based on a complete record. In the event Froccaro placed the interests of Mulligan ahead of Tarantino by having withheld, mishandled, or destroyed the "best evidence" of the extortion letter, then Tarantino could also prove a clear conflict of interest adversely affected Froccaro´s performance at his first trial.  If Froccaro invoked the Fifth Amendment as to his handling of the criminal evidence, the district court would weigh the actual conflict of interest accordingly.

The testimony of Manon Mulligan did not establish that the letter was *lost* as required to allow secondary evidence in lieu of best evidence. Therefore, the crucial motive evidence was improperly admitted without the government first making the preliminary threshold evidentiary showing required under Rules 1002 and 1004 of the Federal Rules of Evidence to establish the purported *loss* of the letter.  In a case where the defendant´s motive is an issue of central importance, this erroneous evidentiary ruling allowing the government to prove motive to commit murder through the use of unreliable secondary evidence without first proving the "loss" of the best evidence, the extortion letter to Scott Mulligan itself, requires a retrial.

16

### 4. <u>DISCOVERY VIOLATION MERITS POST-TRIAL RELIEF</u>

The examination of Manon Mulligan revealed that the government violated mandatory discovery duties by withholding an extortion letter that was retrieved from one of the computers seized during the Gargiulo murder investigation. *See* Retrial, May 2, 2012, pp.1206-1209. The government failed to disclose the results of the forensic inspection of the documents and data entered into the computers. *See* Rule 16(a)(1)(E)-(F), Fed.R.Crim.P.

***<u>All drafts of the extortion letter(s) written on the computers and the obtainable dates of such drafts</u>*** could aid the defense in demonstrating that Gargiulo had always intended to use the "Gargiulo tape" to extort others, requiring suppression under 18 U.S.C. § 2511. ***<u>Any and all of the writings entered into computer databases tending to show Gargiulo´s propensity to commit extortion have to be disclosed</u>***. To the extent that the results of the forensic inspection of the computer data would be favorable to the defense effort to suppress the "Gargiulo tape," the results must be provided under *Brady v. Maryland*, 373 U.S. 83 (1963). The government has a continuing post-trial *Brady* duty to reveal such material evidence to the defendant. *See United States v. Agurs*, 427 U.S. 97, 111 (1976) (noting "special significance to the prosecutor's obligation to serve the cause of justice"); *Imbler v. Pachtman*, 424 U.S. 409, 427 n.25 (1976) (prosecutor is bound by the ethics of his office even "after a conviction").

A new trial and disclosure of all computer data withheld is hereby requested as the Second Circuit has held that such relief is available "if the nondisclosure of these materials was error and was substantially prejudicial." *See Unites States v. Yousef*, 327 F.3d 56, 168 (2d Cir. 2003).

Given the government discovery violation revealed during the retrial, *the district and Circuit court must conduct an in camera review of the data results retrieved by the forensic examination of all the computers seized to determine whether there were other extortionate writings **and the dates of the data entries***. Such data would be critical to the motion to suppress the "Gargiulo tape" because 18 U.S.C. § 2511 requires the defense to prove that Gargiulo harbored ***contemporaneous*** intent to extort at the time that he made the recording. *See* Doc. 356 (motion to suppress illegal interception filed April 19, 2012). The Court must also make all withheld data materials a "sealed" part of the record so that the Second Circuit can conduct its own review of all data obtained from examining all the computers, if necessary. *See Yousef*, 327 F.3d at 168 (Second Circuit conducted *in camera* review of sealed materials seeking "information that would support a *Brady* claim.").

Inasmuch as the lynchpin of the prosecution was the "Gargiulo tape," the government had a mandatory duty under Rule 16 to provide the mirror images of all computer hard drives, computer discs, and other data seized. The defendant requested access to the computer data from the outset. *See* Doc. 187, March 10, 2011; *see also* Transcript, March, 15, 2011, pp.16-17.

Tarantino was entitled to discovery of the requested computer data for forensic inspection pursuant to Rule 16(a)(1)(E), Fed.R.Crim.P., which mandates that "[u]pon a defendant's request, the government must permit the defendant to inspect and to copy … data … if the item is within the government's possession, custody, or control and: (i) the item is material to preparing the defense[.]"  Here, the data is material to the tape suppression.

The trial court has conducted *in camera* review of materials withheld by the government and "discovered" exculpatory *Brady* material, requiring enumerated factual disclosures.  *See* Doc. 164, February 2, 2011, pp.2-3. The government cannot be permitted to obstruct access to all computer data after the retrial has revealed that another extortion letter has been unearthed from one of the computers seized by law enforcement for data inspection. The district court cannot rely on the government´s unilateral evaluation of what constitutes *Brady* material favorable to the defense effort to suppress the "Gargiulo tape" pursuant to 18 U.S.C. § 2511.

The belated disclosure of another extortion letter found within one of the computers also raises the specter of a forensic inspection of the data that was not sufficiently diligent, thereby underscoring the need to permit defendant access to the data to conduct an independent forensic inspection seeking additional evidence to establish a pattern of extortionate activity over an electronically dated time continuum.

Withholding data showing Gargiulo drafted other extortionate threats obtainable through forensic investigation entitles defendant to a new trial and disclosure of all the data for inspection to get evidence discoverable under the prosecution´s continuing post-trial *Brady* obligations applicable to evidence favorable to suppression defense.  *See Agurs* and *Imbler*, *supra*.

## 5. A NEW TRIAL IS REQUIRED BECAUSE "GARGIULO TAPE" SHOULD HAVE BEEN SUPPRESSED UNDER 18 U.S.C. § 2511

The district court summarily denied the defendant's motion *in limine* to suppress illegal interception without an evidentiary hearing, thereby inviting reversible error.  Although Tarantino significantly supplemented the evidentiary record to show that the criminally predisposed Gargiulo had a financial motive to extort him shortly before making the "Gargiulo tape," the district court attached no weight to the new evidence presented by the defense in support of the suppression required under 18 U.S.C. § 2511.

Tarantino presented new evidence documenting a succession of civil court actions against Gargiulo, including adverse judgments entered against Gargiulo weeks before he made the "Gargiulo tape."  Close analysis of the court judgments entered against Gargiulo demonstrated that he had already accumulated over $70,000 in judgments by August 2000, the month before he made the "Gargiulo tape."

Moreover, the motion to suppress also presented for the first time excerpts from the FBI case agent´s grand jury testimony that both glaringly contradicted his testimony before the jury on the meaning of Gargiulo´s reference to the tape as his "insurance" and fully supported the proposition that the primary motivation for the making of the "Gargiulo tape" was to commit extortion.  While the case agent testified before the grand jury that Gargiulo said that retaining control of the tape was his "insurance policy"

*against any government non-payment*, *see* Grand Jury, 7/15/2008, at p.60 ("He [Gargiulo] thought that was his insurance policy.  He stated to me that he would not provide me with the actual tape because that was his ace in the hole, and if he had provided it to me, the federal government wouldn´t need him, and he wanted to hold on to the tape"), the same agent gave diametrically opposed testimony before the trial jury with regard to Gargiulo´s purported "insurance." *Compare* Trial, 4/25/2011, at p.2375 ("He [Gargiulo] stated that he made the tape as an insurance, an insurance *against Christian Tarantino*.") (emphasis added).

The government emphasized that the trial court previously rejected the claim that the Gargiulo recording was an illegal interception because "although it is clear that Gargiulo eventually tried to use the Tape to blackmail Tarantino, the Court was not convinced Gargiulo intended to blackmail Tarantino at the time he recorded their conversation in September 2000." *See* Doc. 223 (Court Order), April 19, 2011, at p.2. However, the government fails to recognize that the defendant presented clear and convincing evidence that Gargiulo was already suffering financial pressures the month before taping his conversation with Tarantino and that he had told the case agent that he had taped the conversation with Tarantino *because* he was "*very bitter*" that his relationship with both Tarantino and Mulligan had "*gone sour*," *see* Grand Jury, 7/15/2008, at p.59, which is also suggested within the dialogue of the tape made in late 2000.  *See*

Transcript of "Gargiulo tape" at p.32 ("when all this stuff happened between me and you and the gyms…").  Thus, the evidence *tips the scale* in favor of finding by a preponderance that Gargiulo´s primary motive or a determinative factor in his motivation for making the "Gargiulo tape" was to commit a crime, to wit: extortion. [3]

### GARGIULO´S "CONTEMPORARY" EXTORTION

Based upon information and belief, Tarantino has a good faith basis to submit to the district court that one Andrew Carino was the victim of a *contemporary extortion* that Gargiulo attempted by using a false criminal complaint within less than six months after he made the "Gargiulo tape." The proximity of that March 19, 2001 date of the *contemporary extortion* added more weight to the temporal evidence and *tipped the scale* toward the tape suppression required under 18 U.S.C. § 2511(2)(d).

The quantum of evidence supplemented by the defense satisfied the applicable ***preponderance of the evidence*** standard.  Tarantino submits that he has made a sufficient showing that it is ***more likely true than not true*** that Gargiulo made the tape with the intent to extort given the following:

_____

[3] Tarantino submits that the "hedge" scenario proposed by the trial court constitutes extortion.  *Planned Parenthood of Columbia/Willamette, Inc. v. American Coalition of Life Activists*, 244 F.3d 1007, 1015 n.8 (9th Cir. 2001) ("Blackmail and extortion - the threat that [Gargiulo would] say or do something unpleasant unless [Tarantino would] take, or refrain from taking, certain actions-are not constitutionally protected.")(brackets added).

(1) Gargiulo had begun to suffer financial pains shortly before the taping;

(2) Gargiulo attempted to extort Andrew Carino by filing a false criminal

complaint on March 19, 2001, less than six months after the tape-recording;

(3) Tarantino complained to associates that Gargiulo was "dry ratting" him;

and (4) Gargiulo kept possession of the tape as his "insurance" to collect in

attempts to collect from Tarantino (and even from government agents).  *See*

Doc. 223 (Court Order), April 19, 2011, at p.4 ("That Gargiulo eventually

tried to blackmail Tarantino is undisputed").

Because the trial court erroneously ruled on the motion to suppress

the illegally intercepted "Gargiulo tape," a new trial must be granted.

Respectfully submitted,

LAW OFFICES OF STEPHEN H. ROSEN, P.A.
100 Almeria Avenue, Suite 205
Coral Gables, Florida 33134
Ph: (305) 448-9900
Fax: (305) 448-9337

s/Stephen H. Rosen
STEPHEN H. ROSEN
Counsel for Defendant
Florida Bar No. 154144
E-MAIL: ATTNYROSEN@AOL.COM

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 8, 2012, I electronically filed the

foregoing document with the Clerk of the Court using CM/ECF.

s/Stephen H. Rosen
STEPHEN H. ROSEN