UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
UNITED STATES OF AMERICA,

                                        MEMORANDUM & ORDER

          -against-                     08-CR-0655(JS)

CHRISTIAN TARANTINO,

                    Defendant.
----------------------------------X
APPEARANCES
For the Government: Loretta E. Lynch, Esq.
                    Carrie N. Capwell, Esq.
                    Sean C. Flynn, Esq.
                    James M. Miskiewicz, Esq.
                    Assistant United States Attorneys
                    Eastern District of New York
                    610 Federal Plaza
                    Central Islip, NY 11722

For Tarantino:      Stephen H. Rosen, Esq.
                    Law Offices of Stephen H. Rosen, P.A.
                    100 Almeria Avenue, Suite 205
                    Coral Gables, Florida 33134

                    Frank A. Doddato, Esq.
                    Law Offices of Frank A. Doddato, P.C.
                    666 Old Country Road, Suite 501
                    Garden City, NY 11530

SEYBERT, District Judge:

          Presently pending before the Court is Defendant
Christian Gerold Tarantino's ("Defendant" or "Tarantino") motion
for a new trial under Rule 33 of the Federal Rules of Criminal
Procedure.  For the following reasons, Defendant's motion is
DENIED.

<u>BACKGROUND</u>

On September 23, 2008, a four count Indictment charged Tarantino with: (1) the 1994 murder of armored car guard Julius Baumgardt ("Baumgardt"); (2) the 1994 murder of Louis Dorval ("Dorval"); (3) Conspiracy to Commit the Obstruction-of-Justice Murder of Vincent Gargiulo ("Garguilo"); and (4) the 2003 murder of Vincent Gargiulo.

A jury trial commenced before this Court on March 28, 2011. At trial, evidence was presented that on June 23, 1994, two individuals--Baumgardt and his partner--were armored car guards working for Mid-Island Check Cashing Company ("Mid-Island"). As the two men exited the armored car and attempted to begin their work day, Defendant and Dorval, armed with a shotgun and a pistol respectively, approached. Nearby, Scott Mulligan ("Mulligan") sat as the look-out. Defendant and Dorval ordered Baumgardt and his partner to the ground. Though Baumgardt complied, Dorval shot and killed him.

After the murder, Defendant, Dorval, and Mulligan fled and dumped the pistol and other materials in a self-storage facility. The pistol had been registered in Dorval's name and had been recovered by Nassau County Police shortly after Baumgardt's death. According to the prosecution, Defendant became concerned that Dorval might eventually cooperate with police and implicate Defendant in the Baumgardt murder. As a

result, Defendant confided in Mulligan and Gargiulo that he would "take care of the problem."

In the summer of 1994, Defendant told Mulligan that Dorval had been killed and that he needed to dispose of the body. Mulligan contacted an acquaintance whom they knew to have a boat. The next day, Mulligan and Defendant took Dorval's body, which had been stuffed into a tool bin, and threw it into the Atlantic Ocean off of the shore of Long Island.

For years the state of affairs remained unchanged. Then, in the fall of 2000, Gargiulo secretly taped Defendant. During this conversation, Defendant admitted to his involvement in the Baumgardt and Dorval murders. Following the downfall of Gargiulo's gym business, Gargiulo threatened Defendant, claiming that if Defendant did not pay Gargiulo, then Gargiulo would turn the secret tape over to the police. Defendant refused Gargiulo's demand and instead hired his business associate, Justin Bressman, to kill Gargiulo. On August 18, 2003, Mr. Bressman shot and killed Gargiulo.

On May 23, 2011, a jury convicted Defendant of the Baumgardt and Dorval murders. The jury, however, did not reach a verdict on Counts Three and Four of the Indictment, which charged Defendant with Conspiracy to Commit the Obstruction-of-Justice Murder of Vincent Gargiulo and the Obstruction-of-Justice Murder of Vincent Gargiulo, respectively.

3

A re-trial was held on Counts Three and Four of the Indictment before this Court beginning on April 23, 2012. A jury subsequently convicted Defendant of Conspiracy to Commit the Obstruction of Justice Murder of Vincent Gargiulo and acquitted Defendant on the Obstruction-of-Justice Murder of Vincent Gargiulo.

Defendant now seeks a new trial on several grounds. First, he asserts that perjurious testimony was presented at the re-trial. Second, he seeks a new trial on Counts One and Two due to a conflict of interest of trial counsel. Third, he contends that the Court erroneously allowed the admission of secondary evidence during the re-trial. Fourth, he contends that the Government withheld <u>Brady</u> material, thus impacting the re-trial. Finally, Defendant asserts that specific evidence should have been suppressed at the re-trial.

DISCUSSION

The Court will first discuss the standard governing Rule 33 motions. It will then address the merits of Tarantino's motion.

## I.   Standard for Granting Motion for a New Trial under Rule 33

"The burden of proving the need for a new trial lies with the defendant." <u>United States v. Ferguson</u>, 49 F. Supp. 2d 321, 323 (S.D.N.Y. 1999) (citing <u>United States v. Soblen</u>, 203 F. Supp. 542 (S.D.N.Y. 1961)), <u>aff'd</u>, 301 F.2d 236 (2d Cir. 1962);

see also United States v. Sasso, 59 F.3d 341, 350 (2d Cir. 1995). The decision whether to grant or deny a motion for a new trial is firmly within the discretion of the trial judge. See Sasso, 59 F.3d at 350; see also Ferguson, 49 F. Supp. 2d at 323 (citing United States v. Rodriguez, 738 F.2d 13, 17 (1st Cir. 1984)); United States v. Zane, 507 F.2d 346, 347 (2d Cir. 1974) (reviewing a trial court's denial of a Rule 33 motion for abuse of discretion); United States v. Madeoy, 912 F.2d 1486, 1490 (D.C. Cir. 1990) (decision to grant post-trial relief is within trial court's sound discretion). "[I]n deciding whether to grant a Rule 33 motion, a judge may weigh the evidence and determine the credibility of witnesses." Ferguson, 49 F. Supp. 2d at 323 (citing United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir. 1992)). Moreover, on a Rule 33 motion, "[t]he Court is not required to view the evidence in the light most favorable to the Government." Id. (citing United States v. Lincoln, 630 F.2d 1313, 1319 (8th Cir. 1980)). Nevertheless, the Court's discretion is limited to the extent that Rule 33 motions for a new trial are "not favored and should be granted only with great caution." United States v. Stofsky, 527 F.2d 237, 243 (2d Cir. 1975) (internal quotation marks and citation omitted).

II. Perjured Testimony

During Defendant's re-trial, the Government presented the testimony of Scott Mulligan. Mulligan testified that

Defendant indicated during several conversations that Dorval was Defendant's "mess" and that Defendant would "clean it up." (Re-Trial 1492-93.)[1] Thereafter, Defendant approached Mulligan and stated that he shot Dorval in the head, the murder "was done", and that Dorval "didn't bleed much." (Re-Trial 1498-99.) The two men then took Dorval's body, by now in a tool bin, out to sea via a friend's boat. (Re-Trial 1508-10.) As they attempted to fill the tool box with debris to help it sink, Mulligan dropped a bolder onto Defendant's right hand. (Re-Trial 1524.) Defendant attempted to further aid the sinking by shooting holes into the bottom of the bin. (Re-Trial 1525.) Defendant and Mulligan were eventually successful in getting the tool bin into the water and they fled the scene. (Re-Trial 1530.)

Defendant now asserts that this testimony was perjured. As proof of the alleged perjury, Defendant cites to the April 6, 2000 grand jury testimony of FBI Agent Schelhorn and AUSA Miskiewicz. (Def. Br. 3.) At that time, the Government had indicted Joseph Pistone ("Pistone"). Pistone provided an account of the Dorval murder in which Pistone admitted to being the shooter and having disposed of the body with the help of his brother, Peter Pistone. The Government

---

[1] Citations to the April 23, 2012 et seq. trial on Counts Three and Four of the Indictment shall hereinafter be referred to as "Re-Trial". Citations to the March 29, 2012 et seq. trial on Counts One and Two of the Indictment shall hereinafter be referred to as "Trial".

apparently does not dispute that it investigated Pistone's account of events and, for at least a period of time, believed Pistone to have shot and killed Dorval. Because this account, placing Pistone as the shooter, is inconsistent with the trial testimony of Mulligan placing Defendant as the gunman, Defendant argues that Mulligan's testimony was perjurious.

A.   Standard for New Trial Based on Perjury

The parties disagree as to the appropriate standard applicable to a motion for a new trial based upon the presentation of perjurious trial testimony. Both parties agree that the materiality of the perjured testimony and the extent to which the prosecution was aware of the perjury are two factors. See United States v. Wallach, 935 F.2d 445, 456 (2d Cir. 1991). The Government, however, also cites to United States v. Zichettello, 208 F.3d 72 (2d Cir. 2000). In Zichettello, the Second Circuit delineated a four-part test: "(i) the witness actually committed perjury; (ii) the alleged perjury was material; (iii) the government knew or should have known of the alleged perjury at the time of trial; and (iv) the perjured testimony remained undisclosed during trial." 208 F.3d at 102 (internal citations omitted). In a relatively recent opinion, the Second Circuit in United States v. Ferguson acknowledged that the two tests appear to be "in tension", though it did not

ultimately address the appropriate test. 676 F.3d 250, 282 (2d Cir. 2011).

As in <u>Ferguson</u>, the Court need not decide whether <u>Wallach</u> or <u>Zichettello</u> governs this inquiry because Defendant's argument fails as a threshold matter. No matter the applicable standard, the first consideration in this inquiry is whether a party in fact presented perjured testimony, see <u>United States v. Haouari</u>, No. 00-CR-0015, 2001 WL 1586676, *4 (S.D.N.Y. Dec. 11, 2001), a requirement Defendant does not meet.

B. <u>Testimony of Scott Mulligan</u>

Defendant has not shown that Mulligan's testimony was perjurious. "Perjury" is when a witness deliberately makes a "material false or misleading statement[] while under oath." <u>Black's Law Dictionary</u> 1254 (9th ed. 2009). Although Mulligan's testimony is arguably inconsistent with Pistone's admission, there is nothing to suggest that Mulligan deliberately gave false or misleading testimony. Mulligan did not testify that he saw who shot Dorval. Rather, he testified that Defendant told Mulligan that Defendant committed the murder. (Re-Trial 1498-99.) With respect to the discarding of Dorval's body, Mulligan testified that he was present and watched Defendant place the tub containing Dorval's body into the Atlantic Ocean and subsequently shoot holes into the tub in an attempt to cause it to sink. (Re-Trial 1508-30.)

Defendant offers no proof of perjury other than the confession of Pistone. This is woefully insufficient. See Buitrago v. Scully, 705 F. Supp. 952, 957 (S.D.N.Y. 1989) (finding that there was no "hard evidence" of perjury). That one witness gives a differing version of events from another is not uncommon in litigation and does not alone establish perjury. See United States v. Tyree, 279 F. App'x 31 (2d Cir. 2008). Courts have offered a myriad of reasons for differing accounts. See id. at 34 (other witness may have been lying, or purportedly perjured testimony could have been due to mistake); see also Ocasio v. United States, No. 08-CV-1305, 2012 WL 3245419, *2 (S.D.N.Y. Aug. 9, 2012) (incorrect testimony may be the result of confusion, mistake, or a faulty memory). As in the aforementioned precedent, the Court is left with little more than two arguably divergent accounts of the Dorval murder. This simply does not constitute perjury.

Furthermore, even if this were perjury, the Court is troubled by the fact that Defendant apparently made a strategic decision not to call Pistone and highlight any inconsistencies, yet now claims that the lack of such disclosure merits a new trial. Defendant was aware of Pistone's account of events at the time Mulligan testified at the re-trial, and the Court permitted Defendant to introduce Pistone's plea allocution if he so chose. (Docket Entry 205.)

Defendant decided not to call Pistone. Rather, defense counsel highlighted inconsistencies in Mulligan's testimony and questioned Mulligan's credibility as a witness during summation. (Def. Reply Br. 5.) Specifically, defense counsel argued that medical evidence offered by the Government to corroborate Mulligan's testimony demonstrated Mulligan's "fabrication." (Def. Reply Br. 5.) The Government had offered medical evidence to show that Defendant had indeed sought medical treatment for a crushed right thumb, consistent with Mulligan's testimony that he had accidentally injured Defendant's thumb during their attempt to dispose of Dorval's corpse. The Government argued that the records indicated that Defendant sought treatment for his right thumb on the same day and around the same time that Mulligan had testified that he and Defendant returned from dumping Dorval's body. (Re-Trial 1892-93.) Defense counsel argued that the records showed two visits, and that the visit for Defendant's right thumb came only well after they disposed of the body. (Re-Trial 1902-07.)

Thus, Defendant did highlight some of the potential inconsistencies in Mulligan's testimony. To the extent that he did not do so, this could only have been a deliberate choice given Defendant's knowledge of Pistone's admission. Accordingly, this state of affairs would give the Court great pause in granting a new trial even if Mulligan's testimony was

in fact perjured. See United States v. Blair, 958 F.2d 26, 29 (2d Cir. 1992) ("We have always assumed, though never expressly held, that perjured testimony must have remained undisclosed during trial in order to require reversal of a conviction."); Conteh v. United States, 226 F. Supp. 2d 514, 520 (S.D.N.Y. 2002) ("[A] defendant seeking relief on the ground of the government's use of perjured testimony must demonstrate that he was unaware, and with due diligence would have remained unaware, of the falsity of the testimony.").

III. Conflict of Interest

In addition to his claims for a new trial regarding the re-trial, Defendant also asserts that counsel during the first trial, James Froccaro, had an actual conflict, thus necessitating a new trial on Counts One and Two. Defendant makes this argument on two related, but independent, grounds: (1) that Mr. Froccaro, at least for a period of time, simultaneously represented Mulligan and Defendant; and (2) Mr. Froccaro operated under an actual "benefactor" conflict of interest because Mulligan paid Mr. Froccaro approximately $150,000 to represent Defendant. As a result, Defendant says, Mr. Froccaro did not pursue the argument that Mulligan shot Dorval, and that Defendant was actually an accessory-after-the-fact.

A.   <u>Timeliness</u>

Federal Rules of Criminal Procedure Rule 33 provides
that motions for a new trial premised on grounds other than
newly discovered evidence "must be filed within 14 days after
the verdict or finding of guilty."[2]   FED. R. CRIM. PRO. 33.   The
Advisory Committee notes for the 2005 amendment to Rule 33
explain that there are some exceptions, however.   Under Federal
Rules of Criminal Procedure Rule 45(b)(1), "[w]hen an act must
or may be done within a specified period, the court on its own
may extend the time, or for good cause may do so on a party's
motion made . . . (B) after the time expires if the party failed
to act because of excusable neglect."   FED. R. CRIM. PRO. 45
(b)(1)(B).

In determining whether excusable neglect exists, the
Court considers four factors: (1) the danger of prejudice to the
non-moving party; (2) the length of delay and possible impact on
proceedings; (3) the reason for delay; and (4) the good faith of
the moving party.   <u>United States v. Frederick</u>, No. 09-258, 2012
WL 2050909 (E.D.N.Y. June 5, 2012); <u>United States v. Sabir</u>, 628
F. Supp. 2d 414 (S.D.N.Y. 2007).

---

[2] Claims of ineffective assistance of counsel are not "newly
discovered evidence".   <u>See</u> <u>United States v. Cammacho</u>, 462 F.
App'x 81, 83 (2d Cir. 2012).

B.  <u>Application</u>

Taking the factors out of order, the Court will first consider the length and reason for the delay in seeking a new trial. Defendant asserts that Mr. Froccaro represented Defendant during all relevant times. Thus, even though Defendant properly sought an extension of time to move for a new trial, and subsequently did move for a new trial on Counts One and Two, the issue of Mr. Froccaro's conflict of interest was never raised because Mr. Froccaro was still counsel for Defendant. Accordingly, Defendant argues that Mr. Froccaro could not have been expected to raise his own conflict.

Defendant's argument is not a novel one. For example, in United States v. Frederick, the defendant argued excusable neglect because counsel that he claimed was ineffective remained his counsel until after the time to file for new trial expired. 2012 WL 2050909, at *9. The District Court for the Eastern District of New York held that this reason did not excuse defendant's delay in waiting over a year and a half after obtaining new counsel and less than one month before his sentencing. Id.

Likewise here, Defendant's explanation of Mr. Froccaro's conflict does not excuse his delay. The jury returned a verdict on Counts One and Two on May 23, 2011. Mr. Froccaro's representation of Defendant terminated on August 17,

13

2011, and Defendant had new counsel for over a year at the time he filed the current motion. In fact, defense counsel at the re-trial explicitly acknowledged Mr. Froccaro's potential conflict and twice raised the issue to the Court. (Re-Trial 7, 919.) As was true at the re-trial, the proper avenue to pursue this argument is on appeal, not through a time-barred motion for a new trial. (Re-Trial 919) (COURT: "[W]hatever other issues you have in terms of a conflict of interest--and Mr. Froccaro can be well vetted on appeal.").

IV. <u>Secondary Evidence</u>

Defendant also seeks a new trial on the grounds that the Court erred in allowing the admission of secondary evidence without the proper proof that the original had been lost, thus contravening the best evidence rule.

During interviews with the Government, Scott Mulligan's wife, Manon Mulligan, discussed a letter she believed to have been written by Vincent Gargiulo (the "Gargiulo letter"). According to her testimony, Scott Mulligan went to prison on marijuana charges on January 3, 2003. (Re-Trial 1316.) Thereafter, Mrs. Mulligan visited family in Canada. (Re-Trial 1321.) When she returned to her home in Bellmore on January 22, 2003, Mrs. Mulligan found a one-page anonymous, type-written letter addressed to Scott Mulligan. (Re-Trial

1323-26.)  She deduced that Gargiulo was the author of the letter.  (Re-Trial 1324-27.)

The Gargiulo letter demanded $500,000 and threatened that, if the money was not paid by a certain date, Gargiulo would deliver to the Federal Bureau of Investigation ("FBI") an audio-tape in which both Defendant and Mulligan were implicated in various crimes.  (Re-Trial 1325-27.)

During an evidentiary hearing, Mrs. Mulligan further testified that, upon receiving the Gargiulo letter, she called her friend Keith Pellegrino ("Pellegrino").  (Re-Trial 1174.) That same day, on January 22, 2003, Pellegrino went to the Mulligan home.  (Re-Trial 1174-75.)  Pellegrino took the Gargiulo letter, stating that he would deliver it to Mr. Froccaro.  (Re-Trial 1174-76.)

At the re-trial, the Court permitted Mrs. Mulligan to testify regarding the contents of the Gargiulo letter as secondary evidence, finding that the Government had sufficiently established that the original Gargiulo letter was lost. Defendant now claims that this ruling was erroneous because the Court should have first elicited testimony from Mr. Froccaro that he indeed did not have the letter.

A.   Best Evidence Rule

Under Federal Rules of Evidence Rule 1002, generally "[a]n original writing, recording, or photograph is required in

order to prove its content . . . " If, however, the original is not available, Federal Rule of Evidence 1004 governs. Rule 1004 provides:

> An original is not required and other evidence of the content of a writing . . . is admissible if --
> (a) all the originals are lost or destroyed, and not by the proponent acting in bad faith . . . .

FED. R. EVID. 1004. "The admissibility of secondary evidence is within the broad discretion of the trial judge." United States v. Chang An-Lo, 851 F.2d 547, 557 (2d Cir. 1988); accord United States v. Covello, 410 F.2d 536, 543 (2d Cir. 1969).

B.  Application

The Court made a thorough inquiry into the potential whereabouts of the original Gargiulo letter, and the Government conducted an ample search. On April 20, 2012, the Government filed its response to Defendant's motion to suppress particular evidence. (Docket Entry 357.) In it, the Government clearly delineated why Mrs. Mulligan's testimony as secondary evidence was necessary in this case. The memorandum explained what Mrs. Mulligan was expected to, and indeed did, testify to. Furthermore, the first footnote of the brief explained that Scott Mulligan executed an attorney-client privilege waiver and permitted Mr. Froccaro to respond to the Government's request. Mr. Froccaro orally responded to the Government that he did not

have the letter and had never received it. In addition, the Government issued a trial subpoena to Pellegrino. Pellegrino invoked his Fifth Amendment right and thus was effectively unavailable for trial.

It is hard to imagine what additional proof the Court could have required in this regard. Defendant offers no reason as to why calling Mr. Froccaro would have been any more effective nor does he even speculate that Mr. Froccaro would have waivered from his unequivocal statement that he never received the letter. The Government's search, along with the hearing in which Mrs. Mulligan testified, satisfies the best evidence rule.

V.    Scott.Doc Letter

Defendant next contends that the Government withheld evidence favorable to the defense in violation of Brady v. Maryland, 373 U.S. 83, 835 S. Ct. 1194 (1963). Specifically, he challenges that the Government failed to disclose a draft extortion letter ("Scott.doc") and the results of the forensic inspection of documents found on computers seized during the investigation into Gargiulo's murder. According to Defendant, the Scott.doc letter demonstrates that Gargiulo had intended to extort Defendant, a showing that would have led to the

suppression of some of the Government's evidence.[3]  The Defendant

takes this contention one step further, also arguing that there

may have been other exculpatory material on the computers, thus

necessitating in camera review or full access to the defense in

order to conduct a forensic examination.

A.   Standard

"Brady requires the prosecution to disclose any

'evidence favorable to an accused . . . where the evidence is

material either to guilt or to punishment, irrespective of the

good faith or bad faith of the prosecution.'"  Ranta v. Bennett,

No. 97-CV-2169, 2000 WL 1100082, *13 (E.D.N.Y. May 23, 2000)

(quoting Brady, 373 U.S. at 87).  "There are three components of

a true Brady violation: The evidence at issue must be favorable

to the accused, either because it is exculpatory, or because it

is impeaching; that evidence must have been suppressed by the

State, either willfully or inadvertently; and prejudice must

have ensued."  Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.

Ct. 1936, 1948 (1999).  The prosecution must disclose Brady

material "in time for its effective use at trial."  United

States v. Coppa, 267 F.3d 132, 135 (2d Cir. 2001).

B.   "Brady" Material

Assuming, arguendo, that Scott.doc is Brady material,

Defendant has not established that the Government withheld this

---

[3] See Section VI infra.

evidence. In fact, the existence of Scott.doc became apparent during a hearing in which Mrs. Mulligan testified. (Re-Trial 1188.) After the hearing, defense counsel asked for the letter, the Court told the Government to turn over the letter, and the Government did so. (Re-Trial 1208-09.)

All of this took place and defense counsel received Scott.doc before Scott and Mrs. Mulligan testified. Thus there was no Brady violation here because the defense received the letter with more than enough time to make effective use of the evidence. See United States v. Douglas, 525 F.3d 225, 245-46 (2d Cir. 2008) (disclosure of 290 pages one business day before trial did not constitute suppression where documents were grouped and easily recognizable); Singh v. Greene, No. 10-CV-4444, 2011 WL 2009309, *22 (E.D.N.Y. May 20, 2011) ("[I]f the defense receives the information from the government in time for its effective use at trial by the defense, then the information has not been 'suppressed' within the meaning of Brady . . . . ") (citation omitted). Indeed, this Court has held that even disclosure during the relevant witness' cross-examination, while adding to the collective materiality inquiry, does not necessarily mean that there has been a Brady violation. Ranta, 2000 WL 1100082, at *25 ("[P]etitioner's generalized grievance concerning the late disclosure of Bloom's plea allocution

minutes provides no indication that defense counsel was unable to make effective use of the minutes after he received them.").

### C. Additional Examination of Computer Documents

Defendant also requests that any other documents on the computer be disclosed for in camera review or inspection by the defense. However, "[t]he government's obligation to search for Brady material and to turn it over at the appropriate time is the sole responsibility of the prosecutor." United States v. Vinieris, 595 F. Supp. 88, 91 (S.D.N.Y. 1984).

Defendant's generalized assertion that, in essence, there could be other potential Brady material does not warrant a ruling that the Government turn over the documents Defendant suggests. Defendant may not independently determine materiality. As the United States Supreme Court has held, and as the Brady case law makes clear, "where a defendant makes only a general request for exculpatory material under Brady . . ., it is the State that decides which information must be disclosed." Pennsylvania v. Ritchie, 480 U.S. 39, 59, 107 S. Ct. 989, 1002 (1987).

Likewise, Defendant's assertion does not merit an in camera review. An in camera review is appropriate where the defendant makes a particularized showing of materiality and usefulness of the sought after information. United States v. James, No. 02-CV-0778, 2007 WL 914242 (E.D.N.Y. 2007).

Defendant has failed to do so. Defendant cannot make any specific showing of materiality and offers only speculation that there could be other documents on the computer. The Court will not engage in a search of an indefinite number of documents on the basis that there may or may not be <u>Brady</u> material. <u>See</u> <u>Bruno v. Conn. Comm'r of Correction</u>, No. 04-CV-0101, 2006 WL 2839232 (D. Conn. Sept. 29, 2006).

VI. <u>Gargiulo Tape</u>

Finally, Defendant asserts that the Court erred in failing to suppress the Gargiulo Tape (the "Tape"). By way of background, the Tape refers to an audio-recording of a conversation between Gargiulo and Defendant. The context of the Tape indicates that it was made some time around September of 2000. In it, Defendant made several incriminating statements, including acknowledging his involvement in the Baumgardt and Dorval murders.

Defendant first moved to suppress the Tape on April 5, 2010 in connection with the first trial. (Docket Entry 75.) At that time, Defendant principally argued that the Tape was made for the purposes of committing a criminal or tortious act, rendering it illegal under Title III and inadmissible at trial. In its December 15, 2010 Order, the Court rejected that argument because, although it was clear that Gargiulo eventually tried to use the Tape to blackmail Defendant, the Court was not convinced

21

that Gargiulo intended to blackmail Defendant at the time he recorded their conversation in September 2000. (Docket Entry 116.)

During the course of the first trial, Defendant renewed his motion to suppress the Tape. (Trial 1555.) This renewed motion was the result of trial testimony from Robert Gerrato, Gargiulo's best friend. Mr. Gerrato testified that Gargiulo told him in the summer of 2003 that Gargiulo was using the Tape to extort Defendant. (Trial 1514-15.) This was consistent with what Gargiulo told Special Agent Robert Schelhorn at a May 2003 meeting. Agent Schelhorn testified at the <u>Mastrangelo</u> hearing before the first trial that Gargiulo said that if the FBI would not buy the Tape, he would get money from Defendant. (Hr'g. Tr. 296-97.)[4]

The Court again rejected Defendant's arguments and denied his request for a hearing on the matter. (Docket Entry 223.) The Court delineated several reasons for its decision, including that neither Mr. Gerrato's nor Agent Schelhorn's testimony shed any additional light on Gargiulo's motive for making the Tape beyond the evidence available to the Court in December 2010. Essentially, Gargiulo's motive in making the Tape was mixed. The Court also held that the failure of

---

[4] "Hr'g Tr." refers to the February 14, 2011 et seq. <u>Mastrangelo</u> hearing.

Gargiulo's gym business presented a financial motive for extortion that arose only after the Tape was created. Finally, the Court reiterated its findings in the December Order that Gargiulo's statements to FBI Agent Schelhorn that the Tape was "insurance" is ambiguous. Gargiulo may have made the Tape to guarantee his physical safety, protect against Defendant implicating Gargiulo, or for a host of other reasons. Ultimately, Defendant could not show by a preponderance of the evidence that Gargiulo made the Tape for a criminal or tortious purpose.

Once more, and just days prior to the re-trial, Defendant again moved to suppress the Tape. (Docket Entry 356.) In that motion, Defendant attached exhibits and argued that new evidence revealed that Gargiulo's gym business was failing and that Gargiulo had a financial motive to extort Defendant in the month before making the Tape. Defendant also claimed that grand jury testimony from Agent Schelhorn demonstrated inconsistencies from his trial testimony and demonstrated that Gargiulo's motivation for making the Tape was extortion. It is this motion that now forms one of the bases for Defendant's current motion for a new trial. Defendant claims that the Court ignored the aforementioned arguments, and that if considered, they would have created a preponderance of the evidence demonstrating Gargiulo's criminal intent. According to Defendant, the Court

summarily denied Defendant's motion and failed to suppress the Tape despite this evidence.

A.  <u>Standard</u>

The federal wiretap law, commonly known as "Title III," governs the circumstances under which intercepts of oral communications may be used at trial.  <u>See</u> 18 U.S.C. § 2510 <u>et seq.</u>  As is relevant here, Section 2511(2)(d) provides that an individual may intercept a communication if that person is a party to the communication or if one of the parties to the conversation has given his prior consent, "unless such communication is intercepted for the purpose of committing any criminal or tortious act . . . ."  Intercepts made in accordance with Section 2511 may be used at trial, subject to the application of the Federal Rules of Evidence.  <u>See</u> 18 U.S.C. § 2515.

To show an intercept violated Title III, Defendant must show by a preponderance of the evidence "either (1) that the primary motivation, or (2) that a determinative factor in [Gargiulo's] motivation for intercepting the conversation was to commit a criminal [or] tortious act."  <u>In re DoubleClick, Inc. Privacy Litig.</u>, 154 F. Supp. 2d 497, 514-15 (S.D.N.Y. 2001). The "legislative history and caselaw make clear that the 'criminal' or 'tortious' purpose requirement is to be construed

narrowly, covering only acts accompanied by a specific contemporary intention to commit a crime or tort." Id. at 515.

B. Application

Contrary to Defendant's assertion, the Court did consider Defendant's motion, yet simply rejected it. As the Court stated at the beginning of the re-trial, the Court did not feel that there was enough evidence to present a 51 percent preponderance of the evidence of a criminal motive in making the Tape. (Re-Trial 5-6.) Defendant's claims of a financial motive in the month before the Tape was made, even if true, do not necessarily weigh in favor of a criminal motive, as Defendant suggests. Gargiulo was a long-time friend of Defendant and knew that Defendant had been involved in at least two murders. Certainly the risk involved in extorting such an individual was high. If this indeed was Gargiulo's motive, there is a break in the chain of logic--namely why Gargiulo would have undertaken such an exorbitant risk without seeking any payout until years later. Evidence regarding Gargiulo's failed gym business adds to the mystery, but does not add anything to the inquiry of Gargiulo's contemporaneous motive in creating the Tape. The Court properly suppressed the Tape and Defendant is not entitled to a new trial on this ground.

## CONCLUSION

For the foregoing reasons, Defendant's motion is DENIED.

SO ORDERED.

/s/ JOANNA SEYBERT_____
Joanna Seybert, U.S.D.J.

Dated:    November 7, 2012
          Central Islip, New York