495

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X

UNITED STATES OF AMERICA,        :     CR 08 655

        v.                       :     U.S. Courthouse
                                       Central Islip, N.Y.
CHRISTIAN TARANTINO,             :
                                       TRANSCRIPT OF TRIAL
            Defendant.           :
                                       April 26, 2012
------------------------------X        9:55 a.m.

BEFORE:

        HONORABLE JOANNA SEYBERT, U.S.D.J.


APPEARANCES:

For the Government:    LORETTA E. LYNCH
                       United States Attorney
                       100 Federal Plaza
                       Central Islip, New York 11722
                       By:  JAMES M. MISKIEWICZ, ESQ.
                            SEAN C. FLYNN, ESQ.
                            Assistants, U.S. Attorney

For the Defendant:     STEPHEN H. ROSEN, ESQ.
                       100 Almeria Avenue - Suite 205
                       Coral Gables, Florida 33134

                       FRANK A. DODDATO, ESQ.
                       666 Old Country Road
                       Garden City, New York 11530


Court Reporter:        HARRY RAPAPORT, C.S.R.
                       United States District Court
                       100 Federal Plaza
                       Central Islip, New York 11722
                       (631) 712-6105


Proceedings recorded by mechanical stenography.
Transcript produced by computer-assisted transcription.


                *HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
                      *OFFICIAL COURT REPORTER*

**496**

1       M O R N I N G   S E S S I O N

2

3           (Whereupon, the following takes place in the

4   absence of the jury.)

5           THE COURT:  Good morning.

6           We have two juror issues to deal with, if you

7   would.  Juror 1502.

8           THE CLERK:  152.

9           THE COURT:  152, right?

10          Another juror called today reporting that her

11  daughter had 104 temperature.

12          Both the jurors are alternates.  If they are

13  dismissed, we still have four alternates left.  And I

14  think that is an appropriate way to proceed.

15          Please have a seat, Mr. Tarantino, Mr. Doddato

16  and Mr. Rosen.

17          Is there anything else you would like the Court

18  to inquire of?  Do you have any position with regard to

19  these two jurors?

20          MR. ROSEN:  We have no problem, obviously, with

21  the juror and the child.  He was pretty awake yesterday

22  afternoon, look -- listening to and reading the tape that

23  was presented on the screen.

24          I would just as soon to leave him on.  If he

25  falls asleep today, I will go along with it.  But he was

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*

*OFFICIAL COURT REPORTER*

**497**

1   pretty attentive yesterday with Mr. Marr and the tape.

2   That was my observation.

3           THE COURT:  The government's position?

4           MR. MISKIEWICZ:  We will leave it to the Court's

5   discretion to excuse him now or not.

6           THE COURT:  I think it is incumbent on the Court

7   when someone writes a letter, a note, saying I can't stay

8   awake.  I would like to bring him out and talk to him to

9   see if there is an alternative.  Maybe if he gets up in

10  the interim and does jumping jacks, it would replenish his

11  energy.

12          I'm inclined to bring him out.  I will ask

13  Charley to bring him out rather than to wait and see.

14          (Juror 152 enters the courtroom.)

15          THE COURT:  Have a seat.

16          How are you doing today?

17          JUROR NO. 152:  Okay.

18          THE COURT:  We received your note and I shared

19  it with the lawyers.

20          I understand that you are used to having a much

21  more active lifestyle, if you will.

22          JUROR NO. 152:  Yes.

23          THE COURT:  And I would just like to make an

24  inquiry.  Do you think you will be able to stay awake?

25          JUROR NO. 152:  No.  I'm not used to sitting

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*

*OFFICIAL COURT REPORTER*

**498**

1   for long periods of time without doing anything.

2           THE COURT:  What about if you got up

3   intermittently and got my permission?

4           JUROR NO. 152:  No.

5           THE COURT:  You don't think it will do it for

6   you?

7           JUROR NO. 152:  I'm not used to sitting down

8   for long periods of time.  I'm always on my feet the whole

9   day.

10          THE COURT:  Have you had any medical tests done

11  to see if there is an issue with this?

12          JUROR NO. 152:  No.  It is just how I'm used to

13  it.  My body is used to it, that's all.  I'm always on my

14  feet all day and not used to sitting down.

15          THE COURT:  You are certain you can't make an

16  adjustment by getting up intermittently?

17          JUROR NO. 152:  No.  I'm a mechanic and I can't

18  stay awake sitting down.

19          THE COURT:  Did you discuss it with the other

20  jurors?

21          JUROR NO. 152:  Yes.  And they told me to write

22  a note.

23          THE COURT:  And it is basically caused by your

24  inability to stay awake?

25          JUROR NO. 152:  Yes.

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*

*OFFICIAL COURT REPORTER*

**499**

1           THE COURT:  You get an adequate amount of sleep

2   each night?

3           JUROR NO. 152:  Yes.

4           THE COURT:  There is no other physical way you

5   can be treated to adjust to this?

6           JUROR NO. 152:  No.  I'm just not used to it.

7           THE COURT:  You have not been able to get used

8   to it the last couple of days?

9           JUROR NO. 152:  Something I just can't get used

10  to.

11          THE COURT:  Do I have the government's consent?

12          MR. MISKIEWICZ:  Yes.

13          THE COURT:  The defendant's consent?

14          MR. ROSEN:  Yes.

15          THE COURT:  Sorry you couldn't serve on this

16  one.  Please pick up your things and don't talk to the

17  other jurors about it.  Maybe you can get over it.

18          JUROR NO. 152:  If I told you my age, you

19  wouldn't believe it.

20          THE COURT:  How old are you?

21          JUROR NO. 152:  19.

22          THE COURT:  I figured you weren't over 20.

23          Thank you.

24          (Juror 152 exits the courtroom.)

25          THE COURT:  Bring the others out and explain

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*

*OFFICIAL COURT REPORTER*

500

1  that the two jurors have been excused.

2      Mr. Marr, do you want to come up, please.

3

4  K E N N E T H   M A R R,

5      called as a witness, having been previously

6      duly sworn, was examined and testified as

7      follows:

8

9      THE COURT:  How much longer do you think you

10  will be?

11     MR. MISKIEWICZ:  Perhaps another 45 minutes.

12     THE COURT:  All right.

13     Jury entering.  Please rise.

14     (Whereupon, the jury at this time entered the

15  courtroom.)

16     THE COURT:  Good morning, folks.  Nice to see

17  you all.  Please be seated, if you would.

18     THE JURORS:  Good morning.

19     THE COURT:  Let me just advise you that you

20  notice that there are two missing alternate jurors.  They

21  have been excused for sufficient reason in the Court's

22  estimation and with the consent of counsel.  So don't draw

23  any assumptions.  Take good care of yourselves and your

24  family members.  And make sure you are here and ready to

25  continue in your service.

---

502

1  admission of KM-1, 2, 3 and 4.  I don't recall if they

2  were formerly admitted before the break.

3      THE COURT:  Any objection?

4      MR. ROSEN:  No other objection.

5      THE COURT:  Received in evidence over objection.

6      MR. MISKIEWICZ:  Thank you.

7      (Whereupon, Government's Exhibits KM-1, KM-2,

8  KM-3 and KM-4 were received in evidence.)

9      (At this time a document was exhibited on

10  courtroom screen.)

11     MR. MISKIEWICZ:  Your Honor, for some reason the

12  Court's ELMO is not displaying.  But we have it on the

13  other screen.

14     Can I inquire of the jury whether they can see

15  it?

16     THE COURT:  There are two other screens here.

17  Can you see them?  And I will squint and look at them,

18  too.

19     Do you have it on your screen, Mr. Marr?

20     THE WITNESS:  Yes, your Honor, I do.

21     THE COURT:  All right.

22 Q  Mr. Marr, could you just tell the members of the jury

23  what are we looking at in this -- in this photograph?

24 A  Yes, sir.

25     As I explained yesterday, this is the magnetic

---

501

1      We are ready to proceed with the continued

2  direct examination of Kenneth Marr.

3      You are still under oath, sir.

4      THE WITNESS:  Yes.

5      THE COURT:  If you would resume.

6      MR. MISKIEWICZ:  Thank you.

7

8  DIRECT EXAMINATION (cont'd)

9  BY MR. MISKIEWICZ:

10 Q  Good morning.  Good morning, Mr. Marr.

11 A  Good morning, sir.

12 Q  When we broke yesterday we were -- I believe I had

13  begun to show you some exhibits.

14     MR. MISKIEWICZ:  If I may approach, your Honor?

15     THE COURT:  Yes.

16     MR. MISKIEWICZ:  Just to orient the witness

17  where we were.

18 Q  Mr. Marr, I showed you yesterday KM-2, KM-3, KM-4.

19     (Handed to the witness.)

20 Q  What are those?

21 A  These are magnetic development photographs that I

22  took when I did my examination, when I did my magnetic

23  development tests.

24 Q  And just to be 100 percent sure --

25     MR. MISKIEWICZ:  Your Honor, we again move the

---

503

1  development test.  This is a photograph that I took of a

2  particular area on the tape after I placed ferro fluid on

3  the tape.  The liquid evaporated off and then the magnetic

4  powder that was on the ferro fluid aligned itself to the

5  magnetic tracks on the tape itself.

6 Q  With my pen on the overhead, this dark area, this is

7  the actual tape here (indicating)?

8 A  Yes, sir.

9      The numbers, the large numbers, 26, 27, 28, that

10  you see, and the vertical etch marks, they are tick marks,

11  between those numbers are etched into the inspection plate

12  itself, the glass plate.

13     So when I do a magnetic development, I placed

14  the tape on the glass plate in position adjacent to these

15  numerical etch marks.

16     The distance between the 26 and the 27, the 27

17  to the 28, etcetera, is one-tenth of an inch.  The

18  individual tick marks in-between those numbers are

19  one-hundredth of an inch.

20     You can see through the microscope we have an

21  enlarged photograph of a particular area I listened to and

22  wanted to get more information about at a certain point in

23  the tape.

24     At this point on Q-39, as I mentioned yesterday,

25  it is side A of the tape, and at a position 0012 and 0013,

Marr-Direct/Miskiewicz

504

1  and it would be 12 seconds and then 13 seconds into the
2  tape, the very beginning of the tape.  This is the
3  non-designated area.
4  Q    Okay.
5        What we are looking at on the screen appears
6  pretty wide, several inches wide on the screen.  But the
7  tape itself we are talking about is KM-1, or what is now
8  housed in KM-1-B; is that correct?
9  A    Yes.
10  Q    The microcassette tape?
11  A    Yes, that's correct.
12  Q    And we are looking at something magnified several
13  times?
14  A    That's correct, sir.
15  Q    Okay.
16        And it appears there are these horizontal lines
17  on the lower half of the tape, and then nothing on the top
18  half.
19        Can you explain what that is?
20  A    Yes, sir.
21        On an analog tape, as I discussed yesterday, a
22  record head places a -- an audio track on the tape.
23        What we are looking at here is side A at the
24  bottom of the tape.  Side B is at the top of the tape, and
25  there are no magnetic tracks on the top of the tape.

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

Marr-Direct/Miskiewicz

505

1        The magnetic tracks on the top of the tape on
2  side A are vertical and placed left to right across the
3  computer screen.
4        When I discussed yesterday about aligning the
5  azimuth, that is what you see there.  Those vertical lines
6  are the position of the gap that is in the record head.
7  And when the tape recorder placed the magnetic information
8  on that tape originally, that gap was positioned as you
9  see there vertically.  And the information was placed from
10  left to right across the tape.
11        When I played it back, as I said yesterday, what
12  I need to do is insure that my playback recorder has the
13  very same azimuth angle.
14        My playback head -- the gap of my playback head
15  needs to be aligned very accurately with the existing
16  track on the tape.  And that is the azimuth angle
17  correction that I discussed yesterday.
18  Q    Let me zoom in for a second.
19        (At this time a document was exhibited on
20  courtroom screen.)
21  Q    Are you saying, to explain to the members of the
22  jury, that these lines represent something that is
23  physically on the tape?
24  A    Yes, sir.
25  Q    What is it?

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

Marr-Direct/Miskiewicz

506

1  A    Those are magnetic -- magnetic marks -- magnetic
2  information that the record head placed on the magnetic
3  tape.
4  Q    So these lines, when they are run across the player,
5  somehow then translated into voice?
6  A    Yes.
7  Q    Or sound, I should say?
8  A    Yes, sir.
9        If I can explain basically how a tape recorder
10  works?
11  Q    Please.
12  A    On an analog tape recorder, the machine is made up
13  basically of a transport system.  The cassette is placed
14  into the recorder and the take-up reel turns and pulls the
15  tape across both an erase head and a record head.
16        When you place the recorder into record mode,
17  the two heads, the record head and the playback head, snug
18  up against the tape.  At that point the record head begins
19  to erase everything on the tape preparing that tape for
20  more or new information that the record head is going to
21  place on that tape.
22        What you see there on this photograph is the
23  record head information that was placed on the tape when
24  it was recorded originally.
25  Q    So for those of us who recall vinyl records, are

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

Marr-Direct/Miskiewicz

507

1  those lines similar to the grooves you saw on vinyl
2  records?
3  A    It would be a similar analogy, but the grooves are
4  different formats than a tape recorder, but the same sort
5  of analogy.
6  Q    The fact that an analog tape leaves something
7  physically etched on the tape, does that assist you in
8  determining if the tape is authentic, or the product of
9  some hack job?
10  A    Yes, sir.
11  Q    Or pieces put together?
12  A    That is one of the powerful aspects of the magnetic
13  development that I mentioned yesterday.
14        When you do a magnetic development, you can
15  visually see the magnetic tracks that are on the analog
16  tape and determine whether a particular event is a copied
17  event or an original event.
18  Q    So this, what we are looking at is KM-3, and I think
19  you indicated already it is an event at approximately 12
20  to 13 seconds from the beginning of the tape?
21  A    Yes, sir.
22  Q    And what event, if anything, did you note when you
23  made this photograph?
24  A    I have to refer to my notes to be sure.  But what I
25  see there is a deflection in the edge line.

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

1  Q   Using my pen, is this what you refer to as a

2  deflection?

3  A   Yes, you can see the horizontal line about midway up

4  that photograph, and a couple of additional lines that are

5  bent or deflected, meaning beneath the area.  And that is

6  what you look at.  That is an indication of an original

7  event.

8  Q   Do you recall what your notation was for this

9  particular area, our do you need your notes to recall

10  exactly what it was?

11  A   Yes, sir, I would need that.

12         MR. MISKIEWICZ:  May I approach, your Honor?

13         THE COURT:  Yes.

14         MR. MISKIEWICZ:  Showing him 3500-KM-1.

15  Q   Take a look at that and see if it refreshes your

16  recollection as to what you found at that moment?

17  A   Yes, sir.  At that position, 12 seconds, and this is

18  a record event, an over-record start.  And that was at

19  time 12.

20         At time 13 this particular photograph includes

21  the area on the tape of both 12 and 13, the beginning of

22  area 13.  And I indicated it was probably a pause/stop

23  start, also a record event.

24  Q   And this is the very beginning of the tape, the very

25  beginning of the designated area we heard yesterday?

1  Q   Did you photograph every time you do a magnetic

2  development?

3  A   I normally did, sir, but not every time.

4  Q   And when you did not photograph on -- withdrawn.

5         Were there times you made a magnetic

6  development, in other words, you put the ferro fluid on

7  and stuck it through the microscope and then did not

8  photograph the result?

9  A   Yes.

10         In some cases there are numerous events that are

11  very similar.  And we put the ferro fluids on it and look

12  under the microscope but do not take a photograph.

13  Q   And why not?

14  A   Basically it is a very time consuming and tedious

15  operation.  And if I see something on the tape that is not

16  considered to be an additional amount of information to

17  gain, then I simply note that in my notes.

18         MR. MISKIEWICZ:  May I approach, your Honor?

19         THE COURT:  Yes.

20         (Counsel approaches the witness.)

21  Q   I want to ask you about, for instance, did you hear

22  zipper sounds at certain areas of the tape recording?

23  A   As I recall, I did note that in my notes, yes.

24  Q   And a zipper sound, or some sort of rustling sound,

25  might that be an area where you might do a magnetic

1  A   It is not the designated area.  It is the beginning

2  of the tape.  The designated area begins at about time 55

3  minutes.

4  Q   Okay.

5         So this we are looking at here is a stop/start

6  about 55 minutes before what we heard yesterday, before

7  the beginning of what we heard yesterday?

8  A   It is well before, the beginning of the tape, and to

9  be sure that it was an over-record stop.

10  Q   And did you find in the designated area we heard

11  yesterday any stop/start or over-record when you analyzed

12  the tape in 2005?

13  A   No, sir, I did not.

14  Q   All right.

15         But would you have been able to find it or were

16  you looking for such things back in 2005?

17  A   Yes, sir.  I was looking for it.

18  Q   And would the magnetic development have shown you if

19  there was a cutting and pasting of information?

20         MR. ROSEN:  Judge, the only objection I have is

21  leading.

22         THE COURT:  Overruled.

23  A   Yes.  The magnetic development test would have been a

24  key part of my analysis.  Not the only part, but one of

25  the tests I definitely would have done.

1  development?

2  A   Oftentimes it might be, but not necessarily.

3  Q   What are you looking for when you hear those sounds?

4  A   Well, when we get surveillance tapes, in many cases

5  any time a recorder is handled -- someone touches the

6  microphone, or the recorder is rubbing in a pocket.  We

7  call it handling sounds or fabric sounds.  It means that

8  the material or the pocket or something is rubbing against

9  the microphone.  We hear that quite often in tapes that we

10  get.

11         But the -- just the fact that we have handling

12  sounds doesn't mean that there is a record event.

13         What we are looking for in addition would be

14  background sounds that are continuous throughout that

15  area.  We are listening for content of the discussions to

16  see if there is any change in topic, for example.  But it

17  is not unusual to hear handling sounds or bumps, and other

18  sounds indicating that someone is bumping or handling that

19  microphone.

20  Q   Okay.

21         When you say that change of topics, are you

22  actually listening to the conversation itself?

23  A   Yes, sir.

24  Q   What the people are saying in the conversation?

25  A   Yes, sir.

Marr-Direct/Miskiewicz

512

1   Q   So part of your analysis is also trying to listen to
2   the actual discussion?
3   A   What I'm listening for is content and context.
4         If, for example, the discussion is about a
5   baseball game, and all of a sudden the topic changes to,
6   you know, the vacation that the person took ten years ago,
7   obviously there is a change in context for some reason.
8   It doesn't mean that there was a record event there, but
9   it is an area that we would look at or I would pay close
10  attention to see if something did happen in which a record
11  event might occur.
12  Q   That recording we heard yesterday in that designated
13  area from about 55 minutes to the end, did you listen to
14  that whole area for contents?
15  A   Yes, sir.
16  Q   And did you find any big breaks in the flow of the
17  conversation?
18         MR. ROSEN:  Objection to the form.
19         THE COURT:  Objection sustained.
20  Q   Did you find any changes in the flow of the content
21  of the tape?
22  A   No.  It seemed to me that the content was continuous.
23  Q   Let me show you now these slides, what is received as
24  KM-4.
25         Do you see that?

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

Marr-Direct/Miskiewicz

513

1   A   Yes, sir.
2   Q   What part of the tape are we looking at here?
3         (At this time a document was exhibited on
4   courtroom screen.)
5   A   Again, this is a magnetic development.  The tape had
6   ferro fluid placed on it.  And I placed it under the
7   microscope.  It is an enlarged view of the very end of the
8   recording.  That event is at one hour, 34 minutes and 53
9   seconds.
10  Q   What, if anything -- what if any conclusions did you
11  draw from what you photographed here?
12  A   What I see there again is the vertical striations
13  with stop -- the vertical striations stop at number 63.
14  Q   I'm putting my pen there.  Is that what you are
15  talking about?  (Indicating)?
16  A   Right.
17         It would be the end of the record head
18  information that had been placed on the tape.
19         Just above the vertical striations you can see a
20  horizontal line.
21  Q   Is it what I'm pointing to (indicating)?
22  A   Yes.
23         It extends from left to right and ends shortly
24  after the information there at 63.  That is --
25  Q   This, again, for the jury sake, am I pointing to the

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

Marr-Direct/Miskiewicz

514

1   right area (indicating)?
2   A   Yes, sir.
3         That is the erase head stop.
4         As you can see, the erase head is taller or
5   higher than the record head information.  And it is
6   designed that way so that the erase head erases everything
7   that is on the tape before new record head information is
8   placed on it.
9   Q   So what if anything did this information tell you
10  about this?
11  A   Well, that tells us where -- it tells us how far
12  apart the record head and erase head are, for one thing.
13  It tells us how tall or how -- what the dimension is for
14  the record head and the erase head.  And most importantly,
15  it tells us what an original end stop looks like.
16         If there were an over-recording on a tape and
17  you would look at the end stop of that recording, it would
18  look like that mark right there (indicating).
19  Q   Okay.
20         So did this information tell you anything about
21  whether or not this tape -- the actual microcassette
22  KM-1-B, was an original recording or a copy of an earlier
23  recording?
24  A   Well, when I combine it with other analyses I did, I
25  determined that that designated area was original,

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

Marr-Direct/Miskiewicz

515

1   continuous and unaltered.
2   Q   I show you what is marked for identification as KM-6,
3   7 and 8.
4         (Handed to the witness.)
5   Q   Would you tell the jury what are
6   Government's Exhibit KM-6, 7 and 8?
7   A   Yes.
8         Computer displays again.  The same information
9   in a different kind of display.  These are called
10  spectrum.  Spectrum is a method to look at information in
11  the recording at very precise frequencies.
12         I will explain what I mean by frequencies.
13  Q   Would this help?
14  A   Yes.
15         MR. MISKIEWICZ:  The government moves for the
16  admission of KM-6, 7 and 8.
17         THE COURT:  Any objection?
18         MR. ROSEN:  Judge, it is a continuing objection.
19         THE COURT:  The objection is overruled.  The
20  documents are entered into evidence.
21         (Whereupon, Government's Exhibits KM-6, KM-7 and
22  KM-8 were received in evidence.)
23  Q   Showing you Government's Exhibit KM-6.
24         What are we looking at here?
25         (At this time a document was exhibited on

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

1 courtroom screen.)

2 A   Can you zoom out, please, to the edges of the

3 display.

4 Q   I will zoom out.

5 A   That is good.

6        On this display we are looking at a narrow area

7 of frequency on the recording.  By frequency, what I mean

8 is the measurement of the sound that is an analogy to the

9 piano.  On the piano you have 88 keys.  On the far

10 left-hand side you have keys that are very low in

11 frequency, a bass style.  On the far right-hand side you

12 have very high frequency, very treble type sounds, you

13 have the bass and treble sounds.

14        On the keyboards on the piano, the lowest key on

15 the piano is in the neighborhood of 30 hertz, H-E-R-T-Z.

16 Hertz is a measurement of frequency.

17        So when we do our examinations, one of the key

18 things that I use is a spectrum display like this.

19        This particular area of frequency we are looking

20 at during the recording is from 115 hertz to 135 hertz.

21        If you were to have a spectrum analyzer in a

22 piano recital and you would hit a single note, you would

23 have one of the notes which would appear somewhere in the

24 neighborhood of 125, 135 hertz.

25        This recording, however, did not have many

1 tones.  But I did find a tone at precisely 127.55 hertz.

2        One of the things I'm looking at in this type of

3 display is whether or not there are side bands.  And a

4 side band would occur when a copy is made.  That is one of

5 the things I look at when doing a spectrum display like

6 this.

7        The reason a copy would have a side band is when

8 you are trying to copy an analog tape like this, the

9 take-up reel that I mentioned earlier is turning.  And it

10 is being -- it is being driven by what is called capstan,

11 C-A-P-S-T-A-N.  And a capstan is a very precise mechanical

12 device that tries to turn the tape at the very precise

13 speed that it was recorded at.  But it is a mechanical

14 device, a mechanical item.  It cannot do that

15 precisely enough to avoid a side band.

16        A side band might occur in the neighborhood, in

17 this case -- on this tone at about 126 hertz or 128 hertz.

18 And that would be one of the indicators I would look for

19 in terms of trying to identify a remnant of a copying

20 process.

21 Q   And you did several of these throughout your

22 examination, I take it?

23 A   I did several spectrum displays, yes, sir.

24 Q   Okay.

25        And 6, and 7 and 8 I showed you earlier, those

1 are just a portion of the spectrum displays that you made?

2 A   Yes.  In several different areas in the designated

3 area I did a spectrum display.

4 Q   Did you find in any of the areas where you did a

5 spectrum analysis, did you ever find evidence of copying,

6 or that the tape was a product of some other copy?

7 A   No, sir, I did not.

8 Q   And what, if anything, did that do in terms of your

9 final conclusion that the tape was authentic?

10 A   Well, it was a contributing factor in my finding, in

11 addition to other tests that I did.

12 Q   Okay.

13        And other than the critical listening that we

14 heard about, the magnetic development, and now the

15 frequency, or the wave form analysis, what else did you do

16 to ascertain that this was an authentic tape?

17 A   Yes, sir.

18        This was the narrow brand spectrum test.  And I

19 think we have seen the display for the high resolution

20 wave form.

21 Q   Showing you KM-9, what is KM-9?

22        (Handed to the witness.)

23 A   KM-9 is a display, what is called high resolution

24 wave form display for events 0012 that we saw earlier for

25 the magnetic development.

1        MR. MISKIEWICZ:  The government moves for the

2 admission of KM-9.

3        MR. ROSEN:  Same objection.

4        THE COURT:  Same ruling.  It is admitted into

5 evidence.

6        (Whereupon, Government's Exhibit KM -9 was

7 received in evidence.)

8 Q   Let me go back a second to Government Exhibit KM-3.

9        This is a record event you found at

10 approximately 12 seconds into the tape?

11 A   Yes, sir.

12 Q   And, again, just to make sure, 12 seconds into the

13 beginning of the tape or 12 seconds into the designated

14 area of the tape?

15 A   The beginning of the tape.

16 Q   So before any of the stuff that we heard yesterday;

17 is that correct?

18 A   That's correct, sir.

19 Q   All right.

20        Now, KM-9 in evidence, how is this related to

21 that photograph that you saw?

22 A   Yes, sir.

23        What we are looking at here is what is called a

24 high resolution wave form display.

25        The information that you see is on the left

Marr-Direct/Miskiewicz
520

1  channel and right channel.
2        When I play back the microcassette tape in the
3  laboratory, I have a machine which is professional
4  quality, and it plays back both left and right channels.
5  The tape itself that I examined was a mono recording. It
6  only had one channel. You see the very same thing on both
7  left and right channels.
8        For playback purposes and analysis purposes, I
9  use a playback head that has both a left channel sensor
10 and a right channel sensor in order to be able to see more
11 precisely what is contained on the tape itself.
12       And as you can see, there is slight differences
13 on the top display from left to right as you see on the
14 bottom display from left to right.
15       Again, as I said yesterday, a high resolution
16 wave form display is analogous to a heart monitor on the
17 hospital.
18       As I listen to a display like this, the cursor
19 passes from left to right and I'm hearing exactly what I'm
20 seeing on the computer display.
21       On the heart monitor in the hospital, you can
22 see the cursor tracing the activity of the heart. But it
23 is the same analogy.
24       Again, this information is simply a different
25 way of looking and hearing the very same thing on the

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

Marr-Direct/Miskiewicz
521

1  tape. The magnetic development allows you to see the
2  magnetic tracks, the high resolution wave form display
3  allows you to see the amplitude of the signal as it
4  progresses from left to right. The spectrum display that
5  we looked at a minute ago is a segment in the recording
6  that processes the information and displays it
7  differently. It displays the frequency on the horizontal
8  of the display.
9        In this case we are seeing time on the
10 horizontal from left to right and the intensity on the
11 vertical for each left and right channel.
12 Q   So these squiggly lines that go up and down, this
13 represents sound or recorded sound on the tape?
14 A   Yes, that's correct.
15 Q   It could be voices or music or whatever, correct?
16 A   That's correct, yes, sir.
17 Q   And there is -- let me zoom in here. And there is
18 one segment here in the beginning where it kind of goes
19 flat.
20       What would that tell you?
21 A   From my analysis, I remember that was event number 11
22 in which the record head and the erase head were very
23 clearly at a record event. And as the tape is being
24 played back there is a segment with no record information
25 between the erase head and the record head.

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

Marr-Direct/Miskiewicz
522

1  Q   So what would that tell you?
2  A   In this case it would tell me it was an original
3  record event.
4  Q   And from this display, if again the tape, KM-1 and
5  KM-1-B, was the product of, say, multiple pieces of
6  recording somehow spliced together, would this wave
7  form -- high resolution wave form analysis help you
8  determine that?
9  A   Yes.
10       It would be one of the contributing factors.
11 And I would look at the intensity level. For example, at
12 event 11 there was essentially no sound at all.
13       I would look at whether or not there was the
14 distance between the record head and the erase head
15 matched the magnetic development picture that it would
16 make separately.
17 Q   Okay.
18       Putting all those pieces together would help you
19 identify whether or not this recording had been, you know,
20 blended together or spliced together from many bits of
21 voice?
22 A   Yes, sir, it would.
23 Q   And, again, this is 55 -- what we are looking at at
24 the screen now is some 55 minutes before what we heard
25 yesterday; is that correct?

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

Marr-Cross/Rosen
523

1  A   Yes, sir.
2  Q   And in what we heard yesterday, did you see anything
3  that suggested that the recording was a product of, you
4  know, bits and pieces slapped together and edited in some
5  fashion?
6  A   No, sir, I did not.
7  Q   How long did it take you to do all this?
8  A   As I recall from my notes, it took in the
9  neighborhood of two to three months.
10 Q   For the entire tape?
11 A   Just for the designated area.
12 Q   You mean the last 39 minutes?
13 A   Yes, sir, that's correct.
14 Q   And after that two to three months and as you sit
15 here today, do you have any doubt about the authenticity
16 of this recording?
17 A   No, sir.
18       MR. MISKIEWICZ: No further questions.
19       THE COURT: Cross-examination.
20
21 CROSS-EXAMINATION
22 BY MR. ROSEN:
23 Q   Mr. Marr, in approximately February of 2011, were you
24 in this building at the U.S. Attorney's Office preparing
25 for a court proceeding that was to take place at the end

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

1    of February 2011?
2    A    Yes, sir.
3    Q    And did you bring anything with you from Quantico,
4    Virginia, your place of employment for the FBI, in
5    anticipation of court proceedings at the end of February
6    of 2011?
7    A    Yes, sir.  I brought my notes and my report.
8    Q    Right.
9             And did you bring Q-39, that is now KM-1-B, or
10   KM-1, with you to that meeting?
11   A    No, sir.  I then returned sometime before that.
12   Q    All right.
13            We are focusing in on February 2011, okay?
14   A    Yes, sir.
15   Q    And you come here for a meeting with these folks at
16   this table, Agent Schelhorn and I believe Assistant U.S.
17   Attorney Carrie Capwell, Mr. Miskiewicz, for preparation
18   for this hearing, correct?
19   A    For the hearing in February of 2011, yes, sir.
20   Q    All right.
21            The Q-39 or KM-1, Q-39 was the designation back
22   in 2004; is that correct?
23   A    Yes, sir.
24   Q    And after you completed your analysis, it became KM-1
25   and then KM-1-B?

1    A    Yes, sir.
2    Q    And that is what we are talking about?
3    A    Yes, sir.
4    Q    Now, when prior to February 2011 did you have
5    physical possession of Q-39?
6    A    I had possession in January 2011 because I was asked
7    to prepare a re-enhancement of the designated area of that
8    tape.  And the CD that I produced is what we heard
9    yesterday.
10   Q    So in January of 2011, about a month prior to your
11   meeting in this building at the U.S. Attorney's Office,
12   you had possession of the tape; is that correct?
13   A    Yes, sir.
14   Q    So everybody is clear, the designated area deals with
15   the conversation between Mr. Tarantino and Mr. Gargiulo;
16   is that correct?
17   A    Yes, sir.
18   Q    We are not talking about the beginning of the tape
19   where there are a lot of stops and starts, we are talking
20   just about the designated area; is that correct?
21   A    Yes, sir.
22   Q    And you did your copy on your equipment in Quantico;
23   is that correct?
24   A    Yes, sir, we did.
25   Q    Now, before you came, did you transfer that Q-39,

1    KM-1 and 1-B back to the U.S. Attorney's Office or to the
2    FBI?
3    A    As I recall I did, yes.  Probably several weeks
4    before that.
5    Q    Okay.
6             Why didn't you just carry it back with you?
7    A    Well, as I recall, sir, I didn't know when I would be
8    coming up here.  And our typical practice is to return
9    evidence along with the enhanced copies that I produced
10   when I complete the exam.  And I completed that in January
11   of 2011.
12   Q    Did anyone assist you in creating that enhanced
13   version that we saw yesterday?
14   A    Yes, sir.
15            I had a technician that assisted me.
16   Q    And what was the technician's name?
17   A    Andrew Galotti, G-A-L-O-T-T-I.
18   Q    Can you tell us what are safety tabs on a
19   microcassette tape?
20   A    Yes, sir.
21            On analog tapes, both microcassette as well as
22   cassette tapes, there are small plastic tabs located on
23   the edge of the housing.  And those safety tabs are
24   designed to prevent accidental over-recordings or erasures
25   after you decided you don't want to have anything else

1    recorded on that tape.
2             In my examination, it is one of the things I
3    always check, to be sure that the safety tabs had been
4    removed.
5    Q    So there were no safety tabs on the microcassette
6    when you did your enhanced version in January of 2011?
7    A    That's correct, sir.
8    Q    And the purpose to make sure of that is so there
9    would be no over-recording created on the tape?
10   A    That's correct.
11   Q    Is that correct?
12   A    Yes, sir.
13   Q    When you got here in 2011 in February, around the
14   20th or 21st of February, and you were in this building
15   and meeting with these people -- I apologize -- with
16   counsel and the agent, did you have any recording
17   equipment in preparation of your testimony in the room
18   with you?
19   A    Yes, sir, I did.
20   Q    Did you have an RMP-9 player?
21   A    Yes, I did.
22   Q    And who provided the RMP-9 player in that room on
23   the -- approximately on February 20th, 2011?
24   A    That recorder was provided by the New York field
25   office technical services division.  I'm not exactly sure

Marr-Cross/Rosen

528

1  who secured who, but it came from the New York field
2  office.
3  Q   Was it brought to the room by Agent Schelhorn?
4  A   I don't recall, sir.  But it was made available.
5  Q   Who made it available; what person physically brought
6  that into the room?
7  A   I don't recall, sir.  But I know I was told that it
8  came from the FBI office in New York.
9  Q   Who told you that?
10 A   Agent Schelhorn.
11 Q   And what is an RMP-9 player?
12 A   An RMP-9 player is a professional quality
13 microcassette playback unit, and it allows you to adjust
14 the azimuth as I discussed earlier.  It has high quality
15 motors and electronics to insure we get very high quality
16 playback recording.  And it is also designed so that it
17 does not have any capability to erase, or any record head
18 in it.
19 Q   Okay.
20        So you have safety tabs on the cassette.  You
21 have an RMP-9 player that is not capable of recording,
22 correct?
23 A   Yes, sir, that's correct.
24 Q   And done to the safety of the microcassette to
25 prevent an over-record, a tampering, some form of break on

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

Marr-Cross/Rosen

529

1  the tape; is that correct?
2  A   That is what it is designed for, sir.
3  Q   Right.
4        By the way, you and I have never had an
5  opportunity to sit down privately and discuss this case,
6  have you -- have we?
7        MR. FLYNN:  Objection.
8        THE COURT:  Sustained.
9  Q   You have done that with the United States government
10 in preparation of your testimony here today?
11       MR. MISKIEWICZ:  No objection.
12       THE COURT:  Did you meet with the government in
13 preparation of your testimony and talk about the case
14 today?
15       THE WITNESS:  Yes, your Honor, I did.
16 Q   Now, in the room with you was Ms. Carrie Capwell, one
17 of the AUSAs; is that correct?
18 A   Yes, sir.
19 Q   And Agent Schelhorn was there; is that correct?
20 A   Most of the time, yes, sir.
21 Q   And did the RMP-9 function properly?
22 A   Sir, we had problems playing back the Q-39 tape.  It
23 functioned satisfactorily sometimes, and sometimes it did
24 not.
25 Q   And what is the danger of an improper functioning of

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

Marr-Cross/Rosen

530

1  an RMP-9 player?
2  A   Well, the -- lots of things could happen.  But the
3  main thing is you can't hear what is being played back.
4  Q   The key is you want to hear what is being played
5  back, but you weren't worried about somebody
6  over-recording on Q-39, correct?
7        MR. MISKIEWICZ:  Objection to form.
8        THE COURT:  Overruled.
9  Q   You can answer the question?
10 A   I'm sorry, sir, I didn't hear what the question was.
11       MR. ROSEN:  Could you please read back the
12 question, Mr. Reporter?
13       THE COURT:  Harry, please.
14       (Whereupon, the court reporter reads the
15 requested material.)
16 A   No, sir.  We are always worried about any possible
17 over-recordings.
18 Q   You said RMP-9 cannot over-record, and you cannot
19 record on the microcassette; is that correct?
20       MR. MISKIEWICZ:  Objection -- withdrawn.  Sorry.
21       THE COURT:  You can answer the question.
22 A   Yes, sir, that's correct.  It does not have the
23 capability for over-recording.
24 Q   So you weren't worried about it using the RMP-9?
25       MR. MISKIEWICZ:  Objection.  Asked and answered.

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

Marr-Cross/Rosen

531

1        MR. ROSEN:  I'm trying to get a straight answer.
2        THE COURT:  Overruled.
3        Please, no speeches.
4        MR. ROSEN:  Sorry.
5        THE COURT:  The jury is instructed to disregard
6  that.
7        You can answer the question.
8  A   Yes, I was -- we used the RMP-9 because it is
9  designed to prevent over-recordings.
10 Q   So you were not worried about over-recordings coming
11 onto the microcassette?  Yes or no.
12 A   Yes, sir, I'm always worried whether or not there are
13 going to be over-recordings.
14 Q   Even though you are using a machine that doesn't have
15 the capability of doing that?
16 A   Yes, sir.
17 Q   Did the government -- withdrawn.
18       Did someone from the United States Attorney's
19 Office bring into the room another recorder?
20 A   Yes, sir.
21 Q   And the other recorder, was it provided by the United
22 States Attorney's Office?
23 A   Yes, sir.
24 Q   And how was it physically brought into the room?
25 A   I don't recall exactly, sir.  All I know is when we

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

Marr-Cross/Rosen

532

1   had problems playing back on the RMP-9, another hand-held
2   recorder was made available.
3          And as a playback in case the RMP-9 would not be
4   functioning for playback to the Court, a hand-held
5   recorder would be able to play back that cassette, that
6   microcassette.
7   Q   And did you play on that reporter Q-39 or KM-1-B?
8   A   It was tested, and I don't recall who it was that
9   tested it.  But, yes, it was tested.
10  Q   Tell us what the test was composed of.
11  A   Well, first of all, you monitor it to make sure the
12  microcassette does not have the safety tabs intact.  When
13  you pop the safety tabs, the integral safety mechanism on
14  any device, the RMP-9 doesn't have recording capability,
15  but any tape recorder has a safety mechanism that senses
16  whether or not the safety tabs have been removed.
17         In this situation, to the best of my knowledge,
18  the microcassette tape was tested.  It was advanced,
19  relined, and determined that it was going to be
20  functional.
21         And I know you are going to get into this, sir,
22  but the issue is subsequent to that time period I was made
23  aware that there was an over-recording in the designated
24  area.
25  Q   We are going to get to that, sir.  Just answer my

Marr-Cross/Rosen

533

1   questions, sir, with respect to the testing.
2          THE COURT:  The question that was asked was:
3   Tell us what the test was composed of.
4          So can you tell us what you tested for.
5          THE WITNESS:  Yes, I explained that.
6   Q   A --
7   A   I explained that, sir.
8   Q   A series of stops, starts, playing?
9   A   Yes.  Playing the tape, insuring the tape advanced
10  forward, rewound properly and did not jam.
11  Q   And did it function?
12  A   Yes, sir.
13  Q   Were the safety tabs -- were they removed from the
14  microcassette when you did the testing?
15  A   Yes, sir.
16  Q   As a matter of fact, they had been removed in the
17  original housing from 2005; is that correct?  Or 2004?
18  The original housing.
19  A   The safety tabs had been removed years before this,
20  correct.
21  Q   And in its present housing -- who removed the safety
22  tabs from the present housing?
23  A   Well, at the event we are discussing --
24  Q   No.  We are not talking about the event.  We are
25  talking about KM-1 in its present housing, who removed the

Marr-Cross/Rosen

534

1   safety tabs for the protection of the microcassette?
2   A   I did, sir.  But that is not the one I used.
3   Q   You didn't use KM-1?
4   A   No, sir.
5          If I can explain --
6   Q   Wait, wait, before you explain --
7          THE COURT:  Do you want him to explain?
8          MR. ROSEN:  Yes, let him explain and I will go
9   back into it.
10         THE COURT:  Thank you.
11         MR. ROSEN:  I'm a little confused about what is
12  in evidence, that is why.
13  A   At this preparation time period we determined that
14  the RMP-9 would be used.  And to my knowledge it was the
15  next day, or later that day or the next day.
16         That Q-39 tape with the Radio Shack housing
17  jammed, the RMP-9.
18         Subsequently the FBI office here sent the tape
19  down to me and I repaired that tape.  I took --
20  Q   Excuse me.
21         Just tell us the timeframe when this took place.
22  A   This was around the 20th or the 25th of February,
23  2011.
24         The tape jammed, and it was sent to me to be
25  repaired.

Marr-Cross/Rosen

535

1          I repaired it.  And I sent the tape to a new
2   Olympic MC 60 housing.
3          I removed the safety tabs from the MC 60 housing
4   and returned the Q-39 housing as well as the MC 60 housing
5   with the Q-39 tape enclosed back to the office here in New
6   York.
7          MR. ROSEN:  May I approach, your Honor?
8          THE COURT:  Yes.
9          (Counsel approaches the witness.)
10  Q   I show you what is in evidence as KM-1-B.  Do you see
11  that?
12  A   Yes, sir.
13  Q   And what you just said is when you played the tape in
14  the offices of the U.S. Attorney around February the 20th
15  of 2011, the microcassette was still in its original
16  housing?
17  A   Yes, sir, that's correct.
18  Q   So when an event that took place in that office on
19  the 20th of February, 2011, it was actually in the
20  original housing that was received by the FBI from 2004?
21  A   That's correct, sir.
22  Q   Now, prior -- after you did the housing change, based
23  on some jamming aspect as you characterized it to us, was
24  there a change made by the FBI for your continuation as a
25  representative of Quantico, Virginia in this case?

Marr-Cross/Rosen

536

1    MR. MISKIEWICZ: Objection.
2    THE COURT: Sustained.
3  Q   Prior to future proceedings that took place in
4  February and March of this year, were you removed from
5  participating in those hearings by the U.S. Attorney's
6  Office in a joint decision with the FBI, your supervisor,
7  in Quantico?
8    MR. MISKIEWICZ: Objection.
9    THE COURT: Sustained.
10    Come up for a moment, please.
11    Excuse us.
12    (Continued on next page.)
13
14
15
16
17
18
19
20
21
22
23
24
25

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

---

Marr-Cross/Rosen

538

1  first given to Kenneth Marr and it was decided that it
2  should be transferred to me for the examination.
3    MR. MISKIEWICZ: Okay.
4    THE COURT: So transferred doesn't mean he is
5  removed. It means someone else is going to look at it and
6  examine it.
7    I don't think there is anywhere in this
8  transcript where you can say that he was removed.
9  Certainly not on the two pages that you showed me that are
10  circled, it doesn't say "removed." And that is page 88
11  and 89. There is a conversation about a conflict and what
12  does it mean.
13    MR. MISKIEWICZ: Judge, I would like to also --
14    MR. ROSEN: I would like to read into the record
15  the rest of what was there.
16    Do you want me to use a different word than the
17  word -- you want me to say "transferred"?
18    THE COURT: I don't think there is any basis to
19  say removed.
20    MR. ROSEN: I will use the word "transferred."
21  Because of a conflict. And it says it right here.
22    THE COURT: Let me hear from Mr. Miskiewicz for
23  a moment and then I will let you read in the words that
24  you would like to read.
25    MR. MISKIEWICZ: My objection is that what

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

---

Marr-Cross/Rosen

537

1    (Whereupon, at this time the following took
2  place at the sidebar.)
3    THE COURT: My understanding is that he wasn't
4  removed per se. An additional witness came in.
5    MR. ROSEN: I have the transcript. There was a
6  conflict and a decision made --
7    THE COURT: Let me read this.
8    MR. ROSEN: Yes.
9    Did I give you the right transcript, this is
10  Mr. Snyder?
11    THE COURT: Yes.
12    (Whereupon, at this time there was a pause in
13  the proceedings.)
14    THE COURT: It doesn't refer to him as being
15  removed. It refers to --
16    MR. ROSEN: He wasn't allowed.
17    THE COURT: Let me finish for a minute, please.
18    MR. ROSEN: I'm sorry. I apologize.
19    THE COURT: It refers to Mr. Snyder
20  participating, and let me get the exact word.
21    Here it is.
22    This is the answer that Mr. Snyder gives.
23    Please identify when you say tape, are you
24  talking about Q-39, the microcassette?
25    Answer: Specimen Q-39, the microcassette, was

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

---

Marr-Cross/Rosen

539

1  counsel is referring to is the testimony of the recent
2  motion to exclude the tape. And Mr. Snyder is saying he
3  was brought in upon the discovery of the over-record.
4    Mr. Snyder testified that at that point, because
5  of the over-record and what appeared to be Mr. Marr's
6  voice, and the fact that Mr. Marr's voice was placed there
7  either accidentally by Mr. Marr, or potentially -- and
8  this was very much at issue then and will continue to be
9  so -- potentially placed there by Mr. Owen, who attempted
10  to tamper with federal evidence.
11    He was then brought in because at that stage it
12  would have been appropriate to have another examiner look
13  at this and begin to examine whether or not there was
14  evidence of an additional crime.
15    So if we are going to go down this path, I'm
16  prepared to call Mr. Owen. I'm prepared to call
17  Mr. Snyder. And we are prepared on rebuttal to put in, if
18  necessary, the fact that after they got the tape, this
19  tampering occurred.
20    I think it is far afield and I think it is going
21  to be highly prejudicial to the defendant. But I see no
22  other way of rebutting the misstatements of counsel than
23  to do so. Because Mr. Marr is obviously not removed. He
24  is right there. He is still on the case. He continues to
25  be on the case. And he has no conflict of interest

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

1  whatsoever with regard to his testimony here today.

2  So I object to this entire line of questioning,

3  and any suggestion that Mr. Marr has been removed. I'm

4  going to seek to rebut, or in our case in chief bring in

5  the fact that their expert not only tampered with the tape

6  but perjured himself on the stand. And we are prepared to

7  bring that out as well. And among other things, that he

8  lied about what he provided to prior counsel.

9  THE COURT: That is a lot to digest.

10  I will give you an opportunity to read what you

11  would like to read into the record. You can talk to your

12  client about what is going on here. We will take our

13  break and you can make a determination if you want to get

14  involved in this.

15  Let me hear what you have to say with respect to

16  what is in the transcript.

17  MR. ROSEN: It says: The U.S. Attorney's Office

18  and our unit chief felt another examiner should conduct

19  the examination.

20  MR. MISKIEWICZ: In 2012.

21  MR. ROSEN: That's right.

22  And I will go back to how the tape got back to

23  Quantico, and the decision was for somebody else to do it

24  other than him.

25  I'm not concerned one bit, one iota, by the same

1  threats we got at the motion to suppress. If they want to

2  charge Tom Owen, a respected guy of 40 years in this

3  field, with causing the damage to the tape after what we

4  went through, let them bring that. I'm not concerned

5  about that one bit. I was not the attorney of record at

6  the time.

7  If they want to bring Tom Owen, and they want to

8  use these frivolous, obnoxious accusations against this

9  guy, let them do it. But don't tell me --

10  MR. FLYNN: Keep your voice down, please.

11  MR. ROSEN: I don't want to say anything

12  anymore. He can do what he wants.

13  MR. MISKIEWICZ: What counsel evidences here is

14  this is exactly what he wants to do, is to completely

15  change the topic away from the subject of his testimony,

16  which was his analysis in 2005, and make it about a

17  subsequent federal investigation into possible tampering

18  in 2012.

19  This has nothing to do with the tape. And I

20  understood the Court's permission and latitude was to

21  attack Mr. Marr as potentially negligently handling the

22  tape. And I'm not objecting to any of that. I can't and

23  I won't.

24  But now to suggest falsely that he has been

25  removed from this investigation is, A, not true. And even

1  if it were arguably true, it is going to open the flood

2  gates to a complete sideshow, a trial within a trial,

3  which has nothing to do with his analysis, your Honor.

4  THE COURT: Let me ask you, Mr. Miskiewicz:

5  What is your evidence so we all know what we are dealing

6  with here in terms of the potential, and what you maintain

7  is going on.

8  The witness has said -- Mr. Marr -- it sounds

9  like my voice. He also indicated the possibility that

10  with this hand-held tape, he -- the hand-held tape

11  recorder, he might have had his voice put on there.

12  There has been no indication that he did so

13  deliberately. However, the defendant is entitled to

14  cross-examine him on how it got on there.

15  MR. MISKIEWICZ: I have no objection to any of

16  that.

17  THE COURT: All right.

18  MR. MISKIEWICZ: And I don't object.

19  All I'm saying is that the misrepresentation

20  that he has been removed from the case, I don't have any

21  way of rebutting that other than to bring out the fact

22  that there was an investigation, an inquiry, which he did

23  not participate in. That is true. We can even stipulate

24  that following the discovery of the over-record, there was

25  an investigation into how it got there. But he didn't

1  participate in it.

2  THE COURT: And you still don't know how it got

3  there?

4  MR. MISKIEWICZ: No. And this was part -- I'm

5  sorry.

6  THE COURT: So saying Mr. Owen was the one who

7  put it there, you don't have proof of that at this point?

8  You don't have direct proof?

9  MR. MISKIEWICZ: We don't have direct proof.

10  THE COURT: You are not going to charge him,

11  Mr. Miskiewicz?

12  MR. MISKIEWICZ: No. But there are other

13  aspects of his testimony in court that are under inquiry.

14  THE COURT: All right.

15  But at this point in time, I don't know if

16  Mr. Owen is coming in. Are you calling him?

17  MR. ROSEN: I don't plan on it.

18  THE COURT: All right.

19  So rather than waste a lot of time here, I think

20  you both are in agreement that the witness was not removed

21  from the case in the sense of you are removed forever.

22  MR. ROSEN: Yes.

23  THE COURT: He is here currently, all right?

24  You have brought out the fact that he was in

25  charge of the tape at various points. You can argue to

Marr-Cross/Rosen

544

1  the jury that he is the one who screwed it up sometime
2  between 2005 and 2011.
3      MR. ROSEN:  I want to just put in a word, that I
4  can use temporarily transferred to allow Mr. Snyder to do
5  an analysis.
6      MR. MISKIEWICZ:  It is not accurate.  He was
7  never transferred from this case.
8      MR. ROSEN:  Temporarily assigned to do the
9  analysis.
10     THE COURT:  Mr. Snyder did an analysis, you can
11  stipulate to that.
12     MR. MISKIEWICZ:  He did an analysis to determine
13  if Tom Owen tampered with it.
14     MR. ROSEN:  No, he did not, please, come on.
15     THE COURT:  Please now.  I have the jury
16  waiting.  Let me let them go and I will hear this in open
17  court.
18
19
20
21
22
23
24
25

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

Marr-Cross/Rosen

546

1      (Whereupon, the following takes place in the
2  absence of the jury.)
3      THE COURT:  We are ready to proceed.
4      Mr. Rosen, I will allow you to examine the
5  witness with regard to another individual being able to
6  review the tape.
7      The government, from what I can see, is not
8  going to be able to establish that Mr. Snyder was brought
9  on for an investigation at this point in time, based on
10  what Mr. Snyder says.  Mr. Snyder refers to Mr. Marr being
11  transferred.  And I don't know if that is the word I'm
12  comfortable with.  But certainly the evidence is unrefuted
13  that Mr. Snyder was brought in to reexamine the tape.  And
14  that is appropriate.
15     MR. ROSEN:  Judge, just for the record, to
16  support the Court's finding, this is to Mr. Snyder on page
17  394 of the transcript.
18     Do you know why you were reassigned to the case?
19     Answer:  Because management felt I should take
20  care -- I should take over the case.
21     Did they give you a reason why that was being
22  done?
23     Answer:  Because it was -- it sounded like it
24  was Mr. Marr's voice on the over-record.
25     I will use the word "reassign temporarily."

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

Marr-Cross/Rosen

545

1      (Whereupon, at this time the following takes
2  place in open court.)
3      THE COURT:  Ladies and gentlemen, let's take a
4  break and I will deal with this and see you in 15 minutes.
5  Thank you.
6      Don't talk about the case.  Talk about baseball,
7  football, if there is anything going on.
8      (Whereupon, at this time the jury leaves the
9  courtroom.)
10     THE COURT:  We will take five minutes gentlemen.
11
12     (Whereupon, a recess was taken.)
13
14
15
16
17
18
19
20
21
22
23
24
25

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

Marr-Cross/Rosen

547

1      THE COURT:  I don't think you have to use any
2  particular word.  He came into the case, Mr. Snyder.
3      I will not allow you to use the word "removed."
4  But he came into the case and it was a decision of
5  management.
6      MR. MISKIEWICZ:  Judge, I'm not rearguing the
7  ruling.  But I want to make clear that counsel will be
8  asking the witness his understanding in that Mr. Rosen
9  won't be reading prior testimony of another witness into
10  this record.
11     THE COURT:  That's correct.
12     MR. ROSEN:  Yes, absolutely.
13     THE COURT:  Bring in the jury, please.  And
14  bring in Mr. Marr.
15     (Whereupon, the jury at this time entered the
16  courtroom.)
17     THE COURT:  We are all back.  Please have a seat
18  and we will continue with the cross-examination of
19  Mr. Marr.
20  BY MR. ROSEN:
21  Q    Mr. Marr, after the February, approximately 20th,
22  session that you had in the U.S. Attorney's Office prior
23  to court proceedings, did the microcassette tape --
24     MR. ROSEN:  I'm sorry, I thought she was still
25  there --

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

548

1  THE COURT:  All set?
2  MR. ROSEN:  Yes.
3  Q  Was the microcassette within a couple of weeks sent
4  back to Quantico for evaluation?
5  A  Yes, sir, and repair.
6  Q  Was a David Snyder assigned for the reanalysis of the
7  tape?
8  A  In 2011 --
9  Q  Yes.
10  A  -- he was not involved.
11  Q  I apologize, you are right.
12  Eventually in February of 2012, was the Q-39
13  KM-1-B sent to Quantico?
14  A  I think it was in January of this year.  But, yes,
15  sir, it was.
16  Q  And when it arrived, what was the purpose of it being
17  there?
18  A  It was to be evaluated, as you said.
19  Q  Was Mr. Snyder, a technician in your office, assigned
20  to do the analysis?
21  A  Yes, sir.
22  He is a qualified authenticity examiner.
23  Q  You were not assigned to the case that you had
24  been -- that analysis on a case that you had been assigned
25  to since 2004; is that correct?

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

549

1  A  2005.  Yes, sir, that's correct.
2  Q  Could you tell us why?
3  A  Yes, sir.
4  In approximately January of this year, 2012, the
5  New York office returned or sent the tape down to Quantico
6  for review.  And during the review, it was determined that
7  there is an over-recording in the designated area.
8  Q  Which means that the tape now as it sits here today
9  is not continuous, correct?
10  A  That's correct, sir.
11  Q  Not uninterrupted, correct?
12  A  That's correct, sir.
13  Q  Do you know when the over-recording, which has now
14  made this tape a non-continuous tape, was made?
15  A  I would --
16  MR. MISKIEWICZ:  Objection -- I'm sorry, I will
17  withdraw the objection.
18  A  Yes, sir.
19  I could speculate, and I'm pretty certain --
20  Q  I'm not asking you to speculate.  I'm asking you to
21  tell us when since 2005, when you had possession, until
22  to-date, was that tape made non-continuous based upon the
23  over-recording.
24  A  My best judgment is that it was in February of 2011.
25  Q  Do you know that for certain?

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

550

1  A  No, sir.
2  Q  Do you know whether or not your voice is on that
3  tape?
4  A  Sir, when --
5  Q  Just say yes or no, and you can explain.
6  A  I don't know for certain, sir.
7  And the explanation --
8  Q  You don't know for sure that your voice is on that
9  tape?
10  A  It sounds like my voice, sir.
11  Q  Is it your voice?
12  A  I can't say for certain, sir.
13  MR. MISKIEWICZ:  Objection.
14  Q  Have you had the FBI lab or any independent facility
15  make a voice identification comparison between your voice
16  and what is on the tape?
17  MR. MISKIEWICZ:  Objection.  Relevance.
18  THE COURT:  Overruled.
19  A  No, sir.  An analysis has not been done.  But it
20  sounds like my voice.
21  MR. ROSEN:  I have nothing further.
22  THE COURT:  Redirect.
23
24
25

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

551

1  REDIRECT EXAMINATION
2  BY MR. MISKIEWICZ:
3  Q  Mr. Marr, you were asked just now a series of
4  questions by counsel regarding the safety tabs, to take it
5  in order.
6  I show you -- I'm marking now
7  Government's Exhibit KM-10.
8  (Handed to the witness.)
9  Q  Is this -- look at that and then I will have a
10  question for you.
11  (Whereupon, at this time there was a pause in
12  the proceedings.)
13  A  This is an Olympus microcassette tape.  I don't see
14  any handwritten markings on it.  The safety tabs are
15  intact on this tape.
16  Q  All right.
17  Is it similar to the kind of microcassette tape
18  that you spent several months analyzing in 2005?
19  A  Yes, sir, it is.
20  Q  Specifically KM-1 and KM-1-B?
21  A  Yes, sir, it is.
22  Q  And would this fairly demonstrate to the jury what a
23  safety tab is?
24  A  Yes, it would.
25  MR. MISKIEWICZ:  May I have permission to have

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

Marr-Redirect/Miskiewicz

552

1   that -- first of all, we move for the admission of KM-10
2   as a demonstrative piece of evidence, and I would ask to
3   mark it in evidence.
4           MR. ROSEN:  I ask for a continuing objection.
5           THE COURT:  To this piece of evidence?
6   Objection overruled.
7           (Whereupon, Government's Exhibit KM-10 was
8   received in evidence.)
9           MR. MISKIEWICZ:  Permission for the witness to
10  come off the stand?
11          THE COURT:  Yes.
12          MR. MISKIEWICZ:  And approach the jury?
13          THE COURT:  Yes.
14          (The witness complies.)
15  Q   Mr. Marr, can you --
16          MR. ROSEN:  Judge, do you want me on this side
17  or the other side?
18          THE COURT:  Wherever you can see best.
19  Q   Mr. Marr, can you just approach the box and just show
20  the members of the jury what you referred to as the safety
21  tab.
22  A   Yes, sir.
23          On the microcassette housing, this is side A.
24  You can see the letter A.
25          This is side B.

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

Marr-Redirect/Miskiewicz

553

1           On the microcassette housing there is a small
2   piece of plastic right here for side A, and over here for
3   side B.
4           That is so that on side A, once you decided that
5   that is the last you want to record on that, you just pop
6   that little piece of plastic, right at the edge of the
7   corner of the housing.
8           These small pieces of plastic are intact.  That
9   is how you buy it in the store.
10          When I do an exam, I make sure that little piece
11  of plastic is popped out of side A and side B.
12  Q   And what you are showing the jurors now, that has the
13  plastic tabs still in it?
14  A   Yes, sir.
15  Q   And how would you remove the plastic tab?
16  A   I would take a small device, maybe like a
17  screwdriver, and place it adjacent to the tab and pop it
18  out.  It is a small little area adjacent to it that allows
19  you to insert like a little small screwdriver or a device
20  to pop it out.
21          Once it is popped out, the recorder has a small
22  sensor, and the small sensor -- once you put the tape in,
23  the sensor inserts itself where that safety tab is
24  located.  And once that safety tab sensor, typically a
25  small little plastic or metal arm, inserts itself in the

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

Marr-Redirect/Miskiewicz

554

1   small area where the safety tab used to be, and the
2   machine detects that the safety tab has been removed and
3   deactivates the recording mechanism of that recorder.
4   Q   And as to KM-1 and KM-1-B, the original microcassette
5   in 2005, did you take note when you handled it and did
6   your analysis that the safety tabs had been removed or
7   were they still there?
8   A   They had been removed and that is in my notes.
9   Q   And so is it accurate to say that that should have
10  prevented anyone from being able to over-record onto that
11  piece of evidence?
12  A   Yes, sir.
13  Q   Including yourself?
14  A   Yes, sir.
15          That is the purpose of those safety tabs.
16  Q   Okay.
17          So if, as counsel asked you, that is your voice
18  that is currently on there, and it was discovered in 2012,
19  it is because the safety tabs failed?
20  A   That is the only thing that I could assume, sir.
21  Q   Okay.
22          You can have a seat again.
23          Thank you.
24          (The witness resumes the witness stand.)
25  Q   Other than the event you testified about on

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

Marr-Redirect/Miskiewicz

555

1   cross-examination in early 2011 when there was another
2   hand-held cassette recorder provided by the U.S.
3   Attorney's Office, did you ever handle the tape, KM-1 and
4   KM-1-B, in a machine that was capable of recording voices
5   or music or anything else on that tape?
6   A   No, sir, I did not.
7   Q   So you were asked, do you know when the over-record
8   that exists today occurred, when do you think that that
9   over-record occurred and why?
10          MR. ROSEN:  Objection to the form of the
11  question, what he thinks.
12          MR. MISKIEWICZ:  I was just referring to his
13  cross-examination.  If I misstated the cross, I will
14  rephrase it.
15          THE COURT:  All right.
16          I will allow you to ask that question because he
17  gave certain opinions that he phrased, and he doesn't know
18  for certain, and he thinks this was the result.  So I will
19  allow it based on that.
20  A   To my best knowledge, sir, that would be the only
21  time that I am aware of.  Because I was present during
22  those preparation times, and the voice sounds like my
23  voice.
24  Q   And have you heard the recording since the discovery
25  of the over-record?

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

1  A  Yes, sir.

2  Q  Counsel asked you a series of questions about a

3  Mr. David Snyder.

4  A  Yes, sir.

5  Q  And he is a fellow audio examiner?

6  A  Yes, sir, he is.

7  Q  And did he have any role in -- withdrawn.

8      When you do an authenticity exam, do you have

9  anyone else go over your work?

10 A  Yes, sir.

11     **An authenticity examination, one of the quality**

12 **assurance aspects of the work that we do is that the work**

13 **and the examination and the report are reviewed and**

14 **analyzed by a peer reviewer.**

15     **A peer reviewer is common in the industry, and**

16 **it insures that there are at least two trained individuals**

17 **that have looked and listened to the results of the**

18 **examination and agree that the results are accurate.**

19 Q  Who peer reviewed your 2005 analysis?

20 A  **Examiner Snyder.**

21 Q  In 2005 did anyone -- Mr. Snyder or anyone else --

22 disagree with your findings?

23 A  **No, sir.**

24 Q  After the event that counsel asked you about, and

25 Mr. Snyder was brought in in early this year, are you

1  aware of any change in the opinion of the authenticity of

2  the tape by Mr. Snyder?

3      MR. ROSEN:  Objection.  Calls for a hearsay

4  conclusion.

5      THE COURT:  Sustained.

6  Q  Well, was Mr. Snyder in early 2012 asked to examine,

7  or reexamine the authenticity of the tape or examine the

8  over-record, if you know?

9  A  **He was asked to examine the area in question, the**

10 **over-record.**

11 Q  And that said, is there anything about that

12 over-recording that changes the analysis, all the analysis

13 that you did back in 2005 and your conclusions about the

14 authenticity of that tape?

15 A  **Other than that area, no, sir.**

16 Q  All right.

17     How much of that area is over-recorded, in terms

18 of time?  How much time in the tape is over-recorded?

19 A  **Approximately 17 seconds.**

20 Q  And is it fair to say that the over-recording is in

21 that approximate area of the tape where the defendant is

22 heard to say the feds are really fucked up and they can

23 use anything?

24 A  **I would really have to refer to the transcript to be**

25 **sure.**

1  Q  But you heard this tape before.  Do you recall if the

2  over-record occurs -- let me ask you this:  Does it occur

3  anywhere in the vicinity of, so, Mel goes, Chris, listen,

4  fucking U.S. Attorney wants to take DNA from you.  If you

5  fucking botched the armored car job up, blah, blah, blah.

6      Is that where the over-record occurs?

7  A  **I would have to check for sure, but it sounds**

8  **familiar.**

9  Q  But is that still on the tape now?

10 A  **That area has been over-recorded.**

11 Q  Well, we will look at -- is there something that

12 would refresh your recollection as to where the

13 over-recording currently exists?

14 A  Yes, sir.

15     **My -- the transcript that is from the designated**

16 **area, it would -- I would look at approximately one hour**

17 **and 28 minutes.**

18 Q  One hour and 28 minutes?

19 A  Yes, sir.

20     MR. MISKIEWICZ:  May I have a moment, your

21 Honor?

22     THE COURT:  Yes.

23     (Whereupon, at this time there was a pause in

24 the proceedings.)

25 Q  Showing you 3500-KM-1.

1      (Handed to the witness.)

2  Q  I will ask you to direct your attention to what is

3  tabbed there.

4  A  Yes.

5      **This is the transcript of the designated area.**

6  **And an area has been yellowed out, and I recall --**

7  Q  Who yellowed it out?

8  A  **I recall doing that myself in order to simply jog my**

9  **memory if I were to be asked about this.**

10 Q  All right.

11     And what is yellowed out?

12     MR. ROSEN:  Judge, the only objection I have is

13 I would like just a brief voir dire.

14     MR. MISKIEWICZ:  I'm not moving it in evidence.

15     THE COURT:  He is not moving it in.  But you can

16 look at it, obviously.  You can go over to the witness

17 stand and look at it if you wish.  You can look at it.

18     MR. ROSEN:  I just had a question about --

19     THE COURT:  No.  You can look at it if you want,

20 and you can recross afterward.

21     (Whereupon, at this time there was a pause in

22 the proceedings.)

23 Q  Have you had a fair opportunity to read the

24 transcript?

25 A  Yes, sir.

1   Q   And does that refresh your recollection as to
2   approximately where the over-record is now and what words
3   were erased as a result of the over-record?
4   A   Yes, sir, it does.
5   Q   And can you tell us approximately what words were
6   erased as a result of the over-record that you discovered
7   in or about 2012?
8   A   Yes, sir.
9          I will read from the transcript.
10         **Chris, I mean they can even use hearsay, I**
11  **think.  Buddy, they can use the fact like its got this,**
12  **quotation marks, unintelligible on it, period.**
13         **Really.**
14         **Yeah, they can use like the most fucked up shit**
15  **in the goddamn planet.  You know what I'm saying?**
16  **Question mark.**
17         **Like they can use almost anything to make their**
18  **case, period.  They like to get -- and that is the end of**
19  **the yellowed area.**
20  Q   And that is the end of what is currently erased as a
21  result of the over-record?
22  A   That's correct, sir.
23  Q   So on the KM-1 and KM-1-B that we heard yesterday,
24  does, for instance, what I asked you earlier in regard to
25  referencing Government's Exhibit RS-39, can you still hear

1   voices saying, yeah, listen, I got a call from Mel, you
2   know?  And I will jump ahead a time.
3          Chris, listen, the fucking U.S. Attorney wants
4   to take DNA from you.  You fucking botched the armored car
5   up, blah, blah, blah, that is still on the tape, isn't it?
6   A   Yes, sir.
7   Q   So, I go, holy fuck, I ain't giving it to them, you
8   know.
9          He says, this, I ain't giving it to them.
10         I go, it's going to come back, that is still on
11  the tape, isn't it?
12  A   Yes, sir.
13         THE COURT:  Ladies and gentlemen, I direct your
14  attention to what is being read is the transcript that the
15  government says is on the tape.  It is the tape that
16  controls, and any reference to the transcript that differs
17  from what you heard on the tape, your recollection as to
18  what is on the tape controls.  And you will have to ask to
19  rehear any portion of it that you may desire to.
20         MR. MISKIEWICZ:  May I have a moment, your
21  Honor?
22         THE COURT:  Sure.
23         (Government counsel confer.)
24         MR. MISKIEWICZ:  One last -- a few questions.
25  BY MR. MISKIEWICZ:

1   Q   You were shown a compact disk yesterday -- if I can
2   have a moment.
3          (Counsel confer.)
4   Q   KM-5.
5          (Handed to the witness.)
6   A   Yes, sir, I recognize this.
7   Q   And counsel again asked you questions on
8   cross-examination about approximately when, if you knew,
9   this over-recording occurred.
10         When did you make that copy?
11  A   I made this copy January of 2011.  This was the
12  re-enhanced version I was about to conduct, and then I
13  returned it.
14  Q   Okay.
15         And prior to enhancing the tape, where did you
16  make -- what did you use to make that copy?  Did you use
17  another copy or did you use the actual tape itself, the
18  microcassette tape?
19  A   I used the actual tape that was sent back in order to
20  do this re-enhancement.
21         Again, it was because the tape had not been
22  enhanced in many years, since 2004 or so.  And we wanted
23  to determine whether or not there was an improvement in
24  technology that would have improved the intelligibility in
25  2011.

1   Q   And the over-record is not on there, is it?
2   A   No, sir, it is not.
3   Q   And that tape, or that particular copy, KM-5, which
4   we read yesterday in its entirety, was made when?
5   A   This cassette was made -- I made this cassette in
6   January of 2011.
7   Q   Cassette?
8   A   Sorry, this compact disk was made in 2011.
9          MR. MISKIEWICZ:  No further questions.
10         THE COURT:  Any questions?
11         MR. ROSEN:  Please.
12
13  RECROSS-EXAMINATION
14  BY MR. ROSEN:
15  Q   How long is the designated area?
16  A   Approximately 39 minutes, sir.
17  Q   And how much into the designated area does the
18  over-record take place?
19  A   I would say approximately 33 to 34 minutes.
20  Q   You testified before that all you did with the
21  hand-held recorder was test it; is that correct?
22  A   Yes, sir.
23  Q   So how did 30 something minutes go by and then there
24  was an over-record?
25  A   I can't say for sure, sir, where that tape was in its

1  position when it was tested, when it traveled back and
2  forth.
3  **Q**   Please, Mr. Marr, you can do --
4        MR. MISKIEWICZ:  Objection.
5        THE COURT:  Do you have an objection?
6        MR. MISKIEWICZ:  Yes.
7        THE COURT:  Sustained.
8  **Q**   Mr. Marr, over a half an hour's worth of tape went by
9  prior to this over-record taking place, did it not?
10       MR. MISKIEWICZ:  Objection.
11       THE COURT:  Overruled.
12 **Q**   Yes or no?
13 **A**   **I'm not sure what you refer to, sir, as far as**
14 **testing whether or not the microcassette played or did not**
15 **play.**
16       MR. ROSEN:  I have no further questions.
17       THE COURT:  Anything else?
18       MR. MISKIEWICZ:  No, your Honor.  Thank you.
19       THE COURT:  Thank you, sir, you may step down.
20       (Whereupon, the witness leaves the witness
21 stand.)
22       THE COURT:  The government's next witness.
23       MR. FLYNN:  Your Honor, the government calls
24 Robert Giovannettone.
25       THE CLERK:  Sir, if you would just remain

1  standing for a moment to be sworn in.
2
3  R O B E R T   G I O V A N N E T T O N E,
4        called as a witness, having been first
5        duly sworn, was examined and testified
6        as follows:
7        THE CLERK:  Take a seat, please.  Speak into the
8  microphone and state and spell your name for the record.
9        THE WITNESS:  Robert Giovannettone,
10 G-I-O-V-A-N-N-E-T-T-O-N-E.
11       THE CLERK:  Thank you.
12       MR. ROSEN:  May I have a moment, your Honor?
13       THE COURT:  Yes.
14       MR. ROSEN:  There are quite a few pictures that
15 I need to go through.
16       THE COURT:  Take your time.
17       MR. MISKIEWICZ:  May I retrieve the exhibits?
18       THE COURT:  Yes.
19       (Whereupon, at this time there was a pause in
20 the proceedings.)
21
22
23
24
25

1  DIRECT EXAMINATION
2  BY MR. FLYNN:
3  **Q**   Good morning, Mr. Giovannettone.
4  **A**   **Good morning.**
5  **Q**   Are you appearing here today pursuant to a subpoena
6  issued to you by the United States Attorney's office?
7  **A**   **Yes, I am.**
8  **Q**   Are you currently retired?
9  **A**   **Yes.**
10 **Q**   Before you retired, what did you do?
11 **A**   **I was a member of the Nassau County Police Department**
12 **for over 33 years.**
13 **Q**   What did you do for them?
14 **A**   **For the first 13 plus years, I was in radio motor**
15 **patrol in the Second Precinct.  I then transferred to the**
16 **Crime Scene Search Unit for a little over 19 years.**
17 **Q**   Okay.
18       What did working for the Crime Scene Search Unit
19 of the Nassau County Police Department entail?
20 **A**   **To respond to all kinds of crime scenes for the**
21 **purpose of documenting those scenes with .35 millimeter**
22 **photography and then attempting to locate and recover any**
23 **physical evidence present at the scene.**
24 **Q**   And in the normal course of your duties, sir, with
25 the crime scene of the Nassau County Police Department,

1  when you were called to a specific scene to document the
2  crime, in general what type of activities would you
3  perform?
4  **A**   **Taking pictures, .35 millimeter pictures, in some**
5  **cases video.  And then recovering forensic evidence,**
6  **fingerprints, blood, hair, fiber, that type of thing.**
7  **Q**   You talked about taking pictures.
8        In or about 1994, was there a certain type of
9  camera that you used to take these pictures, a special
10 camera?
11 **A**   **Just a regular manual .35 millimeter camera.**
12 **Q**   In the normal course during your tenure with the
13 Crime Scene Search Unit, when you travel to a particular
14 crime scene to process it and take pictures, would you
15 travel in a particular type of vehicle?
16 **A**   **Yes.  We used marked police vans.**
17 **Q**   Did the Crime Scene Search Unit have -- withdrawn.
18       Was there anything special about those
19 particular vans?
20 **A**   **Only they contained the various specific equipment to**
21 **process a crime scene, from the cameras, film, down to**
22 **paper bags to put evidence in and everything in-between.**
23 **Q**   Were you serving as an executive with the Crime Scene
24 Unit during 1994?
25 **A**   **Yes.**

Giovannettone-Direct/Flynn

568

1   Q    And in June of that year were you -- do you recall
2   being called to process a scene in Muttontown, or Syosset,
3   Long Island, where an armored car robbery and murder
4   occurred outside an office building?
5   A    Yes.
6   Q    Do you recall arriving at the office building that
7   morning with other members of the Nassau County Police
8   Department?
9   A    Yes.
10  Q    Who assisted in your investigation that day?
11  A    Detective William Lamura, L-A-M-U-R-A, and Detective
12  Sergeant Kenneth Duffy, D-U-F-F-Y, also part of the Crime
13  Scene Unit.
14  Q    Did you participate in processing and analyzing that
15  crime scene that day in June of 1994?
16  A    Yes.
17  Q    And did you -- do you remember completing a report
18  documenting what you did there?
19  A    Yes.
20  Q    What do you remember doing when you first arrived at
21  the scene in Syosset in June of 1994?
22  A    Meeting with and discussing the scene with Detective
23  Pierce of the Homicide Unit.
24  Q    What do you remember seeing there as you arrived
25  there, how would you describe the scene?

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

Giovannettone-Direct/Flynn

569

1   A    It was a large parking lot with a sidewalk leading up
2   to a type -- like an office building.  There was crime
3   scene tape put up to keep people out of the scene,
4   numerous police vehicles and police personnel were
5   present.
6   Q    You testified a few moments ago that one of the first
7   things you did was talk to an individual by the name of
8   Detective Pierce.  Do you remember that?
9   A    Yes.
10  Q    And was Detective Pierce in charge of the scene at
11  that point?
12  A    Yes.
13  Q    And did Detective Pierce give you certain directions
14  and instructions at that point?
15  A    Yes.
16  Q    And as a result of those directions and instructions,
17  what, if anything, did you do?
18  A    I proceeded to photograph the crime scene and upon
19  completion of the photographs look for physical evidence.
20  Q    Mr. Giovannettone, in front of you are a -- is a set
21  of photographs.
22       I will ask you to take a look at what is marked
23  for identification purposes at this trial as
24  Government's Exhibit RRG, Romeo, Romeo Golf, 32, 33, 34,
25  36, 37, 39, 41, 45, 48, 51, 52, 54, and 83 through 88.

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

Giovannettone-Direct/Flynn

570

1        Take a moment to look through those, if you
2   would.
3        (Whereupon, at this time there was a pause in
4   the proceedings.)
5   Q    Do you recognize those Government Exhibits?
6   A    Yes, I do.
7   Q    What are they?
8   A    They are photographs I took on that particular date
9   and location.
10  Q    And those exhibit numbers I just rattled off a few
11  moments ago, are they true and accurate representations of
12  photographs that you yourself took in Syosset, New York,
13  on June 23rd, 1994?
14  A    Yes.
15  Q    And to the best of your knowledge, had any of those
16  photographs been altered or deleted in any way?
17  A    No.
18       MR. FLYNN:  The government moves the photographs
19  I mentioned earlier into evidence at this time.
20       THE COURT:  Any objection?
21       MR. ROSEN:  Objection.
22       Renew the previously filed motions.
23       THE COURT:  The same ruling.
24       The items are admitted into evidence.
25       MR. FLYNN:  Thank you, your Honor.

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

Giovannettone-Direct/Flynn

571

1        (Whereupon, Government's Exhibits RRG-32, 33,
2   34, 36, 37, 39, 41, 45, 48, 51, 52, 54, and 83 through 88
3   were received in evidence.)
4   Q    Mr. Giovannettone, appearing on the screen in front
5   of you and in the courtroom is what has been now admitted
6   into evidence as Government's Exhibit RRG-83.
7        (At this time a document was exhibited on
8   courtroom screen.)
9   Q    Does that photograph represent the crime scene in
10  Syosset, Long Island, when you first arrived on June 23,
11  1994?
12  A    Yes, it does.
13  Q    What are we looking at in that photograph?
14  A    That is a photo of the entrance to the building with
15  the walkway, the armored car to the right, the victim
16  deceased laying on the sidewalk under the sheet, and an
17  orange cone placed next to the body as an evidence marker.
18  Q    Mr. Giovannettone, after taking this photograph, and
19  after first coming onto the scene, did you begin then to
20  photograph the deceased?
21  A    Yes.
22       (At this time a document was exhibited on
23  courtroom screen.)
24  Q    I have now shown you what is marked as previously
25  admitted in evidence as Government's Exhibit RRG-39.

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

Giovannettone-Direct/Flynn

572

1    What are we looking at in this particular
2  photograph?
3  A   It is just a close-up photograph of the deceased
4  covered with the sheet and the orange cone that I placed
5  there.
6  Q   For the record, why did you place the orange cone
7  there?
8  A   Just as an evidence marker primarily for this
9  photograph.
10  Q   When you first arrived at the scene, was this sheet
11  already over Mr. Baumgardt's body?
12  A   Yes.
13    (At this time a document was exhibited on
14  courtroom screen.)
15  Q   Now appearing on the screen in front of you is
16  Government's Exhibit RRG-41.
17    Did you also take this photograph?
18  A   Yes.
19  Q   What is different on this photograph from the
20  previous two?
21  A   I removed the sheet to show the deceased laying on
22  the sidewalk.
23  Q   Was the deceased laying in that position with the
24  sheet on top when you first arrived on the scene?
25  A   Yes.

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

Giovannettone-Direct/Flynn

573

1  Q   In your experience as a crime scene detective, would
2  the deceased's body have been removed in any way prior to
3  your arrival?
4  A   No.
5    (At this time a document was exhibited on
6  courtroom screen.)
7  Q   Mr. Giovannettone, I'm now showing you in the
8  courtroom on the screen Government's Exhibit RRG-36.
9    Is this also a photograph that you yourself took
10  on the morning of June 24th, 1994 in Syosset?
11  A   Yes.
12  Q   Mr. Giovannettone, I'm now showing you what is
13  admitted as Government's Exhibit Romeo Romeo Golf 34.
14    (At this time a document was exhibited on
15  courtroom screen.)
16  Q   What are we looking at on this photograph?
17  A   That is a photograph of the entry doors into the
18  building right above the deceased's apartment after I
19  processed it with fingerprint powder for fingerprints.
20  Q   And these markings -- these markings here on the
21  door, what do those represent, the writing and the arrows?
22  A   They are item numbers of evidence, and chalk marks
23  outlining the fingerprint that I am later going to remove
24  with the homicide detective number within it.
25  Q   Again, is this a photograph that you yourself took?

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

Giovannettone-Direct/Flynn

574

1  A   Yes, it is.
2  Q   Do you actually see your own reflection in that
3  photograph?
4  A   Yes, I do.
5    You can see my arm and elbow in the vicinity of
6  number nine.
7  Q   Is that where my cursor is pointing at this point
8  (indicating)?
9  A   Yes.
10  Q   Mr. Giovannettone, I'm now showing you what is
11  previously admitted as Government's Exhibit RRG-45.
12    (At this time a document was exhibited on
13  courtroom screen.)
14  A   Yes, I do.
15  Q   And did you take that photograph?
16  A   Yes.
17  Q   What are we looking at in
18  Government's Exhibit RRG-45?
19  A   This is the driver's side of the van that was being
20  used as the armored car parked next to the sidewalk
21  leading up to the building.
22  Q   For the record, Mr. Giovannettone, at any point you
23  may refer to your crime scene evaluations.  But at any
24  point in the morning of June 24, 1994, did you become
25  aware of the identity of the deceased?

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

Giovannettone-Direct/Flynn

575

1  A   Yes.
2  Q   And who was the deceased?
3  A   Julius Baumgardt.
4  Q   Mr. Giovannettone, at this point all photographs that
5  we looked at that you took that morning in June of 1994
6  are centered in and around the main doors of the building
7  in Syosset; is that correct?
8  A   Yes.
9  Q   And do you recall taking photographs at a later
10  location that morning, sir?
11  A   Yes.
12  Q   Where did you take those photographs?
13  A   An adjacent parking lot to this area.
14  Q   How far did you have to go to get there?
15  A   About 500 yards maybe.
16  Q   Mr. Giovannettone, I will show you what is now
17  admitted into -- not admitted into evidence yet, but what
18  is marked for identification as
19  Government's Exhibit RRG 1.
20    Do you recognize the area depicted in that
21  photograph?
22  A   Yes, I do.
23  Q   What do you recognize that photograph to depict?
24  A   That is showing the building in question, the parking
25  lot, adjacent parking lots and Jericho Turnpike.

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

Giovannettone-Direct/Flynn

576

1  Q   Does this picture fairly and accurately represent the
2  crime scene that you -- and the surrounding area that you
3  evaluated on June 24th -- on June 23, 1994?
4  A   Yes, it does.
5  Q   And do you see -- do you actually see the armored van
6  in that picture, that you took photographs of that we just
7  saw recently?
8  A   Yes, I do.
9       MR. FLYNN:  Your Honor, the government moves for
10  the admission of Government's Exhibit RRG-1.
11       MR. ROSEN:  Same continuing objection.
12       THE COURT:  Same ruling.  The exhibit is marked
13  in evidence, the photograph.
14       MR. FLYNN:  Thank you, your Honor.
15       (Whereupon, Government's Exhibit RRG-1 was
16  received in evidence.)
17  Q   Mr. Giovannettone, Government's Exhibit RRG-1 is now
18  appearing in the courtroom.
19       (At this time a document was exhibited on
20  courtroom screen.)
21  Q   Please describe for the jury what we are looking at
22  in this photograph.
23  A   You can see the top of the building which is the dark
24  area.
25       To the right --

Giovannettone-Direct/Flynn

577

1  Q   Just for the record, are you referring to this
2  building right here that I have just blown up?
3  A   Correct.
4       That is the building in question.  You can see
5  the entrance way where your cursor is now a little further
6  down.  That is the entrance way of the building where the
7  deceased is lying.  And you can see the white van just to
8  the right of that entrance.
9       MR. FLYNN:  For the record, I am now blowing up
10  on the screen in the courtroom what is identified as the
11  van.
12  Q   Is that the white van, the white van that is now
13  appearing on the screen?
14  A   Yes.
15  Q   What else do we see in this photograph?
16  A   You can see other police vehicles just to the right
17  of the van.  But you can also see in the upper right
18  portion of the photograph in the treed area another police
19  vehicle, and I know it is a red colored vehicle in that
20  area.
21  Q   Mr. Giovannettone, I have blown up the area you
22  identified, the upper right-hand corner of
23  Government's Exhibit RRG-1.
24  A   Yes.
25  Q   In this blown-up version of that photograph, do you

Giovannettone-Direct/Flynn

578

1  see the area that you were asked to go and walk to 500
2  yards away to take additional photographs?
3  A   Yes.
4  Q   And what were you asked to photograph in that area of
5  the parking lot?
6  A   I was asked to photograph that red Chevy Blazer that
7  is parked there.
8  Q   And you are referring to this vehicle where my cursor
9  is (indicating)?  The center of that photograph?
10  A   Yes.
11  Q   Mr. Giovannettone, now appearing on the screen in the
12  courtroom is Government's Exhibit RRG-87.
13       (At this time a document was exhibited on
14  courtroom screen.)
15  Q   Please identify for the jury what we are seeing here
16  as Government's Exhibit RRG-87.
17  A   That is the rear of the Chevy Blazer showing a
18  Florida plate, PCX 42D.
19  Q   What is the other vehicle in the upper right-hand
20  corner of the photograph that is partially obscured?
21  A   That was my police van.
22  Q   Again, who asked you to travel to this location to
23  photograph this particular vehicle?
24  A   I believe it was Detective Pierce.
25  Q   Mr. Giovannettone, appearing now on the courtroom

Giovannettone-Direct/Flynn

579

1  screen is Government's Exhibit RRG-88.
2       (At this time a document was exhibited on
3  courtroom screen.)
4  Q   Did you take this picture as well?
5  A   Yes.
6  Q   For the record, what are we looking at in
7  Government's Exhibit RRG-88?
8  A   The right side of the red Blazer.
9  Q   Is that the same red Blazer that you had to travel
10  500 yards to photograph on the morning of June 23rd, 1994?
11  A   Yes..
12  Q   Mr. Giovannettone, now on the screen on the -- in the
13  courtroom is Government's Exhibit RRG-51.
14       (At this time a document was exhibited on
15  courtroom screen.)
16  Q   Did you take this photograph as well?
17  A   Yes.
18  Q   Did you or any other officer move this vehicle prior
19  to the taking of the photographs?
20  A   No.
21  Q   To the best of your recollection, the position that
22  the vehicle is in now, that was the position -- withdrawn.
23       The position that the vehicle is in in this
24  photograph, was that the position you first saw the

Giovannettone-Direct/Flynn

580

1  vehicle in when you went to photograph it?
2  **A   Yes, it is.**
3  **Q**   Mr. Giovannettone, you testified a little earlier
4  that in the normal course of your duties as a detective
5  with the Crime Scene Bureau, you would also secure
6  physical evidence or remove it from the scene?
7  **A   Yes.**
8  **Q**   Do you recall removing any items of physical evidence
9  from the crime scene on June 23, 1994, in Syosset?
10 **A   Yes.**
11 **Q**   What did you remove?
12 **A   A red blood sample from the sidewalk, a hair sample**
13 **from the sidewalk by the deceased, a set of keys on a**
14 **ring. I took the deceased's gun belt, gun, holster and**
15 **ammunition. I received a set of handcuffs from Mr. Walter**
16 **Tully. I removed five fingerprints, six fingerprints from**
17 **the door and lifts, and photographs of those fingerprints,**
18 **and one fingerprint lift and photo from a vehicle parked**
19 **next to the sidewalk.**
20 **Q**   What did you do with these items of physical evidence
21 once you secured them from the scene?
22 **A   They were all secured to the unit in the police**
23 **department for evaluation and identification.**
24 **Q**   Mr. Giovannettone, about approximately two months
25 later, on September 1st, 1994, were you asked by Detective

Giovannettone-Direct/Flynn

581

1  Pierce, the same individual you referenced before, to
2  travel to a basement apartment in Corona, Queens, to
3  conduct a second scene evaluation?
4  **A   Yes.**
5  **Q**   And did you eventually travel to that basement
6  apartment in Corona, Queens?
7  **A   Yes, I did.**
8  **Q**   And did you process and evaluate that basement
9  apartment?
10 **A   Yes, I did.**
11 **Q**   And after completing and processing that basement
12 apartment in Corona, did you complete a report documenting
13 what you did there?
14 **A   Yes.**
15 **Q**   I will direct your attention to what is in front of
16 you as Government's Exhibit RRG-82.
17        Referring to your crime scene report for that
18 day, do you know who was indicated as being the owner of
19 this basement apartment in Corona, Queens?
20 **A   Louis Dorval.**
21 **Q**   And to the best of your recollection, was Mr. Dorval
22 still living in this basement apartment in Corona, Queens,
23 on or about September 1st, 1994?
24 **A   It appeared to be empty to me.**
25 **Q**   Did you get photographs of both the inside and

Giovannettone-Direct/Flynn

582

1  outside of this basement apartment you were asked to
2  process?
3  **A   Yes.**
4  **Q**   In front of you is a second set of photographs that
5  have been marked for identification as
6  Government's Exhibits Romeo Romeo Golf 60, 61, 62, 63, 67,
7  68, 72 and 77.
8         Do you recognize those exhibits?
9  **A   Yes, I do.**
10 **Q**   What are they?
11 **A   Those are some of the pictures I took of that**
12 **basement apartment on September 1st.**
13        THE COURT:  And on that note, Mr. Flynn, let's
14 break for lunch.  And we will resume, and make it at 1:45.
15        Don't talk about the case and have a nice lunch.
16        We will see you then.
17        (Whereupon, at this time the jury leaves the
18 courtroom.)
19        (Luncheon Recess.)
20
21
22
23
24
25

Giovannettone-Direct/Flynn

583

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Giovannettone-Direct/Flynn

584

1 A F T E R N O O N   S E S S I O N
2
3          (Whereupon, the following takes place in the
4 absence of the jury.)
5          THE COURT:  We are all set to get started again.
6          Please get the witness back up on the stand
7 again.
8          The jury is entering.  Please rise.
9          (Whereupon, the jury at this time entered the
10 courtroom.)
11          THE COURT:  Please be seated if you would.
12          We are ready to resume.
13          Please inquire, Mr. Flynn.
14          MR. FLYNN:  Thank you, your Honor.
15
16 DIRECT EXAMINATION (cont'd)
17 BY MR. FLYNN:
18 Q    Mr. Giovannettone, before we broke for lunch, you
19 testified that after your evaluation of the armored car
20 robbery scene, you were asked by Detective Pierce to
21 evaluate a basement apartment in Corona, Queens on
22 September 1st, 1994; do you recall that?
23 A    Yes.
24 Q    You also testified that that basement apartment
25 belonged to an individual by the name of Louis Dorval in

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

---

Giovannettone-Direct/Flynn

585

1 Corona, Queens?
2 A    Yes.
3 Q    Do you recall that?
4 A    Yes.
5 Q    After -- before we broke I asked you to take a look
6 at photographs in front of you, and again, for the record,
7 they are marked for identification as
8 Government's Exhibits Romeo Romeo Golf, 60 to 63, 67, 68
9 and 72 and 77.
10          Do you recognize those photographs, sir?
11 A    Yes.
12 Q    What do you recognize them to be?
13 A    Photographs I took on September 1st, 1993.
14 Q    And do those photographs fairly and accurately
15 represent the interior of that basement apartment in
16 Corona, Queens as you observed it in September of 1994?
17 A    Yes.
18          MR. FLYNN:  The government moves for the
19 admission of Government's Exhibit RRG-60 through 63, 67,
20 68, 72 and 77.
21          THE COURT:  Objection on those also?
22          MR. ROSEN:  Same continuing objection.
23          THE COURT:  The objection is overruled.
24          (Whereupon, Government's Exhibits RRG-60 through
25 63, 67, 68, 72 and 77 were received in evidence.)

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

---

Giovannettone-Direct/Flynn

586

1 Q    Government's Exhibit RRG-60, Mr. Giovannettone, is
2 appearing in front of you.
3          (At this time a document was exhibited on
4 courtroom screen.)
5 A    Yes.
6 Q    Did you take that photograph?
7 A    Yes.
8 Q    Would you please describe what we are looking at or
9 what we are seeing in Government's Exhibit RRG-60.
10 A    It is a stairway leading down into a side entrance
11 into the basement apartment.
12 Q    Government's Exhibit RRG-61 is now on the screen in
13 front of you.
14          (At this time a document was exhibited on
15 courtroom screen.)
16 Q    Please describe to the jurors what we are looking at
17 in that photograph.
18 A    It is a photo showing the front of the building, the
19 basement apartment being on the right side.
20 Q    Again, that is the basement apartment in Corona,
21 Queens we have been talking about?
22 A    Yes.
23 Q    Government's Exhibit RRG-62, previously admitted, is
24 now on the screen in the courtroom.
25          (At this time a document was exhibited on

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

---

Giovannettone-Direct/Flynn

587

1 courtroom screen.)
2 Q    Mr. Giovannettone, please describe to the jurors what
3 we are looking at in this photograph that you took on
4 September 1st, 1994?
5 A    It is a portion of the kitchen in the basement
6 apartment.
7 Q    Were the cabinets in that kitchen in that orientation
8 when you arrived?
9 A    Yes.
10 Q    Government's Exhibit RRG-63 is now on the screen in
11 front of you.
12          (At this time a document was exhibited on
13 courtroom screen.)
14 Q    Mr. Giovannettone, please describe to the jury what
15 we are seeing on this particular photograph.
16 A    It is another area of the kitchen with the closet
17 open.
18 Q    And, again, Mr. Giovannettone, when you arrived -- to
19 the best of your recollection when you arrived in the
20 apartment, at the apartment, was it in this state?
21          The door, for example, in RRG-63, was it open?
22 A    Yes.
23          (At this time a document was exhibited on
24 courtroom screen.)
25 Q    Government's Exhibit RRG-67 is now on the screen,

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

Giovannettone-Direct/Flynn

588

1  Mr. Giovannettone.
2          What are we looking at here?
3  A   Another portion of the kitchen area.  And it also
4  shows the entrance from the outside into the basement
5  apartment.
6  Q   I'm now showing you what is admitted as
7  Government's Exhibit RRG-68.
8          What are we looking at in this photograph,
9  Mr. Giovannettone, that you took on September 1st, 1994?
10         (At this time a document was exhibited on
11  courtroom screen.)
12  A   It is an area off the kitchen that I termed the
13  dinette area.
14  Q   I'm now showing you admitted Exhibit RRG-72.
15         (At this time a document was exhibited on
16  courtroom screen.)
17  Q   For the record, what are we observing here?
18  A   The bedroom.
19  Q   And is that the bedroom that was in that basement
20  apartment in Corona, Queens?
21  A   Yes.
22  Q   Mr. Giovannettone, before we end your testimony, I
23  would like to take you back to one exhibit from the
24  earlier part of your testimony.  It is marked for
25  identification as Government Romeo Romeo Golf 4.

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

Giovannettone-Direct/Flynn

589

1          Do you recognize the scene depicted in that
2  photograph?
3  A   Yes, I do.
4  Q   What do you recognize it to be?
5  A   It is an aerial photograph of the building and
6  parking lot where the robbery and murder took place.
7  Q   And based on the contents of this particular
8  photograph, are you able to identify that as a photograph
9  of the armored car robbery scene on June 23, 1994?
10  A   Yes.
11         MR. FLYNN:  The government moves for the
12  admission of Government's Exhibit RRG-4.
13         MR. ROSEN:  Same continuing objection.
14  Relevance.
15         THE COURT:  Come up -- just relevancy?
16         MR. ROSEN:  Yes.
17         THE COURT:  Overruled.
18         (Whereupon, Government's Exhibit RRG-4 was
19  received in evidence.)
20  Q   Mr. Giovannettone, I'm now putting the exhibit RRG-4
21  on the screen in the courtroom.
22         (At this time a document was exhibited on
23  courtroom screen.)
24  Q   Would you please -- there is a laser pointer in front
25  of you.  Using the laser pointer on the screen behind you,

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

Giovannettone-Direct/Flynn

590

1  would you please orient the jury to different -- to what
2  we are looking at in this photograph, different items.
3  A   Right in this area (indicating) is the walkway, the
4  armored car where the robbery and murder took place.
5  Q   And for the record, you are identifying with your
6  laser pointer what I will call the middle left -- the
7  left-hand portion of the photograph about midway up, there
8  is a white van that appears to be by the doorway?
9  A   Correct.
10  Q   All right.
11         Please continue.
12  A   And all the way over to the right in this area is
13  that red Chevy Blazer that I later went to that area to
14  photograph.
15  Q   Again, for the record, you are identifying the laser
16  pointer -- with the pointer what appears to be a red
17  vehicle in the extreme right-hand side of the photograph
18  in the parking lot area?
19  A   Right.
20  Q   There appears to be a main road running across the
21  top of the photograph.
22         To your knowledge, what road is that?
23  A   Jericho Turnpike runs up in this area.  And I'm not
24  sure I see it in this picture.
25  Q   If I were to enlarge this portion of the photograph,

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

Giovannettone-Direct/Flynn

591

1  Mr. Giovannettone, on the screen behind you, would that
2  help you?
3  A   Yes.  It is Jericho Turnpike.
4  Q   Thank you.
5          MR. FLYNN:  Your Honor, may I have a moment?
6          THE COURT:  Sure.
7          (Government counsel confer.)
8          MR. FLYNN:  No questions, thank you.
9          MR. ROSEN:  No questions.
10         THE COURT:  All right.
11         The next witness, please.
12         (Whereupon, the witness leaves the witness
13  stand.)
14         MR. MISKIEWICZ:  The government calls Detective
15  Jack Kennedy.
16         THE CLERK:  Please step up.
17
18  J A C K   K E N N E D Y,
19         called as a witness, having been first
20         duly sworn, was examined and testified
21         as follows:
22         THE CLERK:  Thank you.
23         Take a seat, please.  Speak into the microphone
24  and state and spell your name for the record.
25         THE WITNESS:  My name is Jack Kennedy.  Retired

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

1  detective from Nassau County.
2
3  DIRECT EXAMINATION
4  BY MR. MISKIEWICZ:
5  Q  Good afternoon, sir.
6      Detective Kennedy, when did you retire from the
7  Nassau County Police Department?
8  A  April of 2001.
9  Q  How long were you a member of the Nassau County
10 Police Department?
11 A  28 years.
12 Q  And at the time that you retired, where were you
13 assigned?
14 A  The District Attorney's squad.
15 Q  I want to focus your attention on approximately the
16 middle part of 1994.
17     Were you a detective then?
18 A  Yes.
19 Q  Were you assigned to any particular unit?
20 A  I was in the District Attorney's squad then.
21 Q  And were you working on any particular investigation?
22 A  Yes.
23 Q  Did that investigation have any relationship to a
24 location known as 110 Mini Storage?
25 A  Yes, sir.

1  Q  And what was your investigation at that time?
2  A  I was investigating stolen cars that were possibly
3  coming out of the storage facility.
4  Q  All right.
5      Did there come a time you applied for some kind
6  of warrant or search warrant pertaining to that location?
7  A  Yes.
8      I applied for two warrants for that location,
9  look-see warrant.
10 Q  What is a look-see warrant?
11 A  A look-see warrant allows me to go in, having
12 probable cause to believe that there is stolen property
13 inside or something of a criminal nature, to go in,
14 examine it, record it and then leave again.  But not take
15 anything.
16 Q  And what specifically did you obtain a look-see
17 warrant for?
18 A  The first one was for unit A-3.
19 Q  Okay.
20     Did there ever come a time that you got a
21 look-see warrant for any other units?
22 A  Yes.
23     The next one was B-54.
24 Q  All right.
25     And what was this unit that -- can you describe

1  it?
2  A  A-3 was a ground floor unit, it was for a car in the
3  garage floor.
4      B-54 was on the back side of the same building,
5  facing the back of the property and was also big enough
6  for a car to be put in.
7  Q  All right.
8      Showing you what is previously admitted as
9  Government's Exhibit RS-1.
10     Looking at RS-1, do you recognize any of the
11 photos contained in that exhibit?
12     (At this time a document was exhibited on
13 courtroom screen.)
14 A  Yes.
15 Q  What do you recognize to be depicted in RS-1?
16 A  The top right is self-storage rentals, it says on the
17 building, the top right.  And that is the facade of the
18 side of the complex.
19     Next to it is a row of garages, the ground floor
20 level garages, and then units above.  It is a
21 two-story unit.
22     On the bottom left, the brick part of the photo
23 is the manager's office.  And then going down the row is
24 unit A-3, which is the unit I got the look-see warrant
25 for.

1      I can't read the numbers on there.
2  Q  That's fine.
3      This is -- this depicts the self-storage unit
4  that you got a warrant for back when you were
5  investigating something for the Nassau County DA's squad?
6  A  Yes.
7  Q  In 1994?
8  A  Yes.
9  Q  Okay.
10     In or about June 24th, 1994, did you come to
11 this location?
12 A  Yes.
13 Q  And did you have a court order with you at that point
14 when you arrived at the location?
15 A  I had a look-see warrant.
16 Q  For which of the units?
17 A  For unit B-54.
18 Q  Okay.
19     And did there come a time that you actually
20 executed the warrant at unit B-54?
21 A  Yes.  It was about 2:00 o'clock.
22 Q  2:00 o'clock in the afternoon?
23 A  Yes.
24 Q  Okay.
25     Upon executing this warrant, did you go back to

J. Kennedy-Direct/Miskiewicz

596

1    the court or someone you were working with go back to
2    court and get an amended court order or warrant?
3    A    My sergeant called in for a telephonic search
4    warrant, after I had executed my warrant.
5    Q    And what was the purpose of getting the search
6    warrant as opposed to the look-see warrant?
7    A    The look-see warrant I could go in and examine
8    everything in the unit.  I was not able to remove anything
9    from the unit.
10          The search warrant was needed to remove items
11    that we found.
12    Q    And did you ever actually get a full warrant to
13    remove items from B-54?
14    A    Yes.
15    Q    And did you personally remove and seize the items?
16    A    I seized the items and protected it until the unit
17    arrived.  I safeguarded it.  And when the search warrant
18    arrived I was dismissed and my sergeant executed the
19    warrant at the crime scene, and whoever removed the items.
20    Q    Did you at some point take note -- withdrawn.
21          Focusing on RS-1, and I will focus your
22    attention to the upper photograph there.
23          Does this look approximately as it did when you
24    were executing the search warrants that day?
25          (At this time a document was exhibited on

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

J. Kennedy-Direct/Miskiewicz

597

1    courtroom screen.)
2    A    Right.
3          Again, this was the front facade on the
4    building.  And just past the telephone poles here you see
5    a cut off to the right, and that is the ramp going up to
6    110, and the curb line here is 109.
7    Q    All right.
8          As you approached the unit or entered the area,
9    did you come across anyone you recognized?
10    A    Yes.
11    Q    Who did you come across?
12    A    As I was entering the property through the only
13    driveway they had, which is just to the right of this
14    facade, there was a white car with tinted windows coming
15    out at me.  So we had to cross the one way in and if one
16    way out.  And we crossed each other right next to each
17    other.
18          And I saw that it was Scott Mulligan driving the
19    car leaving the facility.
20    Q    And did you know Scott Mulligan?
21    A    Yes.
22    Q    How did you know Scott Mulligan at that time?
23    A    Umm, I knew him since he was about 16 years old,
24    maybe 17, a senior in high school, I think.  I knew his
25    family.  I knew a lot of his friends.  I had known them

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

J. Kennedy-Direct/Miskiewicz

598

1    for a long time.
2    Q    Do you know -- did you know the family socially or as
3    a result of your police work?
4    A    No.  Professionally.  It was as a result of police
5    work.
6    Q    So you were very familiar with the Mulligan family at
7    this stage?  Is that fair to say?
8    A    Yes.
9    Q    So is that why you were able to recognize Scott
10    Mulligan driving out?
11    A    Yes.
12          I recognized him.  And I also went in and turned
13    around and followed him out up to 110 and got the plate
14    number on the car which came back to his mother in
15    Florida.
16    Q    All right.
17          After taking that little detour and taking note
18    of the plate, did there come a time that you actually
19    entered unit B-54 and took note of items that were in
20    there?
21    A    Yes.
22    Q    In sum, what items, if any, did you participate in
23    the seizure of?
24    A    The first thing I noticed is we had a locksmith
25    assigned to our office.  I had the locksmith pick the

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

J. Kennedy-Direct/Miskiewicz

599

1    door.  Because we don't know what we were going to do.  On
2    a look-see warrant, you don't want to break the lock
3    because someone would know we are there.  And then when we
4    went in, the first thing that was there was a white
5    Cadillac Seville, which was the purpose of my warrant.  I
6    had discovered -- seen a report that it was stolen.  And
7    it matched the car I was looking for.
8          And as I walked around the car, laying on the
9    floor behind the car was a black canvas bag.
10    Q    Did there come a time that you saw what was within
11    the canvas bag?
12    A    Yes.
13          Inside the canvas bag when I opened it was a
14    Mossberg shotgun, a model 19 nine millimeter, fully
15    loaded -- the shotgun was fully loaded, an extra clip from
16    the nine millimeter, and two walkie-talkies and two
17    police scanners and an extra clip for the nine millimeter.
18          MR. MISKIEWICZ:  May I approach, your Honor?
19          THE COURT:  Yes.
20          (Handed to the witness.)
21    Q    Showing you what is marked as RS-4, would you take a
22    look at that?
23    A    Yes.
24    Q    Do you recognize it?
25    A    Yes.  It is the gun I recovered from the canvas bag.

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

J. Kennedy-Direct/Miskiewicz

600

1  Q   From B-54?

2  A   Yes.

3  Q   And how do you recognize it?

4  A   It still has -- I put a label on it, a stick'em label

5  on it with my name and the date.  Unfortunately, I labeled

6  it wrong as 6/23 instead of 6/24.  But I was consistent.

7  I had the wrong date .

8  Q   Okay.

9  A   But this is my writing and my sticker on the back.

10  Q   The sticker is still there and that is how you

11  recognize it?

12  A   Yes.

13  Q   And the sticker says what date?

14  A   6/23.

15  Q   Okay.

16        But in fact you seized this weapon on what date?

17  A   6/24.

18  Q   The day after the date there?

19  A   Yes.

20        MR. MISKIEWICZ:  The government moves for the

21  admission of Government's Exhibit RS-4.

22        THE COURT:  Any other objections?

23        MR. ROSEN:  Objection, relevancy.

24        THE COURT:  Overruled.  It is admitted into

25  evidence.

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

---

J. Kennedy-Direct/Miskiewicz

601

1        (Whereupon, Government's Exhibit RS-4 was

2  received in evidence.)

3  Q   Showing you what is marked for Identification as

4  Government's Exhibit RS-36-A, do you recognize that?

5        (Handed to the witness.)

6  A   Yes.

7        It is the nine millimeter I had recovered from

8  the canvas bag on the 24th.

9  Q   Okay.

10        Anything in particular that helps you identify

11  that as the weapon you seized on that day?

12  A   My sticker is no longer on it.  But when I did this I

13  made an invoice, and on the invoice sheet I noted the

14  serial number of the gun, and we can prove it that way.

15  Q   I show you what is marked as 3500-JK-7.

16        Is this the invoice sheet you are referring to?

17  A   Yes.

18        I prepared this and it is my signature at the

19  bottom.

20  Q   Did you note the serial numbers on any of the weapons

21  that were seized that day?

22  A   Yes.  I noted the Mossberg and I noted the Glock,

23  model 19.  It was APX 041.

24        On the silver plate right underneath the barrel

25  is APX 041 as well.

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

---

J. Kennedy-Direct/Miskiewicz

602

1  Q   So that is the gun that you seized on June 24th, 1994?

2  A   Yes.

3  Q   Detective Kennedy, you also mentioned that there were

4  rounds of ammunition?

5  A   Yes.

6  Q   I'm going to show you what has been marked as

7  Government's Exhibit JK-24 and JK-24-A, as well as JK-22,

8  22-A.

9        (Handed to the witness.)

10  Q   Do you recognize -- we will start with JK-24.

11        Do you recognize 24 or 24-A?

12  A   Yes.

13        24 is the clips -- the bullets from the extra

14  clip.  Including black Talon and regular --

15  Q   What is a black Talon?

16  A   A black Talon, where the tip is coated with Teflon.

17  And the purpose of it is to be able to pierce a

18  bullet-proof vest.  They were identified as cop killers

19  when it first came out.

20        MR. ROSEN:  Objection.  Move to strike.

21        THE COURT:  The jury is instructed to disregard

22  the comment.

23        MR. ROSEN:  Reserve a motion.

24        THE COURT:  Please approach.

25        (Continued on next page.)

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

---

J. Kennedy-Direct/Miskiewicz

603

1        (Whereupon, at this time the following took

2  place at the sidebar.)

3        THE COURT:  First of all, is it your intention

4  to object to every exhibit on the grounds of relevancy?

5        MR. ROSEN:  Yes.

6        Because we are not here trying the armored

7  robbery case or any of the 1994 incidents.

8        THE COURT:  I have ruled that the government has

9  a right to establish that these crimes were committed

10  because the government has the burden of proof to

11  establish that the defendant had a motivation to commit

12  the crimes for which he is charged here.

13        I have instructed the jury, and that is the law

14  of the case.

15        If you want to continue to object on the grounds

16  of relevancy, it takes us a little longer, but you can do

17  so.

18        MR. ROSEN:  Unless you want me to have a

19  standing objection.

20        THE COURT:  To the evidence not being relevant?

21  Is that the way you want to operate here?

22        MR. ROSEN:  I don't think it is relevant.

23        THE COURT:  Nothing is relevant?

24        MR. ROSEN:  I didn't say that.  You didn't hear

25  me object to certain things on the Gargiulo matter.  We

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

J. Kennedy-Direct/Miskiewicz

604

1  are not on trial on the armored robbery. That is my
2  position. And the other collateral crime evidence that
3  has been litigated is not relevant. It shows a
4  propensity.
5        Now we have a police officer who has put into
6  the jury's mind that the bullets that were found in the
7  warehouse which were attributable to my client were cop
8  killers.
9        THE COURT: Well, I think --
10       MR. ROSEN: There was no need for that.
11       THE COURT: First of all, they were always
12  referred to as cop killers in various newspapers. It is
13  not something that is startling. For the last 20 years I
14  heard the term "cop killers."
15       MR. ROSEN: Maybe you had. But I don't think
16  the jury has. I think it is a startling thing to say that
17  these were used and known as cop killers. It changes the
18  complete complexity of what they were. They are armor
19  piercing. And then they -- he said they are better known
20  as cop killers. I think it is highly prejudicial. I
21  don't think a cautionary instruction can clear the harm.
22  It was not solicited by the government. It was some kind
23  of spontaneous statement made by the witness.
24       THE COURT: The government's position on the
25  motion -- I assume it is a motion for a mistrial?

J. Kennedy-Direct/Miskiewicz

605

1        MR. ROSEN: Yes.
2        MR. MISKIEWICZ: He made a statement of one
3  phrase. The Court immediately instructed the jury to
4  disregard. I think the jury is presumed to follow the
5  Court's instructions.
6        Again, it is not especially inflammatory. It is
7  a fairly common phrase, at least in New York.
8        That's all.
9        THE COURT: All right.
10       Your motion for a mistrial is denied. There is
11  certainly not any sufficient prejudice here that I can
12  ascertain. And I conclude the jury has been properly
13  apprised and directed and cautioned.
14       Moreover, I would give you a standing objection
15  if the only grounds for every objection you are making is
16  relevancy. But I have to know. So that is why I'm asking
17  you.
18       MR. ROSEN: I'm informing the Court now --
19       THE COURT: You don't think you are protected
20  enough by your prior motions?
21       MR. ROSEN: I don't know. I'm not an appellate
22  lawyer. So out of an abundance of caution now -- if we
23  just state for the record that I have a standing objection
24  to anything introduced by way of physical evidence,
25  photographs or anything else from -- by the way of crime

J. Kennedy-Direct/Miskiewicz

606

1  scenes as a result of the other two crimes, the 1994
2  armored car and the August 1994 Dorval shooting, then I'm
3  okay.
4        THE COURT: I have no problem with that. It is
5  better than to waste the time.
6        MR. ROSEN: Okay.
7        THE COURT: Although I can't understand why you
8  can't follow a simple direction that the Court has made a
9  ruling. But if you want to persist, you have a standing
10  objection.
11       But let me know when it is something else.
12  Because I don't want to guess that it is for one thing
13  versus another.
14       Yes, Mr. Miskiewicz.
15       MR. MISKIEWICZ: Since we are all here, and
16  counsel and I have worked out an agreement about an ATF
17  trace report that will be offered shortly. And as I
18  understand it, they will consent to its admission without
19  calling the ATF agent who prepared the report.
20       But that doesn't negate his continuing objection
21  on relevancy. But I wanted to let the Court know.
22       THE COURT: All right.
23       We are ready to proceed.
24
25       (Whereupon, at this time the following takes

J. Kennedy-Direct/Miskiewicz

607

1  place in open court.)
2        THE COURT: The items of evidence are in.
3  A   And the last objection is overruled.
4        (Whereupon, Government's Exhibits JK-24 and
5  JK-24-A, and JK-22 and JK-22-A were received in evidence.)
6  Q   Just very quickly, detective.
7        There are also what appear to be envelopes. Do
8  they bear some writing on them, and specifically referring
9  to JK 22-A and 24-A?
10  A   Yes. It says here from the clip, and it tells how
11  many rounds of each. And then where I sealed it, I
12  initialed it and dated it, and again, with the wrong date.
13  Q   That is your writing?
14  A   Yes.
15  Q   And you did that when you seized the material?
16  A   When I unloaded the clip and the gun right in the
17  garage.
18  Q   Detective Kennedy, I would like to show you what has
19  been marked as Government's Exhibit JK-25 -- I will do it
20  in order. 25-A, 25-A, as in Boy, 25-D, as in David, 26-A,
21  26-B, as in Boy -- oops, I went out of order. 25-C, as in
22  Charley.
23        Do you recognize those items?
24        (Handed to the witness.)
25  A   Yes.

J. Kennedy-Direct/Miskiewicz

608

1      These four are walkie-talkies that were in the
2  bag.  They are labeled with my tag on them, except this
3  one where the tag is missing.  But, again, the serial
4  number would be on the invoice sheet if needed.
5      These two items here are programmable scanners.
6  Again, they are labeled with my tags, programmable
7  scanners, and you can put in whatever frequency you want.
8  You can listen to police -- you can listen to the fire
9  department and the taxicabs, whatever you want.  If you
10  know the frequency and it is on their system, you can scan
11  it and listen to them.
12      These two at the time were set to Nassau and
13  Suffolk County.
14  Q    Nassau and Suffolk County what?
15  A    Police, I'm sorry.
16      And these four radios were all on the same
17  frequency, so they can talk to each other.
18      These are not communicable.  These are so you
19  can listen, and these so I can talk to you this way.
20  MR. MISKIEWICZ:  The government moves for the
21  admission of JK-25-A, B, C and D, as well as 26-A and B.
22  THE COURT:  They are admitted into evidence.
23  MR. MISKIEWICZ:  Thank you.
24  (Whereupon, Government's Exhibits JK-25-A, B, C
25  and D, and 26-A and B, were received in evidence.)

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

J. Kennedy-Direct/Miskiewicz

609

1  Q    And were these -- is this a --
2  A    That is a whip antenna.  You put it there.  For
3  packaging purposes, some were removed.
4  Q    This would be an antenna to go onto one of these
5  devices?
6  A    Yes.
7  Q    And all this came out of B-54?
8  A    Yes.
9      This was all contained in the black canvas bag.
10  Q    Detective Kennedy -- withdrawn.
11      I will show you what is marked as
12  Government's Exhibit ATF-1, and we move, pursuant to
13  discussions at the sidebar, for the admission -- admission
14  of ATF-1.
15  THE COURT:  Yes.
16  Admitted in evidence.
17  MR. MISKIEWICZ:  Thank up.
18  (Whereupon, Government's Exhibit ATF-1 was
19  received in evidence.)
20  Q    Did there come a time that a request was made to
21  trace the Glock model 19 pistol?
22  A    Yes.
23  Q    And was a trace done by the ATF, to your knowledge?
24  A    Yes.
25  Q    And looking at ATF-1, and I will ask you to focus on

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

J. Kennedy-Direct/Miskiewicz

610

1  the second page, are there any notations on that page with
2  regard to a particular number or some number of weapons?
3  A    Yes.
4      I see two pistols listed at the bottom, one with
5  the serial number on this nine millimeter here.
6  MR. MISKIEWICZ:  May I have a moment, your
7  Honor?
8  THE COURT:  Yes.
9  (Whereupon, at this time there was a pause in
10  the proceedings.)
11  MR. MISKIEWICZ:  If I can retrieve ATF-1 for a
12  moment, please?
13  THE COURT:  Yes.
14  (At this time a document was exhibited on
15  courtroom screen.)
16  Q    Sir, this is the second page of ATF-1; is that
17  correct?
18  A    Yes, partial.
19  Q    And who does it indicate was the purchaser of --
20  well, withdrawn.
21      There are two pistols on this page that are
22  referred to as being purchased?
23  A    Yes.
24  Q    Okay.
25      And who are they being purchased from?

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

J. Kennedy-Direct/Miskiewicz

611

1  A    From American Indoor Gun Range.
2  Q    Where?
3  A    American -- American Indoor Gun Range, 3130 Southwest
4  19th Street in Pembroke, Florida.
5  Q    All right.
6      Do you see a signature or name of the person to
7  whom the firearms were being transferred?
8  A    The person buying the gun?
9  Q    Yes.
10  A    On top it is printed, and then I see right there,
11  Louis Dorval.
12      And then down right at the bottom of the page, I
13  can see now that there are two signatures of Louis Dorval.
14  Q    Okay.
15      What was the date of the purchase?
16  A    2/28/94.
17  Q    And that would be approximately four months before
18  you executed the search warrant at B-54?
19  A    Yes, almost exactly.
20  Q    And among the weapons that are documented as being
21  purchased, can you read where my finger is, the serial
22  number that appears on that second line?
23  A    Yes.  The number two pistol is APX 041 US, which is
24  the same serial number appearing on this nine millimeter.
25  Q    So it was the same serial number that was in the --

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

J. Kennedy-Direct/Miskiewicz

612

1 withdrawn.
2          It was the same serial number that was on the
3 Glock model 19 that you seized from B-54?
4 A   Yes.
5 Q   So this gun came back to Louis Dorval?
6 A   Yes.
7 Q   I want to ask you a couple of more questions about
8 your investigation that year.
9          I will show you what is already admitted into
10 evidence as JK-11 and SM-6.
11          (Handed to the witness.)
12 Q   Were you present when those photographs were taken?
13 A   Yes.
14 Q   Showing you JK-11.
15          (Handed to the witness.)
16          (At this time a document was exhibited on
17 courtroom screen.)
18 Q   Were you -- do you recall approximately, when was
19 this photograph taken?
20 A   September 18th of 1994.
21 Q   Okay.
22          And the other photograph you have in front of
23 you is SM-6?
24 A   Yes.
25 Q   And were you present during the taking of that

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

J. Kennedy-Direct/Miskiewicz

613

1 photograph?
2 A   Yes.
3 Q   And that is Scott Mulligan?
4 A   Yes.
5 Q   Is that the individual that you saw driving out of
6 110 Mini Storage?
7 A   Yes.
8 Q   Where the guns were seized and everything else you
9 testified to were seized?
10 A   Yes.
11 Q   Sir, I want to show you what was marked for
12 identification as JK-30.
13          (Counsel confer.)
14 Q   I will show you what is marked as JK-30, and I will
15 ask you to focus on the photograph itself.
16          (Handed to the witness.)
17 Q   Do you recognize what is depicted on that photograph?
18 A   Yes.
19 Q   Was that photograph also taken on the same date?
20 A   Yes.
21 Q   The same date as the one on the screen now, JK-11?
22 A   Yes.
23 Q   Was this all part of a surveillance you were
24 conducting with other officers on that day?
25 A   Yes.

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

J. Kennedy-Direct/Miskiewicz

614

1 Q   Where were you?
2 A   Jericho Turnpike in Smithtown.  I believe it was
3 called Iron Horse Motorcycle Shop.
4 Q   And did you take note of --
5          MR. MISKIEWICZ:  The government moves for the
6 admission of JK-30.
7          THE COURT:  It is admitted into evidence.
8          (Whereupon, Government's Exhibit JK-30 was
9 received in evidence.)
10 Q   And did you at some point during your surveillance
11 take note of any of the operators of the vehicle that are
12 in that car -- in that photograph?
13 A   Yes.
14          In this particular photograph, I don't
15 remember -- we would have reported -- recorded all the
16 plates, the license plates.  But I don't recall ownership
17 of these particular vehicles.
18 Q   Okay.
19          Back to JK-11 on the screen.  And let me enlarge
20 it for a moment.
21          You were present during the taking of the
22 photograph but you did not take the photograph?
23 A   No.
24          I had my office photographer with me.

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

J. Kennedy-Direct/Miskiewicz

615

1 Q   Okay.
2          Did you actually observe the person depicted in
3 this photograph?
4 A   Yes.
5 Q   Did you recognize him, or did you know who that was
6 at the time?
7 A   Yes.
8          I directed the photographer to take the picture.
9 Q   Okay.
10          Who did you recognize the person in the
11 photograph to be?
12 A   Chris Tarantino.
13 Q   Okay.
14          Do you see Chris Tarantino in the courtroom
15 today?
16 A   Yes.  Seated at the table in a beige jacket.
17          MR. MISKIEWICZ:  The government would ask that
18 the record reflect that Detective Kennedy has identified
19 the defendant.
20          THE COURT:  The record will so reflect.
21 Q   When this photograph was taken -- again, what day or
22 month was this photograph taken?
23 A   September 18th, 1994.
24 Q   Okay.
25          When this photograph was taken, did you take any

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

1  note of the physical condition of the defendant?
2  **A**  Yes.
3  **Q**  What, if anything, did you see?
4  **A**  Well, first of all, I saw him in good shape.
5       But you can see on his right arm, he had a cast
6  on his right arm from about here down over his knuckles
7  (indicating).
8  **Q**  If I can -- this area?
9  **A**  Yes, the top of the cast.
10 **Q**  It is out of view of the photograph, but this
11 comports with your memory that it was a cast?
12 **A**  Yes.
13 **Q**  This was a cast?
14 **A**  Yes.
15 **Q**  And it went over his --
16 **A**  Just over his or up to his knuckles.
17      MR. MISKIEWICZ:  Can I have a moment, your
18 Honor?
19      THE COURT:  Yes.
20      (Government counsel confer.)
21      MR. MISKIEWICZ:  No further questions.
22      THE COURT:  Cross-examination.
23      MR. ROSEN:  Might I approach for a moment, your
24 Honor?
25      THE COURT:  Yes.

1       (Counsel approaches the witness stand.)
2
3  CROSS-EXAMINATION
4  BY MR. ROSEN:
5  **Q**  You indicated that you know Scott Mulligan; is that
6  correct?
7  **A**  Yes.
8  **Q**  Could you describe him, height and weight?
9  **A**  I haven't seen him in -- well, since that day, since
10 June of '94 was the last time I saw him, and that was
11 driving a car -- then I saw him here, I'm sorry,
12 September 18th, 1994.  That is the last time I saw him.
13 **Q**  Describe Scott Mulligan's height and weight in
14 September of 1994.
15 **A**  Okay.
16      Probably just under six foot.  Looked kind of
17 soft, not muscular but not overweight, if you understand
18 what I'm saying.  He is a big guy.  He wasn't tall or
19 ripped or something like that, as you say, from
20 exercising.  He had a Stephen Segal hairdo where it was
21 slick and pulled back into a ponytail.
22 **Q**  What would you estimate his weight?
23 **A**  A little over 200, 215, maybe, 210.
24 **Q**  Not 240, 260?
25 **A**  I don't think so, unless he was a lot more solid than

1  I thought.
2  **Q**  And do you remember the height and weight of
3  Mr. Tarantino back in 1994?
4  **A**  Yes.
5       In '94, again, I would say he is or he was
6  probably around five 10, five 11, always in good shape.
7  Sometimes with more muscular than others.  But he was in
8  good shape.  He always had short hair, athletic looking.
9  Body weight maybe 180 when he was in top shape.
10 **Q**  How about Rob Smyth?
11 **A**  Don't know him.
12 **Q**  Had you ever seen him?
13 **A**  No.
14 **Q**  You don't know who he is?
15 **A**  No.
16 **Q**  No clue in this investigation who Rob Smyth is?
17 **A**  No.
18      MR. ROSEN:  Nothing further.
19      THE COURT:  Anything else?
20      MR. MISKIEWICZ:  No, your Honor.
21      THE COURT:  Thank you, sir.  You can step down.
22      (Whereupon, the witness at this time steps down
23 from the witness stand.)
24      MR. FLYNN:  Your Honor, the government calls
25 Lynn Kennedy.

1
2  L Y N N   K E N N E D Y,
3       called as a witness, having been first
4       duly sworn, was examined and testified
5       as follows:
6       THE CLERK:  Thank you.
7       Take a seat.
8       Please speak into the microphone, and state and
9  spell your name for the record.
10      THE WITNESS:  Lynn Kennedy, L-Y-N-N,
11 K-E-N-N-E-D-Y.
12      THE CLERK:  Thank you.
13
14 DIRECT EXAMINATION
15 BY MR. FLYNN:
16 **Q**  Good afternoon, Ms. Kennedy, how are you?
17 **A**  Good afternoon.  I'm good.
18 **Q**  Are you appearing here today pursuant to a subpoena
19 issued to you by the United States Attorney's office?
20 **A**  Yes.
21 **Q**  And I would like to direct your attention,
22 Ms. Kennedy, to the summer of 1994.
23      Did you have a job at that time?
24 **A**  Yes, I did.
25 **Q**  What did you do?

L. Kennedy-Direct/Flynn

620

1  A   I was the assistant supervisor at Volt Information
2  Sciences.
3  Q   And what sort of company was that then?
4  A   We published the Nynex Yellow Pages.
5  Q   Where was Volt Information Sciences located?
6  A   6851 Jericho Turnpike in Syosset.
7  Q   And what specifically did you do for the company in
8  1994?
9  A   I was the assistant supervisor and helped the
10  day-to-day operations of the data entry department.
11  Q   I would like to direct your attention more
12  specifically to June 23, 1994.
13      Were you at work at Volt on that particular day?
14  A   Yes, I was.
15  Q   And at any point during the morning of June 23rd,
16  1994, was a man murdered outside of your office building?
17  A   Yes.
18  Q   Where specifically did these events take place?
19  A   In the parking lot in front of the building.
20  Q   Where were you at the time?
21  A   I was in my department standing in the back, right
22  alongside the windows.
23  Q   To the best of your recollection, what initially drew
24  your attention to the fact that something unusual was
25  occurring in the parking lot outside the Volt building

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

L. Kennedy-Direct/Flynn

621

1  that day?
2  A   One of my co-workers had shouted that there was a man
3  with a gun in the parking lot.
4  Q   What did you do as a result of that?
5  A   I looked out the window and I began -- I looked out
6  the window and I was banging on the window to try to find
7  out what was going on.
8      (At this time a document was exhibited on
9  courtroom screen.)
10  Q   Ms. Kennedy, on the screen in front of you and in the
11  courtroom, I'm now showing what is previously admitted in
12  evidence in this case as Government's Exhibit RRG-85.
13      Do you recognize the area or the scene depicted
14  in that photograph?
15  A   Yes, I do.
16  Q   What do you recognize it to be?
17  A   That is the Volt Information Sciences office building
18  and parking lot.
19  Q   And does that photograph, Government's
20  Exhibit RRG-85, fairly and accurately depict the building
21  where you worked in June of 1994?
22  A   Yes.
23  Q   Using that photograph as a demonstrative, and you
24  have a laser pointer in front of you I would ask you to
25  use, would you please indicate to the jury what window you

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

L. Kennedy-Direct/Flynn

622

1  went to when a co-worker yelled someone was out in the
2  parking lot with a gun.
3  A   Sure.
4      Can you see it?
5  Q   There is a button there.
6  A   Keep it pushed?  All right.
7      Right about here (indicating).
8  Q   Okay.
9      And for the record, you indicated what appears
10  to be about the fourth window down from the main doors
11  moving left to right?
12  A   Yes.
13  Q   For the record, this Government's Exhibit RRG-85,
14  this depicts a building to the right of the main doors
15  with the numeral 6851 above it.
16      Does this portion of the photograph depict where
17  Volt, the company, was housed at the time?
18  A   Yes, that is it.
19  Q   When you went to the fourth window down on the
20  photograph on that morning and looked down the -- out the
21  window, what is the first thing you saw?
22  A   I saw a man with his back toward me, back turned
23  toward me, and a maroon Chevy Blazer.
24  Q   Would you -- was this man -- how was this man
25  dressed?

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

L. Kennedy-Direct/Flynn

623

1  A   In a dark suit, clean cut, dark hair.
2  Q   Was he facing toward you or away from you?
3  A   His back was towards me, so I didn't see the front of
4  him.  But I saw the back.
5  Q   You say you saw a maroon vehicle?
6  A   Yes.
7  Q   Did you know if anyone at this point was inside that
8  vehicle?
9  A   Yes, there was.
10  Q   Were you able to -- withdrawn.
11      Where inside the vehicle, to the best of your
12  recollection, was this second individual?
13  A   In the driver's seat.
14  Q   Were you able from your vantage point to make out a
15  description of the individual at this time?
16  A   No, I did not.
17  Q   Ms. Kennedy, I'm going to show you what is previously
18  admitted in evidence in this case as
19  Government's Exhibit RRG-88.
20      (At this time a document was exhibited on
21  courtroom screen.)
22  Q   Do you recognize the vehicle depicted in this
23  photograph?
24  A   Yes, I do.
25  Q   What do you recognize it to be?

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

L. Kennedy-Direct/Flynn

624

1    **A    That is the vehicle that was outside of the window**
2    **that day.**
3    Q    Well, this photograph -- the vehicle depicted in this
4    photograph, are you actually sure that that is the exact
5    same vehicle you saw that morning?
6    **A    I am.**
7    Q    Or does it appear to be?
8    **A    It appears to be.**
9         **I'm familiar with that vehicle.  We owned the**
10   **same one at the same time.**
11   Q    What kind of vehicle is it?
12   **A    An S10 Chevy Blazer.**
13   Q    Ms. Kennedy, in addition to seeing that red Chevy
14   Blazer and what you described as two people to this point,
15   when you went to the window and looked out after your
16   co-worker said someone had a gun, did you see any other
17   vehicles outside?
18   **A    I saw the vehicles that were parked in the parking**
19   **lot.**
20   Q    Well, let me direct your attention back to
21   Government's Exhibit RRG-85, if I could.
22        (At this time a document was exhibited on
23   courtroom screen.)
24   Q    Do you see a white van in that photograph?
25   **A    Yes.**

L. Kennedy-Direct/Flynn

625

1    Q    Did you see that white van when you looked out the
2    window that morning?
3    **A    Yes.**
4    Q    Had you seen that van on a similar -- withdrawn.
5         Had you seen that white van at your place of
6    employment on previous occasions?
7    **A    Yes.**
8    Q    What, to your knowledge, was that white van?
9    **A    That is the van that the check cashing service used.**
10   Q    All right.
11        How often, to the best of your recollection,
12   would that van come to your place of employment in 1994?
13   **A    Weekly.**
14   Q    Would you yourself negotiate your payroll check with
15   the employees that worked in that armored van?
16   **A    Yes.**
17   Q    Generally when you worked at Volt in 1994, how many
18   individuals would come into your place of employment each
19   week to negotiate payroll checks?
20   **A    All of -- I would say most of the employees cashed**
21   **their checks.**
22   Q    I'm sorry, how many employees of the van service
23   would you see?
24   **A    I would say two.**
25   Q    And did you come to know either of these men

L. Kennedy-Direct/Flynn

626

1    personally?
2    **A    Yes.**
3    Q    Who?
4    **A    Julius.**
5    Q    And how did you come to know him?
6    **A    Just through conversation over time, you get to know**
7    **people.**
8    Q    And to the best of your recollection, would this
9    white van that is appearing on the screen in the center of
10   Government's Exhibit RRG-85, park in generally the same
11   location each time it arrived?
12   **A    That I'm not sure.**
13   Q    Okay.
14        If I can go back to previous testimony, you
15   stated earlier that one of your co-workers had said there
16   was a man outside your building on June 23rd, 1994 with a
17   gun.  Do you remember that?
18   **A    Yes.**
19   Q    Did you see an individual with a gun when you looked
20   out the window at first?
21   **A    At first, no.**
22   Q    When you saw -- did you eventually come to see
23   someone who had a weapon?
24   **A    Yes.**
25   Q    All right.

L. Kennedy-Direct/Flynn

627

1         Tell me about that.
2    **A    It was after I heard the gunshot.**
3    Q    Okay.
4         Let's back up for a second.
5    **A    Okay.**
6    Q    After you saw -- after you came to the window and saw
7    a man in a blue suit facing away from you, and someone
8    inside the red Chevy Blazer you just described, what was
9    the next thing you saw or heard?
10   **A    The next thing I heard was a gunshot.**
11   Q    And then what happened?
12   **A    And then another individual came from around the**
13   **white van holding a weapon.**
14   Q    What did that weapon look like?
15   **A    To me, it was held like this (indicating).  The best**
16   **example I could come up with would be like a sawed-off**
17   **shotgun.**
18   Q    Ms. Kennedy, I will show you and am showing you what
19   is previously admitted in evidence in this case as
20   Government's Exhibit RS-4.
21        Do you recognize this weapon?
22   **A    It appears that that is what I remember it looking**
23   **like.**
24   Q    Like this weapon here (indicating)?
25   **A    Yes.**

L. Kennedy-Direct/Flynn

628

1  Q   And when you first saw the individual carrying this
2  weapon or what appeared to be this weapon, where was he?
3  If you would use your laser pointer on
4  Government's Exhibit RRG-85.
5  A   **He was coming from this area and running to where the**
6  **car was parked -- the truck was parked.**
7  Q   Where was the truck parked?
8  A   **It is off the picture, but right outside the fourth**
9  **window or so where I was standing.**
10  Q   Okay.
11        In which direction was it facing?  How was it
12  oriented, the red Blazer?
13  A   **Facing this way (indicating).**
14  Q   So the front of the vehicle would be facing towards
15  the left-hand side of the photograph as you were looking
16  at it?
17  A   **Yes.**
18  Q   Okay.
19        When you first looked out the window, did you
20  see the individual with this shotgun?
21  A   **When I first looked out the window?**
22  Q   Yes.
23  A   **No.**
24  Q   And you testified earlier that eventually he came --
25  that person came into the field of view; is that correct?

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

L. Kennedy-Direct/Flynn

629

1  A   **Yes.**
2  Q   And how was that individual holding that weapon when
3  you first saw him or her?
4  A   **Like this (indicating).**
5  Q   Like this (indicating)?
6  A   **Up a little higher, not that high, level.**
7  Q   Approximately how far from the spot of your window
8  was he?
9  A   **Maybe not as far as you are right now.**
10  Q   As far as this?
11  A   **About a car away.**
12  Q   For the record, I'm standing right in front of the
13  prosecution's counsel table.
14  A   **Yes.**
15  Q   How was this person dressed?
16  A   **He was wearing a pig's mask and had on a denim**
17  **jacket.  And there was some blond hair coming out from**
18  **under the mask.**
19  Q   You said he was wearing a pig's mask?
20  A   **Yes.**
21  Q   Would you describe a little more detail what you are
22  talking about.  What kind of pig's mask?
23        Withdrawn.
24        Did this mask appear to be -- was it a full
25  rubber mask to go over your entire head or child's mask?

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

L. Kennedy-Direct/Flynn

630

1  A   **No.  It would be one that they pull on.**
2  Q   To the best of your recollection, what was the height
3  and weight of this individual if you could recall?
4  A   **I would say maybe six foot.  He was much heavier.  A**
5  **big man.  Six feet, 200 pounds.**
6  Q   And when you saw this man with the shotgun -- now we
7  are talking about a third individual; is that correct?
8  A   **Yes.**
9  Q   When you saw this man with the shotgun, what, if
10  anything, did you do?
11  A   **Well, at that point I had stopped banging on the**
12  **window.  And I alerted the other employees that were in my**
13  **department to get down and get away from the windows.**
14        **I ran to the security guard and told him to lock**
15  **the doors.  And I kind of panicked and just took off**
16  **running throughout the building.**
17  Q   And after you -- did you eventually calm down?
18  A   **Eventually I calmed down, yes.**
19  Q   Did you make a telephone call at that point?
20  A   **Yes.  I dialed nine one one.**
21        MR. FLYNN:  Your Honor, permission to approach?
22        THE COURT:  Yes.
23        (Counsel approaches the witness stand.)
24  Q   Ms. Kennedy, I'm handing you what is marked for
25  Identification in this case as Government's Exhibit LWK-1.

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

L. Kennedy-Direct/Flynn

631

1        Have you seen that compact disk before?
2  A   **Yes, I have.**
3  Q   Have you listened to the content of that compact disc
4  before?
5  A   **Yes.**
6  Q   How do you know that?
7  A   **I wrote my initials on the disk.**
8  Q   And when you listened to the content of that compact
9  disk, what did you hear?
10  A   **My nine one one call.**
11  Q   Is that the nine one one call that you placed on the
12  morning of June 23rd, 1994?
13  A   **Yes.**
14        MR. FLYNN:  Your Honor, the government moves for
15  the admission of Government's Exhibit LWK-1.
16        THE COURT:  Admitted into evidence.
17        MR. FLYNN:  Permission to publish to the jury,
18  your Honor?
19        THE COURT:  Yes.
20        (Whereupon, Government's Exhibit LWK-1 was
21  received in evidence.)
22        MR. FLYNN:  Ladies and gentlemen, if you put
23  your headset on, there is a switch on the right-hand side.
24  And switch to the green so it is on.
25  Q   Ms. Kennedy, I would ask you to put your headset on,

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

L. Kennedy-Direct/Flynn

632

1  and make sure that it is on.
2      (Audio tape is played.)
3  Q   Ms. Kennedy, we heard in the audio tape of the nine
4  one one call to the police on June 23rd, 1994 that you
5  referred to a Jeep Cherokee.  Did you hear that?
6  A   Yes.
7  Q   What vehicle were you referring to in that portion of
8  the call?
9  A   I was referring to the Chevy Blazer.
10 Q   Okay.
11     Do you remember telling the dispatcher on the
12 nine one one call that the vehicle was a Cherokee?
13 A   Yes.
14 Q   What do you remember saying there?
15 A   There was a debate with the people in the office as
16 to what the vehicle was.  And I just went with the
17 majority on what kind of car it was.
18 Q   Ms. Kennedy, I will show you what is admitted as
19 RRG-88 again.
20     (At this time a document was exhibited on
21 courtroom screen.)
22 Q   Is that the vehicle you were referring to in the nine
23 one one call?
24 A   Yes.
25 Q   And as you heard in the audio recording that was

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

L. Kennedy-Direct/Flynn

633

1  played, you provided the police dispatcher with a license
2  plate of that red Chevy Blazer; is that correct?
3  A   Yes.
4  Q   After you hung up with the police on the nine one one
5  call, did officers respond to your place of employment?
6  A   Yes.
7  Q   Were you questioned that day?
8  A   Yes.
9  Q   And did you provide a handwritten statement to police
10 concerning what you had seen?
11 A   Yes.
12     MR. FLYNN:  Thank you.
13     No further questions.
14     THE COURT:  Any questions?
15     MR. ROSEN:  No questions.
16     THE COURT:  Thank you.  You may step down.
17     (Whereupon, the witness leaves the courtroom.)
18     MR. DODDATO:  Your Honor, may we approach for a
19 moment, please?
20     THE COURT:  Sure, come on up.
21     Why not take our mid-afternoon break, and I will
22 see you in 15 minutes.
23     Don't talk about the case.
24     (Whereupon, at this time the jury leaves the
25 courtroom.)

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

Schiraldi-Direct/Miskiewicz

634

1      MR. DODDATO:  When I asked to approach, all I
2  was going to do was ask for a bathroom break.
3      There is no need for a sidebar right now.  Our
4  timing was perfect, your Honor.
5      THE COURT:  All right.
6
7      (Whereupon, a recess was taken.)
8
9      THE COURT:  Who is after Ms. Kennedy?
10     MR. MISKIEWICZ:  Vito Schiraldi.
11     (Whereupon, the jury at this time entered the
12 courtroom.)
13     THE COURT:  Please be seated.
14     We are ready to resume.
15     The government's next witness is --
16     MR. MISKIEWICZ:  Detective Vito Schiraldi.
17
18 V I T O   S C H I R A L D I,
19     called as a witness, having been first
20     duly sworn, was examined and testified
21     as follows:
22     THE CLERK:  Please take a seat.
23     Speak into the microphone and state and spell
24 your name for the record.
25     THE WITNESS:  My name is Vito P. Schiraldi, a

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

Schiraldi-Direct/Miskiewicz

635

1  Detective With the Nassau County Police Department.  The
2  last name is S-C-H-I-R-A-L-D-I.
3      THE CLERK:  Thank you.
4
5  DIRECT EXAMINATION
6  BY MR. MISKIEWICZ:
7  Q   Good afternoon, detective.
8      How long have you been with the Nassau County
9  Police Department?
10 A   Just short of 26 years.
11 Q   And you said you were a detective.
12     Let me direct your attention to the timeframe of
13 the summer of 1994.
14 A   Yes.
15 Q   Were you working for the Nassau County Police
16 Department?
17 A   Yes, I was.
18 Q   And where were you assigned?
19 A   To the Scientific Investigation Bureau of The Nassau
20 County Police Department, the forensic laboratory.
21 Q   Okay.
22     What was your duties at that laboratory?
23 A   The handling and analysis of trace evidence.  It
24 could be anything from -- anything of small quantity,
25 dust, hairs, fibers, paint chips, glass.

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

1  Q   And did you receive any specific training to conduct
2  that job?
3  A   Yes.
4        I had taken numerous courses in the use of
5  microscope in a forensic application. I attended numerous
6  courses through the Northeastern Association of Forensic
7  Scientific, a hair and fiber course at the Quantico,
8  Virginia laboratory of the FBI, and I received several
9  hours of job training from my predecessor.
10 Q   Let me direct your attention to June 23, 1994.
11       Do you recall if you were on duty that day?
12 A   Yes, I was.
13 Q   Were you at some point during your shift that day
14 asked to conduct any kind of an examination?
15 A   Yes. I was working 4:00 to 12:00 and I was asked to
16 do an examination of a Chevy Blazer.
17 Q   At the time that you encountered this vehicle, where
18 was the Chevy Blazer?
19 A   In the Emergency Service Unit of our office in
20 Bellmore, New York.
21 Q   And I want to show you what is marked for
22 Identification as Government's Exhibit RRG-50, 55, 56, 57
23 and 58.
24       (Handed to the witness.)
25 Q   Showing you those exhibits, sir, would you take a

1  moment and look at them and see if you can identify what
2  is depicted in there. And tell us, yes or no, if you
3  recognize the photos.
4  A   Yes.
5  Q   Do you recognize the vehicle depicted there?
6  A   Yes.
7  Q   What do you recognize it to be?
8  A   The vehicle I examined. And can I refer to my notes
9  to get the VIN number and what-not?
10 Q   We don't need a VIN number?
11 A   That is a four-door Chevy Blazer that I referred to
12 in my notes.
13       MR. MISKIEWICZ: The government moves for the
14 admission of RRG-50, 55 through 58.
15       THE COURT: Admitted into evidence.
16       (Whereupon, Government's Exhibits RRG-50, 55
17 through 58 were received in evidence.)
18       MR. MISKIEWICZ: May I publish it to the jury,
19 your Honor?
20       THE COURT: Yes.
21       (At this time a document was exhibited on
22 courtroom screen.)
23 Q   Sir, showing you what is marked as RRG-50 in evidence
24 now. What is it we are looking at?
25 A   A Chevy Blazer that I examined the night of the 23rd

1  or the 24th of June.
2  Q   Okay.
3        And there appears to be a lot of dust or some
4  sort of film or some whitish substance. Do you see that
5  on the photograph?
6  A   Yes, I do.
7  Q   Do you know what that is?
8  A   Yes.
9        It is common that that would be latent
10 fingerprint powder and latent prints prior to the
11 examination, prior to the criminalistics section going in.
12 Q   And did you do the fingerprints or someone else?
13 A   Someone else.
14 Q   And what was your assigned duty with respect to this
15 vehicle on that day?
16 A   To examine the interior for any trace evidence,
17 hairs, fibers, paint chips, glass, or anything foreign
18 that might be in that vehicle.
19 Q   Showing you what is received as RRG-55.
20       (At this time a document was exhibited on
21 courtroom screen.)
22 Q   Is that the interior of the vehicle we were looking
23 at a moment ago?
24 A   Yes, it is.
25 Q   And I want to note -- I would like to blow up a

1  portion of the steering wheel.
2        Specifically the steering column, did you note
3  anything unusual about the steering column?
4  A   Yes. The column had been broken.
5  Q   Do you know whether or not -- well, is that the
6  condition it was in when you did your analysis?
7  A   May I refer to my notes to refresh my recollection?
8  Q   Yes.
9  A   Yes.
10 Q   I would like to show you an exhibit.
11       THE COURT: Yes.
12       He wants to show you something first.
13       (Whereupon, at this time there was a pause in
14 the proceedings.)
15 Q   I show you 3500-VS-8.
16       (Counsel confer.)
17       (Handed to the witness.)
18 Q   Take a look at that and see if it refreshes your
19 recollection.
20 A   Yes, it does.
21 Q   So was the steering column broken?
22 A   Yes, it is. It is so noted in my report.
23 Q   All right.
24       Did you -- well, you said your job that day was
25 to try to recover any trace evidence.

Schiraldi-Direct/Miskiewicz

640

1    How did -- how did you on that day go about
2    trying to recover any trace evidence from the interior of
3    this vehicle?
4    **A    First we tried to look with oblique lighting, a**
5    **lighting technique that allows you to show anything that**
6    **might be deposited on the interior.**
7        **Short of that, not finding anything, sticky tape**
8    **around your hand and you just tape, like a lint brush, if**
9    **you will, around the chair itself, or the seats in this**
10   **case, to lift up anything foreign other than the material**
11   **of the interior.**
12   **Q**   I show you what is marked for Identification as VS-2,
13   Government's Exhibit VS-2.
14       (Counsel confer.)
15   **Q**   Showing you VS-2.
16       (Handed to the witness.)
17   **Q**   I ask you to look at the contents of that, and ask
18   you if you recognize what is inside that evidence pouch.
19   **A    Yes, I do.**
20   **Q**   What do you recognize it to be?
21   **A    I recognize it as the actual tape that I had that**
22   **day, and I sealed it in the plastic bag and it bears my**
23   **initials, VS.**
24       MR. MISKIEWICZ:  The government moves for the
25   admission of VS-2.

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

---

Schiraldi-Direct/Miskiewicz

641

1        THE COURT:  Received in evidence.
2        (Whereupon, Government's Exhibit VS-2 was
3    received in evidence.)
4    **Q**   Detective Schiraldi, essentially --
5        MR. MISKIEWICZ:  May I just hold it up and
6    publish it quickly that way for the jury?
7        THE COURT:  Yes.
8        (Whereupon, the exhibit/exhibits were published
9    to the jury.)
10   **Q**   Detective Schiraldi, the dark item in here, is this
11   what you referred to as the sticky tape?
12   **A    That's correct.**
13   **Q**   Detective Schiraldi, did there come a time that you
14   attempted to analyze any material that was stuck onto that
15   tape or attached to that tape?
16   **A    Yes.**
17   **Q**   And what did you do?
18   **A    I looked with a stereo light microscope, which is**
19   **basically a large hand-held magnifier that allows you to**
20   **see things in stereo and 3D.  I removed four hairs and**
21   **mounted it on a glass slide for examination under the**
22   **light microscope.**
23   **Q**   And then what did you do with those hairs?
24   **A    I left them mounted on the slides and examined them**
25   **on the light microscope.**

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

---

Schiraldi-Direct/Miskiewicz

642

1    **Q**   I show you what is marked for Identification as VS-3
2    and VS-6.
3        (Handed to the witness.)
4    **Q**   I ask you to look at VS-6 first.
5        Do you recognize that?
6    **A    Yes.  This is the slide holder and contains the**
7    **slides bearing my case number C88 of '94, bearing my**
8    **initials, VS.**
9    **Q**   And VS-8?
10   **A    The same thing, a slide holder with hairs marked on**
11   **slides, again, C88 of '94, VS.**
12   **Q**   So within the cardboard sleeves there are actual
13   slides?
14   **A    Yes.**
15   **Q**   And is this the usual procedure by which you take
16   trace evidence and mount it and hold it in a file of some
17   kind?
18   **A    Yes.**
19   **Q**   Now, did there come a time that you transferred
20   custody of this material to some other law enforcement
21   agency?
22   **A    Yes.**
23       **I was asked to give the complete packet of all**
24   **the evidence to the FBI.**
25   **Q**   Did you do that?

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

---

Schiraldi-Direct/Miskiewicz

643

1    **A    Yes, I did.**
2    **Q**   And do you recall where you sent the evidence to?
3    **A    The FBI laboratory in Quantico, Virginia.**
4    **Q**   I will show you -- withdrawn.
5        In or about the summer of 2000, July of 2000,
6    did there come a time that additional evidence was
7    collected in connection with this particular homicide
8    investigation by members of your agency?
9    **A    Yes.**
10       **From the course of time from '94 to around that**
11   **time, there were several different collections of**
12   **different individuals collected by other detectives from**
13   **the homicide section of the Nassau County Police**
14   **Department.**
15   **Q**   And did that, if you recall if it included a
16   detective named Michael Bazylewicz?
17   **A    Yes.**
18   **Q**   And did there come a time that you were asked to
19   transfer any of that material to another law enforcement
20   agency?
21   **A    I don't recall at this time.**
22   **Q**   Showing you briefly Government's Exhibit VS-4-A, as
23   in Apple.
24       Do you recognize that at all?
25       (Handed to the witness.)

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

Schiraldi-Direct/Miskiewicz

644

1 A    These are swabs with a homicide number on it.  It
2 does not bear my initials though -- hold on a minute.
3 There is a VS here.  These are swabs that were taken from
4 another individual who took these swabs and might have
5 given it to me to package them and gave it to me to give
6 to the FBI.
7 Q    Do you recall at some point being asked to transfer
8 custody of swabs or any other material in or around 2000
9 or later to the FBI office?
10 A    Yes, I do.
11 Q    And was that also sent down to Quantico?
12 A    Yes.
13        Detective Bayzelewicz gave me this.  And without
14 referring to my notes, he gave me things to send to
15 Quantico.
16 Q    And you did that?
17 A    Yes, I did.
18        MR. MISKIEWICZ:  No further questions.
19        THE COURT:  Any questions?
20        MR. ROSEN:  Yes.
21        May I approach?
22        THE COURT:  Yes.
23        (Counsel approaches the witness stand.)
24
25

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

---

Schiraldi-Cross/Rosen

645

1 CROSS-EXAMINATION
2 BY MR. ROSEN:
3 Q    I show you what is marked in evidence as VS-2.
4        Do you recognize this?
5        (Handed to the witness.)
6 A    Yes, I do.
7 Q    This is the actual tape that you utilized to go to
8 the car with; is that correct?
9 A    Yes.
10 Q    And the purpose of the tape is to pick up materials
11 that could be found in the car?
12 A    Yes.
13 Q    Like on TV, the CSI series stuff; is that right?
14 A    Yes.
15 Q    And you collected this and then you bring it back to
16 your laboratory, correct?
17 A    That's correct.
18 Q    Where has this tape been since you brought it back to
19 your laboratory June 23, June 24, 1994; where has this
20 been?  Can you tell from this evidence package?
21 A    I know for a fact after I examined it I put it in the
22 Property Bureau of The Nassau County Police Department.
23        Then around June of 2001 it was packaged in the
24 property room.  And I assembled all the pieces of evidence
25 in this case together and packaged it in a large box and

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

---

Schiraldi-Cross/Rosen

646

1 FEDEX'd them to Quantico, Virginia, FBI laboratory.
2 Q    And do you know how long it stayed there?
3 A    I don't recollect exactly how long it stayed there.
4 Q    Did you ever see it back itself?
5 A    It came back.  I left the box sealed.  And when I was
6 asked by Agent Schelhorn, he came and it was still sealed
7 and I gave it to him.
8 Q    When was that?
9 A    I would have to refer to my notes.  I don't remember.
10 Q    Do you have any idea?
11 A    Subsequent to 2001.
12        And that was, I would say, 2005, 2006, something
13 like that.
14 Q    So the FBI lab had it in their possession for at
15 least five or six years?
16 A    It was mailed back to us and I stored it again.
17 Agent Schelhorn came back and I gave him the whole sealed
18 box, the box I received from Quantico.  But I don't
19 remember what that date is.
20 Q    When do you think -- how long did the FBI have your
21 evidence?
22 A    I would say maybe a year, a year and a half.
23 Q    So if you sent it up in 2001, you got it back in
24 2002?
25 A    Probably 2002, around there.

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

---

Schiraldi-Cross/Rosen

647

1 Q    And it stayed with you since 2002 in the Nassau
2 County evidence room?
3 A    Sealed in a box, yes.
4 Q    Okay.
5        So for the past approximately nine or ten years,
6 that has remained in the Nassau County lab; is that
7 correct?
8 A    In the Property Bureau.
9 Q    Okay.
10 A    In a sealed condition.
11 Q    Do you have any reason to believe that somebody
12 removed it at any time without your knowledge?
13 A    No, I do not.
14 Q    Okay.
15        When you first looked at this tape, you used
16 certain instruments that you had at the time; is that
17 correct?
18 A    Yes, that's correct.
19 Q    And you are considered an expert in your field; is
20 that correct?
21 A    That's correct, yes.
22 Q    And you received sufficient training, etcetera,
23 etcetera, correct?
24 A    That's correct, yes.
25 Q    And you used some form of light through a microscope?

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

Schiraldi-Cross/Rosen

648

1   A   Light microscopy, yes.
2   Q   Explain what that is.
3   A   Light microscopy is used to reflect any light that
4   comes in, or a light source like a light bulb hits an
5   object with a magnifying glass or stereo light microscope,
6   the light reflected off that individual object is
7   reflected back into the lens or collection piece, and that
8   is what you are visualizing.
9          In light microscopy, polarized light microscopy,
10  biological microscopy, the light is transferred through
11  the slide, and that is what you see through the
12  microscope.
13  Q   And you were able to see hairs?
14  A   Yes.
15  Q   And did you see four hairs?
16  A   Yes.
17  Q   One which was an animal?
18  A   Yes.
19  Q   Two, mixed racial?
20  A   Mixed racial origin, yes.
21  Q   And one Caucasian?
22  A   That's correct.
23  Q   Did you miss any?
24  A   Of those hairs suitable for light microscopy, I
25  didn't miss any.

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

Schiraldi-Cross/Rosen

649

1   Q   You are sure about that?
2   A   Whatever is left on here is light unsuitable for
3   light microscopy.
4          MR. ROSEN:  Thank you.
5          Nothing further, your Honor.
6          THE COURT:  Any questions?
7          MR. MISKIEWICZ:  No, your Honor.
8          THE COURT:  Thank you, sir.  You may step down.
9          (Whereupon, the witness at this time steps down
10  from the witness stand.)
11         THE COURT:  Next witness, please.
12         MR. MISKIEWICZ:  The government calls Detective
13  Bazyelewicz.
14         THE CLERK:  Remain standing to be sworn, please.
15
16  M I C H A E L   B A Z Y L E W I C Z,
17         called as a witness, having been first
18         duly sworn, was examined and testified
19         as follows:
20         THE CLERK:  Thank you.
21         Take a seat, please.
22         Speak right into the microphone.
23         State and spell your name for the record.
24         THE WITNESS:  Detective Michael Bazylewicz,
25  B-A-Z-Y-L-E-W-I-C-Z.

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

Bazylewicz-Direct/Miskiewicz

650

1          THE CLERK:  Thank you.
2
3   DIRECT EXAMINATION
4   BY MR. MISKIEWICZ:
5   Q   Good afternoon, detective.
6          Who do you work for, which agency?
7   A   I'm employed by the Nassau County Police Department.
8   Q   And what are your current assignments?
9   A   I'm currently assigned to the homicide squad,
10  vehicular crimes and reconstruction sets.
11  Q   And I would like to focus your attention to
12  July 18th, 2000.
13         Were you a Nassau County Police Department
14  detective then?
15  A   Yes, I am -- yes, I was, excuse me.
16  Q   And on that day did you have a particular assignment?
17  A   Yes.
18  Q   What was it?
19  A   Actually, I think it was July 20th, 2000.
20  Q   I thought I said that.  If I misspoke, yes.
21         Let's talk about July 20th, 2000.
22  A   I received an assignment to go up to Willard
23  Correctional Center up in Willard, New York.
24         I responded up there to collect samples from an
25  individual.

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

Bazylewicz-Direct/Miskiewicz

651

1   Q   And who is that individual?
2   A   Christian Tarantino.
3   Q   And did you go up alone or with any other fellow
4   officers or agents?
5   A   I went with three other detectives, Detective Anthony
6   Zacarese, Special Agent Robert Schelhorn from the FBI, and
7   Detective Charles Costello from the Nassau County Police
8   Department.
9   Q   And what was your role that day?
10  A   My role was to collect buccal samples and hair
11  samples from Christian Tarantino.
12  Q   Do you see Mr. Tarantino in the courtroom today?
13  A   Yes, I do.
14  Q   Would you point to him and describe an article of
15  clothing that he is wearing.
16  A   Seated right to my right here.  He has a beige,
17  yellowish colored jacket on.
18         MR. MISKIEWICZ:  The government moves for the
19  record to reflect that Detective Bazylewicz identified the
20  defendant.
21         THE COURT:  The record will so reflect.
22  Q   How did you go about that day taking a buccal swab or
23  a -- from the defendant?
24  A   A buccal swab is taken from the inside cheek of the
25  defendant.  You use a Q-tip swab.  It is a wooden -- it

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

1   has a Q-tip on one end, or cotton on one end, and a wooden

2   shaft.

3           In this case I put on rubber gloves or latex

4   gloves. I then opened up a sterile Q-tip wrapper. I

5   pulled out a Q-tip and handed it to Christian Tarantino.

6           I then instructed him what to do, in being that

7   he put the Q-tip inside his mouth and rub it for about 25,

8   40 seconds, or 25 to 30 seconds, and gently swirl the

9   Q-tip around.

10          After he was done I took the swab out and put it

11  into a plastic bag.

12  Q   Okay.

13          Then did you transport that back to somewhere?

14  A   Yes, I did.

15  Q   And did you log or invoice that in some way into

16  evidence?

17  A   Yes.

18  Q   I want to show you what is marked as

19  Government's Exhibit VS-4-A.

20          (Handed to the witness.)

21  Q   Does the material in there look at all like the Q-tip

22  you were describing?

23  A   Yes.

24  Q   Do you recognize that?

25  A   Yes, I do.

1       MR. ROSEN:  No questions.

2       THE COURT:  No questions, you can step down.

3   Thank you, sir.

4           (Whereupon, the witness leaves the witness

5   stand.)

6       THE COURT:  The government's next witness.

7       MR. FLYNN:  Your Honor, can I have a moment to

8   set up a little bit?

9       THE COURT:  Sure.

10          (Whereupon, at this time there was a pause in

11  the proceedings.)

12      MR. FLYNN:  Your Honor, the government calls

13  Stuart Dawson.

14      THE COURT:  All right.

15

16  S T U A R T    D A W S O N,

17          called as a witness, having been first

18          duly sworn, was examined and testified

19          as follows:

20      THE CLERK:  Please be seated and speak into the

21  microphone.

22          State and spell your name for the record.

23      THE WITNESS:  My name is Stuart Dawson,

24  S-T-U-A-R-T, last name D-A-W-S-O-N.

25      THE CLERK:  Thank you.

1   Q   What do you recognize the exhibit to be?

2   A   I recognize it to be two Q-tip swabs enclosed in a

3   plastic bag. That bag has Christian Tarantino's name on

4   it, the Nassau County Police Department is written on it,

5   along with the homicide number on the envelope, on the

6   zip-lock bag.

7   Q   And at some point did you transfer custody of the

8   swab sample to anyone else?

9   A   Yes, I did.

10  Q   Who was that?

11  A   Detective Vito Schiraldi.

12  Q   And for what purpose was that transfer?

13  A   This was to be analyzed for DNA, a sample -- I

14  transferred it over to Detective Vito Schiraldi. The

15  swabs were going to be analyzed for DNA as a reference

16  sample of Christian Tarantino.

17  Q   I guess I didn't do it before --

18      MR. MISKIEWICZ:  The government moves for the

19  admission of VS-4-A.

20      THE COURT:  Admitted into evidence.

21      MR. MISKIEWICZ:  Thank you.

22          (Whereupon, Government's Exhibit VS-4-A was

23  received in evidence.)

24      MR. MISKIEWICZ:  No further questions, thank

25  you.

1

2   DIRECT EXAMINATION

3   BY MR. FLYNN:

4   Q   Good morning, Mr. Dawson.

5   A   Hi.

6   Q   How are you?

7   A   Good.

8   Q   Are you retired?

9   A   Yes, I am.

10  Q   Prior to retiring, what did you do for a living?

11  A   For about 26 years I was a medical examiner at the

12  Suffolk County Medical Examiner's Office, and most

13  recently I was the deputy chief medical examiner there,

14  and I retired in 2009.

15  Q   Were you also the acting chief medical examiner for

16  Suffolk County at one time?

17  A   Yes.

18          On two different occasions for a total of close

19  to two years.

20  Q   And as both the deputy chief and acting chief of the

21  Suffolk County Medical Examiner's Office, did you have

22  supervisory responsibility for other medical examiners in

23  the office?

24  A   Yes.

25          I had supervisory responsibilities with regard

Dawson-Direct/Flynn

656

1    to three other individuals who were deputy medical
2    examiners, and then I would also fill in for the chief
3    medical examiner when the chief was not available. And,
4    of course, it was the same kind of thing when I was acting
5    chief. For a couple of years I was replacing the chief.
6    Q    Did you also have responsibilities, for lack of a
7    better term, of a line medical examiner?
8    A    I'm sorry, what?
9    Q    Did you have the duties and responsibility for a
10   medical examiner who performed autopsies?
11   A    Yes.
12        A significant part of what I did was my own
13   investigations, primarily doing autopsies on cases
14   referred to the office, and then also visiting scenes on
15   occasion, and testifying in court in some instances, which
16   is the sort of thing that all medical examiners do.
17   Q    Would you please describe for the jury, if you would,
18   your educational background?
19   A    Yes.
20        I received a bachelor's degree majoring in
21   physics from Drake University in Iowa, Des Moines, Iowa.
22   And that was in 1970.
23        From 1970 to '71, I was a graduate student
24   studying physics at Iowa State University in Ames, Iowa.
25   I'm originally from Iowa, and that is why all this

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

Dawson-Direct/Flynn

657

1    happened in Iowa.
2        From '71 to '72, I was working in a hospital
3    called Iowa Methodist Hospital in Iowa.
4        My job was to work in the laboratory with
5    pathologists and to assist in the performance of
6    autopsies.
7        From '72 to '76, I was in medical school at the
8    University of Iowa College of Medicine in Iowa City, Iowa.
9        I received an MD degree in 1976. From 1976 to
10   1980 I was in a residency program studying what is called
11   anatomic and clinical pathology at the Cleveland Clinic
12   Foundation in Cleveland, Ohio.
13        From 1980 to 1981 I was in a residency program
14   in a subspecialty called forensic pathology at the
15   Hamilton County Institute of Forensic Medicine Toxicology
16   and Criminalistics in Cincinnati, Ohio. I completed that
17   training in 1981.
18        And then I kind -- to finish the picture, from
19   1981 to 1983 I was the deputy medical examiner in
20   Washington, D.C., and then in 1983 I came to Suffolk
21   County, and then the rest of my career was at Suffolk
22   County.
23        I am board certified in those various specialty
24   areas that I studied.
25   Q    Do you have a medical specialty?

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

Dawson-Direct/Flynn

658

1    A    Yes. Forensic pathology.
2    Q    What is forensic pathology?
3    A    Well, let me first describe what pathology is and
4    then that will make it easier to understand it.
5        Pathology is a medical specialty. And people
6    who are pathologists are different from most doctors in
7    the sense that they don't have patients of their own.
8    Most pathologists work at hospitals, and the activities of
9    a pathologist are designed to aid other doctors who do
10   have patients in arriving at correct diagnoses for their
11   patients.
12        In this regard a pathologist working in the
13   hospital will be responsible to run the laboratory, will
14   examine tissue removed at surgery to determine, for
15   example, if a lump that is biopsied is malignant or not.
16   That is the job of pathologist.
17        As a minor part of what a hospital pathologist
18   does, they do autopsies of people who die in the hospital.
19   A forensic pathologist has subspecialized in just the
20   autopsy portion of what the more general pathologist does,
21   and so I don't run a hospital laboratory and I don't do
22   surgical examinations. I just did autopsies during my
23   career.
24        But the autopsies were of patients who were
25   different than the ones who typically die in the hospital.

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

Dawson-Direct/Flynn

659

1    These were often individuals who died as a result of
2    violence of one sort or another, whether it be homicide or
3    suicide or accident, or sometimes a death from illicit
4    drugs, sudden and unexpected deaths in people who were in
5    apparent good health and that kind of thing.
6        So the forensic pathologist has specialized in
7    the autopsy, and the forensic pathologist has specialized
8    you might say of the study due to death, trauma and
9    poisoning as opposed to natural diseases.
10   Q    Are you licensed to practice medicine in the State of
11   New York?
12   A    Yes.
13   Q    And are you a board certified medical examiner?
14   A    Yes.
15        You are actually board certified in your -- in
16   the specialties that you studied.
17        So I was a medical examiner. But in addition I
18   was board certified in anatomic pathology, clinical
19   pathology, anatomic pathology, being autopsies and
20   surgical pathology. Clinical pathology being running the
21   laboratory. And I'm also board certified in forensic
22   pathology, and I described what that is.
23   Q    Have you done some teaching throughout your career in
24   the field of forensic pathology?
25   A    Yes, I have.

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
OFFICIAL COURT REPORTER

Dawson-Direct/Flynn

660

1  Q   And what sort of teaching have you done?
2  A   Well, I have been part of the faculty at various
3  places during my training.  But currently I am still
4  adjunct professor of pathology at Nassau Community
5  College, and up until a couple of years after my
6  retirement from the Medical Examiner's Office I was also a
7  professor of -- assistant professor of forensic pathology
8  at the medical school at Stony Brook.
9  Q   How many autopsies have you performed in your career?
10  A   About 5,000.
11  Q   Of those, how many involved death from gunshot
12  wounds?
13  A   A few hundred.
14  Q   And while you were a deputy medical examiner at the
15  Suffolk County Medical Examiner's Office, approximately
16  how many autopsies did you perform in any given week?
17  A   It averaged about one a day if you thought in terms
18  of a five-day week.  Of course, someone had to work
19  weekends as well.  It would be about one a day, five a
20  week, 250 a year, something like that.
21  Q   Did the Suffolk County ME's Office have a particular
22  procedure when you worked there that it used for assigning
23  autopsies to a medical examiner?
24  A   Yes.
25        We had a morning meeting where we discussed all

Dawson-Direct/Flynn

661

1  the cases that we had on that particular day.  And just
2  from discussion and so forth, we decided amongst ourselves
3  who would do which cases.
4        In addition, we always had what we would call a
5  scene call schedule.  Meaning if there was an apparent
6  homicide at an associated scene -- by an associated scene,
7  I mean that the victim's body was still at the scene as
8  opposed to be taken at the -- to the hospital.  If the
9  body was still at the scene, whoever was on call that day
10  for the scene would then respond to the scene, examine the
11  body at the scene, and then follow it through and be the
12  person who did the autopsy.
13  Q   Are there advantages from a pathology perspective for
14  the medical examiner to travel to the scene of the crime?
15  A   Yes, very definitely.
16        It is an invaluable thing.  The only reason we
17  can confine it to homicides is that it is also very time
18  consuming.
19        At our office we had investigators who would go
20  to the scene and report back to us directly on average
21  cases.  For the homicide, we would have the medical
22  examiner who was assigned to the case also do the scene.
23  Q   All right.
24        And briefly, if you would, would you just
25  describe for the jury normally how you perform an autopsy,

Dawson-Direct/Flynn

662

1  what steps do you take?
2  A   First, you gather a background or history one way or
3  another.  And this can come from various sources.  In many
4  cases, as I said, we had investigators who wrote reports
5  for us.  Sometimes the police would report the case to us.
6  Sometimes there would be a discussion with family members
7  or physicians who treated a person.
8        So you get background information as to what
9  kind of a case it is.
10        And then the autopsy after that begins with an
11  external inspection where you are looking for pertinent
12  characteristics of the person.  You are looking for signs
13  of abnormality, disease, injury, things like that
14  externally.
15        And then you make incisions, kind of like doing
16  a surgery, and expose the internal organs and further
17  examine them and see if there are any important findings.
18        Them then the organs will subsequently be removed
19  and further examined.
20        As an example, the heart would be removed,
21  examined externally.  Opened, examined internally.  You
22  look at the heart valves, you look at the coronary
23  arteries, you look at the heart muscle itself and take
24  sections through there.
25        You would also save a tissue from the heart to

Dawson-Direct/Flynn

663

1  be looked at under the microscope at a later point in
2  time.  Also as part of the  -- you retain certain tissues,
3  fluid, blood, urine, that type of thing, to be sent to the
4  laboratory to be tested for alcohol and drugs.
5        Then at the conclusion of all this, you dictate
6  all of your observations, your findings, your opinion as
7  to what the cause of death was, and all of that forms the
8  autopsy report, the written report of this study.
9  Q   Are photographs taken during the autopsy?
10  A   Yes.
11        There are some routine photographs that are
12  always taken.
13        However, other photographs the particular
14  medical examiner wants are taken at his or her direction
15  during the course of the examination.
16  Q   Are those photographs made a part of the ultimate
17  autopsy report?
18  A   Yes.
19  Q   Have you previously testified as an expert witness in
20  the area of forensic pathology?
21  A   Yes.
22  Q   Approximately how many times?
23  A   Around 200?
24  Q   Is that in both federal and state court?
25  A   Yes.

Dawson-Direct/Flynn

664

1  Q   Has any Court ever declined to qualify you as an
2  expert in the field of forensic pathology?
3  A   No.
4        MR. FLYNN:  Your Honor, the government moves for
5  the qualification of this witness as an expert in the area
6  of forensic pathology pursuant to Rule 702 of the Federal
7  Rules of Evidence.
8        THE COURT:  Is there any specific objection to
9  this testimony?
10        MR. ROSEN:  No, your Honor.
11        THE COURT:  Okay.
12        The Court finds that the witness is an expert in
13  his field of forensic pathology.  And you may consider his
14  testimony as such, if you choose to.
15        MR. FLYNN:  Your Honor, may I approach?
16        THE COURT:  Yes.
17        MR. FLYNN:  Thank you.
18        (Counsel approaches the witness.)
19  Q   In August of 1994 were you serving with the Suffolk
20  County Medical Examiner's Office during that month and
21  year?
22  A   Yes, I was.
23  Q   And during that month do you recall being summoned to
24  a Coast Guard station on the Great South Bay near Fire
25  Island, New York?

Dawson-Direct/Flynn

665

1  A   Yes.
2  Q   In connection with a murder?
3  A   That's correct.
4  Q   Did you go with anyone from your office?
5  A   I went with one of our investigators, and I also went
6  with one of our drivers, I believe.
7  Q   Did you also take a photographer with you?
8  A   Yes, I believe I did.
9  Q   What happened that day when you received that call?
10  A   Well, it was in the morning.  It was a nice summer
11  morning, as I recall, in August, and I went down to the
12  Coast Guard station and when I arrived I observed a large
13  plastic trunk tool box which was on a rolling cart.  The lid of
14  the box was open and there was the decedent's body inside
15  that trunk or bin, or whatever you want to call it.
16  Q   You are referring to an individual who had been
17  placed in that box when you got there.
18        Was that individual identified that day, the day
19  you traveled to the Great South Bay?
20  A   Yes.
21  Q   And who was he identified as?
22  A   He was identified as Louis Dorval.
23  Q   To your recollection, how was he identified as such?
24  A   By fingerprints.
25  Q   When you got there, when you got to the dock or to

Dawson-Direct/Flynn

666

1  the water's edge, did you have an understanding as to how
2  Mr. Dorval's body and the box had been found?
3  A   Yes.
4  Q   What was that understanding?
5  A   My understanding was the box with Mr. Dorval's body
6  had been found floating well south of Fire Island out in
7  the ocean.  And I believe it was stated to be 29 miles
8  southeast of the Fire Island inlet, and it was discovered
9  by a fishing boat of some kind.  The fishing boat met up
10  eventually with a Coast Guard vessel.  And the Coast Guard
11  vessel then brought the box to the Coast Guard station and
12  off-loaded it onto the rolling cart.  And that was then
13  the condition when I first observed it.
14        MR. FLYNN:  With the Court's permission, I would
15  like to ask Mr. Dawson to step down from the witness stand
16  for a moment.
17        THE COURT:  Yes, you may step down.
18  Q   Mr. Dawson, if you would approach this item of
19  physical evidence marked for identification by the
20  government as Government's Exhibit CW-4, Charley
21  Whiskey 4.
22        Do you recognize this particular item?
23  A   This appears to be the same box in which Mr. Dorval's
24  body was positioned when I first saw it.
25  Q   Are there any identifying marks on the exterior of

Dawson-Direct/Flynn

667

1  the box or the bottom of the box that helped you to your
2  certainty in identifying this item?
3  A   I'm not so sure how I will find them here, but at the
4  time there were some bullet holes or apparent bullet holes
5  in the box.
6        For example, here is a couple of them.
7        And based on the way that this plastic material
8  is pushed outward and the holes are bevelled outward, it
9  looks like these were made from bullets fired from the
10  inside outward.
11  Q   You are referring to what appears to be these three
12  bullet holes here?
13  A   Yes.
14        I don't remember the total number of them, but I
15  remember we saw several bullet holes.
16  Q   And based on those identifying -- based on those
17  bullet holes, are you able to identify this Tuff Bin
18  toolbox as the container for Louis Dorval's body as you
19  saw it that day?
20  A   That appears to be the case, yes.  I believe it is
21  exactly the same box.
22        MR. FLYNN:  The government moves for the
23  admission of Government's Exhibit Charley Whiskey 4.
24        THE COURT:  Admitted in evidence unless there is
25  an additional objection.

691

Dawson-Direct/Flynn

668

1    (Whereupon, Government's Exhibit CW-4 was
2  received in evidence.)
3    Q   How did Mr. Dorval's body appear to you on the dock
4  when you saw it in the box?
5    A   Well, his body was, of course -- well, the individual
6  was deceased, and the most obvious and immediate sign of
7  that was the typical signs of early decomposition which
8  were evident in the sense that there were discolorations
9  of the skin.  There was bloating or swelling of the
10  tissues.  There was what is called marbling.  That is what
11  we call it, where the superficial blood vessels start to
12  become prominent.  It looked like the lines running
13  through a piece of marble.  These are some of the typical
14  signs of decomposition.
15    Q   Mr. Dawson, in front of you there is a series of
16  photographs.  In front of you to your left; you have them
17  there?
18    A   On my left?
19    Q   No.  To your right.  You were right:  They were
20  marked for identification as Government's Exhibits SLD,
21  for Stuart L. Dawson, 6 through 9, 11, 12 and 14.  And 16
22  and 20 also.
23    Do you recognize those exhibits?
24    Please take a moment to look at them.
25    (Whereupon, at this time there was a pause in

Dawson-Direct/Flynn

669

1  the proceedings.)
2    A   I want to make sure I have it and in the right order.
3    6, 7, 8, 9, 11, 12, 14, 16, 20, 21.
4    Is that the numbers you gave?
5    Q   Yes, sir.
6    Do you recognize each of those photographs?
7    A   Yes, I do.
8    Q   Do you recognize those as photographs of either the
9  Tuff Bin toolbox sitting in the courtroom today, Charley
10  Whiskey 4, Government's Exhibit, or Louis Dorval's body as
11  it appeared to you in August of 1994?
12    A   That's correct.  That summarizes all these
13  photographs, correct.
14    MR. FLYNN:  The government moves for the
15  admission of Government's Exhibits 6 through 9, 11, 12,
16  14, 16, 20 and 21.
17    THE COURT:  No additional objections on these
18  exhibits?
19    MR. ROSEN:  No, your Honor.
20    THE COURT:  They are received in evidence.
21    (Whereupon, Government's Exhibits 6 through 9,
22  11, 12, 14, 16, 20 and 21 were received in evidence.)
23    MR. FLYNN:  Ladies and gentlemen, I will go
24  through some of these photographs.
25    A word of caution -- some of the photographs are

Dawson-Direct/Flynn

670

1  fairly graphic.  Just so there is a word of warning to the
2  jury.
3    Q   Mr. Dawson, was Louis Dorval's body transported to
4  the Suffolk County Medical Examiner's Office?
5    A   Yes, it was.
6    Q   And on what day was that?
7    A   That was August 16, 1994.
8    Q   And to the best of your recollection, was that the
9  day that Mr. Dorval's body was found at sea by the Coast
10  Guard?
11    A   Yes.
12    Q   August 16, 1994?
13    A   Yes.
14    Q   Where is the Suffolk County Medical Examiner's
15  Office, by the way?
16    A   The office is located in Hauppauge, along Old Willets
17  Path, about a block north of Veteran's Highway.
18    Q   And was Mr. Dorval's body removed from the box --
19  removed from the box before it got to your offices?
20    A   No.
21    I believe his body was removed at our office to
22  be sure to preserve any evidence that might be in the box
23  and might not be that obvious.  I was concerned that
24  something might be lost if the body was removed at the
25  Coast Guard station.  So the removal was made at our

Dawson-Direct/Flynn

671

1  office.
2    Q   Appearing on the screen in front of you is what is
3  admitted in evidence as Government's Exhibit SLD-11.
4    (At this time a document was exhibited on
5  courtroom screen.)
6    Q   Do you recognize the scene depicted in that
7  photograph?
8    A   Yes, I do.
9    Q   What are we looking at in that photograph?
10    A   That photograph shows the box from the side more or
11  less.  The lid is open and we are looking from the end of
12  the box where Mr. Dorval's lower extremities are located.
13  And you can see his knees encased in blue jeans sticking
14  up a little bit in that photograph.
15    Q   And I may have missed this.  But did you indicate
16  where this particular photograph was taken?
17    A   Yes.
18    This was taken when the box is still at the
19  Coast Guard station sitting on the rolling cart when I
20  first observed it.
21    Q   Mr. Dawson, I'm now showing on the screen
22  Government's Exhibit SLD-12.
23    (At this time a document was exhibited on
24  courtroom screen.)
25    Q   Do you recognize -- what are we looking at in this

Dawson-Direct/Flynn

672

1  particular photograph?

2  **A   That is a photograph taken of the same thing, except**
3  **from the other end of the box and at a little higher angle**
4  **so we are looking down.**

5         **We can see in particular Mr. Dorval's left arm,**
6  **which is across his chest.**

7         **Again, you see the blue jeans covering his lower**
8  **extremities.**

9         **You can see that he is wearing a T-shirt that is**
10 **inscribed, apparently, CK, standing for Calvin Klein. And**
11 **you can see a little bit of the lower part of his face.**
12 **But most of the face is hidden by the box.**

13 Q   On the screen now in the courtroom is Government
14 Exhibit SLD-14.

15        (At this time a document was exhibited on
16 courtroom screen.)

17 Q   Do you recognize that photograph as the view of
18 Mr. Dorval that you saw that day in August, August 16th,
19 1994?

20 **A   Yes, I do.**

21 Q   Did you make any note of the look of Mr. Dorval, how
22 Mr. Dorval's face and extremities appeared on that day?

23 **A   Yes.**

24        **In particular, you can see that there is some**
25 **decompositional discoloration particularly of the upper**

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

Dawson-Direct/Flynn

673

1  **part of the face, that blackening of the skin.**

2         **You can also see that the features are a little**
3  **bit distorted because of some swelling due to gas**
4  **formation.  That is a typical part of the decomposition**
5  **process.**

6         **He was wearing a neck chain which was displaced**
7  **upward.  The neck chain had a St. Christopher medal with**
8  **an inscription on that, and you can note all that.**

9  Q   Was Mr. Dorval's body removed from the Tuff Bin
10 toolbox after it was received at your offices at the
11 Suffolk County Medical Examiner's Office?

12 **A   Yes.**

13 Q   And who removed the body from the box?

14 **A   I believe that I supervised the removal and**
15 **participated in it.  But I may have had some assistance.**

16 Q   Before you began your autopsy, did you make any
17 observations regarding how Mr. Dorval was dressed?

18 **A   Yes.**

19 Q   And how was he dressed?  We saw it in the photograph
20 a moment ago.

21 **A   Well, the most notable thing to me was the fact that**
22 **he was wearing gloves, which -- there is nothing wrong**
23 **with that, but I found it a little unusual because it was**
24 **the middle of the summer and you don't expect people to be**
25 **wearing gloves in the middle of the summer.**

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

Dawson-Direct/Flynn

674

1         **Beyond that, he was wearing a T-shirt, jeans,**
2  **briefs, socks, kind of high-top jogging shoes.  Nothing**
3  **else that was very unusual for summer attire.**

4         MR. FLYNN:  Your Honor, permission to approach
5  the witness?

6         THE COURT:  Yes.

7         (Counsel approaches the witness stand.)

8  Q   Mr. Dawson, I'm handing you a number of items of
9  physical evidence.  They have been marked for
10 identification purposes as Government's Exhibits SLD-22
11 through 26.

12        Please take a moment to orient yourself to these
13 items.

14        (Whereupon, at this time there was a pause in
15 the proceedings.)

16 **A   Okay.**

17 Q   Are you able to -- able to recognize these five
18 exhibits that I placed in front of you?

19 **A   Yes.**

20        **These are all items of shoes or clothing worn by**
21 **Mr. Dorval, which I can tell by looking at the labels that**
22 **are on each one of them.  These are our standard label we**
23 **have for a case.**

24        **Also, there is some writing in red ink, which is**
25 **my writing, where I put my name and initials and so forth.**

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

Dawson-Direct/Flynn

675

1  Q   Do you recognize these items as articles of clothing
2  removed from Louis Dorval's body before you performed your
3  autopsy in August of 1994?

4  **A   Yes, that's correct.**

5         MR. FLYNN:  Your Honor, the government moves for
6  the admission of SLD-22 through 26.

7         THE COURT:  Any additional objection?

8         MR. ROSEN:  No, your Honor.

9         THE COURT:  Received in evidence.

10        (Whereupon, Government's Exhibits SLD-22 through
11 26 were received in evidence.)

12 Q   Mr. Dawson, after you made your initial observations,
13 did you perform an autopsy of Mr. Dorval's body?

14 **A   Yes, I did.**

15 Q   And was that August 16th autopsy assigned autopsy
16 number 94-2563?

17 **A   Yes, it was assigned that number.**

18 Q   After conducting the autopsy of Mr. Dorval on
19 August 16th of 1994, did you have an opinion as to the
20 cause of his death?

21 **A   Yes, I do.**

22 Q   What is that?

23 **A   In my opinion he died as a result of a single gunshot**
24 **wound to his head.**

25 Q   How many bullet wounds did you find on Mr. Dorval's

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

1  body?

2  A   Just one.

3  Q   And where did that bullet enter Mr. Dorval's body

4  again?

5  A   It entered the back part of his head, at the point

6  about one inch to the left of center.

7  Q   Mr. Dawson, I'm showing you what is previously

8  admitted in evidence in this case as

9  Government's Exhibit SLD-21.

10      (At this time a document was exhibited on

11  courtroom screen.)

12  Q   What are we looking at in that photograph?

13  A   In that photograph we are looking at the back of

14  Mr. Dorval's head.  There is an area there that I shaved

15  to remove the scalp hair to visualize the lesion under

16  the -- in the center of that shaved area better, and the

17  lesion or physical abnormality that is there is a typical

18  entrance gunshot wound, which is the one I was just

19  mentioning previously.

20  Q   The bullet that made this gunshot wound to the back

21  of Mr. Dorval's head, what did it travel once it

22  entered his skull?

23  A   The bullet went forward.  It passed through his

24  brain.  And as it passed through his brain, it stayed

25  about one inch to the left of center all the way until it

1  struck essentially the bone of the forehead in the front.

2      During its path, it moved gradually upward

3  slightly at an angle, I estimated at 20 degrees.  So the

4  bullet went straight forward and slightly upward, but did

5  not deviate from the left or the right.

6  Q   Was a bullet recovered from Mr. Dorval's head?

7  A   Yes.

8      Just to finish the story, after striking the

9  bone of the forehead, at that point the bullet did not

10  have sufficient energy left to go through that bone.

11      The impact caused the jacketing material, which

12  is the hard metal on the outside of the bullet, to

13  separate.  And that jacketing material stayed at the point

14  where the bone was struck.  And then the heavy lead core

15  which had separated and ricocheted to the right and ended

16  up slightly to the right of center, again in the forehead

17  area.

18      So the bullet was in two major pieces and both

19  of those pieces were recovered and transmitted to the

20  crime laboratory.

21  Q   During your autopsy, did you make note of any other

22  injuries, significant injuries to Mr. Dorval's body?

23  A   No.

24      There were no other significant injuries.

25  Q   For example, during your autopsy did -- did

1  Mr. Dorval's body appear to be broken in any manner?

2  A   No.  There were no fractures or anything of that

3  sort, except for fractures associated with the gunshot

4  wound.

5  Q   You testified a little earlier about the

6  decompositional change of Mr. Dorval's -- withdrawn.

7      You noted earlier the decompositional change

8  that Mr. Dorval had undergone.  Do you remember that?

9  A   Yes, I do.

10  Q   Based on the nature of the decompositional change in

11  Mr. Dorval's body which you noted during your autopsy, do

12  you have an opinion as to how long Mr. Dorval's body had

13  been at sea before it was recovered?

14  A   Yes, but you have to qualify it slightly.

15      The way I phrase it is the decompositional

16  change we see here is typical in what happens in three or

17  four days under ordinary conditions.

18      The only thing that complicates that is that the

19  body was probably in at least two different conditions,

20  and that is, the trunk is likely to have sunk initially

21  and not in cooler temperatures.  And then with

22  decomposition it would cause the body to become

23  sufficiently buoyant that the body in the trunk would

24  again float to the surface.

25      At that point it would be in warmer water, the

1  sun would be typically shining on it and that would change

2  the temperature.

3      So there are probably at least two different

4  temperatures that this body was exposed to.  But I would

5  again say that three or four days is probably a reasonable

6  estimate.

7  Q   During your autopsy did you make any notations or --

8  did you make any notations concerning the state of

9  Mr. Dorval's hair, most notably the color of his hair?

10  A   Yes.

11      I noticed that his hair was a darker color

12  toward the tips of the hair, and near the roots, in other

13  words, where the hair emerged from the scalp, the hair

14  seemed to be a little more blonde color, which suggested

15  that there might have been some hair dye.  At some point

16  it was used on the hair and grew a little bit, accounting

17  for two different areas of coloration.

18  Q   In conjunction with the autopsy of Mr. Dorval, did

19  you request a toxicology analysis of the victim?

20  A   Yes, I did.

21  Q   And what were the results of that toxicology

22  analysis?

23  A   The toxicology analysis was negative except for the

24  presence of small amounts of alcohol in the system,

25  approximately the equivalent of one or two drinks, that

680

1 is, a drink being a beer, a four ounce glass of wine, or a
2 shot of distilled spirits like whiskey.
3        I would say the amounts here are typical of
4 maybe the effects of two drinks.
5        Except, what you have to know is that as the
6 body decomposes, it actually produces alcohol in it. And
7 the amounts of alcohol present in Mr. Dorval are very
8 typical of the amounts that one sees with this degree of
9 decomposition.
10        Having said that, alcohol is alcohol. And there
11 is no way of telling it is from the decomposition process
12 or the actual drinking of an alcoholic beverage.
13        But based on these findings, my best estimate is
14 that this probably is completely decompositional, and at
15 the time he died he probably had no alcohol in his system
16 at all.
17 Q   Did you eventually submit blood, hair and other body
18 material taken from Mr. Dorval's body to another location?
19 A   Yes.
20 Q   To what location did you send Mr. Dorval's blood?
21 A   Besides the material sent to the toxicology
22 laboratory, in addition, material was sent to the crime
23 lab. And those are two different areas, but they are all
24 in the medical examiner's building. The toxicology area
25 is in one place and the crime lab is in another place.

682

1 not.
2 A   It is never in an autopsy report because it is an
3 opinion. And the opinion isn't based just upon autopsy
4 findings. It is based on history.
5        For example, I mentioned that this body was
6 exposed to two different temperature levels.
7        Suppose later on I got information, additional
8 important information that the person was shot and the
9 body was put in a freezer for a couple of weeks. It would
10 be well preserved and then nothing happened.
11        Then it was taken out of the freezer and thawed
12 out and that is the condition of the body when I saw it.
13        So there are conditions unknown to me when I do
14 an autopsy that we reflect on that estimate. So you don't
15 give that estimate. You just put down the objective
16 things you see in the autopsy, you know, how much
17 decomposition and this and that.
18        And if someone later on at a trial asks you a
19 question, and maybe supplies some information, like the
20 body was in a freezer or something like that, and asks
21 what my opinion is, at that point I give it. But it is
22 not a fixed opinion because there are pieces of
23 information that depend on it that I don't know by just
24 doing an autopsy.
25        MR. ROSEN: Thank you.

681

1        The material I sent to the crime lab was hair,
2 blood, the bullet that I recovered, the clothing and
3 shoes, that kind of a thing.
4        MR. FLYNN: Your Honor, may I have a moment?
5        THE COURT: Yes.
6        (Government counsel confer.)
7        MR. FLYNN: That's all, your Honor. Thank you.
8        THE COURT: Any cross-examination.
9
10 CROSS-EXAMINATION
11 BY MR. ROSEN:
12 Q   What type of bullet was used?
13 A   In my opinion, it looked like a jacketed 38 caliber
14 bullet.
15        Now, I have to add one caveat. The official
16 determination of the bullet is done by the crime lab where
17 they have proper equipment. From my determination I would
18 say it is a jacketed 38 caliber approximately.
19        A 38 caliber, a 357 magnum, a 380 auto, those
20 are approximately 38 caliber ammunition.
21 Q   How come your report doesn't say how long the body
22 had been dead before you did the autopsy?
23 A   Well, because -- the time of day I mentioned before,
24 three or four days?
25 Q   Yes. It is not in here and I'm just asking why it is

683

1        THE COURT: Anything further?
2        MR. FLYNN: No, sir.
3        THE COURT: Thank you. You may step down.
4        (Whereupon, the witness at this time steps down
5 from the witness stand.)
6        THE COURT: Do you want to approach?
7        (Continued on next page.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

684

1          (Whereupon, at this time the following took
2    place at the sidebar.)
3          THE COURT:  Do you have any more witnesses?
4          MR. FLYNN:  No.
5          MR. DODDATO:  I didn't hear you.
6          THE COURT:  Do you have any more witnesses?
7          MR. FLYNN:  We don't have any further witnesses
8    today, no.
9          THE COURT:  All right.
10         I will let the jury go home a little earlier
11   then.
12         MR. FLYNN:  Okay.
13         THE COURT:  On Monday, who will we have?
14         MR. FLYNN:  Charles Wojick, he is very brief.
15         Also Craig Miller, who will take up a while,
16   your Honor, to be sure.
17         MR. MISKIEWICZ:  We have the DNA --
18         MR. FLYNN:  Yes, Constance Fisher, and Sandra
19   Koch.
20         THE COURT:  What is she testifying to?
21         MR. FLYNN:  Part of the DNA group, your Honor.
22         THE COURT:  There were two gals; is that right?
23         MR. FLYNN:  Yes.
24         THE COURT:  Anyone else?
25         MR. MISKIEWICZ:  I just called the marshals

686

1          THE COURT:  I wanted to find out if you would
2    redact the indictment?
3          MR. MISKIEWICZ:  That is what I wanted to ask.
4    If you want, we will prepare it.
5          THE COURT:  It is neater and makes for a better
6    exhibit.
7          MR. MISKIEWICZ:  Also, your Honor, we were not
8    thinking of preparing a new set of jury charges, since we
9    have nothing new other than what your Honor gave the last
10   time.  Obviously counsel might have something.
11         MR. ROSEN:  I will take a look.  To be honest, I
12   have a copy of the charges.  We will take a look.  And I
13   don't foresee anything additional.
14         MR. MISKIEWICZ:  We are on track to rest, if not
15   next Thursday then probably the following Monday, Tuesday
16   at the latest.  But we are pretty much on track for what
17   we estimated.
18         THE COURT:  There is always difficulty
19   forecasting it now.
20         MR. MISKIEWICZ:  I know.
21         THE COURT:  We will let the jury go.  And try to
22   get Mr. Pablo Amador, and if not try to get somebody else.
23   Given them a heads-up.
24         MR. MISKIEWICZ:  I will.
25         MR. ROSEN:  One other thing, your Honor, if we

685

1    earlier today and told them not to produce Pablo Amador
2    until Tuesday because I wasn't sure if we would get
3    through as many witnesses as we just did.  So I may call
4    them back and ask them to produce him for late Monday
5    afternoon.  We may not get to him until Tuesday.
6          THE COURT:  It is hard to estimate, because I
7    don't know if you will ask questions of the DNA people.
8          MR. ROSEN:  I will probably not.
9          THE COURT:  So it will go by quickly.
10         MR. FLYNN:  Miller will probably be about two
11   hours on direct.  And he will probably have some cross,
12   I'm sure.
13         THE COURT:  Who else do you have?  I missed the
14   other name.
15         MR. FLYNN:  Charles Wojick, the Coast Guard guy,
16   your Honor.
17         THE COURT:  You don't want to stipulate to him?
18         MR. ROSEN:  They haven't asked.  Maybe we can.
19         MR. FLYNN:  Maybe we can.  We will talk about
20   it.
21         THE COURT:  All right.
22         What else?
23         MR. MISKIEWICZ:  Just before we break for the
24   day, I wanted to ask a couple of logistical questions
25   about jury charges and an amended indictment, etcetera.

687

1    can approach ex parte concerning some of the subpoenas on
2    the record, of course.
3          THE COURT:  Sure.
4          I also owe you a written opinion on the 404(b).
5    I thought I was going to get it out today.  But the trial
6    has gone on the entire day, and I will get it out tomorrow
7    for sure.
8          MR. MISKIEWICZ:  Thank you.
9          MR. FLYNN:  Thank you, Judge.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

688

1    (Whereupon, at this time the following takes

2    place in open court.)

3    THE COURT:  It is about that time.  We are in

4    recess for the weekend.

5    As you know, we generally don't sit on Friday

6    with the trial as promised, unless you are in the middle

7    of deliberations.

8    It is very important that you don't talk about

9    the case.  Don't let anyone approach you or mention

10    anything, whether it be jurors or non-jurors.

11    Don't tell them you are sitting on this

12    particular case for sure.

13    You are not to review or listen to anything

14    reported on the media.  No social media in terms of

15    talking about the case.  The same as if you were in person

16    with someone.

17    If anyone does try to influence you in any way,

18    you immediately report back to Mr. Baran by giving him a

19    note and not discussing it with the other jurors.

20    Continue to keep an open mind as the case is

21    progressing.

22    Of course, have a good weekend.  And I will see

23    you folks on Monday at 9:45.

24    Thank you.

25    (Whereupon, at this time the jury left the

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

---

689

1    courtroom.)

2    THE COURT:  I will see you on Monday unless

3    something comes up, and I will be right back in a moment.

4    (Case on trial adjourned until 9:45 o'clock

5    a.m., Monday, April 30, 2012.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

691

---

690

## I-N-D-E-X

W-I-T-N-E-S-S-E-S

| | |
|---|---|
| K E N N E T H   M A R R | 500 |
| DIRECT EXAMINATION (cont'd) | 501 |
| BY MR. MISKIEWICZ | |
| CROSS-EXAMINATION | 523 |
| BY MR. ROSEN | |
| REDIRECT EXAMINATION | 551 |
| BY MR. MISKIEWICZ | |
| RECROSS-EXAMINATION | 563 |
| BY MR. ROSEN | |
| R O B E R T   G I O V A N N E T T O N E | 565 |
| DIRECT EXAMINATION | 565 |
| BY MR. FLYNN | |
| J A C K   K E N N E D Y | 591 |
| DIRECT EXAMINATION | 592 |
| BY MR. MISKIEWICZ | |
| CROSS-EXAMINATION | 617 |
| BY MR. ROSEN | |
| L Y N N   K E N N E D Y | 619 |
| DIRECT EXAMINATION | 619 |
| BY MR. FLYNN | |
| V I T O   S C H I R A L D I | 634 |
| DIRECT EXAMINATION | 635 |
| BY MR. MISKIEWICZ | |
| CROSS-EXAMINATION | 645 |
| BY MR. ROSEN | |
| M I C H A E L   B A Z Y L E W I C Z | 649 |
| DIRECT EXAMINATION | 650 |
| BY MR. MISKIEWICZ | |
| S T U A R T   D A W S O N | 654 |
| DIRECT EXAMINATION | 655 |
| BY MR. FLYNN | |
| CROSS-EXAMINATION | 681 |
| BY MR. ROSEN | |

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

---

691

## E-X-H-I-B-I-T-S

| | |
|---|---|
| Government's Exhibits RRG-60 through 63, 67, 68, 72 and 77 were received in evidence | 585 |
| Government's Exhibit CW-4 was received in evidence | 668 |
| Government's Exhibits KM-1, KM-2, KM-3 and KM-4 were received in evidence | 502 |
| Government's Exhibits KM-6, KM-7 and KM-8 were received in evidence | 515 |
| Government's Exhibit KM-9 was received in evidence | 519 |
| Government's Exhibit KM-10 was received in evidence | 552 |
| Government's Exhibits RRG-32, 33, 34, 36, 37, 39, 41, 45, 48, 51, 52, 54, and 83 through 88 were received in evidence | 571 |
| Government's Exhibit RRG-1 was received in evidence | 576 |
| Government's Exhibit RRG-4 was received in evidence | 589 |
| Government's Exhibit RS-4 was received in evidence | 601 |
| Government's Exhibits JK-24 and JK-24-A, and JK-22 and JK-22-A were received in evidence | 607 |
| Government's Exhibits JK-25-A, B, C and D, and 26-A and B, were received in evidence | 608 |
| Government's Exhibit ATF-1 was received in evidence | 609 |
| Government's Exhibit JK-30 was received in evidence | 614 |
| Government's Exhibit LWK-1 was received in evidence | 631 |
| Government's Exhibits RRG-50, 55 through 58 were received in evidence | 637 |
| Government's Exhibit VS-2 was received in evidence | 641 |
| Government's Exhibit VS-4-A was received in evidence | 653 |
| Government's Exhibits 6 through 9, 11, 12, 14, 16, 20 and 21 were received in evidence | 669 |
| Government's Exhibits SLD-22 through 26 were received in evidence | 675 |

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

**'** [column begins]

**'71** [2] - 656:23; 657:2

**'72** [2] - 657:2, 7

**'76** [1] - 657:7

**'94** [5] - 617:10; 618:5; 642:7, 11; 643:10

---

**0**

**0012** [2] - 503:25; 518:24

**0013** [1] - 503:25

**041** [3] - 601:23, 25; 611:23

**08** [1] - 495:3

---

**1**

**1** [1] - 575:19

**1-B** [1] - 526:1

**10** [1] - 618:6

**100** [4] - 495:13, 16, 21; 501:24

**104** [1] - 496:11

**109** [1] - 597:6

**11** [8] - 521:21; 522:12; 618:6; 668:21; 669:3, 15, 22; 691:21

**110** [4] - 592:24; 597:6; 598:13; 613:6

**115** [1] - 516:20

**11530** [1] - 495:19

**11722** [2] - 495:13, 22

**12** [13] - 504:1; 507:19; 508:17, 19, 21; 519:10, 12-13; 668:21; 669:3, 15, 22; 691:21

**125** [1] - 516:24

**126** [1] - 517:17

**127.55** [1] - 517:1

**128** [1] - 517:17

**12:00** [1] - 636:15

**13** [6] - 504:1; 507:20; 508:20-22; 566:14

**135** [2] - 516:20, 24

**14** [5] - 668:21; 669:3, 16, 22; 691:22

**15** [2] - 545:4; 633:22

**1502** [1] - 496:7

**152** [18] - 496:8; 497:14, 17, 22, 25; 498:4, 7, 12, 17, 21, 25; 499:3, 6, 9, 18, 21, 24

**16** [8] - 597:23; 668:21; 669:3, 16, 22; 670:7, 12; 691:22

**16th** [3] - 672:18; 675:15, 19

**17** [2] - 557:19; 597:24

**180** [1] - 618:9

**18th** [4] - 612:20; 615:23; 617:12; 650:12

**19** [6] - 499:21; 566:16; 599:14; 601:23; 609:21; 612:3

**1970** [2] - 656:22

**1976** [2] - 657:9

**1980** [2] - 657:10, 13

**1981** [3] - 657:13, 17, 19

**1983** [2] - 657:19

**1993** [1] - 585:13

**1994** [51] - 567:8, 24; 568:15, 21; 570:13; 571:11; 573:10; 574:24; 575:5; 576:3; 579:10; 580:9, 25; 581:23; 584:22; 585:16; 587:4; 588:9; 589:9; 592:16; 595:7, 10; 602:1; 603:7; 606:1; 612:20; 615:23; 617:12, 14; 618:3; 619:22; 620:8, 12, 16; 621:21; 625:12, 17; 626:16; 631:12; 632:4; 635:13; 636:10; 645:19; 664:19; 669:11; 670:7, 12; 672:19; 675:3, 19

**19th** [1] - 611:4

**1:45** [1] - 582:14

**1st** [7] - 580:25; 581:23; 582:12; 584:22; 585:13; 587:4; 588:9

---

**2**

**2** [1] - 502:1

**2/28/94** [1] - 611:16

**20** [8] - 499:22; 604:13; 668:22; 669:3, 16, 22; 677:3; 691:22

**200** [3] - 617:23; 630:5; 663:23

**2000** [6] - 643:5; 644:8; 650:12, 19, 21

**2001** [4] - 592:8; 645:23; 646:11, 23

**2002** [3] - 646:24; 647:1

**2004** [5] - 524:22; 533:17; 535:20; 548:25; 562:22

**2005** [13] - 509:12, 16;

**2006** [1] - 646:12

**2009** [1] - 655:14

**2011** [23] - 523:23; 524:1, 6, 13, 19; 525:4, 6, 10; 526:11; 527:6, 13, 23; 534:23; 535:15, 19; 544:2; 548:8; 549:24; 555:1; 562:11, 25; 563:6, 8

**2012** [9] - 495:7; 540:20; 541:18; 548:12; 549:4; 554:18; 557:6; 560:7; 689:5

**205** [1] - 495:16

**20th** [8] - 527:14, 23; 534:22; 535:14, 19; 547:21; 650:19, 21

**21** [4] - 669:3, 16, 22; 691:22

**210** [1] - 617:23

**215** [1] - 617:23

**21st** [1] - 527:14

**22-A** [2] - 602:8; 607:9

**23** [7] - 571:10; 576:3; 580:9; 589:9; 620:12; 636:10; 645:19

**23rd** [6] - 579:10; 620:15; 626:16; 631:12; 632:4; 637:25

**23th** [1] - 570:13

**24** [4] - 574:24; 602:11, 13; 645:19

**24-A** [2] - 602:11; 607:9

**240** [1] - 617:24

**24th** [6] - 573:10; 576:3; 595:10; 601:8; 602:1; 638:1

**25** [2] - 652:7

**25-A** [1] - 607:20

**25-B** [1] - 607:20

**25-C** [1] - 607:21

**25-D** [1] - 607:20

**250** [1] - 660:20

**25th** [1] - 534:22

**26** [9] - 495:7; 503:9, 16; 635:10; 655:11; 674:11; 675:6, 11; 691:22

**26-A** [4] - 607:20; 608:21, 25; 691:15

**26-B** [1] - 607:21

**260** [1] - 617:24

---

**533:17; 541:16; 544:2;** [continuation]

533:17; 541:16; 544:2; 549:1, 21; 551:18; 554:5; 556:19, 21; 557:13; 646:12

**27** [3] - 503:9, 16

**28** [5] - 503:9, 17; 558:17; 592:11

**29** [1] - 666:7

**2:00** [2] - 595:21

---

**3**

**3** [1] - 502:1

**30** [4] - 516:15; 563:23; 652:8; 689:5

**3130** [1] - 611:3

**32** [1] - 569:24

**33** [5] - 563:19; 566:12; 569:24; 571:1; 691:9

**33134** [1] - 495:17

**34** [6] - 513:8; 563:19; 569:24; 571:2; 573:13; 691:9

**35** [3] - 566:21; 567:4, 11

**3500-JK-7** [1] - 601:15

**3500-KM-1** [2] - 508:14; 558:25

**3500-VS-8** [1] - 639:15

**357** [1] - 681:19

**36** [3] - 569:25; 571:2; 691:9

**37** [3] - 569:25; 571:2; 691:9

**38** [4] - 681:13, 18

**380** [1] - 681:19

**39** [5] - 523:12; 563:16; 569:25; 571:2; 691:9

**394** [1] - 546:17

**3D** [1] - 641:20

---

**4**

**4** [5] - 502:1; 588:25; 666:21; 667:23; 669:10

**40** [2] - 541:2; 652:8

**404(b)** [1] - 687:4

**41** [3] - 569:25; 571:2; 691:9

**42D** [1] - 578:18

**45** [4] - 500:11; 569:25; 571:2; 691:9

**48** [3] - 569:25; 571:2; 691:9

**4:00** [1] - 636:15

---

**5**

**5,000** [1] - 660:10

**500** [4] - 575:15; 578:1; 579:10; 690:3

---

**501** [1] - 690:3
**502** [1] - 691:5
**51** [3] - 569:25; 571:2; 691:9
**515** [1] - 691:6
**519** [1] - 691:7
**52** [3] - 569:25; 571:2; 691:9
**523** [1] - 690:4
**53** [1] - 513:8
**54** [3] - 569:25; 571:2; 691:9
**55** [9] - 509:2, 6; 512:13; 522:23; 636:22; 637:14, 16; 691:18
**551** [1] - 690:5
**552** [1] - 691:8
**56** [1] - 636:22
**563** [1] - 690:6
**565** [2] - 690:8
**57** [1] - 636:22
**571** [1] - 691:9
**576** [1] - 691:10
**58** [4] - 636:23; 637:14, 17; 691:18
**585** [1] - 691:2
**589** [1] - 691:11
**591** [1] - 690:10
**592** [1] - 690:10

**6**

**6** [6] - 517:25; 668:21; 669:3, 15, 21; 691:21
**6/23** [2] - 600:6, 14
**6/24** [2] - 600:6, 17
**60** [5] - 535:2-4; 582:6; 585:8
**601** [1] - 691:12
**607** [1] - 691:13
**608** [1] - 691:14
**609** [1] - 691:15
**61** [1] - 582:6
**614** [1] - 691:16
**617** [1] - 690:11
**619** [2] - 690:13
**62** [1] - 582:6
**63** [7] - 513:13, 24; 582:6; 585:8, 19, 25; 691:2
**631** [2] - 495:22; 691:17
**634** [1] - 690:15
**635** [1] - 690:15
**637** [1] - 691:18
**641** [1] - 691:19

**645** [1] - 690:16
**649** [1] - 690:18
**650** [1] - 690:18
**653** [1] - 691:20
**654** [1] - 690:20
**655** [2] - 495:3; 690:20
**666** [1] - 495:18
**668** [1] - 691:3
**669** [1] - 691:21
**67** [5] - 582:6; 585:8, 19, 25; 691:2
**675** [1] - 691:22
**68** [5] - 582:7; 585:8, 20, 25; 691:3
**681** [1] - 690:21
**6851** [2] - 620:6; 622:15

**7**

**7** [5] - 515:3, 6, 16; 517:25; 669:3
**702** [1] - 664:6
**712-6105** [1] - 495:22
**72** [5] - 582:7; 585:9, 20, 25; 691:3
**77** [5] - 582:7; 585:9, 20, 25; 691:3

**8**

**8** [5] - 515:3, 6, 16; 517:25; 669:3
**83** [3] - 569:25; 571:2; 691:9
**88** [5] - 516:9; 538:10; 569:25; 571:2; 691:9
**89** [1] - 538:11

**9**

**9** [7] - 519:6; 668:21; 669:3, 15, 21; 691:7, 21
**94-2563** [1] - 675:16
**9:45** [2] - 688:23; 689:4
**9:55** [1] - 495:7

**A**

**A-3** [3] - 593:18; 594:2, 24
**a.m** [2] - 495:7; 689:5
**able** [18] - 497:24; 499:7; 509:15; 520:10; 532:5; 546:5, 8; 554:10; 589:8; 596:8; 598:9; 602:17; 623:10, 14; 648:13; 667:17; 674:17
**abnormality** [2] - 662:13; 676:17
**absence** [3] - 496:4; 546:2; 584:4
**absolutely** [1] - 547:12
**abundance** [1] - 605:22
**accident** [1] - 659:3
**accidental** [1] - 526:24
**accidentally** [1] - 539:7
**accounting** [1] - 679:16
**accurate** [4] - 544:6; 554:9; 556:18; 570:11
**accurately** [4] - 505:15; 576:1; 585:14; 621:20
**accusations** [1] - 541:8
**acting** [3] - 655:15, 20; 656:4
**active** [1] - 497:21
**activities** [2] - 567:2; 658:8
**activity** [1] - 520:22
**actual** [9] - 503:7; 512:2; 514:21; 562:17, 19; 640:21; 642:12; 645:7; 680:12
**add** [1] - 681:15
**addition** [6] - 511:13; 518:11; 624:13; 659:17; 661:4; 680:22
**additional** [11] - 508:4; 510:16; 537:4; 539:14; 578:2; 643:6; 667:25; 669:17; 675:7; 682:7; 686:13
**adequate** [1] - 499:1
**adjacent** [5] - 503:14; 553:17; 575:13, 25
**adjourned** [1] - 689:4
**adjunct** [1] - 660:4
**adjust** [2] - 499:5; 528:13
**adjustment** [1] - 498:16
**admission** [20] - 502:1; 515:16; 519:2; 552:1; 576:10; 585:19; 589:12; 600:21; 606:18; 608:21; 609:13; 614:7; 631:15; 637:14; 640:25; 653:19; 667:23; 669:15; 674:17;
675:6
**admitted** [28] - 502:2; 519:4; 570:24; 571:5, 25; 573:13; 574:11; 575:17; 586:23; 588:6, 14; 594:8; 600:24; 608:22; 609:16; 612:9; 614:8; 621:11; 623:18; 627:19; 631:16; 632:18; 637:15; 653:20; 667:24; 671:3; 676:8
**advanced** [2] - 532:18; 533:9
**advantages** [1] - 661:13
**advise** [1] - 500:19
**aerial** [1] - 589:5
**afield** [1] - 539:20
**afternoon** [9] - 496:22; 592:5; 595:22; 619:16; 633:21; 635:7; 650:5; 685:5
**age** [1] - 499:18
**agency** [4] - 642:21; 643:8, 20; 650:6
**agent** [2] - 527:16; 606:19
**Agent** [7] - 524:16; 528:3, 10; 529:19; 646:6, 17; 651:6
**agents** [1] - 651:4
**ago** [6] - 512:6; 521:5; 569:6; 570:11; 638:23; 673:20
**agree** [1] - 556:18
**agreement** [2] - 543:20; 606:16
**ahead** [1] - 561:2
**aid** [1] - 658:9
**ain't** [2] - 561:7, 9
**alcohol** [7] - 663:4; 679:24; 680:6, 10, 15
**alcoholic** [1] - 680:12
**alerted** [1] - 630:12
**aligned** [2] - 503:4; 505:15
**aligning** [1] - 505:4
**allow** [5] - 544:4; 546:4; 547:3; 555:16, 19
**allowed** [1] - 537:16
**allows** [7] - 521:1, 3; 528:13; 553:18; 593:11; 640:5; 641:19
**Almeria** [1] - 495:16
**almost** [2] - 560:17; 611:19

**alone** [1] - 651:3

**alongside** [1] - 620:22

**altered** [1] - 570:16

**alternate** [1] - 500:20

**alternates** [2] - 496:12

**alternative** [1] - 497:9

**Amador** [2] - 685:1; 686:22

**amended** [2] - 596:2; 685:25

**AMERICA** [1] - 495:3

**American** [3] - 611:1, 3

**Ames** [1] - 656:24

**ammunition** [3] - 580:15; 602:4; 681:20

**amount** [2] - 499:1; 510:16

**amounts** [4] - 679:24; 680:3, 7

**amplitude** [1] - 521:3

**analog** [6] - 504:21; 506:12; 507:6, 15; 517:8; 526:21

**analogous** [1] - 520:16

**analogy** [4] - 507:3, 5; 516:8; 520:23

**analyses** [1] - 514:24

**analysis** [26] - 509:24; 512:1; 518:5, 15; 520:8; 521:21; 522:7; 524:24; 541:16; 542:3; 544:5, 9-10, 12; 548:20, 24; 550:19; 554:6; 556:19; 557:12; 635:23; 639:6; 679:19, 22

**analyze** [1] - 641:14

**analyzed** [4] - 509:11; 556:14; 653:13, 15

**analyzer** [1] - 516:21

**analyzing** [2] - 551:18; 568:14

**anatomic** [3] - 657:11; 659:18

**Andrew** [1] - 526:17

**angle** [4] - 505:13, 16; 672:3; 677:3

**animal** [1] - 648:17

**Answer** [3] - 537:25; 546:19, 23

**answer** [6] - 530:9, 21; 531:1, 7; 532:25; 537:22

**answered** [1] - 530:25

**antenna** [2] - 609:2, 4

**Anthony** [1] - 651:5

**anticipation** [1] - 524:5

**apart** [1] - 514:12

**apartment** [20] - 573:18; 581:2, 6, 9, 12, 19, 22; 582:1, 12; 584:21, 24; 585:15; 586:11, 19-20; 587:6, 20; 588:5, 20

**apologize** [3] - 527:15; 537:18; 548:11

**apparent** [3] - 659:5; 661:5; 667:4

**appear** [6] - 516:23; 607:7; 624:7; 629:24; 668:3; 678:1

**APPEARANCES** [1] - 495:11

**appeared** [5] - 539:5; 581:24; 628:2; 669:11; 672:22

**appearing** [12] - 566:5; 571:4; 572:15; 576:18; 577:13; 578:11, 25; 586:2; 611:24; 619:18; 626:9; 671:2

**appellate** [1] - 605:21

**Apple** [1] - 643:23

**application** [1] - 636:5

**applied** [2] - 593:5, 8

**apprised** [1] - 605:13

**approach** [19] - 501:14; 508:12; 510:18; 535:7; 552:12, 19; 599:18; 602:24; 616:23; 630:21; 633:18; 634:1; 644:21; 664:15; 666:18; 674:4; 683:6; 687:1; 688:9

**approached** [1] - 597:8

**approaches** [7] - 510:20; 535:9; 617:1; 630:23; 644:23; 664:18; 674:7

**appropriate** [3] - 496:14; 539:12; 546:14

**approximate** [1] - 557:21

**April** [3] - 495:7; 592:8; 689:5

**APX** [3] - 601:23, 25; 611:23

**area** [70] - 503:2, 6, 21; 504:3; 508:5, 9,

21-22, 25; 509:1, 10; 510:25; 511:15; 512:9, 13-14; 514:1, 25; 516:6, 19; 518:3; 519:14; 523:11; 525:7, 14, 20; 532:24; 549:7; 553:18; 554:1; 557:9, 15, 17, 21; 558:10, 16; 559:5; 560:19; 563:15, 17; 575:13, 20; 576:2, 24; 577:18, 20-21; 578:1, 4; 587:16; 588:3, 12-13; 590:3, 12-13, 18, 23; 597:8; 616:8; 621:13; 628:5; 663:20; 664:5; 676:14, 16; 677:17; 680:24

**areas** [6] - 510:22; 518:2, 4; 657:24; 679:17; 680:23

**arguably** [1] - 542:1

**argue** [1] - 543:25

**arm** [5] - 553:25; 574:5; 616:5; 672:5

**armor** [1] - 604:18

**armored** [13] - 558:5; 561:4; 568:3; 571:15; 574:20; 576:5; 584:19; 589:9; 590:4; 603:6; 604:1; 606:2; 625:15

**arrival** [1] - 573:3

**arrived** [14] - 548:16; 568:20, 24; 571:10; 572:10, 24; 587:8, 18-19; 595:14; 596:17; 626:11; 665:12

**arriving** [2] - 568:6; 658:10

**arrows** [1] - 573:21

**arteries** [1] - 662:23

**article** [1] - 651:14

**articles** [1] - 675:1

**ascertain** [2] - 518:16; 605:12

**asleep** [1] - 496:25

**aspect** [1] - 535:23

**aspects** [3] - 507:12; 543:13; 556:12

**assembled** [1] - 645:24

**assigned** [14] - 544:8; 548:6, 19, 23-24; 592:13, 19; 598:25; 635:18; 638:14; 650:9; 661:22; 675:15, 17

**assigning** [1] - 660:22

**assignment** [2] - 650:16, 22

**assignments** [1] -

650:8

**assist** [3] - 507:7; 526:12; 657:5

**assistance** [1] - 673:15

**Assistant** [1] - 524:16

**assistant** [3] - 620:1, 9; 660:7

**Assistants** [1] - 495:15

**assisted** [3] - 495:24; 526:15; 568:10

**associated** [3] - 661:6; 678:3

**Association** [1] - 636:6

**assume** [2] - 554:20; 604:25

**assumptions** [1] - 500:23

**assurance** [1] - 556:12

**ATF** [3] - 606:16, 19; 609:23

**ATF-1** [7] - 609:12, 14, 18, 25; 610:11, 16; 691:15

**athletic** [1] - 618:8

**attached** [1] - 641:15

**attack** [1] - 541:21

**attempted** [2] - 539:9; 641:14

**attempting** [1] - 566:22

**attended** [1] - 636:5

**attention** [13] - 512:10; 559:2; 561:14; 581:15; 592:15; 596:22; 619:21; 620:11, 24; 624:20; 635:12; 636:10; 650:11

**attentive** [1] - 497:1

**attire** [1] - 674:3

**attorney** [1] - 541:5

**Attorney** [6] - 495:12, 15; 524:17; 535:14; 558:4; 561:3

**Attorney's** [13] - 523:24; 525:11; 526:1; 531:18, 22; 536:5; 540:17; 547:22; 555:3; 566:6; 592:14, 20; 619:19

**attributable** [1] - 604:7

**audio** [5] - 504:22; 556:5; 632:2, 25

**August** [11] - 606:2;

664:19; 665:11; 669:11;
670:7, 12; 672:18;
675:3, 15, 19

**AUSAs** [1] - 529:17

**authentic** [3] - 507:8;
518:9, 16

**authenticity** [7] -
523:15; 548:22; 556:8,
11; 557:1, 7, 14

**auto** [1] - 681:19

**autopsies** [10] -
656:10, 13; 657:6;
658:18, 22, 24; 659:19;
660:9, 16, 23

**autopsy** [25] - 658:20;
659:7; 661:12, 25;
662:10; 663:8, 17;
673:16; 675:3, 13, 15,
18; 677:21, 25; 678:11;
679:7, 18; 681:22;
682:2, 14, 16, 24

**available** [4] - 528:4;
532:2; 656:3

**Avenue** [1] - 495:16

**average** [1] - 661:20

**averaged** [1] - 660:17

**avoid** [1] - 517:15

**awake** [5] - 496:21;
497:8, 24; 498:18, 24

**aware** [4] - 532:23;
555:21; 557:1; 574:25

**azimuth** [4] - 505:5,
13, 16; 528:14

---

**B**

**B-54** [10] - 593:23;
594:4; 595:17, 20;
596:13; 598:19; 600:1;
609:7; 611:18; 612:3

**B-A-Z-Y-L-E-W-I-C-Z**
[1] - 649:25

**bachelor's** [1] -
656:20

**background** [4] -
511:14; 656:18; 662:2,
8

**bag** [12] - 599:9, 11,
13, 25; 601:8; 608:2;
609:9; 640:22; 652:11;
653:3, 6

**bags** [1] - 567:22

**band** [4] - 517:4, 7, 15

**bands** [1] - 517:3

**banging** [2] - 621:6;
630:11

**Baran** [1] - 688:18

**barrel** [1] - 601:24

---

**baseball** [2] - 512:13;
545:6

**based** [12] - 535:22;
546:9; 549:22; 555:19;
589:7; 667:7, 16;
678:10; 680:13; 682:3

**basement** [17] - 581:2,
5, 8, 11, 19, 22;
582:1, 12; 584:21, 24;
585:15; 586:11, 19-20;
587:5; 588:4, 19

**basis** [1] - 538:18

**bass** [2] - 516:11, 13

**bathroom** [1] - 634:2

**Baumgardt** [1] - 575:3

**Baumgardt's** [1] -
572:11

**Bay** [2] - 664:24;
665:19

**Bayzelewicz** [2] -
644:13; 649:13

**Bazylewicz** [3] -
643:16; 649:24; 651:19

**bear** [2] - 607:8; 644:2

**bearing** [2] - 642:7

**bears** [1] - 640:22

**became** [1] - 524:24

**become** [3] - 574:24;
668:12; 678:22

**bedroom** [2] - 588:18

**beer** [1] - 680:1

**BEFORE** [1] - 495:8

**began** [2] - 621:5;
673:16

**begin** [2] - 539:13;
571:19

**beginning** [12] -
504:2; 507:20; 508:21,
24-25; 509:1, 7-8;
519:13, 15; 521:18;
525:18

**begins** [3] - 506:18;
509:2; 662:10

**begun** [1] - 501:13

**behind** [3] - 589:25;
591:1; 599:9

**beige** [2] - 615:16;
651:16

**Bellmore** [1] - 636:20

**belonged** [1] - 584:25

**belt** [1] - 580:14

**beneath** [1] - 508:5

**bent** [1] - 508:5

**best** [16] - 532:17;
549:24; 552:18; 555:20;
570:15; 579:22; 581:21;

---

587:19; 620:23; 623:11;
625:11; 626:8; 627:15;
630:2; 670:8; 680:13

**better** [5] - 604:19;
606:5; 656:7; 676:16;
686:5

**between** [9] - 503:11,
16, 18; 521:25; 522:14;
525:15; 544:2; 550:15;
567:22

**bevelled** [1] - 667:8

**beverage** [1] - 680:12

**beyond** [1] - 674:1

**big** [4] - 512:16;
594:5; 617:18; 630:5

**bin** [1] - 665:15

**Bin** [3] - 667:17;
669:9; 673:9

**biological** [1] -
648:10

**biopsied** [1] - 658:15

**bit** [7] - 540:25;
541:5; 654:8; 671:14;
672:11; 673:3; 679:16

**bits** [2] - 522:20;
523:4

**black** [5] - 599:9;
602:14-16; 609:9

**blackening** [1] - 673:1

**blah** [6] - 558:5; 561:5

**Blazer** [16] - 578:6,
17; 579:8; 590:13;
622:23; 624:12, 14;
627:8; 628:12; 632:9;
633:2; 636:16, 18;
637:11, 25

**blended** [1] - 522:20

**bloating** [1] - 668:9

**block** [1] - 670:17

**blond** [1] - 629:17

**blonde** [1] - 679:14

**blood** [7] - 567:6;
580:12; 663:3; 668:11;
680:17, 20; 681:2

**blow** [1] - 638:25

**blowing** [1] - 577:9

**blown** [3] - 577:2, 21,
25

**blown-up** [1] - 577:25

**blue** [3] - 627:7;
671:13; 672:7

**board** [5] - 657:23;
659:13, 15, 18, 21

**boat** [2] - 666:9

**body** [43] - 498:13;
571:17; 572:11; 573:2;
618:9; 661:7, 9, 11;

---

665:14; 666:2, 5, 24;
667:18; 668:3, 5;
669:10; 670:3, 9, 18,
21, 24; 673:9, 13;
675:2, 13; 676:1, 3;
677:22; 678:1, 11-12,
19, 22-23; 679:4;
680:6, 17-18; 681:21;
682:5, 9, 12, 20

**bone** [4] - 677:1, 9-10,
14

**botched** [2] - 558:5;
561:4

**bottom** [7] - 504:24;
520:14; 594:22; 601:19;
610:4; 611:12; 667:1

**box** [27] - 552:19;
645:25; 646:5, 18;
647:3; 665:13, 17;
666:2, 5, 11, 23;
667:1, 5, 21; 668:4;
670:18, 22; 671:10, 12,
18; 672:3, 12; 673:13

**Boy** [2] - 607:20

**brain** [2] - 676:24

**brand** [1] - 518:18

**break** [9] - 502:2;
528:25; 540:13; 545:4;
582:14; 599:2; 633:21;
634:2; 685:23

**breaks** [1] - 512:16

**brick** [1] - 594:22

**brief** [2] - 559:13;
684:14

**briefly** [2] - 643:22;
661:24

**briefs** [1] - 674:2

**bring** [15] - 497:8,
12-13; 499:25; 524:3,
9; 531:19; 540:4, 7;
541:4, 7; 542:21;
547:13; 645:15

**broke** [3] - 501:12;
584:18; 585:5

**broken** [3] - 639:4, 21;
678:1

**Brook** [1] - 660:8

**brought** [12] - 524:7;
528:3, 5; 531:24;
539:3, 11; 543:24;
546:8, 13; 556:25;
645:18; 666:11

**brush** [1] - 640:8

**buccal** [3] - 651:10,
22, 24

**buddy** [1] - 560:11

**building** [29] -
523:24; 525:11; 527:14;

568:4, 6; 569:2;
571:14; 573:18; 574:21;
575:6, 24; 576:23;
577:2, 4, 6; 586:18;
589:5; 594:4, 17;
597:4; 620:16, 19, 25;
621:17, 20; 622:14;
626:16; 630:16; 680:24
**bulb** [1] - 648:4
**bullet** [19] - 602:18;
667:4, 12, 15, 17;
675:25; 676:3, 20, 23;
677:4, 6, 9, 12, 18;
681:2, 12, 14, 16
**bullet-proof** [1] -
602:18
**bullets** [3] - 602:13;
604:6; 667:9
**bumping** [1] - 511:18
**bumps** [1] - 511:17
**buoyant** [1] - 678:23
**burden** [1] - 603:10
**Bureau** [4] - 580:5;
635:19; 645:22; 647:8
**button** [1] - 622:5
**buy** [1] - 553:9
**buying** [1] - 611:8
**BY** [29] - 501:9;
523:22; 547:20; 551:2;
561:25; 563:14; 566:2;
584:17; 592:4; 617:4;
619:15; 635:6; 645:2;
650:4; 655:3; 681:11;
690:4-7, 9, 11-12, 14,
16-17, 19, 21

---

### C

**C-A-P-S-T-A-N** [1] -
517:11
**C.S.R** [1] - 495:20
**C88** [2] - 642:7, 11
**cabinets** [1] - 587:7
**Cadillac** [1] - 599:5
**caliber** [4] - 681:13,
18
**calm** [1] - 630:17
**calmed** [1] - 630:18
**Calvin** [1] - 672:10
**camera** [3] - 567:9
**cameras** [1] - 567:21
**cannot** [3] - 517:14;
530:18
**canvas** [6] - 599:9, 11,
13, 25; 601:8; 609:9
**capability** [4] -
528:17; 530:23; 531:15;
532:14

**capable** [2] - 528:3;
555:4
**capstan** [2] - 517:10
**Capwell** [2] - 524:17;
529:16
**car** [24] - 558:5;
561:4; 568:3; 571:15;
574:20; 584:19; 589:9;
590:4; 594:2, 6;
597:14, 19; 598:14;
599:7-9; 606:2; 614:13;
617:11; 628:6; 629:11;
632:17; 645:8, 11
**cardboard** [1] - 642:12
**care** [2] - 500:23;
546:20
**career** [4] - 657:21;
658:23; 659:23; 660:9
**Carrie** [2] - 524:17;
529:16
**carry** [1] - 526:6
**carrying** [1] - 628:1
**cars** [1] - 593:2
**cart** [3] - 665:13;
666:12; 671:19
**case** [44] - 517:17;
521:9; 522:2; 529:5,
13; 532:3; 535:25;
539:24; 540:4; 542:20;
543:21; 544:7; 545:6;
546:18, 20; 547:2, 4;
548:23; 560:18; 582:15;
603:7, 14; 621:12;
623:18; 627:19; 630:25;
633:23; 640:10; 642:7;
645:25; 652:3; 661:22;
662:5, 9; 667:20;
674:23; 676:8; 688:9,
12, 15, 20; 689:4
**cases** [8] - 510:10;
511:4; 567:5; 656:13;
661:1, 3, 21; 662:4
**cashed** [1] - 625:20
**cashing** [1] - 625:9
**cassette** [8] - 506:13;
526:22; 528:20; 532:5;
555:2; 563:5, 7
**cast** [4] - 616:5, 9,
11, 13
**Caucasian** [1] - 648:21
**caused** [2] - 498:23;
677:11
**causing** [1] - 541:3
**caution** [2] - 605:22;
669:25
**cautionary** [1] -
604:21

**cautioned** [1] - 605:13
**caveat** [1] - 681:15
**CD** [1] - 525:8
**Center** [1] - 650:23
**center** [6] - 578:9;
626:9; 676:6, 16, 25;
677:16
**centered** [1] - 575:6
**Central** [3] - 495:5,
13, 22
**certain** [14] - 498:15;
503:22; 510:22; 549:19,
25; 550:6, 12; 555:17;
567:8; 569:13; 603:25;
647:16; 663:2
**certainly** [3] - 538:9;
546:12; 605:11
**certainty** [1] - 667:2
**certified** [5] -
657:23; 659:13, 15, 18,
21
**chain** [2] - 673:6
**chair** [1] - 640:9
**chalk** [1] - 573:22
**change** [12] - 511:16,
21; 512:7; 535:22, 24;
541:15; 557:1; 678:6,
10, 16; 679:1
**changes** [4] - 512:5,
20; 557:12; 604:17
**channel** [6] - 520:1, 6,
9-10; 521:11
**channels** [2] - 520:4,
7
**characteristics** [1] -
662:12
**characterized** [1] -
535:23
**charge** [4] - 541:2;
543:10, 25; 569:10
**charged** [1] - 603:12
**charges** [3] - 685:25;
686:8, 12
**Charles** [3] - 651:7;
684:14; 685:15
**Charley** [5] - 497:13;
607:22; 666:20; 667:23;
669:9
**check** [4] - 527:3;
558:7; 625:9, 14
**checks** [2] - 625:19, 21
**cheek** [1] - 651:24
**Cherokee** [2] - 632:5,
12
**chest** [1] - 672:6
**Chevy** [13] - 578:6, 17;
590:13; 622:23; 624:12;

627:8; 632:9; 633:2;
636:16, 18; 637:11, 25
**chief** [10] - 540:4, 18;
655:13, 15, 20; 656:2,
5
**child** [1] - 496:21
**child's** [1] - 629:25
**chips** [2] - 635:25;
638:17
**choose** [1] - 664:14
**Chris** [5] - 558:3;
560:10; 561:3; 615:12,
14
**CHRISTIAN** [1] - 495:5
**Christian** [5] - 651:2,
11; 652:5; 653:3, 16
**Christopher** [1] -
673:7
**Cincinnati** [1] -
657:16
**circled** [1] - 538:10
**City** [2] - 495:19;
657:8
**CK** [1] - 672:10
**clean** [1] - 623:1
**clear** [3] - 525:14;
547:7; 604:21
**clearly** [1] - 521:23
**CLERK** [15] - 496:8;
564:25; 565:7, 11;
591:16, 22; 619:6, 12;
634:22; 635:3; 649:14,
20; 650:1; 654:20, 25
**Cleveland** [2] - 657:11
**client** [2] - 540:12;
604:7
**clinic** [1] - 657:11
**clinical** [3] - 657:11;
659:18, 20
**clip** [5] - 599:15, 17;
602:14; 607:10, 16
**clips** [1] - 602:13
**close** [3] - 512:9;
572:3; 655:18
**close-up** [1] - 572:3
**closet** [1] - 587:16
**clothing** [4] - 651:15;
674:20; 675:1; 681:2
**clue** [1] - 618:16
**co** [4] - 621:2; 622:1;
624:16; 626:15
**co-worker** [2] - 622:1;
624:16
**co-workers** [2] -
621:2; 626:15
**Coast** [9] - 664:24;

665:12; 666:10; 670:9, 25; 671:19; 685:15

**coated** [1] - 602:16

**collateral** [1] - 604:2

**collect** [2] - 650:24; 651:10

**collected** [3] - 643:7, 12; 645:15

**collection** [1] - 648:7

**collections** [1] - 643:11

**College** [2] - 657:8; 660:5

**color** [3] - 679:9, 11, 14

**coloration** [1] - 679:17

**colored** [2] - 577:19; 651:17

**column** [4] - 639:2-4, 21

**combine** [1] - 514:24

**comfortable** [1] - 546:12

**coming** [8] - 526:8; 531:10; 543:16; 571:19; 593:3; 597:14; 628:5; 629:17

**comment** [1] - 602:22

**commit** [1] - 603:11

**committed** [1] - 603:9

**common** [3] - 556:15; 605:7; 638:9

**communicable** [1] - 608:18

**Community** [1] - 660:4

**compact** [5] - 562:1; 563:8; 631:1, 3, 8

**company** [3] - 620:3, 7; 622:17

**comparison** [1] - 550:15

**complete** [5] - 526:10; 542:2; 581:12; 604:18; 642:23

**completed** [3] - 524:24; 526:10; 657:16

**completely** [2] - 541:14; 680:14

**completing** [2] - 568:17; 581:11

**completion** [1] - 569:19

**complex** [1] - 594:18

**complexity** [1] - 604:18

**complicates** [1] -

678:18

**complies** [1] - 552:14

**comports** [1] - 616:11

**composed** [2] - 532:10; 533:3

**computer** [4] - 495:24; 505:3; 515:8; 520:20

**computer-assisted** [1] - 495:24

**concerned** [3] - 540:25; 541:4; 670:23

**concerning** [3] - 633:10; 679:8; 687:1

**conclude** [1] - 605:12

**conclusion** [3] - 518:9; 557:4; 663:5

**conclusions** [2] - 513:10; 557:13

**condition** [5] - 616:1; 639:6; 647:10; 666:13; 682:12

**conditions** [3] - 678:17, 19; 682:13

**conduct** [5] - 540:18; 562:12; 581:3; 636:1, 14

**conducting** [2] - 613:24; 675:18

**cone** [3] - 571:17; 572:4, 6

**confer** [8] - 561:23; 562:3; 591:7; 613:13; 616:20; 639:16; 640:14; 681:6

**confine** [1] - 661:17

**conflict** [4] - 537:6; 538:11, 21; 539:25

**confused** [1] - 534:11

**conjunction** [1] - 679:18

**connection** [2] - 643:7; 665:2

**consent** [4] - 499:11, 13; 500:22; 606:18

**consider** [1] - 664:13

**considered** [2] - 510:16; 647:19

**consistent** [1] - 600:6

**Constance** [1] - 684:18

**consuming** [2] - 510:14; 661:18

**cont'd** [3] - 501:8; 584:16; 690:3

**contained** [4] - 520:11; 567:20; 594:11; 609:9

**container** [1] - 667:18

**contains** [1] - 642:6

**content** [6] - 511:15; 512:3, 20, 22; 631:3, 8

**contents** [3] - 512:14; 589:7; 640:17

**context** [2] - 512:3, 7

**continuation** [1] - 535:24

**continue** [6] - 500:25; 539:8; 547:18; 590:11; 603:15; 688:20

**Continued** [3] - 536:12; 602:25; 683:7

**continued** [1] - 501:1

**continues** [1] - 539:24

**continuing** [6] - 515:18; 552:4; 576:11; 585:22; 589:13; 606:20

**continuous** [6] - 511:14; 512:22; 515:1; 549:9, 14, 22

**contributing** [2] - 518:10; 522:10

**controls** [2] - 561:16, 18

**conversation** [6] - 511:22, 24; 512:17; 525:15; 538:11; 626:6

**cooler** [1] - 678:21

**cop** [6] - 602:18; 604:7, 12, 14, 17, 20

**copied** [1] - 507:16

**copies** [1] - 526:9

**copy** [12] - 514:22; 517:4, 7-8; 518:6; 525:22; 562:10, 16-17; 563:3; 686:12

**copying** [2] - 517:19; 518:5

**Coral** [1] - 495:17

**core** [1] - 677:14

**corner** [3] - 553:7; 577:22; 578:20

**Corona** [10] - 581:2, 6, 12, 19, 22; 584:21; 585:1, 16; 586:20; 588:20

**coronary** [1] - 662:22

**correct** [65] - 504:8, 11, 14; 519:17; 521:14-16; 522:25; 523:13; 524:18, 22; 525:12, 16, 20, 23; 527:7, 10-11; 528:22; 529:1, 17, 19; 530:6, 19, 22; 533:17, 20; 535:17, 21; 547:11;

548:25; 549:1, 9-12; 560:22; 563:21; 575:7; 577:3; 590:9; 610:17; 617:6; 628:25; 630:7; 633:2; 641:12; 645:8, 16-17; 647:7, 17-18, 20-21, 23-24; 648:22; 658:10; 665:3; 669:12; 675:4

**correction** [1] - 505:17

**Correctional** [1] - 650:23

**Costello** [1] - 651:7

**cotton** [1] - 652:1

**counsel** [21] - 500:22; 527:16; 539:1, 22; 540:8; 541:13; 547:7; 551:4; 554:17; 556:2, 24; 561:23; 562:3, 7; 591:7; 606:16; 616:20; 629:13; 639:16; 681:6; 686:10

**Counsel** [9] - 510:20; 535:9; 613:13; 617:1; 630:23; 640:14; 644:23; 664:18; 674:7

**Country** [1] - 495:18

**County** [34] - 566:11, 19, 25; 568:7; 592:1, 7, 9; 595:5; 608:13; 635:1, 8, 15, 20; 643:13; 645:22; 647:2, 6; 650:7, 13; 651:7; 653:4; 655:12, 16, 21; 657:15, 21-22; 660:15, 21; 664:20; 670:4, 14; 673:11

**couple** [9] - 499:8; 508:4; 548:3; 612:7; 656:5; 660:5; 667:6; 682:9; 685:24

**course** [11] - 566:24; 567:12; 580:4; 636:7; 643:10; 656:4; 660:18; 663:15; 668:5; 687:2; 688:22

**courses** [2] - 636:4, 6

**court** [15] - 523:25; 524:5; 530:14; 543:13; 544:17; 545:2; 547:23; 595:13; 596:1; 607:1; 656:15; 663:24; 688:2

**Court** [11] - 495:20; 496:17; 497:6; 532:4; 605:3, 18; 606:8, 21; 664:1, 12

**COURT** [205] - 495:1; 496:5, 9; 497:3, 6, 15,

18, 23; 498:2, 5, 10, 15, 19, 23; 499:1, 4, 7, 11, 13, 15, 20, 22, 25; 500:9, 12, 16, 19; 501:5, 15; 502:3, 5, 16, 21; 508:13; 509:22; 510:19; 512:19; 515:17, 19; 519:4; 523:19; 529:8, 12; 530:8, 13, 21; 531:2, 5; 533:2; 534:7, 10; 535:8; 536:2, 9; 537:3, 7, 11, 14, 17, 19; 538:4, 18, 22; 540:9; 542:4, 17; 543:2, 6, 10, 14, 18, 23; 544:10, 15; 545:3, 10; 546:3; 547:1, 11, 13, 17; 548:1; 550:18, 22; 552:5, 11, 13, 18; 555:15; 557:5; 558:22; 559:15, 19; 561:13, 22; 563:10; 564:5, 7, 11, 17, 19, 22; 565:13, 16, 18; 570:20, 23; 576:12; 582:13; 584:5, 11; 585:21, 23; 589:15, 17; 591:6, 10; 599:19; 600:22, 24; 602:21, 24; 603:3, 8, 20, 23; 604:9, 11, 24; 605:9, 19; 606:4, 7, 22; 607:2; 608:22; 609:15; 610:8, 13; 614:8; 615:20; 616:19, 22, 25; 618:19, 21; 630:22; 631:16, 19; 633:14, 16, 20; 634:5, 9, 13; 637:15, 20; 639:11; 641:1, 7; 644:19, 22; 649:6, 8, 11; 651:21; 653:20; 654:2, 6, 9, 14; 664:8, 11, 16; 666:17; 667:24; 669:17, 20; 674:6; 675:7, 9; 681:5, 8; 683:1, 3, 6; 684:3, 6, 9, 13, 20, 22, 24; 685:6, 9, 13, 17, 21; 686:1, 5, 18, 21; 687:3; 688:3; 689:2

**Court's** [7] - 497:4; 500:21; 502:12; 541:20; 546:16; 605:5; 666:14
**Courthouse** [1] - 495:4
**courtroom** [61] - 497:14; 499:24; 500:15; 502:10; 505:20; 513:4; 516:1; 545:9; 547:16; 571:5, 8, 23; 572:14; 573:6, 8, 15; 574:13; 576:18, 20; 577:10;

578:12, 14, 25; 579:3, 13, 15; 582:18; 584:10; 586:4, 15, 24; 587:1, 13, 24; 588:11, 16; 589:21, 23; 594:13; 597:1; 610:15; 612:17; 615:14; 621:9, 11; 623:21; 624:23; 632:21; 633:17, 25; 634:12; 637:22; 638:21; 651:12; 669:9; 671:5, 24; 672:13, 16; 676:11; 689:1
**covered** [1] - 572:4
**covering** [1] - 672:7
**CR** [1] - 495:3
**Craig** [1] - 684:15
**created** [1] - 527:9
**creating** [1] - 526:12
**Crime** [7] - 566:16, 18; 567:13, 17, 23; 568:12; 580:5
**crime** [24] - 539:14; 566:20, 25; 567:2, 14, 21; 568:15; 569:2, 18; 571:9; 573:1; 574:23; 576:2; 580:9; 581:17; 596:19; 604:2; 605:25; 661:14; 677:20; 680:22, 25; 681:1, 16
**crimes** [4] - 603:9, 12; 606:1; 650:10
**criminal** [1] - 593:13
**Criminalistics** [1] - 657:16
**criminalistics** [1] - 638:11
**critical** [1] - 518:13
**cross** [11] - 523:19; 542:14; 547:18; 555:1, 13; 562:8; 597:15; 616:22; 681:8; 685:11
**CROSS** [8] - 523:21; 617:3; 645:1; 681:10; 690:4, 11, 16, 21
**cross-examination** [7] - 523:19; 547:18; 555:1, 13; 562:8; 616:22; 681:8
**CROSS-EXAMINATION** [8] - 523:21; 617:3; 645:1; 681:10; 690:4, 11, 16, 21
**cross-examine** [1] - 542:14
**crossed** [1] - 597:16
**CSI** [1] - 645:13
**curb** [1] - 597:6

**current** [1] - 650:8
**cursor** [5] - 520:18, 22; 574:7; 577:5; 578:8
**custody** [3] - 642:20; 644:8; 653:7
**cut** [2] - 597:5; 623:1
**cutting** [1] - 509:19
**CW-4** [3] - 666:20; 668:1; 691:3

### D

**D-A-W-S-O-N** [1] - 654:24
**D.C** [1] - 657:20
**DA's** [1] - 595:5
**damage** [1] - 541:3
**danger** [1] - 529:25
**dark** [5] - 503:6; 576:23; 623:1; 641:10
**darker** [1] - 679:11
**data** [1] - 620:10
**date** [12] - 549:22; 570:8; 600:5, 7, 13, 16, 18; 607:12; 611:15; 613:19, 21; 646:19
**dated** [1] - 607:12
**daughter** [1] - 496:11
**David** [3] - 548:6; 556:3; 607:20
**Dawson** [12] - 654:13, 23; 655:4; 666:15, 18; 668:15, 21; 670:3; 671:21; 674:8; 675:12; 676:7
**day-to-day** [1] - 620:10
**days** [4] - 499:8; 678:17; 679:5; 681:24
**deactivates** [1] - 554:3
**dead** [1] - 681:22
**deal** [2] - 496:6; 545:4
**dealing** [1] - 542:5
**deals** [1] - 525:14
**death** [5] - 659:3, 8; 660:11; 663:7; 675:20
**deaths** [1] - 659:4
**debate** [1] - 632:15
**deceased** [10] - 571:16, 20; 572:3, 21, 23; 574:25; 575:2; 577:7; 580:13; 668:6
**deceased's** [3] - 573:2, 18; 580:14
**decedent's** [1] - 665:14

**decided** [4] - 526:25; 538:1; 553:4; 661:2
**decision** [4] - 536:6; 537:6; 540:23; 547:4
**declined** [1] - 664:1
**decomposes** [1] - 680:6
**decomposition** [7] - 668:7, 14; 673:4; 678:22; 680:9, 11; 682:17
**decompositional** [6] - 672:25; 678:6, 10, 15; 680:14
**Defendant** [2] - 495:6, 16
**defendant** [9] - 539:21; 542:13; 557:21; 603:11; 615:19; 616:1; 651:20, 23, 25
**defendant's** [1] - 499:13
**definitely** [2] - 509:25; 661:15
**deflected** [1] - 508:5
**deflection** [2] - 507:25; 508:2
**degree** [3] - 656:20; 657:9; 680:8
**degrees** [1] - 677:3
**deleted** [1] - 570:16
**deliberately** [1] - 542:13
**deliberations** [1] - 688:7
**demonstrate** [1] - 551:22
**demonstrative** [2] - 552:2; 621:23
**denied** [1] - 605:10
**denim** [1] - 629:16
**department** [5] - 580:23; 608:9; 620:10, 21; 630:13
**Department** [16] - 566:11, 19, 25; 568:8; 592:7, 10; 635:1, 9, 16, 20; 643:14; 645:22; 650:7, 13; 651:8; 653:4
**depict** [3] - 575:23; 621:20; 622:16
**depicted** [11] - 575:20; 589:1; 594:15; 613:17; 615:2; 621:13; 623:22; 624:3; 637:2, 5; 671:6
**depicts** [2] - 595:3; 622:14

**deposited** [1] - 640:6

**deputy** [5] - 655:13, 20; 656:1; 657:19; 660:14

**Des** [1] - 656:21

**describe** [14] - 568:25; 576:21; 586:8, 16; 587:2, 14; 593:25; 617:8, 13; 629:21; 651:14; 656:17; 658:3; 661:25

**described** [3] - 624:14; 627:8; 659:22

**describing** [1] - 652:22

**description** [1] - 623:15

**designated** [19] - 504:3; 508:25; 509:1, 10; 512:12; 514:25; 518:2; 519:13; 523:11; 525:7, 14, 20; 532:23; 549:7; 558:15; 559:5; 563:15, 17

**designation** [1] - 524:21

**designed** [6] - 514:6; 526:24; 528:16; 529:2; 531:9; 658:9

**desire** [1] - 561:19

**detail** [1] - 629:21

**detective** [12] - 573:1, 24; 580:4; 592:1, 17; 602:3; 607:6; 635:7, 11; 643:16; 650:5, 14

**Detective** [27] - 568:11, 22; 569:8, 10, 13; 578:24; 580:25; 584:20; 591:14; 592:6; 607:18; 609:10; 615:18; 634:16; 635:1; 641:4, 10, 13; 644:13; 649:12, 24; 651:5, 7, 19; 653:11, 14

**detectives** [2] - 643:12; 651:5

**detects** [1] - 554:2

**determination** [3] - 540:13; 681:16

**determine** [5] - 507:16; 522:8; 544:12; 562:23; 658:14

**determined** [4] - 514:25; 532:19; 534:13; 549:6

**determining** [1] - 507:8

**detour** [1] - 598:17

**development** [16] - 501:21, 23; 503:1, 13; 507:13; 509:18, 23; 510:2, 6; 511:1; 513:5; 518:14, 25; 521:1; 522:15

**deviate** [1] - 677:5

**device** [5] - 517:12, 14; 532:14; 553:16, 19

**devices** [1] - 609:5

**diagnoses** [1] - 658:10

**dialed** [1] - 630:20

**dictate** [1] - 663:5

**die** [2] - 658:18, 25

**died** [3] - 659:1; 675:23; 680:15

**differences** [1] - 520:12

**different** [18] - 507:4; 515:9; 518:2; 520:24; 538:16; 572:19; 590:1; 643:11; 655:18; 658:6, 25; 678:19; 679:3, 17; 680:23; 682:6

**differently** [1] - 521:7

**differs** [1] - 561:16

**difficulty** [1] - 686:18

**digest** [1] - 540:9

**dimension** [1] - 514:13

**dinette** [1] - 588:13

**dire** [1] - 559:13

**direct** [12] - 501:2; 543:8; 559:2; 561:13; 581:15; 619:21; 620:11; 624:20; 635:12; 636:10; 685:11

**DIRECT** [15] - 501:8; 566:1; 584:16; 592:3; 619:14; 635:5; 650:3; 655:2; 690:3, 8, 10, 13, 15, 18, 20

**directed** [2] - 605:13; 615:8

**direction** [3] - 606:8; 628:11; 663:14

**directions** [2] - 569:13, 16

**directly** [1] - 661:20

**disagree** [1] - 556:22

**disc** [1] - 631:3

**discoloration** [1] - 672:25

**discolorations** [1] -
668:21

**discovered** [4] - 554:18; 560:6; 599:6; 666:8

**discovery** [3] - 539:3; 542:24; 555:24

**discretion** [1] - 497:5

**discuss** [2] - 498:19; 529:5

**discussed** [5] - 504:21; 505:4, 17; 528:14; 660:25

**discussing** [3] - 533:23; 568:22; 688:19

**discussion** [4] - 512:2, 4; 661:2; 662:6

**discussions** [2] - 511:15; 609:13

**disease** [1] - 662:13

**diseases** [1] - 659:9

**disk** [5] - 562:1; 563:8; 631:1, 7, 9

**dismissed** [2] - 496:13; 596:18

**dispatcher** [2] - 632:11; 633:1

**displaced** [1] - 673:6

**display** [20] - 515:9; 516:3, 6, 18; 517:3, 5; 518:3, 19, 23-24; 519:24; 520:13, 16, 18, 20; 521:2, 4, 8; 522:4

**displaying** [1] - 502:12

**displays** [5] - 515:8; 517:23; 518:1; 521:6

**disregard** [3] - 531:5; 602:21; 605:4

**distance** [2] - 503:16; 522:14

**distilled** [1] - 680:2

**distorted** [1] - 673:3

**District** [3] - 495:21; 592:14, 20

**DISTRICT** [1] - 495:1

**division** [1] - 527:25

**DNA** [7] - 558:4; 561:4; 653:13, 15; 684:17, 21; 685:7

**dock** [2] - 665:25; 668:3

**doctors** [2] - 658:6, 9

**document** [37] - 502:9; 505:19; 513:3; 515:25; 567:1; 571:7, 22; 572:13; 573:5, 14; 574:12; 576:19; 578:13; 579:2, 14; 586:3, 14, 25; 587:12, 23; 588:10, 15; 589:22; 594:12; 596:25; 610:14; 612:16; 621:8; 623:20; 624:22; 632:20; 637:21; 638:20; 671:4, 23; 672:15; 676:10

**documented** [1] - 611:20

**documenting** [3] - 566:21; 568:18; 581:12

**documents** [1] - 515:20

**DODDATO** [4] - 495:18; 633:18; 634:1; 684:5

**Doddato** [1] - 496:15

**done** [11] - 498:10; 509:25; 528:24; 529:9; 546:22; 550:19; 609:23; 652:10; 659:23; 660:1; 681:16

**door** [5] - 573:21; 580:17; 587:21; 599:1; 637:11

**doors** [5] - 573:17; 575:6; 622:10, 14; 630:15

**doorway** [1] - 590:8

**Dorval** [16] - 581:20; 584:25; 606:2; 611:11, 13; 612:5; 665:22; 672:18, 21; 673:17; 674:21; 675:18; 678:8; 679:18; 680:7

**Dorval's** [28] - 666:2, 5, 23; 667:18; 668:3; 669:10; 670:3, 9, 18; 671:12; 672:5, 22; 673:9; 675:2, 13, 25; 676:3, 14, 21; 677:6, 22; 678:1, 6, 11-12; 679:9; 680:18, 20

**doubt** [1] - 523:15

**down** [36] - 498:7, 14, 18; 521:12; 529:5; 534:19; 539:15; 541:10; 549:5; 564:19; 567:21; 577:6; 586:10; 594:23; 611:12; 616:6; 618:21; 622:10, 19-20; 630:13, 17-18; 633:16; 644:11; 649:8; 654:2; 665:11; 666:15, 17; 672:4; 682:15; 683:3

**Drake** [1] - 656:21

**draw** [2] - 500:22; 513:11

**dressed** [4] - 622:25;

629:15; 673:17, 19

**drew** [1] - 620:23

**drink** [1] - 680:1

**drinking** [1] - 680:12

**drinks** [2] - 679:25; 680:4

**driven** [1] - 517:10

**driver's** [2] - 574:19; 623:13

**drivers** [1] - 665:6

**driveway** [1] - 597:13

**driving** [4] - 597:18; 598:10; 613:5; 617:11

**drugs** [2] - 659:4; 663:4

**due** [2] - 659:8; 673:3

**Duffy** [1] - 568:12

**DUFFY** [1] - 568:12

**duly** [7] - 500:6; 565:5; 591:20; 619:4; 634:20; 649:18; 654:18

**during** [21] - 516:20; 549:6; 555:21; 567:12, 24; 612:25; 614:11, 22; 620:15; 636:13; 658:22; 660:3; 663:9, 15; 664:20, 23; 677:2, 21, 25; 678:11; 679:7

**dust** [2] - 635:25; 638:3

**duties** [4] - 566:24; 580:4; 635:22; 656:9

**duty** [2] - 636:11; 638:14

**dye** [1] - 679:15

---

**E**

**early** [4] - 555:1; 556:25; 557:6; 668:7

**easier** [1] - 658:4

**EASTERN** [1] - 495:1

**edge** [4] - 507:25; 526:23; 553:6; 666:1

**edges** [1] - 516:2

**edited** [1] - 523:4

**educational** [1] - 656:18

**effects** [1] - 680:4

**either** [3] - 539:7; 625:25; 669:8

**elbow** [1] - 574:5

**electronics** [1] - 528:15

**ELMO** [1] - 502:12

**emerged** [1] - 679:13

**Emergency** [1] - 636:19

**employed** [1] - 650:7

**employees** [4] - 625:15, 20, 22; 630:12

**employment** [5] - 524:4; 625:6, 12, 18; 633:5

**empty** [1] - 581:24

**encased** [1] - 671:13

**enclosed** [2] - 535:5; 653:2

**encountered** [1] - 636:17

**end** [14] - 512:13; 513:7, 17; 514:15, 17; 523:25; 524:5; 560:18, 20; 588:22; 652:1; 671:11; 672:3

**ended** [1] - 677:15

**ends** [1] - 513:23

**energy** [2] - 497:11; 677:10

**enforcement** [2] - 642:20; 643:19

**enhanced** [5] - 526:9, 12; 527:6; 562:12, 22

**enhancement** [2] - 525:7; 562:20

**enhancing** [1] - 562:15

**enlarge** [2] - 590:25; 614:20

**enlarged** [2] - 503:21; 513:7

**entail** [1] - 566:19

**enter** [1] - 676:3

**entered** [9] - 500:14; 515:20; 547:15; 584:9; 597:8; 598:19; 634:11; 676:5, 22

**entering** [3] - 500:13; 584:8; 597:12

**enters** [1] - 497:14

**entire** [4] - 523:10; 540:2; 629:25; 687:6

**entirety** [1] - 563:4

**entitled** [1] - 542:13

**entrance** [7] - 571:14; 577:5, 8; 586:10; 588:4; 676:18

**entry** [2] - 573:17; 620:10

**envelope** [1] - 653:5

**envelopes** [1] - 607:7

**equipment** [4] - 525:22; 527:17; 567:20; 681:17

**equivalent** [1] - 679:25

**erase** [11] - 506:15, 19; 514:3, 6, 12, 14; 521:22, 25; 522:14; 528:17

**erased** [3] - 560:3, 6, 20

**erases** [1] - 514:6

**erasures** [1] - 526:24

**especially** [1] - 605:6

**ESQ** [4] - 495:14, 16, 18

**essentially** [3] - 522:12; 641:4; 677:1

**establish** [3] - 546:8; 603:9, 11

**estimate** [6] - 617:22; 679:6; 680:13; 682:14; 685:6

**estimated** [2] - 677:3; 686:17

**estimation** [1] - 500:22

**etcetera** [4] - 503:17; 647:22; 685:25

**etch** [2] - 503:10, 15

**etched** [2] - 503:11; 507:7

**evaluate** [2] - 581:8; 584:21

**evaluated** [2] - 548:18; 576:3

**evaluation** [4] - 548:4; 580:23; 581:3; 584:19

**evaluations** [1] - 574:23

**evaporated** [1] - 503:3

**event** [22] - 507:16, 19, 22; 508:7, 18, 23; 511:12; 512:8, 11; 513:8; 519:9; 521:21, 23; 522:3, 12; 533:23; 535:18; 554:25; 556:24

**events** [3] - 510:10; 518:24; 620:18

**eventually** [8] - 548:12; 581:5; 626:22; 628:24; 630:17; 666:10; 680:17

**Evidence** [1] - 664:7

**evidence** [113] - 502:5, 8; 515:20, 22; 518:5; 519:5, 7, 20; 526:9; 534:12; 535:10; 539:10, 14; 542:5; 546:12; 552:2, 5, 8; 554:11; 559:14; 566:23;

**erase** 567:5, 22; 569:19; 570:19, 24; 571:3, 6, 17, 25; 572:8; 573:22; 575:17; 576:13, 16; 580:6, 8, 20; 585:25; 589:19; 600:25; 601:2; 603:20; 604:2; 605:24; 607:2, 5; 608:22, 25; 609:16, 19; 612:10; 614:8, 10; 621:12; 623:18; 627:19; 631:16, 21; 635:23; 637:15, 17, 23; 638:16; 639:25; 640:2, 18; 641:1, 3; 642:16, 24; 643:2, 6; 645:3, 20, 24; 646:21; 647:2; 652:16; 653:20, 23; 666:19; 667:24; 668:2; 669:20, 22; 670:22; 671:3; 674:9; 675:9, 11; 676:8; 691:3-8, 10

**evidences** [1] - 541:13

**evident** [1] - 668:8

**ex** [1] - 687:1

**exact** [2] - 537:20; 624:4

**exactly** [8] - 508:10; 520:19; 527:25; 531:25; 541:14; 611:19; 646:3; 667:21

**exam** [3] - 526:10; 553:10; 556:8

**EXAMINATION** [27] - 501:8; 523:21; 551:1; 563:13; 566:1; 584:16; 592:3; 617:3; 619:14; 635:5; 645:1; 650:3; 655:2; 681:10; 690:3-6, 8, 10-11, 13, 15-16, 18, 20

**examination** [21] - 501:2, 22; 517:22; 523:19; 527:2; 538:2; 540:19; 547:18; 555:1, 13; 556:11, 13, 18; 562:8; 616:22; 636:14, 16; 638:11; 641:21; 663:15; 681:8

**examinations** [2] - 516:17; 658:22

**examine** [13] - 538:6; 539:13; 542:14; 546:4; 557:6, 9; 593:14; 596:7; 638:16; 658:14; 661:10; 662:17

**examined** [15] - 500:6; 520:5; 565:5; 591:20; 619:4; 634:20; 637:8,

9

25; 641:24; 645:21; 649:18; 654:18; 662:19, 21

**examiner** [19] - 539:12; 540:18; 548:22; 556:5, 20; 655:11, 13, 15; 656:3, 7, 10; 657:19; 659:13, 17; 660:14, 23; 661:14, 22; 663:14

**Examiner's** [8] - 655:12, 21; 660:6, 15; 664:20; 670:4, 14; 673:11

**examiner** [1] - 680:24

**examiners** [3] - 655:22; 656:2, 16

**example** [10] - 511:16; 512:4; 522:11; 587:21; 627:16; 658:15; 662:20; 667:6; 677:25; 682:5

**except** [5] - 608:2; 672:2; 678:3; 679:23; 680:5

**exclude** [1] - 539:2

**excuse** [4] - 497:5; 534:20; 536:11; 650:15

**excused** [2] - 500:1, 21

**executed** [4] - 595:20; 596:4, 18; 611:18

**executing** [2] - 595:25; 596:24

**executive** [1] - 567:23

**exercising** [1] - 617:20

**Exhibit** [82] - 515:6, 23; 519:6, 8; 551:7; 552:7; 560:25; 569:24; 571:6, 25; 572:16; 573:8, 13; 574:11, 18; 575:19; 576:10, 15, 17; 577:23; 578:12, 16; 579:1, 7, 13; 581:16; 585:19; 586:1, 9, 12, 23; 587:10, 25; 588:7, 14; 589:12, 18; 594:9; 600:21; 601:1, 4; 602:7; 607:19; 609:12, 18; 614:9; 621:12, 20; 622:13; 623:19; 624:21; 626:10; 627:20; 628:4; 630:25; 631:15, 20; 636:22; 640:13; 641:2; 643:22; 652:19; 653:22; 666:20; 667:23; 668:1; 669:10; 671:3, 22; 672:14; 676:9; 691:3, 7-8, 10-12, 15-17, 19

**exhibit** [9] - 570:7; 576:12; 588:23; 589:20; 594:11; 603:4; 639:10; 653:1; 686:6

**exhibit/exhibits** [1] - 641:8

**exhibited** [36] - 502:9; 505:19; 513:3; 515:25; 571:7, 22; 572:13; 573:5, 14; 574:12; 576:19; 578:13; 579:2, 14; 586:3, 14, 25; 587:12, 23; 588:10, 15; 589:22; 594:12; 596:25; 610:14; 612:16; 621:8; 623:20; 624:22; 632:20; 637:21; 638:20; 671:4, 23; 672:15; 676:10

**EXHIBITS** [1] - 691:1

**exhibits** [7] - 501:13; 565:17; 582:8; 636:25; 668:23; 669:18; 674:18

**Exhibits** [24] - 502:7; 515:21; 570:5; 571:1; 582:6; 585:8, 24; 607:4; 608:24; 637:16; 668:20; 669:15, 21; 674:10; 675:10; 691:2, 5-6, 9, 13-14, 18, 21

**existing** [1] - 505:15

**exists** [2] - 555:8; 558:13

**exits** [1] - 499:24

**expect** [1] - 673:24

**experience** [1] - 573:1

**expert** [6] - 540:5; 647:19; 663:19; 664:2, 5, 12

**explain** [11] - 499:25; 504:19; 505:21; 506:9; 515:12; 534:5-8; 550:5; 648:2

**explained** [3] - 502:25; 533:5, 7

**explanation** [1] - 550:7

**expose** [1] - 662:16

**exposed** [2] - 679:4; 682:6

**extends** [1] - 513:23

**exterior** [1] - 666:25

**external** [1] - 662:11

**externally** [2] - 662:14, 21

**extra** [3] - 599:15, 17; 602:13

**extreme** [1] - 590:17

**extremities** [3] - 671:12; 672:8, 22

### F

**fabric** [1] - 511:7

**facade** [3] - 594:17; 597:3, 14

**face** [4] - 672:11, 22; 673:1

**facility** [3] - 550:14; 593:3; 597:19

**facing** [6] - 594:5; 623:2; 627:7; 628:11, 13

**fact** [13] - 507:6; 511:11; 533:16; 539:6, 18; 540:5; 542:21; 543:24; 560:11; 600:16; 620:24; 645:21; 673:21

**factor** [1] - 518:10

**factors** [1] - 522:10

**faculty** [1] - 660:2

**failed** [1] - 554:19

**fair** [3] - 557:20; 559:23; 598:7

**fairly** [6] - 551:22; 576:1; 585:14; 605:7; 621:20; 670:1

**falls** [1] - 496:25

**falsely** [1] - 541:24

**familiar** [3] - 558:8; 598:6; 624:9

**family** [5] - 500:24; 597:25; 598:2, 6; 662:6

**far** [9] - 514:11; 516:9, 11; 539:20; 564:13; 575:14; 629:7, 9

**fashion** [1] - 523:5

**FBI** [17] - 524:4; 526:2; 528:8; 534:18; 535:20, 24; 536:6; 550:14; 636:8; 642:24; 643:3; 644:6, 9; 646:1, 14, 20; 651:6

**features** [1] - 673:2

**February** [16] - 523:23; 524:1, 5, 13, 19; 525:4; 527:13, 23; 534:22; 535:14, 19; 536:4; 547:21; 548:12; 549:24

**Federal** [3] - 495:13, 21; 664:6

**federal** [3] - 539:10; 541:17; 663:24

**FEDEX'd** [1] - 646:1

**feds** [1] - 557:22

**feet** [3] - 498:8, 14; 630:5

**fellow** [2] - 556:5; 651:3

**felt** [2] - 540:18; 546:19

**ferro** [5] - 503:2, 4; 510:6, 11; 513:6

**few** [5] - 561:24; 565:14; 569:6; 570:10; 660:13

**fiber** [2] - 567:6; 636:7

**fibers** [2] - 635:25; 638:17

**field** [8] - 527:24; 528:1; 541:3; 628:25; 647:19; 659:24; 664:2, 13

**figured** [1] - 499:22

**file** [1] - 642:16

**filed** [1] - 570:22

**fill** [1] - 656:2

**film** [2] - 567:21; 638:4

**final** [1] - 518:9

**findings** [5] - 556:22; 662:17; 663:6; 680:13; 682:4

**fine** [1] - 595:2

**finger** [1] - 611:21

**fingerprint** [4] - 573:19, 23; 580:18; 638:10

**fingerprints** [7] - 567:6; 573:19; 580:16; 638:12; 665:24

**finish** [3] - 537:17; 657:18; 677:8

**fire** [1] - 608:8

**Fire** [3] - 664:24; 666:6, 8

**firearms** [1] - 611:7

**fired** [1] - 667:9

**first** [40] - 532:11; 538:1; 552:1; 565:4; 566:14; 568:20; 569:6; 571:10, 19; 572:10, 24; 579:25; 591:19; 593:18; 598:24; 599:4; 602:19; 603:3; 604:11; 616:4; 619:3; 622:21; 626:20; 628:1, 19, 21; 629:3; 634:19; 639:12; 640:4; 642:4; 647:15; 649:17; 654:17; 658:3; 662:2;

28

666:13, 24; 671:20

**Fisher** [1] - 684:18

**fishing** [2] - 666:9

**five** [8] - 545:10; 580:16; 618:6; 646:15; 660:18; 674:17

**five-day** [1] - 660:18

**fixed** [1] - 682:22

**flat** [1] - 521:19

**float** [1] - 678:24

**floating** [1] - 666:6

**flood** [1] - 542:1

**floor** [4] - 594:2, 19; 599:9

**Florida** [4] - 495:17; 578:18; 598:15; 611:4

**flow** [2] - 512:16, 20

**fluid** [5] - 503:2, 4; 510:6; 513:6; 663:3

**fluids** [1] - 510:11

**FLYNN** [52] - 495:14; 529:7; 541:10; 564:23; 566:2; 570:18, 25; 576:9, 14; 577:9; 584:14, 17; 585:18; 589:11; 591:5, 8; 618:24; 619:15; 630:21; 631:14, 17, 22; 633:12; 654:7, 12; 655:3; 664:4, 15, 17; 666:14; 667:22; 669:14, 23; 674:4; 675:5; 681:4, 7; 683:2; 684:4, 7, 12, 14, 18, 21, 23; 685:10, 15, 19; 687:9; 690:9, 14, 21

**Flynn** [2] - 582:13; 584:13

**focus** [5] - 592:15; 596:21; 609:25; 613:15; 650:11

**focusing** [2] - 524:13; 596:21

**folks** [3] - 500:16; 524:15; 688:23

**follow** [3] - 605:4; 606:8; 661:11

**followed** [1] - 598:13

**following** [11] - 496:3; 537:1; 542:24; 545:1; 546:1; 584:3; 603:1; 606:25; 684:1; 686:15; 688:1

**follows** [7] - 500:7; 565:6; 591:21; 619:5; 634:21; 649:19; 654:19

**foot** [2] - 617:16;

630:4

**football** [1] - 545:7

**forecasting** [1] - 686:19

**forehead** [3] - 677:1, 9, 16

**foreign** [2] - 638:17; 640:10

**forensic** [16] - 567:5; 635:20; 636:5; 657:14; 658:1, 19; 659:6, 21, 24; 660:7; 663:20; 664:2, 6, 13

**Forensic** [2] - 636:6; 657:15

**foresee** [1] - 686:13

**forever** [1] - 543:21

**form** [13] - 512:18; 518:15, 20, 24; 519:24; 520:16; 521:2; 522:7; 528:25; 530:7; 555:10; 647:25

**formation** [1] - 673:4

**formats** [1] - 507:4

**formerly** [1] - 502:2

**forms** [1] - 663:7

**forth** [3] - 564:2; 661:2; 674:25

**forward** [3] - 533:10; 676:23; 677:4

**foundation** [1] - 657:12

**four** [12] - 496:13; 599:16; 608:1, 16; 611:17; 637:11; 641:20; 648:15; 678:17; 679:5; 680:1; 681:24

**four-door** [1] - 637:11

**fourth** [3] - 622:10, 19; 628:8

**fractures** [2] - 678:2

**FRANK** [1] - 495:18

**freezer** [3] - 682:9, 11, 20

**frequencies** [2] - 515:11

**frequency** [11] - 516:7, 11-12, 16, 19; 518:15; 521:7; 608:7, 10, 17

**Friday** [1] - 688:5

**friends** [1] - 597:25

**frivolous** [1] - 541:8

**front** [24] - 569:20; 571:4; 572:15; 581:15; 582:4; 585:6; 586:2, 13, 18; 587:11; 589:24;

597:3; 612:22; 620:19; 621:10, 24; 623:3; 628:14; 629:12; 668:15; 671:2; 674:18; 677:1

**fuck** [1] - 561:7

**fucked** [2] - 557:22; 560:14

**fucking** [2] - 558:4; 561:3

**full** [2] - 596:12; 629:24

**fully** [2] - 599:14

**function** [2] - 529:21; 533:11

**functional** [1] - 532:20

**functioned** [1] - 529:23

**functioning** [2] - 529:25; 532:4

**future** [1] - 536:3

---

## G

**G-A-L-O-T-T-I** [1] - 526:17

**G-I-O-V-A-N-N-E-T-T-O -N-E** [1] - 565:10

**Gables** [1] - 495:17

**gain** [1] - 510:17

**Galotti** [1] - 526:17

**gals** [1] - 684:22

**game** [1] - 512:5

**gap** [3] - 505:6, 8, 14

**garage** [2] - 594:3; 607:17

**garages** [2] - 594:19

**Garden** [1] - 495:19

**Gargiulo** [2] - 525:15; 603:25

**gas** [1] - 673:3

**gates** [1] - 542:2

**gather** [1] - 662:2

**general** [2] - 567:2; 658:20

**generally** [3] - 625:17; 626:10; 688:5

**gentlemen** [5] - 545:3, 10; 561:13; 631:22; 669:23

**gently** [1] - 652:8

**Giovannettone** [29] - 564:24; 565:9; 566:3; 569:20; 571:4, 18; 573:7, 12; 574:10, 22; 575:4, 16; 576:17; 577:21; 578:11, 25;

579:12; 580:3, 24; 584:18; 586:1; 587:2, 14, 18; 588:1, 9, 22; 589:20; 591:1

**given** [4] - 538:1; 644:5; 660:16; 686:23

**glass** [7] - 503:12, 14; 635:25; 638:17; 641:21; 648:5; 680:1

**Glock** [3] - 601:22; 609:21; 612:3

**gloves** [2] - 652:3; 673:22, 25

**goddamn** [1] - 560:15

**Golf** [5] - 569:24; 573:13; 582:6; 585:8; 588:25

**Government** [5] - 495:12; 519:8; 570:5; 588:25; 672:13

**government** [37] - 515:15; 519:1; 529:9, 12; 531:17; 546:7; 561:15, 23; 564:23; 570:18; 576:9; 585:18; 589:11; 591:7, 14; 600:20; 603:8, 10; 604:22; 608:20; 614:6; 615:17; 616:20; 618:24; 631:14; 637:13; 640:24; 649:12; 651:18; 653:18; 654:12; 664:4; 666:20; 667:22; 669:14; 675:5; 681:6

**government's** [6] - 497:3; 499:11; 564:22; 604:24; 634:15; 654:6

**Government's** [102] - 502:7; 515:6, 21, 23; 519:6; 551:7; 552:7; 560:25; 569:24; 571:1, 6, 25; 572:16; 573:8, 13; 574:11, 18; 575:19; 576:10, 15, 17; 577:23; 578:12, 16; 579:1, 7, 13; 581:16; 582:6; 585:8, 19, 24; 586:1, 9, 12, 23; 587:10, 25; 588:7; 589:12, 18; 594:9; 600:21; 601:1, 4; 602:7; 607:4, 19; 608:24; 609:12, 18; 614:9; 621:12, 19; 622:13; 623:19; 624:21; 626:10; 627:20; 628:4; 630:25; 631:15, 20; 636:22; 637:16; 640:13; 641:2; 643:22; 652:19; 653:22; 666:20; 667:23;

668:1, 20; 669:10, 15, 21; 671:3, 22; 674:10; 675:10; 676:9; 691:2, 5

**gradually** [1] - 677:2

**graduate** [1] - 656:23

**graphic** [1] - 670:1

**Great** [2] - 664:24; 665:19

**green** [1] - 631:24

**grew** [1] - 679:16

**grooves** [2] - 507:1, 3

**ground** [2] - 594:2, 19

**grounds** [3] - 603:4, 15; 605:15

**group** [1] - 684:21

**Guard** [9] - 664:24; 665:12; 666:10; 670:10, 25; 671:19; 685:15

**guard** [1] - 630:14

**guess** [2] - 606:12; 653:17

**Gun** [1] - 611:3

**gun** [14] - 580:14; 599:25; 601:14; 602:1; 607:16; 611:1, 8; 612:5; 621:3; 622:2; 624:16; 626:17, 19

**guns** [1] - 613:8

**gunshot** [7] - 627:2, 10; 660:11; 675:23; 676:18, 20; 678:3

**guy** [4] - 541:2, 9; 617:18; 685:15

| H |
| --- |

**H-E-R-T-Z** [1] - 516:15

**hack** [1] - 507:9

**hair** [18] - 567:6; 580:12; 618:8; 623:1; 629:17; 636:7; 651:10; 676:15; 679:9, 11-13, 15-16; 680:17; 681:1

**hairdo** [1] - 617:20

**hairs** [8] - 635:25; 638:17; 641:20, 23; 642:10; 648:13, 15, 24

**half** [4] - 504:17; 564:8; 646:22

**Hamilton** [1] - 657:15

**hand** [16] - 516:10; 532:1, 4; 542:10; 555:2; 563:21; 577:22; 578:19; 590:7, 17; 628:15; 631:23; 640:8; 641:19

**hand-held** [7] - 532:1, 4; 542:10; 555:2;

563:21; 641:19

**handcuffs** [1] - 580:15

**handed** [1] - 652:5

**Handed** [20] - 501:19; 515:4; 518:22; 551:8; 559:1; 562:5; 599:20; 601:5; 602:9; 607:24; 612:11, 15; 613:16; 636:24; 639:17; 640:16; 642:3; 643:25; 645:5; 652:20

**handing** [2] - 630:24; 674:8

**handle** [1] - 555:3

**handled** [2] - 511:5; 554:5

**handling** [6] - 511:7, 11, 17-18; 541:21; 635:23

**handwritten** [2] - 551:14; 633:9

**hard** [2] - 677:12; 685:6

**harm** [1] - 604:21

**HARRY** [1] - 495:20

**Harry** [1] - 530:13

**Hauppauge** [1] - 670:16

**head** [36] - 504:22; 505:6, 14; 506:2, 15, 17-18, 20, 23; 513:17; 514:3-7, 12, 14; 520:9; 521:22, 25; 522:14; 528:17; 629:25; 675:24; 676:5, 14, 21; 677:6

**heads** [2] - 506:17; 686:23

**heads-up** [1] - 686:23

**headset** [2] - 631:23, 25

**health** [1] - 659:5

**hear** [15] - 510:21; 511:3, 9, 17; 530:3, 10; 538:22; 540:15; 544:16; 560:25; 603:24; 631:9; 632:5; 684:5

**heard** [21] - 508:25; 509:6, 10; 512:12; 518:14; 519:16; 522:24; 523:2; 525:8; 555:24; 557:22; 558:1; 560:23; 561:17; 604:14; 627:2, 9-10; 632:3, 25

**hearing** [4] - 520:19, 25; 524:18

**hearings** [1] - 536:5

**hearsay** [1] - 557:3; 560:10

**heart** [7] - 520:16, 21-22; 662:20, 22-23, 25

**heavier** [1] - 630:4

**heavy** [1] - 677:14

**height** [4] - 617:8, 13; 618:2; 630:2

**held** [8] - 532:1, 4; 542:10; 555:2; 563:21; 627:15; 641:19

**help** [4] - 515:13; 522:7, 18; 591:2

**helped** [2] - 620:9; 667:1

**helps** [1] - 601:10

**hertz** [8] - 516:15, 20, 24; 517:1, 17

**hi** [1] - 655:5

**hidden** [1] - 672:12

**high** [12] - 516:12; 518:19, 23; 519:24; 520:15; 521:2; 522:7; 528:14; 597:24; 629:6; 674:2

**high-top** [1] - 674:2

**higher** [3] - 514:5; 629:6; 672:3

**highly** [2] - 539:21; 604:20

**Highway** [1] - 670:17

**himself** [1] - 540:6

**history** [2] - 662:2; 682:4

**hit** [1] - 516:22

**hits** [1] - 648:4

**hold** [3] - 641:5; 642:16; 644:2

**holder** [2] - 642:6, 10

**holding** [2] - 627:13; 629:2

**holes** [6] - 667:4, 8, 12, 15, 17

**holster** [1] - 580:14

**holy** [1] - 561:7

**home** [1] - 684:10

**Homicide** [1] - 568:23

**homicide** [9] - 573:24; 643:7, 13; 644:1; 650:9; 653:5; 659:2; 661:6, 21

**homicides** [1] - 661:17

**honest** [1] - 686:11

**Honor** [50] - 501:14, 25; 502:11, 20; 508:12; 510:18; 529:15; 535:7; 542:3; 558:21; 561:21;

564:18, 23; 565:12; 570:25; 576:9, 14; 584:14; 591:5; 599:18; 610:7; 616:18, 24; 618:20, 24; 630:21; 631:14, 18; 633:18; 634:4; 637:19; 649:5, 7; 654:7, 12; 664:4, 10, 15; 669:19; 674:4; 675:5, 8; 681:4, 7; 684:16, 21; 685:16; 686:7, 9, 25

**HONORABLE** [1] - 495:9

**horizontal** [5] - 504:16; 508:3; 513:20; 521:7, 10

**Horse** [1] - 614:3

**Hospital** [1] - 657:3

**hospital** [9] - 520:17, 21; 657:2; 658:13, 17-18, 21, 25; 661:8

**hospitals** [1] - 658:8

**hour** [3] - 513:8; 558:16, 18

**hour's** [1] - 564:8

**hours** [2] - 636:9; 685:11

**housed** [2] - 504:8; 622:17

**housing** [17] - 526:23; 533:17, 21-22, 25; 534:16; 535:2-4, 16, 20, 22; 552:23; 553:1, 7

**hundred** [1] - 660:13

**hundredth** [1] - 503:19

**hung** [1] - 633:4

| I |
| --- |

**idea** [1] - 646:10

**Identification** [5] - 601:3; 630:25; 636:22; 640:12; 642:1

**identification** [12] - 515:2; 550:15; 569:23; 575:18; 580:23; 582:5; 585:7; 588:25; 613:12; 666:19; 668:20; 674:10

**identified** [9] - 577:10, 22; 602:18; 615:18; 651:19; 665:18, 21

**identify** [8] - 517:19; 522:19; 537:23; 578:15; 589:8; 601:10; 637:1; 667:17

**identifying** [5] - 590:5, 15; 666:25;

667:2, 16

**identity** [1] - 574:25
**illicit** [1] - 659:3
**immediate** [1] - 668:6
**immediately** [2] - 605:3; 688:18
**impact** [1] - 677:11
**important** [3] - 662:17; 682:8; 688:8
**importantly** [1] - 514:14
**improper** [1] - 529:25
**improved** [1] - 562:24
**improvement** [1] - 562:23
**in-between** [2] - 503:18; 567:22
**inability** [1] - 498:24
**inch** [4] - 503:17, 19; 676:6, 25
**inches** [1] - 504:6
**incidents** [1] - 603:7
**incisions** [1] - 662:15
**inclined** [1] - 497:12
**included** [1] - 643:15
**includes** [1] - 508:20
**including** [2] - 554:13; 602:14
**incumbent** [1] - 497:6
**independent** [1] - 550:14
**INDEX** [1] - 690:1
**indicate** [3] - 610:19; 621:25; 671:15
**indicated** [6] - 507:19; 508:22; 542:9; 581:18; 617:5; 622:9
**indicating** [10] - 503:7; 511:18; 513:15, 21; 514:1; 574:8; 578:9; 590:3; 627:24; 629:5
**indicating)** [6] - 514:18; 616:7; 622:7; 627:15; 628:13; 629:4
**indication** [2] - 508:6; 542:12
**indicators** [1] - 517:18
**indictment** [2] - 685:25; 686:2
**individual** [22] - 503:18; 546:5; 569:7; 581:1; 584:25; 613:5; 623:12, 15; 626:19; 627:12; 628:1, 20; 629:2; 630:3, 7; 644:4;

648:6; 650:25; 651:7; 665:16, 18; 668:5
**individuals** [5] - 556:16; 625:18; 643:12; 656:1; 659:1
**indoor** [1] - 611:1
**Indoor** [1] - 611:3
**industry** [1] - 556:15
**inflammatory** [1] - 605:6
**influence** [1] - 688:17
**Information** [3] - 620:1, 5; 621:17
**information** [25] - 503:22; 505:7, 9; 506:2, 20, 23; 509:19; 510:16; 513:18, 24; 514:5, 7, 9, 20; 515:8, 10; 519:25; 520:24; 521:6, 24; 662:8; 682:7, 19, 23
**informing** [1] - 605:18
**initial** [1] - 675:12
**initialed** [1] - 607:12
**initials** [5] - 631:7; 640:23; 642:8; 644:2; 674:25
**injuries** [3] - 677:22, 24
**injury** [1] - 662:13
**ink** [1] - 674:24
**inlet** [1] - 666:8
**inquire** [3] - 496:18; 502:14; 584:13
**inquiry** [3] - 497:24; 542:22; 543:13
**inscribed** [1] - 672:10
**inscription** [1] - 673:8
**insert** [1] - 553:19
**inserts** [2] - 553:23, 25
**inside** [11] - 581:25; 593:13; 599:13; 623:7, 11; 627:8; 640:18; 651:24; 652:7; 665:14; 667:10
**inspection** [2] - 503:11; 662:11
**instance** [2] - 510:21; 560:24
**instances** [1] - 656:15
**instead** [1] - 600:6
**Institute** [1] - 657:15
**instructed** [5] - 531:5; 602:21; 603:13; 605:3; 652:6

**instruction** [1] - 604:21
**instructions** [3] - 569:14, 16; 605:5
**instruments** [1] - 647:16
**insure** [2] - 505:12; 528:15
**insures** [1] - 556:16
**insuring** [1] - 533:9
**intact** [3] - 532:12; 551:15; 553:8
**integral** [1] - 532:13
**intelligibility** [1] - 562:24
**intensity** [2] - 521:10; 522:11
**intention** [1] - 603:3
**interest** [1] - 539:25
**interim** [1] - 497:10
**interior** [6] - 585:15; 638:16, 22; 640:2, 6, 11
**intermittently** [2] - 498:3, 16
**internal** [1] - 662:16
**internally** [1] - 662:21
**introduced** [1] - 605:24
**invaluable** [1] - 661:16
**investigating** [2] - 593:2; 595:5
**investigation** [12] - 541:17, 25; 542:22, 25; 546:9; 568:10; 592:21, 23; 593:1; 612:8; 618:16; 643:8
**Investigation** [1] - 635:19
**investigations** [1] - 656:13
**investigators** [3] - 661:19; 662:4; 665:5
**invoice** [5] - 601:13, 16; 608:4; 652:15
**involved** [3] - 540:14; 548:10; 660:11
**iota** [1] - 540:25
**Iowa** [1] - 656:21, 24-25; 657:1, 3, 8
**Iron** [1] - 614:3
**Island** [5] - 568:3; 571:10; 664:25; 666:6, 8
**Islip** [3] - 495:5, 13,

22
**issue** [3] - 498:11; 532:22; 539:8
**issued** [2] - 566:6; 619:19
**issues** [1] - 496:6
**item** [6] - 517:14; 573:22; 641:10; 666:18, 22; 667:2
**items** [18] - 570:24; 580:8, 20; 590:2; 596:10, 13, 15-16, 19; 598:19, 22; 607:2, 23; 608:5; 674:8, 13, 20; 675:1
**itself** [14] - 503:4, 12; 504:7; 511:22; 520:5, 11; 553:23, 25; 562:17; 613:15; 640:9; 646:4; 662:23

---

**J**

**Jack** [2] - 591:15, 25
**jacket** [3] - 615:16; 629:17; 651:17
**jacketed** [2] - 681:13, 18
**jacketing** [2] - 677:11, 13
**jacks** [1] - 497:10
**jam** [1] - 533:10
**JAMES** [1] - 495:14
**jammed** [2] - 534:17, 24
**jamming** [1] - 535:23
**January** [8] - 525:6, 10; 526:10; 527:6; 548:14; 549:4; 562:11; 563:6
**jeans** [3] - 671:13; 672:7; 674:1
**Jeep** [1] - 632:5
**Jericho** [5] - 575:25; 590:23; 591:3; 614:2; 620:6
**JK** [1] - 607:9
**JK-11** [4] - 612:10, 14; 613:21; 614:20
**JK-22** [3] - 602:7; 607:5; 691:14
**JK-22-A** [2] - 607:5; 691:14
**JK-24** [4] - 602:7, 10; 607:4; 691:13
**JK-24-A** [3] - 602:7; 607:5; 691:13
**JK-25** [1] - 607:19
**JK-25-A** [3] - 608:21,

13

24; 691:14

**JK-30** [5] - 613:12, 14; 614:7, 9; 691:16

**JOANNA** [1] - 495:9

**job** [8] - 507:9; 558:5; 619:23; 636:2, 9; 639:24; 657:4; 658:16

**jog** [1] - 559:8

**jogging** [1] - 674:2

**joint** [1] - 536:6

**Judge** [8] - 509:20; 515:18; 538:13; 546:15; 547:6; 552:16; 559:12; 687:9

**judgment** [1] - 549:24

**Julius** [2] - 575:3; 626:4

**July** [4] - 643:5; 650:12, 19, 21

**jump** [1] - 561:2

**jumping** [1] - 497:10

**June** [27] - 568:1, 15, 21; 570:13; 571:10; 573:10; 574:24; 575:5; 576:3; 579:10; 580:9; 589:9; 595:10; 602:1; 617:10; 620:12, 15; 621:21; 626:16; 631:12; 632:4; 636:10; 638:1; 645:19, 23

**juror** [6] - 496:6, 10, 21; 497:14; 499:24

**JUROR** [14] - 497:17, 22, 25; 498:4, 7, 12, 17, 21, 25; 499:3, 6, 9, 18, 21

**JURORS** [1] - 500:18

**jurors** [12] - 496:12, 19; 498:20; 499:17; 500:1, 20; 553:12; 586:16; 587:2; 688:10, 19

**jury** [47] - 496:4; 500:13; 502:14, 22; 505:22; 513:25; 515:5; 531:5; 544:1, 15; 545:8; 546:2; 547:13, 15; 551:22; 552:12, 20; 576:21; 578:15; 582:17; 584:4, 8-9; 587:14; 590:1; 602:21; 603:13; 604:16; 605:3, 12; 621:25; 631:17; 633:24; 634:11; 637:18; 641:6, 9; 656:17; 661:25; 670:22; 684:10; 685:25; 686:8, 21; 688:25

**jury's** [1] - 604:6

## K

**K-E-N-N-E-D-Y** [1] - 619:11

**keep** [4] - 541:10; 569:3; 622:6; 688:20

**Kennedy** [20] - 591:15, 25; 592:6; 602:3; 607:18; 609:10; 615:18; 618:25; 619:10, 16, 22; 621:10; 623:17; 624:13; 627:18; 630:24; 631:25; 632:3, 18; 634:9

**Kenneth** [3] - 501:2; 538:1; 568:12

**key** [4] - 509:24; 516:14, 17; 530:4

**keyboards** [1] - 516:14

**keys** [3] - 516:9; 580:13

**killers** [6] - 602:18; 604:8, 12, 14, 17, 20

**kind** [20] - 515:9; 521:18; 551:17; 593:5; 604:22; 617:16; 624:11; 629:22; 630:15; 632:17; 636:14; 642:17; 656:4; 657:18; 659:5; 662:9, 15; 666:9; 674:2; 681:3

**kinds** [1] - 566:20

**kitchen** [5] - 587:5, 7, 16; 588:3, 12

**Klein** [1] - 672:10

**KM** [2] - 519:6; 691:7

**KM-1** [15] - 502:1, 7; 504:7; 522:4; 524:10, 21, 24; 526:1; 533:25; 534:3; 551:20; 554:4; 555:3; 560:23; 691:5

**KM-1-B** [12] - 504:8; 514:22; 522:5; 524:9, 25; 532:7; 535:10; 548:13; 551:20; 554:4; 555:4; 560:23

**KM-10** [4] - 551:7; 552:1, 7; 691:8

**KM-2** [3] - 501:18; 502:7; 691:5

**KM-3** [5] - 501:18; 502:8; 507:18; 519:8; 691:5

**KM-4** [4] - 501:18; 502:8; 512:24; 691:5

**KM-5** [2] - 544:2; 563:3

**KM-6** [6] - 515:2, 6, 16, 21, 23; 691:6

**KM-7** [2] - 515:21; 691:6

**KM-8** [2] - 515:22; 691:6

**KM-9** [5] - 518:21, 23; 519:2, 20

**knees** [1] - 671:13

**knowledge** [8] - 532:17; 534:14; 555:20; 570:15; 590:22; 609:23; 625:8; 647:12

**known** [4] - 592:24; 597:25; 604:17, 19

**knuckles** [2] - 616:6, 16

**Koch** [1] - 684:19

## L

**lab** [7] - 550:14; 646:14; 647:6; 680:23, 25; 681:1, 16

**label** [3] - 600:4; 674:22

**labeled** [3] - 600:5; 608:2, 6

**labels** [1] - 674:21

**laboratory** [15] - 520:3; 635:20, 22; 636:8; 643:3; 645:16, 19; 646:1; 657:4; 658:13, 21; 659:21; 663:4; 677:20; 680:22

**lack** [1] - 656:6

**ladies** [4] - 545:3; 561:13; 631:22; 669:23

**Lamura** [1] - 568:11

**LAMURA** [1] - 568:11

**large** [5] - 503:9; 569:1; 641:19; 645:25; 665:12

**laser** [6] - 589:24; 590:6, 15; 621:24; 628:3

**last** [11] - 499:8; 523:12; 553:5; 561:24; 604:13; 607:3; 617:10, 12; 635:2; 654:24; 686:9

**late** [1] - 685:4

**latent** [2] - 638:9

**latest** [1] - 686:16

**latex** [1] - 652:3

**latitude** [1] - 541:20

**law** [3] - 603:13; 642:20; 643:19

**lawyer** [1] - 605:22

**lawyers** [1] - 497:19

**laying** [4] - 571:16; 572:21, 23; 599:8

**lead** [1] - 677:14

**leading** [4] - 509:21; 569:1; 574:21; 586:10

**least** [5] - 556:16; 605:7; 646:15; 678:19; 679:3

**leave** [3] - 496:24; 497:4; 593:14

**leaves** [5] - 507:6; 545:8; 564:20; 582:17; 591:12; 633:17, 24; 654:4

**leaving** [1] - 597:19

**left** [31] - 496:13; 505:2, 10; 513:23; 516:10; 519:25; 520:4, 7, 9, 13-14, 19; 521:4, 10-11; 590:6; 594:22; 622:11; 628:15; 641:24; 646:5; 649:2; 668:16, 18; 672:5; 676:6, 25; 677:5, 10; 688:25

**left-hand** [3] - 516:10; 590:7; 628:15

**lens** [1] - 648:7

**lesion** [2] - 676:15, 17

**less** [1] - 671:11

**letter** [2] - 497:7; 552:24

**level** [3] - 522:11; 594:20; 629:6

**levels** [1] - 682:6

**license** [2] - 614:17; 633:1

**licensed** [1] - 659:10

**lid** [2] - 665:13; 671:11

**lied** [1] - 540:8

**lifestyle** [1] - 497:21

**lift** [2] - 580:18; 640:10

**lifts** [1] - 580:17

**light** [17] - 641:18, 22, 25; 647:25; 648:1, 3-6, 9-10, 24; 649:2

**lighting** [2] - 640:4

**likely** [1] - 678:20

**line** [7] - 507:25; 508:3; 513:20; 540:2; 597:6; 611:22; 656:7

**lines** [8] - 504:16; 505:5, 22; 506:4; 507:1; 508:4; 521:12; 668:12

**lint** [1] - 640:8

**liquid** [1] - 503:3

**listed** [1] - 610:4

**listen** [11] - 512:1, 13; 520:18; 558:3; 561:1, 3; 608:8, 11, 19; 688:13
**listened** [4] - 503:21; 556:17; 631:3, 8
**listening** [5] - 496:22; 511:15, 22; 512:3; 518:13
**litigated** [1] - 604:3
**living** [2] - 581:22; 655:10
**loaded** [3] - 599:15; 666:12
**locate** [1] - 566:22
**located** [5] - 526:22; 553:24; 620:5; 670:16; 671:12
**location** [11] - 570:9; 575:10; 578:22; 592:24; 593:6, 8; 595:11, 14; 626:11; 680:18, 20
**lock** [3] - 599:2; 630:14; 653:6
**locksmith** [2] - 598:24
**log** [1] - 652:15
**logistical** [1] - 685:24
**look** [52] - 496:22; 502:17; 508:6, 15; 510:11; 512:9; 514:17; 515:10; 517:5, 18; 522:11, 13; 538:5; 539:12; 551:9; 558:11, 16; 559:16, 19; 569:19, 22; 570:1; 585:5; 593:9-11, 16, 21; 594:24; 595:15; 596:6, 23; 599:2, 22; 627:14; 637:1; 639:18; 640:4, 17; 642:4; 652:21; 662:22; 668:24; 672:21; 686:11
**look-see** [10] - 593:9-11, 16, 21; 594:24; 595:15; 596:6; 599:2
**looked** [17] - 521:5; 556:17; 575:5; 617:16; 621:5; 622:20; 624:15; 625:1; 626:19; 628:19, 21; 641:18; 647:15; 663:1; 668:12; 681:13
**looking** [47] - 502:23; 504:5, 12, 23; 507:18; 509:5, 16-17; 511:3, 13; 513:2; 515:24; 516:6, 19; 517:2;

519:23; 520:25; 522:3; 571:13; 572:1; 573:16; 574:17; 576:21; 579:6; 586:8, 16; 587:3; 588:2, 8; 590:2; 594:10; 599:7; 609:25; 618:8; 627:22; 628:15; 637:24; 638:22; 662:11; 671:9, 11, 25; 672:4; 674:21; 676:12
**looks** [2] - 514:15; 667:9
**LORETTA** [1] - 495:12
**lost** [1] - 670:24
**Louis** [10] - 581:20; 584:25; 611:11, 13; 612:5; 665:22; 667:18; 669:10; 670:3; 675:2
**low** [1] - 516:10
**lower** [4] - 504:17; 671:12; 672:7, 11
**lowest** [1] - 516:14
**lump** [1] - 658:15
**lunch** [3] - 582:14; 584:18
**Luncheon** [1] - 582:19
**LWK-1** [4] - 630:25; 631:15, 20; 691:17
**lying** [1] - 577:7
**LYNCH** [1] - 495:12
**Lynn** [2] - 618:25; 619:10
**LYNN** [1] - 619:10

## M

**machine** [5] - 506:12; 520:3; 531:14; 554:2; 555:4
**magnetic** [27] - 501:21; 502:25; 503:3, 5, 13; 504:25; 505:1, 7; 506:1; 507:12, 14-15; 509:18, 23; 510:1, 5, 25; 513:5; 518:14, 25; 521:1; 522:15
**magnified** [1] - 504:12
**magnifier** [1] - 641:19
**magnifying** [1] - 648:5
**magnum** [1] - 681:19
**mailed** [1] - 646:16
**main** [5] - 530:3; 575:6; 590:20; 622:10, 14
**maintain** [1] - 542:6
**major** [1] - 677:18
**majoring** [1] - 656:20

**majority** [1] - 632:17
**malignant** [1] - 658:15
**man** [10] - 620:16; 621:2; 622:22, 24; 626:16; 627:7; 630:5, 9
**management** [2] - 546:19; 547:5
**manager's** [1] - 594:23
**manner** [1] - 678:1
**manual** [1] - 567:11
**marble** [1] - 668:13
**marbling** [1] - 668:10
**March** [1] - 536:4
**mark** [3] - 514:18; 552:3; 560:16
**marked** [28] - 515:2; 567:16; 569:22; 571:24; 575:18; 576:12; 582:5; 585:7; 588:24; 599:21; 601:3, 15; 602:6; 607:19; 609:11; 613:11, 14; 630:24; 636:21; 637:23; 640:12; 642:1, 10; 645:3; 652:18; 666:19; 668:20; 674:9
**marker** [2] - 571:17; 572:8
**marking** [1] - 551:6
**markings** [3] - 551:14; 573:20
**marks** [8] - 503:10, 15, 18; 506:1; 560:12; 573:22; 666:25
**maroon** [2] - 622:23; 623:5
**Marr** [23] - 497:1; 500:2; 501:2, 10, 18; 502:19, 22; 523:23; 538:1; 539:7, 23; 540:3; 541:21; 542:8; 546:10; 547:14, 19, 21; 551:3; 552:15, 19; 564:3, 8
**Marr's** [3] - 539:5; 546:24
**marshals** [1] - 684:25
**mask** [7] - 629:16, 18-19, 22, 24
**matched** [2] - 522:15; 599:7
**material** [16] - 511:8; 530:15; 607:15; 640:10; 641:14; 642:20; 643:19; 644:8; 652:21; 667:7; 677:11, 13; 680:18, 21-22; 681:1
**materials** [1] - 645:10

**matter** [2] - 533:16; 603:25
**MC** [3] - 535:2
**MD** [1] - 657:9
**ME's** [1] - 660:21
**mean** [9] - 511:12; 512:8; 515:12; 516:7; 523:12; 538:4, 12; 560:10; 661:7
**meaning** [2] - 508:5; 661:5
**means** [3] - 511:7; 538:5; 549:8
**measurement** [2] - 516:8, 16
**mechanic** [1] - 498:17
**mechanical** [1] - 495:24; 517:11, 13
**mechanism** [3] - 532:13, 15; 554:3
**medal** [1] - 673:7
**media** [2] - 688:14
**Medical** [8] - 655:12, 21; 660:6, 15; 664:20; 670:4, 14; 673:11
**medical** [23] - 498:10; 655:11, 13, 15, 22; 656:1, 3, 7, 10, 16; 657:7, 19, 25; 658:5; 659:13, 17; 660:8, 14, 23; 661:14, 21; 663:14; 680:24
**medicine** [1] - 659:10
**Medicine** [1] - 657:8, 15
**meet** [1] - 529:12
**meeting** [6] - 524:10, 15; 525:11; 527:15; 568:22; 660:25
**Mel** [2] - 558:3; 561:1
**member** [2] - 566:11; 592:9
**members** [7] - 500:24; 502:22; 505:21; 552:20; 568:7; 643:8; 662:6
**memory** [2] - 559:9; 616:11
**men** [1] - 625:25
**mention** [1] - 688:9
**mentioned** [7] - 503:24; 507:13; 517:9; 570:19; 602:3; 681:23; 682:5
**mentioning** [1] - 676:19
**met** [1] - 666:9
**metal** [2] - 553:25;

16

677:12

**method** [1] - 515:10

**Methodist** [1] - 657:3

**Michael** [2] - 643:16; 649:24

**microcassette** [27] - 504:10; 514:21; 520:2; 526:19, 21; 527:5; 528:13, 24; 530:19; 531:11; 532:6, 12, 18; 533:14; 534:1; 535:15; 537:24; 547:23; 548:3; 551:13, 17; 552:23; 553:1; 554:4; 562:18; 564:14

**microphone** [9] - 511:6, 9, 19; 565:8; 591:23; 619:8; 634:23; 649:22; 654:21

**microscope** [12] - 503:20; 510:7, 12; 513:7; 636:5; 641:18, 22, 25; 647:25; 648:5, 12; 663:1

**microscopy** [7] - 648:1, 3, 9-10, 24; 649:3

**mid** [1] - 633:21

**mid-afternoon** [1] - 633:21

**middle** [5] - 590:6; 592:16; 673:24; 688:6

**midway** [2] - 508:3; 590:7

**might** [16] - 510:25; 511:2; 512:11; 517:16; 542:11; 616:23; 638:18; 640:6; 644:4; 659:8; 670:22-24; 679:15; 686:10

**miles** [1] - 666:7

**Miller** [2] - 684:15; 685:10

**millimeter** [9] - 566:21; 567:4, 11; 599:14, 16-17; 601:7; 610:5; 611:24

**mind** [2] - 604:6; 688:20

**Mini** [2] - 592:24; 613:6

**minor** [1] - 658:17

**minute** [3] - 521:5; 537:17; 644:2

**minutes** [15] - 500:11; 509:3, 6; 512:13; 513:8; 522:24; 523:12; 545:4, 10; 558:17;

563:16, 19, 23; 633:25

**Miskiewicz** [5] - 524:17; 538:22; 542:4; 543:11; 606:14

**MISKIEWICZ** [99] - 495:14; 497:4; 499:12; 500:11; 501:6, 9, 14, 16, 25; 502:6, 11; 508:12, 14; 510:18; 515:15; 519:1; 523:18; 529:11; 530:7, 20, 25; 536:1, 8; 538:13, 25; 540:20; 541:13; 542:15, 18; 543:4, 9, 12; 544:6, 12; 547:6; 549:16; 550:13, 17; 551:2, 25; 552:9, 12; 555:12; 558:20; 559:14; 561:20, 24-25; 563:9; 564:4, 6, 10, 18; 565:17; 591:14; 592:4; 599:18; 600:20; 605:2; 606:15; 608:20, 23; 609:17; 610:6, 11; 614:6; 615:17; 616:17, 21; 618:20; 634:10, 16; 635:6; 637:13, 18; 640:24; 641:5; 644:18; 649:7, 12; 650:4; 651:18; 653:18, 21, 24; 684:17, 25; 685:23; 686:3, 7, 14, 20, 24; 687:8; 690:4, 6, 11, 16, 19

**misrepresentation** [1] - 542:19

**miss** [2] - 648:23, 25

**missed** [2] - 671:15; 685:13

**missing** [2] - 500:20; 608:3

**misspoke** [1] - 650:20

**misstated** [1] - 555:13

**misstatements** [1] - 539:22

**mistrial** [2] - 604:25; 605:10

**mixed** [2] - 648:19

**mode** [1] - 506:16

**model** [4] - 599:14; 601:23; 609:21; 612:3

**Moines** [1] - 656:21

**moment** [25] - 508:16; 536:10; 538:23; 558:20; 561:20; 562:2; 565:1, 12; 570:1; 591:5; 610:6, 12; 614:21; 616:17, 23; 633:19; 637:1; 638:23; 654:7;

666:16; 668:24; 673:20; 674:12; 681:4; 689:3

**moments** [2] - 569:6; 570:11

**Monday** [6] - 684:13; 685:4; 686:15; 688:23; 689:2, 5

**monitor** [3] - 520:16, 21; 532:11

**mono** [1] - 520:5

**month** [4] - 525:10; 615:22; 664:20, 23

**months** [5] - 523:9, 14; 551:18; 580:24; 611:17

**moreover** [1] - 605:14

**morning** [23] - 496:5; 500:16, 18; 501:10; 566:3; 568:7; 573:10; 574:24; 575:5, 10; 579:10; 620:15; 622:20; 624:5; 625:2; 631:12; 655:4; 660:25; 665:10

**Mossberg** [2] - 599:14; 601:22

**most** [11] - 514:14; 529:20; 560:14; 625:20; 655:12; 658:6, 8; 668:6; 672:12; 673:21; 679:9

**mother** [1] - 598:14

**motion** [6] - 539:2; 541:1; 602:23; 604:25; 605:10

**motions** [2] - 570:22; 605:20

**motivation** [1] - 603:11

**motor** [1] - 566:14

**Motorcycle** [1] - 614:3

**motors** [1] - 528:15

**mount** [1] - 642:16

**mounted** [2] - 641:21, 24

**mouth** [1] - 652:7

**move** [5] - 501:25; 552:1; 579:19; 602:20; 609:12

**moved** [1] - 677:2

**moves** [18] - 515:15; 519:1; 570:18; 576:9; 585:18; 589:11; 600:20; 608:20; 614:6; 631:14; 637:13; 640:24; 651:18; 653:18; 664:4; 667:22; 669:14; 675:5

**moving** [3] - 559:14; 622:11

**MR** [239] - 496:20; 497:4; 499:12, 14; 500:11; 501:6, 9, 14, 16, 25; 502:4, 6, 11; 508:12, 14; 509:20; 510:18; 512:18; 515:15, 18; 519:1, 3; 523:18, 22; 529:7, 11; 530:7, 11, 20, 25; 531:1, 4; 534:8, 11; 535:7; 536:1, 8; 537:5, 8, 16, 18; 538:3, 13-14, 20, 25; 540:17, 20-21; 541:10, 13; 542:15, 18; 543:4, 9, 12, 17, 22; 544:3, 6, 8, 12, 14; 546:15; 547:6, 12, 20, 24; 548:2; 549:16; 550:13, 17, 21; 551:2, 25; 552:4, 9, 12, 16; 555:10, 12; 557:3; 558:20; 559:12, 14, 18; 561:20, 24-25; 563:9, 11, 14; 564:6, 10, 18, 23; 565:12, 14, 17; 566:2; 570:18, 21, 25; 576:9, 11, 14; 577:9; 584:14, 17; 585:18, 22; 589:11, 13, 16; 591:5, 8-9, 14; 592:4; 599:18; 600:20, 23; 602:20, 23; 603:5, 18, 22, 24; 604:10, 15; 605:1, 18, 21; 606:6, 15; 608:20, 23; 609:17; 610:6, 11; 614:6; 615:17; 616:17, 21, 23; 617:4; 618:18, 20, 24; 619:15; 630:21; 631:14, 17, 22; 633:12, 15, 18; 634:1, 10, 16; 635:6; 637:13, 18; 640:24; 641:5; 644:18, 20; 645:2; 649:4, 7, 12; 650:4; 651:18; 653:18, 21, 24; 654:1, 7, 12; 655:3; 664:4, 10, 15, 17; 666:14; 667:22; 669:14, 19, 23; 674:4; 675:5, 8; 681:4, 7, 11; 682:25; 683:2; 684:4, 7, 12, 14, 17-18, 21, 23, 25; 685:8, 10, 15, 18-19, 23; 686:3, 7, 11, 14, 20, 24-25; 687:8; 690:4-7, 9, 11-12, 14, 16-17, 19, 21

**Mulligan** [7] - 597:18, 20, 22; 598:6, 10;

613:3; 617:5
**Mulligan's** [1] - 617:13
**multiple** [1] - 522:5
**murder** [4] - 568:3; 589:6; 590:4; 665:2
**murdered** [1] - 620:16
**muscle** [1] - 662:23
**muscular** [2] - 617:17; 618:7
**music** [2] - 521:15; 555:5
**Muttontown** [1] - 568:2

### N

**N.Y** [1] - 495:5
**name** [19] - 526:16; 565:8; 569:7; 584:25; 591:24; 600:5; 611:6; 619:9; 634:24; 635:2; 649:23; 653:3; 654:22-24; 674:25; 685:14
**named** [1] - 643:16
**narrow** [2] - 516:6; 518:18
**Nassau** [23] - 566:11, 19, 25; 568:7; 592:1, 7, 9; 595:5; 608:12, 14; 635:1, 8, 15, 19; 643:13; 645:22; 647:1, 6; 650:7, 13; 651:7; 653:4; 660:4
**natural** [1] - 659:9
**nature** [2] - 593:13; 678:10
**near** [2] - 664:24; 679:12
**neater** [1] - 686:5
**necessarily** [1] - 511:2
**necessary** [1] - 539:18
**neck** [2] - 673:6
**need** [7] - 505:12; 508:9, 11; 565:15; 604:10; 634:3; 637:10
**needed** [2] - 596:10; 608:4
**needs** [1] - 505:15
**negate** [1] - 606:20
**negative** [1] - 679:23
**negligently** [1] - 541:21
**negotiate** [2] - 625:14, 19
**neighborhood** [4] - 516:15, 24; 517:16;

523:9
**never** [3] - 529:4; 544:7; 682:2
**new** [5] - 506:20; 514:7; 535:1; 686:8
**NEW** [1] - 495:1
**New** [14] - 495:13, 19, 22; 527:24; 528:1, 8; 535:5; 549:5; 570:12; 605:7; 636:20; 650:23; 659:11; 664:25
**newspapers** [1] - 604:12
**next** [19] - 534:15; 536:12; 564:22; 571:17; 574:20; 580:19; 591:11; 593:23; 594:19; 597:16; 602:25; 627:9; 634:15; 649:11; 654:6; 683:7; 686:15
**nice** [3] - 500:16; 582:15; 665:10
**night** [2] - 499:2; 637:25
**nine** [15] - 574:6; 599:14, 16-17; 601:7; 610:5; 611:24; 630:20; 631:10; 632:3, 12, 22; 633:4; 647:5
**NO** [14] - 497:17, 22, 25; 498:4, 7, 12, 17, 21, 25; 499:3, 6, 9, 18, 21
**non** [4] - 504:3; 549:14, 22; 688:10
**non-continuous** [2] - 549:14, 22
**non-designated** [1] - 504:3
**non-jurors** [1] - 688:10
**normal** [3] - 566:24; 567:12; 580:4
**normally** [2] - 510:3; 661:25
**north** [1] - 670:17
**Northeastern** [1] - 636:6
**notable** [1] - 673:21
**notably** [1] - 679:9
**notation** [1] - 508:8
**notations** [3] - 610:1; 679:7
**note** [22] - 497:7, 18; 498:22; 507:22; 510:17, 23; 516:22; 554:5; 582:13; 596:20; 598:17, 19; 601:20; 614:5, 12;

616:1; 638:25; 639:2; 672:21; 673:8; 677:21; 688:19
**noted** [6] - 601:13, 22; 639:22; 678:7, 11
**notes** [13] - 507:24; 508:9; 510:17, 23; 516:23; 523:8; 524:7; 554:8; 637:8, 12; 639:7; 644:14; 646:9
**nothing** [11] - 504:17; 541:19; 542:3; 550:21; 603:23; 618:18; 649:5; 673:22; 674:2; 682:10; 686:9
**notice** [1] - 500:20
**noticed** [2] - 598:24; 679:11
**number** [24] - 513:13; 521:21; 573:24; 574:6; 598:14; 601:14; 608:4; 610:2, 5; 611:22-25; 612:2; 637:9; 642:7; 644:1; 653:5; 667:14; 674:8; 675:16
**numbers** [9] - 503:9, 11, 18; 570:10; 573:22; 595:1; 601:20; 669:4
**numeral** [1] - 622:15
**numerical** [1] - 503:15
**numerous** [4] - 510:10; 569:4; 636:4
**Nynex** [1] - 620:4

### O

**o'clock** [3] - 595:21; 689:4
**oath** [1] - 501:3
**object** [7] - 540:2; 542:18; 603:4, 15, 25; 648:5
**objecting** [1] - 541:22
**objection** [49] - 502:3-5; 509:20; 512:18; 515:17-19; 519:3; 529:7, 11; 530:7, 20, 25; 536:1, 8; 538:25; 542:15; 549:16; 550:13, 17; 552:4, 6; 555:10; 557:3; 559:12; 564:4, 10; 570:20; 576:11; 585:21-23; 589:13; 600:23; 602:20; 603:19; 605:14, 23; 606:10, 20; 607:3; 664:8; 667:25; 675:7
**Objection** [1] - 512:19

**objections** [2] - 600:22; 669:17
**objective** [1] - 682:15
**oblique** [1] - 640:4
**obnoxious** [1] - 541:8
**obscured** [1] - 578:20
**observation** [1] - 497:2
**observations** [3] - 663:6; 673:17; 675:12
**observe** [1] - 615:2
**observed** [4] - 585:16; 665:12; 666:13; 671:20
**observing** [1] - 588:17
**obtain** [1] - 593:16
**obvious** [2] - 668:6; 670:23
**obviously** [5] - 496:20; 512:7; 539:23; 559:16; 686:10
**occasion** [1] - 656:15
**occasions** [2] - 625:6; 655:18
**occur** [4] - 512:11; 517:4, 16; 558:2
**occurred** [5] - 539:19; 555:8; 562:9; 568:4
**occurring** [1] - 620:25
**occurs** [2] - 558:2, 6
**ocean** [1] - 666:7
**OF** [3] - 495:1, 3, 6
**off-loaded** [1] - 666:12
**offered** [1] - 606:17
**office** [28] - 527:25; 528:2, 8; 534:18; 535:5, 18; 548:19; 549:5; 566:6; 568:4, 6; 569:2; 594:23; 598:25; 614:25; 619:19; 620:16; 621:17; 632:15; 636:19; 644:9; 655:23; 656:14; 661:19; 665:4; 670:16, 21; 671:1
**Office** [18] - 523:24; 525:11; 526:1; 531:19, 22; 536:6; 540:17; 547:22; 555:3; 655:12, 21; 660:6, 15, 21; 664:20; 670:4, 15; 673:11
**officer** [2] - 579:19; 604:5
**officers** [3] - 613:24; 633:5; 651:4
**offices** [3] - 535:14; 670:19; 673:10

**official** [1] - 681:15

**often** [3] - 511:9; 625:11; 659:1

**oftentimes** [1] - 511:2

**Ohio** [2] - 657:12, 16

**Old** [2] - 495:18; 670:16

**old** [2] - 499:20; 597:23

**Olympic** [1] - 535:2

**Olympus** [1] - 551:13

**once** [6] - 553:4, 21-22, 24; 580:21; 676:21

**one** [79] - 499:16; 503:17, 19; 507:12; 509:24; 513:8; 514:12; 516:17, 23; 517:2, 4, 18; 520:6; 521:18; 522:10; 527:2; 529:16; 534:2; 540:25; 541:5; 543:6; 544:1; 556:11; 558:16, 18; 561:24; 569:6; 580:18; 588:23; 593:18, 23; 597:15; 605:2; 606:12; 608:3; 609:4; 610:4; 613:21; 621:2; 624:10; 626:15; 630:1, 20; 631:10; 632:4, 12, 23; 633:4; 648:17, 21; 652:1; 655:16; 659:2; 660:17, 19; 662:2; 665:5; 674:22; 676:2, 6, 18, 25; 679:25; 680:8, 25; 681:15; 686:25

**one-hundredth** [1] - 503:19

**one-tenth** [1] - 503:17

**ones** [1] - 658:25

**oops** [1] - 607:21

**open** [10] - 542:1; 544:16; 545:2; 587:17, 21; 607:1; 665:14; 671:11; 688:2, 20

**opened** [3] - 599:13; 652:4; 662:21

**operate** [1] - 603:21

**operation** [1] - 510:15

**operations** [1] - 620:10

**operators** [1] - 614:12

**opinion** [11] - 557:1; 663:6; 675:19, 23; 678:12; 681:13; 682:3, 21-22; 687:4

**opinions** [1] - 555:17

**opportunity** [3] - 529:5; 540:10; 559:2

**opposed** [3] - 596:6; 659:9; 661:8

**orange** [3] - 571:17; 572:4, 6

**order** [9] - 520:10; 551:5; 559:8; 562:19; 595:13; 596:2; 607:20; 669:2

**ordinary** [1] - 678:17

**organs** [2] - 662:16, 18

**orient** [3] - 501:16; 590:1; 674:12

**orientation** [1] - 587:7

**oriented** [1] - 628:12

**origin** [1] - 648:20

**original** [11] - 507:17; 508:6; 514:15, 22, 25; 522:2; 533:17; 535:15, 20; 554:4

**originally** [3] - 505:8; 506:24; 656:25

**ounce** [1] - 680:1

**ourselves** [1] - 661:2

**outlining** [1] - 573:23

**outside** [10] - 568:4; 582:1; 588:4; 620:16, 25; 624:1, 17; 626:16; 628:8; 677:12

**outward** [3] - 667:8, 10

**over-record** [25] - 508:18; 509:9, 11; 528:25; 530:18; 539:3, 5; 542:24; 546:24; 554:10; 555:7, 9, 25; 557:8, 10; 558:2, 6; 560:2, 6, 21; 563:1, 18, 24; 564:9

**over-recorded** [3] - 557:17; 558:10

**over-recording** [12] - 514:16; 527:9; 530:6, 23; 532:23; 549:7, 13, 23; 557:12, 20; 558:13; 562:9

**over-recordings** [5] - 526:24; 530:17; 531:9, 13

**overhead** [1] - 503:6

**overruled** [11] - 509:22; 515:19; 530:8; 531:2; 550:18; 552:6; 564:11; 585:23; 589:17; 600:24; 607:3

**overweight** [1] - 617:17

**owe** [1] - 687:4

**Owen** [7] - 539:9, 16; 541:2, 7; 543:6, 16; 544:13

**own** [3] - 574:2; 656:12; 658:7

**owned** [1] - 624:9

**owner** [1] - 581:18

**ownership** [1] - 614:17

---

**P**

**Pablo** [2] - 685:1; 686:22

**package** [2] - 644:5; 645:20

**packaged** [2] - 645:23, 25

**packaging** [1] - 609:3

**packet** [1] - 642:23

**page** [10] - 536:12; 538:10; 546:16; 602:25; 610:1, 16, 21; 611:12; 683:7

**Pages** [1] - 620:4

**pages** [1] - 538:9

**paint** [2] - 635:25; 638:17

**panicked** [1] - 630:15

**paper** [1] - 567:22

**park** [1] - 626:10

**parked** [7] - 574:20; 578:7; 580:18; 624:18; 628:6

**parking** [13] - 569:1; 575:13, 24-25; 578:5; 589:6; 590:18; 620:19, 25; 621:3, 18; 622:2; 624:18

**part** [20] - 509:24; 512:1; 513:2; 543:4; 568:12; 588:24; 592:16; 594:22; 613:23; 656:12; 658:17; 660:2; 663:2, 16; 672:11; 673:1, 4; 676:5; 684:21

**parte** [1] - 687:1

**partial** [1] - 610:18

**partially** [1] - 578:20

**participate** [4] - 542:23; 543:1; 568:14; 598:22

**participated** [1] - 673:15

**participating** [2] - 536:5; 537:20

**particular** [34] - 503:2, 21; 507:16;

**508:9**, 20; 516:19; 547:2; 563:3; 567:13, 15, 19; 570:8; 572:1; 578:23; 587:15; 589:7; 592:19, 21; 601:10; 610:2; 614:15, 18; 620:13; 643:7; 650:16; 660:21; 661:1; 663:13; 666:22; 671:16; 672:1, 5, 24; 688:12

**particularly** [1] - 672:25

**passed** [2] - 676:23

**passes** [1] - 520:19

**past** [2] - 597:4; 647:5

**pasting** [1] - 509:19

**Path** [1] - 670:17

**path** [3] - 539:15; 676:21; 677:2

**pathologist** [8] - 658:9, 12, 16-17, 19-20; 659:6

**pathologists** [3] - 657:5; 658:6, 8

**pathology** [20] - 657:11, 14; 658:1-3, 5; 659:18-20, 22, 24; 660:4, 7; 661:13; 663:20; 664:2, 6, 13

**patients** [4] - 658:7, 10-11, 24

**patrol** [1] - 566:15

**pause** [11] - 537:12; 551:11; 558:23; 559:21; 565:19; 570:3; 610:9; 639:13; 654:10; 668:25; 674:14

**pause/stop** [1] - 508:22

**pay** [1] - 512:9

**payroll** [2] - 625:14, 19

**PCX** [1] - 578:18

**peer** [3] - 556:14, 19

**Pembroke** [1] - 611:4

**pen** [3] - 503:6; 508:1; 513:14

**people** [11] - 511:24; 527:15; 569:3; 624:14; 626:7; 632:15; 658:5, 18; 659:4; 673:24; 685:7

**per** [1] - 537:4

**percent** [1] - 501:24

**perfect** [1] - 634:4

**perform** [4] - 567:3; 660:16; 661:25; 675:13

**19**

**performance** [1] - 657:5

**performed** [3] - 656:10; 660:9; 675:2

**perhaps** [1] - 500:11

**period** [4] - 532:22; 534:13; 560:12, 18

**periods** [2] - 498:1, 6

**perjured** [1] - 540:6

**permission** [8] - 498:3; 541:20; 551:25; 552:9; 630:21; 631:17; 666:14; 674:4

**persist** [1] - 606:9

**person** [13] - 512:6; 528:5; 611:6, 8; 615:2, 10; 628:25; 629:15; 661:12; 662:7, 12; 682:8; 688:15

**personally** [2] - 596:15; 626:1

**personnel** [1] - 569:4

**perspective** [1] - 661:13

**pertaining** [1] - 593:6

**pertinent** [1] - 662:11

**photo** [4] - 571:14; 580:18; 586:18; 594:22

**photograph** [98] - 502:23; 503:1, 21; 506:22; 507:23; 508:4, 20; 510:1, 4, 8, 12; 519:21; 569:18; 571:9, 13, 18, 20; 572:2, 9, 17, 19; 573:9, 16-17, 25; 574:3, 15; 575:21, 23; 576:13, 22; 577:15, 18, 25; 578:4, 6, 9, 20, 23; 579:10, 17, 25; 580:1; 586:6, 17; 587:3, 15; 588:8; 589:2, 5, 8; 590:2, 7, 14, 17, 21, 25; 596:22; 612:19, 22; 613:1, 15, 17, 19; 614:13, 15, 23; 615:3, 11, 21-22, 25; 616:10; 621:14, 19, 23; 622:16, 20; 623:23; 624:3, 24; 628:15; 638:5; 671:7, 9-10, 14, 16; 672:1, 17; 673:19; 676:12

**photographed** [1] - 513:11

**photographer** [3] - 614:25; 615:8; 665:7

**photographs** [32] - 501:21; 569:19, 21;

570:8, 12, 16, 18; 575:4, 9, 12; 576:6; 578:2; 579:20; 580:17; 581:25; 582:4; 585:6, 10, 13-14; 605:25; 612:12; 663:9, 11, 13, 16; 668:16; 669:6, 8, 13, 24

**photography** [1] - 566:22

**photos** [2] - 594:11; 637:3

**phrase** [3] - 605:3, 7; 678:15

**phrased** [1] - 555:17

**physical** [12] - 499:4; 525:5; 566:23; 569:19; 580:6, 8, 20; 605:24; 616:1; 666:19; 674:9; 676:17

**physically** [4] - 505:23; 507:7; 528:5; 531:24

**physicians** [1] - 662:7

**physics** [2] - 656:21, 24

**piano** [5] - 516:9, 14-15, 22

**pick** [3] - 499:16; 598:25; 645:10

**picture** [8] - 522:15; 576:1, 6; 579:4; 590:24; 615:8; 628:8; 657:18

**pictures** [7] - 565:14; 567:4, 7, 9, 14; 582:11

**piece** [8] - 552:2, 5; 553:2, 6, 10; 554:11; 648:7; 668:13

**pieces** [9] - 507:11; 522:5, 18; 523:4; 553:8; 645:24; 677:18; 682:22

**pierce** [4] - 578:24; 581:1; 584:20; 602:17

**Pierce** [4] - 568:23; 569:8, 10, 13

**piercing** [1] - 604:19

**pig's** [3] - 629:16, 19, 22

**pistol** [2] - 609:21; 611:23

**pistols** [2] - 610:4, 21

**place** [29] - 496:3; 506:16, 21; 523:25; 524:4; 534:21; 535:18; 536:3; 537:2; 545:2; 546:1; 553:17; 563:18;

564:9; 572:6; 584:3; 589:6; 590:4; 603:2; 607:1; 620:18; 625:5, 12, 18; 633:5; 680:25; 684:2; 688:2

**placed** [19] - 503:2, 13; 505:2, 7, 9; 506:2, 13, 23; 513:6, 18; 514:8; 539:6, 9; 571:17; 572:4; 631:11; 665:17; 674:18

**places** [2] - 504:22; 660:3

**plan** [1] - 543:17

**planet** [1] - 560:15

**plastic** [13] - 526:22; 553:2, 6, 8, 11, 13, 15, 25; 640:22; 652:11; 653:3; 665:13; 667:7

**plate** [3] - 503:11, 14; 578:18; 598:13, 18; 601:24; 633:2

**plates** [2] - 614:17

**play** [4] - 520:2; 532:5, 7; 564:15

**playback** [10] - 505:12, 14; 506:17; 520:8; 528:13, 16; 532:3

**played** [8] - 505:11; 521:24; 530:3; 535:13; 564:14; 632:2; 633:1

**player** [7] - 506:4; 527:20, 22; 528:11, 21; 530:1

**playing** [4] - 529:22; 532:1; 533:8

**plays** [1] - 520:4

**Plaza** [2] - 495:13, 21

**plus** [1] - 566:14

**pocket** [2] - 511:6, 8

**point** [33] - 503:22, 24; 506:18; 539:4; 543:7, 15; 546:9; 569:11, 14; 574:7, 22, 24; 575:4; 595:13; 596:20; 614:11; 620:15; 623:7, 14; 624:14; 630:11, 19; 636:13; 644:7; 651:14; 653:7; 663:1; 676:5; 677:9, 13; 678:25; 679:15; 682:21

**pointer** [7] - 589:24; 590:6, 16; 621:24; 628:3

**pointing** [3] - 513:21, 25; 574:7

**points** [1] - 543:25

**poisoning** [1] - 659:9

**polarized** [1] - 648:9

**poles** [1] - 597:4

**Police** [16] - 566:11, 19, 25; 568:7; 592:7, 10; 635:1, 9, 15, 20; 643:13; 645:22; 650:7, 13; 651:7; 653:4

**police** [18] - 567:16; 569:4; 577:16, 18; 578:21; 580:22; 598:3; 599:17; 604:5; 608:8, 15; 632:4; 633:1, 4, 9; 662:5

**ponytail** [1] - 617:21

**pop** [4] - 532:13; 553:5, 17, 20

**popped** [2] - 553:11, 21

**portion** [11] - 518:1; 561:19; 577:18; 587:5; 588:3; 590:7, 25; 622:16; 632:7; 639:1; 658:20

**position** [14] - 496:18; 497:3; 503:14, 25; 505:6; 508:17; 564:1; 572:23; 579:22-25; 604:2, 24

**positioned** [2] - 505:8; 666:24

**possession** [5] - 525:5, 12; 549:21; 646:14

**possibility** [1] - 542:9

**possible** [2] - 530:16; 541:17

**possibly** [1] - 593:2

**potential** [1] - 542:6

**potentially** [3] - 539:7, 9; 541:21

**pouch** [1] - 640:18

**pounds** [1] - 630:5

**powder** [3] - 503:4; 573:19; 638:10

**powerful** [1] - 507:12

**practice** [2] - 526:8; 659:10

**Precinct** [1] - 566:15

**precise** [3] - 515:11; 517:11

**precisely** [3] - 517:1, 15; 520:11

**predecessor** [1] - 636:9

**prejudice** [1] - 605:11

**prejudicial** [2] - 539:21; 604:20

**preparation** [6] - 524:17; 527:17; 529:10, 13; 534:13; 555:22

**prepare** [2] - 525:7; 686:4

**prepared** [6] - 539:16; 540:6; 601:18; 606:19

**preparing** [3] - 506:19; 523:24; 686:8

**presence** [1] - 679:24

**present** [10] - 533:21, 25; 555:21; 566:23; 569:5; 612:12, 25; 614:22; 680:7

**presented** [1] - 496:23

**preserve** [1] - 670:22

**preserved** [1] - 682:10

**presumed** [1] - 605:4

**pretty** [5] - 496:21; 497:1; 504:6; 549:19; 686:16

**prevent** [3] - 526:24; 528:25; 531:9

**prevented** [1] - 554:10

**previous** [3] - 572:20; 625:6; 626:14

**previously** [12] - 500:5; 570:22; 571:24; 574:11; 586:23; 594:8; 621:11; 623:17; 627:19; 663:19; 676:7, 19

**primarily** [2] - 572:8; 656:13

**printed** [1] - 611:10

**prints** [1] - 638:10

**privately** [1] - 529:5

**probable** [1] - 593:12

**problem** [2] - 496:20; 606:4

**problems** [2] - 529:22; 532:1

**procedure** [2] - 642:15; 660:22

**proceed** [4] - 496:14; 501:1; 546:3; 606:23

**proceeded** [1] - 569:18

**proceeding** [1] - 523:25

**Proceedings** [1] - 495:24

**proceedings** [14] - 524:5; 536:3; 537:13; 547:23; 551:12; 558:24; 559:22; 565:20; 570:4; 610:10; 639:14; 654:11;

669:1; 674:15

**process** [8] - 517:20; 567:14, 21; 568:2; 581:8; 582:2; 673:5; 680:11

**processed** [1] - 573:19

**processes** [1] - 521:6

**processing** [2] - 568:14; 581:11

**produce** [2] - 685:1, 4

**produced** [3] - 495:24; 525:8; 526:9

**produces** [1] - 680:6

**product** [4] - 507:8; 518:6; 522:5; 523:3

**professional** [2] - 520:3; 528:12

**professionally** [1] - 598:4

**professor** [3] - 660:4, 7

**program** [2] - 657:10, 13

**programmable** [1] - 608:5

**progresses** [1] - 521:4

**progressing** [1] - 688:21

**prominent** [1] - 668:18

**promised** [1] - 688:6

**proof** [5] - 543:7-9; 602:18; 603:10

**propensity** [1] - 604:4

**proper** [1] - 681:17

**properly** [3] - 529:21; 533:10; 605:12

**property** [4] - 593:12; 594:5; 597:12; 645:24

**Property** [2] - 645:22; 647:8

**prosecution's** [1] - 629:13

**protected** [2] - 596:16; 605:19

**protection** [1] - 534:1

**prove** [1] - 601:14

**provide** [1] - 633:9

**provided** [6] - 527:22, 24; 531:21; 540:8; 555:2; 633:1

**publish** [3] - 631:17; 637:18; 641:6

**published** [2] - 620:4; 641:8

**pull** [1] - 630:1

**pulled** [2] - 617:21;

652:5

**pulls** [1] - 506:14

**purchase** [1] - 611:15

**purchased** [3] - 610:22, 25; 611:21

**purchaser** [1] - 610:19

**purpose** [9] - 527:8; 548:16; 554:15; 566:21; 596:5; 599:5; 602:17; 645:10; 653:12

**purposes** [5] - 520:8; 569:23; 609:3; 674:10

**pursuant** [4] - 566:5; 609:12; 619:18; 664:6

**pushed** [2] - 622:6; 667:8

**put** [24] - 507:11; 510:6, 11; 539:17; 542:11; 543:7; 544:3; 553:22; 567:22; 569:3; 594:6; 600:4; 604:5; 608:7; 609:2; 631:22, 25; 645:21; 652:3, 7, 10; 674:25; 682:9, 15

**putting** [3] - 513:14; 522:18; 589:20

### Q

**Q-39** [15] - 503:24; 524:9, 21; 525:5, 25; 529:22; 530:6; 532:7; 534:16; 535:4; 537:24; 548:12

**Q-tip** [8] - 651:25; 652:1, 4-5, 7, 9, 21; 653:2

**qualification** [1] - 664:5

**qualified** [1] - 548:22

**qualify** [2] - 664:1; 678:14

**quality** [5] - 520:4; 528:12, 14-15; 556:11

**Quantico** [14] - 524:3; 525:22; 535:25; 536:7; 540:23; 548:4, 13; 549:5; 636:7; 643:3; 644:11, 15; 646:1, 18

**quantity** [1] - 635:24

**Queens** [9] - 581:2, 6, 19, 22; 584:21; 585:1, 16; 586:21; 588:20

**questioned** [1] - 633:7

**questioning** [1] - 540:2

**questions** [24] - 523:18; 533:1; 551:4; 556:2; 561:24; 562:7;

563:9; 564:16; 591:8; 612:7; 616:21; 633:13-15; 644:18; 649:6; 653:24; 654:1; 685:7, 24

**quickly** [3] - 607:6; 641:6; 685:9

**quite** [2] - 511:9; 565:14

**quotation** [1] - 560:12

### R

**racial** [2] - 648:19

**radio** [1] - 566:14

**Radio** [1] - 534:16

**radios** [1] - 608:16

**ramp** [1] - 597:5

**ran** [1] - 630:14

**range** [1] - 611:1

**Range** [1] - 611:3

**RAPAPORT** [1] - 495:20

**rather** [2] - 497:13; 543:19

**rattled** [1] - 570:10

**re** [3] - 525:7; 562:12, 20

**re-enhanced** [1] - 562:12

**re-enhancement** [2] - 525:7; 562:20

**read** [13] - 530:11; 537:7; 538:14, 23-24; 540:10; 559:23; 560:9; 561:14; 563:4; 595:1; 611:21

**reading** [2] - 496:22; 547:9

**reads** [1] - 530:14

**ready** [6] - 500:24; 501:1; 546:3; 584:12; 606:23; 634:14

**really** [3] - 557:22, 24; 560:13

**reanalysis** [1] - 548:6

**rear** [1] - 578:17

**rearguing** [1] - 547:6

**reason** [7] - 500:21; 502:11; 512:7; 517:7; 546:21; 647:11; 661:16

**reasonable** [1] - 679:5

**reassign** [1] - 546:25

**reassigned** [1] - 546:18

**rebut** [1] - 540:4

**rebuttal** [1] - 539:17

**rebutting** [2] -

20

28

539:22; 542:21

**receive** [1] - 636:1

**received** [57] - 497:18; 502:5, 8; 512:23; 515:22; 519:7; 535:20; 552:8; 571:3; 576:16; 580:15; 585:25; 589:19; 601:2; 607:5; 608:25; 609:19; 614:10; 631:21; 636:8; 637:17; 638:19; 641:1, 3; 646:18; 647:22; 650:22; 653:23; 656:20; 657:9; 665:9; 668:2; 669:20, 22; 673:10; 675:9, 11; 691:3, 5-8, 10-12, 14-17, 19-20, 22

**recent** [1] - 539:1

**recently** [2] - 576:7; 655:13

**recess** [3] - 545:12; 634:7; 688:4

**Recess** [1] - 582:19

**recital** [1] - 516:22

**recognize** [48] - 562:6; 570:5; 575:20, 23; 582:8; 585:10, 12; 589:1, 4; 594:10, 15; 598:9; 599:24; 600:3, 11; 601:4; 602:10; 607:23; 613:17; 615:5, 10; 621:13, 16; 623:22, 25; 627:21; 637:3, 5, 7; 640:18, 20-21; 642:5; 643:24; 645:4; 652:24; 653:1; 666:22; 668:23; 669:6, 8; 671:6, 25; 672:17; 674:17; 675:1

**recognized** [2] - 597:9; 598:12

**recollect** [1] - 646:3

**recollection** [16] - 508:16; 558:12; 560:1; 561:17; 579:22; 581:21; 587:19; 620:23; 623:12; 625:11; 626:8; 630:2; 639:7, 19; 665:23; 670:8

**reconstruction** [1] - 650:10

**record** [84] - 504:22; 505:6; 506:2, 15-18, 20, 23; 508:18, 23; 509:9, 11; 511:12; 512:8, 10; 513:17; 514:5, 7, 12, 14; 519:9; 521:22-25; 522:3, 14; 528:17, 25;

530:18; 538:14; 539:5; 540:11; 541:5; 542:24; 546:15, 24; 547:10; 553:5; 554:10; 555:7, 9, 25; 557:8, 10; 558:2, 6; 560:2, 6, 21; 563:1, 18, 24; 564:9; 565:8; 572:6; 574:22; 577:1, 9; 579:6; 585:6; 588:17; 590:5, 15; 591:24; 593:14; 605:23; 615:18, 20; 619:9; 622:9, 13; 629:12; 634:24; 649:23; 651:19, 21; 654:22; 687:2

**recorded** [9] - 495:24; 506:24; 517:13; 521:13; 527:1; 557:17; 558:10; 614:16

**recorder** [20] - 505:7, 12; 506:9, 12, 14, 16; 507:4; 511:5; 527:24; 531:19, 21; 532:2, 5, 15; 542:11; 553:21; 554:3; 555:2; 563:21

**recording** [36] - 510:22; 512:12; 513:8; 514:16, 22-23; 515:11; 516:7, 20, 25; 520:5; 521:5; 522:6, 19; 523:3, 16; 527:9, 16; 528:16, 21; 530:6, 23; 532:14, 23; 549:7, 13, 23; 554:3; 555:4, 24; 557:12, 20; 558:13; 562:9; 632:25

**recordings** [5] - 526:24; 530:17; 531:9, 13

**records** [2] - 506:25; 507:2

**recover** [3] - 566:22; 639:25; 640:2

**recovered** [6] - 599:25; 601:7; 677:6, 19; 678:13; 681:2

**recovering** [1] - 567:5

**recross** [1] - 559:20

**RECROSS** [2] - 563:13; 690:6

**RECROSS-EXAMINATION** [2] - 563:13; 690:6

**red** [12] - 577:19; 578:6; 579:8; 580:12; 590:13, 16; 624:13; 627:8; 628:12; 633:2; 674:24

**redact** [1] - 686:2

**redirect** [1] - 550:22

**REDIRECT** [2] - 551:1; 690:5

**reel** [2] - 506:14; 517:9

**reexamine** [1] - 546:13; 557:7

**refer** [9] - 507:24; 508:1; 537:14; 557:24; 564:13; 574:23; 637:8; 639:7; 646:9

**reference** [2] - 561:16; 653:15

**referenced** [1] - 581:1

**referencing** [1] - 560:25

**referred** [7] - 552:20; 604:12; 610:22; 632:5; 637:11; 641:11; 656:14

**referring** [13] - 539:1; 555:12; 577:1; 578:8; 581:17; 601:16; 607:8; 632:7, 9, 22; 644:14; 665:16; 667:11

**refers** [3] - 537:15, 19; 546:10

**reflect** [6] - 615:18, 20; 648:3; 651:19, 21; 682:14

**reflected** [2] - 648:6

**reflection** [1] - 574:2

**refresh** [3] - 558:12; 560:1; 639:7

**refreshes** [2] - 508:15; 639:18

**regard** [7] - 496:18; 540:1; 546:5; 560:24; 610:2; 655:25; 658:12

**regarding** [2] - 551:4; 673:17

**regular** [2] - 567:11; 602:14

**rehear** [1] - 561:19

**related** [1] - 519:20

**relationship** [1] - 592:23

**relevance** [2] - 550:17; 589:14

**relevancy** [6] - 589:15; 600:23; 603:4, 16; 605:16; 606:21

**relevant** [4] - 603:20, 22-23; 604:3

**relined** [1] - 532:19

**remain** [2] - 564:25; 649:14

**remained** [1] - 647:6

**remember** [16] - 521:21; 568:17, 20, 24; 569:8; 614:16; 618:2; 626:17; 627:22; 632:11, 14; 646:9, 19; 667:14; 678:8

**remnant** [1] - 517:19

**removal** [2] - 670:25; 673:14

**remove** [9] - 553:15; 573:23; 580:6, 11; 596:8, 10, 13, 15; 676:15

**removed** [42] - 527:4; 532:16; 533:13, 16, 19, 21, 25; 535:3; 536:4; 537:4, 15; 538:5, 8, 10, 19; 539:23; 540:3; 541:25; 542:20; 543:20; 547:3; 554:2, 6, 8; 572:21; 573:2; 580:16; 596:19; 609:3; 641:20; 647:12; 658:14; 662:18, 20; 670:18, 21, 24; 673:9, 13; 675:2

**removing** [1] - 580:8

**renew** [1] - 570:22

**rentals** [1] - 594:16

**repair** [1] - 548:5

**repaired** [3] - 534:19, 25; 535:1

**rephrase** [1] - 555:14

**replacing** [1] - 656:5

**replenish** [1] - 497:10

**report** [17] - 524:7; 556:13; 568:17; 581:12, 17; 599:6; 606:17, 19; 639:22; 661:20; 662:5; 663:8, 17; 681:21; 682:2; 688:18

**reported** [2] - 614:16; 688:14

**Reporter** [2] - 495:20; 530:12

**reporter** [2] - 530:14; 532:7

**reporting** [1] - 496:10

**reports** [1] - 662:4

**represent** [5] - 505:22; 571:9; 573:21; 576:1; 585:15

**representations** [1] - 570:11

**representative** [1] - 535:25

**represents** [1] - 521:13

**request** [2] - 609:20; 679:19

**requested** [1] - 530:15

**reserve** [1] - 602:23

**residency** [2] - 657:10, 13

**resolution** [6] - 518:19, 23; 519:24; 520:15; 521:2; 522:7

**respect** [3] - 533:1; 540:15; 638:14

**respected** [1] - 541:2

**respond** [3] - 566:20; 633:5; 661:10

**responded** [1] - 650:24

**responsibilities** [2] - 655:25; 656:6

**responsibility** [2] - 655:22; 656:9

**responsible** [1] - 658:13

**rest** [3] - 538:15; 657:21; 686:14

**result** [12] - 510:8; 555:18; 560:3, 6, 21; 569:16; 598:3; 606:1; 621:4; 659:1; 675:23

**results** [3] - 556:17; 679:21

**resume** [4] - 501:5; 582:14; 584:12; 634:14

**resumes** [1] - 554:24

**retain** [1] - 663:2

**retire** [1] - 592:6

**retired** [6] - 566:8, 10; 591:25; 592:12; 655:8, 14

**retirement** [1] - 660:6

**retiring** [1] - 655:10

**retrieve** [2] - 565:17; 610:11

**return** [1] - 526:8

**returned** [4] - 524:11; 535:4; 549:5; 562:13

**review** [4] - 546:6; 549:6; 688:13

**reviewed** [2] - 556:13, 19

**reviewer** [2] - 556:14

**rewound** [1] - 533:10

**ricocheted** [1] - 677:15

**right-hand** [5] - 516:11; 577:22; 578:19; 590:17; 631:23

**ring** [1] - 580:14

**ripped** [1] - 617:19

**rise** [2] - 500:13; 584:8

**RMP-9** [15] - 527:20, 22; 528:11, 21; 529:21; 530:1, 18, 24; 531:8; 532:1, 3, 14; 534:14, 17

**Road** [1] - 495:18

**road** [2] - 590:20, 22

**Rob** [2] - 618:10, 16

**robbery** [7] - 568:3; 584:20; 589:6, 9; 590:4; 603:7; 604:1

**Robert** [3] - 564:24; 565:9; 651:6

**role** [3] - 556:7; 651:9

**rolling** [3] - 665:13; 666:12; 671:19

**Romeo** [10] - 569:24; 573:13; 582:6; 585:8; 588:25

**room** [9] - 527:17, 22; 528:3, 6; 529:16; 531:19, 24; 645:24; 647:2

**roots** [1] - 679:12

**Rosen** [3] - 496:16; 546:4; 547:8

**ROSEN** [88] - 495:16; 496:20; 499:14; 502:4; 509:20; 512:18; 515:18; 519:3; 523:22; 530:11; 531:1, 4; 534:8, 11; 535:7; 537:5, 8, 16, 18; 538:3, 14, 20; 540:17, 21; 541:11; 543:17, 22; 544:3, 8, 14; 546:15; 547:12, 20, 24; 548:2; 550:21; 552:4, 16; 555:10; 557:3; 559:12, 18; 563:11, 14; 564:16; 565:12, 14; 570:21; 576:11; 585:22; 589:13, 16; 591:9; 600:23; 602:20, 23; 603:5, 18, 22, 24; 604:10, 15; 605:1, 18, 21; 606:6; 616:23; 617:4; 618:18; 633:15; 644:20; 645:2; 649:4; 654:1; 664:10; 669:19; 675:8; 681:11; 682:25; 685:8, 18; 686:11, 25; 690:5, 7, 12, 17, 22

**rounds** [2] - 602:4; 607:11

**routine** [1] - 663:11

**row** [2] - 594:19, 23

**RRG** [2] - 569:24; 575:19

**RRG-1** [5] - 576:10, 15, 17; 577:23; 691:10

**RRG-32** [2] - 571:1; 691:9

**RRG-36** [1] - 573:8

**RRG-39** [1] - 571:25

**RRG-4** [4] - 589:12, 18, 20; 691:11

**RRG-41** [1] - 572:16

**RRG-45** [2] - 574:11, 18

**RRG-50** [5] - 636:22; 637:14, 16, 23; 691:18

**RRG-51** [1] - 579:13

**RRG-55** [1] - 638:19

**RRG-60** [5] - 585:19, 24; 586:1, 9; 691:2

**RRG-61** [1] - 586:12

**RRG-62** [1] - 586:23

**RRG-63** [2] - 587:10, 21

**RRG-67** [1] - 587:25

**RRG-68** [1] - 588:7

**RRG-72** [1] - 588:14

**RRG-82** [1] - 581:16

**RRG-83** [1] - 571:6

**RRG-85** [6] - 621:12, 20; 622:13; 624:21; 626:10; 628:4

**RRG-87** [2] - 578:12, 16

**RRG-88** [4] - 579:1, 7; 623:19; 632:19

**RS-1** [4] - 594:9, 15; 596:21

**RS-36-A** [1] - 601:4

**RS-39** [1] - 560:25

**RS-4** [5] - 599:21; 600:21; 601:1; 627:20; 691:12

**rub** [1] - 652:7

**rubber** [2] - 629:25; 652:3

**rubbing** [2] - 511:6, 8

**Rule** [1] - 664:6

**ruled** [1] - 603:8

**Rules** [1] - 664:7

**ruling** [5] - 519:4; 547:7; 570:23; 576:12; 606:9

**run** [3] - 506:4; 658:13, 21

**running** [5] - 590:20; 628:5; 630:16; 659:20; 668:12

**runs** [1] - 590:23

**rustling** [1] - 510:24

**S**

**S-C-H-I-R-A-L-D-I** [1] - 635:2

**S10** [1] - 624:12

**safeguarded** [1] - 596:17

**safety** [27] - 526:18, 23; 527:3, 5; 528:20, 24; 532:12, 15-16; 533:13, 19, 21; 534:1; 535:3; 551:4, 14, 23; 552:20; 553:23; 554:1, 6, 15, 19

**sake** [1] - 513:25

**sample** [5] - 580:12; 653:8, 13, 16

**samples** [3] - 650:24; 651:10

**Sandra** [1] - 684:18

**satisfactorily** [1] - 529:23

**save** [1] - 662:25

**saw** [34] - 507:1; 518:24; 519:21; 526:13; 576:7; 579:25; 597:18; 599:10; 613:5; 616:4; 617:10-12; 622:21; 623:4; 624:5, 18; 626:22; 627:6, 9; 628:1; 629:3; 630:6, 9; 666:24; 667:15, 19; 668:4; 672:18; 673:19; 682:12

**sawed** [1] - 627:16

**sawed-off** [1] - 627:16

**scalp** [2] - 676:15; 679:13

**scan** [1] - 608:10

**scanners** [3] - 599:17; 608:5, 7

**Scene** [7] - 566:16, 18; 567:13, 17, 23; 568:13; 580:5

**scene** [43] - 566:23, 25; 567:1, 14, 21; 568:2, 15, 21-22, 25; 569:3, 10, 18; 571:9, 19; 572:10, 24; 573:1; 574:23; 576:2; 580:6, 9, 21; 581:3, 17; 584:20; 589:1, 9; 596:19; 621:13; 661:5-7, 9-11, 14, 20, 22; 671:6

**scenes** [4] - 566:20;

606:1; 656:14

**schedule** [1] - 661:5

**Schelhorn** [7] -
524:16; 528:3, 10;
529:19; 646:6, 17;
651:6

**Schiraldi** [8] -
634:10, 16, 25; 641:4,
10, 13; 653:11, 14

**school** [3] - 597:24;
657:7; 660:8

**Sciences** [3] - 620:2,
5; 621:17

**Scientific** [2] -
635:19; 636:7

**Scott** [7] - 597:18, 20,
22; 598:9; 613:3;
617:5, 13

**screen** [65] - 496:23;
502:10, 13, 19; 504:5;
505:3, 20; 513:4;
516:1; 522:24; 571:4,
8, 23; 572:14; 573:6,
8, 15; 574:13; 576:20;
577:10, 13; 578:11, 14;
579:1, 3, 12, 15;
586:4, 12, 15, 24;
587:1, 10, 13, 24-25;
588:11, 16; 589:21, 23,
25; 591:1; 594:13;
597:1; 610:15; 612:17;
613:21; 614:20; 621:9;
623:21; 624:23; 626:9;
632:21; 637:22; 638:21;
671:2, 5, 21, 24;
672:13, 16; 676:11

**screens** [1] - 502:16

**screwdriver** [2] -
553:17, 19

**screwed** [1] - 544:1

**se** [1] - 537:4

**sea** [2] - 670:9; 678:13

**sealed** [7] - 607:11;
640:22; 646:5, 17;
647:3, 10

**SEAN** [1] - 495:14

**Search** [4] - 566:16,
18; 567:13, 17

**search** [7] - 593:6;
596:3, 5, 10, 17, 24;
611:18

**seat** [9] - 496:15;
497:15; 547:17; 554:22;
565:7; 591:23; 619:7;
634:22; 649:21

**seated** [6] - 500:17;
584:11; 615:16; 634:13;
651:16; 654:20

**seats** [1] - 640:9

**Second** [1] - 566:15

**second** [9] - 505:18;
519:8; 581:3; 582:4;
610:1, 16; 611:22;
623:12; 627:4

**seconds** [11] - 504:1;
507:20; 508:17; 513:9;
519:10, 12-13; 557:19;
652:8

**section** [2] - 638:11;
643:13

**sections** [1] - 662:24

**secure** [1] - 580:5

**secured** [3] - 528:1;
580:21

**security** [1] - 630:14

**see** [100] - 497:9, 13;
498:11; 500:16; 502:14,
17; 503:10, 20; 505:5,
9; 506:22; 507:15, 25;
508:3, 15; 510:15;
511:16; 512:10, 25;
513:12, 19; 514:4;
519:25; 520:6, 10,
12-13, 22; 521:1, 3;
523:2; 535:10; 539:21;
545:4; 546:7; 551:13;
552:18, 24; 574:2, 5;
576:5, 23; 577:4, 7,
15-17; 578:1; 582:16;
590:24; 593:9-11, 16,
21; 594:24; 595:15;
596:6; 597:4; 599:2;
610:4; 611:6, 10, 13;
615:14; 616:3, 5;
622:4; 623:3; 624:16,
24; 625:1, 23; 626:19,
22; 628:20; 633:22;
637:1; 638:4; 639:18;
641:20; 646:4; 648:11,
13, 15; 651:12; 662:17;
671:13; 672:5, 7, 9,
11, 24; 673:2; 678:16;
682:16; 688:22; 689:2

**seeing** [7] - 520:20;
521:9; 568:24; 578:15;
586:9; 587:15; 624:13

**seek** [1] - 540:4

**sees** [1] - 680:8

**Segal** [1] - 617:20

**segment** [3] - 521:5,
18, 24

**seize** [1] - 596:15

**seized** [9] - 596:16;
600:16; 601:11, 21;
602:1; 607:15; 612:3;
613:8

**seizure** [1] - 598:23

**self** [2] - 594:16;
595:3

**self-storage** [2] -
594:16; 595:3

**send** [2] - 644:14;
680:20

**senior** [1] - 597:24

**sense** [3] - 543:21;
658:7; 668:8

**senses** [1] - 532:15

**sensor** [6] - 520:9;
553:22

**sent** [14] - 534:18, 24;
535:1; 548:3, 13;
549:5; 562:19; 643:2;
644:11; 646:23; 663:3;
680:21; 681:1

**separate** [1] - 677:13

**separated** [1] - 677:15

**separately** [1] -
522:16

**September** [12] -
580:25; 581:23; 582:12;
584:22; 585:13, 16;
587:4; 588:9; 612:20;
615:23; 617:12, 14

**Sergeant** [1] - 568:12

**sergeant** [2] - 596:3,
18

**serial** [8] - 601:14,
20; 608:3; 610:5;
611:21, 24-25; 612:2

**series** [5] - 533:8;
551:3; 556:2; 645:13;
668:15

**serve** [1] - 499:15

**Service** [1] - 636:19

**service** [3] - 500:25;
625:9, 22

**services** [1] - 527:25

**serving** [2] - 567:23;
664:19

**session** [1] - 547:22

**set** [9] - 548:1;
569:20; 580:13, 15;
582:4; 584:5; 608:12;
654:8; 686:8

**sets** [1] - 650:10

**several** [10] - 504:6,
12; 517:21, 23; 518:2;
526:3; 551:18; 636:8;
643:11; 667:15

**Seville** [1] - 599:5

**SEYBERT** [1] - 495:9

**Shack** [1] - 534:16

**shaft** [1] - 652:2

**shape** [4] - 616:4;
618:6, 8

**shared** [1] - 497:18

**shaved** [2] - 676:14, 16

**sheet** [9] - 571:16;
572:4, 10, 21, 24;
601:13, 16; 608:4;
623:13

**shift** [1] - 636:13

**shining** [1] - 679:1

**shirt** [2] - 672:9;
674:1

**shit** [1] - 560:14

**shoes** [3] - 674:2, 20;
681:3

**shooting** [1] - 606:2

**Shop** [1] - 614:3

**short** [3] - 618:8;
635:10; 640:7

**shortly** [2] - 513:23;
606:17

**shot** [2] - 680:2; 682:8

**shotgun** [6] - 599:14;
627:17; 628:20; 630:6,
9

**shouted** [1] - 621:2

**show** [28] - 501:13;
512:23; 515:2; 530:10;
551:6; 552:19; 572:21;
575:16; 601:15; 602:6;
607:18; 609:11; 612:9;
613:11, 14; 623:17;
627:18; 632:18; 636:21;
639:10, 12, 15; 640:5,
12; 642:1; 643:4;
645:3; 652:18

**showed** [3] - 501:18;
517:25; 538:9

**showing** [26] - 508:14;
515:23; 518:21; 553:12;
558:25; 573:7, 12;
574:10; 575:24; 578:17;
586:18; 588:6, 14;
594:8; 599:21; 601:3;
612:14; 621:11; 627:18;
636:25; 637:23; 638:19;
640:15; 643:22; 671:21;
676:7

**shown** [3] - 509:18;
562:1; 571:24

**shows** [3] - 588:4;
604:3; 671:10

**side** [30] - 503:25;
504:23; 505:2; 516:10;
517:3, 7, 15-16;
552:16, 23, 25;
553:2-4, 11; 574:19;
579:8; 586:10, 19;

590:17; 594:4, 18;
628:15; 631:23; 671:10
**sidebar** [5] - 537:2;
603:2; 609:13; 634:3;
684:2
**sideshow** [1] - 542:2
**sidewalk** [7] - 569:1;
571:16; 572:22; 574:20;
580:12, 19
**sign** [1] - 668:6
**signal** [1] - 521:3
**signature** [2] -
601:18; 611:6
**signatures** [1] -
611:13
**significant** [3] -
656:12; 677:22, 24
**signs** [3] - 662:12;
668:7, 14
**silver** [1] - 601:24
**similar** [5] - 507:1, 3;
510:11; 551:17; 625:4
**simple** [1] - 606:8
**simply** [3] - 510:17;
520:24; 559:8
**single** [2] - 516:22;
675:23
**sit** [3] - 523:14;
529:5; 688:5
**sits** [1] - 549:8
**sitting** [7] - 497:25;
498:7, 14, 18; 669:9;
671:19; 688:11
**situation** [1] - 532:17
**six** [5] - 580:16;
617:16; 630:4; 646:15
**skin** [2] - 668:9; 673:1
**skull** [1] - 676:22
**slapped** [1] - 523:4
**SLD** [1] - 668:20
**SLD-11** [1] - 671:3
**SLD-12** [1] - 671:22
**SLD-14** [1] - 672:14
**SLD-21** [1] - 676:9
**SLD-22** [4] - 674:10;
675:6, 10; 691:22
**sleep** [1] - 499:1
**sleeves** [1] - 642:12
**slick** [1] - 617:21
**slide** [4] - 641:21;
642:6, 10; 648:11
**slides** [5] - 512:23;
641:24; 642:7, 11, 13
**slight** [1] - 520:12
**slightly** [4] - 677:3,
16; 678:14

**SM-6** [2] - 612:10, 18
**small** [12] - 526:22;
553:1, 8, 16, 18-19,
21-22, 25; 554:1;
635:24; 679:24
**Smithtown** [1] - 614:2
**Smyth** [1] - 618:10, 16
**snug** [1] - 506:17
**Snyder** [22] - 537:10,
19, 22; 539:2, 4, 17;
544:4, 10; 546:8, 10,
13, 16; 547:2; 548:6,
19; 556:3, 20-21, 25;
557:2, 6
**social** [1] - 688:14
**socially** [1] - 598:2
**socks** [1] - 674:2
**soft** [1] - 617:17
**solicited** [1] - 604:22
**solid** [1] - 617:25
**someone** [16] - 497:7;
511:5, 18; 531:18;
538:5; 596:1; 599:3;
622:1; 624:16; 626:23;
627:7; 638:12; 660:18;
682:18; 688:16
**sometime** [2] - 524:11;
544:1
**sometimes** [6] -
529:23; 618:7; 659:3;
662:5
**somewhere** [2] -
516:23; 652:13
**soon** [1] - 496:24
**sorry** [13] - 499:15;
530:10, 20; 531:4;
537:18; 543:5; 547:24;
549:16; 563:8; 608:15;
617:11; 625:22; 656:8
**sort** [8] - 507:4;
510:24; 620:3; 638:4;
656:16; 659:2; 660:1;
678:3
**sound** [7] - 506:7;
510:24; 516:8; 521:13;
522:12
**sounded** [1] - 546:23
**sounds** [15] - 510:22;
511:3, 7, 12, 14,
17-18; 516:12; 542:8;
550:10, 20; 555:22;
558:7
**source** [1] - 648:4
**sources** [1] - 662:3
**south** [1] - 666:6
**South** [2] - 664:24;
665:19

**southeast** [1] - 666:8
**Southwest** [1] - 611:3
**Special** [1] - 651:6
**special** [2] - 567:9, 18
**specialized** [2] -
659:6
**specialties** [1] -
659:16
**specialty** [3] -
657:23, 25; 658:5
**specific** [4] - 567:1,
20; 636:1; 664:8
**specifically** [7] -
551:20; 593:16; 607:8;
620:7, 12, 18; 639:2
**specimen** [1] - 537:25
**spectrum** [11] -
515:10; 516:18, 21;
517:5, 23; 518:1, 3, 5,
18; 521:4
**speculate** [2] - 549:19
**speeches** [1] - 531:3
**speed** [1] - 517:13
**spell** [6] - 565:8;
591:24; 619:9; 634:23;
649:23; 654:22
**spent** [1] - 551:18
**spirits** [1] - 680:2
**spliced** [2] - 522:6, 20
**spontaneous** [1] -
604:23
**spot** [1] - 629:7
**squad** [4] - 592:14, 20;
595:5; 650:9
**squiggly** [1] - 521:12
**squint** [1] - 502:17
**St** [1] - 673:7
**stage** [2] - 539:11;
598:7
**stairway** [1] - 586:10
**stand** [16] - 540:6;
552:10; 554:24; 559:17;
564:21; 584:6; 591:13;
617:1; 618:23; 630:23;
644:23; 649:10; 654:5;
666:15; 674:7; 683:5
**standard** [1] - 674:22
**standing** [10] - 565:1;
603:19; 605:14, 23;
606:9; 620:21; 628:9;
629:12; 649:14; 672:10
**start** [4] - 508:18, 23;
602:10; 668:11
**started** [1] - 584:5
**startling** [2] -
604:13, 16

**starts** [2] - 525:19;
533:8
**State** [2] - 656:24;
659:10
**state** [10] - 565:8;
587:20; 591:24; 605:23;
619:8; 634:23; 649:23;
654:22; 663:24; 679:8
**statement** [3] -
604:23; 605:2; 633:9
**STATES** [2] - 495:1, 3
**States** [7] - 495:12,
21; 529:9; 531:18, 22;
566:6; 619:19
**station** [5] - 664:24;
665:12; 666:11; 670:25;
671:19
**stay** [4] - 497:7, 24;
498:18, 24
**stayed** [5] - 646:2;
647:1; 676:24; 677:13
**steering** [4] -
639:1-3, 21
**stenography** [1] -
495:24
**step** [9] - 564:19;
591:16; 618:21; 633:16;
649:8; 654:2; 666:15,
17; 683:3
**Stephen** [1] - 617:20
**STEPHEN** [1] - 495:16
**steps** [4] - 618:22;
649:9; 662:1; 683:4
**stereo** [3] - 641:18,
20; 648:5
**sterile** [1] - 652:4
**stick'em** [1] - 600:4
**sticker** [4] - 600:9,
13; 601:12
**sticking** [1] - 671:13
**sticky** [2] - 640:7;
641:11
**still** [20] - 496:13;
501:3; 535:15; 539:24;
543:2; 547:24; 553:13;
554:7; 558:9; 560:25;
561:5, 10; 581:22;
600:4, 10; 646:6;
660:3; 661:7, 9; 671:18
**stipulate** [3] -
542:23; 544:11; 685:17
**stolen** [3] - 593:2, 12;
599:6
**Stony** [1] - 660:8
**stop** [6] - 509:9;
513:13; 514:3, 15, 17
**stop/start** [2] -

24

509:5, 11

**stopped** [1] - 630:11

**stops** [2] - 525:19; 533:8

**Storage** [2] - 592:24; 613:6

**storage** [3] - 593:3; 594:16; 595:3

**store** [1] - 553:9

**stored** [1] - 646:16

**story** [1] - 594:21; 677:8

**straight** [2] - 531:1; 677:4

**Street** [1] - 611:4

**striations** [3] - 513:12, 19

**strike** [1] - 602:20

**striking** [1] - 677:8

**struck** [2] - 677:1, 14

**Stuart** [3] - 654:13, 23; 668:21

**STUART** [1] - 654:24

**stuck** [2] - 510:7; 641:14

**student** [1] - 656:23

**studied** [2] - 657:24; 659:16

**study** [2] - 659:8; 663:8

**studying** [2] - 656:24; 657:10

**stuff** [2] - 519:16; 645:13

**style** [1] - 516:11

**subject** [1] - 541:15

**submit** [1] - 680:17

**subpoena** [2] - 566:5; 619:18

**subpoenas** [1] - 687:1

**subsequent** [3] - 532:22; 541:17; 646:11

**subsequently** [2] - 534:18; 662:18

**subspecialized** [1] - 658:19

**subspecialty** [1] - 657:14

**substance** [1] - 638:4

**sudden** [2] - 512:5; 659:4

**sufficient** [4] - 500:21; 605:11; 647:22; 677:10

**sufficiently** [1] - 678:23

**Suffolk** [13] - 608:24; 655:12, 16, 21; 657:20; 660:15, 21; 664:19; 670:4, 14; 673:11

**suggest** [1] - 541:24

**suggested** [2] - 523:3; 679:14

**suggestion** [1] - 540:3

**suicide** [1] - 659:3

**suit** [2] - 623:1; 627:7

**suitable** [1] - 648:24

**Suite** [1] - 495:16

**sum** [1] - 598:22

**summarizes** [1] - 669:12

**summer** [7] - 619:22; 635:13; 643:5; 665:10; 673:24; 674:3

**summoned** [1] - 664:23

**sun** [1] - 679:1

**sunk** [1] - 678:20

**superficial** [1] - 668:11

**supervised** [1] - 673:14

**supervisor** [3] - 536:6; 620:1, 9

**supervisory** [2] - 655:22, 25

**supplies** [1] - 682:19

**support** [1] - 546:16

**suppose** [1] - 682:7

**suppress** [1] - 541:1

**surface** [1] - 678:24

**surgery** [2] - 658:14; 662:16

**surgical** [2] - 658:22; 659:20

**surrounding** [1] - 576:2

**surveillance** [3] - 511:4; 613:23; 614:11

**Sustained** [4] - 529:8; 536:2, 9; 564:7

**sustained** [2] - 512:19; 557:5

**swab** [5] - 651:22, 24-25; 652:10; 653:8

**swabs** [6] - 644:1, 3-4, 8; 653:2, 15

**swelling** [2] - 668:9; 673:3

**swirl** [1] - 652:8

**switch** [2] - 631:23

**sworn** [9] - 500:6; 565:1, 5; 591:20;

619:4; 634:20; 649:14, 18; 654:18

**Syosset** [8] - 568:2, 21; 570:12; 571:10; 573:10; 575:7; 580:9; 620:6

**system** [4] - 506:13; 608:10; 679:24; 680:15

## T

**T-shirt** [2] - 672:9; 674:1

**tab** [8] - 551:23; 552:21; 553:15, 17, 23-24; 554:1

**tabbed** [1] - 559:3

**table** [3] - 524:16; 615:16; 629:13

**tabs** [20] - 526:18, 22-23; 527:3, 5; 528:20; 532:12, 16; 533:13, 19, 22; 534:1; 535:3; 551:4, 14; 553:13; 554:6, 15, 19

**tag** [2] - 608:2

**tags** [1] - 608:6

**take-up** [2] - 506:14; 517:9

**talkies** [2] - 599:16; 608:1

**tall** [2] - 514:13; 617:18

**taller** [1] - 514:4

**Talon** [3] - 602:14

**tamper** [1] - 539:10

**tampered** [2] - 540:5; 544:13

**tampering** [3] - 528:25; 539:19; 541:17

**tape** [153] - 496:22; 497:1; 503:2, 5, 7, 14, 23, 25; 504:2, 7, 10, 17, 21-22, 24-25; 505:1, 7-8, 10, 16, 23; 506:3, 9, 12, 15, 18-19, 21, 23; 507:4, 6-8, 16, 20; 508:21, 24; 509:2, 8, 12; 510:15, 22; 512:21; 513:2, 5, 18; 514:7, 16, 21; 517:8, 12; 518:6, 9, 16; 519:10, 13-15; 520:2, 5, 11; 521:1, 13, 23; 522:4; 523:10; 525:8, 12, 18; 526:19; 527:1, 9; 529:1, 22; 532:15, 18; 533:9; 534:16, 18-19,

24; 535:1, 5, 13; 537:23; 539:2, 18; 540:5, 22; 541:3, 19, 22; 542:10; 543:25; 546:6, 13; 547:23; 548:7; 549:5, 8, 14, 22; 550:3, 9, 16; 551:13, 15, 17; 553:22; 555:3, 5; 557:2, 7, 14, 18, 21; 558:1, 9; 561:5, 11, 15, 17-18; 562:15, 17-19, 21; 563:3, 25; 564:8; 569:3; 632:2; 640:7, 21; 641:11, 15; 645:7, 10, 18; 647:15

**tapes** [4] - 511:4, 9; 526:21

**Tarantino** [10] - 496:15; 525:15; 615:12, 14; 618:3; 651:2, 11-12; 652:5; 653:16

**TARANTINO** [1] - 495:5

**Tarantino's** [1] - 653:3

**taxicabs** [1] - 608:9

**teaching** [2] - 659:23; 660:1

**technical** [1] - 527:25

**technician** [2] - 526:15; 548:19

**technician's** [1] - 526:16

**technique** [1] - 640:5

**technology** [1] - 562:24

**tedious** [1] - 510:14

**Teflon** [1] - 602:16

**telephone** [2] - 597:4; 630:19

**telephonic** [1] - 596:3

**temperature** [3] - 496:11; 679:2; 682:6

**temperatures** [2] - 678:21; 679:4

**temporarily** [3] - 544:4, 8; 546:25

**ten** [2] - 512:6; 647:5

**tenth** [1] - 503:17

**tenure** [1] - 567:12

**term** [2] - 604:14; 656:7

**termed** [1] - 588:12

**terms** [6] - 517:19; 518:8; 542:6; 557:17; 660:17; 688:14

**test** [6] - 503:1;

509:23; 518:18; 532:10;
533:3; 563:21

**tested** [7] - 532:8, 18;
533:4; 564:1; 663:4

**testified** [18] -
500:6; 539:4; 554:25;
563:20; 565:5; 569:6;
580:3; 584:19, 24;
591:20; 613:9; 619:4;
628:24; 634:20; 649:18;
654:18; 663:19; 678:5

**testifying** [2] -
656:15; 684:20

**testimony** [13] -
527:17; 529:10, 13;
539:1; 540:1; 541:15;
543:13; 547:9; 588:22,
24; 626:14; 664:9, 14

**testing** [3] - 533:1,
14; 564:14

**tests** [4] - 498:10;
501:23; 509:25; 518:11

**thawed** [1] - 682:11

**THE** [230] - 496:5, 8-9;
497:3, 6, 15, 18, 23;
498:2, 5, 10, 15, 19,
23; 499:1, 4, 7, 11,
13, 15, 20, 22, 25;
500:9, 12, 16, 18-19;
501:4, 15; 502:3, 5,
16, 20-21; 508:13;
509:22; 510:19; 512:19;
515:17, 19; 519:4;
523:19; 529:8, 12, 15;
530:8, 13, 21; 531:2,
5; 533:2, 5; 534:7, 10;
535:8; 536:2, 9; 537:3,
7, 11, 14, 17, 19;
538:4, 18, 22; 540:9;
542:4, 17; 543:2, 6,
10, 14, 18, 23; 544:10,
15; 545:3, 10; 546:3;
547:1, 11, 13, 17;
548:1; 550:18, 22;
552:5, 11, 13, 18;
555:15; 557:5; 558:22;
559:15, 19; 561:13, 22;
563:10; 564:5, 7, 11,
17, 19, 22, 25; 565:7,
9, 11, 13, 16, 18;
570:20, 23; 576:12;
582:13; 584:5, 11;
585:21, 23; 589:15, 17;
591:6, 10, 16, 22, 25;
599:19; 600:22, 24;
602:21, 24; 603:3, 8,
20, 23; 604:9, 11, 24;
605:9, 19; 606:4, 7,
22; 607:2; 608:22;

609:15; 610:8, 13;
614:8; 615:20; 616:19,
22, 25; 618:19, 21;
619:6, 10, 12; 630:22;
631:16, 19; 633:14, 16,
20; 634:5, 9, 13, 22,
25; 635:3; 637:15, 20;
639:11; 641:1, 7;
644:19, 22; 649:6, 8,
11, 14, 20, 24; 650:1;
651:21; 653:20; 654:2,
6, 9, 14, 20, 23, 25;
664:8, 11, 16; 666:17;
667:24; 669:17, 20;
674:6; 675:7, 9; 681:5,
8; 683:1, 3, 6; 684:3,
6, 9, 13, 20, 22, 24;
685:6, 9, 13, 17, 21;
686:1, 5, 18, 21;
687:3; 688:3; 689:2

**thinking** [1] - 686:8

**thinks** [2] - 555:11, 18

**third** [1] - 630:7

**threats** [1] - 541:1

**three** [8] - 523:9, 14;
651:5; 656:1; 667:11;
678:16; 679:5; 681:24

**throughout** [4] -
511:14; 517:21; 630:16;
659:23

**Thursday** [1] - 686:15

**tick** [2] - 503:10, 18

**timeframe** [2] -
534:21; 635:12

**timing** [1] - 634:4

**tinted** [1] - 597:14

**tip** [9] - 602:16;
651:25; 652:1, 4-5, 7,
9, 21; 653:2

**tips** [1] - 679:12

**tissue** [2] - 658:14;
662:25

**tissues** [2] - 663:2;
668:10

**to-date** [1] - 549:22

**today** [17] - 496:10,
25; 497:16; 523:15;
529:10, 14; 540:1;
549:8; 555:8; 566:5;
615:15; 619:18; 651:12;
669:9; 684:8; 685:1;
687:5

**together** [7] - 507:11;
522:6, 18, 20; 523:4;
645:25

**Tom** [3] - 541:2, 7;
544:13

**tomorrow** [1] - 687:6

**tone** [2] - 517:1, 17

**tones** [1] - 517:1

**took** [28] - 501:22;
503:1; 512:6; 523:8;
534:19, 21; 535:18;
536:3; 537:1; 570:8,
12; 573:9, 25; 575:5;
576:6; 580:14; 582:11;
585:13; 587:3; 588:9;
589:6; 590:4; 598:19;
603:1; 630:15; 644:4;
652:10; 684:1

**tool** [1] - 665:13

**toolbox** [3] - 667:18;
669:9; 673:10

**top** [14] - 504:17,
24-25; 505:1; 520:13;
572:24; 576:23; 590:21;
594:16; 611:10; 616:9;
618:9; 674:2

**topic** [3] - 511:16;
512:5; 541:15

**topics** [1] - 511:21

**total** [2] - 655:18;
667:14

**touches** [1] - 511:5

**toward** [4] - 622:22;
623:2; 679:12

**towards** [2] - 623:3;
628:14

**Toxicology** [1] -
657:15

**toxicology** [5] -
679:19, 21, 23; 680:21,
24

**trace** [8] - 606:17;
609:21, 23; 635:23;
638:16; 639:25; 640:2;
642:16

**tracing** [1] - 520:22

**track** [4] - 504:22;
505:16; 686:14, 16

**tracks** [5] - 503:5;
504:25; 505:1; 507:15;
521:2

**trained** [1] - 556:16

**training** [5] - 636:1,
9; 647:22; 657:17;
660:3

**TRANSCRIPT** [1] - 495:6

**transcript** [13] -
495:24; 537:5, 9;
538:8; 540:16; 546:17;
557:24; 558:15; 559:5,
24; 560:9; 561:14, 16

**transcription** [1] -
495:24

**transfer** [5] - 525:25;
643:19; 644:7; 653:7,
12

**transferred** [12] -
538:2, 4, 17, 20;
544:4, 7; 546:11;
566:15; 611:7; 642:19;
648:10; 653:14

**translated** [1] - 506:5

**transmitted** [1] -
677:19

**transport** [2] -
506:13; 652:13

**transported** [1] -
670:3

**trauma** [1] - 659:8

**travel** [8] - 567:13,
15; 578:22; 579:9;
581:2, 5; 661:14;
676:21

**traveled** [2] - 564:1;
665:19

**treated** [2] - 499:5;
662:7

**treble** [2] - 516:12

**treed** [1] - 577:18

**TRIAL** [1] - 495:6

**trial** [8] - 542:12;
569:23; 604:1; 682:18;
687:5; 688:6; 689:4

**tried** [1] - 640:4

**tries** [1] - 517:12

**truck** [2] - 628:6

**true** [4] - 541:25;
542:1, 23; 570:11

**trunk** [3] - 665:15;
678:20, 23

**try** [5] - 621:6;
639:25; 686:21; 688:17

**trying** [6] - 512:1;
517:8, 19; 531:1;
603:6; 640:2

**Tuesday** [3] - 685:2, 5;
686:15

**Tuff** [3] - 667:17;
669:9; 673:9

**Tully** [1] - 580:16

**turn** [1] - 517:12

**turned** [2] - 598:12;
622:22

**turning** [1] - 517:9

**Turnpike** [5] - 575:25;
590:23; 591:3; 614:2;
620:6

**turns** [1] - 506:14

**TV** [1] - 645:13

**two** [38] - 496:6, 19;

500:1, 20; 502:16;
506:17; 523:9, 14;
538:9; 556:16; 572:20;
580:24; 593:8; 594:21;
599:16; 606:1; 608:5,
12; 610:4, 21; 611:13,
23; 624:14; 625:24;
648:19; 653:2; 655:18;
677:18; 678:19; 679:3,
17, 25; 680:4, 23;
682:6; 684:22; 685:10

**two-story** [1] - 594:21

**type** [9] - 516:12;
517:2; 567:2, 6, 8, 15;
569:2; 663:3; 681:12

**typical** [8] - 526:8;
668:7, 13; 673:4;
676:17; 678:16; 680:3,
8

**typically** [3] -
553:24; 658:25; 679:1

## U

**U.S** [13] - 495:4, 15;
523:24; 524:16; 525:11;
526:1; 535:14; 536:5;
540:17; 547:22; 555:2;
558:4; 561:3

**U.S.D.J** [1] - 495:9

**ultimate** [1] - 663:16

**umm** [1] - 597:23

**unaltered** [1] - 515:1

**under** [11] - 501:3;
510:12; 513:6; 543:13;
571:16; 617:16; 629:18;
641:21; 663:1; 676:15;
678:17

**undergone** [1] - 678:8

**underneath** [1] -
601:24

**understood** [1] -
541:20

**unexpected** [1] - 659:4

**unfortunately** [1] -
600:5

**unintelligible** [1] -
560:12

**uninterrupted** [1] -
549:11

**Unit** [8] - 566:16, 18;
567:13, 17, 24; 568:13,
23; 636:19

**unit** [18] - 528:13;
540:18; 580:22; 592:19;
593:18, 25; 594:2, 21,
24; 595:3, 17, 20;
596:8, 16; 597:8;
598:19

**UNITED** [2] - 495:1,

**United** [7] - 495:12,
21; 529:9; 531:18, 21;
566:6; 619:19

**units** [3] - 593:21;
594:20; 595:16

**University** [3] -
656:21, 24; 657:8

**unknown** [1] - 682:13

**unless** [5] - 603:18;
617:25; 667:24; 688:6;
689:2

**unloaded** [1] - 607:16

**unrefuted** [1] - 546:12

**unsuitable** [1] - 649:2

**unusual** [5] - 511:17;
620:24; 639:3; 673:23;
674:3

**up** [58] - 497:9; 498:2,
16; 499:16; 500:2;
506:12, 14, 18; 508:3;
517:9; 521:12; 526:8;
536:10; 544:1; 557:22;
558:5; 560:14; 561:5;
569:1, 3; 572:3;
574:21; 577:2, 9, 21,
25; 584:6; 589:15;
590:7, 23; 591:16;
597:5; 598:13; 609:17;
616:16; 627:4, 16;
629:6; 633:4, 20;
638:25; 640:10; 641:5;
645:10; 646:23;
650:22-24; 651:3;
652:4; 654:8; 660:5;
666:9; 671:14; 677:16;
684:15; 686:23; 689:3

**upper** [5] - 577:17, 22;
578:19; 596:22; 672:25

**upward** [3] - 673:7;
677:2, 4

**urine** [1] - 663:3

**US** [1] - 611:23

**usual** [1] - 642:15

**utilized** [1] - 645:7

## V

**vacation** [1] - 512:6

**valves** [1] - 662:22

**van** [20] - 574:19;
576:5; 577:7, 11-12,
17; 578:21; 590:8;
624:24; 625:1, 4-5,
8-9, 12, 15, 22; 626:9;
627:13

**vans** [2] - 567:16, 19

**vantage** [1] - 623:14

**various** [6] - 543:25;
567:20; 604:12; 657:23;
660:2; 662:3

**vehicle** [34] - 567:15;
577:19; 578:8, 19, 23;
579:19, 23-24; 580:1,
18; 590:17; 614:12;
623:5, 8, 11, 22;
624:1, 3, 5, 9, 11;
628:14; 632:7, 12, 16,
22; 636:17; 637:5, 8;
638:15, 18, 22; 640:3

**vehicles** [5] - 569:4;
577:16; 614:18; 624:17

**vehicular** [1] - 650:10

**version** [4] - 526:13;
527:6; 562:12; 577:25

**versus** [1] - 606:13

**vertical** [7] - 503:10;
505:2, 5; 513:12, 19;
521:11

**vertically** [1] - 505:9

**vessel** [2] - 666:10

**vessels** [1] - 668:11

**vest** [1] - 602:18

**Veteran's** [1] - 670:17

**vicinity** [2] - 558:3;
574:5

**victim** [2] - 571:15;
679:19

**victim's** [1] - 661:7

**video** [1] - 567:5

**view** [4] - 513:7;
616:10; 628:25; 672:17

**VIN** [2] - 637:9

**vinyl** [2] - 506:25;
507:1

**violence** [1] - 659:2

**Virginia** [5] - 524:4;
535:25; 636:8; 643:3;
646:1

**visiting** [1] - 656:14

**visualize** [1] - 676:15

**visualizing** [1] -
648:8

**visually** [1] - 507:15

**Vito** [5] - 634:10, 16,
25; 653:11, 14

**voice** [18] - 506:5;
522:21; 539:6; 541:10;
542:9, 11; 546:24;
550:2, 8, 10-11, 15,
20; 554:17; 555:22

**voices** [3] - 521:15;
555:4; 561:1

**voir** [1] - 559:13

**Volt** [7] - 620:1, 5,

13, 25; 621:17; 622:17;
625:17

**VS** [4] - 640:23; 642:8,
11; 644:3

**VS-2** [7] - 640:12, 15,
25; 641:2; 645:3;
691:19

**VS-3** [1] - 642:1

**VS-4-A** [5] - 643:22;
652:19; 653:19, 22;
691:20

**VS-6** [2] - 642:2, 4

**VS-8** [1] - 642:9

## W

**wait** [3] - 497:13;
534:6

**waiting** [1] - 544:16

**walk** [1] - 578:1

**walked** [1] - 599:8

**walkie** [2] - 599:16;
608:1

**walkie-talkies** [2] -
599:16; 608:1

**walkway** [1] - 571:15;
590:3

**Walter** [1] - 580:15

**wants** [6] - 541:12, 14;
558:4; 561:3; 639:12;
663:14

**warehouse** [1] - 604:7

**warmer** [1] - 678:25

**warning** [1] - 670:1

**warrant** [25] - 593:6,
9-11, 17, 21; 594:24;
595:4, 15, 20, 25;
596:2, 4, 6-7, 10, 12,
17, 19; 599:2, 5;
611:18

**warrants** [2] - 593:8;
596:24

**Washington** [1] -
657:20

**waste** [2] - 543:19;
606:5

**water** [1] - 678:25

**water's** [1] - 666:1

**wave** [8] - 518:15, 20,
24; 519:24; 520:16;
521:2; 522:6

**weapon** [10] - 600:16;
601:11; 626:23; 627:13,
21, 24; 628:2; 629:2

**weapons** [3] - 601:20;
610:2; 611:20

**wearing** [8] - 629:16,
19; 651:15; 672:9;

673:6, 22, 25; 674:1
**week** [4] - 625:19;
660:16, 18, 20
**weekend** [2] - 688:4, 22
**weekends** [1] - 660:19
**weekly** [1] - 625:13
**weeks** [3] - 526:3;
548:3; 682:9
**weight** [6] - 617:8, 13,
22; 618:2, 9; 630:3
**what-not** [1] - 637:9
**whatsoever** [1] - 540:1
**wheel** [1] - 639:1
**whip** [1] - 609:2
**Whiskey** [3] - 666:21;
667:23; 669:10
**whiskey** [1] - 680:2
**white** [12] - 577:7, 12;
590:8; 597:14; 599:4;
624:24; 625:1, 5, 8;
626:9; 627:13
**whitish** [1] - 638:4
**whole** [3] - 498:8;
512:14; 646:17
**wide** [2] - 504:6
**Willard** [2] - 650:22
**Willets** [1] - 670:16
**William** [1] - 568:11
**window** [17] - 621:5,
25; 622:10, 19, 21;
624:1, 15; 625:2;
626:20; 627:6; 628:9,
19, 21; 629:7; 630:12
**windows** [3] - 597:14;
620:22; 630:13
**wine** [1] - 680:1
**wish** [1] - 559:17
**withdraw** [1] - 549:17
**withdrawn** [15] -
510:4; 530:20; 531:17;
556:7; 567:17; 579:23;
596:20; 609:10; 610:20;
612:1; 623:10; 625:4;
629:23; 643:4; 678:6
**witness** [71] - 500:5;
501:16, 19; 510:20;
515:4; 518:22; 535:9;
537:4; 542:8; 543:20;
546:5; 547:8; 551:8;
552:9, 14; 554:24;
559:1, 16; 562:5;
564:20, 22; 565:4;
584:6; 591:11, 19;
599:20; 601:5; 602:9;
604:23; 607:24; 612:11,
15; 613:16; 617:1;
618:22; 619:3; 630:23;

633:17; 634:15, 19;
636:24; 639:17; 640:16;
642:3; 643:25; 644:23;
645:5; 649:9-11, 17;
652:20; 654:4, 6, 17;
663:19; 664:5, 12, 18;
666:15; 674:5, 7; 683:4
**WITNESS** [10] - 501:4;
502:20; 529:15; 533:5;
565:9; 591:25; 619:10;
634:25; 649:24; 654:23
**witnesses** [4] - 684:3,
6-7; 685:3
**WITNESSES** [1] - 690:2
**Wojick** [2] - 684:14;
685:15
**wooden** [2] - 651:25;
652:1
**word** [11] - 537:20;
538:16, 20; 544:3;
546:11, 25; 547:2;
669:25; 670:1
**words** [5] - 510:6;
538:23; 560:2, 5;
679:13
**worker** [2] - 622:1;
624:16
**workers** [2] - 621:2;
626:15
**works** [1] - 506:10
**worn** [1] - 674:20
**worried** [5] - 530:5,
16, 24; 531:10, 12
**worth** [1] - 564:8
**wound** [4] - 675:24;
676:18, 20; 678:4
**wounds** [2] - 660:12;
675:25
**wrapper** [1] - 652:4
**write** [1] - 498:21
**writes** [1] - 497:7
**writing** [6] - 573:21;
600:9; 607:8, 13;
674:24
**written** [3] - 653:4;
663:8; 687:4
**wrote** [2] - 631:7;
662:4

## Y

**yards** [3] - 575:15;
578:2; 579:10
**year** [10] - 536:4;
548:14; 549:4; 556:25;
568:1; 612:8; 646:22;
660:20; 664:21
**years** [17] - 512:6;

533:19; 541:2; 562:22;
566:12, 14, 16; 592:11;
597:23; 604:13; 635:10;
646:15; 647:5; 655:11,
19; 656:5; 660:5
**yelled** [1] - 622:1
**Yellow** [1] - 620:4
**yellowed** [4] - 559:6,
11; 560:19
**yellowish** [1] - 651:17
**Yes.** [1] - 579:11
**yesterday** [25] -
496:21; 497:1; 501:12,
18; 502:25; 503:24;
504:21; 505:4, 11, 17;
507:13; 508:25; 509:6,
11; 512:12; 519:16;
520:15; 522:25; 523:2;
525:9; 526:13; 560:23;
562:1; 563:4
**YORK** [1] - 495:1
**York** [14] - 495:13, 19,
22; 527:24; 528:1, 8;
535:6; 549:5; 570:12;
605:7; 636:20; 650:23;
659:11; 664:25
**yourself** [6] - 554:13;
570:12; 573:9, 25;
625:14; 674:12
**yourselves** [1] -
500:23

## Z

**Zacarese** [1] - 651:6
**zip** [1] - 653:6
**zip-lock** [1] - 653:6
**zipper** [2] - 510:22, 24
**zoom** [4] - 505:18;
516:2, 4; 521:17