914

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------X

UNITED STATES OF AMERICA,        :     CR 08 655

          v.                     :     U.S. Courthouse
                                       Central Islip, N.Y.
CHRISTIAN TARANTINO,             :
                                       TRANSCRIPT OF TRIAL
               Defendant.        :
                                       May 1, 2012
-------------------------------X       9:15 a.m.

BEFORE:

          HONORABLE JOANNA SEYBERT, U.S.D.J.


APPEARANCES:

For the Government:   LORETTA E. LYNCH
                      United States Attorney
                      100 Federal Plaza
                      Central Islip, New York 11722
                      By:  JAMES M. MISKIEWICZ, ESQ.
                           SEAN C. FLYNN, ESQ.
                           Assistants, U.S. Attorney

For the Defendant:    STEPHEN H. ROSEN, ESQ.
                      100 Almeria Avenue - Suite 205
                      Coral Gables, Florida 33134

                      FRANK A. DODDATO, ESQ.
                      666 Old Country Road
                      Garden City, New York 11530


Court Reporters:      OWEN WICKER
                      HARRY RAPAPORT
                      United States District Court
                      100 Federal Plaza
                      Central Islip, New York 11722
                      (631) 712-6105


Proceedings recorded by mechanical stenography.
Transcript produced by computer-assisted transcription.

*Owen Wicker, RPR*
*Official Court Reporter*

Proceedings

915

MORNING SESSION

1
2           M O R N I N G   S E S S I O N
3           THE CLERK:  There is one juror who is running
4   late about ten minutes.  The Judge will be out shortly.
5           THE COURT:  I understand we are one juror short.
6           There is an outstanding application on a motion
7   with respect to testimony of Mrs. Mulligan -- her first
8   name is Manon?
9           MR. MISKIEWICZ:  Manon.
10          THE COURT:  -- Ms. Manon Mulligan's testimony
11  with respect to a letter that she received, purportedly
12  from Vincent Gargiulo.
13          What I'd like to do is, because of a couple of
14  issues, I think, that still remain in terms of how the
15  Government alleges how this came about, perhaps an offer
16  of proof would be appropriate.  And perhaps we can have
17  Mrs. Mulligan testify, not today, as the way things are
18  going, but tomorrow.
19          I have a judges' meeting today which will run
20  from 1 o'clock to at least 2 o'clock.  So that will take
21  up a pretty good chunk of time.
22          Additionally, I have to leave here at 4:30
23  because of the commitment I have in Nassau County.
24          My recollection of Mr. Amador's testimony is
25  that it will be at least --

Proceedings

916

1           MR. MISKIEWICZ:  -- another hour, at least, on
2   direct.
3           THE COURT:  And then on cross-examination, if
4   it's anything like the last cross-examination, probably be
5   an hour and a half, I would think.
6           But I don't know what your approach will be,
7   Mr. Rosen or Mr. Doddato.
8           And after that, you have several other witnesses
9   who are on board?
10          MR. MISKIEWICZ:  Yes, we have several others.
11  And given the way the schedule is, we probably would not
12  get to Mrs. Mulligan.
13          When you mean an offer of testimony, do you mean
14  outside the jury?
15          THE COURT:  Yes.
16          MR. MISKIEWICZ:  Okay.
17          THE COURT:  There are certain things I need to
18  make an evaluation of outside the presence of the jury so
19  that it will not in any way taint the fairness of this
20  trial.  All right?
21          MR. MISKIEWICZ:  Yes, your Honor.
22          Mr. Flynn is here.  He went downstairs to get
23  something from the office for counsel, and this is really
24  his motion.  But we were talking about this recently, and
25  we think the better practice -- obviously we, are still

Proceedings

917

1   moving for permission for her to testify about the
2   contents of this letter.
3           THE COURT:  Right.
4           MR. MISKIEWICZ:  It came up pretrial, something
5   about intentions, about an attorney-client privilege
6   possibly being breached.
7           We don't concede that, but we were amending what
8   we would seek to elicit from her, basically, after she
9   testifies about -- if she is permitted to testify, about
10  the contents of the letter.  That is simply saying she no
11  longer has the letter as opposed to getting into the whole
12  business --
13          THE COURT:  With respect to Pellegrino --
14          MR. MISKIEWICZ:  Exactly, where it went to
15  Mr. Mulligan's attorney at the time, who was
16  Mr. Tarantino's former lawyer.  So we'll jump over that
17  and move into the next phase.
18          Obviously, with that representation, we would
19  hope that the Court, if counsel were so inclined, would
20  preclude counsel from getting into the whole Keith
21  Pellegrino, Jimmy Froccaro story, again, which would have
22  been from Pellegrino.  What Pellegrino told her would be
23  hearsay.
24          So I just want to put that out there.  I don't
25  mean to request a ruling in any way.

Proceedings

918

1           I guess the first step is whether or not any of
2   this material about the contents should come in, and we'll
3   have her testify, and you may make your ruling.
4           THE COURT:  Anything you would like to add,
5   Mr. Rosen?
6           MR. ROSEN:  Judge, I appreciate the Government's
7   candor, but I think Keith Pellegrino and James Froccaro
8   may be essential witnesses.  They have material and
9   relevant information concerning that letter.  And if they
10  have read it, both of them or either have read it, it
11  becomes testimonial in nature as to what is contained in
12  it.
13          The case law talks about bad faith.  And it's
14  our position if Mr. Pellegrino takes the Fifth Amendment,
15  then we would ask the Government to grant immunity to
16  Mr. Pellegrino so that we can go into what he has to say.
17          And the same would be for Mr. Froccaro.  If he
18  invokes a Fifth Amendment privilege, or if he fails to
19  waive -- the privilege is with Mr. Tarantino, not with
20  Mr. Froccaro.
21          I have not spoken to Mr. Froccaro.  I have
22  spoken twice with him on the phone, maybe six or seven
23  months ago, and we've had no contact since.  I was not
24  aware that the Government had contacted him directly and
25  he had told them that he had never seen that letter.

Proceedings

919

1       This also brings up issues from the first trial
2   concerning conflicts of interest between Mr. Froccaro and
3   Scott Mulligan.
4       We have already raised with the Court issues of
5   his conflict of interest with the Cutias, and we've
6   factually played out foundation with that.  We may have
7   similar issues here concerning dual loyalty by
8   Mr. Froccaro.
9       There are also issues that may come up in
10  regards to fees and other things which would cause us to
11  necessitate to bring Mr. Froccaro forward and find out
12  what this is all about.
13      I think the first step is either the Court or
14  the Government to give Mr. Pellegrino immunity.  All he
15  will say is whether or not he gave the letter to
16  Mr. Froccaro, and then we can go from there.  That is the
17  first spot.
18      I don't see where he would have a basis for a
19  Fifth Amendment privilege --
20      THE COURT:  Well, he's not a witness.  We may
21  not get there.  And if there is no testimony implicating
22  him or involving him in this situation, we wouldn't even
23  get to that step.
24      MR. ROSEN:  I can't agree with that.
25      THE COURT:  Well, you can't ignore it.  But

Proceedings

920

1   right now I'm trying this case, and whatever other issues
2   you have in terms of a conflict of interest -- and
3   Mr. Froccaro can be well vetted on appeal.
4       First, I must make a determination as to whether
5   or not Manon Mulligan will be permitted to testify.  If
6   the Government is saying they will not get into what
7   happened to the letter, then I may not even reach that
8   point.  I may feel the evidence is insufficient.  But I
9   must make that determination first, as to whether or not
10  she will be permitted to testify.
11      The testimony of Manon Mulligan, in terms of her
12  subsequent conversations with the defendant -- that's the
13  proffer that has been made.
14      MR. FLYNN:  Yes, your Honor.
15      THE COURT:  That may be enough to permit her to
16  testify.  I don't know.  But at this point I'm keeping an
17  open mind.
18      I don't see the need at this juncture to get
19  into attorney-client collateral issues if Mr. Pellegrino
20  is not testifying and Manon Mulligan is not getting into
21  who she gave the letter to.
22      So at this juncture, that is my first point that
23  I'm going to be dealing with, probably tomorrow, not
24  today, because we'll not have time for that.
25      MR. ROSEN:  Maybe I'm confused, and I just want

Proceedings

921

1   to bring this up.
2       I thought that the Government, based upon their
3   letter of April 20th, sought to introduce to the Court the
4   contents of the letter through Ms. Mulligan.
5       THE COURT:  Yes.
6       MR. ROSEN:  If they do that, they have to get
7   past a good-faith issue with what happened to the letter.
8   That is where they come in.
9       That's why I raise those issues, because the
10  Court, in its evaluation of what happened to that
11  letter -- if she says, I gave it up, I don't have it, then
12  the further inquiry has to be made in order to satisfy the
13  case law in bad faith under the case law.
14      THE COURT:  Let me hear from the Government.
15      I didn't get a written submission, I don't
16  believe, Mr. Rosen?
17      MR. ROSEN:  I'm sorry, your Honor.
18      THE COURT:  Was there a written submission on
19  the Mrs. Mulligan issue?
20      MR. ROSEN:  I did not.
21      THE COURT:  Okay.  Thank you.
22      MR. FLYNN:  Your Honor, this talk about the bad
23  faith, that stems from Section 1004 of the Federal Rules
24  of Evidence.  That is the exception to the original
25  document.

Proceedings

922

1       THE COURT:  Right.
2       MR. FLYNN:  That exception is not applicable
3   here because we don't have the documents.  It has been
4   lost, a term of art used in the rules.
5       Bad faith.  First of all, it's their burden to
6   show bad faith, not ours.  It's not our burden to overcome
7   some bad faith.  They have to make some sort of showing.
8       Secondly, it is bad faith on the part of the
9   Government?  This letter was lost in 2003.  Also, we
10  proffered in our letter, in my motion, your Honor, the
11  letter came to Mrs. Mulligan in 2003.  Although we've
12  agreed we wouldn't get into this, she would testify that
13  she gave it to Pellegrino.
14      Pellegrino made certain statements to her about
15  what he was going to do with it.
16      The Government had nothing to do with any of
17  that.  She wasn't an agent of the Government at the time
18  or today.  That had nothing to do with Government bad
19  faith.  There is no bad faith, nor could she ever show bad
20  faith in this on the part of the Government.
21      THE COURT:  Let me just add that the jurors are
22  now here.  Ask we get Mr. Amador up.
23      MR. MISKIEWICZ:  May we have a moment?  The
24  marshals have him.
25      THE COURT:  Next door.

Proceedings

923

1      MR. MISKIEWICZ:  I mentioned this to counsel.
2  Debbie Marshall, from the witness protection unit,
3  indicated to me:  On the way up on the freight elevator,
4  the doors opened.  Some juror, a number of jurors, saw
5  Mr. Amador in handcuffs.  The door closed, and there was
6  no conversation or anything.
7      I don't have any application.
8      THE COURT:  They were told he's in prison.
9      MR. MISKIEWICZ:  I don't think there is an
10  application, frankly.  I don't have an application.  I
11  don't believe counsel has any application, but I wanted to
12  let your Honor know what happened.
13      THE COURT:  Any objection on this?
14      MR. ROSEN:  No, your Honor.
15      MR. DODDATO:  May I be permitted --
16      THE COURT:  You don't have an application on
17  this?
18      MR. DODDATO:  No, I'm just raising another
19  issue.
20      In reading the Newsday of today, there is
21  another article about the case in the paper again.  The
22  article mentioned he had been convicted in the prior
23  trial.
24      I bring that to the Court's attention for
25  whatever thoughts your Honor has on the subject.

*Owen Wicker, RPR*
*Official Court Reporter*

Proceedings

924

1      THE COURT:  I've given them the general
2  admonition not to look at anything in the media concerning
3  the case.  Unless someone gives Mr. Baran a note to
4  indicate that they've read it, I don't think I should
5  bring the point up.  Because we pretty much have agreed
6  that's not a good way to go, and it just focuses their
7  attention on what has been written in the media.
8      MR. DODDATO:  True, Judge, but I wanted to make
9  a point that there was another article published in the
10  paper.
11      THE COURT:  Yes.
12      MR. MISKIEWICZ:  Your Honor, under 26.2, your
13  Honor, we request the defendant's disclosure of any
14  statements they have in their possession of any disclosure
15  of statements they have in the case.  We're looking at
16  arresting possibly as early as tomorrow, if not Thursday.
17  And rather than have any delay, I would ask that counsel
18  be prepared to call their witnesses.
19      But also, you know, I think it is within the
20  discretion of the Court to turn over those statements in
21  advance of trial, rather than have us ask for
22  adjournments, to prepare for cross-examination, etcetera.
23      So that's my application.
24      THE COURT:  Your expectation is that you will
25  actually rest on Thursday?

*Owen Wicker, RPR*
*Official Court Reporter*

Proceedings

925

1      MR. MISKIEWICZ:  I think there's a good chance
2  we may rest on Thursday, yes.
3      THE COURT:  All right.
4      MR. MISKIEWICZ:  If we get through everybody
5  except for Manon, that leaves us with two witnesses for
6  Thursday, at which time we'll rest at the conclusion of
7  Scott Mulligan's testimony.
8      It is possible his cross-examination may stretch
9  things out until Monday, but it's also possible we'll be
10  done.
11      I understand there are Rule 29 motions,
12  etcetera, to be done, but I just don't want to have a
13  situation where we have a delay of a couple of days where
14  witnesses have not been produced, and also, you know,
15  because we've not been given the statements.  And Rule
16  26.2 provides for the Government getting statements as we
17  have provided to them under 3500.
18      THE COURT:  All right.  I expect the statements
19  to be turned over by the close of business tomorrow.  I
20  think that's a fair way to handle this.
21      If they rest on Thursday, then they'll have the
22  weekend to review it.  If they rest on Monday, they will
23  have had the statements and the opportunity to review it.
24  And, of course, I'll have the Rule 29 motions by you, and
25  I can consider those.

*Owen Wicker, RPR*
*Official Court Reporter*

Proceedings

926

1      But I think it is only fair -- you expect to
2  call about six witnesses, approximately?
3      MR. ROSEN:  I'd say probably for sure, four.
4      THE COURT:  All right.  And may I inquire?  Will
5  they be fact witnesses or experts?
6      MR. ROSEN:  Fact witnesses.  Only fact
7  witnesses.
8      THE COURT:  Okay.
9      MR. ROSEN:  I would also say that 99 percent, if
10  I do have anything else, came from the Government's own
11  302s.
12      THE COURT:  Okay.
13      MR. ROSEN:  They already have, except for
14  possibly one thing that I'm thinking of -- everything that
15  I expect to get by way of testimonial evidence from the
16  witnesses are contained in the Government's 302s.
17      THE COURT:  All right.
18      MR. ROSEN:  That's how I learned about the
19  witnesses.
20      So they already have everything -- I say with a
21  caveat of one percent, because I have to confer with
22  Mr. Doddato.
23      THE COURT:  Why don't you do that, and I'll
24  revisit this later today.
25      The jurors are here and Mr. Amador is here.

*Owen Wicker, RPR*
*Official Court Reporter*

Amador - Direct/Miskiewicz

927

1     MR. MISKIEWICZ:  Your Honor, just to complete
2  that thought, then, in that case we would like, within
3  that time frame you've already articulated, a list of who
4  those four witnesses are.
5     THE COURT:  Before you respond to that, let me
6  just ask you, so we're all on the front page:  No one
7  wants me to say anything to the jurors about seeing
8  Mr. Amador?
9     MR. MISKIEWICZ:  No.
10     THE COURT:  Thank you.
11     (Whereupon, the jury at this time enters the
12  courtroom.)
13     THE COURT:  Sorry for the little bit of delay,
14  but we had to handle some things this morning, and we
15  always accommodate your schedule and our schedule as well.
16     On that note, Mr. Miskiewicz, please continue
17  your direct examination of Mr. Amador.
18     Mr. Amador, you are still under oath.
19
20  P A B L O   A M A D O R,
21     having been previously sworn, resumed the stand
22     and testified further as follows:
23  DIRECT EXAMINATION
24  BY MR. MISKIEWICZ:  (Continued)
25  Q  Mr. Amador, at the break yesterday, we were talking

*Owen Wicker, RPR*
*Official Court Reporter*

---

Amador - Direct/Miskiewicz

929

1  recall whether or not you saw Justin Bressman there?
2  A  Yes.
3  Q  Did he come to the apartment, or did he call you, or
4  how did you see him?
5  A  He just showed up at the apartment.
6  Q  When he showed up at the apartment, what was he
7  wearing, if you recall?
8  A  He was wearing regular clothes.
9  Q  Did not have a Synergy Gym outfit that day?
10  A  Correct.
11  Q  About what time of the day did he arrive, if you
12  recall?
13  A  In the morning when the sun came up.
14  Q  Now, are the lights still out in the morning?
15  A  There was no electricity, but the sun came out.
16  That's how we had the light.
17  Q  Did he stay for a little while or a long while that
18  day?
19  A  He stayed for a while, a long while.
20  Q  Were you still together with him into the afternoon
21  or early evening of that day, Friday, August 15, 2003?
22  A  Yes, sir.
23  Q  Did there come a time that you and -- withdrawn.
24     Did you stay in the apartment the whole time or
25  did you go out?

*Owen Wicker, RPR*
*Official Court Reporter*

---

Amador - Direct/Miskiewicz

928

1  about the blackout in 2003, in August, of New York City.
2  I believe we ended with you testifying that you were, on
3  the day of the blackout, you were in New Jersey with some
4  people.
5     Did there come a time when you came back into
6  New York City, specifically Manhattan, while the blackout
7  was still undergoing?
8  A  Yes.
9  Q  How did you get back in?
10  A  A friend of mine drove me back in.
11  Q  The same friend that you were with and who drove you
12  out to New Jersey?
13  A  Correct.
14  Q  What day of the week, if you will recall, was this
15  when you finally got back into the city during the day of
16  the blackout?
17  A  It was Thursday night, possibly turning into Friday
18  morning.
19  Q  Until around midnight --
20  A  Yes.
21  Q  -- lights were still out?
22  A  Yes.
23  Q  And when you returned to Manhattan, where did you go?
24  A  I went to Leshawn Campbell's apartment.
25  Q  And the next morning, Friday, August 15th, do you

*Owen Wicker, RPR*
*Official Court Reporter*

---

Amador - Direct/Miskiewicz

930

1  A  We left the apartment together.
2  Q  Okay.  And did there come a time that you went
3  anywhere with Mr. Justin Bressman on that day, August 15,
4  2003?
5  A  Yes.  In the afternoon we had left the apartment
6  together.
7  Q  And eventually did you go anywhere?
8  A  Yes.  Yes, we went out to eat and we went to swim.
9  Q  Where did you swim?
10  A  At the Sheraton Hotel in midtown.
11  Q  And is it fair to say you snuck into the Sheraton
12  Hotel?
13  A  Correct.
14  Q  You didn't pay to get in there.  You snuck in and
15  used their facilities?
16  A  Correct.
17  Q  After the Sheraton Hotel, where did you go?
18  A  Then we went to the Synergy Gym on 53rd Street
19  between Fifth and Sixth Avenue.
20  Q  Where did you go?
21  A  Justin went there to get some guns from a locker.
22  Q  How do you know that?
23  A  He told me.
24  Q  What was the purpose of getting the guns, according
25  to Justin?

*Owen Wicker, RPR*
*Official Court Reporter*

---

Amador - Direct/Miskiewicz

931

1  A  He wanted to sell a couple of guns to get high, to
2  get the money.
3  Q  To get the money?
4  A  Yes.
5  Q  Did you go with him to this Synergy Gym?
6  A  Yes, sir.
7  Q  And you said -- is this the West 23rd Street gym you
8  testified about yesterday?
9  A  Correct.
10 Q  Showing you what has been admitted as PA-7, and I'll
11 direct your attention to -- you said it was between Fifth
12 and Sixth --
13 A  Correct.
14 Q  -- Avenues?
15 A  Yes.
16 Q  On West 23rd Street?
17 A  West 23rd.
18 Q  Can you see my curser that I'm pointing to
19 approximately where the West 23rd Street gym was?
20 A  Yes.
21 Q  For the record, the intersection of West 23rd Street
22 and Sixth Avenue.
23       By the way, there is an orange line going north
24 and south on this map.  What is that?
25 A  The F train.

*Owen Wicker, RPR*
*Official Court Reporter*

---

Amador - Direct/Miskiewicz

933

1  of his clothes, put it at the end of the duffle bag,
2  turned around and opened up a nickel-plated lock, the
3  second lock on the right-hand side.  Took out a bag --
4  Q  What was this lock locking?
5  A  It was right behind the locker that he took out his
6  clothes from.  He turned around.  It was the second lock
7  on the top, the right-hand corner.
8  Q  Another locker from the rocker room?
9  A  Yes.
10 Q  All right.  Go on.  What did you see next?
11 A  He took out the key from his duffle bag, turned
12 around, opened the lock, took out a carpenter's bag that
13 had weapons inside.
14 Q  What did you see?
15 A  I saw some rags.  Inside of the rags was individually
16 wrapped handguns sticking out.
17 Q  What parts of the handguns did you see?
18 A  The butts of the guns.
19 Q  What do you mean by "a carpenter's bag"?
20 A  A bag that you would use, like a person who is in
21 construction.
22 Q  What did you see him do with this carpenter bag with
23 weapons inside?
24 A  Proceeded to put it in the middle of his duffle bag
25 that he had separated the clothes.  Put it in the middle

*Owen Wicker, RPR*
*Official Court Reporter*

---

Amador - Direct/Miskiewicz

932

1  Q  What train line?
2  A  The F train.
3  Q  Does that go all the way down to the lower east side,
4  to the neighborhood you live?
5  A  Yes.
6  Q  The Sheraton, is that uptown?
7  A  Correct.
8  Q  How did you get there to this gym?
9  A  Took the train.
10 Q  This F line?
11 A  Yes, sir.
12 Q  So you went to the West 23rd Street gym.
13       Did you go into the gym with Justin Bressman?
14 A  Correct.
15 Q  Tell us what happened when you went in.
16 A  We went in.  We was in like a steam room they have
17 there for a little while.  They have two standup showers.
18 We showered also.  He changed his clothes.  We went to the
19 locker room.  It is closer to the steam room.  When you
20 first come in, you first see the lockers.
21       He proceeded to bend down.  He opened up a
22 combination lock.  He took out a duffle bag.
23 Q  Where was the combination lock?
24 A  On the locker.
25       He took out the black duffle bag, took out some

*Owen Wicker, RPR*
*Official Court Reporter*

---

Amador - Direct/Miskiewicz

934

1  there, and took out a white and yellow plastic bag that
2  had boxes of ammunition.
3  Q  How did you see there was ammunition inside the bag?
4  A  It was see-through.
5  Q  What kind of bag was it?
6  A  Like a plastic grocery bag.
7  Q  Like a supermarket plastic?
8  A  Plastic.
9  Q  Partially see-through, or opaque?
10 A  Correct.
11 Q  Then what?
12 A  Then he put that inside his duffle bag, and he closed
13 it up.
14 Q  So did he put the entire carpenter's bag into his
15 duffle bag?
16 A  Correct.
17 Q  One bag went into the other?
18 A  Both of them went into the big duffle bag.
19 Q  Okay.  Then what happened?
20 A  Then we walked outside of the locker room.  We went
21 to the front, and a guy told him he had to make a phone
22 call.
23 Q  A guy.  What do you mean "a guy"?  Who?
24 A  One of the workers there.
25 Q  Okay.  And did he make a phone call?

*Owen Wicker, RPR*
*Official Court Reporter*

1 A   Yes.

2 Q   Do you know who he was calling?

3 A   No.

4 Q   Then what happened?

5 A   When this was happening, I seen a guy talking to

6 another individual inside the place.  And it was a guy,

7 like a construction worker.  He had a tool belt.

8 Q   So where, if anywhere, did you and Justin Bressman go

9 next?

10 A   We left Synergy, went to the train station, and we

11 went down to Second Avenue.

12 Q   Why did you go down to Second Avenue?

13 A   We went to a pizzeria to call Miguel Pena.

14        Miguel Pena was a friend of mine who also helped

15 Campbell, also, from time to time.

16 Q   What was the purpose of calling Miguel Pena?

17 A   To sell him the handguns.

18 Q   Who called him?

19 A   I called him.

20 Q   Did Miguel Pena ever meet you at that pizzeria?

21 A   Yes, he did.

22 Q   And at this stage, what is the situation with the

23 blackout:  pending, or over, or do you recall?

24 A   It was starting to come back, the power.

25 Q   Okay.  So Miguel Pena, did he meet you inside the

1 pizzeria or somewhere else?

2 A   Inside the pizzeria, in the back.

3 Q   Tell us what happened when he arrived.

4 A   When he arrived at the pizzeria, Justin told him he

5 had some handguns for sale, and Miguel told me he wanted

6 to see them.  We were sitting right by the bathroom.

7 Justin opened it up and handed him two .9 millimeters.

8 Q   Did you see them?

9 A   Yes.

10 Q   How did you see they were .9 millimeter?

11 A   Miguel went to the bathroom, and I followed him to

12 the bathroom and looked at the handguns.

13 Q   Where were the patrons in the pizzeria?

14 A   The electricity was minimal, just enough to run their

15 business, but relatively dark in the back.

16 Q   How far were you sitting from the bathroom to the

17 pizzeria?

18 A   Three or four feet.

19 Q   So you went into this bathroom, just you and Miguel?

20 A   Correct.

21 Q   And you saw the weapons there?

22 A   Yes, sir.

23 Q   Was -- did it look like the same weapon you testified

24 about yesterday, that Ruger?

25 A   No.  They were different.

1 Q   Okay.  Then what happened?

2 A   Then he sat back down, and he talked to Justin about

3 the price.  Justin told him it was 900, and Miguel

4 proceeded to pay him with cocaine and money.

5 Q   Anything else happen?

6 A   And he showed him another little gun, a Browning.

7 Q   A Browning?

8 A   Yes.

9 Q   A little gun.  What do you mean?

10 A   Small enough to hold it in the palm of your hand.

11 Q   What happened to that gun, if you know?

12 A   Miguel looked at it, and I looked at it in the bag,

13 and I said it was a nice little gun.

14        Justin said he was not selling that gun at that

15 time, and he wanted to keep it because it was easy to

16 conceal.

17 Q   So he did not sell it?

18 A   At that time, no.

19 Q   By the way, where was this pizzeria located?

20 A   Located on Houston Street, right next to Katz's

21 Delicatessen.

22 Q   So what, if anything, happened after this

23 transaction, the sale of guns, Friday, April 15, 2003, at

24 the pizzeria?

25 A   Justin took off to the Bronx, and I went with Miguel

1 back to Leshawn's house.

2 Q   Downtown?

3 A   He told me he was going to the Bronx.

4 Q   Did he tell you why he was going to the Bronx?

5 A   Didn't tell me.

6 Q   How did you get to your house or apartment on the FDR

7 Drive from the pizzeria?

8 A   Me and Miguel took a cab.

9 Q   Did you get any of the money from the purchase or the

10 sale of the weapons?

11 A   No, sir.

12 Q   What about any of the drugs?

13 A   No.

14 Q   That night, Friday, April 15, 2003, where did you

15 spend the night that night?

16 A   I spent the night at my daughter's house.

17 Q   Where does your daughter live?

18 A   Close by.

19 Q   And any particular reason why you remember spending

20 the night there with your daughter on Friday night?

21 A   Because I spend the nights on Friday, and I share a

22 cab with her mother to go uptown where she used to go to

23 work.

24 Q   You were separated from your wife, your common-law

25 wife, at the time?

1   A   Yes, but we're still friends.

2   Q   So you were not at Leshawn Campbell's apartment on

3   Friday night; is that correct?

4   A   Correct.

5   Q   Did there come a time that you returned to Leshawn

6   Campbell's apartment that weekend?

7   A   On Saturday.

8   Q   And approximately what time of day on Saturday?

9        This would have been August 16th?

10  A   Right.

11  Q   Approximately what time on Saturday, August 16th, did

12  you return to Leshawn's apartment?

13  A   I would say the evening.

14  Q   All right.  And who, if anybody, was there when you

15  arrived?

16  A   Me and La Shon was there.

17  Q   Did anyone else eventually arrive?

18  A   Yes.

19  Q   Who?

20  A   Justin.

21  Q   And did anyone else -- well, what was the purpose of

22  Justin coming on that occasion?

23  A   Justin came over to look for Miguel.

24  Q   And was Miguel there?

25  A   No, but he came later on, a short time after.

1   Q   What was the purpose of looking for Miguel?  Did he

2   tell you?

3   A   He wanted to sell him a .25 Browning, .25 caliber

4   handgun.

5   Q   Was this the gun you mentioned a little while ago

6   that fits in the palm of your hand?

7   A   Correct.

8   Q   Do you know whether or not Justin sold that gun to

9   Miguel Pena?

10  A   He did.

11  Q   After that transaction, what, if anything,

12  happened -- withdrawn.

13       Did Leshawn Campbell leave, or did he spend any

14  more time with you at that apartment, Leshawn Campbell's

15  apartment, that weekend?

16  A   Leshawn Campbell lived there.

17  Q   I'm saying -- I'll rephrase the question.

18       After he sold the gun to Pena, did Justin leave

19  Campbell's apartment or did he stay in the apartment?

20  A   He stayed with him.

21  Q   And for how long did he stay?

22  A   Until the next day.

23  Q   And the next day would have been Sunday?

24  A   Correct.

25  Q   Did he leave on Sunday, or did he stay from Sunday

1   into Monday?

2   A   He stayed from Sunday until Monday.

3   Q   What all were you doing during this weekend?

4   A   Hanging out drinking, getting high.

5   Q   I want to direct your attention to the evening into

6   early morning of Sunday, August 17th, Monday, August 18th.

7        Was Justin Bressman still hanging out with you

8   at the Campbell apartment?

9   A   Yes, sir.

10  Q   What, if anything -- withdrawn.

11       Were you asleep or were you awake?

12  A   We was up.

13  Q   What, if anything, were you doing?

14  A   We were just talking.  Hanging out.

15  Q   Did you at any time see that weapon that you

16  described yesterday, that Ruger, again during that period

17  of time?

18  A   Yes.

19  Q   Tell us:  What did you see?

20  A   In the late hours of the morning, Justin took out the

21  gun from his duffle bag.  When he came back and sold

22  Miguel the .25 caliber, he had a duffle bag on him, and it

23  had the Ruger in it.

24  Q   How do you know that?

25  A   When he went to sell the gun to Miguel, he said, keep

1   an eye on the bag for his gun.

2   Q   Where was the gun?

3   A   There was a table near the sofa where we were getting

4   high and hanging out.

5   Q   In the apartment?

6   A   Correct.

7   Q   And he told you to keep an eye on it inside the

8   apartment?

9   A   Yes.

10  Q   And then directing your attention either late Sunday

11  or early hours Monday, you saw the gun again?

12  A   Correct.

13  Q   What was he doing with that gun?

14  A   He was cleaning it.

15  Q   And what, if anything, happened?

16  A   He had took out his gloves that he was cleaning the

17  weapon down.  And I had gotten up to get something to

18  drink in the kitchen, and I was in there with La Shon, and

19  the gun accidentally went off.

20  Q   Before we get to that, did you talk to him at all

21  anymore about why he had this gun and what he intended to

22  do with it?

23  A   Yes.

24  Q   What did you ask him, and what did he tell you?

25  A   He was talking about that his boss, Matty -- he said

Amador - Direct/Miskiewicz

943

1  that his boss had got a nervous breakdown of some sort,
2  and he left Vinnie in charge of the gym, and that Vinnie
3  went and sold the equipment behind his back.
4           They put a lien on his house, and he didn't want
5  Vinnie appearing in court; that he was going to pay him
6  $35,000 to kill Vinnie.
7  Q   Who didn't want Vinnie to appear in court?
8  A   His boss at Synergy.
9  Q   This guy Matty?
10 A   Yes.
11 Q   Did you ever meet somebody by the name of Matty Roth?
12 A   No.
13 Q   Other than Justin -- did you see anybody that he
14 referred to as his boss?
15 A   No.
16 Q   Other than what Justin told you about his boss being
17 named Matty Roth, did you ever see on a sign when you
18 went to Synergy or anything like this, that this
19 establishment is owned by Matty Roth or anything like
20 that?
21 A   No.
22 Q   And you never met this guy here, the defendant?
23 A   No, sir.
24 Q   So then what happened?  You got us to the point you
25 stepped out of the room and there was a gunshot.  What

Amador - Direct/Miskiewicz

944

1  happened after the gunshot?
2  A   La Shon went crazy.
3  Q   What do you mean by "crazy"?
4  A   He started yelling at this.  This guy is cleaning the
5  gun, accidentally going off.  Doesn't want the cops going
6  to the apartment.
7  Q   What happened next?
8  A   I tried to calm him down.  Justin went and proceeded
9  to finish wiping the gun down, and he put the silencer on
10 the weapon.  He took the pillowcase that he was laying
11 down on.  He took the pillowcase out of the pillow, [sic]
12 and put the handgun inside the pillow case and tied it
13 into a knot.  He asked me for a book bag.
14 Q   And did you give him a book bag?
15 A   Yes, sir.
16 Q   What kind of a book bag?
17 A   A regular book bag where you have wheels on the back,
18 and you roll it or carry it.
19 Q   Like an adult luggage or kids' bag?
20 A   Adults or for kids.
21 Q   And then what happened?
22 A   Then we proceeded -- we left the apartment together.
23 He told me to walk him to the train station.
24 Q   And then what happened?
25 A   We left, and we were walking behind the building, and

Amador - Direct/Miskiewicz

945

1  we had a conversation, again, talking about the money,
2  that it needed to be paid.  He wanted to start a business.
3  He told me if I was acting as a lookout, that he
4  would give me $3500 out of the money.
5  Q   How did you -- what route did you take to get to the
6  train station?
7  A   Behind the building it had some compacters, garbage
8  compacter.  I remember looking behind him, exactly where
9  we were.  There were cars that were parked parallel.  And
10 we were walking on Delancey Street by the bridge.
11 Q   I will zero in on a portion of PA-7.
12          Do you see what I have up on the screen, PA-7,
13 that portion of PA-7, the lower right-hand corner?  Do you
14 see that?
15 A   Yes, sir.
16 Q   Can you just tell us what street it is that you
17 followed to get to the train station?
18 A   Just on top where it says "Delancey Street," that's
19 the sidewalk we took, going westbound.
20 Q   Okay.  And there's a little -- again, that orange
21 line there is kind of going northbound on the left-hand
22 side of the screen there.
23          Is that the F line you described?  Is that the
24 station you were headed to?
25 A   Correct.

Amador - Direct/Miskiewicz

946

1          MR. MISKIEWICZ:  I'm handing Mr. Amador the
2  laser pointer in case he needs it.
3  BY MR. MISKIEWICZ:
4  Q   And you said there was a trash compacter where he
5  asked you would you be a lookout, in sum and substance.
6  Approximately where is that?
7  A   This is Leshawn Campbell's apartment.  Right there is
8  the garbage compacter.
9  Q   Did you agree to be a lookout?
10 A   Yes, sir.
11 Q   So then what happened?
12 A   We walked along Delancey Street.  When we got to
13 Clinton Street, we stopped at a grocery store.
14 Q   Where is that?  Point to the map with the pointer.
15 A   Right there.
16 Q   And what did you do at that grocery store?
17 A   Justin bought me a beer.
18 Q   I'm sorry?
19 A   Justin bought me a beer.
20 Q   Do you remember what kind of beer it was?
21 A   A Colt 45.
22 Q   What did you do then?
23 A   Then we went to the train station on Essex Street.
24 Q   What did you do -- what train, if any, did you get
25 on?

Amador - Direct/Miskiewicz

947

1 A   We took the F uptown.
2 Q   Okay.  And where did you go uptown?
3 A   To 34th Street and Sixth Avenue.
4 Q   Let me see if I can zero in on that area.
5        Showing you a part of that map, PA-7, the orange
6 line.  It seems to terminate at a dot there at 34th and
7 Sixth Avenue.
8        Is that where you went?
9 A   Yes, sir.
10 Q   What did you do when you got off the F train?
11 A   I was following Justin because I didn't know where we
12 were going.  We got off at 34th Street, and we walked on
13 this side of the street to 30th Street.
14 Q   Indicating the west side of Sixth Avenue?
15 A   Southbound of the street, yes.
16 Q   Then what?
17 A   Then we turned east on 30th (indicating).
18 Q   Indicating eastbound, that you were walking somewhere
19 towards Broadway at that point?
20 A   Yes.
21 Q   Then what happened?
22 A   On 30th Street, they had two telephone booths on the
23 corner right here.
24 Q   What did you do at the telephone booths?
25 A   We stopped there, and he was looking up and down the

Owen Wicker, RPR
Official Court Reporter

948

1 street.
2 Q   You were looking up and down the street or Justin?
3 A   Justin.
4 Q   What was he looking for?
5 A   Looking for an individual named Vinnie.
6 Q   So then what, if anything, happened?
7 A   I seen a picture on the floor.  I picked it up and
8 proceeded to put it on the phone booth.
9 Q   What kind of a picture?
10 A   It was a religious picture.
11 Q   Was it on the sidewalk?
12 A   Right in front of the phone booth, upside down.
13 Q   Why did you do that?
14 A   I have no idea.  I just did it.
15 Q   Then what happened?
16 A   I put the picture on the phone booth, and I put my
17 beer inside.  And Justin kept looking up and down.
18        He started to complain to me he hoped we didn't
19 take too long, that if we missed him we had to go to
20 Sunnyside.
21 Q   At that time, did you know what he was talking about?
22 A   No.
23 Q   Had you ever been to Sunnyside before?
24 A   No.  I didn't even know where Sunnyside was.
25 Q   So after that, what happened?

Owen Wicker, RPR
Official Court Reporter

Amador - Direct/Miskiewicz

949

1 A   After that, he told me to take a walk with him.  We
2 turned the corner on 30th and walked towards Fifth Avenue.
3 Q   Point to approximately the route where you were
4 walking.
5 A   The phone booth is inside of the block, a little bit
6 off the corner, so we walked here and we walked here.
7 There was a construction site in the middle of the block
8 on this side of the street.
9 Q   You are indicating the north side of the block of
10 30th between Broadway and Fifth; is that correct?
11 A   Yes, sir.
12 Q   And the phone booth was on Broadway?
13 A   It's on Broadway, a little bit in the block.
14 Q   So then what happened?  When you went to this
15 construction site, what happened?
16 A   He scanned.  He looked at the crowd.  There was guys
17 waiting to go to work.  He looked at the crowd, and he
18 didn't see Vinnie.
19        So we walked back to the phone booth.  He
20 occupied the phone booth to the right, facing north, and I
21 had the one that had the picture and the beer bottle in
22 it.
23 Q   What happened, if anything?
24 A   He put the book bag in the phone booth, in the corner
25 on the shelf, took out the gun in the pillowcase.  He took

Owen Wicker, RPR
Official Court Reporter

950

1 a practice shot diagonally across the street.
2 Q   A practice shot?
3 A   Yes, sir.
4 Q   Did it make a noise?
5 A   No.  I just heard the round hit a metal gate across
6 the street of a business.
7 Q   Was the silencer on at this point?
8 A   Correct.
9 Q   What was the purpose of taking a practice shot, if
10 you know?
11 A   I guess he wanted to see if the mechanism was still
12 working.
13 Q   This is the same gun that was jamming that you
14 testified about yesterday?
15 A   Correct.
16 Q   What happened when he took that practice shot and you
17 heard the noise or the ping?
18 A   He questioned -- he asked me:  Do you think it is
19 strong enough to kill him?
20 Q   Then what happened -- withdrawn.
21        Did you say anything?
22 A   I said I didn't know.
23 Q   Then what happened?
24 A   He went back to the phone booth.  He opened up the
25 pillowcase.  The empty shell fell down on the floor

Owen Wicker, RPR
Official Court Reporter

Amador - Direct/Miskiewicz

951

1 between us. I picked it up and put it in my right-hand
2 pocket.
3        He looked at the gun and said it was ready to
4 go, meaning the round went into the gun, and he was ready
5 to take another shot.
6 Q   So he shot through the pillowcase?
7 A   Correct.
8 Q   And --
9 A   He had on latex gloves the whole time.
10 Q   Okay. Let's go back to the exhibit I showed you
11 yesterday.
12        MR. MISKIEWICZ: If I may, your Honor? One
13 second?
14        THE COURT: Yes.
15 BY MR. MISKIEWICZ:
16 Q   Showing you PA-11 in evidence. You said the round
17 fell out, or the shell fell out, of the --
18 A   -- pillowcase --
19 Q   -- when he opened it.
20        Would you explain what the round or the shell is
21 that you are talking about, and where does it come out of
22 when you shoot this?
23 A   When a shot is fired from a weapon, a semiautomatic,
24 the shell is expelled from here (indicating). When it is
25 expelled, it shoots out.

Owen Wicker, RPR
Official Court Reporter

Amador - Direct/Miskiewicz

952

1        The purpose of the pillowcase was not to leave
2 any evidence at the crime scene.
3 Q   So it shot out into the pillowcase?
4 A   Yes, sir.
5 Q   And you picked it up?
6 A   I picked it up and put it in my right-hand pocket.
7 Q   And why did you do that?
8 A   Well, because he didn't want to leave any physical
9 evidence of the gun or of the crime at the scene.
10 Q   Did he eventually put the gun back into the
11 pillowcase?
12 A   Yes. He tied the knot back up, put it into the
13 pillowcase, and put it inside the book bag, standing up.
14 Q   So what, if anything, happened next?
15 A   We was waiting. He was looking up and down, scanning
16 the street. I noticed a police van on the corner, and I
17 told him there was police on the corner waiting for the
18 light. After the light changed, the police turned right
19 and went downtown on our side of the street. They made a
20 long turn, and they stopped at the light. I guess 29th
21 Street.
22 Q   Then what happened, if anything?
23 A   Then a little while after that, he looked up the
24 block. He told me, that's him. He knows Vinnie's coming
25 down the street behind us.

Owen Wicker, RPR
Official Court Reporter

Amador - Direct/Miskiewicz

953

1 Q   What did you see, if anything?
2 A   I seen a Caucasian male walking with a cooler in his
3 hand and a hard hat, a construction hat, in the other.
4 Q   Did you get a look at this guy?
5 A   Yes.
6 Q   Showing you what is in evidence as RS-19.
7        Do you recognize that person that is depicted in
8 that photograph?
9 A   It's Vinnie.
10 Q   Did you know this person?
11 A   No.
12 Q   So what, if anything, happened next?
13 A   When he said that was Vinnie, he took the gloves off
14 his hands and put them in his pocket. He went and grabbed
15 the gun out of the book bag.
16        I snatched the book bag from inside the phone
17 booth where he was and put it on my shoulder, and went to
18 the corner after that, acting as if I was hailing a cab.
19 Q   And did you see what, if anything, happened next?
20 A   When Vinnie came upon Justin, Justin turned to his
21 left, turned around, counterclockwise, and came
22 face to face with Vinnie.
23 Q   Where was Justin standing at this point?
24 A   In the phone booth.
25 Q   Okay. What, if anything, happened when he faced

Owen Wicker, RPR
Official Court Reporter

Amador - Direct/Miskiewicz

954

1 Vinnie?
2 A   Vinnie looked up at Justin, said, Justin, what are
3 you doing around here, he said. He put his hand on his
4 shoulder like he was patting him.
5 Q   Which hand?
6 A   Justin had his left hand on Vinnie's right shoulder.
7 Q   Like pushing him? Punching him? Friendly gesture?
8 A   Friendly gesture, like tapping him on the shoulder.
9 Q   What happened?
10 A   Vinnie proceeded to his left, and put the cooler and
11 the hard hat down on the ground. And when he was coming
12 on his way up, Justin looked up and down to me.
13        When Justin went to stand up, he didn't get to
14 fully stand up. Justin pulled the gun, and he shot him in
15 the face.
16 Q   How was he holding the gun?
17 A   He was holding the gun hidden behind his thigh.
18 Q   And how did he hold the gun when he raised it and
19 pointed it at Vinnie's face?
20 A   Grabbed it like this (indicating).
21 Q   With two hands?
22 A   Correct.
23 Q   What, if anything, did you see next?
24 A   I seen Vinnie fall backwards with his hands like this
25 (indicating).

Owen Wicker, RPR
Official Court Reporter

Amador - Direct/Miskiewicz

955

1  Q   Indicating his hands kind of look flopping backwards
2  in the air?
3  A   The impact of the round hitting him on his face
4  knocked him off his feet, and he fell back.
5  Q   What happened next?
6  A   Justin took a split second over him and ran towards
7  me.
8  Q   Did you see or hear anything?
9  A   He told me, come on.
10 Q   What, if anything, happened then -- withdrawn.
11     What, if anything, did you do then?
12 A   He had specks of blood on his left hand.  I looked at
13 him.  I stood frozen.  He said, come on.
14     I took too long for him, and he started to run.
15 Q   Where did he run to?
16 A   He ran towards like the west side of the street but
17 going north, and then arched and came back into 31st
18 Street between Broadway and Fifth.
19 Q   I'll pull up a part of the map again.  If you can
20 indicate for the benefit of the members of the jury, what
21 was his route when he ran away from the scene?
22 A   This is where the murder occurred.  He ran this way
23 and then he ran that way.  He was running alongside the
24 cars.
25 Q   Did you lose sight of him at some point?

Owen Wicker, RPR
Official Court Reporter

Amador - Direct/Miskiewicz

956

1  A   When he turned the corner at 31st and Broadway.
2  Q   What did you do?
3  A   I walked across the street right here.  Then I went
4  up -- right there they have some big flower pots in front
5  of a building.  I threw the spent shell I had in my
6  right-hand pocket inside the flower pot, and I crossed the
7  street diagonally from there, this way.  And I ended up
8  almost like behind him.
9  Q   And when you got -- or after you threw the spent
10 shell into the flower pot, what, if anything, did you do?
11 A   I proceeded to walk a little bit up, and I turned
12 almost the same route that Justin had taken, but I took a
13 more straight path.  And I was walking.
14 Q   Okay.  And where did you eventually go?
15 A   I stopped in front of a store that sold cellular
16 phones.  I stood there for a little while, a quick second
17 or two, and I looked around me.  I seen there was a man
18 sitting on a chair, and for some reason he had his eyes on
19 me.  It spooked me out.
20     So I crossed the street.  There was also a
21 construction thing going on there.  They only had one lane
22 of the street working.  They had it divided in the middle
23 of the street.
24     So I walked up a little more ahead, and I hailed
25 a cab by between Broadway and Fifth Avenue on 31st Street.

Owen Wicker, RPR
Official Court Reporter

Amador - Direct/Miskiewicz

957

1  Q   Where did you take the cab?
2  A   Told him to take me to Leshawn's house.
3     He made a left on Broadway, and I came upon the
4  crime scene again.
5  Q   What did you see?
6  A   I seen a police car there.
7  Q   And did you eventually continue in that cab to
8  Leshawn Campbell's house?
9  A   Correct.
10 Q   Did you see Mr. Bressman again that day at all?
11 A   No.
12 Q   By the way, this whole time that you were in the
13 vicinity of Broadway and 30th, approximately what time of
14 day was it that you were waiting for Vinnie and when he
15 was actually shot and killed?
16 A   I would say like from 6:30, 7 o'clock in the morning.
17 Q   So about what time did you arrive back at Campbell's
18 apartment?
19 A   Maybe after 7:30.
20 Q   And did you see or hear from Justin Bressman for the
21 rest of that day, Monday, August 18th?
22 A   No.
23 Q   Did you see Justin Bressman again at all that week?
24 A   He came the next day.
25 Q   Came where?

Owen Wicker, RPR
Official Court Reporter

Amador - Direct/Miskiewicz

958

1  A   To Leshawn's house.
2  Q   And what did he say?
3  A   He knocked on the door.  I opened it up.  I was
4  cleaning the house.  He came in.
5     As soon as I closed the door, he told me:  Did
6  you see that?  And he started pointing to his face, the
7  bridge of his nose.
8     He said, that's where I shot him, the bridge of
9  his nose.  It was a good shot.  He was boasting about it.
10    I didn't want anybody to hear what he was
11 saying, because he was inside the door.  I moved him to
12 the closet where I previously retrieved the book bag that
13 I gave him, which is a little more inside of the
14 apartment.
15    I asked him:  What happened?  Where did he go?
16    He said he went to a friend's factory in
17 Brooklyn where they got rid of the gun and his clothes.
18 Q   Prior to going to the scene, he promised you some
19 money for being a lookout?
20 A   Correct.
21 Q   Did he bring the money that day?
22 A   No.
23 Q   Did you talk at all about the money?
24 A   I asked him what happened with the money.  He said
25 that the day of the murder, he called Matty, his boss, and

Owen Wicker, RPR
Official Court Reporter

1  told him about what happened.
2          Matty took him out to eat, and during that
3  conversation of the eating, he told me that that's what
4  happened --
5  **Q**  "He" meaning who?
6  **A**  Matty.
7  **Q**  So Justin is telling you what Matty told him?
8  **A**  Yes.  Told him that he couldn't come up with the
9  money in one shot because -- that he would be under
10  scrutiny.
11  **Q**  Who would be under scrutiny?
12  **A**  Matty.
13  **Q**  And so what would happen?  Or what, if anything,
14  would happen with the money, you being paid?
15  **A**  I would have to wait, he told me.
16  **Q**  Anything else happen that morning when he showed up?
17  **A**  I asked him:  What did he say about the weapons,
18  about the guns?
19  **Q**  Which guns you are talking about, the Ruger or the
20  other guns?
21  **A**  The other guns.
22  **Q**  What did he tell you?
23  **A**  Came up with some story he told Matty on the day of
24  the blackout get-together with his friends, and they had
25  to do that.  And when the cops came upon the scene, they

1  had to throw away some weapons.
2          And he said, even the Browning, the little
3  weapon?
4          And he said, yeah.
5  **Q**  What, if anything, happened next in this time that --
6  with Justin Bressman in the apartment?
7  **A**  On the day of the murder, when I got back to the
8  apartment, I told Leshawn Campbell what happened, that
9  Justin shot the guy in the face and killed him.
10          Justin went into the room to talk to Leshawn
11  Campbell and came back with a total different demeanor.
12  **Q**  What do you mean by that?
13          What was his demeanor when he first showed up at
14  the apartment?
15  **A**  He was boasting what he had did in the apartment,
16  that he was happy.
17  **Q**  What was his demeanor in the room when he was talking
18  to Campbell?
19  **A**  He was pissed off.
20  **Q**  At who?
21  **A**  At me.
22  **Q**  What, if anything, did he say to you?
23  **A**  That I had a big mouth.
24  **Q**  Anything happen then?
25  **A**  He went into the room where he had put the duffle bag

1  that he had the night we left to do the murder, in the
2  morning.  He left the duffle bag with the clothes inside
3  Miguel's room.
4          He grabbed the duffle bag.  He said nothing to
5  me.  He left.
6          And I asked him about the money, in the hallway.
7  He was opening up the doorway to the staircase, and I
8  asked about the money.
9          He told me he will have to skip town, that he'll
10  have the money wired to me, that he'll call me.
11  **Q**  Did you have any further discussion with him that
12  day?
13  **A**  He called me up on the phone.
14  **Q**  How soon after he left the apartment did he call you
15  up on the phone?
16  **A**  Minutes later.
17  **Q**  Do you know where he was calling from?
18  **A**  No.
19  **Q**  And what phone was he calling you at?
20  **A**  Leshawn Campbell's house.
21  **Q**  Was that a house phone, like a hard line phone, or
22  was it a cell phone?
23  **A**  It was a hard line.
24  **Q**  What, if anything, did he say to you, did Justin
25  Bressman say to you, when he called you on the phone?

1  **A**  That I had a big mouth, that I shouldn't have said
2  anything to La Shon, I had no business in doing that, and
3  he was upset for me for telling La Shon anything.
4  **Q**  Showing you what has been marked for identification
5  as PA-13.
6          Showing you PA-13, without commenting on it, did
7  you ever have any discussion with Justin about what I've
8  just shown you?
9  **A**  Yes.
10  **Q**  Was that the same day, in other words, the day after
11  the murder?
12  **A**  Correct.
13  **Q**  Was it on the phone?
14  **A**  Yeah.
15  **Q**  What, if anything, did he say to you?
16  **A**  After we had the initial conversation, we hung up the
17  phone.  A little bit later he called me up again, and he
18  asked me what type of beer was I drinking.
19          I tried to lie to him, because I knew what had
20  happened.  I left the beer at the crime scene.  I told him
21  it was a Budweiser.
22          And he told me that I was full of it, that it
23  was a Colt 45, and if I ever knew anything about
24  fingerprints --
25          I said, Justin, you have nothing to worry about

1015

1  with me.

2          He said, no, through you they can get to me, and

3  he called me a loose end.

4  Q   Did he make reference to anything that he had seen

5  earlier or during that period of time during that day?

6  A   He told me about it in the newspaper.  He told me to

7  go get the newspaper.

8  Q   Did you?

9  A   Yes.

10  Q   What, if anything, did you see in the newspaper?

11  A   I seen this article, forensic guy, about the bottle

12  of beer, examining it, in the paper.

13          MR. MISKIEWICZ:  May I have a moment with

14  counsel, your Honor?

15          THE COURT:  Yes.

16          MR. MISKIEWICZ:  We'll move on for now, your

17  Honor.

18          THE COURT:  All right.

19  BY MR. MISKIEWICZ:

20  Q   Mr. Amador, showing you what is in evidence as PA-3.

21          Do you recognize what is depicted in PA-3?

22  A   Yes, sir.

23  Q   What do you recognize it to be?

24  A   That was the phone booth that I occupied and left the

25  picture on and my beer bottle on.

1  Q   So I'm using the curser here with respect to this

2  religious painting.  This is the picture or the painting

3  you picked up from the sidewalk?

4  A   Yes.

5  Q   What is this?

6  A   The bag holding the beer bottle on the left.

7  Q   Zeroing in on that, is that the Colt 45 beer bottle?

8  A   Yes, sir.

9  Q   And you saw the next day an article in the newspaper

10  about -- depicting that same bottle?

11  A   Yes.

12  Q   That is what Bressman told you?

13  A   Yes.

14  Q   And you saw the article itself?

15  A   Yes, sir.

16  Q   All right.  So what, if anything, then happened,

17  either that day or in any of the following days after the

18  murder, between you and Justin Bressman?

19  A   When that happened, I started carrying a pistol with

20  me for my protection.

21  Q   Why?

22  A   Because he called me a loose end.

23  Q   What does that mean?

24  A   That means that he had to tie up unfinished business.

25  That's how I took it.  He didn't say it in a good way.

1  Q   So you started carrying what kind of a weapon?

2  A   A .22 caliber Astra.

3  Q   Was it illegal for you to carry a pistol in

4  Manhattan?

5  A   Yes, sir.

6  Q   You knew it was illegal?

7  Q   Excuse me?

8  Q   You knew it was illegal?

9  A   Yes, sir.

10  Q   But you were carrying it for protection?

11  A   Yes.

12          MR. ROSEN:  Objection.  Leading.

13          THE COURT:  Sustained.

14  BY MR. MISKIEWICZ:

15  Q   Why were you carrying it?

16  A   To protect myself.

17  Q   Okay.  Did there come a time that you saw Justin,

18  again in the days -- or couple of days after the murder?

19  A   Yes.

20  Q   When did you see him and where?

21  A   I was out.  I came into the apartment at the

22  nighttime.  It was on a Thursday.  And Justin was in the

23  apartment with La Shon.

24  Q   What, if anything, did he say to you, and what did

25  you say to him?

1  A   I said, what's going on?

2          He told me that he just got released from the

3  precinct, that the NYPD detectives picked him up at the

4  gym, and on his way to the precinct to answer questions.

5  He said Matty had gotten him a lawyer.

6  Q   And when he said "Matty," who was he referring to who

7  got him a lawyer?

8  A   His boss at the gym.

9  Q   Did you ever see Justin after that?

10  A   Yes.

11  Q   Tell us about that event.

12  A   He came on the following Monday to Leshawn's.

13  Q   That's a week after the murder?

14  A   Correct.

15  Q   What was the purpose of him coming there?

16  A   He had a scheme that he wanted to rob a drug dealer.

17  Q   And what, if anything, were you supposed to have to

18  do with the scheme?

19  A   He told me that if I had access to get a gun.

20          I said, yeah.  I had one the whole time, but I

21  lied to him.  I told him I had to go out and get it, even

22  though I had it the whole time.

23  Q   What did you do with Justin, if anything, regarding

24  this supposed scheme to kill or rob a drug dealer?

25  A   We went outside.  We got into his car.

Amador - Direct/Miskiewicz

967

1  Q   What kind of car was he driving?
2  A   A Q45.
3  Q   What color?
4  A   It was black with like a cream interior.
5  Q   A Q45.  Is that an Infiniti?
6  A   Infiniti Q45.
7  Q   Where did you go?
8  A   We went to the uptown Synergy Gym.
9  Q   Did you ever see Justin's car before?
10 A   No.
11 Q   Did he tell you where he got the car from?
12 A   He said Matty got the car for him.
13 Q   So you drove in this Infiniti Q45 uptown.
14     Where?
15 A   Right across the street from the Synergy Gym.
16 Q   What Synergy Gym?
17 A   The one uptown, in the 90s.
18 Q   Had you ever been to that Synergy Gym before?
19 A   Yes.
20 Q   With whom?
21 A   He came outside to speak to me.  I never set foot in
22 the uptown gym.
23 Q   That was prior to this event, prior to the Infiniti?
24 A   Yes.
25 Q   So what happened when you got to this Synergy Gym --

*Owen Wicker, RPR*
*Official Court Reporter*

Amador - Direct/Miskiewicz

968

1  withdrawn.
2      The Synergy Gym, you said what cross-streets?
3  A   On First and Second Avenue, like in the low 90s.
4  Q   Okay.  So the east side.
5  A   Correct.
6  Q   So what, if anything, happened when you got to the
7  Synergy Gym?
8  A   When we got to the Synergy Gym, an individual came
9  out of the building, a stocky fellow, and proceeded to
10 stand next to Justin on the driver's side, look over to
11 him and talking to him about him having to call the guy
12 over, and me and Justin going in to rob him.  But Justin
13 wanted to hold my gun.
14 Q   Did you know who this guy was?
15 A   No.
16 Q   Ever meet him before?
17 A   Never.
18 Q   So then what happened?
19 A   Then the guy left that he was speaking to.  Justin
20 told me to wait for him on the block while he took a
21 ten-minute drive in order to speak to somebody.
22 Q   So you waited on the corner?
23 A   I wait a minute just off the corner -- there's two
24 buildings that look almost alike.  I was on the staircase
25 smoking a cigarette, and an old lady come out.  She

*Owen Wicker, RPR*
*Official Court Reporter*

Amador - Direct/Miskiewicz

969

1  started yelling at me for smoking a cigarette on the
2  stoop.
3  Q   Then what happened?
4  A   Standing on the street with a gun in my pocket and
5  this lady is yelling at me.  When Justin came back, he
6  came back with another individual in the passenger seat
7  that I had previously occupied.
8  Q   Is it fair to say -- well, was there any reason in
9  particular that you were now concerned that you had this
10 argument with the old lady?
11 A   I mean, I was nervous now that I had a weapon in my
12 pocket.  I didn't want the lady to call the cops on me
13 because I didn't live there.
14 Q   What happened when Justin came back?
15 A   When Justin came back with another individual in the
16 front seat, I sat down -- it was a four-door car.  I told
17 Justin that I didn't feel right, to take me back to
18 Leshawn's.
19 Q   And did he?
20 A   Yeah.  He said that he didn't know what he was
21 thinking about.  He shouldn't be around there.
22 Q   Did you ever see Justin Bressman again?
23 A   When he dropped me off by Leshawn's house, I never
24 seen him again after that.
25 Q   I want to direct your attention to later, late summer

*Owen Wicker, RPR*
*Official Court Reporter*

Amador - Direct/Miskiewicz

970

1  or early fall of 2003.
2      Did there come a time that you were arrested?
3  A   Yes, sir.
4  Q   And were you arrested by the New York City Police
5  Department?
6  A   Correct.
7  Q   What were you charged with?
8  A   Possession of a handgun in the second degree.
9  Q   And was that the handgun that you testified about a
10 moment ago that you started carrying?
11 A   Correct.
12 Q   Did there come a time that you eventually pled guilty
13 to that crime of possession of a handgun?
14 A   Yes, sir.
15 Q   Were you sentenced?
16 A   Yes.
17 Q   What was your sentence?
18 A   Seven years.
19 Q   When did you begin serving your sentence on that
20 charge?
21 A   From for the day I was arrested --
22 Q   What day was that?
23 A   September 16, 2003.
24 Q   You've been in jail ever since?
25 A   Correct.

*Owen Wicker, RPR*
*Official Court Reporter*

Amador - Direct/Miskiewicz

971

1    Q    Did there come a time after you pled guilty in New
2    York State court for a possession of a weapon that you
3    pled guilty to any other crime?
4    A    Yes.
5    Q    What did you plead guilty to?
6    A    I pled guilty to manslaughter in the first degree.
7    Q    What manslaughter are you referring to?
8    A    To the Gargiulo homicide.
9    Q    Did you enter into an agreement with respect to the
10   Gargiulo homicide with either the federal government or
11   the New York District Attorney's Office?
12   A    Yes, sir.
13   Q    What do you understand the terms of that agreement to
14   be that resulted in your entering into a guilty plea?
15   A    They told me that I must be made aware my potential
16   maximum could be 25 years' incarceration, but if I testify
17   and I give the truth of everything that happened and
18   everything that I've done, that they will make a
19   recommendation of 8 to 15; 8 minimum, 15 maximum.
20   Q    And you would be sentenced in federal court or state
21   court?
22   A    State court.
23   Q    And when they said you had to tell about everything
24   that happened, does that mean you had to tell law
25   enforcement or the Government?

Owen Wicker, RPR
Official Court Reporter

Amador - Direct/Miskiewicz

972

1    A    Correct.
2    Q    Does that include the federal government?
3    A    Yes, sir.
4    Q    And is it your understanding that as a result of your
5    entering into that guilty plea, that that's why you are
6    testifying here today as part of your cooperation, that
7    you agree to and you enter a guilty plea?
8    A    Correct.
9    Q    Other than this range of 8 to 15 years that you could
10   get, has anybody on behalf of the New York City Attorney's
11   Office told you what your sentence would be?
12   A    No.
13   Q    Has anyone on behalf of the United States Attorney's
14   Office told you or promised you what your sentence will
15   be?
16   A    No.
17   Q    Did anybody force you to enter into a guilty plea?
18   A    No, sir.
19   Q    Did anybody -- has anyone on behalf of either the New
20   York District Attorney's Office, the New York City Police
21   Department, the FBI or the U.S. Attorney's Office ever
22   told you that your sentence is dependant on, you know, how
23   well you do on the stand?
24   A    No, sir.
25   Q    Did anybody tell you who Manny Roth is?

Owen Wicker, RPR
Official Court Reporter

Amador - Direct/Miskiewicz

973

1    A    No.
2    Q    Did anybody tell you what to say on the stand this
3    morning?
4    A    No.
5         MR. MISKIEWICZ:  Your Honor, I'm about to go
6    into another section.
7         THE COURT:  Let's take our mid-morning break
8    then, folks.  Do not talk about the case.
9         (Whereupon, at this time the jury exits the
10   courtroom.)
11        (Whereupon, a recess was taken.)
12        MR. MISKIEWICZ:  Your Honor, this has to do with
13   PA-13.  This is a New York Post article.
14        We're moving under Rule 201 that the Court can
15   take judicial notice of such things as newspaper articles,
16   and that this was a newspaper article in the New York
17   Post.
18        We are prepared to redact out the entire
19   article.  We don't need the article.  We are simply moving
20   it in because of the photos that are depicted.
21        In particular, one photo is duplicative of the
22   crime scene.  There are other photos in evidence.  It
23   simply has the crime scene evidence person dusting the
24   Colt 45 beer bottle.
25        And I believe counsel has an objection.

Owen Wicker, RPR
Official Court Reporter

Amador - Direct/Miskiewicz

974

1         THE COURT:  What is your objection?
2         MR. ROSEN:  Obviously, it's hearsay.  It's
3    cumulative.  He's already testified about it.  There's no
4    reason to put the article in.  He could identify it.  And
5    he already said, I've seen the article, and that's why I
6    did certain things afterwards.  Then I understood what
7    Mr. Bressman was saying, that's why I lied to him
8    about the Budweiser.
9         THE COURT:  It would make more sense if you had
10   the actual article so the witness's testimony would
11   clearly be documented.  It's not hearsay in the sense
12   that -- the fact that there was an article that depicted
13   this particular Colt 45 bottle was published the following
14   day?
15        MR. MISKIEWICZ:  Yes, August 19, 2003, in the
16   New York Post.
17        THE COURT:  As long as nothing of the written
18   material comes in, I'll allow it over your objection.
19        THE CLERK:  Jury entering.
20        (Whereupon, the jury at this time enters the
21   courtroom.)
22        THE COURT:  Please be seated.
23        We'll go until about a quarter of one, if that
24   is okay with you folks today.
25        You may continue, Mr. Miskiewicz.

Owen Wicker, RPR
Official Court Reporter

Amador - Direct/Miskiewicz

975

1    MR. MISKIEWICZ:  May I proceed, your Honor?
2    THE COURT:  Yes.
3  BY MR. MISKIEWICZ:
4  Q  Mr. Amador, I believe we were at the break and
5  discussed that you entered into a guilty plea.  And you
6  testified under the terms of the agreement with the New
7  York District Attorney's Office, correct?
8  A  Correct.
9  Q  Do you have -- other than what you've testified about
10  your understanding of the agreement, are there any other
11  side deals that have prompted you to enter into an
12  agreement that you have not mentioned so far?
13  A  No.
14  Q  I'd like to go back to the murder scene.
15    I'm showing you a close-up portion of
16  Government's Exhibit PA-3.
17    I'll show you another photograph in evidence,
18  specifically, PA-4.
19    Do you recognize what is depicted now, what is
20  in front of you as PA-4?
21  A  Yes, sir.
22  Q  What do you recognize to be depicted in that
23  photograph?
24  A  That's the murder scene.
25  Q  Okay.  Could you orient us as to what street are we

Amador - Direct/Miskiewicz

976

1  looking at at the far end of this photograph?
2  A  We're looking northbound on 30th Street to 31st
3  Street on Broadway.
4  Q  Okay.  So it's -- sort of dead center in the
5  photograph, there are some -- there seems to be some
6  scaffolding with a green thing on top, some sort of
7  covering.
8    If we kept walking under that scaffolding
9  forward, we would be on what street?
10  A  31st.
11  Q  Okay.  And the sidewalk depicted in the foreground,
12  is that 30th or are we on Broadway here?
13  A  This is Broadway, 30th, looking towards 31st Street.
14  Q  To the left, there is a couple of pay phone kiosks.
15  Do you see that?
16  A  Yes.
17  Q  Are those the pay phone kiosks that you referred to
18  earlier?
19  A  Yes.
20  Q  Of which two did you say you first stood in when you
21  first arrived?
22  A  The one closest to us.
23  Q  Showing you what is in evidence as PA-2.
24    Is that the same photograph we saw a little
25  while ago?

Amador - Direct/Miskiewicz

977

1  A  Correct.
2  Q  And is that the pay phone you stood in initially?
3  A  Yes.
4  Q  There is what appears to be a small cooler, a white
5  and bluish-green cooler, as well as something to be inside
6  of that?
7  A  Yes.
8  Q  Do you recognize that?
9  A  Yes.
10  Q  What do you recognize those items to be?
11  A  That was the items that Vinnie was carrying.
12  Q  Is that the position that the cooler was in when you
13  ran -- or left the scene that day?
14  A  No.
15  Q  Showing you PA-4.
16    If you can, using the laser pointer,
17  approximately where was the cooler when you last saw it?
18  A  Right there (indicating).
19  Q  You are indicating closer to the center of the
20  sidewalk, just below a pool of blood.
21  A  Yes.
22  Q  And did Justin -- did you see who moved the cooler?
23  A  No.
24  Q  After you ran from the scene, I think you said you
25  ended up driving by it again when you got into that taxi?

Amador - Direct/Miskiewicz

978

1  A  Correct.
2  Q  And what did you notice?
3  A  The police was putting up a perimeter, that line
4  (indicating).
5  Q  Okay.
6  A  And there was a police car facing uptown.
7  Q  Showing you what is in evidence as PA-5.
8    What are we looking at here?
9  A  We are looking at the opposite direction, facing
10  downtown.  Facing 30th and Broadway, the corner of 30th
11  Street.
12  Q  You testified earlier there was, prior to Vinnie,
13  Mr. Gargiulo, arriving at the scene, there was a practice
14  shot?
15  A  Correct.
16  Q  Can you, by looking at this photograph, describe
17  approximately which way the practice shot was taken?
18  A  Diagonally across the street.  Over here
19  (indicating).
20  Q  You are pointing to one of the buildings -- I guess
21  that would be the west side of Broadway?
22  A  Correct.
23  Q  And there are a lot of people around there on this
24  photograph, correct?
25  A  Yes, sir.

Amador - Direct/Miskiewicz

979

1  Q    What was the scene like when you arrived, you know, I
2  think you said somewhere between 6:30 and 7 o'clock?
3  A    Pretty much desolate.
4  Q    And what about the storefronts?  What did they look
5  like?
6  A    They were pulled down.
7  Q    What do you mean "pulled down"?
8  A    They were closed.  The stores were closed.
9  Q    You mean there were metal roll-down gates?
10  A    Yes, sir.
11  Q    And again, from looking at this photograph, can you
12  tell us approximately from which direction did Vinnie
13  arrive when you first noticed him?
14  A    This would have been his view walking down.
15  Q    I'm sorry?
16  A    This would have been his view walking.
17  Q    Okay.  So he would have been coming from this
18  direction that is depicted?
19  A    Yes.
20  Q    Okay.  Looking at PA-4, does this more or less depict
21  your view?
22  A    Correct.
23  Q    So Vinnie would have been walking towards you?
24  A    Yes, sir.
25  Q    And head on or face on?

Amador - Direct/Miskiewicz

980

1  A    Yes, sir.
2  Q    Were you in the middle of the sidewalk or were you
3  someplace else?
4  A    I was on the corner, this side (indicating).
5  Q    I think you are indicating to the left side of the
6  photograph?
7  A    Back here, the corner.
8  Q    Basically on the left side of the photograph, a
9  little bit off of the frame as we see on the photograph;
10  is that correct?
11  A    Yes, sir.
12      MR. MISKIEWICZ:  Your Honor, at this time I
13  would ask permission to allow the witness to come down off
14  the stand.
15      THE COURT:  All right.
16  BY MR. MISKIEWICZ:
17  Q    Mr. Amador, I will ask that you demonstrate for the
18  members of the jury, first of all, where did Justin
19  Bressman hold this gun as Vinnie approached?
20      And over in us, I guess, facing the bench or
21  where Judge Seybert is would be the direction of the
22  telephone booths?
23  A    When he knew that Vinnie was coming, took the gloves
24  off and put it in the pocket, I took the book bag out and
25  proceeded to the corner.  When I did that, I was acting

Amador - Direct/Miskiewicz

981

1  like I was hailing a taxi but looking for the police.
2      When I looked, I seen Vinnie looking down, and
3  when I looked up, Justin turned counterclockwise and came
4  face to face with him.
5  Q    Assuming I'm Vinnie walking down, looking in this
6  direction, show us how he turned.
7  A    He turned this way (indicating).
8  Q    So he turned that way?
9  A    Yes.
10  Q    And you have your hands -- you have your right hand
11  behind you.  Is that the way the hand was when you saw it?
12  A    Yes.
13  Q    So is it fair to say that it looked like he was
14  hiding it by his side?
15  A    Yes.
16  Q    So when Vinnie approaches -- you tell me at
17  approximately what point, as I approach you, assuming you
18  are Justin, do you see him say something along the lines
19  of, hey, what are you doing here?
20  A    Well, Justine, what are you will doing here?  What
21  are you doing around here?
22  Q    For the record, we're almost an arm-length apart.
23  A    Justin was patting him on the shoulder, holding him
24  like this.  And Vinnie looked at him and proceeded to turn
25  to his left.  Put the cooler down with the hard hat.

Amador - Direct/Miskiewicz

982

1      Justin was up, down, and he was looking down
2  towards to me.
3      When Vinnie was starting to look up, Justin took
4  the gun like this, by the muzzle of the silencer, and shot
5  him in the face before he fully got to stand up.
6  Q    And the gun was where, inside the pillowcase?
7  A    Inside the pillow.
8  Q    Where were his hands?
9  A    His hand was placed over the pillowcase, which was in
10  turn holding the gun.  He was able to manipulate the
11  trigger to shoot outside the pillowcase.
12  Q    So you are saying that -- just to demonstrate,
13  assuming this was a pillowcase, was it this size or
14  bigger?
15  A    Bigger.
16  Q    But was his hands inside the pillowcase?
17  A    No.
18  Q    Outside?
19  A    Outside.  You could have held a bag like this, and
20  the gun handle was inside the pillowcase.
21  Q    The trigger finger?
22  A    His finger was able to go inside the trigger handle
23  and manipulate the trigger.
24  Q    Where would the ejected shell casing go?
25  A    It would stay in the pillowcase.  That was the reason

1015

Amador - Direct/Miskiewicz

983

1  why he had the pillowcase.
2  **Q**   Okay.  Again looking at PA-4, you were standing at
3  approximately that location, maybe a little bit to the
4  left, when all this happened?
5  **A**   Yes, sir.
6  **Q**   Where did Justin go?
7  **A**   Justin ran towards me.  He ran this way (indicating),
8  **towards me.**
9      **I stood frozen.  I saw speckles of blood on his**
10 **arm.  He saw that he wasn't moving.  He had the gun**
11 **cradled in his hand and proceeded to run that way and**
12 **disappeared on Broadway.  He was -- he was going towards**
13 **the driver's side of the cars.**
14 **Q**   Well, and then you proceeded -- you and he proceeded
15 to go -- or he left separately from you, and you proceeded
16 on to that taxi?
17 **A**   Correct.
18 **Q**   And you headed downtown?
19 **A**   Yes.
20     MR. MISKIEWICZ:  Your Honor, at this time I'm
21 going to publish a portion of PA-13, with the Court's
22 permission.
23     THE COURT:  Yes, a portion.
24 BY MR. MISKIEWICZ:
25 **Q**   Mr. Amador, you said the day after, Justin Bressman

Owen Wicker, RPR
Official Court Reporter

---

Amador - Direct/Miskiewicz

984

1  came to your apartment, correct?
2  **A**   Yes, sir.
3  **Q**   And you said that you saw the New York Post article?
4  **A**   **After he called me, I went and purchased the**
5  **newspaper.**
6  **Q**   And I'll show you PA-13, and I'll zero in on a
7  portion of PA-13.
8      I'm going to ask you:  Is this the photograph
9  that you saw in the New York Post story about Vinnie
10 Gargiulo's murder the next day?
11 **A**   **Yes, sir.**
12 **Q**   And could you describe for the court, what are we
13 looking at here?
14 **A**   **Looking at a 99-cent bottle of beer that Justin**
15 **bought for me at a grocery store on Clinton Street, the**
16 **bottle of beer.**
17 **Q**   Do you know what that person is doing with the bottle
18 of beer?
19 **A**   **He's dusting it.**
20 **Q**   For fingerprints?
21 **A**   **Yes, sir.**
22 **Q**   Your fingerprints?
23 **A**   **Yes.**
24 **Q**   The one that you knew you left at the scene, correct?
25 **A**   **Yes, sir.**

Owen Wicker, RPR
Official Court Reporter

---

Amador - Direct/Miskiewicz

985

1  **Q**   This bottle of beer and also the religious picture
2  that is depicted in PA-2; is that correct (indicating)?
3  **A**   **Correct.**
4  **Q**   I will show you what has been marked for
5  identification as PA-10.
6      Mr. Amador, what is PA-10, or what is depicted
7  in that?
8  **A**   **That is a .22 caliber Astra revolver that I got.**
9  **Q**   That's your gun?
10 **A**   Yes, sir.
11     MR. MISKIEWICZ:  The Government moves for the
12 admission of PA-13 -- I'm sorry, PA-10.
13     MR. ROSEN:  The only objection is foundation.
14     THE COURT:  All right.
15     MR. ROSEN:  How it became in the possession of
16 the Government.
17     THE COURT:  Please approach on this.  Come on
18 up.
19     (Whereupon, at this time the following took
20 place at the sidebar.)
21     MR. MISKIEWICZ:  (Handing.)
22     Your Honor, he identifies it as his own gun.  It
23 even has an evidence tag by the NYPD which has his name on
24 it and the New York County complaint number on it.  And
25 it's a photograph of the gun he was charged with and

Owen Wicker, RPR
Official Court Reporter

---

Amador - Direct/Miskiewicz

986

1  identified.  I don't know what more of a foundation we
2  need to lay.
3      MR. ROSEN:  But the jury doesn't know that.  The
4  jury doesn't know that.
5      THE COURT:  All right.
6      MR. ROSEN:  That's the whole point.  I'll get
7  into that.  And all I want to know is where it was seized
8  from him, how it was seized, how it got the evidence tag
9  on it.  It didn't just materialize.
10     MR. MISKIEWICZ:  Before the break, he testified
11 that he was arrested carrying that Astra, and now he's
12 also identified that he was charged, he was sentenced to
13 seven years for it.  He has been in jail ever since.
14 Testified to the date.
15     With all due respect to counsel, I don't know
16 what else -- I'm happy to ask, but I don't know else I can
17 do.
18     THE COURT:  I think you can establish it.  You
19 can cross him on it.
20     MR. MISKIEWICZ:  Thank you.
21     (End of sidebar conference.)
22     THE COURT:  The objection is overruled.
23 PA-10 is in.
24     (Whereupon, Government Exhibit PA-10 was
25 received in evidence.)

Owen Wicker, RPR
Official Court Reporter

Amador - Direct/Miskiewicz

987

BY MR. MISKIEWICZ:

1  Q    Showing you now what has been marked in evidence as
2
3  PA-10, Mr. Amador.
4        This was the gun that you had with you when you
5  were arrested in September of 2003?
6  A    Correct.
7  Q    Okay.  And is this gun -- or did this gun ever have a
8  silencer on it?
9  A    No.
10  Q    Was it fitted to be able to put a silencer on it?
11  A    You cannot put a silencer on a revolver.
12  Q    This is the gun that ultimately resulted in you
13  pleading guilty; is that correct?
14  A    Correct.
15  Q    And although this is not the gun, the gun that you
16  testified about that you saw Justin Bressman kill Vinnie
17  Gargiulo with appeared more like this (indicating)?
18  A    Correct.
19  Q    It was a Ruger?
20  A    Yes.
21  Q    During this period of time in 2003, did you have a
22  cell phone?
23  A    No.
24  Q    What telephone number or numbers did you use if
25  anyone needed to contact you?

*Owen Wicker, RPR*
*Official Court Reporter*

---

Amador - Direct/Miskiewicz

988

1  A    Leshawn's house.
2  Q    Do you know a man by the name of Martin Matulis?
3  A    No.
4  Q    Did you know anybody who lived in Sunnyside, Queens,
5  during this period of time?
6  A    No.
7  Q    A weekend, specifically, in 2003?
8  A    I don't know anybody in Sunnyside.
9        MR. MISKIEWICZ:  May I just have a moment, your
10  Honor?
11        THE COURT:  Yes.
12        MR. MISKIEWICZ:  One last question.
13  BY MR. MISKIEWICZ:
14  Q    That Saturday -- Friday of the blackout after you
15  went to the pizzeria and Katz's Deli -- I'm sorry, the
16  pizzeria next to Katz's Deli, you said you slept where
17  that night?
18  A    Excuse me?
19  Q    Friday night, where did you sleep after the guns were
20  transacted?
21  A    My daughter's house.
22  Q    You were not at Leshawn Campbell's house that night?
23  A    No.
24  Q    And you slept there?
25  A    Until the next day.

*Owen Wicker, RPR*
*Official Court Reporter*

---

Amador - Direct/Miskiewicz

989

1  Q    What time did you get up?
2  A    Like the morning time.
3  Q    About 7, 8 o'clock?
4  A    Maybe a little later.
5  Q    Shortly after midnight on August 16, 2003, were you
6  in Leshawn Campbell's apartment that day, early morning
7  hours, Friday night into Saturday, right after midnight?
8  A    No.
9  Q    And you didn't know anybody by the name of Martin
10  Matulis?
11  A    No.
12  Q    And you didn't know anybody by the name of Christian
13  Tarantino?
14  A    No, sir.
15  Q    By that time, had Leshawn Campbell -- withdrawn.
16        By that weekend, had Mr. Bressman come to
17  Leshawn Campbell's apartment several times?
18        MR. ROSEN:  Objection.  It's cumulative and
19  repetitious.
20        THE COURT:  I'll allow this last question, and
21  then you'll move on.
22  A    He came out Saturday, and he stood from then on.
23  BY MR. MISKIEWICZ:
24  Q    I'm talking about that whole period of time, that
25  week leading up to the murder.  How many times,

*Owen Wicker, RPR*
*Official Court Reporter*

---

Amador - Direct/Miskiewicz

990

1  approximately, did you hear or know that -- see or know
2  that Justin Bressman had come to Campbell's apartment?
3  A    Several times.
4        MR. ROSEN:  Objection.  Cumulative and
5  repetitious.
6        THE COURT:  Overruled.
7  A    He came several times.
8        MR. MISKIEWICZ:  Okay.  No further questions.
9        THE COURT:  Cross-examination?
10        MR. ROSEN:  Yes.
11        MR. MISKIEWICZ:  Sorry, your Honor, but we need
12  to approach about one additional matter.
13        THE COURT:  Come up.
14        (Whereupon, at this time the following took
15  place at the sidebar.)
16        MR. MISKIEWICZ:  Sorry, I should have done this
17  earlier.
18        We're renewing our objection that we've raised
19  in the first trial regarding impeachment of this witness
20  regarding any priors that he had --
21        MR. ROSEN:  You can see that I'm not using it.
22  I'm just going to say he's a convicted felon, that's all.
23        THE COURT:  All right.
24        MR. MISKIEWICZ:  Thank you.
25        (End of sidebar discussion.)

*Owen Wicker, RPR*
*Official Court Reporter*

Amador - Cross/Rosen

991

1  CROSS-EXAMINATION
2  BY MR. ROSEN:
3  **Q**  Mr. Amador, my name is Steve Rosen.  I represent
4  Christian Tarantino.
5  **A**  **Yes, sir.**
6  **Q**  Have we ever met?
7  **A**  **No.**
8  **Q**  Have we ever talked?
9  **A**  **No.**
10  **Q**  You never had an opportunity for me to ask you
11  questions and for you to give responses, correct?
12  **A**  **Yes.**
13  **Q**  You've done that with the Government, have you not?
14  **A**  **Yes.**
15  **Q**  How many times do you think since 2004 -- 2003 or
16  2004 that you've met with the Government?
17  **A**  **Many times.**
18  **Q**  How many?
19  **A**  **I can't count.**
20  **Q**  Well, how many in 2003?
21  **A**  **2003, none.  I pled guilty to my gun, and that was**
22  **it, and I went upstate.**
23  **Q**  You were arrested in September of 2003, were you not?
24  **A**  **Yes.**
25  **Q**  And you were arrested as a convicted felon in

Owen Wicker, RPR
Official Court Reporter

---

Amador - Cross/Rosen

992

1  possession of a firearm?
2  **A**  **Correct.**
3  **Q**  When did you start cooperating with the Government
4  after that arrest?
5  **A**  **2004.**
6  **Q**  All right.  And is that before you pled guilty or
7  after you pled guilty and got your eight years?
8  **A**  **What eight years?**
9  **Q**  Seven years.
10  **A**  **That was after.**
11  **Q**  You had begun negotiating a plea for the charge of
12  possession of a firearm by a convicted felon prior to your
13  cooperation with the Government, correct?
14  MR. MISKIEWICZ:  Objection as to form.
15  "Negotiated."
16  THE COURT:  He had a lawyer.  The lawyer
17  negotiated the plea.
18  THE WITNESS:  It's called a plea bargain.  I
19  didn't give any information about nothing, about anybody,
20  when I copped out to that gun.
21  BY MR. ROSEN:
22  **Q**  You decided to do it afterwards, correct?
23  **A**  **Correct.**
24  MR. MISKIEWICZ:  Objection.
25  THE COURT:  Overruled.

Owen Wicker, RPR
Official Court Reporter

---

Amador - Cross/Rosen

993

1  BY MR. ROSEN:
2  **Q**  Yes?
3  **A**  **Yes.**
4  **Q**  Now, prior to you pleading guilty in 2004 and
5  cooperating not only with the state people, the New York
6  District Attorney's Office and the U.S. government, you
7  have been friends with Leshawn Campbell for quite some
8  time, correct?
9  **A**  **Correct.**
10  **Q**  I want to go back to August, around August 1st of
11  2003, which we've described here in the murder of Vincent
12  Gargiulo.
13  What were you doing as far as employment in
14  August of 2003?
15  **A**  **I was unemployed.**
16  **Q**  All right.  How long had you been unemployed prior to
17  that time?
18  **A**  **About two years.**
19  **Q**  And how did you support yourself?
20  **A**  **I was on welfare.**
21  **Q**  And how much money were you receiving on welfare?
22  **A**  **Not that much.**
23  **Q**  Well, you made an application to the welfare people?
24  **A**  **Uh-huh.**
25  **Q**  How much were you getting in August of 2003?

Owen Wicker, RPR
Official Court Reporter

---

Amador - Cross/Rosen

994

1  **A**  **I can't remember.**
2  **Q**  You had children, did you not?
3  **A**  **Yes.**
4  **Q**  Who supported your children?
5  **A**  **My ex-wife.**
6  **Q**  You didn't contribute in any way, correct?
7  **A**  **For the two years I was unemployed, no.**
8  **Q**  During August of 2003, you were also on methadone,
9  were you not?
10  **A**  **Correct.**
11  **Q**  That's because you were a heroin addict?
12  **A**  **Yes.**
13  **Q**  How long had you been on heroin before you sought
14  help at this methadone clinic?
15  **A**  **Maybe about ten years.**
16  **Q**  So you were a heroin addict for almost ten years when
17  you began methadone treatment.
18  When did you start that treatment?
19  **A**  **In 2000.**
20  **Q**  But you were still smoking crack, using drugs, on
21  methadone, correct, in August?
22  **A**  **Yes.**
23  **Q**  You would consider yourself a junkie, correct?
24  **A**  **Yes.**
25  **Q**  Now you've been in jail for seven years, and

Owen Wicker, RPR
Official Court Reporter

Amador - Cross/Rosen

995

1  hopefully you've cleaned up your act.  Have you?
2  A   I have.
3          MR. MISKIEWICZ:  Objection.
4          THE COURT:  Overruled.
5          MR. MISKIEWICZ:  I object to the seven years.
6  BY MR. ROSEN:
7  Q   How long have you been in jail?
8  A   Almost nine years.
9  Q   You've served seven?
10 A   I'm done with the seven years.
11 Q   Now you're doing a term of eight and a half to
12 fifteen sentence on manslaughter?
13 A   Well, the Court has not decided yet on what I will
14 get.
15 Q   Because if you testify for the Government, you will
16 get them to come into court and seek a reduction of that
17 sentence before the judge before you are sentenced,
18 correct?
19 A   It's 8 to 15.
20 Q   It's 8 to 15?
21 A   A recommendation.  But I can still get 25 years.
22 It's up to the judge.
23 Q   You pled --
24         MR. MISKIEWICZ:  Objection.
25         THE COURT:  Let him finish his question.

Owen Wicker, RPR
Official Court Reporter

Amador - Cross/Rosen

996

1  BY MR. ROSEN:
2  Q   You pled to a 25-year with a recommendation of 8 to
3  15, correct?
4  A   Correct.
5  Q   You are hoping by testifying here in this courtroom
6  that you will get a reduction of the eight-year sentence,
7  the determinant portion?
8  A   I could get a lenient sentence, but I don't know if
9  they will go under the eight.
10 Q   When you say "lenient," what does "lenient" mean to
11 you?
12 A   When a person pleads manslaughter, the amount of
13 penalty is 8 years to 25 years for anybody charged with
14 manslaughter in the first degree.
15         Do you understand?
16 Q   And you are providing substantial assistance to the
17 Government, are you not?
18 A   Yes.
19 Q   And you hope for a reduction of that eight-year
20 determinant sentence?
21 A   Yes.
22 Q   That's all I'm asking you.
23         MR. MISKIEWICZ:  Objection.
24         THE COURT:  Overruled.
25 BY MR. ROSEN:

Owen Wicker, RPR
Official Court Reporter

Amador - Cross/Rosen

997

1  Q   You are looking for a leniency based upon your
2  testimony in this courtroom today.  Yes or no?
3  A   I answered that.  I said yes.
4  Q   Now, Leshawn Campbell rented an apartment in August
5  of 2003 right near the FDR Drive, correct?
6  A   Yes.
7  Q   And I think you said it was 525 FDR Drive?
8  A   Yes.
9  Q   What apartment?
10 A   1-A.
11 Q   So he had the ground-floor apartment?
12 A   No, it starts on the second floor, 1A.
13 Q   Was it a walkup?
14 A   You can take an elevator.  It's only one flight.
15 Q   How long had Leshawn Campbell lived at that
16 apartment, if you know, prior to August of 2003?
17 A   I don't know.
18 Q   The apartment itself, did it have furniture in it?
19 A   Yes.
20 Q   What type of furniture did it have in the kitchen?
21 A   It had a table, a couple of chairs, refrigerator,
22 microwave, a sink, stove, cabinets.
23 Q   Did Leshawn Campbell work?
24 A   No.
25 Q   He didn't work either?

Owen Wicker, RPR
Official Court Reporter

Amador - Cross/Rosen

998

1  A   No.  I believe he was going to school.
2  Q   How old a gentleman was he in 2003, August?
3  A   Probably in his mid twenties.
4  Q   And how old were you?
5  A   Thirty-two.
6  Q   And so you were older than he was, right?
7  A   Correct.
8  Q   And how did you first meet Leshawn Campbell?
9  A   I knew him a few years prior to that through a
10 brother-in-law of mine.
11 Q   What brother-in-law?
12 A   Not Justin Bressman.  My sister's husband.
13 Q   Your sister's husband?
14 A   Correct.
15 Q   Was that involving drug trafficking?
16 A   No.
17 Q   Was Leshawn Campbell a drug dealer?
18 A   No.
19 Q   Did you ever see him buy and sell drugs?
20 A   He wasn't like a drug dealer.  He would buy drugs to
21 get high.
22 Q   So he would get high with you?
23 A   Yeah, on occasion.
24 Q   Right.  What was his drug of choice?  Was he a crack
25 smoker too?

Owen Wicker, RPR
Official Court Reporter

Amador - Cross/Rosen

999

1   A   No.  It was pot and cocaine.
2   Q   You did powdered cocaine; you did crack cocaine?
3   A   Yes.
4   Q   Is there a difference to what happens to your mind
5   when you are smoking crack cocaine?
6   A   The same thing.
7   Q   What happens?
8   A   What happens, you get paranoid.
9   Q   You get paranoid.
10          You get delusional?
11  A   It's a stimulant.  You get delusional.
12  Q   Do you know what the word "paranoid" means?
13  A   I understand what it means.
14  Q   What does it mean?
15          What happens when you get paranoid and you are
16  high on crack cocaine?
17  A   A heightened state of awareness.
18  Q   You don't look at windows.  You think people are
19  following you?
20  A   Not me.
21  Q   Not you?
22  A   No.
23  Q   What effects does it have on you?
24  A   It didn't make me delusional.
25  Q   So you are on methadone.  You are smoking crack

Owen Wicker, RPR
Official Court Reporter

Amador - Cross/Rosen

1001

1          THE COURT:  All right.  You may proceed.
2   BY MR. ROSEN:
3   Q   Leshawn Campbell is alone in the apartment, correct?
4   A   Correct.
5   Q   Did you, in August of 2003, have access to that
6   apartment with a key?
7   A   Yes.
8   Q   When were you given a key by Leshawn Campbell?
9   A   Probably a year prior.
10  Q   Have you spoken to Leshawn Campbell since you've been
11  incarcerated?
12  A   I spoke to him maybe once or twice.
13  Q   When was the last time you spoke to him?
14  A   The last time I spoke to him was the ending of 2003,
15  right towards the holidays.
16  Q   You were in jail?
17  A   Yes.
18  Q   Did he come visit you in jail?
19  A   No.
20  Q   It's your testimony under oath today that you had a
21  key to Leshawn Campbell's apartment for at least a year
22  prior to Justin Bressman and you killing Vincent Gargiulo
23  on August the 16th of 2003?
24  A   I moved in probably a year prior to that.  I got the
25  key a little bit afterwards.  I know one time I got locked

Owen Wicker, RPR
Official Court Reporter

Amador - Cross/Rosen

1000

1   cocaine the weekend before this alleged murder took
2   place -- withdrawn -- before this murder took place.  This
3   was your state of awareness, the crack, the methadone.
4   What else?
5   A   The drinking.
6   Q   What were you drinking in the apartment?
7   A   Beer.
8   Q   Beer?
9   A   Yes.
10  Q   Do you remember what type of beer you were drinking?
11  A   I don't remember, sir.
12  Q   Leshawn Campbell did not work.  Was he the lessee of
13  that apartment?
14  A   Yes, sir.
15  Q   How do you know that?
16  A   Because his family had left, and left him in charge
17  of the apartment.
18  Q   And he was alone in that apartment after his family
19  had vacated, correct?
20  A   Correct.
21  Q   Where did the family go?
22          MR. MISKIEWICZ:  Objection, your Honor.
23          MR. ROSEN:  I'm just laying a foundation, Judge.
24          THE COURT:  Come up.  I'll hear it.
25          MR. ROSEN:  I'll withdraw the question.

Owen Wicker, RPR
Official Court Reporter

Amador - Cross/Rosen

1002

1   out; I didn't have a key.  Then I got a key from him.
2   Q   Did you have clothes at the apartment?
3   A   Yes, sir.
4   Q   Where were your clothes kept at that apartment?
5   A   At the closet where I was speaking to Justin Bressman
6   when he came into the apartment.
7   Q   Did you keep clothes anywhere else in the City of New
8   York during that period of time?
9   A   Probably had some clothes in my daughter's house.
10  Q   Where does your daughter live?
11          MR. MISKIEWICZ:  Objection.
12          THE COURT:  Please approach.  Come on up.
13          MR. ROSEN:  I'll just ask what period of time.
14          MR. MISKIEWICZ:  Objection.
15          THE COURT:  Just come up, please.  Don't make
16  these statements in front of the jury.  Let's move on.
17          The jury is instructed to disregard this little
18  discussion between counsel.
19          (Whereupon, at this time the following took
20  place at the sidebar.)
21          THE COURT:  What's your objection?
22          MR. MISKIEWICZ:  It's irrelevant, and the
23  security -- this man is in the Witness Protection Program
24  for a reason.  We know there have been efforts to reach
25  his family.  This is outrageous.  This is completely

Owen Wicker, RPR
Official Court Reporter

Amador - Cross/Rosen

1003

1 outrageous. There is absolutely no reason for this.
2         MR. ROSEN: He wrote up on that Friday night he
3 went to his daughter's place, the Friday night. He
4 testified he went to the daughter's house and spent the
5 whole night there.
6         THE COURT: And he testified that he shared a
7 cab with his wife or the mother of his daughter uptown.
8         Let me ask you: Where are you going with this?
9 Why is this relevant?
10         MR. ROSEN: Because I have witnesses that I'm
11 calling that will call this man an absolute liar about
12 everything he said so far to this Court.
13         THE COURT: So it's your position that the
14 location where his wife's home is is extremely crucial.
15         MR. ROSEN: I didn't say that. When I said -- I
16 had said to him, Mr. Miskiewicz, I'll bring in the area.
17         But he opened the door by saying he spent Friday
18 night there and didn't come back to the apartment until
19 Saturday.
20         And that's why he asked questions about
21 Matulis's phone calls, asked him why he wasn't there. He
22 was with his kid.
23         That's why I brought it up. He opened the door.
24         MR. MISKIEWICZ: The location is not necessary.
25         THE COURT: Why do you think the location is

*Owen Wicker, RPR*
*Official Court Reporter*

Amador - Cross/Rosen

1004

1 necessary? Do you think it was in New Jersey or Timbuktu?
2 Where do you think he met -- do your witnesses tell you --
3 this is the only question I have, Mr. Rosen: Do your
4 witnesses tell you he doesn't have a wife, they don't live
5 anywhere?
6         MR. ROSEN: No.
7         THE COURT: So why is it relevant? That's all I
8 want to know.
9         MR. ROSEN: Judge, I said if they lived in
10 Manhattan, I'll just say Manhattan. That's it. He opened
11 up the door to all of this.
12         THE COURT: I don't necessarily think he opened
13 up the door. But as in the last trial, Mr. Rosen, I think
14 we have to be careful not to mention in front of the jury
15 the Witness Protection Program.
16         MR. ROSEN: Of course not.
17         THE COURT: So let's go a little bit more
18 gently.
19         The Government has no opposition if he went to
20 visit his wife in her apartment in Manhattan?
21         MR. MISKIEWICZ: No, your Honor.
22         THE COURT: Thank you. We'll start with that
23 question.
24         (End of sidebar conference.)
25         THE COURT: The question will be rephrased.

*Owen Wicker, RPR*
*Official Court Reporter*

Amador - Cross/Rosen

1005

1 BY MR. ROSEN:
2 Q    Your daughter lives with her mother?
3 A    **Correct.**
4 Q    Someplace in Manhattan?
5 A    **Correct.**
6 Q    Did you have clothes over there?
7 A    **Yes.**
8 Q    How often would you stay with them?
9 A    **On Friday I would go over and stay over.**
10 Q    Just like you said you did that weekend in August,
11 correct?
12 A    **Correct.**
13 Q    That would have been the 15th, the Saturday, into the
14 16th?
15 A    **Correct.**
16 Q    Because the blackout was on Thursday, correct,
17 August 14th?
18 A    **Yes, sir.**
19 Q    And you left Manhattan during the blackout and went
20 to New Jersey, correct?
21         MR. MISKIEWICZ: Objection. Form.
22 BY MR. ROSEN:
23 Q    Did you go during the blackout to New Jersey with
24 friends?
25 A    **I went before. It happened while I was over there.**

*Owen Wicker, RPR*
*Official Court Reporter*

Amador - Cross/Rosen

1006

1 Q    So you were already in New Jersey when the blackout
2 occurred?
3 A    **Yes.**
4 Q    Leshawn Campbell and his apartment. Anybody else
5 live there besides the two of you?
6 A    **Miguel Pena stayed there from time to time.**
7 Q    Do you know, have you spoken to Miguel Pena in the
8 last -- since 2003?
9 A    **No.**
10 Q    And it's Miguel Pena you claimed -- is the person you
11 claimed is a drug dealer, correct?
12 A    **Yes.**
13 Q    A gun trafficker, correct?
14 A    **Well, he bought the guns from Justin.**
15 Q    Well, what does that make him?
16         He bought the guns, correct --
17 A    **Uh-huh.**
18 Q    -- that Mr. Bressman stole, you claimed, from the
19 23rd Street gym on that Saturday -- I'm sorry, on that
20 Friday, the 15th, correct?
21 A    **He didn't sell all the guns.**
22 Q    But some?
23 A    **Yes.**
24 Q    And he stole them on Friday the 15th, correct?
25 A    **Correct.**

*Owen Wicker, RPR*
*Official Court Reporter*

Amador - Cross/Rosen

1007

1  Q  Miguel Pena, did he have a job, if you know?
2  A  I don't know.
3  Q  Was this sort of like a crash pad for you, Pena, and
4  other of your friends, the Leshawn Campbell apartment?
5  A  Leshawn Campbell lived there permanently.
6  Q  But you crashed there?
7  A  I had a bed.  I had a TV.  I had a music system also
8  in my room.
9  Q  How did you pay for those?
10  A  I had it.
11  Q  From where?  You are on welfare.  How could you
12  afford to pay for those things?
13  A  When I left my daughter, I took some of that,
14  clothing, music, TV, and I got a bed.
15  Q  You had known Justin Bressman for a period of time as
16  well, correct?
17  A  Correct.
18  Q  And during the month of August, you ran into Justin
19  Bressman accidentally on the street, correct?
20  A  The last week in July I ran into him.
21  Q  The last week in July?
22  A  Correct.
23  Q  How long had it been since you'd last seen him?
24  A  He was living with me in 2003 in Brooklyn --
25  Q  But that was only for two months?

Owen Wicker, RPR
Official Court Reporter

Amador - Cross/Rosen

1008

1  A  Right.  But that was like a year and a half, and I
2  didn't see him.
3  Q  And you see him on the street, and you invite him to
4  come with you to Leshawn Campbell's apartment?
5  A  Correct.
6  Q  You had the ability to have people come and visit you
7  at the Leshawn Campbell apartment?
8  A  I had a key.
9  Q  You had a key.
10      So you could bring anybody you wanted at any
11  time, day or night, because that was your apartment as
12  well?
13  A  My name wasn't on the lease.
14  Q  But you lived there?
15  A  Correct.
16  Q  And you could bring people to the apartment whenever
17  you wanted to?
18  A  Yes.
19  Q  You could bring people to smoke crack with, correct?
20  A  Or I could bring people to cook with.
21  Q  I asked you if you could bring people who could smoke
22  crack.  Yes or no?
23  A  Yes.
24  Q  Did you bring Justin Bressman there to smoke crack
25  with?

Owen Wicker, RPR
Official Court Reporter

Amador - Cross/Rosen

1009

1  A  Didn't start out that way, no.
2  Q  Did you bring Justin Bressman to the apartment, and
3  did you smoke crack with him the weekend before the
4  murder?
5  A  Yes.
6  Q  Did you know whether or not Justin Bressman knew
7  Vincent Gargiulo?
8  A  At the time, he called him Vinnie.  He never
9  mentioned his full, complete name, or the last name.  He
10  just said Vinnie.
11  Q  Vinnie?
12  A  Right.
13  Q  Assume Vinnie is Vincent Gargiulo, okay?
14  A  It is.
15  Q  What was the relationship that Justin Bressman had
16  with Vinnie?
17  A  It seemed like a friendship, because when he greeted
18  him, it was, hey, how are you doing?  I ain't seen you for
19  a while.
20  Q  That's on the street that morning, correct?
21  A  Correct.
22  Q  How about before then?  What was their relationship
23  about?  Do you know?
24  A  No.
25  Q  Do you know whether or not Justin Bressman bought

Owen Wicker, RPR
Official Court Reporter

Amador - Cross/Rosen

1010

1  drugs from Vincent Gargiulo?  Vinnie?
2  A  I never knew that man was involved in drugs or
3  anything.
4  Q  What did he tell you about him?
5  A  He said his boss needed him killed.
6  Q  What did Justin Bressman say to you about his
7  relation, if any, with Vinnie?
8  A  No.  Nothing.
9  Q  Well, he called Vinnie in your presence the week
10  before the murder, didn't he?
11      MR. MISKIEWICZ:  Objection.
12      THE COURT:  Sustained.
13  BY MR. ROSEN:
14  Q  Did you know when Justin Bressman's phone was turned
15  off by his cell phone company?
16  A  I never knew he had a cell phone.
17  Q  In your presence, you never saw Justin Bressman make
18  a cell phone call to anyone from Leshawn Campbell's
19  apartment?
20  A  No.
21  Q  When -- you never saw him in August -- I'm talking
22  about -- withdrawn.
23      Did you ever see Justin Bressman with a cell
24  phone in August of 2003?
25  A  No.

Owen Wicker, RPR
Official Court Reporter

Amador - Cross/Rosen

1011

1 Q   How did he communicate with people during his various
2 stays at Leshawn Campbell's apartment?  By the phone?
3 A   He used Leshawn's phone, the house phone.
4 Q   So it's your testimony under oath today that the only
5 time you ever saw Justin Bressman use a phone was using
6 Leshawn Campbell's house phone?
7 A   Probably.
8         MR. MISKIEWICZ:  Objection.  Asked and answered.
9         MR. ROSEN:  He just answered yes.
10         THE COURT:  It doesn't make it any better.  The
11 jury is asked to disregard it.
12         MR. ROSEN:  He's already answered the question.
13         THE COURT:  The jury is instructed the answer is
14 struck.
15         MR. ROSEN:  May we have a side bar?
16         THE COURT:  Yes.  Come up.
17         (Whereupon, at this time the following took
18 place at the sidebar.)
19         THE COURT:  I think the record is clear that
20 this witness has not testified that he saw Justin Bressman
21 make a call to Vinnie.  Is that correct?
22         MR. ROSEN:  A cell phone.
23         THE COURT:  No.  He said that --
24         MR. MISKIEWICZ:  The answer is yes.
25         THE COURT:  He said that Justin Bressman, to his

Owen Wicker, RPR
Official Court Reporter

---

Amador - Cross/Rosen

1012

1 knowledge -- he didn't know he had a cell phone.
2 You heard that, correct?
3         MR. ROSEN:  Yes, I did.
4         THE COURT:  Okay.  Now, you asked him whether or
5 not he used, "he" being Bressman, used a phone in the
6 apartment, and the answer was "probably."
7         Is that what we just heard?
8         MR. ROSEN:  I didn't hear "probably."  I thought
9 he said he did not see him use any other phone other than
10 the land line in Leshawn Campbell's apartment.  Not
11 probably; he didn't.
12         That's why I want it cleared up, and that's why
13 we're having the sidebar.  I'd like to ask the question
14 again.
15         THE COURT:  What is the question you are
16 attempting to ask him?
17         MR. ROSEN:  Did the only phone that he ever saw
18 Justin Bressman use was the land line in Leshawn
19 Campbell's apartment.
20         MR. MISKIEWICZ:  I thought he answered that
21 question, and that was the end of it.  I don't know if the
22 court reporter indicated "probably."
23         THE COURT:  There's a bit of confusion here.
24 You can ask that question, and then we'll go on from
25 there.

Owen Wicker, RPR
Official Court Reporter

---

Amador - Cross/Rosen

1013

1         MR. ROSEN:  How long will you go for, Judge?
2         THE COURT:  Until a quarter until one, as I said
3 earlier.
4         MR. DODDATO:  It's 12:35.
5         (End of sidebar discussion.)
6 BY MR. ROSEN:
7 Q   Mr. Amador, the only phone you ever saw Justin
8 Bressman use was the land line in Leshawn Campbell's
9 apartment; yes or no?
10 A   Yes.
11 Q   Let me ask you something.  You have tattoos on your
12 arms?
13 A   Yes, sir.
14         MR. ROSEN:  Judge, could we have the witness
15 remove the sweatshirt so we can expose the tattoos?  It
16 will become obvious a little bit.
17         MR. MISKIEWICZ:  Objection.
18         THE COURT:  Just come up a moment to explain.
19         MR. ROSEN:  We have to do it ex parte then.
20         MR. MISKIEWICZ:  We would like to be a part of
21 this trial.
22         THE COURT:  Once again, I'm trying to save a
23 little bit of time here, but it doesn't seem to be going
24 away.  I anticipate it will take a little while.
25         So please step outside for a moment, and then

Owen Wicker, RPR
Official Court Reporter

---

Proceedings

1014

1 you'll start your lunch break a little earlier.
2         Have a nice lunch, please.
3         (Whereupon, at this time the jury exits the
4 courtroom.)
5         THE COURT:  If you can ask the witness to step
6 outside -- or ask the witness to step outside.
7         Okay.
8         (Out of the presence of the jury.)
9         THE COURT:  You are making an application to
10 speak to me ex parte as to the reason why you want to do
11 this?
12         MR. ROSEN:  Yes.
13         THE COURT:  And you are saying there is a
14 crucial need to exclude the Government from the discussion
15 based on -- may I ask you what?
16         MR. ROSEN:  Our defense case.
17         THE COURT:  Mr. Rosen, I will step outside with
18 you and Mr. Doddato, and you will put on the record,
19 outside the presence of the Government, the reasons why
20 you think you have to make this application ex parte.  And
21 they should include reasons such as you have a good-faith
22 basis to believe that the Government will do something
23 that will affect your presentation of your defense case.
24         MR. ROSEN:  Yes, your Honor.
25         THE COURT:  And then I'll make a determination

Owen Wicker, RPR
Official Court Reporter

Proceedings

1015

1  as to whether or not you've indicated such a good-faith
2  basis.
3          Step out, if you would, with Mr. Doddato and the
4  court reporter.
5          (Ex parte proceedings were conducted in-camera
6  between the Court and defense counsel.)
7          (Pages 1016 through 1021 were removed from the
8  record.)
9          (Continued.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*Owen Wicker, RPR*
*Official Court Reporter*

---

Proceedings

1023

1          A F T E R N O O N    S E S S I O N
2
3
4          (Whereupon, the following takes place in the
5  absence of the jury.)
6          THE COURT:  Please be seated for a moment.
7          Obviously I'm not pleased with the amount of
8  time the meeting took place.
9          I will allow you to have Mr. Amador take off his
10  sweatshirt.  I don't see a reason not to do it before the
11  jury if that is what you are requesting.
12          And the government will find out what the
13  strategy is with respect to this when you get the
14  statements of any witnesses that you have.
15          MR. MISKIEWICZ:  Your Honor, how are we in a
16  position to object on relevance grounds?  I don't know
17  what it is that --
18          THE COURT:  The only thing I'm reassured about,
19  Mr. Miskiewicz, is that the material that was gleaned by
20  the defendant, and as was indicated earlier, came from
21  documents that they received from the government.
22          So based on that, I'm going to allow the inquiry
23  in front of the jury.
24          MR. MISKIEWICZ:  Well, perhaps counsel can
25  illuminate what documents he is referring to.  I can't see

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*Official Court Reporter*

---

Proceedings

1022

1          (In open court.)
2          THE COURT:  I'll see you at 2 o'clock, and I'll
3  give you a decision as to what will happen that was
4  outside your presence.
5          So I'll see you at 2 o'clock.
6          (Whereupon, a recess was taken.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*Official Court Reporter*

---

Proceedings

1024

1  what document references tattoos exists in the 3500
2  material.  At the very least, I think we should have the
3  opportunity to know what that is so we can interpose an
4  objection on relevance before this jury is exposed to
5  whatever it is.
6          THE COURT:  The Court made a determination,
7  Mr. Miskiewicz, that there is a good-faith basis to allow
8  this demonstration.  And that there is a possibility that
9  it may be relevant.
10          If it is not relevant, the jury will be
11  instructed to disregard it.  And they can do that as they
12  have done a number of times.
13          So bring in Mr. Amador and let's bring in the
14  jurors.
15          I will have to stop at a quarter after 4:00.  So
16  we will not have any break.
17
18  P A B L O    A M A D O R,
19      called as a witness, having been previously
20      duly sworn, was examined and testified as
21      follows:
22
23          THE COURT:  The jury is entering.
24          (Whereupon, the jury at this time entered the
25  courtroom.)

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*Official Court Reporter*

1025

1  THE COURT:  Welcome back.
2  Please be seated.
3  Ladies and gentlemen, I rarely keep a jury
4  waiting an hour and a half.  It is extra waiting.  I give
5  you my sincere apology.
6  By way of explanations, we have a board of
7  judges meeting, which means we usually have about 20 or so
8  Article III Judges appointed for life, who all like to
9  talk.  And we have these meetings with the courthouse in
10  Brooklyn and out here.
11  There was a very serious discussion today
12  because it was involving -- I can tell you this much --
13  something that is important.  It is the appointment of
14  certain individuals that will be working in the court.
15  So I have to say it wasn't as if I could say I'm
16  done, I'm tired of listening to you people, I'm leaving.
17  So I apologize sincerely.  And I will have to
18  break a little earlier so this can be continued.
19  We will break at 4:15, if it is okay with you.
20  And you can remain seated.  And we will not take an
21  afternoon break.
22  Once again, I'm very sorry.  Don't blame it on
23  the parties or witnesses or lawyers.  Blame it on me and
24  the rest of my colleagues.
25  Thank you for understanding.

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
Official Court Reporter

1026

1  You may continue, Mr. Rosen.
2  Your last request was to have the witness remove
3  his sweatshirt.
4  If you would do that, Mr. Amador.
5  (The witness complies.)
6  THE WITNESS:  I have a T-shirt on.
7  THE COURT:  You have a T-shirt on.  Please take
8  that off, sir.
9  (The witness complies.)
10  MR. ROSEN:  Would you stand up, Mr. Amador.
11  THE COURT:  Just stand up, please.
12  MR. ROSEN:  Would you turn to your left and
13  stand right there.
14  (The witness complies.)
15  MR. ROSEN:  Can the jury see the tattoos?
16  Judge, can we have --
17  THE COURT:  Stand a little closer.
18  Stand right in the middle of the courtroom.
19  Can you see now?
20  MR. ROSEN:  Turn to the left.
21  (The witness complies.)
22  MR. ROSEN:  Everybody see the tattoos?
23  Please turn to the left and then turn to your
24  right.
25  (The witness complies.)

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
Official Court Reporter

1027

1  MR. ROSEN:  Everybody see it?
2  Thank you.
3  You can put your shirts back on.
4  THE COURT:  If you would, sir.
5  (The witness complies.)
6
7  CROSS-EXAMINATION (cont'd)
8  BY MR. ROSEN:
9  Q  Mr. Amador, can you explain to the jury what is
10  represented by that tattoo on your right arm?
11  A  **This tattoo is an angel crying over a burial site.**
12  Q  And what is the tattoo on your left arm?
13  A  **It is a cross for my mother, in dedication to my**
14  **mother.  And on the bottom is my daughter's name, first**
15  **name and middle name.**
16  Q  Thank you.
17  Let's get back to the timeframe of August the
18  1st --
19  MR. MISKIEWICZ:  We move to have the
20  demonstration and the last several questions stricken from
21  the record on relevance grounds.
22  THE COURT:  Your objection is overruled at this
23  time.
24  Q  Let's go back to August the 1st, around the end of
25  July 2003, when you see Justin Bressman.  You haven't seen

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
Official Court Reporter

1028

1  him for a while, and you see him on the street.
2  You go back to LeShawn Campbell's residence, do
3  you not?
4  A  **Yes, sir.**
5  Q  And what do you do there?
6  A  **He just came over with me and we were talking.  And**
7  **prior to him leaving, I gave him LeShawn Campbell's house**
8  **number to the phone.**
9  Q  And did you see what he did, how he either wrote it
10  down, placed it on a cell phone?  What did he do?
11  A  **Wrote it on a piece of paper.**
12  Q  All right.
13  Did you get high that day?
14  A  **I don't recall, no.**
15  Q  You don't recall?
16  A  **No, we didn't.**
17  Q  Was anybody else in the apartment?
18  A  **It could have been that LeShawn was in his room.**
19  Q  I'm sorry?
20  A  **It could have been that LeShawn Campbell was in his**
21  **room.**
22  Q  Anyone else --
23  A  **No.**
24  Q  -- came in?
25  A  **No.**

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
Official Court Reporter

1  Q    And now, moving fast forward a couple of weeks to the
2  week prior to the week of the blackout.  And we are
3  talking about the 5th, 6th, 7th, in that area of August.
4  A    Yes.
5  Q    Did you see Justin Bressman that week?
6  A    He called me on the phone.
7  Q    Where?
8  A    At LeShawn's.
9  Q    What did he have to say to you?
10 A    He said give him 45 minutes and to meet at the
11 apartment.  He needed some help with something.
12 Q    Are you referring to the incident involving the gun?
13 A    Correct.
14 Q    Did you do any drugs with Justin Bressman prior to
15 the incident with the gun?
16 A    Before?
17 Q    Yes.
18 A    It is like ten years.  Prior to that, maybe yeah.
19 But not in July that first week, no.
20 Q    So he comes over to the apartment to which you said
21 you are living and he provides you with a firearm and
22 shows you a firearm; is that correct?
23 A    His firearm.  He needed help.
24 Q    I understand that.
25        He shows you a firearm?

1  A    Correct.
2  Q    And it is mechanically not working, correct?
3  A    No.  It is working, but it jammed after the first
4  round.
5  Q    And if it jammed after the first round, it is not
6  properly working?
7  A    Correct.
8  Q    Why did he go to you?  What expertise do you have in
9  firearms that he would go to you and show you this handgun
10 and ask you to help him out and fix it?
11       MR. MISKIEWICZ:  Objection.
12       Calls for speculation.
13       THE COURT:  The question is:  Why did he go to
14 you?
15       MR. ROSEN:  Yes.
16       THE COURT:  You can answer that question.
17 A    He probably felt confident.  I'm his brother-in-law
18 and he can trust me.  So he came and asked me for help.
19 Q    Well, what did you know about firearms?
20 A    Not that much.
21 Q    So why would he go to you then if you didn't know
22 that much to help him with a firearm that was jamming?
23       MR. MISKIEWICZ:  Objection.
24 A    I don't know what he was thinking.
25       MR. MISKIEWICZ:  Objection.

1        THE COURT:  Your answer is you don't know; is
2  that it?
3        THE WITNESS:  Yes.
4        THE COURT:  The answer is he doesn't know.
5  Q    Did he say anything to you about the reason he was
6  bringing the firearm to you for your help?
7  A    That he needed to kill Vinnie for Mattie.
8  Q    He said that the first time?
9  A    He said he had a job to do for Mattie.
10 Q    You said he said to kill Vinnie?
11 A    He said he was not going to play baseball with him.
12 Q    You just told us the first time he brought the gun he
13 said it was to kill Vinnie?
14 A    He said he had a job to do for Mattie.  That is my
15 testimony.
16 Q    What is that?
17 A    That is my testimony.
18       I said, why are you walking around with this
19 weapon with a silencer, and he said I had a job to do for
20 Mattie.
21 Q    You just told us to kill Vinnie?
22 A    I must have misspoken.  But he told me he had a job
23 to do for Mattie.
24 Q    And Mattie was his boss?
25 A    His boss from Synergy.

1  Q    From Synergy?
2  A    Yes.
3  Q    And Justin Bressman, if you know, what Synergy Gym
4  did he work for?
5  A    I visited two of them.  The one on 90 something
6  street and Second Avenue, and the one on 23rd Street that
7  I went in with him to retrieve the gun.
8  Q    This is the gym -- this is the gym on West 23rd
9  Street?
10 A    There was two of them.  There was one in the upper
11 90s on Second Avenue on the east side.  The one he got the
12 gun from was on West 23rd Street between Fifth and Sixth
13 Avenue.
14 Q    Referring now to the one on 23rd Street.
15 A    Okay.
16 Q    Did he work, Justin Bressman, at that location?
17 A    When we walked in, we walked in like he knew
18 everybody there.  He even made a phone call in the place.
19 Q    I'll ask you again.
20       Did Justin Bressman work at the West 23rd
21 between Fifth and Sixth Avenues in Manhattan at that
22 Synergy Gym?
23       MR. MISKIEWICZ:  Objection.  Asked and answered.
24       THE COURT:  Sustained.
25       MR. ROSEN:  Judge --

Amador-Cross/Rosen

1033

1    THE COURT: Ask him again, and answer it again.
2  Q  You can answer.
3  A  **They are both Synergy Gyms.**
4  Q  And I'm asking you about the West 23rd Street gym.
5  A  **Okay.**
6  Q  Was Justin Bressman an employee of that Synergy Gym?
7  A  **He had the keys to the locker. He worked there. He**
8  **had the uniform to the gym. I don't know how to answer**
9  **the question. I walked into both of them. And he walked**
10 **into 23rd Street and used the shower stall, the sauna, and**
11 **had a locker there, and he had a key for the locker with**
12 **the gun and opened it. I don't know how to answer your**
13 **question.**
14 Q  You just did.
15     MR. MISKIEWICZ: Objection. Move to strike.
16     THE COURT: No colloquy.
17     The objection is sustained.
18 Q  So the Mattie Roth that you have been testifying was
19 the owner of the West 23rd Synergy Gym?
20     MR. MISKIEWICZ: Objection.
21     THE COURT: Is that your testimony?
22 A  **He is the owner of Synergy Gyms.**
23 Q  No. You said he is the owner of the West 23rd and
24 the upper east side gyms.
25     MR. MISKIEWICZ: Objection.

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*Official Court Reporter*

---

Amador-Cross/Rosen

1034

1    THE COURT: Sustained.
2  Q  Did Mattie Roth own the West 23rd Street gym, the
3  Synergy Gym on that address?
4     MR. MISKIEWICZ: Objection.
5  Q  If you know.
6     THE COURT: Overruled.
7  A  **Sir, I believe it is a franchise. I came to believe**
8  **that Synergy Gym is more than one gym. There are two**
9  **Synergy Gyms that I seen.**
10 Q  But you told us he was the owner. That Mattie Roth
11 was the owner of Synergy Gyms.
12 A  **Correct.**
13     MR. MISKIEWICZ: Objection. Misstates the
14 record.
15     THE COURT: Ladies and gentlemen, it is for your
16 determination as to what is contained in the record.
17 Q  Did you ever go up to the gym on the 90s and Second
18 Avenue on the east side?
19 A  **I went up there but didn't go into the gym. I waited**
20 **for him outside on the street.**
21 Q  And approximately when was that in time?
22 A  **When he had lived with me in Bushwick.**
23 Q  And that was in 2002?
24 A  **Correct.**
25 Q  Now, the Synergy Gym T-shirt that he wore and you

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*Official Court Reporter*

---

Amador-Cross/Rosen

1035

1  described it, did that have a location on it?
2  A  **No.**
3  Q  The blackout is on a Thursday, August 14th; is that
4  correct?
5  A  **Correct.**
6  Q  And who slept over -- who slept in the apartment the
7  evening of the blackout, which would be Thursday, the
8  14th, sir?
9  A  **I was in Jersey.**
10 Q  But you came back?
11 A  **Right.**
12 Q  You came back maybe in the early morning hours,
13 around 12 midnight of that day, Thursday; is that correct?
14 A  **Correct.**
15 Q  Did you sleep in the apartment?
16 A  **Your question was the evening. I wasn't there. I**
17 **was in Jersey in the evening.**
18 Q  Any time before 12:00 midnight is the evening.
19     MR. MISKIEWICZ: Objection.
20 Q  Did you sleep in LeShawn Campbell's apartment
21 Thursday into Friday morning, the day of the blackout?
22 A  **Yes.**
23 Q  Who else slept in the apartment?
24 A  **LeShawn.**
25 Q  Anybody else?

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*Official Court Reporter*

---

Amador-Cross/Rosen

1036

1  A  **Miguel had came by, but then he had left.**
2  Q  Well, how would you know that if you were in
3  New Jersey?
4  A  **When I came through the tunnel, I had called before**
5  **in New Jersey, I called and said I was on my way over**
6  **there.**
7  Q  Okay.
8     Who were you with in New Jersey on the evening
9  of August 14th, 2003?
10 A  **A friend of mine named Joey.**
11 Q  All right.
12     What is his last name?
13 A  **I don't know his last name.**
14 Q  How long had you known him?
15 A  **A couple of months.**
16 Q  Were you in his car?
17 A  **Correct.**
18 Q  What kind of car did he have?
19 A  **He had a Chevy Tahoe, SUV.**
20 Q  And you drove in the blackout -- the date of the
21 blackout to New Jersey in the Tahoe; is that correct?
22 A  **It wasn't a blackout yet, but, yeah.**
23 Q  And you got to New Jersey, and what did you do in
24 New Jersey?
25 A  **Hung out with some girls.**

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*Official Court Reporter*

Amador-Cross/Rosen

1037

1  Q   Did you get high?

2  A   Yes.

3  Q   Okay.

4        What did you get high with on that Thursday

5  evening?

6  A   **Marijuana and cocaine.**

7  Q   You smoked crack?

8  A   **No.**

9  Q   You snorted cocaine?

10 A   **Correct.**

11 Q   Who supplied the cocaine?

12 A   **I had it.**

13 Q   And where did you get it from?

14 A   **From Miguel.**

15 Q   And how did you afford to pay Miguel for the cocaine

16 you were snorting that evening?

17 A   **I had --**

18        MR. MISKIEWICZ:  Objection.  Relevance.

19        THE COURT:  Excuse me?

20        MR. MISKIEWICZ:  Objection.  Relevance.

21        THE COURT:  Overruled.

22 A   **He gave it to me.**

23 Q   For free?

24 A   **Correct.**

25 Q   And you didn't have to do anything for it?  He

Amador-Cross/Rosen

1038

1  supplied you with powdered cocaine which you used to party

2  with that night?

3        MR. MISKIEWICZ:  Objection.

4        THE COURT:  Overruled.

5  A   **Correct.**

6  Q   So on the way back, you come back, and there are no

7  lights in Manhattan; is that correct?

8  A   **Yes, sir.**

9  Q   Is there any rail service in Manhattan on that

10 evening?

11        MR. MISKIEWICZ:  Objection.  Relevance.

12        THE COURT:  Excuse me?

13        MR. MISKIEWICZ:  Relevance and scope.

14        THE COURT:  Sustained.

15        MR. ROSEN:  Judge, I'm laying a foundation.

16        THE COURT:  All right.  Let's move up.  Come on

17 up.

18        (Continued on next page.)

19

20

21

22

23

24

25

Amador-Cross/Rosen

1039

1        (Whereupon, at this time the following took

2  place at the sidebar.)

3        THE COURT:  Mr. Rosen, what is the relevancy as

4  to whether there is rail service?

5        MR. ROSEN:  Because we have the witness

6  testifying under oath, not only in this trial but in the

7  last trial and at the Mastrangello hearing, that he went

8  on the following day on an F train uptown.

9        I have copies from the Metropolitan Transit

10 Authority that there was no train service any time Friday.

11 And the story is a blatant perjured statement.  And I will

12 show you the letter from MTA.

13        THE COURT:  I accept that premise.  Just come

14 here.

15        What is your response?

16        MR. MISKIEWICZ:  Rail service coming in from

17 New Jersey has nothing to do with the MTA.  So I still

18 don't understand the purpose of this.  I still think it is

19 irrelevant, the scope of the -- beyond the scope of -- so

20 what if he took the rail versus a car back through the

21 Lincoln or Holland Tunnel.

22        THE COURT:  Because if he is smoking crack and

23 getting high, it goes to his recollection of these events.

24        MR. MISKIEWICZ:  I didn't object to -- okay.

25 That was my objection, your Honor.

Amador-Cross/Rosen

1040

1        I apologize for not standing up.  I was trying

2  to make the objection quickly and move on.

3        MR. ROSEN:  Frank, it is on the desk.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Amador-Cross/Rosen

1041

1    (Whereupon, at this time the following takes
2  place in open court.)
3    THE COURT:  The objection is overruled.
4    You may proceed.
5    (Continued on next page.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Amador-Cross/Rosen

1042

1    (Whereupon, at this time the following took
2  place at the sidebar.)
3    MR. ROSEN:  Do you want the see the letter
4  there?
5    THE COURT:  If he has the wrong subway, so be
6  it.
7    MR. ROSEN:  All right.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Amador-Cross/Rosen

1043

1    (Whereupon, at this time the following takes
2  place in open court.)
3    MR. ROSEN:  Read back, please, the last
4  question, and you can answer the question.
5    (Whereupon, the court reporter reads the
6  requested material.)
7  A  Yes.
8  Q  There was?
9  A  Uh-huh.
10  Q  The trains were working that day?
11  A  Correct.
12  Q  All right.
13    So it is your testimony under oath today --
14    MR. MISKIEWICZ:  Objection.
15    I would like a clarification of what time in the
16  evening we are talking about.
17    THE COURT:  Okay.
18    The timeframe we are talking about and what
19  train are we talking about?
20    MR. ROSEN:  First we are talking about when he
21  comes back from New Jersey, and then I will get into the
22  following day, which would be the 15th or Friday.
23    THE COURT:  I will allow it on that basis.
24  Q  Go ahead.
25  A  Yes.  There was rail service.

Amador-Cross/Rosen

1044

1  Q  So the F train was working on Friday, the 15th of
2  August, 2003, which allowed you and Justin Bressman to go
3  uptown to West 23rd Street gym and the Sheraton Hotel,
4  etcetera; is that correct?
5  A  Correct.
6  Q  If I showed you a letter from the New York City
7  Transit --
8    MR. MISKIEWICZ:  Objection.
9    THE COURT:  No, no.  Not that way.
10    Your objection is sustained.
11  Q  Mr. Amador, the F train did not work on Friday,
12  August the 15th --
13    MR. MISKIEWICZ:  Objection to counsel
14  testifying.
15    THE COURT:  Sustained.
16  Q  Did you get on board on Friday the 15th of August, in
17  the afternoon, onto a subway car on the F line in
18  Manhattan?
19  A  Yes.
20  Q  If there was no service that day, then you have
21  perjured yourself and your testimony before this Court.
22    MR. MISKIEWICZ:  Objection.
23    THE COURT:  Sustained.
24    MR. ROSEN:  Judge, may I show him the letter
25  from --

Amador-Cross/Rosen

1045

1    THE COURT:  Come on up here.  Come up.

2    (Continued on next page.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*Official Court Reporter*

---

Amador-Cross/Rosen

1046

1    (Whereupon, at this time the following took

2    place at the sidebar.)

3    MR. MISKIEWICZ:  Can I see that, please?

4    MR. ROSEN:  Yes, of course.

5    (Document handed to Mr. Miskiewicz.)

6    THE COURT:  When you get done, I would also like

7    to take a look at it, please.

8    (Handed to the Court.)

9    MR. MISKIEWICZ:  I haven't had a chance to read

10    the whole thing.  But I will listen.

11    THE COURT:  Essentially it says it was out from

12    Thursday until Saturday morning at 3:24 a.m., the service

13    on the F line from Blaine Street --

14    MR. MISKIEWICZ:  Delancey.

15    THE COURT:  Delancey, rather, uptown.

16    MR. MISKIEWICZ:  My objection is he can't

17    testify to this letter, whoever Mr. Leo Blumenthal is.  It

18    is hearsay.  He can call Mr. Blumenthal.

19    MR. ROSEN:  I thought we could perhaps

20    stipulate, instead of bringing him in, to the introduction

21    of this letter, publish the letter and move on to another

22    subject.

23    THE COURT:  It is unlike a newspaper or

24    something I would normally be taking judicial notice of.

25    At this point in time, perhaps you can get into

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*Official Court Reporter*

---

Amador-Cross/Rosen

1047

1    an agreement later.

2    MR. ROSEN:  We have a cover sheet from the New

3    York City Transit Authority from this gentleman on this

4    stationery.

5    I think the Court can take judicial notice that

6    this is not something prepared by anybody else other than

7    under normal business circumstances.  It is a business

8    record rule.

9    THE COURT:  It is not certified.  And not that

10    it has to be certified necessarily.

11    MR. ROSEN:  Perhaps the government would be

12    willing to stipulate.

13    MR. MISKIEWICZ:  I would like to see

14    Mr. Blumenthal here.

15    MR. ROSEN:  You will have to see him on Monday.

16    THE COURT:  I don't know if he is coming in on

17    Monday.

18    MR. ROSEN:  I thought we could get into some

19    agreement so we don't have to bring him in.

20    Would you speak to this gentleman to verify it?

21    MR. MISKIEWICZ:  I will see him on the stand.

22    MR. ROSEN:  Come on.

23    THE COURT:  You can debate this later.

24    Mr. Miskiewicz, if it is possible, after making

25    the necessary contacts with Mr. Blumenthal -- you really

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*Official Court Reporter*

---

Amador-Cross/Rosen

1048

1    should have some kind of record.

2    He refers in the letter to saying you made a

3    FOIA request and he will respond as follows, providing

4    records.  They usually have some kind of records to back

5    it up.

6    I'm not saying it is not proper.  Not saying you

7    can't reach an agreement.  Right now it is not proper and

8    you will not question him on it now.

9    MR. ROSEN:  All right.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*Official Court Reporter*

1    (Whereupon, at this time the following takes
2    place in open court.)
3    THE COURT:  The objection is sustained.
4  Q   So it is your testimony, sir, you got on the F line
5  or the F train on Friday afternoon with Justin Bressman;
6  is that correct?
7  A   Yes.
8  Q   And the train was functioning, service hadn't been
9  stopped by the blackout, and you were on that train; is
10  that correct?
11  A   No.  It was stopped.  But then it resumed.
12  Q   It removed -- resumed Friday --
13  A   Late Friday afternoon, yes, it was resumed.
14  Q   Your testimony is Friday afternoon when you got to
15  the platform, the F train was working, operable, and you
16  were able to get on that train with Bressman and go across
17  and uptown.  That is your testimony?
18  A   Yes, sir.
19  Q   Now, you first went to a Sheraton Hotel; is that
20  correct?
21  A   Yes.
22  Q   And where was this Sheraton Hotel located?
23  A   Midtown.
24  Q   Which one in midtown?
25  A   I believe it is in the 50's.

1  Q   Do you believe or are you guessing?
2  A   It might be in the midtown, but toward the 50's.
3  That was my first time there.
4  Q   But you were with Justin Bressman on that date, and
5  this is the same day he allegedly stole all these guns
6  from the locker at West 23rd Street; is that correct?
7  A   Correct.
8  Q   So you don't know which Sheraton Hotel, correct?
9  A   I can tell you what the pool looks like that we went
10  to at the Sheraton Hotel.
11  Q   What did the front of the hotel look like?
12  A   When you walk into the doors, the desk is to your
13  left-hand side.  You pass that desk, on the left side of
14  it is elevators to go up.
15  Q   How can we know from that description what Sheraton
16  Hotel you were in?
17    MR. MISKIEWICZ:  Objection.
18    THE COURT:  Sustained.
19  Q   What street was it on, the avenue?
20  A   It wasn't an avenue, it was on the west side, Seventh
21  Avenue.
22  Q   There was a Sheraton on Seventh Avenue?
23  A   Yes.
24  Q   Someplace in the 50's?
25  A   Yes.

1  Q   You are sure about this?
2    MR. MISKIEWICZ:  Objection.
3    THE COURT:  Sustained.
4  Q   Is that the hotel, the Sheraton Hotel --
5    MR. MISKIEWICZ:  Objection to this.
6  Q   You then get back on the subway?
7  A   Correct.
8  Q   The operating F line, the day after the blackout, and
9  go down to West 23rd Street?
10  A   Yes, sir.
11  Q   And at West 23rd Street did you go into a sauna or
12  steam room?
13  A   Yes.
14  Q   So the gym at West 23rd Street, if that is where you
15  went, had in 2003 a sauna and/or steam room in which you
16  went into, correct?
17  A   Correct.
18    Actually shower stalls.  We showered there.
19  Q   Two shower stalls?
20  A   Stand-up shower stalls, yes.
21  Q   But what I'm focusing in on is the steam room.
22  A   Yes.
23  Q   Or sauna?  Which one was it, steam room or sauna?
24  A   When you walk in, on the side there is hot rocks
25  where you throw water on and steam.  So do you call it a

1  steam room or sauna?
2  A   Sauna with steam.
3  A   And it has a wooden bench you sit down on like an L.
4  Q   And it was the West 23rd Street gym; is that correct?
5  A   Yes.
6  Q   And that was the same gym that was owned by Mattie
7  Roth; is that correct?
8  A   Well, he owned Synergy Gym, yes.
9  Q   I asked you about the West 23rd Street gym.
10  A   Justin never per se told me he was the owner of that
11  precise gym.  But he said he is the owner of Synergy Gym.
12  He was the boss.  Justin worked for Synergy.
13    If I went to a franchise, like McDonald's or
14  something, you say I work for one McDonald?  There is
15  probably 20 or hundred of them.
16    And Synergy Gym, there is one on 23rd Street and
17  one uptown on Second and 90th.  I can tell you exactly
18  where it was on the block and everything.
19  Q   There was five others.
20  A   I don't know that.
21    MR. MISKIEWICZ:  Counsel is testifying again.
22    THE COURT:  Yes.
23    The jury is to disregard that there were five
24  others.
25  Q   Now, once inside the Synergy Gym, you had just come

Amador-Cross/Rosen
1053

1  from swimming at the Sheraton; is that correct?
2  A  Yes.
3  Q  And what did you do in the sauna?
4  A  We was just hanging out in there, me and Justin.
5  Q  All right.
6      You are inside the sauna hanging out on
7  West 23rd Street; is that correct?
8  A  Yes.  My first time ever in the sauna.
9  Q  All right.
10     And after you got out, is that when he stole the
11 guns that were hidden in a locker?
12 A  Well, he went and got some towels and he took a
13 shower and I was in the separate stand-up shower stall.
14     Then when he went in front to his locker, he
15 opened up the combination lock and took out the empty
16 duffle bag and took some of his clothes in it and spread
17 it out toward the end.  And took out some keys, and took
18 out a nickel plated locker lock in the top right corner
19 and started to pull out the guns and ammunition.
20 Q  Now, was there anybody else in the locker room?
21 A  I think one guy came in to use the bathroom and then
22 left.
23 Q  Was there staff in the front door of the locker room,
24 the gym?
25 A  When we left, one guy came to make a phone call.  He

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
Official Court Reporter

Amador-Cross/Rosen
1054

1  greeted him, shook his hands and he went to make a phone
2  call.
3  Q  Okay.
4      Did Justin Bressman make a phone call on the
5  land line of Synergy Gym, 23 West 23rd Street, that day?
6  A  Yes.
7  Q  And do you know who he called that day?
8  A  No.
9  Q  Now, this is Friday, the 15th of August; is that
10 correct?
11 A  Late afternoon, Friday.
12 Q  But you actually saw him on the telephone -- making a
13 phone call and using the phone?
14 A  When he went to use the phone, I seen an individual
15 talking to another man who had a tool belt on.  He was
16 pointing to something in there while Justin made his phone
17 call.
18     When Justin made a phone call, he came back to
19 me and I was sitting next to the guns who was -- that was
20 sitting next to me on a wooden bench to my left.  And he
21 grabbed the guns and put it in his duffle bag and we went
22 out to the train to catch the train.
23 Q  So he carried the firearms in a duffle bag with the
24 ammunition and the guns onto the same F line train and
25 took the train back down to --

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
Official Court Reporter

Amador-Cross/Rosen
1055

1  A  To Second Avenue.
2  Q  I'm sorry?
3  A  To Second Avenue.
4  Q  No.  You are going to LeShawn Campbell's house,
5  correct -- no, pizzeria?
6  A  Yes.
7  Q  Pizzeria next to Katz's?
8  A  Yes.
9  Q  And you took the F train to do that?
10 A  Correct.
11 Q  So you took the F train uptown to the Sheraton.  And
12 you are taking the F train downtown to 23rd Street.  And
13 now you are taking the F train with the guns to the
14 Houston Street where the pizzeria and Katz's is?
15 A  Correct.
16 Q  So you just told us you actually saw Justin Bressman
17 making a phone call in the West 23rd Street gym; is that
18 correct?
19 A  Correct.
20 Q  Approximately what time did he make that phone call?
21 A  After 4:00, close to 5:00 o'clock in the afternoon.
22 Q  Sometime between 4:00 and 5:00?
23 A  Yes.
24 Q  Could it have been closer to 5:00 or closer to 4:00?
25 A  I don't know that.

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
Official Court Reporter

Amador-Cross/Rosen
1056

1  Q  But it was somewhere in that timeframe?
2  A  Correct.
3  Q  Did he tell you who he was calling?
4  A  No.
5      (Counsel confer.)
6  Q  I show you what is marked in evidence, identified as
7  PA-10.  And I don't know what government exhibit this is?
8      THE COURT:  It is PA-10.
9      MR. ROSEN:  PA-10.
10     (Handed to the witness.)
11 Q  Do you recognize Exhibit PA-10?
12 A  Yes, sir.
13 Q  Tell us -- hold it up.  Face the jury.
14     (The witness complies.)
15 Q  Now, that is a pistol; is that correct?
16 A  Correct.
17 Q  And it is a .22 caliber pistol; is that correct?
18 A  Correct.
19 Q  And this is a gun that you had, correct?
20 A  Yes, sir.
21 Q  All right.
22     When did you first get this firearm?
23 A  Miguel gave it to me after he purchased the gun from
24 Justin.
25 Q  Was this in the bag of guns?

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
Official Court Reporter

Amador-Cross/Rosen

1057

1  A   No.
2  Q   So this was a gun that Miguel had on him and gave you
3  that day, August the 15th, 2003; is that correct?
4       MR. MISKIEWICZ: Objection.
5       THE COURT: Did Miguel give it to you on that
6  day, August 15, 2003?
7       THE WITNESS: It could have been that day or
8  Saturday. But he gave it to me after he bought the guns.
9  Q   Well, was it Friday or was it Saturday?
10 A   I would say it was Friday, it was Friday.
11 Q   And it was Friday?
12 A   Yes.
13 Q   And that is the 15th; is that correct?
14 A   Yes, after we got back.
15 Q   So you have that firearm now in your possession?
16 A   Correct.
17 Q   And you had it prior to the 18th?
18 A   Correct.
19 Q   And that firearm is a .22 caliber; is that correct?
20 A   Yes, sir.
21 Q   And the Strum Luger is a .22 caliber gun, too; is
22 that correct?
23 A   Yes.
24 Q   Just coincidental that the gun you owned carries the
25 same bullet as the gun carried by Justin Bressman on the

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*Official Court Reporter*

Amador-Cross/Rosen

1058

1  18th of August, 2003; is that correct?
2       MR. MISKIEWICZ: Objection.
3       THE COURT: Sustained.
4  Q   Did Justin Bressman carry a Strum Luger .22 on the
5  18th of August, 2003?
6  A   Yes.
7  Q   Did you have that gun on August the 18th, 2003?
8  A   It was in the apartment.
9  Q   I didn't ask you that. I asked you if you had that
10 gun -- did you own that gun that was given to you by
11 Miguel Pena?
12 A   And I left it in the apartment.
13 Q   Did you have that gun on --
14      MR. MISKIEWICZ: Objection.
15 Q   You left the gun in the apartment, so you said?
16      MR. MISKIEWICZ: Objection. Argumentative.
17      THE COURT: Sustained. Sustained.
18 Q   But the gun was given to you on the 15th; is that
19 correct?
20 A   Yes.
21      MR. MISKIEWICZ: Objection. Asked and answered
22 a couple of times.
23 Q   It is your testimony under oath --
24      MR. MISKIEWICZ: There is an objection.
25 Q   That you left the gun in --

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*Official Court Reporter*

Amador-Cross/Rosen

1059

1       THE COURT: There is an objection, there is an
2  objection.
3       Step back to the podium. Take a deep breath and
4  start with a question that you have not asked before.
5       The last objection was sustained.
6  Q   You had a .22 caliber revolver given to you on the
7  15th. Yes or no?
8  A   Yes.
9       MR. MISKIEWICZ: Objection. Asked and answered.
10      MR. ROSEN: Judge --
11      THE COURT: Yes.
12      The objection is sustained.
13      MR. ROSEN: Judge, as a lead-in to other
14 questions.
15      THE COURT: Mr. Rosen, the objection is
16 sustained.
17 Q   The ammunition that went into your gun and the
18 ammunition that went into Justin Bressman's gun, were they
19 not the same?
20 A   Yes.
21 Q   Now, in September of 2003 you are arrested for
22 possession of that firearm; is that correct?
23 A   Correct.
24 Q   And when you were arrested, do you remember going
25 down to the stationhouse and giving a statement in regards

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*Official Court Reporter*

Amador-Cross/Rosen

1060

1  to that gun?
2  A   Yes, sir.
3       MR. ROSEN: Is this D, C, D, for us?
4       THE COURT: I don't know. I think you are up to
5  about D. Mr. Baran is not here right now. So go with D
6  for now.
7  Q   After your arrest and while you were in custody at
8  the New York City detention center, and I show you what is
9  marked as Defendant's Exhibit 10 -- D.
10      (Handed to the witness.)
11 Q   Do you recognize the handwriting, the signature, and
12 what is on it?
13 A   Yes.
14 Q   Who signed this page?
15 A   I did.
16 Q   Who wrote the words on the top of the page?
17 A   I did.
18      MR. ROSEN: We move it in evidence, Judge.
19      THE COURT: Please approach.
20      Bring it up with you, Mr. Rosen.
21      (Continued on next page.)
22
23
24
25

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*Official Court Reporter*

1    (Whereupon, at this time the following took
2 place at the sidebar.)
3    THE COURT:  Any objection?
4    MR. MISKIEWICZ:  Yes.
5    He hasn't denied that he said this.  He hasn't
6 even been asked a question.
7    Under Rule 609 and 608, I don't see how it comes
8 in.  Impeachment as to what?
9    MR. ROSEN:  It is not impeachment.  It is a
10 handwritten confession.
11    MR. MISKIEWICZ:  So what?
12    THE COURT:  What is contained in now
13 Defendant's Exhibit D for identification is the following
14 statement:  I didn't have the gun.  I wouldn't carry a gun
15 because my father was a man -- was murdered by a man with
16 a gun.  It is dated September 17th, 2003, and signed, I
17 believe, by the witness.
18    So you can ask foundation questions.  You are
19 saying he wouldn't admit to possessing a gun, you are
20 saying, okay?
21    MR. ROSEN:  Is it in?
22    THE COURT:  No, it is not in.  You have to ask
23 some foundation questions first.
24
25

1    (Whereupon, at this time the following takes
2 place in open court.)
3    THE COURT:  There was an objection.  The
4 objection was sustained for now.
5 Q   When you were arrested in September of 2003, do you
6 remember the date?
7 A   The 16th.
8 Q   Do you remember giving a statement to the New York
9 City Police Department?
10 A   Yes.
11 Q   Did you write it in your own hand?
12 A   Yes.
13 Q   What did you say?  You had an opportunity to see it.
14 What did you say to the New York City Police Department on
15 the day of your arrest concerning the gun in PA-10?
16 A   That I denied owning it.
17 Q   You said:  I didn't have a gun; is that correct?
18 A   Yes.
19 Q   What else did you say?
20 A   I said I wouldn't carry a gun because my father was
21 murdered by a man with a gun.
22 Q   And that was a lie?
23 A   Yes.
24    MR. MISKIEWICZ:  Objection to form.
25    THE COURT:  Sustained.

1 Q   Did you tell the truth?
2 A   No.
3 Q   So the very first time anybody had to question you
4 concerning this firearm, you deny that it was yours; is
5 that correct?
6 A   Correct.
7 Q   After you were not -- did you have counsel at the
8 time that you did this?
9 A   Yes.
10 Q   And what was your reason behind saying that the gun
11 wasn't yours?
12 A   I was upset that I got arrested, and I just tried to
13 deny ownership of the weapon.
14 Q   It wouldn't be that it could link you up to a
15 homicide that took place on August the 18th, one month
16 before?
17 A   They could have tested it then and they could test it
18 now.  That is not the murder weapon.  I'm sure of that.
19 Q   You are what?
20 A   I'm sure of that.
21 Q   You are sure of it?
22 A   Positive.
23 Q   Let me ask you a question:
24    You indicated that on the day of the shooting,
25 you were there in the early morning hours about 6:00, 7:00

1 o'clock, you said?
2 A   Was where?
3 Q   On the street where Vincent Gargiulo got shot?
4 A   Yes.
5 Q   You showed up there about what time?
6 A   It was a little time prior to that.
7 Q   Was it dark out?
8 A   No.  It was light time.
9 Q   What time had you left LeShawn Campbell's apartment
10 to go there?
11 A   The sun had just came out.  It was light outside.  I
12 can't give you a specific time, but the sun came out.  It
13 was sunrise.
14 Q   You are sure you didn't leave at 2:00 a.m.?
15 A   No.  Positive.
16 Q   Positive?
17 A   I don't know -- it would have been dark.  The sun
18 don't come out at 2:00.
19 Q   And when the shooting took place, were there any
20 people on the street in your vicinity?
21 A   There were stragglers around, there was, across the
22 street, crossing by me also.
23 Q   It wasn't desolate.  There were people?
24 A   There was a couple of people coming, just walking by,
25 in the picture there wasn't a lot of people there.

Amador-Cross/Rosen
1065

1    (Defense counsel confer.)
2 **Q**   You indicated that Justin Bressman had said something
3 to you in regards to messing up or something, that you
4 messed up or you did something because of the stuff at the
5 telephone booth?
6 **A   Because of the fingerprints left on the box.**
7 **Q**   What was the word you used?
8 **A   He said I was a loose end.**
9 **Q**   Right.
10        You were a loose end.  And what did you take
11 that to mean?
12 **A   As a threat.**
13 **Q**   So Justin Bressman -- you believe at that point in
14 time, which is about a day or two after the incident,
15 considered you a threat?
16 **A   Yes.**
17 **Q**   Then explain to me why he asked you to get involved
18 with a drug rip-off robbery a short time later.
19        MR. MISKIEWICZ:  Objection.
20        THE COURT:  Sustained.
21 **Q**   Did Justin Bressman try to get you involved in a drug
22 rip-off robbery?
23 **A   Yes.**
24 **Q**   When did that take place?
25 **A   Monday.**

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
Official Court Reporter

Amador-Cross/Rosen
1066

1 **Q**   Monday of when?
2 **A   The following week after the murder.**
3 **Q**   So after you were considered a problem for him, he
4 comes to you and wants to engage you to be partners with
5 him in a drug rip-off?
6 **A   Right.**
7 **Q**   And you indicated you didn't go ahead with the drug
8 rip-off; is that correct?
9 **A   I felt it was a ruse.**
10 **Q**   A ruse for what?
11 **A   It didn't feel right.  My sense was telling me to get**
12 **out of there.**
13 **Q**   He came in a four-door black vehicle with someone
14 else?
15 **A   Q-45, yes.**
16 **Q**   Now, you have testified in several other legal
17 proceedings involving this case, have you not?
18 **A   Yes.**
19 **Q**   In those other legal proceedings, did you ever
20 mention a four-door black Infiniti prior to your testimony
21 here this afternoon?
22 **A   Yes.**
23 **Q**   You did?
24 **A   Yes.**
25 **Q**   So if I were to show you your transcript of those

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
Official Court Reporter

Amador-Cross/Rosen
1067

1 hearings, you would be able to find the black Infiniti
2 because you mentioned it?
3        MR. MISKIEWICZ:  Objection.
4        THE COURT:  Sustained.
5        Please come up.
6        (Continued on next page.)

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
Official Court Reporter

Amador-Cross/Rosen
1068

1        (Whereupon, at this time the following took
2 place at the sidebar.)
3        MR. MISKIEWICZ:  My objection is that this is an
4 improper manner going down to impeachment.
5        THE COURT:  Yes.
6        MR. MISKIEWICZ:  If he can show -- I don't know
7 how he can show a negative.  But if he can show that his
8 testimony is incorrect and confront him with that, that is
9 one thing.
10        It is also incredibly dangerous to be talking
11 about prior proceedings given the circumstances of this
12 case.
13        So for those reasons I will object.
14        THE COURT:  Do you have a question where the
15 witness is asked, did you see any cars?
16        MR. ROSEN:  We have it, but I have to find it.
17        THE COURT:  You have to find it, all right.
18        MR. ROSEN:  Can we break now 15 minutes early,
19 so tomorrow morning I will have it available?
20        THE COURT:  Can you go into a different area
21 with this guy?
22        MR. ROSEN:  I'm really at the end.  And this is
23 a crucial --
24        THE COURT:  How about Mr. Doddato, can you ask
25 him to go through it?

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
Official Court Reporter

Amador-Cross/Rosen
1069

1    MR. ROSEN: I have the disk of the trial. And I
2  have the portion where he does not mention it.
3    I can show him that. But the Mastrangello
4  hearing testimony, I don't have it.
5    THE COURT: Is it on there?
6    MR. ROSEN: It is not. He does not describe the
7  car.
8    THE COURT: My question is: Was there a
9  question such as, Mr. Amador, at the time that you were by
10 the gym somewhere, did you see any Infiniti, or whatever
11 it was.
12   MR. ROSEN: He testified he only saw it that day
13 when it drove up.
14   THE COURT: Was he ever asked a question,
15 though, in his prior testimony, and he says, no, I didn't
16 see anything? I didn't see any car?
17   Was there ever an attempt to elicit that?
18   MR. ROSEN: I would have to go back and look at
19 the cross of Froccaro.
20   But this black Infiniti is something new. And
21 it is my good-faith basis to believe that there is
22 somebody who told him the importance of that black
23 Infiniti from the last trial, and that is a year. And
24 that's all I can say.
25   I'm not going to go into the basis for that.

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
Official Court Reporter

Amador-Cross/Rosen
1070

1  But I have a good-faith basis for that.
2    THE COURT: Do you have any recollection of him
3  being asked that question?
4    MR. MISKIEWICZ: I don't.
5    My only recollection is the Department of Motor
6  Vehicles has a black Q-45 Infiniti registered to Justin
7  Bressman. And, you know, we know who sold it to
8  Mr. Bressman.
9    THE COURT: Is there -- is this something you
10 learned from the last trial?
11   MR. MISKIEWICZ: No. We always knew this.
12   THE COURT: You didn't put it in in the last
13 trial?
14   MR. MISKIEWICZ: He doesn't know anything about
15 this. And I assume what counsel is saying is that he is
16 committing or suborning perjury --
17   MR. ROSEN: I didn't say that.
18   THE COURT: I don't want this. I need argument
19 and no bickering. It is the end of the day.
20   MR. ROSEN: It is the first time he used that.
21   THE COURT: You said that somebody told him how
22 important it was to get it in.
23   MR. ROSEN: I didn't point an accusatory finger
24 at anyone in particular. It seems like you are getting a
25 little defensive here.

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
Official Court Reporter

Amador-Cross/Rosen
1071

1    THE COURT: Nobody is defensive.
2    You are asking for basically a 25 minute
3  additional recess to look this up. You don't know where
4  this is. And I'm not certain that you have a question
5  that would be permissible to ask the witness.
6    You also tell me you have no other questions to
7  ask him.
8    MR. ROSEN: Well, I have to speak to the
9  defendant and Mr. Doddato for a moment to make that
10 decision.
11   THE COURT: Why don't you do that.
12   If you can fill up the 15 minutes, fine. If
13 not, I will let him go.
14   Go talk to the defendant.
15   (Defense counsel confer with the defendant.)
16   MR. ROSEN: Your Honor, we have no further
17 questions.
18   THE COURT: But you want the opportunity to
19 bring in the transcript and you can look at that tomorrow?
20   MR. ROSEN: Yes.
21   THE COURT: He will be on call.
22   I will not make you start your redirect now.
23   You do intend to have redirect, I assume?
24   Also, I have to remind everyone to keep your
25 voices down.

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
Official Court Reporter

Amador-Cross/Rosen
1072

1    MR. MISKIEWICZ: Yes.

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER
Official Court Reporter

Amador-Cross/Rosen

1073

1  (Whereupon, at this time the following takes
2  place in open court.)
3  THE COURT:  Some of you look a little sleepy.  I
4  know this constant back and forth can be a little tedious.
5  We will break for the day.  Tomorrow will be a
6  better day, and we will have things running more smoothly.
7  I promise you there will be no judge's meeting.
8  I thank you for your joint patience here.  You
9  have been wonderful.
10  Let me give you the same instructions I give you
11  all the time.
12  Don't read or listen or read anything that might
13  be in the media.  Stay off a social network.
14  Don't talk to anyone about this case.  If anyone
15  approaches you or attempts to influence you in any way,
16  report it to me by giving Mr. Baran a note.  Do not
17  discuss it with the other jurors.
18  If you see something in the media, totally
19  disregard it.
20  Don't do any research about this case.
21  Continue to keep an open mind.
22  I'm hopeful tomorrow and Thursday, at least, I
23  will give you a better estimate as to the length of the
24  trial.
25  On that note, have a nice evening and we will

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*Official Court Reporter*

Amador-Cross/Rosen

1074

1  see you tomorrow morning.
2  (Whereupon, at this time the jury leaves the
3  courtroom.)
4  THE COURT:  Mrs. Mulligan, we can deal with her
5  tomorrow, I assume, she will be a while?
6  MR. MISKIEWICZ:  Yes.
7  THE COURT:  And after Mr. Amador, I think we
8  will move along more quickly.
9  MR. MISKIEWICZ:  Yes, your Honor.
10  MR. FLYNN:  As far as timing for Mrs. Mulligan,
11  do you want to do her in the beginning of the day?
12  THE COURT:  If everyone gets here by 9:15, I
13  think I can do her early in the morning and hear what she
14  has to say in terms of whether or not there is going to be
15  any further discussion with her testimony with respect to
16  receipt of a letter, what was in the letter, and whether
17  she can authenticate it, and then I will make the
18  appropriate assessment under the best evidence rule and a
19  determination as to whether or not she is going to be able
20  to testify.
21  MR. MISKIEWICZ:  I have one more thing.  I know
22  you have to leave, but can we have the order directing
23  them to turn over the witness list?
24  THE COURT:  That was going to be today, I
25  thought.

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*Official Court Reporter*

Amador-Cross/Rosen

1075

1  MR. ROSEN:  No, tomorrow.
2  THE COURT:  All right, tomorrow.
3  And the materials, you will probably have to get
4  it in tomorrow so they can have the weekend to review it.
5  From what you are saying, it is all material you
6  got from them, so designate what you consider to be
7  statements, or what you might use.
8  Do you have any actual written statements from
9  any individuals?
10  MR. ROSEN:  Yes.  We have their 302s.
11  THE COURT:  You mean the items that were done by
12  law enforcement?
13  MR. ROSEN:  Yes.
14  THE COURT:  And you are going to use them as a
15  basis to cross-examine law enforcement?
16  MR. ROSEN:  No.
17  They are the basis for us producing these
18  witnesses.
19  THE COURT:  Yes.  I understand that part of it.
20  But in terms of written material, have you taken any
21  written statements from these individuals?
22  MR. ROSEN:  No.
23  THE COURT:  No written statements whatsoever.
24  MR. ROSEN:  I don't think so.
25  THE COURT:  No notes, nothing?

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*Official Court Reporter*

Amador-Cross/Rosen

1076

1  MR. ROSEN:  I haven't.  I will find out from the
2  investigators if they have.
3  THE COURT:  Oh, that will be really important to
4  find out.  Please let me know first thing tomorrow
5  morning.
6  MR. ROSEN:  I know it can only involve one of
7  three witnesses.
8  THE COURT:  Make sure whatever it is and make
9  sure you have a copy of any statements.
10  MR. MISKIEWICZ:  Thank you.
11  (Case on trial adjourned until 9:15 o'clock
12  a.m., Wednesday, May 2, 2012.)
13
14
15
16
17
18
19
20
21
22
23
24
25

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*Official Court Reporter*

### I-N-D-E-X

**W-I-T-N-E-S-S-E-S**

P A B L O   A M A D O R          927

DIRECT EXAMINATION           927
BY MR. MISKIEWICZ

CROSS-EXAMINATION          991
BY MR. ROSEN

P A B L O   A M A D O R          1024

**E-X-H-I-B-I-T-S**

Government Exhibit PA-10 was received in 986
evidence

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*Official Court Reporter*

## $

**$35,000** [1] - 943:6

**$3500** [1] - 945:4

## 0

**08** [1] - 914:3

## 1

**1** [2] - 914:7; 915:20

**1-A** [1] - 997:10

**10** [1] - 1060:9

**100** [3] - 914:13, 16, 22

**1004** [1] - 921:23

**1016** [1] - 1015:7

**1021** [1] - 1015:7

**1024** [1] - 1077:8

**11530** [1] - 914:19

**11722** [2] - 914:13, 22

**12** [1] - 1035:13

**12:00** [1] - 1035:18

**12:35** [1] - 1013:4

**14th** [4] - 1005:17; 1035:3, 8; 1036:9

**15** [13] - 929:21; 930:3; 937:23; 938:14; 971:19; 972:9; 995:19; 996:3; 1057:6; 1068:18; 1071:12

**15th** [13] - 928:25; 1005:13; 1006:20, 24; 1043:22; 1044:1, 12, 16; 1054:9; 1057:3, 13; 1058:18; 1059:7

**16** [2] - 970:23; 989:5

**16th** [5] - 939:9, 11; 1001:23; 1005:14; 1062:7

**17th** [2] - 941:6; 1061:16

**18th** [7] - 941:6; 957:21; 1057:17; 1058:1, 5, 7; 1063:15

**19** [1] - 974:15

**1A** [1] - 997:12

**1st** [3] - 993:10; 1027:18, 24

## 2

**2** [4] - 915:20; 1022:2, 5; 1076:12

**20** [2] - 1025:7; 1052:15

**2000** [1] - 994:19

**2002** [1] - 1034:23

**2003** [43] - 922:9, 11; 928:1; 929:21; 930:1; 937:23; 938:14; 970:1, 23; 974:15; 987:5, 21; 988:7; 989:5; 991:15, 20-21, 23; 993:11, 14, 25; 994:8; 997:5, 16; 998:2; 1001:5, 14, 23; 1006:8; 1007:24; 1010:24; 1027:25; 1036:9; 1044:2; 1051:15; 1057:3, 6; 1058:1, 5, 7; 1059:21; 1061:16; 1062:5

**2004** [4] - 991:15; 992:5; 993:4

**201** [1] - 973:14

**2012** [2] - 914:7; 1076:12

**205** [1] - 914:16

**20th** [1] - 921:3

**22** [7] - 965:2; 985:8; 1056:17; 1057:19, 21; 1058:4; 1059:6

**23** [1] - 1054:5

**23rd** [29] - 931:7, 16-17, 19, 21; 932:12; 1006:19; 1032:6, 8, 12, 14, 20; 1033:4, 10, 19, 23; 1034:2; 1044:3; 1050:6; 1051:9, 11, 14; 1052:4, 9, 16; 1053:7; 1054:5; 1055:12, 17

**25** [7] - 940:3; 941:22; 971:16; 995:21; 996:13; 1071:2

**25-year** [1] - 996:2

**26.2** [2] - 924:12; 925:16

**29** [2] - 925:11, 24

**29th** [1] - 952:20

**2:00** [2] - 1064:14, 18

## 3

**302s** [3] - 926:11, 16; 1075:10

**30th** [11] - 947:13, 17, 22; 949:2, 10; 957:13; 976:2, 12-13; 978:10

**31st** [6] - 955:17; 956:1, 25; 976:2, 10, 13

**33134** [1] - 914:17

**34th** [3] - 947:3, 6, 12

**3500** [2] - 925:17; 1024:1

**3:24** [1] - 1046:12

## 4

**45** [6] - 946:21; 962:23; 964:7; 973:24; 974:13; 1029:10

**4:00** [4] - 1024:15; 1055:21, 24

**4:15** [1] - 1025:19

**4:30** [1] - 915:22

## 5

**50's** [3] - 1049:25; 1050:2, 24

**525** [1] - 997:7

**53rd** [1] - 930:18

**5:00** [3] - 1055:21, 24

**5th** [1] - 1029:3

## 6

**608** [1] - 1061:7

**609** [1] - 1061:7

**631** [1] - 914:23

**655** [1] - 914:3

**666** [1] - 914:18

**6:00** [1] - 1063:25

**6:30** [2] - 957:16; 979:2

**6th** [1] - 1029:3

## 7

**7** [3] - 957:16; 979:2; 989:3

**712-6105** [1] - 914:23

**7:00** [1] - 1063:25

**7:30** [1] - 957:19

**7th** [1] - 1029:3

## 8

**8** [8] - 971:19; 972:9; 989:3; 995:19; 996:2, 13

## 9

**9** [2] - 936:7, 10

**90** [1] - 1032:5

**900** [1] - 937:3

**90s** [4] - 967:17; 968:3; 1032:11; 1034:17

**90th** [1] - 1052:17

**927** [2] - 1077:3

**986** [1] - 1077:15

**99** [1] - 926:9

**99-cent** [1] - 984:14

**991** [1] - 1077:6

**9:15** [3] - 914:7; 1074:12; 1076:11

## A

**a.m** [4] - 914:7; 1046:12; 1064:14; 1076:12

**ability** [1] - 1008:6

**able** [6] - 982:10, 22; 987:10; 1049:16; 1067:1; 1074:19

**absence** [1] - 1023:5

**absolute** [1] - 1003:11

**absolutely** [1] - 1003:1

**accept** [1] - 1039:13

**access** [2] - 966:19; 1001:5

**accidentally** [3] - 942:19; 944:5; 1007:19

**accommodate** [1] - 927:15

**according** [1] - 930:24

**accusatory** [1] - 1070:23

**act** [1] - 995:1

**acting** [3] - 945:3; 953:18; 980:25

**actual** [2] - 974:10; 1075:8

**add** [2] - 918:4; 922:21

**addict** [2] - 994:11, 16

**additional** [2] - 990:12; 1071:3

**additionally** [1] - 915:22

**address** [1] - 1034:3

**adjourned** [1] - 1076:11

**adjournments** [1] - 924:22

**admission** [1] - 985:12

**admit** [1] - 1061:19

**admitted** [1] - 931:10

**admonition** [1] - 924:2

**adult** [1] - 944:19

**adults** [1] - 944:20

**advance** [1] - 924:21

**affect** [1] - 1014:23

**afford** [2] - 1007:12; 1037:15

**afternoon** [10] - 929:20; 930:5; 1025:21; 1044:17; 1049:5, 13-14; 1054:11; 1055:21; 1066:21

**afterwards** [3] - 974:6; 992:22; 1001:25

**agent** [1] - 922:17

**ago** [4] - 918:23; 940:5; 970:10; 976:25

**agree** [3] - 919:24; 946:9; 972:7

**agreed** [2] - 922:12; 924:5

**agreement** [8] - 971:9, 13; 975:6, 10, 12; 1047:1, 19; 1048:7

**ahead** [3] - 956:24; 1043:24; 1066:7

**ain't** [1] - 1009:18

**air** [1] - 955:2

**alike** [1] - 968:24

**alleged** [1] - 1000:1

**allegedly** [1] - 1050:5

**alleges** [1] - 915:15

**allow** [7] - 974:18; 980:13; 989:20; 1023:9, 22; 1024:7; 1043:23

**allowed** [1] - 1044:2

**Almeria** [1] - 914:16

**almost** [6] - 956:8, 12; 968:24; 981:22; 994:16; 995:8

**alone** [2] - 1000:18; 1001:3

**alongside** [1] - 955:23

**Amador** [24] - 922:22; 923:5; 926:25; 927:8, 17-18, 25; 946:1; 963:20; 975:4; 980:17; 983:25; 985:6; 987:3; 991:3; 1013:7; 1023:9; 1024:13; 1026:4, 10; 1027:9; 1044:11; 1069:9; 1074:7

**Amador's** [1] - 915:24

**amending** [1] - 917:7

**Amendment** [3] - 918:14, 18; 919:19

**AMERICA** [1] - 914:3

**ammunition** [6] - 934:2; 1053:19; 1054:24; 1059:17

**amount** [2] - 996:12; 1023:7

**angel** [1] - 1027:11

**answer** [12] - 966:4; 1011:13, 24; 1012:6; 1030:16; 1031:1, 4; 1033:1, 8, 12; 1043:4

**answered** [8] - 997:3; 1011:8, 12; 1012:20; 1032:23; 1058:21; 1059:9

**anticipate** [1] -

1013:24

**apart** [1] - 981:22

**apartment** [75] - 928:24; 929:3, 5-6, 24; 930:1, 5; 938:6; 939:2, 6, 12; 940:14, 19; 941:8; 942:5, 8; 944:6, 22; 946:7; 957:18; 958:14; 960:6, 8, 14-15; 961:14; 965:21, 23; 984:1; 989:6, 17; 990:2; 997:4, 9, 11, 16, 18; 1000:6, 13, 17-18; 1001:3, 6, 21; 1002:2, 4, 6; 1003:18; 1004:20; 1006:4; 1007:4; 1008:4, 7, 11, 16; 1009:2; 1010:19; 1011:2; 1012:6, 10, 19; 1013:9; 1028:17; 1029:11, 20; 1035:6, 15, 20, 23; 1058:8, 12, 15; 1064:9

**apologize** [2] - 1025:17; 1040:1

**apology** [1] - 1025:5

**appeal** [1] - 920:3

**appear** [1] - 943:7

**APPEARANCES** [1] - 914:11

**appeared** [1] - 987:17

**appearing** [1] - 943:5

**applicable** [1] - 922:2

**application** [10] - 915:6; 923:7, 10-11, 16; 924:23; 993:23; 1014:9, 20

**appointed** [1] - 1025:8

**appointment** [1] - 1025:13

**appreciate** [1] - 918:6

**approach** [6] - 916:6; 981:17; 985:17; 990:12; 1002:12; 1060:19

**approached** [1] - 980:19

**approaches** [2] - 981:16; 1073:15

**appropriate** [2] - 915:16; 1074:18

**April** [3] - 921:3; 937:23; 938:14

**arched** [1] - 955:17

**area** [4] - 947:4; 1003:16; 1029:3; 1068:20

**argument** [2] - 969:10; 1070:18

**argumentative** [1] - 1058:16

**arm** [4] - 981:22; 983:10; 1027:10, 12

**arm-length** [1] - 981:22

**arms** [1] - 1013:12

**arrest** [3] - 992:4; 1060:7; 1062:15

**arrested** [11] - 970:2, 4, 21; 986:11; 987:5; 991:23, 25; 1059:21, 24; 1062:5; 1063:12

**arresting** [1] - 924:16

**arrive** [4] - 929:11; 939:17; 957:17; 979:13

**arrived** [5] - 936:3; 939:15; 976:21; 979:1

**arriving** [1] - 978:13

**art** [1] - 922:4

**article** [15] - 923:21; 924:9; 963:11; 964:9, 14; 973:13, 16, 19; 974:4, 10, 12; 984:3

**Article** [1] - 1025:8

**articles** [1] - 973:15

**articulated** [1] - 927:3

**asleep** [1] - 941:11

**assessment** [1] - 1074:18

**assistance** [1] - 996:16

**Assistants** [1] - 914:15

**assisted** [1] - 914:25

**assume** [4] - 1009:13; 1070:15; 1071:23; 1074:5

**assuming** [3] - 981:5, 17; 982:13

**Astra** [3] - 965:2; 985:8; 986:11

**attempt** [1] - 1069:17

**attempting** [1] - 1012:16

**attempts** [1] - 1073:15

**attention** [6] - 923:24; 924:7; 931:11; 941:5; 942:10; 969:25

**Attorney** [2] - 914:12, 15

**attorney** [3] - 917:5, 15; 920:19

**Attorney's** [7] - 971:11; 972:10, 13, 20-21; 975:7; 993:6

**attorney-client** [2] - 917:5; 920:19

**August** [42] - 928:1, 25; 929:21; 930:3; 939:9, 11; 941:6; 957:21; 974:15; 989:5; 993:10, 14, 25; 994:8, 21; 997:4, 16; 998:2; 1001:5, 23; 1005:10, 17; 1007:18; 1010:21, 24; 1027:17, 24; 1029:3; 1035:3; 1036:9; 1044:2, 12, 16; 1054:9; 1057:3, 6; 1058:1, 5, 7; 1063:15

**authenticate** [1] - 1074:17

**Authority** [2] - 1039:10; 1047:3

**available** [1] - 1068:19

**Avenue** [19] - 914:16; 930:19; 931:22; 935:11; 947:3, 7, 14; 949:2; 956:25; 968:3; 1032:6, 11, 13; 1034:18; 1050:21; 1055:1, 3

**avenue** [2] - 1050:19

**Avenues** [1] - 931:14; 1032:21

**awake** [1] - 941:11

**aware** [2] - 918:24; 971:15

**awareness** [2] - 999:17; 1000:3

**B**

**backwards** [2] - 954:24; 955:1

**bad** [10] - 918:13; 921:13, 22; 922:5-8, 18

**bag** [43] - 932:22, 25; 933:1, 3, 11-12, 19-20, 22, 24; 934:1, 3, 5-6, 12, 14-15, 17-18; 937:12; 941:21; 942:1; 944:13, 16-17, 19; 949:24; 952:13; 953:15; 958:12; 960:25; 961:2, 4; 964:6; 980:24; 982:19; 1053:16; 1054:21, 23; 1056:25

**bar** [1] - 1011:15

**Baran** [3] - 924:3; 1060:5; 1073:16

**bargain** [1] - 992:18

**baseball** [1] - 1031:11

**based** [4] - 921:2;

3

997:1; 1014:15; 1023:22

**basis** [10] - 919:18; 1014:22; 1015:2; 1024:7; 1043:23; 1069:21, 25; 1070:1; 1075:15, 17

**bathroom** [6] - 936:6, 11-12, 16, 19; 1053:21

**became** [1] - 985:15

**become** [1] - 1013:16

**becomes** [1] - 918:11

**bed** [2] - 1007:7, 14

**beer** [19] - 946:17, 19-20; 948:17; 949:21; 962:18, 20; 963:12, 25; 964:6; 973:24; 984:14, 16, 18; 985:1; 1000:7, 10

**BEFORE** [1] - 914:8

**began** [1] - 994:17

**begin** [1] - 970:19

**beginning** [1] - 1074:11

**begun** [1] - 992:11

**behalf** [3] - 972:10, 13, 19

**behind** [10] - 933:5; 943:3; 944:25; 945:7; 952:25; 954:17; 956:8; 981:11; 1063:10

**below** [1] - 977:20

**belt** [2] - 935:7; 1054:15

**bench** [3] - 980:20; 1052:3; 1054:20

**bend** [1] - 932:21

**benefit** [1] - 955:20

**best** [1] - 1074:18

**better** [4] - 916:25; 1011:10; 1073:6, 23

**between** [14] - 919:2; 930:19; 931:11; 949:10; 951:1; 955:18; 956:25; 964:18; 979:2; 1002:18; 1015:6; 1032:12, 21; 1055:22

**beyond** [1] - 1039:19

**bickering** [1] - 1070:19

**big** [4] - 934:18; 956:4; 960:23; 962:1

**bigger** [2] - 982:14

**bit** [12] - 927:13; 949:5, 13; 956:11; 962:17; 980:9; 983:3; 1001:25; 1004:17; 1012:23; 1013:16, 23

**black** [8] - 932:25; 967:4; 1066:13, 20; 1067:1; 1069:20, 22; 1070:6

**blackout** [20] - 928:1, 3, 6, 16; 935:23; 959:24; 988:14; 1005:16, 19, 23; 1006:1; 1029:2; 1035:3, 7, 21; 1036:20-22; 1049:9; 1051:8

**Blaine** [1] - 1046:13

**blame** [2] - 1025:22

**blatant** [1] - 1039:11

**block** [7] - 949:5, 7, 9, 13; 952:24; 968:20; 1052:18

**blood** [3] - 955:12; 977:20; 983:9

**bluish** [1] - 977:5

**bluish-green** [1] - 977:5

**Blumenthal** [4] - 1046:17; 1047:14, 25

**board** [3] - 916:9; 1025:6; 1044:16

**boasting** [2] - 958:9; 960:15

**book** [10] - 944:13, 16-17; 949:24; 952:13; 953:15; 958:12; 980:24

**boot** [1] - 953:24

**booth** [12] - 948:8, 12, 16; 949:5, 12, 19-20, 24; 950:24; 953:17; 963:24; 1065:5

**booths** [3] - 947:22, 24; 980:22

**boss** [11] - 942:25; 943:1, 8, 14, 16; 958:25; 966:8; 1010:5; 1031:24; 1052:12

**bottle** [12] - 949:21; 963:11, 25; 964:6, 10; 973:24; 974:13; 984:14, 16-17; 985:1

**bottom** [1] - 1027:14

**bought** [7] - 946:17, 19; 984:15; 1006:14, 16; 1009:25; 1057:8

**box** [1] - 1065:6

**boxes** [1] - 934:2

**breached** [1] - 917:6

**break** [11] - 927:25; 973:7; 975:4; 986:10; 1014:1; 1024:16; 1025:18, 21; 1068:18;

1073:5

**breakdown** [1] - 943:1

**breath** [1] - 1059:3

**Bressman** [59] - 929:1; 930:3; 932:13; 935:8; 941:7; 957:10, 20, 23; 960:6; 961:25; 964:12, 18; 969:22; 974:7; 980:19; 983:25; 987:16; 989:16; 990:2; 998:12; 1001:22; 1002:5; 1006:18; 1007:15, 19; 1008:24; 1009:2, 6, 15, 25; 1010:6, 17, 23; 1011:5, 20, 25; 1012:5, 18; 1013:8; 1027:25; 1029:5, 14; 1032:3, 16, 20; 1033:6; 1044:2; 1049:5, 16; 1050:4; 1054:4; 1055:16; 1057:25; 1058:4; 1065:2, 13, 21; 1070:7

**Bressman's** [2] - 1010:14; 1059:18

**bridge** [3] - 945:10; 958:7

**bring** [18] - 919:11; 921:1; 923:24; 924:5; 958:21; 1003:16; 1008:10, 16, 19-21, 24; 1009:2; 1024:13; 1047:19; 1060:20; 1071:19

**bringing** [2] - 1031:6; 1046:20

**brings** [1] - 919:1

**Broadway** [15] - 947:19; 949:10, 12-13; 955:18; 956:1, 25; 957:3, 13; 976:3, 12-13; 978:10, 21; 983:12

**Bronx** [3] - 937:25; 938:3

**Brooklyn** [3] - 958:17; 1007:24; 1025:10

**brother** [3] - 998:10; 1030:17

**brother-in-law** [3] - 998:10; 1030:17

**brought** [2] - 1003:23; 1031:12

**Browning** [4] - 937:6; 940:3; 960:2

**Budweiser** [2] - 962:21; 974:8

**building** [4] - 944:25; 945:7; 956:5; 968:9

**buildings** [2] - 968:24; 978:20

**bullet** [1] - 1057:25

**burden** [2] - 922:5

**burial** [1] - 1027:11

**Bushwick** [1] - 1034:22

**business** [9] - 917:12; 925:19; 936:15; 945:2; 950:6; 962:2; 964:24; 1047:7

**butts** [1] - 933:18

**buy** [2] - 998:19

**BY** [25] - 927:24; 946:3; 951:15; 963:19; 965:14; 975:3; 980:16; 983:24; 987:1; 988:13; 989:23; 991:2; 992:21; 993:1; 995:6; 996:1, 25; 1001:2; 1005:1, 22; 1010:13; 1013:6; 1027:13; 1077:5, 7

---

C

**cab** [7] - 938:8, 22; 953:18; 956:25; 957:1, 7; 1003:7

**cabinets** [1] - 997:22

**caliber** [8] - 940:3; 941:22; 965:2; 985:8; 1056:17; 1057:19, 21; 1059:6

**calm** [1] - 944:8

**camera** [1] - 1015:5

**Campbell** [23] - 935:15; 940:13, 16; 941:8; 960:8, 11, 18; 989:15; 993:7; 997:4, 15, 23; 998:8, 17; 1000:12; 1001:3, 8, 10; 1006:4; 1007:4; 1008:7; 1028:20

**Campbell's** [26] - 928:24; 939:2, 6; 940:14, 19; 946:7; 957:8, 17; 961:20; 988:22; 989:6, 17; 990:2; 1001:21; 1008:4; 1010:18; 1011:2, 6; 1012:10, 19; 1013:8; 1028:2, 7; 1035:20; 1055:4; 1064:9

**candor** [1] - 918:7

**cannot** [1] - 987:11

**car** [14] - 957:6; 966:25; 967:1, 9, 11-12; 969:16; 978:6; 1036:16, 18; 1039:20; 1044:17; 1069:7, 16

4

**careful** [1] - 1004:14

**carpenter** [1] - 933:22

**carpenter's** [3] - 933:12, 19; 934:14

**carried** [2] - 1054:23; 1057:25

**carries** [1] - 1057:24

**carry** [5] - 944:18; 965:3; 1058:4; 1061:14; 1062:20

**carrying** [7] - 964:19; 965:1, 10, 15; 970:10; 977:11; 986:11

**cars** [4] - 945:9; 955:24; 983:13; 1068:15

**case** [18] - 918:13; 920:1; 921:13; 923:21; 924:3, 15; 927:2; 944:12; 946:2; 973:8; 1014:16, 23; 1066:17; 1068:12; 1073:14, 20; 1076:11

**casing** [1] - 982:24

**catch** [1] - 1054:22

**Caucasian** [1] - 953:2

**caveat** [1] - 926:21

**cell** [9] - 961:22; 987:22; 1010:15, 18, 23; 1011:22; 1012:1; 1028:10

**cellular** [1] - 956:15

**center** [3] - 976:4; 977:19; 1060:8

**Central** [3] - 914:5, 13, 22

**certain** [5] - 916:17; 922:14; 974:6; 1025:14; 1071:4

**certified** [2] - 1047:9

**chair** [1] - 956:18

**chairs** [1] - 997:21

**chance** [2] - 925:1; 1046:9

**changed** [2] - 932:18; 952:18

**charge** [4] - 943:2; 970:20; 992:11; 1000:16

**charged** [4] - 970:7; 985:25; 986:12; 996:13

**Chevy** [1] - 1036:19

**children** [2] - 994:2, 4

**choice** [1] - 998:24

**CHRISTIAN** [1] - 914:5

**Christian** [2] - 989:12; 991:4

**chunk** [1] - 915:21

**cigarette** [2] - 968:25; 969:1

**circumstances** [2] - 1047:7; 1068:11

**City** [12] - 914:19; 928:1, 6; 970:4; 972:10, 20; 1002:7; 1044:6; 1047:3; 1060:8; 1062:9, 14

**city** [1] - 928:15

**claimed** [3] - 1006:10, 18

**clarification** [1] - 1043:15

**cleaned** [1] - 995:1

**cleaning** [4] - 942:14, 16; 944:4; 958:4

**clear** [1] - 1011:19

**cleared** [1] - 1012:12

**clearly** [1] - 974:11

**CLERK** [2] - 915:3; 974:19

**client** [2] - 917:5; 920:19

**clinic** [1] - 994:14

**Clinton** [2] - 946:13; 984:15

**close** [4] - 925:19; 938:18; 975:15; 1055:21

**close-up** [1] - 975:15

**closed** [5] - 923:5; 934:12; 958:5; 979:8

**closer** [5] - 932:19; 977:19; 1026:17; 1055:24

**closest** [1] - 976:22

**closet** [2] - 958:12; 1002:5

**clothes** [13] - 929:8; 932:18; 933:1, 6, 25; 958:17; 961:2; 1002:2, 4, 7, 9; 1005:6; 1053:16

**clothing** [1] - 1007:14

**cocaine** [12] - 937:4; 999:1, 5, 16; 1000:1; 1037:6, 9, 11, 15; 1038:1

**coincidental** [1] - 1057:24

**collateral** [1] - 920:19

**colleagues** [1] - 1025:24

**colloquy** [1] - 1033:16

**color** [1] - 967:3

**Colt** [5] - 946:21;

962:23; 964:7; 973:24; 974:13

**combination** [3] - 932:22; 1053:15

**coming** [9] - 939:22; 952:24; 954:11; 966:15; 979:17; 980:23; 1039:16; 1047:16; 1064:24

**commenting** [1] - 962:6

**commitment** [1] - 915:23

**committing** [1] - 1070:16

**common** [1] - 938:24

**common-law** [1] - 938:24

**communicate** [1] - 1011:1

**compacter** [3] - 945:8; 946:4, 8

**compacters** [1] - 945:7

**company** [1] - 1010:15

**complain** [1] - 948:18

**complaint** [1] - 985:24

**complete** [2] - 927:1; 1009:9

**completely** [1] - 1002:25

**complies** [7] - 1026:5, 9, 14, 21, 25; 1027:5; 1056:14

**computer** [1] - 914:25

**computer-assisted** [1] - 914:25

**conceal** [1] - 937:16

**concede** [1] - 917:7

**concerned** [1] - 969:9

**concerning** [6] - 918:9; 919:2, 7; 924:2; 1062:15; 1063:4

**conclusion** [1] - 925:6

**conducted** [1] - 1015:5

**confer** [4] - 926:21; 1056:5; 1065:1; 1071:15

**conference** [2] - 986:21; 1004:24

**confession** [1] - 1061:10

**confident** [1] - 1030:17

**conflict** [2] - 919:5; 920:2

**conflicts** [1] - 919:2

**confront** [1] - 1068:8

**confused** [1] - 920:25

**confusion** [1] - 1012:23

**consider** [3] - 925:25; 994:23; 1075:6

**considered** [2] - 1065:15; 1066:3

**constant** [1] - 1073:4

**construction** [6] - 933:21; 935:7; 949:7, 15; 953:3; 956:21

**cont'd** [1] - 1027:7

**contact** [2] - 918:23; 987:25

**contacted** [1] - 918:24

**contacts** [1] - 1047:25

**contained** [4] - 918:11; 926:16; 1034:16; 1061:12

**contents** [4] - 917:2, 10; 918:2; 921:4

**continue** [5] - 927:16; 957:7; 974:25; 1026:1; 1073:21

**Continued** [6] - 1015:9; 1038:18; 1041:5; 1045:2; 1060:21; 1067:6

**continued** [2] - 927:24; 1025:18

**contribute** [1] - 994:6

**conversation** [4] - 923:6; 945:1; 959:3; 962:16

**conversations** [1] - 920:12

**convicted** [4] - 923:22; 990:22; 991:25; 992:12

**cook** [1] - 1008:20

**cooler** [8] - 953:2; 954:10; 977:4, 12, 17, 22; 981:25

**cooperating** [2] - 992:3; 993:5

**cooperation** [2] - 972:6; 992:13

**copies** [1] - 1039:9

**copped** [1] - 992:20

**cops** [3] - 944:5; 959:25; 969:12

**copy** [1] - 1076:9

**Coral** [1] - 914:17

**corner** [17] - 933:7; 945:13; 947:23; 949:2, 6, 24; 952:16; 953:18; 956:1; 968:22; 978:10; 980:4, 7, 25; 1053:18

**correct** [155] - 928:13; 929:10; 930:13, 16; 931:9, 13; 932:7, 14; 934:10, 16; 936:20; 939:3; 940:7, 24; 942:6, 12; 945:25; 949:10; 950:8, 15; 951:7; 954:22; 957:9; 958:20; 962:12; 966:14; 968:5; 970:6, 11, 25; 972:1, 8; 975:7; 977:1; 978:1, 15, 22, 24; 979:22; 980:10; 983:17; 984:1, 24; 985:2; 987:6, 13-14, 18; 991:11; 992:2, 13, 22-23; 993:8; 994:6, 10, 21, 23; 995:18; 996:3; 997:5; 998:7, 14; 1000:19; 1001:3; 1005:3, 5, 11-12, 15-16, 20; 1006:11, 13, 16, 20, 24-25; 1007:16, 19, 22; 1008:5, 15, 19; 1009:20; 1011:21; 1012:2; 1029:13, 22; 1030:1, 7; 1034:12, 24; 1035:4, 13-14; 1036:17, 21; 1037:10, 24; 1038:5, 7; 1043:11; 1044:4; 1049:6, 10, 20; 1050:6-8; 1051:7, 16-17; 1052:4, 7; 1053:1, 7; 1054:10; 1055:5, 10, 15, 18-19; 1056:2, 15-19; 1057:3, 13, 16, 18-19, 22; 1058:1, 19; 1059:22; 1062:17; 1063:5; 1066:8

**Counsel** [1] - 1056:5

**counsel** [18] - 916:23; 917:19; 923:1, 11; 924:17; 963:14; 973:25; 986:15; 1002:18; 1015:6; 1023:24; 1044:13; 1052:21; 1063:7; 1065:1; 1070:15; 1071:15

**count** [1] - 991:19

**counterclockwise** [2] - 953:21; 981:3

**Country** [1] - 914:18

**County** [2] - 915:23; 985:24

**couple** [10] - 915:13; 925:13; 931:1; 965:18; 976:14; 997:21; 1029:1; 1036:15; 1058:22; 1064:24

**course** [3] - 925:24; 1004:16; 1046:4

**Court** [16] - 914:20; 917:19; 919:4, 13; 921:3, 10; 924:20; 973:14; 995:13; 1003:12; 1015:6; 1024:6; 1044:21; 1046:8; 1047:5

**COURT** [190] - 914:1; 915:5, 10; 916:3, 15, 17; 917:3, 13; 918:4; 919:20, 25; 920:15; 921:5, 14, 18, 21; 922:1, 21, 25; 923:8, 13, 16; 924:1, 11, 24; 925:3, 18; 926:4, 8, 12, 17, 23; 927:5, 10, 13; 951:14; 963:15, 18; 965:13; 973:7; 974:1, 9, 17, 22; 975:2; 980:15; 983:23; 985:14, 17; 986:5, 18, 22; 988:11; 989:20; 990:6, 9, 13, 23; 992:16, 25; 995:4, 25; 996:24; 1000:24; 1001:1; 1002:12, 15, 21; 1003:6, 13, 25; 1004:7, 12, 17, 22, 25; 1010:12; 1011:10, 13, 16, 19, 23, 25; 1012:4, 15, 23; 1013:2, 18, 22; 1014:5, 9, 13, 17, 25; 1022:2; 1023:6, 18; 1024:6, 23; 1025:1; 1026:7, 11, 17; 1027:4, 22; 1030:13, 16; 1031:1, 4; 1032:24; 1033:1, 16, 21; 1034:1, 6, 15; 1037:19, 21; 1038:4, 12, 14, 16; 1039:3, 13, 22; 1041:3; 1042:5; 1043:17, 23; 1044:9, 15, 23; 1045:1; 1046:6, 11, 15, 23; 1047:9, 16, 23; 1049:3; 1050:18; 1051:3; 1052:22; 1056:8; 1057:5; 1058:3, 17; 1059:1, 11, 15; 1060:4, 19; 1061:3, 12, 22; 1062:3, 25; 1065:20; 1067:4; 1068:5, 14, 17, 20, 24; 1069:5, 8, 14; 1070:2, 9, 12, 18, 21; 1071:1, 11, 18, 21; 1073:3; 1074:4, 7, 12, 24; 1075:2, 11, 14, 19, 23, 25; 1076:3, 8

**court** [18] - 943:5, 7; 971:2, 20-22; 984:12; 995:16; 1012:22; 1015:4; 1022:1; 1025:14; 1041:2; 1043:2, 5; 1049:2; 1062:2; 1073:2

**Court's** [2] - 923:24; 983:21

**courthouse** [1] - 1025:9

**Courthouse** [1] - 914:4

**courtroom** [9] - 927:12; 973:10; 974:21; 996:5; 997:2; 1014:4; 1024:25; 1026:18; 1074:3

**cover** [1] - 1047:2

**covering** [1] - 976:7

**CR** [1] - 914:3

**crack** [13] - 994:20; 998:24; 999:2, 5, 16, 25; 1000:3; 1008:19, 22, 24; 1009:3; 1037:7; 1039:22

**cradled** [1] - 983:11

**crash** [1] - 1007:3

**crashed** [1] - 1007:6

**crazy** [2] - 944:2

**cream** [1] - 967:4

**crime** [8] - 952:2, 9; 957:4; 962:20; 970:13; 971:3; 973:22

**CROSS** [3] - 991:1; 1027:7; 1077:6

**cross** [10] - 916:3; 924:22; 925:8; 968:2; 986:19; 990:9; 1027:13; 1069:19; 1075:15

**CROSS-EXAMINATION** [3] - 991:1; 1027:7; 1077:6

**cross-examination** [5] - 916:3; 924:22; 925:8; 990:9

**cross-examine** [1] - 1075:15

**cross-streets** [1] - 968:2

**crossed** [2] - 956:6, 20

**crossing** [1] - 1064:22

**crowd** [2] - 949:16

**crucial** [3] - 1003:14; 1014:14; 1068:23

**crying** [1] - 1027:11

**cumulative** [3] - 974:3; 989:18; 990:4

**curser** [2] - 931:18;

964:1

**custody** [1] - 1060:7

**Cutias** [1] - 919:5

**D**

**dangerous** [1] - 1068:10

**dark** [3] - 936:15; 1064:7, 17

**date** [4] - 986:14; 1036:20; 1050:4; 1062:6

**dated** [1] - 1061:16

**daughter** [6] - 938:17, 20; 1002:10; 1003:7; 1005:2; 1007:13

**daughter's** [6] - 938:16; 988:21; 1002:9; 1003:3; 1027:14

**days** [4] - 925:13; 964:17; 965:18

**dead** [1] - 976:4

**deal** [1] - 1074:4

**dealer** [5] - 966:16, 24; 998:17, 20; 1006:11

**dealing** [1] - 920:23

**deals** [1] - 975:11

**debate** [1] - 1047:23

**Debbie** [1] - 923:2

**decided** [2] - 992:22; 995:13

**decision** [2] - 1022:3; 1071:10

**dedication** [1] - 1027:13

**deep** [1] - 1059:3

**defendant** [6] - 920:12; 943:22; 1023:20; 1071:9, 14

**Defendant** [2] - 914:6, 16

**Defendant's** [2] - 1060:9; 1061:13

**defendant's** [1] - 924:13

**defense** [5] - 1014:16, 23; 1015:6; 1065:1; 1071:15

**defensive** [2] - 1070:25; 1071:1

**degree** [3] - 970:8; 971:6; 996:14

**Delancey** [5] - 945:10, 18; 946:12; 1046:14

**delay** [3] - 924:17; 925:13; 927:13

**Deli** [2] - 988:15

5

**Delicatessen** [1] - 937:21

**delusional** [3] - 999:10, 24

**demeanor** [3] - 960:11, 13, 17

**demonstrate** [2] - 980:17; 982:12

**demonstration** [2] - 1024:8; 1027:20

**denied** [2] - 1061:5; 1062:16

**deny** [2] - 1063:4, 13

**Department** [5] - 970:5; 972:21; 1062:9, 14; 1070:5

**dependant** [1] - 972:22

**depict** [1] - 979:20

**depicted** [10] - 953:7; 963:21; 973:20; 974:12; 975:19, 22; 976:11; 979:18; 985:2, 6

**depicting** [1] - 964:10

**describe** [3] - 978:16; 984:12; 1069:6

**described** [4] - 941:16; 945:23; 993:11; 1035:1

**description** [1] - 1050:15

**designate** [1] - 1075:6

**desk** [3] - 1040:3; 1050:12

**desolate** [2] - 979:3; 1064:23

**detectives** [1] - 966:3

**detention** [1] - 1060:8

**determinant** [2] - 996:7, 20

**determination** [6] - 920:4, 9; 1014:25; 1024:6; 1034:16; 1074:19

**diagonally** [3] - 950:1; 956:7; 978:18

**difference** [1] - 999:4

**different** [3] - 936:25; 960:11; 1068:20

**direct** [5] - 916:2; 927:17; 931:11; 941:5; 969:25

**DIRECT** [2] - 927:23; 1077:4

**directing** [2] - 942:10; 1074:22

**direction** [5] - 978:9; 979:12, 18; 980:21;

981:6

**directly** [1] - 918:24

**disappeared** [1] - 983:12

**disclosure** [2] - 924:13

**discretion** [1] - 924:20

**discuss** [1] - 1073:17

**discussed** [1] - 975:5

**discussion** [8] - 961:11; 962:7; 990:25; 1002:18; 1013:5; 1014:14; 1025:11; 1074:15

**disk** [1] - 1069:1

**disregard** [5] - 1002:17; 1011:11; 1024:11; 1052:23; 1073:19

**DISTRICT** [2] - 914:1

**District** [5] - 914:21; 971:11; 972:20; 975:7; 993:6

**divided** [1] - 956:22

**document** [3] - 921:25; 1024:1; 1046:5

**documented** [1] - 974:11

**documents** [3] - 922:3; 1023:21, 25

**DODDATO** [5] - 914:18; 923:15, 18; 924:8; 1013:4

**Doddato** [6] - 916:7; 926:22; 1014:18; 1015:3; 1068:24; 1071:9

**done** [10] - 925:10, 12; 971:18; 990:16; 991:13; 995:10; 1024:12; 1025:16; 1046:6; 1075:11

**door** [13] - 922:25; 923:5; 958:3, 5, 11; 969:16; 1003:17, 23; 1004:11, 13; 1053:23; 1066:13, 20

**doors** [2] - 923:4; 1050:12

**doorway** [1] - 961:7

**dot** [1] - 947:6

**down** [36] - 932:3, 21; 935:11; 937:2; 942:17; 944:8, 11; 947:25; 948:2, 12, 17; 950:25; 952:15, 25; 954:11; 969:16; 979:6, 9, 14; 980:13; 981:2, 5, 25;

982:1; 1028:10; 1051:9; 1052:3; 1054:25; 1059:25; 1068:4; 1071:25

**downstairs** [1] - 916:22

**downtown** [5] - 938:2; 952:19; 978:10; 983:18; 1055:12

**drink** [1] - 942:18

**drinking** [5] - 941:4; 962:18; 1000:5, 10

**drive** [2] - 968:21; 997:5

**Drive** [2] - 938:7; 997:7

**driver's** [2] - 968:10; 983:13

**driving** [2] - 967:1; 977:25

**dropped** [1] - 969:23

**drove** [5] - 928:10; 967:13; 1036:20; 1069:13

**drug** [11] - 966:16, 24; 998:15, 17, 20, 24; 1006:11; 1065:18, 21; 1066:5, 7

**drugs** [7] - 938:12; 994:20; 998:19; 1010:1; 1029:14

**dual** [1] - 919:7

**due** [1] - 986:15

**duffle** [16] - 932:22, 25; 933:1, 11, 24; 934:12, 15, 18; 941:21; 960:25; 961:2, 4; 1053:16; 1054:21, 23

**duly** [1] - 1024:20

**duplicative** [1] - 973:21

**during** [14] - 928:15; 941:3, 16; 959:2; 963:5; 987:21; 988:5; 994:8; 1002:8; 1005:19, 23; 1007:18; 1011:1

**dusting** [2] - 973:23; 984:19

**E**

**early** [10] - 924:16; 929:21; 941:6; 942:11; 970:1; 989:6; 1035:12; 1063:25; 1068:18; 1074:13

**east** [6] - 932:3; 947:17; 968:4; 1032:11; 1033:24; 1034:18

**eastbound** [1] - 947:18

**EASTERN** [1] - 914:1

**easy** [1] - 937:15

**eat** [2] - 930:8; 959:2

**eating** [1] - 959:3

**effects** [1] - 999:23

**efforts** [1] - 1002:24

**eight** [6] - 992:7; 995:11; 996:6, 9, 19

**eight-year** [2] - 996:6, 19

**either** [8] - 918:10; 919:13; 942:10; 964:17; 971:10; 972:19; 997:25; 1028:9

**ejected** [1] - 982:24

**electricity** [2] - 929:15; 936:14

**elevator** [2] - 923:3; 997:14

**elevators** [1] - 1050:14

**elicit** [2] - 917:8; 1069:17

**employee** [1] - 1033:6

**employment** [1] - 993:13

**empty** [2] - 950:25; 1053:15

**end** [11] - 933:1; 963:3; 964:22; 976:1; 1012:21; 1027:24; 1053:17; 1065:8, 10; 1068:22; 1070:19

**End** [4] - 986:21; 990:25; 1004:24; 1013:5

**ended** [3] - 928:2; 956:7; 977:25

**ending** [1] - 1001:14

**enforcement** [3] - 971:25; 1075:12, 15

**engage** [1] - 1066:4

**enter** [4] - 971:9; 972:7, 17; 975:11

**entered** [2] - 975:5; 1024:24

**entering** [4] - 971:14; 972:5; 974:19; 1024:23

**enters** [2] - 927:11; 974:20

**entire** [2] - 934:14; 973:18

**equipment** [1] - 943:3

**ESQ** [4] - 914:14, 16, 18

**essential** [1] - 918:8

**essentially** [1] - 1046:11

**Essex** [1] - 946:23

**establish** [1] - 986:18

**establishment** [1] - 943:19

**estimate** [1] - 1073:23

**etcetera** [3] - 924:22; 925:12; 1044:4

**evaluation** [2] - 916:18; 921:10

**evening** [13] - 929:21; 939:13; 941:5; 1035:7, 16-18; 1036:8; 1037:5, 16; 1038:10; 1043:16; 1073:25

**event** [2] - 966:11; 967:23

**events** [1] - 1039:23

**eventually** [6] - 930:7; 939:17; 952:10; 956:14; 957:7; 970:12

**evidence** [20] - 920:8; 926:15; 951:16; 952:2, 9; 953:6; 963:20; 973:22; 975:17; 976:23; 978:7; 985:23; 986:8, 25; 987:2; 1056:6; 1060:18; 1074:18; 1077:16

**Evidence** [1] - 921:24

**Ex** [1] - 1015:5

**ex** [4] - 994:5; 1013:19; 1014:10, 20

**ex-wife** [1] - 994:5

**exactly** [3] - 917:14; 945:8; 1052:17

**examination** [6] - 916:3; 924:22; 925:8; 927:17; 990:9

**EXAMINATION** [5] - 927:23; 991:1; 1027:7; 1077:4, 6

**examine** [1] - 1075:15

**examined** [1] - 1024:20

**examining** [1] - 963:12

**except** [2] - 925:5; 926:13

**exception** [2] - 921:24; 922:2

**exclude** [1] - 1014:14

**excuse** [4] - 965:7; 988:18; 1037:19; 1038:12

**exhibit** [2] - 951:10; 1056:7

**Exhibit** [6] - 975:16;

986:24; 1056:11; 1060:9; 1061:13; 1077:15

**EXHIBITS** [1] - 1077:14

**exists** [1] - 1024:1

**exits** [2] - 973:9; 1014:3

**expect** [3] - 925:18; 926:1, 15

**expectation** [1] - 924:24

**expelled** [2] - 951:24

**expertise** [1] - 1030:8

**experts** [1] - 926:5

**explain** [4] - 951:20; 1013:18; 1027:9; 1065:17

**explanations** [1] - 1025:6

**expose** [1] - 1013:15

**exposed** [1] - 1024:4

**extra** [1] - 1025:4

**extremely** [1] - 1003:14

**eye** [2] - 942:1, 7

**eyes** [1] - 956:18

---

**F**

**face** [12] - 953:22; 954:15, 19; 955:3; 958:6; 960:9; 979:25; 981:4; 982:5; 1056:13

**faced** [1] - 953:25

**facilities** [1] - 930:15

**facing** [5] - 949:20; 978:6, 9-10; 980:20

**fact** [4] - 926:5; 974:12

**factory** [1] - 958:16

**factually** [1] - 919:6

**fails** [1] - 918:18

**fair** [5] - 925:20; 926:1; 930:11; 969:8; 981:13

**fairness** [1] - 916:19

**faith** [16] - 918:13; 921:7, 13, 23; 922:5-8, 19-20; 1014:21; 1015:1; 1024:7; 1069:21; 1070:1

**fall** [2] - 954:24; 970:1

**family** [4] - 1000:16, 18, 21; 1002:25

**far** [6] - 936:16; 975:12; 976:1; 993:13; 1003:12; 1074:10

**fast** [1] - 1029:1

**father** [2] - 1061:15; 1062:20

**FBI** [1] - 972:21

**FDR** [3] - 938:6; 997:5, 7

**federal** [3] - 971:10, 20; 972:2

**Federal** [3] - 914:13, 22; 921:13

**fees** [1] - 919:10

**feet** [2] - 936:18; 955:4

**fell** [4] - 950:25; 951:17; 955:4

**fellow** [1] - 968:9

**felon** [3] - 990:22; 991:25; 992:12

**felt** [2] - 1030:17; 1066:9

**few** [1] - 998:9

**fifteen** [1] - 995:12

**Fifth** [11] - 918:14, 18; 919:19; 930:19; 931:11; 949:2, 10; 955:18; 956:25; 1032:12, 21

**fill** [1] - 1071:12

**finally** [1] - 928:15

**fine** [1] - 1071:12

**finger** [2] - 982:21; 1070:23

**fingerprints** [4] - 962:24; 984:20, 22; 1065:6

**finish** [2] - 944:9; 995:25

**firearm** [13] - 992:1, 12; 1029:21-23, 25; 1030:22; 1031:6; 1056:22; 1057:15, 19; 1059:22; 1063:4

**firearms** [3] - 1030:9, 19; 1054:23

**fired** [1] - 951:23

**First** [1] - 968:3

**first** [35] - 915:7; 918:1; 919:1, 13, 17; 920:4, 9, 22; 922:5; 932:20; 960:13; 971:6; 976:20; 979:13; 980:18; 990:19; 996:14; 998:8; 1027:14; 1029:19; 1030:3, 5; 1031:8, 12; 1043:20; 1049:19; 1050:3; 1053:8; 1056:22; 1061:23;

**fits** [1] - 940:6

**fitted** [1] - 987:10

**five** [2] - 1052:19, 23

**fix** [1] - 1030:10

**flight** [1] - 997:14

**floor** [4] - 948:7; 950:25; 997:11

**flopping** [1] - 955:1

**Florida** [1] - 914:17

**flower** [3] - 956:4, 6, 10

**Flynn** [1] - 916:22

**FLYNN** [5] - 914:14; 920:14; 921:22; 922:2; 1074:10

**focuses** [1] - 924:6

**focusing** [1] - 1051:21

**FOIA** [1] - 1048:3

**folks** [2] - 973:8; 974:24

**followed** [2] - 936:11; 945:17

**following** [24] - 947:11; 964:17; 966:12; 974:13; 985:19; 990:14; 999:19; 1002:19; 1011:17; 1023:4; 1039:1, 8; 1041:1; 1042:1; 1043:1, 22; 1046:1; 1049:1; 1061:1, 13; 1062:1; 1066:2; 1068:1; 1073:1

**follows** [3] - 927:22; 1024:21; 1048:3

**foot** [1] - 967:21

**force** [1] - 972:17

**foreground** [1] - 976:11

**forensic** [1] - 963:11

**form** [3] - 992:14; 1005:21; 1062:24

**former** [1] - 917:16

**forth** [1] - 1073:4

**forward** [3] - 919:11; 976:9; 1029:1

**foundation** [7] - 919:6; 985:13; 986:1; 1000:23; 1038:15; 1061:18, 23

**four** [6] - 926:3; 927:4; 936:18; 969:16; 1066:13, 20

**four-door** [3] - 969:16; 1066:13, 20

**frame** [2] - 927:3; 980:9

1063:3; 1070:20; 1076:4

7

**franchise** [2] - 1034:7; 1052:13

**frank** [1] - 1040:3

**FRANK** [1] - 914:18

**frankly** [1] - 923:10

**free** [1] - 1037:23

**freight** [1] - 923:3

**Friday** [33] - 928:17, 25; 929:21; 937:23; 938:14, 20-21; 939:3; 988:14, 19; 989:7; 1003:2, 17; 1005:9; 1006:20, 24; 1035:21; 1039:10; 1043:22; 1044:1, 11, 16; 1049:5, 12-14; 1054:9, 11; 1057:9

**friend** [4] - 928:10; 935:14; 1036:10

**friend's** [1] - 958:16

**friendly** [2] - 954:7

**friends** [5] - 939:1; 959:24; 993:7; 1005:24; 1007:4

**friendship** [1] - 1009:17

**Froccaro** [11] - 917:21; 918:7, 17, 20-21; 919:2, 8, 11, 16; 920:3; 1069:19

**front** [13] - 927:6; 934:21; 948:12; 956:4, 15; 969:16; 975:20; 1002:16; 1004:14; 1023:23; 1050:11; 1053:14, 23

**frozen** [2] - 955:13; 983:9

**full** [2] - 962:22; 1009:9

**fully** [2] - 954:14; 982:5

**functioning** [1] - 1049:8

**furniture** [2] - 997:18, 20

---

### G

**Gables** [1] - 914:17

**garbage** [2] - 945:7; 946:8

**Garden** [1] - 914:19

**Gargiulo** [11] - 915:12; 971:8, 10; 978:13; 987:17; 993:12; 1001:22; 1009:7, 13; 1010:1; 1064:3

**Gargiulo's** [1] - 984:10

**gate** [1] - 950:5

**gates** [1] - 979:9

**general** [1] - 924:1

**gentleman** [3] - 998:2; 1047:3, 20

**gentlemen** [2] - 1025:3; 1034:15

**gently** [1] - 1004:18

**gesture** [2] - 954:7

**get-together** [1] - 959:24

**girls** [1] - 1036:25

**given** [8] - 916:11; 924:1; 925:15; 1001:8; 1058:10, 18; 1059:6; 1068:11

**gleaned** [1] - 1023:19

**gloves** [4] - 942:16; 951:9; 953:13; 980:23

**good-faith** [6] - 921:7; 1014:21; 1015:1; 1024:7; 1069:21; 1070:1

**Government** [29] - 914:12; 915:15; 918:15, 24; 919:14; 920:6; 921:2, 14; 922:9, 16-18, 20; 925:16; 971:25; 985:11, 16; 986:24; 991:13, 16; 992:3, 13; 995:15; 996:17; 1004:19; 1014:14, 19, 22; 1077:15

**government** [7] - 971:10; 972:2; 993:6; 1023:12, 21; 1047:11; 1056:7

**Government's** [4] - 918:6; 926:10, 16; 975:16

**grabbed** [4] - 953:14; 954:20; 961:4; 1054:21

**grant** [1] - 918:15

**green** [2] - 976:6; 977:5

**greeted** [2] - 1009:17; 1054:1

**grocery** [4] - 934:6; 946:13, 16; 984:15

**ground** [2] - 954:11; 997:11

**ground-floor** [1] - 997:11

**grounds** [2] - 1023:16; 1027:11

**guess** [5] - 918:1; 950:11; 952:20; 978:20; 980:20

**guessing** [1] - 1050:1

**guilty** [15] - 970:12; 971:1, 3, 5-6, 14; 972:5, 7, 17; 975:5; 987:13; 991:21; 992:6; 993:4

**gun** [82] - 937:6, 9, 11, 13-14; 940:5, 8, 18; 941:21, 25; 942:1, 11, 13, 19, 21; 944:5, 9; 949:25; 950:13; 951:3; 952:9; 953:15; 954:14, 16-18; 958:17; 966:19; 968:13; 969:4; 980:19; 982:4, 6, 10, 20; 983:10; 985:9, 22, 25; 987:4, 7, 12, 15; 991:21; 992:20; 1006:13; 1029:12, 15; 1031:12; 1032:7, 12; 1033:12; 1056:19, 23; 1057:2, 21, 24-25; 1058:7, 10, 13, 15, 18, 25; 1059:17; 1060:1; 1061:14, 16, 19; 1062:15, 17, 20-21; 1063:10

**guns** [22] - 930:21, 24; 931:1; 933:18; 937:23; 959:18-21; 988:19; 1006:14, 16, 21; 1050:5; 1053:11, 19; 1054:19, 21, 24; 1055:13; 1056:25; 1057:8

**gunshot** [2] - 943:25; 944:1

**guy** [17] - 934:21, 23; 935:5; 943:9, 22; 944:4; 953:4; 960:9; 963:11; 968:11, 14, 19; 1053:21, 25; 1068:21

**guys** [1] - 949:16

**Gym** [23] - 929:9; 930:18; 931:5; 967:8, 15-16, 18, 25; 968:2, 7-8; 1032:3, 22; 1033:6, 19; 1034:3, 8, 25; 1052:8, 11, 16, 25; 1054:5

**gym** [27] - 931:7, 19; 932:8, 12-13; 943:2; 966:4, 8; 967:22; 1006:19; 1032:8; 1033:4, 8; 1034:2, 8, 17, 19; 1044:3;

1051:14; 1052:4, 6, 9, 11; 1053:24; 1055:17; 1069:10

**Gyms** [4] - 1033:3, 22; 1034:9, 11

**gyms** [1] - 1033:24

---

### H

**hailed** [1] - 956:24

**hailing** [2] - 953:18; 981:1

**half** [4] - 916:5; 995:11; 1008:1; 1025:4

**hallway** [1] - 961:6

**hand** [20] - 933:3, 7; 937:10; 940:6; 945:13, 21; 951:1; 952:6; 953:3; 954:3, 5-6; 955:12; 956:6; 981:10; 982:9; 983:11; 1050:13; 1062:11

**handcuffs** [1] - 923:5

**handed** [2] - 936:7; 1046:5

**Handed** [3] - 1046:8; 1056:10; 1060:10

**handgun** [6] - 940:4; 944:12; 970:8, 13; 1030:9

**handguns** [5] - 933:16; 935:17; 936:5, 12

**handing** [2] - 946:1; 985:21

**handle** [4] - 925:20; 927:14; 982:20, 22

**hands** [8] - 953:14; 954:21, 24; 955:1; 981:10; 982:8, 16; 1054:1

**handwriting** [1] - 1060:11

**handwritten** [1] - 1061:10

**hanging** [6] - 941:4, 7, 14; 942:4; 1053:4, 6

**happy** [2] - 960:16; 986:16

**hard** [5] - 953:3; 954:11; 961:21, 23; 981:25

**HARRY** [1] - 914:21

**hat** [4] - 953:3; 954:11; 981:25

**head** [1] - 979:25

**headed** [2] - 945:24; 983:18

**hear** [8] - 921:14;

955:8; 957:20; 958:10;
990:1; 1000:24; 1012:8;
1074:13

**heard** [4] - 950:5, 17;
1012:2, 7

**hearing** [2] - 1039:7;
1069:4

**hearings** [1] - 1067:1

**hearsay** [4] - 917:23;
974:2, 11; 1046:18

**heightened** [1] -
999:17

**held** [1] - 982:19

**help** [7] - 994:14;
1029:11, 23; 1030:10,
18, 22; 1031:6

**helped** [1] - 935:14

**heroin** [3] - 994:11,
13, 16

**hidden** [2] - 954:17;
1053:11

**hiding** [1] - 981:14

**high** [10] - 931:1;
941:4; 942:4; 998:21;
999:16; 1028:13;
1037:1, 4; 1039:23

**hit** [1] - 950:5

**hitting** [1] - 955:3

**hold** [5] - 937:10;
954:18; 968:13; 980:19;
1056:13

**holding** [5] - 954:16;
964:6; 981:23; 982:10

**holidays** [1] - 1001:15

**Holland** [1] - 1039:14

**home** [1] - 1003:14

**homicide** [3] - 971:8,
10; 1063:15

**Honor** [29] - 916:21;
920:14; 921:17, 22;
922:10; 923:12, 14, 25;
924:12; 927:1; 951:12;
963:14, 17; 973:5, 12;
975:1; 980:12; 983:20;
985:22; 988:10; 990:11;
1000:22; 1004:21;
1014:24; 1023:15;
1039:25; 1071:16;
1074:9

**HONORABLE** [1] - 914:9

**hope** [2] - 917:19;
996:19

**hoped** [1] - 948:18

**hopeful** [1] - 1073:22

**hopefully** [1] - 995:1

**hoping** [1] - 996:5

**hot** [1] - 1051:24

**Hotel** [10] - 930:10,
12, 17; 1044:3;
1049:19, 22; 1050:8,
10, 16; 1051:4

**hotel** [2] - 1050:11;
1051:4

**hour** [3] - 916:1, 5;
1025:4

**hours** [5] - 941:20;
942:11; 989:7; 1035:12;
1063:25

**house** [20] - 938:1, 6,
16; 943:4; 957:2, 8;
958:1, 4; 961:20;
969:23; 988:1, 21-22;
1002:9; 1003:4; 1011:3,
6; 1028:7; 1055:4

**Houston** [2] - 937:20;
1055:14

**hundred** [1] - 1052:15

**hung** [2] - 962:16;
1036:25

**husband** [2] - 998:12

---

**I**

**idea** [1] - 948:14

**identification** [3] -
962:4; 985:5; 1061:13

**identified** [3] -
986:1, 12; 1056:6

**identifies** [1] -
985:22

**identify** [1] - 974:4

**ignore** [1] - 919:25

**III** [1] - 1025:8

**illegal** [3] - 965:3, 6,
8

**illuminate** [1] -
1023:25

**immunity** [2] - 918:15;
919:14

**impact** [1] - 955:3

**impeachment** [4] -
990:19; 1061:8; 1068:4

**implicating** [1] -
919:21

**importance** [1] -
1069:22

**important** [3] -
1025:13; 1070:22;
1076:3

**improper** [1] - 1068:4

**in-camera** [1] - 1015:5

**incarcerated** [1] -
1001:11

**incarceration** [1] -
971:16

**incident** [3] -
1029:12, 15; 1065:14

**inclined** [1] - 917:19

**include** [2] - 972:2;
1014:21

**incorrect** [1] - 1068:8

**incredibly** [1] -
1068:10

**INDEX** [1] - 1077:1

**indicate** [2] - 924:4;
955:20

**indicated** [7] - 923:3;
1012:22; 1015:1;
1023:20; 1063:24;
1065:2; 1066:7

**indicating** [9] -
947:14, 18; 949:9;
955:1; 977:19; 980:5;
983:7; 985:2; 987:17

**indicating)** [9] -
947:17; 951:24; 954:20,
25; 977:18; 978:4, 19;
980:4; 981:7

**individual** [6] -
935:6; 948:5; 968:8;
969:6, 15; 1054:14

**individually** [1] -
933:15

**individuals** [3] -
1025:14; 1075:9, 21

**Infiniti** [9] - 967:5,
13, 23; 1066:20;
1067:1; 1069:10, 20,
23; 1070:6

**infiniti** [1] - 967:6

**influence** [1] -
1073:15

**information** [2] -
918:9; 992:19

**initial** [1] - 962:16

**inquire** [1] - 926:4

**inquiry** [2] - 921:12;
1023:22

**inside** [26] - 933:13,
15, 23; 934:3, 12;
935:6, 25; 936:2;
942:7; 944:12; 948:17;
949:5; 952:13; 953:16;
956:6; 958:11, 13;
961:2; 977:5; 982:6,
16, 20, 22; 1052:25;
1053:6

**instead** [1] - 1046:20

**instructed** [3] -
1002:17; 1011:13;
1024:11

**instructions** [1] -

1073:10

**insufficient** [1] -
920:8

**intend** [1] - 1071:23

**intended** [1] - 942:21

**intentions** [1] - 917:5

**interest** [3] - 919:2,
5; 920:2

**interior** [1] - 967:4

**interpose** [1] - 1024:3

**intersection** [1] -
931:21

**introduce** [1] - 921:3

**introduction** [1] -
1046:20

**investigators** [1] -
1076:2

**invite** [1] - 1008:3

**invokes** [1] - 918:18

**involve** [1] - 1076:6

**involved** [3] - 1010:2;
1065:17, 21

**involving** [5] -
919:22; 998:15;
1025:12; 1029:12;
1066:17

**irrelevant** [2] -
1002:22; 1039:19

**Islip** [3] - 914:5, 13,
22

**issue** [3] - 921:7, 19;
923:19

**issues** [8] - 915:14;
919:1, 4, 7, 9; 920:1,
19; 921:9

**items** [3] - 977:10;
1075:11

**itself** [2] - 964:14;
997:18

---

**J**

**jail** [6] - 970:24;
986:13; 994:25; 995:7;
1001:16, 18

**James** [1] - 918:7

**JAMES** [1] - 914:14

**jammed** [2] - 1030:3, 5

**jamming** [2] - 950:13;
1030:22

**Jersey** [16] - 928:3,
12; 1004:1; 1005:20,
23; 1006:1; 1035:9, 17;
1036:3, 5, 8, 21,
23-24; 1039:17; 1043:21

**Jimmy** [1] - 917:21

**JOANNA** [1] - 914:9

20

**job** [5] - 1007:1; 1031:9, 14, 19, 22

**Joey** [1] - 1036:10

**joint** [1] - 1073:8

**Judge** [13] - 915:4; 918:6; 924:8; 980:21; 1000:23; 1004:9; 1013:1, 14; 1026:16; 1038:15; 1044:24; 1059:13; 1060:18

**judge** [4] - 995:17, 22; 1032:25; 1059:10

**judge's** [1] - 1073:7

**judges** [1] - 1025:7

**Judges** [1] - 1025:8

**judges'** [1] - 915:19

**judicial** [3] - 973:15; 1046:24; 1047:5

**July** [4] - 1007:20; 1027:25; 1029:19

**jump** [1] - 917:16

**juncture** [2] - 920:18, 22

**junkie** [1] - 994:23

**juror** [3] - 915:3, 5; 923:4

**jurors** [6] - 922:21; 923:4; 926:25; 927:7; 1024:14; 1073:17

**jury** [30] - 916:14, 18; 927:11; 955:20; 973:9; 974:19; 980:18; 986:3; 1002:16; 1004:14; 1011:11, 13; 1014:3, 8; 1023:5, 11, 23; 1024:4, 10, 23-24; 1025:3; 1026:15; 1027:9; 1052:23; 1056:13; 1074:2

**Justin** [119] - 929:1; 930:3, 21, 25; 932:13; 935:8; 936:4, 7; 937:2, 14, 25; 939:20, 22-23; 940:8, 18; 941:7, 20; 943:13, 16; 944:8; 946:17, 19; 947:11; 948:2, 17; 953:20, 23; 954:2, 6, 12, 14; 955:6; 956:12; 957:20, 23; 959:7; 960:6, 9-10; 961:24; 962:7, 25; 964:18; 965:17, 22; 966:9, 23; 968:10, 12, 19; 969:5, 14-15, 17, 22; 977:22; 980:18; 981:3, 18, 23; 982:1, 3; 983:6, 25; 984:14; 987:16; 990:2; 998:12; 1001:22; 1002:5; 1006:14; 1007:15, 18; 1008:24; 1009:2, 6, 15, 25; 1010:6, 14, 17, 23; 1011:5, 20, 25; 1012:18; 1013:7; 1027:25; 1029:5, 14; 1032:3, 16, 20; 1033:6; 1044:2; 1049:5; 1050:4; 1052:10, 12; 1053:4; 1054:4, 16, 18; 1055:16; 1056:24; 1057:25; 1058:4; 1059:18; 1065:2, 13, 21; 1070:6

**Justin's** [1] - 967:9

**Justine** [1] - 981:20

**K**

**Katz's** [5] - 937:20; 988:15; 1005:7, 14

**keep** [7] - 937:15; 941:25; 942:7; 1002:7; 1025:3; 1071:24; 1073:21

**keeping** [1] - 920:16

**Keith** [2] - 917:20; 918:7

**kept** [3] - 948:17; 976:8; 1002:4

**key** [10] - 933:11; 1001:6, 8, 21, 25; 1002:1; 1008:8; 1033:11

**keys** [2] - 1033:7; 1053:17

**kid** [1] - 1003:22

**kids** [1] - 944:20

**kids'** [1] - 944:19

**kill** [8] - 943:6; 950:19; 966:24; 987:16; 1031:7, 10, 13, 21

**killed** [3] - 957:15; 960:9; 1010:5

**killing** [1] - 1001:22

**kind** [11] - 934:5; 944:16; 945:21; 946:20; 948:9; 955:1; 965:1; 967:1; 1036:18; 1048:1, 4

**kiosks** [2] - 976:14, 17

**kitchen** [2] - 942:18; 997:20

**knocked** [2] - 955:4; 958:3

**knot** [2] - 944:13; 952:12

**knowledge** [1] - 1012:1

**known** [2] - 1007:15;

1036:14

**knows** [1] - 952:24

**L**

**ladies** [2] - 1025:3; 1034:15

**lady** [4] - 968:25; 969:5, 10, 12

**land** [4] - 1012:10, 18; 1013:8; 1054:5

**lane** [1] - 956:21

**laser** [2] - 946:2; 977:16

**last** [22] - 916:4; 977:17; 988:12; 989:20; 1001:13; 1004:13; 1006:8; 1007:20, 23; 1009:9; 1026:2; 1027:20; 1036:12; 1039:7; 1043:3; 1059:5; 1069:23; 1070:10, 12

**late** [6] - 915:4; 941:20; 942:10; 969:25; 1049:13; 1054:11

**latex** [1] - 951:9

**law** [10] - 918:13; 921:13; 938:24; 971:24; 998:10; 1030:17; 1075:12, 15

**lawyer** [5] - 917:16; 966:5, 7; 992:16

**lawyers** [1] - 1025:23

**lay** [1] - 986:2

**laying** [3] - 944:10; 1000:23; 1038:15

**lead** [1] - 1059:13

**lead-in** [1] - 1059:13

**leading** [2] - 965:12; 989:25

**learned** [2] - 926:18; 1070:10

**lease** [1] - 1008:13

**least** [6] - 915:20, 25; 916:1; 1001:21; 1024:2; 1073:22

**leave** [8] - 915:22; 940:13, 18, 25; 952:1, 8; 1064:14; 1074:22

**leaves** [2] - 925:5; 1074:2

**leaving** [2] - 1025:16; 1028:7

**left** [47] - 930:1, 5; 935:10; 943:2; 944:22, 25; 945:21; 953:21; 954:6, 10; 955:12; 957:3; 961:1, 5, 14;

962:20; 963:24; 964:6; 968:19; 976:14; 977:13; 980:5, 8; 981:25; 983:4, 15; 984:24; 1000:16; 1005:19; 1007:13; 1026:12, 20, 23; 1027:12; 1036:1; 1050:13; 1053:22, 25; 1054:20; 1058:12, 15, 25; 1064:9; 1065:6

**left-hand** [2] - 945:21; 1050:13

**legal** [2] - 1066:16, 19; 1073:23

**length** [2] - 981:22; 1073:23

**leniency** [1] - 997:1

**lenient** [3] - 996:8, 10

**Leo** [1] - 1046:17

**Leshawn** [45] - 928:24; 939:2, 5; 940:13, 16; 946:7; 957:8; 960:8, 10; 961:20; 988:22; 989:6, 15, 17; 993:7; 997:4, 15, 23; 998:8, 17; 1000:12; 1001:3, 8, 10, 21; 1006:4; 1007:4; 1008:4, 7; 1010:18; 1011:2, 6; 1012:10, 18; 1013:8; 1028:2, 7, 18, 20; 1035:20, 24; 1055:4; 1064:9

**Leshawn's** [10] - 938:1; 939:12; 957:2; 958:1; 966:12; 969:18, 23; 988:1; 1011:3; 1029:8

**less** [1] - 979:20

**lessee** [1] - 1000:12

**letter** [26] - 915:11; 917:2, 10-11; 918:9, 25; 919:15; 920:7, 21; 921:3, 7, 11; 922:9-11; 1039:12; 1042:3; 1044:6, 24; 1046:17, 21; 1048:2; 1074:16

**liar** [1] - 1003:11

**lie** [2] - 962:19; 1062:22

**lied** [2] - 966:21; 974:7

**lien** [1] - 943:4

**life** [1] - 1025:8

**light** [6] - 929:16; 952:18, 20; 1064:8, 11

**lights** [3] - 928:21; 929:14; 1038:7

**Lincoln** [1] - 1039:21

**line** [18] - 931:23;

932:1, 10; 945:21, 23;
947:6; 961:21, 23;
978:3; 1012:10, 18;
1013:8; 1044:17;
1046:13; 1049:4;
1051:8; 1054:5, 24

**lines** [1] - 981:18

**link** [1] - 1063:14

**list** [2] - 927:3;
1074:23

**listen** [2] - 1046:10;
1073:12

**listening** [1] -
1025:16

**live** [6] - 932:4;
938:17; 969:13;
1002:10; 1004:4; 1006:5

**lived** [7] - 940:16;
988:4; 997:15; 1004:9;
1007:5; 1008:14;
1034:22

**lives** [1] - 1005:2

**living** [2] - 1007:24;
1029:21

**located** [3] - 937:19;
1049:22

**location** [6] - 983:3;
1003:14, 24-25;
1032:16; 1035:1

**lock** [9] - 932:22;
933:2-4, 6, 12;
1053:15, 18

**locked** [1] - 1001:25

**locker** [15] - 930:21;
932:19, 24; 933:5, 8;
934:20; 1033:7, 11;
1050:6; 1053:11, 14,
18, 20, 23

**lockers** [1] - 932:20

**locking** [1] - 933:4

**look** [16] - 924:2;
936:23; 939:23; 953:4;
955:1; 968:10, 24;
979:4; 982:3; 999:18;
1046:7; 1050:11;
1069:18; 1071:3, 19;
1073:3

**looked** [15] - 936:12;
937:12; 949:16; 951:3;
952:23; 954:2, 12;
955:12; 956:17; 981:2,
13, 24

**looking** [25] - 924:15;
940:1; 945:8; 947:25;
948:2, 4-5, 17; 952:15;
976:1, 13; 978:8, 16;
979:11, 20; 981:1, 5;
982:1; 983:2; 984:13;

997:1

**lookout** [4] - 945:3;
946:5, 9; 958:19

**looks** [1] - 1050:9

**loose** [4] - 963:3;
964:22; 1065:8, 10

**LORETTA** [1] - 914:12

**lose** [1] - 955:25

**lost** [2] - 922:4, 9

**low** [1] - 968:3

**lower** [2] - 932:3;
945:13

**loyalty** [1] - 919:7

**Luger** [2] - 1057:21;
1058:4

**luggage** [1] - 944:19

**lunch** [2] - 1014:1

**LYNCH** [1] - 914:12

---

**M**

**male** [1] - 953:2

**man** [9] - 956:17;
988:2; 1002:23;
1003:11; 1010:2;
1054:15; 1061:15;
1062:21

**Manhattan** [12] -
928:6, 23; 965:4;
1004:10, 20; 1005:4,
19; 1032:21; 1038:7, 9;
1044:18

**manipulate** [2] -
982:10, 23

**manner** [1] - 1068:4

**Manny** [1] - 972:25

**Manon** [7] - 915:8-10;
920:5, 11, 20; 925:5

**manslaughter** [5] -
971:6; 995:12; 996:12,
14

**map** [4] - 931:24;
946:14; 947:5; 955:19

**marijuana** [1] - 1037:6

**marked** [5] - 962:4;
985:4; 987:2; 1056:6;
1060:9

**Marshall** [1] - 923:2

**marshals** [1] - 922:24

**Martin** [2] - 988:2;
989:9

**Mastrangello** [2] -
1039:7; 1069:3

**material** [8] - 918:2,
8; 974:18; 1023:19;
1024:2; 1043:6; 1075:5,
20

**materialize** [1] -

986:9

**materials** [1] - 1075:3

**matter** [1] - 990:12

**Mattie** [10] - 1031:7,
9, 14, 20, 23-24;
1033:18; 1034:2, 10;
1052:6

**Matty** [14] - 942:25;
943:9, 11, 17, 19;
958:25; 959:2, 6-7, 12,
23; 966:5; 967:12

**Matulis** [1] - 988:2;
989:10

**Matulis's** [1] -
1003:21

**maximum** [2] - 971:16,
19

**McDonald** [1] - 1052:14

**McDonald's** [1] -
1052:13

**mean** [17] - 916:13;
917:25; 933:19; 934:23;
937:9; 944:3; 960:12;
964:23; 969:11; 971:24;
979:7, 9; 996:10;
999:14; 1065:11;
1075:11

**meaning** [2] - 951:4;
959:5

**means** [4] - 964:24;
999:12; 1025:7

**mechanical** [1] -
914:24

**mechanically** [1] -
1030:2

**mechanism** [1] - 950:11

**media** [4] - 924:2, 7;
1073:13, 18

**meet** [6] - 935:20, 25;
943:11; 968:16; 998:8;
1029:10

**meeting** [4] - 915:19;
1023:8; 1025:7; 1073:7

**meetings** [1] - 1025:9

**members** [2] - 955:20;
980:18

**mention** [3] - 1004:14;
1066:20; 1069:2

**mentioned** [6] - 923:1,
22; 940:5; 975:12;
1009:9; 1067:2

**messed** [1] - 1065:4

**messing** [1] - 1065:3

**met** [4] - 943:22;
991:6, 16; 1004:2

**metal** [2] - 950:5;
979:9

**methadone** [6] - 994:8,
14, 17, 21; 999:25;
1000:3

**Metropolitan** [1] -
1039:9

**microwave** [1] - 997:22

**mid** [2] - 973:7; 998:3

**mid-morning** [1] -
973:7

**middle** [7] - 933:24;
949:7; 956:22; 980:2;
1026:18; 1027:15

**midnight** [5] - 928:19;
989:5, 7; 1035:13, 18

**midtown** [4] - 930:10;
1049:23; 1050:2

**might** [3] - 1050:2;
1073:12; 1075:7

**Miguel** [29] - 935:13,
16, 20, 25; 936:5, 11,
19; 937:3, 12, 25;
938:8; 939:23; 940:1,
9; 941:22, 25; 1006:6,
10; 1007:1; 1036:1;
1037:14; 1056:23;
1057:2, 5; 1058:11

**Miguel's** [1] - 961:3

**millimeter** [1] -
936:10

**millimeters** [1] -
936:7

**mind** [3] - 920:17;
999:4; 1073:21

**mine** [4] - 928:10;
935:14; 998:10; 1036:10

**minimal** [1] - 936:14

**minimum** [1] - 971:19

**minute** [3] - 968:21,
23; 1071:2

**minutes** [5] - 915:4;
961:16; 1029:10;
1068:18; 1071:12

**MISKIEWICZ** [123] -
914:14; 915:9; 916:1,
10, 16, 21; 917:4, 14;
922:23; 923:1, 9;
924:12; 925:1, 4;
927:1, 9, 24; 946:1, 3;
951:12, 15; 963:13, 16,
19; 965:14; 973:5, 12;
974:15; 975:1, 3;
980:12, 16; 983:20, 24;
985:11, 21; 986:10, 20;
987:1; 988:9, 12-13;
989:23; 990:8, 11, 16,
24; 992:14, 24; 995:3,
5, 24; 996:23; 1000:22;
1002:11, 14, 22;

1003:24; 1004:21;
1005:21; 1010:11;
1011:8, 24; 1012:20;
1013:17, 20; 1023:15,
24; 1027:19; 1030:11,
23, 25; 1032:23;
1033:15, 20, 25;
1034:4, 13; 1035:19;
1037:18, 20; 1038:3,
11, 13; 1039:16, 24;
1043:14; 1044:8, 13,
22; 1046:3, 9, 14, 16;
1047:13, 21; 1050:17;
1051:2, 5; 1052:21;
1057:4; 1058:2, 14, 16,
21, 24; 1059:9; 1061:4,
11; 1062:24; 1065:19;
1067:3; 1068:3, 6;
1070:4, 11, 14; 1072:1;
1074:6, 9, 21; 1076:10;
1077:5

**Miskiewicz** [7] -
927:16; 974:25;
1003:16; 1023:19;
1024:7; 1046:5; 1047:24

**missed** [1] - 948:19

**misspoken** [1] -
1031:22

**misstates** [1] -
1034:13

**moment** [8] - 922:23;
963:13; 970:10; 988:9;
1013:18, 25; 1023:6;
1071:9

**Monday** [12] - 925:9,
22; 941:1, 6; 942:11;
957:21; 966:12;
1047:15, 17; 1065:25;
1066:1

**money** [16] - 931:2;
937:4; 938:9; 945:1, 4;
958:19, 21, 23-24;
959:9, 14; 961:6, 8,
10; 993:21

**month** [2] - 1007:18;
1063:15

**months** [3] - 918:23;
1007:25; 1036:15

**morning** [23] - 927:14;
928:18, 25; 929:13;
941:6, 20; 957:16;
959:16; 961:2; 973:3,
7; 989:2, 6; 1009:20;
1035:12, 21; 1046:12;
1063:25; 1068:19;
1074:1, 13; 1076:5

**mother** [5] - 938:22;
1003:7; 1005:2; 1027:13

**motion** [3] - 915:6;

916:24; 922:10

**motions** [2] - 925:11,
24

**motor** [1] - 1070:5

**mouth** [2] - 960:23;
962:1

**move** [11] - 917:17;
963:16; 989:21;
1002:16; 1027:19;
1033:15; 1038:16;
1040:2; 1046:21;
1060:18; 1074:8

**moved** [3] - 958:11;
977:22; 1001:24

**moves** [1] - 985:11

**moving** [5] - 917:1;
973:14, 19; 983:10;
1029:1

**MR** [239] - 915:9;
916:1, 10, 16, 21;
917:4, 14; 918:6;
919:24; 920:14, 25;
921:6, 17, 20, 22;
922:2, 23; 923:1, 9,
14-15, 18; 924:8, 12;
925:1, 4; 926:3, 6, 9,
13, 18; 927:1, 9, 24;
946:1, 3; 951:12, 15;
963:13, 16, 19; 965:12,
14; 973:5, 12; 974:2,
15; 975:1, 3; 980:12,
16; 983:20, 24; 985:11,
13, 15, 21; 986:3, 6,
10, 20; 987:1; 988:9,
12-13; 989:18, 23;
990:4, 8, 10-11, 16,
21, 24; 991:2; 992:14,
21, 24; 993:1; 995:3,
5-6, 24; 996:1, 23, 25;
1000:22, 25; 1001:2;
1002:11, 13-14, 22;
1003:2, 10, 15, 24;
1004:6, 9, 16, 21;
1005:1, 21-22; 1010:11,
13; 1011:8, 12, 15, 22,
24; 1012:3, 8, 17, 20;
1013:1, 4, 6, 14, 17,
19-20; 1014:12, 16, 24;
1023:15, 24; 1026:10,
12, 15, 20, 22; 1027:1,
8, 19; 1030:11, 15, 23,
25; 1032:23, 25;
1033:15, 20, 25;
1034:4, 13; 1035:19;
1037:18, 20; 1038:3,
11, 13, 15; 1039:5, 16,
24; 1040:3; 1042:3, 7;
1043:3, 14, 20; 1044:8,
13, 22, 24; 1046:3, 9,

14, 16, 19; 1047:2, 11,
13, 15, 18, 21-22;
1048:9; 1050:17;
1051:2, 5; 1052:21;
1056:9; 1057:4; 1058:2,
14, 16, 21, 24; 1059:9,
13; 1060:3, 18; 1061:4,
9, 11, 21; 1062:24;
1065:19; 1067:3;
1068:3, 6, 16, 18, 22;
1069:1, 6, 12, 18;
1070:4, 11, 14, 17, 20,
23; 1071:8, 16, 20;
1072:1; 1074:6, 9-10,
21; 1075:1, 10, 13, 16,
22, 24; 1076:1, 6, 10;
1077:5, 7

**MTA** [2] - 1039:12, 17

**Mulligan** [12] - 915:7,
17; 916:12; 919:3;
920:5, 11, 20; 921:4,
19; 922:11; 1074:4, 10

**Mulligan's** [3] -
915:10; 917:15; 925:7

**murder** [19] - 955:22;
958:25; 960:7; 961:1;
962:11; 964:18; 965:18;
966:13; 975:14, 24;
984:10; 989:25; 993:11;
1000:1; 1009:4;
1010:10; 1063:18;
1066:2

**murdered** [2] -
1061:15; 1062:21

**music** [2] - 1007:7, 14

**must** [4] - 920:4, 9;
971:15; 1031:22

**muzzle** [1] - 982:4

## N

**N.Y** [1] - 914:5

**name** [15] - 915:8;
943:11; 985:23; 988:2;
989:9, 12; 991:3;
1008:13; 1009:9;
1027:14; 1036:12

**named** [3] - 943:17;
948:5; 1036:10

**Nassau** [1] - 915:23

**nature** [1] - 918:11

**near** [2] - 942:3; 997:5

**necessarily** [2] -
1004:12; 1047:10

**necessary** [3] -
1003:24; 1004:1;
1047:25

**necessitate** [1] -
919:11

**need** [7] - 916:17;
920:18; 973:19; 986:2;
990:11; 1014:14;
1070:18

**needed** [6] - 945:2;
987:25; 1010:5;
1029:11, 23; 1031:7

**needs** [1] - 946:2

**negative** [1] - 1068:7

**negotiated** [2] -
992:15, 17

**negotiating** [1] -
992:11

**neighborhood** [1] -
932:4

**nervous** [2] - 943:1;
969:11

**network** [1] - 1073:13

**never** [12] - 918:25;
943:22; 967:21; 968:17;
969:23; 991:10; 1009:8;
1010:2, 16-17, 21;
1052:10

**new** [1] - 1069:20

**NEW** [1] - 914:1

**New** [39] - 914:13, 19,
22; 928:1, 3, 6, 12;
970:4; 971:1, 11;
972:10, 19-20; 973:13,
16; 974:16; 975:6;
984:3, 9; 985:24;
993:5; 1002:7; 1004:1;
1005:20, 23; 1006:1;
1036:3, 5, 8, 21,
23-24; 1039:17;
1043:21; 1044:6;
1047:2; 1060:8; 1062:8,
14

**Newsday** [1] - 923:20

**newspaper** [8] - 963:6,
10; 964:9; 973:15;
984:5; 1046:23

**next** [29] - 917:17;
922:25; 928:25; 933:10;
935:9; 937:20; 940:22;
944:7; 952:14; 953:12,
19; 954:23; 955:5;
957:24; 960:5; 964:9;
968:10; 984:10; 988:16,
25; 1038:18; 1041:5;
1045:2; 1054:19;
1055:7; 1060:21; 1067:6

**nice** [3] - 937:13;
1014:2; 1073:25

**nickel** [2] - 933:2;
1053:18

**nickel-plated** [1] -
933:2

**12**

20

**night** [19] - 928:17; 938:14-16, 20; 939:3; 961:1; 988:17, 19, 22; 989:7; 1003:2, 5, 18; 1008:11; 1038:2

**nights** [1] - 938:21

**nighttime** [1] - 965:22

**nine** [1] - 995:8

**nobody** [1] - 1071:1

**noise** [2] - 950:4, 17

**none** [1] - 991:21

**normal** [1] - 1047:7

**normally** [1] - 1046:24

**north** [4] - 931:23; 949:9, 20; 955:17

**northbound** [2] - 945:21; 976:2

**nose** [2] - 958:7, 9

**note** [4] - 924:3; 927:16; 1073:16, 25

**notes** [1] - 1075:25

**nothing** [9] - 922:16, 18; 961:4; 962:25; 974:17; 992:19; 1010:8; 1039:17; 1075:25

**notice** [4] - 973:15; 978:2; 1046:24; 1047:5

**noticed** [2] - 952:16; 979:13

**number** [5] - 923:4; 985:24; 987:24; 1024:12; 1028:8

**numbers** [1] - 987:24

**NYPD** [2] - 966:3; 985:23

---

**O**

**o'clock** [10] - 915:20; 957:16; 979:2; 989:3; 1022:2, 5; 1055:21; 1064:1; 1076:11

**oath** [6] - 927:18; 1001:20; 1011:4; 1039:6; 1043:13; 1058:23

**object** [4] - 995:5; 1023:16; 1039:24; 1068:13

**objection** [72] - 923:13; 965:12; 973:25; 974:1, 18; 985:13; 986:22; 989:18; 990:4, 18; 992:14, 24; 995:3, 24; 996:23; 1000:22; 1002:11, 14, 21; 1005:21; 1010:11; 1011:8; 1013:17;

1024:4; 1027:22; 1030:11, 23, 25; 1032:23; 1033:15, 17, 20, 25; 1034:4, 13; 1035:19; 1037:18, 20; 1038:3, 11; 1039:25; 1040:2; 1041:3; 1043:14; 1044:8, 10, 13, 22; 1046:16; 1049:3; 1050:17; 1051:2, 5; 1057:4; 1058:2, 14, 16, 21, 24; 1059:1, 5, 9, 12, 15; 1061:3; 1062:3, 24; 1065:19; 1067:3; 1068:3

**obvious** [1] - 1013:16

**obviously** [4] - 916:25; 917:18; 974:2; 1023:7

**occasion** [2] - 939:22; 998:23

**occupied** [3] - 949:20; 963:24; 969:7

**occurred** [2] - 955:22; 1006:2

**OF** [3] - 914:1, 3, 6

**offer** [2] - 915:15; 916:13

**office** [1] - 916:23

**Office** [7] - 971:11; 972:11, 14, 20-21; 975:7; 993:6

**often** [1] - 1005:8

**Old** [1] - 914:18

**old** [4] - 968:25; 969:10; 998:2, 4

**older** [1] - 998:6

**once** [4] - 1001:12; 1013:22; 1025:22; 1052:25

**one** [40] - 915:3, 5; 926:14, 21; 927:6; 934:17, 24; 949:21; 951:12; 956:21; 959:9; 966:20; 967:17; 973:21; 974:23; 976:22; 978:20; 984:24; 988:12; 990:12; 997:14; 1001:25; 1013:2; 1032:5, 10-11, 14; 1034:8; 1049:24; 1051:23; 1052:14, 16-17; 1053:21, 25; 1063:15; 1068:9; 1074:21; 1076:6

**opaque** [1] - 934:9

**open** [8] - 920:17; 1022:1; 1041:2; 1043:2; 1049:2; 1062:2; 1073:2,

21

**opened** [14] - 923:4; 932:21; 933:2, 12; 936:7; 950:24; 951:19; 958:3; 1003:17, 23; 1004:10, 12; 1033:12; 1053:15

**opening** [1] - 961:7

**operable** [1] - 1049:15

**operating** [1] - 1051:8

**opportunity** [5] - 925:23; 991:10; 1024:3; 1062:13; 1071:18

**opposed** [1] - 917:11

**opposite** [1] - 978:9

**opposition** [1] - 1004:19

**orange** [3] - 931:23; 945:20; 947:5

**order** [3] - 921:12; 968:21; 1074:22

**orient** [2] - 975:25; 980:20

**original** [1] - 921:24

**outfit** [1] - 929:9

**outrageous** [2] - 1002:25; 1003:1

**outside** [16] - 916:14, 18; 934:20; 966:25; 967:21; 982:11, 18-19; 1013:25; 1014:6, 17, 19; 1022:4; 1034:20; 1064:11

**outstanding** [1] - 915:6

**overcome** [1] - 922:6

**overruled** [10] - 986:22; 990:6; 992:25; 995:4; 996:24; 1027:22; 1034:6; 1037:21; 1038:4; 1041:3

**OWEN** [1] - 914:20

**own** [5] - 926:10; 985:22; 1034:2; 1058:10; 1062:11

**owned** [4] - 943:19; 1052:6, 8; 1057:24

**owner** [7] - 1033:19, 22-23; 1034:10; 1052:10

**ownership** [1] - 1063:13

**owning** [1] - 1062:16

---

**P**

**PA-10** [12] - 985:5, 12; 986:23; 987:3; 1056:7-9, 11; 1062:15;

1077:15

**PA-11** [1] - 951:16

**PA-13** [7] - 962:5; 973:13; 983:21; 984:6; 985:12

**PA-2** [2] - 976:23; 985:2

**PA-3** [3] - 963:20; 975:16

**PA-4** [5] - 975:18, 20; 977:15; 979:20; 983:2

**PA-5** [1] - 978:7

**PA-7** [5] - 931:10; 945:11-13; 947:5

**pad** [1] - 1007:3

**page** [8] - 927:6; 1038:18; 1041:5; 1045:2; 1060:14, 16, 21; 1067:6

**Pages** [1] - 1015:7

**paid** [2] - 945:2; 959:14

**painting** [2] - 964:2

**palm** [2] - 937:10; 940:6

**paper** [4] - 923:21; 924:10; 963:12; 1028:11

**parallel** [1] - 945:9

**paranoid** [4] - 999:8, 12, 15

**parked** [1] - 945:9

**part** [7] - 922:8, 20; 947:5; 955:19; 972:6; 1013:20; 1075:19

**parte** [4] - 1013:19; 1014:10, 20; 1015:5

**partially** [1] - 934:9

**particular** [5] - 938:19; 969:9; 973:21; 974:13; 1070:24

**parties** [1] - 1025:23

**partners** [1] - 1066:4

**parts** [1] - 933:17

**party** [1] - 1038:1

**pass** [1] - 1050:13

**passenger** [1] - 969:6

**past** [1] - 921:7

**path** [1] - 956:13

**patience** [1] - 1073:8

**patrons** [1] - 936:13

**patting** [2] - 954:4; 981:23

**pay** [9] - 930:14; 937:4; 943:5; 976:14, 17; 977:2; 1007:9, 12; 1037:15

**Pellegrino** [11] - 917:13, 21-22; 918:7, 14, 16; 919:14; 920:19; 922:13

**Pena** [13] - 935:13, 16, 20, 25; 940:9, 18; 1006:6, 10; 1007:1, 3; 1058:11

**penalty** [1] - 996:13

**pending** [1] - 935:23

**people** [16] - 928:4; 978:23; 993:5, 23; 999:18; 1008:6, 16, 19-21; 1011:1; 1025:16; 1064:20, 23

**per** [1] - 1052:10

**percent** [2] - 926:9, 21

**perhaps** [6] - 915:15; 1023:24; 1046:19, 25; 1047:11

**perimeter** [1] - 978:3

**period** [8] - 941:16; 963:5; 987:21; 988:5; 989:24; 1002:8, 13; 1007:15

**perjured** [2] - 1039:11; 1044:21

**perjury** [1] - 1070:16

**permanently** [1] - 1007:5

**permissible** [1] - 1071:5

**permission** [3] - 917:1; 980:13; 983:22

**permit** [1] - 920:15

**permitted** [4] - 917:9; 920:5, 10; 923:15

**person** [7] - 933:20; 953:7, 10; 973:23; 984:17; 996:12; 1006:10

**phase** [1] - 917:17

**phone** [59] - 918:22; 934:21, 25; 948:8, 12, 16; 949:5, 12, 19-20, 24; 950:24; 953:16, 24; 961:13, 15, 19, 21-22, 25; 962:13, 17; 963:24; 976:14, 17; 977:2; 987:22; 1003:21; 1010:14-16, 18, 24; 1011:2, 5-6, 22; 1012:1, 5, 9, 17; 1013:7; 1028:8, 10; 1029:6; 1032:18; 1053:25; 1054:1, 4, 13-14, 16, 18; 1055:17, 20

**phones** [1] - 956:16

**photo** [1] - 973:21

**photograph** [14] - 953:8; 975:17, 23; 976:1, 5, 24; 978:16, 24; 979:11; 980:6, 8-9; 984:8; 985:25

**photos** [2] - 973:20, 22

**physical** [1] - 952:8

**picked** [6] - 948:7; 951:1; 952:5; 964:3; 966:3

**picture** [9] - 948:7, 9-10, 16; 949:21; 963:25; 964:2; 985:1; 1064:25

**piece** [1] - 1028:11

**pillow** [3] - 944:11; 982:7

**pillowcase** [18] - 944:10; 949:25; 950:25; 951:6, 18; 952:1, 3, 11, 13; 982:6, 9, 11, 13, 16, 20, 25; 983:1

**ping** [1] - 950:17

**pissed** [1] - 960:19

**pistol** [4] - 964:19; 965:3; 1056:15, 17

**pizzeria** [15] - 935:13, 20; 936:1, 4, 13, 17; 937:19, 24; 938:7; 988:15; 1055:5, 7, 14

**place** [24] - 935:6; 985:20; 990:15; 1000:2; 1002:20; 1003:3; 1011:18; 1023:4, 8; 1032:18; 1039:2; 1041:2; 1042:2; 1043:2; 1046:2; 1049:2; 1061:2; 1062:2; 1063:15; 1064:19; 1065:24; 1068:2; 1073:2

**placed** [2] - 982:9; 1028:10

**plastic** [4] - 934:1, 6

**plated** [2] - 933:2; 1053:18

**platform** [1] - 1049:15

**play** [1] - 1031:11

**played** [1] - 919:6

**Plaza** [2] - 914:13, 22

**plea** [8] - 971:14; 972:5, 7, 17; 975:5; 992:11, 17

**plead** [1] - 971:5

**pleading** [2] - 987:13; 993:4

**pleads** [1] - 996:12

**pleased** [1] - 1023:7

**pled** [9] - 970:12; 971:1, 3, 6; 991:21; 992:6; 995:23; 996:2

**pocket** [7] - 951:2; 952:6; 953:14; 956:6; 969:4, 12; 980:24

**podium** [1] - 1059:3

**point** [17] - 920:8, 16, 22; 924:5, 9; 943:24; 946:14; 947:19; 949:3; 950:7; 953:23; 955:25; 981:17; 986:6; 1046:25; 1065:13; 1070:23

**pointed** [1] - 954:19

**pointer** [3] - 946:2, 14; 977:16

**pointing** [4] - 931:18; 958:6; 978:20; 1054:16

**Police** [4] - 970:4; 972:20; 1062:9, 14

**police** [7] - 952:16-18; 957:6; 978:3, 6; 981:1

**pool** [2] - 977:20; 1050:9

**portion** [8] - 945:11, 13; 975:15; 983:21, 23; 984:7; 996:7; 1069:2

**position** [4] - 918:14; 977:12; 1003:13; 1023:16

**positive** [3] - 1063:22; 1064:15

**possessing** [1] - 1061:19

**possession** [9] - 924:14; 970:8, 13; 971:2; 985:15; 992:1, 12; 1057:15; 1059:22

**possibility** [1] - 1024:8

**possible** [3] - 925:8; 1047:24

**possibly** [4] - 917:6; 924:16; 926:14; 928:17

**Post** [5] - 973:13, 17; 974:16; 984:3, 9

**pot** [3] - 956:6, 10; 999:1

**potential** [1] - 971:15

**pots** [1] - 956:4

**powdered** [2] - 999:2; 1038:1

**power** [1] - 935:24

**practice** [7] - 916:25; 950:1, 9, 16; 978:13,

**precinct** [2] - 966:3; 17

**precise** [1] - 1052:11

**preclude** [1] - 917:20

**premise** [1] - 1039:13

**prepare** [1] - 924:22

**prepared** [3] - 924:18; 973:18; 1047:6

**presence** [6] - 916:18; 1010:9, 17; 1014:8, 19; 1022:4

**presentation** [1] - 1014:23

**pretrial** [1] - 917:4

**pretty** [3] - 915:21; 924:5; 979:3

**previously** [4] - 927:21; 958:12; 969:7; 1024:19

**price** [1] - 937:3

**priors** [1] - 990:20

**prison** [1] - 923:8

**privilege** [4] - 917:5; 918:18; 919:19

**problem** [1] - 1066:3

**proceed** [3] - 975:1; 1001:1; 1041:4

**proceeded** [15] - 932:21; 933:24; 937:4; 944:8, 22; 948:8; 954:10; 956:11; 968:9; 980:25; 981:24; 983:11, 14

**Proceedings** [1] - 914:24

**proceedings** [4] - 1015:5; 1066:17, 19; 1068:11

**produced** [2] - 914:25; 925:14

**producing** [1] - 1075:17

**proffer** [1] - 920:13

**proffered** [1] - 922:10

**Program** [2] - 1002:23; 1004:15

**promise** [1] - 1073:7

**promised** [2] - 958:18; 972:14

**prompted** [1] - 975:11

**proof** [1] - 915:16

**proper** [1] - 1048:6

**properly** [1] - 1030:6

**protect** [1] - 965:16

**protection** [3] - 923:2; 964:20; 965:10

14

20

**Protection** [2] - 1002:23; 1004:15

**provided** [1] - 925:17

**provides** [2] - 925:16; 1029:21

**providing** [2] - 996:16; 1048:3

**publish** [2] - 983:21; 1046:21

**published** [2] - 924:9; 974:13

**pull** [2] - 955:19; 1053:19

**pulled** [3] - 954:14; 979:6

**punching** [1] - 954:7

**purchase** [1] - 938:9

**purchased** [2] - 984:4; 1056:23

**purportedly** [1] - 915:11

**purpose** [8] - 930:24; 935:16; 939:21; 940:1; 950:9; 952:1; 966:15; 1039:18

**pushing** [1] - 954:7

**put** [32] - 917:24; 933:1, 24-25; 934:12, 14; 943:4; 944:9, 12; 948:8, 16; 949:24; 951:1; 952:6, 10, 12-13; 953:14, 17; 954:3, 10; 960:25; 974:4; 980:24; 981:25; 987:10; 1014:18; 1027:3; 1054:21; 1070:12

**putting** [1] - 978:3

---

**Q**

**Q-45** [2] - 1066:15; 1070:6

**Q45** [4] - 967:2, 5-6, 13

**quarter** [3] - 974:23; 1013:2; 1024:15

**Queens** [1] - 988:4

**questioned** [1] - 950:18

**questions** [10] - 966:4; 990:8; 991:11; 1003:20; 1027:20; 1059:14; 1061:18, 23; 1071:6, 17

**quick** [1] - 956:16

**quickly** [1] - 1040:2; 1074:8

**quite** [1] - 993:7

---

**R**

**rags** [2] - 933:15

**rail** [5] - 1038:9; 1039:4, 16, 20; 1043:25

**raise** [1] - 921:9

**raised** [3] - 919:4; 954:18; 990:18

**raising** [1] - 923:18

**ran** [11] - 955:6, 16, 21-23; 977:13, 24; 983:7; 1007:18, 20

**range** [1] - 972:9

**RAPAPORT** [1] - 914:21

**rarely** [1] - 1025:3

**rather** [3] - 924:17, 21; 1046:15

**reach** [3] - 920:7; 1002:24; 1048:7

**read** [7] - 918:10; 924:4; 1043:3; 1046:9; 1073:12

**reading** [1] - 923:20

**reads** [1] - 1043:5

**ready** [2] - 951:3

**really** [4] - 916:23; 1047:25; 1068:22; 1076:3

**reason** [11] - 938:19; 956:18; 969:8; 974:4; 982:25; 1002:24; 1003:1; 1014:10; 1023:10; 1031:5; 1063:10

**reasons** [3] - 1014:19, 21; 1068:13

**reassured** [1] - 1023:18

**receipt** [1] - 1074:16

**received** [4] - 915:11; 986:25; 1023:21; 1077:15

**receiving** [1] - 993:21

**recently** [1] - 916:24

**recess** [3] - 973:11; 1022:6; 1071:3

**recognize** [9] - 953:7; 963:21, 23; 975:19, 22; 977:8, 10; 1056:11; 1060:11

**recollection** [4] - 915:24; 1039:23; 1070:2, 5

**recommendation** [3] - 971:19; 995:21; 996:2

**record** [10] - 931:21;

---

**recorded** [1] - 914:24

**records** [2] - 1048:4

**redact** [1] - 973:18

**redirect** [2] - 1071:22

**reduction** [1] - 995:16; 996:6, 19

**reference** [1] - 963:4

**references** [1] - 1024:1

**referred** [2] - 943:14; 976:17

**referring** [5] - 966:6; 971:7; 1023:25; 1029:12; 1032:14

**refers** [1] - 1048:2

**refrigerator** [1] - 997:21

**regarding** [3] - 966:23; 990:19

**regards** [3] - 919:10; 1059:25; 1065:3

**registered** [1] - 1070:6

**regular** [2] - 929:8; 944:17

**relation** [1] - 1010:7

**relationship** [2] - 1009:15, 22

**relatively** [1] - 936:15

**released** [1] - 966:2

**relevance** [7] - 1023:16; 1024:4; 1027:21; 1037:18, 20; 1038:11, 13

**relevancy** [1] - 1039:3

**relevant** [5] - 918:9; 1003:9; 1004:7; 1024:9

**religious** [3] - 948:10; 964:2; 985:1

**remain** [2] - 915:14; 1025:20

**remember** [9] - 938:19; 945:8; 946:20; 994:1; 1000:10; 1059:24; 1062:6, 8

**remind** [1] - 1071:24

**remove** [2] - 1013:15; 1026:2

**removed** [2] - 1015:7; 1049:12

**renewing** [1] - 990:18

**rented** [1] - 997:4

---

**repetitious** [2] - 989:19; 990:5

**rephrase** [1] - 940:17

**rephrased** [1] - 1004:25

**report** [1] - 1073:16

**reporter** [3] - 1012:22; 1015:4; 1043:5

**Reporters** [1] - 914:20

**represent** [1] - 991:3

**representation** [1] - 917:18

**represented** [1] - 1027:10

**request** [4] - 917:25; 924:13; 1026:2; 1048:3

**requested** [1] - 1043:6

**requesting** [1] - 1023:11

**research** [1] - 1073:20

**residence** [1] - 1028:2

**respect** [8] - 915:7, 11; 917:13; 964:1; 971:9; 986:15; 1023:13; 1074:15

**respond** [2] - 927:5; 1048:3

**response** [1] - 1039:15

**responses** [1] - 991:11

**rest** [7] - 924:25; 925:2, 6, 21-22; 957:21; 1025:24

**result** [1] - 972:4

**resulted** [2] - 971:14; 987:12

**resumed** [4] - 927:21; 1049:11

**retrieve** [1] - 1032:7

**retrieved** [1] - 958:12

**return** [1] - 939:12

**returned** [2] - 928:23; 939:5

**review** [3] - 925:22; 1075:4

**revisit** [1] - 926:24

**revolver** [3] - 985:8; 987:11; 1059:6

**rid** [1] - 958:17

**right-hand** [6] - 933:3, 7; 945:13; 951:1; 952:6; 956:6

**rip** [4] - 1065:18, 22; 1066:5, 8

**rip-off** [4] - 1065:18, 22; 1066:5, 8

**Road** [1] - 914:18

---

**rob** [3] - 966:16, 24; 968:12

**robbery** [2] - 1065:18, 22

**rocker** [1] - 933:8

**rocks** [1] - 1051:24

**roll** [2] - 944:18; 979:9

**roll-down** [1] - 979:9

**room** [20] - 932:16, 19; 933:8; 934:20; 943:25; 960:10, 17, 25; 961:3; 1007:8; 1028:18, 21; 1051:12, 15, 21, 23; 1052:1; 1053:20, 23

**Rosen** [11] - 916:7; 918:5; 921:16; 991:3; 1004:3, 13; 1014:17; 1026:1; 1039:3; 1059:15; 1060:20

**ROSEN** [110] - 914:16; 918:6; 919:24; 920:25; 921:6, 17, 20; 923:14; 926:3, 6, 9, 13, 18; 965:12; 974:2; 985:13, 15; 986:3, 6; 989:18; 990:4, 10, 21; 991:2; 992:21; 993:1; 995:6; 996:1, 25; 1000:23, 25; 1001:2; 1002:13; 1003:2, 10, 15; 1004:6, 9, 16; 1005:1, 22; 1010:13; 1011:9, 12, 15, 22; 1012:3, 8, 17; 1013:1, 6, 14, 19; 1014:12, 16, 24; 1026:10, 12, 15, 20, 22; 1027:1, 8; 1030:15; 1032:25; 1038:15; 1039:5; 1040:3; 1042:3, 7; 1043:3, 20; 1044:24; 1046:4, 19; 1047:2, 11, 15, 18, 22; 1048:9; 1056:9; 1059:10, 13; 1060:3, 18; 1061:9, 21; 1068:16, 18, 22; 1069:1, 6, 12, 18; 1070:17, 20, 23; 1071:8, 16, 20; 1075:1, 10, 13, 16, 22, 24; 1076:1, 6; 1077:7

**Roth** [8] - 943:11, 17, 19; 972:25; 1033:18; 1034:2, 10; 1052:7

**round** [7] - 950:5; 951:4, 16, 20; 955:3; 1030:4

**route** [4] - 945:5; 949:3; 955:21; 956:12

**RS-19** [1] - 953:6

**Ruger** [5] - 936:24; 941:16, 23; 959:19; 987:19

**rule** [2] - 1047:8; 1074:18

**Rule** [5] - 925:11, 15, 24; 973:14; 1061:7

**Rules** [1] - 921:23

**rules** [1] - 922:4

**ruling** [2] - 917:25; 918:3

**run** [5] - 915:19; 936:14; 955:14; 983:11

**running** [3] - 915:3; 955:23; 1073:6

**ruse** [2] - 1066:9

**S**

**sale** [3] - 936:5; 937:23; 938:10

**sat** [2] - 937:2; 969:16

**satisfy** [1] - 921:12

**Saturday** [12] - 939:7, 11; 988:14; 989:7, 22; 1003:19; 1005:13; 1006:19; 1046:12; 1057:8

**sauna** [10] - 1033:10; 1051:11, 15, 23; 1052:1; 1053:3, 6, 8

**save** [1] - 1013:22

**saw** [25] - 923:4; 929:1; 933:15; 936:21; 942:11; 964:9, 14; 965:17; 976:24; 977:17; 981:11; 983:9; 984:3, 9; 987:16; 1010:17, 21; 1011:5, 20; 1012:17; 1013:7; 1054:12; 1055:16; 1069:12

**scaffolding** [2] - 976:6, 8

**scanned** [1] - 949:16

**scanning** [1] - 952:15

**scene** [16] - 952:2, 9; 955:21; 957:4; 958:18; 959:25; 962:20; 973:22; 975:14, 24; 977:13, 24; 978:13; 979:1; 984:24

**schedule** [3] - 916:11; 927:15

**scheme** [3] - 966:16, 18, 24

**school** [1] - 998:1

**scope** [3] - 1038:13; 1039:19

**Scott** [2] - 919:3; 925:7

**screen** [2] - 945:12, 18

**scrutiny** [2] - 959:10

**se** [1] - 1052:10

**SEAN** [1] - 914:14

**seat** [2] - 969:6, 16

**seated** [4] - 974:22; 1023:6; 1025:2, 20

**Second** [9] - 935:11; 968:3; 1032:6, 11; 1034:17; 1052:17; 1055:1, 3

**second** [7] - 933:3, 6; 951:13; 955:6; 956:16; 970:8; 997:12

**secondly** [1] - 922:8

**section** [1] - 973:6

**Section** [1] - 921:23

**security** [1] - 1002:23

**see** [74] - 919:18; 920:18; 929:4; 931:18; 932:20; 933:10, 14, 17, 22; 934:3, 9; 936:6, 8, 10; 941:15, 19; 943:13, 17; 945:12, 14; 947:4; 949:18; 950:11; 953:1, 19; 954:23; 955:8; 957:5, 10, 20, 23; 958:6; 963:10; 965:20; 966:9; 967:9; 969:22; 976:15; 977:22; 980:9; 981:18; 990:1, 21; 998:19; 1008:2; 1010:23; 1012:9; 1022:2, 5; 1023:10, 25; 1026:15, 19, 22; 1027:1, 25; 1028:1, 9; 1029:5; 1042:3; 1046:3; 1047:13, 15, 21; 1061:7; 1062:13; 1068:15; 1069:10, 16; 1073:18; 1074:1

**see-through** [2] - 934:4, 9

**seeing** [1] - 927:7

**seek** [2] - 917:8; 995:16

**seem** [1] - 1013:23

**seized** [2] - 986:7

**sell** [7] - 931:1; 935:17; 937:17; 940:3; 941:25; 998:19; 1006:21

**selling** [1] - 937:14

**semiautomatic** [1] - 951:23

**sense** [3] - 974:9, 11; 1066:11

**sentence** [10] - 970:17, 19; 972:11, 14, 22; 995:12, 17; 996:6, 8, 20

**sentenced** [4] - 970:15; 971:20; 986:12; 995:17

**separate** [1] - 1053:13

**separated** [2] - 933:25; 938:24

**separately** [1] - 983:15

**September** [6] - 970:23; 987:5; 991:23; 1059:21; 1061:16; 1062:5

**serious** [1] - 1025:11

**served** [1] - 995:9

**service** [8] - 1038:9; 1039:4, 10, 16; 1043:25; 1044:20; 1046:12; 1049:8

**serving** [1] - 970:19

**set** [1] - 967:21

**seven** [8] - 918:22; 970:18; 986:13; 992:9; 994:25; 995:5, 9

**Seventh** [1] - 1050:20, 22

**several** [7] - 916:8, 10; 989:17; 990:3, 7; 1027:20; 1066:16

**SEYBERT** [1] - 914:9

**Seybert** [1] - 980:21

**share** [1] - 938:21

**shared** [1] - 1003:6

**sheet** [1] - 1047:2

**shelf** [1] - 949:25

**shell** [7] - 950:25; 951:17, 20, 24; 956:5, 10; 982:24

**Sheraton** [14] - 930:10, 17; 932:6; 1044:3; 1049:19, 22; 1050:8, 10, 15, 22; 1051:4; 1053:1; 1055:11

**shirt** [3] - 1026:6; 1034:25

**shirts** [1] - 1027:3

**Shon** [6] - 939:16; 942:18; 944:2; 962:2; 965:23

**shook** [1] - 1054:1

**shoot** [2] - 951:22; 982:11

**shooting** [2] - 1063:24; 1064:19

**shoots** [1] - 951:25

**short** [3] - 915:5; 939:25; 1065:18

**shortly** [2] - 915:4; 989:5

**shot** [18] - 950:1, 9, 16; 951:5, 23; 952:3; 954:14; 957:15; 958:8; 959:9; 960:9; 978:14, 17; 982:4; 1064:3

**shoulder** [5] - 953:17; 954:4, 6, 8; 981:23

**show** [16] - 922:6, 19; 975:17; 981:6; 984:6; 985:4; 1030:9; 1039:12; 1044:24; 1056:6; 1060:8; 1066:25; 1068:6; 1069:3

**showed** [8] - 929:5; 937:6; 951:10; 959:16; 960:13; 1044:6; 1064:5

**shower** [6] - 1033:10; 1051:18-20; 1053:13

**showered** [2] - 932:18; 1051:18

**showers** [1] - 932:17

**showing** [13] - 922:7; 931:10; 947:5; 951:16; 953:6; 962:4, 6; 963:20; 975:15; 976:23; 977:15; 978:7; 987:2

**shown** [1] - 962:8

**shows** [2] - 1029:22, 25

**sic** [1] - 944:11

**side** [26] - 932:3; 933:3; 945:22; 947:13; 949:8; 952:19; 955:16; 968:4, 10; 975:11; 978:21; 980:4, 8; 981:14; 983:13; 1011:15; 1032:11; 1033:24; 1034:18; 1050:13, 20; 1051:24

**sidebar** [14] - 985:20; 986:21; 990:15, 25; 1002:20; 1004:24; 1011:18; 1012:13; 1013:5; 1039:2; 1042:2; 1046:2; 1061:2; 1068:2

**sidewalk** [6] - 945:19; 948:11; 964:3; 976:11; 977:20; 980:2

**sight** [1] - 955:25

**sign** [1] - 943:17

**signature** [1] - 1060:11

**signed** [2] - 1060:14; 1061:16

**silencer** [7] - 944:1; 950:7; 982:4; 987:8, 10-11; 1031:19

**similar** [1] - 919:7

**simply** [3] - 917:10; 973:19, 23

**sincere** [1] - 1025:5

**sincerely** [1] - 1025:17

**sink** [1] - 997:22

**sister's** [2] - 998:12

**sit** [1] - 1052:3

**site** [3] - 949:7, 15; 1027:11

**sitting** [5] - 936:6, 16; 956:18; 1054:19

**situation** [3] - 919:22; 925:13; 935:22

**six** [2] - 918:22; 926:2

**Sixth** [8] - 930:19; 931:12, 22; 947:3, 7, 14; 1032:12, 21

**size** [1] - 982:13

**skip** [1] - 961:9

**sleep** [3] - 988:19; 1035:15, 20

**sleepy** [1] - 1073:3

**slept** [5] - 988:16, 24; 1035:6, 23

**small** [2] - 937:10; 977:4

**smoke** [4] - 1008:19, 21, 24; 1009:3

**smoked** [1] - 1037:7

**smoker** [1] - 998:25

**smoking** [6] - 968:25; 969:1; 994:20; 999:5, 25; 1039:22

**smoothly** [1] - 1073:6

**snatched** [1] - 953:16

**snorted** [1] - 1037:9

**snorting** [1] - 1037:16

**snuck** [2] - 930:11, 14

**social** [1] - 1073:13

**sofa** [1] - 942:3

**sold** [6] - 940:8, 18; 941:21; 943:3; 956:15; 1070:7

**someone** [2] - 924:3; 1066:13

**someplace** [3] - 980:3; 1005:4; 1050:24

**sometime** [1] - 1055:22

**somewhere** [5] - 936:1; 947:18; 979:2; 1056:1; 1069:10

**soon** [2] - 958:5; 961:14

**sorry** [12] - 921:17; 927:13; 946:18; 979:15; 985:12; 988:15; 990:11, 16; 1006:19; 1025:22; 1028:19; 1055:2

**sort** [5] - 922:7; 943:1; 976:4, 6; 1007:3

**sought** [2] - 921:3; 994:13

**south** [1] - 931:24

**southbound** [1] - 947:15

**speaking** [2] - 968:19; 1002:5

**specific** [1] - 1064:12

**specifically** [3] - 928:6; 975:18; 988:7

**speckles** [1] - 983:9

**specks** [1] - 955:12

**speculation** [1] - 1030:12

**spend** [3] - 938:15, 21; 940:13

**spending** [1] - 938:19

**spent** [5] - 938:16; 956:5, 9; 1003:4, 17

**split** [1] - 955:6

**spoken** [4] - 918:21; 1001:10; 1006:7

**spooked** [1] - 956:19

**spot** [1] - 919:17

**spread** [1] - 1053:16

**staff** [1] - 1053:23

**stage** [1] - 935:22

**staircase** [2] - 961:7; 968:24

**stall** [2] - 1033:10; 1053:13

**stalls** [3] - 1051:18

**stand** [16] - 927:21; 954:13; 968:10; 972:23; 973:2; 980:14; 982:5; 1026:10, 13, 17-18; 1047:21; 1051:20; 1053:13

**stand-up** [2] - 1051:20; 1053:13

**standing** [5] - 952:13; 953:23; 969:4; 983:2; 1040:1

**standup** [1] - 932:17

**start** [8] - 945:2; 992:3; 994:18; 1004:22; 1009:1; 1014:1; 1059:4; 1071:22

**started** [9] - 944:4; 948:18; 955:14; 958:6; 964:19; 965:1; 969:1; 970:10; 1053:19

**starting** [2] - 935:24; 982:3

**starts** [1] - 997:12

**state** [5] - 971:20, 22; 993:5; 999:17; 1000:3

**State** [1] - 971:2

**statement** [4] - 1039:11; 1059:25; 1061:14; 1062:8

**statements** [15] - 922:14; 924:14, 20; 925:15, 18, 23; 1002:16; 1023:14; 1075:7, 21, 23; 1076:9

**STATES** [2] - 914:1, 3

**States** [3] - 914:12, 21; 972:13

**station** [6] - 935:10; 944:23; 945:6, 17, 24; 946:23

**stationery** [1] - 1047:4

**stationhouse** [1] - 1059:25

**stay** [9] - 929:17, 24; 940:19, 21, 25; 982:25; 1005:8; 1073:13

**stayed** [4] - 929:19; 940:20; 941:2; 1006:6

**stays** [1] - 1011:2

**steam** [9] - 932:16, 19; 1051:12, 15, 21, 23, 25; 1052:1

**stems** [1] - 921:23

**stenography** [1] - 914:24

**step** [9] - 918:1; 919:13, 23; 1013:25; 1014:5, 17; 1015:3; 1059:3

**STEPHEN** [1] - 914:16

**stepped** [1] - 943:25

**Steve** [1] - 991:3

**sticking** [1] - 933:16

**still** [14] - 915:14; 916:25; 927:18; 928:7, 21; 929:14, 20; 939:1; 941:7; 950:11; 994:20; 995:21; 1039:17

**stimulant** [1] - 999:11

**stipulate** [2] - 1046:20; 1047:12

**stocky** [1] - 968:9

**stole** [4] - 1006:18, 24; 1050:5; 1053:10

**stood** [6] - 955:13; 956:16; 976:20; 977:2; 983:9; 989:22

**stoop** [1] - 969:2

**stop** [1] - 1024:15

**stopped** [6] - 946:13; 947:25; 952:20; 956:15; 1049:9, 11

**store** [4] - 946:13, 16; 956:15; 984:15

**storefronts** [1] - 979:4

**stores** [1] - 979:8

**story** [4] - 917:21; 959:23; 984:9; 1039:11

**stove** [1] - 997:22

**stragglers** [1] - 1064:21

**straight** [1] - 956:13

**strategy** [1] - 1023:13

**street** [32] - 945:16; 947:13, 15; 948:1; 949:8; 950:1, 6; 952:16, 19, 25; 955:16; 956:3, 7, 20, 22-23; 967:15; 969:4; 975:25; 976:9; 978:18; 1007:19; 1008:3; 1009:20; 1028:1; 1032:6; 1034:20; 1050:19; 1064:3, 20, 22

**Street** [46] - 930:18; 931:7, 16, 19, 21; 932:12; 937:20; 945:10, 18; 946:12, 23; 947:3, 12-13, 22; 952:21; 955:18; 956:25; 976:2, 13; 978:11; 984:15; 1006:19; 1032:6, 9, 12, 14; 1033:4, 10; 1034:2; 1044:3; 1046:13; 1050:6; 1051:9, 11, 14; 1052:4, 9, 16; 1053:7; 1054:5; 1055:12, 14, 17

**streets** [1] - 968:2

**stretch** [1] - 925:8

**stricken** [1] - 1027:20

**strike** [1] - 1033:15

**strong** [1] - 950:19

**struck** [1] - 1011:14

**Strum** [2] - 1057:21; 1058:4

**stuff** [1] - 1065:4

**subject** [2] - 923:25; 1046:22

**submission** [2] - 921:15, 18

**suborning** [1] - 1070:16

**subsequent** [1] - 920:12

**substance** [1] - 946:5

**substantial** [1] - 996:16

**subway** [3] - 1042:5; 1044:17; 1051:6

**Suite** [1] - 914:16

**sum** [1] - 946:5

**summer** [1] - 969:25

**sun** [5] - 929:13, 15; 1064:11, 17

**Sunday** [6] - 940:23, 25; 941:2, 6; 942:10

**Sunnyside** [5] - 948:20, 23-24; 988:4, 8

**sunrise** [1] - 1064:13

**supermarket** [1] - 934:7

**supplied** [2] - 1037:11; 1038:1

**support** [1] - 993:19

**supported** [1] - 994:4

**supposed** [2] - 966:17, 24

**Sustained** [12] - 1034:1; 1038:14; 1044:15, 23; 1050:18; 1051:3; 1058:3, 17; 1062:25; 1065:20; 1067:4

**sustained** [10] - 965:13; 1010:12; 1032:24; 1033:17; 1044:10; 1049:3; 1059:5, 12, 16; 1062:4

**SUV** [1] - 1036:19

**sweatshirt** [3] - 1013:15; 1023:10; 1026:3

**swim** [2] - 930:8

**swimming** [1] - 1053:1

**sworn** [2] - 927:21; 1024:20

**Synergy** [33] - 929:9; 930:18; 931:5; 935:10; 943:8, 18; 967:8, 15-16, 18, 25; 968:2, 7-8; 1031:25; 1032:1, 3, 22; 1033:3, 6, 19, 22; 1034:3, 8-9, 11, 25; 1052:8, 11-12, 16, 25; 1054:5

**system** [1] - 1007:7

---
**T**
---

**T-shirt** [3] - 1026:6; 1034:25

**table** [2] - 942:3; 997:21

**tag** [2] - 985:23; 986:8

**Tahoe** [2] - 1036:19, 21

**taint** [1] - 916:19

**talks** [1] - 918:13

**tapping** [1] - 954:8

**Tarantino** [3] - 918:19; 989:13; 991:4

**TARANTINO** [1] - 914:5

**Tarantino's** [1] - 917:16

**tattoo** [3] - 1027:10

**tattoos** [5] - 1013:11, 15; 1024:1; 1026:15, 22

**taxi** [3] - 977:25; 981:1; 983:16

**tedious** [1] - 1073:4

**telephone** [6] - 947:22, 24; 980:22; 987:24; 1054:12; 1065:5

**ten** [5] - 915:4; 968:21; 994:15; 1029:18

**ten-minute** [1] - 968:21

**term** [2] - 922:4; 995:11

**terminate** [1] - 947:6

**terms** [7] - 915:14; 920:2, 11; 971:13; 975:6; 1074:14; 1075:20

**test** [1] - 1063:17

**tested** [1] - 1063:17

**testified** [18] - 927:22; 931:8; 936:23; 950:14; 970:9; 974:3; 975:6, 9; 978:12; 986:10, 14; 987:16; 1003:4, 6; 1011:20; 1024:20; 1066:16; 1069:12

**testifies** [1] - 917:9

**testify** [12] - 915:17; 917:1, 9; 918:3; 920:5, 10, 16; 922:12; 971:16; 995:15; 1046:17; 1074:20

**testifying** [8] - 920:20; 928:2; 972:6; 996:5; 1033:18; 1039:6; 1044:14; 1052:21

**testimonial** [2] - 918:11; 926:15

**testimony** [25] - 915:7, 10, 24; 916:13; 919:21; 920:11; 925:7; 974:10; 997:2; 1001:20; 1011:4; 1031:15, 17; 1033:21; 1043:13; 1044:21; 1049:4, 14, 17; 1058:23; 1066:20; 1068:8; 1069:4, 15; 1074:15

**THE** [195] - 915:3, 5, 10; 916:3, 15, 17; 917:3, 13; 918:4; 919:20, 25; 920:15; 921:5, 14, 18, 21; 922:1, 21, 25; 923:8, 13, 16; 924:1, 11, 24; 925:3, 18; 926:4, 8, 12, 17, 23; 927:5, 10, 13; 951:14; 963:15, 18; 965:13; 973:7; 974:1, 9, 17, 19, 22; 975:2; 980:15; 983:23; 985:14, 17; 986:5, 18, 22; 988:11; 989:20; 990:6, 9, 13, 23; 992:16, 18, 25; 995:4, 25; 996:24; 1000:24; 1001:1; 1002:12, 15, 21; 1003:6, 13, 25; 1004:7, 12, 17, 22, 25; 1010:12; 1011:10, 13, 16, 19, 23, 25; 1012:4, 15, 23; 1013:2, 18, 22; 1014:5, 9, 13, 17, 25; 1022:2; 1023:6, 18; 1024:6, 23; 1025:1; 1026:6, 11, 17; 1027:4, 22; 1030:13, 16; 1031:1, 3-4; 1032:24; 1033:1, 16, 21; 1034:1, 6, 15; 1037:19, 21; 1038:4, 12, 14, 16; 1039:3, 13, 22; 1041:3; 1042:5; 1043:17, 23; 1044:9, 15, 23; 1045:1; 1046:6, 11, 15, 23; 1047:9, 16, 23; 1049:3; 1050:18; 1051:3; 1052:22; 1056:8; 1057:5, 7; 1058:3, 17; 1059:1, 11, 15; 1060:4, 19; 1061:3, 12, 22; 1062:3, 25; 1065:20; 1067:4; 1068:5, 14, 17, 20, 24; 1069:5, 8, 14; 1070:2, 9, 12, 18, 21; 1071:1, 11, 18, 21; 1073:3; 1074:4, 7, 12,

18

they've [1] - 924:4
thigh [1] - 954:17
thinking [3] - 926:14; 969:21; 1030:24
thirty [1] - 998:5
thirty-two [1] - 998:5
thoughts [1] - 923:25
threat [2] - 1065:12, 15
three [2] - 936:18; 1076:7
threw [2] - 956:5, 9
throw [2] - 960:1; 1051:25
Thursday [15] - 924:16, 25; 925:2, 6, 21; 928:17; 965:22; 1005:16; 1035:3, 7, 13, 21; 1037:4; 1046:12; 1073:22
tie [1] - 964:24
tied [2] - 944:12; 952:12
Timbuktu [1] - 1004:1
timeframe [3] - 1027:17; 1043:18; 1056:1
timing [1] - 1074:10
tired [1] - 1025:16
today [14] - 915:17, 19; 920:24; 922:18; 923:20; 926:24; 972:6; 974:24; 997:2; 1001:20; 1011:4; 1025:11; 1043:13; 1074:24
together [5] - 929:20; 930:1, 6; 944:22; 959:24
tomorrow [14] - 915:18; 920:23; 924:16; 925:19; 1068:19; 1071:19; 1073:5, 22; 1074:1, 5; 1075:1, 4; 1076:4
took [54] - 932:9, 22, 25; 933:3, 5, 11-12; 934:1; 937:25; 938:8; 941:20; 942:16; 944:10; 945:19; 947:1; 949:25; 950:16; 953:13; 955:6, 14; 956:12; 959:2; 964:25; 968:20; 980:23; 982:3; 985:19; 990:14; 1000:1; 1002:19; 1007:13; 1011:17; 1023:8; 1039:1, 20;

1042:1; 1046:1; 1053:12, 15-17; 1054:25; 1055:9, 11; 1061:1; 1063:15; 1064:19; 1068:1
tool [2] - 935:7; 1054:15
top [5] - 933:7; 945:18; 976:6; 1053:18; 1060:16
total [1] - 960:11
totally [1] - 1073:18
toward [2] - 1050:2; 1053:17
towards [11] - 947:19; 949:2; 955:6, 16; 976:13; 979:23; 982:2; 983:7, 12; 1001:15
towels [1] - 1053:12
town [1] - 961:9
trafficker [1] - 1006:13
trafficking [1] - 998:15
train [29] - 931:25; 932:1, 9; 935:10; 944:23; 945:6, 17; 946:23; 947:10; 1039:8, 10; 1043:19; 1044:1, 11; 1049:5, 8-9, 15-16; 1054:22, 24-25; 1055:9, 11
trains [1] - 1043:10
transacted [1] - 988:20
transaction [2] - 937:23; 940:11
TRANSCRIPT [1] - 914:6
transcript [3] - 914:25; 1066:25; 1071:19
transcription [1] - 914:25
Transit [2] - 1039:9; 1047:3
transit [1] - 1044:7
trash [1] - 946:4
treatment [2] - 994:17
trial [15] - 916:20; 919:1; 923:23; 924:21; 990:19; 1004:13; 1013:21; 1039:6; 1069:1, 23; 1070:10, 13; 1073:24; 1076:11
TRIAL [1] - 914:6
tried [3] - 944:8; 962:19; 1063:12

trigger [4] - 982:11, 21
true [1] - 924:8
trust [1] - 1030:18
truth [2] - 971:17; 1063:1
try [1] - 1065:21
trying [3] - 920:1; 1013:22; 1040:1
tunnel [1] - 1036:4
Tunnel [1] - 1039:21
turn [9] - 924:20; 952:20; 981:24; 982:10; 1026:12, 20, 23; 1074:23
turned [16] - 925:19; 933:2, 6, 11; 947:17; 949:2; 952:18; 953:20; 956:1, 11; 981:3, 6-8; 1010:14
turning [1] - 928:17
TV [2] - 1007:7, 14
twenties [1] - 998:3
twice [2] - 918:22; 1001:12
two [18] - 925:5; 932:17; 936:7; 947:22; 954:21; 956:17; 968:23; 976:20; 993:18; 994:7; 998:5; 1006:5; 1007:25; 1032:5, 10; 1034:8; 1051:19; 1065:14
type [3] - 962:18; 997:20; 1000:10

**U**

U.S [4] - 914:4, 15; 972:21; 993:6
U.S.D.J [1] - 914:9
ultimately [1] - 987:12
under [18] - 921:13; 924:12; 925:17; 927:18; 959:9, 11; 973:14; 975:6; 976:8; 996:9; 1001:20; 1011:4; 1036:3; 1043:13; 1047:7; 1058:23; 1061:7; 1074:18
undergoing [1] - 928:7
understood [1] - 974:6
unemployed [3] - 993:15; 994:7
unfinished [1] - 964:24
uniform [1] - 1033:8
unit [1] - 923:2

UNITED [2] - 914:1, 3
United [3] - 914:12, 21; 972:13
unless [1] - 924:3
unlike [1] - 1046:23
up [102] - 915:21; 917:4; 919:1, 9; 921:1, 11; 922:22; 923:3; 924:5; 929:5, 13; 932:21; 933:2; 934:13; 936:7; 941:12; 942:17; 945:12; 947:25; 948:2, 7, 17; 950:24; 951:1; 952:5, 12-13, 15, 23; 954:2, 12-14; 955:19; 956:4, 7, 11, 24; 958:3; 959:8, 16, 23; 960:13; 961:7, 13, 15; 962:16; 964:3, 24; 966:3; 975:15; 977:25; 978:3; 981:3; 982:1, 3, 5; 985:18; 989:1, 25; 990:13; 995:1, 22; 1000:24; 1002:12, 15; 1003:2, 23; 1004:11, 13; 1011:16; 1012:12; 1013:18; 1026:10; 1034:17, 19; 1038:16; 1040:1; 1045:1; 1048:5; 1050:14; 1051:20; 1053:13, 15; 1056:13; 1060:4, 20; 1063:14; 1064:5; 1065:3; 1067:5; 1069:13; 1071:3, 12
upper [2] - 1032:10; 1033:24
upset [2] - 962:3; 1063:12
upside [1] - 948:12
upstate [1] - 991:22
uptown [16] - 932:6; 938:22; 947:1; 967:8, 13, 17, 22; 978:6; 1003:7; 1039:8; 1044:3; 1046:15; 1049:17; 1052:17; 1055:11

**V**

vacated [1] - 1000:19
van [1] - 952:16
various [1] - 1011:1
vehicle [1] - 1066:13
Vehicles [1] - 1070:6
verify [1] - 1047:20
versus [1] - 1039:20
vetted [1] - 920:3
vicinity [2] - 957:13; 1064:20

20

4002

19

view [3] - 979:14, 16, 21

Vincent [7] - 915:12; 993:11; 1001:22; 1009:7, 13; 1010:1; 1064:3

Vinnie [43] - 943:2, 5-7; 948:5; 949:18; 953:9, 13, 20, 22; 954:1, 10, 13, 24; 957:14; 977:11; 978:12; 979:12, 23; 980:19, 23; 981:2, 5, 16, 24; 982:3; 984:9; 987:16; 1009:8, 10-11, 13, 16; 1010:1, 7, 9; 1011:21; 1031:7, 10, 13, 21

Vinnie's [3] - 952:24; 954:6, 19

visit [3] - 1001:18; 1004:20; 1008:6

visited [1] - 1032:5

voices [1] - 1071:25

**W**

wait [3] - 959:15; 968:20, 23

waited [2] - 968:22; 1034:19

waiting [6] - 949:17; 952:15, 17; 957:14; 1025:4

waive [1] - 918:19

walk [5] - 944:23; 949:1; 956:11; 1050:12; 1051:24

walked [13] - 934:20; 946:12; 947:12; 949:2, 6, 19; 956:3, 24; 1032:17; 1033:9

walking [13] - 944:25; 945:10; 947:18; 949:4; 953:2; 956:13; 976:8; 979:14, 16, 23; 981:5; 1031:18; 1064:24

walkup [1] - 997:13

wants [2] - 927:7; 1066:4

water [1] - 1051:25

weapon [12] - 936:23; 941:15; 942:17; 944:10; 951:23; 960:3; 965:1; 969:11; 971:2; 1031:19; 1063:13, 18

weapons [6] - 933:13, 23; 936:21; 938:10; 959:17; 960:1

wearing [2] - 929:7

Wednesday [1] - 1076:12

week [12] - 928:14; 957:23; 966:13; 989:25; 1007:20; 1010:9; 1029:2, 5, 19; 1066:2

weekend [10] - 925:22; 939:6; 940:15; 941:3; 988:7; 989:16; 1000:1; 1005:10; 1009:3; 1075:4

weeks [1] - 1029:1

welcome [1] - 1025:1

welfare [4] - 993:20, 23; 1007:11

West [22] - 931:7, 16, 19, 21; 932:12; 1032:8, 12, 20; 1033:4, 19, 23; 1034:2; 1044:3; 1050:6; 1051:9, 11, 14; 1052:4, 9; 1053:7; 1054:5; 1055:17

west [5] - 931:17; 947:14; 955:16; 978:21; 1050:20

westbound [1] - 945:19

whatsoever [1] - 1075:23

wheels [1] - 944:17

white [2] - 934:1; 977:4

whole [11] - 917:11, 20; 929:24; 951:9; 957:12; 966:20, 22; 986:6; 989:24; 1003:5; 1046:10

WICKER [1] - 914:20

wife [6] - 938:24; 994:5; 1003:7; 1004:4, 20

wife's [1] - 1003:14

willing [1] - 1047:12

windows [1] - 999:18

wiping [1] - 944:9

wired [1] - 961:10

withdraw [1] - 1000:25

withdrawn [9] - 929:23; 940:12; 941:10; 950:20; 955:10; 968:1; 989:15; 1000:2; 1010:22

WITNESS [4] - 992:18; 1026:6; 1031:3; 1057:7

witness [24] - 919:20; 923:2; 980:13; 990:19; 1011:20; 1013:14; 1014:5; 1024:19; 1026:2, 5, 9, 14, 21, 25; 1027:5; 1039:5;

1056:10, 14; 1060:10; 1061:17; 1068:15; 1071:5; 1074:23

Witness [2] - 1002:23; 1004:15

witness's [1] - 974:10

witnesses [19] - 916:8; 918:8; 924:18; 925:5, 14; 926:2, 5-7, 16, 19; 927:4; 1003:10; 1004:2, 4; 1023:14; 1025:23; 1075:18; 1076:7

WITNESSES [1] - 1077:2

wonderful [1] - 1073:9

wooden [2] - 1052:3; 1054:20

word [2] - 999:12; 1065:7

words [2] - 962:10; 1060:16

wore [1] - 1034:25

worker [1] - 935:7

workers [1] - 934:24

worry [1] - 962:25

wrapped [1] - 933:16

write [1] - 1062:11

written [8] - 921:15, 18; 924:7; 974:17; 1075:8, 20-21, 23

wrote [4] - 1003:2; 1028:9, 11; 1060:16

**Y**

year [7] - 996:6, 19; 1001:9, 21, 24; 1008:1; 1069:23

years [19] - 970:18; 972:9; 986:13; 992:7-9; 993:18; 994:7, 15-16, 25; 995:5, 8, 10, 21; 996:13; 998:9; 1029:18

years' [1] - 971:16

yelling [3] - 944:4; 969:1, 5

yellow [1] - 934:1

yesterday [6] - 927:25; 931:8; 936:24; 941:16; 950:14; 951:11

YORK [1] - 914:1

York [25] - 914:13, 19, 22; 928:1, 6; 970:4; 971:2, 11; 972:10, 20; 973:13, 16; 974:16; 975:7; 984:3, 9; 985:24; 993:5; 1002:8; 1044:6; 1047:3; 1060:8;

1062:8, 14

yourself [3] - 993:19; 994:23; 1044:21

**Z**

zero [3] - 945:11; 947:4; 984:6

zeroing [1] - 964:7