1078

1            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF NEW YORK
2
    ------------------------------X
3
    UNITED STATES OF AMERICA,      :   CR 08 655
4
          v.                       :   U.S. Courthouse
5                                      Central Islip, N.Y.
    CHRISTIAN TARANTINO,           :
6                                      TRANSCRIPT OF TRIAL
                  Defendant.       :
7                                      May 2, 2012
    ------------------------------X   9:30 a.m.
8
    BEFORE:
9
                HONORABLE JOANNA SEYBERT, U.S.D.J.
10                      and a jury

11  APPEARANCES:

12  For the Government:  LORETTA E. LYNCH
                         United States Attorney
13                       100 Federal Plaza
                         Central Islip, New York 11722
14                       By:  JAMES M. MISKIEWICZ, ESQ.
                              SEAN C. FLYNN, ESQ.
15                            Assistants, U.S. Attorney

16  For the Defendant:   STEPHEN H. ROSEN, ESQ.
                         100 Almeria Avenue - Suite 205
17                       Coral Gables, Florida 33134

18                       FRANK A. DODDATO, ESQ.
                         666 Old Country Road
19                       Garden City, New York 11530

20  Court Reporter:      HARRY RAPAPORT
                         OWEN M. WICKER
21                       STEPHANIE PICOZZI
                         United States District Court
22                       100 Federal Plaza
                         Central Islip, New York 11722
23                       (631) 712-6105

24
    Proceedings recorded by mechanical stenography.
25  Transcript produced by computer-assisted transcription.


                    OWEN WICKER, RPR
                  OFFICIAL COURT REPORTER

1079

1          M O R N I N G   S E S S I O N

2

3          THE COURT:  Let me see what the situation is
4   with our jurors.  They were told to come at 9:45.

5          Is Mr. Amador here?

6          MR. MISKIEWICZ:  Yes, your Honor.  I think he's
7   in one of the other rooms.  We're ready to bring him out.

8          THE COURT:  And you have no further questions
9   for Mr. Amador, do you?

10         MR. ROSEN:  I do not.

11         THE COURT:  So you will do your redirect.

12         MR. MISKIEWICZ:  Yes, your Honor.  It will be
13  brief.

14         I just wanted to indicate that I think Ms. Manon
15  Mulligan has arrangements to fly out tonight.  If there is
16  any way of doing this evidentiary hearing --

17         THE COURT:  If you want to get started with her
18  now, bring her out.

19         MR. FLYNN:  Your Honor, we're ready to do it now
20  or perhaps lunchtime.

21         THE COURT:  I'm ready to do it at lunchtime.

22         MR. MISKIEWICZ:  Your Honor, should we have
23  Mr. Amador fill in at this point?

24         THE COURT:  Hopefully, he will not run into a
25  juror.

OWEN WICKER, RPR
OFFICIAL COURT REPORTER

1080

1          Gentlemen, there will be a request to charge.  I
2   know it's a little bit early.  There are a couple you
3   probably want to emphasize in terms of the prior murders,
4   and the Court is aware of the needed charge with respect
5   to how they can consider the evidence related to these
6   prior murders in terms of the restrictions they have and
7   how it can be used with respect to 404(b) motivation
8   purposes rather than just propensity.  That's my concern.

9          So if you can get something in today or
10  Monday...

11         MR. MISKIEWICZ:  We'll work on that.

12         Other than that, though -- that's why I raised
13  this last week -- does the Court want us to resubmit our
14  earlier charges from the last trial?

15         THE COURT:  No, I want you to give me what you
16  have in terms of this particular case.

17         MR. MISKIEWICZ:  Yes.

18         THE COURT:  And I'll refer to the prior charges,
19  obviously, the stock ones in terms of conspiracy and all
20  that, you know.

21         MR. MISKIEWICZ:  We also prepared a redacted
22  indictment.

23         THE COURT:  Indictment?

24         MR. MISKIEWICZ:  Yes.

25         THE COURT:  Thank you.

OWEN WICKER, RPR
OFFICIAL COURT REPORTER

---

Amador - Redirect/Miskiewicz

1081

1          (Short recess taken.)

2          THE COURT:  Mr. Amador, we're waiting on, I
3   believe, two jurors.  They should be here shortly.

4          THE WITNESS:  Yes, ma'am.

5          THE CLERK:  Judge, they are all here.  They'll
6   be out in a moment.

7          (Whereupon, the jury at this time enters the
8   courtroom.)

9          THE COURT:  Good morning.  We're ready to
10  resume.

11         At this time the Government is continuing to do
12  their redirect of Mr. Amador.

13         You are still under oath, Mr. Amador.

14         Mr. Miskiewicz?

15         MR. MISKIEWICZ:  Thank you.

16  P A B L O   A M A D O R,

17         having been previously sworn, resumed the stand

18         and testified further as follows:

19  REDIRECT EXAMINATION

20  BY MR. MISKIEWICZ:

21  Q   Good morning, Mr. Amador.

22         Mr. Amador, yesterday on cross-examination by
23  Mr. Rosen, you were asked a series of questions about the
24  apartment on FDR Drive that you shared with Leshawn
25  Campbell.

OWEN WICKER, RPR
Official Court Reporter

Amador - Redirect/Miskiewicz

1082

1          Do you recall being asked those questions?

2   A   Yes, sir.

3   Q   I will show you what has been marked for
4   identification as PA-14.

5          Showing you PA-14, do you recognize that?

6   A   Yes, sir.

7   Q   What do you recognize that to be?

8   A   **The outline of the apartment, Leshawn's apartment.**

9   Q   Have you seen that outline before?

10  A   Yes.

11  Q   Is that a fair and accurate representation of the
12  layout of the Leshawn Campbell's apartment at that time,
13  when you lived there in August of 2003?

14  A   Yes, sir.

15         MR. MISKIEWICZ:  The Government moves for the
16  admission of PA-14.

17         THE COURT:  Any objection?

18         MR. ROSEN:  No objection.

19         THE COURT:  Received in evidence.

20         (Whereupon, Government Exhibit PA-14 was
21  received in evidence.)

22         MR. MISKIEWICZ:  May I publish it, your Honor?

23         THE COURT:  Yes.

24         (The aforementioned document(s) were published
25  to the jury.)

OWEN WICKER, RPR
Official Court Reporter

Amador - Redirect/Miskiewicz

1083

1 BY MR. MISKIEWICZ:

2 Q    Mr. Amador, showing you up on the screen behind

3 you -- and this is PA-14.  I don't mean to go over the

4 entire layout.

5         But first of all, can you tell us within this,

6 which was the bedroom that you used?

7 A    Bedroom number three (indicating), right here.

8 Q    Okay.  And is that where you said, I think in

9 cross-examination, you said you had some of your personal

10 belongings there?

11 A    There, yes.

12 Q    All right.  With respect to that, you were asked a

13 series of questions also about the episode when the gun

14 was malfunctioning and conversations you had with Justin

15 Bressman about the gun malfunctioning.

16        Could you show or explain to the members of the

17 jury where you were, where you and Justin Bressman and

18 whoever else were, while attempting to figure out what was

19 wrong with the gun?

20 A    We were in the kitchen, by the kitchen table, right

21 here (indicating).

22 Q    All right.  There came a time, I think you said,

23 there was -- you and/or Mr. Bressman were firing the

24 weapon outside the window.  Where was the window?

25 A    (Indicating.)

OWEN WICKER, RPR
Official Court Reporter

Amador - Redirect/Miskiewicz

1084

1 Q    Okay.  And it indicates there apartment 1-A, but you

2 were one level above the ground level?

3 A    One level above, yes.

4 Q    You were shooting into what?

5 A    Into the grassy area.

6 Q    You were asked by Mr. Rosen questions about what was

7 said to you by Mr. Bressman about why he had the weapon.

8 And if you can clarify for the members of the jury:  On

9 this occasion when the gun was malfunctioning and the

10 first time you saw the Ruger, what, if anything, did

11 Mr. Bressman tell you about this weapon?

12 A    He said he had a job to do for Matty.

13 Q    Mr. Rosen said that Mr. Bressman told you that he had

14 to kill somebody, during cross-examination from yesterday.

15 And you said something about misspeaking.  Did he use the

16 word "kill" on that first page?

17 A    He just said he had a job to do for Matty.

18 Q    What did you understand "job" to mean, the fact that

19 he had his gun with him?

20 A    What I understood the job to mean was that he had to

21 murder somebody, kill somebody.

22 Q    So that was your understanding, that he didn't use

23 the word "kill" on that occasion; he just said he had a

24 job to do?

25 A    Correct.

OWEN WICKER, RPR
Official Court Reporter

Amador - Redirect/Miskiewicz

1085

1 Q    Did there come a time, though, that he specifically

2 said something about killing or murdering somebody?

3 A    Yes.  That's why I had put it together in my mind,

4 and I knew the whole story.  That's why I came up with

5 that about the killing.

6         The day -- the morning the gun accidentally went

7 off, that's when they told me they had to carry out the

8 contract, the killing of Vinnie.

9 Q    What day was that?

10 A    The early morning of the 18th of August of 2003.

11 Q    That was several days, a week or more, after the gun

12 jamming incident when you were shooting out the window?

13 A    Correct.

14 Q    So there were two times when there is a reference to

15 Vinnie; is that correct?

16 A    First time he said he had a job to do, and the second

17 time was when he said I had to kill Vinnie and was getting

18 paid to do it.

19 Q    You mentioned the morning of August 18th and the gun

20 going off.  Where was Justin Bressman when he was cleaning

21 the gun and it went off?

22 A    He was sitting in the living room on the biggest

23 sofa.

24 Q    The bigger sofa?

25 A    Yes.  There was a two-piece and a one-piece.

OWEN WICKER, RPR
Official Court Reporter

Amador - Redirect/Miskiewicz

1086

1 Q    You are indicating the upper part of that diagram.

2         When the gun went off, where were you?

3 A    I was in the kitchen with Leshawn.

4 Q    You testified yesterday there was a -- on

5 cross-examination -- where was the book bag where that

6 came out of?

7 A    I had my dirty laundry inside this closet.

8         MR. ROSEN:  Judge, it's outside of cross.  I

9 didn't go into it.

10        THE COURT:  Overruled.

11 BY MR. MISKIEWICZ:

12 Q    Could you indicate with a letter or some sort of

13 designation for that closet?

14 A    The letter E.

15 Q    E?

16 A    Yes.

17 Q    What was in that closet?

18 A    My dirty laundry, and the book bag used on the day of

19 the murder.

20 Q    And you gave him the book bag, and then he left?

21 A    No, I left with him.  But before that, he had put the

22 pillowcase -- and he had gloves on, latex gloves.  He put

23 the gun with the silencer in it, put it in the pillowcase,

24 tied it up into a knot.  Put it inside the -- and put it

25 into the field box, a black field box, and put an empty

OWEN WICKER, RPR
Official Court Reporter

Amador - Redirect/Miskiewicz

1087

1 clip inside the field box also, inside the book bag.

2 Q    By the way, what is a field box?

3         MR. ROSEN:  Objection.  Outside the scope of the

4 cross-examination.

5         THE COURT:  Please come up for a moment.

6         MR. MISKIEWICZ:  Your Honor, I'll withdraw the

7 question.

8         THE COURT:  Withdraw the question and move on.

9 BY MR. MISKIEWICZ:

10 Q    You were asked by Mr. Rosen to remove your

11 sweatshirts and display some tattoos.  You said one of

12 them was a tattoo with an angle over the grave site, and

13 the other one was in memory or in honor of your daughter.

14 Whose grave site are you referring to?

15 A    The grave site of my father.

16 Q    And there were some letters or initials on your

17 daughter's tattoo, or the tattoo in memory or honor of

18 your daughter.  What are the initials?

19 A    Just her first name and her middle name.  And I have

20 one more for my mother (indicating).

21 Q    Anything on those -- or any significance to those

22 tattoos?

23 A    In honor of them, that's all.

24 Q    The statement with respect to the .22 caliber

25 revolver, you lied to the NYPD.  Were you lying when you

*OWEN WICKER, RPR*
*Official Court Reporter*

---

Amador - Redirect/Miskiewicz

1089

1 involving the murder?

2 A    Yes.  They asked me -- they knew I was there, and I

3 didn't deny it.  They asked me what happened.

4         I told them Justin killed him.

5         And they asked me, what else?

6         I really didn't want to get into it.  I told him

7 it was on the behest of his boss.

8         They asked me what did his boss do?  What type

9 of job?

10        I told him it had to do with weightlifting.

11 Q    You did not give them the name of Synergy?

12 A    Yes.

13 Q    You said it had to do with weightlifting?

14 A    Yes.

15 Q    That was when?

16 A    That was on the 17th -- the 17th or the 16th when I

17 got arrested, when I went to central booking.

18 Q    Of 2003?

19 A    Of 2003.

20        Prior to seeing the judge on the gun charge,

21 they talked to me.

22 Q    And what month?

23 A    August of 2003 -- I mean September of 2003.

24 Q    So about a month after the murder?

25 A    Correct.

*OWEN WICKER, RPR*
*Official Court Reporter*

---

Amador - Redirect/Miskiewicz

1088

1 said your father was killed by the gun?

2 A    No.

3 Q    The fact that that really was your gun and you were

4 in possession, you were lying to them about that, right?

5 A    Right.

6 Q    You ultimately did plead guilty to that.  Is that

7 what you testified about and you got seven years for?

8 A    Correct.

9 Q    You were asked about when you began cooperating with

10 any law enforcement authority.  On the day of your arrest,

11 were you at some point brought to central booking in

12 Manhattan?

13 A    Yes.

14 Q    Were you visited by Detectives Brzostek and Valentine

15 Troll, T-R-O-L-L?

16 A    Yes.

17 Q    Were you interviewed by them?

18 A    Yes, sir.

19 Q    What did you tell them?

20 A    They asked me if the .22 caliber pistol that I was

21 carrying, arrested with, if it was the murder weapon.

22 Q    What, if anything, did you tell them?

23 A    I told them to take it, test it, and come back to

24 speak to me; that I was positive it wasn't.

25 Q    Did you tell them anything else about what transpired

*OWEN WICKER, RPR*
*Official Court Reporter*

---

Amador - Redirect/Miskiewicz

1090

1 Q    You told this to the NYPD?

2 A    NYPD officers.

3 Q    So your cooperation, as far as you are concerned,

4 when did it begin in this matter?

5 A    My cooperation started from the beginning, but my

6 lawyers talked me out of it in 2003.  I copped out to

7 seven years for the handgun, went upstairs, and went down

8 in 2004, and I started cooperating.

9 Q    Mr. Rosen asked you why Mr. Bressman would bring you

10 up to that Synergy in the east 90s.  Do you remember those

11 questions?

12 A    Yes.

13 Q    You indicated that at some point you believed that

14 Justin bringing you up there was a ruse.  I think you used

15 the word "ruse."

16        What did you mean by that?

17 A    It felt fishy.  My sixth sense told me to get out of

18 this in the situation.  I didn't feel right.

19 Q    What did you think would happen?

20 A    I thought I was going to get set up, that they would

21 kill me.

22 Q    Why?

23 A    Because what I knew, and what Justin knew what I

24 knew.

25 Q    Finally, you were asked a bunch of questions

*OWEN WICKER, RPR*
*Official Court Reporter*

1    regarding your taking a subway ride or taking the subway
2    on August -- Friday.
3        I want to ask you:  Regardless of when that
4    whole business about the transaction of the other guns
5    took place, whether it was Friday or Saturday or some
6    other day, were you sleeping in Campbell's apartment
7    Friday into Saturday, Friday night the 15th into Saturday
8    the 16th?
9    **A    No.  I was at my daughter's house.**
10   Q    Is there any reason why you have a specific memory of
11   that?
12   **A    Because I used to do that at times to take a shared**
13   **ride with my daughter's mother.  Because they had a**
14   **program on 25th Street, and I would share a cab, and she**
15   **would go to work.**
16   Q    The program you are referring to is the methadone
17   program?
18   **A    On 25th Street, correct.**
19   Q    A substance abuse program?
20   **A    Substance abuse program.**
21   Q    That was Saturday morning?
22   **A    Saturday mornings I would go there and specifically**
23   **pick up my medication.**
24   Q    You shared a ride with your wife?
25   **A    Ex-wife.**

1    Q    Where would she be going on the Saturday morning?
2    **A    She would drop me off and go en route to her job.**
3    Q    Is that why you have a specific recollection to that
4    nine years later, almost?
5    **A    Yes.**
6    Q    That you were not sleeping in Campbell's apartment on
7    Friday night?
8    **A    Yes.**
9    Q    I will show you what has been admitted into evidence
10   as Government's Exhibit VZ-1.
11       MR. MISKIEWICZ:  If I may publish it on the
12   ELMO?
13       THE COURT:  Is it in evidence?
14       MR. MISKIEWICZ:  Yes, VZ-1.
15       THE COURT:  VZ.  All right.
16   BY MR. MISKIEWICZ:
17   Q    Sir, I will show you in evidence VZ-1.
18       Can you see what it says on the first page of
19   VZ-1?
20   **A    Yes.  That is Leshawn's name and the address.**
21   Q    That is the address where you lived?
22   **A    Correct.**
23   Q    525 Franklin D. Roosevelt Drive, Manhattan?
24   **A    Correct.**
25   Q    I want to turn to a page --

1        MR. ROSEN:  Judge, objection.
2        THE COURT:  Please approach.
3        (Whereupon, at this time the following took
4    place at the sidebar.)
5        THE COURT:  Didn't you go into this previously,
6    the numbers, the addresses.
7        MR. MISKIEWICZ:  On my direct, I don't believe I
8    did.
9        THE COURT:  At some point -- how did you get
10   this in?
11       MR. MISKIEWICZ:  It was part of the stipulation.
12       THE COURT:  And your objection, you didn't go
13   into it?
14       MR. ROSEN:  Of course not.  I didn't touch the
15   records, the phone numbers.  I asked him one question:
16   Did he have a cell phone.
17       THE COURT:  Wasn't there some questions about
18   the land line and the calls?
19       MR. ROSEN:  No, that was from the gym, the 23rd
20   Street gym.
21       THE COURT:  What is your response?
22       MR. MISKIEWICZ:  A series of cross-examination
23   questions about whether or not you recall seeing Justin
24   Bressman using a land line or cell phone at Leshawn
25   Campbell's apartment.  It tangentially goes on to the

1    attack of his memory about could he have been on the
2    subway and where this particular night.
3        We've had conversations earlier today, but this
4    is what this whole thing is about.  It's about who is
5    making this phone call Friday into Saturday from the
6    Leshawn Campbell apartment to the defendant.
7        THE COURT:  Right.
8        MR. MISKIEWICZ:  And it can only be three
9    people:  either Mr. Amador -- and for some reason, he's
10   lying about it, but he's still calling Bressman or
11   Tarantino.  So it's who he is calling from the apartment.
12       And I suspect we'll move at some point in this
13   case, you know, perhaps some business records why the
14   subway went back into service.
15       Whatever his memory is, it is, but there is no
16   question there was a phone call from the defendant to the
17   place the murderer left on the morning of August 18.
18       MR. ROSEN:  This opens up a whole new can of
19   worms.  I stayed away from these records.
20       THE COURT:  These are in evidence.
21       MR. ROSEN:  I know that.  But I didn't go into
22   it on cross.  He had, on direct, the opportunity.
23       THE COURT:  You went into the concept about the
24   phone calls.
25       MR. ROSEN:  At the 23rd Street gym and about the

## Amador - Redirect/Miskiewicz

**1095**

1  cell phone.  I didn't go into did he make phone calls,
2  Justin Bressman, from the land line at Leshawn Campbell's
3  home.  I did not.
4       If he can show me it, I'll take it back and
5  apologize.
6       THE COURT:  You have to keep your voice down,
7  okay?
8       MR. ROSEN:  I did not go into that area
9  purposely.
10       THE COURT:  Whether you did it purposely or
11  without thought, it is still the same thing.
12       MR. ROSEN:  I didn't do it.
13       THE COURT:  Whether there is a fair amount of
14  cross-examination on cell phones and land lines from the
15  apartment.
16       MR. ROSEN:  Not from me.  Unless we can see it.
17  Unless I can see it.  If he can show me something, I'll
18  take it back.
19       THE COURT:  Do you have any specific
20  recollection?
21       MR. MISKIEWICZ:  I do.
22       THE COURT:  I do recall a fair amount of
23  cross-examination.  I can go back now and pull it up.
24       MR. MISKIEWICZ:  I do have a recollection;
25  that's why I'm going into it.  And I would need a minute

*OWEN WICKER, RPR*
*Official Court Reporter*

## Amador - Redirect/Miskiewicz

**1096**

1  to look it up.
2       THE COURT:  Take a moment, and I'll look it up
3  as well.
4       And you have a copy of the transcript?
5       MR. ROSEN:  I do.
6       (End of sidebar conference.)
7       THE COURT:  Mr. Rosen, are you looking for that
8  item?
9       MR. ROSEN:  Yes, your Honor.
10       THE COURT:  Unfortunately, I can't get it up on
11  my screen.  So if you can find that, Counsel.
12       MR. MISKIEWICZ:  Yes, your Honor.
13       THE COURT:  Do you want to approach on that?
14       MR. ROSEN:  Yes.
15       (Whereupon, at this time the following took
16  place at the sidebar.)
17       MR. ROSEN:  The only two questions -- here's the
18  transcript on 1011.  I asked him about the cell phone,
19  what phone did he use.
20       MR. MISKIEWICZ:  It begins earlier.  It begins
21  on page 1010.  I don't have the line numbers here.
22       But:  Did you know when Justin Bressman's phone
23  was turned off by his cell phone company?
24       Answer:  I never knew he had a cell phone.
25       Question:  In your presence, you never saw

*OWEN WICKER, RPR*
*Official Court Reporter*

## Amador - Redirect/Miskiewicz

**1097**

1  Justin Bressman make a cell phone call to anyone from
2  Leshawn Campbell's apartment?
3       Answer:  No.
4       Question:  When -- you never saw him in August.
5  I'm talking about -- withdrawn.
6       Did you ever see Justin Bressman with a cell
7  phone in August 2003?
8       Answer:  No.
9       Question:  How did he communicate with people
10  during his various stays at Leshawn Campbell's apartment?
11  By the phone?
12       Answer:  He used Leshawn's phone, the house
13  phone.
14       Question:  So it's your testimony under oath
15  today that the only time you ever saw Justin Bressman use
16  a phone was using Leshawn Campbell's phone?
17       Answer:  Probably.
18       There was an objection:  Asked and answered.
19       Then we have a whole lot of colloquy about
20  making a call to Justin Bressman.
21       Turn the page.
22       THE COURT:  Yes.  Mr. Rosen says:  I didn't hear
23  "probably."  That's what the court reporter and I heard.
24       But in any event, he said he did not
25  see him use any other phone other than the land line in

*OWEN WICKER, RPR*
*Official Court Reporter*

## Amador - Redirect/Miskiewicz

**1098**

1  Leshawn's apartment.
2       Not probably; he didn't.  That's your statement
3  at sidebar, Mr. Rosen.
4       Continuing with Mr. Rosen's statement:
5       That is why I want it cleared up, and that's why
6  we're having the sidebar.  I'd like to ask the question
7  again.
8       The Court:  What is the question you are
9  attempting to ask him?
10       Mr. Rosen:  Was the only phone that he saw
11  Justin Bressman use was the land line in Leshawn
12  Campbell's apartment.
13       MR. ROSEN:  Right.  I didn't go into anything
14  about the phone calls.  I didn't go into the contents, the
15  phone numbers.  This is what he wants to go into.
16       Let him ask the question "Did you see him use it
17  on that day?" and that's it.
18       THE COURT:  You are asking the question to
19  solicit phone use.
20       MR. ROSEN:  I'm sorry, your Honor, I did not
21  open the door to this.
22       THE COURT:  Your objection is overruled.
23       (End of sidebar conference.)
24  BY MR. MISKIEWICZ:
25  Q   Mr. Amador, showing you a page from VZ-1.  If you

*OWEN WICKER, RPR*
*Official Court Reporter*

1  look down the heading of this column, it is Y-R-M-O-D-Y,
2  O30816.
3        Assuming that is August 16th of '03 -- do you
4  see that? Do you see that?
5  A  Yes, sir.
6  Q  The third entry down, 12:18 a.m. Do you see that?
7  A  Yes.
8  Q  This would have been August 16th, Saturday, 2003, a
9  little after midnight, early morning hours.
10        Do you see where we are?
11  A  Yes, sir.
12  Q  Okay. There is a stipulation of evidence that the
13  number 646-739-3560 was used by the defendant, Christian
14  G. Tarantino, in August of 2003.
15        Did you call Christian G. Tarantino at
16  12:18 a.m. on August 16, 2003, from Leshawn Campbell's
17  apartment?
18  A  I didn't know him. No.
19  Q  Okay. The early morning hours of Saturday,
20  August 16th, you were sleeping where?
21  A  In my daughter's house.
22  Q  Do you know if Leshawn Campbell, your roommate, ever
23  knew a man by the name of Christian G. Tarantino?
24  A  No.
25        MR. MISKIEWICZ: No further questions.

1        MR. ROSEN: Can you leave that up there, please?
2        MR. MISKIEWICZ: Certainly.
3        MR. ROSEN: Thank you.
4  RECROSS-EXAMINATION
5  BY MR. ROSEN:
6  Q  Mr. Amador, referring to the same exhibit, there is,
7  if you can see in succession, a call at 12:17, 12:18,
8  another call at 12:18, a call at 12:22, and a call at
9  12:23, and a call at 12:30.
10        Do you see that on the same exhibit?
11  A  Yes, sir.
12  Q  The call at 12:17 from Leshawn Campbell's apartment
13  went to Marty Matulis. Do you know who Marty Matulis is?
14  A  No, sir.
15  Q  He's his friend from Sunnyside. Do you remember
16  that?
17  A  No.
18  Q  Do you know whether or not he, Justin Bressman,
19  bought drugs from Marty Matulis?
20  A  No.
21  Q  Did you ever see Marty Matulis involved in drug
22  dealing with Justine Bressman?
23  A  I don't know who Marty Matulis is.
24  Q  The second call goes to one Peter Sanchez.
25        Do you know who Peter Sanchez is?

1  A  No, sir.
2  Q  Do you know whether or not Justin Bressman bought
3  drugs from Peter Sanchez?
4  A  I don't know who this person is, sir.
5  Q  You don't know Marty Matulis; you don't know Peter
6  Sanchez?
7  A  No, sir.
8        MR. MISKIEWICZ: Objection. Asked and answered.
9  BY MR. ROSEN:
10  Q  Your next call at the same time goes from the
11  apartment to Mr. Tarantino.
12        How long was that phone call for, if you know,
13  from that chart?
14  A  I can't tell.
15  Q  Can you tell?
16  A  I can't tell.
17  Q  Secondly, the next number, called at 12:18, exactly
18  in the same minute that Mr. Tarantino's phone was called,
19  do you know whose phone number that is?
20  A  What time are you talking about?
21  Q  At 12:18 in the morning.
22  A  No.
23  Q  I'm sorry, 12:22.
24  A  I don't know whose phone.
25  Q  You don't know whose phone number that is?

1  A  No, sir.
2  Q  That is Sammy Sotto.
3        Do you know whether or not Mr. Sotto,
4  Mr. Sanchez, Mr. Matulis, are all known drug dealers in
5  the city of New York and the people that he used to cop
6  drugs from for Mr. Bressman?
7        MR. MISKIEWICZ: Objection.
8        THE COURT: Overruled.
9  A  I don't know, sir.
10  BY MR. ROSEN:
11  Q  Did anybody from the Government show you those phone
12  numbers and tell you whose numbers they were before you
13  got on the stand today?
14  A  No, sir.
15  Q  You smoked crack with Justin Bressman the weekend
16  before the murder on August the 18th, correct?
17  A  Right.
18  Q  And this phone call -- withdrawn.
19        This conversation you had with Mr. Bressman
20  about Matty Roth telling him to kill Vinnie Gargiulo for
21  $35,000 took place after you had smoked crack with him for
22  two days, correct?
23  A  Right.
24  Q  The prosecutor talked about the wings on your right
25  arm, and the jury had an opportunity to see those wings.

Amador - Recross/Rosen

1103

1 How large of a tattoo is it?
2 A Takes up my arm.
3 Q Takes up most of the top part of your arm, correct?
4 A Correct.
5 Q Between your elbow and your shoulder blade?
6 A No, between here and here. It comes up to here
7 (indicating).
8 Q So it's about five, six inches?
9 A Yes.
10 Q And what color is it?
11 A It's in green and black, light blue, yellow.
12 Q It's a pretty vivid picture of wings. The guy that
13 did it did an excellent job, did he not?
14 MR. MISKIEWICZ: Objection.
15 THE COURT: Sustained.
16 BY MR. ROSEN:
17 Q The wings are colorful, correct?
18 MR. MISKIEWICZ: We'll stipulate to the color of
19 the wings.
20 THE COURT: That is not necessary. Let him
21 answer the question.
22 BY MR. ROSEN:
23 Q The wings are colorful, are they not?
24 A Yes, sir.
25 Q And on the morning of the murder of Vincent Gargiulo,

*OWEN WICKER, RPR*
*Official Court Reporter*

Amador - Further Redirect/Miskiewicz

1105

1 MR. ROSEN: I have no further questions.
2 THE COURT: Anything else?
3 FURTHER REDIRECT EXAMINATION
4 BY MR. MISKIEWICZ:
5 Q What tee shirt were you wearing?
6 A I had a tee shirt that had an outline of a weapon, of
7 a gun.
8 Q And what did the logo or description say?
9 A The tee shirt was the outline of a .9 mm Beretta, and
10 it says, "Nine reasons to keep your mouth shut."
11 Q Any reason why you remember that?
12 A Because the next day when Justin called me and told
13 me to go buy the newspaper, after he cursed me out on the
14 phone, I went to purchase the newspaper. And ironically,
15 the guy at the counter asked me: Why is it nine reasons
16 to keep your mouth shut?
17 Because it's like an x-ray of the weapon. The
18 clip is loaded. Had more than nine rounds in it, and he
19 was counting the bullets.
20 It stuck in my head. I am telling you, I
21 couldn't even put this in a book.
22 MR. MISKIEWICZ: No further questions.
23 THE COURT: Anything else?
24 MR. ROSEN: No, your Honor.
25 THE COURT: You may step down, Mr. Amador.

*OWEN WICKER, RPR*
*Official Court Reporter*

Amador - Recross/Rosen

1104

1 what type of shirt were you wearing?
2 A I had a tee shirt on.
3 Q The tee shirt would have exposed that tattoo, would
4 it not?
5 A No.
6 Q It would not?
7 A No, sir.
8 Q So you're saying under oath today that the tattoo
9 that was on your right arm, at the time when your arm
10 would have been extended, would not have shown the tattoo?
11 A For one, my arm was never extended. Two, it never
12 was in my hand or in my possession. And the tee shirt
13 came down lower than the tattoo. Actually, this shirt
14 would cover the tattoo.
15 Q Do you have the tee shirt on now?
16 A No, but I have a collection of it, sir.
17 Q What color was the tee shirt you were wearing that
18 day?
19 A Light blue.
20 MR. ROSEN: Judge, can I have a moment?
21 THE COURT: Yes.
22 BY MR. ROSEN:
23 Q Sir, were you wearing a white tee shirt and black
24 jeans on the morning of August 18th?
25 A No.

*OWEN WICKER, RPR*
*Official Court Reporter*

Amador - Further Redirect/Miskiewicz

1106

1 If counsel will approach before I make other
2 arrangements.
3 (Whereupon, at this time the following took
4 place at the sidebar.)
5 THE COURT: Do you want me to have the jury step
6 out?
7 MR. ROSEN: For what?
8 THE COURT: He's in custody. I don't think
9 there is any issue, but I want to ask you.
10 MR. ROSEN: You mean for Amador?
11 THE COURT: Yes.
12 MR. ROSEN: No.
13 THE COURT: Who is your next witness?
14 MR. MISKIEWICZ: Detective Salta.
15 (End of sidebar conference.)
16 THE COURT: The Government will call their next
17 witness, Detective Salta.
18
19 J E F F   S A L T A,
20 called as a witness, having been first
21 duly sworn, was examined and testified
22 as follows:
23 THE WITNESS: Detective Jeff Salta, S-A-L-T-A,
24 Shield 934, presently assigned to Manhattan South
25 Homicide.

*Owen M. Wicker, RPR*
*Official Court Reporter*

Salta - Direct/Miskiewicz

1107

1    
2    DIRECT EXAMINATION
3    BY MR. MISKIEWICZ:
4    Q    Good morning, Detective Salta.
5    A    Good morning.
6    Q    Detective Salta, how long have you been with the
7    NYPD?
8    A    Twenty-eight years.
9    Q    And when did you first make detective?
10   A    1999.
11   Q    In August of 2003, were you assigned to homicide
12   investigation in the midtown south?
13   A    Yes.
14   Q    And specifically what homicide investigation were you
15   assigned?
16   A    Case of Vincent Gargiulo.
17   Q    Were you working with any other detectives at that
18   time?
19   A    Yes.
20   Q    Who?
21   A    Specifically, Detective Brzostek.
22   Q    Detective Salta, if you could lean forward towards
23   the microphone.  It's not very good with range.
24        Did there come a time, as part of your
25   investigation, you attempted to interview an individual by

Salta - Direct/Miskiewicz

1108

1    the name of Justin Bressman?
2    A    Yes.
3    Q    Do you recall the date that you actually encountered
4    Mr. Bressman and interviewed him?
5    A    August 21, 2003.
6    Q    Where -- first of all, who were you with when you had
7    this encounter?
8    A    Detective Brzostek.
9    Q    Where were you?
10   A    In front of 43 West 23rd Street.
11   Q    Was there a particular business or residence or some
12   other location that you were at at that address?
13   A    Yes.  By the Synergy Gym.
14   Q    Did you see Mr. Bressman arrive at that location, or
15   was he already there when you arrived?
16   A    We saw him arrive.
17   Q    What did he arrive in?
18   A    A black Infiniti four-door sedan.
19   Q    How did you know it was Justin Bressman in that black
20   Infiniti four-door sedan, if you know?
21   A    Because I viewed a mug shot photo previously.
22   Q    Did you at some point enter or attempt to speak to
23   Mr. Bressman?
24   A    Yes.
25   Q    And where did you first encounter him?

Salta - Direct/Miskiewicz

1109

1    A    In front of the Synergy Gym.
2    Q    What, if anything, did you say to him?
3    A    I introduced myself to him and explained to him that
4    we were investigating the death of Vincent Gargiulo.
5        He told me he heard about Vinnie from reading
6    something in the newspaper.
7        I then asked him if he could come back with us
8    to the midtown south detective squad to answer some
9    questions.
10   Q    What, if anything, did he say?
11   A    He agreed, and at first he said he wanted to check in
12   to work, to make sure -- to let them know that he was
13   coming to us.
14   Q    Did he go to his place of employment?
15   A    Yes, he did.
16   Q    Did he come back out?
17   A    Yeah.
18   Q    And where, if anywhere, did you go after that?
19   A    We took him back to the midtown south squad.
20   Q    When you say "we," you mean you and Detective
21   Brzostek?
22   A    Yes.
23   Q    When you got there, did you begin to interview
24   Mr. Bressman?
25   A    Yes.

Salta - Direct/Miskiewicz

1110

1    Q    Did you begin to interview Mr. Bressman about the
2    murder of Vincent Gargiulo?
3    A    Yes.
4    Q    Without stating what he said to you, did there come a
5    time that the interview was suddenly halted?
6    A    Yes, it was.
7    Q    Why?
8    A    I was informed by my immediate supervisor, Sergeant
9    Scantlebury, there was a --
10        THE WITNESS:  May I look at my notes?
11        THE COURT:  Looking at your notes to get the
12   spelling?
13        MR. MISKIEWICZ:  3500 JS-1.
14        THE WITNESS:  S-c-a-n-t-l-e-b-u-r-y.
15   BY MR. MISKIEWICZ:
16   Q    Detective Salta, so did you speak to this individual
17   who claimed to be an attorney on the phone?
18   A    Yes, I did.
19   Q    Did he identify himself?
20   A    Yes, he did.
21   Q    And what name did he give?
22   A    Mel Roth.
23   Q    What, if anything, did Mr. Roth say or ask of you?
24   A    He said that he represents Justin Bressman and that I
25   should stop interviewing him immediately.

1290

Salta - Direct/Miskiewicz

1111

1   Q   What, if anything, did you do with that information?
2   A   Well, I told Mr. Roth that Justin Bressman came in
3   here voluntarily and that he wants to speak with us.
4   Q   By the way, I will show you on the screen what has
5   been moved into evidence as RG-2.
6       Do you recognize that photo?
7   A   Yes, I do.  Justin Bressman.
8   Q   That's the individual you were interviewing that day?
9   A   Yes, it is.
10  Q   August 21st?
11  A   Yes.
12  Q   2003?
13  A   Yes.
14  Q   So after you told Mr. Mel Roth, or Melvyn Roth, this
15  information, what, if anything, happened next?
16  A   He said he didn't care and that I should stop talking
17  to him immediately.
18  Q   What did you do?
19  A   I asked him if he wanted to speak with him, and he
20  said, yes, he did.
21      I went back into the interview room, asked
22  Mr. Bressman did he contact an attorney.
23      He said, no, he did not.
24      And I said, you are free to leave at any time.
25      He said, yes, I know.  I'm here to help you.

Owen M. Wicker, RPR
Official Court Reporter

Salta - Direct/Miskiewicz

1112

1       I said, there is an attorney on the phone by the
2   name of Mel Roth.  Do you know him?
3       I know him, but he doesn't represent me.
4       I asked him if he wants to speak with him on the
5   phone, and he said yes.
6   Q   Did he speak with Mr. Roth?
7   A   Yes.
8   Q   He said he did not call Mr. Roth, and Mr. Roth,
9   although he knew him, didn't represent him.
10      Did you say anything like that to Mr. Roth?
11  A   Yes.
12  Q   What if anything did Mr. Roth say?
13  A   He said that I should stop talking to him.
14  Q   And did Mr. Roth indicate at all who or why he was
15  calling, given that Mr. Bressman said he didn't have a
16  lawyer and wasn't represented by Mr. Roth?
17  A   I asked him who contacted him, and he said a
18  concerned party.
19  Q   Shortly thereafter, then, after this phone call, did
20  the conversation or the interview end with Mr. Bressman?
21  A   No, it did not.
22  Q   Did it end at some point?
23  A   Yes.
24  Q   At some point did you return Mr. Bressman to the
25  Synergy Gym where you first encountered him?

Owen M. Wicker, RPR
Official Court Reporter

Salta - Cross/Rosen

1113

1   A   We had dropped him off one block away.
2   Q   Why?
3   A   He felt -- he didn't feel safe going back to the gym.
4   Q   What did he say to you?
5   A   He said in substance that if people from the gym knew
6   that he was talking to the police, his life would be in
7   jeopardy.
8       MR. MISKIEWICZ:  No further questions.
9       THE COURT:  Cross-examination.
10  CROSS-EXAMINATION
11  BY MR. ROSEN:
12  Q   When you first got to the Synergy Gym on West 23rd
13  Street, what time in the morning was it?
14  A   Approximately 10:30 a.m.
15  Q   And Mr. Bressman was not there, correct?
16  A   That's correct.
17  Q   And you went in to see the person at the front desk?
18  A   Yes.
19  Q   His name was Anthony Del Negro?
20  A   That's correct.
21  Q   And you identified yourselves as police officers?
22  A   As detectives, yes.
23  Q   And you told him why you were there?
24  A   To see Justin Bressman.
25  Q   So you identify yourself as New York City Police

Owen M. Wicker, RPR
Official Court Reporter

Salta - Cross/Rosen

1114

1   Department; you have a badge; you want to speak to Justin
2   Bressman.
3       But he's afraid to go back to the gym.  He's
4   afraid to go back into the gym because he doesn't want
5   people to know that he's talking to the New York City
6   Police Department?
7       MR. MISKIEWICZ:  Objection.
8   BY MR. ROSEN:
9   Q   Is that your testimony under oath today?
10      MR. MISKIEWICZ:  Objection.
11      THE COURT:  Sustained.
12  BY MR. ROSEN:
13  Q   You just told us Justin Bressman told you to leave
14  him a block from the Synergy Gym, correct?
15  A   That's correct.
16  Q   Because he didn't want people to know that he was
17  cooperating with the police, correct?
18  A   That's correct.
19  Q   Did you escort him out of the gym with Brzostek?
20  A   Yes, we did.
21  Q   So everybody in the gym knew from 10:30 in the
22  morning where he was going and what was going on, because
23  you had told everybody, correct?
24      MR. MISKIEWICZ:  Objection.
25      THE COURT:  Sustained.

Owen M. Wicker, RPR
Official Court Reporter

1   MR. ROSEN:  On what ground?
2   THE COURT:  Come on here.  Come up.
3   (Whereupon, at this time the following took
4   place at the sidebar.)
5   THE COURT:  The statement "you had told
6   everybody" everything is vague, it's confusing, and it is
7   improper.  Is there anything else you would like to add to
8   it?
9   MR. MISKIEWICZ:  No, your Honor.
10   THE COURT:  That's the reason.
11   (End of sidebar conference.)
12   THE COURT:  Objection is sustained.
13   BY MR. ROSEN:
14   Q   Detective, when you first arrived at West 23rd
15   Street, did you speak to the fellow at the front desk,
16   Anthony Del Negro?
17   A   Yes, I did.
18   Q   Did you tell him why you were there?
19   A   No.
20   Q   You didn't tell him you were there to see Justin
21   Bressman?
22   A   To see Justin Bressman; not why we want to speak with
23   him.
24   Q   But you told him you were there to speak to Justin
25   Bressman?

Owen M. Wicker, RPR
Official Court Reporter

1   A   That's correct.
2   Q   And you and Detective Brzostek escorted Justin
3   Bressman to the station house, correct?
4   A   That's correct.
5   Q   You left with him, correct?
6   A   Yes.
7   Q   You got into your vehicle and drove away?
8   A   That's right.
9   Q   When Justin Bressman went into West 23rd Street, he
10   made a telephone call, did he not?
11   A   Yes, he did.
12   Q   And he called from a land line, did he not?
13   A   Yes, he did.
14   Q   Tell us:  From your investigation, who did Justin
15   Bressman call the morning that you showed up at West 23rd
16   Street?
17   MR. MISKIEWICZ:  Objection.  Scope.
18   THE COURT:  Excuse me?
19   MR. MISKIEWICZ:  Scope.
20   THE COURT:  Overruled.
21   A   I'm not sure who he called.
22   BY MR. ROSEN:
23   Q   He made a phone call that morning to let somebody
24   know what was happening to him?
25   MR. MISKIEWICZ:  Objection.

Owen M. Wicker, RPR
Official Court Reporter

1   BY MR. ROSEN:
2   Q   Did he tell you that?
3   THE COURT:  Sustained.
4   BY MR. ROSEN:
5   Q   Did he tell you why he was making the phone call,
6   sir?
7   A   No, he did not.
8   Q   Did you see him on the phone?
9   A   Yes, I did.
10   Q   Did you do anything to investigate the phone number
11   that Justin Bressman called the morning he was taken to
12   the station house?
13   MR. MISKIEWICZ:  Objection.
14   THE COURT:  Overruled.
15   A   I did not do anything personally.
16   BY MR. ROSEN:
17   Q   Well, who do?
18   MR. MISKIEWICZ:  Objection.
19   BY MR. ROSEN:
20   Q   If you know.
21   THE COURT:  I'll allow it.
22   A   I don't recall.
23   MR. ROSEN:  Nothing further.
24   THE COURT:  Anything further?
25   MR. MISKIEWICZ:  No, your Honor.  Thank you.

Owen M. Wicker, RPR
Official Court Reporter

1   THE COURT:  You can step down, sir.
2   (Witness excused.)
3   THE COURT:  Next witness.
4   MR. MISKIEWICZ:  Scott Flynn.
5   THE COURT:  No relationship to Sean Flynn, I
6   assume.
7   S C O T T   F L Y N N,
8   called as a witness, having been first
9   duly sworn, was examined and testified
10   as follows:
11   THE WITNESS:  Scott Flynn.
12   DIRECT EXAMINATION
13   BY MR. MISKIEWICZ:
14   Q   Good morning, Mr. Flynn.
15   A   Good morning.
16   Q   Mr. Flynn, you are here appearing by way of a
17   subpoena issued to you by the U.S. Attorney's Office; is
18   that correct?
19   A   Yes.
20   Q   Mr. Flynn, what do you do for a living?
21   A   I'm a CPA.
22   Q   And how long have you been a CPA?
23   A   For 20 years.
24   Q   A CPA is a Certified Public Accountant, correct?
25   A   Yes.

Owen M. Wicker, RPR
Official Court Reporter

Scott Flynn - Direct/Miskiewicz

1119

1  Q   In 2003, were you a CPA licensed to perform
2  accounting services?
3  A   Yes, I was.
4  Q   In the state of New York?
5  A   Correct.
6  Q   In that period of time, did you do any accounting
7  services for the defendant in this case:  Christian
8  Tarantino?
9  A   Yes.
10 Q   Did you do any accounting service for his company
11 known as -- or a group of companies under the rubric of
12 Synergy Gyms or Synergy Fitness?
13         MR. ROSEN:  Objection.  Assumes facts --
14         THE COURT:  Please approach.
15         Approach.
16         (Whereupon, at this time the following took
17 place at the sidebar.)
18         THE COURT:  Number one, he didn't finish the
19 question, all right?  So I think the objection is
20 premature.
21         Number two, what is your objection?
22         MR. ROSEN:  It assumes facts not in evidence.
23 There is no evidence on this record that Christian
24 Tarantino had a portion of any Synergy Gym anywhere.
25         THE COURT:  Okay.  Now, this accountant will

Owen M. Wicker, RPR
Official Court Reporter

Scott Flynn - Direct/Miskiewicz

1120

1  testify that the defendant had an ownership interest or
2  provided records with respect to Synergy Gyms; is that
3  correct, Mr. Miskiewicz?
4         MR. MISKIEWICZ:  Yes.  Based upon what he said
5  at the last trial, yes.
6         THE COURT:  So I'm overruling your objection at
7  this point.  And if he can establish the appropriate
8  foundation, then I'll let it in.
9         MR. ROSEN:  Okay.
10        (End of sidebar discussion.)
11        THE COURT:  The objection is overruled.
12        MR. MISKIEWICZ:  Your Honor, may we have the
13 last question read back?
14        THE COURT:  Yes.  Hold on one second.
15        Question:  Did you do any accounting service for
16 his company known as -- or a group of companies under the
17 rubric of Synergy Gyms or Synergy Fitness?
18        THE WITNESS:  Yes.
19 BY MR. MISKIEWICZ:
20 Q   What kind of accounting services did you perform?
21 A   We do bookkeeping services, prepare tax returns.
22 Q   And in doing those bookkeeping services and tax
23 returns, did -- was made aware of or ultimately report
24 and records regarding who the principal partners or owners
25 of the Synergy Fitness Gyms were at that time?

Owen M. Wicker, RPR
Official Court Reporter

Scott Flynn - Direct/Miskiewicz

1121

1  A   Well, a lot of these corporations were C
2  corporations, where there is no attachment as to who the
3  shareholders are and the owners.  In a lot of instances,
4  we were not fully aware of who or all of the owners were.
5  Q   Okay.  What about Mr. Tarantino?
6  A   Are you asking was I aware that he was an owner?
7  Q   Yes.
8  A   Yes, I was aware.
9  Q   And was there one corporation or several that used at
10 least the word "Synergy" in it?
11 A   Several.  Several Synergy Fitness Clubs in various
12 ownership groups.
13 Q   And were -- what geographic area?
14 A   New York City and Long Island.
15 Q   Okay.  Would you receive -- I should say prepare, for
16 purposes of tax reporting, either W-2 statements to
17 employees -- let's do that first.
18 A   Yes.
19 Q   Okay.  What about any other statement, reports of
20 income, to not necessarily employees but principals or
21 partners or anything else like that?
22 A   Well, it would be W-2s or 1099s.
23 Q   Explain to the members of the jury what a 1099 is.
24 A   A 1099 would be -- it's a document sent to the IRS to
25 notify them someone was paid compensation but was not

Owen M. Wicker, RPR
Official Court Reporter

Scott Flynn - Cross/Rosen

1122

1  considered an employee.
2  Q   All right.  And you did this for how many years for
3  Synergy?
4  A   Oh, since 1998.
5  Q   Are you still doing it for Synergy?
6  A   Yes.
7  Q   In the time since 1998 to the present, have you ever
8  issued a W-2 to an employee by the name of Matty Roth?
9  A   No.
10 Q   And have you ever issued a form 1099 to anybody by
11 the name of Matty Roth?
12 A   No.
13 Q   Have you ever issued a 1099 or a W-2 to anybody by
14 the name of Matthew Roth?
15 A   No.
16 Q   M. Roth?
17 A   No.
18        MR. MISKIEWICZ:  No further questions.  Thank
19 you very much.
20 CROSS-EXAMINATION
21 BY MR. ROSEN:
22 Q   Mr. Flynn, you are the present accountant for Synergy
23 Gyms, correct?
24 A   Yes.
25 Q   I want to take you back to 2003 and the summer of

Owen M. Wicker, RPR
Official Court Reporter

Scott Flynn - Cross/Rosen

1123

1  2003, okay?
2  A   Yes.
3  Q   The gym on West 23rd Street, was that gym owned and
4  operated, the Synergy Gym, by Brett and Eric Holzer's
5  group?
6  A   Yes.
7  Q   Who else was in Brett and Eric Holzer's group on the
8  23rd Street gym, if you recall?
9  A   That's hard to say.
10 Q   I know it's going back a long way.  But you clearly
11 remember Brett and Eric Holzer as the owners of the West
12 23rd Street gym?
13 A   Yes.
14 Q   And there's also a gym on East 22nd Street, between
15 22nd and 23rd.  That is also a Synergy Fitness, correct?
16 A   Correct.
17 Q   And that is also owned by Brett and Eric Holzer, is
18 it not?
19     MR. MISKIEWICZ:  Objection.
20     I'd seek a clarification for time frame.
21     THE COURT:  At the same time frame?
22     MR. ROSEN:  Yes.
23 A   I don't know if it -- if Eric was an owner, but it
24 was Brett's gym.
25 BY MR. ROSEN:

Owen M. Wicker, RPR
Official Court Reporter

Scott Flynn - Cross/Rosen

1124

1  Q   The two gyms on 23rd Street, on the east and west
2  side, were owned by the Holzers, correct?
3  A   Yes.
4  Q   When you say "owned by the Holzers," did they have
5  the franchise for those two locations?
6  A   Not in a formal sense.  I don't know if there was a
7  franchise document.  I don't believe there was.  But they
8  operated and owned that location.
9  Q   Did you do the books and records for those locations?
10 A   Yes.
11 Q   Did you ever see a W-2 -- withdrawn.
12     Did you ever create a W-2 or a 1099 for those
13 two gyms for Justin Bressman?
14 A   Uhm, I think so.  I think so.  I think we, uhm -- I
15 think we did a 1099 for him.
16 Q   Out of which one, the West 23rd or the East 23rd?
17 A   Well, it wasn't specifically from that corporation.
18 We use a corporation to process the payroll or 1099s for
19 the whole group, so I believe that's where this 1099 was
20 issued, out of those companies.
21 Q   Out of one of those two companies?
22 A   Not out of West or East 23rd, but a separate company
23 that would process payments to independent contractors or
24 employees.
25     MR. ROSEN:  Thank you very much.

Owen M. Wicker, RPR
Official Court Reporter

Scott Flynn - Redirect/Miskiewicz

1125

1      MR. MISKIEWICZ:  Very briefly, if I may, your
2  Honor?
3      THE COURT:  Yes.
4  REDIRECT EXAMINATION
5  BY MR. MISKIEWICZ:
6  Q   Preparing things like W-2's for these groups of
7  companies, did you become aware that individual employees
8  might work at different locations, different Synergy Gyms?
9  A   Yes.
10 Q   So if a 1099, or a W-2 in this case -- I'm sorry, a
11 1099 or W-2 was issued in the name of Justin Bressman at
12 a -- out of a particular address, does that mean he only
13 worked at one address?
14 A   No.
15     MR. MISKIEWICZ:  Okay.  No further questions.
16     THE COURT:  Anything else?
17     MR. ROSEN:  No, your Honor.
18     THE COURT:  Thank you.
19     You may step down.
20     (Witness excused.)
21     THE COURT:  Next witness.
22     THE CLERK:  Good morning.  Step up.
23     Raise your right hand, and you will be sworn in
24 first.
25 M E L V Y N   R O T H,

Owen M. Wicker, RPR
Official Court Reporter

M. Roth - Direct/Miskiewicz

1126

1  called as a witness, having been first
2  duly sworn, was examined and testified
3  as follows:
4      THE WITNESS:  Melvyn Roth, R-O-T-H, M-E-L-V-Y-N.
5  DIRECT EXAMINATION
6  BY MR. MISKIEWICZ:
7  Q   Good morning, Mr. Roth.
8  A   Good morning.
9  Q   Mr. Roth, you are an attorney admitted to the bar in
10 the state of New York, correct?
11 A   That's correct.
12 Q   And you have been practicing law for a good period of
13 time, correct?
14 A   Correct.
15 Q   Okay.  And from time to time you have represented the
16 defendant in this case, Christian Gerald Tarantino,
17 correct?
18 A   Correct.
19 Q   I want to direct your attention to August 21, 2003.
20     Do you recall receiving a telephone call from
21 Mr. Tarantino?
22 A   I do.
23 Q   And what, if anything, did Mr. Tarantino ask you to
24 do that day?
25 A   He asked me to represent an individual who was being

Owen M. Wicker, RPR
Official Court Reporter

M. Roth - Cross/Rosen

1127

1 questioned by detectives in Manhattan.
2 Q   And what individual was that?
3 A   I believe his last name was Bressman. I don't recall
4 his exact name at this point.
5 Q   What did you do?
6 A   I told them I was representing that individual and to
7 cease any questioning.
8 Q   How did you know where Mr. Bressman was?
9 A   Mr. Tarantino advised me.
10          MR. MISKIEWICZ: No further questions.
11          THE COURT: Any questions?
12 CROSS-EXAMINATION
13 BY MR. ROSEN:
14 Q   Mr. Roth, when you heard from Mr. Tarantino, did he
15 offer you any money to represent Mr. Bressman?
16 A   No.
17 Q   Did you know Mr. Tarantino in a professional sense?
18 A   Yes.
19 Q   You had personally represented him, had you not?
20 A   I had.
21 Q   Is it unusual to have former clients of yours refer
22 cases to you?
23 A   No.
24 Q   In the criminal field, do you basically rely on
25 former clients and perhaps some other lawyers to get you

Owen M. Wicker, RPR
Official Court Reporter

---

M. Roth - Cross/Rosen

1128

1 your business?
2 A   That's correct.
3 Q   Have you ever received any referrals from
4 Mr. Tarantino before?
5 A   I had.
6 Q   Approximately how many?
7 A   I would be guessing. Probably anywhere from 10 to
8 20. Maybe more.
9 Q   And these were people that Mr. Tarantino knew from
10 the street, so to speak?
11          MR. MISKIEWICZ: Objection.
12          THE COURT: Sustained.
13 BY MR. ROSEN:
14 Q   That Mr. Tarantino knew?
15          MR. MISKIEWICZ: Objection.
16          THE COURT: Overruled.
17          If you know.
18 A   I would assume so.
19 BY MR. ROSEN:
20 Q   Because when they called you, they used his name as a
21 referral?
22 A   That's correct.
23 Q   Did you use -- on the phone with the police officer
24 when you called, did you use the term "a concerned friend"?
25 A   I don't recall.

Owen M. Wicker, RPR
Official Court Reporter

1290

---

1129

1 Q   I apologize. I've been corrected by my colleague.
2 The term is "concerned party."
3          Do you remember using that phrase?
4 A   I don't recall.
5 Q   Does that mean that Mr. Tarantino, when he referred
6 you the case of Mr. Bressman, was concerned about his own
7 welfare?
8          MR. MISKIEWICZ: Objection.
9          THE COURT: Sustained.
10 BY MR. ROSEN:
11 Q   Does that mean that Mr. Tarantino, if you know, based
12 upon your experience with him, if that meant he was
13 concerned about his own welfare?
14          MR. MISKIEWICZ: Objection.
15          THE COURT: Sustained.
16          MR. ROSEN: I have nothing further.
17          THE COURT: Anything further?
18          MR. MISKIEWICZ: No, your Honor.
19          THE COURT: Thank you. You may step down.
20          (Witness excused.)
21          THE COURT: Ladies and gentlemen, we'll take our
22 mid-morning break. Don't discuss the case.
23          (Whereupon, at this time the jury exits the
24 courtroom.)
25          (Whereupon, a recess was taken.)

Owen M. Wicker, RPR
Official Court Reporter

---

1130

1          MR. ROSEN: So I don't have to stand up and make
2 objections, the detectives coming on, they are gearing up
3 to play the -- show the transcripts. We played the
4 transcripts once to the jury. We have gone into different
5 parts of the transcript. And I don't know if this is
6 going to be cumulative or this is going to be a situation
7 that's just more repetition, more -- they have seen it.
8 They have heard it. They have talked about it. And I
9 don't see the point if it's going to be cumulative and
10 repetitious to play a fourth or fifth time, show the
11 transcript a fourth or fifth time.
12          THE COURT: Showing the transcript, you have
13 shown it a number of times. I don't know how many times.
14 Have you played the tapes once or twice?
15          MR. MISKIEWICZ: We played the tape very briefly
16 with Agent Schelhorn and Kenneth Marr. The point is not
17 to be repetitious. The point of the specific excerpts of
18 the tape we are going to play with the next witness is to
19 further establish the identity of the speakers on the
20 tape, because there are several statements that the
21 defendant makes referring to the DNA connection of
22 Willard, and this detective was there and he will be able
23 to explain yeah, I said those things. So that's another
24 piece that the jury can take with it to determine the
25 authenticity of the tapes.

Stephanie Picozzi, OCR, RPR
Official Court Reporter

1131

1    (The jury enters the courtroom.)
2    THE COURT:  Come on up here.
3    (Sidebar.)
4    THE COURT:  Mr. Rosen, you are saying it's
5    repetitious.
6    MR. ROSEN:  And cumulative.
7    THE COURT:  I think it's a relatively confusing
8    piece of evidence.  I think the government has the
9    responsibility in order to meet its burden of proof of
10   establishing defendant's involvement in these two murders.
11   So the cast of characters and the names of people that are
12   mentioned during the tape require some explanation.
13   Also, the actual gathering of the DNA, although
14   it was touched upon by Agent Schelhorn, there are certain
15   other references to the other detectives that were there,
16   and I think that that clarification may entail focusing on
17   the portions of the tape that deal with the DNA.
18   MR. ROSEN:  Judge, they played that portion.
19   Detective Brostech was the witness.  He was up there when
20   they took the buccal swabs.  He testified.  We conceded
21   the voice of the defendant.  This is just totally
22   cumulative -- giving them an opportunity to go back.
23   Everybody knows about what took place in this -- on this
24   audiotape based upon the transcript they have read
25   continuously.

Stephanie Picozzi, OCR, RPR
Official Court Reporter

1133

1    make that clear.  If they want to stipulate, that's up to
2    them.
3    MR. ROSEN:  He did not contest -- we asked when
4    William Gargiulo took the witness stand, we said, Judge,
5    we are not contesting who is on it.  You let them put him
6    on anyway.  They wouldn't agree to a stipulation.  I don't
7    know where that comes from.  To me, this is all
8    cumulative.
9    THE COURT:  I heard your objection.
10   MR. ROSEN:  It's repetitious.
11   THE COURT:  The objection is overruled.  Please
12   proceed.
13   (Sidebar concluded.)
14   (Continued on the next page.)
15
16
17
18
19
20
21
22
23
24
25

Stephanie Picozzi, OCR, RPR
Official Court Reporter

1132

1    THE COURT:  It hasn't been continuous.
2    MR. ROSEN:  Yes, it has.  They had the
3    transcript up with the entire 39 minutes.
4    THE COURT:  That was one time earlier in the
5    trial.
6    MR. ROSEN:  They have used the transcripts to
7    highlight other things.  We have conceded the identity.
8    This is just cumulative.  Repetitious.  Everybody knows
9    about it.  We have had witnesses on the armored car and
10   Craig Miller about the Dorval homicide.
11   THE COURT:  This is one additional -- let me
12   finish.  This is one additional person who was there
13   during the collection of the DNA and has been referred to
14   on the tape.  So I'm going to allow it and that's my
15   ruling.
16   Your objection is overruled.
17   MR. MISKIEWICZ:  Thank you, your Honor.
18   For clarification purposes, I think this is
19   aside from the last objection, but there has never been a
20   stipulation to this jury, the defense never stipulated
21   that is the defendant on the tape.  There has been
22   stipulations or concessions in pretrial litigation and
23   motions, but before this jury there is no stipulation.
24   I'm not saying even if there was, it's
25   inappropriate to have Detective Zacarese, but I wanted to

Stephanie Picozzi, OCR, RPR
Official Court Reporter

Zacarese - direct/Miskiewicz

1134

1    (In open court.)
2    MR. MISKIEWICZ:  The government calls Detective
3    Zacarese.
4    THE CLERK:  State and spell your name for the
5    record.
6    THE WITNESS:  Anthony Zacarese, Z.A.C.A.R.E.S.E.
7
8    A N T H O N Y   Z A C A R E S E,
9    having been duly sworn
10   was examined and testified as follows:
11
12   DIRECT EXAMINATION
13   BY MR. MISKIEWICZ:
14   Q    Good morning, sir.
15        Detective Zacarese, are you currently retired?
16   A    Yes, sir.
17   Q    You are retired from what employment?
18   A    I was a detective in the Nassau County Police
19   Department.
20   Q    How long were you a member of the Nassau County
21   Police Department?
22   A    33 years.
23   Q    You started out as a patrol officer?
24   A    Yes, sir.
25   Q    When did you make detective?

Stephanie Picozzi, OCR, RPR
Official Court Reporter

Zacarese - direct/Miskiewicz

1135

1 A  1998.

2 Q  When did you retire?

3 A  2002.

4 Q  2002?

5 A  Yes, sir.

6 Q  In the end of 1999 and beginning of 2000, were you

7 assigned or did you inherit an open investigation?

8 A  Yes, sir, I did.

9 Q  What was that?

10 A  It was an investigation that had been held by two

11 prior detectives ahead of me of the death of Julius

12 Baumgardt during the commission of a robbery in the Second

13 Precinct.

14 Q  That's the Second Precinct in Nassau?

15 A  Yes, sir.

16 Q  Does that encompass the area of Syosset or Old

17 Brookville?

18 A  Syosset, Old Brookville, Woodbury.

19 Q  Did there come a time that you joined forces, if you

20 will, with the FBI?

21 A  Yes, sir.

22 Q  Did you work with any particular law enforcement

23 agent with the FBI during that period of time?

24 A  When we joined together, I was working with Agent

25 Robert Schelhorn.

Stephanie Picozzi, OCR, RPR
Official Court Reporter

---

Zacarese - direct/Miskiewicz

1136

1 Q  Did there come a time that you traveled anywhere with

2 Mr. Schelhorn or Agent Schelhorn to connect DNA?

3 A  Yes, sir, on a number of occasions we traveled

4 together.

5 Q  I want to direct your attention to July 2000.  Did

6 you travel to an upstate facility known as the Willard

7 Drug Treatment Center?

8 A  Yes, I did.

9 Q  Who did you go there with?

10 A  Along with two other detectives and Agent Schelhorn.

11 Q  Two other detectives from what agency?

12 A  Nassau County Police Department.

13 Q  Who are they?

14 A  Detective Charlie Costello from the print section and

15 Detective Bazylewicz, who was at the lab at that time.

16 Q  Whose DNA or prints were you going to take?

17 A  We were going up to that facility to get the DNA and

18 prints from the defendant, Christian Tarantino.

19 Q  Did you at some point take the DNA?

20 A  Yes, sir, we did.

21 Q  Did you see the defendant that day?

22 A  Yes, sir, I did.

23 Q  About how long were you in the same room or

24 conference room or what facility it was?

25 A  In the area they set aside for us, I believe the

Stephanie Picozzi, OCR, RPR
Official Court Reporter

---

Zacarese - direct/Miskiewicz

1137

1 combined time was probably maybe a little short of an hour

2 in total.

3 Q  Do you see the defendant that you took the DNA from

4 in courtroom here today?

5 A  Yes, sir, I do.

6 Q  Can you point to him and describe the clothing he is

7 wearing?

8 A  The defendant is sitting at defense counsel table.

9 He is wearing a light tan jacket and a light blue shirt.

10     MR. MISKIEWICZ:  May the record reflect the

11 witness has identified the defendant, Christian Tarantino?

12     THE COURT:  Yes.

13 Q  Now, Detective Zacarese, when you -- since taking the

14 DNA, have you had an opportunity to listen to what is

15 variously referred to as the Gargiulo microcassette tape

16 in this case?

17 A  Yes, sir.  Ultimately some years later, even after I

18 retired, I finally got to listen to that microcassette

19 tape.

20 Q  And have you listened to it once or more than once?

21 A  More than once.

22 Q  Have you had occasion to review any transcripts

23 prepared in connection with that tape recording?

24 A  Yes, sir, I have.

25     MR. MISKIEWICZ:  Your Honor, at this time we

Stephanie Picozzi, OCR, RPR
Official Court Reporter

---

Zacarese - direct/Miskiewicz

1138

1 request to have the members of the jury put on their

2 headphones again and publish to the jury portions of the

3 tape.

4     THE COURT:  If you would, just remember to turn

5 the button on, the green button.

6     (Tape played)

7     (Tape stopped)

8 Q  Detective Zacarese, we have for the record played the

9 first one minute and 44 seconds of the recording.  I will

10 ask you a couple of questions about what we heard.

11     First of all, when you went up to Willard, did

12 you say anything to the defendant about the purpose of

13 your visit that day?

14 A  Yes, sir, I did.

15 Q  What did you say?

16 A  I wanted to be sure that he understood why we were

17 there and what the procedure was going to be regarding

18 fulfilling the subpoena from the Grand Jury.

19 Q  And so you told him you were there to investigate a

20 botched armored car robbery?

21 A  No, sir.

22 Q  So when you say you wanted to assure yourself that he

23 knew why you were there, what exactly did you tell him?

24 A  I told him that we had a subpoena that we were

25 supposed to take from him, specifically hair samples,

Stephanie Picozzi, OCR, RPR
Official Court Reporter

Zacarese - direct/Miskiewicz

1139

1    mucal (ph) cell samples and palm prints as per the
2    subpoena from the Grand Jury.
3    **Q**    What about -- did you make any reference to a botched
4    armored car robbery?
5         MR. ROSEN:  Objection.  Asked and answered.
6         THE COURT:  Sustained.
7         MR. ROSEN:  Cumulative.  Repetitious.
8         THE COURT:  Sustained.
9    **Q**    In your presence, did anyone make any reference to
10   any specifics of the investigation that you were up there
11   to pursue that day?
12   **A**    No, sir.
13   **Q**    There is the word maroon that is heard.  Was there
14   any vehicle or car of any kind that was red or maroon that
15   you were interested in in the course of your investigation
16   into the death of Julius Baumgardt?
17   **A**    Yes, sir, there was.
18   **Q**    What was that?
19   **A**    That was a red Chevy blazer which was recovered at
20   **the scene of that homicide.**
21   **Q**    Okay.  And what were you attempting to do with
22   respect to taking DNA from defendant on that day?
23   **A**    We had recovered some evidence from that vehicle.**
24   **The crime lab at the time had gone through that vehicle**
25   **and taken tape lifts of hair samples and other items that**

Stephanie Picozzi, OCR, RPR
Official Court Reporter

Zacarese - direct/Miskiewicz

1140

1    **were recovered and that had been stored in the laboratory**
2    **and we were looking to match anything up to what was**
3    **recovered from that car.**
4    **Q**    Did you tell the defendant that -- any of this?
5    **A**    No, sir.
6    **Q**    In your presence, did either Agent Schelhorn or
7    Detective Bazylewicz or Detective Costello say that to the
8    defendant?
9    **A**    No, sir, that would not have been done.**
10        MR. MISKIEWICZ:  Again, your Honor, we ask the
11   members of the jurors put on their headphones.
12        THE COURT:  If you would.
13        (Tape played)
14        (Tape stopped)
15   **Q**    Detective Zacarese, for the record, again, we have
16   heard a portion, about a minute long, starting at
17   approximately 4 minutes seven seconds into the tape.
18        We heard the reference to how long it had been,
19   six, coming up on seven years.  You went up to Willard
20   with Agent Schelhorn in July of 2000?
21   **A**    Yes, sir.
22   **Q**    And how many years had it been since the murder of
23   Julius Baumgardt?
24   **A**    That took place in June of 1994, so it would be six
25   **years one month.**

Stephanie Picozzi, OCR, RPR
Official Court Reporter

Zacarese - direct/Miskiewicz

1141

1    **Q**    Six years one month.
2         Did you tell the defendant that you were
3    investigating a matter that was -- a murder that was
4    six, a little over six years old at that point?
5    **A**    I didn't give the defendant any indication of what I**
6    **was investigating.**
7    **Q**    Before we put on the speakers, bear with me, I will
8    try to find the right place.
9         MR. MISKIEWICZ:  If the members of the jury can
10   put their headphones again, and for the record, I'm
11   beginning the tape 7 minutes 37 seconds into the
12   designated area.
13        (Tape played)
14        (Tape stopped)
15   **Q**    Did you make any reference to an investigation into a
16   security guard being killed as one of the reasons why you
17   were up at Willard that day in July 2000?
18   **A**    Absolutely not.**
19        MR. ROSEN:  Asked and answered three times.
20        THE COURT:  Overruled.
21   **A**    Absolutely not.**
22   **Q**    What about, the word Louie or Louis Dorval come out
23   of anybody's mouth?
24   **A**    No, sir.**
25   **Q**    From you or anybody else present?

Stephanie Picozzi, OCR, RPR
Official Court Reporter

Zacarese - direct/Miskiewicz

1142

1    **A**    No, sir.**
2         MR. MISKIEWICZ:  Again, I can queue it up before
3    we put it on the speakers.
4         Again, if the members of the jury can put on the
5    speakers (sic).
6         (Tape played)
7         (Tape stopped)
8    **Q**    Detective Zacarese, as part of your investigation
9    with the FBI at this time, did you at some point seek to
10   take DNA from an individual by the name of Scott Mulligan?
11   **A**    Yes, sir, I did.**
12   **Q**    Was that before or after you went to Willard?
13   **A**    I believe it was after.**
14   **Q**    Did you tell the defendant when you were up at
15   Willard that you were going to next take the DNA of
16   anybody by the name of Scott?
17   **A**    No, sir, absolutely not.**
18   **Q**    In your presence, did any members of the team with
19   you that day mention that they were also seeking to take
20   the DNA of Scott Mulligan?
21   **A**    No, sir.**
22   **Q**    There is a reference also in the portion of the tape
23   that we heard to a trunk, finger being squished on a
24   trunk.
25        Did you or Agent Schelhorn or anybody else in

Stephanie Picozzi, OCR, RPR
Official Court Reporter

Zacarese - direct/Miskiewicz

1143

1 your party say anything about the trunk that has been
2 moved into evidence as CW 1 -- sorry, CW 4?
3 **A   No, sir, we did not.**
4 **Q**   Any mention of Louis Dorval's murder?
5 **A   Not at all.**
6 **Q**   I would like to move on.
7      Detective Zacarese, have you had an opportunity
8 or occasion to study or review any of the exhibits,
9 specifically the phone records, that have been offered
10 into evidence in this case?
11 **A   Yes, sir, I have.**
12 **Q**   First of all, prior to your retirement, did you have
13 any duties in the Nassau County Police Department related
14 to either the acquisition of or analysis of telephone
15 records?
16 **A   Yes, sir, my prior assignments in the Police**
17 **Department included some tenure in the District Attorney's**
18 **office where I learned how to do phone record analysis.**
19 **Q**   Did you receive any training to do that?
20 **A   Yes, sir, I did.**
21 **Q**   From who?
22 **A   From AT&T, Bell Atlantic at the time, they no longer**
23 **exist, some people from Verizon, and I had an opportunity**
24 **to get some training directly from the research arm of**
25 **AT&T, Lucent Technology.  They had an office here on Long**

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

Zacarese - direct/Miskiewicz

1144

1 **Island.  I spent some time with them.**
2 **Q**   Have you done actual analysis of telephone records in
3 other homicide investigations in the past when you were --
4 prior to your retirement?
5 **A   Yes.  One other homicide investigation in the federal**
6 **system and one attempted murder case in the state system.**
7 **Q**   I will show you what has been received in evidence in
8 this matter, I will read them out for the record, but I'm
9 showing you what's been received in evidence as, among
10 others, VZ 1, SN 1, AT 1, AT 2, AT 3, VZ 2, VZ 3, VZ 4, VZ
11 5, 6, 7 and VW 2.
12      Showing you these, have you seen these records
13 prior to your testimony today?
14 **A   Yes.**
15 **Q**   Have you reviewed them?
16 **A   Yes, sir.**
17 **Q**   For what purpose have you reviewed those records?
18 **A   The records contained here are records specific to**
19 **certain phone numbers attached to this case with**
20 **principals named on those phone records as being part of**
21 **this case.**
22 **Q**   In anticipation of your testimony, were you asked to
23 prepare a summary of certain transactions that are
24 contained in those exhibits that I just read aloud?
25 **A   Yes, sir.**

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

Zacarese - direct/Miskiewicz

1145

1 **Q**   Have you done that?
2 **A   Yes, sir, I have.**
3 **Q**   In summary, what did -- did you base the summary on
4 the actual records or did you base them on something else?
5 **A   They are based on the actual records contained in the**
6 **subpoenaed documents.**
7 **Q**   I'm showing you what's been marked for identification
8 as AZ 1.  Do you recognize AZ 1?
9 **A   Yes, sir, I do.**
10 **Q**   What do you recognize AZ 1 to be?
11 **A   This is a compilation of the records that I prepared**
12 **consistent with what I found in the subpoenaed records and**
13 **compiled it into this report.**
14 **Q**   Does it include every transaction that's in those
15 records that we have read out a minute ago?
16 **A   No, sir.  These are specific records to specific**
17 **phone numbers on specific dates and specific time periods.**
18 **Q**   In summary fashion?
19 **A   Yes, sir.**
20      MR. MISKIEWICZ:  The government moves for the
21 admission of AZ 1.
22      MR. ROSEN:  Objection.  It does not --
23      THE COURT:  Come on up.
24      (Sidebar.)
25      THE COURT:  Mr. Rosen.

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

Zacarese - direct/Miskiewicz

1146

1      MR. ROSEN:  Is this coming in as an aid or as an
2 aid to the jury or an exhibit in evidence?  There is a
3 difference.
4      THE COURT:  I'm aware of the difference.  This
5 record is a compilation, as the witness has said, of
6 records that are already in evidence.  I would assume it's
7 coming in as an aid.
8      MR. MISKIEWICZ:  Yes.
9      THE COURT:  I will advise the jury they have to
10 base their view of the evidence and their determination on
11 what is in the subpoenaed records.  Those are in evidence.
12      But generally speaking, I allow charts to come
13 in when there is voluminous records which have been
14 summarized to the extent of the government's view of the
15 evidence.  If you have a different view of what these are,
16 you can put in your own charts.  I don't have a problem
17 with that.  You can put them in through this witness.
18      MR. ROSEN:  As long as the Court gives that
19 instruction to the jury, what you just said in regards to
20 that's the government's version that this is coming in
21 strictly as an aid, I have no problem, because this was
22 introduced as an exhibit, not as an aid.
23      THE COURT:  It will become an exhibit with the
24 cautionary instruction that it is based on documents
25 already in evidence.  It the government's view to assist

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

Zacarese - direct/Miskiewicz

1147

1  them.  They don't have to adopt it.  But it's an aid and
2  the Court finds that it will shorten the length of this
3  examination of this witness.  We don't need him to
4  recreate the chart in front of us by referring to all the
5  different items in here.  So that will be the instruction
6  the jury has.  It's totally appropriate.
7          MR. ROSEN:  Okay.
8          (Sidebar concluded.)
9          (In open court.)
10         THE COURT:  Ladies and gentlemen, this
11  particular exhibit is going to be admitted into evidence.
12  It is based on records that are already in evidence.  It
13  is the government's view of what these phone calls mean.
14         Therefore, in order to assist you and aid you in
15  eventually reaching a verdict in this case, you can look
16  at this particular exhibit, but you must find that what is
17  on the particular exhibit is in fact what is in the phone
18  records.  It has to be based on documents already in the
19  phone records.
20         So to that extent, I'm allowing it in as an
21  exhibit, but it's not necessarily the evidence in this
22  case.  You have to rely upon the phone records.  This is
23  to assist you and shorten the examination.  You may have a
24  different view of what these records represent, the whole
25  string of records that have been presented to you.

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

Zacarese - direct/Miskiewicz

1148

1          If would you, Mr. Miskiewicz.
2          MR. MISKIEWICZ:  Thank you, your Honor.
3  BY MR. MISKIEWICZ:
4  Q    Detective Zacarese, I'm showing you on the screen in
5  front of you what is now in evidence as AZ 1.  Did you
6  prepare this chart?
7  A    Yes, sir, I did.
8  Q    You prepared it using the phone records that are in
9  evidence, the ones that I read out loud before?
10 A    **Yes, sir.  The object was to take the phone records**
11 **and look for certain comparison indicators in the phone**
12 **records and then compile a chart from that.**
13 Q    So just to orient the jury, the left-hand column has
14 the date and the first one there on the upper left is
15 7/25/03.
16        Do you see that?
17 A    Yes, sir.
18 Q    Now, was that all of the calls for that particular
19 caller on that day or you just selected one?
20 A    **On that day, that's, this particular call was**
21 **pertinent.**
22 Q    There are arrows --
23        MR. ROSEN:  I didn't quite get that, was what?
24        THE WITNESS:  That particular call was
25 pertinent.

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

Zacarese - direct/Miskiewicz

1149

1          MR. ROSEN:  That is the witness' --
2          THE COURT:  I'm allowing the witness to testify,
3  let him complete and he can use that answer and you can
4  cross-examine him on that phrase.
5          MR. ROSEN:  That word, pertinent.
6          THE COURT:  You certainly can, sir.
7          Please complete your answer, Mr. Zacarese.
8  Q    Did you conclude your answer?
9  A    Yes, sir.
10 Q    There are arrows in the middle.  What do they
11 represent?
12 A    **That's the direction of the call.**
13 Q    So based on your training and your looking at the
14 actual exhibits, you are able to determine who is calling
15 whom?
16 A    Yes, sir.
17 Q    In some instances, did you have, let's say, two
18 different or multiple records from different phones or
19 different phone companies overlapping on a particular
20 transaction?
21 A    **That takes a little explaining.  The phone companies**
22 **themselves, whether they be landline or cellular**
23 **companies, each have unique characteristics and the way**
24 **they do their bookkeeping for their phone records.**
25        **The ideal situation, even if you have the same**

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

Zacarese - direct/Miskiewicz

1150

1  company, when you are looking at two separate individual
2  phone records, for example, two cell phones from the same
3  company or two landlines from the same company, depending
4  on the type of records that you obtain, whether they be
5  call detail records of the calls on that individual phone
6  or what we call a dump of the switch information contained
7  for that phone, very often you will find that you will get
8  the outgoing call from one phone being recorded as an
9  incoming call on the other phone that's being called.
10        So you can do a comparison and see both sides of
11 the transaction.
12 Q    Okay.
13        What is a dump?
14 A    **Without making it really technical, the switching**
15 **network that most of the phone companies go through**
16 **handles all the traffic of the phones going to and from**
17 **locations.  That information needs to be maintained by the**
18 **phone company because they get paid by the call, or by the**
19 **minute, or by the second, however they decide to do their**
20 **business.  And that information has to be downloaded**
21 **periodically to the company in order to do the billing**
22 **records.**
23        **So a dump would be the actual switching network,**
24 **when you do a search for the switch, you describe what you**
25 **are looking for and, again, varying companies handle the**

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

Zacarese - direct/Miskiewicz

1151

1 information and how long it's maintained in different
2 ways. Some last three months, some used to last six
3 months in the switching network where they could go back
4 six months and get records of particular transactions you
5 were looking for. That would be the switching network.
6 Q   Okay.
7       When I get my bill in the mail from the phone
8 company, and there are phone numbers on there, is that a
9 dump?
10 A   No, sir, that's your call detail. That's the
11 individual call detail that's produced for the billing
12 records.
13 Q   So what's the difference in the information that's
14 provided in a dump versus what I get in the mail?
15 A   A dump generally provides more information for the
16 phone company to accurately track their phone records,
17 considering that especially when you are going from one
18 carrier to another, or from a cell phone company through
19 the switching network of a landline company, you are
20 calling a regular house phone as opposed to another cell
21 phone.
22 Q   What additional piece of information do you get out
23 of the dump that you don't get out of just, you know, your
24 cell phone bill, your phone bill?
25 A   There is a higher degree of accuracy in the dump on

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

Zacarese - direct/Miskiewicz

1152

1 the time allotment. They split down, I think in some
2 cases to hundred thousandth of a second in some cases.
3 There are inbound and outbound call records are defined
4 better than your call at home, for example, on your bill.
5 It doesn't tell you which way it's going.
6 Q   Do you get both inbound and outbound calls on a dump?
7 A   Yes, sir.
8 Q   You don't get that in your monthly bill?
9 A   Depending on the phone company, some people, if you
10 so desire, I guess you can ask the phone company to give
11 you that information. I know my bill doesn't have it.
12 Q   All right.
13       Back to AZ 1. What you have depicted here, just
14 in general, what is it that -- the first several
15 transactions, what do you indicate here on July 25, July
16 30, July 31, August 1 of '03, what do you depict?
17 A   Those are records we analyzed and looked at for the
18 Gargiulo cell phone number that was listed in the case.
19 Made phone calls from his cell phone to Agent Schelhorn's
20 phone on those dates and times for that duration.
21 Q   Sir, in this case, the Gargiulo phone that you are
22 referring to, was that in Vincent Gargiulo's name or in
23 somebody else's name?
24 A   I believe it was in Mr. Matulis' name.
25 Q   Let's jump to the next transaction, August 4, 2003 at

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

Zacarese - direct/Miskiewicz

1153

1 11:59. What did you find there?
2 A   We found a transaction of the Bressman cell phone
3 records, calling the Gargiulo cell which lasted for 4.11
4 minutes.
5 Q   Again, this is based on the actual records?
6 A   These are the actual phone company records, yes, sir.
7 Q   Again, for clarity, this isn't the only phone call on
8 that day for the Gargiulo cell -- or the Bressman cell?
9 A   No, there were other cells. We were only looking for
10 connections that we were interested in.
11 Q   Jumping down to the last date there, August 8, 2003,
12 specifically starting at 2:18:10, for the record, who is
13 calling whom here?
14 A   At 2:18:10, we have Bressman's cell calling
15 Gargiulo's cell. At 2:18:31, we have another call from
16 the Bressman cell to the Gargiulo cell.
17 Q   The first call was only 15 seconds, according to the
18 records you looked at?
19 A   Yes, sir. And the next call was 1:37, one minute 37
20 seconds.
21 Q   At 3:13 p.m., what happens?
22 A   At 3:13 p.m., we have calls going -- doesn't
23 represent the reverse, but this time it's Gargiulo's cell
24 calling the Bressman cell, and the same thing for the next
25 phone call at 5:00 p.m.

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

Zacarese - direct/Miskiewicz

1154

1 Q   At 5:00 p.m., there is a call going between the
2 Gargiulo cell and the Bressman cell, is that what you saw?
3 A   At 5:00 p.m.?
4 Q   At 5:00 p.m.
5 A   Yes, the Gargiulo cell calls the Bressman cell phone,
6 at which call lasted 1.06.
7 Q   And then at 5:06, what happens?
8 A   At 5:06, on that same date, the Bressman cell phone
9 calls the cell phone listed for Tarantino and that call
10 lasts for ten seconds.
11 Q   Were there any other calls between Bressman and
12 Tarantino phone on that day?
13 A   Later on that evening, at 7:18 p.m., the Tarantino
14 cell phone calls the Bressman cell phone, and that call
15 lasted for one minute and 47 seconds.
16 Q   Sir, I want to show you what's been received in
17 evidence as Government's Exhibit SN 1. There is a
18 stipulation in evidence that the number 646-739-3560 was
19 in 2003 used by the defendant in this case. This first
20 page of the record has what name as the user name?
21 A   Andrew Levine, David Palau, and I believe in the
22 header of that page attached to care of Synergy Fitness or
23 Synergy gyms.
24 Q   Is that what you are referring to (indicating) --
25 A   Yes, sir.

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

Zacarese - direct/Miskiewicz

1155

1  Q   -- this number, 646-739-3560, is that what you are in
2  your summary chart referring to as the Tarantino cell?
3  A   Yes, sir.
4  Q   So even though it says Andrew Levine, David Palau,
5  care of Synergy Fitness as the billing name and account
6  billing name, that is the number, for purposes of your
7  analysis, that is referred to throughout the summary chart
8  as defendant's?
9  A   Yes, sir.
10  Q   I will show you the next page of SN 1.  Is this page
11  of the actual phone company records that you retained and
12  analyzed for preparation of this summary chart?
13  A   Yes, this is the page that was produced by Sprint
14  NEXTEL on those records for that phone number.
15  Q   Just briefly, on left-hand column under customer PTN,
16  that's the phone number?
17  A   That is the phone number, yes, sir.
18  Q   Is the date --
19  A   The date is designated by the date of the month, then
20  the month spelled out or abbreviated and then the year,
21  '03.
22  Q   It has call initiation?
23  A   The call initiation time is the time the call
24  actually starts, and it's done in military time.
25  Q   Military time, that is 0 to 2400 hours?

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

Zacarese - direct/Miskiewicz

1156

1  A   0 meaning 3 in this case, 3:00 in the morning.  3:00
2  in the afternoon would be 1500.
3  Q   And then under the column time, that's what, the
4  duration, or what is that?
5  A   In this particular case, this company breaks it out
6  in seconds and then divides the seconds down into minutes
7  and decimal of minutes.
8  Q   And then what is this, says outbound?
9  A   That means the call was an outbound call from this
10  particular phone going to the number that is following the
11  inbound or outbound designation.
12  Q   So outbound to this 212 number?
13  A   On the first line of the report, it would be outbound
14  from Mr. Tarantino's cell phone number to that 212 number.
15  Q   And then elsewhere we see the word inbound but
16  basically the information is the same, but in that
17  instance the line refers to an inbound call?
18  A   That phone number on the end was calling into the
19  defendant's cell phone.
20  Q   Is this a dump?
21  A   Yes, sir.
22  Q   Or an example of a dump.
23     Back to the second page of SZ 1, is the format
24  the same?
25  A   Yes, sir, basically the format remains the same,

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

Zacarese - direct/Miskiewicz

1157

1  obviously the information on it continues going to the
2  calendar date on the left-hand side, we continue with the
3  calendar date.
4  Q   So on August 9, did you find a call between the
5  defendant's cell phone and the Bressman cell phone?
6  A   Yes, sir, at 11:48 p.m., the Tarantino cell phone
7  called the Bressman cell phone, and that call lasted 16
8  seconds.
9  Q   There was similar contact between those two phones on
10  August 10, is that correct?
11  A   Yes, sir.  In that case, on August 10, there is one
12  call, each going in each direction.
13  Q   Jumping to August 15, 2003, Friday, did you find a
14  call from Vincent Gargiulo to Special Agent Schelhorn in
15  that evening?
16  A   Yes, at 7:06 p.m.
17  Q   At 7:16 p.m. on August 15, any other phone calls that
18  you found that you analyzed and summarized on this chart?
19  A   Can you say that again?
20  Q   Any other phone call on August 15 that you summarized
21  on this chart?
22  A   On the 15th at 7:16 p.m., we found a phone call
23  originating on the Tarantino cell going to the Bressman
24  cell for 0 minutes and seconds.
25  Q   I want to focus your attention on the last

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

Zacarese - direct/Miskiewicz

1158

1  transaction on this summary, August 16, 2003, Saturday, a
2  little after midnight.  Did you have the records of the
3  Leshawn Campbell apartment?
4  A   Yes, sir.
5  Q   Previously showing you what's in evidence as VZ 1,
6  the first page of that.
7  A   That's the subscriber information from Verizon, yes,
8  sir.
9  Q   There is a call for 0 seconds to Martin Matulis'
10  cell.  Is that a different cell in the name of Martin
11  Matulis or is that the Vincent Gargiulo cell phone?
12  A   I would have to go back and look at the index, but I
13  think that's a different number.
14  Q   We will come back to that later.
15     12:18 a.m., what did you find in your analysis
16  of the records?
17  A   From that apartment phone number listed on that
18  subscriber information, the Leshawn Campbell phone, that
19  phone made a call at 12:18 a.m. on the 16th and spoke for
20  three minutes and five seconds for the Tarantino cell.
21  Q   You heard testimony earlier today questioning about
22  how long that phone call took place, or whether or not it
23  was of any length of time in that phone call.
24     Fair to say the Leshawn Campbell VZ 1 records,
25  the way this company kept the records, didn't tell you how

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

Zacarese - direct/Miskiewicz

1159

1 long that phone call was, correct?

2 **A    On the call detail in that phone company's records,**

3 **no, they do not.**

4 **Q    How do you know it was 3 minutes and -- 3.-- 3.05**

5 minutes?

6 **A    In this case, we go to the other phone and look for**

7 **the dump of the Tarantino cell, which is more explicit**

8 **than the Verizon records.  In those records, it shows that**

9 **call lasted 3.05 minutes.**

10 **Q    Are you talking about this Andrew Levine, David**

11 Palau, for which there is a stipulation?

12 **A    Yes, sir.**

13 **Q    The defendant's phone?**

14 **A    The defendant's phone.**

15 **Q    SN 1?**

16 **A    SN 1, which stands for Sprint NEXTEL.**

17 **Q    I'm showing you a page listed -- I will show you one**

18 of the pages from that and ask you to tell us what you

19 see, or what is it here that told you that that phone call

20 from the Leshawn Campbell apartment shortly after midnight

21 Saturday lasted three minutes plus.

22        Do you see that phone call?

23 **A    Yes, sir.  It's on the top of the two highlighted**

24 **lines in that report, August 16, it shows at 18 minutes**

25 **after midnight --**

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

---

Zacarese - direct/Miskiewicz

1160

1 **Q    Let me put my pen there.  Is this what we are talking**

2 about (indicating)?

3 **A    Yes, sir.  We have an inbound call to Mr. Tarantino's**

4 **cell phone that lasts for 3.08 minutes.**

5 **Q    That's the 3.08 minutes?**

6 **A    Yes, sir, just in front of the word inbound.**

7 **Q    This is Leshawn Campbell's number?**

8 **A    Yes, sir, that's the phone number on the Verizon**

9 **records for Leshawn Campbell.**

10 **Q    This is the defendant's number, 646-739-3560?**

11 **A    Yes, sir.**

12 **Q    How do we know the time of day this phone call**

13 occurred?

14 **A    Right after 15 August '03.**

15 **Q    15 August?**

16 **A    Sorry, 16, 16 August '03, there are the numbers 0:18,**

17 **and that represents 18 minutes after midnight.**

18        MR. MISKIEWICZ:  Your Honor, I'm about to get

19 into another area.

20        THE COURT:  Now is a good time for us to break.

21        Ladies and gentlemen, don't talk about the case.

22 I will see you folks at 2:00.

23        (A recess was taken.)

24        THE COURT:  Mr. Rosen, we are going forward with

25 this hearing?

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

---

M. Mulligan (jury absent)

1161

1        MR. ROSEN:  Yes.

2        Mr. Flynn, you may inquire.

3        MR. FLYNN:  May I have one moment, your Honor?

4        THE COURT:  Yes.

5        (Pause)

6

7 **M A N O N   M U L L I G A N,**

8        having been duly sworn

9        was examined and testified as follows:

10

11        THE CLERK:  State your name for the record,

12 please.

13        THE WITNESS:  Manon Mulligan, M.A.N.O.N.,

14 M.U.L.L.I.G.A.N.

15        THE COURT:  You may inquire.

16 DIRECT EXAMINATION

17 BY MR. FLYNN:

18 **Q    Afternoon, Ms. Mulligan.**

19 **A    Afternoon.**

20 **Q    How are you?**

21 **A    I'm good.**

22 **Q    Are you appearing here today pursuant to a subpoena**

23 that's been issued to you by my office, the United States

24 Attorney's office?

25 **A    Yes, I am.**

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

---

M. Mulligan (jury absent)

1162

1 **Q    For the record, what country were you born in?**

2 **A    In Canada.**

3 **Q    What region of Canada?**

4 **A    Quebec City.**

5 **Q    What is your native language?**

6 **A    French Canadian.**

7 **Q    Are you a United States citizen?**

8 **A    Yes, I am.**

9 **Q    Are you fluent in English?**

10 **A    Yes.**

11 **Q    But is that your native language?**

12 **A    No, French is.**

13 **Q    Sorry?**

14 **A    French is.**

15 **Q    Are you married to an individual by the name of Scott**

16 Mulligan?

17 **A    Yes, I am.**

18 **Q    Is your husband currently incarcerated?**

19 **A    Yes, he is.**

20 **Q    Was your husband previously incarcerated in 2003 and**

21 2004?

22 **A    Yes, he was.**

23 **Q    What was he incarcerated for in 2003 and 2004?**

24        MR. ROSEN:  Objection, relevance.

25        THE COURT:  Overruled.

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

M. Mulligan (jury absent)

1163

1   A   Conspiracy of selling marijuana.
2   Q   Where did he serve his prison term for that crime
3   throughout the year of 2003 and 2004?
4   A   In Massachusetts.
5   Q   When did Mr. Mulligan, Scott, report to federal
6   prison in Massachusetts specifically?
7   A   In January.
8   Q   Of what year?
9   A   Of 2003.
10  Q   And after he reported to prison on January 3 of 2003
11  in Massachusetts, did you leave the country for a period
12  of time?
13  A   Yes, I did.
14  Q   Where did you go?
15  A   Costa Rica.
16  Q   Did you go visit your family after he reported to
17  prison?
18  A   Yes, I did.
19  Q   Where does your family live?
20  A   In Quebec City, Canada.
21  Q   After Scott left to go to prison in January of 2003,
22  where did you go?
23  A   To Quebec City.
24  Q   For what reason?
25  A   To visit my family.

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

M. Mulligan (jury absent)

1164

1   Q   Okay.
2       Who did you go with?
3   A   My mother and my son.
4       MR. FLYNN:  Your Honor, may I approach?
5       THE COURT:  Yes.
6       MR. FLYNN:  Thank you.
7   Q   Ms. Mulligan, I handed you a physical exhibit which
8   has been marked for identification in this trial as
9   Government's Exhibit MM, for Manon Mulligan, 1.  Take a
10  minute to look at that.  Read through it, if you would
11  like.
12  A   Yes.
13  Q   Do you recognize that document?
14  A   Yes, it's my passport.
15  Q   What country issued you that passport?
16  A   Canada.
17  Q   Referring to the inside, what year was it issued to
18  you?
19  A   It was issued in 1997.
20  Q   Is it still current?
21  A   No, it's not.
22  Q   When did it expire?
23  A   2002.
24      MR. FLYNN:  Your Honor, the United States moves
25  for the admission of this passport for the purposes of the

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

M. Mulligan (jury absent)

1165

1   hearing.
2       THE COURT:  Any objection?
3       MR. ROSEN:  Yes.  If it expired in 2002 and the
4   events took place in 2003, what is the relevance?
5       THE COURT:  All right.
6       MR. ROSEN:  She went to Canada in 2003, she
7   didn't have a passport.  I don't know the purpose of any
8   of this based upon the fact we are supposed to be dealing
9   with Mr. Frocaro, Mr. Pellegrino.
10      THE COURT:  We are not dealing with any of these
11  people.  This is an offer of proof on the authentication
12  issue.  We are not dealing with that at this point in
13  time, maybe on appeal, but it's not being dealt with now.
14  What's the relevance of this passport?
15      MR. FLYNN:  To set a foundation for when she
16  left the country and when she returned from Quebec.  There
17  are stamps in the passport that indicate she returned from
18  her trip out of the country on January 22, 2003.
19      THE COURT:  You have stamps from 2003?
20      MR. FLYNN:  I do, your Honor.
21      THE COURT:  Then I will allow it to come in on
22  that basis only.
23      (Government Exhibit MM 1 received in evidence.)
24      MR. FLYNN:  Thank you, your Honor.
25  BY MR. FLYNN:

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

M. Mulligan (jury absent)

1166

1   Q   Ms. Mulligan, I ask you to turn to page 10 of the
2   passport.
3   A   Yes.
4   Q   Okay.
5       MR. ROSEN:  Judge, can I see the document?
6       THE COURT:  Sure.  Show it to counsel.
7       MR. FLYNN:  Certainly.
8   Q   Ms. Mulligan, your passport is now in evidence.  It's
9   been marked and admitted as Government's Exhibit MM 1.  I
10  have directed your attention to page 10 of your passport.
11  That's the number that's actually written on the passport.
12  Each page is individually stamped.
13      Do you -- it is now appearing on the screen in
14  the courtroom as well and on the monitors.  Do you see a
15  marking on your passport on that page, page 10, which
16  reflects your trip to Quebec after your husband left for
17  prison?
18  A   Yes.
19  Q   Would you identify what that stamp looks like?
20  A   It's a black stamp.  It's a stamp on January 14, 2003
21  entering Canada, Quebec City.
22  Q   And the writing on that black stamp indicates it was
23  issued, looks like from Customs in Quebec, Canada?
24  A   Yes.
25  Q   It's dated January 14, 2003, is that correct?

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

M. Mulligan (jury absent)

1167

1  A  Yes.

2  Q  Does that comport with your recollection as to when

3  you left for Canada to visit your family after Scott was,

4  or after Scott reported to federal prison in Massachusetts

5  in 2003?

6  A  Yes.

7  Q  Do you see a corresponding stamp on that page, same

8  page, reflects your return to the United States from

9  Quebec City in 2003?

10  A  Yes.

11  Q  That stamp is a little bit difficult to make out as

12  it appears on the screens in courtroom.  But can you read

13  the date on the booklet you have in front of you?

14  A  Yes, I can.

15  Q  For the record, I'm referring to the red stamp which

16  overlaps in part the Quebec, black Quebec stamp, am I

17  correct?

18  A  Yes.

19  Q  What's the date of the stamp?

20  A  January 22, 2003.

21  Q  Does that date, January 22, 2003 comport with your

22  recollection as to when you returned to the United States

23  from Canada after your trip following your husband's

24  reporting to prison?

25  A  Yes.

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

---

M. Mulligan (jury absent)

1169

1  A  There was a white envelope with a typed address on

2  it.

3  Q  Whose address -- withdrawn.

4      What did the envelope physically look like?

5  A  It was about 4-by-6, white, and it was typed in

6  black.

7  Q  What was typed on the outside of the envelope?

8  A  It was Scott Mulligan to our address.

9  Q  The letter was addressed to your husband?

10  A  Yes.

11  Q  At your home, 4 Joseph Court in Bellmore?

12  A  Yes.

13  Q  Did you notice a postmark?

14  A  No.

15  Q  Did you notice a return address?

16  A  No.

17  Q  Did you open the envelope?

18  A  Yes, I did.

19  Q  Where in the house were you standing when you opened

20  the envelope?

21  A  I was downstairs in the living room.

22  Q  Was anyone with you at the time?

23  A  Yes.

24  Q  Who?

25  A  My mother and my son.

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

---

M. Mulligan (jury absent)

1168

1  Q  How did you -- by what means of transportation did

2  you return to the United States?

3  A  I took a car service.

4  Q  How did you first get into the country from Quebec?

5  A  Airplane.

6  Q  Where did you land?

7  A  I landed in Newark, New Jersey.

8  Q  From the Newark Airport, where did you go on January

9  22, 2003?

10  A  I went to my home in Bellmore, Long Island.

11  Q  Is that where you were living at the time, Bellmore?

12  A  Yes.

13  Q  Is that where your husband Scott had lived prior to

14  his reporting to prison 19 days earlier?

15  A  Yes.

16  Q  When you got home from the airport that day after

17  spending roughly eight days in Canada, what did you do?

18  A  I opened my mail.

19  Q  Where did you open your mail?

20  A  Downstairs in my living room.

21  Q  Was there anything included in the mail that had

22  accumulated over the eight days you were out of the

23  country that caused you concern?

24  Q  What did you find?

25  Q  What did you find?

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

---

M. Mulligan (jury absent)

1170

1  Q  How old -- what's your son's name?

2  A  Ty.

3  Q  How old was Ty at the time?

4  A  Ty was about eight months.

5  Q  What was inside the envelope?

6  A  There was a letter.

7  Q  How many pieces of paper?

8  A  One.

9  Q  What size was the piece of paper, if you can recall?

10  A  Like 5-by-7, about.

11  Q  What color was the paper?

12  A  White.

13  Q  Was the letter handwritten?

14  A  No, it was typed also.

15  Q  Was it signed?

16  A  No.

17  Q  So it was anonymous essentially?

18  A  Yes.

19  Q  How long was the letter?

20  A  Maybe two paragraphs, half a page.

21  Q  Did you read the letter?

22  A  Yes, I did.

23  Q  In sum and substance, what did the letter say?

24  A  It said that whoever wrote the letter had requested a

25  ransom of 500,000 in exchange of a tape that he had.

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

M. Mulligan (jury absent)

1171

1  Q    When you use the word ransom, did the letter contain
2  a demand essentially for $500,000?
3  A    Yes.
4  Q    It referenced a tape.  Did the letter, as you read it
5  and as you recall, did it say what was on this tape?
6  A    **It said that it was previous criminal crimes that**
7  **they have done.**
8  Q    Who did you -- based on your reading of the letter on
9  January 22, 2003, who did you -- whose crimes did you
10 understand the letter to be referring to?
11 A    **Chris Tarantino and my husband Scott Mulligan.**
12 Q    Did the letter say anything about what would happen
13 if money was not paid to the author?
14 A    **That he would return the tape to the FBI.**
15 Q    Did it say anything else?
16 A    **Yes, there was a deadline.**
17 Q    Did the letter say -- to the best of your
18 recollection, did the letter say anything about what would
19 happen if somebody happened to the author of the letter?
20 A    **That somebody else had a copy of the tape as well.**
21 Q    And?
22 A    **And whoever had it would return it to the FBI if**
23 **something would happen to him.**
24 Q    Was there something about the letter that caused you
25 particular concern and caused you particular anxiety?

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

---

M. Mulligan (jury absent)

1172

1  A    **Yes, the deadline.**
2  Q    What deadline?
3  A    **There was a date that if he didn't get the money by**
4  **that date, that he would turn the tape in but the date had**
5  **passed.**
6  Q    Sorry?
7  A    **The date had passed when I got home and opened the**
8  **envelope, and I read the letter, I noticed that the date**
9  **was already passed, that I was actually in Canada when**
10 **that happened.**
11 Q    So if I understand you correctly, there was a
12 deadline in the letter that indicated that if the money
13 was not paid, the tape would be turned over to the FBI?
14 A    **Yes.**
15 Q    If I understand your testimony correctly, you were
16 concerned because that date had already passed?
17 A    **Yes.**
18 Q    Because -- were you -- had you been in Canada for
19 over a week prior?
20 A    **Yes.**
21 Q    Were you scared at this point?
22 A    **Yes, I was.**
23 Q    Why?
24 A    **Because I was alone with my son at home and my**
25 **mother.**

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

---

M. Mulligan (jury absent)

1173

1  Q    As you read the letter, did you have an understanding
2  as to who had written it?
3  A    **Yes.**
4  Q    Who?
5  A    **Vinnie Gargiulo.**
6  Q    Had something occurred prior to Scott reporting for
7  prison which caused you to believe that the letter had
8  been written by Vinnie?
9  A    **Yes.**
10 Q    What?
11 A    **One night we went out for dinner, we got home, I**
12 **checked the messages and there was a message on the**
13 **answering service.**
14 Q    Were you and your husband physically home when this
15 message had been left on your answering machine?
16 A    **No.**
17 Q    Again, where were you?
18 A    **We were out to dinner.**
19 Q    When you came home from dinner, who played the
20 message?
21 A    **I did.**
22 Q    Did your husband also hear it?
23 A    **Yes.**
24 Q    And on the message, what did you hear?
25 A    **I heard somebody rambling and screaming.  It was hard**

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

---

M. Mulligan (jury absent)

1174

1  **to make up what he was saying, but I heard something like**
2  **stop talking about me or I will go kill you, and the rest**
3  **was just screaming.**
4  Q    After that message was left, did you subsequently
5  come to understand that Mr. Gargiulo had left it?
6  A    **No, not that night.**
7  Q    But did you subsequently, after the message was left,
8  come to understand that Vinnie had left it?
9  A    **Yes.**
10 Q    Going back to January 22, 2003, the day you returned
11 from Quebec and read the letter and became scared because
12 the deadline in the letter passed, did you call anyone?
13 A    **Yes, I did.**
14 Q    Who did you call?
15 A    **I called my friend Keith Pellegrino.**
16 Q    Is he a friend of yours -- was he a friend of yours
17 in 2003?
18 A    **Yes.**
19 Q    Was he a friend of your husband's in 2003?
20 A    **Yes.**
21 Q    Did you understand him to be a friend of the
22 defendant's in 2003?
23 A    **Yes.**
24 Q    Is Mr. Pellegrino also a business partner and owner
25 of certain Synergy gyms on Long Island?

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

1  A   Yes.
2  Q   How soon after you read this threatening letter did
3  you call Mr. Keith Pellegrino?
4  A   Right away.
5  Q   What did you say to him?
6  A   I said that I got something weird in the mail and he
7  said okay, I will come over.
8  Q   Did you subsequently see Mr. Pellegrino that day?
9  A   Yes.
10 Q   Where?
11 A   At my house.
12 Q   The same day, January 22, 2003?
13 A   Yes.
14 Q   Did you give Mr. Pellegrino anything when he arrived?
15 A   I gave him the letter.
16 Q   Did he read it in your presence?
17 A   Yes, he did.
18 Q   After he read the letter, what did Mr. Pellegrino say
19 to you?
20 A   He said that he would give it to the attorney and he
21 said don't tell Scott, let's just give it to the attorney
22 first before you tell him anything.
23 Q   When he said the attorney, who did you understand him
24 to be referring to?
25 A   James Frocaro.

1  June vacation?
2       THE COURT:  June vacation where?
3       MR. ROSEN:  To Canada.
4       THE COURT:  What year?
5       MR. ROSEN:  2003.
6       THE COURT:  June of 2003, all right.
7  Q   Do you remember that conversation you had with your
8  husband?
9  A   No.
10 Q   About the letter?
11 A   No.
12 Q   In January of this year?
13 A   No.
14 Q   If I played it, would it help you refresh your
15 recollection of what you said to him and what he said to
16 you about the letter?
17 A   Yes, but I never said anything.
18 Q   Did you tell him you didn't remember when you got the
19 letter?
20 A   No.
21 Q   You didn't remember exactly what was in the letter?
22 A   No.
23 Q   Before I play the tape, tell me what was in the
24 letter that you read?  What was the date on the letter?
25 A   I don't remember the date.

1  Q   Did Mr. Frocaro represent your husband in January of
2  2003?
3  A   Yes.
4  Q   Did Mr. Pellegrino leave with the letter that day?
5  A   Yes.
6  Q   Have you ever seen that letter again?
7  A   No.
8       MR. FLYNN:  No further questions, your Honor.
9       THE COURT:  Any questions?
10 CROSS-EXAMINATION
11 BY MR. ROSEN:
12 Q   Mrs. Mulligan, you have conversed with your husband,
13 have you not, since he has been in jail since December of
14 2011 on the telephone?
15 A   Yes.
16 Q   I have subpoenaed those phone calls and I have your
17 calls with you and your husband.
18 A   Okay.
19 Q   I just want you to know that.
20      Did you receive the letter after you came back
21 from your June vacation in Canada or your January vacation
22 in Canada?
23 A   My January vacation.
24 Q   Did anything happen in June in regards to the letter,
25 the tape or anything else after you came back from your

1  Q   You testified that the date had already expired for
2  the demand, correct?
3  A   Yes, but it was no date on the top of the letter.
4  Q   What was the date for the demand in the letter?
5  A   I don't remember the exact date, but I remember it
6  was passed, January 22.
7  Q   Do you remember the date of the demand?
8  A   No, I don't.
9  Q   So that's one portion of the letter that you don't
10 remember, correct?
11 A   That's correct.
12 Q   We know that the letter was signed by Vincent
13 Gargiulo?
14 A   It was not signed.
15 Q   It was not signed?
16 A   No.
17 Q   What was in the letter that you determined that
18 Vincent Gargiulo had sent it to you?
19 A   Well, I just had a call prior to that threatening my
20 husband, and I knew that he had some mental problem and
21 drug problem, so it was pretty clear when I read the
22 letter that it was from Vinnie.
23 Q   So you had received a message on your landline phone?
24 A   Yes.
25 Q   And this is before your husband went to Devons,

1  correct?

2  A  Yes.

3  Q  So your husband would have heard that, correct?

4  A  Yes.

5  Q  Because you played it together?

6  A  No, I played it first and I let him listen after.

7  Q  And you were there when he heard it?

8  A  Yes.

9  Q  Then the letter comes to you shortly thereafter, is

10 that what you are testifying under oath today, that's what

11 happened, the sequence?

12 A  I received the letter when I got home and I opened my

13 mail. It was already at my house when I arrived on

14 January 22 from Canada.

15 Q  What was the date that you had received the message

16 on the phone from Vincent Gargiulo?

17 A  I don't remember the date. I know it was about

18 November, December of '02.

19 Q  Did you save the message?

20 A  No.

21 Q  Did Mr. Pellegrino hear the message?

22 A  No.

23 Q  Did Mr. Tarantino hear the message?

24 A  Yes, he did.

25 Q  And when did you play that for him?

1  Q  You are testifying under oath that you did not know

2  it was Vincent Gargiulo who was on the phone?

3  A  No, I didn't know.

4  Q  The letter was not signed. You don't remember the

5  demand date. And there was no date on the letter itself,

6  correct?

7  A  No.

8  Q  Was the letter more than one page?

9  A  No, it wasn't.

10 Q  Was it handwritten or typed?

11 A  It was typed.

12 Q  And tell us, to the best of your recollection, what

13 was on the letter?

14 A  There was mention of a tape.

15 Q  Tell us what was said about the tape on the letter.

16 A  The tape said that he said that he had a tape that

17 had prior crime, criminal crime that they have done, and

18 if he didn't get 500,000 by a certain date, that he would

19 return the tape to the FBI, and if he was for some reason

20 he would disappear, somebody else had a copy of that tape

21 and they would give it to the FBI.

22 Q  What else did it say?

23 A  That's it.

24 Q  Did it mention your husband by name?

25 A  I don't recall.

1  A  I didn't play that. My husband played the message

2  for him and I was not present at that time.

3  Q  Who told you? Who told you that Scott Mulligan

4  played Vincent Gargiulo's message for Christian Tarantino?

5  A  My husband.

6  Q  And when did he tell you that? He went to Devon's

7  January 3. So he would have had to have told him about it

8  sometime between when he got the message, he heard the

9  message and then played it for Mr. Tarantino. When would

10 that be?

11 A  The next day.

12 Q  So sometime in November, December of 2002, your

13 husband told you he played that message for Mr. Tarantino?

14 A  Yes, and he told me because I wanted to know who left

15 that message, because I had no clue.

16 Q  You didn't know Vincent Gargiulo?

17 A  I knew him, but I didn't know it was his voice.

18 Q  How long had you known Vincent Gargiulo prior to you

19 receiving this message?

20 A  I met Vinnie in 1994.

21 Q  So we are talking about December of '02. That's

22 eight years?

23 A  Yes. When somebody is screaming on the phone and

24 doesn't make any sense or they are on drugs, sometimes you

25 can't make sense of who is talking.

1  Q  Did it mention Mr. Tarantino by name?

2  A  I don't recall.

3  Q  Did it mention the prior crimes that were involved?

4  A  No.

5  Q  So you remember ten words of a letter?

6        MR. FLYNN: Objection.

7        THE COURT: Sustained.

8  A  The letter was not that long.

9        THE COURT: No, you don't answer it. Next

10 question.

11        MR. ROSEN: Can I have a moment, Judge?

12        THE COURT: Yes.

13        MR. ROSEN: Judge, we are going to play two

14 portions of two different phone calls that Mrs. Mulligan

15 had with her husband where her husband is helping her make

16 recollections of her testimony here today.

17        THE COURT: Okay. Have you provided the

18 government with any copies of these phone conversations?

19        MR. ROSEN: I have. I have given them the same

20 disks that I got from GEO.

21        MR. FLYNN: For the record, we received seven

22 compact disks that contain hundreds of calls. We got them

23 two days ago. We haven't been able to listen to the

24 entirety of the disks, but they are in our physical

25 possession.

1290

Mulligan - cross/Rosen
1183

1    THE COURT:  Do you want to identify what
2  portion?  Then I will break for a while.  I don't see us
3  getting done with this witness today if we are going to
4  continue the trial, and I'm not going to interrupt the
5  trial to continue this hearing.
6    So identify what tapes you are talking about.
7  You intend to play one tape -- one tape or two, you are
8  holding up your fingers.
9    MR. ROSEN:  We have two CDs, we will stick with
10  one CD with two phone calls that will last probably a
11  total of five minutes, six minutes.
12    MR. FLYNN:  Just play it now.
13    THE COURT:  Play it now then.  I didn't know how
14  long they were.
15    MR. ROSEN:  We will try to keep it...
16    THE COURT:  Play it now.
17    (Continued on the next page.)
18
19
20
21
22
23
24
25

Stephanie Picozzi, OCR, RPR
Official Court Reporter

---

M. Mulligan-Cross/Rosen (Jury Absent)
1185

1  replay.  But at this point in time, are you going to be
2  much longer?  Because I will have the witness come back at
3  another time.
4    MR. ROSEN:  Let's come back then.  Because we
5  already heard that --
6    THE COURT:  I don't want a summary.  You tell me
7  it will be longer?
8    MR. ROSEN:  Yes.
9    THE COURT:  Mr. Flynn, I see you rising to
10  object, there is just so much I can do in the space of
11  this particular amount of time.  If every one was here
12  earlier this morning, we could have done it this morning.
13  And that was not to be.
14    I'm not looking at you as being the one that is
15  late.  It was certain things beyond Mr. Tarantino's
16  control.  However, it is what it is.  It is now a quarter
17  after 1:00.  I have a criminal case I had to take
18  in-between.  I have a jury I told 2:00 o'clock.
19    Mr. Rosen is finding it difficult to queue up.
20  If it is going to take ten minutes to queue up, we will
21  not go very far.
22    How long will it take you to get to that portion
23  of the tape?
24    MR. ROSEN:  I'm trying to do the best I can.
25  Hopefully --

Stephanie Picozzi, OCR, RPR
Official Court Reporter

---

M. Mulligan-Cross/Rosen (Jury Absent)
1184

1
2    THE COURT:  Are you ready to go, Mr. Rosen?
3    MR. FLYNN:  Can I have a date and time, please?
4    MR. DODDATO:  January 4th, and it starts at 2200
5  hours.
6    (Counsel confer.)
7    MR. ROSEN:  It is just a few calls, Judge.  And
8  when you hear all of them --
9    THE COURT:  All right.
10    MR. ROSEN:  Okay, Judge.  I'm ready.
11    THE COURT:  Okay.  Just play the tape.  That's
12  all.
13    (Audio tape is played.)
14    THE COURT:  Now there is another call?
15    MR. ROSEN:  Yes.
16  January 5th.
17    THE COURT:  January 5th, what time?
18    MR. ROSEN:  1648.  And I hope it goes as smooth
19  as the last one.
20    Judge, for the record, was the court reporter
21  able to take down --
22    THE COURT:  The court reporter doesn't take down
23  any tapes or recordings.
24    MR. ROSEN:  So if we replay --
25    THE COURT:  If you need to replay, you will

Stephanie Picozzi, OCR, RPR
Official Court Reporter

---

M. Mulligan-Cross/Rosen (Jury Absent)
1186

1    THE COURT:  That is the only additional tape you
2  want to play; is that correct?
3    MR. ROSEN:  Yes.  For now, yes.  For the
4  purposes of this hearing, yes.
5    THE COURT:  For the purposes of this hearing,
6  all right.
7    Now, Mr. Flynn, I heard what was on the tape.  I
8  don't need a summary now.
9    See if you can get it up on the tape now.
10    MR. ROSEN:  Now?
11    THE COURT:  The phone call now.
12    MR. ROSEN:  Okay.
13    THE COURT:  Please, next time designate the area
14  so we can know precisely where it is.
15    MR. ROSEN:  That is what I did.
16    THE COURT:  All right.
17  I will just step outside for a moment.
18    (Whereupon, at this time there was a pause in
19  the proceedings.)
20    THE COURT:  Okay?
21    MR. ROSEN:  Yes.  We should be good.
22  May I proceed?
23    THE COURT:  Yes, please.
24    (Audio tape is played.)
25    THE COURT:  That completes the call?

Stephanie Picozzi, OCR, RPR
Official Court Reporter

M. Mulligan-Cross/Rosen (Jury Absent)

1187

1    MR. ROSEN:  Yes.
2    THE COURT:  Thank you.
3    You want to examine the witness further?
4  BY MR. ROSEN:
5  Q   Did you hear the tape in regards to the conversation
6  you had concerning Chris Tarantino and telling you to stop
7  asking questions?
8    MR. FLYNN:  Objection.
9  Q   And your husband says -- you say to your husband, I
10 don't remember that?  And he says, I remember it clear as
11 day?
12   MR. FLYNN:  Objection.
13 Q   And it is up to you to determine --
14   MR. FLYNN:  Objection.
15   THE COURT:  There is an objection.  Can't you
16 hear him?  He is shouting in your ear.
17   MR. ROSEN:  I haven't finished.
18   MR. FLYNN:  Objection.
19   THE COURT:  Sustained.
20   MR. ROSEN:  I have no further questions.
21   THE COURT:  Do you have anything further,
22 Mr. Flynn?
23   MR. FLYNN:  Your Honor, can I have one moment?
24   THE COURT:  Yes.
25   (Government counsel confer.)

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

M. Mulligan-Redirect/Flynn (Jury Absent)

1188

1
2  REDIRECT EXAMINATION
3  BY MR. FLYNN:
4  Q   Ms. Mulligan, you heard questions from Mr. Rosen
5  about the government showing you a letter that had been
6  written -- that had been obtained from Mr. Gargiulo's
7  computer.  Do you remember that?
8  A   Yes.
9  Q   Do you remember being shown that letter?
10 A   Yes, I do.
11 Q   What did you tell us -- what did you tell
12 Special Agent Schelhorn when he showed you that letter?
13 A   I never saw that letter.
14 Q   All right.
15   So the letter that he showed you, your
16 recollection is that was not the letter you received from
17 Mr. Gargiulo; is that correct?
18 A   Absolutely not, yes.
19 Q   Your recollection is that you received a completely
20 different letter; is that correct?
21 A   Yes, totally different.
22 Q   And you have an independent recollection of that
23 letter; is that correct?
24 A   Yes.
25 Q   And you heard Mr. Rosen ask you some questions about

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

M. Mulligan-Redirect/Flynn (Jury Absent)

1189

1  the defendant visiting your home and telling you to stop
2  asking questions about Vinnie; is that correct?
3  A   Yes.
4  Q   And was that before or after Mr. Gargiulo died?
5  A   After.
6  Q   And there was testimony in this case, and evidence,
7  that Mr. Gargiulo died in August of 2003; is that correct?
8  A   Yes.
9  Q   Some eight months after you received a letter from
10 Mr. Gargiulo in January of 2003; is that correct?
11 A   Yes.
12 Q   Thank you.
13   Do you also have a specific recollection
14 concerning the contents of the letter you received from
15 Mr. Gargiulo because of a visit you were paid at your home
16 in Bellmore a week later?
17 A   Yes.
18 Q   Who came to visit you at your home in Bellmore --
19   MR. ROSEN:  Judge, the only objection I have is
20 after the June trip to Canada or after the January trip to
21 Canada?
22   She said the letter came in her mailbox after
23 the June trip, according to what was on the tape.
24   THE COURT:  I didn't reach that conclusion,
25 sorry.

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

M. Mulligan-Redirect/Flynn (Jury Absent)

1190

1    MR. ROSEN:  I can play it again.
2    THE COURT:  No.  It is not necessary for you to
3  play it again.  Just specify what date we are talking
4  about.
5    MR. FLYNN:  Okay.
6  Q   Ms. Mulligan, after you traveled to -- you previously
7  testified that your husband went to Devans on January 3,
8  2003; is that correct?
9  A   Yes.
10 Q   You previously testified that you then went to Canada
11 soon thereafter and he had seen your passport with the
12 stamps; is that correct?
13 A   Yes.
14 Q   You testified you returned from Quebec on
15 January 2nd, 2003; is that correct?
16 A   Yes.
17 Q   And you also testified that you opened the letter on
18 that day you gave it to Mr. Pellegrino; is that correct?
19 A   Yes.
20 Q   A week after that you -- you were visited at your
21 home in Bellmore?
22 A   Yes, I had a visitor.
23 Q   Who came to visit you at your home in Bellmore then?
24 A   Chris Tarantino.
25 Q   Did you engage in a conversation with Mr. Tarantino

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

M. Mulligan-Redirect/Flynn (Jury Absent)

1191

1 in your home in Bellmore a week after you opened the
2 letter at approximately on January 22nd, 2003?
3 **A** Yes.
4 **Q** Had you called Mr. Tarantino to come over?
5 **A** No.
6 **Q** Did he just show up?
7 **A** Yes.
8 **Q** Did you invite him in?
9 **A** Yes.
10 **Q** Did you subsequently engage in a conversation in your
11 home?
12 **A** Yes.
13 **Q** Where was that conversation in your home?
14 **A** In the kitchen.
15 **Q** Were you seated or were you standing?
16 **A** I was standing.
17 **Q** Was the defendant seated or was he standing?
18 MR. ROSEN: Objection to leading.
19 THE COURT: Overruled.
20 **A** He was sitting.
21 **Q** All right.
22 And during that conversation, did the two of you
23 discuss the letter that you had received from
24 Mr. Gargiulo?
25 **A** Yes.

Stephanie Picozzi, OCR, RPR
Official Court Reporter

M. Mulligan-Redirect/Flynn (Jury Absent)

1192

1 **Q** Tell us about that conversation.
2 **A** That I was worried about the letter and what the
3 **content said and that there was -- I was mostly concerned**
4 **about the deadline date and it already had passed. And he**
5 **said to me, I got the same one. And I said, well, can**
6 **someone go talk to him, you know, because I know he is**
7 **going crazy.**
8 **And he said, don't worry about it. I will take**
9 **care of it.**
10 **Q** And when you said -- he said -- you testified that
11 you asked Mr. Tarantino, should someone go talk to him.
12 During your conversation with the defendant, did
13 you have a mutual understanding as to who had written your
14 letter and his letter?
15 **A** Yes.
16 **Q** Who?
17 **A** Billy Gargiulo.
18 **Q** And did the defendant say that to you?
19 **A** Yes.
20 **Q** And did the two of you, you and the defendant, talk
21 about how Mr. Gargiulo's deadline for the disclosure of
22 the tape had already passed?
23 **A** Yes.
24 **Q** Okay.
25 And did the defendant try to offer you some

Stephanie Picozzi, OCR, RPR
Official Court Reporter

M. Mulligan-Recross/Rosen (Jury Absent)

1193

1 comfort?
2 **A** He said, well, the thing had already passed and
3 **nothing happened, so it is okay.**
4 **Q** And then what did you say?
5 **A** I said, then could someone go talk to him, you know,**
6 **maybe just talk to him and see what is going on.**
7 **And he says, yes, I'll go talk to him and I will**
8 **take care of it. Don't worry.**
9 **Q** When the defendant said he would take care of it, in
10 what manner did he say that to you?
11 **A** He whispered in my ear.
12 MR. FLYNN: Thank you, no further questions.
13
14 RECROSS-EXAMINATION
15 BY MR. ROSEN:
16 **Q** Did you give the letter to Keith Pellegrino?
17 **A** Yes.
18 **Q** Did you go in the same car to Keith Pellegrino's
19 office to James Froccaro's office?
20 **A** No, we didn't.
21 **Q** You are sure about that?
22 **A** I'm positive.
23 **Q** Is this something else your husband told you about in
24 one of the phone calls?
25 MR. FLYNN: Objection.

Stephanie Picozzi, OCR, RPR
Official Court Reporter

M. Mulligan-Recross/Rosen (Jury Absent)

1194

1 THE COURT: Sustained.
2 **Q** You gave the letter to Keith Pellegrino --
3 MR. FLYNN: Objection. Asked and answered.
4 THE COURT: Overruled.
5 Let him finish his question.
6 **Q** What did you see Mr. Pellegrino do with the letter?
7 **A** He took it in his hand when he walked out of my
8 **house.**
9 **Q** Was he with anyone?
10 **A** Yes, he was.
11 **Q** With who?
12 **A** He was with Steven Laganas.
13 **Q** Did he leave with Mr. Laganas with the letter?
14 **A** Yes.
15 **Q** And where did he tell you he was taking the letter?
16 **A** He was taking it to James Froccaro, our attorney .
17 **Q** Okay, when you say our attorney --
18 **A** My husband's attorney.
19 **Q** He told you he was leaving your home and going to
20 take this to Scott Mulligan's attorney, James Froccaro; is
21 that correct?
22 **A** Yes.
23 **Q** And what was the discussion you had with
24 Mr. Pellegrino for the reason why he was going to deliver
25 that to Mr. Froccaro for your husband?

Stephanie Picozzi, OCR, RPR
Official Court Reporter

1290

M. Mulligan-Recross/Rosen (Jury Absent)

1195

1   A   Because my husband was in prison.
2   Q   And what was the purpose for him to bring it to
3   Mr. Froccaro?
4   A   Because I couldn't leave my house.  I had an eight
5   month old baby.  And I was bringing it to the attorney,
6   and I called Keith, who was my friend, who said I will
7   bring it to the attorney.
8   Q   And what was the purpose in you lying for
9   Mr. Froccaro to have this letter?
10      MR. FLYNN:  Objection.
11  Q   To protect Scott or not to protect Scott?
12      THE COURT:  Sustained.
13  Q   Was the purpose of you giving Mr. Froccaro, your
14  husband's lawyer, the letter for his own protection?
15      MR. FLYNN:  Objection.
16      THE COURT:  Sustained.
17      MR. ROSEN:  On what ground?  Judge --
18      THE COURT:  She already answered the question
19  for starters.
20      MR. ROSEN:  I didn't hear it.  If I did, I
21  wouldn't ask the question again.
22      THE COURT:  Okay.
23  Q   Is there something funny about these proceedings?
24  A   No.
25      MR. FLYNN:  Objection.

Stephanie Picozzi, OCR, RPR
Official Court Reporter

---

M. Mulligan-Recross/Rosen (Jury Absent)

1196

1   Q   Then why are you smirking?
2       MR. FLYNN:  Objection.
3       THE COURT:  I can't see the witness' face.
4       MR. ROSEN:  I can tell you she keeps looking
5   over to counsel table for the government smirking.
6       MR. FLYNN:  Objection.
7       MR. ROSEN:  Am I lying?
8       THE COURT:  Excuse me, Mr. Rosen.  She is also
9   looking at your direction.  I don't have that advantage.
10      If you would, Ms. Mulligan, turn slightly toward
11  me with the microphone and you can answer that way.
12      All right.
13  Q   What was the purpose in your mind for Pellegrino to
14  deliver to Froccaro the letter from Vincent Gargiulo?
15  A   It was actually to protect myself.  I was alone and
16  my husband was in prison.  And I was scared.
17  Q   It had nothing to do with Scott?
18  A   He was already in prison.
19  Q   But why Mr. Froccaro?
20  A   Because he was his attorney.
21  Q   And what good would that have done Scott?
22      MR. FLYNN:  Objection.
23      THE COURT:  Overruled.
24      What, if any, good would it have done Scott?
25      THE WITNESS:  I don't know.

Stephanie Picozzi, OCR, RPR
Official Court Reporter

---

M. Mulligan-Recross/Rosen (Jury Absent)

1197

1       MR. ROSEN:  Nothing further.
2       THE COURT:  Thank you.
3       Do you have anything further?
4       MR. FLYNN:  No, your Honor.
5       THE COURT:  Thank you.
6       You are done for now.
7       I will make a determination as to whether I will
8   hear any additional argument that you have.  Right now the
9   witness is free to go.
10      I will see you folks at 2:00 o'clock.
11      (Luncheon Recess.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Stephanie Picozzi, OCR, RPR
Official Court Reporter

---

1198

1       A F T E R N O O N   S E S S I O N
2
3       (Whereupon, the following takes place in the
4   absence of the jury.)
5       THE COURT:  Mr. Zacarese, we will finish up with
6   you.
7       Where is Mr. Rosen?
8       MR. DODDATO:  I just called him.  We separated
9   for a few minutes.  I think he might be in the men's room.
10      THE COURT:  Please go get him.  I don't want to
11  keep the jury waiting any longer than necessary.
12      MR. DODDATO:  Sure.
13      (Whereupon, at this time there was a pause in
14  the proceedings.)
15      THE COURT:  Before I bring the jury out, do you
16  wish to make any statements with regard to the testimony
17  of Manon Mulligan?
18      MR. ROSEN:  Yes.
19      Well, number one, if we look at the burden of
20  proof, it has to be on the proponent.
21      THE COURT:  A preponderance of the evidence to
22  show initially that this is testimony that can be
23  authenticated by the recollection of the witness who is
24  testifying.
25      MR. ROSEN:  I think the first thing that the

Stephanie Picozzi, OCR, RPR
Official Court Reporter

**1199**

1  Court has to decide is whether or not the document has
2  been lost or misplaced under the statute.
3       The last we heard, Mr. Keith Pellegrino had in
4  his person -- on his person the letter in question.
5  Without going forward with Mr. Pellegrino, either he
6  destroyed it or he gave it to Mr. Froccaro, they cannot
7  meet their burden.
8       Then if we get to that stage, then the Court
9  will have to determine whether or not her statements can
10 be used to self-authenticate the document. But we have
11 not reached that stage. Because the first part of the
12 statute deals with the party proponent introducing
13 sufficient evidence by a preponderance that the document
14 is lost, and the government hasn't done that.
15      THE COURT: Well, I think they have in the sense
16 that the proponent here is not Mrs. Mulligan. Rather, it
17 is the government. Okay?
18      There is nothing to indicate that this
19 particular document wasn't in the government custody or
20 control.
21      So the witness has said what happened to it.
22 She hasn't seen it since. So I don't think this burden
23 coming about as you described it.
24      Let me hear from the government a moment.
25      MR. ROSEN: Then I have comments about

Stephanie Picozzi, OCR, RPR
Official Court Reporter

**1201**

1  deadline set in the letter for the $500,000 or the tape
2  would be turned over. And she remembers that
3  distinctively. And that is why she contacted
4  Mr. Pellegrino.
5       The letter can also be corroborated,
6  authenticated, by the testimony of other witnesses.
7       Bob Gerrato. Bob Gerrato already testified in
8  the trial here that they told him that they had sent a
9  letter already to Manon Mulligan. That is Bob Gerrato's
10 testimony that corroborates Ms. Mulligan's testimony here
11 at the evidentiary hearing.
12      Ms. Mulligan also testified that the week after
13 her -- her recollection is solidified in her mind by the
14 fact that the defendant came to her home a week later.
15 Obviously he had gotten word of the letter.
16      How he got word we don't know. That is
17 irrelevant.
18      He came to the home and had a discussion with
19 her about the letter, about its content, and how the
20 author of the letter and the identical letter he had
21 received, or a similar letter, was Vinnie.
22      So it is not only Ms. Mulligan's testimony,
23 which I submit, your Honor, on its face is sufficient.
24 But it is also taken in conjunction with the
25 circumstances.

Stephanie Picozzi, OCR, RPR
Official Court Reporter

**1200**

1  Mrs. Mulligan's testimony.
2       THE COURT: I understand, and we will get into
3  that.
4       Is there anything the government would like to
5  respond as to whether or not you met your burden with
6  regard to the testimony of Mrs. Mulligan with respect to
7  the quality of the letter or recollection as to what was
8  contained in the letter and her subsequent statement as
9  they pertain to her giving the letter to another person?
10      MR. FLYNN: Your Honor, the legal framework for
11 getting this testimony in, and there are three parts to
12 it.
13      One of them, as you correctly identified, is
14 authentication.
15      The legal standard under the Second Circuit is
16 that the document can be authenticated by its distinctive
17 contents taken in conjunction with all the surrounding
18 circumstances surrounding the document.
19      This document -- this letter can be
20 authenticated not only from Ms. Mulligan's testimony,
21 which was fairly clear both on direct and on
22 cross-examination regarding the content of the letter.
23      Does she remember the letter? Does she have it
24 memorized? No.
25      But she remembers distinctively that there was a

Stephanie Picozzi, OCR, RPR
Official Court Reporter

**1202**

1  I cite United States versus Bagaric, 706 F. 2d
2  42, 67, Second Circuit 1983.
3       Taken in conjunction with the circumstances
4  surrounding the Mulligans, the Tarantinos, and Gargiulo at
5  this period of time in 2003, and we heard the testimony
6  about the surrounding circumstances. And I submit, your
7  Honor, that is additional authentication.
8       If you would like to hear me on the hearsay side
9  of it or the best evidence rule, I can speak to that as
10 well.
11      She can authenticate that letter, your Honor,
12 and the way she has done it is legally sufficient here.
13      THE COURT: In terms of the best evidence, I
14 don't think it is necessary to get to that. And let me
15 hear what you say about getting the letter in at this
16 point.
17      MR. ROSEN: Judge, we played a tape --
18      THE COURT: Now you are going into the content
19 of the letter; is that correct?
20      MR. ROSEN: Yes.
21      THE COURT: All right.
22      MR. ROSEN: It is clear that he is telling her,
23 Mr. Scott Mulligan is telling his wife on the phone call
24 he doesn't remember the contents exactly what is in the
25 letter. Because, don't you remember, you came up and told

Stephanie Picozzi, OCR, RPR
Official Court Reporter

1203

1 me about the contents, what you told me about the letter?
2         I don't remember.
3         Then he tells her what is in the letter.
4         It is as clear as day.  She has no recollection
5 until she went to the jail in January and her husband told
6 her what was in the letter.  And that is in both calls one
7 and two.
8         As a matter of fact, she even says in phone call
9 two, it probably was in June because the date -- I'll play
10 it again.
11        THE COURT:  No.  You don't have to play it
12 again.  I heard it clearly the first time.  I just don't
13 agree with your interpretation with what is on there.
14        MR. ROSEN:  She says, I don't remember.  It
15 could have been the second trip to Canada back in June
16 when I got the letter.
17        And then he coached her into telling her what
18 took place back in January, and what he understood the
19 contents of the letter to be.
20        It is clear as day that this woman has no
21 independent recollection.  She doesn't know the date.  She
22 doesn't know the date in which the payoff --
23        THE COURT:  She doesn't know if there is a date
24 on it.  She testified consistently, Mr. Rosen, that the
25 letter was received and opened by her when she got back

Stephanie Picozzi, OCR, RPR
Official Court Reporter

1204

1 from Canada in January of 2003.
2         MR. ROSEN:  That is not what the tape says,
3 Judge, in all due respect.
4         The second tape says it could have been June.
5 And I would like to play it over so we have a clear
6 record.
7         THE COURT:  I heard what was on the second tape.
8 I haven't reached the same conclusion that you have.
9         What else does the government have to say on
10 this?
11        MR. FLYNN:  I appreciate Mr. Rosen's comments,
12 Judge.  Unfortunately for the defense, the tape they
13 played, the first tape, actually corroborates her
14 completely.
15        THE COURT:  The first phone call did corroborate
16 her.
17        MR. ROSEN:  Because her husband told her what to
18 say.
19        THE COURT:  No, Mr. Rosen.  That is not what is
20 on the tape.
21        MR. FLYNN:  That is not what is on the tape,
22 your Honor.
23        MR. ROSEN:  I don't know.  Maybe I'm losing it.
24 Can I bring one point up --
25        THE COURT:  No.  Not at this time.  Let him

Stephanie Picozzi, OCR, RPR
Official Court Reporter

1205

1 finish what he has to say and then I will listen to you.
2         MR. ROSEN:  Thank you.
3         MR. FLYNN:  We can listen to the tape again,
4 your Honor.  We can listen to it 20 times.
5         If you listen to that tape, she has a clear
6 independent recollection -- she tells him on the tape what
7 was in the letter she got.
8         There was no coaxing there.  The second
9 recording doesn't have to do with the letter in January of
10 2003.  It is that the defendant came to the house after
11 Vinnie died and told Scott to stop talking about it in a
12 completely different conversation.
13        THE COURT:  And that is what I heard.
14        MR. ROSEN:  We will ask the court reporter to
15 clarify it.
16        THE COURT:  In any event --
17        MR. ROSEN:  I have a more pressing issue.
18        She mentioned in the transcript, and first her
19 husband brought it up, and then it was verified --
20        THE COURT:  There is no transcript actually.  It
21 is a tape.
22        MR. ROSEN:  I meant the tape.
23        THE COURT:  Yes, on two phone calls.
24        MR. ROSEN:  Yes.
25        She read a letter downloaded from Kyatt's

Stephanie Picozzi, OCR, RPR
Official Court Reporter

1206

1 computer and I never got that letter.
2         THE COURT:  I don't think she said Kyatt's
3 computer.
4         What she indicated, and the government asked her
5 questions on redirect about a letter shown to her which
6 supposedly came off -- came from Vinnie.  And she said at
7 the time the government asked her these questions showed
8 her this letter.  She had never seen it before.
9         It is a different thing we are talking about
10 here.
11        Please, indicate whether or not, one, what your
12 position is with regard to the record made on redirect by
13 the government.  And also, what, if anything, you have
14 shown to the defendant or not shown to the defendant with
15 respect to this letter.
16        MR. FLYNN:  The letter that I brought up on
17 redirect, they don't have the letter.  That is true.
18        During Ms. Mulligan's prep session, we showed
19 her a letter that came off of Vincent Gargiulo's computer
20 at his father's home.  The letter is a letter that looks
21 to be a draft of a letter that Vinnie apparently wrote at
22 one point to Scott and Chris, the defendant, and
23 Mr. Mulligan.
24        We showed her that letter.  We printed it and
25 showed her, is this the letter you received?

Stephanie Picozzi, OCR, RPR
Official Court Reporter

1207

1 She said, no, that is not it. I know what I
2 received. That is not it. It is a different letter, and
3 that's all.
4 There were some questions with regard to that
5 letter on cross-examination, and I on redirect brought
6 out, yes, we did show you the letter.
7 She said, yeah, I remember that.
8 What did you say?
9 That was not the letter. I remember what I got,
10 and that is not it.
11 So that is further proof that she has a memory
12 of what she got. We showed her something and she said
13 that is not it.
14 THE COURT: The only discrepancies I have seen
15 with respect to the content of her testimony here today
16 that would give me any pause is that initially the
17 government indicated that in the letter Mrs. Mulligan
18 received in January, the one she read, she testified that
19 it referred to both Mr. Mulligan, her husband, and to the
20 defendant by name. And that is not consistent with her
21 testimony. That is inconsistent.
22 MR. FLYNN: What she has testified to --
23 THE COURT: Today she says she doesn't know --
24 she doesn't recall saying the names. But in your
25 submission to the Court on page 7, you indicate that she

1208

1 did by name recall who was mentioned in Mr. Gargiulo's
2 letter that the witness claimed to have read in January of
3 2003.
4 MR. FLYNN: Well, she has testified, your Honor,
5 that the letter was addressed to her husband Scott.
6 THE COURT: But there is no mention in the
7 letter about the defendant and Scott.
8 MR. FLYNN: That was her testimony today. But
9 she did indicate she understood the letter was directed --
10 THE COURT: Yes, that was her understanding, and
11 not by name.
12 I kept the jury waiting now 25 minutes beyond
13 the time I told them to come in.
14 I will continue with Mr. Zacarese's testimony,
15 and if we have to take a break to deal with this issue, we
16 will take a break.
17 And you can summarize your opinion as to whether
18 or not Mrs. Mulligan's testimony should go forward. At
19 this point in time I indicated to you what I think is the
20 appropriate basis for admission under 901.
21 MR. ROSEN: Judge, can we get that letter? Can
22 you ask the government to produce it?
23 THE COURT: Are you intending on using it in
24 evidence?
25 MR. MISKIEWICZ: No, your Honor.

1209

1 THE COURT: Is there some reason you can't turn
2 it over to the defendant?
3 MR. MISKIEWICZ: We can turn it over.
4 THE COURT: Turn it over to them now.
5 THE CLERK: Jury entering.
6 (Whereupon, the jury at this time entered the
7 courtroom.)
8 THE COURT: All right. We are ready to go.
9
10 A N T H O N Y   Z A C A R E S E,
11 called as a witness, having been previously
12 duly sworn, was examined and testified as
13 follows:
14
15 THE COURT: We are ready to continue with the
16 testimony of Mr. Zacarese.
17
18 DIRECT EXAMINATION (cont'd)
19 BY MR. MISKIEWICZ:
20 Q Sir, I want to direct your attention back to the
21 exhibit you were looking at before the lunch break, and
22 particularly the third page of that exhibit. It is AZ-1.
23 (At this time a document was exhibited on
24 courtroom screen.)
25 Q I'm showing you now page three of AZ-1.

1210

1 Would you tell us what days and what
2 transactions or phone calls were summarized on this page?
3 A Starting at the top of the page, the date is the 18th
4 of August of '03.
5 Q Why did you focus on that particular day?
6 A That is the day of the Gargiulo murder.
7 Q Okay.
8 And what phone records or phone calls did you
9 find by looking at the various records that you testified
10 about in the morning on August 18th?
11 A Started very early in the morning of the first record
12 that we came up with subsequent to the time of the murder
13 that was recorded by the New York City Police Department,
14 was a call from the Synergy, outbound to the Tarantino
15 cell phone, which lasted 17 seconds long. And that was at
16 7:05 that morning, approximately, from what I remember of
17 the New York City Police reports, 15 or 20 minutes from
18 the actual shooting.
19 MR. ROSEN: Judge, the only objection I have is
20 that there is no identification of whom Synergy Gym is.
21 THE COURT: Can you identify where that phone is
22 located?
23 THE WITNESS: I believe it is the West 23rd
24 Street gym.
25 MR. ROSEN: Thank you.

Zacarese-Direct/Miskiewicz

1211

1      THE COURT:  Okay.

2 **Q**  And that is based on the original phone records from

3 the West 23rd Street Synergy Gym?

4 **A**  Yes.

5 **Q**  So there is a phone call from the Synergy at

6 7:06 a.m. on West 23rd Street.

7      What else did you find from your review of the

8 phone records?

9 **A**  Well, following that time line and having the one

10 number -- we got a hit on the Tarantino cell phone and

11 looked at that on the incoming side.  And at 7:15 in the

12 morning we received an incoming call to the Tarantino cell

13 phone that came -- originated from a pay phone located on

14 Sixth Avenue on West 16th Street in New York City and that

15 phone call lasted 12 seconds.

16 **Q**  That was a public pay phone?

17 **A**  A public pay phone on the sidewalk at that location.

18 **Q**  And that was nine minutes after the first phone call?

19 **A**  Yes, sir.

20 **Q**  And then what did you find?

21 **A**  The next subsequent phone call originated 7:55 that

22 morning.  Again, it was an incoming phone call to the

23 Tarantino cell phone from a pay phone in front of 103 West

24 14th Street in New York City.  Again, a sidewalk New York

25 City pay phone.  That phone call lasted 13 seconds.

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

---

Zacarese-Direct/Miskiewicz

1212

1 **Q**  About an hour later at 8:52 a.m., from looking at the

2 original phone records, what other call did you note on

3 this summary?

4 **A**  We have an outbound call from the Tarantino cell

5 phone at 8:52 that was dialed out to the Bressman cell

6 phone.  There is no recorded time on that call.

7      MR. MISKIEWICZ:  May I approach, your Honor?

8      THE COURT:  Yes.

9      (Counsel approaches the witness stand.)

10 **Q**  I will show you what is received in evidence as

11 Government's Exhibit AT, as in Thomas, 1.

12      (Handed to the witness.)

13 **Q**  Is that one of the original phone records that you

14 used for this summary?

15 **A**  Yes, sir, it is.

16 **Q**  And what does it indicate as to whether or not the

17 Bressman cell phone was in operation on this day,

18 August 18th, 2003?

19 **A**  Well, in the subscriber information date, which is

20 the first page of the report, aside from giving the

21 details on the subscriber's address, the status of the

22 account is listed down at the bottom portion of the page.

23      It shows here that on the 14th of August, 2003,

24 the account was suspended by AT&T for nonpayment,

25 disconnect.  And that would have been four days prior to

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

---

Zacarese-Direct/Miskiewicz

1213

1 the incident of the murder.

2 **Q**  And going back to the first page in your summary,

3 specifically August 14th, at 8:27 a.m., do you see a call

4 from the Tarantino cell to the Bressman cell?

5 **A**  Yes, sir.

6      The call originated on the Tarantino cell phone

7 to the Bressman cell phone on that date, the 14th, at

8 8:27.  It lasted three minutes and 47 seconds.

9 **Q**  And after that do you see -- did you ever see any

10 other completed calls to the Bressman cell phone after

11 8/14/03?

12 **A**  On this page, no, sir.

13 **Q**  And as a matter of fact, on this page, on 8/15,

14 Friday, by saying zero on this last column, are you saying

15 the records show that there was an attempt by the

16 Tarantino cell phone to call Bressman and there were zero

17 seconds going through?

18 **A**  It indicates here that -- it would not show up as an

19 incoming call on the Bressman cell phone because there was

20 never a connection.  It never went through.  But on the

21 Tarantino records, the dump, it shows that a call had

22 originated from this phone, attempted to go to the

23 Bressman cell phone.  But there was never a connection and

24 there were no seconds recorded.

25 **Q**  Back to the day of the murder, August 18th, that

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

---

Zacarese-Direct/Miskiewicz

1214

1 evening, you also had the records of Mr. Mel Roth?

2 **A**  Yes.

3 **Q**  And his phone numbers?

4 **A**  Yes.

5 **Q**  And did you see incoming calls or outgoing calls from

6 Mr. Roth to any of the other individuals in this

7 investigation?

8 **A**  Yes, sir.

9 **Q**  And turning to a third page of AZ-1, did you see a

10 series of phone calls between Mr. Roth and the Tarantino

11 cell?

12 **A**  Yes, sir.

13 **Q**  And that is -- is that what is depicted here?

14 **A**  For the date of 8/19 of '03, yes, sir.

15 **Q**  And how many calls, for the record, if you can

16 quickly add them up, how many calls between the Roth cell

17 phone and the Tarantino cell phone?

18 **A**  I can't see the complete bottom part of the page.

19 But so far I have a count of eight.

20      The Tarantino cell phone to Mel Roth is seven.

21 **Q**  Okay.

22      MR. ROSEN:  Judge, can we have the phone numbers

23 and the locations for the Synergy Gym just referred to by

24 the officer -- by the detective?

25      THE COURT:  Yes.

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

Zacarese-Direct/Miskiewicz

1215

1    Do you know which Synergy it was?

2    THE WITNESS:  Yes, sir.  It is the West 23rd

3 Street gym.

4    THE COURT:  Thank you.

5  Q   In addition to that, on the 19th at 1:50 p.m., what,

6 if anything, do you see in terms of a phone call that you

7 summarized in this chart?

8  A   There is an outbound call from the Campbell apartment

9 that was made to the Synergy Gym, again, on West 23rd,

10 which lasted less than two minutes.

11  Q   Now, directing your attention to one of the last

12 pages of your summary, August 21st, 2003.

13    Why did you particularly look at this date,

14 which is after the date of the murder?

15  A   Well, what stood out on this date is that the phone

16 calls at 10:31 and 10:39 a.m. on the 21st originated from

17 Mr. Roth's cell phone number to the Midtown South precinct

18 on two separate occasions on that date.

19  Q   And why were you looking at this date?

20  A   That was the date that Mr. Bressman was being

21 interviewed at the precinct, the Midtown South precinct.

22  Q   All right.

23    And is it fair to say that the phone records

24 bore out that Midtown South was contacted by Mr. Roth?

25  A   Yes, sir, it does.

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

---

Zacarese-Direct/Miskiewicz

1216

1  Q   And prior to -- prior to that -- withdrawn.

2    Lastly, I will show you the fourth page of AZ-1.

3 And this is also -- this map is also included in another

4 exhibit, but you have added some items here.

5    Could you just -- let me try to zero in on this,

6 and explain, what, if anything, you summarized by way of

7 analysis of phone records on this portion of AZ-1.

8  A   This map depicts the area of the homicide, which

9 occurs here (indicating).

10    The location of the Synergy Gym, which is

11 located here (indicating).

12  Q   Well, by here, what Synergy Gym are you referring to

13 for the record?

14  A   This is the West 23rd Street gym which is located

15 here (indicating).

16    The pay phone on the first phone call is here

17 (indicating).  The second phone call that -- there happens

18 to be another Synergy Gym on West 14th Street.  Basically

19 that is the activity for that date, the date of the

20 Gargiulo murder.

21  Q   And does that somehow correlate to the summary chart

22 that we looked at for 8/19/03?

23  A   Yes, sir, it does.

24  Q   Is this basically a more graphic representation of

25 that summary?

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

---

Zacarese-Direct/Miskiewicz

1217

1  A   It is a graphic representation of the occurrences

2 that took place according to that time line.

3  Q   Explain to us what is represented in this map.

4  A   Here we have the location where the Gargiulo murder

5 took place at sometime prior to the first phone call.

6    We have the Synergy Gym located here on West

7 23rd Street (indicating).

8  Q   Is this the gym you indicated earlier --

9  A   In the phone records.

10  Q   Sorry?

11  A   In the phone records, yes.

12  Q   At 7:06 a.m.?

13  A   Yes.

14  Q   To where?

15  A   Could you put that page up or the hard copy?

16    (At this time a document was exhibited on

17 courtroom screen.)

18  Q   At 7:06, where is that?

19  A   At 7:06 in the morning, the phone at Synergy Gym

20 calls the Tarantino cell phone.  And that call lasts for

21 19 seconds.

22    MR. ROSEN:  Is that the West 23rd?

23  Q   Is that the West 23rd Street gym?

24  A   Yes, the West 23rd Street gym.

25  Q   And back to the map, what next occurred -- what is

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

---

Zacarese-Direct/Miskiewicz

1218

1 depicted on this map in terms of phone traffic?

2  A   The next phone traffic originates on -- from the

3 first pay phone to the Tarantino cell phone.

4  Q   And you are indicating at or about -- you are

5 indicating a location at approximately Sixth Avenue

6 between 17th and 16th Street -- West 17th, 16th?

7  A   Yes, that's correct.

8  Q   And that is -- that phone call was made when?

9  A   7:15.

10  Q   To who?

11  A   From that pay phone at that location to the Tarantino

12 cell phone.  And it lasted 12 seconds.

13  Q   Back to the map, what is next?

14  A   The second pay phone call which originates from this

15 location (indicating).  And the address escapes me again

16 without the reference on the screen.  But that pay phone

17 from 103 West 14th Street originates from that pay phone

18 and goes to the Tarantino cell phone, and that lasts for

19 13 seconds.

20    MR. MISKIEWICZ:  May I have a moment, your

21 Honor?

22    THE COURT:  All right.

23    (Government counsel confer.)

24    MR. MISKIEWICZ:  No further questions.

25    THE COURT:  All right.

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

Zacarese-Cross/Rosen

1219

1  Cross-examination.
2  MR. ROSEN:  Yes.
3
4  CROSS-EXAMINATION
5  BY MR. ROSEN:
6  Q  What phone records do you have, sir, in front of you?
7  A  **This is just the AT&T Bressman --**
8  Q  The Bressman cell records?
9  A  **Yes.**
10 Q  I want to go -- what is the exhibit number,
11 please?
12 A  **I beg your pardon?**
13 THE COURT:  AT-1.
14 Q  AT-1?
15 A  **Yes, sir.**
16 Q  Would you please go to the date of April 22, 2003.
17 (Whereupon, at this time there was a pause in
18 the proceedings.)
19 Q  Do you have it, sir?
20 A  **I'm looking.**
21 Q  Thank you.
22 (Whereupon, at this time there was a pause in
23 the proceedings.)
24 A  **You did say April 22nd?**
25 Q  Please.

Stephanie Picozzi, OCR, RPR
Official Court Reporter

Zacarese-Cross/Rosen

1220

1  Do you have it?
2  A  **Not in this batch.  Maybe it is here.**
3  MR. ROSEN:  I guess we have to add ours.  I
4  thought the exhibit is whole.
5  THE COURT:  No.
6  Whatever you have, show it to the witness.
7  MR. ROSEN:  Judge, we will come back to it.  We
8  are looking for our copy, but I don't see it.
9  THE COURT:  Whatever it is.
10 MR. ROSEN:  I'll go on to something else.
11 Q  You mentioned Marty Martulis.
12 What was Marty Martulis' relationship with
13 Vincent Gargiulo?
14 A  **I have no idea.**
15 Q  Well, what was Vincent Gargiulo doing with Marty
16 Martulis' phone?
17 A  **Again, I have no idea.  I don't know Mr. Martulis,**
18 **nor do I know Mr. Gargiulo.**
19 Q  What investigation did you do to determine the
20 relationship between Vincent Gargiulo and Marty Martulis?
21 A  **I personally did no relationship investigation.**
22 Q  Vincent Gargiulo had a phone registered to Marty
23 Martulis, did he not?
24 A  **Yes.**
25 Q  What was the address on that registration form?

Stephanie Picozzi, OCR, RPR
Official Court Reporter

Zacarese-Cross/Rosen

1221

1  A  **For Mr. Martulis' phone?**
2  Q  Yes.
3  A  **I would have to look at the records.**
4  MR. ROSEN:  May I approach?
5  THE COURT:  Yes.
6  (Handed to the witness.)
7  A  **You were asking me for the address on the Martulis**
8  **account?**
9  Q  Yes.
10 He had two phone numbers; is that correct?
11 A  **I have one listed here.**
12 Q  Well, you indicated that Gargiulo had one of
13 Martulis' phones.  So I'm trying to get the phone number
14 for Vincent Gargiulo which was registered to Martin
15 Martulis, and I also want Martin Martulis' phone.
16 A  **Could you repeat that question, please?**
17 Q  Okay.
18 Did Vincent Gargiulo use a phone registered to
19 Martin Martulis?
20 A  **He used a cell phone registered to Mr. Martulis.**
21 Q  Tell me that phone number, please.
22 A  **(917) 509-9375.**
23 Q  And you call that the Vincent Gargiulo phone; is that
24 correct?
25 A  **Registered to Martin Martulis.**

Stephanie Picozzi, OCR, RPR
Official Court Reporter

Zacarese-Cross/Rosen

1222

1  Q  Now, please tell me Martin Martulis' phone number?
2  A  **When you say his phone number -- that is the only**
3  **number I have for him.**
4  Q  Take a look, if you would, sir, to August the 3rd,
5  2003.
6  Maybe I can help you along here, okay?
7  August the 3rd, 2003, on Vincent Gargiulo's
8  phone of (917) 509-9375.
9  A  **August 3rd, 2003?**
10 Q  Yes.  At 3:40 p.m.
11 A  **Yes, sir.**
12 Q  Who is making the call and who is being called?
13 A  **It indicates that the call phone number was**
14 **(917) 509-9375.**
15 Q  So the caller was Vincent Gargiulo; is that correct?
16 MR. MISKIEWICZ:  Objection.
17 Q  Well, the phone that he was using made that phone
18 call; is that correct?
19 A  **The phone call was made from that phone to that**
20 **phone.**
21 Q  Yes.
22 To that phone?
23 A  **Yes, sir.**
24 You said (917) 509-9375?
25 Q  Yes.  And the number that was called should have been

Stephanie Picozzi, OCR, RPR
Official Court Reporter

Zacarese-Cross/Rosen

1223

1  Justin Bressman.

2  A    The called phone number for the time you specified on

3  8/3 at 3:40 p.m., the number that was called was

4  (917) 509-9375.

5  Q    Do you have Mr. Gargiulo's phone here?

6  A    This is Mr. Gargiulo's phone.

7  Q    How could he be calling himself?

8  A    That is what you do when you get your voice mail.

9  Q    Oh.  So he was picking up voice mail messages from

10  his phone?

11  A    That is how it works on my phone.

12  Q    Okay.

13        That's all you have to say.

14        What was the next call that was made from that

15  phone?

16  A    The next call on 8/3?

17  Q    Yes.  At 3:41 p.m.?

18  A    That call was made to a number, (212) 535-8082.

19  Q    Whose phone number is that?

20  A    I have no idea.

21  Q    Isn't that Marty Martulis' phone call -- phone

22  number?

23  A    I just said I have no idea whose it is.

24  Q    Why didn't you take the time to determine whose phone

25  number he was calling, Vincent Gargiulo, on that day?  You

Stephanie Picozzi, OCR, RPR
Official Court Reporter

Zacarese-Cross/Rosen

1224

1  didn't think it was pertinent?

2        MR. MISKIEWICZ:  Objection.

3        THE COURT:  Sustained.

4  Q    You don't know whose phone number that is, do you?

5  A    Looking at these records, no, sir, I have no way of

6  knowing.

7  Q    Is there anything you can look at at this counsel

8  table to help you refresh your recollection as to whose

9  phone number that is?

10        MR. MISKIEWICZ:  Objection.

11        THE COURT:  Sustained.

12  Q    Is there anything you can look at in your files to

13  help you refresh your recollection on whose phone number

14  was called?

15        MR. MISKIEWICZ:  Objection.

16        THE COURT:  Overruled.

17  A    The only index I have are the key phone numbers that

18  we used for the search parameters.

19  Q    The key numbers were developed by you, is that

20  correct?

21  A    The key numbers were drawn down from the information

22  of the case on which numbers we were looking to key in on

23  to track and find out the communications between them.

24  Q    And you didn't think that Martin Martulis was such a

25  person for you to track down?

Stephanie Picozzi, OCR, RPR
Official Court Reporter

Zacarese-Cross/Rosen

1225

1        MR. MISKIEWICZ:  Objection.

2        THE COURT:  Sustained.

3  Q    Did you believe that Martin Matulis could have

4  information concerning Vincent Gargiulo, since Gargiulo

5  was using a phone registered to him?

6  A    That didn't enter into my calculations here.  I had

7  no idea who Mr. Martulis was.

8  Q    Do you know now?

9  A    To this day I don't know who he is.

10  Q    If I told you it was his roommate, is it something

11  you may have heard from somebody sitting to the table --

12  at the table to my right?

13        MR. MISKIEWICZ:  Objection.

14        THE COURT:  Sustained.

15  Q    I want you to take a look at, if you could,

16  July 27th, 2003, at approximately 3:54 p.m.?

17  A    For which phone?

18  Q    I apologize.  For Mr. Justin Bressman.

19  A    The date again, sir?

20  Q    A call from Justin Bressman at 3:54 p.m. on

21  July 27th.

22  Q    July 27th at 3:55 p.m.?

23  A    Yes, sir.  3:54 p.m.?

24  Q    July 27th of '03?

25  Q    July 27th, Justin Bressman's phone.  Do you have

Stephanie Picozzi, OCR, RPR
Official Court Reporter

Zacarese-Cross/Rosen

1226

1  July 27th?

2  A    I have July 27th, Justin Bressman's phone number, at

3  3:55 p.m.

4  Q    Okay.

5        My notes say 3:54.

6        Tell us who he called on that date.

7  A    The number listed --

8        MR. MISKIEWICZ:  Objection.  What time?

9        MR. ROSEN:  He has 3:55.  It is my error, I said

10  3:54.

11        THE COURT:  3:55, okay.

12        MR. MISKIEWICZ:  Thank you.

13  A    It goes to (917) 806-2441.

14  Q    Do you know whose number that is?

15  A    No, sir, I do not.

16  Q    Did you make any attempt to investigate whose phone

17  number that would be?

18  A    No, sir.

19  Q    What is the next call you have on Justin Bressman's

20  phone?

21  A    On the 27th of July?

22  Q    Please.

23  A    The call is an incoming call at 3:58 p.m., with no

24  recorded number.  It lasts four minutes long.

25  Q    And do you know who called him?

Stephanie Picozzi, OCR, RPR
Official Court Reporter

Zacarese-Cross/Rosen

1227

1   A   According to these records, no, I have no way of
2   knowing because it was an anonymous number.
3   Q   And what the next -- what is the next phone call you
4   have?
5   A   On the 27th of July, 2003, at 4:02 p.m.  I have an
6   outgoing call of (917) 743-0766.
7   Q   And whose phone number is that?
8   A   I do not know.
9   Q   On August the 1st at 4:38 p.m. you have a call from
10  Justin Bressman -- August 1st.
11  A   Okay.
12          What time?
13  Q   August the 1st at 4:38 p.m.
14  A   That is line 733 on the report?  I'm asking you:  Is
15  that line 733 on the records?
16  Q   I'm looking at Justin Bressman's phone number on
17  August 1st, 2003, at 4:38 p.m.
18  A   (917) 509-9375.
19  Q   And has he called that number before?
20  A   Have I seen it before?
21  Q   Yes.
22  A   Yes.
23  Q   And whose phone number is it?
24  A   It is the cell phone number of Mr. Martin Martulis'
25  cell phone that Vinnie Gargiulo had.

Stephanie Picozzi, OCR, RPR
Official Court Reporter

Zacarese-Cross/Rosen

1228

1   Q   And on that date, Justin Bressman on August the 1st,
2   some 17 days before he was murdered, was speaking to
3   Justin Bressman; is that correct?
4   A   I'm sorry?  One more time.
5   Q   The homicide took place on the 18th of August, did it
6   not?
7   A   That's correct.
8   Q   And this is on August the 1st, is it not?
9   A   Yes, sir.
10  Q   How long was the call between the two of them?
11  A   According to this list, one minute.
12  Q   Okay.
13          Now, I want you to take a look at Vincent
14  Gargiulo's phone records for August the 1st at around
15  5:00 o'clock, the same afternoon that he called, that
16  Justin Bressman had called Vincent Gargiulo.
17          MR. MISKIEWICZ:  Which exhibit are we looking
18  at?  Which telephone number are we referring to?
19          THE COURT:  If you could.
20          MR. ROSEN:  We are looking at Vincent Gargiulo's
21  phone records in the name of Martin Martulis.
22  A   And the date again, sir?
23  Q   The date is the same day we were just discussing,
24  August 1st, 2003.
25          MR. MISKIEWICZ:  Again, referencing which

Stephanie Picozzi, OCR, RPR
Official Court Reporter

Zacarese-Cross/Rosen

1229

1   exhibit?
2           THE COURT:  I think he is looking at -- which
3   exhibit is it again?  I thought we were on the same page
4   here.
5           MR. ROSEN:  The witness should be looking at
6   Mr. Bressman's cell phone records.
7           THE COURT:  All right.
8           MR. ROSEN:  I'm sorry, Mr. Gargiulo's cell phone
9   records.
10          THE COURT:  And that is marked as which exhibit?
11  A   You are comparing Mr. Bressman's cell phone records
12  and Mr. Gargiulo's phone in the cus -- Martulis' phone in
13  the custody of Mr. Gargiulo; is that correct?
14  Q   Yes.
15  A   You want me to go to the same date on the 4th?
16  Q   The 1st?
17  A   August 1st, 2003.
18  Q   And the time again, sir?
19  A   5:15 p.m.
20          MR. MISKIEWICZ:  What phone number are we
21  talking about?
22          MR. ROSEN:  Vincent Gargiulo's cell phone.  Read
23  it into the record, please.
24          MR. MISKIEWICZ:  Which phone number is he
25  referring to?

Stephanie Picozzi, OCR, RPR
Official Court Reporter

Zacarese-Cross/Rosen

1230

1           MR. ROSEN:  (917) 509-9375; is that correct?
2           THE COURT:  Is that the number you have as the
3   number that Mr. Gargiulo was using that came from Martin
4   Martulis?
5           THE WITNESS:  That's correct, your Honor.
6           THE COURT:  All right.
7   Q   You are looking at those phone records, the calls to
8   and from Vincent Gargiulo's cell phone.
9           Do you understand?
10  A   Yes.
11  Q   Please.
12  A   On August 1st at 5:15 p.m., the cell phone
13  (917) 509-9375 originated a phone call outbound to
14  (917) 373-9990.
15  Q   Who is that person?
16  A   I have no idea, sir.
17  Q   Do you know the name Sammy Soto?
18  A   No, sir.
19  Q   And do you know anything about the background of
20  Mr. Soto and drug trafficking in Manhattan?
21  A   No, sir.
22          MR. MISKIEWICZ:  Objection.
23  Q   Did you do --
24          THE COURT:  Overruled.
25  Q   Did you do anything to investigate that phone number

Stephanie Picozzi, OCR, RPR
Official Court Reporter

Zacarese-Cross/Rosen

**1231**

1   and that person?
2   **A   No, sir.**
3       **My investigation was limited to cell phone**
4   **records and their connection between each other.**
5   **Q**   That is what I'm asking you.
6   **A   Sorry?**
7   **Q**   These are cell phone records.  These are calls made
8   from targeted phones, and you don't know who he is
9   calling; is that correct?
10      MR. MISKIEWICZ:  Objection to form.
11      THE COURT:  Sustained.
12  **Q**   The next call at 5:27 to Mister -- from
13  Mr. Gargiulo's cell phone goes to who, sir?
14      We are staying with Mr. Gargiulo's phone
15  records, his cell phone records.
16  **A   That's correct.**
17  **Q**   August 1st.
18  **A   August 1st, the next successive phone number is at**
19  **5:18 p.m.**
20  **Q**   Well, I have -- I have --
21      MR. MISKIEWICZ:  Objection.
22  **Q**   -- 5:27?
23      THE COURT:  Do you have a 5:27 on there after
24  the --
25      THE WITNESS:  There are a -- it is a

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

---

Zacarese-Cross/Rosen

**1233**

1   **A   It says three minutes.**
2   **Q**   At 5:39 p.m., who did Mister -- or the person who had
3   that phone, who did they call next?
4   **A   (917) 373-9990.**
5   **Q**   And whose phone number is that?
6   **A   You tell me it is Mr. Soto's phone.**
7   **Q**   Right.
8       He called it again?
9   **A   Yes.**
10  **Q**   So now he has called it four times in less than two
11  hours, and you don't know who the person is he is calling?
12      MR. MISKIEWICZ:  Objection.
13  **Q**   Correct?
14      THE COURT:  Sustained.
15  **Q**   Do you know who he was calling?
16  **A   Do I know?**
17  **Q**   Do you know who he was calling?
18  **A   Do I know Mr. Soto?**
19  **Q**   Yes.
20  **A   No, I do not.**
21  **Q**   And the next number -- I apologize.
22      The next time is 7:07 p.m.  Where is the call
23  to?
24  **A   To the Bressman cell phone.**
25  **Q**   Now he has called Justin Bressman, and within three

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

---

Zacarese-Cross/Rosen

**1232**

1   considerable number of calls later.
2       THE COURT:  Calls later?
3       THE WITNESS:  Right.
4   **Q**   Do you have a call at 5:15 p.m. from Vincent
5   Gargiulo?
6   **A   To what number?**
7   **Q**   What do you have?
8   **A   I have (917) 373 9990.**
9   **Q**   That is the one we just discussed with Mr. Soto?
10  **A   That is the one I just gave you, yes.**
11  **Q**   The next call I'm interested in is at 5:27 p.m. from
12  Mr. Gargiulo.
13  **A   The next call at 5:27 is (917) 373-9990.**
14  **Q**   And that is Mr. Sammy Soto again; is that correct?
15  **A   That is the same number.  I don't know who it belongs**
16  **to.**
17  **Q**   And during that same minute, who did he call next, or
18  that phone call, to who next?
19  **A   The next recorded phone call is again 5:27,**
20  **(917) 445-2141.**
21  **Q**   And whose phone number is that?
22  **A   That is the Bressman cell phone.**
23  **Q**   So on that date we have a call from Mr. Gargiulo's
24  phone to Justin Bressman.  And how long was that phone
25  call, what was the duration?

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

---

Zacarese-Cross/Rosen

**1234**

1   hours he called him twice and Mr. Soto four times; is that
2   correct?
3   **A   Somebody has called those numbers that amount of**
4   **times, yes.**
5   **Q**   Do you have any information to tell us that Gargiulo
6   was not using that phone on August 1st?
7       MR. MISKIEWICZ:  Which phone?
8       MR. ROSEN:  The Gargiulo cell phone that we
9   agreed to.
10      THE COURT:  Sustained.
11      Come on up.
12      Excuse me.
13      (Continued on next page.)
14
15
16
17
18
19
20
21
22
23
24
25

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

Zacarese-Cross/Rosen

1235

1    (Whereupon, at this time the following took
2  place at the sidebar.)
3    THE COURT:  I have no problem with you asking
4  repeatedly this particular number, this particular number.
5  You can summarize it as far as I'm concerned.  But,
6  please, don't continue to ask him, doesn't he know it is
7  Soto?  I see the jurors are beginning to gesture that they
8  are not interested.
9    MR. ROSEN:  Thank you.
10    (Continued on next page.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

---

Zacarese-Cross/Rosen

1237

1    MR. MISKIEWICZ:  I'm objecting to testimony from
2  counsel.
3    MR. ROSEN:  We stipulated to it.
4    MR. MISKIEWICZ:  Objection.  There is no
5  stipulation.
6    THE COURT:  Come on up.  Let's straighten this
7  out, gentlemen.
8    (Continued on next page.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

---

Zacarese-Cross/Rosen

1236

1    (Whereupon, at this time the following takes
2  place in open court.)
3  **Q**  Still looking at 7:07 p.m. on August the 1st to
4  Vincent Gargiulo's cell phone.
5    Did he call Justin Bressman?
6  **A  There was a phone call made from the Gargiulo cell**
7  **phone, outbound to (917) 445-2141.  It lasted for**
8  **approximately one minute at 7:07 p.m. on August 1st.**
9  **Q**  And whose phone number is that?
10  **A  That is the Bressman cell phone.**
11  **Q**  I want you to go now to August the 2nd.
12  **A  Time?**
13  **Q**  10:27 a.m.
14  **A  I have it.**
15  **Q**  Also looking at Mr. Gargiulo's phone records; is that
16  correct?
17  **A  These are Mr. Gargiulo's phone records, yes, sir.**
18  **Q**  Tell us, who did he call?
19    MR. MISKIEWICZ:  Can we have it again?  What
20  phone number are we referring to?  The phone number?
21    MR. ROSEN:  We should be referring to
22  (917) 509-9375; is that correct?
23  **A  That's correct, sir.**
24  **Q**  And the one that is registered to Martin Martulis
25  that Vincent Gargiulo was using?

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

---

Zacarese-Cross/Rosen

1238

1    (Whereupon, at this time the following took
2  place at the sidebar.)
3    THE COURT:  You are saying that there was an
4  agreement that Mr. Gargiulo was using the cell phone that
5  was registered to Martin Martulis?  Is that what you are
6  saying.
7    MR. MISKIEWICZ:  Your Honor, he has gotten the
8  witness confused.  He did an excellent job, and that is
9  good for him.  But the phone number he keeps referring to
10  is Martin Martulis' phone.
11    THE COURT:  There are two Martulis phones?
12    MR. MISKIEWICZ:  The testimony is it is a (917)
13  860 -- I don't remember the last four digits at this time
14  standing here.
15    I will clean it up on redirect.  But I think
16  this is contrary to the stipulation as to which phone
17  number it is.
18    THE COURT:  Get the stipulation out and let's
19  read out the stipulation and get it cleared up.
20    MR. ROSEN:  Judge, can we take ten minutes to
21  get this cleared up?
22    THE COURT:  All right.
23    (Continued on next page.)
24
25

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

Zacarese-Cross/Rosen

1239

1    (Whereupon, at this time the following takes
2    place in open court.)
3    THE COURT:  Folks, we will take our
4    mid-afternoon break, hopefully 15 minutes, and no more.
5    Just don't talk about the case or anything that
6    is happening here.
7
8    (Whereupon, at this time the jury leaves the
9    courtroom.)
10   MR. MISKIEWICZ:  We can probably excuse the
11   witness.
12   THE COURT:  You can step down.
13   THE WITNESS:  Thank you, your Honor.
14   THE COURT:  Is it going to take a while to find
15   the stipulation, or do you have it?
16   MR. MISKIEWICZ:  No.  I have the stipulation.
17   THE COURT:  All right.
18   MR. MISKIEWICZ:  The stipulation does not
19   indicate the user of the numbers.  It only indicates the
20   custodian, or what the custodian would testify to.
21   The number that is in question is -- the number
22   that Agent Schelhorn testified was the number that
23   Mr. Gargiulo used was (917) 860-6210.
24   The phone number that counsel has been referring
25   to as the Gargiulo/Matulis number is (917) 509-3375.

Stephanie Picozzi, OCR, RPR
Official Court Reporter

Zacarese-Cross/Rosen

1240

1    MR. ROSEN:  I asked him which phone it was --
2    THE COURT:  He hasn't memorized the stipulation.
3    And I don't see any reason to confuse the jury any further
4    because he is not that good on numbers, unfortunately.
5    But you entered into a specific stipulation, and
6    to go around and around with different numbers that are
7    not in the stipulation will just needlessly confuse the
8    jury.
9    MR. ROSEN:  Judge, I asked him which Marty
10   Matulis number it was.  And he read it into the record.
11   Is this the one that Vince Gargiulo is using?
12   Yes.
13   And I followed along with that.  I'm not the one
14   who is confused.  The witness is confused because he
15   didn't remember the second Marty Matulis number that was
16   used by Marty Matulis.
17   THE COURT:  Let me get up to that portion
18   because I was not writing down the numbers, I know there
19   was one critical number that ended in a zero, and this
20   wasn't it.
21   I will search for it.  Just take a break at this
22   point.
23   MR. MISKIEWICZ:  Judge, we are not making any
24   application with regard to any of the testimony.  At this
25   stage, other than we have gone through this, it is

Stephanie Picozzi, OCR, RPR
Official Court Reporter

Zacarese-Cross/Rosen

1241

1    confusing.  And we will clean up whatever we have to do on
2    redirect.
3    THE COURT:  And he does say that in response to
4    your question, or your objection, Mr. Miskiewicz, which
5    phone number is he referring to?
6    Mr. Rosen, (917) 509-9375; is that correct?
7    The Court:  Is that the number you have as the
8    number Gargiulo was using that came from Martin Martulis?
9    The Witness:  That's correct, your Honor.
10   The Court:  All right.
11   Mr. Rosen, you are going with what is presented.
12   But you are on notice that the stipulation does not apply
13   to it.  And the jury should probably be instructed there
14   is no such stipulation.
15   MR. ROSEN:  We entered into the stipulation to
16   allow the records in and identify those records so we
17   wouldn't have to bring the custodian in.
18   THE COURT:  I understand.
19   MR. MISKIEWICZ:  My objection was in the
20   presence of the jury to suggest that there was a
21   stipulation that that number --
22   THE COURT:  Was the number being used.  And that
23   was not in the stipulation.  I agree.
24   All right.  We are moving on.
25   How much longer do you think you have with

Stephanie Picozzi, OCR, RPR
Official Court Reporter

Zacarese-Cross/Rosen

1242

1    Detective Zacarese?
2    MR. ROSEN:  I on my notes followed along with
3    him thinking that was Vincent Gargiulo's and it turned out
4    it is Martin Martulis.
5    THE COURT:  So everybody is confused.
6    MR. ROSEN:  Yes.
7    THE COURT:  All right.
8    How much longer do you have with him?
9    MR. ROSEN:  I have some time with him.
10   THE COURT:  Over an hour and a half?
11   MR. ROSEN:  Oh, no, no, no.
12   THE COURT:  A half an hour?
13   MR. ROSEN:  I don't know.  I'm more confused now
14   about the Marty Matulis registration.  And how the witness
15   doesn't know that before he takes the stand is also
16   troubling.  But that is okay.
17   We will try -- will the Court say something to
18   the jury that unfortunately the witness and counsel were
19   under the wrong -- using the wrong phone number for
20   Mr. Gargiulo?  Something to clarify --
21   THE COURT:  I don't want to decide facts here.
22   If there has been confusion, it is up to the government to
23   straighten it out when they get up in terms of what the
24   numbers are.
25   The witness has obviously made an error.

Stephanie Picozzi, OCR, RPR
Official Court Reporter

Zacarese-Cross/Rosen

1243

1  Therefore, the jury can assess that.  You can try to get
2  the numbers straight.  And based on the questions asked by
3  the Court, and by you, Mr. Rosen, and with the initial
4  question by Mr. Miskiewicz, the jury can make a
5  determination as to whether it is a willful or intentional
6  error or it is just a general confusion on not memorizing
7  the numbers.
8         Thank you.
9
10         (Whereupon, a recess was taken.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Zacarese-Cross/Rosen

1244

1         THE COURT:  What is the situation?
2         Let's get Mr. Zacarese back on the stand.
3         MR. ROSEN:  He made a mistake.  He was using the
4  wrong phone list and wrong phone numbers.
5         I will try to cut to the chase and ask him to
6  refresh his recollection.  They have a phone key, to use
7  the key.
8         THE COURT:  All right.
9         Why don't you resume the stand.
10        Mr. Miskiewicz, you don't have a problem with
11  that, do you?
12        MR. MISKIEWICZ:  No, your Honor.
13        THE COURT:  All right.
14        (Whereupon, the jury at this time entered the
15  courtroom.)
16        THE COURT:  Please be seated.
17        Ready to resume.
18        Mr. Rosen.
19        MR. ROSEN:  Yes, your Honor.
20  BY MR. ROSEN:
21  Q    Detective Zacarese, there is a key phone list.
22        I believe you may have been mistaken as to whose
23  numbers are what, and we spent 20 minutes doing it.  But
24  we will try to clarify that up now.
25  A    Yes.

---

Zacarese-Cross/Rosen

1245

1  Q    Please take a look at the list, and I will let you
2  read right off the list, and you don't have to refresh
3  your recollection or anything.  Just please read to us
4  first Vincent Gargiulo's phone number that is registered
5  to -- in the name of Martin Martulis.
6  A    **(917) 860-6210.**
7  Q    Okay.
8         You understand that you have been giving us
9  (917) 509-9375 this whole time, and that is Marty
10  Martulis' number?
11  A    **That is Marty Martulis' cell phone, yes.**
12  Q    And when I asked you about Vince Gargiulo, you told
13  us that the 9375 number was Vince's, it wasn't?  You made
14  a mistake.  It is okay.  And I just want to clarify that
15  the whole time you were doing Marty Martulis' number
16  instead of Vincent Gargiulo's number, you understand now?
17  A    **I understand I was confused by your question, yes,**
18  **sir.**
19  Q    I confused you by asking you what phone number it
20  was?
21        MR. MISKIEWICZ:  Objection.
22        THE COURT:  Sustained.
23        Let's move on.  He asked about a number ending
24  in zero, and we were discussing that at that time.
25  Q    What is Vincent Gargiulo's phone number?  You can

---

Zacarese-Cross/Rosen

1246

1  read it right off the paper.
2  A    **The Gargiulo cell phone?**
3  Q    Yes.
4  A    **The Gargiulo cell phone.  That is the subscriber of**
5  **Marty Martulis.**
6  Q    Correct?
7  A    **Is (917) 860-6210.**
8  Q    And when we are talking about Mr. Gargiulo, please
9  refer to that.  Okay?
10        Now that you have your list, do you see that
11  there is a separate number for Martin Martulis?
12  A    **That would be the Martin Martulis cell phone number.**
13        THE COURT:  And what is the number for the
14  Martulis cell phone number?
15        THE WITNESS:  It is listed here as Martin
16  Martulis, in parenthesis, Gargiulo roommate, close
17  parenthesis, cell.  And that is (917) 509-9375.
18  Q    Okay.
19        That is Marty Martulis' cell phone, okay?
20  A    **Yes, sir.**
21  Q    I want you to take a look at the phone records for
22  the Synergy Fitness Club on West 23rd Street.  I have it
23  as VZ-3.
24        Do you have those records, sir?
25  A    **What do you have it as?**

Zacarese-Cross/Rosen

1247

1  Q   V --
2  A   VZ?
3  A   VZ-3.
4  A   3, okay.
5       (Whereupon, at this time there was a pause in
6  the proceedings.)
7  A   Yes, sir, I have it.
8  Q   Okay.
9       I'd like you to go to August 14th of '03,
10 please.  We are dealing with West 23rd Street, Synergy
11 Gym, August 14th, 2003.
12 A   The hour of the day?
13 Q   Sorry?
14 A   The hour of the day?
15 Q   The whole day.
16 A   Okay.
17 Q   Do you see records for the whole day of August 14th,
18 please?
19 A   The records start on page 4 of the records.  They
20 continue to page 5 and end on page 6.
21      MR. ROSEN:  Judge, may I approach?
22      THE COURT:  Yes.
23      (Counsel approaches the witness stand.)
24 Q   Please look at page 6.
25      Do you see the date August 14th, 2003 on that

Stephanie Picozzi, OCR, RPR
Official Court Reporter

Zacarese-Cross/Rosen

1248

1  page?
2  A   Yes, sir.  As I said, this is where it ended when you
3  told me to look up the 14th.
4  Q   Okay.
5       So what is referred to on page 6 of those
6  records, the last phone call, it was made at what time?
7  A   The last phone call on the page or the last phone
8  call for the 14th?
9  Q   For the 14th.
10 A   The last phone call made on the 14th was at 4:06 p.m.
11 The phone number dialed was (917) 373-9990.
12 Q   Right underneath that, what is the next entry in the
13 phone records right below the one that you looked at?
14 A   The next record in sequence is reported to have been
15 made on 3/8 -- sorry, 8/16 of '03, August 16th of '03, at
16 8:38 a.m.  That phone --
17 Q   There are no phone records for Friday, August 15th,
18 from the Synergy Gym on West 23rd Street; is that correct?
19 A   There are none produced in this report.
20 Q   Well, who produced the report?
21 A   The phone company.
22 Q   Does it tell you something about the fact of the
23 blackout that was on the 14th and the phones were not
24 working on the 15th at the West 23rd Street gym?
25 A   This report doesn't say anything about blackouts.

Stephanie Picozzi, OCR, RPR
Official Court Reporter

Zacarese-Cross/Rosen

1249

1  Q   The blackout was on Thursday, the 14th; is that
2  correct?
3  A   I know that independently of these phone records.
4  Q   All right.
5       Were there any phone calls made in and out of
6  the Synergy Gym on Friday, August 15th?
7  A   There is nothing recorded here on these records.
8  Q   When was the first phone call after August 14th at
9  the Synergy Gym?
10 A   I just said, August 14th of '03, at 8:38 in the
11 morning was the first phone call after the 14th of August.
12 Q   You mean the 16th, not the 14th?
13 A   After the 14th, the next phone call was the 16th at
14 8:38 a.m.
15 Q   Okay.
16      And these were produced for you or one of your
17 fellow agents by the telephone company; is that correct?
18 A   As I understand it, it was produced for the Manhattan
19 District Attorney's Office as per one of their subpoenas
20 by the phone company.
21 Q   Okay.
22      Thank you.
23      I want you to please, from your chart, the chart
24 that you made for this Court, August the 16th of '03.  Can
25 you please refer to your chart.

Stephanie Picozzi, OCR, RPR
Official Court Reporter

Zacarese-Cross/Rosen

1250

1  A   I don't have that copy.
2  Q   You don't have the evidence copy?
3  A   You are talking about the color-coded chart?
4  Q   No -- yes.  Isn't it up there?
5       This.
6  A   It is not here, no, sir.
7       MR. ROSEN:  I thought it was marked.
8       MR. MISKIEWICZ:  For the record, this is AZ-1.
9       MR. ROSEN:  I don't see it.
10      Can we substitute this?
11      THE COURT:  Yes.  Let him have it, yes.
12      MR. ROSEN:  Thank you.
13      (Handed to the witness.)
14 Q   I want you to take a look at your chart, August the
15 16th, 2003.
16 A   Yes, sir.  That would be the second page of this
17 group?
18 Q   I don't have your copy.  But I'm looking at
19 August 16th.  It should be the second page.
20 A   Yes, sir, it is.
21 Q   And, please, keep the phone number list that you have
22 and refer to it to make sure that we are dealing with the
23 right phone number.  Thank you.
24      On the 16th, would you say that that is a
25 Saturday?  Is August the 16th a Saturday?

Stephanie Picozzi, OCR, RPR
Official Court Reporter

1  A   My recollection says it is.  But I can't be sure
2  without looking at a calendar.
3  Q   Well, if the blackout was Thursday, the 14th, and
4  Friday was the 15th, and was Saturday the 16th?
5  A   It would seem so, yes.
6  Q   All right.
7          At 12:17 a.m., please take out the LeShawn
8  Campbell phone list, if you would.
9  A   Do you want me to work from the key?
10  Q   I want to make sure that LeShawn Campbell's phone
11  number is on the key.  And then I would like you to please
12  get the correct records according to the key, LeShawn
13  Campbell's phone records.
14  A   You want me to reference to you now the phone
15  numbers?
16  Q   Okay.
17          Give me LeShawn Campbell's phone record -- phone
18  number.  And then please find the records.
19  A   (212) 529-1837 .
20  Q   Okay.
21          Please find those records.
22  A   Yes, sir.
23  Q   Got them?
24  A   Yes, sir.
25  Q   Please turn to August 16th at 12:17 a.m., according

1  to your chart.
2  A   August 16th, 12:17 a.m., I have it.
3  Q   Got it?
4  A   Yes.
5  Q   See your chart?
6  A   Yes.
7  Q   Do you have the phone records?
8  A   I'm looking at the page, yes.
9  Q   You indicate that from Campbell's apartment at
10  12:17 a.m., Campbell/Amador apartment, land line.
11          Do you see that?
12  A   Yes, sir.
13  Q   There was a call made from that phone, which you
14  previously identified, to Martin Martulis' cell phone.
15  A   Yes, sir.
16  Q   Tell us what phone number that is.
17  A   (917) 519-9375.
18  Q   Now, you gave us Martin Martulis' phone number and
19  not Vincent Gargiulo's phone number.
20          Are you confused, or do you understand what is
21  written there?  And I don't mean any disrespect.  I want
22  to make sure we got it right.
23          Which cell phone number of Martin Martulis are
24  we talking about?  Are we talking about Martin Martulis'
25  cell phone or Vincent Gargiulo's cell phone?  Which one?

1  A   (917) 509-9375.
2  Q   Okay.
3  A   It is listed as Martin Martulis' cell phone.  Martin
4  Martulis was Gargiulo's roommate on the key.  And this was
5  his cell phone.
6  Q   So now you know who Martin Martulis is, but you
7  didn't know before because the key told you; is that
8  correct?
9  A   I still don't know who Martin Martulis is.  I know
10  this number belonged to Martin Martulis.
11  Q   Okay.
12          So there was a land line call to Martin
13  Martulis' phone number at 12:17; is that correct?
14  A   12:17, phone number at the LeShawn Campbell residence
15  made a phone call at 12:17 a.m. to a phone number
16  belonging to the cell phone of Martin Martulis.
17  Q   How long was the duration of the call?
18  A   These records do not show duration.
19  Q   Okay.
20          Did you attempt in any way to try to get records
21  produced by the phone company which would give you the
22  duration of the phone calls?
23  A   All records from that time period are no longer kept
24  by the phone company.  So no attempt could be made to make
25  the phone records available that far back.  Verizon

1  doesn't keep them that long.
2  Q   Okay.
3          The District Attorney's Office got involved in
4  this case in August of 2003.
5          When were the records subpoenaed so we would not
6  be placed in that position by the District Attorney's
7  Office in 2003, if you know?
8          MR. MISKIEWICZ:  Objection.
9          THE COURT:  Placed in that position by the
10  District Attorney's Office?
11          MR. ROSEN:  Meaning that we don't have proper
12  records from that time.
13          THE COURT:  Sustained as to proper records.
14          Do you have a question regarding procuring these
15  records?  If you do, I will let you ask that question.
16          MR. ROSEN:  Yes.
17  Q   When did you obtain the record that you have in
18  evidence for LeShawn Campbell's phone number?
19  A   When did I retain it?  When did I have access to
20  these records?
21  Q   Yes.
22  A   Within the last year.
23  Q   How about your office, when did they have access to
24  them?
25  A   Probably before that as well.

1290

Zacarese-Cross/Rosen

1255

1  Q   All right.
2        When is the next phone call, sir?
3  A   **The same day?**
4  Q   The same day, staying with LeShawn Campbell's
5  apartment.
6  A   **August 16th at 12:18, and it is in 2003, the next**
7  **phone number call is (917) 373-9990.**
8  Q   And whose cell phone is that?
9  A   **My recollection is that earlier you said it was**
10 **Mr. Soto.  And I think that is the name you used before,**
11 **but I'm not sure.**
12 Q   Okay.
13       According to your chart, at 12:18 there was a
14 call from Campbell/Amador to Tarantino.
15 A   **Yes, sir.**
16 Q   Okay.
17       So before the Soto call, there is a call to
18 Mr. Tarantino; is that correct?
19 A   **No.**
20       **After the Soto call there is a call to**
21 **Mr. Tarantino.**
22 Q   So in-between 12:17 and 12:18 there is a call on the
23 Campbell line to Soto?
24 A   **After the 12:17 call, the next two calls in**
25 **succession are both timed at 12:18.  The first call is to**

Stephanie Picozzi, OCR, RPR
Official Court Reporter

Zacarese-Cross/Rosen

1256

1  the 373-9990, and I believe it is Mr. Soto's number.  And
2  **the immediate call again at 12:18, which occurred during a**
3  **60 second cycle, was to Mr. Tarantino's phone.**
4  Q   And what is the next call or the fourth call of the
5  evening?
6  A   **The next call, and it wasn't in the evening.  This**
7  **was in the a.m.**
8  Q   The a.m., what time?
9  A   **12:22 a.m.**
10 Q   It is pretty dark out, isn't it?  It is early in the
11 morning?
12 A   **I would expect it to be dark during that hour, yes.**
13 Q   Thank you.
14       What is the fourth phone call?
15 A   **(917) 743-0766.**
16 Q   And what time was that call?
17 A   **Again, that was at 12:22 a.m.**
18 Q   And who did that go to?
19 A   **I'm sorry, sir.**
20 Q   Who did that go to?
21 A   **I don't know.**
22 Q   What was the next phone call on Saturday morning, the
23 16th, after the one you just told us about?
24 A   **The next phone call takes place at 12:23 a.m. on the**
25 **16th. It goes to 646, the area code.  602-1391.**

Stephanie Picozzi, OCR, RPR
Official Court Reporter

Zacarese-Cross/Rosen

1257

1  Q   Whose phone number is that?
2  A   **I don't know.**
3  Q   How many phone calls were made on Saturday evening
4  from LeShawn Campbell's apartment within the space of
5  about 15 minutes, starting at 12:17?
6  A   **Up to what time?**
7  Q   12:17 to 12:30, whatever you want.
8  A   **Doing just the a.m.'s.**
9  Q   Yes.
10 A   **Starts at 12:17 and stops at 2:58 a.m., which is just**
11 **before 3:00 o'clock in the morning.**
12 Q   Okay.
13       How many phone calls are made from that
14 residence on that Saturday night?
15 A   **13.**
16 Q   Going to your chart of August 21st, 2003, there seems
17 to be something missing.  Do you know what that is?
18       MR. MISKIEWICZ:  Objection.
19 Q   Something that you didn't put in.
20       MR. MISKIEWICZ:  Objection.
21 Q   Do you have the West 23rd Street Synergy Gym phone
22 records?
23 A   **VZ-3, to be sure we have the right ones, Victor Zebra**
24 **3?**
25 Q   Let me just make sure.

Stephanie Picozzi, OCR, RPR
Official Court Reporter

Zacarese-Cross/Rosen

1258

1        VZ-3, yes.
2  A   **All right.**
3  Q   I want you to go to August 21st, 2003?
4  A   **The timeframe?**
5  Q   The first call of the day.
6  A   **August 21st, 2003?**
7  Q   Yes.  August 21st, 2003.
8  A   **Just confirm that we are talking about the Synergy**
9  **Gym number from 43 West 23rd Street, Manhattan?**
10 Q   Yes, sir.
11 A   **(212) 647-8484 is the originating number.**
12 Q   Okay.
13       On your chart, so there is no confusion, on your
14 chart you have 10:25 a.m. on August 21st, and let me put
15 that up.
16       (At this time a document was exhibited on
17 courtroom screen.)
18 Q   Do you see August 21st, 2003?  Do you see it up
19 there?
20 A   **Yes, sir.**
21 Q   Is there a phone call from Synergy Gym in Baldwin,
22 New York, to Mel Roth?
23       I don't want to confuse you.  I got you looking
24 at Synergy Gym on West 23rd on hold.  I'm now asking about
25 Synergy Gym in Baldwin, New York, as per your chart.

Stephanie Picozzi, OCR, RPR
Official Court Reporter

Zacarese-Cross/Rosen
1259

1  Okay?
2  A  You want me to pull the Baldwin records now?
3  Q  No.  I'm asking you to look at your chart and tell me
4  if it is accurate what is said up there.  Look at the
5  chart, your chart.
6  A  I'm looking at this chart which you have up here.
7  (indicating)?
8  Q  Yes.
9  A  This particular one -- 10:25 a.m.?
10  Q  Yes.
11         Is that accurate, your own chart?
12  A  I don't know.  I would have to check the other
13  records.
14  Q  Who prepared the chart?
15  A  I did.
16  Q  So you don't know without checking -- I'll accept
17  that that is your chart and that you did it right.
18  A  Yes, sir.  But you are asking me if it is accurate.
19  And I need to look at the other records.
20  Q  All right, go ahead.
21         (Whereupon, at this time there was a pause in
22  the proceedings.)
23  A  8/21, 2003 --
24  Q  Your chart says 10:25 -- oh, the date.
25  A  8/21/2003, 10:25 in the morning, phone number

Stephanie Picozzi, OCR, RPR
Official Court Reporter

Zacarese-Cross/Rosen
1260

1  (516) 683-8400, which is Mel Roth's number, was dialed
2  from the Synergy Gym in Baldwin.
3  Q  Okay.
4         Now, I want you to go back to the Synergy Gym
5  exhibit, which is VZ-3, at West 23rd Street, same time,
6  same date.
7  A  Synergy Gym on West 23rd Street for August 21st, 2003
8  at 10:25 a.m.?
9  Q  Correct.
10  A  There is no call at 10:25 a.m.
11  Q  What is the first phone call on the day of
12  August 21st of 2003 from the Synergy Gym on West 23rd?
13  A  On the 21st of August, 2003, at 8:11 a.m. (sic).
14  Phone number (212) 645-5200 was dialed.
15  Q  Okay.
16         MR. ROSEN:  May I approach, Judge?
17         THE COURT:  Yes.
18         (Counsel approaches the witness stand.)
19  Q  Do you have the Synergy Gym records VZ-1?
20  A  VZ-3 is the Synergy Gym, 43 West 23rd Street in
21  Manhattan, New York.
22  Q  Yes.
23         Please go to page 11.
24  A  The phone call starts on the 24th on page 10.
25  Q  Please go to page 11.

Stephanie Picozzi, OCR, RPR
Official Court Reporter

Zacarese-Cross/Rosen
1261

1  A  Page 11?
2  Q  Yes.
3         Just to be safe, the last phone call on page 10,
4  what is the time of that call from Synergy Gym?
5  A  From Synergy Gym on the morning of the 21st of
6  August, 2003?
7  Q  Yes, sir.
8  A  The first phone call that was dialed from that number
9  at the Synergy Gym was dialed, (212) 645-5200, and that
10  was at 8:11 a.m. on the morning of the 21st.  The first
11  call of the day.
12  Q  Okay.
13         Let's go to 10:30 on that day.
14  A  10:30 on the 21st?
15  Q  Yes.
16  A  Still from the 23rd Street gym?
17  Q  Yes, sir.
18  A  10:31 is the closest phone call, and it was to
19  (212) 679-7300.  And that call took place at 10:31 the
20  morning of the 21st.
21  Q  And what was --
22  A  From the Synergy Gym on 21st Street in Manhattan, not
23  Baldwin.
24  Q  Correct.
25         What was the duration of the phone call?

Stephanie Picozzi, OCR, RPR
Official Court Reporter

Zacarese-Cross/Rosen
1262

1  A  These records do not show duration.
2  Q  And the next call, and that would be -- withdrawn.
3         Do you know the number that was called from the
4  Synergy Gym on West 23rd Street that day, (212) 679-7300?
5  Can you tell us whose phone number that was?
6  A  No, sir, I cannot.
7  Q  Okay.
8         Were you here for Detective Salta's testimony?
9  A  Yes, sir.
10  Q  Did you hear Detective Salta say that he went to pick
11  up Justin Bressman at 10:30 in the morning on the 21st?
12  A  Yes, sir.
13  Q  And the phone call made from the phone at 10:31, did
14  you think that that was an important call for you to
15  determine whose phone number that was and place it on your
16  chart?
17  A  No, sir.
18  Q  I would like you to take a look at LeShawn Campbell's
19  cell phone -- withdrawn.
20         I would like you to take a look at LeShawn
21  Campbell's land line one more time.
22  A  I have it.
23  Q  I'm sorry?
24  A  I have it.
25  Q  What is the furthest date that you have going back?

Stephanie Picozzi, OCR, RPR
Official Court Reporter

Zacarese-Cross/Rosen

1263

1 A   On which --

2 Q   On LeShawn Campbell's?

3 A   The earliest or the last day?

4 Q   I apologize.  The earliest date.

5 A   These records start on August 5th of 2003, and they

6 end on August 25th.

7         MR. ROSEN:  Your Honor, I would like to be able

8 to supplement the record for that phone line beginning on

9 March the 19th of 2003.

10        THE COURT:  Why don't you just come up for a

11 moment and we can discuss it.

12        MR. ROSEN:  Okay.

13        (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

Stephanie Picozzi, OCR, RPR
Official Court Reporter

---

Zacarese-Cross/Rosen

1264

1         (Whereupon, at this time the following took

2 place at the sidebar.)

3         THE COURT:  All right.

4         MR. ROSEN:  These were records supplied to me by

5 the government.

6         THE COURT:  What is the purpose of getting

7 something from March 19th?

8         MR. ROSEN:  Well, it starts on March 19th.

9         There are a series of phone calls.  I will not

10 go into every one, maybe two or three, where LeShawn

11 Campbell's phone line calls Justin Bressman's cell phone

12 number.

13        THE COURT:  Okay, sure.

14        MR. MISKIEWICZ:  Can I just see that?

15        MR. ROSEN:  Yes.

16        THE COURT:  Are the tabs --

17        MR. ROSEN:  Those are mine.

18        THE COURT:  My question is:  Those are the

19 calls?

20        MR. ROSEN:  Yes.

21        MR. MISKIEWICZ:  Can we have it marked as an

22 exhibit, a defense exhibit?  We have no objection to it.

23        THE COURT:  Defendant's Exhibit E.

24        (Whereupon, Defendant's Exhibit E was received

25 in evidence.)

Stephanie Picozzi, OCR, RPR
Official Court Reporter

---

Zacarese-Cross/Rosen

1265

1         (Continued on next page.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Stephanie Picozzi, OCR, RPR
Official Court Reporter

---

Zacarese-Cross/Rosen

1266

1         (Whereupon, at this time the following takes

2 place in open court.)

3         MR. ROSEN:  Your Honor, the government has no

4 objection --

5         THE COURT:  Yes, supplementing the record with

6 those numbers.

7 Q   Going back --

8         THE COURT:  And you are marking it as

9 Defendant's Exhibit --

10        MR. ROSEN:  Exhibit E.

11        THE COURT:  Now in evidence.

12        MR. MISKIEWICZ:  There is no objection.

13        THE COURT:  Okay.

14        MR. ROSEN:  Judge, it would be easier if I stand

15 here and go through the tabs very quickly.

16        THE COURT:  Stand there, okay.

17        MR. ROSEN:  I think it would be helpful.

18        THE COURT:  No problem.

19 Q   Do you have your phone list?  Yes.

20        Taking a look at what is marked in evidence as

21 Defendant's Exhibit E, the land line phone numbers of

22 LeShawn Campbell, and I bring your attention to April the

23 3rd -- sorry, April 22 of 2003.  Do you see it, the yellow

24 line.

25 A   4/22 of '03?

Stephanie Picozzi, OCR, RPR
Official Court Reporter

1290

Zacarese-Cross/Rosen

1267

1 Q    Yes.

2       That is from LeShawn Campbell's apartment.

3       Who did he call, or somebody call, from that

4 line as early as April 22 of 2003?

5 A    **The number recorded here on this call is -- going out**

6 **from Campbell, and verifying Campbell's number, is**

7 **(917) 445-2141.  And that number comes back to the**

8 **Bressman cell phone.**

9 Q    So somebody as early as April of 2003 called Justin

10 Bressman's cell phone from the LeShawn Campbell apartment;

11 is that correct?

12 A    **Yes, sir.**

13 Q    And how long was the duration of that phone call?

14 A    **Not indicated here on the duration.**

15 Q    Thank you.

16       MR. ROSEN:  May I, Judge?

17       THE COURT:  Yes.

18       MR. ROSEN:  Thank you.

19       (Whereupon, at this time there was a pause in

20 the proceedings.)

21 Q    Taking a look at April 25th of 2003, do you see the

22 yellow lines?

23 A    **Yes, sir, I do.**

24 Q    What is the earliest phone call on that date that is

25 in yellow, and that refers to the phone number so the

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

---

Zacarese-Cross/Rosen

1268

1 record is clear --

2       MR. ROSEN:  I'm trying to make it as easy as I

3 can.

4       THE COURT:  Okay.

5 Q    Oh, on April 25th --

6 A    **On April 25th, according to these records, the phone**

7 **number called again at 3:59 p.m. at 4:00 p.m. and at**

8 **4:05 p.m.**

9 Q    So within a space of three minutes?

10 A    **Same number, (917) 445-2141.**

11 Q    And whose number was called?

12 A    **Again, it is Mr. Bressman's cell phone.**

13 Q    Moving forward to April 28th, the phone records of

14 LeShawn Campbell -- I apologize -- yes, April 28th.

15 A    **You want me to read these here?**

16 Q    Yes, please.

17       Just make sure we have the date, the time and

18 the accurate number that was called from LeShawn Campbell

19 to this number.

20 A    **Originating from LeShawn Campbell's phone?**

21 Q    Yes, sir.

22 A    **On April 28th, at 7:33 p.m., at 8:39 p.m., at**

23 **8:45 p.m.**

24 Q    Stop right there.

25       Whose number on those three occasions were

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

---

Zacarese-Cross/Rosen

1269

1 called?

2 A    **Justin Bressman's cell phone, (917) 445-2141.**

3 A    And that was in April of '03?

4 A    **According to these records, yes.**

5 Q    Somebody obviously knew Justin Bressman's cell phone

6 number in order to call him?

7 A    **I can't speculate on who knew what.**

8 Q    I didn't ask you that.

9       Somebody from that number called his phone, his

10 cell phone?

11 A    **That phone number at LeShawn Campbell's apartment**

12 **dialed Justin Bressman's cell phone.**

13 Q    Yes, sir, okay.

14       Keep going.

15 A    **Again on the same date, April 28th of '03, dialed**

16 **from LeShawn Campbell's phone number to Justin Bressman's**

17 **phone number of (917) 445-2141, at 10:58 p.m., at**

18 **10:58 p.m. a second time, at 11:42 p.m., and then it**

19 **continues on to the next day.**

20 Q    This --

21 A    **That is the 29th.**

22 Q    Were there any phone calls?

23 A    **Yes, sir, there was.**

24       April 29th of '03, 12:18 p.m., from LeShawn

25 Campbell's phone line dialed (917) 445-2141 at 12:18 p.m.,

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

---

Zacarese-Cross/Rosen

1270

1 no duration listed.

2 Q    Turning now again to Defendant's Exhibit E in

3 evidence, referring to June 3rd of 2011.

4       Can you tell us if there is a call between

5 LeShawn Campbell's apartment and Justin Bressman's cell

6 phone number?

7       (Defense counsel confer.)

8       MR. ROSEN:  Sorry, 2003.

9 A    **The records you showed me, if it is correct, from the**

10 **time period of June 11th, 2003, and the highlighted**

11 **portion of this page shows a phone call made from the**

12 **Justin Bressman -- from the LeShawn Campbell land line**

13 **phone to phone number (917) 445-2141, and it was made at**

14 **1:34 a.m.  No duration shown.**

15       **The next item is on July 28th, 7/28 of '03.  It**

16 **originates from (212) 529-1837, which is the LeShawn**

17 **Campbell land line.  And it goes out to (917) 445-2141,**

18 **which is the Bressman cell phone, at 2:16 p.m.  No**

19 **duration shown.**

20 Q    Taking a look at the same Exhibit E in evidence, we

21 are now on August the 4th of 2003.  The highlighted

22 portions, please.

23 A    **Again, for clarification, the phone number originated**

24 **in the call (212) 529-1837, and it takes place on**

25 **August 4, 2003.**

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

Zacarese-Cross/Rosen

1271

1    The first highlighted call is at 7:28 p.m.  The
2  (917) 445-2141, which is listed as the Bressman cell
3  phone.
4    The next call for that same phone number is at
5  7:33 p.m.  And both of those calls have no duration.
6    The next subsequent phone call to Justin
7  Bressman's cell phone number of (917) 445-2141 takes place
8  on August 4th, 2003, at 7:46 p.m.
9  Q   No duration on any of these?
10 A   No duration on any of these records.
11   MR. ROSEN:  That's it.
12   THE COURT:  Okay.
13   MR. ROSEN:  These are other notes, this stuff.
14   THE COURT:  All right.  That is fine.
15   MR. ROSEN:  May I have one moment, if your Honor
16 please?
17   THE COURT:  Sure.
18   MR. ROSEN:  Thank you.
19   (Whereupon, at this time there was a pause in
20 the proceedings.)
21   MR. ROSEN:  Judge, one more moment, please?
22   THE COURT:  Sure.
23   (Defense counsel confer with the defendant.)
24   MR. ROSEN:  No further questions, your Honor.
25   THE COURT:  Anything further?

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

---

Zacarese-Redirect/Miskiewicz

1272

1    MR. MISKIEWICZ:  May I approach the witness box
2  and confer with counsel for a moment?
3    THE COURT:  Yes.
4    (Counsel confer.)
5
6  REDIRECT EXAMINATION
7  BY MR. MISKIEWICZ:
8  Q   Detective Zacarese, showing you what is now marked as
9  Defendant's Exhibit AZ-2.
10   (Handed to the witness.)
11 Q   Is that the key of phone records you testified about
12 earlier today and this afternoon?
13 A   Yes, this is the key to the phone numbers and that
14 are assigned to each of the individuals contained in this
15 book.
16   MR. MISKIEWICZ:  The government moves the
17 admission of SI-2.
18   MR. ROSEN:  No objection.
19   THE COURT:  In evidence.
20   (Whereupon, Government's Exhibit SI-2 was
21 received in evidence.)
22   MR. MISKIEWICZ:  No further questions.
23   THE COURT:  Anything further?
24   MR. MISKIEWICZ:  No questions.
25   THE COURT:  From Mr. Rosen.

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

---

Zacarese-Redirect/Miskiewicz

1273

1    MR. ROSEN:  No, ma'am.
2    THE COURT:  You may step down.
3    (Whereupon, the witness leaves the witness
4  stand.)
5    THE COURT:  Do you wish to approach on your next
6  witness?
7    (Continued on next page.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

---

1274

1    (Whereupon, at this time the following took
2  place at the sidebar.)
3    THE COURT:  Does it make any sense to -- well, I
4  have additional argument to hear from you.  And it is not
5  going to be long, Mr. Rosen.
6    MR. ROSEN:  No, no.
7    THE COURT:  Mrs. Mulligan is going to be sent
8  home?
9    MR. FLYNN:  If it is all right with the Court, I
10 guess the government would I guess recommend that she
11 testify first thing in the morning.
12   THE COURT:  No problem with that.
13   MR. FLYNN:  She has been subpoenaed and she will
14 be here.
15   THE COURT:  I very clearly heard what was on the
16 tape.  And I also conferred with my law clerk, whose ears
17 is a little bit better because he is substantially
18 younger, and he verified what I thought that was on there.
19 And he disagrees with me when he feels there is something
20 else.
21   MR. ROSEN:  I will listen to it again.  Let me
22 just listen to it again, and I would appreciate --
23   THE COURT:  Just be here at 9:15 in the morning
24 to start, and with the equipment.
25   MR. ROSEN:  All right.

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

**1275**

1      You have to get up earlier.

2      THE COURT:  Not the witness.

3      MR. FLYNN:  Ms. Mulligan will be here at 9:15 to

4 start the trial?

5      THE COURT:  No.

6      We should have her available in case there is

7 any clarification that needs to be asked.

8      Right now, based on what I heard, and based on

9 the rules of evidence in terms of the authenticity, in

10 terms of the best evidence rule, I'm going to allow her to

11 testify.

12      In terms of any discrepancies that you have

13 seen, as far as I'm concerned, it goes to the weight and

14 not to her being able to testify.

15      You can cross her on a number of things.  If you

16 want to admit the tapes, unless I hear something else --

17 well, what is your position on that?

18      MR. FLYNN:  There are two tapes.

19      THE COURT:  I heard those two phone calls.

20      MR. FLYNN:  The government's position based on

21 what we heard is consistent and no impeachment value in

22 that first tape at all.

23      The second tape causes a little bit of a

24 different issue for the government.  But it does not

25 relate to the letter.  That relates to a second

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

**1276**

1 face-to-face conversation she had with the defendant in

2 August of 2003, based on what I heard on that tape, or

3 that conversation, which was the second conversation that

4 was played, the one from January 5th, 2012.  And there was

5 a more substantial conversation there between Scott

6 Mulligan and Manon Mulligan in that second conversation.

7      The government will front that in her testimony.

8 At no time during that conversation did Scott Mulligan

9 tell her how to testify or what to testify to.  In fact,

10 told her that it is your recollection -- it is your

11 recollection -- that is what you told -- it is your

12 recollection, and you need to tell the truth.  In fact,

13 Mr. Mulligan even said that on the recording.

14      I intend to front on the direct that she has

15 spoken with Mr. Mulligan on the phone.  They have

16 discussed the events.  Because he has not told her what to

17 testify, and I expect after my direct testimony with Manon

18 there will be no impeachment on that second conversation

19 either, since I will confront what is contained in the

20 conversation and she will admit to it.  She will admit

21 that she spoke to her husband.  She will admit they

22 discussed the events, and that it helped her to

23 recollect -- her conversation with her husband helped her

24 to recollect what occurred in August of 2003.

25      Once I do that, there will be no impeachment

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

**1277**

1 value of the second call either.  And I have no problem

2 fronting that, either.

3      MR. ROSEN:  That is not the way it goes.

4      THE COURT:  Stop talking to each other.

5 I will let the jury go.

6      Uncross your hands, Mr. Rosen.

7      Have a seat and I will let the jury go.

8      MR. ROSEN:  All right.

9      (Continued on next page.)

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

**1278**

1      (Whereupon, at this time the following takes

2 place in open court.)

3      THE COURT:  Ladies and gentlemen, it is about

4 that time.

5      I will excuse you for the day.  Tomorrow we will

6 start at 9:45.  Please be here promptly.  I believe we

7 will have a number of witnesses, and I will give you a

8 much better idea of the schedule of the trial as it

9 unfolds.

10      Do not talk to anyone about this case.  If

11 anyone tries to influence you in any way, report it to me

12 without discussing it with the other jurors.

13      Give Mr. Baran a written note and don't tell the

14 other jurors about it.

15      Don't read, review, listen to anything reported

16 in the media about the case.  If you see something,

17 totally disregard it.

18      No social media concerning anything going on in

19 this case.  And make sure you don't let people know you

20 are sitting on this case or any other case.

21      Additionally, you are to keep an open mind, and

22 not to do any research and investigation concerning the

23 facts of the case.

24      Have a real nice evening.

25      There is a local bakery here and I heard from

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

**1279**

1  other jurors on other cases, and generally if the case
2  lasts more than a week, I think the jury should have some
3  cookies on myself. I'm not baking them. I'm just
4  purchasing them.
5        Have a good evening and see you tomorrow.
6        (Whereupon, at this time the jury leaves the
7  courtroom.)
8        THE COURT:  The government indicated it tends to
9  disclose as to what occurred at the hearing in terms of
10  the second conversation in which Mrs. Mulligan is speaking
11  with her husband and he suggested to her it was June or
12  August, or whatever, and then going into what occurred
13  after August and what she heard vis-à-vis the Gargiulo
14  murder.
15        Do you have a response to that, Mr. Rosen?
16        MR. ROSEN:  They are only doing it because we
17  played the tape.  And I think the jury has a right to hear
18  themselves what he said to her to get her to remember, and
19  we can play the tape.  Just for the sole purpose to say,
20  yes, you changed your mind.  Yes, you listened to the tape
21  yesterday, yes, you spoke to counsel for the government.
22  And let's hear what your husband said to you.
23        THE COURT:  Play the portion now so I can hear
24  it now.  I know you can do it.  Take a couple of minutes
25  and do it.  If you need assistance, I think Mr. Doddato

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

**1280**

1  can help you on it.
2        MR. ROSEN:  He is worse than me.
3        (Whereupon, at this time there was a pause in
4  the proceedings.)
5        MR. ROSEN:  It should be in this vicinity.
6        (Audio tape is played.)
7        THE COURT:  That is the end of the call?
8        MR. ROSEN:  Yes, the portion.
9        MR. DODDATO:  That is the end of the portion we
10  were referring to, yes, Judge.
11        THE COURT:  The government's position is you
12  want to front that she discussed this with her husband and
13  he was reminding her?
14        It can be interpreted as reminding her and
15  clearing up any confusion as to what she said on the
16  subsequent visit to Devans.  That is what it appears to
17  be.
18        However, I think it is important as to the
19  conversation they had between each other in terms of going
20  to the U.S. Attorney's Office, being in the same room with
21  one another, and what their perceptions were, and whether
22  they were allowed to discuss anything.  It is all relevant
23  to their credibility.
24        MR. FLYNN:  I don't think they were discussing
25  being in the same room with each other.  In fact, they

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

**1281**

1  never were in our offices.
2        THE COURT:  Alone, I believe, is the operating
3  phrase.
4        You can confront or front it.
5        MR. FLYNN:  The government's position is that
6  the call is hearsay.  It can only come in to --
7        THE COURT:  If it impeaches her credibility.
8        MR. FLYNN:  If it impeaches her testimony.
9        THE COURT:  Yes.
10        MR. FLYNN:  If on direct she is asked questions
11  as to whether she had conversations with her husband
12  concerning her recollection, or concerning the events of
13  August 2003, that call referenced what she told Scott in
14  the prison in Devans, and I don't see how -- we will see
15  how the testimony comes in tomorrow, but I don't
16  understand since the call already admitted to discussing
17  as not having a clear recollection as to what had
18  occurred, since her husband had just been yanked out of
19  the house two days before Christmas.  And then having an
20  opportunity to discuss it with him which may have jogged
21  her memory, and then having four months to sit and reflect
22  on the events, I don't know how the call would have
23  impeached her if she had discussed it.
24        That's all I have to say, your Honor.
25        We will see how the testimony comes in.

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

**1282**

1        THE COURT:  We will see how the testimony goes.
2        I will see you folks tomorrow at 9:15.  Please
3  don't make it later than that.  Have a nice evening.
4        MR. FLYNN:  Thank you, your Honor.
5        THE COURT:  In terms of future witnesses, let me
6  get an understanding of that.
7        MR. FLYNN:  The government has two witnesses
8  left.  Manon Mulligan is about an hour on direct.  I
9  expect it would be lengthy on cross.  And then our last
10  witness is Scott Mulligan and he is about six and a half
11  hours on direct.
12        THE COURT:  Six and a half hours?
13        MR. FLYNN:  Yes, your Honor.
14        THE COURT:  So you figure Mrs. Mulligan will be
15  done tomorrow sometime in the morning?  And then you will
16  start with Scott Mulligan in the afternoon?
17        MR. FLYNN:  At some point tomorrow we will have
18  both.
19        MR. ROSEN:  I guess we will not get to cross him
20  until Monday then.
21        I want to make sure our witnesses are here on
22  Monday, right?
23        THE COURT:  I can't tell you how long you will
24  be on cross.  If the government will spend six hours with
25  him on direct --

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

1283

1    MR. FLYNN:  It may be less than that.  And I
2  suspect given the nature of Ms. Mulligan's testimony, I
3  doubt if I will be done with Mr. Mulligan before the end
4  of the week -- before the end of the day.
5    THE COURT:  Which is the end of the week.
6    MR. FLYNN:  He is a very important witness and
7  there is a lot of information there.
8    MR. ROSEN:  What shall I tell the marshal's
9  service about the prisoner?
10    THE COURT:  The one person you have in custody?
11    MR. ROSEN:  No, two.
12    THE COURT:  Two?
13    Probably bring one over and then we will go from
14  there.
15    Do you have -- you can let them know on
16  Thursday; is that correct?  The one person you have to let
17  them know by.  So let them know today that one of them you
18  will want on Monday and the second one you can have on
19  Tuesday.  And we can figure out -- you figure out which
20  one.
21    MR. MISKIEWICZ:  Your Honor, can we have the
22  list now?
23    MR. ROSEN:  I will give it to him.
24    THE COURT:  Who are the people you are calling?
25    MR. ROSEN:  Let me just say this:  All four

Stephanie Picozzi, OCR, RPR
Official Court Reporter

1284

1  witnesses are on the government's own witness list.
2    THE COURT:  I got it.
3    MR. ROSEN:  Do I still have to tell them?
4    THE COURT:  Yes, you still have to tell them.
5    MR. ROSEN:  LeShawn Campbell, Joseph Pistone,
6  Anthony DeNegro and Richard Tramble.
7    MR. MISKIEWICZ:  It is Reonegro.
8    THE COURT:  Yes.
9    MR. ROSEN:  Every one of the witnesses was put
10  down by the government in the questionnaires.
11    THE COURT:  Including Richard Tramble?
12    MR. ROSEN:  Yes.
13    MR. MISKIEWICZ:  Your Honor, we may have an
14  application as to this.  Again, it has to do with what
15  your Honor ruled several months ago regarding the prior
16  convictions.
17    Obviously Mr. Pistone --
18    THE COURT:  I didn't have Joseph Pistone in a
19  prior trial.  I had his brother, Peter Pistone.  And I
20  made certain rulings as to his prior convictions, yes.
21    MR. MISKIEWICZ:  All I'm saying is insofar as we
22  are going to hear Mr. Pistone testify in an effort to
23  negate the prior conviction for the Louis Dorval murder,
24  we may have an application that goes back to your Honor's
25  order of some months ago about the collateral estoppel as

Stephanie Picozzi, OCR, RPR
Official Court Reporter

1285

1  to whether or not as to whether the government can move
2  into the prior conviction.  And I'm just raising that
3  since I believe your Honor wants to give the jury a sense
4  of timing, and that is an issue that we are going to have
5  applications about if and when Mr. Pistone is in fact
6  called by the defense.
7    MR. ROSEN:  The only reason he is being called
8  is because Scott Mulligan is going to say that Chris told
9  him he killed him, and he did it inside the warehouse, in
10  Craig Miller's warehouse, and that they painted the
11  floors.
12    THE COURT:  Who is the "they"?
13    MR. ROSEN:  Sorry?
14    THE COURT:  Who is the "they" that painted the
15  floors?
16    MR. ROSEN:  Rob Smyth, Chris Tarantino.  And I
17  don't know if Scott Mulligan engaged in the painting.  He
18  did engage in the disposal of the body, because we heard
19  Craig Miller.
20    But I'm not doing it for those reasons, to
21  underline the attack of the Dorval conviction.  I'm doing
22  it because Scott Mulligan is going to say that Chris
23  confessed to the murder, and that is why they did the
24  warehouse painting.
25    It is a correct --

Stephanie Picozzi, OCR, RPR
Official Court Reporter

1286

1    THE COURT:  He confessed to the murder and that
2  is why they painted the warehouse?
3    MR. ROSEN:  Yes, to cover the blood, because if
4  Chris killed him in the house according to Mulligan, and
5  then to clean up the blood they repainted -- you may have
6  remembered Craig Miller went into that.
7    THE COURT:  The sheetrock and all that, yes.
8    MR. ROSEN:  Yes.
9    He says I'm impeaching Mulligan.  Obviously that
10  is why we are bringing him.
11    THE COURT:  Okay, you are impeaching Mulligan.
12    MR. ROSEN:  Yes.  We are not challenging the
13  underlying conviction.
14    THE COURT:  You are going to bring Joseph
15  Pistone in, who is going to come in and testify -- nothing
16  to do with the fact that he is serving jail time on any
17  charge, any murder or anything else, conspiracy, etcetera.
18  And you are going to have him come in and only talk about
19  painting the floor and sheetrock?
20    MR. ROSEN:  No, no.  That is Scott Mulligan who
21  is going to do that.
22    THE COURT:  Right.
23    MR. ROSEN:  And because he is going to claim
24  Chris Tarantino, my client, confessed to him for killing
25  Louis Dorval.

Stephanie Picozzi, OCR, RPR
Official Court Reporter

1287

1      THE COURT: Right.

2      MR. ROSEN: Mr. Pistone already confessed to

3 this Court that he put a bullet in the back of the head

4 and he killed Joseph Pistone (sic). And that is why --

5      THE COURT: That Joseph Pistone killed Louis

6 Dorval, obviously you meant to say?

7      MR. ROSEN: Yes.

8      MR. MISKIEWICZ: Then it is an impeachment of

9 the defendant taking credit for the murder. It is not an

10 impeachment of the witness.

11      I think there is a 403 argument here. This goes

12 beyond confusion.

13      Frankly, I don't see -- I don't see why they

14 want to put it in.

15      I also am familiar enough with Mr. Pistone, who

16 will say in the rest of the 3500 material he was

17 disappointed that Mr. Tarantino took credit for the

18 murder.

19      So I'm just saying -- I haven't been privy to

20 what their thinking is. I think there is going to be an

21 application prior to him testifying. It might cause a

22 delay.

23      I'm just raising it with your Honor.

24      THE COURT: As far as you know, Mr. Joseph

25 Pistone is not raising the Fifth Amendment privileges or

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

---

1288

1 anything of that sort? And he is currently serving a

2 sentence for the murder of Louis Dorval.

3      MR. MISKIEWICZ: Conspiracy.

4      THE COURT: Conspiracy to murder. I understand

5 the prior rulings on it.

6      MR. ROSEN: As a predicate act for RICO.

7      THE COURT: All right.

8      MR. MISKIEWICZ: And he named Mr. Tarantino.

9      THE COURT: As a person who was --

10      MR. MISKIEWICZ: Well, I don't want to give away

11 my cross-examination. But it is going to be an

12 interesting -- it will be interesting. I can't wait to

13 see Joe again.

14      THE COURT: Then see him you shall,

15 Mr. Miskiewicz.

16      Have a nice evening.

17      (Case on trial adjourned until 9:15 o'clock

18 a.m., Thursday, May 3, 2012.)

19

20

21

22

23

24

25

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

1290

---

1289

**I-N-D-E-X**

**W-I-T-N-E-S-S-E-S**

| | |
|---|---|
| PABLO AMADOR | 1081 |
| REDIRECT EXAMINATION | 1081 |
| BY MR. MISKIEWICZ | |
| RECROSS-EXAMINATION | 1100 |
| BY MR. ROSEN | |
| FURTHER REDIRECT EXAMINATION | 1105 |
| BY MR. MISKIEWICZ | |
| | 1106 |
| JEFF SALTA, | |
| DIRECT EXAMINATION | 1107 |
| BY MR. MISKIEWICZ | |
| CROSS-EXAMINATION | 1113 |
| BY MR. ROSEN | |
| SCOTT FLYNN | 1118 |
| DIRECT EXAMINATION | 1118 |
| BY MR. MISKIEWICZ | |
| CROSS-EXAMINATION | 1122 |
| BY MR. ROSEN | |
| REDIRECT EXAMINATION | 1125 |
| BY MR. MISKIEWICZ | |
| MELVYN ROTH | 1125 |
| DIRECT EXAMINATION | 1126 |
| BY MR. MISKIEWICZ | |
| CROSS-EXAMINATION | 1127 |
| BY MR. ROSEN | |
| ANTHONY ZACARESE | 1134 |
| DIRECT EXAMINATION | 1134 |
| BY MR. MISKIEWICZ | |

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

---

1290

| | |
|---|---|
| MANON MULLIGAN | 1161 |
| (jury absent) | 1161 |
| DIRECT EXAMINATION | 1161 |
| BY MR. FLYNN | |
| CROSS-EXAMINATION | 1176 |
| BY MR. ROSEN | |
| REDIRECT EXAMINATION | 1188 |
| BY MR. FLYNN | |
| RECROSS-EXAMINATION | 1193 |
| BY MR. ROSEN | |
| ANTHONY ZACARESE | 1209 |
| DIRECT EXAMINATION (cont'd) | 1209 |
| BY MR. MISKIEWICZ | |
| CROSS-EXAMINATION | 1219 |
| BY MR. ROSEN | |
| REDIRECT EXAMINATION | 1272 |
| BY MR. MISKIEWICZ | |

**E-X-H-I-B-I-T-S**

| | |
|---|---|
| Defendant's Exhibit E was received in evidence | 1264 |
| Government Exhibit PA-14 was received in evidence | 1082 |
| Government Exhibit MM 1 received in evidence | 1165 |
| Government's Exhibit SI-2 was received in evidence | 1272 |

*Stephanie Picozzi, OCR, RPR*
*Official Court Reporter*

**$**

**$35,000** [1] - 1102:21
**$500,000** [2] - 1171:2; 1201:1

**'**

**'02** [2] - 1179:18; 1180:21
**'03** [18] - 1099:3; 1152:16; 1155:21; 1160:14, 16; 1210:4; 1214:14; 1225:24; 1247:9; 1248:15; 1249:10, 24; 1266:25; 1269:3, 15, 24; 1270:15

**0**

**0** [4] - 1155:25; 1156:1; 1157:24; 1158:9
**08** [1] - 1078:3
**0:18** [1] - 1160:16

**1**

**1** [23] - 1143:2; 1144:10; 1145:8, 10, 21; 1148:5; 1152:13, 16; 1154:17; 1155:10; 1156:23; 1158:5, 24; 1159:15; 1164:9; 1165:23; 1166:9; 1212:11; 1290:20
**1-A** [1] - 1084:1
**1.06** [1] - 1154:6
**10** [8] - 1128:7; 1157:10; 1166:1, 10, 15; 1260:24; 1261:3
**100** [3] - 1078:13, 16, 22
**1010** [1] - 1096:21
**1011** [1] - 1096:18
**103** [2] - 1211:23; 1218:17
**1081** [1] - 1289:3
**1082** [1] - 1290:19
**1099** [9] - 1121:23; 1122:10, 13; 1124:12, 15, 19; 1125:10
**1099s** [2] - 1121:22; 1124:18
**10:25** [6] - 1258:14; 1259:9, 24-25; 1260:8, 10
**10:27** [1] - 1236:13
**10:30** [5] - 1113:14; 1114:21; 1261:13; 1262:11
**10:31** [4] - 1215:16;

1261:18; 1262:13
**10:39** [1] - 1215:16
**10:58** [2] - 1269:17
**11** [3] - 1260:23, 25; 1261:1
**1100** [1] - 1289:4
**1105** [1] - 1289:5
**1106** [1] - 1289:6
**1107** [1] - 1289:7
**1113** [1] - 1289:8
**1118** [2] - 1289:10
**1122** [1] - 1289:11
**1125** [2] - 1289:12, 14
**1126** [1] - 1289:14
**1127** [1] - 1289:15
**1134** [2] - 1289:17
**11530** [1] - 1078:19
**1161** [3] - 1290:3
**1165** [1] - 1290:20
**11722** [2] - 1078:13, 22
**1176** [1] - 1290:5
**1188** [1] - 1290:6
**1193** [1] - 1290:7
**11:42** [1] - 1269:18
**11:48** [1] - 1157:6
**11:59** [1] - 1153:1
**11th** [1] - 1270:10
**12** [2] - 1211:15; 1218:12
**1209** [2] - 1290:8
**1219** [1] - 1290:10
**1264** [1] - 1290:17
**1272** [2] - 1290:11, 20
**12:17** [14] - 1100:7, 12; 1251:7, 25; 1252:2, 10; 1253:13-15; 1255:22, 24; 1257:5, 7, 10
**12:18** [15] - 1099:6, 16; 1100:7; 1101:17, 21; 1158:15, 19; 1255:6, 13, 22, 25; 1256:2; 1269:24
**12:22** [4] - 1100:8; 1101:23; 1256:9, 17
**12:23** [2] - 1100:9; 1256:24
**12:30** [2] - 1100:9; 1257:7
**13** [3] - 1211:25; 1218:19; 1257:15
**14** [2] - 1166:20, 25
**14th** [22] - 1211:24; 1212:23; 1213:3, 7; 1216:18; 1218:17; 1247:9, 11, 17, 25;

1248:3, 8-10, 23; 1249:1, 8, 10-13; 1251:3
**15** [9] - 1153:17; 1157:13, 17, 20; 1160:14; 1210:17; 1239:4; 1257:5
**1500** [1] - 1156:2
**15th** [6] - 1091:7; 1157:22; 1248:17, 24; 1249:6; 1251:4
**16** [6] - 1099:16; 1157:7; 1158:1; 1159:24; 1160:16
**1648** [1] - 1184:18
**16th** [23] - 1089:16; 1091:8; 1099:3, 8, 20; 1158:19; 1211:14; 1218:6; 1248:15; 1249:12, 24; 1250:15, 19, 24-25; 1251:4, 25; 1252:2; 1255:6; 1256:23, 25
**17** [2] - 1210:15; 1228:2
**17th** [4] - 1089:16; 1218:6
**18** [3] - 1094:17; 1159:24; 1160:17
**18th** [9] - 1085:10, 19; 1102:16; 1104:24; 1210:3, 10; 1212:18; 1213:25; 1228:5
**19** [2] - 1168:14; 1217:21
**1983** [1] - 1202:2
**1994** [2] - 1140:24; 1180:20
**1997** [1] - 1164:19
**1998** [3] - 1122:4, 7; 1135:1
**1999** [2] - 1107:10; 1135:6
**19th** [4] - 1215:5; 1263:9; 1264:7
**1:00** [1] - 1185:17
**1:34** [1] - 1270:14
**1:37** [1] - 1153:19
**1:50** [1] - 1215:5
**1st** [16] - 1227:9, 13, 17; 1228:1, 8, 14, 24; 1229:16; 1230:12; 1231:17; 1234:6; 1236:3, 8

**2**

**2** [4] - 1078:7; 1144:10

**20** [5] - 1118:23; 1128:8; 1205:4; 1210:17; 1244:23
**2000** [4] - 1135:6; 1136:5; 1140:20; 1141:17
**2002** [5] - 1135:3; 1164:23; 1165:3; 1180:12
**2003** [100] - 1082:13; 1085:10; 1089:18, 23; 1090:6; 1097:7; 1099:8, 14, 16; 1107:11; 1108:5; 1111:12; 1119:1; 1122:25; 1123:1; 1126:19; 1152:25; 1153:11; 1154:19; 1157:13; 1158:1; 1162:20, 23; 1163:3, 9-10, 21; 1165:4, 6, 18-19; 1166:20, 25; 1167:5, 9, 20-21; 1168:9; 1171:9; 1174:10, 17, 19, 22; 1175:12; 1176:2; 1177:5; 1189:7, 10; 1190:8, 15; 1191:2; 1202:5; 1204:1; 1205:10; 1208:3; 1212:18, 23; 1215:12; 1219:16; 1222:5, 7, 9; 1225:16; 1227:5, 17; 1228:24; 1229:17; 1247:11, 25; 1250:15; 1254:4, 7; 1255:6; 1257:16; 1258:3, 6-7, 18; 1259:23; 1260:7, 12-13; 1261:6; 1263:5, 9; 1266:23; 1267:4, 9, 21; 1270:8, 10, 21, 9; 1271:8; 1276:2, 24; 1281:13
**2004** [4] - 1090:8; 1162:21, 23; 1163:3
**2011** [2] - 1176:14; 1270:3
**2012** [3] - 1078:7; 1276:4; 1288:18
**205** [1] - 1078:16
**21** [2] - 1108:5; 1126:19
**212** [11] - 1156:12, 14; 1223:18; 1251:19; 1258:11; 1260:14; 1261:9, 19; 1262:4; 1270:16, 24
**21st** [18] - 1111:10; 1215:12, 16; 1257:16; 1258:3, 6-7, 14, 18;

1260:7, 12-13; 1261:5,
10, 14, 20, 22; 1262:11
**22** [14] - 1087:24;
1088:20; 1165:18;
1167:20; 1168:9;
1171:9; 1174:10;
1175:12; 1178:6;
1179:14; 1219:16;
1266:23; 1267:4
**2200** [1] - 1184:4
**22nd** [4] - 1123:14;
1191:2; 1219:24
**23rd** [38] - 1093:19;
1094:25; 1108:10;
1113:12; 1115:14;
1116:9, 15; 1123:3, 8,
12, 15; 1124:1, 16, 22;
1210:23; 1211:3, 6;
1215:2, 9; 1216:14;
1217:7, 22-24; 1246:22;
1247:10; 1248:18, 24;
1257:21; 1258:9, 24;
1260:5, 7, 12, 20;
1261:16; 1262:4
**2400** [1] - 1155:25
**24th** [1] - 1260:24
**25** [2] - 1152:15;
1208:12
**25th** [6] - 1091:14, 18;
1263:6; 1267:21; 1268:5
**27th** [9] - 1225:16,
21-22, 24-25; 1226:1,
21; 1227:5
**28th** [5] - 1268:13, 22;
1269:15; 1270:15
**29th** [2] - 1269:21, 24
**2:00** [3] - 1160:22;
1185:18; 1197:10
**2:16** [1] - 1270:18
**2:18:10** [2] - 1153:12,
14
**2:18:31** [1] - 1153:15
**2:58** [1] - 1257:10
**2d** [1] - 1202:1
**2nd** [2] - 1190:15;
1236:11

---

### 3

**3** [11] - 1144:10;
1156:1; 1159:4;
1163:10; 1180:7;
1190:7; 1247:4;
1257:24; 1288:18
**3.05** [2] - 1159:4, 9
**3.08** [2] - 1160:4
**3/8** [1] - 1248:15
**30** [1] - 1152:16

**31** [1] - 1152:16
**33** [1] - 1134:22
**33134** [1] - 1078:17
**3500** [2] - 1110:13;
1287:16
**37** [2] - 1141:11;
1153:19
**373** [1] - 1232:8
**373-9990** [6] -
1230:14; 1232:13;
1233:4; 1248:11;
1255:7; 1256:1
**39** [1] - 1132:3
**3:00** [3] - 1156:1;
1257:11
**3:13** [2] - 1153:21
**3:40** [2] - 1222:10;
1223:3
**3:41** [1] - 1223:17
**3:54** [5] - 1225:16, 20,
23; 1226:5, 10
**3:55** [4] - 1225:22;
1226:3, 9, 11
**3:58** [1] - 1226:23
**3:59** [1] - 1268:7
**3rd** [5] - 1222:4, 7, 9;
1266:23; 1270:3

---

### 4

**4** [7] - 1140:17;
1143:2; 1144:10;
1152:25; 1169:11;
1247:19; 1270:25
**4-by-6** [1] - 1169:5
**4.11** [1] - 1153:3
**4/22** [1] - 1266:25
**403** [1] - 1287:11
**404(b** [1] - 1080:7
**42** [1] - 1202:2
**43** [3] - 1108:10;
1258:9; 1260:20
**44** [1] - 1138:9
**445-2141** [11] -
1232:20; 1236:7;
1267:7; 1268:10;
1269:2, 17, 25;
1270:13, 17; 1271:2, 7
**47** [2] - 1154:15;
1213:8
**4:00** [1] - 1268:7
**4:02** [1] - 1227:5
**4:05** [1] - 1268:8
**4:06** [1] - 1248:10
**4:38** [3] - 1227:9, 13,
17
**4th** [4] - 1184:4;

1229:15; 1270:21;
1271:8

---

### 5

**5** [2] - 1144:11;
1247:20
**5-by-7** [1] - 1170:10
**500,000** [2] - 1170:25;
1181:18
**509-3375** [1] - 1239:25
**509-9375** [13] -
1221:22; 1222:8, 14,
24; 1223:4; 1227:18;
1230:1, 13; 1236:22;
1241:6; 1245:9;
1246:17; 1253:1
**516** [1] - 1260:1
**519-9375** [1] - 1252:17
**525** [1] - 1092:23
**529-1837** [3] -
1251:19; 1270:16, 24
**535-8082** [1] - 1223:18
**5:00** [5] - 1153:25;
1154:1, 3-4; 1228:15
**5:06** [2] - 1154:7
**5:15** [3] - 1229:19;
1230:12; 1232:4
**5:18** [1] - 1231:19
**5:27** [6] - 1231:12,
22-23; 1232:11, 13, 19
**5:39** [1] - 1233:2
**5th** [4] - 1184:16;
1263:5; 1276:4

---

### 6

**6** [4] - 1144:11;
1247:20, 24; 1248:5
**60** [1] - 1256:3
**602-1391** [1] - 1256:25
**631** [1] - 1078:23
**645-5200** [2] -
1260:14; 1261:9
**646** [1] - 1256:25
**646-739-3560** [4] -
1099:13; 1154:18;
1155:1; 1160:10
**647-8484** [1] - 1258:11
**655** [1] - 1078:3
**666** [1] - 1078:18
**67** [1] - 1202:2
**679-7300** [2] -
1261:19; 1262:4
**683-8400** [1] - 1260:1

---

### 7

**7** [3] - 1141:11;

1144:11; 1207:25
**7/25/03** [1] - 1148:15
**7/28** [1] - 1270:15
**706** [1] - 1202:1
**712-6105** [1] - 1078:23
**733** [2] - 1227:14
**743-0766** [2] - 1227:6;
1256:15
**7:05** [1] - 1210:16
**7:06** [5] - 1157:16;
1211:6; 1217:12, 18
**7:07** [3] - 1233:22;
1236:3, 8
**7:15** [2] - 1211:11;
1218:9
**7:16** [2] - 1157:17, 22
**7:18** [1] - 1154:13
**7:28** [1] - 1271:1
**7:33** [2] - 1268:22;
1271:5
**7:46** [1] - 1271:8
**7:55** [1] - 1211:21

---

### 8

**8** [1] - 1153:11
**8/14/03** [1] - 1213:11
**8/15** [1] - 1213:13
**8/16** [1] - 1248:15
**8/19** [1] - 1214:14
**8/19/03** [1] - 1216:22
**8/21** [1] - 1259:23
**8/21/2003** [1] -
1259:25
**8/3** [2] - 1223:3, 16
**806-2441** [1] - 1226:13
**860** [1] - 1238:13
**860-6210** [3] -
1239:23; 1245:6; 1246:7
**8:11** [2] - 1260:13;
1261:10
**8:27** [1] - 1213:3, 8
**8:38** [3] - 1248:16;
1249:10, 14
**8:39** [1] - 1268:22
**8:45** [1] - 1268:23
**8:52** [2] - 1212:1, 5

---

### 9

**9** [2] - 1105:9; 1157:4
**901** [1] - 1208:20
**90s** [1] - 1090:10
**917** [39] - 1221:22;
1222:8, 14, 24; 1223:4;
1226:13; 1227:6, 18;
1230:1, 13-14; 1232:8,

2

13, 20; 1233:4; 1236:7, 22; 1238:12; 1239:23, 25; 1241:6; 1245:6, 9; 1246:7, 17; 1248:11; 1252:17; 1253:1; 1255:7; 1256:15; 1267:7; 1268:10; 1269:2, 17, 25; 1270:13, 17; 1271:2, 7

**934** [1] - 1106:24
**9375** [1] - 1245:13
**9990** [1] - 1232:8
**9:15** [4] - 1274:23; 1275:3; 1282:2; 1288:17
**9:30** [1] - 1078:7
**9:45** [2] - 1079:4; 1278:6

---

### A

**a.m** [33] - 1078:7; 1099:6, 16; 1113:14; 1158:15, 19; 1211:6; 1212:1; 1213:3; 1215:16; 1217:12; 1236:13; 1248:16; 1249:14; 1251:7, 25; 1252:2, 10; 1253:15; 1256:7-9, 17, 24; 1257:10; 1258:14; 1259:9; 1260:8, 10, 13; 1261:10; 1270:14; 1288:18
**a.m.'s** [1] - 1257:8
**abbreviated** [1] - 1155:20
**able** [6] - 1130:22; 1149:14; 1182:23; 1184:21; 1263:7; 1275:14
**absence** [1] - 1198:4
**absent** [1] - 1290:3
**absolutely** [4] - 1141:18, 21; 1142:17; 1188:18
**abuse** [2] - 1091:19
**accept** [1] - 1259:16
**access** [2] - 1254:19, 23
**accidentally** [1] - 1085:6
**according** [11] - 1153:17; 1189:23; 1217:2; 1227:1; 1228:11; 1251:12, 25; 1255:13; 1268:6; 1269:4; 1286:4
**account** [4] - 1155:5; 1212:22, 24; 1221:8

**Accountant** [1] - 1118:24
**accountant** [1] - 1119:25; 1122:22
**accounting** [5] - 1119:2, 6, 10; 1120:15, 20
**accumulated** [1] - 1168:22
**accuracy** [1] - 1151:25
**accurate** [5] - 1082:11; 1259:4, 11, 18; 1268:18
**accurately** [1] - 1151:16
**acquisition** [1] - 1143:14
**act** [1] - 1288:6
**activity** [1] - 1216:19
**actual** [10] - 1131:13; 1144:2; 1145:4; 1149:14; 1150:23; 1153:5; 1155:11; 1210:18
**add** [3] - 1115:7; 1214:16; 1220:3
**added** [1] - 1216:4
**addition** [1] - 1215:5
**additional** [7] - 1132:11; 1151:22; 1186:1; 1197:8; 1202:7; 1274:4
**additionally** [1] - 1278:21
**address** [13] - 1092:20; 1108:12; 1125:12; 1169:1, 3, 8, 15; 1212:21; 1218:15; 1220:25; 1221:7
**addressed** [2] - 1169:9; 1208:5
**addresses** [1] - 1093:6
**adjourned** [1] - 1288:17
**admission** [5] - 1082:16; 1145:21; 1164:25; 1208:20; 1272:17
**admit** [4] - 1275:16; 1276:20
**admitted** [5] - 1092:9; 1126:9; 1147:11; 1166:9; 1281:16
**adopt** [1] - 1147:1
**advantage** [1] - 1196:9
**advise** [1] - 1146:9
**advised** [1] - 1127:9

**aforementioned** [1] - 1082:24
**afraid** [2] - 1114:3
**afternoon** [7] - 1156:2; 1161:18; 1228:15; 1239:4; 1272:12; 1282:16
**agency** [1] - 1136:11
**Agent** [3] - 1157:14; 1188:12; 1239:22
**agent** [10] - 1130:16; 1131:14; 1135:23; 1136:2, 10; 1140:6, 20; 1142:25; 1152:19
**agents** [1] - 1249:17
**ago** [4] - 1145:15; 1182:23; 1284:15, 25
**agree** [3] - 1133:6; 1203:13; 1241:23
**agreed** [2] - 1109:11; 1234:9
**agreement** [1] - 1238:4
**ahead** [3] - 1135:11; 1259:20
**aid** [7] - 1146:1, 7, 21-22; 1147:1, 14
**airplane** [1] - 1168:5
**airport** [2] - 1168:8, 16
**allotment** [1] - 1152:1
**allow** [6] - 1117:21; 1132:14; 1146:12; 1165:21; 1241:16; 1275:10
**allowed** [1] - 1280:22
**allowing** [2] - 1147:20; 1149:2
**Almeria** [1] - 1078:16
**almost** [1] - 1092:4
**alone** [3] - 1172:24; 1196:15; 1281:2
**aloud** [1] - 1144:24
**Amador** [14] - 1079:5, 9, 23; 1081:2, 12-13, 21-22; 1083:2; 1094:9; 1098:25; 1100:6; 1105:25; 1106:10
**Amendment** [1] - 1287:25
**AMERICA** [1] - 1078:3
**amount** [4] - 1095:13, 22; 1185:11; 1234:3
**analysis** [6] - 1143:14, 18; 1144:2; 1155:7; 1158:15; 1216:7
**analyzed** [3] - 1152:17; 1155:12;

1157:18

**Andrew** [3] - 1154:21; 1155:4; 1159:10
**angle** [1] - 1087:12
**anonymous** [2] - 1170:17; 1227:2
**Answer** [5] - 1096:24; 1097:3, 8, 12, 17
**answer** [7] - 1103:21; 1109:8; 1149:3, 7-8; 1182:9; 1196:11
**answered** [6] - 1097:18; 1101:8; 1139:5; 1141:19; 1194:3; 1195:18
**answering** [2] - 1173:13, 15
**Anthony** [4] - 1113:19; 1115:16; 1134:6; 1284:6
**anticipation** [1] - 1144:22
**anxiety** [1] - 1171:25
**anyway** [1] - 1133:6
**apartment** [30] - 1081:24; 1082:8, 12; 1084:1; 1091:6; 1092:6; 1093:25; 1094:6, 11; 1095:15; 1097:2, 10; 1098:1, 12; 1099:17; 1100:12; 1101:11; 1158:3, 17; 1159:20; 1215:8; 1252:9; 1255:5; 1257:4; 1267:2, 10; 1269:11; 1270:5
**apologize** [6] - 1095:5; 1129:1; 1225:18; 1233:21; 1263:4; 1268:14
**appeal** [1] - 1165:13
**APPEARANCES** [1] - 1078:11
**appearing** [3] - 1118:16; 1161:22; 1166:13
**application** [4] - 1240:24; 1284:14, 24; 1287:21
**applications** [1] - 1285:5
**apply** [1] - 1241:12
**appreciate** [2] - 1204:23; 1274:22
**approach** [12] - 1093:2; 1096:13; 1106:1; 1119:14; 1164:4; 1212:7; 1221:4; 1247:21; 1260:16; 1272:1; 1273:5

3

29

**approaches** [3] - 1212:9; 1247:23; 1260:18

**appropriate** [3] - 1120:7; 1147:6; 1208:20

**April** [15] - 1219:16, 24; 1266:22; 1267:4, 9, 21; 1268:5, 13-14, 22; 1269:3, 15, 24

**area** [10] - 1084:5; 1095:8; 1121:13; 1135:16; 1136:25; 1141:12; 1160:19; 1186:13; 1216:8; 1256:25

**argument** [3] - 1197:8; 1274:4; 1287:11

**arm** [7] - 1102:25; 1103:2; 1104:9, 11; 1143:24

**armored** [3] - 1132:9; 1138:20; 1139:4

**arrangements** [2] - 1079:15; 1106:2

**arrest** [1] - 1088:10

**arrested** [2] - 1088:21; 1089:17

**arrive** [3] - 1108:14, 16

**arrived** [4] - 1108:15; 1115:14; 1175:14; 1179:13

**arrows** [2] - 1148:22; 1149:10

**aside** [3] - 1132:19; 1136:25; 1212:20

**assess** [1] - 1243:1

**assigned** [5] - 1106:24; 1107:11, 15; 1135:7; 1272:14

**assignments** [1] - 1143:16

**assist** [3] - 1146:25; 1147:14, 23

**assistance** [1] - 1279:25

**Assistants** [1] - 1078:15

**assisted** [1] - 1078:25

**assume** [3] - 1118:6; 1128:18; 1146:6

**assumes** [2] - 1119:13, 22

**assuming** [1] - 1099:3

**assure** [1] - 1138:22

**AT** [4] - 1144:10; 1212:11

**AT&T** [4] - 1143:22, 24; 1212:24; 1219:7

**AT-1** [2] - 1219:13

**Atlantic** [1] - 1143:22

**attached** [2] - 1144:19; 1154:22

**attachment** [1] - 1121:2

**attack** [2] - 1094:1; 1285:21

**attempt** [5] - 1108:22; 1213:15; 1226:16; 1253:20, 24

**attempted** [3] - 1107:25; 1144:6; 1213:22

**attempting** [3] - 1083:18; 1098:9; 1139:21

**attention** [7] - 1126:19; 1136:5; 1157:25; 1166:10; 1209:20; 1215:11; 1266:22

**Attorney** [2] - 1078:12, 15

**attorney** [14] - 1110:17; 1111:22; 1112:1; 1126:9; 1175:20, 23; 1194:16-18, 20; 1195:5, 7; 1196:20

**Attorney's** [8] - 1118:17; 1143:17; 1161:24; 1249:19; 1254:3, 6, 10; 1280:20

**audio** [3] - 1184:13; 1186:24; 1280:6

**audiotape** [1] - 1131:24

**August** [99] - 1082:13; 1085:10, 19; 1089:23; 1091:2; 1094:17; 1097:4, 7; 1099:3, 8, 14, 16, 20; 1102:16; 1104:24; 1107:11; 1108:5; 1111:10; 1126:19; 1152:16, 25; 1153:11; 1157:4, 10-11, 13, 17, 20; 1158:1; 1159:24; 1160:14-16; 1189:7; 1210:4, 10; 1212:18, 23; 1213:3, 25; 1215:12; 1222:4, 7, 9; 1227:9, 13, 17; 1228:1, 5, 8, 14, 24; 1229:17; 1230:12; 1231:17; 1234:6;

1236:3, 8, 11; 1247:9, 11, 17, 25; 1248:15, 17; 1249:6, 8, 10-11, 24; 1250:14, 19, 25; 1251:25; 1252:2; 1254:4; 1255:6; 1257:16; 1258:3, 6-7, 14, 18; 1260:7, 12-13; 1261:6; 1263:5; 1270:21, 25; 1271:8; 1276:2, 24; 1279:12; 1281:13

**authenticate** [2] - 1199:10; 1202:11

**authenticated** [4] - 1198:23; 1200:16, 20; 1201:6

**authentication** [3] - 1165:11; 1200:14; 1202:7

**authenticity** [2] - 1130:25; 1275:9

**author** [3] - 1171:13, 19; 1201:20

**authority** [1] - 1088:10

**available** [2] - 1253:6; 1275:6

**Avenue** [3] - 1078:16; 1211:14; 1218:5

**aware** [7] - 1080:4; 1120:23; 1121:4, 6, 8; 1125:7; 1146:4

**AZ** [6] - 1145:8, 10, 21; 1148:5; 1152:13

**AZ-1** [6] - 1209:22, 25; 1214:9; 1216:2, 7; 1250:8

**AZ-2** [1] - 1272:9

---

**B**

**baby** [1] - 1195:5

**background** [1] - 1230:19

**badge** [1] - 1114:1

**bag** [4] - 1086:5, 18, 20; 1087:1

**Bagaric** [1] - 1202:1

**bakery** [1] - 1278:25

**baking** [1] - 1279:3

**Baldwin** [5] - 1258:21, 25; 1259:2; 1260:2; 1261:23

**bar** [1] - 1126:9

**Baran** [1] - 1278:13

**base** [3] - 1145:3; 1146:10

**based** [17] - 1120:4; 1129:11; 1131:24; 1145:5; 1146:24; 1147:12, 18; 1149:13; 1153:5; 1165:8; 1171:8; 1211:2; 1243:2; 1275:8, 20; 1276:2

**basis** [2] - 1165:22; 1208:20

**batch** [1] - 1220:2

**Baumgardt** [3] - 1135:12; 1139:16; 1140:23

**Bazylewicz** [2] - 1136:15; 1140:7

**bear** [1] - 1141:7

**became** [1] - 1174:11

**become** [2] - 1125:7; 1146:23

**bedroom** [2] - 1083:6

**BEFORE** [1] - 1078:8

**beg** [1] - 1219:12

**began** [1] - 1088:9

**begin** [3] - 1090:4; 1109:23; 1110:1

**beginning** [5] - 1090:5; 1135:6; 1141:11; 1235:7; 1263:8

**begins** [2] - 1096:20

**behest** [1] - 1089:7

**behind** [1] - 1083:2

**Bell** [1] - 1143:22

**Bellmore** [8] - 1168:10; 1169:11; 1189:16, 18; 1190:21, 23; 1191:1

**belonged** [1] - 1253:10

**belonging** [1] - 1253:16

**belongings** [1] - 1083:10

**belongs** [1] - 1232:15

**below** [1] - 1248:13

**Beretta** [1] - 1105:9

**best** [6] - 1171:17; 1181:12; 1185:24; 1202:9, 13; 1275:10

**better** [3] - 1152:4; 1274:17; 1278:8

**between** [20] - 1103:5; 1123:14; 1154:1, 11; 1157:4, 9; 1180:8; 1185:18; 1214:10, 16; 1218:6; 1220:20; 1224:23; 1228:10; 1231:4; 1255:22; 1270:4; 1276:5; 1280:19

4

**beyond** [3] - 1185:15; 1208:12; 1287:12
**bigger** [1] - 1085:24
**biggest** [1] - 1085:22
**bill** [6] - 1151:7, 24; 1152:4, 8, 11
**billing** [4] - 1150:21; 1151:11; 1155:5
**Billy** [1] - 1192:17
**bit** [4] - 1080:2; 1167:11; 1274:17; 1275:23
**black** [9] - 1086:25; 1103:11; 1104:23; 1108:18; 1166:20, 22; 1167:16; 1169:6
**blackout** [3] - 1248:23; 1249:1; 1251:3
**blackouts** [1] - 1248:25
**blade** [1] - 1103:5
**blazer** [1] - 1139:19
**block** [2] - 1113:1; 1114:14
**blood** [2] - 1286:3, 5
**blue** [3] - 1103:11; 1104:19; 1137:9
**Bob** [3] - 1201:7, 9
**body** [1] - 1285:18
**book** [6] - 1086:5, 18, 20; 1087:1; 1105:21; 1272:15
**booking** [2] - 1088:11; 1089:17
**bookkeeping** [3] - 1120:21; 1149:24
**booklet** [1] - 1167:13
**books** [2] - 1120:23; 1124:9
**bore** [1] - 1215:24
**born** [1] - 1162:1
**boss** [2] - 1089:7
**botched** [2] - 1138:20; 1139:3
**bottom** [2] - 1212:22; 1214:18
**bought** [2] - 1100:19; 1101:2
**box** [5] - 1086:25; 1087:1; 1272:1
**break** [8] - 1129:22; 1160:20; 1183:2; 1208:15; 1209:21; 1239:4; 1240:21
**breaks** [1] - 1156:5
**Bressman** [94] -

1083:15, 17, 23; 1084:7, 11, 13; 1085:20; 1090:9; 1093:24; 1094:10; 1095:2; 1097:1, 6, 15, 20; 1098:11; 1100:18, 22; 1101:2; 1102:6, 15, 19; 1108:1, 4, 14, 19, 23; 1109:24; 1110:1, 24; 1111:2, 7, 22; 1112:15, 20, 24; 1113:15, 24; 1114:2, 13; 1115:21, 25; 1116:3, 9, 15; 1117:11; 1124:13; 1125:11; 1127:3, 8, 15; 1129:6; 1153:2, 8, 16, 24; 1154:2, 5, 8, 11, 14; 1157:5, 7, 23; 1212:5, 17; 1213:4, 7, 10, 16, 19, 23; 1215:20; 1219:7; 1223:1; 1225:18, 20; 1227:10; 1228:1, 3, 16; 1232:22, 24; 1233:24; 1236:5, 10; 1262:11; 1267:8; 1270:12, 18; 1271:2
**Bressman's** [17] - 1096:22; 1153:14; 1225:25; 1226:2, 19; 1227:16; 1229:6, 11; 1264:11; 1267:10; 1268:12; 1269:2, 5, 12, 16; 1270:5; 1271:7
**Brett** [4] - 1123:4, 7, 11, 17
**Brett's** [1] - 1123:24
**brief** [1] - 1079:13
**briefly** [3] - 1125:1; 1130:15; 1155:15
**bring** [11] - 1079:7, 18; 1090:9; 1195:2, 7; 1198:15; 1204:24; 1241:17; 1266:22; 1283:13; 1286:14
**bringing** [3] - 1090:14; 1195:5; 1286:10
**Brookville** [2] - 1135:17
**Brostech** [1] - 1131:19
**brother** [1] - 1284:19
**brought** [4] - 1088:11; 1205:19; 1206:16; 1207:5
**Brzostek** [6] - 1088:14; 1107:21; 1108:8; 1109:21; 1114:19; 1116:2

**buccal** [1] - 1131:20
**bullet** [1] - 1287:3
**bullets** [1] - 1105:19
**bunch** [1] - 1090:25
**burden** [5] - 1131:9; 1198:19; 1199:7, 22; 1200:5
**business** [6] - 1091:4; 1094:13; 1108:11; 1128:1; 1150:20; 1174:24
**button** [2] - 1138:5
**buy** [1] - 1105:13
**BY** [64] - 1081:20; 1083:1; 1086:11; 1087:9; 1092:16; 1098:24; 1100:5; 1101:9; 1102:10; 1103:16, 22; 1104:22; 1105:4; 1107:3; 1110:15; 1113:11; 1114:8, 12; 1115:13; 1116:22; 1117:1, 4, 16, 19; 1118:13; 1120:19; 1122:21; 1123:25; 1125:5; 1126:6; 1127:13; 1128:13, 19; 1129:10; 1134:13; 1148:3; 1161:17; 1165:25; 1176:11; 1187:4; 1188:3; 1193:15; 1209:19; 1219:5; 1244:20; 1272:7; 1289:4-6, 8-9, 11-13, 15-16, 18; 1290:4-7, 9

---

**C**

**cab** [1] - 1091:14
**calculations** [1] - 1225:6
**calendar** [3] - 1157:2; 1251:2
**caliber** [2] - 1087:24; 1088:20
**caller** [2] - 1148:19; 1222:15
**Campbell** [20] - 1081:25; 1094:6; 1099:22; 1158:3, 18, 24; 1159:20; 1160:9; 1215:8; 1251:8; 1253:14; 1255:23; 1266:22; 1267:6, 10; 1268:14, 18; 1270:12, 17; 1284:5
**Campbell's** [30] - 1082:12; 1091:6;

1092:6; 1093:25; 1095:2; 1097:2, 10, 16; 1098:12; 1099:16; 1100:12; 1160:7; 1251:10, 13, 17; 1252:9; 1254:18; 1255:4; 1257:4; 1262:18, 21; 1263:2; 1264:11; 1267:2, 6; 1268:20; 1269:11, 16, 25; 1270:5
**Campbell/Amador** [2] - 1252:10; 1255:14
**Canada** [21] - 1162:2; 1163:20; 1164:16; 1165:6; 1166:21, 23; 1167:3, 23; 1168:17; 1172:9, 18; 1176:21; 1177:3; 1179:14; 1189:20; 1190:10; 1203:15; 1204:1
**Canadian** [1] - 1162:6
**cannot** [2] - 1199:6; 1262:6
**car** [7] - 1132:9; 1138:20; 1139:4, 14; 1140:3; 1168:3; 1193:18
**care** [6] - 1111:16; 1154:22; 1155:5; 1192:9; 1193:8
**carrier** [1] - 1151:18
**carry** [1] - 1085:7
**carrying** [1] - 1088:21
**case** [37] - 1080:16; 1094:13; 1107:16; 1119:7; 1125:10; 1126:16; 1129:6, 22; 1137:16; 1143:10; 1144:6, 19, 21; 1147:15, 22; 1152:18, 21; 1154:19; 1156:1, 5; 1157:11; 1159:6; 1160:21; 1185:17; 1189:6; 1224:22; 1239:5; 1254:4; 1275:6; 1278:10, 16, 19-20, 23; 1279:1; 1288:17
**cases** [4] - 1127:22; 1152:2; 1279:1
**cast** [1] - 1131:11
**caused** [4] - 1168:23; 1171:24; 1173:7
**causes** [1] - 1275:23
**cautionary** [1] - 1146:24
**CD** [1] - 1183:10
**CDs** [1] - 1183:9
**cease** [1] - 1127:7

cell [122] - 1093:16, 24; 1095:1, 14; 1096:18, 23-24; 1097:1, 6; 1139:1; 1150:2; 1151:18, 20, 24; 1152:18; 1153:2, 8, 14-16, 23-24; 1154:2, 5, 8-9, 14; 1155:2; 1156:14, 19; 1157:5-7, 23-24; 1158:10, 20; 1159:7; 1160:4; 1210:15; 1211:10, 12, 23; 1212:4, 17; 1213:4, 6-7, 10, 16, 19, 23; 1214:11, 16-17, 20; 1215:17; 1217:20; 1218:3, 12, 18; 1219:8; 1221:20; 1227:24; 1229:6, 8, 11, 22; 1230:8, 12; 1231:3, 7, 13, 15; 1232:22; 1233:24; 1234:8; 1236:4, 6, 10; 1238:4; 1245:11; 1246:2, 4, 12, 14, 17, 19; 1252:14, 23, 25; 1253:3, 5, 16; 1255:8; 1262:19; 1264:11; 1267:8, 10; 1268:12; 1269:2, 5, 10, 12; 1270:5, 18; 1271:2, 7

cells [1] - 1153:9

cellular [1] - 1149:22

center [1] - 1136:7

Central [3] - 1078:5, 13, 22

central [2] - 1088:11; 1089:17

certain [8] - 1131:14; 1144:19, 23; 1148:11; 1174:25; 1181:18; 1185:15; 1284:20

certainly [3] - 1100:2; 1149:6; 1166:7

Certified [1] - 1118:24

challenging [1] - 1286:12

changed [1] - 1279:20

characteristics [1] - 1149:23

characters [1] - 1131:11

charge [4] - 1080:1, 4; 1089:20; 1286:17

charges [2] - 1080:14, 18

Charlie [1] - 1136:14

chart [32] - 1101:14; 1147:4; 1148:6, 12; 1155:2, 7, 12; 1157:18, 21; 1215:7; 1216:21; 1249:23, 25; 1250:3, 14; 1252:1, 5; 1255:13; 1257:16; 1258:13, 25; 1259:3, 5-6, 11, 14, 17, 24; 1262:16

charts [2] - 1146:12, 16

chase [1] - 1244:5

check [2] - 1109:11; 1259:12

checked [1] - 1173:12

checking [1] - 1259:16

Chevy [1] - 1139:19

Chris [9] - 1171:11; 1187:6; 1190:24; 1206:22; 1285:8, 16, 22; 1286:4, 24

Christian [9] - 1099:13, 15, 23; 1119:7, 23; 1126:16; 1136:18; 1137:11; 1180:4

CHRISTIAN [1] - 1078:5

Christmas [1] - 1281:19

Circuit [2] - 1200:15; 1202:2

circumstances [4] - 1200:18; 1201:25; 1202:3, 6

cite [1] - 1202:1

citizen [1] - 1162:7

city [5] - 1102:5; 1162:4; 1163:20, 23; 1166:21

City [10] - 1078:19; 1113:25; 1114:5; 1121:14; 1167:9; 1210:13, 17; 1211:14, 24

claim [1] - 1286:23

claimed [2] - 1110:17; 1208:2

clarification [5] - 1123:20; 1131:16; 1132:18; 1270:23; 1275:7

clarify [5] - 1084:8; 1205:15; 1242:20; 1244:24; 1245:14

clarity [1] - 1153:7

clean [3] - 1238:15; 1241:1; 1286:5

cleaning [1] - 1085:20

clear [11] - 1133:1; 1178:21; 1187:10; 1200:21; 1202:22; 1203:4, 20; 1204:5; 1205:5; 1268:1; 1281:17

cleared [3] - 1098:5; 1238:19, 21

clearing [1] - 1280:15

clearly [3] - 1123:10; 1203:12; 1274:15

clerk [1] - 1274:16

CLERK [5] - 1081:5; 1125:22; 1134:4; 1161:11; 1209:5

client [1] - 1286:24

clients [2] - 1127:21, 25

clip [2] - 1087:1; 1105:18

close [1] - 1246:16

closest [1] - 1261:18

closet [3] - 1086:7, 13, 17

clothing [1] - 1137:6

club [1] - 1246:22

Clubs [1] - 1121:11

clue [1] - 1180:15

coached [1] - 1203:17

coaxing [1] - 1205:8

code [1] - 1256:25

coded [1] - 1250:3

collateral [1] - 1284:25

colleague [1] - 1129:1

collection [2] - 1104:16; 1132:13

colloquy [1] - 1097:19

color [5] - 1103:10, 18; 1104:17; 1170:11; 1250:3

color-coded [1] - 1250:3

colorful [2] - 1103:17, 23

column [5] - 1099:1; 1148:13; 1155:15; 1156:3; 1213:14

combined [1] - 1137:1

comfort [1] - 1193:1

coming [7] - 1109:13; 1130:2; 1140:19; 1146:1, 7, 20; 1199:23

comments [2] - 1199:25; 1204:11

commission [1] -

communicate [1] - 1097:9

communications [1] - 1224:23

compact [1] - 1182:22

companies [10] - 1119:11; 1120:16; 1124:20; 1125:7; 1149:19, 21, 23; 1150:15, 25

company [24] - 1096:23; 1119:10; 1120:16; 1124:22; 1150:1, 3, 18, 21; 1151:8, 16, 18-19; 1152:9; 1153:6; 1155:11; 1156:5; 1158:25; 1248:21; 1249:17, 20; 1253:21, 24

company's [1] - 1159:2

comparing [1] - 1229:11

comparison [2] - 1148:11; 1150:10

compensation [1] - 1121:25

compilation [2] - 1145:11; 1146:5

compile [1] - 1148:12

compiled [1] - 1145:13

complete [3] - 1149:3, 7; 1214:18

completed [1] - 1213:10

completely [3] - 1188:19; 1204:14; 1205:12

completes [1] - 1186:25

comport [2] - 1167:2, 21

computer [5] - 1078:25; 1188:7; 1206:1, 3, 19

computer-assisted [1] - 1078:25

conceded [2] - 1131:20; 1132:7

concept [1] - 1094:23

concern [3] - 1080:8; 1168:23; 1171:25

concerned [10] - 1090:3; 1112:18; 1128:24; 1129:2, 6, 13; 1172:16; 1192:3; 1235:5; 1275:13

**concerning** [7] - 1187:6; 1189:14; 1225:4; 1278:18, 22; 1281:12

**concessions** [1] - 1132:22

**conclude** [1] - 1149:8

**concluded** [2] - 1133:13; 1147:8

**conclusion** [2] - 1189:24; 1204:8

**confer** [7] - 1184:6; 1187:25; 1218:23; 1270:7; 1271:23; 1272:2, 4

**conference** [5] - 1096:6; 1098:23; 1106:15; 1115:11; 1136:24

**conferred** [1] - 1274:16

**confessed** [4] - 1285:23; 1286:1, 24; 1287:2

**confirm** [1] - 1258:8

**confront** [2] - 1276:19; 1281:4

**confuse** [3] - 1240:3, 7; 1258:23

**confused** [8] - 1238:8; 1240:14; 1242:5, 13; 1245:17, 19; 1252:20

**confusing** [3] - 1115:6; 1131:7; 1241:1

**confusion** [5] - 1242:22; 1243:6; 1258:13; 1280:15; 1287:12

**conjunction** [3] - 1200:17; 1201:24; 1202:3

**connect** [1] - 1136:2

**connection** [5] - 1130:21; 1137:23; 1213:20, 23; 1231:4

**connections** [1] - 1153:10

**consider** [1] - 1080:5

**considerable** [1] - 1232:1

**considered** [1] - 1122:1

**considering** [1] - 1151:17

**consistent** [3] - 1145:12; 1207:20; 1275:21

**consistently** [1] - 1203:24

**conspiracy** [5] - 1080:19; 1163:1; 1286:17; 1288:3

**cont'd** [2] - 1209:18; 1290:9

**contact** [2] - 1111:22; 1157:9

**contacted** [3] - 1112:17; 1201:3; 1215:24

**contain** [2] - 1171:1; 1182:22

**contained** [7] - 1144:18, 24; 1145:5; 1150:6; 1200:8; 1272:14; 1276:19

**content** [5] - 1192:3; 1200:22; 1201:19; 1202:18; 1207:15

**contents** [6] - 1098:14; 1189:14; 1200:17; 1202:24; 1203:1, 19

**contest** [1] - 1133:3

**contesting** [1] - 1133:5

**continue** [7] - 1157:2; 1183:4; 1208:14; 1209:15; 1235:6; 1247:20

**Continued** [10] - 1133:14; 1183:17; 1234:13; 1235:10; 1237:8; 1238:23; 1263:13; 1265:1; 1273:7; 1277:9

**continues** [2] - 1157:1; 1269:19

**continuing** [2] - 1081:11; 1098:4

**continuous** [1] - 1132:1

**continuously** [1] - 1131:25

**contract** [1] - 1085:8

**contractors** [1] - 1124:23

**contrary** [1] - 1238:16

**control** [2] - 1185:16; 1199:20

**conversation** [22] - 1102:19; 1112:20; 1177:7; 1187:5; 1190:25; 1191:10, 13, 22; 1192:1, 12; 1205:12; 1276:1, 3,

5-6, 8, 18, 20, 23; 1279:10; 1280:19

**conversations** [4] - 1083:14; 1094:3; 1182:18; 1281:11

**conversed** [1] - 1176:12

**conviction** [4] - 1284:23; 1285:2, 21; 1286:13

**convictions** [2] - 1284:16, 20

**cookies** [1] - 1279:3

**cooperating** [3] - 1088:9; 1090:8; 1114:17

**cooperation** [2] - 1090:3, 5

**cop** [1] - 1102:5

**copies** [1] - 1182:18

**copped** [1] - 1090:6

**copy** [8] - 1096:4; 1171:20; 1181:20; 1217:15; 1220:8; 1250:1, 18

**Coral** [1] - 1078:17

**corporation** [3] - 1121:9; 1124:17

**corporations** [2] - 1121:1

**correct** [99] - 1084:25; 1085:13, 15; 1088:8; 1089:25; 1091:18; 1092:22, 24; 1102:16, 22; 1103:3, 17; 1113:15, 20; 1114:14, 17-18, 23; 1116:1, 3-5; 1118:18, 24; 1119:5; 1120:3; 1122:23; 1123:15; 1124:2; 1126:10, 13-14, 17-18; 1128:2, 22; 1157:10; 1159:1; 1166:25; 1167:17; 1178:2, 10-11; 1179:1, 3; 1181:6; 1186:2; 1188:17, 20, 23; 1189:2, 7, 10; 1190:8, 12, 15, 18; 1194:21; 1202:19; 1218:7; 1221:10, 24; 1222:15, 18; 1224:20; 1228:3, 7; 1229:13; 1230:1, 5; 1231:9, 16; 1232:14; 1233:13; 1234:2; 1236:16, 22-23; 1241:6, 9; 1246:6; 1248:18; 1249:2, 17; 1251:12; 1253:8, 13; 1255:18; 1260:9; 1261:24; 1267:11;

1270:9; 1283:16; 1285:25

**corrected** [1] - 1129:1

**correctly** [3] - 1172:11, 15; 1200:13

**correlate** [1] - 1216:21

**corresponding** [1] - 1167:7

**corroborate** [1] - 1204:15

**corroborated** [1] - 1201:5

**corroborates** [2] - 1201:10; 1204:13

**Costa** [1] - 1163:15

**Costello** [2] - 1136:14; 1140:7

**Counsel** [6] - 1096:11; 1184:6; 1212:9; 1247:23; 1260:18; 1272:4

**counsel** [14] - 1106:1; 1137:8; 1166:6; 1187:25; 1196:5; 1218:23; 1224:7; 1237:2; 1239:24; 1242:18; 1270:7; 1271:23; 1272:2; 1279:21

**count** [1] - 1214:19

**counter** [1] - 1105:15

**counting** [1] - 1105:19

**country** [7] - 1162:1; 1163:11; 1164:15; 1165:16, 18; 1168:4, 23

**Country** [1] - 1078:18

**County** [4] - 1134:18, 20; 1136:12; 1143:13

**couple** [3] - 1080:2; 1138:10; 1279:24

**course** [2] - 1093:14; 1139:15

**COURT** [332] - 1078:1; 1079:3, 8, 11, 17, 21, 24; 1080:15, 18, 23, 25; 1081:2, 9; 1082:17, 19, 23; 1086:10; 1087:5, 8; 1092:13, 15; 1093:2, 5, 9, 12, 17, 21; 1094:9, 20, 23; 1095:6, 10, 13, 19, 22; 1096:2, 7, 10, 13; 1097:22; 1098:18, 22; 1102:8; 1103:15, 20; 1104:21; 1105:2, 23, 25; 1106:5, 8, 11, 13, 16; 1110:11; 1113:9;

1114:11, 25; 1115:2, 5, 10, 12; 1116:18, 20; 1117:3, 14, 21, 24; 1118:1, 3, 5; 1119:14, 18, 25; 1120:6, 11, 14; 1123:21; 1125:3, 16, 18, 21; 1127:11; 1128:12, 16; 1129:9, 15, 17, 19, 21; 1130:12; 1131:2, 4, 7; 1132:1, 4, 11; 1133:9, 11; 1137:12; 1138:4; 1139:6, 8; 1140:12; 1141:20; 1145:23, 25; 1146:4, 9, 23; 1147:10; 1149:2, 6; 1160:20, 24; 1161:4, 15; 1162:25; 1164:5; 1165:2, 5, 10, 19, 21; 1166:6; 1176:9; 1177:2, 4, 6; 1182:7, 9, 12, 17; 1183:1, 13, 16; 1184:2, 9, 11, 14, 17, 22, 25; 1185:6, 9; 1186:1, 5, 11, 13, 16, 20, 23, 25; 1187:2, 15, 19, 21, 24; 1189:24; 1190:2; 1191:19; 1194:1, 4; 1195:12, 16, 18, 22; 1196:3, 8, 23; 1197:2, 5; 1198:5, 10, 15, 21; 1199:15; 1200:2; 1202:13, 18, 21; 1203:11, 23; 1204:7, 15, 19, 25; 1205:13, 16, 20, 23; 1206:2; 1207:14, 23; 1208:6, 10, 23; 1209:1, 4, 8, 15; 1210:21; 1211:1; 1212:8; 1214:25; 1215:4; 1218:22, 25; 1219:13; 1220:5, 9; 1221:5; 1224:3, 11, 16; 1225:2, 14; 1226:11; 1228:19; 1229:2, 7, 10; 1230:2, 6, 24; 1231:11, 23; 1232:2; 1233:14; 1234:10; 1235:3; 1237:6; 1238:3, 11, 18, 22; 1239:3, 12, 14, 17; 1240:2, 17; 1241:3, 18, 22; 1242:5, 7, 10, 12, 21; 1244:1, 8, 13, 16; 1245:22; 1246:13; 1247:22; 1250:11; 1254:9, 13; 1260:17; 1263:10; 1264:3, 6, 13, 16, 18, 23; 1266:5, 8, 11, 13, 16, 18; 1267:17; 1268:4;

1271:12, 14, 17, 22, 25; 1272:3, 19, 23, 25; 1273:2, 5; 1274:3, 7, 12, 15, 23; 1275:2, 5, 19; 1277:4; 1278:3; 1279:8, 23; 1280:7, 11; 1281:2, 7, 9; 1282:1, 5, 12, 14, 23; 1283:5, 10, 12, 24; 1284:2, 4, 8, 11, 18; 1285:12, 14; 1286:1, 7, 11, 14, 22; 1287:1, 5, 24; 1288:4, 7, 9, 14

**Court** [17] - 1078:20; 1080:4, 13; 1098:8; 1146:18; 1147:2; 1199:1, 8; 1207:25; 1241:7, 10; 1242:17; 1243:3; 1249:24; 1274:9; 1287:3

**court** [11] - 1097:23; 1134:1; 1147:9; 1169:11; 1184:20, 22; 1205:14; 1236:2; 1239:2; 1266:2; 1278:2

**Courthouse** [1] - 1078:4

**courtroom** [13] - 1081:8; 1129:24; 1131:1; 1137:4; 1166:14; 1167:12; 1209:7, 24; 1217:17; 1239:9; 1244:15; 1258:17; 1279:7

**cover** [2] - 1104:14; 1286:3

**CPA** [4] - 1118:21, 24; 1119:1

**CR** [1] - 1078:3

**crack** [2] - 1102:15, 21

**Craig** [4] - 1132:10; 1285:10, 19; 1286:6

**crazy** [1] - 1192:7

**create** [1] - 1124:12

**credibility** [2] - 1280:23; 1281:7

**credit** [2] - 1287:9, 17

**crime** [4] - 1139:24; 1163:2; 1181:17

**crimes** [3] - 1171:6, 9; 1182:3

**criminal** [4] - 1127:24; 1171:6; 1181:17; 1185:17

**critical** [1] - 1240:19

**CROSS** [10] - 1113:10; 1122:20; 1127:12; 1176:10; 1219:4;

1289:8, 11, 15; 1290:5, 10

**cross** [20] - 1081:22; 1083:9; 1084:14; 1086:5, 8; 1087:4; 1093:22; 1094:22; 1095:14, 23; 1113:9; 1149:4; 1200:22; 1207:5; 1219:1; 1275:15; 1282:9, 19, 24; 1288:11

**cross-examination** [13] - 1081:22; 1083:9; 1084:14; 1086:5; 1087:4; 1093:22; 1095:14, 23; 1113:9; 1200:22; 1207:5; 1219:1; 1288:11

**CROSS-EXAMINATION** [10] - 1113:10; 1122:20; 1127:12; 1176:10; 1219:4; 1289:8, 11, 15; 1290:5, 10

**cross-examine** [1] - 1149:4

**cumulative** [7] - 1130:6, 9; 1131:6, 22; 1132:8; 1133:8; 1139:7

**current** [1] - 1164:20

**cursed** [1] - 1105:13

**cus** [1] - 1229:12

**custodian** [3] - 1239:20; 1241:17

**custody** [4] - 1106:8; 1199:19; 1229:13; 1283:10

**customer** [1] - 1155:15

**customs** [1] - 1166:23

**cut** [1] - 1244:5

**CW** [2] - 1143:2

**cycle** [1] - 1256:3

**D**

**dark** [2] - 1256:10, 12

**date** [65] - 1108:3; 1148:14; 1153:11; 1154:8; 1155:18; 1157:2; 1167:13, 19, 21; 1172:3, 7-8, 16; 1177:24; 1178:1, 3-5, 7; 1179:15, 17; 1181:5, 18; 1184:3; 1190:3; 1192:4; 1203:9, 21-23; 1210:3; 1212:19; 1213:7; 1214:14; 1215:13-15, 18-20; 1216:19; 1219:16;

1225:19; 1226:6; 1228:1, 22-23; 1229:15; 1232:23; 1247:25; 1259:24; 1260:6; 1262:25; 1263:4; 1267:24; 1268:17; 1269:15

**dated** [1] - 1166:25

**dates** [2] - 1145:17; 1152:20

**daughter** [2] - 1087:13, 18

**daughter's** [4] - 1087:17; 1091:9, 13; 1099:21

**David** [3] - 1154:21; 1155:4; 1159:10

**days** [10] - 1085:11; 1102:22; 1168:14, 17, 22; 1182:23; 1210:1; 1212:25; 1228:2; 1281:19

**deadline** [8] - 1171:16; 1172:1, 12; 1174:12; 1192:4, 21; 1201:1

**deal** [2] - 1131:17; 1208:15

**dealers** [1] - 1102:4

**dealing** [6] - 1100:22; 1165:8, 10, 12; 1247:10; 1250:22

**deals** [1] - 1199:12

**dealt** [1] - 1165:13

**death** [3] - 1109:4; 1135:11; 1139:16

**December** [4] - 1176:13; 1179:18; 1180:12, 21

**decide** [3] - 1150:19; 1199:1; 1242:21

**decimal** [1] - 1156:7

**defendant** [40] - 1094:6, 16; 1099:13; 1119:7; 1120:1; 1126:16; 1130:21; 1131:21; 1132:21; 1136:18, 21; 1137:3, 8, 11; 1138:12; 1139:22; 1140:4, 8; 1141:2, 5; 1142:14; 1154:19; 1189:1; 1191:17; 1192:12, 18, 20, 25; 1193:9; 1201:14; 1205:10; 1206:14, 22; 1207:20; 1208:7; 1209:2; 1271:23; 1276:1; 1287:9

**Defendant** [2] -
1078:6, 16
**Defendant's** [7] -
1264:23; 1266:9, 21;
1270:2; 1272:9; 1290:17
**defendant's** [8] -
1131:10; 1155:8;
1156:19; 1157:5;
1159:13; 1160:10;
1174:22
**defense** [7] - 1132:20;
1137:8; 1204:12;
1264:22; 1270:7;
1271:23; 1285:6
**defined** [1] - 1152:3
**degree** [1] - 1151:25
**Del** [2] - 1113:19;
1115:16
**delay** [1] - 1287:22
**deliver** [2] - 1194:24;
1196:14
**demand** [5] - 1171:2;
1178:2, 4, 7; 1181:5
**DeNegro** [1] - 1284:6
**deny** [1] - 1089:3
**Department** [8] -
1114:1, 6; 1134:19, 21;
1136:12; 1143:13, 17;
1210:13
**depict** [1] - 1152:16
**depicted** [3] -
1152:13; 1214:13;
1218:1
**depicts** [1] - 1216:8
**describe** [2] - 1137:6;
1150:24
**described** [1] -
1199:23
**description** [1] -
1105:8
**designate** [1] -
1186:13
**designated** [2] -
1141:12; 1155:19
**designation** [2] -
1086:13; 1156:11
**desire** [1] - 1152:10
**desk** [2] - 1113:17;
1115:15
**destroyed** [1] - 1199:6
**detail** [4] - 1150:5;
1151:10; 1159:2
**details** [1] - 1212:21
**Detective** [16] -
1106:14, 17; 1107:4, 6,
21-22; 1108:8; 1109:20;
1110:16; 1115:14;

1116:2; 1131:19;
1242:1; 1262:8, 10;
1272:8
**detective** [21] -
1106:23; 1107:9;
1109:8; 1130:22;
1132:25; 1134:2, 15,
18, 25; 1136:14;
1137:13; 1138:8;
1140:7, 15; 1142:8;
1143:7; 1148:4;
1214:24; 1244:21
**detectives** [8] -
1107:17; 1113:22;
1127:1; 1130:2;
1131:15; 1135:11;
1136:10
**Detectives** [1] -
1088:14
**determination** [3] -
1146:10; 1197:7; 1243:5
**determine** [7] -
1130:24; 1149:14;
1187:13; 1199:9;
1220:19; 1223:24;
1262:15
**determined** [1] -
1178:17
**Devans** [3] - 1190:7;
1280:16; 1281:14
**developed** [1] -
1224:19
**Devon's** [1] - 1180:6
**Devons** [1] - 1178:25
**diagram** [1] - 1086:1
**dialed** [9] - 1212:5;
1248:11; 1260:1, 14;
1261:8; 1269:12, 15, 25
**died** [3] - 1189:4, 7;
1205:11
**difference** [3] -
1146:3; 1151:13
**different** [20] -
1125:8; 1130:4;
1146:15; 1147:5, 24;
1149:18; 1151:1;
1158:10, 13; 1182:14;
1188:20; 1205:12;
1206:9; 1207:2; 1240:6;
1275:24
**difficult** [2] -
1167:11; 1185:19
**digits** [1] - 1238:13
**dinner** [3] - 1173:11,
18
**DIRECT** [12] - 1107:2;
1118:12; 1126:5;
1134:12; 1161:16;

1209:18; 1289:7, 10,
14, 17; 1290:4, 9
**direct** [12] - 1093:7;
1094:22; 1126:19;
1136:5; 1200:21;
1209:20; 1276:14, 17;
1281:10; 1282:8, 11, 25
**directed** [2] -
1166:10; 1208:9
**directing** [1] -
1215:11
**direction** [3] -
1149:12; 1157:12;
1196:9
**directly** [1] - 1143:24
**dirty** [2] - 1086:7, 18
**disagrees** [1] -
1274:19
**disappear** [1] -
1181:20
**disappointed** [1] -
1287:17
**disclose** [1] - 1279:9
**disclosure** [1] -
1192:21
**disconnect** [1] -
1212:25
**discrepancies** [2] -
1207:14; 1275:12
**discuss** [5] - 1129:22;
1191:23; 1263:11;
1280:22; 1281:20
**discussed** [5] -
1232:9; 1276:16, 22;
1280:12; 1281:23
**discussing** [5] -
1228:23; 1245:24;
1278:12; 1280:24;
1281:16
**discussion** [3] -
1120:10; 1194:23;
1201:18
**disks** [3] - 1182:20,
22, 24
**display** [1] - 1087:11
**disposal** [1] - 1285:18
**disregard** [1] -
1278:17
**disrespect** [1] -
1252:21
**distinctive** [1] -
1200:16
**distinctively** [2] -
1200:25; 1201:3
**District** [6] -
1078:21; 1143:17;
1249:19; 1254:3, 6, 10

**DISTRICT** [2] - 1078:1
**divides** [1] - 1156:6
**DNA** [14] - 1130:21;
1131:13, 17; 1132:13;
1136:2, 16-17, 19;
1137:3, 14; 1139:22;
1142:10, 15, 20
**document** [14] -
1121:24; 1124:7;
1164:12; 1166:5;
1199:1, 10, 13, 19;
1200:16, 18-19;
1209:23; 1217:16;
1258:16
**document(s** [1] -
1082:24
**documents** [3] -
1145:6; 1146:24;
1147:18
**Doddato** [1] - 1279:25
**DODDATO** [5] - 1078:18;
1184:4; 1198:8, 12;
1280:9
**done** [15] - 1140:9;
1144:2; 1145:1;
1155:24; 1171:7;
1181:17; 1183:3;
1185:12; 1196:21, 24;
1197:6; 1199:14;
1202:12; 1282:15;
1283:3
**door** [3] - 1098:21;
1108:18, 20
**Dorval** [7] - 1132:10;
1141:22; 1284:23;
1285:21; 1286:25;
1287:6; 1288:2
**Dorval's** [1] - 1143:4
**doubt** [1] - 1283:3
**down** [21] - 1090:7;
1095:6; 1099:1, 6;
1104:13; 1105:25;
1118:1; 1125:19;
1129:19; 1152:1;
1153:11; 1156:6;
1184:21; 1212:22;
1224:21, 25; 1239:12;
1240:18; 1273:2;
1284:10
**downloaded** [2] -
1150:20; 1205:25
**downstairs** [2] -
1168:20; 1169:21
**draft** [1] - 1206:21
**drawn** [1] - 1224:21
**Drive** [2] - 1081:24;
1092:23
**drop** [1] - 1092:2

**dropped** [1] - 1113:1

**drove** [1] - 1116:7

**drug** [5] - 1100:21; 1102:4; 1136:7; 1178:21; 1230:20

**drugs** [4] - 1100:19; 1101:3; 1102:6; 1180:24

**due** [1] - 1204:3

**duly** [6] - 1106:21; 1118:9; 1126:2; 1134:9; 1161:8; 1209:12

**dump** [13] - 1150:6, 13, 23; 1151:9, 14-15, 23, 25; 1152:6; 1156:20, 22; 1159:7; 1213:21

**duration** [16] - 1152:20; 1156:4; 1232:25; 1253:17, 22; 1261:25; 1262:1; 1267:13; 1270:1, 14, 19; 1271:5, 9

**during** [13] - 1084:14; 1097:10; 1131:12; 1132:13; 1135:12, 23; 1191:22; 1192:12; 1206:18; 1232:17; 1256:2, 12; 1276:8

**duties** [1] - 1143:13

---

### E

**ear** [2] - 1187:16; 1193:11

**earliest** [3] - 1263:3; 1267:24

**early** [8] - 1080:2; 1085:10; 1099:9, 19; 1210:11; 1256:10; 1267:4, 9

**ears** [1] - 1274:16

**easier** [1] - 1266:14

**East** [3] - 1123:14; 1124:16, 22

**east** [2] - 1090:10; 1124:1

**EASTERN** [1] - 1078:1

**easy** [1] - 1268:2

**effort** [1] - 1284:22

**eight** [8] - 1107:8; 1168:17, 22; 1170:4; 1180:22; 1189:9; 1195:4; 1214:19

**either** [8] - 1094:9; 1121:16; 1140:6; 1143:14; 1199:5; 1276:19; 1277:1

**elbow** [1] - 1103:5

**ELMO** [1] - 1092:12

**elsewhere** [1] - 1156:15

**emphasize** [1] - 1080:3

**employee** [2] - 1122:1, 8

**employees** [4] - 1121:17, 20; 1124:24; 1125:7

**employment** [2] - 1109:14; 1134:17

**empty** [1] - 1086:25

**en** [1] - 1092:2

**encompass** [1] - 1135:16

**encounter** [2] - 1108:7, 25

**encountered** [2] - 1108:3; 1112:25

**end** [11] - 1112:20, 22; 1135:6; 1156:18; 1247:20; 1263:6; 1280:7, 9; 1283:3

**End** [5] - 1096:6; 1098:23; 1106:15; 1115:11; 1120:10

**ended** [2] - 1240:19; 1248:2

**ending** [1] - 1245:23

**enforcement** [2] - 1088:10; 1135:22

**engage** [3] - 1190:25; 1191:10; 1285:18

**engaged** [1] - 1285:17

**English** [1] - 1162:9

**entail** [1] - 1131:16

**enter** [2] - 1108:22; 1225:6

**entered** [4] - 1209:6; 1240:5; 1241:15; 1244:14

**entering** [2] - 1166:21; 1209:5

**enters** [2] - 1081:7; 1131:1

**entire** [2] - 1083:4; 1132:3

**entirety** [1] - 1182:24

**entry** [2] - 1099:6; 1248:12

**envelope** [7] - 1169:1, 4, 7, 17, 20; 1170:5; 1172:8

**episode** [1] - 1083:13

**equipment** [1] - 1274:24

**Eric** [5] - 1123:4, 7, 11, 17, 23

**error** [3] - 1226:9; 1242:25; 1243:6

**escapes** [1] - 1218:15

**escort** [1] - 1114:19

**escorted** [1] - 1116:2

**especially** [1] - 1151:17

**ESQ** [4] - 1078:14, 16, 18

**essentially** [2] - 1170:17; 1171:2

**establish** [2] - 1120:7; 1130:19

**establishing** [1] - 1131:10

**estoppel** [1] - 1284:25

**etcetera** [1] - 1286:17

**evening** [10] - 1154:13; 1157:15; 1214:1; 1256:5; 1257:3; 1278:24; 1279:5; 1282:3; 1288:16

**event** [2] - 1097:24; 1205:16

**events** [5] - 1165:4; 1276:16, 22; 1281:12, 22

**eventually** [1] - 1147:15

**evidence** [55] - 1080:5; 1082:19, 21; 1092:9, 13, 17; 1094:20; 1099:12; 1111:5; 1119:22; 1131:8; 1139:23; 1143:2, 10; 1144:7, 9; 1146:2, 6, 10-11, 15, 25; 1147:11, 21; 1148:5, 9; 1154:17; 1158:5; 1165:23; 1166:8; 1189:6; 1198:21; 1199:13; 1202:9, 13; 1208:24; 1212:10; 1250:2; 1254:18; 1264:25; 1266:11, 20; 1270:3, 20; 1272:19, 21; 1275:9; 1290:17, 19

**evidentiary** [2] - 1079:16; 1201:11

**ex** [1] - 1091:25

**ex-wife** [1] - 1091:25

**exact** [2] - 1127:4; 1178:5

**exactly** [4] - 1101:17; 1138:23; 1177:21; 1202:24

**EXAMINATION** [36] -

**Exhibit** [17] - 1082:20; 1092:10; 1165:23; 1212:11; 1264:23; 1266:9, 21; 1270:2, 20; 1272:9, 20; 1290:17, 19

**exhibited** [3] - 1209:23; 1217:16; 1258:16

**exhibits** [3] - 1143:8; 1144:24; 1149:14

**EXHIBITS** [1] - 1290:16

**exist** [1] - 1143:23

**exits** [1] - 1129:23

**expect** [3] - 1256:12;

1081:19; 1100:4; 1105:3; 1107:2; 1113:10; 1118:12; 1122:20; 1125:4; 1126:5; 1127:12; 1134:12; 1161:16; 1176:10; 1188:2; 1193:14; 1209:18; 1219:4; 1272:6; 1289:3-5, 7-8, 10-12, 14-15, 17; 1290:4-7, 9

**examination** [15] - 1081:22; 1083:9; 1084:14; 1086:5; 1087:4; 1093:22; 1095:14, 23; 1113:9; 1147:3, 23; 1200:22; 1207:5; 1219:1; 1288:11

**examine** [2] - 1149:4; 1187:3

**examined** [6] - 1106:21; 1118:9; 1126:2; 1134:10; 1161:9; 1209:12

**example** [3] - 1150:2; 1152:4; 1156:22

**excellent** [2] - 1103:13; 1238:8

**excerpts** [1] - 1130:17

**exchange** [1] - 1170:25

**excuse** [5] - 1116:18; 1196:8; 1234:12; 1239:10; 1278:5

**excused** [3] - 1118:2; 1125:20; 1129:20

**exhibit** [25] - 1100:6, 10; 1146:2, 22-23; 1147:11, 16-17, 21; 1154:17; 1164:7, 9; 1166:9; 1209:21; 1216:4; 1219:10; 1220:4; 1228:17; 1229:1, 3, 10; 1260:5; 1264:22

1276:17; 1282:9

**experience** [1] - 1129:12

**expire** [1] - 1164:22

**expired** [2] - 1165:3; 1178:1

**explain** [5] - 1083:16; 1121:23; 1130:23; 1216:6; 1217:3

**explained** [1] - 1109:3

**explaining** [1] - 1149:21

**explanation** [1] - 1131:12

**explicit** [1] - 1159:7

**exposed** [1] - 1104:3

**extended** [2] - 1104:10

**extent** [2] - 1146:14; 1147:20

---

**F**

**face** [4] - 1196:3; 1201:23; 1276:1

**face-to-face** [1] - 1276:1

**facility** [3] - 1136:6, 17, 24

**fact** [13] - 1084:18; 1088:3; 1147:17; 1165:8; 1201:14; 1203:8; 1213:13; 1248:22; 1276:9, 12; 1280:25; 1285:5; 1286:16

**facts** [4] - 1119:13, 22; 1242:21; 1278:23

**fair** [5] - 1082:11; 1095:13, 22; 1158:24; 1215:23

**fairly** [1] - 1200:21

**familiar** [1] - 1287:15

**family** [4] - 1163:16, 19, 25; 1167:3

**far** [7] - 1090:3; 1185:21; 1214:19; 1235:5; 1253:25; 1275:13; 1287:24

**fashion** [1] - 1145:18

**father** [2] - 1087:15; 1088:1

**father's** [1] - 1206:20

**FBI** [8] - 1135:20, 23; 1142:9; 1171:14, 22; 1172:13; 1181:19, 21

**FDR** [1] - 1081:24

**federal** [3] - 1144:5; 1163:5; 1167:4

**Federal** [2] - 1078:22

**fellow** [2] - 1115:15; 1249:17

**felt** [2] - 1090:17; 1113:3

**few** [2] - 1184:7; 1198:9

**field** [5] - 1086:25; 1087:1; 1127:24

**fifth** [2] - 1130:10

**Fifth** [1] - 1287:25

**figure** [4] - 1083:18; 1282:14; 1283:19

**files** [1] - 1224:12

**fill** [1] - 1079:23

**finally** [2] - 1090:25; 1137:18

**fine** [1] - 1271:14

**finger** [1] - 1142:23

**fingers** [1] - 1183:8

**finish** [5] - 1119:18; 1132:12; 1194:5; 1198:5; 1205:1

**finished** [1] - 1187:17

**firing** [1] - 1083:23

**first** [54] - 1083:5; 1084:10, 16; 1085:16; 1087:19; 1092:18; 1106:20; 1107:9; 1108:6, 25; 1109:11; 1112:25; 1113:12; 1115:14; 1118:8; 1121:17; 1125:24; 1126:1; 1138:9, 11; 1143:12; 1148:14; 1152:14; 1153:17; 1154:19; 1156:13; 1158:6; 1168:4; 1175:22; 1179:6; 1198:25; 1199:11; 1203:12; 1204:13, 15; 1205:18; 1210:11; 1211:18; 1212:20; 1213:2; 1216:16; 1217:5; 1218:3; 1245:4; 1249:8, 11; 1255:25; 1258:5; 1260:11; 1261:8, 10; 1271:1; 1274:11; 1275:22

**fishy** [1] - 1090:17

**fitness** [3] - 1154:22; 1155:5; 1246:22

**Fitness** [5] - 1119:12; 1120:17, 25; 1121:11; 1123:15

**five** [3] - 1103:8; 1158:20; 1183:11

**floor** [1] - 1286:19

**floors** [2] - 1285:11, 15

**Florida** [1] - 1078:17

**fluent** [1] - 1162:9

**fly** [1] - 1079:15

**FLYNN** [59] - 1078:14; 1079:19; 1161:3, 17; 1164:4, 6, 24; 1165:15, 20, 24-25; 1166:7; 1176:8; 1182:6, 21; 1183:12; 1184:3; 1187:8, 12, 14, 18, 23; 1188:3; 1190:5; 1193:12, 25; 1194:3; 1195:10, 15, 25; 1196:2, 6, 22; 1197:4; 1200:10; 1204:11, 21; 1205:3; 1206:16; 1207:22; 1208:4, 8; 1274:9, 13; 1275:3, 18, 20; 1280:24; 1281:5, 8, 10; 1282:4, 7, 13, 17; 1283:1, 6; 1290:4, 6

**Flynn** [11] - 1118:4, 11, 14, 16, 20; 1122:22; 1161:2; 1185:9; 1186:7; 1187:22

**focus** [2] - 1157:25; 1210:5

**focusing** [1] - 1131:16

**folks** [4] - 1160:22; 1197:10; 1239:3; 1282:2

**followed** [2] - 1240:13; 1242:2

**following** [17] - 1093:3; 1096:15; 1106:3; 1115:3; 1119:16; 1156:10; 1167:23; 1198:3; 1211:9; 1235:1; 1236:1; 1238:1; 1239:1; 1264:1; 1266:1; 1274:1; 1278:1

**follows** [7] - 1081:18; 1106:22; 1118:10; 1126:3; 1134:10; 1161:9; 1209:13

**forces** [1] - 1135:19

**form** [3] - 1122:10; 1220:25; 1231:10

**formal** [1] - 1124:6

**format** [2] - 1156:23, 25

**former** [2] - 1127:21, 25

**forward** [5] - 1107:22; 1160:24; 1199:5; 1208:18; 1268:13

**foundation** [2] - 1120:8; 1165:15

**four** [9] - 1108:18, 20; 1212:25; 1226:24; 1233:10; 1234:1; 1238:13; 1281:21; 1283:25

**four-door** [2] - 1108:18, 20

**fourth** [5] - 1130:10; 1216:2; 1256:4, 14

**frame** [2] - 1123:20

**framework** [1] - 1200:10

**franchise** [2] - 1124:5, 7

**FRANK** [1] - 1078:18

**Franklin** [1] - 1092:23

**frankly** [1] - 1287:13

**free** [2] - 1111:24; 1197:9

**French** [3] - 1162:6, 12, 14

**Friday** [11] - 1091:2, 5, 7; 1092:7; 1094:5; 1157:13; 1213:14; 1248:17; 1249:6; 1251:4

**friend** [8] - 1100:15; 1128:24; 1174:15, 19, 21; 1195:6

**Frocaro** [3] - 1165:9; 1175:25; 1176:1

**Froccaro** [9] - 1194:16, 20, 25; 1195:3, 9, 13; 1196:14, 19; 1199:6

**Froccaro's** [1] - 1193:19

**front** [14] - 1108:10; 1109:1; 1113:17; 1115:15; 1147:4; 1148:5; 1160:6; 1167:13; 1211:23; 1219:6; 1276:7, 14; 1280:12; 1281:4

**fronting** [1] - 1277:2

**fulfilling** [1] - 1138:18

**fully** [1] - 1121:4

**funny** [1] - 1195:23

**FURTHER** [2] - 1105:3; 1289:5

**furthest** [1] - 1262:25

**future** [1] - 1282:5

---

**G**

**Gables** [1] - 1078:17

11

29

**Garden** [1] - 1078:19

**Gargiulo** [70] - 1102:20; 1103:25; 1107:16; 1109:4; 1110:2; 1133:4; 1137:15; 1152:18, 21; 1153:3, 8, 16; 1154:2, 5; 1157:14; 1158:11; 1173:5; 1174:5; 1178:13, 18; 1179:16; 1180:16, 18; 1181:2; 1188:17; 1189:4, 7, 10, 15; 1191:24; 1192:17; 1196:14; 1202:4; 1210:6; 1216:20; 1217:4; 1220:13, 15, 18, 20, 22; 1221:12, 14, 18, 23; 1222:15; 1223:25; 1225:4; 1227:25; 1228:16; 1229:13; 1230:3; 1232:5, 12; 1234:5, 8; 1236:6, 25; 1238:4; 1239:23; 1240:11; 1241:8; 1242:20; 1245:12; 1246:2, 4, 8, 16; 1279:13

**Gargiulo's** [30] - 1152:22; 1153:15, 23; 1180:4; 1188:6; 1192:21; 1206:19; 1208:1; 1222:7; 1223:5; 1228:14, 20; 1229:8, 12, 22; 1230:8; 1231:13; 1232:23; 1236:4, 15, 17; 1242:3; 1245:4, 16, 25; 1252:19, 25; 1253:4

**Gargiulo/Matulis** [1] - 1239:25

**gathering** [1] - 1131:13

**gearing** [1] - 1130:2

**general** [2] - 1152:14; 1243:6

**generally** [3] - 1146:12; 1151:15; 1279:1

**gentlemen** [6] - 1080:1; 1129:21; 1147:10; 1160:21; 1237:7; 1278:3

**GEO** [1] - 1182:20

**geographic** [1] - 1121:13

**Gerald** [1] - 1126:16

**Gerrato** [2] - 1201:7

**Gerrato's** [1] - 1201:9

**gesture** [1] - 1235:7

**given** [3] - 1112:11; 1182:19; 1283:2

**gloves** [2] - 1086:22

**Government** [9] - 1078:12; 1081:11; 1082:15, 20; 1102:11; 1106:16; 1165:23; 1290:19

**government** [32] - 1131:8; 1134:2; 1145:20; 1182:18; 1187:25; 1188:5; 1196:5; 1199:14, 17, 19, 24; 1200:4; 1204:9; 1206:4, 7, 13; 1207:17; 1208:22; 1218:23; 1242:22; 1264:5; 1266:3; 1272:16; 1274:10; 1275:24; 1276:7; 1279:8, 21; 1282:7, 24; 1284:10; 1285:1

**Government's** [4] - 1092:10; 1212:11; 1272:20; 1290:20

**government's** [11] - 1146:14, 20, 25; 1147:13; 1154:17; 1164:9; 1166:9; 1275:20; 1280:11; 1281:5; 1284:1

**Grand** [2] - 1138:18; 1139:2

**graphic** [2] - 1216:24; 1217:1

**grassy** [1] - 1084:5

**grave** [3] - 1087:12, 14

**green** [2] - 1103:11; 1138:5

**ground** [3] - 1084:2; 1115:1; 1195:17

**group** [6] - 1119:11; 1120:16; 1123:5, 7; 1124:19; 1250:17

**groups** [2] - 1121:12; 1125:6

**guard** [1] - 1141:16

**guess** [5] - 1152:10; 1220:3; 1274:10; 1282:19

**guessing** [1] - 1128:7

**guilty** [1] - 1088:6

**gun** [15] - 1083:13, 15, 19; 1084:9, 19; 1085:6, 11, 19, 21; 1086:2, 23; 1088:1, 3; 1089:20; 1105:7

**guns** [1] - 1091:4

**guy** [2] - 1103:12; 1105:15

**Gym** [36] - 1108:13; 1109:1; 1112:25; 1113:12; 1114:14; 1119:24; 1123:4; 1210:20; 1211:3; 1214:23; 1215:9; 1216:10, 12, 18; 1217:6, 19; 1247:11; 1248:18; 1249:6, 9; 1257:21; 1258:9, 21, 24-25; 1260:2, 4, 7, 12, 19-20; 1261:4, 9, 22; 1262:4

**gym** [23] - 1093:19; 1094:25; 1113:3, 5; 1114:3, 19, 21; 1123:3, 8, 12, 14, 24; 1210:24; 1215:3; 1216:14; 1217:8, 23-24; 1248:24; 1261:16

**Gyms** [6] - 1119:12; 1120:2, 17, 25; 1122:23; 1125:8

**gyms** [4] - 1124:1, 13; 1154:23; 1174:25

## H

**hair** [2] - 1138:25; 1139:25

**half** [5] - 1170:20; 1242:10, 12; 1282:10, 12

**halted** [1] - 1110:5

**hand** [6] - 1104:12; 1125:23; 1148:13; 1155:15; 1157:2; 1194:7

**Handed** [4] - 1212:12; 1221:6; 1250:13; 1272:10

**handed** [1] - 1164:7

**handgun** [1] - 1090:7

**handle** [1] - 1150:25

**handles** [1] - 1150:16

**hands** [1] - 1277:6

**handwritten** [2] - 1170:13; 1181:10

**hard** [3] - 1123:9; 1173:25; 1217:15

**HARRY** [1] - 1078:20

**head** [2] - 1105:20; 1287:3

**header** [1] - 1154:22

**heading** [1] - 1099:1

**headphones** [3] - 1138:2; 1140:11; 1141:10

**hear** [20] - 1097:22; 1173:22, 24; 1179:21, 23; 1184:8; 1187:5, 16; 1195:20; 1197:8; 1199:24; 1202:8, 15; 1262:10; 1274:4; 1275:16; 1279:17, 22-23; 1284:22

**heard** [34] - 1097:23; 1109:5; 1127:14; 1130:8; 1133:9; 1138:10; 1139:13; 1140:16, 18; 1142:23; 1158:21; 1173:25; 1174:1; 1179:3, 7; 1180:8; 1185:5; 1186:7; 1188:4, 25; 1199:3; 1202:5; 1203:12; 1204:7; 1205:13; 1225:11; 1274:15; 1275:8, 19, 21; 1276:2; 1278:25; 1279:13; 1285:18

**hearing** [8] - 1079:16; 1160:25; 1165:1; 1183:5; 1186:4; 1201:11; 1279:9

**hearsay** [2] - 1202:8; 1281:6

**held** [1] - 1135:10

**help** [6] - 1111:25; 1177:14; 1222:6; 1224:8, 13; 1280:1

**helped** [2] - 1276:22

**helpful** [1] - 1266:17

**helping** [1] - 1182:15

**higher** [1] - 1151:25

**highlight** [1] - 1132:7

**highlighted** [4] - 1159:23; 1270:10, 21; 1271:1

**himself** [2] - 1110:19; 1223:7

**hit** [1] - 1211:10

**hold** [2] - 1120:14; 1258:24

**holding** [1] - 1183:8

**Holzer** [2] - 1123:11, 17

**Holzer's** [2] - 1123:4, 7

**Holzers** [2] - 1124:2, 4

**home** [24] - 1095:3; 1152:4; 1168:10, 16; 1169:11; 1172:7, 24; 1173:11, 14, 19; 1179:12; 1189:1, 15, 18; 1190:21, 23;

12

1191:1, 11, 13;
1194:19; 1201:14, 18;
1206:20; 1274:8
**Homicide** [1] - 1106:25
**homicide** [8] -
1107:11, 14; 1132:10;
1139:20; 1144:3, 5;
1216:8; 1228:5
**Honor** [57] - 1079:6,
12, 19, 22; 1082:22;
1087:6; 1096:9, 12;
1098:20; 1105:24;
1115:9; 1117:25;
1120:12; 1125:2, 17;
1129:18; 1132:17;
1137:25; 1140:10;
1148:2; 1160:18;
1161:3; 1164:4, 24;
1165:20, 24; 1176:8;
1187:23; 1197:4;
1200:10; 1201:23;
1202:7, 11, 1204:22;
1205:4; 1208:4, 25;
1212:7; 1218:21;
1230:5; 1238:7;
1239:13; 1241:9;
1244:12, 19; 1263:7;
1266:3; 1271:15, 24;
1281:24; 1282:4, 13;
1283:21; 1284:13, 15;
1285:3; 1287:23
**honor** [3] - 1087:13,
17, 23
**Honor's** [1] - 1284:24
**HONORABLE** [1] - 1078:9
**hope** [1] - 1184:18
**hopefully** [3] -
1079:24; 1185:25;
1239:4
**hour** [8] - 1137:1;
1212:1; 1242:10, 12;
1247:12, 14; 1256:12;
1282:8
**hours** [9] - 1099:9, 19;
1155:25; 1184:5;
1233:11; 1234:1;
1282:11, 24
**house** [14] - 1091:9;
1097:12; 1099:21;
1116:3; 1117:12;
1151:20; 1169:19;
1175:11; 1179:13;
1194:8; 1195:4;
1205:10; 1281:19;
1286:4
**hundred** [1] - 1152:2
**hundreds** [1] - 1182:22
**husband** [40] - 1162:18,
20; 1166:16; 1168:13;

1169:9; 1171:11;
1173:14, 22; 1176:1,
12, 17; 1177:8;
1178:20, 25; 1179:3;
1180:1, 5, 13; 1181:24;
1182:15; 1187:9;
1190:7; 1193:23;
1194:25; 1195:1;
1196:16; 1203:5;
1204:17; 1205:19;
1207:19; 1208:5;
1276:21, 23; 1279:11,
22; 1280:12; 1281:11,
18
**husband's** [4] -
1167:23; 1174:19;
1194:18; 1195:14

---

I

**idea** [7] - 1220:14, 17;
1223:20, 23; 1225:7;
1230:16; 1278:8
**ideal** [1] - 1149:25
**identical** [1] -
1201:20
**identification** [4] -
1082:4; 1145:7; 1164:8;
1210:20
**identified** [4] -
1113:21; 1137:11;
1200:13; 1252:14
**identify** [7] -
1110:19; 1113:25;
1166:19; 1183:1, 6;
1210:21; 1241:16
**identity** [2] -
1130:19; 1132:7
**immediate** [1] -
1110:8; 1256:2
**immediately** [2] -
1110:25; 1111:17
**impeached** [1] -
1281:23
**impeaches** [2] - 1281:7
**impeaching** [2] -
1286:9, 11
**impeachment** [5] -
1275:21; 1276:18, 25;
1287:8, 10
**important** [3] -
1262:14; 1280:18;
1283:6
**improper** [1] - 1115:7
**in-between** [2] -
1185:18; 1255:22
**inappropriate** [1] -
1132:25
**inbound** [7] - 1152:3,

6; 1156:11, 15, 17;
1160:3, 6
**incarcerated** [3] -
1162:18, 20, 23
**inches** [1] - 1103:8
**incident** [2] -
1085:12; 1213:1
**include** [1] - 1145:14
**included** [3] -
1143:17; 1168:21;
1216:3
**including** [1] -
1284:11
**income** [1] - 1121:20
**incoming** [7] - 1150:9;
1211:11, 22; 1213:19;
1214:5; 1226:23
**inconsistent** [1] -
1207:21
**independent** [4] -
1124:23; 1188:22;
1203:21; 1205:6
**independently** [1] -
1249:3
**INDEX** [1] - 1289:1
**index** [2] - 1158:12;
1224:17
**indicate** [12] -
1079:14; 1086:12;
1112:14; 1152:15;
1165:17; 1199:18;
1206:11; 1207:25;
1208:9; 1212:16;
1239:19; 1252:9
**indicated** [9] -
1090:13; 1172:12;
1206:4; 1207:17;
1208:19; 1217:8;
1221:12; 1267:14;
1279:8
**indicates** [5] -
1084:1; 1166:22;
1213:18; 1222:13;
1239:19
**indicating** [8] -
1083:7, 25; 1086:1;
1154:24; 1160:2;
1218:4; 1259:7
**indicating)** [7] -
1083:21; 1087:20;
1103:7; 1216:9, 11, 15,
17; 1217:7; 1218:15
**indication** [1] -
1141:5
**indicators** [1] -
1148:11
**indictment** [2] -
1080:22

**individual** [12] -
1107:25; 1110:16;
1111:8; 1125:7;
1126:25; 1127:2, 6;
1142:10; 1150:1, 5;
1151:11; 1162:15
**individually** [1] -
1166:12
**individuals** [2] -
1214:6; 1272:14
**Infiniti** [2] -
1108:18, 20
**influence** [1] -
1278:11
**information** [19] -
1111:1, 15; 1150:6, 17,
20; 1151:1, 13, 15, 22;
1152:11; 1156:16;
1157:1; 1158:7, 18;
1212:19; 1224:21;
1225:4; 1234:5; 1283:7
**informed** [1] - 1110:8
**inherit** [1] - 1135:7
**initial** [1] - 1243:3
**initials** [2] -
1087:16, 18
**initiation** [2] -
1155:22
**inquire** [2] - 1161:2,
15
**inside** [7] - 1086:7,
24; 1087:1; 1164:17;
1170:5; 1285:9
**insofar** [1] - 1284:21
**instance** [1] - 1156:17
**instances** [2] -
1121:3; 1149:17
**instead** [1] - 1245:16
**instructed** [1] -
1241:13
**instruction** [3] -
1146:19, 24; 1147:5
**intend** [2] - 1183:7;
1276:14
**intending** [1] -
1208:23
**intentional** [1] -
1243:5
**interest** [1] - 1120:1
**interested** [4] -
1139:15; 1153:10;
1232:11; 1235:8
**interesting** [2] -
1288:12
**interpretation** [1] -
1203:13
**interpreted** [1] -

1280:14

**interrupt** [1] - 1183:4

**interview** [6] - 1107:25; 1109:23; 1110:1, 5; 1111:21; 1112:20

**interviewed** [3] - 1088:17; 1108:4; 1215:21

**interviewing** [2] - 1110:25; 1111:8

**introduced** [2] - 1109:3; 1146:22

**introducing** [1] - 1199:12

**investigate** [4] - 1117:10; 1138:19; 1226:16; 1230:25

**investigating** [3] - 1109:4; 1141:3, 6

**investigation** [16] - 1107:12, 14, 25; 1116:14; 1135:7, 10; 1139:10, 15; 1141:15; 1142:8; 1144:5; 1214:7; 1220:19, 21; 1231:3; 1278:22

**investigations** [1] - 1144:3

**invite** [1] - 1191:8

**involved** [3] - 1100:21; 1182:3; 1254:3

**involvement** [1] - 1131:10

**involving** [1] - 1089:1

**ironically** [1] - 1105:14

**irrelevant** [1] - 1201:17

**IRS** [1] - 1121:24

**Island** [4] - 1121:14; 1144:1; 1168:10; 1174:25

**Islip** [3] - 1078:5, 13, 22

**issue** [6] - 1106:9; 1165:12; 1205:17; 1208:15; 1275:24; 1285:4

**issued** [11] - 1118:17; 1122:8, 10, 13; 1124:20; 1125:11; 1161:23; 1164:15, 17, 19; 1166:23

**it..** [1] - 1183:15

**item** [2] - 1096:8; 1270:15

**items** [3] - 1139:25; 1147:5; 1216:4

**itself** [1] - 1181:5

## J

**jacket** [1] - 1137:9

**jail** [3] - 1176:13; 1203:5; 1286:16

**JAMES** [1] - 1078:14

**James** [4] - 1175:25; 1193:19; 1194:16, 20

**jamming** [1] - 1085:12

**January** [34] - 1163:7, 10, 21; 1165:18; 1166:20, 25; 1167:20; 1168:8; 1171:9; 1174:10; 1175:12; 1176:1, 21, 23; 1177:12; 1178:6; 1179:14; 1180:7; 1184:4, 16-17; 1189:10, 20; 1190:7, 15; 1191:2; 1203:5, 18; 1204:1; 1205:9; 1207:18; 1208:2; 1276:4

**jeans** [1] - 1104:24

**Jeff** [1] - 1106:23

**jeopardy** [1] - 1113:7

**Jersey** [1] - 1168:7

**JOANNA** [1] - 1078:9

**job** [10] - 1084:12, 17-18, 20, 24; 1085:16; 1089:9; 1092:2; 1103:13; 1238:8

**Joe** [1] - 1288:13

**jogged** [1] - 1281:20

**joined** [2] - 1135:19, 24

**Joseph** [7] - 1169:11; 1284:5, 18; 1286:14; 1287:4, 24

**JS-1** [1] - 1110:13

**Judge** [25] - 1081:5; 1086:8; 1093:1; 1104:20; 1133:4; 1182:11; 1184:7, 10, 20; 1189:19; 1202:17; 1204:3, 12; 1208:21; 1210:19; 1214:22; 1220:7; 1238:20; 1240:23; 1247:21; 1260:16; 1266:14; 1267:16; 1271:21; 1280:10

**judge** [6] - 1089:20; 1131:18; 1166:5; 1182:13; 1195:17; 1240:9

**Julius** [3] - 1135:11; 1139:16; 1140:23

**July** [16] - 1136:5; 1140:20; 1141:17; 1152:15; 1225:16, 21-22, 24-25; 1226:1, 21; 1227:5; 1270:15

**jump** [1] - 1152:25

**jumping** [2] - 1153:11; 1157:13

**June** [14] - 1140:24; 1176:21, 24; 1177:1, 6; 1189:20, 23; 1203:9, 15; 1204:4; 1270:3, 10; 1279:11

**juror** [1] - 1079:25

**jurors** [7] - 1079:4; 1081:3; 1140:11; 1235:7; 1278:12, 14; 1279:1

**jury** [46] - 1078:10; 1081:7; 1082:25; 1083:17; 1084:8; 1102:25; 1106:5; 1121:23; 1129:23; 1130:4, 24; 1131:1; 1132:20, 23; 1138:1; 1141:9; 1142:4; 1146:2, 9, 19; 1147:6; 1148:13; 1185:18; 1198:4, 11, 15; 1208:12; 1209:5; 1239:8; 1240:3, 8; 1241:13, 20; 1242:18; 1243:1, 4; 1244:14; 1277:5, 7; 1279:2, 6, 17; 1285:3; 1290:3

**Jury** [2] - 1138:18; 1139:2

**Justin** [59] - 1083:14, 17; 1085:20; 1089:4; 1090:14, 23; 1093:23; 1095:2; 1096:22; 1097:1, 6, 15, 20; 1098:11; 1100:18; 1101:2; 1102:15; 1105:12; 1108:1, 19; 1110:24; 1111:2, 7; 1113:24; 1114:1, 13; 1115:20, 22, 24; 1116:2, 9, 14; 1117:11; 1124:13; 1125:11; 1223:1; 1225:18, 20, 25; 1226:2, 19; 1227:10, 16; 1228:1, 3, 16; 1232:24; 1233:25; 1236:5; 1262:11; 1264:11; 1267:9; 1269:2, 5, 12, 16; 1270:5, 12; 1271:6

**Justine** [1] - 1100:22

## K

**keep** [9] - 1095:6; 1105:10, 16; 1183:15; 1198:11; 1250:21; 1254:1; 1269:14; 1278:21

**keeps** [2] - 1196:4; 1238:9

**Keith** [7] - 1174:15; 1175:3; 1193:16, 18; 1194:2; 1195:6; 1199:3

**Kenneth** [1] - 1130:16

**kept** [3] - 1158:25; 1208:12; 1253:23

**key** [14] - 1224:17, 19, 21-22; 1244:6, 21; 1251:9, 11-12; 1253:4, 7; 1272:11, 13

**kill** [8] - 1084:14, 16, 21, 23; 1085:17; 1090:21; 1102:20; 1174:2

**killed** [7] - 1088:1; 1089:4; 1141:16; 1285:9; 1286:4; 1287:4

**killing** [4] - 1085:2, 5, 8; 1286:24

**kind** [2] - 1120:20; 1139:14

**kitchen** [4] - 1083:20; 1086:3; 1191:14

**knot** [1] - 1086:24

**knowing** [2] - 1224:6; 1227:2

**known** [5] - 1102:4; 1119:11; 1120:16; 1136:6; 1180:18

**knows** [2] - 1131:23; 1132:8

**Kyatt's** [2] - 1205:25; 1206:2

## L

**lab** [2] - 1136:15; 1139:24

**laboratory** [1] - 1140:1

**ladies** [4] - 1129:21; 1147:10; 1160:21; 1278:3

**Laganas** [2] - 1194:12

**land** [14] - 1093:18, 24; 1095:2, 14; 1097:25; 1098:11; 1116:12; 1168:6;

1252:10; 1253:12;
1262:21; 1266:21;
1270:12, 17
**landed** [1] - 1168:7
**landline** [3] -
1149:22; 1151:19;
1178:23
**landlines** [1] - 1150:3
**language** [2] - 1162:5,
11
**large** [1] - 1103:1
**last** [24] - 1080:13;
1120:5, 13; 1127:3;
1132:19; 1151:2;
1153:11; 1157:25;
1183:10; 1184:19;
1199:3; 1213:14;
1215:11; 1238:13;
1248:6, 10; 1254:22;
1261:3; 1263:3; 1282:9
**lasted** [13] - 1153:3;
1154:6, 15; 1157:7;
1159:9, 21; 1210:15;
1211:15, 25; 1213:8;
1215:10; 1218:12;
1236:7
**lastly** [1] - 1216:2
**lasts** [6] - 1154:10;
1160:4; 1217:20;
1218:18; 1226:24;
1279:2
**late** [1] - 1185:15
**latex** [1] - 1086:22
**laundry** [2] - 1086:7,
18
**law** [4] - 1088:10;
1126:12; 1135:22;
1274:16
**lawyer** [2] - 1112:16;
1195:14
**lawyers** [2] - 1090:6;
1127:25
**layout** [2] - 1082:12;
1083:4
**leading** [1] - 1191:18
**lean** [1] - 1107:22
**learned** [1] - 1143:18
**least** [1] - 1121:10
**leave** [7] - 1100:1;
1111:24; 1114:13;
1163:11; 1176:4;
1194:13; 1195:4
**leaves** [3] - 1239:8;
1273:3; 1279:6
**leaving** [1] - 1194:19
**left** [19] - 1086:20;
1094:17; 1116:5;

1148:13; 1155:15;
1157:2; 1163:21;
1165:16; 1166:16;
1167:3; 1173:15;
1174:4, 7-8; 1180:14;
1282:8
**left-hand** [3] -
1148:13; 1155:15;
1157:2
**legal** [2] - 1200:10, 15
**legally** [1] - 1202:12
**length** [2] - 1147:2;
1158:23
**lengthy** [1] - 1282:9
**Leshawn** [44] - 1081:24;
1082:12; 1086:3;
1093:24; 1094:6;
1095:2; 1097:2, 10, 16;
1098:11; 1099:16, 22;
1100:12; 1158:3, 18,
24; 1159:20; 1160:7, 9;
1251:7, 10, 12, 17;
1253:14; 1254:18;
1255:4; 1257:4;
1262:18, 20; 1263:2;
1264:10; 1266:22;
1267:2, 10; 1268:14,
18, 20; 1269:11, 16,
24; 1270:5, 12, 16;
1284:5
**Leshawn's** [4] -
1082:8; 1092:20;
1097:12; 1098:1
**less** [3] - 1215:10;
1233:10; 1283:1
**letter** [128] - 1086:12,
14; 1169:9; 1170:6, 13,
19, 21, 23-24; 1171:1,
4, 8, 10, 12, 17-19,
24; 1172:8, 12; 1173:1,
7; 1174:11; 1175:2, 15,
18; 1176:4, 6, 20, 24;
1177:10, 16, 19, 21,
24; 1178:3, 9, 12, 17,
22; 1179:9, 12; 1181:4,
8, 13, 15; 1182:5, 8;
1188:5, 9, 12-13,
15-16, 20, 23; 1189:9,
14, 22; 1190:17;
1191:2, 23; 1192:2, 14;
1193:16; 1194:2, 6, 13,
15; 1195:9, 14;
1196:14; 1199:4;
1200:7-9, 19, 22-23;
1201:1, 5, 9, 15,
19-21; 1202:11, 15, 19,
25; 1203:1, 3, 6, 16,
19, 25; 1205:7, 9, 25;
1206:1, 5, 8, 15-17,

19-21, 24-25; 1207:2,
5-6, 9, 17; 1208:2, 5,
7, 9, 21; 1275:25
**letters** [1] - 1087:16
**level** [3] - 1084:2
**Levine** [3] - 1154:21;
1155:4; 1159:10
**licensed** [1] - 1119:1
**lied** [1] - 1087:25
**life** [1] - 1113:6
**lifts** [1] - 1139:25
**light** [4] - 1103:11;
1104:19; 1137:9
**limited** [1] - 1231:3
**line** [25] - 1093:18,
24; 1095:2; 1096:21;
1097:25; 1098:11;
1116:12; 1156:13, 17;
1211:9; 1217:2;
1227:14; 1252:10;
1253:12; 1255:23;
1262:21; 1263:8;
1264:11; 1266:21, 24;
1267:4; 1269:25;
1270:12, 17
**lines** [3] - 1095:14;
1159:24; 1267:22
**list** [11] - 1228:11;
1244:4, 21; 1245:1;
1246:10; 1250:21;
1251:8; 1266:19;
1283:22; 1284:1
**listed** [11] - 1152:18;
1154:9; 1158:17;
1159:17; 1212:22;
1221:11; 1226:7;
1246:15; 1253:3;
1270:1; 1271:2
**listen** [11] - 1137:14,
18; 1179:6; 1182:23;
1205:1, 3-5; 1274:21;
1278:15
**listened** [2] -
1137:20; 1279:20
**litigation** [1] -
1132:22
**live** [1] - 1163:19
**lived** [3] - 1082:13;
1092:21; 1168:13
**living** [5] - 1085:22;
1118:20; 1168:11, 20;
1169:21
**loaded** [1] - 1105:18
**local** [1] - 1278:25
**located** [5] - 1210:22;
1211:13; 1216:11, 14;
1217:6
**location** [9] -

1108:12, 14; 1124:8;
1211:17; 1216:10;
1217:4; 1218:5, 11, 15
**locations** [5] -
1124:5, 9; 1125:8;
1150:17; 1214:23
**logo** [1] - 1105:8
**look** [31] - 1096:1;
1099:1; 1110:10;
1147:15; 1148:11;
1158:12; 1159:6;
1164:10; 1169:4;
1198:19; 1215:13;
1221:3; 1222:4; 1224:7,
12; 1225:15; 1228:13;
1245:1; 1246:21;
1247:24; 1248:3;
1250:14; 1259:3, 19;
1262:18, 20; 1266:20;
1267:21; 1270:20
**looked** [5] - 1152:17;
1153:18; 1211:11;
1216:22; 1248:13
**looking** [32] - 1096:7;
1110:11; 1140:2;
1149:13; 1150:1, 25;
1151:5; 1153:9;
1185:14; 1196:4, 9;
1209:21; 1210:9;
1212:1; 1215:19;
1219:20; 1220:8;
1224:5, 22; 1227:16;
1228:17, 20; 1229:2, 5;
1230:7; 1236:3, 15;
1250:18; 1251:2;
1252:8; 1258:23; 1259:6
**looks** [3] - 1166:19,
23; 1206:20
**LORETTA** [1] - 1078:12
**losing** [1] - 1204:23
**lost** [2] - 1199:2, 14
**loud** [1] - 1148:9
**Louie** [1] - 1141:22
**Louis** [6] - 1141:22;
1143:4; 1284:23;
1286:25; 1287:5; 1288:2
**lower** [1] - 1104:13
**Lucent** [1] - 1143:25
**lunch** [1] - 1209:21
**Luncheon** [1] - 1197:11
**lunchtime** [2] -
1079:20
**lying** [5] - 1087:25;
1088:4; 1094:10;
1195:8; 1196:7
**LYNCH** [1] - 1078:12

**M**

M-E-L-V-Y-N [1] - 1126:4

M.A.N.O.N [1] - 1161:13

M.U.L.L.I.G.A.N [1] - 1161:14

ma'am [2] - 1081:4; 1273:1

machine [1] - 1173:15

mail [9] - 1151:7, 14; 1168:18, 21; 1175:6; 1179:13; 1223:8

mailbox [1] - 1189:22

maintained [2] - 1150:17; 1151:1

malfunctioning [3] - 1083:14; 1084:9

man [1] - 1099:23

Manhattan [9] - 1088:12; 1092:23; 1106:24; 1127:1; 1230:20; 1249:18; 1258:9; 1260:21; 1261:22

manner [1] - 1193:10

Manon [8] - 1079:14; 1161:13; 1164:9; 1198:17; 1201:9; 1276:6, 17; 1282:8

map [6] - 1216:3, 8; 1217:3, 25; 1218:1, 13

March [3] - 1263:9; 1264:7

marijuana [1] - 1163:1

marked [9] - 1082:3; 1145:7; 1164:8; 1166:9; 1229:10; 1250:7; 1264:21; 1266:20; 1272:8

marking [2] - 1166:15; 1266:8

maroon [2] - 1139:13

Marr [1] - 1130:16

married [1] - 1162:15

marshal's [1] - 1283:8

Martin [32] - 1158:9; 1221:14, 19, 25; 1222:1; 1224:24; 1225:3; 1227:24; 1228:21; 1230:3; 1236:24; 1238:5, 10; 1241:8; 1242:4; 1245:5; 1246:11, 15; 1252:14, 18, 23-24; 1253:3, 6, 9-10, 12, 16

Martulis [30] -

Martulis' [19] - 1220:12, 16; 1221:1, 13, 15; 1222:1; 1223:21; 1227:24; 1229:12; 1238:10; 1245:10, 15; 1246:19; 1252:14, 18, 24; 1253:3, 13

Marty [21] - 1100:13, 19, 21, 23; 1101:5; 1220:11, 15, 20, 22; 1223:21; 1240:9, 15-16; 1242:14; 1245:9, 11, 15; 1246:5, 19

Massachusetts [4] - 1163:4, 6, 11; 1167:4

match [1] - 1140:2

material [1] - 1287:16

matter [5] - 1090:4; 1141:3; 1144:8; 1203:8; 1213:13

Matthew [1] - 1122:14

Matty [5] - 1084:12, 17; 1102:20; 1122:8, 11

Matulis [13] - 1100:13, 19, 21, 23; 1101:5; 1102:4; 1158:11; 1225:3; 1240:10, 15-16; 1242:14

Matulis' [2] - 1152:24; 1158:9

mean [13] - 1083:3; 1084:18, 20; 1089:23; 1090:16; 1106:10; 1109:20; 1125:12; 1129:5, 11; 1147:13; 1249:12; 1252:21

meaning [2] - 1156:1; 1254:11

means [2] - 1156:9; 1168:1

meant [3] - 1129:12; 1205:22; 1287:6

mechanical [1] - 1078:24

media [2] - 1278:16, 18

medication [1] - 1091:23

meet [2] - 1131:9;

1199:7

Mel [7] - 1110:22; 1111:14; 1112:2; 1214:1, 20; 1258:22; 1260:1

Melvyn [2] - 1111:14; 1126:4

member [1] - 1134:20

members [8] - 1083:16; 1084:8; 1121:23; 1138:1; 1140:11; 1141:9; 1142:4, 18

memorized [2] - 1200:24; 1240:2

memorizing [1] - 1243:6

memory [7] - 1087:13, 17; 1091:10; 1094:1, 15; 1207:11; 1281:21

men's [1] - 1198:9

mental [1] - 1178:20

mention [7] - 1142:19; 1143:4; 1181:14, 24; 1182:1, 3; 1208:6

mentioned [5] - 1085:19; 1131:12; 1205:18; 1208:1; 1220:11

message [18] - 1173:12, 15, 20, 24; 1174:4, 7; 1178:23; 1179:15, 19, 21, 23; 1180:1, 4, 8-9, 13, 15, 19

messages [2] - 1173:12; 1223:9

met [2] - 1180:20; 1200:5

methadone [1] - 1091:16

microcassette [2] - 1137:15, 18

microphone [2] - 1107:23; 1196:11

mid [1] - 1129:22; 1239:4

mid-afternoon [1] - 1239:4

mid-morning [1] - 1129:22

middle [2] - 1087:19; 1149:10

midnight [5] - 1099:22; 1158:2; 1159:20, 25; 1160:17

Midtown [3] - 1215:17, 21, 24

midtown [3] - 1107:12;

1109:8, 19

might [3] - 1125:8; 1198:9; 1287:21

military [2] - 1155:24

Miller [3] - 1132:10; 1285:19; 1286:6

Miller's [1] - 1285:10

mind [5] - 1085:3; 1196:13; 1201:13; 1278:21; 1279:20

mine [1] - 1264:17

minute [12] - 1095:25; 1101:18; 1138:9; 1140:16; 1145:15; 1150:19; 1153:19; 1154:15; 1164:10; 1228:11; 1232:17; 1236:8

minutes [33] - 1132:3; 1140:17; 1141:11; 1153:4; 1156:6; 1157:24; 1158:20; 1159:4, 9, 21, 24; 1160:4, 17; 1183:11; 1185:20; 1198:9; 1208:12; 1210:17; 1211:18; 1213:8; 1215:10; 1226:24; 1233:1; 1238:20; 1239:4; 1244:23; 1257:5; 1268:9; 1279:24

MISKIEWICZ [146] - 1078:14; 1079:6, 12, 22; 1080:11, 17, 21, 24; 1081:15, 20; 1082:15, 22; 1083:1; 1086:11; 1087:6, 9; 1092:11, 14, 16; 1093:7, 11, 22; 1094:8; 1095:21, 24; 1096:12, 20; 1098:24; 1099:25; 1100:2; 1101:8; 1102:7; 1103:14, 18; 1105:4, 22; 1106:14; 1107:3; 1110:13, 15; 1113:8; 1114:7, 10, 24; 1115:9; 1116:17, 19, 25; 1117:13, 18, 25; 1118:4, 13; 1120:4, 12, 19; 1122:18; 1123:19; 1125:1, 5, 15; 1126:6; 1127:10; 1128:11, 15; 1129:8, 14, 18; 1130:15; 1132:17; 1134:2, 13; 1137:10, 25; 1140:10; 1141:9; 1142:2; 1145:20; 1146:8; 1148:2; 1160:18; 1208:25;

1209:3, 19; 1212:7;
1218:20, 24; 1222:16;
1224:2, 10, 15; 1225:1,
13; 1226:8, 12;
1228:17, 25; 1229:20,
24; 1230:22; 1231:10,
21; 1233:12; 1234:7;
1236:19; 1237:1, 4;
1238:7, 12; 1239:10,
16, 18; 1240:23;
1241:19; 1244:12;
1245:21; 1250:8;
1254:8; 1257:18, 20;
1264:14, 21; 1266:12;
1272:1, 7, 16, 22, 24;
1283:21; 1284:7, 13,
21; 1287:8; 1288:3, 8,
10; 1289:4, 6, 8, 11,
13, 15, 18; 1290:9, 11

**Miskiewicz** [7] -
1081:14; 1120:3;
1148:1; 1241:4; 1243:4;
1244:10; 1288:15

**misplaced** [1] - 1199:2

**missing** [1] - 1257:17

**misspeaking** [1] -
1084:15

**mistake** [2] - 1244:3;
1245:14

**mistaken** [1] - 1244:22

**Mister** [2] - 1231:12;
1233:2

**MM** [4] - 1164:9;
1165:23; 1166:9;
1290:20

**moment** [14] - 1081:6;
1087:5; 1096:2;
1104:20; 1161:3;
1182:11; 1186:17;
1187:23; 1199:24;
1218:20; 1263:11;
1271:15, 21; 1272:2

**Monday** [3] - 1282:20,
22; 1283:18

**Monday..** [1] - 1080:10

**money** [4] - 1127:15;
1171:13; 1172:3, 12

**monitors** [1] - 1166:14

**month** [7] - 1089:22,
24; 1140:25; 1141:1;
1155:19; 1195:5

**monthly** [1] - 1152:8

**months** [8] - 1151:2-4;
1170:4; 1189:9;
1281:21; 1284:15, 25

**morning** [48] - 1081:9,
21; 1085:6, 10, 19;
1091:21; 1092:1;

1094:17; 1099:9, 19;
1101:21; 1103:25;
1104:24; 1107:4;
1113:13; 1114:22;
1116:15, 23; 1117:11;
1118:14; 1125:22;
1126:7; 1129:22;
1134:14; 1156:1;
1185:12; 1210:10, 16;
1211:12, 22; 1217:19;
1249:11; 1256:11, 22;
1257:11; 1259:25;
1261:5, 10, 20;
1262:11; 1274:11, 23;
1282:15

**mornings** [1] - 1091:22

**most** [2] - 1103:3;
1150:15

**mostly** [1] - 1192:3

**mother** [5] - 1087:20;
1091:13; 1164:3;
1169:25; 1172:25

**motions** [1] - 1132:23

**motivation** [1] -
1080:7

**mouth** [3] - 1105:10,
16; 1141:23

**move** [5] - 1087:8;
1094:12; 1143:6;
1245:23; 1285:1

**moved** [2] - 1111:5;
1143:2

**moves** [4] - 1082:15;
1145:20; 1164:24;
1272:16

**moving** [2] - 1241:24;
1268:13

**MR** [434] - 1079:6, 10,
12, 19, 22; 1080:11,
17, 21, 24; 1081:15,
20; 1082:15, 18, 22;
1083:1; 1086:8, 11;
1087:3, 6, 9; 1092:11,
14, 16; 1093:1, 7, 11,
14, 19, 22; 1094:8, 18,
21, 25; 1095:8, 12, 16,
21, 24; 1096:5, 9, 12,
14, 17, 20; 1098:13,
20, 24; 1099:25;
1100:1-3, 5; 1101:8;
1102:7, 10; 1103:14,
16, 18, 22; 1104:20,
22; 1105:1, 4, 22, 24;
1106:7, 10, 12, 14;
1107:3; 1110:13, 15;
1113:8, 11; 1114:7, 10,
12, 24; 1115:1, 9, 13;
1116:17, 19, 22, 25;
1117:1, 4, 13, 16,

18-19, 23, 25; 1118:4,
13; 1119:13, 22;
1120:4, 9, 12, 19;
1122:18, 21; 1123:19,
22, 25; 1124:25;
1125:1, 5, 15, 17;
1126:6; 1127:10, 13;
1128:11, 13, 15, 19;
1129:8, 10, 14, 16, 18;
1130:1, 15; 1131:6, 18;
1132:2, 6, 17; 1133:3,
10; 1134:2, 13;
1137:10, 25; 1139:5, 7;
1140:10; 1141:9, 19;
1142:2; 1145:20, 22;
1146:1, 8, 18; 1147:7;
1148:2, 23; 1149:1, 5;
1160:18; 1161:1, 3, 17;
1162:24; 1164:4, 6, 24;
1165:3, 6, 15, 20,
24-25; 1166:5, 7;
1176:8, 11; 1177:3, 5;
1182:6, 11, 13, 19, 21;
1183:9, 12, 15; 1184:3,
7, 10, 15, 18, 24;
1185:4, 8, 24; 1186:3,
10, 12, 15, 21; 1187:1,
4, 8, 12, 14, 17-18,
20, 23; 1188:3;
1189:19; 1190:1, 5;
1191:18; 1193:12, 15,
25; 1194:3; 1195:10,
15, 17, 20, 25; 1196:2,
4, 6-7, 22; 1197:1, 4;
1198:8, 12, 18, 25;
1199:25; 1200:10;
1202:17, 20, 22;
1203:14; 1204:2, 11,
17, 21, 23; 1205:2, 14,
17, 22, 24; 1206:16;
1207:22; 1208:4, 8, 21,
25; 1209:3, 19;
1210:19, 25; 1212:7;
1214:22; 1217:22;
1218:20, 24; 1219:2, 5;
1220:3, 7, 10; 1221:4;
1222:16; 1224:2, 10,
15; 1225:1, 13; 1226:8,
12; 1228:17, 20, 25;
1229:5, 8, 20, 22, 24;
1230:1, 22; 1231:10,
21; 1233:12; 1234:7;
1235:9; 1236:19, 21;
1237:1, 3-4; 1238:7,
12, 20; 1239:10, 16,
18; 1240:1, 9, 23;
1241:15, 19; 1242:2, 6,
9, 11, 13; 1244:3, 12,
19-20; 1245:21;
1247:21; 1250:7-9, 12;

1254:8, 11, 16;
1257:18, 20; 1260:16;
1263:7, 12; 1264:4, 8,
14-15, 17, 20-21;
1266:3, 10, 12, 14, 17;
1267:16, 18; 1268:2;
1270:8; 1271:11, 13,
15, 18, 21, 24; 1272:1,
7, 16, 18, 22, 24;
1273:1; 1274:6, 9, 13,
21, 25; 1275:3, 18, 20;
1277:3, 8; 1279:16;
1280:2, 5, 8-9, 24;
1281:5, 8, 10; 1282:4,
7, 13, 17, 19; 1283:1,
6, 8, 11, 21, 23, 25;
1284:3, 5, 7, 9, 12-13,
21; 1285:7, 13, 16;
1286:3, 8, 12, 20, 23;
1287:2, 7-8; 1288:3, 6,
8, 10; 1289:4-6, 8-9,
11-13, 15-16, 18;
1290:4-7, 9

**mucal** [1] - 1139:1

**mug** [1] - 1108:21

**Mulligan** [48] -
1079:15; 1142:10, 20;
1161:13, 18; 1162:16;
1163:5; 1164:7, 9;
1166:1, 8; 1169:8;
1171:11; 1176:12;
1180:3; 1182:14;
1188:4; 1190:6;
1196:10; 1198:17;
1199:16; 1200:6;
1201:9, 12; 1202:23;
1206:23; 1207:17, 19;
1274:7; 1275:3; 1276:6,
8, 13, 15; 1279:10;
1282:8, 10, 14, 16;
1283:3; 1285:8, 17, 22;
1286:4, 9, 11, 20

**Mulligan's** [8] -
1194:20; 1200:1, 20;
1201:10, 22; 1206:18;
1208:18; 1283:2

**Mulligans** [1] - 1202:4

**multiple** [1] - 1149:18

**murder** [28] - 1084:21;
1086:19; 1088:21;
1089:1, 24; 1102:16;
1103:25; 1110:2;
1140:22; 1141:3;
1143:4; 1144:6; 1210:6,
12; 1213:1, 25;
1215:14; 1216:20;
1217:4; 1279:14;
1284:23; 1285:23;
1286:1, 17; 1287:9, 18;
1288:2, 4

18

murdered [1] - 1228:2
murderer [1] - 1094:17
murdering [1] - 1085:2
murders [3] - 1080:3, 6; 1131:10
must [1] - 1147:16
mutual [1] - 1192:13

**N**

N.Y [1] - 1078:5
name [39] - 1087:19; 1089:11; 1092:20; 1099:23; 1108:1; 1110:21; 1112:2; 1113:19; 1122:8, 11, 14; 1125:11; 1127:3; 1128:20; 1134:4; 1142:10, 16; 1152:22-24; 1154:20; 1155:5; 1158:10; 1161:11; 1162:15; 1170:1; 1181:24; 1182:1; 1207:20; 1208:1, 11; 1228:21; 1230:17; 1245:5; 1255:10
named [2] - 1144:20; 1288:8
names [2] - 1131:11; 1207:24
Nassau [5] - 1134:18, 20; 1135:14; 1136:12; 1143:13
native [2] - 1162:5, 11
nature [1] - 1283:2
necessarily [2] - 1121:20; 1147:21
necessary [4] - 1103:20; 1190:2; 1198:11; 1202:14
need [7] - 1095:25; 1147:3; 1184:25; 1186:8; 1259:19; 1276:12; 1279:25
needed [1] - 1080:4
needlessly [1] - 1240:7
needs [2] - 1150:17; 1275:7
negate [1] - 1284:23
Negro [2] - 1113:19; 1115:16
network [5] - 1150:15, 23; 1151:3, 5, 19
never [15] - 1096:24; 1097:4; 1104:11; 1132:19; 1177:17;

1188:13; 1206:1, 8; 1213:20, 23; 1281:1
NEW [1] - 1078:1
new [1] - 1094:18
New [18] - 1078:13, 19, 22; 1102:5; 1113:25; 1114:5; 1119:4; 1121:14; 1126:10; 1168:7; 1210:13, 17; 1211:14, 24; 1258:22, 25; 1260:21
Newark [2] - 1168:7
newspaper [3] - 1105:13; 1109:6
next [62] - 1101:10, 17; 1105:12; 1106:13, 16; 1111:15; 1118:3; 1125:21; 1130:18; 1133:14; 1142:15; 1152:25; 1153:19, 24; 1155:10; 1180:11; 1182:9; 1183:17; 1186:13; 1211:21; 1217:25; 1218:2, 13; 1223:14, 16; 1226:19; 1227:3; 1231:12, 18; 1232:11, 13, 17-19; 1233:3, 21-22; 1234:13; 1235:10; 1237:8; 1238:23; 1248:12, 14; 1249:13; 1255:2, 6, 24; 1256:4, 6, 22, 24; 1262:2; 1263:13; 1265:1; 1269:19; 1270:15; 1271:4, 6; 1273:5, 7; 1277:9
NEXTEL [2] - 1155:14; 1159:16
nice [3] - 1278:24; 1282:3; 1288:16
night [6] - 1091:7; 1092:7; 1094:2; 1173:11; 1174:6; 1257:14
nine [4] - 1092:4; 1105:15, 18; 1211:18
Nine [1] - 1105:10
none [1] - 1248:19
nonpayment [1] - 1212:24
note [2] - 1212:2; 1278:13
notes [5] - 1110:10; 1226:5; 1242:2; 1271:13
nothing [8] - 1117:23; 1129:16; 1193:3; 1196:17; 1197:1; 1199:18; 1249:7;

1286:15
notice [2] - 1169:13, 15; 1241:12
noticed [1] - 1172:8
notify [1] - 1121:25
November [2] - 1179:18; 1180:12
number [154] - 1083:7; 1099:13; 1101:17, 19, 25; 1117:10; 1119:18, 21; 1130:13; 1136:3; 1152:18; 1154:18; 1155:1, 6, 14, 16-17; 1156:10, 12, 14, 18; 1158:13, 17; 1160:7, 10; 1166:11; 1198:19; 1211:10; 1215:17; 1219:10; 1221:13, 21; 1222:1-3, 13, 25; 1223:2, 18-19, 22, 25; 1224:4, 9, 13; 1226:2, 7, 14, 17, 24; 1227:2, 7, 16, 19, 23-24; 1228:18; 1229:20, 24; 1230:2, 25; 1231:18; 1232:1, 6, 15, 21; 1233:5, 21; 1235:4; 1236:9, 20; 1238:9, 17; 1239:21, 24-25; 1240:10, 15, 19; 1241:5, 7-8, 21-22; 1242:19; 1245:4, 10, 13, 15-16, 19, 23, 25; 1246:11-14; 1248:11; 1250:21, 23; 1251:11, 18; 1252:16, 18-19, 23; 1253:10, 13-15; 1254:18; 1255:7; 1256:1; 1257:1; 1258:9, 11; 1259:25; 1260:1, 14; 1261:8; 1262:3, 5, 15; 1264:12; 1267:5-7, 25; 1268:7, 10-11, 18-19, 25; 1269:6, 9, 11, 16-17; 1270:6, 13, 23; 1271:4, 7; 1275:15; 1278:7
numbers [31] - 1093:6, 15; 1096:21; 1098:15; 1102:12; 1144:19; 1145:17; 1151:8; 1160:16; 1214:3, 22; 1221:10; 1224:17, 19, 21-22; 1234:3; 1239:19; 1240:4, 6, 18; 1242:24; 1243:2, 7; 1244:4, 23; 1251:15; 1266:6, 21; 1272:13
NYPD [4] - 1087:25; 1090:1; 1107:7

**O**

o'clock [5] - 1185:18; 1197:10; 1228:15; 1257:11; 1288:17
030816 [1] - 1099:2
oath [6] - 1081:13; 1097:14; 1104:8; 1114:9; 1179:10; 1181:1
object [2] - 1148:10; 1185:10
objecting [1] - 1237:1
objection [75] - 1082:17; 1087:3; 1093:1, 12; 1097:18; 1098:22; 1101:8; 1102:7; 1103:14; 1114:7, 10, 24; 1115:12; 1116:17, 25; 1117:13, 18; 1119:13, 19, 21; 1120:6, 11; 1123:19; 1128:11, 15; 1129:8, 14; 1132:16, 19; 1133:9, 11; 1139:5; 1145:22; 1162:24; 1165:2; 1182:6; 1187:8, 12, 14-15, 18; 1189:19; 1191:18; 1193:25; 1194:3; 1195:10, 15, 25; 1196:2, 6, 22; 1210:19; 1222:16; 1224:2, 10, 15; 1225:1, 13; 1226:8; 1230:22; 1231:10, 21; 1233:12; 1237:4; 1241:4, 19; 1245:21; 1254:8; 1257:18, 20; 1264:22; 1266:4, 12; 1272:18
objections [1] - 1130:2
obtain [2] - 1150:4; 1254:17
obtained [1] - 1188:6
obviously [8] - 1080:19; 1157:1; 1201:15; 1242:25; 1269:5; 1284:17; 1286:9; 1287:6
occasion [4] - 1084:9, 23; 1137:22; 1143:8
occasions [3] - 1136:3; 1215:18; 1268:25
occurred [8] - 1160:13; 1173:6; 1217:25; 1256:2; 1276:24; 1279:9, 12; 1281:18
occurrences [1] -

29

1217:1

**occurs** [1] - 1216:9

**OF** [3] - 1078:1, 3, 6

**offer** [3] - 1127:15; 1165:11; 1192:25

**offered** [1] - 1143:9

**Office** [6] - 1118:17; 1249:19; 1254:3, 7, 10; 1280:20

**office** [7] - 1143:18, 25; 1161:23; 1193:19; 1254:23

**officer** [3] - 1128:23; 1134:23; 1214:24

**officers** [2] - 1090:2; 1113:21

**offices** [1] - 1281:1

**often** [1] - 1150:7

**Old** [2] - 1078:18; 1135:18

**old** [5] - 1135:16; 1141:4; 1170:1, 3; 1195:5

**once** [6] - 1130:4, 14; 1137:20; 1276:25

**one** [88] - 1079:7; 1084:2; 1085:25; 1087:11, 13, 20; 1093:15; 1100:24; 1104:11; 1113:1; 1119:18; 1120:14; 1121:9; 1124:16, 21; 1125:13; 1132:4, 11-12; 1138:9; 1140:25; 1141:1, 16; 1144:5; 1148:14, 19; 1150:8; 1151:17; 1153:19; 1154:15; 1157:11; 1159:17; 1161:3; 1170:8; 1173:11; 1178:9; 1181:8; 1183:7, 10; 1184:19; 1185:11, 14; 1187:23; 1192:5; 1193:24; 1198:19; 1200:13; 1203:6; 1204:24; 1206:11, 22; 1207:18; 1211:9; 1212:13; 1215:11; 1221:11; 1228:4, 11; 1232:9; 1236:8, 24; 1240:11, 13, 19; 1248:13; 1249:16, 19; 1252:25; 1256:23; 1259:9; 1262:21; 1264:10; 1271:15, 21; 1276:4; 1280:21; 1283:10, 13, 16-18, 20; 1284:9

**one-piece** [1] -

**ones** [3] - 1080:19; 1148:9; 1257:23

**open** [11] - 1098:21; 1134:1; 1135:7; 1147:9; 1168:19; 1169:17; 1236:2; 1239:2; 1266:2; 1278:2, 21

**opened** [7] - 1168:18; 1169:19; 1172:7; 1179:12; 1190:17; 1191:1; 1203:25

**opens** [1] - 1094:18

**operated** [2] - 1123:4; 1124:8

**operating** [1] - 1281:2

**operation** [1] - 1212:17

**opinion** [1] - 1208:17

**opportunity** [7] - 1094:22; 1102:25; 1131:22; 1137:14; 1143:7, 23; 1281:20

**opposed** [1] - 1151:20

**order** [5] - 1131:9; 1147:14; 1150:21; 1269:6; 1284:25

**orient** [1] - 1148:13

**original** [3] - 1211:2; 1212:2, 13

**originated** [7] - 1211:13, 21; 1213:6, 22; 1215:16; 1230:13; 1270:23

**originates** [4] - 1218:2, 14, 17; 1270:16

**originating** [3] - 1157:23; 1258:11; 1268:20

**outbound** [12] - 1152:3, 6; 1156:8, 11-13; 1210:14; 1212:4; 1215:8; 1230:13; 1236:7

**outgoing** [3] - 1150:8; 1214:5; 1227:6

**outline** [4] - 1082:8; 1105:6, 9

**outside** [5] - 1083:24; 1086:8; 1087:3; 1169:7; 1186:17

**overlapping** [1] - 1149:19

**overlaps** [1] - 1167:16

**overruled** [16] - 1086:10; 1098:22; 1102:8; 1116:20; 1117:14; 1120:11; 1128:16; 1132:16;

1133:11; 1141:20; 1162:25; 1191:19; 1194:4; 1196:23; 1224:16; 1230:24

**overruling** [1] - 1120:6

**OWEN** [1] - 1078:20

**own** [6] - 1129:6, 13; 1146:16; 1195:14; 1259:11; 1284:1

**owned** [5] - 1123:3, 17; 1124:2, 4, 8

**owner** [3] - 1121:6; 1123:23; 1174:24

**owners** [4] - 1120:24; 1121:3; 1123:11

**ownership** [2] - 1120:1; 1121:12

---

**P**

**p.m** [50] - 1153:21, 25; 1154:1, 3-4, 13; 1157:6, 16-17, 22; 1215:5; 1222:10; 1223:3, 17; 1225:16, 20, 22-23; 1226:3, 23; 1227:5, 9, 13, 17; 1229:19; 1230:12; 1231:19; 1232:4, 11; 1233:2, 22; 1236:3, 8; 1248:10; 1268:7, 22-23; 1269:17, 24-25; 1270:18; 1271:1, 5, 8 20

**PA-14** [6] - 1082:4, 16, 20; 1083:3; 1290:19

**page** [64] - 1084:16; 1092:18, 25; 1096:21; 1097:21; 1098:25; 1133:14; 1154:20, 22; 1155:10, 13; 1156:23; 1158:6; 1159:17; 1166:1, 10, 12, 15; 1167:7; 1170:20; 1181:8; 1183:17; 1207:25; 1209:22, 25; 1210:2; 1212:20, 22; 1213:2, 12-13; 1214:9, 18; 1216:2; 1217:15; 1229:3; 1234:13; 1235:10; 1237:8; 1238:23; 1247:19, 24; 1248:1, 5, 7; 1250:16, 19; 1252:8; 1260:23-25; 1261:1, 3; 1263:13; 1265:1; 1270:11; 1273:7; 1277:9

**pages** [2] - 1159:18; 1215:12

**paid** [6] - 1085:18;

1121:25; 1150:18; 1171:13; 1172:13; 1189:15

**painted** [3] - 1285:10, 14; 1286:2

**painting** [3] - 1285:17, 24; 1286:19

**Palau** [3] - 1154:21; 1155:4; 1159:11

**palm** [1] - 1139:1

**paper** [4] - 1170:7, 9, 11; 1246:1

**paragraphs** [1] - 1170:20

**parameters** [1] - 1224:18

**pardon** [1] - 1219:12

**parenthesis** [2] - 1246:16

**part** [9] - 1086:1; 1093:11; 1103:3; 1107:24; 1142:8; 1144:20; 1167:16; 1199:11; 1214:18

**particular** [23] - 1080:16; 1094:2; 1108:11; 1125:12; 1135:22; 1147:11, 16-17; 1148:18, 20, 24; 1149:19; 1151:4; 1156:5, 10; 1171:25; 1185:11; 1199:19; 1210:5; 1235:4; 1259:9

**particularly** [2] - 1209:22; 1215:13

**partner** [1] - 1174:24

**partners** [2] - 1120:24; 1121:21

**parts** [2] - 1130:5; 1200:11

**party** [4] - 1112:18; 1129:2; 1143:1; 1199:12

**passed** [9] - 1172:5, 7, 9, 16; 1174:12; 1178:6; 1192:4, 22; 1193:2

**passport** [12] - 1164:14, 25; 1165:7, 14, 17; 1166:2, 8, 10-11, 15; 1190:11

**past** [1] - 1144:3

**patrol** [1] - 1134:23

**pause** [10] - 1186:18; 1198:13; 1207:16; 1219:17, 22; 1247:5; 1259:21; 1267:19; 1271:19; 1280:3

**Pause** [1] - 1161:5

**pay** [11] - 1211:13,

16-17, 23, 25; 1216:16; 1218:3, 11, 14, 16

**payments** [1] - 1124:23

**payoff** [1] - 1203:22

**payroll** [1] - 1124:18

**Pellegrino** [18] - 1165:9; 1174:15, 24; 1175:3, 8, 14, 18; 1176:4; 1179:21; 1190:18; 1193:16; 1194:2, 6, 24; 1196:13; 1199:3, 5; 1201:4

**Pellegrino's** [1] - 1193:18

**pen** [1] - 1160:1

**people** [13] - 1094:9; 1097:9; 1102:5; 1113:5; 1114:5, 16; 1128:9; 1131:11; 1143:23; 1152:9; 1165:11; 1278:19; 1283:24

**per** [3] - 1139:1; 1249:19; 1258:25

**perceptions** [1] - 1280:21

**perform** [2] - 1119:1; 1120:20

**perhaps** [3] - 1079:20; 1094:13; 1127:25

**period** [7] - 1119:6; 1126:12; 1135:23; 1163:11; 1202:5; 1253:23; 1270:10

**periodically** [1] - 1150:21

**periods** [1] - 1145:17

**person** [14] - 1101:4; 1113:17; 1132:12; 1199:4; 1200:9; 1224:25; 1230:15; 1231:1; 1233:2, 11; 1283:10, 16; 1288:9

**personal** [1] - 1083:9

**personally** [3] - 1117:15; 1127:19; 1220:21

**pertain** [1] - 1200:9

**pertinent** [4] - 1148:21, 25; 1149:5; 1224:1

**Peter** [5] - 1100:24; 1101:3, 5; 1284:19

**ph** [1] - 1139:1

**phone** [418] - 1093:15, 24; 1094:5, 16, 24; 1095:1; 1096:18, 22-24; 1097:1, 7, 11-13, 16, 25; 1098:10, 14-15, 19;

1101:12, 18-19, 24-25; 1102:11, 18; 1105:14; 1110:17; 1112:1, 5, 19; 1116:23; 1117:5, 8, 10; 1128:23; 1143:9, 18; 1144:19; 1145:17; 1147:13, 17, 19, 22; 1148:8, 10-11; 1149:19, 21, 24; 1150:2, 5, 7-9, 15, 18; 1151:7, 16, 18, 20-21, 24; 1152:9, 18-21; 1153:2, 6-7, 25; 1154:5, 8-9, 12, 14; 1155:11, 14, 16-17; 1156:10, 14, 18-19; 1157:5-7, 17, 20, 22; 1158:11, 17-19, 22-23; 1159:1, 6, 13-14, 19, 22; 1160:4, 8, 12; 1176:16; 1178:23; 1179:16; 1180:23; 1181:2; 1182:14, 18; 1183:10; 1186:11; 1193:24; 1202:23; 1203:8; 1204:15; 1205:23; 1210:2, 8, 15, 21; 1211:2, 5, 8, 10, 13, 15-18, 21-23, 25; 1212:2, 5-6, 13, 17; 1213:6, 10, 16, 19, 22-23; 1214:3, 10, 17, 20, 22; 1215:6, 15, 17, 23; 1216:7, 16-17; 1217:5, 9, 11, 19-20; 1218:1-3, 8, 11-12, 14, 16-18; 1219:6; 1220:16, 22; 1221:1, 10, 13, 15, 18, 20-21, 23; 1222:1, 8, 13, 17, 19-20, 22; 1223:2, 5-6, 10-11, 15, 19, 21, 24; 1224:4, 9, 13, 17; 1225:5, 17, 25; 1226:2, 16, 20; 1227:3, 7, 16, 23-25; 1228:14, 21; 1229:6, 8, 11-12, 20, 22, 24; 1230:7, 12-13, 25; 1231:3, 7, 13-15, 18; 1232:18, 21-22, 24; 1233:3, 5-6, 24; 1234:6-8; 1236:4, 6-7, 9-10, 15, 17, 20; 1238:4, 9-10, 16; 1239:24; 1240:1; 1241:5; 1242:19; 1244:4, 6, 21; 1245:4, 11, 19, 25; 1246:2, 4, 12, 14, 19, 21; 1248:6, 10-11, 13, 16-17, 21; 1249:3, 5, 8, 11, 13, 20; 1250:21, 23;

1251:8, 10, 13-14, 17; 1252:7, 13-14, 16, 18-19, 23, 25; 1253:3, 5, 13-16, 21-22, 24-25; 1254:18; 1255:2, 7-8; 1256:3, 14, 22, 24; 1257:1, 3, 13, 21; 1258:21; 1259:25; 1260:11, 14, 24; 1261:3, 8, 18, 25; 1262:5, 13, 15, 19; 1263:8; 1264:9, 11; 1266:19, 21; 1267:8, 10, 13, 24-25; 1268:6, 12-13, 20; 1269:2, 5, 9-12, 16-17, 22, 25; 1270:6, 11, 13, 18, 23; 1271:3, 6-7; 1272:11, 13; 1275:19; 1276:15

**phones** [9] - 1095:14; 1149:18; 1150:2, 16; 1157:9; 1221:13; 1231:8; 1238:11; 1248:23

**photo** [2] - 1108:21; 1111:6

**phrase** [3] - 1129:3; 1149:4; 1281:3

**physical** [2] - 1164:7; 1182:24

**physically** [2] - 1169:4; 1173:14

**pick** [2] - 1091:23; 1262:10

**picking** [1] - 1223:9

**PICOZZI** [1] - 1078:21

**picture** [1] - 1103:12

**piece** [6] - 1085:25; 1130:24; 1131:8; 1151:22; 1170:9

**pieces** [1] - 1170:7

**pillowcase** [2] - 1086:22

**pistol** [1] - 1088:20

**Pistone** [12] - 1284:5, 17-19, 22; 1285:5; 1286:15; 1287:2, 4-5, 15, 25

**place** [32] - 1091:5; 1093:4; 1094:17; 1096:16; 1102:21; 1106:4; 1109:14; 1115:4; 1119:17; 1131:23; 1140:24; 1141:8; 1158:22; 1165:4; 1198:3; 1203:18; 1217:2, 5; 1228:5; 1235:2; 1236:2; 1238:2; 1239:2;

1256:24; 1261:19; 1262:15; 1264:2; 1266:2; 1270:24; 1271:7; 1274:2; 1278:2

**placed** [2] - 1254:6, 9

**play** [20] - 1130:3, 10, 18; 1177:23; 1179:25; 1180:1; 1182:13; 1183:7, 12-13, 16; 1184:11; 1186:2; 1190:1, 3; 1203:9, 11; 1204:5; 1279:19, 23

**played** [24] - 1130:3, 14-15; 1131:18; 1138:6, 8; 1140:13; 1141:13; 1142:6; 1173:19; 1177:14; 1179:5; 1180:1, 4, 9, 13; 1184:13; 1186:24; 1202:17; 1204:13; 1276:4; 1279:17; 1280:6

**Plaza** [2] - 1078:13, 22

**plead** [1] - 1088:6

**plus** [1] - 1159:21

**point** [26] - 1079:23; 1088:11; 1090:13; 1093:9; 1094:12; 1108:22; 1112:22, 24; 1120:7; 1127:4; 1130:9, 16-17; 1136:19; 1137:6; 1141:4; 1142:9; 1165:12; 1172:21; 1185:1; 1202:16; 1204:24; 1206:22; 1208:19; 1240:22; 1282:17

**police** [4] - 1113:6, 21; 1114:17; 1128:23

**Police** [9] - 1113:25; 1114:6; 1134:18, 21; 1136:12; 1143:13, 16; 1210:13, 17

**portion** [14] - 1119:24; 1131:18; 1140:16; 1142:22; 1178:9; 1183:2; 1185:22; 1212:22; 1216:7; 1240:17; 1270:11; 1279:23; 1280:8

**portions** [4] - 1131:17; 1138:2; 1182:14; 1270:22

**position** [7] - 1206:22; 1254:6, 9; 1275:17, 20; 1280:11; 1281:5

**positive** [2] - 1088:24; 1193:22

**possession** [3] -

1088:4; 1104:12; 1182:25

**postmark** [1] - 1169:13

**practicing** [1] - 1126:12

**precinct** [5] - 1135:13; 1215:17, 21

**precisely** [1] - 1186:14

**predicate** [1] - 1288:6

**premature** [1] - 1119:20

**prep** [1] - 1206:18

**preparation** [1] - 1155:12

**prepare** [4] - 1120:21; 1121:15; 1144:23; 1148:6

**prepared** [5] - 1080:21; 1137:23; 1145:11; 1148:8; 1259:14

**preparing** [1] - 1125:6

**preponderance** [2] - 1198:21; 1199:13

**presence** [6] - 1096:25; 1139:9; 1140:6; 1142:18; 1175:16; 1241:20

**present** [4] - 1122:7, 22; 1141:25; 1180:2

**presented** [2] - 1147:25; 1241:11

**presently** [1] - 1106:24

**pressing** [1] - 1205:17

**pretrial** [1] - 1132:22

**pretty** [3] - 1103:12; 1178:21; 1256:10

**previous** [1] - 1171:6

**previously** [9] - 1081:17; 1093:5; 1108:21; 1158:5; 1162:20; 1190:6, 10; 1209:11; 1252:14

**principal** [1] - 1120:24

**principals** [2] - 1121:20; 1144:20

**print** [1] - 1136:14

**printed** [1] - 1206:24

**prints** [3] - 1136:16, 18; 1139:1

**prison** [14] - 1163:2, 6, 10, 17, 21; 1166:17; 1167:4, 24; 1168:14; 1173:7; 1195:1;

1196:16, 18; 1281:14

**prisoner** [1] - 1283:9

**privileges** [1] - 1287:25

**privy** [1] - 1287:19

**problem** [9] - 1146:16, 21; 1178:20; 1235:3; 1244:10; 1266:18; 1274:12; 1277:1

**procedure** [1] - 1138:17

**proceed** [2] - 1133:12; 1186:22

**proceedings** [10] - 1186:19; 1195:23; 1198:14; 1219:18, 23; 1247:6; 1259:22; 1267:20; 1271:20; 1280:4

**Proceedings** [1] - 1078:24

**process** [2] - 1124:18, 23

**procuring** [1] - 1254:14

**produce** [1] - 1208:22

**produced** [8] - 1078:25; 1151:11; 1155:13; 1248:19; 1249:16, 18; 1253:21

**professional** [1] - 1127:17

**program** [5] - 1091:14, 16-17, 19

**promptly** [1] - 1278:6

**proof** [4] - 1131:9; 1165:11; 1198:20; 1207:11

**propensity** [1] - 1080:8

**proper** [2] - 1254:11, 13

**proponent** [3] - 1198:20; 1199:12, 16

**prosecutor** [1] - 1102:24

**protect** [3] - 1195:11; 1196:15

**protection** [1] - 1195:14

**provided** [4] - 1120:2, 23; 1151:14; 1182:17

**provides** [1] - 1151:15

**PTN** [1] - 1155:15

**public** [2] - 1211:16

**Public** [1] - 1118:24

**publish** [3] - 1082:22;

1092:11; 1138:2

**published** [1] - 1082:24

**pull** [2] - 1095:23; 1259:2

**purchase** [1] - 1105:14

**purchasing** [1] - 1279:4

**purpose** [9] - 1138:12; 1144:17; 1165:7; 1195:2, 8, 13; 1196:13; 1264:6; 1279:19

**purposely** [1] - 1095:9

**purposes** [7] - 1080:24; 1121:16; 1132:18; 1155:6; 1164:25; 1186:4

**pursuant** [1] - 1161:22

**pursue** [1] - 1139:11

**put** [24] - 1085:3; 1086:21-25; 1105:21; 1133:5; 1138:1; 1140:11; 1141:7, 10; 1142:3; 1146:16; 1160:1; 1217:15; 1257:19; 1258:14; 1284:9; 1287:3, 14

---

**Q**

**quality** [1] - 1200:7

**quarter** [1] - 1185:16

**Quebec** [13] - 1162:4; 1163:20, 23; 1165:16; 1166:16, 21, 23; 1167:9, 16; 1168:4; 1174:11; 1190:14

**questioned** [1] - 1127:1

**questioning** [2] - 1127:7; 1158:21

**questionnaires** [1] - 1284:10

**questions** [37] - 1079:8; 1081:23; 1082:1; 1083:13; 1084:6; 1090:11, 25; 1093:17, 23; 1096:17; 1099:25; 1105:1, 22; 1109:9; 1113:8; 1122:18; 1125:15; 1127:10; 1138:10; 1176:8; 1187:7, 20; 1188:4, 25; 1189:2; 1193:12; 1206:5, 7; 1207:4; 1218:24; 1243:2; 1271:24; 1272:22, 24; 1281:10

**queue** [3] - 1142:2; 1185:19

**quickly** [2] - 1214:16; 1266:15

**quite** [1] - 1148:23

---

**R**

**raise** [1] - 1125:23

**raised** [1] - 1080:12

**raising** [3] - 1285:2; 1287:23, 25

**rambling** [1] - 1173:25

**range** [1] - 1107:23

**ransom** [2] - 1170:25; 1171:1

**RAPAPORT** [1] - 1078:20

**rather** [2] - 1080:8; 1199:16

**ray** [1] - 1105:17

**reach** [1] - 1189:24

**reached** [2] - 1199:11; 1204:8

**reaching** [1] - 1147:15

**read** [29] - 1120:13; 1131:24; 1144:8, 24; 1145:15; 1148:9; 1164:10; 1167:12; 1170:21; 1171:4; 1172:8; 1173:1; 1174:11; 1175:2, 16, 18; 1177:24; 1178:21; 1205:25; 1207:18; 1208:2; 1229:22; 1238:19; 1240:10; 1245:2; 1246:1; 1268:15; 1278:15

**reading** [2] - 1109:5; 1171:8

**ready** [9] - 1079:7, 19, 21; 1081:9; 1184:2, 10; 1209:8, 15; 1244:17

**real** [1] - 1278:24

**really** [3] - 1088:3; 1089:6; 1150:14

**reason** [10] - 1091:10; 1094:9; 1105:11; 1115:10; 1163:24; 1181:19; 1194:24; 1209:1; 1240:3; 1285:7

**reasons** [4] - 1105:10, 15; 1141:16; 1285:20

**receive** [3] - 1121:15; 1143:19; 1176:20

**received** [29] - 1082:19, 21; 1128:3; 1144:7, 9; 1154:16; 1165:23; 1178:23; 1179:12, 15; 1182:21; 1188:16, 19; 1189:9,

14; 1191:23; 1201:21;
1203:25; 1206:25;
1207:2, 18; 1211:12;
1212:10; 1264:24;
1272:21; 1290:17, 19
**receiving** [2] -
1126:20; 1180:19
**Recess** [1] - 1197:11
**recess** [4] - 1081:1;
1129:25; 1160:23;
1243:10
**recognize** [6] -
1082:5, 7; 1111:6;
1145:8, 10; 1164:13
**recollect** [2] -
1276:23
**recollection** [29] -
1092:3; 1095:20, 24;
1167:2, 22; 1171:18;
1177:15; 1181:12;
1188:16, 19, 22;
1189:13; 1198:23;
1200:7; 1201:13;
1203:4, 21; 1205:6;
1224:8, 13; 1244:6;
1245:3; 1251:1; 1255:9;
1276:10-12; 1281:12, 17
**recollections** [1] -
1182:16
**recommend** [1] -
1274:10
**record** [30] - 1119:23;
1134:5; 1137:10;
1138:8; 1140:15;
1141:10; 1143:18;
1144:8; 1146:5;
1153:12; 1154:20;
1161:11; 1162:1;
1167:15; 1182:21;
1184:20; 1204:6;
1206:12; 1210:11;
1214:15; 1216:13;
1229:23; 1240:10;
1248:14; 1250:8;
1251:17; 1254:17;
1263:8; 1266:5; 1268:1
**recorded** [9] -
1078:24; 1150:8;
1210:13; 1212:6;
1213:24; 1226:24;
1232:19; 1249:7; 1267:5
**recording** [4] -
1137:23; 1138:9;
1205:9; 1276:13
**recordings** [1] -
1184:23
**records** [128] -
1093:15; 1094:13, 19;
1120:2, 24; 1124:9;

1143:9, 15; 1144:2, 4,
17-18, 20; 1145:4,
11-12, 15-16; 1146:6,
11, 13; 1147:12, 18-19,
22, 24-25; 1148:8, 10,
12; 1149:18, 24;
1150:2, 4-5, 22;
1151:4, 12, 16; 1152:3,
17; 1153:3, 5-6, 18;
1155:11, 14; 1158:2,
16, 24-25; 1159:2, 8;
1160:9; 1210:8; 1211:2,
8; 1212:2, 13; 1213:15,
21; 1214:1; 1215:23;
1216:7; 1217:9, 11;
1219:6, 8; 1221:3;
1224:5; 1227:1, 15;
1228:14, 21; 1229:6, 9,
11; 1230:7; 1231:4, 7,
15; 1236:15, 17;
1241:16; 1246:21, 24;
1247:17, 19; 1248:6,
13, 17; 1249:3, 7;
1251:12, 18, 21;
1252:7; 1253:18, 20,
23, 25; 1254:5, 12-13,
15, 20; 1257:22;
1259:2, 13, 19;
1260:19; 1262:1;
1263:5; 1264:4; 1268:6,
13; 1269:4; 1270:9;
1271:10; 1272:11
**recovered** [4] -
1139:19, 23; 1140:1, 3
**recreate** [1] - 1147:4
**RECROSS** [4] - 1100:4;
1193:14; 1289:4; 1290:7
**RECROSS-EXAMINATION**
[4] - 1100:4; 1193:14;
1289:4; 1290:7
**red** [3] - 1139:14, 19;
1167:15
**redacted** [1] - 1080:21
**redirect** [8] -
1079:11; 1081:12;
1206:5, 12, 17; 1207:5;
1238:15; 1241:2
**REDIRECT** [10] -
1081:19; 1105:3;
1125:4; 1188:2; 1272:6;
1289:3, 5, 12; 1290:6,
11
**refer** [5] - 1080:18;
1127:21; 1246:9;
1249:25; 1250:22
**reference** [8] -
1085:14; 1139:3, 9;
1140:18; 1141:15;
1142:22; 1218:16;

1251:14
**referenced** [2] -
1171:4; 1281:13
**references** [1] -
1131:15
**referencing** [1] -
1228:25
**referral** [1] - 1128:21
**referrals** [1] - 1128:3
**referred** [7] - 1129:5;
1132:13; 1137:15;
1155:7; 1207:19;
1214:23; 1248:9
**referring** [22] -
1087:14; 1091:16;
1100:6; 1130:21;
1147:4; 1152:22;
1154:24; 1155:2;
1164:17; 1167:15;
1171:10; 1175:24;
1216:12; 1228:18;
1229:25; 1236:20;
1238:9; 1239:24;
1241:5; 1270:3; 1280:10
**refers** [2] - 1156:17;
1267:25
**reflect** [2] - 1137:10;
1281:21
**reflects** [2] -
1166:16; 1167:8
**refresh** [5] - 1177:14;
1224:8, 13; 1244:6;
1245:2
**regard** [5] - 1198:16;
1206:6; 1206:12;
1207:4; 1240:24
**regarding** [6] -
1091:1; 1120:24;
1138:17; 1200:22;
1254:14; 1284:15
**regardless** [1] -
1091:3
**regards** [3] - 1146:19;
1176:24; 1187:5
**region** [1] - 1162:3
**registered** [9] -
1220:22; 1221:14, 18,
20, 25; 1225:5;
1236:24; 1238:5; 1245:4
**registration** [2] -
1220:25; 1242:14
**regular** [1] - 1151:20
**relate** [1] - 1275:25
**related** [2] - 1080:5;
1143:13
**relates** [1] - 1275:25
**relationship** [4] -
1118:5; 1220:12, 20

**relatively** [1] -
1131:7
**relevance** [3] -
1162:24; 1165:4, 14
**relevant** [1] - 1280:22
**rely** [2] - 1127:24;
1147:22
**remains** [1] - 1156:25
**remember** [32] -
1090:10; 1100:15;
1105:11; 1123:11;
1129:3; 1138:4; 1177:7,
18, 21, 25; 1178:5, 7,
10; 1179:17; 1181:4;
1182:5; 1187:10;
1188:7, 9; 1200:23;
1202:24; 1203:2, 14;
1207:7, 9; 1210:16;
1238:13; 1240:15;
1279:18
**remembered** [1] -
1286:6
**remembers** [2] -
1200:25; 1201:2
**reminding** [2] -
1280:13
**remove** [1] - 1087:10
**Reonegro** [1] - 1284:7
**repainted** [1] - 1286:5
**repeat** [1] - 1221:16
**repeatedly** [1] -
1235:4
**repetition** [1] -
1130:7
**repetitious** [6] -
1130:10, 17; 1131:5;
1132:8; 1133:10; 1139:7
**replay** [3] - 1184:24;
1185:1
**report** [10] - 1145:13;
1156:13; 1159:24;
1163:5; 1212:20;
1227:14; 1248:19, 25;
1278:11
**reported** [5] -
1163:10, 16; 1167:4;
1248:14; 1278:15
**Reporter** [1] - 1078:20
**reporter** [4] -
1097:23; 1184:20, 22;
1205:14
**reporting** [4] -
1121:16; 1167:24;
1168:14; 1173:6
**reports** [2] - 1121:19;
1210:17
**represent** [8] -

1112:3, 9; 1126:25; 1127:15; 1147:24; 1149:11; 1153:23; 1176:1

**representation** [3] - 1082:11; 1216:24; 1217:1

**represented** [4] - 1112:16; 1126:15; 1127:19; 1217:3

**representing** [1] - 1127:6

**represents** [2] - 1110:24; 1160:17

**request** [2] - 1080:1; 1138:1

**requested** [1] - 1170:24

**require** [1] - 1131:12

**research** [2] - 1143:24; 1278:22

**residence** [3] - 1108:11; 1253:14; 1257:14

**respect** [10] - 1080:4, 7; 1083:12; 1087:24; 1120:2; 1139:22; 1200:6; 1204:3; 1206:15; 1207:15

**respond** [1] - 1200:5

**response** [3] - 1093:21; 1241:3; 1279:15

**responsibility** [1] - 1131:9

**rest** [2] - 1174:2; 1287:16

**restrictions** [1] - 1080:6

**resubmit** [1] - 1080:13

**resume** [3] - 1081:10; 1244:9, 17

**resumed** [1] - 1081:17

**retain** [1] - 1254:19

**retained** [1] - 1155:11

**retire** [1] - 1135:2

**retired** [3] - 1134:15, 17; 1137:18

**retirement** [2] - 1143:12; 1144:4

**return** [7] - 1112:24; 1167:8; 1168:2; 1169:15; 1171:14, 22; 1181:19

**returned** [5] - 1165:16; 1167:22; 1174:10; 1190:14

**returns** [2] - 1120:4080 23

**reverse** [1] - 1153:23

**review** [4] - 1137:22; 1143:8; 1211:7; 1278:25

**reviewed** [2] - 1144:15, 17

**revolver** [1] - 1087:25

**RG-2** [1] - 1111:5

**Rica** [1] - 1163:15

**Richard** [2] - 1284:6, 11

**RICO** [1] - 1288:6

**ride** [3] - 1091:1, 13, 24

**rising** [1] - 1185:9

**Road** [1] - 1078:18

**Rob** [1] - 1285:16

**robbery** [3] - 1135:12; 1138:20; 1139:4

**Robert** [1] - 1135:25

**room** [9] - 1085:22; 1111:21; 1136:23; 1168:20; 1169:21; 1198:9; 1280:20, 25

**roommate** [4] - 1099:22; 1225:10; 1246:16; 1253:4

**rooms** [1] - 1079:7

**Roosevelt** [1] - 1092:23

**ROSEN** [228] - 1078:16; 1079:10; 1082:18; 1086:8; 1087:3; 1093:1, 14, 19; 1094:18, 21, 25; 1095:8, 12, 16; 1096:5, 9, 14, 17; 1098:13, 20; 1100:1, 3, 5; 1101:9; 1102:10; 1103:16, 22; 1104:20, 22; 1105:1, 24; 1106:7, 10, 12; 1113:11; 1114:8, 12; 1115:1, 13; 1116:22; 1117:1, 4, 16, 19, 23; 1119:13, 22; 1120:9; 1122:21; 1123:22, 25; 1124:25; 1125:17; 1127:13; 1128:13, 19; 1129:10, 16; 1130:1; 1131:6, 18; 1132:2, 6; 1133:3, 10; 1139:5, 7; 1141:19; 1145:22; 1146:1, 18; 1147:7; 1148:23; 1149:1, 5; 1161:1; 1162:24; 1165:3, 6; 1166:5; 1176:11; 1177:3, 5; 1182:11, 13,

19; 1183:9, 15; 1184:7, 10, 15, 18, 24; 1185:4, 8, 24; 1186:3, 10, 12, 15, 21; 1187:1, 4, 17, 20; 1189:19; 1190:1; 1191:18; 1193:15; 1195:17, 20; 1196:4, 7; 1197:1; 1198:18, 25; 1199:25; 1202:17, 20, 22; 1203:14; 1204:2, 17, 23; 1205:2, 14, 17, 22, 24; 1208:21; 1210:19, 25; 1214:22; 1217:22; 1219:2, 5; 1220:3, 7, 10; 1221:4; 1226:9; 1228:20; 1229:5, 8, 22; 1230:1; 1234:8; 1235:9; 1236:21; 1237:3; 1238:20; 1240:1, 9; 1241:15; 1242:2, 6, 9, 11, 13; 1244:3, 19-20; 1247:21; 1250:7, 9, 12; 1254:11, 16; 1260:16; 1263:7, 12; 1264:4, 8, 15, 17, 20; 1266:3, 10, 14, 17; 1267:16, 18; 1268:2; 1270:8; 1271:11, 13, 15, 18, 21, 24; 1272:18; 1273:1; 1274:6, 21, 25; 1277:3, 8; 1279:16; 1280:2, 5, 8; 1282:19; 1283:8, 11, 23, 25; 1284:3, 5, 9, 12; 1285:7, 13, 16; 1286:3, 8, 12, 20, 23; 1287:2, 7; 1288:6; 1289:5, 9, 12, 16; 1290:5, 7, 10

**Rosen** [28] - 1081:23; 1084:6, 13; 1087:10; 1090:9; 1096:7; 1097:22; 1098:3, 10; 1131:4; 1145:25; 1160:24; 1184:2; 1185:19; 1188:4, 25; 1196:8; 1198:7; 1203:24; 1204:19; 1241:6, 11; 1243:3; 1244:18; 1272:25; 1274:5; 1277:6; 1279:15

**Rosen's** [2] - 1098:4; 1204:11

**Roth** [29] - 1102:20; 1110:22; 1111:2, 14; 1112:2, 6, 8, 10, 12, 14, 16; 1122:8, 11, 14, 16; 1126:4, 7, 9; 1127:14; 1214:1, 6, 10, 16, 20; 1215:24;

**ROTH** [1] - 1126:4

**Roth's** [2] - 1215:17; 1260:1

**roughly** [1] - 1168:17

**rounds** [1] - 1105:18

**route** [1] - 1092:2

**rubric** [2] - 1119:11; 1120:17

**Ruger** [1] - 1084:10

**rule** [2] - 1202:9; 1275:10

**ruled** [1] - 1284:15

**rules** [1] - 1275:9

**ruling** [1] - 1132:15

**rulings** [2] - 1284:20; 1288:5

**run** [1] - 1079:24

**ruse** [2] - 1090:14

**S**

**S-c-a-n-t-l-e-b-u-r-y** [1] - 1110:14

**safe** [2] - 1113:3; 1261:3

**Salta** [8] - 1106:14, 17, 23; 1107:4, 6, 22; 1110:16; 1262:10

**SALTA** [1] - 1106:23

**Salta's** [1] - 1262:8

**Sammy** [3] - 1102:2; 1230:17; 1232:14

**samples** [3] - 1138:25; 1139:1, 25

**Sanchez** [5] - 1100:24; 1101:3, 6; 1102:4

**Saturday** [17] - 1091:5, 7, 21-22; 1092:1; 1094:5; 1099:8, 19; 1158:1; 1159:21; 1250:25; 1251:4; 1256:22; 1257:3, 14

**save** [1] - 1179:19

**saw** [8] - 1084:10; 1096:25; 1097:4, 15; 1098:10; 1108:16; 1154:2; 1188:13

**Scantlebury** [1] - 1110:9

**scared** [3] - 1172:21; 1174:11; 1196:16

**scene** [1] - 1139:20

**schedule** [1] - 1278:8

**Schelhorn** [12] - 1130:16; 1131:14; 1135:25; 1136:2, 10; 1140:6, 20; 1142:25;

1157:14; 1188:12; 1239:22

**Schelhorn's** [1] - 1152:19

**scope** [3] - 1087:3; 1116:17, 19

**Scott** [36] - 1118:4, 11; 1142:10, 16, 20; 1162:15; 1163:5, 21; 1167:3; 1168:13; 1169:8; 1171:11; 1173:6; 1175:21; 1180:3; 1194:20; 1195:11; 1196:17, 21, 24; 1202:23; 1205:11; 1206:22; 1208:5, 7; 1276:5, 8; 1281:13; 1282:10, 16; 1285:8, 17, 22; 1286:20

**screaming** [3] - 1173:25; 1174:3; 1180:23

**screen** [9] - 1083:2; 1096:11; 1111:4; 1148:4; 1166:13; 1209:24; 1217:17; 1218:16; 1258:17

**screens** [1] - 1167:12

**Sean** [1] - 1118:5

**SEAN** [1] - 1078:14

**search** [3] - 1150:24; 1224:18; 1240:21

**seat** [1] - 1277:7

**seated** [3] - 1191:15, 17; 1244:16

**Second** [2] - 1200:15; 1202:2

**second** [27] - 1085:16; 1100:24; 1120:14; 1135:12, 14; 1150:19; 1152:2; 1156:23; 1203:15; 1204:4, 7; 1205:8; 1216:17; 1218:14; 1240:15; 1250:16, 19; 1256:3; 1269:18; 1275:23, 25; 1276:3, 6, 18; 1277:1; 1279:10; 1283:18

**secondly** [1] - 1101:17

**seconds** [22] - 1138:9; 1140:17; 1141:11; 1153:17, 20; 1154:10, 15; 1156:6; 1157:8, 24; 1158:9, 20; 1210:15; 1211:15, 25; 1213:8, 17, 24; 1217:21; 1218:12, 19

**section** [1] - 1136:14

**security** [1] - 1144:6

**sedan** [2] - 1108:18, 20

**see** [74] - 1079:3; 1092:18; 1095:16; 1097:6, 25; 1098:16; 1099:4, 6, 10; 1100:7, 10, 21; 1102:25; 1108:14; 1113:17, 24; 1115:20, 22; 1117:8; 1124:11; 1130:9; 1136:21; 1137:3; 1148:16; 1150:10; 1156:15; 1159:19, 22; 1160:22; 1166:5, 14; 1167:7; 1175:8; 1183:2; 1185:9; 1186:9; 1193:6; 1194:6; 1196:3; 1197:10; 1213:3, 9; 1214:5, 9, 18; 1215:6; 1220:8; 1235:7; 1240:3; 1246:10; 1247:17, 25; 1250:9; 1252:5, 11; 1258:18; 1264:14; 1266:23; 1267:21; 1278:16; 1279:5; 1281:14, 25; 1282:1; 1287:13; 1288:13

**seeing** [2] - 1089:20; 1093:23

**seek** [2] - 1123:20; 1142:9

**seeking** [1] - 1142:19

**seem** [1] - 1251:5

**selected** [1] - 1148:19

**self** [1] - 1199:10

**self-authenticate** [1] - 1199:10

**selling** [1] - 1163:1

**sense** [8] - 1090:17; 1124:6; 1127:17; 1180:24; 1199:15; 1274:3; 1285:3

**sent** [4] - 1121:24; 1178:18; 1201:8; 1274:7

**sentence** [1] - 1288:2

**separate** [4] - 1124:22; 1150:1; 1215:18; 1246:11

**separated** [1] - 1198:8

**September** [1] - 1089:23

**sequence** [2] - 1179:11; 1248:14

**Sergeant** [1] - 1110:8

**series** [5] - 1081:23; 1083:13; 1093:22; 1214:10; 1264:9

**serve** [1] - 1163:2

**service** [6] - 1094:14; 1119:10; 1120:15; 1168:3; 1173:13; 1283:9

**services** [5] - 1119:2, 7; 1120:20

**serving** [2] - 1286:16; 1288:1

**session** [1] - 1206:18

**set** [4] - 1090:20; 1136:25; 1165:15; 1201:1

**seven** [6] - 1088:7; 1090:7; 1140:17, 19; 1182:21; 1214:20

**several** [7] - 1085:11; 1121:9, 11; 1130:20; 1152:14; 1284:15

**SEYBERT** [1] - 1078:9

**shall** [2] - 1283:8; 1288:14

**share** [1] - 1091:14

**shared** [3] - 1081:24; 1091:12, 24

**shareholders** [1] - 1121:3

**sheetrock** [2] - 1286:7, 19

**Shield** [1] - 1106:24

**shirt** [12] - 1104:1-3, 12-13, 15, 17, 23; 1105:5, 9; 1137:9

**shooting** [3] - 1084:4; 1085:12; 1210:18

**short** [2] - 1081:1; 1137:1

**shorten** [2] - 1147:2, 23

**shortly** [4] - 1081:3; 1112:19; 1159:20; 1179:9

**shot** [1] - 1108:21

**shoulder** [1] - 1103:5

**shouting** [1] - 1187:16

**show** [25] - 1082:3; 1083:16; 1092:9, 17; 1095:4, 17; 1102:11; 1111:4; 1130:3, 10; 1144:7; 1154:16; 1155:10; 1159:17; 1166:6; 1191:6; 1198:22; 1207:6; 1212:10; 1213:15, 18; 1216:2; 1220:6; 1253:18; 1262:1

**showed** [9] - 1116:15; 1188:12, 15; 1206:7, 18, 24-25; 1207:12;

1270:9

**showing** [13] - 1082:5; 1083:2; 1098:25; 1130:12; 1144:9, 12; 1145:7; 1148:4; 1158:5; 1159:17; 1188:5; 1209:25; 1272:8

**shown** [8] - 1104:10; 1130:13; 1188:9; 1206:5, 14; 1270:14, 19

**shows** [5] - 1159:8, 24; 1212:23; 1213:21; 1270:11

**shut** [2] - 1105:10, 16

**SI-2** [3] - 1272:17, 20; 1290:20

**sic)** [3] - 1142:5; 1260:13; 1287:4

**side** [4] - 1124:2; 1157:2; 1202:8; 1211:11

**sidebar** [16] - 1093:4; 1096:6, 16; 1098:3, 6, 23; 1106:4, 15; 1115:4, 11; 1119:17; 1120:10; 1235:2; 1238:2; 1264:2; 1274:2

**Sidebar** [4] - 1131:3; 1133:13; 1145:24; 1147:8

**sides** [1] - 1150:10

**sidewalk** [2] - 1211:17, 24

**signed** [5] - 1170:15; 1178:12, 14-15; 1181:4

**significance** [1] - 1087:21

**silencer** [1] - 1086:23

**similar** [2] - 1157:9; 1201:21

**sit** [1] - 1281:21

**site** [3] - 1087:12, 14

**sitting** [5] - 1085:22; 1137:8; 1191:20; 1225:11; 1278:20

**situation** [5] - 1079:3; 1090:18; 1130:6; 1149:25; 1244:1

**six** [12] - 1103:8; 1140:19, 24; 1141:1, 4; 1151:2, 4; 1183:11; 1282:10, 12, 24

**sixth** [1] - 1090:17

**Sixth** [2] - 1211:14; 1218:5

**size** [1] - 1170:9

**sleeping** [3] - 1091:6; 1092:6; 1099:20

**slightly** [1] - 1196:10

**smirking** [2] - 1196:1, 5

**smoked** [2] - 1102:15, 21

**smooth** [1] - 1184:18

**Smyth** [1] - 1285:16

**SN** [5] - 1144:10; 1154:17; 1155:10; 1159:15

**social** [1] - 1278:18

**sofa** [2] - 1085:23

**sole** [1] - 1279:19

**solicit** [1] - 1098:19

**solidified** [1] - 1201:13

**someone** [4] - 1121:25; 1192:6, 11; 1193:5

**sometime** [4] - 1180:8, 12; 1217:5; 1282:15

**sometimes** [1] - 1180:24

**son** [3] - 1164:3; 1169:25; 1172:24

**son's** [1] - 1170:1

**soon** [2] - 1175:2; 1190:11

**sorry** [19] - 1098:20; 1101:23; 1125:10; 1143:2; 1160:16; 1162:13; 1172:6; 1189:25; 1217:10; 1228:4; 1229:8; 1231:6; 1247:13; 1248:15; 1256:19; 1262:23; 1266:23; 1270:8; 1285:13

**sort** [2] - 1086:12; 1288:1

**Soto** [11] - 1230:17, 20; 1232:9, 14; 1233:18; 1234:1; 1235:7; 1255:10, 17, 20, 23

**Soto's** [2] - 1233:6; 1256:1

**Sotto** [1] - 1102:2

**sotto** [1] - 1102:3

**south** [3] - 1107:12; 1109:8, 19

**South** [4] - 1106:24; 1215:17, 21, 24

**space** [3] - 1185:10; 1257:4; 1268:9

**speakers** [4] - 1130:19; 1141:7; 1142:3, 5

**speaking** [3] - 1146:12; 1228:2; 1279:10

**Special** [2] - 1157:14; 1188:12

**specific** [11] - 1091:10; 1092:3; 1095:19; 1130:17; 1144:18; 1145:16; 1189:13; 1240:5

**specifically** [10] - 1085:1; 1091:22; 1107:14, 21; 1124:17; 1138:25; 1143:9; 1153:12; 1163:6; 1213:3

**specifics** [1] - 1139:10

**specified** [1] - 1223:2

**specify** [1] - 1190:3

**speculate** [1] - 1269:7

**spell** [1] - 1134:4

**spelled** [1] - 1155:20

**spelling** [1] - 1110:12

**spend** [1] - 1282:24

**spending** [1] - 1168:17

**spent** [2] - 1144:1; 1244:23

**split** [1] - 1152:1

**spoken** [1] - 1276:15

**sprint** [2] - 1155:13; 1159:16

**squad** [2] - 1109:8, 19

**squished** [1] - 1142:23

**stage** [3] - 1199:8, 11; 1240:25

**stamp** [9] - 1166:19, 22; 1167:7, 11, 15-16, 19

**stamped** [1] - 1166:12

**stamps** [3] - 1165:17, 19; 1190:12

**stand** [13] - 1081:17; 1102:13; 1130:1; 1133:4; 1212:9; 1242:15; 1244:2, 9; 1247:23; 1260:18; 1266:14, 16; 1273:4

**standard** [1] - 1200:15

**standing** [5] - 1169:19; 1191:15-17; 1238:14

**stands** [1] - 1159:16

**start** [6] - 1247:19; 1263:5; 1274:24; 1275:4; 1278:6; 1282:16

**started** [5] - 1079:17; 1090:5, 8; 1134:23;

1210:11

**starters** [1] - 1195:19

**starting** [4] - 1140:16; 1153:12; 1210:3; 1257:5

**starts** [5] - 1155:24; 1184:4; 1257:10; 1260:24; 1264:8

**state** [5] - 1119:4; 1126:10; 1134:4; 1144:6; 1161:11

**statement** [6] - 1087:24; 1098:2, 4; 1115:5; 1121:19; 1200:8

**statements** [4] - 1121:16; 1130:20; 1198:16; 1199:9

**STATES** [2] - 1078:1, 3

**States** [9] - 1078:12, 21; 1161:23; 1162:7; 1164:24; 1167:8, 22; 1168:2; 1202:1

**stating** [1] - 1110:4

**station** [2] - 1116:3; 1117:12

**status** [1] - 1212:21

**statute** [1] - 1199:2, 12

**stayed** [1] - 1094:19

**staying** [2] - 1231:14; 1255:4

**stays** [1] - 1097:10

**stenography** [1] - 1078:24

**step** [9] - 1105:25; 1106:5; 1118:1; 1125:19, 22; 1129:19; 1186:17; 1239:12; 1273:2

**STEPHANIE** [1] - 1078:21

**STEPHEN** [1] - 1078:16

**Steven** [1] - 1194:12

**stick** [1] - 1183:9

**still** [10] - 1081:13; 1094:10; 1095:11; 1122:5; 1164:20; 1236:3; 1253:9; 1261:16; 1284:3

**stipulate** [2] - 1103:18; 1133:1

**stipulated** [2] - 1132:20; 1237:3

**stipulation** [22] - 1093:11; 1099:12; 1132:20, 23; 1133:6; 1154:18; 1159:11;

1237:5; 1238:16, 18-19; 1239:15, 18; 1240:2, 5, 7; 1241:12, 14-15, 21, 23

**stipulations** [1] - 1132:22

**stock** [1] - 1080:19

**stood** [1] - 1215:15

**stop** [9] - 1110:25; 1111:16; 1112:13; 1174:2; 1187:6; 1189:1; 1205:11; 1268:24; 1277:4

**stopped** [4] - 1138:7; 1140:14; 1141:14; 1142:7

**stops** [1] - 1257:10

**stored** [1] - 1140:1

**story** [1] - 1085:4

**straight** [1] - 1243:2

**straighten** [2] - 1237:6; 1242:23

**Street** [39] - 1091:14, 18; 1093:20; 1094:25; 1108:10; 1113:13; 1115:15; 1116:9, 16; 1123:3, 8, 12, 14; 1124:1; 1210:24; 1211:3, 6, 14, 24; 1215:3; 1216:14, 18; 1217:7, 23-24; 1218:6, 17; 1246:22; 1247:10; 1248:18, 24; 1257:21; 1258:9; 1260:5, 7, 20; 1261:16, 22; 1262:4

**street** [1] - 1128:10

**strictly** [1] - 1146:21

**string** [1] - 1147:25

**stuck** [1] - 1105:20

**study** [1] - 1143:8

**stuff** [1] - 1271:13

**submission** [1] - 1207:25

**submit** [2] - 1201:23; 1202:6

**subpoena** [5] - 1118:17; 1138:18, 24; 1139:2; 1161:22

**subpoenaed** [6] - 1145:6, 12; 1146:11; 1176:16; 1254:5; 1274:13

**subpoenas** [1] - 1249:19

**subscriber** [4] - 1158:7, 18; 1212:19; 1246:4

subscriber's [1] - 1212:21

subsequent [5] - 1200:8; 1210:12; 1211:21; 1271:6; 1280:16

subsequently [4] - 1174:4, 7; 1175:8; 1191:10

substance [4] - 1091:19; 1113:5; 1170:23

substantial [1] - 1276:5

substantially [1] - 1274:17

substitute [1] - 1250:10

subway [4] - 1091:1; 1094:2, 14

succession [2] - 1100:7; 1255:25

successive [1] - 1231:18

suddenly [1] - 1110:5

sufficient [3] - 1199:13; 1201:23; 1202:12

suggest [1] - 1241:20

suggested [1] - 1279:11

Suite [1] - 1078:16

sum [1] - 1170:23

summarize [2] - 1208:17; 1235:5

summarized [6] - 1146:14; 1157:18, 20; 1210:2; 1215:7; 1216:6

summary [16] - 1144:23; 1145:3, 18; 1155:2, 7, 12; 1158:1; 1185:6; 1186:8; 1212:3, 14; 1213:2; 1215:12; 1216:21, 25

summer [1] - 1122:25

Sunnyside [1] - 1100:15

supervisor [1] - 1110:8

supplement [1] - 1263:8

supplementing [1] - 1266:5

supplied [1] - 1264:4

supposed [2] - 1138:25; 1165:8

supposedly [1] -

1206:6

surrounding [4] - 1200:17; 1202:4, 6

suspect [2] - 1094:12; 1283:2

suspended [1] - 1212:24

sustained [13] - 1103:15; 1114:11, 25; 1115:12; 1117:3; 1128:12; 1129:9, 15; 1139:6, 8; 1182:7; 1187:19; 1254:13

Sustained [11] - 1194:1; 1195:12, 16; 1224:3, 11; 1225:2, 14; 1231:11; 1233:14; 1234:10; 1245:22

swabs [1] - 1131:20

sweatshirts [1] - 1087:11

switch [2] - 1150:6, 24

switching [5] - 1150:14, 23; 1151:3, 5, 19

sworn [8] - 1081:17; 1106:21; 1118:9; 1125:23; 1126:2; 1134:9; 1161:8; 1209:12

synergy [3] - 1154:22; 1155:5

Synergy [56] - 1089:11; 1090:10; 1108:13; 1109:1; 1112:25; 1113:12; 1114:14; 1119:12, 24; 1120:2, 17, 25; 1121:10; 1122:3, 5, 22; 1123:4, 15; 1125:8; 1174:25; 1210:14, 20; 1211:3, 5; 1214:23; 1215:1, 9; 1216:10, 12, 18; 1217:6, 19; 1246:22; 1247:10; 1248:18; 1249:6, 9; 1257:21; 1258:8, 21, 24-25; 1260:2, 4, 7, 12, 19-20; 1261:4, 9, 22; 1262:4

Syosset [2] - 1135:16, 18

system [2] - 1144:6

SZ [1] - 1156:23

---
T
---

table [6] - 1083:20; 1137:8; 1196:5; 1224:8; 1225:11

tabs [2] - 1264:16; 1266:15

tan [1] - 1137:9

tangentially [1] - 1093:25

tape [72] - 1130:15, 18, 20; 1131:12, 17; 1132:14, 21; 1137:15, 19, 23; 1138:3, 6-7; 1139:25; 1140:13, 17; 1141:11, 13-14; 1142:6, 22; 1170:25; 1171:4, 14, 20; 1172:4, 13; 1176:25; 1177:23; 1181:14-16, 19-20; 1183:7; 1184:11, 13; 1185:23; 1186:1, 7, 9, 24; 1187:5; 1189:23; 1192:22; 1201:1; 1202:17; 1204:2, 4, 7, 12-13, 20-21; 1205:3, 5-6, 21-22; 1274:16; 1275:22; 1276:2; 1279:17, 19-20; 1280:6

tapes [6] - 1130:14, 25; 1183:6; 1184:23; 1275:16, 18

TARANTINO [1] - 1078:5

Tarantino [63] - 1094:11; 1099:14, 23; 1101:11; 1119:8, 24; 1121:5; 1126:16, 21, 23; 1127:9, 14, 17; 1128:4, 9, 14; 1129:5, 11; 1136:18; 1137:11; 1154:9, 12-13; 1155:2; 1157:6, 23; 1158:20; 1159:7; 1171:11; 1179:23; 1180:4, 9, 13; 1182:1; 1187:6; 1190:24; 1191:4; 1192:11; 1210:14; 1211:10, 12, 23; 1212:4; 1213:4, 6, 16, 21; 1214:10, 17, 20; 1217:20; 1218:3, 11, 18; 1255:14, 18, 21; 1285:16; 1286:24; 1287:17; 1288:8

Tarantino's [5] - 1101:18; 1156:14; 1160:3; 1185:15; 1256:3

Tarantinos [1] - 1202:4

targeted [1] - 1231:8

tattoo [9] - 1087:12, 17; 1103:1; 1104:3, 8, 10, 13

tattoos [2] - 1087:11,

tax [3] - 1120:21; 1121:16

team [1] - 1142:18

technical [1] - 1150:14

technology [1] - 1143:25

tee [9] - 1104:2, 12, 15, 17, 23; 1105:5, 9

telephone [7] - 1116:10; 1126:20; 1143:14; 1144:2; 1176:14; 1228:18; 1249:17

ten [4] - 1154:10; 1182:5; 1185:20; 1238:20

tends [1] - 1279:8

tenure [1] - 1143:17

term [3] - 1128:24; 1129:2; 1163:2

terms [14] - 1080:3, 6, 16, 19; 1202:13; 1215:6; 1218:1; 1242:23; 1275:9, 12; 1279:9; 1280:19; 1282:5

test [1] - 1088:23

testified [25] - 1081:18; 1086:4; 1088:7; 1106:21; 1118:9; 1126:2; 1131:20; 1134:10; 1161:9; 1178:1; 1190:7, 10, 14, 17; 1192:10; 1201:7, 12; 1203:24; 1207:18, 22; 1208:4; 1209:12; 1210:9; 1239:22; 1272:11

testify [11] - 1120:1; 1149:2; 1239:20; 1274:11; 1275:11, 14; 1276:9, 17; 1284:22; 1286:15

testifying [4] - 1179:10; 1181:1; 1198:24; 1287:21

testimony [36] - 1097:14; 1114:9; 1144:13, 22; 1158:21; 1172:15; 1182:16; 1189:6; 1198:16, 22; 1200:1, 6, 11, 20; 1201:6, 10, 22; 1202:5; 1207:15, 21; 1208:8, 14, 18; 1209:16; 1237:1; 1238:12; 1240:24; 1262:8;

1276:7, 17; 1281:8, 15,
25; 1282:1; 1283:2
**THE** [354] - 1079:3, 8,
11, 17, 21, 24;
1080:15, 18, 23, 25;
1081:2, 4-5, 9;
1082:17, 19, 23;
1086:10; 1087:5, 8;
1092:13, 15; 1093:2, 5,
9, 12, 17, 21; 1094:7,
20, 23; 1095:6, 10, 13,
19, 22; 1096:2, 7, 10,
13; 1097:22; 1098:18,
22; 1102:8; 1103:15,
20; 1104:21; 1105:2,
23, 25; 1106:5, 8, 11,
13, 16, 23; 1110:10,
14; 1113:9; 1114:11,
25; 1115:2, 5, 10, 12;
1116:18, 20; 1117:3,
14, 21, 24; 1118:1, 3,
5, 11; 1119:14, 18, 25;
1120:6, 11, 14, 18;
1123:21; 1125:3, 16,
18, 21-22; 1126:4;
1127:11; 1128:12, 16;
1129:9, 15, 17, 19, 21;
1130:12; 1131:2, 4, 7;
1132:1, 4, 11; 1133:9,
11; 1134:4, 6; 1137:12;
1138:4; 1139:6, 8;
1140:12; 1141:20;
1145:23, 25; 1146:4, 9,
23; 1147:10; 1148:24;
1149:2, 6; 1160:20, 24;
1161:4, 11, 13, 15;
1162:25; 1164:5;
1165:2, 5, 10, 19, 21;
1166:6; 1176:9; 1177:2,
4, 6; 1182:7, 9, 12,
17; 1183:1, 13, 16;
1184:2, 9, 11, 14, 17,
22, 25; 1185:6, 9;
1186:1, 5, 11, 13, 16,
20, 23, 25; 1187:2, 15,
19, 21, 24; 1189:24;
1190:2; 1191:19;
1194:1, 4; 1195:12, 16,
18, 22; 1196:3, 8, 23,
25; 1197:2, 5; 1198:5,
10, 15, 21; 1199:15;
1200:2; 1202:13, 18,
21; 1203:11, 23;
1204:7, 15, 19, 25;
1205:13, 16, 20, 23;
1206:2; 1207:14, 23;
1208:6, 10, 23; 1209:1,
4-5, 8, 15; 1210:21,
23; 1211:1; 1212:8;
1214:25; 1215:2, 4;

1218:22, 25; 1219:14;
1220:5, 9; 1221:5;
1224:3, 11, 16; 1225:2,
14; 1226:11; 1228:19;
1229:2, 7, 10; 1230:2,
5-6, 24; 1231:11, 23,
25; 1232:2; 1233:14;
1234:10; 1235:3;
1237:6; 1238:3, 11, 18,
22; 1239:3, 12-14, 17;
1240:2, 17; 1241:3, 18,
22; 1242:5, 7, 10, 12,
21; 1244:1, 8, 13, 16;
1245:22; 1246:13, 15;
1247:22; 1250:11;
1254:9, 13; 1260:17;
1263:10; 1264:3, 6, 13,
16, 18, 23; 1266:5, 8,
11, 13, 16, 18;
1267:17; 1268:4;
1271:12, 14, 17, 22,
25; 1272:3, 19, 23, 25;
1273:2, 5; 1274:3, 7,
12, 15, 23; 1275:2, 5,
19; 1277:4; 1278:3;
1279:8, 23; 1280:7, 11;
1281:2, 7, 9; 1282:1,
5, 12, 14, 23; 1283:5,
10, 12, 24; 1284:2, 4,
8, 11, 18; 1285:12, 14;
1286:1, 7, 11, 14, 22;
1287:1, 5, 24; 1288:4,
7, 9, 14
**themselves** [2] -
1149:22; 1279:18
**thereafter** [3] -
1112:19; 1179:9;
1190:11
**therefore** [1] -
1147:14
**Therefore** [1] - 1243:1
**thinking** [2] - 1242:3;
1287:20
**third** [3] - 1099:6;
1209:22; 1214:9
**Thomas** [1] - 1212:11
**thousandth** [1] -
1152:2
**threatening** [2] -
1175:2; 1178:19
**three** [14] - 1083:7;
1094:8; 1141:19;
1151:2; 1158:20;
1159:21; 1200:11;
1209:25; 1213:8;
1233:1, 25; 1264:10;
1268:9, 25
**throughout** [2] -
1155:7; 1163:3

**Thursday** [4] - 1249:1;
1251:3; 1283:16;
1288:18
**tied** [1] - 1086:24
**timed** [1] - 1255:25
**timeframe** [1] - 1258:4
**timing** [1] - 1285:4
**today** [18] - 1080:9;
1094:3; 1097:15;
1102:13; 1104:8;
1114:9; 1137:4;
1144:13; 1158:21;
1161:22; 1179:10;
1182:16; 1183:3;
1207:15, 23; 1208:8;
1272:12; 1283:17
**together** [4] - 1085:3;
1135:24; 1136:4; 1179:5
**tomorrow** [6] - 1278:5;
1279:5; 1281:15;
1282:2, 15, 17
**tonight** [1] - 1079:15
**took** [27] - 1091:5;
1093:3; 1096:15;
1102:21; 1106:3;
1109:19; 1115:3;
1119:16; 1131:20, 23;
1133:4; 1137:3;
1140:24; 1158:22;
1165:4; 1168:3; 1194:7;
1203:18; 1217:2, 5;
1228:5; 1235:1; 1238:1;
1261:19; 1264:1;
1274:1; 1287:17
**top** [4] - 1103:3;
1159:23; 1178:3; 1210:3
**total** [2] - 1137:2;
1183:11
**totally** [4] - 1131:21;
1147:6; 1188:21;
1278:17
**touch** [1] - 1093:14
**touched** [1] - 1131:14
**toward** [1] - 1196:10
**towards** [1] - 1107:22
**track** [3] - 1151:16;
1224:23, 25
**traffic** [3] - 1150:16;
1218:1
**trafficking** [1] -
1230:20
**training** [3] -
1143:19, 24; 1149:13
**Tramble** [1] - 1284:6,
11
**transaction** [7] -
1091:4; 1145:14;
1149:20; 1150:11;

1152:25; 1153:2; 1158:1
**transactions** [4] -
1144:23; 1151:4;
1152:15; 1210:2
**transcript** [10] -
1078:25; 1096:4, 18;
1130:5, 11-12; 1131:24;
1132:3; 1205:18, 20
**TRANSCRIPT** [1] -
1078:6
**transcription** [1] -
1078:25
**transcripts** [4] -
1130:3; 1132:6; 1137:22
**transpired** [1] -
1088:25
**transportation** [1] -
1168:1
**travel** [1] - 1136:6
**traveled** [3] - 1136:1,
3; 1190:6
**treatment** [1] - 1136:7
**trial** [11] - 1080:14;
1120:5; 1132:5; 1164:8;
1183:4; 1201:8; 1275:4;
1278:8; 1284:19;
1288:17
**TRIAL** [1] - 1078:6
**tries** [1] - 1278:11
**trip** [7] - 1165:18;
1166:16; 1167:23;
1189:20, 23; 1203:15
**Troll** [1] - 1088:15
**TROLL** [1] - 1088:15
**troubling** [1] -
1242:16
**true** [1] - 1206:17
**trunk** [3] - 1142:23;
1143:1
**truth** [1] - 1276:12
**try** [9] - 1141:8;
1183:15; 1192:25;
1216:5; 1242:17;
1243:1; 1244:5, 24;
1253:20
**trying** [3] - 1185:24;
1221:13; 1268:2
**Tuesday** [1] - 1283:19
**turn** [10] - 1092:25;
1097:21; 1138:4;
1166:1; 1172:4;
1196:10; 1209:1, 3-4;
1251:25
**turned** [4] - 1096:23;
1172:13; 1201:2; 1242:3
**turning** [2] - 1214:9;
1270:2

27

29

**twenty** [1] - 1107:8
**twenty-eight** [1] - 1107:8
**twice** [2] - 1130:14; 1234:1
**two** [47] - 1081:3; 1085:14, 25; 1096:17; 1102:22; 1104:11; 1119:21; 1124:1, 5, 13, 21; 1131:10; 1135:10; 1136:10; 1149:17; 1150:1-3; 1157:9; 1159:23; 1170:20; 1182:13, 23; 1183:7, 9-10; 1191:22; 1192:20; 1203:7, 9; 1205:23; 1215:10, 18; 1221:10; 1228:10; 1233:10; 1238:11; 1255:24; 1264:10; 1275:18; 1281:19; 1282:7; 1283:11
**two-piece** [1] - 1085:25
**Ty** [3] - 1170:2
**type** [3] - 1089:8; 1104:1; 1150:4
**typed** [6] - 1169:1, 5, 7; 1170:14; 1181:10

## U

**U.S** [4] - 1078:4, 15; 1118:17; 1280:20
**U.S.D.J** [1] - 1078:9
**ultimately** [2] - 1088:6; 1137:17
**uncross** [1] - 1277:6
**under** [14] - 1081:13; 1097:14; 1104:8; 1114:9; 1119:11; 1120:16; 1155:15; 1156:3; 1179:10; 1181:1; 1199:2; 1200:15; 1208:20; 1242:19
**underline** [1] - 1285:21
**underlying** [1] - 1286:13
**underneath** [1] - 1248:12
**understood** [4] - 1084:20; 1138:16; 1203:18; 1208:9
**unfolds** [1] - 1278:9
**unfortunately** [4] - 1096:10; 1204:12; 1240:4; 1242:18

**unique** [1] - 1149:23
**UNITED** [2] - 1078:1, 3
**United** [9] - 1078:12, 21; 1161:23; 1162:7; 1164:24; 1167:8, 22; 1168:2; 1202:1
**unless** [3] - 1095:16; 1275:16
**unusual** [1] - 1127:21
**up** [76] - 1083:2; 1085:4; 1086:24; 1087:5; 1090:10, 14, 20; 1091:23; 1094:18; 1095:23; 1096:1, 10; 1098:5; 1100:1; 1103:2, 6; 1115:2; 1116:15; 1125:22; 1130:1; 1131:2, 19; 1132:3; 1133:1; 1136:17; 1138:11; 1139:10; 1140:2, 19; 1141:17; 1142:2, 14; 1145:23; 1174:1; 1183:8; 1185:19; 1186:9; 1187:13; 1191:6; 1198:5; 1202:25; 1204:24; 1205:19; 1206:16; 1210:12; 1213:18; 1214:16; 1217:15; 1223:9; 1234:11; 1237:6; 1238:15, 19, 21; 1240:17; 1241:1; 1242:22; 1244:24; 1248:3; 1250:4; 1257:6; 1258:15, 18; 1259:4, 6; 1262:11; 1263:10; 1275:1; 1280:15; 1286:5
**upper** [2] - 1086:1; 1148:14
**upstairs** [1] - 1090:7
**upstate** [1] - 1136:6
**user** [2] - 1154:20; 1239:19

## V

**vacation** [5] - 1176:21, 23; 1177:1
**vague** [1] - 1115:6
**Valentine** [1] - 1088:14
**value** [2] - 1275:21; 1277:1
**various** [3] - 1097:10; 1121:11; 1210:9
**variously** [1] - 1137:15
**varying** [1] - 1150:25

**vehicle** [4] - 1116:7; 1139:14, 23
**verdict** [1] - 1147:15
**verified** [2] - 1205:19; 1274:18
**verifying** [1] - 1267:6
**Verizon** [5] - 1143:23; 1158:7; 1159:8; 1160:8; 1253:25
**version** [1] - 1146:20
**versus** [2] - 1151:14; 1202:1
**vicinity** [1] - 1280:5
**victor** [1] - 1257:23
**view** [6] - 1146:10, 14-15, 25; 1147:13, 24
**viewed** [1] - 1108:21
**Vince** [2] - 1240:11; 1245:12
**Vince's** [1] - 1245:13
**Vincent** [41] - 1103:25; 1107:16; 1109:4; 1110:2; 1152:22; 1157:14; 1158:11; 1178:12, 18; 1179:16; 1180:4, 16, 18; 1181:2; 1196:14; 1206:19; 1220:13, 15, 20, 22; 1221:14, 18, 23; 1222:7, 15; 1223:25; 1225:4; 1228:13, 16, 20; 1229:22; 1230:8; 1232:4; 1236:4, 25; 1242:3; 1245:4, 16, 25; 1252:19, 25
**Vinnie** [16] - 1085:8, 15, 17; 1102:20; 1109:5; 1173:5, 8; 1174:8; 1178:22; 1180:20; 1189:2; 1201:21; 1205:11; 1206:6, 21; 1227:25
**vis-à-vis** [1] - 1279:13
**visit** [8] - 1138:13; 1163:16, 25; 1167:3; 1189:15, 18; 1190:23; 1280:16
**visited** [2] - 1088:14; 1190:20
**visiting** [1] - 1189:1
**visitor** [1] - 1190:22
**vivid** [1] - 1103:12
**voice** [5] - 1095:6; 1131:21; 1180:17; 1223:8
**voluminous** [1] - 1146:13

**voluntarily** [1] - 1111:3
**VW** [1] - 1144:11
**VZ** [9] - 1092:15; 1144:10; 1158:5, 24; 1247:2
**VZ-1** [6] - 1092:10, 14, 17, 19; 1098:25; 1260:19
**VZ-3** [6] - 1246:23; 1247:3; 1257:23; 1258:1; 1260:5, 20

## W

**W-2** [7] - 1121:16; 1122:8, 13; 1124:11; 1125:10
**W-2's** [1] - 1125:6
**W-2s** [1] - 1121:22
**wait** [1] - 1288:12
**waiting** [3] - 1081:2; 1198:11; 1208:12
**walked** [1] - 1194:7
**wants** [4] - 1098:15; 1111:3; 1112:4; 1285:3
**warehouse** [4] - 1285:9, 24; 1286:2
**ways** [1] - 1151:2
**weapon** [6] - 1083:24; 1084:7, 11; 1088:21; 1105:6, 17
**wearing** [6] - 1104:1, 17, 23; 1105:5; 1137:7, 9
**week** [11] - 1080:13; 1085:11; 1172:19; 1189:16; 1190:20; 1191:1; 1201:12, 14; 1279:2; 1283:4
**weekend** [1] - 1102:15
**weight** [1] - 1275:13
**weightlifting** [2] - 1089:10, 13
**weird** [1] - 1175:6
**welfare** [2] - 1129:7, 13
**West** [36] - 1108:10; 1113:12; 1115:14; 1116:9, 15; 1123:3, 11; 1124:16, 22; 1210:23; 1211:3, 6, 14, 23; 1215:2, 9; 1216:14, 18; 1217:6, 22-24; 1218:6, 17; 1246:22; 1247:10; 1248:18, 24; 1257:21; 1258:9, 24; 1260:5, 7, 12, 20; 1262:4

29

**west** [1] - 1124:1
**whispered** [1] - 1193:11
**white** [4] - 1104:23; 1169:1, 5; 1170:12
**whole** [12] - 1085:4; 1091:4; 1094:4, 18; 1097:19; 1124:19; 1147:24; 1220:4; 1245:9, 15; 1247:15, 17
**WICKER** [1] - 1078:20
**wife** [3] - 1091:24; 1202:23
**Willard** [7] - 1130:22; 1136:6; 1138:11; 1140:19; 1141:17; 1142:12, 15
**willful** [1] - 1243:5
**William** [1] - 1133:4
**window** [3] - 1083:24; 1085:12
**wings** [6] - 1102:24; 1103:12, 17, 19, 23
**wish** [2] - 1198:16; 1273:5
**withdraw** [2] - 1087:6, 8
**withdrawn** [7] - 1097:5; 1102:18; 1124:11; 1169:3; 1216:1; 1262:2, 19
**witness** [47] - 1106:13, 17, 20; 1118:3, 8; 1125:21; 1126:1; 1130:18; 1131:19; 1133:4; 1137:11; 1146:5, 17; 1147:3; 1149:2; 1183:3; 1185:2; 1187:3; 1197:9; 1198:23; 1199:21; 1208:2; 1209:11; 1212:9, 12; 1220:6; 1221:6; 1229:5; 1238:8; 1239:11; 1240:14; 1242:14, 18, 25; 1247:23; 1250:13; 1260:18; 1272:1, 10; 1273:3, 6; 1275:2; 1282:10; 1283:6; 1284:1; 1287:10
**Witness** [4] - 1118:2; 1125:20; 1129:20; 1241:9
**WITNESS** [18] - 1081:4; 1106:23; 1110:10, 14; 1118:11; 1120:18; 1126:4; 1134:6; 1148:24; 1161:13;

1196:25; 1210:23; 1215:2; 1230:5; 1231:25; 1232:3; 1239:13; 1246:15
**witness'** [2] - 1149:1; 1196:3
**witnesses** [8] - 1132:9; 1201:6; 1278:7; 1282:5, 7, 21; 1284:1, 9
**WITNESSES** [1] - 1289:2
**woman** [1] - 1203:20
**Woodbury** [1] - 1135:18
**word** [12] - 1084:16, 23; 1090:15; 1121:10; 1139:13; 1141:22; 1149:5; 1156:15; 1160:6; 1171:1; 1201:15
**words** [1] - 1182:5
**works** [1] - 1223:11
**worms** [1] - 1094:19
**worried** [1] - 1192:2
**worry** [2] - 1192:8; 1193:8
**worse** [1] - 1280:2
**writing** [2] - 1166:22; 1240:18
**written** [7] - 1166:11; 1173:2, 8; 1188:6; 1192:13; 1252:21; 1278:13
**wrote** [2] - 1170:24; 1206:21

---

**X**

**x-ray** [1] - 1105:17

---

**Y**

**yanked** [1] - 1281:18
**year** [7] - 1155:20; 1163:3, 8; 1164:17; 1177:4, 12; 1254:22
**years** [14] - 1088:7; 1090:7; 1092:4; 1107:8; 1118:23; 1122:2; 1134:22; 1137:17; 1140:19, 22, 25; 1141:1, 4; 1180:22
**yellow** [4] - 1103:11; 1266:23; 1267:22, 25
**yesterday** [4] - 1081:22; 1084:14; 1086:4; 1279:21
**YORK** [1] - 1078:1
**York** [17] - 1078:13, 19, 22; 1102:5; 1113:25; 1114:5;

1119:4; 1121:14; 1126:10; 1210:13, 17; 1211:14, 24; 1258:22, 25; 1260:21
**younger** [1] - 1274:18
**yourself** [2] - 1113:25; 1138:22
**yourselves** [1] - 1113:21
**YRMODY** [1] - 1099:1

---

**Z**

**Z.A.C.A.R.E.S.E** [1] - 1134:6
**Zacarese** [17] - 1132:25; 1134:3, 6, 15; 1137:13; 1138:8; 1140:15; 1142:8; 1143:7; 1148:4; 1149:7; 1198:5; 1209:16; 1242:1; 1244:2, 21; 1272:8
**Zacarese's** [1] - 1208:14
**zebra** [1] - 1257:23
**zero** [5] - 1213:14, 16; 1216:5; 1240:19; 1245:24