1291

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
-------------------------------X

UNITED STATES OF AMERICA,        :    CR 08 655

          v.                     :    U.S. Courthouse
                                      Central Islip, N.Y.
CHRISTIAN TARANTINO,             :
                                      TRANSCRIPT OF TRIAL
               Defendant.        :
                                      May 3, 2012
-------------------------------X      9:30 a.m.
```

BEFORE:

          HONORABLE JOANNA SEYBERT, U.S.D.J.
                  and a jury

APPEARANCES:

For the Government:    LORETTA E. LYNCH
                       United States Attorney
                       100 Federal Plaza
                       Central Islip, New York 11722
                       By:  JAMES M. MISKIEWICZ, ESQ.
                            SEAN C. FLYNN, ESQ.
                            Assistants, U.S. Attorney

For the Defendant:     STEPHEN H. ROSEN, ESQ.
                       100 Almeria Avenue - Suite 205
                       Coral Gables, Florida 33134

                       FRANK A. DODDATO, ESQ.
                       666 Old Country Road
                       Garden City, New York 11530

Court Reporter:        HARRY RAPAPORT
                       STEPHANIE PICOZZI
                       OWEN M. WICKER
                       United States District Court
                       100 Federal Plaza
                       Central Islip, New York 11722
                       (631) 712-6105

Proceedings recorded by mechanical stenography.
Transcript produced by computer-assisted transcription.

**1292**

1
2          M O R N I N G   S E S S I O N
3
4          (Whereupon, the following takes place in the
5    absence of the jury.)
6          THE COURT:  Good morning.
7          Please be seated, if you would.
8          We are going to hear argument on whether or not
9    the defendant should be permitted to play the tape of
10   Mr. and Mrs. Mulligan, the second tape with respect to the
11   defendant's claims that Scott Mulligan was coaching his
12   wife about certain facts involved in the case.
13         Does the government have anything else they
14   would like to add?
15         MR. MISKIEWICZ:  No, your Honor.  I don't think
16   I have anything else to add.
17         THE COURT:  You don't have anything to add, do
18   you?
19         MR. ROSEN:  No.
20         THE COURT:  Essentially I will let it in.  It is
21   a close call.  But I think the fact that the government is
22   getting in testimony with respect to this missing letter
23   and the issue as to Manon Mulligan's recollection.  And
24   one can interpret, I guess, the second conversation as
25   Scott Mulligan coaching, and certainly in the light

**1293**

1    favorable to the government, to have his wife recollection
2    refreshed.
3          It is not like she is coming in with a ringing
4    endorsement like, oh, yes, Scott, I don't believe I forgot
5    that, yes, that happened.  She seems to acquiesce more
6    than to dispute -- I mean more than to agree.
7          So it is somewhere between the feeling that I
8    have in ways that it could be interpreted.  And the
9    government will be able to front it, but I want the tape
10   played.  It is really a factual issue for the jury to
11   determine whether or not it is positive for the government
12   or if it reflects on Mrs. Mulligan's ability to recall.
13         MR. FLYNN:  Yes, your Honor.
14         THE COURT:  All right.
15         We have that done.
16         Is there anything else?
17         MR. ROSEN:  No, your Honor.
18         THE COURT:  I don't know if Mr. Baran has
19   mentioned to you, one of the alternates has a stomach flu
20   or a stomach virus, whatever, something involving a virus.
21         So it is my intention to discharge that person.
22   And that will leave us with three alternates, Charley?
23         THE CLERK:  Yes.
24         THE COURT:  And I think that is sufficient in
25   view of the expected length of the trial.

**1294**

1          The alternates seem to be coming off pretty
2    easily.  And I'm glad we picked as many as we did.
3          If there is nothing else, the first witness will
4    be who?
5          MR. FLYNN:  Your Honor, Manon Mulligan will be
6    our first witness.
7          THE COURT:  And after that you expect Scott
8    Mulligan to come in?
9          MR. FLYNN:  Yes, your Honor.
10         THE COURT:  And I don't see Mr. Miskiewicz.  So
11   I assume he is getting ready with Mr. Scott Mulligan?
12         MR. FLYNN:  No, your Honor.
13         He actually went down to print out a transcript
14   of Ms. Mulligan's transcript from yesterday for both
15   myself and for defense counsel.  And he should be up
16   momentarily.
17         THE COURT:  All right.
18         I don't know if I have one.
19         THE CLERK:  Yes, there is.
20         THE COURT:  Thank you.  Charley is right on the
21   ball here.
22         The jury has their cookies, I hope no one has an
23   objection to that.  At a trial a couple of years ago,
24   there was an objection by defense counsel for the Court to
25   give them cookies.  I thought it was reasonable to do.

**1295**

1    They come in here and there are -- they are volunteers.
2          MR. ROSEN:  Who would object to that?
3          THE COURT:  Mr. Rosen, it is a long story,
4    believe me.
5          MR. FLYNN:  I probably overestimated the length
6    of Mr. Mulligan's testimony yesterday.  But I don't think
7    I will finish him today.
8          MR. ROSEN:  I just geared up with her thinking
9    we will finish up on Monday and I will cross on Monday
10   which I don't predict to be very lengthy.  And that is why
11   I'm concerned that perhaps we should have both of the
12   prisoners available on Monday.  It depends on how long
13   Mr. Flynn will be on Monday.  I do not right now think of
14   a lengthy cross for Mr. Mulligan -- depending, of course,
15   on what happens.  But from what he has in his debriefings,
16   etcetera, etcetera.
17         THE COURT:  I'm not looking to rush anybody.
18   But I should let you folks know for scheduling purposes
19   that I had a request to -- from the Chief Judge to have
20   our meeting take up most of the afternoon on Tuesday.  It
21   was adjourned until Tuesday.  So we are starting at
22   1:00 o'clock.  And Tuesday might be a half a day.  So I
23   don't want to not give you -- this is a rather important
24   meeting, and I would like to spend the day on it.
25         We will need a day to do the charge, I would

**1296**

1  think, or a half day.

2          MR. ROSEN:  I don't foresee that either.  I had

3  the original charge.  And I will look at it again.

4          THE COURT:  I think the important issue on the

5  new charge will be obviously setting out what the working

6  elements are for this.

7          MR. ROSEN:  The Fowler situation, the case from

8  the Supreme Court about obstruction?

9          THE COURT:  Yes.

10          MR. FLYNN:  Your Honor, the elements are the

11  same as they were on the first trial.  Counts 3 and 4 will

12  be now counts 1 and 2.  It would be the same elements.

13          As we discussed and as we promised the Court,

14  the government will construct a supplemental charge

15  regarding how the jury can consider the evidence of the

16  first two homicides.

17          THE COURT:  All right.

18          MR. FLYNN:  Thank you, Judge.

19          THE COURT:  There is one other scheduling issue.

20          I will be leaving here at 4:30, which is a 15

21  minute differential, on Monday, for a function in

22  Brooklyn.

23          MR. ROSEN:  We will have the whole day Monday

24  then until 4:15?

25          THE COURT:  Yes.

**1297**

1          MR. ROSEN:  Then maybe we should have both

2  prisoners here.

3          THE COURT:  No one is going to fault you,

4  Mr. Rosen.

5          MR. ROSEN:  Thank you.

6          THE COURT:  I'm not looking to make life

7  difficult.

8          MR. ROSEN:  I appreciate that.

9          THE COURT:  And I know the government is

10  cooperating with respect to the prisoners.

11

12          (Whereupon, a recess was taken.)

13

14

15

16

17

18

19

20

21

22

23

24

25

**1298**

1          THE COURT:  The jurors are here.  We can bring

2  them out.  And we can get Mrs. Mulligan in and put her on

3  the stand.

4          (Whereupon, the jury at this time entered the

5  courtroom.)

6          THE COURT:  Good morning, folks, nice to see you

7  all.

8          The government's next witness, Mr. Miskiewicz,

9  or Mr. Flynn.

10          MR. FLYNN:  Your Honor, the government calls

11  Manon Mulligan.

12          THE COURT:  Please rise, Ms. Mulligan.

13

14  M A N O N   M U L L I G A N,

15          called as a witness, having been first

16          duly sworn, was examined and testified

17          as follows:

18          THE CLERK:  Please sit down and speak into the

19  microphone.

20          State and spell your name for the record.

21          THE WITNESS:  Manon Mulligan.  M-A-N-O-N,

22  M-U-L-L-A-G-A-N(sic).

23

24

25

**M. Mulligan-Direct/Flynn**

**1299**

1  DIRECT EXAMINATION

2  BY MR. FLYNN:

3  Q    Good morning, Ms. Mulligan.

4  A    **Good morning.**

5  Q    Are you appearing here today pursuant to a subpoena

6  issued by the United States Attorney's office?

7  A    **Yes.**

8  Q    In what country were you born?

9  A    **Canada.**

10  Q    What region in Canada?

11  A    **Quebec City.**

12  Q    What is your native language?

13  A    **French Canadian.**

14  Q    Are you a United States citizen?

15  A    **Yes, I am.**

16  Q    Are you fluent in English?

17  A    **Yes, I am.**

18  Q    Is that your primary language?

19  A    **No.  French is.**

20  Q    Are you familiar with the defendant in this case,

21  Christian Tarantino?

22  A    **Yes.**

23  Q    Where did you first meet Mr. Tarantino?

24  A    **In New York City at the China Club.**

25  Q    Approximately in what year?

M. Mulligan-Direct/Flynn

1300

1   A    1994.
2   Q    For the record, what is the China Club or what was it
3   when it existed?
4   A    It was a nightclub.
5   Q    And after meeting the defendant in this case, did you
6   become romantically involved with him for a period of
7   time?
8   A    Yes, I did.
9   Q    For approximately how long did you date
10  Mr. Tarantino?
11  A    Like about eight months.
12  Q    Do you see Mr. Tarantino in the courtroom here today?
13  A    Yes, I do.
14  Q    Could you please identify him, pointing to him?
15  A    He is right here.
16  Q    And indicate an article of clothing he is wearing,
17  please?
18  A    A beige jacket and a striped shirt.
19       MR. FLYNN:  Your Honor, can the record please
20  reflect that Ms. Mulligan has identified the defendant in
21  this case?
22       THE COURT:  Yes.
23       MR. FLYNN:  Thank you.
24  Q    After meeting the defendant in the China Club in
25  1994, did you have occasion to meet his larger group of

M. Mulligan-Direct/Flynn

1301

1   friends?
2   A    Yes, I did.
3   Q    And through the defendant, whom did you meet?
4   A    I met Scott Mulligan, Ron Smyth, Vinnie Gargiulo and
5   his brother, Steven Tarantino.
6   Q    Mrs. Mulligan, I'm going to put an exhibit on the
7   courtroom screen.  Do you have a monitor in front of you,
8   directly to your left?
9   A    Yes.
10  Q    And appearing on the screen now is what is previously
11  admitted in evidence in this case as
12  Government's Exhibit CM-1.
13       (At this time a document was exhibited on
14  courtroom screen.)
15  Q    Can you see that photograph on the screen?
16  A    Yes, I do.
17  Q    Thank you.
18       Do you recognize the three individuals that are
19  depicted in that photograph?
20  A    Yes, I do.
21  Q    And from left to right, who are they?
22  A    There is Chris Tarantino, Rob Smyth and Scott
23  Mulligan.
24  Q    And at some point after meeting the defendant and his
25  friends in or about 1994, did you begin to develop a

M. Mulligan-Direct/Flynn

1302

1   relationship with Scott Mulligan?
2   A    Yes, I did.
3   Q    Briefly, how did that come about?
4   A    Just hanging out with them, being friends.  And Scott
5   was -- actually became like -- you know, he was Chris's
6   best friend and he was looking out for me, looking out for
7   me when Chris was in jail, and he would drive me to visit
8   Chris.
9   Q    Where was the defendant in prison during a portion of
10  the time that you dated?
11       MR. ROSEN:  Judge, the only objection I have to
12  the last statement is I reserve a motion.
13       THE COURT:  All right.
14       Why don't you come up now and I will listen to
15  your motion.
16       (Continued on next page.)
17
18
19
20
21
22
23
24
25

M. Mulligan-Direct/Flynn

1303

1        (Whereupon, at this time the following took
2   place at the sidebar.)
3        MR. ROSEN:  The question did not require an
4   answer that included the word jail, and the fact that my
5   client has been in jail sometime before.  So --
6        THE COURT:  I will tell the jury to disregard
7   it.
8        You are moving for a mistrial?
9        MR. ROSEN:  Yes.
10       THE COURT:  Your response?
11       MR. MISKIEWICZ:  I don't think there is any
12  dispute that the defendant has been in jail.  It doesn't
13  rise to the level of a mistrial.
14       THE COURT:  This is not a period of time that we
15  were talking about in Willard.
16       So the preparation of the witness would not
17  necessarily elicit that.  I don't know how else she can
18  describe how else she became friends with Scott Mulligan
19  and he was looking out for her.
20       I will tell the jury to disregard it.  I'm
21  denying the motion for a mistrial.  I will direct the jury
22  to disregard any reference to jail.
23       MR. FLYNN:  Yes, your Honor.
24       THE COURT:  And not to draw any negative
25  inference against the defendant.

M. Mulligan-Direct/Flynn

1304

1    MR. FLYNN:  Thank you, your Honor.

2    (Continued on next page.)

---

M. Mulligan-Direct/Flynn

1305

1    (Whereupon, at this time the following takes

2    place in open court.)

3    THE COURT:  Ladies and gentlemen, I'm

4    instructing you to disregard the reference to "jail."

5    You are not to draw any negative inferences as to whether

6    the defendant was in jail or not in jail.  You are to

7    presume the defendant to be innocent of these charges.

8    Can you all do that?

9    ALL JURORS:  Yes.

10    THE COURT:  Thank you.

11    If you have any difficulty with that, let me

12    know and I will advise you further.

13    MR. FLYNN:  May I continue, your Honor?

14    THE COURT:  Yes.

15    Q    After you met Scott Mulligan, did you eventually

16    marry Scott Mulligan?

17    A    Yes.

18    Q    Are you married to Scott Mulligan today?

19    A    Yes.

20    Q    For how long have you been married to Mr. Mulligan?

21    A    16 years.

22    Q    Doing the math, it means you and Mr. Mulligan were

23    married in approximately 1996; is that correct?

24    A    That's correct.

25    Q    And during this period of time, the mid-1990s, did

---

M. Mulligan-Direct/Flynn

1306

1    you also come to know an individual known as Vincent

2    Gargiulo?

3    A    Yes, I did.

4    Q    Did you understand him to be a friend of both your

5    husband's and the defendant's?

6    A    Yes.

7    Q    And did you have an opportunity to observe the three

8    of them together?

9    A    Yes.

10    Q    Based on those observations, how close was your

11    husband and the defendant to Vinnie?

12    A    They were all best friends.

13    MR. ROSEN:  Objection to the form of the

14    question.

15    THE COURT:  Take it one by one, if you would.

16    Q    How close was your husband to Vincent Gargiulo?

17    A    Very close.

18    Q    How close was Mr. Gargiulo to the defendant based on

19    your observations?

20    A    Very close.

21    Q    I will put another photograph on the screen, SM-6.

22    (At this time a document was exhibited on

23    courtroom screen.)

24    Q    Do you recognize that?

25    A    Yes.

---

M. Mulligan-Direct/Flynn

1307

1    Q    Whom do you recognize those individuals to be?

2    A    My husband, Scott Mulligan, and Vinnie Gargiulo.

3    Q    Is your husband on the right-hand side of that

4    picture?

5    A    Yes, he is.

6    Q    In addition to being personal friends, were the

7    defendant, your husband and Vincent Gargiulo also business

8    partners at one time or another during the 1990s and then

9    into this last decade?

10    A    Yes, they were.

11    Q    What kind of business?

12    A    In the gym business.

13    Q    When you first met the defendant and Mr. Mulligan,

14    your husband, were they employed in some way in 1994, '95?

15    A    Yes, they were.

16    Q    How were they employed?

17    A    They worked for the Eastside Fitness in Manhattan, a

18    gym.

19    Q    And where was Eastside Fitness?

20    A    It was in the upper east side.

21    Q    And what was Eastside Fitness?

22    A    A gym.

23    Q    To the best of your recollection, what did your

24    husband and the defendant do in Eastside Fitness in the

25    mid-90s?

M. Mulligan-Direct/Flynn

1308

1  A  They were personal trainers.
2  Q  To your knowledge, was Mr. Gargiulo also employed at
3  Eastside Fitness during this period of time?
4  A  Yes, he was.
5  Q  In what capacity?
6  A  He was also a trainer.
7  Q  Are you and your husband still involved in the gym
8  and fitness industry today?
9  A  Yes.
10  Q  In what capacity?
11  A  We own gyms.
12  Q  How many fitness centers does the Mulligan family,
13  you, own?
14  A  Four.
15  Q  And are these gyms known by a particular trade name?
16  A  Yes.
17  Q  What?
18  A  Synergy Fitness.
19  Q  And to your knowledge, does the defendant or his
20  family own certain Synergy Gyms on Long Island as well?
21  A  Yes.
22  Q  Do the Mulligans and the Tarantinos currently have
23  ownership interest in the same fitness clubs today?
24  A  No, they don't.
25  Q  After you and Scott Mulligan were married in or about

M. Mulligan-Direct/Flynn

1309

1  1996, where did the two of you live?
2  A  In Long Island, Bellmore.
3  Q  I will fast forward here.
4       Sometime in the year 2000, do you recall
5  receiving a visit at your home in Bellmore from
6  Special Agent Schelhorn and a detective from the Nassau
7  County Police Department?
8  A  Yes.
9  Q  What time of year did this happen in 2000, to the
10  best of your recollection?
11  A  It was like in the summertime.
12  Q  Were you at home when Special Agent Schelhorn and the
13  detective from the Nassau County Police Department visited
14  you in Bellmore?
15  A  Yes, I was.
16  Q  To the best of your recollection, was Mr. Mulligan at
17  home at the time?
18  A  No --
19       MR. ROSEN:  Objection to leading the witness.
20       THE COURT:  Overruled on that portion.  But
21  after that you should ask less leading questions.
22  Q  Where was your husband when they arrived?  Where was
23  your husband when Special Agent Schelhorn came by?
24  A  He was at work.
25  Q  Sorry?

M. Mulligan-Direct/Flynn

1310

1  A  He was at work.
2  Q  And after you answered the door, did either
3  Special Agent Schelhorn or the detective give you
4  anything?
5  A  Yes, they did.
6  Q  What did they give you?
7  A  Their business card.
8  Q  How long were they at your home?
9  A  Like ten seconds.
10  Q  And after receiving the business card from them,
11  Special Agent Schelhorn and the detective, what did you do
12  with the card?
13  A  I gave to it my husband, Scott.
14  Q  Later in the summer of 2000 at some point after being
15  visited by law enforcement and receiving that business
16  card, did you leave the country for a period of time?
17  A  Yes, I did.
18  Q  Where did you go?
19  A  I went to Canada.
20  Q  In front of you is one physical exhibit marked for
21  identification as Government's Exhibit MM-1.
22  A  Yes.
23  Q  Do you recognize that?
24  A  Yes.
25  Q  What is it?

M. Mulligan-Direct/Flynn

1311

1  A  It is my passport.
2  Q  Okay.
3       Is that a current passport?
4  A  No, it is not.
5  Q  Is it an expired passport?
6  A  Yes, it is.
7  Q  But do you recognize it as yours based on the inside
8  cover and the marks inside?
9  A  Yes.
10       MR. FLYNN:  The government moves for the
11  admission of Government's Exhibit MM-1.
12       THE COURT:  Any objection?
13       MR. ROSEN:  No objection.
14       THE COURT:  Received in evidence.
15       (Whereupon, Government's Exhibit MM-1 was
16  received in evidence.)
17  Q  What country issued you that passport, Mrs. Mulligan?
18  A  Canada.
19  Q  Mrs. Mulligan, would you open that passport to
20  page 8.
21       It has a number on the back portion marked as
22  page 8.  Do you see that?
23  A  Yes.
24  Q  Do you see a stamp marked in blue on the left-hand
25  side of that page, page 8 of Government's Exhibit MM-1?

M. Mulligan-Direct/Flynn

1312

1 A   Yes.

2       (At this time a document was exhibited on

3   courtroom screen.)

4 Q   And where were you that -- when that stamp was placed

5   on your passport?

6 A   I was in Costa Rica.

7 Q   Is that where you went in the summer of 2000 after

8   the detective and Special Agent Schelhorn came to your

9   home?

10 A   Yes.

11 Q   Costa Rica?

12 A   Yes.

13 Q   Okay.

14       Did you travel to Costa Rica in the summer of

15   2000 by yourself or with someone?

16 A   By myself.

17 Q   Did you meet anyone in Costa Rica when you went?

18 A   Yes.

19 Q   Who did you meet there?

20 A   My husband, Scott.

21 Q   To the best of your recollection, how long had your

22   husband been in Costa Rica prior to traveling there in the

23   summer of 2000?

24 A   About a week or two.

25 Q   He went a week ahead of you?

M. Mulligan-Direct/Flynn

1313

1 A   Yes.

2 Q   All right.

3       To the best of your recollection, how long --

4   withdrawn.

5       Ms. Mulligan, if you would read off your

6   passport, there is a date associated with a stamp received

7   in Costa Rica when you went there.  Can you read that

8   date?

9 A   It was August 14th.

10 Q   Of what year?

11 A   Of 2000.

12 Q   Okay.

13       Does that comport with your recollection as to

14   when you went to Costa Rica in the summer of 2000?

15 A   Yes.

16 Q   How long were you there, to the best of your

17   recollection?

18 A   About a week.

19 Q   In the lower portion of page 8 of your passport is a

20   second stamp which I will highlight on the screen now, and

21   it is dated August 19th, 2000.  And it is stamped in Miami

22   by the immigration office.

23       Does that comport with your recollection as to

24   when you returned from Costa Rica?

25 A   Yes.

M. Mulligan-Direct/Flynn

1314

1 Q   August 19th, 2000?

2       MR. ROSEN:  The only objection I have is to the

3   continued leading.

4       THE COURT:  Overruled on that.

5 Q   Did you return to the United States with your husband

6   from Costa Rica?

7 A   Yes, I did.

8 Q   Ms. Mulligan, sometime after the trip you took with

9   your husband to Costa Rica in the summer of 2000, sometime

10   after did you develop an understanding that Mr. Gargiulo,

11   Vinnie, was beginning to have personal problems?

12 A   Yes.

13 Q   And approximately when to the best of your

14   recollection do you recall having this understanding

15   regarding Mr. Gargiulo and problems he was having?

16 A   In 2002.

17 Q   To the best of your recollection, what sort of

18   problems was he having, how would you describe it?

19 A   Drug, alcohol and mental problem.

20 Q   Did you additionally come to realize at some point in

21   time that Vinnie Gargiulo had been admitted to a live-in

22   mental health facility?

23 A   Yes.

24 Q   And around that same period of time, do you recall an

25   instance where a threatening voice mail message was left

M. Mulligan-Direct/Flynn

1315

1   on your home phone?

2       MR. ROSEN:  Objection.

3       THE COURT:  The same as to this area.

4 Q   Do you recall receiving a threatening voice mail

5   message at your home?

6 A   Yes, I did.

7 Q   Approximately when did this occur?

8 A   Umm, the end of 2002.

9 Q   Were you and your husband at home when this message

10   was left on your home phone answering machine?

11 A   No.

12 Q   Where were you?

13 A   We were out to dinner.

14 Q   Again, where were you living with your husband during

15   this period of time, 2002, the end of 2002?

16 A   In Bellmore, Long Island.

17 Q   The same house?

18 A   Yes.

19 Q   When you got home from being out with your husband on

20   this particular occasion, what happened?

21 A   When we got home, I played the answering machine.

22 Q   Okay.

23       What did you hear?

24 A   I heard somebody screaming.  It was hard to make

25   sense what he was saying.  But I heard like, stop talking

M. Mulligan-Direct/Flynn

**1316**

1  about me or I'll kill you.  And the rest I couldn't make
2  out anything, he was screaming like a crazy person.
3  Q    Where were you when you played this message?
4  A    In my kitchen.
5  Q    Did your husband subsequently hear the message?
6  A    Yes, he did.
7  Q    Were you upset by this?
8  A    Very upset.
9  Q    Why?
10  A    Because I was scared.  I was home with a young child,
11  and my husband had to go to prison in January.
12  Q    I'm sorry, was your husband getting ready to leave
13  for prison?
14  A    Yes, he was.
15  Q    After you played this message and after your husband
16  heard it, did you subsequently have an understanding --
17  subsequently come to understand that the message had been
18  left by Mr. Gargiulo?
19  A    Yes.
20  Q    You stated a moment ago that your husband had to
21  report to federal prison.  When did your husband report to
22  federal prison?
23  A    January 3rd of 2003.
24  Q    How many weeks -- withdrawn.
25        To the best of your recollection, how long

---

M. Mulligan-Direct/Flynn

**1317**

1  before January of 2003 when your husband went to prison
2  had this message been left on your voice mail?
3  A    It was very shortly before that.
4  Q    All right.
5        Where did your husband go to prison?
6  A    In Massachusetts, Devans.
7  Q    What had your husband, Scott Mulligan, been convicted
8  of to require him to report to a federal prison?
9  A    Conspiracy of selling marijuana.
10  Q    What prison sentence did he receive?
11  A    36 months.
12  Q    Up to three years?
13  A    Yes.
14  Q    Were you upset when he left?
15  A    Yes, I was.
16  Q    Did the message that was left by Mr. Gargiulo on your
17  home phone a month or so prior -- a short time prior --
18  cause you any additional level of concern?
19  A    Yes.
20  Q    Why?
21  A    Because I was alone with a six month old baby.
22  Q    Well, did you fear for your safety?
23  A    Yes.
24  Q    Safety of your child?
25  A    Yes.  I felt someone can come and hurt us.

---

M. Mulligan-Direct/Flynn

**1318**

1  Q    How old was your child at the time?
2  A    When my husband left it was -- he was eight months.
3  Q    Shortly after your husband reported to federal prison
4  in Massachusetts on January 3rd, 2003, did you leave the
5  country for a period of time again?
6        MR. ROSEN:  Judge, this is continuing to be
7  leading.
8        THE COURT:  I understand.
9        If you come up, I'll explain my ruling.
10        (Continued on next page.)

---

M. Mulligan-Direct/Flynn

**1319**

1        (Whereupon, at this time the following took
2  place at the sidebar.)
3        THE COURT:  Let me hear your objection.
4        MR. ROSEN:  Judge, this is -- I mean, I'm doing
5  this a long time.  This is a script.  He has questions and
6  answers and he is reading directly from the questions like
7  a script.
8        These are key points right now about what took
9  place in January of 2003 with Mr. Christian Tarantino and
10  her and the coming to the house.
11        THE COURT:  All right.
12        MR. ROSEN:  And he is just asking question by
13  question, what did you do when you went to the prison?
14        What did you do when you heard the tape?
15        What did you do?
16        Everything in his question gives the answer.
17        THE COURT:  What did you do?  That is not
18  leading.  When did you do it?  That is not leading.
19        MR. ROSEN:  But he says, when you went to Devans
20  to speak with your husband in the beginning -- I mean, if
21  we read back the last six questions, every one of them
22  gave her the answer to the question, every one of them.
23        THE COURT:  Keep your voice lower.
24        MR. ROSEN:  Every one of them gave the answer.
25        I would like the court reporter for the record

M. Mulligan-Direct/Flynn

**1320**

1 to read back the last six questions.

2 　　　　THE COURT:  He doesn't have to read them back.

3 I have seen them on the screen.

4 　　　　MR. ROSEN:  Thank you.

5 　　　　MR. FLYNN:  All I'm doing, that is called

6 looping, which is an accepted practice by most

7 prosecutors.  I'm including her answer into the next

8 question that she has previously given.  It is not

9 leading.  I'm not suggesting the answer to what I'm

10 asking.  She can say yes or no.  I'm asking what she did.

11 It is on her.

12 　　　　As far as the statements as it being a script, I

13 have questions written out.  That is how I prepare for

14 every witness.

15 　　　　THE COURT:  She also testified yesterday at a

16 hearing outside the presence of the jury, so that may

17 explain perhaps some of the ways you are questioning her.

18 　　　　Try to ask your questions in terms of what did

19 you do next.  Rather than to say, did you fear for your

20 life or the baby's life, that is suggesting the answer.

21 　　　　MR. FLYNN:  All right.

22 　　　　THE COURT:  Objection is sustained.

23 　　　　(Continued on next page.)

24

25

---

M. Mulligan-Direct/Flynn

**1321**

1 　　　　(Whereupon, at this time the following takes

2 place in open court.)

3 **Q**　After Scott Mulligan reported to prison in January of

4 2003, did you leave the country for a period of time?

5 **A**　**Yes, I did.**

6 **Q**　Where did you go?

7 **A**　**To Canada, Quebec City.**

8 **Q**　Again, is that where you were from?

9 **A**　**Yes.**

10 **Q**　What was the purpose of your trip to Quebec City,

11 Canada, in January of 2003?

12 **A**　**Visiting my family.**

13 **Q**　Who, if anyone, did you go with?

14 **A**　**My mom and my son.**

15 **Q**　All right.

16 　　　　I will ask you again to pick up a copy of your

17 passport -- not the copy, but it is the passport.  And if

18 you would turn to page 10.

19 　　　　I also highlighted on page 10, a copy which is

20 now appearing on the screen in the courtroom.

21 　　　　(At this time a document was exhibited on

22 courtroom screen.)

23 **A**　**Yes.**

24 **Q**　Do you see page 10?

25 **A**　**Yes, I do.**

---

M. Mulligan-Direct/Flynn

**1322**

1 **Q**　All right.

2 　　　　Do you see a marking on your passport on page 10

3 which reflects your trip to Quebec in January of 2003?

4 **A**　**Yes, I do.**

5 **Q**　What color is that?

6 **A**　**Black.**

7 **Q**　And what date is on that black stamp that is in your

8 passport?

9 **A**　**January 14th, 2003.**

10 **Q**　Does that comport with your recollection as to when

11 you left for Quebec after Scott went to prison?

12 **A**　**Yes.**

13 **Q**　Now, the second passport -- withdrawn.

14 　　　　There is a second stamp on that page of the

15 passport, page 10.

16 　　　　(At this time a document was exhibited on

17 courtroom screen.)

18 　　　　Do you see the second stamp?

19 **A**　**Yes.**

20 **Q**　What color is it?

21 **A**　**Red.**

22 **Q**　It is hard to make it out on the photocopy, and on

23 the screen it is difficult to make out.  But reading the

24 original, the passport in your hand, what date is stamped?

25 **A**　**January 22, 2003.**

---

M. Mulligan-Direct/Flynn

**1323**

1 **Q**　Does that stamp comport with your recollection as to

2 when you returned from Quebec?

3 **A**　**Yes.**

4 **Q**　How did you get back into the country from Canada?

5 **A**　**By plane.**

6 **Q**　Where did you fly to?

7 **A**　**To Newark, New Jersey.**

8 **Q**　After you landed at Newark on January 22, 2003,

9 where, if anywhere, did you go?

10 **A**　**I went to my home in Bellmore, Long Island.**

11 **Q**　And when you got home from the airport that day after

12 spending eight days in Canada, what did you do?

13 **A**　**I opened my mail.**

14 **Q**　Where in your home did you do that?

15 **A**　**Downstairs in my living room.**

16 **Q**　How many floors does your home have?

17 **A**　**Two floors.**

18 **Q**　Okay.

19 　　　　Was there anything in the mail that had

20 accumulated over that eight day period that you were gone

21 that caused you concern?

22 **A**　**Yes.**

23 **Q**　What did you find?

24 **A**　**A white envelope.**

25 **Q**　And what did -- excuse me, did you say a white

---

M. Mulligan-Direct/Flynn

1324

1  envelope?
2  A   Yes.
3  Q   And what did the envelope, other than its color, look
4  like?
5  A   There was no return address, and the address was
6  typed.
7  Q   Okay.
8      To whom was this envelope addressed?
9  A   To my husband, Scott Mulligan.
10 Q   And how big is the envelope?
11 A   About four by six.
12 Q   Use your hand, if you will, approximately how big?
13 A   About this big (indicating).
14 Q   Did you notice the postmark?
15 A   No, I did not.
16 Q   Again, did you notice the return address?
17 A   No, no return address.
18 Q   And did you open it?
19 A   Yes, I did.
20 Q   Where in your house were you standing when you opened
21 this anonymous or no return address envelope?
22 A   Downstairs in my living room.
23 Q   What was inside the envelope when you opened it?
24 A   A letter.
25 Q   Okay.

M. Mulligan-Direct/Flynn

1325

1      How many pieces of paper?
2  A   Just one piece of paper.
3  Q   What color was the paper?
4  A   White.
5  Q   Was the letter handwritten or was it typed?
6  A   It was typed.
7  Q   Was it signed?
8  A   No.
9      MR. ROSEN:  Objection.
10     THE COURT:  Overruled.
11     Describe the letter, if you would.
12     THE WITNESS:  The letter was like five by seven.
13 And it was also typed.  There was no signature.  It was
14 also all typed and there was maybe two paragraphs on it.
15 Q   What did it say, to the best of your recollection?
16 A   It said -- whoever wrote the letter said that he had
17 a tape, and the tape had things that they had done,
18 criminal things that they had done in the past.  And he
19 wanted a ransom of 500,000.  And if he didn't get the
20 ransom, that he would turn the tape in to the FBI.
21     And if he would disappear, then someone else had
22 a copy of that tape and they would turn it over to the
23 FBI.
24     And then there was a deadline date also.
25 Q   What do you mean by that deadline?

M. Mulligan-Direct/Flynn

1326

1      MR. ROSEN:  Judge, the only objection I have is
2  I wish to renew the prior motions which were filed.
3      THE COURT:  Yes.  That is noted.  And we have
4  the same ruling.
5  Q   Ms. Mulligan, please continue with what the letter
6  said.  You were saying there was a deadline?
7  A   Yes.  There was a deadline.
8  Q   Please tell the jury what you mean by a deadline.
9  A   That there was a deadline, that he wanted the money
10 by a certain date or he would turn the tape in .
11 Q   Okay.
12     Was there anything about that deadline that
13 caused you particular concern?
14 A   Yes.
15 Q   What?
16 A   That they had -- the days had passed when I was in
17 Canada when the deadline was mentioned.
18 Q   Okay.
19     Based on the letter's contents, and other
20 circumstances, who did you believe wrote the letter as you
21 were reading it?
22 A   Vinnie Gargiulo.
23 Q   Why?
24 A   Because of that recent phone call at the house.
25 Q   That phone call that you testified about earlier, are

M. Mulligan-Direct/Flynn

1327

1  you aware of whether or not the defendant heard that voice
2  call message as well?
3  A   Yes, he did.
4  Q   Without telling us what you did with the letter, or
5  who you gave it to, do you still have it?
6  A   No, I don't.
7  Q   Soon after providing this threatening letter -- soon
8  after receiving this threatening letter, I should say, did
9  you receive a visitor at your home in Bellmore?
10 A   Yes, I did.
11 Q   Who came to your house?
12 A   Chris Tarantino.
13 Q   Again, where was your husband at this time?
14 A   He was in prison.
15 Q   Where?
16 A   In Massachusetts, Devans.
17 Q   Approximately how long after you read the letter from
18 Mr. Gargiulo did the defendant show up at your house?
19 A   A day or two after.
20 Q   Had you called the defendant?
21 A   No.
22 Q   Had you asked him to come over?
23 A   No.
24 Q   And who was in home -- at home in Bellmore that day
25 when the defendant came over?

M. Mulligan-Direct/Flynn

1328

1  A    My mom and my baby.

2  Q    Did you invite the defendant in?

3  A    Yes, I did.

4  Q    Did you speak to the defendant in your home in

5  Bellmore that day?

6  A    Yes.

7  Q    January of 2003?

8  A    Yes.

9  Q    Where inside the home did this conversation take

10  place?

11  A    In the kitchen.

12  Q    Were you seated or standing during this conversation?

13  A    I was standing.

14  Q    And what about Mr. Tarantino?

15  A    He was sitting.

16  Q    You said your mother was home at the time.

17       To the best of your recollection, where was she?

18  A    She was downstairs in the bedroom with my baby.

19  Q    Who initiated the conversation once you were in the

20  kitchen?

21  A    He did.

22  Q    What did the two of you talk about, to the best of

23  your recollection?

24  A    He talked about the letter.

25  Q    Specifically, what?

---

M. Mulligan-Direct/Flynn

1329

1  A    That I told him I was worried, and that he said he

2  had one, too.

3  Q    I'm sorry, he said what?

4  A    That he also got a letter, and I asked him, like, can

5  someone -- can you go talk to him, see what is going on?

6       I was really scared because my husband wasn't

7  home.

8       He said, yes, don't worry.  He said, I'll take

9  care of it.

10  Q    Okay.

11       Did you and the defendant discuss at all the

12  contents of the letter that he said he had received?

13  A    Yes.

14  Q    What did the two of you talk about with respect to

15  the defendant's letter?

16  A    About the tape, and that there was a deadline.  And

17  that is what I was worried about because the date had

18  passed.

19  Q    And I believe you testified you discussed a deadline

20  with the defendant, are you referring to the deadline you

21  saw in your letter as well?

22  A    Yes.

23  Q    When you spoke to the defendant about the deadline,

24  what, if anything, did the two of you discuss?

25  A    That the deadline had passed and nothing happened, so

---

M. Mulligan-Direct/Flynn

1330

1  I shouldn't be worried.

2  Q    Based on your conversation with the defendant in your

3  kitchen in Bellmore in January of 2003, did you have an

4  understanding as to who had written the defendant's

5  letter?

6  A    Yes.

7  Q    And what was that understanding based on?

8  A    Vinnie Gargiulo.

9  Q    That is who had written it.  How did you know the

10  defendant's letter had been written by Vinnie Gargiulo?

11  A    Because it was the same letter.

12  Q    And did you hear that from the defendant?

13  A    Yes.

14  Q    You testified a moment ago that the defendant told

15  you he would take care of it; is that correct?

16  A    Yes.

17  Q    And in what manner did the defendant say that to you?

18  A    He whispered in my ear.

19  Q    How long was the defendant in your home that day in

20  January of 2003?

21  A    15, 20 minutes.

22  Q    Did he eventually leave?

23  A    Yes.

24  Q    Since that day did you ever discuss either your

25  letter or his letter from Mr. Gargiulo with him?

---

M. Mulligan-Direct/Flynn

1331

1  A    No.

2  Q    If I can go back for a second.

3       Do you recall during this conversation whether

4  the defendant gave you any instructions with respect to

5  your husband and the letter?

6  A    No.

7  Q    Did you mention the fact that you got a letter to

8  your husband?

9  A    No, I didn't.

10  Q    Why not?

11  A    Because they told me not to tell anything.

12  Q    When you say "they," does that include the defendant?

13       MR. ROSEN:  Objection.  Leading.

14       THE COURT:  Sustained.

15       Come on up.

16       Excuse us.

17       (Continued on next page.)

18

19

20

21

22

23

24

25

M. Mulligan-Direct/Flynn

1332

1 (Whereupon, at this time the following took
2 place at the sidebar.)
3 THE COURT: Obviously she was going to say that
4 Keith Pellegrino and the defendant told her not to mention
5 it to her husband.
6 Trying to keep away from Keith Pellegrino --
7 MR. ROSEN: No.
8 THE COURT: You want Keith Pellegrino in here?
9 MR. ROSEN: Absolutely.
10 THE COURT: But that is not happening, because
11 for purposes of this trial I'm not going to get into --
12 MR. ROSEN: She gave the letter --
13 THE COURT: You be quiet for a minute and let me
14 finish.
15 MR. ROSEN: I apologize.
16 THE COURT: I will not get into giving the
17 letter to Froccaro. I don't see how that is probative on
18 the issues before this Court at this time.
19 You will have whatever rights you have on appeal
20 in terms of Curcio, and the government's failure to advise
21 the Court in the first trial that Mr. Froccaro had
22 represented Scott Mulligan, and what if any impact there
23 should have been and whether there should have been a
24 hearing is something for later on.
25 But at this point in time the witness offered

M. Mulligan-Direct/Flynn

1333

1 the following testimony.
2 She received the letter. It is authenticated
3 officially, as far as I'm concerned. She no longer has
4 the letter. That is obviously an evidentiary issue and I
5 have allowed the fact that she got a letter and no longer
6 has it.
7 I don't see any reason to bring Keith Pellegrino
8 in. But I will hear your argument as to why this should
9 be done.
10 You are saying there was a script somehow and
11 somehow this witness deviated from the script because I'm
12 sure you said don't mention Pellegrino.
13 MR. FLYNN: She didn't mention Pellegrino.
14 THE COURT: The operative pronoun was "they."
15 MR. FLYNN: Look, your Honor. She is very
16 nervous.
17 THE COURT: I'm not criticizing anybody here.
18 MR. FLYNN: She is testifying truthfully.
19 MR. ROSEN: Oh, please. Don't categorize her
20 testimony.
21 THE COURT: What is your point?
22 Stop it.
23 MR. MISKIEWICZ: I'm sorry.
24 MR. ROSEN: Your Honor --
25 THE COURT: He is not done.

M. Mulligan-Direct/Flynn

1334

1 There was an objection to a leading question in
2 terms of Mr. Flynn saying, did the defendant say anything
3 to you with regards to the letter and telling your
4 husband? And that was a leading question.
5 MR. ROSEN: No, the question is "they."
6 You see, Keith Pellegrino --
7 THE COURT: It was not.
8 MR. ROSEN: Keith Pellegrino was the first --
9 THE COURT: She responded "they."
10 MR. ROSEN: The first person who told her not to
11 let Scott know about the letter is Keith Pellegrino.
12 MR. FLYNN: Your Honor precluded that.
13 MR. ROSEN: How can I not ask that question?
14 They are saying he told her.
15 Before that, Pellegrino told her, I'm taking the
16 letter from you. Don't tell Scott. The first person in
17 her debriefing, she never mentioned Tarantino. She
18 mentions Pellegrino warned her, do not tell your husband.
19 That has to be part of cross-examination because
20 he was the first. Tarantino was the second. They didn't
21 tell you that. In her debriefing, that is what she said,
22 that he warned her, they were good friends, Scott, him and
23 her. Don't tell your husband. He is in jail. He
24 shouldn't know these things. We can handle it ourselves.
25 THE COURT: Okay, all right.

M. Mulligan-Direct/Flynn

1335

1 What is your response?
2 MR. FLYNN: Look, again, your Honor, the reason
3 we are here is because Mr. Rosen objected to a leading
4 question.
5 The reason I asked the question in that manner,
6 it was to avoid mention of Mr. Pellegrino.
7 He can bring up Mr. Pellegrino if he wants. I
8 would just -- any mention of Mr. Pellegrino should be
9 limited not to the fact that she gave the letter to him,
10 but also Pellegrino and Tarantino, which she always
11 maintained, both told her not to mention the letter to
12 Scott Mulligan in prison.
13 THE COURT: I will allow him to bring out
14 Mr. Pellegrino.
15 You are calling him as a witness?
16 MR. ROSEN: I may, I may.
17 THE COURT: I will allow you to bring out that
18 there was a conversation with Pellegrino not to mention
19 the letter also and that conversation occurred first.
20 I really don't feel it is necessary to get into
21 her giving the letter to Scott Pellegrino -- Keith
22 Pellegrino, rather, to give to James Froccaro.
23 MR. ROSEN: Okay.
24 I will just ask the one question: Did you give
25 the letter to Pellegrino?

M. Mulligan-Direct/Flynn

1336

1    Yes.
2    I will stop right there.
3    THE COURT:  What is the point of that?
4    MR. FLYNN:  What is the point of that?
5    MR. ROSEN:  It shows the trust that she had in
6  Pellegrino.  That when he said to her originally, don't do
7  anything, don't let Scott know, I'll handle it.
8    THE COURT:  I don't think that was her
9  testimony.
10    MR. ROSEN:  It will be.
11    MR. FLYNN:  No.  Your Honor precluded him from
12  getting into that specifically.
13    THE COURT:  I want to stay away from the
14  attorney issue.
15    MR. ROSEN:  I will, I will.  I will not ask a
16  question about Froccaro.  I just want to put the letter in
17  Keith Pellegrino's hand.  That is it.  That is where I'll
18  stop.
19    MR. FLYNN:  Your Honor precluded this.  I didn't
20  open any door as to this.
21    MR. ROSEN:  Sure you did.
22    MR. FLYNN:  I did not.
23    THE COURT:  Please don't bicker back and forth,
24  gentlemen.  This is a courtroom.
25    MR. FLYNN:  Your Honor, in fact, she has not

M. Mulligan-Direct/Flynn

1337

1  even mentioned Mr. Pellegrino's name in her testimony.
2    THE COURT:  She has not?
3    MR. FLYNN:  Not once.
4    MR. ROSEN:  Because you told her not to.
5    THE COURT:  She obviously mentioned him in the
6  hearing before the Court.
7    Let's move on.
8    You can ask her about what, if anything, the
9  defendant said to her about the letter.
10    MR. FLYNN:  All right.
11    (Continued on next page.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

M. Mulligan-Direct/Flynn

1338

1    (Whereupon, the following takes place in open
2  court.).
3    THE COURT:  The objection is sustained.
4  **Q**  What if anything did the defendant say to you in your
5  kitchen in January of 2003, Mrs. Mulligan, about the
6  letter?
7  **A   He said he got one, too.**
8    **And I was concerned because there was a**
9  **deadline, and it had passed.**
10    **He said to me nothing happened yet, so it is**
11  **okay.**
12  **Q**  Did the defendant say anything to you about informing
13  your husband about the letter?
14  **A   No.**
15  **Q**  Did you tell Scott about the letter -- I'm sorry.
16    Did you tell your husband, Mr. Mulligan, about
17  the letter while he was in prison?
18  **A   Never.**
19  **Q**  Did you not tell your husband, Mr. Mulligan, about
20  the letter based on some conversation you had with the
21  defendant?
22  **A   Yes.**
23  **Q**  What did the defendant say to you?
24    MR. ROSEN:  Judge, he --
25    THE COURT:  Overruled.

M. Mulligan-Direct/Flynn

1339

1  **A   Not to tell Scott.**
2  **Q**  Why?  Why did he say that?  What did he say?
3    MR. ROSEN:  Objection to state of mind of
4  someone else.
5    THE COURT:  Tell us what the conversation was,
6  when it occurred, and so forth.
7    THE WITNESS:  He told me not to tell him because
8  he was in prison and he didn't want him to worry about
9  that.  And also because I was home alone with my son.
10  **Q**  Mrs. Mulligan, I would like to direct your attention
11  now to August of 2003.
12    During that month do you recall becoming aware
13  that Vincent Gargiulo had been murdered?
14  **A   Yes.**
15  **Q**  Where was your husband at the time?
16  **A   He was in prison.**
17  **Q**  How did you first learn that Vincent Gargiulo was
18  dead?
19  **A   My friend Keith Pellegrino called me.**
20  **Q**  Who is Keith Pellegrino?
21  **A   He is a good friend and he is also a business**
22  **partner.**
23  **Q**  In 2003 -- in August of 2003 did you also have an
24  understanding that Mr. Pellegrino was a business partner
25  of the defendant's?

M. Mulligan-Direct/Flynn

1340

1 **A** No.

2 **Q** Well, in August of 2003 was Mr. Pellegrino a friend

3 of the defendant's as well?

4 **A** Yeah.

5 **Q** Did Mr. Pellegrino also own Synergy Gyms?

6 **A** Yes.

7 **Q** To the extent you can recall -- when in relation to

8 Mr. Gargiulo's death did Mr. Pellegrino call you?

9 **A** The same day.

10 **Q** And after receiving this call from Mr. Pellegrino,

11 did you speak to your husband?

12 **A** Yes, I did.

13 **Q** Was that conversation in person or over the phone?

14 **A** It was over the phone.

15 **Q** And while your husband was in prison in

16 Massachusetts, how often did you speak with him?

17 **A** Every day.

18 **Q** When in relation to Mr. Pellegrino's initial phone

19 call regarding Vinnie's death did you speak to your

20 husband in prison?

21 **A** The same day.

22 **Q** And what, if anything, did you say to Scott Mulligan

23 on the phone that day?

24 **A** That I had just found out that Vinnie had died.

25 **Q** And without telling us what your husband said to you,

M. Mulligan-Direct/Flynn

1341

1 the words, what was his reaction?

2 **A** He was upset.

3 **Q** Again, without telling us exactly -- withdrawn.

4     Without telling us what your husband,

5 Mr. Mulligan, said to you on the phone, did he give you

6 certain directions? Did he ask you to do something?

7 **A** Yes.

8     To find out -- find out how he died.

9 **Q** As a result of -- as a result of that conversation

10 with your husband, when he asked you how -- to find out

11 how Vinnie died, what did you do?

12 **A** I called Keith Pellegrino and asked him if he knew

13 how he died.

14 **Q** How many times did you call Mr. Pellegrino?

15 **A** Several times.

16 **Q** Over the span of how many days?

17 **A** Just that same two days.

18 **Q** And were you eventually able to learn -- well, did

19 you eventually come to find out how Mr. Gargiulo had been

20 killed?

21 **A** Yes.

22 **Q** Did you attend Vinnie's funeral or wake?

23 **A** Yes, I did.

24 **Q** Where was it?

25 **A** It was in Brooklyn.

M. Mulligan-Direct/Flynn

1342

1 **Q** With whom, if anyone, did you go to the wake with?

2 **A** I went with Keith Pellegrino.

3 **Q** Did you see the defendant at Mr. Gargiulo's wake?

4 **A** Yes, I did.

5 **Q** Did you speak with the defendant at Mr. Gargiulo's

6 wake?

7 **A** I said hello.

8 **Q** But shortly after -- shortly after Mr. Gargiulo's

9 wake, did you speak with the defendant again?

10 **A** Yes.

11 **Q** Where did this conversation take place?

12 **A** At my house in Bellmore.

13 **Q** How long after Vinnie's wake did you have this

14 conversation with the defendant at your house in Bellmore?

15 **A** Shortly after, in the same week.

16 **Q** Mrs. Mulligan, is your husband, Scott Mulligan,

17 currently incarcerated?

18 **A** Yes, he is.

19 **Q** When was he arrested by the FBI in connection with

20 this case?

21 **A** December -- December of 2011, two days before

22 Christmas.

23 **Q** And was he -- has he been charged with murder?

24 **A** Yes, he has.

25 **Q** By the United States Attorney's Office?

M. Mulligan-Direct/Flynn

1343

1 **A** Yes.

2 **Q** Has he pled guilty to that charge?

3 **A** Yes, he did.

4 **Q** Does he face a life sentence, a possible life

5 sentence?

6 **A** Yes.

7 **Q** When he was arrested two days before Christmas by the

8 FBI, were you upset?

9 **A** Very upset.

10 **Q** After he was arrested and charged with murder, were

11 you thinking clearly?

12 **A** No, I wasn't.

13 **Q** Immediately after your husband's arrest, or a short

14 time after your husband's arrest, were you questioned by

15 the federal government concerning your knowledge of the

16 defendant?

17 **A** Yes, I was.

18 **Q** And during that questioning soon after your husband's

19 arrest and charging, could you recall the specifics of the

20 conversation you had with the defendant in August of 2003

21 in Bellmore, which you are about to tell the jury about

22 now?

23 **A** Yes.

24 **Q** At first could you recall the specifics?

25 **A** No, I didn't.

M. Mulligan-Direct/Flynn

**1344**

1  Q   Have you spoken to your husband, Mr. Mulligan, in
2  prison, since he had been incarcerated now?
3  A   **Yes.**
4  Q   And how often do you speak with your husband in
5  prison now?
6  A   **Every day.**
7  Q   Have you discussed with your husband the events of
8  August of 2003 with your husband -- withdrawn.
9         Have you discussed the events of August 2003
10 with your husband over the jail telephone since he has
11 been incarcerated?
12 A   **No.**
13 Q   Have you talked about your conversation with the
14 defendant in August of 2003 with Scott Mulligan since he
15 has been in prison over the phone?
16 A   **Yes, I did.**
17 Q   And during those conversations, or during at least
18 one conversation that you had with your husband on the
19 jail telephone, did he attempt to refresh your
20 recollection as to what had occurred in your house in
21 Bellmore in August?
22 A   **Yes, he did.**
23 Q   Has that conversation with your husband helped you to
24 remember your conversation with Chris Tarantino at your
25 home in Bellmore in August of 2003?

M. Mulligan-Direct/Flynn

**1345**

1  A   **Yes, it did.**
2  Q   And after the initial shock of your husband's arrest,
3  and in pleading guilty to murder, have you had a chance to
4  reflect on the summer of 2003 over the last four months?
5  A   **Yes.**
6  Q   As you sit here today, do you have an independent
7  recollection of your conversation with the defendant in
8  your home in Bellmore that you are about to tell the jury
9  about?
10 A   **Yes, I do.**
11 Q   And has the government -- has anyone from the
12 government told you or instructed you how to testify here
13 today in this case?
14 A   **No.**
15 Q   Has your husband instructed you or told you how to
16 testify in this case today?
17 A   **No.**
18 Q   Has anyone promised you anything with respect to your
19 husband and the sentence he will receive as a result of
20 his guilty plea to the murder charge?
21 A   **No.**
22 Q   When the defendant came to your home in August of
23 2003 after Vinnie's wake, did you invite him in?
24 A   **Yes.**
25 Q   Did you engage him in a conversation?

M. Mulligan-Direct/Flynn

**1346**

1  A   **Yes.**
2  Q   Where in your home did this conversation take place?
3  A   **Same place, in my kitchen.**
4  Q   And where were you in relationship to the defendant?
5  A   **I was standing.**
6  Q   And what about him?
7  A   **I was in the kitchen.**
8  Q   And what about him?
9  A   **He was sitting.**
10 Q   And who was home at the time besides the two of you?
11 A   **My mom and my son.**
12 Q   And where was that?
13 A   **Downstairs.**
14 Q   What was the first thing that you and the defendant
15 talked about during this conversation?
16 A   **Umm, the gym.**
17 Q   Okay.
18        Were you -- were the Mulligans and the
19 Tarantinos together within the gyms at this point?
20 A   **Yes.**
21 Q   To the best of your recollection, what did you and he
22 talk about with respect to the business of the gyms?
23 A   **Just talking about construction, things that my**
24 **husband had, you know, told me to tell him, instructions**
25 **as to business related, employees.**

M. Mulligan-Direct/Flynn

**1347**

1  Q   Well, you testified that Mr. Mulligan had given you
2  certain instructions to tell the defendant about the gyms.
3  A   **Yes.**
4  Q   And when you did that, how did the defendant respond?
5  A   **Umm, not very good.  He just said, well, tell Scott**
6  **to let me take care of the business.  The gym will be here**
7  **when he comes home.**
8  Q   And did that annoy you?
9  A   **Yes, it did.**
10 Q   Why?
11 A   **Because the way he said it, it upset me.  Because my**
12 **husband is very smart and he made that business.**
13 Q   Okay.
14        After you two did -- after you and the defendant
15 discussed the gyms, the business, did Mr. Tarantino say
16 anything else to you?
17 A   **Yes.**
18 Q   What did he say?
19 A   **He said, and tell him to stop asking questions about**
20 **Vinnie.**
21 Q   What was your reaction -- what reaction, if any, did
22 you have to that statement?
23 A   **I was shocked, speechless, scared.**
24 Q   And as you sit here today, you have a specific
25 recollection of that conversation?

M. Mulligan-Direct/Flynn

1348

1  A    Yes, I do.  I'll never forget it.
2  Q    How much longer did the defendant stay at your home
3  after he said that?
4  A    A couple of minutes.
5  Q    Have you ever had any further conversations with
6  regard to Mr. Gargiulo with the defendant since that day?
7  A    Never.
8  Q    At some point after this conversation with the
9  defendant in which he told you to tell Mr. Mulligan to
10 stop asking questions about Vinnie, did you see your
11 husband physically?
12 A    Yes, I did.
13 Q    And where did you see him?
14 A    In prison.
15 Q    And, again, during this period of time, where was
16 your husband incarcerated?
17 A    In Massachusetts, Devans.
18 Q    To the best of your recollection, approximately how
19 long after the defendant was in your home did you see
20 Mr. Mulligan?
21 A    A few days after.
22 Q    How did you get to Massachusetts?
23 A    I drove.
24 Q    All right.
25        Did you go with anyone?

M. Mulligan-Direct/Flynn

1349

1  A    I went with my mom and my son.
2  Q    And were you able to see Mr. Mulligan at the Devans
3  Correctional Institute when you went up to see him?
4  A    Yes.
5        MR. ROSEN:  Can we have a time period, Judge?
6        THE COURT:  I believe it has already been
7  mentioned.
8        But specifically can you tell us when this
9  occurred, when you drove up on this trip to see your
10 husband?
11 Q    In relation to -- when in relation to the defendant's
12 visit to your home did you go see Scott Mulligan in
13 prison?
14 A    It was a few days after.
15 Q    And you already testified that Mr. Mulligan -- I'm
16 sorry, withdrawn.
17        You already testified that the defendant was in
18 your home a few days after the wake, Vincent Gargiulo's
19 wake; is that correct?
20 A    Yes.
21 Q    And that would be in August of 2003; is that correct?
22 A    Yes.
23 Q    Thank you.
24        For how long were you able to see Scott Mulligan
25 when you went up to see him personally?

M. Mulligan-Direct/Flynn

1350

1  A    Like for an hour.
2  Q    What sort of room were you and Mr. Mulligan in when
3  you saw him?
4  A    It was a large room, like a gymnasium.
5  Q    All right.
6        What was the layout of the gymnasium?
7  A    It was an open room and there were chairs lined up,
8  like in rows.  And we could sit next to each other.
9  Q    Were the two of you alone?
10 A    No.
11 Q    Were there other people in there?
12 A    Yes.
13 Q    Who?
14 A    Other inmates with their family.
15 Q    Was your mother and your son with you at this time?
16 A    Yes, they were.
17 Q    Were they sitting next to you and your husband?
18 A    No, they were in a playroom.
19 Q    There was a playroom?
20 A    Yes.
21 Q    Did you engage in semiprivate conversation with your
22 husband in that gymnasium?
23 A    Yes.
24 Q    Okay.
25        And during this conversation, did you tell the

M. Mulligan-Direct/Flynn

1351

1  defendant -- excuse me -- did you tell your husband
2  anything about your conversation with Mr. Tarantino the
3  week before, a few days before?
4  A    Yes.
5  Q    What did you -- how did you start that conversation
6  with Mr. Mulligan?
7  A    About the conversation we had about the gyms.
8  Q    Okay.
9        What did you say about the gyms?
10 A    Well, I told him he said, you know, just tell him to
11 sit tight.  Don't worry, I'm taking care of the gym and
12 when he gets home the gym will be there.
13 Q    So you related what Mr. Tarantino told to your
14 husband?
15 A    Yes.
16 Q    And when you said that about the gyms from
17 Mr. Tarantino to your husband, were you able to observe a
18 reaction by Scott Mulligan?
19 A    Yes.
20 Q    What was his reaction when you told him what the
21 defendant said about the gym?
22 A    He was pissed off.
23 Q    Sorry?
24 A    He was pissed off.
25 Q    After you told your husband about the defendant's

M. Mulligan-Direct/Flynn

1352

1 comments about the gym, did you say anything else to your
2 husband?
3 A    Yes.
4 Q    While you were there at Devans?
5 A    Yes, I did.
6 Q    And what did you say?
7 A    I told him that he also said stop asking questions
8 about Vinnie.
9 Q    Without telling us what -- were you able to observe a
10 reaction from your husband when you passed along that
11 message from Chris Tarantino?
12 A    Yes.
13 Q    Without telling us any words that came out of
14 Mr. Mulligan's mouth, what was that reaction?
15        MR. ROSEN:  Judge, I have no objection to
16 hearing --
17        THE COURT:  Please come up.
18        If you have no objection, it is not necessary to
19 come up.  If you do have an objection, come up.
20        MR. ROSEN:  I do not.
21 Q    What was your husband's reaction when you passed
22 along Chris Tarantino's message?
23 A    He was silent.
24 Q    After you passed along that message and Scott
25 Mulligan became silent, did you ever speak with your

M. Mulligan-Direct/Flynn

1353

1 husband again while he was in prison about Vincent
2 Gargiulo, or his murder?
3 A    No.
4 Q    In the weeks and months that followed Mr. Gargiulo's
5 murder and your conversation with the defendant, did you
6 begin to have anxieties?
7 A    Yes.
8 Q    Why?
9 A    Because I was by myself with my son and my mom alone
10 at home.
11 Q    And was your anxiety such that you after Vinnie's
12 murder sought professional help for?
13 A    Yes, I did.
14 Q    What sort of help?
15 A    Excuse me?
16 Q    What sort of help?
17 A    Psychiatrist.
18 Q    You saw a therapist?
19 A    Yes.
20 Q    And in the course of seeing that therapist, were you
21 prescribed certain medications to help you alleviate your
22 anxiety and your fear?
23 A    Yes.
24 Q    And what sorts of medications were you prescribed?
25 A    Xanax for antianxiety and Celebrex for depression,

M. Mulligan-Direct/Flynn

1354

1 and Lunesta, which is a sleeping aid.
2 Q    Do you continue to take some of those medications
3 today?
4 A    Yes, I do.
5 Q    And do any of those medications affect your ability
6 to think or remember the events of 2003 -- well, do they
7 affect your ability to remember events?
8 A    No.
9 Q    Do they affect your ability to think clearly?
10 A    No.
11 Q    Do you have any doubt about the events that you
12 testified to today about in 2003?
13 A    No.
14 Q    When, to the best of your recollection, was your
15 husband released from prison for the marijuana conviction?
16 A    It was 2004.
17 Q    And after your husband was released from prison in
18 Massachusetts in 2004, did he come straight home?
19 A    No, he did not.
20 Q    Where did he go first?
21 A    He went to a halfway house.
22 Q    And where was that halfway house?
23 A    It was in West Palm Beach.
24 Q    And by this point in time, August of 2004, where were
25 you living?  Where were you and your son living?

M. Mulligan-Direct/Flynn

1355

1 A    In Florida.
2 Q    And had you moved?
3 A    Yes.
4 Q    Did there come a time after he was released -- after
5 your husband was released from prison in Massachusetts
6 when you and your husband did speak about the letter you
7 had received in January of 2003 from Vincent Gargiulo?
8 A    After he was released, yes.
9 Q    All right.
10        Tell me about that conversation.
11 A    He was very mad.  He was very upset at me.
12 Q    Well, who brought up the letter first?
13 A    He did.
14 Q    Okay.
15        So when you first -- when you saw him after he
16 was released from prison, he already knew about the letter
17 at that point?
18 A    Yes, he knew.
19 Q    Again, without telling us what Mr. Mulligan said to
20 you about the letter after he was released from prison,
21 did you have an opportunity to observe his demeanor, his
22 reaction?
23 A    Yes.
24 Q    And what was it?
25 A    He was very mad at me that I never mentioned the

**1356**

1    letter to him while he was incarcerated.

2    **Q**    And after Scott got mad at you, did you say anything

3    to him in response?

4    **A**    **I said that I just didn't want to upset you.  There**

5    **is nothing you could have done.**

6        MR. FLYNN:  No further questions, your Honor.

7    Thank you.

8        THE COURT:  It is time to take our morning

9    break, and we will see you folks in 15 minutes.

10       Thank you.

11

12       (Whereupon, a recess was taken.)

13

14

15

16

17

18

19

20

21

22

23

24

25

**1357**

1        THE COURT:  Before the witness comes up on the

2    stand again, let me indicate a couple of things.

3        1, the jurors, you may have seen as I was

4    walking out, were thanking me for the cookies.  I don't

5    think it warrants any discussion.  If you have an issue,

6    let me know.

7        MR. ROSEN:  I do not.

8        THE COURT:  In terms of your continuing

9    examination of the witness, Mrs. Mulligan, Mr. Flynn,

10   there are certain things that you didn't indicate, certain

11   facts, not so much with the last question, but you were

12   directly aiming it at Mr. Tarantino as having a

13   conversation.  I understand that I had mentioned to

14   counsel yesterday that I didn't want to get into Keith

15   Pellegrino giving the letter, for the purposes of giving

16   the letter to an attorney.  I think that's an appellate

17   issue.  There is no reason to go into it now.

18       I will, however, allow you, Mr. Rosen, to

19   examine about Keith Pellegrino and any conversation she

20   had with him.  But stay away from going into who she was

21   supposed to give it to.

22       MR. ROSEN:  I will.

23       THE COURT:  All right.  Let's bring in Mrs.

24   Mulligan and we will get started.

25       How much longer -- rather, how long do you think

**M. Mulligan - cross/Rosen**

**1358**

1    your cross will be?

2        MR. ROSEN:  Not that long.

3        THE COURT:  Okay.

4        We may be able to start with Scott Mulligan this

5    morning?

6        MR. ROSEN:  He is in the building.

7        Maybe.

8        THE COURT:  I'm just asking in terms of timing.

9        (The witness, Manon Mulligan retakes the stand.)

10       (The jury enters the courtroom.)

11       THE COURT:  Please be seated.  We are ready to

12   resume.

13   CROSS-EXAMINATION

14   BY MR. ROSEN:

15   **Q**    Mrs. Mulligan, my name is Steve Rosen, I represent

16   Chris Tarantino.  We had an opportunity to meet in

17   courtroom yesterday afternoon, did we not?

18   **A**    **Yes, we did.**

19   **Q**    That was the first time I had an opportunity to

20   examine you in a legal proceeding?

21   **A**    **Yes.**

22   **Q**    The government arrested your husband back on 12/23 of

23   2011, correct?

24   **A**    **Yes.**

25   **Q**    They charged him with murder, you have testified?

**M. Mulligan - cross/Rosen**

**1359**

1    **A**    **Yes.**

2    **Q**    And that murder carries a life sentence, does it not?

3    **A**    **Yes, it does.**

4    **Q**    Have you had discussions with your husband in regards

5    to his hopes that his cooperation will give him a sentence

6    less than life?

7    **A**    **Yes.**

8    **Q**    And have you talked to him in regards to you helping

9    him try to attain that goal of reducing his sentence from

10   life imprisonment?

11   **A**    **No.**

12   **Q**    Why are you testifying here, if not to help your

13   husband get a better sentence?

14   **A**    **I'm testifying here to tell the truth.**

15   **Q**    Well, we hope so.  You swore under oath to tell the

16   truth?

17   **A**    **Yes.**

18       MR. FLYNN:  Objection.

19       THE COURT:  Sustained.

20   **A**    **I'm here to testify for Vincent Gargiulo.**

21   **Q**    You are here to testify for Vincent Gargiulo?

22   **A**    **Well, that's what I'm here for.**

23   **Q**    Is your testimony, if you know this, going to be

24   taken into consideration by the government when they

25   recommend a sentence for your husband?

M. Mulligan - cross/Rosen

1360

1  A    I believe so.
2  Q    So you are here to testify to help reduce the
3  sentence for your husband after his plea of guilty to
4  murder?
5  A    Yes, I'm supporting my husband.
6  Q    And in supporting your husband, you have agreed to
7  testify?
8  A    I got subpoenaed.
9  Q    You wouldn't have come in without a subpoena?
10        MR. FLYNN:  Objection.
11        THE COURT:  Sustained.
12 Q    Did you receive a subpoena?
13        THE COURT:  The objection is overruled on the
14 last question.
15 Q    Would you have come in here voluntarily without a
16 subpoena?
17        MR. FLYNN:  Objection.
18        THE COURT:  Overruled.  The question was did she
19 receive a subpoena, I believe she said yes.  The objection
20 was sustained on the other question.
21 A    I received a subpoena.
22 Q    Would you have come in voluntarily to help your
23 husband?
24 A    Of course I would.
25 Q    So the subpoena doesn't mean anything --

M. Mulligan - cross/Rosen

1361

1        MR. FLYNN:  Objection.
2        THE COURT:  Sustained.
3  Q    -- to you?
4        MR. FLYNN:  Objection.
5  A    Yes, it means something.
6        THE COURT:  No, no.  Don't answer that one.
7  Q    What does the subpoena mean to you?
8  A    That I have no choice to come to court.
9  Q    I thought you were coming anyway, yes or no?
10 A    I don't want to be here.
11 Q    You don't want to help your husband?
12 A    Of course I want to help him, but I'm scared, I don't
13 want to do this.
14 Q    Your husband was arrested on December 23, 2011.
15 After that, when was the next time you met any
16 representatives of the United States government to discuss
17 your testimony?
18 A    Shortly after his arrest.
19 Q    Okay.  Give us a date and time and place.
20 A    I met them here.
21 Q    When you say here, you mean in this building?
22 A    Yes, in this building.
23 Q    You came up from Florida?
24 A    Yes.
25 Q    At your own expense or their expense?

M. Mulligan - cross/Rosen

1362

1  A    My expense.
2  Q    Okay.  And you came to the offices of the United
3  States Attorney here in this building?
4  A    Yes.
5  Q    Was Agent Schelhorn present?
6  A    Yes, he was.
7  Q    And he is the fellow who went to Miami or went to
8  Delray Beach and arrested your husband?
9  A    Yes.
10 Q    Was Mr. Sean Flynn present?
11 A    No.
12 Q    Was Mr. Miskiewicz present?
13 A    No, not at my house in Florida.
14 Q    I apologize.  My fault, here in this building.
15        Schelhorn was there in Florida at the time of
16 the arrest.  When you came after the arrest to talk with
17 the representatives of the United States government, who
18 was present at that meeting?
19 A    Mr. Schelhorn and Mr. Flynn.
20 Q    How about Mr. Miskiewicz here?
21 A    Not the first time I met him.
22 Q    So you had a conversation with them, correct?
23 A    Yes, I did.
24 Q    Was your husband present?
25 A    No, he wasn't.

M. Mulligan - cross/Rosen

1363

1  Q    You had a conversation, and is it your testimony,
2  under oath today, that at the first conversation you had
3  with them, that you brought up the fact that Christian
4  Tarantino had also received a letter?
5  A    Yes.
6  Q    You did?
7  A    Yes.
8  Q    Okay.
9        Do you remember the date of the interview?
10 A    No, I don't.
11 Q    Do you remember -- was it January or December?
12 A    It was definitely January.
13 Q    Could you give us the approximate date?
14 A    It was after the holidays, because it was Christmas
15 and New Year's, so it was definitely after New Year's.
16 Q    I'm asking you to recall events that took place this
17 year, correct?
18 A    Yes.
19 Q    And your recollection of those -- these events back
20 in 2003 are more vivid to you than what took place this
21 year?
22        MR. FLYNN:  Objection.
23        THE COURT:  Sustained.
24 Q    Do you remember the date that you came this year to
25 meet with Mr. Flynn and Agent Schelhorn?

M. Mulligan - cross/Rosen

1364

1 A   **Not the specific date, no.**
2 Q   Did you go there in the afternoon or morning?
3 A   **I went there in the afternoon.**
4 Q   How many hours did you spend with them?
5 A   **An hour or two.**
6 Q   An hour or two?
7 A   **Yes.**
8 Q   Which one was it, an hour or two?
9 A   **An hour and a half.**
10 Q   Did you tell them on that date -- by the way, have
11 you ever seen the notes that Agent Schelhorn took that
12 day?
13 A   **No, I never did.**
14 Q   Did they offer to show them to you?
15 A   **No.**
16 Q   If I showed you those notes, would they help you
17 recollect whether or not you told them on that date that
18 Christian Tarantino had also received a letter?
19       MR. FLYNN:  Objection.
20       THE COURT:  Sustained.
21 Q   Would it refresh your recollection if I showed you
22 the agent's notes of what he said you said that day?
23       MR. FLYNN:  Objection.
24       THE COURT:  Sustained.  The jury is instructed
25 to disregard the question.

M. Mulligan - cross/Rosen

1365

1 Q   On that day, did you tell him -- tell Mr. Flynn and
2 Agent Schelhorn:   I dated CT on and off for approximately
3 one year?
4       MR. FLYNN:  Objection.
5 Q   Did you tell them that?
6       THE COURT:  Overruled.
7 A   **No, about eight to ten months.**
8 Q   So you didn't say one year?
9 A   **No, under a year.**
10 Q   That you met CT, which is Christian Tarantino, at the
11 China Club?
12 A   **Yes.**
13       THE COURT:  Please approach, Mr. Rosen, for a
14 moment.
15       (Continued on the next page.)
16
17
18
19
20
21
22
23
24
25

M. Mulligan - cross/Rosen

1366

1       (Sidebar.)
2       THE COURT:  Mr. Rosen, I have said on a number
3 of occasions, 302s are not verbatim statements, they are
4 not to be used to cross-examine the non-author of the
5 statement.  And you can't go through the entire 302 and
6 say:  Did you tell him this, did you tell him this,
7 because it's all consistent then in the end to say but you
8 never told them that you had spoken to Christian Tarantino
9 about the letter.  Okay?
10       You just can't do that.
11       MR. ROSEN:  I will be calling the agent then.
12       THE COURT:  You can call the agent, that will be
13 fine.  Let's move on.
14       (Sidebar concluded.)
15       (Continued on the next page.)
16
17
18
19
20
21
22
23
24
25

M. Mulligan - cross/Rosen

1367

1       (In open court.)
2 BY MR. ROSEN:
3 Q   Approximately what year did you meet Christian
4 Tarantino at the China Club?
5 A   **1994.**
6 Q   You dated him for about a year, a little less than a
7 year, and in 1996 you married Scott Mulligan, correct?
8 A   **Yes, I did.**
9 Q   What was the date of your wedding?
10 A   **April 25.**
11 Q   Of what year?
12 A   **1996.**
13 Q   What type of relationship did you have with Mr.
14 Tarantino?
15 A   **Friend relationship.**
16 Q   Were you lovers?
17 A   **Before my husband, yes.**
18 Q   I just asked about Mr. Tarantino.  Were you lovers
19 with Mr. Tarantino?
20 A   **Yes, I was.**
21 Q   And you loved him, did you not?
22 A   **It was a casual relationship, more sexual**
23 **relationship.**
24 Q   You never told him you loved him and wanted to marry
25 him?

M. Mulligan - cross/Rosen

**1368**

1    A    Never.

2    Q    Did you do a lot of drugs in 1994 with Mr. Tarantino,

3    Scott Mulligan, Vinnie Gargiulo and others?

4    A    **Some.**

5    Q    When you say some, let's break it down.  When you

6    were with Mr. Tarantino, himself, what kind of drugs of

7    choice did you use?

8    A    **Ecstasy.**

9    Q    What else?

10    A    **That's it.**

11    Q    You didn't use powdered cocaine?

12    A    **No.**

13    Q    When did you start using powdered cocaine in the

14    '90s?

15            MR. FLYNN:  Objection.

16            THE COURT:  Sustained.

17            MR. ROSEN:  It goes --

18            THE COURT:  You can ask the question did you use

19    cocaine in the '90s.

20    Q    Did you use -- besides Ecstasy in the '90s, did you

21    use powdered cocaine?

22    A    **Some occasion.**

23    Q    Did you do that with your husband?

24    A    **Yes, I did.**

25    Q    Did you do that with Mr. Tarantino?

M. Mulligan - cross/Rosen

**1369**

1    A    **No.**

2    Q    Did you do it with Mr. Gargiulo?

3    A    **No.**

4    Q    Who would you say your most intimate friends were in

5    the 1990s after you married Scott Mulligan?

6    A    **Keith Pellegrino, Steve Raganas, Vinnie Gargiulo,**

7    **Chris Tarantino.**

8    Q    Vinnie Gargiulo was a close friend, correct?

9    A    **Yes.**

10    Q    And you said he used and abused alcohol and drugs,

11    correct?

12    A    **That's what I found out.**

13    Q    You were his good friend.  Didn't you observe him --

14    A    **No, I was in the hospital when he was on drugs and he**

15    **had mental problems.**

16    Q    You were in the hospital?

17    A    **Yes, I was.**

18    Q    For how long?

19    A    **I was in the hospital for three months, I was on**

20    **bedrest with my son, pregnancy.**

21    Q    The three months -- we are talking about the decade

22    of the '90s.  Excluding those three months, did you use

23    drugs with Vincent Gargiulo?

24            MR. FLYNN:  Objection to form.

25            THE COURT:  I think the three months were in

M. Mulligan - cross/Rosen

**1370**

1    what year are talking about?  You had your son in?

2            THE WITNESS:  I had my son in 2002.  I was in

3    the hospital in 2002.

4            THE COURT:  All right.

5    Q    We are talking about in the '90s.

6            THE COURT:  Forget 2002, let's talk about the

7    '90s.

8    Q    Did you use drugs with Vincent Gargiulo?

9    A    **No, I never did.**

10    Q    Did you see him abuse drugs?

11    A    **No.**

12    Q    At all?  You didn't see Vinnie Gargiulo at any

13    parties with Christian Tarantino and your husband, Scott

14    Mulligan, abuse alcohol and drugs in the '90s?

15    A    **Alcohol, but no drugs.**

16    Q    After your first meeting with the government and you

17    don't remember the date, do you remember the month?

18    A    **January, I said it was after New Year's.**

19    Q    I thought you said you weren't sure.

20    A    **No, I know it was January.**

21            MR. FLYNN:  Objection.

22    Q    After that date, when was the next time you met with

23    Mr. Flynn in this building?

24    A    **It was in March.**

25    Q    Do you remember the date?

M. Mulligan - cross/Rosen

**1371**

1    A    **It was -- I don't remember.**

2    Q    If I told you it was March 6, would I be accurate?

3    A    **I don't remember.**

4    Q    Now, that was just a couple of months ago.  You don't

5    remember the date that you saw Mr. Flynn?

6            MR. FLYNN:  Objection.

7            THE COURT:  Overruled.

8    A    **I don't remember months -- I don't remember dates,**

9    **but I remember the month.**

10    Q    Did you see him on consecutive days in the month of

11    March?

12    A    **No.**

13    Q    One day, then the next day?

14    A    **No -- yes, I did.**

15    Q    Now, prior to meeting with Mr. Flynn in March of this

16    year and, subsequent or after your January meeting with

17    Mr. Flynn, how many times did you see your husband at the

18    detention facility that he is housed in?

19    A    **You mean after January?**

20    Q    Yeah.  And before March.  So between January and

21    March, how many times in person did you see your husband?

22    A    **Three times.**

23    Q    That would be January 31, 2012?

24    A    **I don't remember the date.**

25    Q    Were you with Thomas Garrett on that date?

M. Mulligan - cross/Rosen

1372

1  A    Yes.

2  Q    So you remember going with Thomas Garrett to the

3  detention center and having a face-to-face conversation,

4  the three of you, at the facility?

5  A    **My son and my mother-in-law were also with us.**

6  Q    I will show you what we can mark as Defense Exhibit

7  F.

8        THE COURT:  If you would, gentlemen, take a look

9  at the document.

10       MR. FLYNN:  Your Honor, the government objects

11  to this.

12       THE COURT:  Come on up.

13       (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

M. Mulligan - cross/Rosen

1373

1        (Sidebar.)

2        THE COURT:  Your objection?

3        MR. FLYNN:  The objection is that the document

4  is hearsay and that there is no inconsistency to how she

5  has testified, and that document, for it to be used as

6  impeachment.  She testified she went to GEO to see her

7  husband in January and that she was accompanied by an

8  individual named Mr. Garrett.

9        MR. ROSEN:  Then she said she went with her

10  family.

11       THE COURT:  They don't sign in?

12       MR. ROSEN:  Sure they do, I have the sign-in of

13  the mother and the child.

14       THE COURT:  They are not underlined.  If they

15  have a face-to-face meeting, then they sign in.

16       MR. ROSEN:  No.  Any meeting.

17       THE COURT:  Any meeting?

18       So even though the son is eight years old, he

19  signs in?

20       MR. ROSEN:  He is listed.  I think the mother

21  signs for him.  We have those sign-in sheets as well.

22       THE COURT:  They are in a different group?

23       MR. ROSEN:  I segregated them.  I'm only dealing

24  with January to March.

25       THE COURT:  How is it inconsistent?

M. Mulligan - cross/Rosen

1374

1        MR. ROSEN:  She said her family was with her at

2  the time.  They weren't.  It was only her and Garrett.

3        THE COURT:  So it's consistent that she was

4  there, but you want to use this to compare it against the

5  fact that the mother-in-law and son never signed in?

6        MR. ROSEN:  Correct.

7        THE COURT:  This is relevant to show her lack of

8  memory?

9        MR. ROSEN:  Yes.  And also I'm laying

10  foundations for conversations between her and Garrett and

11  her husband.

12       THE COURT:  Who is Garrett, by the way?

13       MR. ROSEN:  He is supposed to be a business

14  partner of her husband.  His name will be, as the cross

15  goes on, it will become much more understanding of what

16  Mr. Garrett's role is.

17       THE COURT:  In terms of them being hearsay, I

18  don't think there is any question with regard to there

19  being business records.  Do you want to bring someone in

20  on that?  Then the hearsay exception would be dealt with

21  by defense counsel's proffer that the fact that she and

22  Garrett signed in and her son and mother-in-law didn't

23  means that they either, 1, didn't go with her, or 2, they

24  went with her but didn't go inside the institution.

25       I think that would be a fair question to elicit

M. Mulligan - cross/Rosen

1375

1  now.

2        It's not going in yet until she identifies it.

3        Mr. Rosen, I think you want to amend the way you

4  pronounced the name of the other person you made reference

5  to.

6        MR. ROSEN:  It's Garrett, with a G.

7        THE COURT:  First name Thomas.

8        MR. ROSEN:  Thomas.

9        (Sidebar concluded.)

10       (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (In open court.)

2    THE COURT:  You can show the witness the

3 documents.

4 BY MR. ROSEN:

5    Q    I show you what's been marked Defendant's Exhibit F

6 for identification for the date January 31, 2012.  Do you

7 see the signees that signed in at the detention facility

8 that houses your husband?

9    A    Yes, I see it.

10    Q    Who went with you on January 31 of 2012?

11    A    Mr. Thomas Garrett.

12    Q    Who else?

13    A    And myself.

14    Q    Right.  Your mother and son were not present at that

15 meeting, correct?

16    A    They weren't.  When you asked me the question, you

17 told me we were sitting all together in a table.  That's

18 when my mother-in-law came with my son.  This we were

19 through a glass.

20    Q    So you were able to communicate with your husband on

21 a phone system through a glass?

22    A    Yes.

23    Q    Mr. Garrett was present in the cubicle with you when

24 you spoke to your husband, correct?

25    A    Yes.

1    Q    Now, this was on January 31, 2012, correct?

2    A    Yes.

3    MR. ROSEN:  Judge, I move the exhibit into

4 evidence based upon her recognition of the dates and

5 times.

6    THE COURT:  I understand that.  But ask her the

7 next question with regard to who, if anybody else, also

8 went in to visit Scott Mulligan on than date.

9    Q    I'm showing you what's been marked as Defense Exhibit

10 F for the date January 31.  Did anybody else go in to see

11 Scott Mulligan on that date, according to those records?

12    A    No.

13    Q    I show you what's been marked as part of Exhibit F.

14    MR. ROSEN:  Judge, can we move it in at this

15 time?

16    THE COURT:  The first portion of it can be moved

17 in.

18    Q    I will show you as part of Exhibit F, you see the

19 date February 18, 2012?

20    A    Yes, I do.

21    Q    Who visited Scott Mulligan on that date?

22    A    Myself and Shirley Tevella.

23    Q    Who is that?

24    A    Shirley Tevella, my girlfriend.

25    Q    It was your girlfriend?

1    A    Yes.

2    Q    On that date, did you see him face to face or using

3 the phone and the glass?

4    A    Using the phone and the glass.

5    Q    I show you what's been marked as part of F.  Do you

6 see the date on that log-in sheet?

7    A    Yes, I do.

8    Q    What's the date?

9    A    March 6.

10    Q    Was that the date that you had the meeting with the

11 government prior to you going to the institution?

12    A    I'm not sure if it was before or after.

13    Q    You saw him on consecutive days.  Do you remember

14 whether or not it was March the 7, the second day of your

15 meetings with Mr. Flynn?

16    A    I don't recall.

17    Q    So you would have seen your husband after your

18 debriefing on the 6th, but before your debriefing on the

19 7th, correct?

20    MR. FLYNN:  Objection.

21    Q    If you recall?

22    THE COURT:  Sustained.

23    Q    Do you remember the sequence of events in March,

24 seeing the government, seeing your husband and then seeing

25 the government again?

1    MR. FLYNN:  Objection.

2    THE COURT:  Do you remember it that way?

3    THE WITNESS:  Yes, I do, because I live in

4 Florida, I would take the opportunity to visit my husband

5 and have meetings with them.

6    THE COURT:  Them being the government?

7    THE WITNESS:  Yes, the government, yes.

8    Q    Did you speak about the case with your husband on

9 March the 6th?

10    MR. FLYNN:  Objection.

11    THE COURT:  Overruled.

12    A    This case?

13    Q    Yes.

14    A    I don't recall.

15    Q    You don't recall sitting in a room with your

16 husband --

17    A    I was not sitting in a room.

18    Q    -- and discussing what was going on in the debriefing

19 that you just had that morning or that afternoon?

20    A    I was not sitting in a room.  I was on the phone

21 through a glass.

22    Q    So you are on the phone and you had no conversation

23 whatsoever with your husband concerning what took place

24 that afternoon with the government?

25    MR. FLYNN:  Objection.

M. Mulligan - cross/Rosen

1380

1   THE COURT: Please approach. Come on up.
2       (Sidebar.)
3   THE COURT: Mr. Flynn, what is your objection?
4   It's not privilege, is it?
5   MR. FLYNN: My first objection, your Honor, as
6   to form, what he was asking her to talk about the case,
7   there were two different cases.
8   MR. ROSEN: Come on, you are really getting
9   picky here.
10  THE COURT: I took it to mean this case that's
11  currently going on, that she would have spoken to you
12  about.
13  MR. FLYNN: I know they are intertwined. That
14  was my objection. But she also testified that she doesn't
15  remember, the last --
16  THE COURT: He has the right to probe. This is
17  an important issue.
18  MR. FLYNN: Okay.
19  THE COURT: The objection is overruled.
20      (Sidebar concluded.)
21      (Continued on the next page.)
22
23
24
25

M. Mulligan - cross/Rosen

1381

1       (In open court.)
2   BY MR. ROSEN:
3   Q   You can answer the question.
4   MR. ROSEN: Miss Court Reporter, can you please
5   read the question?
6       (Whereupon, the record was read back.)
7   **A   No, I didn't say I had no conversation.**
8   Q   Well, tell us what your conversation was in
9   discussing what you said to the government that day in
10  regards to Christian Tarantino.
11  **A   I don't recall what I told him what I said, but I**
12  **know he was asking me how I was, if I was nervous and just**
13  **being concerned.**
14  Q   I want to know what you told him about what was said
15  at the meeting by you.
16  **A   Whatever they asked me, that's what I answered, what**
17  **we just talked about.**
18  Q   You are talking about Mr. Flynn asked you questions
19  and you gave him answers?
20  **A   Yes.**
21  Q   In his office?
22  **A   Not in his office, in a courtroom, like a room, a**
23  **meeting room.**
24  Q   And who was present?
25  **A   There was Mr. Schelhorn and Mr. Flynn.**

M. Mulligan - cross/Rosen

1382

1   Q   And did they have a series of questions and answers
2   for you? How did it go in the meeting?
3   **A   No, they asked me to tell my story, how did I meet**
4   **Chris Tarantino, how did I meet my husband. And go on,**
5   **and until this day.**
6   Q   Well, you did that in January, did you not?
7   **A   Yes, I did.**
8   Q   Then you did it again in March, correct?
9   **A   Yes.**
10  Q   And then you did it again the following day in March
11  after you saw your husband, correct?
12  **A   Yes.**
13  Q   At any time since this day, have you had
14  conversations with your husband on the telephone in
15  regards to your testimony here?
16  **A   Not specific of what I have to say, what I'm going to**
17  **say.**
18  Q   Are you sure?
19  **A   No, I'm not sure.**
20  Q   You are not sure that you had the conversations, or
21  you are not sure about the conversations? What is it?
22  **A   I'm not sure about if I had any conversation about**
23  **this.**
24  Q   Well, Mr. Flynn asked you whether or not you had
25  received any instructions from your husband in regards to

M. Mulligan - cross/Rosen

1383

1   what you should say.
2   MR. FLYNN: Objection. Misstates --
3   Q   Do you remember?
4   MR. FLYNN: -- misstates the record.
5   THE COURT: If she remembers it that way or the
6   jury remembers it that way, I will allow the question to
7   be asked.
8   **A   He never gave me an instruction of what to say.**
9   THE COURT: He being Mr. Flynn?
10  MR. ROSEN: I'm sorry.
11  Q   Mr. Mulligan, your husband, did he tell you on the
12  phone anything, what to say in the court room?
13  **A   Yes, to tell the truth.**
14  Q   Did he remind you of things that you had forgotten?
15  **A   Not in -- not in my visit with him.**
16  Q   I'm talking about on the phone.
17  **A   Yes, probably.**
18  Q   Let's talk about the phone. How did he remind you of
19  what facts, while you were on the phone with him, to help
20  you with your testimony before the ladies and gentlemen of
21  the jury?
22  **A   I was very upset.**
23  THE COURT: Can you narrow it down on the phone,
24  approximately?
25  Q   January the 5th at 4:48 in the afternoon. You heard

M. Mulligan - cross/Rosen

1384

1  the tape yesterday.
2  **A   I did hear the tape.**
3        MR. FLYNN:  Objection.
4        THE COURT:  Objection is sustained.  The jury is
5  instructed to disregard that question.
6        Now, let's start this over again.
7        In January of 2012?
8        MR. ROSEN:  That's correct.
9  **Q**   January 5 at 1648 hours.
10       THE COURT:  Now, you have a question of the
11 witness pertaining to a conversation she had with her
12 husband, Mr. Mulligan, ask the question.
13 **Q**   Did you discuss whether or not Christian Tarantino
14 had told you to tell Scott to stop asking questions about
15 Vinnie Gargiulo?
16 **A   Yes, he did.**
17 **Q**   You heard it?
18 **A   Yes, I did.**
19 **Q**   And you told us here this morning, and tell me if I'm
20 wrong:  I will never forget it, what he told me,
21 Christian Tarantino, to say to my husband?
22 **A   No, I didn't say that.**
23 **Q**   You didn't say you will never forget it?
24 **A   I will never forget about --**
25 **Q**   You want us to read back your testimony about what

M. Mulligan - cross/Rosen

1385

1  you said in reference to:  I will never forget it?
2  **A   I will never forget these moments.**
3  **Q**   We were talking about the statements that you went up
4  to Devens and told your husband stop asking questions,
5  Christian says, or Chris says stop asking questions about
6  Gargiulo?
7        MR. FLYNN:  Objection.
8  **Q**   Correct?
9        THE COURT:  Sustained.  Please approach and I
10 will give you the reason why.
11       (Continued on the next page.)

M. Mulligan - cross/Rosen

1386

1        (Sidebar.)
2        THE COURT:  Mr. Rosen, do not mention prior
3  proceedings in that context, at least at this point.
4        Now, the questions are getting convoluted, vague
5  and they are confusing.  So break it down, ask limited
6  questions, which is the best way on cross-examination
7  sometimes.
8        MR. ROSEN:  Yes.  Thank you.
9        (Sidebar concluded.)
10       (Continued on the next page.)

M. Mulligan - cross/Rosen

1387

1        (In open court.)
2  BY MR. ROSEN:
3  **Q**   The conversation that you had with Christian
4  Tarantino about the subject of stop asking Scott -- you
5  should stop asking questions about Vinnie, did that take
6  place in your home in August of 2003?
7  **A   Yes, it did.**
8  **Q**   And who was present in the home when Christian
9  Tarantino told you to tell Scott to stop asking questions
10 about Vinnie?
11 **A   My brother and my son, they were downstairs.**
12 **Q**   They weren't party to the conversation, were they?
13 **A   No, they weren't.**
14 **Q**   So they didn't hear what he had to say, correct?
15 **A   No.**
16 **Q**   And then you went up to Devens in August -- Vinnie
17 passed away on August the 18th, correct?
18 **A   Yes.**
19 **Q**   Some time immediately thereafter you went up to
20 Devens to talk to your husband, correct?
21 **A   Yes.**
22 **Q**   And it was at this meeting with your husband that you
23 told -- is it at that meeting in August of 2003 where you
24 told your husband about the remarks that Christian
25 Tarantino had stated to you in your home, correct?

M. Mulligan - cross/Rosen

**1388**

1  A  Yes.

2  Q  And who did you say you went to Devens with?

3  A  **My mother and my son.**

4      MR. ROSEN:  We will mark this as Exhibit G.

5      THE COURT:  Any objection?

6      MR. FLYNN:  No.

7      MR. ROSEN:  Judge, we would like to introduce

8  the list -- visitor's list for the Federal Correction

9  Institute at Devens as Exhibit G.

10     THE COURT:  All right.  No objection, show it to

11 the witness.  If she recognizes it, it will come in.

12 Q  I show you what's marked in evidence as Defense

13 Exhibit G, the visitor's list at Devens for August of

14 2003.  Tell us who you went with in August of 2003 to see

15 your husband while he was incarcerated in that federal

16 facility.

17     MR. FLYNN:  Objection.  Your Honor.

18     MR. ROSEN:  It's in evidence.

19     THE COURT:  Please come up.  It's not in

20 evidence yet.  Yes, it is in evidence.  Let me see the

21 document, if you would, Mr. Flynn.

22     (Continued on the next page.)

23

24

25

M. Mulligan - cross/Rosen

**1389**

1      (Sidebar.)

2      THE COURT:  This is at Devens.  You brought in a

3  sheet from the GEO.  They have different regulations

4  there, obviously.  She has already testified that in

5  August of 2003 she visited her husband.

6      MR. ROSEN:  With her family.

7      THE COURT:  With her family.

8      MR. ROSEN:  And she didn't.

9      MR. FLYNN:  I don't think her testimony was in

10 August of 2003.  I think her testimony was shortly

11 thereafter when Vinnie was murdered.  It happens to be

12 September 4.

13     THE COURT:  She said within a week.

14     MR. FLYNN:  Yes, your Honor.

15     THE COURT:  She had a conversation with Chris a

16 couple of days later within a week, she didn't say

17 September.  Now she comes in September --

18     MR. ROSEN:  August 21.

19     THE COURT:  Okay.  Well, that's consistent.  She

20 sees him on August 21.

21     MR. ROSEN:  With Thomas Garrett, not her family.

22     THE COURT:  So she didn't mention Thomas

23 Garrett.

24     MR. FLYNN:  The conversation she is remembering,

25 your Honor, is the one some two weeks later, she goes up

M. Mulligan - cross/Rosen

**1390**

1  after Vinnie's wake, Vinnie is waked a week after his

2  murder, that would put his murder the 25th or 26th.  Then

3  she sees the defendant and goes up shortly thereafter,

4  which would put her smack dab around Labor Day weekend,

5  when she goes up with her mother.

6      MR. ROSEN:  It's not what she said.  I can bring

7  it out.

8      THE COURT:  I think what she said, it was

9  August, whether it was -- she has one here, August 21.

10     MR. ROSEN:  Yes.

11     THE COURT:  Which is consistent with her --

12     MR. FLYNN:  Not to nitpick your Honor, August 21

13 would be right after the murder but before he is waked,

14 before the wake, like in the interim.

15     THE COURT:  Yeah.

16     MR. ROSEN:  They can bring that out.

17     THE COURT:  You can straighten that out.

18     MR. FLYNN:  My objection was to -- my memory of

19 her testimony was that she remembers going, and she

20 testified:  I remember going to visit my husband shortly

21 after the wake.  I don't believe she said August of 2003,

22 but I could be wrong.

23     THE COURT:  I think she did.  Let's get it

24 straightened out.

25     (Sidebar concluded.)

M. Mulligan - cross/Rosen

**1391**

1      (In open court.)

2      THE COURT:  The objection is overruled.

3  BY MR. ROSEN:

4  Q  Do you see the visitors' list?

5  A  **Yes, I do.**

6  Q  For August 21, 2003?

7  A  **Yes, I do.**

8  Q  Who went with you on that day?

9  A  **Thomas Garrett.**

10 Q  Not your mother, not your mother-in-law, not your

11 child, but in August after Vinnie passed away, you went

12 with Thomas Garrett, correct?

13 A  **Yes.**

14 Q  Now, this is the same Thomas Garrett you went with to

15 the facility that he is in, in Queens, New York?

16 A  **Yes.**

17 Q  What was the relationship between Scott Mulligan and

18 Thomas Garrett?

19 A  **Friends.**

20 Q  Weren't they in a business relationship, too?

21 A  **Yes, also.**

22 Q  What was their relationship in business?

23 A  **Mr. Garrett has some shares in the business.**

24 Q  Which business is that?

25 A  **The gym business.**

M. Mulligan - cross/Rosen

1392

1  Q   Tell us what individual gyms are owned by you and
2  Thomas Garrett, meaning you, you and your husband and
3  Thomas Garrett?
4  A   **Long Beach, Long Island, Merrick and Syosset and**
5  **Baldwin, I believe.**
6  Q   Have any of those been recently sold?
7  A   **No.**
8  Q   Does Mr. Garrett receive a check from the Synergy
9  gyms that you just identified?
10 A   **I don't know.**
11 Q   Do you receive a check?
12 A   **Yes.**
13 Q   Does your mother-in-law receive a check?
14 A   **Yes.**
15 Q   Does your husband still receive a check while he is
16 in jail?
17 A   **No.**
18 Q   That was stopped?
19 A   **Yes.**
20 Q   You don't receive any additional compensation from
21 the gym since your husband went in?
22 A   **No.**
23 Q   Let's get back to the conversation you had in August
24 of 2003 at Devens about Christian Tarantino and what he
25 stated to you.

M. Mulligan - cross/Rosen

1393

1          Please tell the ladies and gentlemen of the jury
2  what you told your husband in August 2003, to the best of
3  your recollection, that Christian Tarantino said in
4  regards to tell Vinnie -- tell Scott to stop asking
5  questions about Vinnie, that subject.  Tell us what was
6  said by you and what was said by your husband.
7  A   **After we had talked about the business, and I said**
8  **and also, Chris said to ask, to stop asking question about**
9  **Vinnie, and my husband became silent and never asked any**
10 **question after.**
11 Q   So he made no response to what you told him Christian
12 Tarantino had said?
13 A   **No.**
14 Q   And you have an independent recollection of having
15 that conversation with your husband at Devens in 2003,
16 correct?
17 A   **Yes.**
18 Q   Now, in January 5 of 2012, you had a telephone
19 conversation with your husband where you discussed what
20 took place at Devens in 2003, correct?
21 A   **Yes.**
22          MR. ROSEN:  Judge, I would like to play the tape
23 at this point.
24          THE COURT:  I think it's going to take us a
25 little longer.  If you don't mind, we can break a little

M. Mulligan - cross/Rosen

1394

1  earlier and get back here at 1:45.
2          Okay, folks, don't talk about the case and I
3  will see you then.
4          (The jury leaves the courtroom.)
5          (A luncheon recess was taken.)
6          (Continued on the next page.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

M. Mulligan - cross/Rosen

1395

1          A F T E R N O O N   S E S S I O N
2
3          (The jury enters the courtroom.)
4          THE COURT:  All right.  Please be seated, if you
5  would.
6          We are ready to start playing the tape.
7          MR. ROSEN:  Judge, can we please have the court
8  reporter read back the last question?
9          (Whereupon, the record was read back.)
10         (Tape played.)
11         (Tape stopped.)
12 BY MR. ROSEN:
13 Q   Whose voice is that?
14 A   **My voice.**
15         (Tape played.)
16         (Tape stopped.)
17 Q   Whose voice is that?
18 A   **My husband, Scott Mulligan.**
19 Q   Are you on the phone?
20 A   **Yes, we are.**
21         (Tape played.)
22         (Tape stopped.)
23 Q   Did you hear the conversation, Mrs. Mulligan?
24 A   **Yes, I did.**
25 Q   Did you hear you say twice:  I don't remember the

1  conversation?

2  **A    Yes.**

3  **Q**    Did your husband tell you in that conversation what

4  you should say in regards to what happened at Devens?

5  **A    He told me what he remembers what I told him and he**

6  **reminded me.**

7  **Q**    And you still told him you didn't remember?

8  **A    Yes.**

9  **Q**    And what he reminded you of is what you testified

10  here today?

11  **A    Yes.**

12          (Tape played.)

13          (Tape stopped.)

14  **Q**    What is your husband doing then if not telling you

15  what to say in this courtroom that you don't remember?

16          MR. FLYNN:  Objection.

17          THE COURT:  Sustained.

18  **Q**    Was your husband telling you what to say?

19          MR. FLYNN:  Objection.  Asked and answered.

20          THE COURT:  I will allow him to ask it again.

21          You may answer the question.

22  **Q**    Yes or no?

23  **A    No, he was reminding me.**

24          (Tape played.)

25          (Tape stopped.)

1  **Q**    Did you hear you just say on the phone:  I don't

2  remember?

3  **A    Yes.**

4  **Q**    And he told you what he wanted to you say in this

5  courtroom?

6          MR. FLYNN:  Objection.

7  **Q**    Because you didn't remember.

8          THE COURT:  Sustained.

9  **Q**    Did he tell you in this conversation what he said --

10  what you said to him or what he wants you to say to him in

11  Devens?

12          MR. FLYNN:  Objection.

13          THE COURT:  Sustained.

14  **A    He is trying to --**

15          THE COURT:  No, you don't answer.

16          THE WITNESS:  Sorry.

17  **Q**    Until January 5 of 2012, you had no independent

18  recollection of the conversation at Devens before that

19  phone call?

20  **A    No.  I just got two days before Christmas 20 FBI**

21  **agents storming into my house with machine gun and rifle**

22  **pointing to my head to take me out of my house.  It was**

23  **ten days after this happened when my son was alone in his**

24  **bedroom upstairs then I -- my mind was not clear.  I was**

25  **in shock till it was ten days that this happened.**

1  **Q**    Let me play a little bit more of the conversation and

2  tell me to stop in the portions where you are so shocked

3  about what happened at the time of your husband's arrest

4  that you are not able to think of what is going on here.

5          THE COURT:  Objection?

6          MR. FLYNN:  Objection.

7          THE COURT:  Sustained.  Sustained.

8          Come on up.

9          (Tape played.)

10          (Tape stopped.)

11          (Continued on the next page.)

1          (Sidebar.)

2          THE COURT:  The reason why I raised the

3  objection, Mr. Rosen, is not to interrupt your

4  cross-examination.  I understand it's a crucial area.  The

5  reason we are all up here, because it's a confusing

6  question, tell me when to stop when you said to your

7  husband you were so upset.  Plus, you know, I think in the

8  context you are doing it, it is unfair.

9          I will allow you to --

10          MR. ROSEN:  Unfair?

11          THE COURT:  You are asking multiple questions at

12  the same time.

13          If the government has no objection, you can go

14  forward with it.  But I read the question again after you

15  stated it and it just -- tell me when you said to your

16  husband so you were so upset.  I understand your

17  commenting on it in summation such as listen to this tape,

18  there was nothing wrong with her, she knew what was going

19  on, she was more than willing to do what her husband told

20  her to do.  I don't have a problem with that.

21          Where it gets a little bit unfair to me or very

22  unfair to me is when you ask a question you tell me where

23  to stop when you indicate you are so upset your mind is

24  not straight.

25          MR. ROSEN:  That's a legitimate question.

M. Mulligan - cross/Rosen

**1400**

1    THE COURT: You don't have any objection?

2    MR. ROSEN: He didn't.

3    THE COURT: He didn't. I will give you that.

4    But I viewed it as being confusing at the very least.

5    MR. FLYNN: Then I objected after you prompted

6    me, your Honor.

7    THE COURT: That's accurate on your part. I

8    will reverse myself, tell the jury I'm reversing myself

9    and you can ask the question. I will even state the

10    question for you.

11    MR. ROSEN: Please.

12    THE COURT: Okay.

13    (Sidebar concluded.)

14    (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

M. Mulligan - cross/Rosen

**1401**

1    (In open court.)

2    THE COURT: Ladies and gentlemen, I'm going to

3    reverse my position that I earlier had with the objection

4    being sustained and therefore I am going to allow

5    Mr. Rosen to ask the following question:  Let me play a

6    bit more of the conversation and tell me to stop in the

7    portions where you are so shocked about what happened at

8    the time of your husband's arrest that you were not able

9    to think of what is going on here.

10    You can answer that question. Let him play the

11    tape, then you tell him what portions he has asked you

12    for.

13    (Tape played.)

14    (Tape stopped.)

15    MR. ROSEN: No further questions.

16    THE COURT: Redirect.

17    MR. ROSEN: I apologize. We have to introduce

18    into evidence this portion of the tape so that --

19    THE COURT: Yes.

20    The jury is instructed there is now in evidence

21    the portion of the tape that you heard. There is no

22    transcript. The tape is the evidence. So if at any time

23    during your deliberations you want that portion of the

24    recording to be played for you, you will have that

25    opportunity. Just let me know.

M. Mulligan - redirect/Flynn

**1402**

1    MR. ROSEN: For the record, it's January the 5th

2    at 1648 which is 4:48 in the afternoon. The conversation

3    was between Mrs. Mulligan on the jail phone with her

4    husband Scott, incarcerated at GEO. It will be Exhibit H,

5    Defendant's Exhibit H.

6    THE COURT: Admitted into evidence as stated.

7    MR. ROSEN: Thank you, your Honor.

8    (Defendant's Exhibit H received in evidence.)

9    MR. FLYNN: May I inquire, your Honor?

10    THE COURT: Yes.

11    REDIRECT EXAMINATION

12    BY MR. FLYNN:

13    **Q**    You heard the recording?

14    **A    Yes, I did.**

15    **Q**    Do you understand any of what your husband -- did you

16    understand any of what your husband was telling you or

17    talking to you about in that recording for it to mean that

18    you should make up your testimony here today?

19    **A    No.**

20    **Q**    Have you done that? Have you made up your testimony

21    here today?

22    **A    No, I didn't.**

23    **Q**    In that conversation that defense counsel played for

24    you as he just told you was on January 5, 2012, did you

25    hear that?

M. Mulligan - redirect/Flynn

**1403**

1    **A    Yes, I did.**

2    **Q**    And your husband as you have previously testified was

3    arrested and charged with murder on December 23, 2011, is

4    that right?

5    **A    Yes.**

6    **Q**    Would you agree with me that was roughly two weeks

7    before that?

8    **A    Yeah, it was about ten days.**

9    **Q**    Did that conversation with your husband on the jail

10    phone help you to recall what the defendant said to new

11    your home in August of 2003?

12    **A    Yes, it did.**

13    **Q**    Over the past four months have you had time to

14    reflect on what happened in August of 2003 when the

15    defendant came to your home?

16    **A    Yes, I did.**

17    **Q**    As you sit here today, do you have any doubt in your

18    mind that when the defendant came to your home in August

19    2003, he told you after Vinnie's murder to tell your

20    husband to stop asking questions about Vinnie?

21    **A    I have no doubt.**

22    MR. FLYNN: Thank you. No further questions.

23    THE COURT: Any questions?

24    MR. ROSEN: No, your Honor.

25    THE COURT: Thank you. You can step down.

**M. Mulligan - redirect/Flynn**

**1404**

1  Ladies and gentlemen, we will take a short break
2  to arrange for the next witness.
3  Don't talk about anything.
4  (The jury leaves the courtroom.)
5  THE COURT:  Before the jury comes back, I want
6  to talk to you about the limiting instruction that you
7  would like me to give them with regard to Mr. Mulligan's
8  testimony as to the two prior offenses.  Talk to each
9  other, I can give you the general instruction I would like
10 to make sure the jury understands what their obligation is
11 in terms of how they use the testimony that relates to the
12 murder of Julius Baumgardt and also relates to Louis
13 Dorval's murder.
14 (A recess was taken.)
15 (Continued on the next page.)

**Proceedings**

**1405**

1  THE COURT:  Let me hear what you wish in terms
2  of the limiting instruction.
3  MR. MISKIEWICZ:  What counsel and I agree to,
4  you should reiterate that portion of the preliminary
5  instruction you gave at the beginning of the trial about
6  the other two murders and how the evidence would be for
7  you, not for propensity but for motivation as to this
8  murder.
9  THE COURT:  Okay.
10 MR. ROSEN:  And he's not on trial for those
11 offenses.
12 THE COURT:  All right.  Want to bring them out?
13 I can give it to them at the beginning of the
14 testimony or wait until the relevant part.
15 MR. ROSEN:  I think it should be in the
16 beginning.
17 THE COURT:  All right.
18 MR. ROSEN:  And if we have to renew it and as a
19 reminder, I think that is appropriate.
20 (Whereupon, the jury at this time enters the
21 courtroom.)
22 THE COURT:  Please be seated, if you would.
23 The Government will call its next witness, and I
24 will give you a limiting instruction.
25 If you would.

**S. Mulligan - Direct/Flynn**

**1406**

1  MR. FLYNN:  Your Honor, the United States calls
2  Scott Mulligan.
3  THE COURT:  Please swear the witness in.
4  S C O T T   M U L L I G A N,
5  called as a witness, having been first
6  duly sworn, was examined and testified
7  as follows:
8  THE CLERK:  State and spell your name for the
9  record.
10 THE WITNESS:  Scott Mulligan, M-U-L-L-I-G-A-N.
11 THE COURT:  Ladies and gentlemen, this witness,
12 it will be expected, will testify to other murders that
13 you've heard in this case before.
14 As I instructed at the beginning of the trial,
15 this evidence is being submitted not to show any criminal
16 propensity as to Mr. Christian Tarantino, and it is not
17 for the purpose of having the defendant on trial for those
18 crimes that will be testified about.
19 However, the only reason that the evidence is
20 being submitted as to the two prior murders relate to
21 what, if any, motivation there was for the defendant to
22 commit this third murder that is alleged.
23 He's only on trial with the charges that will be
24 in the indictment.  There will be two counts.
25 So with that understanding, we'll proceed with

**S. Mulligan - Direct/Flynn**

**1407**

1  this witness's testimony.
2  Thank you, Mr. Flynn.
3  MR. FLYNN:  Thank you, your Honor.
4  DIRECT EXAMINATION
5  BY MR. FLYNN:
6  Q  There's a microphone in front of you.  The acoustics
7  are not so great.  I'd ask you to speak slowly and into
8  the microphone.
9  A  Yes.
10 Q  Are you familiar with the defendant in this case,
11 Christian Tarantino?
12 A  Yes.
13 Q  How are you familiar with him?
14 A  We grew up together.
15 Q  Where did you grow up?
16 A  Bellmore, Merrick area.
17 Q  Where did Mr. Tarantino grow up, if you know?
18 A  Merrick.
19 Q  Did the two of you attend school together?
20 A  Yes.
21 Q  What school?
22 A  John F. Kennedy.
23 Q  Did you graduate from there?
24 A  Yes.
25 Q  What year did you graduate?

S. Mulligan - Direct/Flynn

1408

1   A   1985.
2   Q   Was Mr. Tarantino in your graduating class?
3   A   No.
4   Q   Was he older or younger?
5   A   Older.  Younger.
6   Q   How much?
7   A   One year.
8   Q   Would you please identify Mr. Tarantino here and
9   point him out and what clothing he's wearing?
10  A   The tan tweed coat.
11      MR. FLYNN:  Let the record reflect that the
12  defendant has identified Mr. Tarantino.
13      THE WITNESS:  Yes.
14  BY MR. FLYNN:
15  Q   Where did you go to college?
16  A   University of Maryland, College Park.
17  Q   Did you graduate?
18  A   No.
19  Q   How many years did you attend at College Park,
20  University of Maryland?
21  A   Three.
22  Q   What year did you leave Maryland?
23  A   '89.
24  Q   After you left college for three years, where did you
25  go?

S. Mulligan - Direct/Flynn

1409

1   A   Back to Bellmore.
2   Q   Okay.  And at that time did you reunite with the
3   defendant and continue your friendship with him?
4   A   Yes.
5   Q   In addition to attending school in the 1980s, did you
6   and the defendant commit crimes together?
7   A   Yes.
8   Q   When did you begin to commit crimes with the
9   defendant?
10  A   '89 into the '90s.
11  Q   Did those crimes include a string of commercial
12  burglaries?
13  A   Yes.
14  Q   Where did those burglaries and robberies take place?
15  A   Nassau, Suffolk, and some in Queens.
16  Q   All right, Mr. Mulligan, I will direct your attention
17  to December of 1993.
18      Do you recall participating in a commercial
19  robbery or a burglary of a Filene's Basement department
20  store in that year?
21  A   Yes.
22      MR. ROSEN:  Judge, that's a continuing
23  objection.
24      THE COURT:  Yes, ladies and gentlemen.  You will
25  hear testimony.  The defendant is presumed innocent, and

S. Mulligan - Direct/Flynn

1410

1   it it is up to you to make a determination on this.
2       Please go forward.  It's not being submitted for
3   any propensity to commit any crimes.
4   BY MR. FLYNN:
5   Q   December of '93, Filene's Basement?
6   A   Yes.
7   Q   Where did that burglary or robbery take place?
8   A   Manhasset.
9   Q   Who, if anyone, did you commit that burglary at the
10  Filene's Basement department store with?
11  A   The defendant, Robert Smyth and Darren Graham.
12  Q   Who is Darren Graham?
13  A   A friend of ours.  Grew up with Chris's younger
14  brother.
15  Q   What sort of store is Filene's Basement, for those
16  who don't know?
17  A   It's a department store.
18  Q   All right.  What was the purpose of you and the
19  defendant, Rob Smyth and Darren Graham, burglarizing
20  Filene's Basement in December of 1993?  What were you
21  looking for?
22  A   Fur coats.
23  Q   What time of day did you and the defendant rob that
24  store?
25  A   Late evening, early morning.

S. Mulligan - Direct/Flynn

1411

1   Q   Okay.  What role did you play, if any, in the
2   burglary?
3   A   I was a lookout.
4   Q   What does it mean to be a lookout?
5   A   It means I would park up in a different area and
6   watch for any police coming into the area, and I would
7   notify the entry team.
8   Q   For the Filene's Basement robbery, who was the entry
9   team?
10  A   It would be the defendant, Rob Smyth and Darren
11  Graham.
12  Q   How did you and the defendant and Rob Smyth get
13  turned on to Filene's Basement as a potential target?
14  A   Through Craig Miller.
15  Q   And as you understood it in 1993, did you and the
16  defendant establish some sort of plan for burglarizing the
17  store?
18  A   Yes.
19  Q   What was the -- well, who established the plan?
20  A   Mainly myself, the defendant and Rob Smyth.
21  Q   And what was the plan to be?
22  A   I was to go to the window -- through the wall behind
23  the burglar system.
24  Q   Could you be a little more specific?
25      You said to "go through the wall."  How would

S. Mulligan - Direct/Flynn

1412

1 you do that?

2 A  A sledgehammer through the wall, so the motion

3 detectors wouldn't pick it up.

4 Q  And is that what actually happened?

5 A  No.

6 Q  Why not?

7 A  Couldn't get through.

8 Q  The wall?

9 A  Yes.

10 Q  When you say "the wall," are you saying the outside

11 wall of the actual store?  The building?

12 A  Yes.

13 Q  So what actually happened that night in December of

14 1993?

15 A  They changed plans and went through the front window

16 of the store instead.

17 Q  Where were you positioned while Mr. Tarantino,

18 Mr. Smyth, Mr. Graham, smashed the window in the store?

19 A  Across the street on the main road.

20 Q  What was that main road?

21 A  Northern Boulevard.

22 Q  From your recollection of that night, approximately

23 how far away was that from the entrance of the store?

24 A  About a quarter mile.

25 Q  Were you on foot?

S. Mulligan - Direct/Flynn

1413

1 A  No.

2 Q  Were you in a vehicle?

3 A  Yes.

4 Q  What vehicle were you in?

5 A  I was in a black Toyota Tercel.

6 Q  Did you have anything with you in that black Toyota

7 Tercel that night?

8 A  Yes.

9 Q  What?

10 A  A walkie-talkie.

11 Q  And what was the walkie-talkie for?

12 A  To keep in contact with the entry team.

13 Q  Were you able to do that?

14 A  Yes.

15 Q  In December of 1993?

16 A  Yes.

17 Q  To the best of your recollection, that night when

18 Mr. Tarantino, Mr. Smyth and Mr. Graham went through the

19 window of the Filene's Basement, did an alarm go off?

20 A  Yes.

21 Q  To the best of your recollection, and having

22 maintained communication with them, how long were they

23 inside the Filene's Basement?

24 A  Roughly three minutes.

25 Q  And eventually were you able to view and see what

S. Mulligan - Direct/Flynn

1414

1 they had stolen that evening from the Filene's Basement?

2 A  Yes.

3 Q  What did you see?

4 A  A large bunch of furs.

5 Q  Mr. Mulligan, in front of you are a series of

6 exhibits we'll be referencing during a portion of your

7 testimony today.  To the far left-hand side in front of

8 you are four photographs.  I'd ask you to pick them up.

9     They are labeled for identification Government's

10 Exhibit SM-1, SM-2, SM-3 and SM-10.

11     Do you see those?

12 A  Yes.

13 Q  Do you recognize those?

14 A  Yes.

15 Q  What do you recognize them to be?

16 A  The front of the store, the spot on the wall where we

17 attempted to go through where the furs were located.

18 Q  Do those photographs fairly and accurately represent

19 the Filene's Basement department store that was

20 burglarized in 1994 as it existed in 1994?

21 A  Yes.

22 Q  Had you been in the Filene's Basement prior to the

23 night of the burglary?

24 A  Yes.

25 Q  For what reason?

S. Mulligan - Direct/Flynn

1415

1 A  To see where the motion detectors were located.

2 Q  Who -- did you go there with anyone else prior to the

3 burglary?

4 A  Yes, I went in with the defendant.

5     MR. FLYNN:  Your Honor, the Government offers

6 into evidence Government's Exhibit SM-1 through -3, and

7 SM-10.

8     THE COURT:  They are admitted into evidence.

9     (Whereupon, Government Exhibits SM-1, SM-1, SM-3

10 and SM-10 were received in evidence.)

11 BY MR. FLYNN:

12 Q  Mr. Mulligan, in front of you, Mr. Mulligan, is a

13 monitor.  We'll be using that monitor during your

14 testimony.

15     Behind you is the courtroom movie screen, and

16 Government's Exhibit SM-1 is appearing on both your

17 monitor and in the courtroom.

18     What are we looking at on SM-1?

19 A  The front of the store.

20 Q  And for the record, what store?

21 A  Filene's Basement.

22 Q  The Filene's Basement you and the defendant

23 burglarized in 1993, in December?

24 A  Yes.

25 Q  Do you see -- I'll highlight a portion of the

S. Mulligan - Direct/Flynn

**1416**

1  photograph.

2  MR. FLYNN:  And for the record, the portion of

3  highlighting is on the original SM-1, on the right-hand

4  side of the picture.

5  BY MR. FLYNN:

6  Q  Do you see that what appears to be a mark on the wall

7  there?

8  A  **Yes.**

9  Q  What is that mark?

10  A  **That is where the attempt to go through the wall was.**

11  Q  Mr. Mulligan, showing you SM-10, do you see that

12  exhibit?

13  A  **Yes.**

14  Q  And for the record, what are we looking at in

15  Government's Exhibit SM-10?

16  A  **That is where we tried to go through the wall.**

17  **That's the breaking of the wall.**

18  Q  For the record, is that the outside wall of the

19  Filene's Basement that was burglarized?

20  A  **Yes.**

21  Q  Showing you on the courtroom screen Government's

22  Exhibit SM-2 admitted into evidence.

23  Do you recognize the scene depicted in that

24  picture?

25  A  **Yes.**

S. Mulligan - Direct/Flynn

**1417**

1  Q  What are we looking at in that photograph?

2  A  **That is where the furs were located.**

3  Q  Had you been in that portion of the Filene's Basement

4  prior to the night of the burglary?

5  A  **Yes.**

6  Q  And again, for the record, what state is this portion

7  of the store in in this photograph?

8  A  **It's located by the front entrance, all the way to**

9  **the right corner and back somewhat.**

10  MR. ROSEN:  Judge, I'm not able to hear the

11  witness.

12  THE COURT:  I know it is hard to talk into the

13  microphone and look at the exhibit, but make sure before

14  you respond that you turn towards the microphone.  All

15  right?

16  THE WITNESS:  Sure.

17  THE COURT:  All right.

18  BY MR. FLYNN:

19  Q  I'm asking you, what state is it in, like?

20  A  **It's completely in disarray.  Everything is a wreck**

21  **from pulling the furs out of there.**

22  Q  Showing you what has been admitted as Government's

23  Exhibit SM-3.

24  What are we looking at in the photograph?

25  A  **The same area again.**

S. Mulligan - Direct/Flynn

**1418**

1  Q  Okay.  To the best of your recollection,

2  approximately how many fur coats did you, the defendant

3  and Rob Smyth and Derrick [sic] Graham steal from the

4  Filene's Basement that night, December of 1993?

5  A  **Roughly 200.**

6  Q  To the best of your recollection, how were those fur

7  coats taken away from the store that night?

8  A  **A stolen van.**

9  Q  Where did you and the defendant take the furs after

10  you left the Filene's Basement?

11  A  **Back to Craig Miller's warehouse.**

12  Q  Can ultimately recall what was done with the fur

13  coats after it was delivered to the warehouse?

14  A  **Sold to family, friends, and eventually Louis Dorval.**

15  Q  Who was Louis Dorval?

16  A  **He was a friend of the defendant's.**

17  Q  Mr. Mulligan, there's a photograph in front of you,

18  the next exhibit to the left.  It is marked for

19  identification as Government's Exhibit SM-4.

20  Do you recognize that individual?

21  A  **Yes.**

22  Q  Who is it?

23  A  **Louis Dorval.**

24  Q  Is that a photograph of Louis Dorval as you remember

25  him prior to his death in 1994?

S. Mulligan - Direct/Flynn

**1419**

1  A  **Yes.**

2  MR. FLYNN:  The Government moves for the

3  admission of SM-4.

4  MR. ROSEN:  I thought it was in evidence under a

5  different number.

6  THE COURT:  I don't know.  But at this point in

7  time it's in evidence, and we can use an exhibit number

8  when we're certain.

9  (Whereupon, Government Exhibit SM-4 was received

10  in evidence.)

11  BY MR. FLYNN:

12  Q  Who is that?

13  A  **Sir?**

14  Q  Who is that?

15  A  **Louis Dorval.**

16  Q  When did you first meet Louis Dorval?

17  A  **I met him when he came out of prison.  Chris**

18  **introduced us to him.**

19  Q  Okay.  And how did the defendant introduce Louis

20  Dorval to you?

21  A  **A friend of his that he met in Nassau County jail.**

22  Q  To your knowledge, what was the defendant in prison

23  for?

24  MR. ROSEN:  Objection.

25  THE COURT:  Please approach on this for a

S. Mulligan - Direct/Flynn

**1420**

1    moment.

2         Excuse us.

3         (Whereupon, at this time the following took

4    place at the sidebar.)

5         THE COURT:  This was the 404(b) application that

6    the Government made previously.  I don't remember how he

7    met Louis Dorval.  I thought they actually met in the

8    neighborhood.

9         MR. ROSEN:  Right.

10        MR. FLYNN:  Your Honor, this was part of the

11   original 404(b) application that we filed before the first

12   trial, and it was something that was not removed in your

13   Honor's most recent --

14        The reason he was in prison was because he had

15   stolen fur coats in New Jersey with Vincent Gargiulo.  And

16   the reason it was applied for in the first 404(b) motion

17   and the motion we renewed is it establishes the defendant

18   and Mr. Gargiulo had previously committed crimes together.

19        THE COURT:  And he would be more willing -- the

20   defendant was more willing to speak to him for his crimes?

21        MR. FLYNN:  I mean, he's going to say he was in

22   the Nassau County jail for stealing fur coats with

23   Gargiulo, and it has been put in our 404(b) application

24   and approved by your Honor.  And it doesn't establish that

25   the defendant and Vinnie committed crimes together.

---

S. Mulligan - Direct/Flynn

**1421**

1         MR. ROSEN:  He was not in the Nassau County jail

2    for that case.

3         THE COURT:  I don't know how he could have been

4    in the Nassau County jail, because if anything, it was a

5    federal crime.

6         MR. FLYNN:  I misspoke, your Honor.  He was in

7    Leavenworth.

8         THE COURT:  Why don't we at this point think for

9    a moment, because I let you get a fair amount of things

10   for particular purposes under the 404(b).

11        One, I'm letting you get into the various crimes

12   that Mr. Mulligan committed with the defendant.

13        Two, I previously had let you get into this fur

14   coat thing down in New Jersey.

15        You don't have to reference where -- and you are

16   right, I do remember now that Mr. Gargiulo and

17   Mr. Tarantino met on a federal case involving furs, and

18   that's when we had the whole Froccaro testimony.

19        MR. ROSEN:  Your Honor, Mr. Tarantino was never

20   charged in that crime, only Mr. Dorval and Mr. Fatato.

21        MR. FLYNN:  I'm sorry, I'm confusing everything.

22   He's referring to the Giampa indictment.  That is

23   different.

24        THE COURT:  That was the reason that

25   precipitated Dorval going on the lam, etcetera.

---

S. Mulligan - Direct/Flynn

**1422**

1         MR. FLYNN:  Right.  This reference I've made

2    through Mr. Mulligan here is the defendant met Louis

3    Dorval in prison.  The reason he was in prison was because

4    he had committed a theft of some fur coats in New Jersey

5    with, among other people, Vincent Gargiulo.

6         During the first trial, we brought in an

7    undercover agent wearing an eye patch, Mr. Salmieri.  He

8    testified to his observations of surveillance of the

9    defendant and Gargiulo together.  The purpose of that was

10   to establish the criminal relationship between Tarantino

11   and Gargiulo.

12        We're not doing that in this trial, and we're

13   not bringing in a witness to testify to the in-depth --

14        THE COURT:  Why don't we strike the question and

15   say they met before that.  They had a relationship in the

16   neighborhood.  You have in this case, it's uncontroverted,

17   that the defendant and Gargiulo were friends.

18        MR. FLYNN:  Okay.

19        MR. ROSEN:  Your Honor, he's talking about

20   Dorval now, not Gargiulo.

21        MR. FLYNN:  He met him in the neighborhood.  He

22   met him in prison.  That's where the defendant met him.

23   He met Vinnie and Scott -- Mr. Mulligan, I should say --

24   through the neighborhood.

25        I can move on, your Honor.

---

S. Mulligan - Direct/Flynn

**1423**

1         THE COURT:  So you will withdraw the question?

2         MR. FLYNN:  Yes, your Honor.

3         THE COURT:  Okay.

4         MR. ROSEN:  And will you strike it, Judge, the

5    answer -- the question, rather?  Disregard it?

6         THE COURT:  Yes.

7         (End of sidebar conference.)

8         THE COURT:  Ladies and gentlemen, the last

9    question is struck, and the answer that you may have heard

10   is also struck.

11        You are to disregard it.  Do you understand?

12   Don't consider it at all.

13        Please move on, Mr. Flynn.

14        MR. FLYNN:  Yes, your Honor.

15   BY MR. FLYNN:

16   Q    Mr. Mulligan, a few moments ago you testified that

17   one of the individuals you committed the Filene's Basement

18   burglary with in 1993 was Robert Smyth.  Do you remember

19   that?

20   A    Yes.

21   Q    Who was Robert Smyth?

22   A    **He's a childhood friend and lives directly across the**

23   **street from the defendant.**

24   Q    Does he live across the street from the defendant

25   now?

---

S. Mulligan - Direct/Flynn

1424

1  A    No.
2  Q    Did he in the 1980s and in the 1990s?
3  A    Yes.
4  Q    Mr. Mulligan, on the screen in the courtroom, I'm
5  showing you what has previously been admitted into
6  evidence as Government's Exhibit CM-1.
7        Do you see that?
8  A    Yes.
9  Q    Do you recognize the individuals in that photograph?
10 A    Yes.
11 Q    From left to right, who are they?
12 A    The defendant, Rob Smyth and myself.
13 Q    How did you know Robert Smyth in 1993?
14 A    I met him through the defendant.
15 Q    Mr. Mulligan, in addition to the Filene's Basement
16 burglary, do you recall committing another commercial
17 burglary, this time in a furrier in Queens, New York,
18 during the winter of 1994?
19 A    Yes.
20 Q    Who, if anyone, did you commit the burglary of the
21 Queens furrier with?
22 A    With the defendant, Darren Graham, Rob Smyth and
23 another individual from Queens.
24 Q    What sort of building was this Queens-based furrier
25 in?

S. Mulligan - Direct/Flynn

1425

1  A    In a freestanding building.
2  Q    To the best of your recollection, how did you and the
3  defendant become aware of this separate furrier?
4  A    Someone tipped us off to it, driving by and noticed
5  it.
6  Q    And what was the purpose of burglarizing this
7  business in early 1994?
8  A    For stolen furs.  To steal the furs.
9  Q    What time of day did this burglary occur?
10 A    Sometime between 11 p.m. and 2 a.m.
11 Q    And what role did you play in this burglary?
12 A    I was the lookout.
13 Q    What role, if any, did Tarantino and the others play?
14 A    They were again the entry team who went in.
15 Q    Please -- was there a plan established for
16 burglarizing this furrier?
17 A    Yes.
18 Q    What was the plan for this building?
19 A    To disable the alarm system and go through the back
20 door.
21 Q    How would you do that?  How would you disable the
22 alarm system?
23 A    Cut the phone lines, and when we were in, knock the
24 alarm box off the wall.
25 Q    What do you mean by that?

S. Mulligan - Direct/Flynn

1426

1  A    The main alarm system inside, we would sledgehammer
2  off the wall.
3  Q    What would that do?
4  A    That would stop the call from going out.
5  Q    Once you knocked -- well, how would you actually get
6  in through the door?  How did you actually get in through
7  the door?
8  A    Through crowbars and pry bars.
9  Q    And to the best of your recollection, is that what
10 happened that evening?
11 A    Yes.
12 Q    Where were you positioned in relation to -- as a
13 lookout -- withdrawn.
14       As a lookout, where were you positioned in
15 relation to the building?
16 A    Across the street on the main road.
17 Q    Were you on foot?
18 A    No, I was in a black Toyota Tercel vehicle.
19 Q    Who owned that Toyota Tercel, by the way?
20 A    My girlfriend at the time.
21 Q    How far away was the building from that location
22 again?
23 A    Roughly a quarter mile or so.
24 Q    And what was the purpose of being a quarter mile away
25 from where the defendant and Smyth were?

S. Mulligan - Direct/Flynn

1427

1        MR. ROSEN:  Judge, objection.  Relevancy.
2        THE COURT:  Overruled.
3  BY MR. FLYNN:
4  Q    What was the purpose of being in that location?
5  A    To see if there were any police driving by.  This way
6  I could alert them if they were.
7  Q    How would you alert them?
8  A    From a walkie-talkie.
9  Q    Did you have a walkie-talkie with you that night?
10 A    Yes.
11 Q    And -- well, did the defendant have a walkie-talkie
12 as well?
13 A    Yes.
14 Q    And to the best of your recollection, did
15 Mr. Tarantino, Mr. Smyth and yourself steal anything from
16 that furrier in Queens?
17 A    Yes.
18 Q    What?
19 A    Furs and bonds.
20 Q    What kind of bonds?
21 A    I think they were triple A bonds.
22 Q    You mean like commercial paper, money?
23 A    Bonds that you would buy that would mature in
24 20 years.
25 Q    Did you see the bonds?

S. Mulligan - Direct/Flynn

1428

1 A   Yes.

2 Q   Did you see the fur coats?

3 A   Yes.

4 Q   How were they transported away from the furrier in

5 Queens?

6 A   In a van.

7 Q   What kind of van?

8 A   A stolen van, regular, like -- not a box car but a

9 regular van.

10 Q   To the extent you can recall, what was done with the

11 furs and the bonds that you stole after you stole them?

12 A   We made a list of what they were, at which point we

13 sold them through Louis Dorval and a friend of him, Gae

14 Fatato, and his father.

15 Q   Mr. Mulligan, do you recall participating in another

16 burglary during the winter of 1994 with the defendant,

17 this time of a jewelry store in Plainview?

18 A   Yes.

19 Q   Plainview, Long Island?

20 A   Yes.

21 Q   Where in Plainview, Long Island, was this burglary of

22 a jewelry store?

23 A   South Oyster Bay Road.

24 Q   And other than the defendant, who were you with when

25 you did that?

S. Mulligan - Direct/Flynn

1429

1 A   I was with Rob Smyth, Darren Graham and Mike Morris.

2 Q   What sort of building were you located in?

3 A   In a strip mall.

4 Q   What time of year in 1994 did that occur?

5 A   Wintertime.

6 Q   Why do you remember that?

7 A   Because there was a storm.

8 Q   What kind of storm?

9 A   A snowstorm at the time.

10 Q   To the best of your recollection, how did you and

11 Mr. Tarantino get turned on to that Plainview jewelry

12 store?

13 A   Just from driving around, we would notice stores, one

14 of us, at which point we would tell each other about it.

15 Q   What time of day did the burglary of the jewelry

16 store occur?

17 A   Late evening or early morning.

18 Q   What role did you play?

19 A   I was a lookout again.

20 Q   What role did Mr. Tarantino and the others play?

21 A   Well, Mike Morris was a lookout also, and the

22 defendant, Rob Smyth and Darren Graham were the entry

23 guys.

24 Q   As a lookout, where were you positioned in relation

25 to the store?

S. Mulligan - Direct/Flynn

1430

1 A   I was parked across the street on a side street,

2 facing the front.

3 Q   How far away?

4 A   About a half mile.

5 Q   Were you in a vehicle?

6 A   Yes.

7 Q   Which one?

8 A   The black Toyota Tercel.

9 Q   And again, did you have anything with you that night

10 as a lookout down the street from the Plainview jewelry

11 store?

12 A   Yes.  A walkie-talkie.

13 Q   Did the defendant have a walkie-talkie as well?

14 A   Yes.

15 Q   Were you able to remain in communications at all

16 times?

17 A   Yes.

18 Q   And to the best of your recollection, did the

19 defendant, Rob Smyth and the others break into that

20 jewelry store that night?

21 A   Yes.

22 Q   How did they do that?

23 A   Through the back door, with the crowbars, and again

24 tried to disable the alarm system from a room located in

25 the rear of the store.

S. Mulligan - Direct/Flynn

1431

1 Q   Were you able to disarm that alarm system?

2 A   Yes.

3 Q   How did you know when they were done, when they were

4 breaking in the store?

5 A   They would tell me on the walkie-talkie when it was

6 done, at which point we would move out.

7 Q   Did you and the defendant and Mr. Smyth and the

8 others steal anything that night?

9 A   Yes.

10 Q   What?

11 A   Jewelry.

12 Q   What did you do with the jewelry that you stole?

13 A   We kept what we wanted to keep for ourselves and

14 friends, and we sold the rest.

15 Q   Mr. Mulligan, in committing this burglary of the

16 jewelry store in Plainview in 1994, how many vehicles were

17 used in total?

18 A   Two.

19 Q   What were they?

20 A   There was a Chevy blazer and a black Toyota Tercel.

21 Q   What color was the Chevy Blazer?

22 A   Gray.

23 Q   What role did that Chevy Blazer play in the burglary

24 of the jewelry store?

25 A   That was used to transport all these stolen goods

S. Mulligan - Direct/Flynn

1432

1  from the store and for the defendants to get away in.
2  Q    Whose red Blazer was it?
3  A    It was stolen.
4  Q    Who stole it?
5  A    Myself and the defendant.
6  Q    When did you steal it?
7  A    It was stolen early January.
8  Q    From where?
9  A    From a car dealership in Hicksville.
10 Q    At this car dealership in Hicksville in January of
11 1994, what happened?  How did you steal it?
12 A    I drove there, the defendant got out on foot, and he
13 used a screwdriver to columnize it to steal it.
14 Q    You said the defendant got out on foot.  Did you
15 drive to this location with him?
16 A    Yes.
17 Q    Did you drop him off?
18 A    I drove and dropped him off and went to the side
19 street.
20 Q    What does it mean to columnize the steering wheel?
21 A    To peel back everything that goes from the ignition
22 back to the dashboard, at which point you would have
23 access to a rod that you would push or pull to start the
24 car.
25 Q    Mr. Mulligan, I'm placing on the screen in the

S. Mulligan - Direct/Flynn

1433

1  courtroom what has been previously admitted into evidence
2  in this case as Government's Exhibit RRG-88.
3        Do you see that photograph?
4  A    Yes.
5  Q    Do you recognize the vehicle in that photograph?
6  A    Yes.
7  Q    What do you recognize it to be?
8  A    It's the vehicle that was stolen that evening.
9  Q    Do you recognize that as the red Chevy Blazer you
10 testified to about a moment ago?
11 A    Yes.
12 Q    Mr. Mulligan, I'm now showing you on the screen what
13 has been previously admitted into evidence as Government's
14 Exhibit RRG-54.
15       Do you recognize the scene depicted in this
16 photograph?
17 A    Yes.
18 Q    What does this photograph depict?
19 A    It shows the steering column all peeled away.
20 Q    The steering column of what?
21 A    Of the Chevy Blazer.
22 Q    I'll just enlarge a section of the photograph which
23 is now appearing on the screen.
24       Do you see the steering column there?
25 A    Yes.

S. Mulligan - Direct/Flynn

1434

1  Q    Based on your testimony before, is that the steering
2  column that has been columnized?
3  A    Yes.
4  Q    Is this the actual Chevy Blazer you testified before
5  that had been columnized by the defendant?
6  A    Yes.
7  Q    Subsequent to you and the defendant stealing this
8  vehicle, were you in it?
9  A    No.
10 Q    After you and the defendant stole the Blazer, did you
11 have an opportunity to ride in it?
12 A    Yes.
13 Q    Did you have an opportunity to observe the interior
14 of the Blazer?
15 A    Yes.
16 Q    Consequently, approximately how many times were you
17 in the Blazer during 1994?
18 A    Roughly two or three times.
19 Q    And -- well, after you and the defendant stole the
20 Chevy Blazer from the car dealership in Hicksville in
21 1994, did you keep it for a period of time?
22 A    Yes.
23 Q    Did you store the Blazer in a particular location?
24 A    Yes, Craig Miller's warehouse.
25 Q    Where exactly is this warehouse?

S. Mulligan - Direct/Flynn

1435

1  A    It's located in Farmingdale, New York, by the
2  industrial park, by the cemetery.
3  Q    What does the warehouse look like?
4  A    The one we used was a freestanding, almost like a
5  garage.
6  Q    And how did you and the defendant come to use
7  Mr. Miller's warehouse in 1994?
8  A    We knew Craig Miller prior.
9  Q    Who contacted Craig Miller to use the warehouse?
10 A    I did.
11 Q    And did you and the defendant use that warehouse for
12 a period of time?
13 A    Yes.
14 Q    What did you use it for?
15 A    They used it to put stolen merchandise and store a
16 car.
17 Q    Mr. Mulligan, appearing on the screen in the
18 courtroom now is what has been admitted into evidence as
19 Government's Exhibit CM-13.
20       Do you see that on the screen?
21 A    Yes.
22 Q    What does Government's Exhibit CM-13 depict?
23 A    The warehouse space that we used.
24 Q    All right.  Well, would you agree with me there are
25 two buildings reflected on this photograph?

S. Mulligan - Direct/Flynn

1436

1  A    Yes.

2  Q    To the best of your recollection, what were each of

3  the buildings that are on this photograph?

4  A    **The building to the left is a freestanding one that**

5  **we used all the time.  And the building to the right is**

6  **his family's building they owned that they ran their own**

7  **business out of.**

8  Q    All right.  The first building you identified on the

9  left, you said that's the building we used.

10           When you say "we," who are you referring to?

11 A    **The defendant.  Myself.  Rob Smyth.**

12 Q    Anyone else?

13 A    **Darren Graham.  Louis Dorval.**

14 Q    And I'm sorry, the building on the left?  The larger

15 right building?

16 A    **The one that the Millers occupied with their own**

17 **business.**

18 Q    To the best of your recollection, who owned this

19 facility here in 1994?

20        MR. ROSEN:  Judge, the only objection I have is

21 cumulative.  It's repetitious to Mr. Miller --

22        THE COURT:  All right.  Please approach.

23        (Whereupon, at this time the following took

24 place at the sidebar.)

25

---

S. Mulligan - Direct/Flynn

1437

1        THE COURT:  Is there any issue that the building

2  was owned by Miller's family, the chain --

3        MR. FLYNN:  The General Chain.

4        THE COURT:  General Chain.

5        MR. MISKIEWICZ:  No, your Honor.

6        THE COURT:  Why is it important to this witness?

7  It's corroborative to Mr. Miller's testimony.  We have two

8  witnesses that will be testifying.

9        THE COURT:  I don't know why we're going over

10 this.  I don't think it is an issue.

11        MR. MISKIEWICZ:  Right.  Your Honor, I guess

12 I'll remind the Court and counsel this is the precise

13 location where Dorval was killed.

14        THE COURT:  Not Dorval -- yes, Dorval, I'm

15 sorry.

16        MR. FLYNN:  Also, the rendezvous and embarkation

17 point for the robbery.

18        I only have one more question, and I'll move on

19 to another topic if you wish.

20        THE COURT:  You believe the ownership is

21 important?

22        MR. FLYNN:  I'll move on, your Honor.  It has

23 already been established.

24        THE COURT:  Okay.

25        (End of sidebar conference.)

---

S. Mulligan - Direct/Flynn

1438

1        THE COURT:  The objection is sustained.

2  BY MR. FLYNN:

3  Q    Mr. Mulligan, what is in front of you is a photograph

4  on the table which has been marked for identification as

5  Government's Exhibit EM-5 -- I'm sorry, SM-5.

6        Do you see that?

7  A    Yes.

8  Q    It's a photograph of an individual.  Do you recognize

9  that individual?

10 A    Yes.

11 Q    Whom do you recognize him to be?

12 A    **Craig Miller.**

13        MR. FLYNN:  Your Honor, the Government moves for

14 the admission of Government's Exhibit SM-5.

15        THE COURT:  If there is no objection, it is

16 received in evidence.

17        (Whereupon, Government Exhibit SM-5 was received

18 in evidence.)

19 BY MR. FLYNN:

20 Q    For the record, Mr. Mulligan, who is that?

21 A    **Craig Miller.**

22 Q    Okay.  Did you have an understanding as to whether

23 the defendant knew Craig Miller as well in 1994?

24 A    Yes.

25 Q    Did Mr. Miller know you were storing these stolen

---

S. Mulligan - Direct/Flynn

1439

1  items at his warehouse in 1994?

2  A    Yes.

3  Q    And the red Chevy Blazer?

4  A    Yes.

5  Q    And while you were using Craig Miller's warehouse,

6  what if anything did you provide him in return for storing

7  these items?

8  A    **We used to give him the opportunity to fence the**

9  **stolen goods we had gotten, and I used to sell marijuana**

10 **with him at times.**

11 Q    In addition to Craig Miller's warehouse near the

12 cemetery in Farmingdale, did you keep stolen property at

13 any other location?

14 A    Yes.

15 Q    Where?

16 A    **Mini Storage on Route 109 and the cross road of Route**

17 **110.**

18 Q    Where was the second section?

19 A    **On 109, across from 110.**

20 Q    Did you use this space located at his business with

21 anyone else?

22 A    Yes.

23 Q    Who?

24 A    **The defendant, Rob Smyth, Darren Graham.  Some of the**

25 **younger kids, Derrick Harrington, Louis Dorval.**

S. Mulligan - Direct/Flynn

**1440**

1  Q   How many of the units at this 110 Mini Storage were
2  occupied by you and the defendant and other individuals in
3  1994?
4  A   Two.
5  Q   What was kept in each of the units?
6  **A   One unit had had stolen items that had been purchased**
7  **on stolen credit cards - housing parts, windows, etcetera,**
8  **tiles - and the other one had cars that would be stolen**
9  **and retagged.**
10 Q   These household items you referenced being stored in
11 one of the units, who were those household items for?
12 **A   Myself.**
13 Q   How did you obtain those household items?
14 **A   Through stolen credit cards.**
15 Q   I believe you testified a moment ago that Louis
16 Dorval also used one of these storage units; is that
17 correct?
18 **A   Yes.**
19 Q   What did he use that storage unit for?
20 **A   He would retag cars.**
21 Q   What does that mean?
22 **A   He would change a VIN number on the stolen car to**
23 **make it a legitimate car for resale.**
24 Q   How would he do that?
25        MR. ROSEN:  Judge, objection.  Relevancy.  This

S. Mulligan - Direct/Flynn

**1441**

1  is outside of the scope of the Court's order.
2        THE COURT:  I'll allow it as to Mr. Dorval.
3  BY MR. FLYNN:
4  Q   How would Mr. Dorval retag cars and change VIN
5  numbers?  How would he do that?
6  **A   He would buy a car wrecked but not consider stolen.**
7  **It would have a clean title.  Take the VIN number from**
8  **that and put them into a stolen vehicle to be resold.**
9  Q   Mr. Mulligan, appearing on the screen in the
10 courtroom is Government's Exhibit RS-1, previously
11 admitted in evidence.
12        For the record, it is a compilation, I would
13 say, of four photographs.
14        Do you see that?
15 **A   Yes.**
16 Q   Generally, what do these four photographs represent?
17 **A   The storage unit facility.**
18 Q   And are you referring to the storage unit facility
19 you testified about on 110 in Farmingdale?
20 **A   Yes.**
21 Q   Do you see the unit you used to use to keep your
22 household items that were stolen?
23 **A   Yes.**
24 Q   Which of the four photographs depicts that unit?
25 **A   The bottom one to the left.**

S. Mulligan - Direct/Flynn

**1442**

1  Q   Okay.  So you are talking about this area here
2  (indicating)?
3  **A   Yes.**
4  Q   And to the best of your recollection, which of the
5  photographs, if any, represents the area of the storage
6  unit that was used by Louis Dorval during this period of
7  time?
8  **A   It would be the bottom right.**
9  Q   The units that you just discussed, these units here,
10 the 110 mini-storage in Farmingdale, did you and the
11 defendant rent those units in your own name?
12 **A   No.**
13 Q   Why not?
14 **A   If something happened, if they wanted to come back to**
15 **us.**
16 Q   So in whose name were those units rented, if you
17 know?
18 **A   Some of the younger kids that the defendant's brother**
19 **was friends with.**
20 Q   I'm sorry, could you you say that again?
21 **A   Some of the younger kids that the defendant's younger**
22 **brother is friends with.**
23 Q   You referenced the defendant's younger brother.  Did
24 you know that individual?
25 **A   Yes.**

S. Mulligan - Direct/Flynn

**1443**

1  Q   Do you know that individual?
2  **A   Yes.**
3  Q   What is his name?
4  **A   Steven Tarantino.**
5  Q   How many years younger than Christian Tarantino is
6  Steven Tarantino?
7  **A   Roughly three.**
8  Q   By the way, Mr. Mulligan, during this period of time
9  when you were committing these burglaries with the
10 defendant and others, did you notice the defendant to
11 shake in any way or have tremors?
12 **A   No.**
13 Q   What kind of shape was the defendant in in 1994?
14 **A   He was in great shape.  Phenomenal.**
15 Q   I will show you what has previously been admitted
16 into evidence in this case as Government's Exhibit JK-11.
17        Do you recognize the individual depicted in that
18 photograph?
19 **A   Yes.**
20 Q   Who do you recognize him to be?
21 **A   The defendant.**
22 Q   Does that exhibit fairly and accurately represent
23 Mr. Tarantino as he looked in 1994?
24 **A   Yes.**
25 Q   I'm going to switch gears for a second, Mr. Mulligan.

S. Mulligan - Direct/Flynn

**1444**

1    During this period of time in the early to the
2    mid 1990s when you are committing these burglaries with
3    the defendant and Robert Smyth, did you know an individual
4    by the name of Vincent Gargiulo?
5    Q    Yes.
6    Q    How did you know Vincent Gargiulo?
7    A    **I grew up with him.**
8    Q    How did you meet him?
9    A    **Probably the first grade.**
10    Q    Were you and Mr. Gargiulo friends in the first grade?
11    A    **No.**
12    Q    Well, how did you meet Vinnie?
13    A    **He was friends with my older brother.**
14    Q    Is your older brother still alive?
15    A    **No.**
16    Q    How did he die?
17    A    **Drug overdose.**
18        MR. ROSEN:  Objection.  Relevance.
19        THE COURT:  Overruled.
20    BY MR. FLYNN:
21    Q    How did he die?
22    A    **Drug overdose.**
23    Q    What year?
24    A    **'87.**
25    Q    Was Vinnie friends with your brother?

S. Mulligan - Direct/Flynn

**1445**

1    A    **Yes.**
2    Q    Mr. Mulligan, I will show you what has been admitted
3    into evidence in this case as Government's Exhibit SM-6.
4        Do you recognize it, the two people depicted in
5    that photograph?
6    A    **Yes.**
7    Q    From left to right, who are they?
8    A    **Vincent Gargiulo and myself.**
9    Q    As you grew up, did you attend school with Vinnie?
10    A    **Yes.**
11    Q    Approximately how many years older is Mr. Gargiulo?
12    A    **About four.**
13    Q    And in 1994, did you have an understanding as to
14    whether Mr. Gargiulo also knew the defendant?
15    A    **Yes.**
16    Q    Did you have the opportunity to socialize with both
17    Mr. Gargiulo and the defendant at the same time?
18    A    **Yes.**
19    Q    Do you have an understanding as to whether the
20    defendant and Mr. Gargiulo ever committed any crimes
21    together?
22    A    **Yes.**
23    Q    What crime did Mr. Gargiulo and and the defendant
24    commit together?
25    A    **Burglaries.**

S. Mulligan - Direct/Flynn

**1446**

1    Q    How do you know that?
2    A    **They were all best friends together.**
3    Q    Mr. Mulligan, I would now like to direct your
4    attention specifically to June 23, 1994.
5        On that day, did you participate in an armed car
6    robbery in Syosset, New York, during which an employee of
7    the armed car service was murdered?
8    A    **Yes.**
9    Q    Within the last four months, were you charged by the
10    United States Attorney's Office with participating in that
11    robbery and in the murder of the guard, Julius Baumgardt?
12    A    Yes.
13    Q    On January 30th of this year, did you plead guilty in
14    this court to the commission of that crime in violation of
15    Title 18 U.S. Code Sections 33, 34, and 2?
16    A    Yes.
17    Q    Did you plead guilty on January 3rd of this year, or
18    in this court, pursuant to a cooperation agreement with
19    the Government?
20    A    Yes.
21    Q    Is that government -- is that agreement in writing?
22    A    Yes.
23    Q    In front of you, Mr. Mulligan, is an exhibit which
24    has been marked for identification purposes in this case
25    as Government's Exhibit SM-7.

S. Mulligan - Direct/Flynn

**1447**

1        Please take a moment to look at that and
2    familiarize yourself with it.
3        Do you recognize that document?
4    A    **Yes.**
5    Q    What is it?
6    A    **It's my cooperation agreement.**
7    Q    I'd ask you to turn to the last page.
8        Is your signature on the last page?
9    A    **Yes.**
10    Q    Can you tell us the date of your cooperation
11    agreement?
12    A    **January 3, 2012.**
13        MR. FLYNN:  Your Honor, the Government moves for
14    the admission of Government's Exhibit SM-7.
15        THE COURT:  Any objection?
16        MR. ROSEN:  No, your Honor.
17        THE COURT:  Received in evidence.
18        (Whereupon, Government Exhibit SM-7 was received
19    in evidence.)
20    BY MR. FLYNN:
21    Q    Have you been sentenced yet in connection with your
22    case?
23    A    **No.**
24    Q    What term of incarceration, potentially, do you face
25    under the statute?

S. Mulligan - Direct/Flynn

1448

1 A    Life.

2 Q    What is your understanding of what your main

3 obligations are to the Government under your cooperation

4 agreement with us?

5 A    **Tell all my involvement in crime, and the whole truth**

6 **about everything that went on.**

7 Q    Does your cooperation agreement require you to not

8 commit any crimes in the future?

9 A    **Yes.**

10 Q    Does it also require you to do what you are doing

11 today, to testify?

12 A    **Yes.**

13 Q    If you meet your obligations under the cooperation

14 agreement, Government's Exhibit SM-7, what is your

15 understanding of what the Government has agreed to do for

16 you?

17 A    **To write a letter to the judge providing all the**

18 **information that I've helped the Government with.  And in**

19 **return, I would hope that the judge would give me a**

20 **lighter sentence.**

21 Q    Well, what is your understanding of what the judge

22 will do with the letter that we write in connection with

23 your sentencing?

24 A    **She would take into consideration my help that I've**

25 **given to the Government.**

S. Mulligan - Direct/Flynn

1449

1 Q    If you receive such a letter, is the judge required

2 to give you a sentence below life imprisonment?

3 A    **No.**

4 Q    Will the United States Attorney's Office recommend a

5 particular definite sentence to the judge in connection

6 with your crime?

7 A    **No.**

8 Q    What is -- who makes the ultimate decision of what

9 sentence you will receive?

10 A    **The judge.**

11 Q    Do you hope that you will receive a sentence less

12 than life because of your cooperation and your testimony

13 here today?

14 A    **Yes.**

15 Q    And based on your understanding of your cooperation

16 agreement with the Government, does your sentence depend

17 in any way on the ultimate outcome of this trial?

18 A    **No.**

19 Q    Meaning whether or not Christian Tarantino is

20 convicted of the crimes with which he is charged?

21 A    **No.**

22 Q    As you sit here today, do you have any idea what the

23 judge will sentence you to in connection with your crime?

24 A    **No, not at all.**

25 Q    Has anyone promised you what sentence you will

S. Mulligan - Direct/Flynn

1450

1 receive in exchange for your testimony here today?

2 A    **No.**

3 Q    Mr. Mulligan, with whom did you commit the June 23,

4 1994, armored car robbery that resulted in the death of

5 Julius Baumgardt?

6 A    **The defendant, Rob Smyth and Louis Dorval.**

7 Q    How did the four of you come to target this

8 particular armored car?

9 A    **Greg Morgan had told me about it out at Spratts.**

10 Q    Who is Greg Morgan?

11 A    **He was a friend that also worked for a close friend**

12 **of mine in a stockbroker firm.**

13 Q    You mentioned someone by the name of Spratt; is that

14 right?

15 A    **Yes.**

16 Q    In 1994, what was Spratts?

17 A    **A sports bar.**

18 Q    What was Greg Morgan's connection, if any, to Spratts

19 in 1994?

20 A    **He was a bartender.**

21 Q    Did you know Mr. Morgan -- well, withdrawn.

22       Did you attend Spratts -- or did you go to

23 Spratts in 1994?

24 A    **Yes.**

25 Q    Did you go there regularly?

S. Mulligan - Direct/Flynn

1451

1 A    **Yes.**

2 Q    Who did you go there with, if anyone?

3 A    **Most of the time, all of us went together, myself,**

4 **the defendant, Rob Smyth, Darren Graham, a bunch of other**

5 **individuals in the neighborhood.  Barry Rabkin,**

6 **R-A-B-K-I-N.**

7 Q    Did you know Mr. Morgan -- withdrawn.

8       Other than Spratts, did you know Mr. Morgan

9 independently from anywhere else?

10 A    **Yes.**

11 Q    From where?

12 A    **I knew him from working with Barry Rabkin and having**

13 **a share in the Hamptons house.**

14 Q    So he was from the Hamptons?

15 A    **Yes.**

16 Q    I believe you testified a moment ago that Mr. Morgan

17 worked for Mr. Rabkin.

18 A    **Yes.**

19 Q    What line of work were they in?

20 A    **Stockbroker.**

21 Q    Mr. Mulligan, on the screen -- in front of you is a

22 photograph that is marked for identification as

23 Government's Exhibit SM-8.  Take a moment to look at that.

24       Do you recognize that individual?

25 A    **Yes.**

S. Mulligan - Direct/Flynn

1452

1   Q    Whom do you recognize him to be?

2   A    **Greg Morgan.**

3   Q    Is Government's Exhibit SM-8 -- does it fairly and

4   accurately represent how Mr. Morgan appeared in or about

5   1994?

6   A    **Yes.**

7         MR. FLYNN:  The Government moves for the

8   admission of Government's Exhibit SM-8.

9         THE COURT:  No objection.

10        MR. ROSEN:  No objection.

11        THE COURT:  Received in evidence.

12        (Whereupon, Government Exhibit SM-8 was received

13  in evidence.)

14  BY MR. FLYNN:

15  Q    For the record, Mr. Morgan -- I'm sorry.

16        For the record, Mr. Mulligan, Government's

17  Exhibit SM-8 is appearing on the screen in the courtroom.

18  For the record, who is that?

19  A    **Greg Morgan.**

20  Q    You indicated a moment ago Mr. Morgan was the

21  individual who informed you of the armored car?

22  A    **Yes.**

23  Q    Where did this conversation take place?

24  A    **By the sports bar area in Spatts.**

25  Q    Where in Spatts?

---

S. Mulligan - Direct/Flynn

1453

1   A    **In the area of the bar.**

2   Q    Who initiated this conversation between you and

3   Mr. Morgan?

4   A    **Mr. Morgan.**

5   Q    And what did he say with respect to the armored car?

6   A    **Told me there's a check cashing truck that comes to**

7   **his building, cashing checks for everyone in the building,**

8   **and he felt there is a lot of money in the truck at the**

9   **time.**

10  Q    Did Mr. Morgan tell you anything regarding the

11  description of the individuals who operate the truck?

12  A    **Yes.  He mentioned they were very lackadaisical and**

13  **elderly.**

14  Q    And did Mr. Morgan -- based on your conversation with

15  Mr. Morgan, where did you understand him to work?

16  A    **In the brokerage firm in Syosset.**

17  Q    Did Mr. Morgan say -- what, if anything, did

18  Mr. Morgan say to you about the delivery schedule of this

19  armored truck?

20  A    **They came around lunchtime once a week.**

21  Q    Did Mr. Morgan tell you how he himself knew of this

22  information?

23  A    **Yes.  That he worked in the building, and he would**

24  **see them there every week.**

25  Q    Did Mr. Morgan tell you he physically observed this

---

S. Mulligan - Direct/Flynn

1454

1   truck on occasions?

2   A    **Yes.**

3   Q    Did you and Mr. Morgan discuss at Spratts that day

4   the prospect of you robbing the vehicle?

5   A    **Yes.**

6   Q    What did you tell Mr. Morgan?  What was your plan

7   initially?

8   A    **That we were going to pull up in a tow truck and**

9   **steal the armored truck out of there when no one was**

10  **there, in there.  Bring it into the parking lot, peel the**

11  **doors open and steal the money out of it.**

12  Q    Initially, was the plan to steal money from the

13  armored truck an armed robbery?

14  A    **No.**

15  Q    And again, please explain how this was going to work.

16  A    **We were going to come in with the tow truck and hook**

17  **up the armored truck, pull it out to the rear parking lot,**

18  **peel the back doors open and steal the money while it was**

19  **unoccupied.**

20  Q    Did you and Mr. Morgan have any discussion about

21  compensation for him?

22  A    **No, just that we would take care of him.**

23  Q    What do you mean by that?

24  A    **That we would compensate him in some way.  We really**

25  **didn't tell him how much, because we didn't know what was**

---

S. Mulligan - Direct/Flynn

1455

1   there.

2   Q    For the record, you've been referring to "we" a

3   number of times in this discussion.  Who are you referring

4   to?

5   A    **Myself, the defendant and Rob Smyth at the time.**

6   Q    At the time you spoke to Mr. Morgan at Spratts that

7   evening, did you tell him that the defendant was going to

8   be part of this?

9   A    **Yes.**

10  Q    Approximately how far in advance of the actual

11  armored car robbery of June 23rd did this conversation

12  with Mr. Morgan take place?

13  A    **Roughly two, three months.  About three months.**

14  Q    Was the defendant there that night when you spoke to

15  Mr. Morgan?

16  A    **No.**

17  Q    Did you subsequently relay the information Mr. Morgan

18  had imparted to the defendant?

19  A    **Yes.**

20  Q    To the best of your recollection, where did that

21  conversation take place?

22  A    **In the city, by the gym on the upper east side, 81st**

23  **and Third.**

24  Q    Did you have a connection to that gym?

25  Q

---

S. Mulligan - Direct/Flynn

1456

1 Q   What?

2 A   We had a personal training company inside the gym.

3 Q   Who is "we"?  Who had the company?

4 A   Myself, the defendant and Vincent Gargiulo.

5 Q   And during this conversation you had with the

6 defendant in -- well, approximately four months before the

7 armored car robbery, what did you tell him in the gym in

8 Manhattan?

9 A   That Greg Morgan had given me a score.  That there

10 was an armored truck there that left money in the back of

11 it, and if we were interested in doing it.

12 Q   Was anyone else present during this conversation?

13 A   Yes.  Vincent Gargiulo.

14 Q   I'm sorry?

15 A   Vinnie.  Vincent Gargiulo.

16 Q   Why did you share this information with the

17 defendant?

18 A   He was just close to us, and he was there, and he

19 was -- like I said, we are all, like, friends, like best

20 friends together.

21 Q   During this period in 1994, how close were you to

22 Christian Tarantino?

23 A   Very close.  We were like brothers, almost.

24 Q   Did the defendant respond when you told him about --

25 withdrawn.

---

S. Mulligan - Direct/Flynn

1457

1       Did the defendant respond when you told him

2 about the armored car robbery?

3 A   Yes.

4 Q   What was his response?

5 A   He was excited for the idea and wanted to take a look

6 at it.

7 Q   As it was initially planned -- and you spoke about

8 that a moment ago -- what was your role to be in the

9 theft, the tow truck theft of the armored van?

10 A   I was to be the lookout again.

11 Q   Once you used the tow truck and pulled away the van,

12 how were you going to get into the back of the van?

13 A   With pry bars.  And if we had to, we had

14 industrial-sized saws if we needed to cut it.

15 Q   Did those saws have any particular type of bit?

16 A   Diamond-cut blades.

17 Q   After you discussed the armored car robbery, or the

18 potential armored car robbery, with Mr. Tarantino and

19 Mr. Gargiulo, did you and the defendant attempt any

20 further investigation into the armored car?

21 A   Yes.

22 Q   What did you do?

23 A   We went to the location, at which point we surveilled

24 and we watched to see where it came in, roughly around the

25 time they came in, and what they did.

---

S. Mulligan - Direct/Flynn

1458

1 Q   Did you personally participate in some of these

2 surveillance sessions?

3 A   Yes.

4 Q   And with whom did you participate in the

5 surveillance?

6 A   With the defendant.  Myself and the defendant.

7 Q   Approximately how many times were you present in

8 Syosset surveilling the armored car?

9 A   Roughly two or three times.

10 Q   To the best of your recollection, what did you

11 observe while surveilling the armored car in Syosset?

12 A   We would observe the truck was parked always in the

13 same spot.  The two gentlemen would get out and -- with

14 the two suitcases they walked in with.

15 Q   Mr. Mulligan, I'm now showing you on the screen in

16 the courtroom what has previously been admitted into

17 evidence as Government's Exhibit RRG-86.

18       Do you recognize the scene depicted in the

19 photograph?

20 A   Yes.

21 Q   What do you recognize it to be?

22 A   The crime scene and the van to the left.

23 Q   Do you recognize it -- it appears to be a parking

24 lot, is it not?

25 A   Yes.

---

S. Mulligan - Direct/Flynn

1459

1 Q   What is the parking lot for?

2 A   The parking lot for the building where everyone

3 worked with -- for the stockbroker and whatnot.

4 Q   On the left-hand side of the screen there appears to

5 be a white vehicle.  Do you see that?

6 A   Yes.

7 Q   What is that?

8 A   That is the vehicle where the armored car came in.

9 Q   Showing you what has been admitted as RRG-45.

10       Do you recognize the vehicle depicted in the

11 photograph?

12 A   Yes.

13 Q   Again, what is it?

14 A   The armored car that was used.

15 Q   To the best of your recollection, what day of the

16 week did you conduct these surveillance missions of the

17 armored car with the defendant on?

18 A   It was during the week.  I don't recall if it was a

19 Tuesday or a Thursday.

20 Q   Directing your attention back to Government's Exhibit

21 RRG-86, using that photograph as a reference, are you able

22 to -- do you see the location where you and the defendant

23 would set up shop for your surveillance?

24 A   Yes.

25 Q   Where?

S. Mulligan - Direct/Flynn

1460

1    A    Back toward the third row over in this area, to the
2    right (indicating).
3    Q    Got it.  All right.
4         Without pointing, since it doesn't show up on
5    the screen, just describe where you and the defendant
6    would set up to surveil the armored car.
7    A    About the third row back of the vehicles on the
8    right-hand side.
9    Q    The right-hand side of the photograph, third row back
10   of the vehicles, am I correct, in approximately that
11   location there (indicating)?
12   A    Yes.
13        MR. FLYNN:  Your Honor, may I approach?
14        THE COURT:  Is this a good time for an afternoon
15   break?
16        THE COURT:  Folks, I was planning to break a
17   little bit earlier since we had an earlier break.
18        Do you need another break?
19        THE JURY:  No.
20        THE COURT:  Thank you.  If you do, let me know.
21   BY MR. FLYNN:
22   Q    Just using the laser pointer, would you point out
23   where in the parking lot you and Mr. Tarantino were parked
24   each time you conducted surveillance of the armored car?
25   A    Roughly around here (indicating).

S. Mulligan - Direct/Flynn

1461

1    Q    For the record, you have indicated what appears to be
2    the third or fourth row back, immediately to the right of
3    that large tree --
4    A    Yes.
5    Q    -- in the photograph.
6         And during each of these surveillance sessions,
7    did you physically see the armored car each time?
8    A    Yes.
9    Q    And where would the armored car go each time it came?
10   A    It would always park in that handicapped spot.
11   Q    During any of these surveillance sessions, I'll call
12   them, did either you or the defendant get out of the
13   vehicle?
14   A    Yes.
15   Q    Well, who got out?
16   A    The defendant.
17   Q    And what, if anything, did you observe him do when he
18   exited the vehicle you were in?
19   A    Just to walk by the vehicle, see if anything was
20   inside, anything else what going on.
21   Q    When he returned to your vehicle, what did he say?
22   A    Couldn't observe anything.
23   Q    Inside what?
24   A    Inside the van.
25   Q    Based upon your conversations with the defendant

S. Mulligan - Direct/Flynn

1462

1    during this period of time, are you aware if he
2    participated in additional surveillance missions without
3    you?
4    A    Yes.
5    Q    What was that understanding?
6    A    He went with Rob Smyth on the road to surveil it, to
7    see what was going on with that.  And he went with Louis
8    Dorval to surveil it also, at which point they realized
9    there was no money left inside the vehicle.
10   Q    What do you mean by that?
11   A    Well, they must have watched when they got out and
12   opened the doors, and there were no more suitcases left
13   inside.
14   Q    If there was no money in the vehicle, where was it?
15   A    The two suitcases were with the armored guards.
16   Q    So they took all the money with them?
17   A    Yes.
18   Q    Left nothing in the vehicle?
19   A    Yes.
20   Q    Who made those observations, to the best of your
21   understanding?
22   A    I don't know if it was the defendant or Louis Dorval.
23   Q    This information -- withdrawn.
24        Were you present when that was observed?
25   A    No.

S. Mulligan - Direct/Flynn

1463

1    Q    Did that information cause the original plan
2    regarding hooking a tow truck up to the back of the
3    armored car to change in any way?
4    A    Yes.
5    Q    How did it change?
6    A    Switched from stealing the truck to armed robbery.
7    Q    And why?  Why did it change?
8    A    Because there was no money left in the truck, and the
9    mark seemed easy enough to do.  So at this point
10   Mr. Dorval and the defendant decided they would do an
11   armored robbery instead.
12   Q    Okay.  When the plan worked from a theft of a truck
13   to the armored car robbery, did your role change in any
14   way?
15   A    Yes.
16   Q    When?  Explain.
17   A    I had backed out of it at that point.
18   Q    Why did you back out?
19   A    Because I wasn't involved in doing the armed robbery
20   or doing anything with the guns.
21   Q    Could you explain a little bit?
22   A    I didn't want to get involved in the robbery.
23   Couldn't do that much jail time if I got caught.
24   Q    To your knowledge, when you backed out of the plan
25   that had inured to an armed robbery, did anyone approach

S. Mulligan - Direct/Flynn

1464

1 to take your place?
2 A   Yes.
3 Q   Who?
4 A   **My understanding, it was Guy Fotato, Richie Maldoon,**
5 **M-A-L-D-O-O-N.**
6 Q   Anyone else?
7 A   **Vinnie knew about the job with us, but he wasn't**
8 **interested in doing it.**
9 Q   And who approached, to your knowledge, those other
10 individuals, including Mr. Gargiulo?
11 A   **The defendant and Louis Dorval.**
12 Q   At some point before the robbery, did you agree to
13 get involved again?
14 A   **Yes.**
15 Q   With the robbery crew?
16 A   **Yes.**
17 Q   In what capacity?
18 A   **As a lookout.**
19 Q   Why?
20 A   **They talked me into it, and the money.**
21 Q   When you say they talked you into it, who are you
22 referring to?
23 A   **The defendant and Rob Smyth.  They couldn't trust**
24 **anyone else that they did want to bring on it, and didn't**
25 **want to let anyone else in, so I agreed to do it.**

S. Mulligan - Direct/Flynn

1465

1 Q   Prior to the robbery, did you discuss with
2 Mr. Tarantino, Mr. Smyth and Mr. Dorval how the money you
3 worked to steal would be split amongst the four of you?
4 A   **Yes.**
5 Q   What was the breakdown supposed to be?
6 A   **It was going to be I would get ten percent as the**
7 **lookout, and they were split it evenly amongst themselves.**
8 Q   What about Mr. Morgan?
9 A   **They said they would take care of him.  There was no**
10 **price set.**
11 Q   Okay.  Mr. Mulligan, I'd like to briefly direct your
12 attention to the day before the robbery.  That would be
13 June 22, 1994.
14       Do you recall that day?
15 A   **Yes.**
16 Q   On that day, did you and the defendant, Louis Dorval
17 and Rob Smyth take any steps to prepare for the robbery
18 the next day?
19 A   **Yes.**
20 Q   What steps, if any, did you take?
21 A   **Cleaned out the vehicle, inside and outside, washed**
22 **it, Windex'd everything, vacuumed it.  Mr. Smyth did most**
23 **all of that.  Chris and I recharge all the batteries from**
24 **the walkie-talkies and the scanners.**
25 Q   All right.  Let's break that information down.

S. Mulligan - Direct/Flynn

1466

1       You indicated that Mr. Smyth cleaned the
2 vehicle.  Is that your testimony?
3 A   **Yes.**
4 Q   What vehicle are you referring to?
5 A   **The Blazer.**
6 Q   And is that the vehicle that -- that we've looked at
7 previously during your testimony, Government's Exhibit
8 RRG-88?
9 A   **Yes.**
10 Q   Why were you cleaning the Blazer the day before the
11 robbery?
12 A   **To make sure there were no fingerprints or DNA or**
13 **anything inside of it.**
14 Q   Why?
15 A   **Because we were going to leave the vehicle behind.**
16 Q   Again, who was the individual who cleaned the Blazer
17 the day before the robbery?
18 A   **Rob Smyth.**
19 Q   Well, where did this occur?
20 A   **At Craig Miller's warehouse.**
21 Q   Again, this was the day before the robbery?
22 A   **Yes.**
23 Q   What specifically do you remember about Mr. Smyth
24 cleaning the Blazer the day before the robbery?
25 A   **It was hot out.  He was down to his underwear**

S. Mulligan - Direct/Flynn

1467

1 cleaning inside the truck.
2 Q   How was he cleaning?
3 A   **With a vacuum, Windex.**
4 Q   Inside and out?
5 A   **Yes.**
6 Q   What else do you remember, other than the cleaning of
7 the Blazer at Craig Miller's warehouse?  What else
8 occurred that day before the robbery?
9 A   **We charged all the walkie-talkies and the scanners.**
10 Q   All right.  You mentioned scanners.  What is a
11 scanner?
12 A   **It is something you could listen to all the police**
13 **calls as they come out.  So you plug in a police band, so**
14 **if you are in the police band, you can hear all the calls**
15 **that are coming out.**
16 Q   You've testified that this was to be an armed
17 robbery.
18       Do you recall seeing any weapons the day before?
19 A   **Not the day before, but the day of.**
20 Q   All right.  After you cleaned the car -- well, how
21 long did you clean the car -- withdrawn.
22       To the best of your recollection, for how long
23 did Mr. Smyth clean the Blazer the day before the robbery?
24 A   **It was several hours.**
25 Q   Who else physically was there the day before washing

S. Mulligan - Direct/Flynn

1468

1  it?

2  A    Myself and the defendant.

3  Q    Did -- after this occurred, what, if any, plans did

4  you and the defendant and Mr. Smyth make for the next day?

5  A    To meet back at the warehouse that morning, early.

6  Roughly 9, 9:30.

7  Q    Again, for the record, what warehouse are you

8  referring to?

9  A    Craig Miller's.

10  Q    The location referenced in Government's Exhibit

11  SM-13?

12  A    Yes.

13  Q    On the morning of the robbery -- now we're on

14  June 23, 1994, the next day.

15         What, if anything, did you do that morning?

16  A    I -- we met up at the warehouse space.

17  Q    Sorry?

18  A    Warehouse space of Craig Miller's.

19  Q    Was anyone else there?

20  A    Yes.

21  Q    Who was there?

22  A    Robert Dorval, Louis Smyth [sic] and the defendant.

23  Q    Approximately what time did you get to -- that

24  morning to the Miller's warehouse?

25  A    Between 9, 9:30.

S. Mulligan - Direct/Flynn

1469

1  Q    When you got to Craig Miller's warehouse the morning

2  of the robbery, what, if anything, do you remember about

3  how everyone was dressed?

4  A    Mr. Dorval was wearing a suit with a bulletproof vest

5  under it, and the defendant and Rob Smyth, they were

6  wearing sweat clothes with a button-up top.

7  Q    To the extent you know, what was the purpose of

8  Mr. Dorval wearing a suit?

9  A    To blend in with the other people who worked at the

10  building, the stockbrokers.

11  Q    Was he wearing any sort of disguise as well?

12  A    Yes.

13  Q    What?

14  A    Mustache and fake hair.

15  Q    You indicated that he was wearing a bulletproof vest;

16  is that correct?

17  A    Yes.

18  Q    Was the defendant and Mr. Smyth wearing a bulletproof

19  vest as well?

20  A    Yes.

21  Q    Did those bulletproof vests make them bigger than

22  they actually were at the time?

23  A    Yes.

24  Q    Were -- well, you indicated that Mr. Dorval had a

25  disguise on when you saw him the morning of the robbery at

S. Mulligan - Direct/Flynn

1470

1  Miller's warehouse, correct?

2  A    Yes.

3  Q    Did the defendant and Mr. Smyth have anything with

4  them that would conceal their identity?

5  A    Yes.

6  Q    What?

7  A    Pig masks.

8  Q    Did you see the masks?

9  A    Yes.

10  Q    What did did they look like?

11  A    Mask that you pull over completely.  Has a pig face

12  and a black nose.

13  Q    Did you have a weapon with you that morning?

14  A    No.

15  Q    Did any of your coconspirators, including the

16  defendant, have a weapon with them that morning?

17  A    Yes.

18  Q    All right.  Who, if anyone, had weapons with them at

19  Craig Miller's warehouse before the robbery?

20  A    Louis Dorval and the defendant.

21  Q    And Louis Dorval.  What sort of weapon did Louis

22  Dorval have with him that day?

23  A    A pistol.

24  Q    What kind of pistol?

25  A    My recollection is a 9-millimeter Glock.

S. Mulligan - Direct/Flynn

1471

1  Q    What color was it?

2  A    Black.

3  Q    Did you see it?

4  A    Yes.

5  Q    You indicated the defendant had a weapon.  What

6  weapon did the defendant have with him?

7  A    A pistol grip shotgun.

8  Q    What color was it?

9  A    Black.

10  Q    Mr. Mulligan, I'm showing you what has been

11  previously admitted into evidence in this case as

12  Government's Exhibit RS-4.

13         Do you recognize this weapon?

14  A    Yes.

15  Q    What do you recognize it to be?

16  A    Looks like the weapon that was there that morning

17  that we were wiping down.

18  Q    What do you mean?

19  A    Making sure it had no fingerprints on it.

20  Q    Who had this weapon?

21  A    The defendant.

22  Q    From where did Mr. Tarantino obtain that shotgun?

23  A    Through a gun store in Merrick.

24  Q    How do you know that?

25  A    Because I was there.  The younger guys, Steven

S. Mulligan - Direct/Flynn

1472

1    Tarantino's friends, purchased it.
2    Q    To your knowledge, did Mr. Tarantino walk into the
3    gun store in Merrick and buy it?
4    A    No.
5    Q    Who did?
6    A    Some of the younger kids.
7    Q    As you sit here today, do you recall those names, the
8    individuals' names?
9    A    Well, there was Gus, G-U-S, John -- he was Tom
10   Belisis' cousin.
11   Q    And what, if anything, do you remember -- what, if
12   anything, do you remember Tarantino and Dorval doing with
13   their weapons at Miller's warehouse before you left for
14   the robbery site?
15   A    Wiping them down.
16   Q    What other items were distributed between you and the
17   defendant and Mr. Dorval that morning?
18   A    Walkie-talkies and scanners.
19   Q    What did you take with you?
20   A    A walkie-talkie and a scanner.
21   Q    Why?
22   A    Because I was going to be a lookout, and I would
23   listen in case a call came out.
24        MR. FLYNN:  Your Honor, may I approach?
25        THE COURT:  Yes.

S. Mulligan - Direct/Flynn

1473

1    BY MR. FLYNN:
2    Q    All right.  Mr. Mulligan, I'm showing you what has
3    previously been admitted into evidence as Government's
4    Exhibit JK-26-A.  Also, JD-25-D.
5        Do you recognize these items?
6    A    Yes.  One is a scanner, and one is a walkie-talkie.
7    Q    Which is the scanner?
8    A    To the right.  JK-26-A.
9    Q    And do those look substantially similar to the
10   scanner and the walkie-talkie you personally had with you
11   on the morning of the armored car robbery, June 23, 1994?
12   A    Yes.
13   Q    Did you eventually depart for the robbery site in
14   Syosset that day?
15   A    Yes.
16   Q    What time did you and -- did you, Mr. Mulligan, park?
17   A    About 10 a.m.
18   Q    What vehicle did you leave in?
19   A    The Toyota Tercel.
20   Q    Who, if anyone, did you go with?
21   A    I went alone.
22   Q    All right.  Who left first?
23   A    I did.
24   Q    How did you get from Farmingdale, where Craig
25   Miller's warehouse was, to Syosset on June 23, 1994?

S. Mulligan - Direct/Flynn

1474

1    A    I took Route 110 to the Long Island Expressway, to
2    the Seaford Oyster Bay Expressway, to Jericho Turnpike at
3    the end.
4    Q    To the extent you know, how did the defendant and
5    Mr. Smyth get to the robbery site that day?
6    A    They came in the Chevy Blazer.
7    Q    Again, that's the vehicle that is depicted in
8    Government's Exhibit RRG-88?
9    A    Yes.
10   Q    How do you know they were in the Blazer?
11   A    Because they passed by me when I was parked.
12   Q    Where were you parked?
13   A    Across the street from the area in a gas station.
14   Q    What street?
15   A    Right on Jericho Turnpike.
16   Q    All right.  To the extent you know, how did Dorval
17   get to the robbery site?
18   A    He came in a different car, in an Infiniti.
19   Q    What kind of car?
20   A    Infiniti.
21   Q    Do you remember the model number?
22   A    A Q45.
23   Q    Again, why the two cars, other than your vehicle?
24   A    The Blazer was to be left behind, and they were to
25   switch cars and go into the Infiniti in case a call came

S. Mulligan - Direct/Flynn

1475

1    out for the Blazer.
2    Q    To the best of your recollection, approximately what
3    time did you arrive at the site of the robbery that day,
4    June 23rd?
5    A    Between 10:15 and 10:30.
6    Q    Again, where precisely did you go when you got there?
7        On the screen in front of you, Mr. Mulligan, is
8    what has been previously admitted into evidence as
9    Government's Exhibit RRG-4.
10       Do you recognize that -- do you recognize what
11   that photograph depicts?
12   A    Yes.
13   Q    What does that depict?
14   A    It's an aerial shot of the building.
15   Q    All right.  Are you familiar with this area of
16   Syosset?
17   A    Yes.
18   Q    Based on your -- are you familiar with it based on
19   your previous surveillance missions you conducted there
20   prior to your robbery?
21   A    Yes.
22   Q    Familiarize yourself with the picture.
23       Can you please identify for the jury the area
24   where the armored van is and where it was when you
25   surveilled it during your previous missions?

S. Mulligan - Direct/Flynn

1476

1  A     (Indicating.)

2  Q     For the record, you've indicated an area of the

3  photograph just above the tree line on the left-hand side;

4  is that correct?

5  A     Yes.

6  Q     And in that photograph, do you see the armored car?

7  A     Yes.

8  Q     Would you also please indicate for the jury where you

9  went and positioned yourself as a lookout on the day of

10 the robbery?

11 A     (Indicating).  Right by the end.  Whoops.

12 Q     And for the record, you've placed your laser pointer

13 on what appears to be a gas station above -- to the north,

14 I guess, above, looking in the photograph, the area of the

15 armored car robbery?

16 A     Yes.

17 Q     I've blown it up on the screen.

18        Do you remember exactly where you parked your

19 car to be a lookout?

20 A     Right about in here (indicating).

21 Q     And again for the record, what -- do you see a road

22 directly in front of that gas station?

23 A     Yes.

24 Q     For the record, what road is that?

25 A     Jericho Turnpike.

S. Mulligan - Direct/Flynn

1477

1  Q     You testified a little earlier that as you were

2  parked in this location there, that gas station, you saw

3  the defendant and Mr. Smyth drive by in the red Chevy

4  Blazer.

5  A     Yes.

6  Q     Could you indicate on the screen where you saw them

7  drive by?

8  A     They came Underhill.

9  Q     I'm sorry?

10 A     They came down Underhill Road.  It's hard to see on

11 this.

12 Q     Did you have the ability to communicate with the

13 defendant and Mr. Smyth that morning?

14 A     Yes.

15 Q     How so?

16 A     On walkie-talkie.

17 Q     To your knowledge, did the defendant have one as

18 well?

19 A     Yes.

20 Q     All right.  And just before the robbery occurred, did

21 you -- do you recall a conversation with the defendant on

22 the walkie-talkie?

23 A     Yes.

24 Q     What did he say to you?

25 A     He said, is it all clear?

S. Mulligan - Direct/Flynn

1478

1  Q     Did you respond?

2  A     Yes.

3  Q     How did you respond?

4  A     Yes.

5  Q     After you had that conversation with the defendant

6  whether it was all clear, how long were you sitting there

7  between your next contact with the defendant?

8  A     Right away.  At that point it happened, within two

9  minutes.

10 Q     I'm sorry?

11 A     Right away.  Like within a minute or two.

12 Q     At some point did you have an understanding that the

13 robbery was over?

14 A     Yes.

15 Q     And when did you first know the robbery was over?

16 A     When I saw him go by the car, and at the same token

17 they told me over the walkie-talkie to go, go, go.

18 Q     You said they came by you?

19 A     They drove past me, yes.

20 Q     Where were you then?

21 A     Parked at the gas station, still, on Jericho

22 Turnpike.

23 Q     What car was the defendant -- well, what car came by

24 you?

25 A     The white Q45 Infiniti.

S. Mulligan - Direct/Flynn

1479

1  Q     Were you able to see who was inside the vehicle?

2  A     Yes.

3  Q     Who?

4  A     Rob Smyth, the defendant and Louis Dorval.

5  Q     What did you do at that point?

6  A     I left out behind them and headed back to the Craig

7  Miller warehouse.

8  Q     On your way back to Craig Miller's warehouse after

9  the robbery in Farmingdale, did you learn that someone had

10 been killed during the armored car robbery?

11 A     Yes.

12 Q     How did you come to that -- how did you learn of that

13 information?

14 A     It came across the scanner that I had with me that it

15 was a DOA.

16 Q     What does that mean?

17 A     Dead on arrival.

18 Q     What were you thinking at that point?

19 A     I just panicked.  My stomach dropped at that point.

20 Q     Did you continue on -- at that point, where did you

21 go?

22 A     I continued on to Craig Miller's warehouse.

23 Q     And did you eventually reach that location?

24 A     Yes.

25 Q     What do you remember happening when you got back to

S. Mulligan - Direct/Flynn

1480

1 Q    Craig Miller's warehouse?
2 A    Well, there was an argument going on as I got in.
3 Q    Who was arguing?
4 A    The defendant with Louis Dorval.
5 Q    What sort of argument were they having?
6 A    Over what had happened.  Defendant kept asking him
7 how it happened, how it happened.  And Louis Dorval kept
8 saying, it was a mistake.
9 Q    All right.  Who got -- withdrawn.
10        When you arrived at Craig Miller's warehouse
11 after the robbery, was everyone else there?
12 A    Yes.
13 Q    I mean you, Scott Mulligan, Louis Dorval and the
14 defendant.
15 A    Yes.
16 Q    Did you have an opportunity to observe their
17 demeanor?
18 A    Yes.
19 Q    In what state were your three coconspirators?
20 A    Everything was shaken up at the time.  Everyone was
21 trying to get out of there as quickly as possible.
22 Q    Do you recall witnessing a particular conversation at
23 the Miller warehouse between Tarantino and Mr. Dorval
24 concerning a weapon?
25 A    Yes.

S. Mulligan - Direct/Flynn

1481

1 Q    Tell me about that.
2 A    Tarantino wanted to take the weapon with us, and
3 Mr. Dorval wanted to take it himself, as he wanted to keep
4 it.  And the defendant wanted to bring it with us to get
5 rid of it.
6 Q    What weapon are we talking about?
7 A    The pistol.
8 Q    Who had the pistol during the robbery?
9 A    Mr. Dorval.
10 Q    Did you subsequently come to understand that that
11 weapon was the weapon that fired the bullet through the
12 back of his head?
13 A    Yes.
14 Q    Why did Mr. Dorval want to keep it?
15 A    Because he thought he could drill out the barrel and
16 keep the gun.
17 Q    Well, who won that argument?
18 A    The defendant.
19 Q    What time of day is this all happening now?
20 A    This is still before lunch, before noon, like 11:30,
21 a quarter to 12, 12 o'clock by now.
22 Q    How long were you there?
23 A    Not even five minutes.
24 Q    What if anything do you remember Mr. Smyth during
25 during this period of time?

S. Mulligan - Direct/Flynn

1482

1 A    Nothing.  Everyone was just scrambling to get out of
2 there during that period of time.
3 Q    Did you eventually leave?
4 A    Yes.
5 Q    Did you leave with someone?
6 A    Yes.
7 Q    With whom?
8 A    The defendant.
9 Q    Where did you and the defendant go?
10 A    We went to Manhattan.
11 Q    Who drove?
12 A    I did.
13 Q    What vehicle did you take?
14 A    The Tercel.
15 Q    What was the purpose of going to New York City with
16 the defendant?
17 A    To establish an alibi.
18 Q    What do you mean?
19 A    We wanted to establish that we were in the city at
20 the time this crime had taken place, just in case we were
21 accused of it.
22 Q    What, if anything, did you and the defendant take
23 with you in your Tercel and go to the city with when you
24 went to the warehouse?
25 A    We took the pistol that Louis Dorval used.

S. Mulligan - Direct/Flynn

1483

1 Q    How long did it take you to get from Craig Miller's
2 warehouse in Farmingdale to Manhattan?
3 A    Roughly 45 minutes.
4 Q    During that ride, did you have a conversation with
5 the defendant?
6 A    Yes.
7 Q    What did he tell you about the robbery during the
8 ride?
9 A    Basically that, you know, Louie did it by mistake.
10 He was trying to hold him down, and the gun went off, and
11 that Louie wanted to keep the pistol at that point so he
12 could redrill it out to save it.
13        And the defendant didn't want him to have it.
14 He wanted him to get rid of it.
15 Q    You testified just a moment ago that the defendant
16 was saying that Louie was trying to hold him down.  Who is
17 "him"?
18 A    Mr. Baumgardt.
19 Q    Did you have the opportunity to observe the
20 defendant's demeanor during this ride?
21 A    Yes.
22 Q    What was his demeanor?
23 A    Mainly concentrating to establish where we were and
24 getting rid of what he had.
25 Q    Did you and the defendant eventually reach Manhattan

S. Mulligan - Direct/Flynn

1484

1  that day?

2  A   Yes.

3  Q   And did you and the defendant cross any bridge to get

4  off the Island of Manhattan?

5  A   Yes, the 59th Street bridge.

6  Q   What if anything happened as you and the defendant

7  crossed the 59th Street bridge in your Toyota Tercel?

8  A   The defendant threw the gun and few pieces off the

9  bridge into the water.

10  Q   Who brought the gun?

11  A   The defendant.

12  Q   Again, who is driving at this point?

13  A   Myself.

14  Q   Did you have to stop the car to throw the weapon into

15  the river?

16  A   No.

17  Q   How did that work?

18  A   He threw pieces out the window, the gun, like you

19  would throw trash out.

20  Q   After the defendant threw the weapon into the East

21  River, where did you go?

22  A   We went to the gym on 32nd and Park.

23  Q   What gym?

24  A   Eastside Fitness.

25  Q   What was the purpose of going there?

S. Mulligan - Direct/Flynn

1485

1  A   To establish an alibi.

2  Q   Who owned that gym?

3  A   Damon, D-A-M-O-N, Rasucci, R-A-S-U-C-C-I, and Brett

4  Holzer.

5  Q   All right.  What happened when you got -- with the

6  defendant -- withdrawn.

7       What happened when you and the defendant got to

8  Damon -- Mr. Rasucci and Mr. Holzer's gym?

9  A   Nothing.  The defendant and I both went inside.  He

10  went inside to change into some gym clothes, and at that

11  point I received a phone call.

12  Q   Who called you?

13  A   Barry Rabkin.

14  Q   And again, who is Mr. Rabkin to you in 1994?

15  A   He was a close friend of mine.

16  Q   All right.  How long were you at Eastside Fitness?

17  A   Roughly 15 minutes.

18  Q   Where did you go when you left?

19  A   I went to Barry -- I went outside to speak to Barry

20  Rabkin on the phone.

21  Q   Did you eventually conclude your conversation with

22  Mr. Rabkin?

23  A   Yes.

24  Q   And after you concluded your conversation with

25  Mr. Rabkin, what, if anything, did you do?

S. Mulligan - Direct/Flynn

1486

1  A   I went -- met him back at his office in Garden City,

2  and from there I went out east to the Hamptons to go to

3  the police station.

4  Q   What was the purpose?

5  A   He had to fill out a police report because someone

6  damaged his house there, and I wanted to go because it was

7  an alibi for myself.

8  Q   But it was just coincidental that he called you?

9  A   Yes.

10  Q   What happened when you went out to the Hamptons that

11  day.

12       Well, I should say, did the defendant go with

13  you?

14  A   No.

15  Q   So did you leave the defendant at the gym in

16  Manhattan?

17  A   Yes.

18  Q   And parted ways?

19  A   Yes.

20  Q   And what happened when you got out to the Hamptons

21  that day?

22  A   I went to the Hamptons, Barry Rabkin made his police

23  report there, and after that, we left and came back to

24  Long Island.  East Meadow.

25  Q   The fact that you had gone to a police station in the

S. Mulligan - Direct/Flynn

1487

1  Hamptons that day, did that give you any sort of level of

2  comfort?

3  A   Yes.

4  Q   Why?

5  A   I felt as though I established an alibi where I was

6  after that crime had happened.

7  Q   How long were you out in the Hamptons with Mr. Rabkin

8  on the day of the murder, June 23, 1994?

9  A   About an hour.

10  Q   What, if anything, did you do later in the day?

11  A   I went back to East Meadow where I lived and

12  proceeded to go meet with the defendant and Rob Smyth in

13  East Meadow around the block from me.

14  Q   I didn't catch the last part.  You went to East

15  Meadow?

16  A   Yes.

17  Q   Did you meet anyone there?

18  A   Yes.

19  Q   Who?

20  A   Met the defendant and Rob Smyth.

21  Q   Where specifically did you go to in East Meadow?

22  A   The defendant's house.

23  Q   What time of day was this happening?

24  A   It was dinnertime by then.  Roughly 5, 6 o'clock.

25  Q   Was there anyone else in the defendant's house when

S. Mulligan - Direct/Flynn

1488

1  you got there, other than the defendant and Rob Smyth?
2  A   Marissa Levy.
3  Q   What relation did she have to anyone?
4  A   At the time, she was his live-in girlfriend.
5  Q   Whose?
6  A   The defendant.
7  Q   What did you and the defendant and Rob Smyth do at
8  his house that evening?
9  A   We counted the money and then divided it.
10 Q   What money?
11 A   The money from the armored car.
12 Q   How much money did you get personally from your
13 participation in the armored car robbery with the
14 defendant, Mr. Smyth and Mr. Dorval?
15 A   About 9200.
16 Q   To the best of your recollection, how much money did
17 the other three individuals receive?
18 A   Like roughly 27 each, 27,000 each.
19         MR. FLYNN:  Your Honor, do we intend to take a
20 break at this point?
21         THE COURT:  No, we'll go to about 4:30.
22         MR. FLYNN:  All right.
23 BY MR. FLYNN:
24 Q   Mr. Mulligan, I'd like to now direct your attention
25 to the weeks following the armored car robbery and the

S. Mulligan - Direct/Flynn

1489

1  murder of Julius Baumgardt later in the summer of 1994.
2         Did there come a time -- did there come a point
3  in time during that summer when you and the defendant
4  engaged in a conversation concerning Louis Dorval?
5  A   Yes.
6  Q   All right.  Did this conversation occur once or did
7  it occur on multiple occasions?
8  A   Multiple.
9  Q   Who else participated in these conversations
10 regarding Mr. Dorval?
11 A   At different times it was myself, the defendant,
12 Vinnie Gargiulo and Rob Smyth.
13 Q   What did the four of you discuss?
14 A   The fact that law enforcement was looking for him.
15 And he had no intentions of being caught, and we were
16 concerned if he was caught, that he would tell.
17 Q   Did you have an understanding during the summer of
18 1994 that Mr. Dorval was wanted by both federal and state
19 law enforcement?
20 A   Yes.
21 Q   Were you also concerned that Mr. Dorval was a suspect
22 in the armored car robbery?
23 A   Yes.
24 Q   What did you know with respect to his status?
25 A   We knew that the feds were looking for him in regards

S. Mulligan - Direct/Flynn

1490

1  to the bonds, furs, coats.
2  Q   Was the defendant aware of that fact as well?
3  A   Yes.
4  Q   How do you know that?
5  A   Because we discussed it several times.
6  Q   Had Mr. Dorval said anything to you and the defendant
7  which caused you particular concern about him?
8  A   Yes.  That he was never going back to jail.
9  Q   Specifically what about that statement concerned you?
10 A   The fact that he was not to tell, not to go back to
11 jail, or he made a comment that he would go out shooting.
12 Q   Did you have an opportunity to see Mr. Dorval during
13 the summer of 1994, during the time he was wanted by law
14 enforcement?
15 A   Yes.
16 Q   What if anything did you notice about Mr. Dorval's
17 appearance?
18 A   He had changed his hair color.
19 Q   How so?
20 A   He lightened it to a blondish color.
21 Q   What if anything do you remember about where
22 Mr. Dorval was living during this period of time?
23 A   He had moved to Queens.
24 Q   Would you be more specific?
25 A   Originally lived in Elmont, and we knew he was being

S. Mulligan - Direct/Flynn

1491

1  looked for by the FBI and other law enforcement.  He found
2  another apartment in Queens, Corona, that no one knew he
3  was located there.  Stayed there.
4  Q   What sort of apartment was it?
5  A   Basement apartment.
6  Q   During the summer of 1994, did you have occasion to
7  be in that apartment?
8  A   Yes.
9  Q   And again, what was your understanding why he was
10 living in that basement apartment in Corona, Queens?
11 A   To avoid being captured by law enforcement.
12 Q   Mr. Mulligan, I will show you on the screen in front
13 of you and behind you what has been previously admitted
14 into evidence as Government's Exhibit RRG-60.
15         Do you see that photograph?
16 A   Yes.
17 Q   Do you recognize it?
18 A   Yes.
19 Q   What do you recognize it to be?
20 A   The basement apartment entrance to Louis Dorval's
21 apartment.
22 Q   Is that the apartment you indicated was in Corona,
23 Queens?
24 A   Yes.
25 Q   Showing you Government's Exhibit RRG-62.

S. Mulligan - Direct/Flynn

1492

1         Do you recognize that photograph?

2 A   **Yes.**

3 Q   What does that photograph depict?

4 A   **The kitchen in his apartment.**

5 Q   Same apartment?

6 A   **Same apartment.**

7 Q   Government's Exhibit RRG-65.

8         Do you recognize that photograph?

9 A   **Yes.**

10 Q   And again, what is that?

11 A   **That's also his apartment.**

12 Q   All right.  Mr. Mulligan, did there come a point in

13 time during the summer of 1994 when a plan was formulated

14 to kill Louis Dorval?

15 A   **Yes.**

16 Q   When was the decision made to kill Louis Dorval and

17 when he was ultimately to be murdered?

18 A   **Roughly a week and a half, two weeks.**

19 Q   Who made the ultimate decision?

20 A   **We all discussed it, but the defendant ultimately**

21 **made it.**

22 Q   Where were you when the defendant ultimately made

23 this decision to murder Lou Dorval?

24 A   **We were in the city, the upper east side, the gym of**

25 **the defendant's.**

---

S. Mulligan - Direct/Flynn

1493

1 Q   What was your understanding why the defendant wanted

2 to murder Louis Dorval?

3 A   **He felt as though he brought Louie into it, and it**

4 **was up to him with regards to cleaning up the mess and**

5 **getting rid of him.**

6 Q   You said "cleaning up the mess."

7         Did the defendant specifically use that word?

8 A   **Yes.**

9 Q   What did he say?

10 A   **Well, I couldn't tell you word for word, but he said,**

11 **it is my mess, and I'll clean it up.**

12 Q   Who else was party to this conversation?

13 A   **At different times, by then it was myself, the**

14 **defendant and Vinnie Gargiulo.**

15 Q   Well, Vinnie hasn't been involved in the armored car

16 robbery, correct?

17 A   **Yes.**

18 Q   So why, to your knowledge, was Vinnie, Mr. Gargiulo,

19 included in this conversation regarding the murder of

20 Louis Dorval?

21 A   **He was someone basically -- back then, he was older**

22 **than the defendant, myself, and when it came to crime --**

23         THE COURT:  I think you are a little bit too

24 close to the mike.  Try and speak close enough but not

25 directly into it..

---

S. Mulligan - Direct/Flynn

1494

1 A   **-- he was someone we looked up to back when we were**

2 **younger, and we confided with each other back then all the**

3 **time.**

4 Q   When the defendant said that Louis Dorval was his

5 mess and he would clean it up, what did you understand

6 that to mean?

7 A   **Meaning he brought Louie around, and it was his**

8 **responsibility to get rid of him.**

9 Q   Did Mr. Tarantino discuss with you -- withdrawn.

10         What if anything did the defendant state to you

11 about how or when he could kill Louis Dorval?

12 A   **The idea was for him and Rob Smyth to tell him there**

13 **was a burglary, and they would meet him at the warehouse,**

14 **at which point the defendant would shoot him.**

15 Q   Which warehouse, for the record?

16 A   **Craig Miller's warehouse.**

17 Q   Before Mr. Dorval's murder, did you also have

18 discussions with the defendant regarding the manner in

19 which he wanted to dispose of Louis Dorval's body?

20 A   **Yes.**

21 Q   Tell me about those discussions.

22 A   **That we were going to put him into a trunk**

23 **afterwards, and I was going to borrow a friend's boat, at**

24 **which point we would take it out and dump it in the ocean.**

25 Q   Did you say a trunk?

---

S. Mulligan - Direct/Flynn

1495

1 A   **Yes.  A toolbox.**

2 Q   Did you assist the defendant in shopping for a

3 toolbox?

4 A   **Yes.**

5 Q   Tell me about that.

6 A   **We went to one or two Home Depots to find something**

7 **that would be usable.**

8 Q   And during the time that you went with the defendant

9 to shop for a toolbox, did you pick one out?

10 A   **Yes.**

11 Q   To the best of your recollection, did you and the

12 defendant buy the toolbox at that time?

13 A   **No.**

14 Q   And did the defendant, to the best of your

15 recollection -- did you engage in a conversation

16 concerning contacting anyone to help in the disposal

17 process?

18 A   **Yes.**

19 Q   Tell me about that.

20 A   **Called Craig Miller to see if I could borrow his**

21 **boat.**

22 Q   Again, is that the same Craig Miller that owned the

23 warehouse?

24 A   **Yes.**

25 Q   During this period of time, did you have an

S. Mulligan - Direct/Flynn

1496

1 understanding that Craig Miller owned a boat?

2 A   Yes.

3 Q   Did you know where it was?

4 A   Yes.

5 Q   Where was it?

6 A   Behind his family's home in Merrick.

7 Q   Did you contact Craig Miller?

8 A   Yes.

9 Q   Who contacted Craig Miller?

10 A   I did.

11 Q   Tell me about your conversation with Mr. Miller?

12 A   I called him up and asked if I could borrow his boat.

13       He said, why.

14       And I told him I wanted to dump some burglary

15 tools.

16 Q   Did he agree to use his boat?

17 A   No.

18 Q   Do you mean --

19 A   He agreed he would take us on the boat but not take

20 it out.

21 Q   How many times did you call Mr. Miller regarding the

22 use of his boat?

23 A   Two or three times.

24 Q   Why did you have to call Mr. Miller more than one

25 time?

S. Mulligan - Direct/Flynn

1497

1 A   Because it didn't work out as expected, that Louis --

2 or Louie wasn't killed as expected when it came up, and

3 that he was supposed to meet at the warehouse for a

4 burglary, and things didn't work out.

5 Q   If I understand you correctly, like there were false

6 alarms regarding when Louis would be killed?

7 A   Yes.

8 Q   These conversations you had with Mr. Miller, the two

9 or three conversations, how far apart were they spaced?

10 A   Within days of each other.

11 Q   Did there come a point in time you became aware Louis

12 Dorval was in fact dead?

13 A   Yes.

14 Q   When did that occur?

15 A   The day?  I'm not sure of the exact date.

16 Q   Where were you at the time when you came to

17 understand that Louie was dead?

18 A   I was at a bar on Merrick Avenue in North Merrick.

19 Q   Who were you with?

20 A   I was with Vinnie Gargiulo and Bob Gerrato.

21 Q   What time of day was this happening?

22 A   This was evening, once again, somewhere around

23 midnight.

24 Q   When you were with Mr. Gerrato and Mr. Gargiulo, were

25 you inside or outside of this establishment?

S. Mulligan - Direct/Flynn

1498

1 A   Three of us were inside.

2 Q   At some point did anyone else come to the bar?

3 A   Yes.

4 Q   Who came?

5 A   The defendant and Rob Smyth.

6 Q   All right.  After Mr. Tarantino and Mr. Smyth came to

7 the bar in North Merrick, what, if anything, happened?

8 A   We went outside to speak.

9 Q   Who went outside?

10 A   Vinnie Gargiulo, the defendant, myself and Rob Smyth.

11 Q   What about Mr. Gerrato?

12 A   No.

13 Q   He stayed inside?

14 A   Yes.

15 Q   And after you went outside, the four of you, what

16 happened?

17 A   At that point the defendant told me that it was done,

18 and at which point we came up with a plan to go forward to

19 Louie's apartment in Corona, Queens, to empty everything

20 out.

21 Q   What specifically did Mr. Tarantino say.  What was

22 done?

23 A   He just said it was done with regards to Louie, but

24 he didn't say, quote/unquote, Louie.  He just said it was

25 done.

S. Mulligan - Direct/Flynn

1499

1 Q   Did Mr. Tarantino indicate how he had killed

2 Mr. Dorval?

3 A   Yes.

4 Q   How?

5 A   He shot him in the head.

6 Q   Did he make any other statements concerning the

7 manner in which Louie was killed?

8 A   Yes.  That he really didn't bleed much.

9 Q   And did Mr. Tarantino indicate to you and the others

10 where Mr. Dorval had been shot?

11 A   Yes.  In the head at Craig Miller's warehouse.

12 Q   I'm sorry.  And did Mr. Tarantino -- withdrawn.

13       What, if anything, did Mr. Tarantino say

14 regarding who was with him at the time of the murder?

15 A   Yes.  Rob Smyth.

16 Q   Did Mr. Tarantino say anything -- withdrawn.

17       What, if anything, did Mr. Tarantino say

18 regarding Mr. Smyth's role in the murder?

19 A   That he helped him place him into the box.

20 Q   After the defendant, Mr. Tarantino, and Rob Smyth

21 informed you that Mr. Dorval had been killed, what, if

22 anything, did you do the same night?

23 A   We went to his apartment in Corona, Queens, at which

24 point we started bagging up all his clothes and looking

25 for his share of the money from the armored car heist.

S. Mulligan - Direct/Flynn

1500

1  Q   Who went?

2  A   Myself, the defendant and Rob Smyth.

3  Q   Why were you bagging up his clothes and removing

4  items from his apartment?

5  A   We wanted to make it look like he had left to avoid

6  capture.

7  Q   That Mr. Dorval had left?

8  A   Yes.

9  Q   I will show you, Mr. Mulligan, what has been

10 previously admitted into evidence as Government's Exhibit

11 RRG-65.

12      Do you see that?

13 A   Yes.

14 Q   And again, for the record, what does that exhibit

15 depict?

16 A   Louis Dorval's apartment.

17 Q   And does Government RRG-65 fairly and accurately

18 represent the state in which you and the defendant left

19 his apartment the night he was murdered?

20 A   Yes.

21 Q   The same with Government's Exhibit RRG-62?

22 A   Yes.

23 Q   The cabinets were in the open position like that?

24 A   Yes.

25 Q   Does that comport with your recollection?

S. Mulligan - Direct/Flynn

1501

1  A   Yes.

2  Q   What did you do with Mr. Dorval's things, like his

3  clothes and stuff?

4  A   We threw everything out in the dumpsters.

5  Q   Where?

6  A   Spread out in different locations.

7  Q   What else did you remove from Mr. Dorval's apartment

8  with the defendant that night?

9  A   Two kilos of cocaine.

10 Q   What else?

11 A   His dog.

12 Q   Whose dog?

13 A   Louie Dorval's.

14 Q   Who took the dog?

15 A   I did.

16 Q   What did you do?

17 A   I brought it to the Wantagh animal shelter and tied

18 him to the door out front.

19 Q   What time did this occur?

20 A   About 2 a.m. by now.

21 Q   Did you and the defendant and Mr. Smyth, other than

22 gutting his apartment, do anything else to make it appear

23 as if he had fled?

24 A   Nothing else to the apartment, no.

25 Q   Well, did you do anything else at all?

S. Mulligan - Direct/Flynn

1502

1  A   Yes.  We started calling his cell phone several times

2  to make it look like we were trying to get in touch with

3  him also.

4  Q   All right.  Other than calling Mr. Dorval's cell

5  phone, did you, Mr. Mulligan, make any other phone calls

6  that night?

7  A   Yes.

8  Q   Who did you call?

9  A   I called Craig Miller.

10 Q   For what reason?

11 A   To meet him in the morning to get his boat.

12 Q   Did you speak with Mr. Miller that night, to the best

13 of your recollection?

14 A   No.

15 Q   Well, what happened when you called him that night

16 then?

17 A   I left a message that I needed to see him the first

18 thing in the morning.

19 Q   Okay.  And did you -- well, did you speak with

20 Mr. Miller again before seeing him?

21 A   I spoke to him early the following morning.

22 Q   The morning after Mr. Dorval's murder?

23 A   Yes.

24 Q   Okay.  And tell me about your conversation with

25 Mr. Miller the next morning.

S. Mulligan - Direct/Flynn

1503

1  A   I said to Craig Miller that I needed to get together

2  with him right away that morning.

3  Q   Okay.  After that conversation, what happened?

4  A   I made an appointment to meet him at his mother's

5  house in Merrick.

6  Q   Made an appointment?

7  A   Yes, at 10:30 that morning, and relayed a message at

8  that point to the defendant, at which point we met him

9  there.

10 Q   What time did you get to Mr. Al Miller's house?

11 A   About 10:30.

12 Q   Who got there first?

13 A   I did.

14 Q   Mr. Mulligan, I'm showing you what has been

15 previously admitted into evidence as Government's Exhibit

16 CM-3.

17      Do you recognize that exhibit?

18 A   Yes.

19 Q   What does it depict?

20 A   The front of Craig Miller's house.

21 Q   All right.  Is that the house where the boat was

22 docked in 1994?

23 A   Yes.

24 Q   Showing you what has been admitted as Government's

25 Exhibit CM-4.

S. Mulligan - Direct/Flynn

1504

1        Do you recognize that photograph?

2 **A**   **Yes.**

3 **Q**   What does it depict?

4 **A**   **The sidewalk way to the back of the yard.**

5 **Q**   Whose backyard?

6 **A**   **Craig Miller's.**

7 **Q**   Government's Exhibit CM-5 is on the screen in the

8 courtroom.

9        Do you recognize that exhibit?

10 **A**   **Yes.**

11 **Q**   What do you recognize it to be?

12 **A**   **His backyard.**

13 **Q**   Whose backyard?

14 **A**   **I'm sorry. Craig Miller.**

15 **Q**   Government's Exhibit CM-5. To the best of your

16 recollection, was his backyard substantially in a similar

17 state, Miller's backyard, that is, in 1994?

18 **A**   **Yes.**

19 **Q**   For example, was his deck there?

20 **A**   **Yes.**

21 **Q**   Government's Exhibit CM-6 appearing in the courtroom.

22        Do you recognize that exhibit?

23 **A**   **Yes.**

24 **Q**   What is it?

25 **A**   **That's the dock that goes down to the boat.**

S. Mulligan - Direct/Flynn

1505

1 **Q**   I'll show you Government's Exhibit CM-7, which is

2 admitted and now appearing on the screen in the courtroom.

3        Do you recognize the item depicted in that

4 photograph?

5 **A**   **Yes.**

6 **Q**   What is it?

7 **A**   **That's the Miller family boat.**

8 **Q**   Is that the boat you previously referenced in your

9 testimony here this afternoon?

10 **A**   **Yes.**

11 **Q**   Okay. And in fact, in this picture, Government's

12 Exhibit CM-7, is the boat parked in almost the same

13 position it was when you arrived at Miller's house that

14 day in August of 1994?

15 **A**   **Yes, roughly.**

16 **Q**   When you arrived at Mr. Miller's waterside home in

17 1994, what was he doing when you got there?

18 **A**   **He was prepping the boat.**

19 **Q**   Could you be more specific?

20 **A**   **Warming up the engine and taking off all the plastic**

21 **off the flybridge and stuff.**

22 **Q**   When you got there, did you and he engage in

23 conversation?

24 **A**   **Yes, small talk.**

25 **Q**   After you arrived, who, if anyone, arrived behind

S. Mulligan - Direct/Flynn

1506

1 you?

2 **A**   **The defendant.**

3 **Q**   What sort of vehicle did the defendant arrive in?

4 **A**   **A blue Cherokee.**

5 **Q**   Is that a Jeep?

6 **A**   **Yes.**

7 **Q**   From where -- if you know, from where had

8 Mr. Tarantino obtained that Jeep Cherokee?

9 **A**   **He had bought it from Louie Dorval.**

10 **Q**   I will show you -- well, what did Mr. Tarantino do

11 with the Jeep Cherokee when he arrived at a the house that

12 morning?

13 **A**   **He backed it up to the front of the garage where the**

14 **white car is now parked.**

15 **Q**   For the record, you are identifying the white vehicle

16 depicted in Government's Exhibit CM-3?

17 **A**   **Yes.**

18 **Q**   In the driveway of Mr. Miller's home?

19 **A**   **Yes.**

20 **Q**   What, if anything, did the defendant have with him in

21 the back of the Jeep Cherokee when he arrived at

22 Mr. Miller's house?

23 **A**   **Black toolbox and crowbars wrapped up in a white**

24 **sheet, and cinder blocks in the back.**

25 **Q**   You referenced a number of times a box. In the

S. Mulligan - Direct/Flynn

1507

1 middle of the courtroom, I'm wheeling out into the center

2 of the courtroom what has previously been admitted as

3 Government's Exhibit CW-4.

4        Do you recognize this physical piece of

5 evidence?

6 **A**   **Yes.**

7 **Q**   What do you recognize it to be?

8 **A**   **The box that I had picked out at Home Depot and the**

9 **box that I carried out to the backyard.**

10 **Q**   Is that the same or a substantially similar box, the

11 one that you helped the defendant pick out at Home Depot?

12 **A**   **Yes.**

13 **Q**   Was Rob Smyth with Mr. Tarantino when he arrived at

14 Craig Miller house in August of 1994?

15 **A**   **No.**

16 **Q**   Where was Rob Smyth at the time?

17 **A**   **He was at Craig Miller's warehouse.**

18 **Q**   How do you know that?

19 **A**   **Because the defendant had told me.**

20 **Q**   What did the defendant say regarding what Mr. Smyth

21 was doing at the same time Mr. Tarantino was showing up at

22 Miller house with that box?

23 **A**   **He was cleaning up the warehouse and painting.**

24 **Q**   Did Mr. Tarantino indicate to you why he was doing

25 that?

S. Mulligan - Direct/Flynn

**1508**

1    A    To paint over where all the blood was, some of the
2    blood was, from Louis Dorval.
3    Q    After Mr. Tarantino arrived in the Jeep, what, if
4    anything, happened?
5    A    At that point we just started unloading everything
6    into the boat.
7    Q    Okay.  How did you and Mr. Tarantino carry that black
8    box onto Mr. Miller's boat?
9    A    One was in the front and one was in the rear.
10   Q    Was it heavy?
11   A    Yes.
12   Q    Did you look inside the box at that point?
13   A    No.
14   Q    Well, did you know what was inside the box?
15   A    Yes.
16   Q    Were you able to get the box onto Mr. Miller's boat
17   that morning with the defendant?
18   A    Yes.
19   Q    All right.  Using the picture on the screen, Miller's
20   boat, Government's Exhibit CM-7, as a demonstrative, would
21   you please indicate where you and the defendant were
22   standing and how you got the box onto the boat at that
23   point?
24   A    We were standing on the bulkhead over here, one here,
25   one person on the boat, and we tried to pull the box

S. Mulligan - Direct/Flynn

**1509**

1    through the opening over here onto the boat (indicating).
2    Q    You said -- you indicated there was an opening on the
3    boat?
4    A    Yes.
5    Q    What sort of opening is it?
6    A    It's a latch where the top opens up and the door
7    swings out.
8    Q    Do you see where my cursor is on the screen in the
9    courtroom?
10   A    Yes.
11   Q    Is that an approximate location where the opening of
12   the boat is?
13   A    Yes.
14   Q    Where was Mr. Miller at this point?
15   A    He was -- at that point I think he was on the boat,
16   on the flybridge.
17   Q    Were you successful with the defendant in getting the
18   box onto the boat that morning?
19   A    Yes.
20   Q    And where, if anywhere, did you place it on the boat
21   for the voyage?
22   A    On the rear left side of the boat, in the back over
23   here (indicating).
24   Q    Okay.  And did you bring anything else on board
25   A    Yes, we brought the cinder blocks and a sheet wrapped

S. Mulligan - Direct/Flynn

**1510**

1    in.
2    Q    You brought cinder blocks?
3    A    Big boulders of block.
4    Q    What was the purpose of that?
5    A    To sink the box.
6    Q    What time of day is it at this point, to the best of
7    your recollection?
8    A    It's the morning, roughly 11 o'clock.
9    Q    Other than you and Mr. Tarantino and Mr. Miller, was
10   anyone else on the boat?
11   A    No.
12   Q    All right.  And after you and Mr. Tarantino and
13   Mr. Miller and the box were on the boat, what, if
14   anything, happened?
15   A    We headed out towards the ocean through the Jones
16   Beach inlet.
17        THE COURT:  On that note, Mr. Flynn, we'll break
18   for the day.
19        MR. FLYNN:  Yes, your Honor.
20        THE COURT:  Ladies and gentlemen, it is really,
21   really critical that you do not discuss anything that has
22   occurred in this courtroom with anyone, including your
23   fellow jurors.
24        We are going to resume on Monday at 9:45.  If
25   anyone tries to talk to you about this case or influences

S. Mulligan - Direct/Flynn

**1511**

1    you in any way, you will immediately report that to me by
2    giving Mr. Baran a note.
3        You are not to review or listen to anything that
4    may be reported in the media concerning the case.  If you
5    should come across something, ignore it totally.
6        Also, you are not to do any social media
7    concerning this case.  You must not do any independent
8    research or investigation concerning the case.  And of
9    course, continue to keep an open mind.
10        Now, I promised you folks that I would give you
11   an estimate toward the end of this week.  It is expected
12   that the Government will perhaps complete their case, and
13   it is expected that you will get the case sometime towards
14   the end of the week.  So I will give you a total update on
15   Monday.
16        It is expected that on Tuesday, if the case
17   continues into Tuesday, which I have some reason to think
18   it will, Tuesday will be a half a day.  We will go until
19   1 o'clock because of that meeting that I discussed with
20   you.
21        So I'm trying to give you as much information --
22   this is my best estimate.  It may go longer; it may go
23   shorter.
24        However, you still have to hear, after the case
25   is done, you still have to hear summations, and I have to

1512

1 charge you on the law.
2         Have a nice weekend.  I will see you folks on
3 Monday.
4         (Whereupon, at this time the jury exits the
5 courtroom.)
6         (Whereupon, the proceedings were adjourned until
7 Monday, May 7, 2012, at 9:45 a.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1514

**E-X-H-I-B-I-T-S**

| | |
|---|---|
| Government's Exhibit MM-1 was received in evidence | 1311 |
| Defendant's Exhibit H received in evidence | 1402 |
| Government Exhibits SM-1, SM-1, SM-3 and SM-10 were received in evidence | 1415 |
| Government Exhibit SM-4 was received in evidence | 1419 |
| Government Exhibit SM-5 was received in evidence | 1438 |
| Government Exhibit SM-7 was received in evidence | 1447 |
| Government Exhibit SM-8 was received in evidence | 1452 |

1513

**I-N-D-E-X**

**W-I-T-N-E-S-S-E-S**

| | |
|---|---|
| M A N O N   M U L L I G A N | 1298 |
| DIRECT EXAMINATION | 1299 |
| BY MR. FLYNN | |
| CROSS-EXAMINATION | 1358 |
| BY MR. ROSEN | |
| REDIRECT EXAMINATION | 1402 |
| BY MR. FLYNN | |
| S C O T T   M U L L I G A N | 1406 |
| DIRECT EXAMINATION | 1407 |
| BY MR. FLYNN | |

**'87** [1] - 1444:24
**'89** [2] - 1408:23; 1409:10
**'90s** [8] - 1368:14, 19-20; 1369:22; 1370:5, 7, 14; 1409:10
**'93** [1] - 1410:5
**'95** [1] - 1307:14

---

**0**

**08** [1] - 1291:3

---

**1**

**1** [4] - 1296:12; 1357:3; 1374:23; 1511:19
**10** [6] - 1321:18, 24; 1322:2, 15; 1473:17
**100** [3] - 1291:13, 16, 22
**109** [2] - 1439:16, 19
**10:15** [1] - 1475:5
**10:30** [3] - 1475:5; 1503:7, 11
**11** [2] - 1425:10; 1510:8
**110** [6] - 1439:17, 19; 1440:1; 1441:19; 1442:10; 1474:1
**11530** [1] - 1291:19
**11722** [2] - 1291:13, 22
**11:30** [1] - 1481:20
**12** [2] - 1481:21
**12/23** [1] - 1358:22
**1298** [1] - 1513:4
**1299** [1] - 1513:5
**1311** [1] - 1514:2
**1358** [1] - 1513:7
**1402** [2] - 1513:9; 1514:4
**1406** [1] - 1513:11
**1407** [1] - 1513:12
**1415** [1] - 1514:5
**1419** [1] - 1514:7
**1438** [1] - 1514:9
**1447** [1] - 1514:11
**1452** [1] - 1514:13
**14th** [2] - 1313:9; 1322:9
**15** [4] - 1296:20; 1330:21; 1356:9; 1485:17

---

**16** [1] - 1305:21
**1648** [2] - 1384:9; 1402:2
**18** [2] - 1377:19; 1446:15
**18th** [1] - 1387:17
**1980s** [2] - 1409:5; 1424:2
**1985** [1] - 1408:1
**1990s** [4] - 1307:8; 1369:5; 1424:2; 1444:2
**1993** [9] - 1409:17; 1410:20; 1411:15; 1412:14; 1413:15; 1415:23; 1418:4; 1423:18; 1424:13
**1994** [48] - 1300:1, 25; 1301:25; 1307:14; 1367:5; 1368:2; 1414:20; 1418:25; 1424:18; 1425:7; 1428:16; 1429:4; 1431:16; 1432:11; 1434:17, 21; 1435:7; 1436:19; 1438:23; 1439:1; 1440:3; 1443:13, 23; 1445:13; 1446:4; 1450:4, 16, 19, 23; 1452:5; 1456:21; 1465:13; 1468:14; 1473:11, 25; 1485:14; 1487:8; 1489:1, 18; 1490:13; 1491:6; 1492:13; 1503:22; 1504:17; 1505:14, 17; 1507:14
**1996** [4] - 1305:23; 1309:1; 1367:7, 12
**19th** [2] - 1313:21; 1314:1
**1:00** [1] - 1295:22
**1:45** [1] - 1394:1

---

**2**

**2** [5] - 1296:12; 1374:23; 1425:10; 1446:15; 1501:20
**20** [3] - 1330:21; 1397:20; 1427:24
**200** [1] - 1418:5
**2000** [11] - 1309:4, 9; 1310:14; 1312:7, 15, 23; 1313:11, 14, 21; 1314:1, 9
**2002** [7] - 1314:16; 1315:8, 15; 1370:2, 6
**2003** [45] - 1316:23;

---

317:1; 1318:4; 1319:9; 1321:4, 11; 1322:3, 9, 25; 1323:8; 1328:7; 1330:3, 20, 1338:5; 1339:11, 23; 1340:2; 1343:20; 1344:8, 14, 25; 1345:4, 23; 1349:21; 1354:6, 12; 1355:7; 1363:20; 1387:6, 23; 1388:14; 1389:5, 10; 1390:21; 1391:6; 1392:24; 1393:2, 15, 20; 1403:11, 14, 19
**2004** [3] - 1354:16, 18, 24
**2011** [4] - 1342:21; 1358:23; 1361:14; 1403:3
**2012** [12] - 1291:7; 1371:23; 1376:6, 10; 1377:1, 19; 1384:7; 1393:18; 1397:17; 1402:24; 1447:12; 1512:7
**205** [1] - 1291:16
**21** [5] - 1389:18, 20; 1390:9, 12; 1391:6
**22** [3] - 1322:25; 1323:8; 1465:13
**23** [8] - 1361:14; 1403:3; 1446:4; 1450:3; 1468:14; 1473:11, 25; 1487:8
**23rd** [2] - 1455:11; 1475:4
**25** [1] - 1367:10
**25th** [1] - 1390:2
**26th** [1] - 1390:2
**27** [1] - 1488:18
**27,000** [1] - 1488:18

---

**3**

**3** [4] - 1291:7; 1296:11; 1415:6; 1447:12
**302** [1] - 1366:5
**302s** [1] - 1366:3
**30th** [1] - 1446:13
**31** [5] - 1371:23; 1376:6, 10; 1377:1, 10
**32nd** [1] - 1484:22
**33** [1] - 1446:15
**33134** [1] - 1291:17
**34** [1] - 1446:15
**36** [1] - 1317:11
**3rd** [3] - 1316:23;

---

1318:4; 1446:17

---

**4**

**4** [2] - 1296:11; 1389:12
**404(b** [4] - 1420:5, 11, 16, 23
**404(b)** [1] - 1421:10
**45** [1] - 1483:3
**4:15** [1] - 1296:24
**4:30** [2] - 1296:20; 1488:21
**4:48** [2] - 1383:25; 1402:2

---

**5**

**5** [5] - 1384:9; 1393:18; 1397:17; 1402:24; 1487:24
**500,000** [1] - 1325:19
**59th** [2] - 1484:5, 7
**5th** [2] - 1383:25; 1402:1

---

**6**

**6** [3] - 1371:2; 1378:9; 1487:24
**631** [1] - 1291:23
**655** [1] - 1291:3
**666** [1] - 1291:18
**6th** [2] - 1378:18; 1379:9

---

**7**

**7** [2] - 1378:14; 1512:7
**712-6105** [1] - 1291:23
**7th** [1] - 1378:19

---

**8**

**8** [4] - 1311:20, 22, 25; 1313:19
**81st** [1] - 1455:22

---

**9**

**9** [2] - 1468:6, 25
**9-millimeter** [1] - 1470:25
**9200** [1] - 1488:15
**9:30** [2] - 1291:7; 1468:6, 25
**9:45** [2] - 1510:24; 1512:7

---

**1**

**A**

a.m [5] - 1291:7; 1425:10; 1473:17; 1501:20; 1512:7
ability [5] - 1293:12; 1354:5, 7, 9, 1477:12
able [18] - 1293:9; 1341:18; 1349:2, 24; 1351:17; 1352:9; 1358:4; 1376:20; 1398:4; 1401:8; 1413:13, 25; 1417:10; 1430:15; 1431:1; 1459:21; 1479:1; 1508:16
absence [1] - 1292:5
absolutely [1] - 1332:9
abuse [2] - 1370:10, 14
abused [1] - 1369:10
accepted [1] - 1320:6
access [1] - 1432:23
accompanied [1] - 1373:7
according [1] - 1377:11
accumulated [1] - 1323:20
accurate [2] - 1371:2; 1400:7
accurately [4] - 1414:18; 1443:22; 1452:4; 1500:17
accused [1] - 1482:21
acoustics [1] - 1407:6
acquiesce [1] - 1293:5
actual [3] - 1412:11; 1434:4; 1455:10
add [3] - 1292:14, 16
addition [4] - 1307:6; 1409:5; 1424:15; 1439:11
additional [3] - 1317:18; 1392:20; 1462:2
additionally [1] - 1314:20
address [5] - 1324:5, 16-17, 21
addressed [1] - 1324:8
adjourned [2] - 1295:21; 1512:6
admission [5] - 1311:11; 1419:3; 1438:14; 1447:14; 1452:8

admitted [24] - 1301:11; 1314:21; 1402:6; 1415:8; 1416:22; 1417:22; 1424:5; 1433:1, 13; 1435:18; 1441:11; 1443:15; 1445:2; 1458:16; 1459:9; 1471:11; 1473:3; 1475:8; 1491:13; 1500:10; 1503:15, 24; 1505:2; 1507:2
advance [1] - 1455:10
advise [2] - 1305:12; 1332:20
aerial [1] - 1475:14
affect [3] - 1354:5, 7, 9
afternoon [10] - 1295:20; 1358:17; 1364:2; 1379:19, 24; 1383:25; 1402:2; 1460:14; 1505:9
afterwards [1] - 1494:23
agent [7] - 1362:5; 1363:25; 1364:11; 1365:2; 1366:11; 1422:7
Agent [6] - 1309:6, 12, 23; 1310:3, 11; 1312:8
agent's [1] - 1364:22
agents [1] - 1397:21
ago [11] - 1294:23; 1316:20; 1330:14; 1371:4; 1423:16; 1433:10; 1440:15; 1451:16; 1452:20; 1457:8; 1483:15
agree [6] - 1293:6; 1403:6; 1405:3; 1435:24; 1464:12; 1496:16
agreed [4] - 1360:6; 1448:15; 1464:25; 1496:19
agreement [8] - 1446:18, 21; 1447:6, 11; 1448:4, 7, 14; 1449:16
ahead [1] - 1312:25
aid [1] - 1354:1
aiming [1] - 1357:12
airport [1] - 1323:11
al [1] - 1503:10
alarm [7] - 1413:19; 1425:19, 22, 24; 1426:1; 1430:24; 1431:1
alarms [1] - 1497:6

alcohol [4] - 1314:19; 1369:10; 1370:14
alert [2] - 1427:6
alibi [4] - 1482:17; 1485:1; 1486:7; 1487:5
alive [1] - 1444:14
ALL [1] - 1305:9
alleged [1] - 1406:22
alleviate [1] - 1353:21
allow [8] - 1335:13, 17; 1357:18; 1383:6; 1396:20; 1399:9; 1401:4; 1441:2
allowed [1] - 1333:5
Almeria [1] - 1291:16
almost [3] - 1435:4; 1456:23; 1505:12
alone [6] - 1317:21; 1339:9; 1350:9; 1353:9; 1397:23; 1473:21
alternates [3] - 1293:19, 22; 1294:1
amend [1] - 1375:3
AMERICA [1] - 1291:3
amount [1] - 1421:9
animal [1] - 1501:17
annoy [1] - 1347:8
anonymous [1] - 1324:21
answer [14] - 1303:4; 1319:16, 22, 24; 1320:7, 9, 20; 1361:6; 1381:3; 1396:21; 1397:15; 1401:10; 1423:5, 9
answered [3] - 1310:2; 1381:16; 1396:19
answering [2] - 1315:10, 21
answers [3] - 1319:6; 1381:19; 1382:1
antianxiety [1] - 1353:25
anxieties [1] - 1353:6
anxiety [2] - 1353:11, 22
anyway [1] - 1361:9
apart [1] - 1497:9
apartment [20] - 1491:2, 4-5, 7, 10, 20-22; 1492:4-6, 11; 1498:19; 1499:23; 1500:4, 16, 19; 1501:7, 22, 24
apologize [3] - 1332:15; 1362:14;

1401:17
appeal [1] - 1332:19
appear [1] - 1501:22
appearance [1] - 1490:17
APPEARANCES [1] - 1291:11
appeared [1] - 1452:4
appearing [10] - 1299:5; 1301:10; 1321:20; 1415:16; 1433:23; 1435:17; 1441:9; 1452:17; 1504:21; 1505:2
appellate [1] - 1357:16
application [3] - 1420:5, 11, 23
applied [1] - 1420:16
appointment [2] - 1503:4, 6
appreciate [1] - 1297:8
approach [8] - 1365:13; 1380:1; 1385:9; 1419:25; 1436:22; 1460:13; 1463:25; 1472:24
approached [1] - 1464:9
appropriate [1] - 1405:19
approved [1] - 1420:24
approximate [2] - 1363:13; 1509:11
April [2] - 1291:7; 1367:10
area [16] - 1315:3; 1399:4; 1407:16; 1411:5; 1417:25; 1442:1, 5; 1452:24; 1453:1; 1460:1; 1474:13; 1475:15, 23; 1476:2, 14
arguing [1] - 1480:3
argument [5] - 1292:8; 1333:8; 1480:2, 5; 1481:17
armed [7] - 1446:5, 7; 1454:13; 1463:6, 19, 25; 1467:16
armored [40] - 1450:4, 8; 1452:21; 1453:5, 19; 1454:9, 13, 17; 1455:11; 1456:7, 10; 1457:2, 9, 17-18, 20; 1458:8, 11; 1459:8, 14, 17; 1460:6, 24; 1461:7,

9; 1462:15; 1463:3, 11,
13; 1473:11; 1475:24;
1476:6, 15; 1479:10;
1488:11, 13, 25;
1489:22; 1493:15;
1499:25

**arrange** [1] - 1404:2

**arrest** [9] - 1343:13,
19; 1345:2; 1361:18;
1362:16; 1398:3; 1401:8

**arrested** [7] -
1342:19; 1343:7, 10;
1358:22; 1361:14;
1362:8; 1403:3

**arrival** [1] - 1479:17

**arrive** [2] - 1475:3;
1506:3

**arrived** [10] - 1309:22;
1480:10; 1505:13, 16,
25; 1506:11, 21;
1507:13; 1508:3

**article** [1] - 1300:16

**assist** [1] - 1495:2

**Assistants** [1] -
1291:15

**assisted** [1] - 1291:25

**associated** [1] -
1313:6

**assume** [1] - 1294:11

**attain** [1] - 1359:9

**attempt** [3] - 1344:19;
1416:10; 1457:19

**attempted** [1] -
1414:17

**attend** [5] - 1341:22;
1407:19; 1408:19;
1445:9; 1450:22

**attending** [1] - 1409:5

**attention** [6] -
1339:10; 1409:16;
1446:4; 1459:20;
1465:12; 1488:24

**Attorney** [3] -
1291:12, 15; 1362:3

**attorney** [2] -
1336:14; 1357:16

**Attorney's** [4] -
1299:6; 1342:25;
1446:10; 1449:4

**August** [38] - 1313:9,
21; 1314:1; 1339:11,
23; 1340:2; 1343:20;
1344:8, 14, 21, 25;
1345:22; 1349:21;
1354:24; 1387:6, 16-17,
23; 1388:13; 1389:5,
10, 18, 20; 1390:9, 12,
21; 1391:6, 11;

1392:23; 1393:2;
1403:11, 14, 18;
1505:14; 1507:14

**authenticated** [1] -
1333:2

**author** [1] - 1366:4

**available** [1] -
1295:12

**Avenue** [2] - 1291:16;
1497:18

**avoid** [3] - 1335:6;
1491:11; 1500:5

**aware** [6] - 1327:1;
1339:12; 1425:3;
1462:1; 1490:2; 1497:11

---

### B

**baby** [3] - 1317:21;
1328:1, 18

**baby's** [1] - 1320:20

**backed** [3] - 1463:17,
24; 1506:13

**backyard** [6] - 1504:5,
12-13, 16-17; 1507:9

**bagging** [2] - 1499:24;
1500:3

**Baldwin** [1] - 1392:5

**ball** [1] - 1294:21

**band** [2] - 1467:13

**bar** [6] - 1450:17;
1452:24; 1453:1;
1497:18; 1498:2, 7

**Baran** [2] - 1293:18;
1511:2

**barrel** [1] - 1481:15

**Barry** [6] - 1451:5, 12;
1485:13, 19; 1486:22

**bars** [1] - 1426:8;
1457:13

**bartender** [1] -
1450:20

**based** [15] - 1306:10,
18; 1311:7; 1326:19;
1330:2, 7; 1338:20;
1377:4; 1424:24;
1434:1; 1449:15;
1453:14; 1461:25;
1475:18

**basement** [3] - 1491:5,
10, 20

**Basement** [20] -
1409:19; 1410:5, 10,
15, 20; 1411:8, 13;
1413:19, 23; 1414:1,
19, 22; 1415:21;
1416:19; 1417:3;
1418:4, 10; 1423:17;

1424:15

**batteries** [1] -
1465:23

**Baumgardt** [5] -
1404:12; 1446:11;
1450:5; 1483:18; 1489:1

**Bay** [2] - 1428:23;
1474:2

**Beach** [4] - 1354:23;
1362:8; 1392:4; 1510:16

**became** [5] - 1302:5;
1303:18; 1352:25;
1393:9; 1497:11

**become** [3] - 1300:6;
1374:15; 1425:3

**becoming** [1] - 1339:12

**bedrest** [1] - 1369:20

**bedroom** [2] - 1328:18;
1397:24

**BEFORE** [1] - 1291:8

**begin** [3] - 1301:25;
1353:6; 1409:8

**beginning** [6] -
1314:11; 1319:20;
1405:5, 13, 16; 1406:14

**behind** [8] - 1411:22;
1415:15; 1466:15;
1474:24; 1479:6;
1491:13; 1496:6;
1505:25

**beige** [1] - 1300:18

**Belisis'** [1] - 1472:10

**Bellmore** [17] -
1309:2, 5, 14; 1315:16;
1323:10; 1327:9, 24;
1328:5; 1330:3;
1342:12, 14; 1343:21;
1344:21, 25; 1345:8;
1407:16; 1409:1

**below** [1] - 1449:2

**best** [46] - 1302:6;
1306:12; 1307:23;
1309:10, 16; 1312:21;
1313:3, 16; 1314:13,
17; 1316:25; 1325:15;
1328:17, 22; 1346:21;
1348:18; 1354:14;
1386:6; 1393:2;
1413:17, 21; 1418:1, 6;
1425:2; 1426:9;
1427:14; 1429:10;
1430:18; 1436:2, 18;
1442:4; 1446:2;
1455:20; 1456:19;
1458:10; 1459:15;
1462:20; 1467:22;
1475:2; 1488:16;
1495:11, 14; 1502:12;

1504:15; 1510:6;
1511:22

**better** [1] - 1359:13

**between** [13] - 1293:7; **3**
1371:20; 1374:10;
1391:17; 1402:3;
1422:10; 1425:10;
1453:2; 1468:25;
1472:16; 1475:5;
1478:7; 1480:23

**bicker** [1] - 1336:23

**big** [4] - 1324:10,
12-13; 1510:3

**bigger** [1] - 1469:21

**bit** [7] - 1398:1;
1399:21; 1401:6;
1457:15; 1460:17;
1463:21; 1493:23

**black** [12] - 1322:6;
1413:5; 1426:18;
1430:8; 1431:20;
1470:12; 1471:2, 9;
1506:23; 1508:7

**blades** [1] - 1457:16

**blazer** [1] - 1431:20

**Blazer** [23] - 1431:21,
23; 1432:2; 1433:9, 21;
1434:4, 10, 14, 17, 20,
23; 1439:3; 1466:5, 10,
16, 24; 1467:7, 23;
1474:6, 10, 24; 1475:1;
1477:4

**bleed** [1] - 1499:8

**blend** [1] - 1469:9

**block** [2] - 1487:13;
1510:3

**blocks** [3] - 1506:24;
1509:25; 1510:2

**blondish** [1] - 1490:20

**blood** [2] - 1508:1

**blown** [1] - 1476:17

**blue** [2] - 1311:24;
1506:4

**board** [1] - 1509:24

**boat** [29] - 1494:23;
1495:21; 1496:1, 12,
16, 19, 22; 1502:11;
1503:21; 1504:25;
1505:7, 12, 18; 1508:6,
8, 16, 20, 22, 25;
1509:1, 3, 12, 15, 18,
20, 22; 1510:10, 13

**Bob** [1] - 1497:20

**body** [1] - 1494:19

**bonds** [7] - 1427:19-21,
23, 25; 1428:11; 1490:1

**born** [1] - 1299:8

borrow [3] - 1494:23; 1495:20; 1496:12

bottom [2] - 1441:25; 1442:8

bought [1] - 1506:9

boulders [1] - 1510:3

Boulevard [1] - 1412:21

box [17] - 1425:24; 1428:8; 1499:19; 1506:25; 1507:8-10, 22; 1508:8, 12, 14, 16, 22, 25; 1509:18; 1510:5, 13

break [13] - 1356:9; 1368:5; 1386:5; 1393:25; 1404:1; 1430:19; 1460:15-18; 1465:25; 1488:20; 1510:17

breakdown [1] - 1465:5

breaking [2] - 1416:17; 1431:4

Brett [1] - 1485:3

bridge [4] - 1484:3, 5, 7, 9

briefly [2] - 1302:3; 1465:11

bring [14] - 1298:1; 1333:7; 1335:7, 13, 17; 1357:23; 1374:19; 1390:6, 16; 1405:12; 1454:10; 1464:24; 1481:4; 1509:24

bringing [1] - 1422:13

brokerage [1] - 1453:16

Brooklyn [2] - 1296:22; 1341:25

brother [9] - 1301:5; 1387:11; 1410:14; 1442:18, 22-23; 1444:13, 25

brothers [1] - 1456:23

brought [10] - 1355:12; 1363:3; 1389:2; 1422:6; 1484:10; 1493:3; 1494:7; 1501:17; 1509:25; 1510:2

building [27] - 1358:6; 1361:21; 1362:3, 14; 1370:23; 1412:11; 1424:24; 1425:1, 18; 1426:15, 21; 1429:2; 1436:4-6, 8-9, 14-15; 1437:1; 1453:7, 23; 1459:2; 1469:10; 1475:14

buildings [2] -

bulkhead [1] - 1508:24

bullet [1] - 1481:11

bulletproof [4] - 1469:4, 15, 18, 21

bunch [2] - 1414:4; 1451:4

burglar [1] - 1411:23

burglaries [5] - 1409:12, 14; 1443:9; 1444:2; 1445:25

burglarized [3] - 1414:20; 1415:23; 1416:19

burglarizing [4] - 1410:19; 1411:16; 1425:6, 16

burglary [21] - 1409:19; 1410:7, 9; 1411:2; 1414:23; 1415:3; 1417:4; 1423:18; 1424:16, 20; 1425:9, 11; 1428:16, 21; 1429:15; 1431:15, 23; 1494:13; 1496:14; 1497:4

business [25] - 1307:7, 11-12; 1310:7, 10, 15; 1339:21, 24; 1346:22, 25; 1347:6, 12, 15; 1374:13, 19; 1391:20, 22-25; 1393:7; 1425:7; 1436:7, 17; 1439:20

button [1] - 1469:6

button-up [1] - 1469:6

buy [4] - 1427:23; 1441:6; 1472:3; 1495:12

BY [31] - 1299:2; 1358:14; 1367:2; 1376:4; 1381:2; 1387:2; 1391:3; 1395:12; 1402:12; 1407:5; 1408:14; 1410:4; 1415:11; 1416:5; 1417:18; 1419:11; 1423:15; 1427:3; 1438:2, 19; 1441:3; 1444:20; 1447:20; 1452:14; 1460:21; 1473:1; 1488:23; 1513:6, 8, 10, 13

**C**

cabinets [1] - 1500:23

Canada [9] - 1299:9; 1310:19; 1311:18; 1321:7, 11; 1323:4, 12;

1326:17

Canadian [1] - 1299:13

capacity [3] - 1308:5, 10; 1464:17

capture [1] - 1500:6

captured [1] - 1491:11

car [52] - 1428:8; 1432:9, 24; 1434:20; 1435:16; 1440:22; 1441:6; 1446:5, 7; 1450:4, 8; 1452:21; 1453:5; 1455:11; 1456:7; 1457:2, 17-18, 20; 1458:8, 11; 1459:8, 14, 17; 1460:6, 24; 1461:7, 9; 1463:3, 13; 1467:20; 1473:11; 1474:18; 1476:6, 15, 19; 1478:16, 23; 1479:10; 1484:14; 1488:11, 13, 25; 1489:22; 1493:15; 1499:25; 1506:14

card [4] - 1310:7, 10, 12, 16

cards [2] - 1440:7, 14

care [6] - 1329:9; 1330:15; 1347:6; 1351:11; 1454:22; 1465:9

carried [1] - 1507:9

carries [1] - 1359:2

carry [1] - 1508:7

cars [5] - 1440:8, 20; 1441:4; 1474:23, 25

case [36] - 1292:12; 1296:7; 1299:20; 1300:5, 21; 1301:11; 1342:20; 1345:13, 16; 1379:8, 12; 1380:6, 10; 1394:2; 1406:13; 1407:10; 1421:2, 17; 1422:16; 1433:2; 1443:16; 1445:3; 1446:24; 1447:22; 1471:11; 1472:23; 1474:25; 1482:20; 1510:25; 1511:4, 7-8, 12-13, 16, 24

cases [1] - 1380:7

cashing [2] - 1453:6

casual [1] - 1367:22

catch [1] - 1487:14

categorize [1] - 1333:19

caught [3] - 1463:23; 1489:15

caused [3] - 1323:21;

1326:13; 1490:7

Celebrex [1] - 1353:25

cell [2] - 1502:1, 4

cemetery [2] - 1435:2; 1439:12

center [2] - 1372:3; 1507:1

centers [1] - 1308:12

Central [3] - 1291:5, 13, 22

certain [9] - 1292:12; 1308:20; 1326:10; 1341:6; 1347:2; 1353:21; 1357:10; 1419:8

certainly [1] - 1292:25

chain [1] - 1437:2

Chain [2] - 1437:3

chairs [1] - 1350:7

chance [1] - 1345:3

change [7] - 1440:22; 1441:4; 1463:3, 5, 7, 13; 1485:10

changed [1] - 1412:15; 1490:18

charge [7] - 1295:25; 1296:3, 5, 14; 1343:2; 1345:20; 1512:1

charged [8] - 1342:23; 1343:10; 1358:25; 1403:3; 1421:20; 1446:9; 1449:20; 1467:9

charges [2] - 1305:7; 1406:23

charging [1] - 1343:19

Charley [2] - 1293:22; 1294:20

check [5] - 1392:8, 11, 13, 15; 1453:6

checks [1] - 1453:7

Cherokee [4] - 1506:4, 8, 11, 21

Chevy [10] - 1431:20, 23; 1433:9, 21; 1434:4, 20; 1439:3; 1474:6; 1477:3

Chief [1] - 1295:19

child [5] - 1316:10; 1317:24; 1318:1; 1373:13; 1391:11

childhood [1] - 1423:22

China [5] - 1299:24; 1300:2, 24; 1365:11; 1367:4

choice [2] - 1361:8;

1368:7

**Chris** [15] - 1301:22; 1302:7; 1327:12; 1344:24; 1352:11, 22; 1358:16; 1369:7; 1382:4; 1385:5; 1389:15; 1393:8; 1419:17; 1465:23

**Chris's** [2] - 1302:5; 1410:13

**CHRISTIAN** [1] - 1291:5

**Christian** [23] - 1299:21; 1319:9; 1363:3; 1364:18; 1365:10; 1366:8; 1367:3; 1370:13; 1381:10; 1384:13, 21; 1385:5; 1387:3, 8, 24; 1392:24; 1393:3, 11; 1406:16; 1407:11; 1443:5; 1449:19; 1456:22

**Christmas** [4] - 1342:22; 1343:7; 1363:14; 1397:20

**cinder** [3] - 1506:24; 1509:25; 1510:2

**circumstances** [1] - 1326:20

**citizen** [1] - 1299:14

**City** [7] - 1291:19; 1299:11, 24; 1321:7, 10; 1482:15; 1486:1

**city** [4] - 1455:22; 1482:19, 23; 1492:24

**claims** [1] - 1292:11

**class** [1] - 1408:2

**clean** [5] - 1441:7; 1467:21, 23; 1493:11; 1494:5

**cleaned** [4] - 1465:21; 1466:1, 16; 1467:20

**cleaning** [8] - 1466:10, 24; 1467:1, 6; 1493:4, 6; 1507:23

**clear** [3] - 1397:24; 1477:25; 1478:6

**clearly** [2] - 1343:11; 1354:9

**CLERK** [4] - 1293:23; 1294:19; 1298:18; 1406:8

**client** [1] - 1303:5

**close** [14] - 1292:21; 1306:10, 16-18, 20; 1369:8; 1450:11; 1456:18, 21, 23; 1485:15; 1493:24

**clothes** [5] - 1469:6; 1485:10; 1499:24; 1500:3; 1501:3

**clothing** [2] - 1300:16; 1408:9

**club** [2] - 1299:24; 1365:11

**Club** [3] - 1300:2, 24; 1367:4

**clubs** [1] - 1308:23

**CM-1** [2] - 1301:12; 1424:6

**CM-13** [2] - 1435:19, 22

**CM-3** [2] - 1503:16; 1506:16

**CM-4** [1] - 1503:25

**CM-5** [2] - 1504:7, 15

**CM-6** [1] - 1504:21

**CM-7** [3] - 1505:1, 12; 1508:20

**coaching** [2] - 1292:11, 25

**coat** [2] - 1408:10; 1421:14

**coats** [9] - 1410:22; 1418:2, 7, 13; 1420:15, 22; 1422:4; 1428:2; 1490:1

**cocaine** [5] - 1368:11, 13, 19, 21; 1501:9

**coconspirators** [2] - 1470:15; 1480:19

**Code** [1] - 1446:15

**coincidental** [1] - 1486:8

**college** [2] - 1408:15, 24

**College** [2] - 1408:16, 19

**color** [9] - 1322:5, 20; 1324:3; 1325:3; 1431:21; 1471:1, 8; 1490:18, 20

**column** [4] - 1433:19, 24; 1434:2

**columnize** [2] - 1432:13, 20

**columnized** [2] - 1434:2, 5

**comfort** [1] - 1487:2

**coming** [6] - 1293:3; 1294:1; 1319:10; 1361:9; 1411:6; 1467:15

**comment** [1] - 1490:11

**commenting** [1] - 1399:17

**comments** [1] - 1352:1

**commercial** [4] - 1409:11, 18; 1424:16; 1427:22

**commission** [1] - 1446:14

**commit** [9] - 1406:22; 1409:6, 8; 1410:3, 9; 1424:20; 1445:24; 1448:8; 1450:3

**committed** [6] - 1420:18, 25; 1421:12; 1422:4; 1423:17; 1445:20

**committing** [4] - 1424:16; 1431:15; 1443:9; 1444:2

**communicate** [2] - 1376:20; 1477:12

**communication** [1] - 1413:22

**communications** [1] - 1430:15

**company** [2] - 1456:2

**compare** [1] - 1374:4

**compensate** [1] - 1454:24

**compensation** [2] - 1392:20; 1454:21

**compilation** [1] - 1441:12

**complete** [1] - 1511:12

**completely** [2] - 1417:20; 1470:11

**comport** [5] - 1313:13, 23; 1322:10; 1323:1; 1500:25

**computer** [1] - 1291:25

**computer-assisted** [1] - 1291:25

**conceal** [1] - 1470:4

**concentrating** [1] - 1483:23

**concern** [4] - 1317:18; 1323:21; 1326:13; 1490:7

**concerned** [7] - 1295:11; 1333:3; 1338:8; 1381:13; 1489:16, 21; 1490:9

**concerning** [9] - 1343:15; 1379:23; 1480:24; 1489:4; 1496:9; 1499:6; 1511:4, 7

**conclude** [1] - 1485:21

**concluded** [7] - 1366:14; 1375:9;

1380:20; 1386:9; 1390:25; 1400:13; 1485:24

**conduct** [1] - 1459:16

**conducted** [2] - 1460:24; 1475:19

**conference** [2] - 1423:7; 1437:25

**confided** [1] - 1494:2

**confusing** [4] - 1386:5; 1399:5; 1400:4; 1421:21

**connection** [7] - 1342:19; 1447:21; 1448:22; 1449:5, 23; 1450:18; 1455:24

**consecutive** [2] - 1371:10; 1378:13

**consequently** [1] - 1434:16

**consider** [3] - 1296:15; 1423:12; 1441:6

**consideration** [2] - 1359:24; 1448:24

**consistent** [4] - 1366:7; 1374:3; 1389:19; 1390:11

**conspiracy** [1] - 1317:9

**construct** [1] - 1296:14

**construction** [1] - 1346:23

**contact** [3] - 1413:12; 1478:7; 1496:7

**contacted** [2] - 1435:9; 1496:9

**contacting** [1] - 1495:16

**contents** [2] - 1326:19; 1329:12

**context** [2] - 1386:3; 1399:8

**continue** [6] - 1305:13; 1326:5; 1354:2; 1409:3; 1479:20; 1511:9

**continued** [2] - 1314:3; 1479:22

**Continued** [18] - 1302:16; 1304:2; 1318:10; 1320:23; 1331:17; 1337:11; 1365:15; 1366:15; 1372:13; 1375:10; 1380:21; 1385:11; 1386:10; 1388:22;

**5**

1394:6; 1398:11; 1400:14; 1404:15

**continues** [1] - 1511:17

**continuing** [3] - 1318:6; 1357:8; 1409:22

**conversation** [82] - 1292:24; 1328:9, 12, 19; 1330:2; 1331:3; 1335:18; 1338:20; 1339:5; 1340:13; 1341:9; 1342:11, 14; 1343:20; 1344:13, 18, 23-24; 1345:7, 25; 1346:2, 15; 1347:25; 1348:8; 1350:21, 25; 1351:2, 5, 7; 1353:5; 1355:10; 1357:13, 19; 1362:22; 1363:1; 1372:3; 1379:22; 1381:7; 1382:22; 1384:11; 1387:3, 12; 1389:15, 24; 1392:23; 1393:15, 19; 1395:23; 1396:1, 3; 1397:9, 18; 1398:1; 1401:6; 1402:2, 23; 1403:9; 1452:23; 1453:2, 14; 1455:11, 21; 1456:5, 12; 1477:21; 1478:5; 1480:22; 1483:4; 1485:21, 24; 1489:4, 6; 1493:12, 19; 1495:15; 1496:11; 1502:24; 1503:3; 1505:23

**conversations** [10] - 1344:17; 1348:5; 1374:10; 1382:14, 20-21; 1461:25; 1489:9; 1497:8

**convicted** [2] - 1317:7; 1449:20

**conviction** [1] - 1354:15

**convoluted** [1] - 1386:4

**cookies** [3] - 1294:22, 25; 1357:4

**cooperating** [1] - 1297:10

**cooperation** [9] - 1359:5; 1446:18; 1447:6, 10; 1448:3, 7, 13; 1449:12, 15

**copy** [4] - 1321:16, 19; 1325:22

**Coral** [1] - 1291:17

**corner** [1] - 1417:9

**Corona** [5] - 1491:2,

10, 22; 1498:19; 1499:23

**correct** [33] - 1305:23; 1330:15; 1349:19, 21; 1358:23; 1362:22; 1363:17; 1367:7; 1369:8, 11; 1374:6; 1376:15, 24; 1377:1; 1378:19; 1382:8, 11; 1384:8; 1385:8; 1387:14, 17, 20, 25; 1391:12; 1393:16, 20; 1440:17; 1460:10; 1469:16; 1470:1; 1476:4; 1493:16

**correction** [1] - 1388:8

**correctional** [1] - 1349:3

**correctly** [1] - 1497:5

**corroborative** [1] - 1437:7

**Costa** [10] - 1312:6, 11, 14, 17, 22; 1313:7, 14, 24; 1314:6, 9

**counsel** [6] - 1294:15, 24; 1357:14; 1402:23; 1405:3; 1437:12

**counsel's** [1] - 1374:21

**counted** [1] - 1488:9

**country** [6] - 1299:8; 1310:16; 1311:17; 1318:5; 1321:4; 1323:4

**Country** [1] - 1291:18

**counts** [3] - 1296:11; 1406:24

**County** [6] - 1309:7, 13; 1419:21; 1420:22; 1421:1, 4

**couple** [5] - 1294:23; 1348:4; 1357:2; 1371:4; 1389:16

**course** [5] - 1295:14; 1353:20; 1360:24; 1361:12; 1511:9

**Court** [9] - 1291:20; 1294:24; 1296:8, 13; 1332:18, 21; 1337:6; 1437:12

**COURT** [219] - 1291:1; 1292:6, 17, 20; 1293:14, 18, 24; 1294:7, 10, 17, 20; 1295:3, 17; 1296:4, 9, 17, 19, 25; 1297:3, 6, 9; 1298:1, 6, 12; 1300:22; 1302:13;

1303:6, 10, 14, 24; 1305:3, 10, 14; 1306:15; 1309:20; 1311:12, 14; 1314:4; 1315:3; 1318:8; 1319:3, 11, 17, 23; 1320:2, 15, 22; 1325:10; 1326:3; 1331:14; 1332:3, 8, 10, 13, 16; 1333:14, 17, 21, 25; 1334:7, 9, 25; 1335:13, 17; 1336:3, 8, 13, 23; 1337:2, 5; 1338:3, 25; 1339:5; 1349:6; 1352:17; 1356:8; 1357:1, 8, 23; 1358:3, 8, 11; 1359:19; 1360:11, 13, 18; 1361:2, 6; 1363:23; 1364:20, 24; 1365:6, 13; 1366:2, 12; 1368:16, 18; 1369:25; 1370:4, 6; 1371:7; 1372:8, 12; 1373:2, 11, 14, 17, 22, 25; 1374:3, 7, 12, 17; 1375:7; 1376:2; 1377:6, 16; 1378:22; 1379:2, 6, 11; 1380:1, 3, 10, 16, 19; 1383:5, 9, 23; 1384:4, 10; 1385:9; 1386:2; 1388:5, 10, 19; 1389:2, 7, 13, 15, 19, 22; 1390:8, 11, 15, 17, 23; 1391:2; 1393:24; 1395:4; 1396:17, 20; 1397:8, 13, 15; 1398:5, 7; 1399:2, 11; 1400:1, 3, 7, 12; 1401:2, 16, 19; 1402:6, 10; 1403:23, 25; 1404:5; 1405:1, 9, 12, 17, 22; 1406:3, 11; 1409:24; 1415:8; 1417:12, 17; 1419:6, 25; 1420:5, 19; 1421:3, 8, 24; 1422:14; 1423:1, 3, 6, 8; 1427:2; 1436:22; 1437:1, 4, 6, 9, 14, 20, 24; 1438:1, 15; 1441:2; 1444:19; 1447:15, 17; 1452:9, 11; 1460:14, 16, 20; 1472:25; 1488:21; 1493:23; 1510:17, 20

**court** [15] - 1305:2; 1319:25; 1321:2; 1361:8; 1367:1; 1376:1; 1381:1, 4; 1383:12; 1387:1; 1391:1; 1395:7; 1401:1; 1446:14, 18

**Court's** [1] - 1441:1

**court.)** [1] - 1338:2

**Courthouse** [1] - 1291:4

**courtroom** [36] - 1298:5; 1300:12; 1301:7, 14; 1306:23; 1312:3; 1321:20, 22; 1322:17; 1336:24; 1358:10, 17; 1381:22; 1394:4; 1395:3; 1396:15; 1397:5; 1404:4; 1405:21; 1415:15, 17; 1416:21; 1424:4; 1433:1; 1435:18; 1441:10; 1452:17; 1458:16; 1504:8, 21; 1505:2; 1507:1; 1509:9; 1510:22; 1512:5

**cousin** [1] - 1472:10

**cover** [1] - 1311:8

**CR** [1] - 1291:3

**Craig** [37] - 1411:14; 1418:11; 1434:24; 1435:8; 1438:12, 21, 23; 1439:5, 11; 1466:20; 1467:7; 1468:9, 18; 1469:1; 1470:19; 1473:24; 1479:6, 8, 22; 1480:1, 10; 1483:1; 1494:16; 1495:20, 22; 1496:1, 7, 9; 1499:11; 1502:9; 1503:1, 20; 1504:6, 14; 1507:14, 17

**crazy** [1] - 1316:2

**credit** [2] - 1440:7, 14

**crew** [1] - 1464:15

**crime** [11] - 1421:5, 20; 1445:23; 1446:14; 1448:5; 1449:6, 23; 1458:22; 1482:20; 1487:6; 1493:22

**crimes** [12] - 1406:18; 1409:6, 8, 11; 1410:3; 1420:18, 20, 25; 1421:11; 1445:20; 1448:8; 1449:20

**criminal** [3] - 1325:18; 1406:15; 1422:10

**critical** [1] - 1510:21

**criticizing** [1] - 1333:17

**cross** [10] - 1295:9, 14; 1334:19; 1358:1; 1366:4; 1374:14;

**6**

7

1386:6; 1399:4; 1439:16; 1484:3

**CROSS** [2] - 1358:13; 1513:7

**cross-examination** [3] - 1334:19; 1386:6; 1399:4

**CROSS-EXAMINATION** [2] - 1358:13; 1513:7

**cross-examine** [1] - 1366:4

**crossed** [1] - 1484:7

**crowbars** [3] - 1426:8; 1430:23; 1506:23

**crucial** [1] - 1399:4

**CT** [2] - 1365:2, 10

**cubicle** [1] - 1376:23

**cumulative** [1] - 1436:21

**Curcio** [1] - 1332:20

**current** [1] - 1311:3

**cursor** [1] - 1509:8

**cut** [3] - 1425:23; 1457:14, 16

**CW-4** [1] - 1507:3

---

**D**

**dab** [1] - 1390:4

**damaged** [1] - 1486:6

**Damon** [2] - 1485:3, 8

**DAMON** [1] - 1485:3

**Darren** [10] - 1410:11, 19; 1411:10; 1424:22; 1429:1, 22; 1436:13; 1439:24; 1451:4

**dashboard** [1] - 1432:22

**date** [34] - 1300:9; 1313:6, 8; 1322:7, 24; 1325:24; 1326:10; 1329:17; 1361:19; 1363:9, 13, 24; 1364:1, 10, 17; 1367:9; 1370:17, 22, 25; 1371:5, 24-25; 1376:6; 1377:8, 10-11, 19, 21; 1378:2, 6, 8, 10; 1447:10; 1497:15

**dated** [4] - 1302:10; 1313:21; 1365:2; 1367:6

**dates** [2] - 1371:8; 1377:4

**days** [18] - 1323:12; 1326:16; 1341:16; 1342:21; 1343:7; 1348:21; 1349:14, 18;

---

1351:3; 1371:10; 1378:13; 1389:16; 1397:20, 23, 25; 1403:8; 1497:10

**dead** [4] - 1339:18; 1479:17; 1497:12, 17

**deadline** [14] - 1325:24; 1326:6-9, 12, 17; 1329:16, 19-20, 23, 25; 1338:9

**dealership** [3] - 1432:9; 1434:20

**dealing** [1] - 1373:23

**dealt** [1] - 1374:20

**death** [4] - 1340:8, 19; 1418:25; 1450:4

**debriefing** [5] - 1334:17, 21; 1378:18; 1379:18

**debriefings** [1] - 1295:15

**decade** [2] - 1307:9; 1369:21

**December** [12] - 1342:21; 1361:14; 1363:11; 1403:3; 1409:17; 1410:5, 20; 1412:13; 1413:15; 1415:23; 1418:4

**decided** [1] - 1463:10

**decision** [4] - 1449:2; 1492:16, 19, 23

**deck** [1] - 1504:19

**defendant** [244] - 1292:9; 1299:20; 1300:5, 20, 24; 1301:3, 24; 1302:9; 1303:12, 25; 1305:6; 1306:11, 18; 1307:7, 13, 24; 1308:19; 1327:1, 18, 20, 25; 1328:2, 4; 1329:11, 20, 23; 1330:2, 12, 14, 17, 19; 1331:4, 12; 1332:4; 1334:2; 1337:9; 1338:4, 12, 21, 23; 1342:3, 5, 9, 14; 1343:16, 20; 1344:14; 1345:7, 22; 1346:4, 14; 1347:2, 4, 14; 1348:2, 6, 9, 19; 1349:17; 1351:1, 21; 1353:5; 1390:3; 1403:10, 15, 18; 1406:17, 21; 1407:10; 1408:12; 1409:3, 6, 9, 25; 1410:11, 19, 23; 1411:10, 12, 16, 20; 1415:4, 22; 1418:2, 9; 1419:19, 22; 1420:17,

---

20, 25; 1421:12; 1422:3, 9, 17, 22; 1423:23; 1424:12, 14, 22; 1425:3; 1426:25; 1427:11; 1428:16, 24; 1429:22; 1430:13, 19; 1431:7; 1432:5, 12, 14; 1434:5, 7, 10, 19; 1435:6, 11; 1436:11; 1438:23; 1439:24; 1440:2; 1442:11; 1443:10, 13, 21; 1444:3; 1445:14, 17, 20, 23; 1450:6; 1451:4; 1455:5, 7, 14, 18; 1456:4, 6, 17, 24; 1457:1, 19; 1458:6; 1459:17, 22; 1460:5; 1461:12, 16, 25; 1462:22; 1463:10; 1464:11, 23; 1465:16; 1468:2, 4, 22; 1469:5, 18; 1470:3, 16, 20; 1471:5, 21; 1472:17; 1474:4; 1477:3, 13, 17, 21; 1478:5, 7, 23; 1479:4; 1480:4, 6, 14; 1481:4, 18; 1482:8, 16, 22; 1483:5, 13, 15, 25; 1484:3, 6, 8, 11, 20; 1485:6, 9; 1486:12, 15; 1487:12, 20; 1488:1, 6-7, 14; 1489:3, 11; 1490:2, 6; 1492:20, 22; 1493:1, 7, 14, 22; 1494:4, 10, 14, 18; 1495:2, 8, 12, 14; 1498:5, 10, 17; 1499:20; 1500:2, 18; 1501:8, 21; 1503:8; 1506:2, 20; 1507:11, 19-20; 1508:17, 21; 1509:17

**Defendant** [2] - 1291:6, 16

**defendant's** [17] - 1292:11; 1306:5; 1329:15; 1330:4, 10; 1339:25; 1340:3; 1349:11; 1351:25; 1418:16; 1442:18, 21, 23; 1483:20; 1487:22, 25; 1492:25

**Defendant's** [4] - 1376:5; 1402:5, 8; 1514:4

**defendants** [1] - 1432:1

**defense** [7] - 1294:15, 24; 1372:6; 1374:21;

---

1377:9; 1388:12; 1402:23

**definite** [1] - 1449:5

**definitely** [2] - 1363:12, 15

**deliberations** [1] - 1401:23

**delivered** [1] - 1418:13

**delivery** [1] - 1453:18

**Delray** [1] - 1362:8

**demeanor** [4] - 1355:21; 1480:17; 1483:20, 22

**demonstrative** [1] - 1508:20

**denying** [1] - 1303:21

**depart** [1] - 1473:13

**Department** [2] - 1309:7, 13

**department** [4] - 1409:19; 1410:10, 17; 1414:19

**depict** [7] - 1433:18; 1435:22; 1475:13; 1492:3; 1500:15; 1503:19; 1504:3

**depicted** [10] - 1301:19; 1416:23; 1433:15; 1443:17; 1445:4; 1458:18; 1459:10; 1474:7; 1505:3; 1506:16

**depicts** [2] - 1441:24; 1475:11

**Depot** [2] - 1507:8, 11

**Depots** [1] - 1495:6

**depression** [1] - 1353:25

**depth** [1] - 1422:13

**Derrick** [2] - 1418:3; 1439:25

**describe** [4] - 1303:18; 1314:18; 1325:11; 1460:5

**description** [1] - 1453:11

**detective** [5] - 1309:6, 13; 1310:3, 11; 1312:8

**detectors** [2] - 1412:3; 1415:1

**detention** [3] - 1371:18; 1372:3; 1376:7

**determination** [1] - 1410:1

**determine** [1] -

1293:11

**Devans** [6] - 1317:6; 1319:19; 1327:16; 1348:17; 1349:2; 1352:4

**develop** [2] - 1301:25; 1314:10

**Devens** [13] - 1385:4; 1387:16, 20; 1388:2, 9, 13; 1389:2; 1392:24; 1393:15, 20; 1396:4; 1397:11, 18

**deviated** [1] - 1333:11

**diamond** [1] - 1457:16

**diamond-cut** [1] - 1457:16

**die** [2] - 1444:16, 21

**died** [4] - 1340:24; 1341:8, 11, 13

**different** [10] - 1373:22; 1380:7; 1389:3; 1411:5; 1419:5; 1421:23; 1474:18; 1489:11; 1493:13; 1501:6

**differential** [1] - 1296:21

**difficult** [2] - 1297:7; 1322:23

**difficulty** [1] - 1305:11

**dinner** [1] - 1315:13

**dinnertime** [1] - 1487:24

**direct** [6] - 1303:21; 1339:10; 1409:16; 1446:3; 1465:11; 1488:24

**DIRECT** [4] - 1299:1; 1407:4; 1513:5, 12

**directing** [1] - 1459:20

**directions** [1] - 1341:6

**directly** [6] - 1301:8; 1319:6; 1357:12; 1423:22; 1476:22; 1493:25

**disable** [3] - 1425:19, 21; 1430:24

**disappear** [1] - 1325:21

**disarm** [1] - 1431:1

**disarray** [1] - 1417:20

**discharge** [1] - 1293:21

**discuss** [10] - 1329:11, 24; 1330:24; 1361:16;

**discussed** [11] - 1296:13; 1329:19; 1344:7, 9; 1347:15; 1393:19; 1442:9; 1457:17; 1490:5; 1492:20; 1511:19

**discussing** [2] - 1379:18; 1381:9

**discussion** [3] - 1357:5; 1454:20; 1455:3

**discussions** [3] - 1359:4; 1494:18, 21

**disguise** [2] - 1469:11, 25

**disposal** [1] - 1495:16

**dispose** [1] - 1494:19

**dispute** [2] - 1293:6; 1303:12

**disregard** [8] - 1303:6, 20, 22; 1305:4; 1364:23; 1384:5; 1423:5, 11

**distributed** [1] - 1472:16

**DISTRICT** [2] - 1291:1

**District** [1] - 1291:21

**divided** [1] - 1488:9

**DNA** [1] - 1466:12

**DOA** [1] - 1479:15

**dock** [1] - 1504:25

**docked** [1] - 1503:22

**document** [10] - 1301:13; 1306:22; 1312:2; 1321:21; 1322:16; 1372:9; 1373:3, 5; 1388:21; 1447:3

**documents** [1] - 1376:3

**DODDATO** [1] - 1291:18

**dog** [3] - 1501:11, 14

**done** [16] - 1293:15; 1325:17; 1333:9, 25; 1356:5; 1402:20; 1418:12; 1428:10; 1431:3, 6; 1498:17, 22-23, 25; 1511:25

**door** [8] - 1310:2; 1336:20; 1425:20; 1426:6; 1430:23; 1501:18; 1509:6

**doors** [3] - 1454:11, 18; 1462:12

**Dorval** [70] - 1418:14, 23-24; 1419:15, 20;

1420:7; 1421:20, 25; 1422:3, 20; 1428:13; 1436:13; 1437:13; 1439:25; 1440:16; 1441:2, 4; 1442:6; 1450:6; 1462:8, 22; 1463:10; 1464:11; 1465:2, 16; 1468:22; 1469:4, 8, 24; 1470:20-22; 1472:12, 17; 1474:16; 1479:4; 1480:4, 7, 13, 23; 1481:3, 9, 14; 1482:25; 1488:14; 1489:4, 10, 18, 21; 1490:6, 12, 22; 1492:14, 16, 23; 1493:2, 20; 1494:4, 11; 1497:12; 1499:2, 10, 21; 1500:7; 1506:9; 1508:2

**Dorval's** [11] - 1404:13; 1490:16; 1491:20; 1494:17, 19; 1500:16; 1501:2, 7, 13; 1502:4, 22

**doubt** [3] - 1354:11; 1403:17, 21

**down** [16] - 1294:13; 1298:18; 1368:5; 1383:23; 1386:5; 1403:25; 1421:14; 1430:10; 1465:25; 1466:25; 1471:17; 1472:15; 1477:10; 1483:10, 16; 1504:25

**downstairs** [5] - 1323:15; 1324:22; 1328:18; 1346:13; 1387:11

**draw** [2] - 1303:24; 1305:5

**dressed** [1] - 1469:3

**drill** [1] - 1481:15

**drive** [4] - 1302:7; 1432:15; 1477:3, 7

**driveway** [1] - 1506:18

**driving** [4] - 1425:4; 1427:5; 1429:13; 1484:12

**drop** [1] - 1432:17

**dropped** [2] - 1432:18; 1479:19

**drove** [6] - 1348:23; 1349:9; 1432:12, 18; 1478:19; 1482:11

**drug** [3] - 1314:19; 1444:17, 22

**drugs** [9] - 1368:2, 6; 1369:10, 14, 23;

1370:8, 10, 14

**duly** [2] - 1298:16; 1406:6

**dump** [2] - 1494:24; 1496:14                    **8**

**dumpsters** [1] - 1501:4

**during** [51] - 1302:9; 1305:25; 1307:8; 1308:3; 1315:14; 1328:12; 1331:3; 1339:12; 1343:18; 1344:17; 1346:15; 1348:15; 1350:25; 1401:23; 1414:6; 1415:13; 1422:6; 1424:18; 1428:16; 1434:17; 1442:6; 1443:8; 1444:1; 1446:6; 1456:5, 12, 21; 1459:18; 1461:6, 11; 1462:1; 1466:7; 1475:25; 1479:10; 1481:8, 24-25; 1482:2; 1483:4, 7, 20; 1489:3, 17; 1490:12, 22; 1491:6; 1492:13; 1495:8, 25

---

### E

**ear** [1] - 1330:18

**early** [7] - 1410:25; 1425:7; 1429:17; 1432:7; 1444:1; 1468:5; 1502:21

**easily** [1] - 1294:2

**East** [6] - 1484:20; 1486:24; 1487:11, 13-14, 21

**east** [4] - 1307:20; 1455:22; 1486:2; 1492:24

**EASTERN** [1] - 1291:1

**Eastside** [6] - 1307:17, 19, 21, 24; 1308:3; 1485:16

**eastside** [1] - 1484:24

**easy** [1] - 1463:9

**Ecstasy** [2] - 1368:8, 20

**eight** [6] - 1300:11; 1318:2; 1323:12, 20; 1365:7; 1373:18

**either** [5] - 1296:2; 1310:2; 1330:24; 1374:23; 1461:12

**elderly** [1] - 1453:13

**elements** [3] - 1296:6,

10, 12

**elicit** [2] - 1303:17; 1374:25

**Elmont** [1] - 1490:25

**EM-5** [1] - 1438:5

**embarkation** [1] - 1437:16

**employed** [3] - 1307:14, 16; 1308:2

**employee** [1] - 1446:6

**employees** [1] - 1346:25

**empty** [1] - 1498:19

**End** [2] - 1423:7; 1437:25

**end** [7] - 1315:8, 15; 1366:7; 1474:3; 1476:11; 1511:11, 14

**endorsement** [1] - 1293:4

**enforcement** [6] - 1310:15; 1489:14, 19; 1490:14; 1491:1, 11

**engage** [4] - 1345:25; 1350:21; 1495:15; 1505:22

**engaged** [1] - 1489:4

**engine** [1] - 1505:20

**English** [1] - 1299:16

**enlarge** [1] - 1433:22

**entered** [1] - 1298:4

**enters** [3] - 1358:10; 1395:3; 1405:20

**entire** [1] - 1366:5

**entrance** [3] - 1412:23; 1417:8; 1491:20

**entry** [5] - 1411:7; 1413:12; 1425:14; 1429:22

**envelope** [7] - 1323:24; 1324:1, 3, 8, 10, 21, 23

**ESQ** [4] - 1291:14, 16, 18

**essentially** [1] - 1292:20

**establish** [7] - 1411:16; 1420:24; 1422:10; 1482:17, 19; 1483:23; 1485:1

**established** [4] - 1411:19; 1425:15; 1437:23; 1487:5

**establishes** [1] - 1420:17

**establishment** [1] -

**estimate** [2] - 1511:11, 22

**etcetera** [4] - 1295:16; 1421:25; 1440:7

**evening** [8] - 1410:25; 1414:1; 1426:10; 1429:17; 1433:8; 1455:7; 1488:8; 1497:22

**evenly** [1] - 1465:7

**events** [8] - 1344:7, 9; 1354:6, 11; 1363:16, 19; 1378:23

**eventually** [11] - 1305:15; 1330:22; 1341:18; 1413:25; 1418:14; 1473:13; 1479:23; 1482:3; 1483:25; 1485:21

**evidence** [52] - 1296:15; 1301:11; 1311:14, 16; 1377:4; 1388:12, 18, 20; 1401:18, 20, 22; 1402:6, 8; 1405:6; 1406:15, 19; 1415:6, 8, 10; 1416:22; 1419:4, 7, 10; 1424:6; 1433:1, 13; 1435:18; 1438:16, 18; 1441:11; 1443:16; 1445:3; 1447:17, 19; 1452:11, 13; 1458:17; 1471:11; 1473:3; 1475:8; 1491:14; 1500:10; 1503:15; 1507:5; 1514:3, 6, 8, 10, 12, 14

**evidentiary** [1] - 1333:4

**exact** [1] - 1497:15

**exactly** [3] - 1341:3; 1434:25; 1476:18

**EXAMINATION** [8] - 1299:1; 1358:13; 1402:11; 1407:4; 1513:5, 7, 9, 12

**examination** [4] - 1334:19; 1357:9; 1386:6; 1399:4

**examine** [3] - 1357:19; 1358:20; 1366:4

**examined** [2] - 1298:16; 1406:6

**example** [1] - 1504:19

**exception** [1] - 1374:20

**exchange** [1] - 1450:1

**excited** [1] - 1457:5

**excluding** [1] - 1369:22

**excuse** [5] - 1323:25; 1331:16; 1351:1; 1353:15; 1420:2

**exhibit** [20] - 1301:6; 1310:20; 1372:6; 1377:3, 9, 13, 18; 1388:4, 9, 13; 1416:12; 1417:13; 1418:18; 1419:7; 1443:22; 1446:23; 1500:14; 1503:17; 1504:9, 22

**Exhibit** [66] - 1301:12; 1310:21; 1311:11, 15, 25; 1376:5; 1402:4, 8; 1414:10; 1415:6, 16; 1416:15, 22; 1417:23; 1418:19; 1419:9; 1424:6; 1433:2, 14; 1435:19, 22; 1438:5, 14, 17; 1441:10; 1443:16; 1445:3; 1446:25; 1447:14, 18; 1448:14; 1451:23; 1452:3, 8, 12, 17; 1458:17; 1459:20; 1466:7; 1468:10; 1471:12; 1473:4; 1474:8; 1475:9; 1491:14, 25; 1492:7; 1500:10, 21; 1503:15, 25; 1504:7, 15, 21; 1505:1, 12; 1506:16; 1507:3; 1508:20; 1514:2, 4, 7, 9, 11, 13

**exhibited** [5] - 1301:13; 1306:22; 1312:2; 1321:21; 1322:16

**EXHIBITS** [1] - 1514:1

**Exhibits** [2] - 1415:9; 1514:5

**exhibits** [1] - 1414:6

**existed** [2] - 1300:3; 1414:20

**exited** [1] - 1461:18

**exits** [1] - 1512:4

**expect** [1] - 1294:7

**expected** [7] - 1293:25; 1406:12; 1497:1; 1511:11, 13, 16

**expense** [3] - 1361:25; 1362:1

**expired** [1] - 1311:5

**explain** [5] - 1318:9; 1320:17; 1454:15;

**1463:16, 21**

**Expressway** [2] - 1474:1

**extent** [5] - 1340:7; 1428:10; 1469:7; 1474:4, 16

**eye** [1] - 1422:7

---

**F**

---

**face** [9] - 1343:4; 1372:3; 1373:15; 1378:2; 1447:24; 1470:11

**face-to-face** [2] - 1372:3; 1373:15

**facility** [9] - 1314:22; 1371:18; 1372:4; 1376:7; 1388:16; 1391:15; 1436:19; 1441:17

**facing** [1] - 1430:2

**fact** [15] - 1292:21; 1303:4; 1331:7; 1333:5; 1335:9; 1336:25; 1363:3; 1374:5, 21; 1486:25; 1489:14; 1490:2, 10; 1497:12; 1505:11

**facts** [3] - 1292:12; 1357:11; 1383:19

**factual** [1] - 1293:10

**failure** [1] - 1332:20

**fair** [2] - 1374:25; 1421:9

**fairly** [4] - 1414:18; 1443:22; 1452:3; 1500:17

**fake** [1] - 1469:14

**false** [1] - 1497:5

**familiar** [5] - 1299:20; 1407:10, 13; 1475:15, 18

**familiarize** [2] - 1447:2; 1475:22

**family** [12] - 1308:12, 20; 1321:12; 1350:14; 1373:10; 1374:1; 1389:6, 21; 1418:14; 1437:2; 1505:7

**family's** [2] - 1436:6; 1496:6

**far** [8] - 1320:12; 1333:3; 1412:23; 1414:7; 1426:21; 1430:3; 1455:10; 1497:9

**Farmingdale** [7] - 1435:1; 1439:12;

**9**

1441:19; 1442:10;
1473:24; 1479:9; 1483:2
**Fatato** [2] - 1421:20;
1428:14
**father** [1] - 1428:14
**fault** [2] - 1297:3;
1362:14
**favorable** [1] - 1293:1
**FBI** [6] - 1325:20, 23;
1342:19; 1343:8;
1397:20; 1491:1
**fear** [3] - 1317:22;
1320:19; 1353:22
**February** [1] - 1377:19
**Federal** [2] - 1291:13,
22
**federal** [10] - 1316:21;
1317:8; 1318:3;
1343:15; 1388:8, 15;
1421:5, 17; 1489:18
**feds** [1] - 1489:25
**fellow** [2] - 1362:7;
1510:23
**felt** [4] - 1317:25;
1453:8; 1487:5; 1493:3
**fence** [1] - 1439:8
**few** [6] - 1348:21;
1349:14, 18; 1351:3;
1423:16; 1484:8
**filed** [2] - 1326:2;
1420:11
**Filene's** [20] -
1409:19; 1410:5, 10,
15, 20; 1411:8, 13;
1413:19, 23; 1414:1,
19, 22; 1415:21;
1416:19; 1417:3;
1418:4, 10; 1423:17;
1424:15
**fill** [1] - 1486:5
**fine** [1] - 1366:13
**fingerprints** [2] -
1466:12; 1471:19
**finish** [3] - 1295:7, 9;
1332:14
**fired** [1] - 1481:11
**firm** [2] - 1450:12;
1453:16
**first** [38] - 1294:3, 6;
1296:11, 16; 1298:15;
1299:23; 1307:13;
1332:21; 1334:8, 10,
16, 20; 1335:19;
1339:17; 1343:24;
1346:14; 1354:20;
1355:12, 15; 1358:19;
1362:21; 1363:2;

1370:16; 1375:7;
1377:16; 1380:5;
1406:5; 1419:16;
1420:11, 16; 1422:6;
1436:8; 1444:9;
1473:22; 1478:15;
1502:17; 1503:12
**Fitness** [7] - 1307:17,
19, 21, 24; 1308:3;
1484:24; 1485:16
**fitness** [4] - 1308:8,
12, 18, 23
**five** [2] - 1325:12;
1481:23
**flash** [1] - 1309:3
**fled** [1] - 1501:23
**floors** [2] - 1323:16
**Florida** [6] - 1291:17;
1355:1; 1361:23;
1362:13, 15; 1379:4
**flu** [1] - 1293:19
**fluent** [1] - 1299:16
**fly** [1] - 1323:6
**flybridge** [2] -
1505:21; 1509:16
**Flynn** [22] - 1295:13;
1298:9; 1334:2; 1357:9;
1362:10, 19; 1363:25;
1365:1; 1370:23;
1371:5, 15, 17;
1378:15; 1380:3;
1381:18, 25; 1382:24;
1383:9; 1388:21;
1407:2; 1423:13;
1510:17
**FLYNN** [120] - 1291:14;
1293:13; 1294:5, 9, 12;
1295:5; 1296:10, 18;
1298:10; 1299:2;
1300:19, 23; 1303:23;
1304:1; 1305:13;
1311:10; 1320:5, 21;
1333:13, 15, 18;
1334:12; 1335:2;
1336:4, 11, 19, 22, 25;
1337:3, 10; 1356:6;
1359:18; 1360:10, 17;
1361:1, 4; 1363:22;
1364:19, 23; 1365:4;
1368:15; 1369:24;
1370:21; 1371:6;
1372:10; 1373:3;
1378:20; 1379:1, 10,
25; 1380:5, 13, 18;
1383:2, 4; 1384:3;
1385:7; 1388:6, 17;
1389:9, 14, 24;
1390:12, 18; 1396:16,
19; 1397:6, 12; 1398:6;

1400:5; 1402:9, 12;
1403:22; 1406:1;
1407:3, 5; 1408:11, 14;
1410:4; 1415:5, 11;
1416:2, 5; 1417:18;
1419:2, 11; 1420:10,
21; 1421:6, 21; 1422:1,
18, 21; 1423:2, 14-15;
1427:3; 1437:3, 16, 22;
1438:2, 13, 19; 1441:3;
1444:20; 1447:13, 20;
1452:7, 14; 1460:13,
21; 1472:24; 1473:1;
1488:19, 22-23;
1510:19; 1513:6, 10, 13
**folks** [7] - 1295:18;
1298:6; 1356:9; 1394:2;
1460:16; 1511:10;
1512:2
**followed** [1] - 1353:4
**following** [14] -
1292:4; 1303:1; 1305:1;
1319:1; 1321:1; 1332:1;
1333:1; 1338:1;
1382:10; 1401:5;
1420:3; 1436:23;
1488:25; 1502:21
**follows** [2] - 1298:17;
1406:7
**foot** [4] - 1412:25;
1426:17; 1432:12, 14
**foresee** [1] - 1296:2
**forget** [7] - 1348:1;
1370:6; 1384:20, 23-24;
1385:1
**forgot** [1] - 1293:4
**forgotten** [1] -
1383:14
**form** [3] - 1306:13;
1369:24; 1380:6
**formulated** [1] -
1492:13
**forth** [2] - 1336:23;
1339:6
**forward** [4] - 1309:3;
1399:14; 1410:2;
1498:18
**Fotato** [1] - 1464:4
**foundations** [1] -
1374:10
**four** [15] - 1308:14;
1324:11; 1345:4;
1403:13; 1414:8;
1441:13, 16, 24;
1445:12; 1446:9;
1450:7; 1456:6; 1465:3;
1489:13; 1498:15
**fourth** [1] - 1461:2

**Fowler** [1] - 1296:7
**FRANK** [1] - 1291:18
**freestanding** [3] -
1425:1; 1435:4; 1436:4
**French** [2] - 1299:13,
19
**friend** [16] - 1302:6;
1306:4; 1339:19, 21;
1340:2; 1367:15;
1369:8, 13; 1410:13;
1418:16; 1419:21;
1423:22; 1428:13;
1450:11; 1485:15
**friend's** [1] - 1494:23
**friends** [21] - 1301:1,
25; 1302:4; 1303:18;
1306:12; 1307:6;
1334:22; 1369:4;
1391:19; 1418:14;
1422:17; 1431:14;
1442:19, 22; 1444:10,
13, 25; 1446:2;
1456:19; 1472:1
**friendship** [1] -
1409:3
**Froccaro** [5] -
1332:17, 21; 1335:22;
1336:16; 1421:18
**front** [23] - 1293:9;
1301:7; 1310:20;
1407:6; 1412:15;
1414:5, 7, 16; 1415:12,
19; 1417:8; 1418:17;
1430:2; 1438:3;
1446:23; 1451:21;
1475:7; 1476:22;
1491:12; 1501:18;
1503:20; 1506:13;
1508:9
**function** [1] - 1296:21
**funeral** [1] - 1341:22
**fur** [9] - 1410:22;
1418:2, 6, 12; 1420:15,
22; 1421:13; 1422:4;
1428:2
**furrier** [7] - 1424:17,
21, 24; 1425:3, 16;
1427:16; 1428:4
**furs** [11] - 1414:4, 17;
1417:2, 21; 1418:9;
1421:17; 1425:8;
1427:19; 1428:11;
1490:1
**future** [1] - 1448:8

---

**G**

---

**Gables** [1] - 1291:17

**10**

**11**

**Gae** [1] - 1428:13

**garage** [2] - 1435:5; 1506:13

**Garden** [2] - 1291:19; 1486:1

**Gargiulo** [62] - 1301:4; 1306:2, 16, 18; 1307:2, 7; 1308:2; 1314:10, 15, 21; 1316:18; 1317:16; 1326:22; 1327:18; 1330:8, 10, 25; 1339:13, 17; 1341:19; 1348:6; 1353:2; 1355:7; 1359:20; 1368:3; 1369:2, 6, 8, 23; 1370:8, 12; 1384:15; 1385:6; 1420:15, 18, 23; 1421:16; 1422:5, 9, 11, 17, 20; 1444:4, 10; 1445:8, 11, 14, 17, 20, 23; 1456:4, 13, 15; 1457:19; 1464:10; 1489:12; 1493:14, 18; 1497:20, 24; 1498:10

**Gargiulo's** [6] - 1340:8; 1342:3, 5, 8; 1349:18; 1353:4

**Garguilo** [1] - 1444:6

**Garrett** [20] - 1371:25; 1372:2; 1373:8; 1374:2, 10, 12, 22; 1375:6; 1376:11, 23; 1389:21, 23; 1391:9, 12, 14, 18, 23; 1392:2, 8

**Garrett's** [1] - 1374:16

**gas** [5] - 1474:13; 1476:13, 22; 1477:2; 1478:21

**geared** [1] - 1295:8

**gears** [1] - 1443:25

**general** [2] - 1404:9; 1437:4

**General** [1] - 1437:3

**generally** [1] - 1441:16

**gentlemen** [12] - 1305:3; 1336:24; 1372:8; 1383:20; 1393:1; 1401:2; 1404:1; 1406:11; 1409:24; 1423:8; 1458:13; 1510:20

**GEO** [3] - 1373:6; 1389:3; 1402:4

**Gerrato** [3] - 1497:20, 24; 1498:11

**Giampa** [1] - 1421:22

**girlfriend** [4] - 1377:24; 1426:20; 1488:4

**given** [4] - 1320:8; 1347:1; 1448:25; 1456:9

**glad** [1] - 1294:2

**glass** [5] - 1376:19, 21; 1378:3; 1379:21

**Glock** [1] - 1470:25

**goal** [1] - 1359:9

**goods** [2] - 1431:25; 1439:9

**Government** [26] - 1291:12; 1405:23; 1415:5, 9; 1419:2, 9; 1420:6; 1438:13, 17; 1446:19; 1447:13, 18; 1448:3, 15, 18, 25; 1449:16; 1452:7, 12; 1500:17; 1511:12; 1514:5, 7, 9, 11, 13

**government** [27] - 1292:13, 21; 1293:1, 9, 11; 1296:14; 1297:9; 1298:10; 1311:10; 1343:15; 1345:11; 1358:22; 1359:24; 1361:16; 1362:17; 1370:16; 1372:10; 1378:11, 24-25; 1379:6, 24; 1381:9; 1399:13; 1446:21

**government's** [2] - 1298:8; 1332:20

**Government's** [53] - 1301:12; 1310:21; 1311:11, 15, 25; 1414:9; 1415:6, 16; 1416:15, 21; 1417:22; 1418:19; 1424:6; 1433:2, 13; 1435:19, 22; 1438:5, 14; 1441:10; 1443:16; 1445:3; 1446:25; 1447:14; 1448:14; 1451:23; 1452:3, 8, 16; 1458:17; 1459:20; 1466:7; 1468:10; 1471:12; 1473:3; 1474:8; 1475:9; 1491:14, 25; 1492:7; 1500:10, 21; 1503:15, 24; 1504:7, 15, 21; 1505:1, 11; 1506:16; 1507:3; 1508:20; 1514:2

**grade** [2] - 1444:9

**graduate** [3] - 1407:23, 25; 1408:17

**graduating** [1] - 1408:2

**Graham** [13] - 1410:14, 19; 1411:11; 1412:18; 1413:18; 1418:3; 1424:22; 1429:1, 22; 1436:13; 1439:24; 1451:4

**gray** [1] - 1431:22

**great** [2] - 1407:7; 1443:14

**Greg** [6] - 1450:9, 18; 1452:2, 19; 1456:9

**grew** [4] - 1407:14; 1410:13; 1444:7; 1445:9

**grip** [1] - 1471:7

**group** [2] - 1300:25; 1373:22

**grow** [2] - 1407:15, 17

**guard** [1] - 1446:11

**guards** [1] - 1462:15

**guess** [3] - 1292:24; 1437:11; 1476:14

**guilty** [6] - 1343:2; 1345:3, 20; 1360:3; 1446:13, 17

**gun** [8] - 1397:21; 1471:23; 1472:3; 1481:16; 1483:10; 1484:8, 10, 18

**guns** [1] - 1463:20

**Gus** [1] - 1472:9

**GUS** [1] - 1472:9

**gutting** [1] - 1501:22

**Guy** [1] - 1464:4

**guys** [2] - 1429:23; 1471:25

**gym** [23] - 1307:12, 18, 22; 1308:7; 1346:16; 1347:6; 1351:11, 21; 1352:1; 1391:25; 1392:21; 1455:22, 24; 1456:2, 7; 1484:22; 1485:2, 8, 10; 1486:15; 1492:24

**gymnasium** [3] - 1350:4, 6, 22

**gyms** [11] - 1308:11, 15; 1346:19, 22; 1347:2, 15; 1351:7, 9, 16; 1392:1, 9

**Gyms** [2] - 1308:20; 1340:5

---

## H

**hair** [2] - 1469:14;

1490:18

**half** [6] - 1295:22; 1296:1; 1364:9; 1430:4; 1492:18; 1511:18

**halfway** [2] - 1354:21

**Hamptons** [8] - 1451:13; 1486:2, 10, 20, 22; 1487:1, 7

**hand** [11] - 1307:3; 1311:24; 1322:24; 1324:12; 1336:17; 1414:7; 1416:3; 1459:4; 1460:8; 1476:3

**handicapped** [1] - 1461:10

**handle** [2] - 1334:24; 1336:7

**handwritten** [1] - 1325:5

**hanging** [1] - 1302:4

**hard** [4] - 1315:24; 1322:22; 1417:12; 1477:10

**Harrington** [1] - 1439:25

**HARRY** [1] - 1291:20

**head** [4] - 1397:22; 1481:12; 1499:5, 11

**headed** [2] - 1479:6; 1510:15

**health** [1] - 1314:22

**hear** [18] - 1292:8; 1315:23; 1316:5; 1319:3; 1330:12; 1333:8; 1384:2; 1387:14; 1395:23, 25; 1397:1; 1402:25; 1405:1; 1409:25; 1417:10; 1467:14; 1511:24

**heard** [11] - 1315:24; 1316:16; 1319:14; 1327:1; 1383:25; 1384:17; 1401:21; 1402:13; 1406:13; 1423:9

**hearing** [4] - 1320:16; 1332:24; 1337:6; 1352:16

**hearsay** [3] - 1373:4; 1374:17, 20

**heavy** [1] - 1508:10

**heist** [1] - 1499:25

**hello** [1] - 1342:7

**help** [14] - 1353:12, 14, 16, 24; 1359:12; 1360:2, 22; 1361:11; 1364:16; 1383:19;

1403:10; 1448:24;
1495:16

**helped** [4] - 1344:23;
1448:18; 1499:19;
1507:11

**helping** [1] - 1359:8

**Hicksville** [3] -
1432:9; 1434:20

**highlight** [2] -
1313:20; 1415:25

**highlighted** [1] -
1321:19

**highlighting** [1] -
1416:3

**himself** [3] - 1368:6;
1453:21; 1481:3

**hold** [2] - 1483:10, 16

**holidays** [1] - 1363:14

**Holzer** [1] - 1485:4

**Holzer's** [1] - 1485:8

**Home** [3] - 1495:6;
1507:8, 11

**home** [48] - 1309:5, 12,
17; 1310:8; 1312:9;
1315:1, 5, 9-10, 19,
21; 1316:10; 1317:17;
1323:10, 14, 16;
1327:9, 24; 1328:4, 9,
16; 1329:7; 1330:19;
1339:9; 1344:25;
1345:8, 22; 1346:2, 10;
1347:7; 1348:2, 19;
1349:12, 18; 1351:12;
1353:10; 1354:18;
1387:6, 8, 25; 1403:11,
15, 18; 1496:6;
1505:16; 1506:18

**homicides** [1] -
1296:16

**Honor** [51] - 1292:15;
1293:13, 17; 1294:5, 9,
12; 1296:10; 1298:10;
1300:19; 1303:23;
1304:1; 1305:13;
1333:15, 24; 1334:12;
1335:2; 1336:11, 19,
25; 1356:6; 1372:10;
1380:5; 1388:17;
1389:14, 25; 1390:12;
1400:6; 1402:7, 9;
1403:24; 1406:1;
1407:3; 1415:5;
1420:10, 24; 1421:6,
19; 1422:19, 25;
1423:2, 14; 1437:5, 11,
22; 1438:13; 1447:13,
16; 1460:13; 1472:24;
1488:19; 1510:19

**Honor's** [1] - 1420:13

**HONORABLE** [1] - 1291:9

**hook** [1] - 1454:16

**hooking** [1] - 1463:2

**hope** [4] - 1294:22;
1359:15; 1448:19;
1449:11

**hopes** [1] - 1359:5

**hospital** [4] -
1369:14, 16, 19; 1370:3

**hot** [1] - 1466:25

**hour** [6] - 1350:1;
1364:5, 8-9; 1487:9

**hours** [3] - 1364:4;
1384:9; 1467:24

**house** [28] - 1315:17;
1319:10; 1324:20;
1326:24; 1327:11, 18;
1342:12, 14; 1344:20;
1354:21; 1362:13;
1397:21; 1451:13;
1486:6; 1487:22, 25;
1488:8; 1503:5, 10,
20-21; 1505:13;
1506:11, 22; 1507:14,
22

**housed** [1] - 1371:18

**household** [4] -
1440:10, 13; 1441:22

**houses** [1] - 1376:8

**housing** [1] - 1440:7

**hurt** [1] - 1317:25

**husband** [141] -
1306:11, 16; 1307:2, 7,
14, 24; 1308:7;
1309:22; 1310:13;
1312:20, 22; 1314:5, 9;
1315:9, 14, 19; 1316:5,
11-12, 15, 20-21;
1317:1, 5, 7; 1318:2;
1319:20; 1324:9;
1327:13; 1329:6;
1331:5, 8; 1332:5;
1334:4, 18, 23;
1338:13, 16, 19;
1339:15; 1340:11, 15,
20, 25; 1341:4, 10;
1342:16; 1344:1, 4,
7-8, 10, 18, 23;
1345:15, 19; 1346:24;
1347:12; 1348:11, 16;
1349:10; 1350:17, 22;
1351:1, 14, 17, 25;
1352:2, 10; 1353:1;
1354:15, 17; 1355:5;
1358:22; 1359:4, 13,
25; 1360:3, 5-6, 23;
1361:11, 14; 1362:8,

24; 1367:17; 1368:23;
1370:13; 1371:17, 21;
1373:7; 1374:11, 14;
1376:8, 20, 24;
1378:17, 24; 1379:4, 8,
16, 23; 1382:4, 11, 14,
25; 1383:11; 1384:12,
21; 1385:4; 1387:20,
22, 24; 1388:15;
1389:5; 1390:20;
1392:2, 15, 21; 1393:2,
6, 9, 15, 19; 1395:18;
1396:3, 14, 18; 1399:7,
16, 19; 1402:4, 15-16;
1403:2, 9, 20

**husband's** [8] -
1306:5; 1343:13, 18;
1345:2; 1352:21;
1398:3; 1401:8

---

**I**

**idea** [3] - 1449:22;
1457:5; 1494:12

**identification** [7] -
1310:21; 1376:6;
1414:9; 1418:19;
1438:4; 1446:24;
1451:22

**identified** [4] -
1300:20; 1392:9;
1408:12; 1436:8

**identifies** [1] -
1375:2

**identify** [3] -
1300:14; 1408:8;
1475:23

**identifying** [1] -
1506:15

**identity** [1] - 1470:4

**ignition** [1] - 1432:21

**ignore** [1] - 1511:5

**immediately** [4] -
1343:13; 1387:19;
1461:2; 1511:1

**immigration** [1] -
1313:22

**impact** [1] - 1332:22

**imparted** [1] - 1455:18

**impeachment** [1] -
1373:6

**important** [5] -
1295:23; 1296:4;
1380:17; 1437:6, 21

**imprisonment** [2] -
1359:10; 1449:2

**in-depth** [1] - 1422:13

**incarcerated** [7] -

1342:17; 1344:2, 11;
1348:16; 1356:1;
1388:15; 1402:4

**incarceration** [1] -
1447:24

**include** [2] - 1331:12;
1409:11

**included** [2] - 1303:4;
1493:19

**including** [4] -
1320:7; 1464:10;
1470:15; 1510:22

**inconsistency** [1] -
1373:4

**inconsistent** [1] -
1373:25

**independent** [4] -
1345:6; 1393:14;
1397:17; 1511:7

**independently** [1] -
1451:9

**INDEX** [1] - 1513:1

**indicate** [10] -
1300:16; 1357:2, 10;
1399:23; 1476:8;
1477:6; 1499:1, 9;
1507:24; 1508:21

**indicated** [9] -
1452:20; 1461:1;
1466:1; 1469:15, 24;
1471:5; 1476:2;
1491:22; 1509:2

**Indicating** [1] -
1476:1

**indicating** [2] -
1442:2; 1460:11

**indicating)** [6] -
1324:13; 1460:2, 25;
1476:20; 1509:1, 23

**Indicating)** [1] -
1476:11

**indictment** [2] -
1406:24; 1421:22

**individual** [14] -
1306:1; 1373:8; 1392:1;
1418:20; 1424:23;
1438:8; 1442:24;
1443:1, 17; 1444:3;
1451:24; 1452:21;
1466:16

**individuals** [9] -
1301:18; 1307:1;
1423:17; 1424:9;
1440:2; 1451:5;
1453:11; 1464:10;
1488:17

**individuals'** [1] -
1472:8

12

industrial [2] - 1435:2; 1457:14

industrial-sized [1] - 1457:14

industry [1] - 1308:8

inference [1] - 1303:25

inferences [1] - 1305:5

Infiniti [4] - 1474:18, 20, 25; 1478:25

influences [1] - 1510:25

information [9] - 1448:18; 1453:22; 1455:17; 1456:16; 1462:23; 1463:1; 1465:25; 1479:13; 1511:21

informed [2] - 1452:21; 1499:21

informing [1] - 1338:12

initial [2] - 1340:18; 1345:2

initiated [2] - 1328:19; 1453:2

inlet [1] - 1510:16

inmates [1] - 1350:14

innocent [2] - 1305:7; 1409:25

inquire [1] - 1402:9

inside [25] - 1311:7; 1324:23; 1328:9; 1374:24; 1413:23; 1426:1; 1456:2; 1461:20, 23-24; 1462:9, 13; 1465:21; 1466:13; 1467:1, 4; 1479:1; 1485:9; 1497:25; 1498:1, 13; 1508:12, 14

instance [1] - 1314:25

instead [2] - 1412:16; 1463:11

institute [2] - 1349:3; 1388:9

institution [2] - 1374:24; 1378:11

instructed [6] - 1345:12, 15; 1364:24; 1384:5; 1401:20; 1406:14

instructing [1] - 1305:4

instruction [6] - 1383:8; 1404:6, 9;

1405:2, 5, 24

instructions [4] - 1331:4; 1346:24; 1347:2; 1382:25

intend [1] - 1488:19

intention [1] - 1293:21

intentions [1] - 1489:15

interest [1] - 1308:23

interested [2] - 1456:11; 1464:8

interim [1] - 1390:14

interior [1] - 1434:13

interpret [1] - 1292:24

interpreted [1] - 1293:8

interrupt [1] - 1399:3

intertwined [1] - 1380:13

interview [1] - 1363:9

intimate [1] - 1369:4

introduce [3] - 1388:7; 1401:17; 1419:19

introduced [1] - 1419:18

inured [1] - 1463:25

investigation [2] - 1457:20; 1511:8

invite [2] - 1328:2; 1345:23

involved [7] - 1292:12; 1300:6; 1308:7; 1463:19, 22; 1464:13; 1493:15

involvement [1] - 1448:5

involving [2] - 1293:20; 1421:17

Island [10] - 1308:20; 1309:2; 1315:16; 1323:10; 1392:4; 1428:19, 21; 1474:1; 1484:4; 1486:24

Islip [3] - 1291:5, 13, 22

issue [11] - 1292:23; 1293:10; 1296:4, 19; 1333:4; 1336:14; 1357:5, 17; 1380:17; 1437:1, 10

issued [2] - 1299:6; 1311:17

issues [1] - 1332:18

it. [1] - 1493:25

Item [1] - 1505:3

items [10] - 1439:1, 7; 1440:6, 10-11, 13; 1441:22; 1472:16; 1473:5; 1500:4

## J

jacket [1] - 1300:18

jail [21] - 1302:7; 1303:4, 12, 22; 1305:4, 6; 1334:23; 1344:10, 19; 1392:16; 1402:3; 1403:9; 1419:21; 1420:22; 1421:1, 4; 1463:23; 1490:8, 11

JAMES [1] - 1291:14

James [1] - 1335:22

January [43] - 1316:11, 23; 1317:1; 1318:4; 1319:9; 1321:3, 11; 1322:3, 9, 25; 1323:8; 1328:7; 1330:3, 20; 1338:5; 1355:7; 1363:11; 1370:18, 20; 1371:16, 19-20, 23; 1373:7, 24; 1376:6, 10; 1377:1, 10; 1382:6; 1383:25; 1384:7, 9; 1393:18; 1397:17; 1402:1, 24; 1432:7, 10; 1446:13, 17; 1447:12

JD-25-D [1] - 1473:4

Jeep [5] - 1506:5, 8, 11, 21; 1508:3

Jericho [4] - 1474:2, 15; 1476:25; 1478:21

Jersey [4] - 1323:7; 1420:15; 1421:14; 1422:4

jewelry [10] - 1428:17, 22; 1429:11, 15; 1430:10, 20; 1431:11, 16, 24

JK-11 [1] - 1443:16

JK-26-A [2] - 1473:4, 8

JOANNA [1] - 1291:9

job [1] - 1464:7

John [2] - 1407:22; 1472:9

Jones [1] - 1510:15

Judge [15] - 1295:19; 1296:18; 1302:11; 1318:6; 1319:4; 1326:1; 1338:24; 1349:5; 1352:15; 1409:22; 1417:10; 1423:4; 1427:1; 1436:20;

1440:25

judge [12] - 1377:3, 14; 1388:7; 1393:22; 1395:7; 1448:17, 19, 21; 1449:1, 5, 10, 23

Julius [4] - 1404:12; 1446:11; 1450:5; 1489:1

June [9] - 1446:4; 1450:3; 1455:11; 1465:13; 1468:14; 1473:11, 25; 1475:4; 1487:8

JURORS [1] - 1305:9

jurors [3] - 1298:1; 1357:3; 1510:23

JURY [1] - 1460:19

jury [30] - 1291:10; 1292:5; 1293:10; 1294:22; 1296:15; 1298:4; 1303:6, 20-21; 1320:16; 1326:8; 1343:21; 1345:8; 1358:10; 1364:24; 1383:6, 21; 1384:4; 1393:1; 1394:4; 1395:3; 1400:8; 1401:20; 1404:4, 10; 1405:20; 1475:23; 1476:8; 1512:4

## K

keep [12] - 1319:23; 1332:6; 1413:12; 1431:13; 1434:21; 1439:12; 1441:21; 1481:3, 14, 16; 1483:11; 1511:9

Keith [16] - 1332:4, 6, 8; 1333:7; 1334:6, 8, 11; 1335:21; 1336:17; 1339:19; 1341:12; 1342:2; 1357:14, 19; 1369:6

Kennedy [1] - 1407:22

kept [4] - 1431:13; 1440:5; 1480:6

key [1] - 1319:8

kids [4] - 1439:25; 1442:18, 21; 1472:6

kill [4] - 1316:1; 1492:14, 16; 1494:11

killed [8] - 1341:20; 1437:13; 1479:10; 1497:2, 6; 1499:1, 7, 21

kilos [1] - 1501:9

kind [8] - 1307:11; 1368:6; 1427:20;

**13**

14

1428:7; 1429:8;
1443:13; 1470:24;
1474:19
**kitchen** [8] - 1316:4;
1328:11, 20; 1330:3;
1338:5; 1346:3, 7;
1492:4
**knock** [1] - 1425:23
**knocked** [1] - 1426:5
**knowledge** [9] -
1308:2, 19; 1343:15;
1419:22; 1463:24;
1464:9; 1472:2;
1477:17; 1493:18
**known** [2] - 1306:1;
1308:15

L

**labeled** [1] - 1414:9
**Labor** [1] - 1390:4
**lack** [1] - 1374:7
**lackadaisical** [1] -
1453:12
**ladies** [9] - 1305:3;
1383:20; 1393:1;
1401:2; 1404:1;
1406:11; 1409:24;
1423:8; 1510:20
**lam** [1] - 1421:25
**landed** [1] - 1323:8
**language** [2] -
1299:12, 18
**large** [3] - 1350:4;
1414:4; 1461:3
**larger** [2] - 1300:25;
1436:14
**laser** [2] - 1460:22;
1476:12
**last** [14] - 1302:12;
1307:9; 1319:21;
1320:1; 1345:4;
1357:11; 1360:14;
1380:15; 1395:8;
1423:8; 1446:9; 1447:7;
1487:14
**latch** [1] - 1509:6
**late** [2] - 1410:25;
1429:17
**law** [13] - 1310:15;
1372:5; 1374:5, 22;
1376:18; 1391:10;
1392:13; 1489:14, 19;
1490:13; 1491:1, 11;
1512:1
**laying** [1] - 1374:9
**layout** [1] - 1350:6
**leading** [11] - 1309:19,

21; 1314:3; 1318:7;
1319:18; 1320:9;
1331:13; 1334:1, 4;
1335:3
**learn** [4] - 1339:17;
1341:18; 1479:9, 12
**least** [3] - 1344:17;
1386:3; 1400:4
**leave** [12] - 1293:22;
1310:16; 1316:12;
1318:4; 1321:4;
1330:22; 1408:22;
1466:15; 1473:18;
1482:3, 5; 1486:15
**Leavenworth** [1] -
1421:7
**leaves** [2] - 1394:4;
1404:4
**leaving** [1] - 1296:20
**left** [40] - 1301:8, 21;
1311:24; 1314:25;
1315:10; 1316:18;
1317:2, 14, 16; 1318:2;
1322:11; 1408:24;
1414:7; 1418:10, 18;
1424:11; 1436:4, 9, 14;
1441:25; 1445:7;
1456:10; 1458:22;
1459:4; 1462:9, 12, 18;
1463:8; 1472:13;
1473:22; 1474:24;
1476:3; 1479:6;
1485:18; 1486:23;
1500:5, 7, 18; 1502:17;
1509:22
**left-hand** [4] -
1311:24; 1414:7;
1459:4; 1476:3
**legal** [1] - 1358:20
**legitimate** [2] -
1399:25; 1440:23
**length** [2] - 1293:25;
1295:5
**lengthy** [2] - 1295:10,
14
**less** [4] - 1309:21;
1359:6; 1367:6; 1449:11
**letter** [57] - 1292:22;
1324:24; 1325:5, 11-12,
16; 1326:5, 20; 1327:4,
7-8, 17; 1328:24;
1329:4, 12, 15, 21;
1330:5, 10-11, 25;
1331:5, 7; 1332:12, 17;
1333:2, 4-5; 1334:3,
11, 16; 1335:9, 11, 19,
21, 25; 1336:16;
1337:9; 1338:6, 13, 15,
17, 20; 1355:6, 12, 16,

20; 1356:1; 1357:15;
1363:4; 1364:18;
1366:9; 1448:17, 22;
1449:1
**letter's** [1] - 1326:19
**letting** [1] - 1421:11
**level** [3] - 1303:13;
1317:18; 1487:1
**Levy** [1] - 1488:2
**life** [11] - 1297:6;
1320:20; 1343:4;
1359:2, 6, 10; 1448:1;
1449:2, 12
**light** [1] - 1292:25
**lightened** [1] -
1490:20
**lighter** [1] - 1448:20
**limited** [2] - 1335:9;
1386:5
**limiting** [3] - 1404:6;
1405:2, 24
**line** [2] - 1451:19;
1476:3
**lined** [1] - 1350:7
**lines** [1] - 1425:23
**list** [5] - 1388:8, 13;
1391:4; 1428:12
**listed** [1] - 1373:20
**listen** [5] - 1302:14;
1399:17; 1467:12;
1472:23; 1511:3
**live** [5] - 1309:1;
1314:21; 1379:3;
1423:24; 1488:4
**live-in** [2] - 1314:21;
1488:4
**lived** [2] - 1487:11;
1490:25
**lives** [1] - 1423:22
**living** [7] - 1315:14;
1323:15; 1324:22;
1354:25; 1490:22;
1491:10
**located** [9] - 1414:17;
1415:1; 1417:2, 8;
1429:2; 1430:24;
1435:1; 1439:20; 1491:3
**location** [13] -
1426:21; 1427:4;
1432:15; 1434:23;
1437:13; 1439:13;
1457:23; 1459:22;
1460:11; 1468:10;
1477:2; 1479:23;
1509:11
**locations** [1] - 1501:6
**log** [1] - 1378:6

**log-in** [1] - 1378:6
**look** [15] - 1296:3;
1324:3; 1333:15;
1335:2; 1372:8;
1417:13; 1435:3;
1447:1; 1451:23;
1457:5; 1470:10;
1473:9; 1500:5; 1502:2;
1508:12
**looked** [4] - 1443:23;
1466:6; 1491:1; 1494:1
**looking** [14] - 1295:17;
1297:6; 1302:6;
1303:19; 1410:21;
1415:18; 1416:14;
1417:1, 24; 1476:14;
1489:14, 25; 1499:24
**lookout** [15] - 1411:3;
1425:12; 1426:13;
1429:19, 21, 24;
1430:10; 1457:10;
1464:18; 1465:7;
1472:22; 1476:9, 19
**looks** [1] - 1471:16
**looping** [1] - 1320:6
**LORETTA** [1] - 1291:12
**Lou** [1] - 1492:23
**Louie** [12] - 1483:9,
11, 16; 1493:3; 1494:7;
1497:2, 17; 1498:23;
1499:7; 1501:13; 1506:9
**Louie's** [1] - 1498:19
**Louis** [43] - 1404:12;
1418:14, 23-24;
1419:15, 19; 1420:7;
1422:2; 1428:13;
1436:13; 1439:25;
1440:15; 1442:6;
1450:6; 1462:7, 22;
1464:11; 1465:16;
1468:22; 1470:20;
1479:4; 1480:4, 7, 13;
1482:25; 1489:4;
1491:20; 1492:14, 16;
1493:2, 20; 1494:4, 11,
19; 1497:1, 6, 11;
1500:16; 1508:2
**loved** [2] - 1367:21, 24
**lovers** [2] - 1367:16,
18
**lower** [2] - 1313:19;
1319:23
**lunch** [1] - 1481:20
**luncheon** [1] - 1394:5
**lunchtime** [1] -
1453:20
**Lunesta** [1] - 1354:1
**LYNCH** [1] - 1291:12

**M**

**M-A-L-D-O-O-N** [1] - 1464:5

**M-U-L-L-A-G-A-N(sic)** [1] - 1298:22

**M-U-L-L-I-G-A-N** [1] - 1406:10

**machine** [3] - 1315:10, 21; 1397:21

**mad** [3] - 1355:11, 25; 1356:2

**mail** [5] - 1314:25; 1315:4; 1317:2; 1323:13, 19

**main** [5] - 1412:19; 1426:1, 16; 1448:2

**maintained** [2] - 1335:11; 1413:22

**Maldoon** [1] - 1464:4

**mall** [1] - 1429:3

**Manhasset** [1] - 1410:8

**Manhattan** [7] - 1307:17; 1456:8; 1482:10; 1483:2, 25; 1484:4; 1486:16

**manner** [4] - 1330:17; 1335:5; 1494:18; 1499:7

**MANON** [1] - 1298:21

**Manon** [5] - 1292:23; 1294:5; 1298:11, 21; 1358:9

**March** [13] - 1370:24; 1371:2, 11, 15, 20-21; 1373:24; 1378:9, 14, 23; 1379:9; 1382:8, 10

**marijuana** [3] - 1317:9; 1354:15; 1439:9

**Marissa** [1] - 1488:2

**mark** [5] - 1372:6; 1388:4; 1416:6, 9; 1463:9

**marked** [12] - 1310:20; 1311:21, 24; 1376:5; 1377:9, 13; 1378:5; 1388:12; 1418:18; 1438:4; 1446:24; 1451:22

**marking** [1] - 1322:2

**marks** [1] - 1311:8

**married** [6] - 1305:18, 20, 23; 1308:25; 1367:7; 1369:5

**marry** [2] - 1305:16; 1367:24

**Maryland** [3] - 1408:16, 20, 22

**mask** [1] - 1470:11

**masks** [2] - 1470:7

**Massachusetts** [8] - 1317:6; 1318:4; 1327:16; 1340:16; 1348:17, 22; 1354:18; 1355:5

**math** [1] - 1305:22

**mature** [1] - 1427:23

**Meadow** [5] - 1486:24; 1487:11, 13, 15, 21

**mean** [25] - 1293:6; 1319:4, 20; 1325:25; 1326:8; 1360:25; 1361:7, 21; 1371:19; 1380:10; 1402:17; 1411:4; 1420:21; 1425:25; 1427:22; 1432:20; 1440:21; 1454:23; 1462:10; 1471:18; 1479:16; 1483:18; 1494:6; 1496:18

**meaning** [3] - 1392:2; 1449:19; 1494:7

**means** [4] - 1305:22; 1361:5; 1374:23; 1411:5

**mechanical** [1] - 1291:24

**media** [2] - 1511:4, 6

**medications** [4] - 1353:21, 24; 1354:2, 5

**meet** [21] - 1299:23; 1300:25; 1301:3; 1312:17, 19; 1358:16; 1363:25; 1367:3; 1382:3; 1419:16; 1444:8, 12; 1448:13; 1468:5; 1487:12, 17; 1494:13; 1497:3; 1502:11; 1503:4

**meeting** [20] - 1295:20, 24; 1300:5, 24; 1301:24; 1362:18; 1370:16; 1371:15; 1373:15-17; 1376:15; 1378:10; 1381:15, 23; 1382:2; 1387:22; 1511:19

**meetings** [2] - 1378:15; 1379:5

**memory** [2] - 1374:8; 1390:18

**mental** [3] - 1314:19, 22; 1369:15

**mention** [10] - 1331:7; 1332:4; 1333:12; 1335:6, 8, 11, 18;

886:2; 1389:22

**mentioned** [10] - 1293:19; 1326:17; 1334:17; 1337:1, 5; 1349:7; 1355:25; 1357:13; 1450:13; 1453:12; 1467:10

**mentions** [1] - 1334:18

**merchandise** [1] - 1435:15

**Merrick** [10] - 1392:4; 1407:16, 18; 1471:23; 1472:3; 1496:6; 1497:18; 1498:7; 1503:5

**mess** [4] - 1493:4, 6, 11; 1494:5

**message** [15] - 1314:25; 1315:5, 9; 1316:3, 5, 15, 17; 1317:2, 16; 1327:2; 1352:11, 22, 24; 1502:17; 1503:7

**met** [24] - 1301:4; 1305:15; 1307:13; 1361:15, 20; 1362:21; 1365:10; 1370:22; 1419:17, 21; 1420:7; 1421:17; 1422:2, 15, 21-23; 1424:14; 1468:16; 1486:1; 1487:20; 1503:8

**Miami** [2] - 1313:21; 1362:7

**microphone** [5] - 1298:19; 1407:6, 8; 1417:13

**mid** [1] - 1444:2

**mid-1990s** [1] - 1305:25

**mid-90s** [1] - 1307:25

**middle** [1] - 1507:1

**midnight** [1] - 1497:23

**might** [1] - 1295:22

**Mike** [2] - 1429:1, 21

**mike** [1] - 1493:24

**mile** [4] - 1412:24; 1426:23; 1430:4

**Miller** [31] - 1411:14; 1435:8; 1436:21; 1438:12, 21, 23, 25; 1479:7; 1480:23; 1495:20, 22; 1496:1, 7, 9, 11, 21, 24; 1497:8; 1502:9, 12, 20, 25; 1503:1; 1504:14; 1505:7; 1507:14, 22; 1509:14; 1510:9, 13

**Miller's** [36] - 1418:11; 1434:24;

1435:7; 1437:2, 7; 1439:5, 11; 1466:20; 1467:7; 1468:9, 18, 24; 1469:1; 1470:1, 19; 1472:13; 1473:25; 1479:8, 22; 1480:1, 10; 1483:1; 1494:16; 1499:11; 1503:10, 20; 1504:6, 17; 1505:13, 16; 1506:18, 22; 1507:17; 1508:8, 16, 19

**Millers** [1] - 1436:16

**mind** [6] - 1339:3; 1393:25; 1397:24; 1399:23; 1403:18; 1511:9

**mine** [2] - 1450:12; 1485:15

**Mini** [2] - 1439:16; 1440:1

**mini** [1] - 1442:10

**mini-storage** [1] - 1442:10

**minute** [3] - 1296:21; 1332:13; 1478:11

**minutes** [8] - 1330:21; 1348:4; 1356:9; 1413:24; 1478:9; 1481:23; 1483:3; 1485:17

**Miskiewicz** [4] - 1294:10; 1298:8; 1362:12, 20

**MISKIEWICZ** [7] - 1291:14; 1292:15; 1303:11; 1333:23; 1405:3; 1437:5, 11

**miss** [1] - 1381:4

**missing** [1] - 1292:22

**missions** [4] - 1459:16; 1462:2; 1475:19, 25

**misspoke** [1] - 1421:6

**misstates** [2] - 1383:2, 4

**mistake** [2] - 1480:8; 1483:9

**mistrial** [3] - 1303:8, 13, 21

**MM-1** [5] - 1310:21; 1311:11, 15, 25; 1514:2

**model** [1] - 1474:21

**mom** [5] - 1321:14; 1328:1; 1346:11; 1349:1; 1353:9

**moment** [13] - 1316:20; 1330:14; 1365:14; 1420:1; 1421:9;

**15**

16

1433:10; 1440:15;
1447:1; 1451:16, 23;
1452:20; 1457:8;
1483:15
**momentarily** [1] -
1294:16
**moments** [2] - 1385:2;
1423:16
**Monday** [10] - 1295:9,
12-13; 1296:21, 23;
1510:24; 1511:15;
1512:3, 7
**money** [19] - 1326:9;
1427:22; 1453:8;
1454:11, 18; 1456:10;
1462:9, 14, 16; 1463:8;
1464:20; 1465:2;
1488:9-12, 16; 1499:25
**monitor** [4] - 1301:7;
1415:13, 17
**month** [6] - 1317:17,
21; 1339:12; 1370:17;
1371:9
**months** [17] - 1300:11;
1317:11; 1318:2;
1345:4; 1353:4; 1365:7;
1369:19, 21-22, 25;
1371:4, 8; 1403:13;
1446:9; 1455:13; 1456:6
**Morgan** [29] - 1450:9,
21; 1451:7, 16; 1452:2,
4, 15, 19-20; 1453:3,
10, 14-15, 17-18, 21,
25; 1454:3, 6, 20;
1455:6, 12, 15, 17;
1456:9; 1465:8
**Morgan's** [1] - 1450:18
**morning** [34] - 1292:6;
1298:6; 1299:3; 1356:8;
1358:5; 1364:2;
1379:19; 1384:19;
1410:25; 1429:17;
1468:5, 13, 15, 24;
1469:1, 25; 1470:13,
16; 1471:16; 1472:17;
1473:11; 1477:13;
1502:11, 18, 21-22, 25;
1503:2, 7; 1506:12;
1508:17; 1509:18;
1510:8
**Morris** [2] - 1429:1, 21
**most** [6] - 1295:20;
1320:6; 1369:4;
1420:13; 1451:3;
1465:22
**mother** [14] - 1328:16;
1350:15; 1372:5;
1373:13, 20; 1374:5,
22; 1376:14, 18;

1388:3; 1390:5;
1391:10; 1392:13
**mother's** [1] - 1503:4
**mother-in-law** [6] -
1372:5; 1374:5, 22;
1376:18; 1391:10;
1392:13
**motion** [7] - 1302:12,
15; 1303:21; 1412:2;
1415:1; 1420:16
**motions** [1] - 1326:2
**motivation** [2] -
1405:7; 1406:21
**mouth** [1] - 1352:14
**move** [9] - 1337:7;
1366:13; 1377:3, 14;
1422:25; 1423:13;
1431:6; 1437:18, 22
**moved** [3] - 1355:2;
1377:16; 1490:23
**moves** [5] - 1311:10;
1419:2; 1438:13;
1447:13; 1452:7
**movie** [1] - 1415:15
**moving** [1] - 1303:8
**MR** [245] - 1292:15, 19;
1293:13, 17; 1294:5, 9,
12; 1295:2, 5, 8;
1296:2, 7, 10, 18, 23;
1297:1, 5, 8; 1298:10;
1299:2; 1300:19, 23;
1302:11; 1303:3, 9, 11,
23; 1304:1; 1305:13;
1306:13; 1309:19;
1311:10, 13; 1314:2;
1315:2; 1318:6; 1319:4,
12, 19, 24; 1320:4, 21;
1325:9; 1326:1;
1331:13; 1332:7, 9, 12,
15; 1333:13, 15, 18-19,
23-24; 1334:5, 8, 10,
12-13; 1335:2, 16, 23;
1336:4, 10-11, 15, 19,
21-22, 25; 1337:3, 10;
1338:24; 1339:3;
1349:5; 1352:15, 20;
1356:6; 1357:7, 22;
1358:2, 6, 14; 1359:18;
1360:10, 17; 1361:1, 4;
1363:22; 1364:19, 23;
1365:4; 1366:11;
1367:2; 1368:15, 17;
1369:24; 1370:21;
1371:6; 1372:10;
1373:3, 9, 12, 16, 20,
23; 1374:1, 6, 9, 13;
1375:6, 8; 1376:4;
1377:3, 14; 1378:20;
1379:1, 10, 25; 1380:5,

9, 13, 18; 1381:2, 4;
1383:2, 4, 10; 1384:3,
8; 1385:7; 1386:8;
1387:2; 1388:4, 6-7,
17-18; 1389:6, 8-9, 14,
18, 21, 24; 1390:6, 10,
12, 16, 18; 1391:3;
1393:22; 1395:7, 12;
1396:16, 19; 1397:6,
12; 1398:6; 1399:10,
25; 1400:2, 5, 11;
1401:15, 17; 1402:1, 7,
9, 12; 1403:22, 24;
1405:3, 10, 15, 18;
1406:1; 1407:3, 5;
1408:11, 14; 1409:22;
1410:4; 1415:5, 11;
1416:2, 5; 1417:10, 18;
1419:2, 4, 11, 24;
1420:9, 21; 1421:1, 6,
19, 21; 1422:1, 18-19,
21; 1423:2, 4, 14-15;
1427:1, 3; 1436:20;
1437:3, 5, 11, 16, 22;
1438:2, 13, 19;
1440:25; 1441:3;
1444:18, 20; 1447:13,
16, 20; 1452:7, 10, 14;
1460:13, 21; 1472:24;
1473:1; 1488:19, 22-23;
1510:19; 1513:6, 8, 10,
13
**Mulligan** [121] -
1292:10, 25; 1294:5, 8,
11; 1295:14; 1298:2,
11-12, 21; 1299:3;
1300:20; 1301:4, 6, 23;
1302:1; 1303:18;
1305:15, 18, 20, 22;
1307:2, 13; 1308:12,
25; 1309:16; 1311:17,
19; 1313:5; 1314:8;
1317:7; 1321:3; 1324:9;
1326:5; 1332:22;
1335:12; 1338:5, 16,
19; 1339:10; 1340:22;
1341:5; 1342:16;
1344:1, 14; 1347:1;
1348:9, 20; 1349:2, 12,
15, 24; 1350:2; 1351:6,
18; 1352:25; 1355:19;
1357:9, 24; 1358:4, 9,
15; 1367:7; 1368:3;
1369:5; 1370:14;
1377:8, 11, 21;
1383:11; 1384:12;
1391:17; 1395:18, 23;
1402:3; 1406:2, 10;
1409:16; 1414:5;
1415:12; 1416:11;

1418:17; 1421:12;
1422:2, 23; 1423:16;
1424:4, 15; 1428:15;
1431:15; 1432:25;
1433:12; 1435:17;
1438:3, 20; 1441:9;
1443:8, 25; 1445:2;
1446:3, 23; 1450:3;
1451:21; 1452:16;
1458:15; 1465:11;
1471:10; 1473:2, 16;
1475:7; 1480:13;
1488:24; 1491:12;
1492:12; 1500:9;
1502:5; 1503:14
**Mulligan's** [6] -
1292:23; 1293:12;
1294:14; 1295:6;
1352:14; 1404:7
**Mulligans** [2] -
1308:22; 1346:18
**multiple** [3] -
1399:11; 1489:7
**murder** [29] - 1342:23;
1343:10; 1345:3, 20;
1353:2, 5, 12; 1358:25;
1359:2; 1360:4; 1390:2,
13; 1403:3, 19;
1404:12; 1405:8;
1406:22; 1446:11;
1487:8; 1489:1;
1492:23; 1493:2, 19;
1494:17; 1499:14, 18;
1502:22
**murdered** [5] -
1339:13; 1389:11;
1446:7; 1492:17;
1500:19
**murders** [3] - 1405:6;
1406:12, 20
**must** [2] - 1462:11;
1511:7
**mustache** [1] - 1469:14

---

## N

**N(sic)** [1] - 1298:22
**N.Y** [1] - 1291:5
**name** [13] - 1298:20;
1308:15; 1337:1;
1358:15; 1374:14;
1375:4, 7; 1406:8;
1442:11, 16; 1443:3;
1444:4; 1450:13
**named** [1] - 1373:8
**names** [2] - 1472:7
**narrow** [1] - 1383:23
**Nassau** [7] - 1309:6,
13; 1409:15; 1419:21;

1420:22; 1421:1, 4
**native** [1] - 1299:12
**near** [1] - 1439:11
**necessarily** [1] - 1303:17
**necessary** [2] - 1335:20; 1352:18
**need** [2] - 1295:25; 1460:18
**needed** [3] - 1457:14; 1502:17; 1503:1
**negative** [2] - 1303:24; 1305:5
**neighborhood** [5] - 1420:8; 1422:16, 21, 24; 1451:5
**nervous** [2] - 1333:16; 1381:12
**never** [20] - 1334:17; 1338:18; 1348:1, 7; 1355:25; 1364:13; 1366:8; 1367:24; 1368:1; 1370:9; 1374:5; 1383:8; 1384:20, 23-24; 1385:1; 1393:9; 1421:19; 1490:8
**new** [5] - 1296:5; 1363:15; 1370:18; 1403:10
**NEW** [1] - 1291:1
**New** [13] - 1291:13, 19, 22; 1299:24; 1323:7; 1391:15; 1420:15; 1421:14; 1422:4; 1424:17; 1435:1; 1446:6; 1482:15
**Newark** [2] - 1323:7
**next** [35] - 1298:8; 1302:16; 1304:2; 1318:10; 1320:7, 19, 23; 1331:17; 1337:11; 1350:8, 17; 1361:15; 1365:15; 1366:15; 1370:22; 1371:13; 1372:13; 1375:10; 1377:7; 1380:21; 1385:11; 1386:10; 1388:22; 1394:6; 1398:11; 1400:14; 1404:2, 15; 1405:23; 1418:18; 1465:18; 1468:4, 14; 1478:7; 1502:25
**nice** [2] - 1298:6; 1512:2
**night** [19] - 1412:13, 22; 1413:7, 17; 1414:23; 1417:4;

1418:4, 7; 1427:9; 1430:9, 20; 1431:8; 1455:14; 1499:22; 1500:19; 1501:8; 1502:6, 12, 15
**nightclub** [1] - 1300:4
**nitpick** [1] - 1390:12
**non** [1] - 1366:4
**non-author** [1] - 1366:4
**noon** [1] - 1481:20
**North** [2] - 1497:18; 1498:7
**north** [1] - 1476:13
**Northern** [1] - 1412:21
**nose** [1] - 1470:12
**note** [2] - 1510:17; 1511:2
**noted** [1] - 1326:3
**notes** [3] - 1364:11, 16, 22
**nothing** [9] - 1294:3; 1329:25; 1338:10; 1356:5; 1399:18; 1462:18; 1482:1; 1485:9; 1501:24
**notice** [5] - 1324:14, 16; 1429:13; 1443:10; 1490:16
**noticed** [1] - 1425:4
**notify** [1] - 1411:7
**number** [9] - 1311:21; 1366:2; 1419:5, 7; 1440:22; 1441:7; 1455:3; 1474:21; 1506:25
**numbers** [1] - 1441:5

## O

**o'clock** [5] - 1295:22; 1481:21; 1487:24; 1510:8; 1511:19
**oath** [2] - 1359:15; 1363:2
**object** [1] - 1295:2
**objected** [2] - 1335:3; 1400:5
**objection** [75] - 1294:23; 1302:11; 1306:13; 1309:19; 1311:12; 1314:2; 1315:2; 1319:3; 1320:22; 1325:9; 1326:1; 1331:13; 1334:1; 1338:3; 1339:3; 1352:15, 18-19; 1359:18; 1360:10, 13,

7, 19; 1361:1, 4; 1363:22; 1364:19, 23; 1365:4; 1368:15; 1369:24; 1370:21; 1371:6; 1373:2; 1378:20; 1379:1, 10, 25; 1380:3, 5, 14, 19; 1383:2; 1384:3; 1385:7; 1388:5, 10, 17; 1390:18; 1391:2; 1396:16, 19; 1397:6, 12; 1398:5; 1399:3, 13; 1400:1; 1401:3; 1409:23; 1419:24; 1427:1; 1436:20; 1438:1, 15; 1440:25; 1444:18; 1447:15; 1452:9
**objects** [1] - 1372:10
**obligation** [1] - 1404:10
**obligations** [2] - 1448:3, 13
**observations** [4] - 1306:10, 19; 1422:8; 1462:20
**observe** [12] - 1306:7; 1351:17; 1352:9; 1355:21; 1369:13; 1434:13; 1458:11; 1461:17, 22; 1480:16; 1483:19
**observed** [2] - 1453:25; 1462:24
**obstruction** [1] - 1296:8
**obtain** [2] - 1440:13; 1471:22
**obtained** [1] - 1506:8
**obviously** [5] - 1296:5; 1332:3; 1333:4; 1337:5; 1389:4
**occasion** [4] - 1300:25; 1315:20; 1368:22; 1491:6
**occasions** [3] - 1366:3; 1454:1; 1489:7
**occupied** [2] - 1436:16; 1440:2
**occur** [9] - 1315:7; 1425:9; 1429:4, 16; 1466:19; 1489:6; 1497:14; 1501:19
**occurred** [8] - 1335:19; 1339:6; 1344:20; 1349:9; 1467:8; 1468:3; 1477:20; 1510:22

**ocean** [2] - 1494:24; 1510:15
**OF** [3] - 1291:1, 3, 6
**offenses** [2] - 1404:8; 1405:11
**offer** [1] - 1364:14
**offered** [1] - 1332:25
**offers** [1] - 1415:5
**office** [5] - 1299:6; 1313:22; 1381:21; 1486:1
**Office** [3] - 1342:25; 1446:10; 1449:4
**offices** [1] - 1362:2
**officially** [1] - 1333:3
**often** [2] - 1340:16; 1344:4
**Old** [1] - 1291:18
**old** [3] - 1317:21; 1318:1; 1373:18
**older** [6] - 1408:4; 1444:13; 1445:11; 1493:21
**once** [7] - 1328:19; 1337:3; 1426:5; 1453:20; 1457:11; 1489:6; 1497:22
**one** [52] - 1292:24; 1293:19; 1294:18, 22; 1296:19; 1297:3; 1306:15; 1307:8; 1310:20; 1319:21, 24; 1325:2; 1329:2; 1335:24; 1338:7; 1344:18; 1361:6; 1364:8; 1365:3, 8; 1371:13; 1389:25; 1390:9; 1408:7; 1421:11; 1423:17; 1429:13; 1430:7; 1435:4; 1436:4, 16; 1437:18; 1440:6, 8, 11, 16; 1441:25; 1454:9; 1473:6; 1477:17; 1491:2; 1495:6, 9; 1496:24; 1507:11; 1508:9, 24
**open** [17] - 1305:2; 1311:19; 1321:2; 1324:18; 1336:20; 1338:1; 1350:7; 1367:1; 1376:1; 1381:1; 1387:1; 1391:1; 1401:1; 1454:11, 18; 1500:23; 1511:9
**opened** [4] - 1323:13; 1324:20, 23; 1462:12

**17**

18

**opening** [4] - 1509:1, 5, 11
**opens** [1] - 1509:6
**operate** [1] - 1453:11
**operative** [1] - 1333:14
**opportunity** [13] - 1306:7; 1355:21; 1358:16, 19; 1379:4; 1401:25; 1434:11, 13; 1439:8; 1445:16; 1480:16; 1483:19; 1490:12
**order** [1] - 1441:1
**original** [5] - 1296:3; 1322:24; 1416:3; 1420:11; 1463:1
**originally** [2] - 1336:6; 1490:25
**ourselves** [2] - 1334:24; 1431:13
**outcome** [1] - 1449:17
**outside** [10] - 1320:16; 1412:10; 1416:18; 1441:1; 1465:21; 1485:19; 1497:25; 1498:8, 15
**overdose** [2] - 1444:17, 22
**overestimated** [1] - 1295:5
**overruled** [13] - 1309:20; 1314:4; 1325:10; 1338:25; 1360:13, 18; 1365:6; 1371:7; 1379:11; 1380:19; 1391:2; 1427:2; 1444:19
**OWEN** [1] - 1291:21
**own** [8] - 1308:11, 13, 20; 1340:5; 1361:25; 1436:6, 16; 1442:11
**owned** [8] - 1392:1; 1426:19; 1436:6, 18; 1437:2; 1485:2; 1495:22; 1496:1
**ownership** [2] - 1308:23; 1437:20
**Oyster** [2] - 1428:23; 1474:2

---

**P**

---

**p.m** [1] - 1425:10
**page** [31] - 1302:16; 1304:2; 1311:20, 22, 25; 1313:19; 1318:10; 1320:23; 1321:18, 24;

1322:2, 14-15; 1331:17; 1337:11; 1365:15; 1366:15; 1372:13; 1375:10; 1380:21; 1385:11; 1386:10; 1388:22; 1394:6; 1398:11; 1400:14; 1404:15; 1447:7
**paint** [1] - 1508:1
**painting** [1] - 1507:23
**Palm** [1] - 1354:23
**panicked** [1] - 1479:19
**paper** [4] - 1325:1-3; 1427:22
**paragraphs** [1] - 1325:14
**Park** [3] - 1408:16, 19; 1484:22
**park** [4] - 1411:5; 1435:2; 1461:10; 1473:16
**parked** [10] - 1430:1; 1458:12; 1460:23; 1474:11; 1476:18; 1477:2; 1478:21; 1505:12; 1506:14
**parking** [6] - 1454:10, 17; 1458:23; 1459:1; 1460:23
**part** [9] - 1334:19; 1377:13, 18; 1378:5; 1400:7; 1405:14; 1420:10; 1455:8; 1487:14
**parted** [1] - 1486:18
**participate** [3] - 1446:5; 1458:1, 4
**participated** [2] - 1462:2; 1489:9
**participating** [3] - 1409:18; 1428:15; 1446:10
**participation** [1] - 1488:13
**particular** [10] - 1308:15; 1315:20; 1326:13; 1421:10; 1434:23; 1449:5; 1450:8; 1457:15; 1480:22; 1490:7
**parties** [1] - 1370:13
**partner** [3] - 1339:22, 24; 1374:14
**partners** [1] - 1307:8
**parts** [1] - 1440:7
**party** [2] - 1387:12; 1493:12

**passed** [10] - 1326:16; 1329:18, 25; 1338:9; 1352:10, 21, 24; 1387:17; 1391:11; 1474:11
**passport** [15] - 1311:1, 3, 5, 17, 19; 1312:5; 1313:6, 19; 1321:17; 1322:2, 8, 13, 15, 24
**past** [3] - 1325:18; 1403:13; 1478:19
**patch** [1] - 1422:7
**peel** [3] - 1432:21; 1454:10, 18
**peeled** [1] - 1433:19
**Pellegrino** [34] - 1332:4, 6, 8; 1333:7, 12-13; 1334:6, 8, 11, 15, 18; 1335:6-8, 10, 14, 18, 21-22, 25; 1336:6; 1339:19, 24; 1340:2, 5, 8, 10; 1341:12, 14; 1342:2; 1357:15, 19; 1369:6
**Pellegrino's** [3] - 1336:17; 1337:1; 1340:18
**people** [4] - 1350:11; 1422:5; 1445:4; 1469:9
**percent** [1] - 1465:6
**perhaps** [3] - 1295:11; 1320:17; 1511:12
**period** [23] - 1300:6; 1303:14; 1305:25; 1308:3; 1310:16; 1314:24; 1315:15; 1318:5; 1321:4; 1323:20; 1348:15; 1349:5; 1434:21; 1435:12; 1442:6; 1443:8; 1444:1; 1456:21; 1462:1; 1481:25; 1482:2; 1490:22; 1495:25
**permitted** [1] - 1292:9
**person** [8] - 1293:21; 1316:2; 1334:10, 16; 1340:13; 1371:21; 1375:4; 1508:25
**personal** [4] - 1307:6; 1308:1; 1314:11; 1456:2
**personally** [4] - 1349:25; 1458:1; 1473:10; 1488:12
**pertaining** [1] - 1384:11
**phenomenal** [1] -

1443:14
**phone** [32] - 1315:1, 10; 1317:17; 1326:24; 1340:13, 18, 23; 1341:5; 1344:15; 1376:21; 1378:3; 1379:20, 22; 1383:12, 16, 18-19, 23; 1395:19; 1397:1, 19; 1402:3; 1403:10; 1425:23; 1485:11, 20; 1502:1, 5
**photocopy** [1] - 1322:22
**photograph** [37] - 1301:15, 19; 1306:21; 1416:1; 1417:1, 7, 24; 1418:17, 24; 1424:9; 1433:3, 5, 16, 18, 22; 1435:25; 1436:3; 1438:3, 8; 1443:18; 1445:5; 1451:22; 1458:19; 1459:11, 21; 1460:9; 1461:5; 1475:11; 1476:3, 6, 14; 1491:15; 1492:1, 3, 8; 1504:1; 1505:4
**photographs** [6] - 1414:8, 18; 1441:13, 16, 24; 1442:5
**physical** [2] - 1310:20; 1507:4
**physically** [4] - 1348:11; 1453:25; 1461:7; 1467:25
**pick** [5] - 1321:16; 1412:3; 1414:8; 1495:9; 1507:11
**picked** [2] - 1294:2; 1507:8
**picky** [1] - 1380:9
**PICOZZI** [1] - 1291:20
**picture** [6] - 1307:4; 1416:4, 24; 1475:22; 1505:11; 1508:19
**piece** [2] - 1325:2; 1507:4
**pieces** [3] - 1325:1; 1484:8, 18
**pig** [2] - 1470:7, 11
**pissed** [2] - 1351:22, 24
**pistol** [7] - 1470:23; 1471:7; 1481:7; 1482:25; 1483:11
**place** [29] - 1292:4; 1303:2; 1305:2; 1319:2, 9; 1321:2; 1328:10; 1332:2; 1338:1;

1342:11; 1346:2;
1361:19; 1363:16, 20;
1379:23; 1387:6;
1393:20; 1409:14;
1410:7; 1420:4;
1436:24; 1452:23;
1455:12, 21; 1464:1;
1482:20; 1499:19;
1509:20

**placed** [2] - 1312:4;
1476:12

**placing** [1] - 1432:25

**Plainview** [6] -
1428:17, 19, 21;
1429:11; 1430:10;
1431:16

**plan** [12] - 1411:16,
19, 21; 1425:15, 18;
1454:6, 12; 1463:1, 10,
24; 1492:13; 1498:18

**plane** [1] - 1323:5

**planned** [1] - 1457:7

**planning** [1] - 1460:16

**plans** [2] - 1412:15;
1468:3

**plastic** [1] - 1505:24

**play** [11] - 1292:9;
1393:22; 1398:1;
1401:5, 10; 1411:1;
1425:11, 13; 1429:18,
20; 1431:23

**played** [13] - 1293:10;
1315:21; 1316:3, 15;
1395:10, 15, 21;
1396:12, 24; 1398:9;
1401:13, 24; 1402:23

**playing** [1] - 1395:6

**playroom** [2] - 1350:18

**Plaza** [2] - 1291:13, 22

**plea** [2] - 1345:20;
1360:3

**plead** [2] - 1446:13, 17

**pleading** [1] - 1345:3

**pled** [1] - 1343:2

**plug** [1] - 1467:13

**plus** [1] - 1399:7

**point** [54] - 1301:24;
1310:14; 1314:20;
1332:25; 1333:21;
1336:3; 1346:19;
1348:8; 1354:24;
1355:17; 1386:3;
1393:23; 1408:9;
1419:6; 1421:8;
1428:12; 1429:14;
1431:6; 1432:22;
1437:17; 1457:23;
1460:22; 1462:8;

1463:9, 17; 1464:12;
1478:8, 12; 1479:5,
18-20; 1483:11;
1484:12; 1485:11;
1488:20; 1489:2;
1492:12; 1494:14, 24;
1497:11; 1498:2, 17-18;
1499:24; 1503:8;
1508:5, 12, 23;
1509:14; 1510:6

**pointer** [2] - 1460:22;
1476:12

**pointing** [3] -
1300:14; 1397:22;
1460:4

**points** [1] - 1319:8

**police** [9] - 1411:6;
1427:5; 1467:12-14;
1486:3, 5, 22, 25

**Police** [2] - 1309:7, 13

**portion** [14] - 1302:9;
1309:20; 1311:21;
1313:19; 1377:16;
1401:18, 21, 23;
1405:4; 1414:6;
1415:25; 1416:2;
1417:3, 6

**portions** [3] - 1398:2;
1401:7, 11

**position** [3] - 1401:3;
1500:23; 1505:13

**positioned** [5] -
1412:17; 1426:12, 14;
1429:24; 1476:9

**positive** [1] - 1293:11

**possible** [2] - 1343:4;
1480:21

**postmark** [1] - 1324:14

**potential** [2] -
1411:13; 1457:18

**potentially** [1] -
1447:24

**powdered** [3] -
1368:11, 13, 21

**practice** [1] - 1320:6

**precipitated** [1] -
1421:25

**precise** [1] - 1437:12

**precisely** [1] - 1475:6

**precluded** [3] -
1334:12; 1336:11, 19

**predict** [1] - 1295:10

**pregnancy** [1] -
1369:20

**preliminary** [1] -
1405:4

**preparation** [1] -

1303:16

**prepare** [2] - 1320:13;
1465:17

**prepping** [1] - 1505:18

**prescribed** [2] -
1353:21, 24

**presence** [1] - 1320:16

**present** [12] - 1362:5,
10, 12, 18, 24;
1376:14, 23; 1381:24;
1387:8; 1456:12;
1458:7; 1462:24

**presume** [1] - 1305:7

**presumed** [1] - 1409:25

**pretty** [1] - 1294:1

**previous** [2] -
1475:19, 25

**previously** [21] -
1301:10; 1320:8;
1403:2; 1420:6, 18;
1421:13; 1424:5;
1433:1, 13; 1441:10;
1443:15; 1458:16;
1466:7; 1471:11;
1473:3; 1475:8;
1491:13; 1500:10;
1503:15; 1505:8; 1507:2

**price** [1] - 1465:10

**primary** [1] - 1299:18

**print** [1] - 1294:13

**prison** [37] - 1302:9;
1316:11, 13, 21-22;
1317:1, 5, 8, 10;
1318:3; 1319:13;
1321:3; 1322:11;
1327:14; 1335:12;
1338:17; 1339:8, 16;
1340:15, 20; 1344:2, 5,
15; 1348:14; 1349:13;
1353:1; 1354:15, 17;
1355:5, 16, 20;
1419:17, 22; 1420:14;
1422:3, 22

**prisoners** [3] -
1295:12; 1297:2, 10

**privilege** [1] - 1380:4

**probative** [1] -
1332:17

**probe** [1] - 1380:16

**problem** [2] - 1314:19;
1399:20

**problems** [4] -
1314:11, 15, 18;
1369:15

**proceed** [1] - 1406:25

**proceeded** [1] -
1487:12

**proceeding** [1] -
1358:20

**proceedings** [2] -
1386:3; 1512:6

**Proceedings** [1] -
1291:24

**process** [1] - 1495:17

**produced** [1] - 1291:25

**professional** [1] -
1353:12

**proffer** [1] - 1374:21

**promised** [4] -
1296:13; 1345:18;
1449:25; 1511:10

**prompted** [1] - 1400:5

**pronoun** [1] - 1333:14

**pronounced** [1] -
1375:4

**propensity** [3] -
1405:7; 1406:16; 1410:3

**property** [1] - 1439:12

**prosecutors** [1] -
1320:7

**prospect** [1] - 1454:4

**provide** [1] - 1439:6

**providing** [2] -
1327:7; 1448:17

**pry** [2] - 1426:8;
1457:13

**psychiatrist** [1] -
1353:17

**pull** [5] - 1432:23;
1454:8, 17; 1470:11;
1508:25

**pulled** [1] - 1457:11

**pulling** [1] - 1417:21

**purchased** [2] -
1440:6; 1472:1

**purpose** [12] - 1321:10;
1406:17; 1410:18;
1422:9; 1425:6;
1426:24; 1427:4;
1469:7; 1482:15;
1484:25; 1486:4; 1510:4

**purposes** [5] -
1295:18; 1332:11;
1357:15; 1421:10;
1446:24

**pursuant** [2] - 1299:5;
1446:18

**push** [1] - 1432:23

**put** [10] - 1298:2;
1301:6; 1306:21;
1336:16; 1390:2, 4;
1420:23; 1435:15;
1441:8; 1494:22

**20**

**Q**

**Q45** [2] - 1474:22; 1478:25
**quarter** [4] - 1412:24; 1426:23; 1481:21
**Quebec** [6] - 1299:11; 1321:7, 10; 1322:3, 11; 1323:2
**Queens** [14] - 1391:15; 1409:15; 1424:17, 21, 23-24; 1427:16; 1428:5; 1490:23; 1491:2, 10, 23; 1498:19; 1499:23
**Queens-based** [1] - 1424:24
**questioned** [1] - 1343:14
**questioning** [2] - 1320:17; 1343:18
**questions** [26] - 1309:21; 1319:5, 21; 1320:1, 13, 18; 1347:19; 1348:10; 1352:7; 1356:6; 1381:18; 1382:1; 1384:14; 1385:4; 1386:4, 6; 1387:5, 9; 1393:5; 1399:11; 1401:15; 1403:20, 22
**quickly** [1] - 1480:21
**quiet** [1] - 1332:13
**quote/unquote** [1] - 1498:24

**R**

**R-A-B-K-I-N** [1] - 1451:6
**Rabkin** [10] - 1451:5, 12, 17; 1485:13, 20, 22, 25; 1486:22; 1487:7
**Raganas** [1] - 1369:6
**raised** [1] - 1399:2
**ran** [1] - 1436:6
**ransom** [2] - 1325:19
**RAPAPORT** [1] - 1291:20
**Rasucci** [2] - 1485:3, 8
**RASUCCI** [1] - 1485:3
**rather** [5] - 1295:23; 1320:19; 1335:22; 1357:25; 1423:5
**reach** [2] - 1479:23; 1483:25
**reaction** [9] - 1341:1; 1347:21; 1351:18, 20; 1352:10, 14, 21; 1355:22

**read** [12] - 1313:5, 7; 1319:21; 1320:1; 1327:17; 1381:5; 1384:25; 1395:8; 1399:14
**reading** [3] - 1319:6; 1322:23; 1326:21
**ready** [4] - 1294:11; 1316:12; 1358:11; 1395:6
**realize** [1] - 1314:20
**realized** [1] - 1462:8
**really** [8] - 1293:10; 1329:6; 1335:20; 1380:8; 1454:24; 1499:8; 1510:20
**rear** [4] - 1430:25; 1454:17; 1508:9; 1509:22
**reason** [15] - 1333:7; 1335:2, 5; 1357:17; 1385:10; 1399:2, 5; 1406:19; 1414:25; 1420:14, 16; 1421:24; 1422:3; 1502:10; 1511:17
**reasonable** [1] - 1294:25
**receive** [15] - 1317:10; 1327:9; 1345:19; 1360:12, 19; 1392:8, 11, 13, 15, 20; 1449:1, 9, 11; 1450:1; 1488:17
**received** [27] - 1311:14, 16; 1313:6; 1329:12; 1333:2; 1355:7; 1360:21; 1363:4; 1364:18; 1382:25; 1402:8; 1415:10; 1419:9; 1438:16; 1447:17; 1452:11; 1485:11; 1514:2, 4, 6-7, 9, 11, 13
**receiving** [6] - 1309:5; 1310:10, 15; 1315:4; 1327:8; 1340:10
**recent** [2] - 1326:24; 1420:13
**recently** [1] - 1392:6
**recess** [4] - 1297:12; 1356:12; 1394:5; 1404:14
**recharged** [1] - 1465:23
**recognition** [1] - 1377:4
**recognize** [43] -

1301:18; 1306:24; 1307:1; 1310:23; 1311:7; 1414:13, 15; 1416:23; 1418:20; 1424:9; 1433:5, 7, 9, 15; 1438:8, 11; 1443:17, 20; 1445:4; 1447:3; 1451:24; 1452:1; 1458:18, 21, 23; 1459:10; 1471:13, 15; 1473:5; 1475:10; 1491:17, 19; 1492:1, 8; 1503:17; 1504:1, 9, 11, 22; 1505:3; 1507:4, 7
**recognizes** [1] - 1388:11
**recollect** [1] - 1364:17
**recollection** [55] - 1292:23; 1293:1; 1307:23; 1309:10, 16; 1312:21; 1313:3, 13, 17, 23; 1314:14, 17; 1316:25; 1322:10; 1323:1; 1325:15; 1328:17, 23; 1344:20; 1345:7; 1346:21; 1347:25; 1348:18; 1354:14; 1363:19; 1364:21; 1393:3, 14; 1397:18; 1412:22; 1413:17, 21; 1418:1, 6; 1425:2; 1426:9; 1427:14; 1429:10; 1430:18; 1436:2, 18; 1442:4; 1455:20; 1458:10; 1459:15; 1467:22; 1470:25; 1475:2; 1488:16; 1495:11, 15; 1500:25; 1502:13; 1504:16; 1510:7
**recommend** [2] - 1359:25; 1449:4
**record** [30] - 1298:20; 1300:2, 19; 1319:25; 1381:6; 1383:4; 1395:9; 1402:1; 1406:9; 1408:11; 1415:20; 1416:2, 14, 18; 1417:6; 1438:20; 1441:12; 1452:15, 18; 1455:2; 1461:1; 1468:7; 1476:2, 12, 21, 24; 1494:15; 1500:14; 1506:15
**recorded** [1] - 1291:24
**recording** [3] - 1401:24; 1402:13, 17
**records** [2] - 1374:19;

1377:11
**red** [5] - 1322:21; 1432:2; 1433:9; 1439:3; 1477:3
**redirect** [1] - 1401:16
**REDIRECT** [2] - 1402:11; 1513:9
**redrill** [1] - 1483:12
**reduce** [1] - 1360:2
**reducing** [1] - 1359:9
**reference** [7] - 1303:22; 1305:4; 1375:4; 1385:1; 1421:15; 1422:1; 1459:21
**referenced** [5] - 1440:10; 1442:23; 1468:10; 1505:8; 1506:25
**referencing** [1] - 1414:6
**referring** [9] - 1329:20; 1421:22; 1436:10; 1441:18; 1455:2; 1464:22; 1466:4; 1468:8
**reflect** [4] - 1300:20; 1345:4; 1403:14; 1408:11
**reflected** [1] - 1435:25
**reflects** [2] - 1293:12; 1322:3
**refresh** [2] - 1344:19; 1364:21
**refreshed** [1] - 1293:2
**regard** [4] - 1348:6; 1374:18; 1377:7; 1404:7
**regarding** [13] - 1296:15; 1314:15; 1340:19; 1453:10; 1463:2; 1489:10; 1493:19; 1494:18; 1496:21; 1497:6; 1499:14, 18; 1507:20
**regards** [11] - 1334:3; 1359:4, 8; 1381:10; 1382:15, 25; 1393:4; 1396:4; 1489:25; 1493:4; 1498:23
**region** [1] - 1299:10
**regular** [2] - 1428:8
**regularly** [1] - 1450:25
**regulations** [1] - 1389:3
**reiterate** [1] - 1405:4

**21**

relate [1] - 1406:20

related [2] - 1346:25; 1351:13

relates [2] - 1404:11

relation [8] - 1340:7, 18; 1349:11; 1426:12, 15; 1429:24; 1488:3

relationship [11] - 1302:1; 1346:4; 1367:13, 15, 22-23; 1391:17, 20, 22; 1422:10, 15

relay [1] - 1455:17

relayed [1] - 1503:7

released [7] - 1354:15, 17; 1355:4, 8, 16, 20

relevance [1] - 1444:18

relevancy [2] - 1427:1; 1440:25

relevant [2] - 1374:7; 1405:14

remain [1] - 1430:15

remarks [1] - 1387:24

remember [43] - 1344:24; 1354:6; 1363:9, 11, 24; 1370:17, 25; 1371:1, 3, 5, 8-9, 24; 1372:2; 1378:13, 23; 1379:2; 1380:15; 1383:3; 1390:20; 1395:25; 1396:7, 15; 1397:2, 7; 1418:24; 1420:6; 1421:16; 1423:18; 1429:6; 1466:23; 1467:6; 1469:2; 1472:11; 1474:21; 1476:18; 1479:25; 1481:24; 1490:21

remembering [1] - 1389:24

remembers [4] - 1383:5; 1390:19; 1396:5

remind [3] - 1383:14, 18; 1437:12

reminded [2] - 1396:6, 9

reminder [1] - 1405:19

reminding [1] - 1396:23

remove [1] - 1501:7

removed [1] - 1420:12

removing [1] - 1500:3

rendezvous [1] - 1437:16

renew [2] - 1326:2; 1405:18

renewed [1] - 1420:17

rent [1] - 1442:11

rented [1] - 1442:16

repetitious [1] - 1436:21

report [6] - 1316:21; 1317:8; 1486:5, 23; 1511:1

reported [3] - 1318:3; 1321:3; 1511:4

Reporter [1] - 1291:20

reporter [3] - 1319:25; 1381:4; 1395:8

represent [6] - 1358:15; 1414:18; 1441:16; 1443:22; 1452:4; 1500:18

representatives [2] - 1361:16; 1362:17

represented [1] - 1332:22

represents [1] - 1442:5

request [1] - 1295:19

require [4] - 1303:3; 1317:8; 1448:7, 10

required [1] - 1449:1

resale [1] - 1440:23

research [1] - 1511:8

reserve [1] - 1302:12

resold [1] - 1441:8

respect [9] - 1292:10, 22; 1297:10; 1329:14; 1331:4; 1345:18; 1346:22; 1453:5; 1489:24

respond [6] - 1347:4; 1417:14; 1456:24; 1457:1; 1478:1, 3

responded [1] - 1334:9

response [5] - 1303:10; 1335:1; 1356:3; 1393:11; 1457:14

responsibility [1] - 1494:8

rest [2] - 1316:1; 1431:14

result [3] - 1341:9; 1345:19

resulted [1] - 1450:4

resume [2] - 1358:12; 1510:24

retag [2] - 1440:20; 1441:4

retagged [1] - 1440:9

retakes [1] - 1358:9

return [7] - 1314:5; 1324:5, 16-17, 21; 1439:6; 1448:19

returned [2] - 1313:24; 1323:2; 1461:21

reunite [1] - 1409:2

reverse [2] - 1400:8; 1401:3

reversing [1] - 1400:8

review [1] - 1511:3

Rica [10] - 1312:6, 11, 14, 17, 22; 1313:7, 14, 24; 1314:6, 9

Richie [1] - 1464:4

rid [5] - 1481:5; 1483:14, 24; 1493:5; 1494:8

ride [4] - 1434:11; 1483:4, 8, 20

rifle [1] - 1397:21

right-hand [4] - 1307:3; 1416:3; 1460:8

rights [1] - 1332:19

ringing [1] - 1293:3

rise [2] - 1298:12; 1303:13

river [1] - 1484:15

River [1] - 1484:21

Road [3] - 1291:18; 1428:23; 1477:10

road [7] - 1412:19; 1426:16; 1439:16; 1462:6; 1476:21, 24

Rob [35] - 1301:22; 1410:19; 1411:10, 12, 20; 1418:3; 1424:12, 22; 1429:1, 22; 1430:19; 1436:11; 1439:24; 1450:6; 1451:4; 1455:5; 1462:6; 1464:23; 1465:17; 1466:18; 1469:5; 1479:4; 1487:12, 20; 1488:1, 7; 1489:12; 1494:12; 1498:5, 10; 1499:15, 20; 1500:2; 1507:13, 16

rob [1] - 1410:23

robberies [1] - 1409:14

robbery [56] - 1409:19; 1410:7; 1411:8; 1437:17; 1446:6, 11; 1450:4; 1454:13;

1455:11; 1456:7; 1457:2, 17-18; 1463:6, 11, 13, 19, 22, 25; 1464:12, 15; 1465:1, 12, 17; 1466:11, 17, 21, 24; 1467:8, 17, 23; 1468:13; 1469:2, 25; 1470:19; 1472:14; 1473:11, 13; 1474:5, 17; 1475:3, 20; 1476:10, 15; 1477:20; 1478:13, 15; 1479:9; 1480:11; 1481:8; 1483:7; 1488:13, 25; 1489:22; 1493:16

robbing [1] - 1454:4

Robert [6] - 1410:11; 1423:18, 21; 1424:13; 1444:3; 1468:22

rod [1] - 1432:23

role [10] - 1374:16; 1411:9; 1425:11, 13; 1429:18, 20; 1431:23; 1457:8; 1463:13; 1499:18

romantically [1] - 1300:6

Ron [1] - 1301:4

room [12] - 1323:15; 1324:22; 1350:2, 4, 7; 1379:15, 17, 20; 1381:22; 1383:12; 1430:24

Rosen [11] - 1295:3; 1297:4; 1335:3; 1357:18; 1358:15; 1365:13; 1366:2; 1375:3; 1386:2; 1399:3; 1401:5

ROSEN [121] - 1291:16; 1292:19; 1293:17; 1295:2, 8; 1296:2, 7, 23; 1297:1, 5, 8; 1302:11; 1303:3, 9; 1306:13; 1309:19; 1311:13; 1314:2; 1315:2; 1318:6; 1319:4, 12, 19, 24; 1320:4; 1325:9; 1326:1; 1331:13; 1332:7, 9, 12, 15; 1333:19, 24; 1334:5, 8, 10, 13; 1335:16, 23; 1336:5, 10, 15, 21; 1337:4; 1338:24; 1339:3; 1349:5; 1352:15, 20; 1357:7, 22; 1358:2, 6, 14; 1366:11; 1367:2; 1368:17; 1373:9, 12,

16, 20, 23; 1374:1, 6, 9, 13; 1375:6, 8; 1376:4; 1377:3, 14; 1380:8; 1381:2, 4; 1383:10; 1384:8; 1386:8; 1387:2; 1388:4, 7, 18; 1389:6, 8, 18, 21; 1390:6, 10, 16; 1391:3; 1393:22; 1395:7, 12; 1399:10, 25; 1400:2, 11; 1401:15, 17; 1402:1, 7; 1403:24; 1405:10, 15, 18; 1409:22; 1417:10; 1419:4, 24; 1420:9; 1421:1, 19; 1422:19; 1423:4; 1427:1; 1436:20; 1440:25; 1444:18; 1447:16; 1452:10; 1513:8

**roughly** [18] - 1403:6; 1413:24; 1418:5; 1426:23; 1434:18; 1443:7; 1455:13; 1457:24; 1458:9; 1460:25; 1468:6; 1483:3; 1485:17; 1487:24; 1488:18; 1492:18; 1505:15; 1510:8

**Route** [3] - 1439:16; 1474:1

**row** [4] - 1460:1, 7, 9; 1461:2

**rows** [1] - 1350:8

**RRG-4** [1] - 1475:9

**RRG-45** [1] - 1459:9

**RRG-54** [1] - 1433:14

**RRG-60** [1] - 1491:14

**RRG-62** [2] - 1491:25; 1500:21

**RRG-65** [3] - 1492:7; 1500:11, 17

**RRG-86** [2] - 1458:17; 1459:21

**RRG-88** [3] - 1433:2; 1466:8; 1474:8

**RS-1** [1] - 1441:10

**RS-4** [1] - 1471:12

**ruling** [2] - 1318:9; 1326:4

**rush** [1] - 1295:17

---

**S**

---

**safety** [2] - 1317:22, 24

**Salmieri** [1] - 1422:7

**save** [1] - 1483:12

**saw** [11] - 1329:21; 1350:3; 1353:18; 1355:15; 1371:5; 1378:13; 1382:11; 1469:25; 1477:2, 6; 1478:16

**saws** [2] - 1457:14

**scanner** [6] - 1467:11; 1472:20; 1473:6, 10; 1479:14

**scanners** [4] - 1465:24; 1467:9; 1472:18

**scared** [4] - 1316:10; 1329:6; 1347:23; 1361:12

**scene** [4] - 1416:23; 1433:15; 1458:18, 22

**schedule** [1] - 1453:18

**scheduling** [2] - 1295:18; 1296:19

**Schelhorn** [13] - 1309:6, 12, 23; 1310:3, 11; 1312:8; 1362:5, 15, 19; 1363:25; 1364:11; 1365:2; 1381:25

**school** [4] - 1407:19, 21; 1409:5; 1445:9

**scope** [1] - 1441:1

**score** [1] - 1456:9

**Scott** [58] - 1292:11, 25; 1293:4; 1294:7, 11; 1301:4, 22; 1302:1, 4; 1303:18; 1305:15, 18; 1307:2; 1308:25; 1310:13; 1312:20; 1317:7; 1321:3; 1322:11; 1324:9; 1332:22; 1334:11, 16, 22; 1335:12, 21; 1336:7; 1338:15; 1339:1; 1340:22; 1342:16; 1344:14; 1347:5; 1349:12, 24; 1351:18; 1352:24; 1356:2; 1358:4; 1367:7; 1368:3; 1369:5; 1370:13; 1377:8, 11, 21; 1384:14; 1387:4, 9; 1391:17; 1393:4; 1395:18; 1402:4; 1406:2, 10; 1422:23; 1480:13

**scrambling** [1] - 1482:1

**screaming** [2] - 1315:24; 1316:2

**screen** [35] - 1301:7, 10, 14-15; 1306:21, 23; 1312:3; 1313:20; 1320:3; 1321:20, 22; 1322:17, 23; 1415:15; 1416:21; 1424:4; 1432:25; 1433:12, 23; 1435:17, 20; 1441:9; 1451:21; 1452:17; 1458:15; 1459:4; 1460:5; 1475:7; 1476:17; 1477:6; 1491:12; 1504:7; 1505:2; 1508:19; 1509:8

**screwdriver** [1] - 1432:13

**script** [5] - 1319:5, 7; 1320:12; 1333:10

**Seaford** [1] - 1474:2

**SEAN** [1] - 1291:14

**Sean** [1] - 1362:10

**seated** [5] - 1292:7; 1328:12; 1358:11; 1395:4; 1405:22

**second** [11] - 1292:10, 24; 1313:20; 1322:13, 18; 1331:2; 1334:20; 1378:14; 1439:18; 1443:25

**seconds** [1] - 1310:9

**section** [2] - 1433:22; 1439:18

**Sections** [1] - 1446:15

**see** [77] - 1294:10; 1298:6; 1300:12; 1301:15; 1311:22, 24; 1321:24; 1322:2, 18; 1329:5; 1332:17; 1333:7; 1334:6; 1342:3; 1348:10, 13, 19; 1349:2, 9, 12, 24-25; 1356:9; 1370:10, 12; 1371:10, 17, 21; 1373:6; 1376:7, 9; 1377:10, 18; 1378:2, 6; 1388:14, 20; 1391:4; 1394:3; 1413:25; 1414:3, 11; 1415:1, 25; 1416:6, 11; 1424:7; 1427:5, 25; 1428:2; 1433:3, 24; 1435:20; 1438:6; 1441:14, 21; 1453:24; 1457:24; 1459:5, 22; 1461:7, 19; 1462:7; 1470:8; 1471:3; 1476:6, 21; 1477:10; 1479:1; 1490:12; 1491:15; 1495:20; 1500:12; 1502:17;

1509:8; 1512:2

**seeing** [6] - 1353:20; 1378:24; 1467:18; 1502:20

**seem** [1] - 1294:1

**sees** [2] - 1389:20; 1390:3

**segregated** [1] - 1373:23

**sell** [1] - 1439:9

**selling** [1] - 1317:9

**semiprivate** [1] - 1350:21

**sense** [1] - 1315:25

**sentence** [18] - 1317:10; 1343:4; 1345:19; 1359:2, 5, 9, 13, 25; 1360:3; 1448:20; 1449:2, 5, 9, 11, 16, 23, 25

**sentenced** [1] - 1447:21

**sentencing** [1] - 1448:23

**separate** [1] - 1425:3

**September** [3] - 1389:12, 17

**sequence** [1] - 1378:23

**series** [2] - 1382:1; 1414:5

**service** [1] - 1446:7

**sessions** [3] - 1458:2; 1461:6, 11

**set** [3] - 1459:23; 1460:6; 1465:10

**setting** [1] - 1296:5

**seven** [1] - 1325:12

**several** [4] - 1341:15; 1467:24; 1490:5; 1502:1

**sexual** [1] - 1367:22

**SEYBERT** [1] - 1291:9

**shake** [1] - 1443:11

**shaken** [1] - 1480:20

**shape** [2] - 1443:13

**share** [3] - 1451:13; 1456:16; 1499:25

**shares** [1] - 1391:23

**sheet** [4] - 1378:6; 1389:3; 1506:24; 1509:25

**sheets** [1] - 1373:21

**shelter** [1] - 1501:17

**Shirley** [1] - 1377:22, 24

**shirt** [1] - 1300:18

**shock** [2] - 1345:2;

1397:25

**shocked** [3] - 1347:23; 1398:2; 1401:7

**shoot** [1] - 1494:14

**shooting** [1] - 1490:11

**shop** [2] - 1459:23; 1495:9

**shopping** [1] - 1495:2

**short** [3] - 1317:17; 1343:13; 1404:1

**shorter** [1] - 1511:23

**shortly** [9] - 1317:3; 1318:3; 1342:8, 15; 1361:18; 1389:10; 1390:3, 20

**shot** [3] - 1475:14; 1499:5, 10

**shotgun** [2] - 1471:7, 22

**show** [19] - 1327:18; 1364:14; 1372:6; 1374:7; 1376:2, 5; 1377:13, 18; 1378:5; 1388:10, 12; 1406:15; 1443:15; 1445:2; 1460:4; 1491:12; 1500:9; 1505:1; 1506:10

**showed** [2] - 1364:16, 21

**showing** [14] - 1377:9; 1416:11, 21; 1417:22; 1424:5; 1433:12; 1458:15; 1459:9; 1471:10; 1473:2; 1491:25; 1503:14, 24; 1507:21

**shows** [2] - 1336:5; 1433:19

**sic** [2] - 1418:3; 1468:22

**side** [14] - 1307:3, 20; 1311:25; 1414:7; 1416:4; 1430:1; 1432:18; 1455:22; 1459:4; 1460:8; 1476:3; 1492:24; 1509:22

**sidebar** [7] - 1303:2; 1319:2; 1332:2; 1420:4; 1423:7; 1436:24; 1437:25

**Sidebar** [12] - 1366:1, 14; 1373:1; 1375:9; 1380:2, 20; 1386:1, 9; 1389:1; 1390:25; 1399:1; 1400:13

**sidewalk** [1] - 1504:4

**sign** [4] - 1373:11, 15, 21

**sign-in** [2] - 1373:12, 21

**signature** [2] - 1325:13; 1447:8

**signed** [4] - 1325:7; 1374:5, 22; 1376:7

**signees** [1] - 1376:7

**signs** [2] - 1373:19, 21

**silent** [3] - 1352:23, 25; 1393:9

**similar** [3] - 1473:9; 1504:16; 1507:10

**sink** [1] - 1510:5

**sit** [8] - 1298:18; 1345:6; 1347:24; 1350:8; 1351:11; 1403:17; 1449:22; 1472:7

**site** [5] - 1472:14; 1473:13; 1474:5, 17; 1475:3

**sitting** [8] - 1328:15; 1346:9; 1350:17; 1376:17; 1379:15, 17, 20; 1478:6

**situation** [1] - 1296:7

**six** [4] - 1317:21; 1319:21; 1320:1; 1324:11

**sized** [1] - 1457:14

**sledgehammer** [2] - 1412:2; 1426:1

**sleeping** [1] - 1354:1

**slowly** [1] - 1407:7

**SM-1** [9] - 1414:10; 1415:6, 9, 16, 18; 1416:3; 1514:5

**SM-10** [6] - 1414:10; 1415:7, 10; 1416:11, 15; 1514:6

**SM-13** [1] - 1468:11

**SM-2** [2] - 1414:10; 1416:22

**SM-3** [4] - 1414:10; 1415:9; 1417:23; 1514:5

**SM-4** [4] - 1418:19; 1419:3, 9; 1514:7

**SM-5** [4] - 1438:5, 14, 17; 1514:9

**SM-6** [2] - 1306:21; 1445:3

**SM-7** [5] - 1446:25; 1447:14, 18; 1448:14; 1514:11

**SM-8** [6] - 1451:23; 1452:3, 8, 12, 17; 1514:13

**smack** [1] - 1390:4

**small** [1] - 1505:24

**smart** [1] - 1347:12

**smashed** [1] - 1412:18

**Smyth** [63] - 1301:4, 22; 1410:11, 19; 1411:10, 12, 20; 1412:18; 1413:18; 1418:3; 1423:18, 21; 1424:12, 22; 1426:25; 1427:15; 1429:1, 22; 1430:19; 1431:7; 1436:11; 1439:24; 1444:3; 1450:6; 1451:4; 1455:5; 1462:6; 1464:23; 1465:2, 17, 22; 1466:1, 18, 23; 1467:23; 1468:4, 22; 1469:5, 18; 1470:3; 1474:5; 1477:3, 13; 1479:4; 1481:24; 1487:12, 20; 1488:1, 7, 14; 1489:12; 1494:12; 1498:5, 10; 1499:15, 20; 1500:2; 1501:21; 1507:13, 16, 20

**Smyth's** [1] - 1499:18

**snowstorm** [1] - 1429:9

**social** [1] - 1511:6

**socialize** [1] - 1445:16

**sold** [4] - 1392:6; 1418:14; 1428:13; 1431:14

**someone** [13] - 1312:15; 1317:25; 1325:21; 1329:5; 1339:4; 1374:19; 1425:4; 1450:13; 1479:9; 1482:5; 1486:5; 1493:21; 1494:1

**sometime** [6] - 1303:5; 1309:4; 1314:8; 1425:10; 1511:13

**sometimes** [1] - 1386:7

**somewhat** [1] - 1417:9

**somewhere** [2] - 1293:7; 1497:22

**son** [19] - 1321:14; 1339:9; 1346:11; 1349:1; 1350:15; 1353:9; 1354:25; 1369:20; 1370:1; 1372:5; 1373:18; 1374:5, 22; 1376:14, 18; 1387:11; 1388:3; 1397:23

**soon** [3] - 1327:7;

1343:18

**sorry** [21] - 1309:25; 1316:12; 1329:3; 1333:23; 1338:15; 1349:16; 1351:23; 1383:10; 1397:16; 1421:21; 1436:14; 1437:15; 1438:5; 1442:20; 1452:15; 1456:14; 1468:17; 1477:9; 1478:10; 1499:12; 1504:14

**sort** [15] - 1314:17; 1350:2; 1353:14, 16; 1410:15; 1411:16; 1424:24; 1429:2; 1469:11; 1470:21; 1480:5; 1487:1; 1491:4; 1506:3; 1509:5

**sorts** [1] - 1353:24

**sought** [1] - 1353:12

**south** [1] - 1428:23

**space** [4] - 1435:23; 1439:20; 1468:16, 18

**spaced** [1] - 1497:9

**span** [1] - 1341:16

**Spatts** [2] - 1452:24

**Special** [6] - 1309:6, 12, 23; 1310:3, 11; 1312:8

**specific** [6] - 1347:24; 1364:1; 1382:16; 1411:24; 1490:24; 1505:19

**specifically** [9] - 1328:25; 1336:12; 1349:8; 1446:4; 1466:23; 1487:21; 1490:9; 1493:7; 1498:21

**specifics** [2] - 1343:19, 24

**speechless** [1] - 1347:23

**spell** [2] - 1298:20; 1406:8

**spend** [2] - 1295:24; 1364:4

**spending** [1] - 1323:12

**split** [2] - 1465:3, 7

**spoken** [3] - 1344:1; 1366:8; 1380:11

**sports** [2] - 1450:17; 1452:24

**spot** [3] - 1414:16; 1458:13; 1461:10

**Spratt** [1] - 1450:13

**Spratts** [8] - 1450:9,

23

24

16, 18, 22-23; 1451:8;
1454:3; 1455:6

**spread** [1] - 1501:6

**stamp** [8] - 1311:24;
1312:4; 1313:6, 20;
1322:7, 14, 18; 1323:1

**stamped** [2] - 1313:21;
1322:24

**stand** [3] - 1298:3;
1357:2; 1358:9

**standing** [6] -
1324:20; 1328:12;
1346:5; 1508:22, 24

**start** [6] - 1351:5;
1358:4; 1368:13;
1384:6; 1395:6; 1432:23

**started** [4] - 1357:24;
1499:24; 1502:1; 1508:5

**starting** [1] - 1295:21

**state** [11] - 1298:20;
1339:3; 1400:9; 1406:8;
1417:6, 19; 1480:19;
1489:18; 1494:10;
1500:18; 1504:17

**statement** [4] -
1302:12; 1347:22;
1366:5; 1490:9

**statements** [4] -
1320:12; 1366:3;
1385:3; 1499:6

**STATES** [2] - 1291:1, 3

**States** [12] - 1291:12,
21; 1299:6, 14; 1314:5;
1342:25; 1361:16;
1362:3, 17; 1406:1;
1446:10; 1449:4

**station** [7] - 1474:13;
1476:13, 22; 1477:2;
1478:21; 1486:3, 25

**status** [1] - 1489:24

**statute** [1] - 1447:25

**stay** [3] - 1336:13;
1348:2; 1357:20

**stayed** [2] - 1491:3;
1498:13

**steal** [12] - 1418:3;
1425:8; 1427:15;
1431:8; 1432:6, 11, 13;
1454:9, 11-12, 18;
1465:3

**stealing** [3] -
1420:22; 1434:7; 1463:6

**steering** [5] -
1432:20; 1433:19, 24;
1434:1

**stenography** [1] -
1291:24

**step** [1] - 1403:25

**STEPHANIE** [1] -
1291:20

**STEPHEN** [1] - 1291:16

**steps** [2] - 1465:17, 20

**Steve** [2] - 1358:15;
1369:6

**Steven** [4] - 1301:5;
1443:4, 6; 1471:25

**still** [9] - 1308:7;
1327:5; 1392:15;
1396:7; 1444:14;
1478:21; 1481:20;
1511:24

**stockbroker** [3] -
1450:12; 1451:20;
1459:3

**stockbrokers** [1] -
1469:10

**stole** [6] - 1428:11;
1431:12; 1432:4;
1434:10, 19

**stolen** [21] - 1414:1;
1418:8; 1420:15;
1425:8; 1428:8;
1431:25; 1432:3, 7;
1433:8; 1435:15;
1438:25; 1439:9, 12;
1440:6-8, 14, 22;
1441:6, 8, 22

**stomach** [3] - 1293:19;
1479:19

**stop** [22] - 1315:25;
1333:22; 1336:2, 18;
1347:19; 1348:10;
1352:7; 1384:14;
1385:4; 1387:4, 9;
1393:4, 8; 1398:2;
1399:6, 23; 1401:6;
1403:20; 1426:4;
1484:14

**stopped** [8] - 1392:18;
1395:11, 16, 22;
1396:13, 25; 1398:10;
1401:14

**Storage** [2] - 1439:16;
1440:1

**storage** [6] - 1440:16,
19; 1441:17; 1442:5, 10

**store** [32] - 1409:20;
1410:10, 15, 17, 24;
1411:17; 1412:11, 16,
18, 23; 1414:16, 19;
1415:19; 1417:7;
1418:7; 1428:17, 22;
1429:12, 16, 25;
1430:11, 20, 25;
1431:4, 16, 24; 1432:1;

**stored** [1] - 1440:10

**stores** [1] - 1429:13

**storing** [2] - 1438:25;
1439:6

**storm** [2] - 1429:7

**storming** [1] - 1397:21

**story** [2] - 1295:3;
1382:3

**straight** [2] -
1354:18; 1399:24

**straighten** [1] -
1390:17

**straightened** [1] -
1390:24

**Street** [2] - 1484:5, 7

**street** [10] - 1412:19;
1423:23; 1426:16;
1430:1, 10; 1432:19;
1474:13

**strike** [2] - 1422:14;
1423:4

**string** [1] - 1409:11

**strip** [1] - 1429:3

**striped** [1] - 1300:18

**struck** [2] - 1423:9

**stuff** [2] - 1501:3;
1505:21

**subject** [2] - 1387:4;
1393:5

**submitted** [3] -
1406:15, 20; 1410:2

**subpoena** [8] - 1299:5;
1360:9, 12, 16, 19, 21,
25; 1361:7

**subpoenaed** [1] -
1360:8

**subsequent** [2] -
1371:16; 1434:7

**subsequently** [5] -
1316:5, 16-17; 1455:17;
1481:10

**substantially** [3] -
1473:9; 1504:16;
1507:10

**successful** [1] -
1509:17

**sufficient** [1] -
1293:24

**Suffolk** [1] - 1409:15

**suggesting** [2] -
1320:9, 20

**suit** [2] - 1469:4, 8

**suitcases** [3] -
1458:14; 1462:12, 15

**Suite** [1] - 1291:16

**summation** [1] -
1399:17

**summations** [1] -
1511:25

**summer** [13] - 1310:14;
1312:7, 14, 23;
1313:14; 1314:9;
1345:4; 1489:1, 3, 17;
1490:13; 1491:6;
1492:13

**summertime** [1] -
1309:11

**supplemental** [1] -
1296:14

**supporting** [1] -
1360:5

**supposed** [4] -
1357:21; 1374:13;
1465:5; 1497:3

**Supreme** [1] - 1296:8

**surveil** [3] - 1460:6;
1462:6, 8

**surveillance** [10] -
1422:8; 1458:2, 5;
1459:16, 23; 1460:24;
1461:6, 11; 1462:2;
1475:19

**surveilled** [2] -
1457:23; 1475:25

**surveilling** [2] -
1458:8, 11

**suspect** [1] - 1489:21

**Sustained** [1] -
1331:14

**sustained** [20] -
1320:22; 1338:3;
1359:19; 1360:11, 20;
1361:2; 1363:23;
1364:20, 24; 1368:16;
1378:22; 1384:4;
1385:9; 1396:17;
1397:8, 13; 1398:7;
1401:4; 1438:1

**swear** [1] - 1406:3

**sweat** [1] - 1469:6

**swings** [1] - 1509:24

**switch** [2] - 1443:25;
1474:25

**switched** [1] - 1463:6

**swore** [1] - 1359:15

**sworn** [2] - 1298:16;
1406:6

**Synergy** [4] - 1308:18,
20; 1340:5; 1392:8

**Syosset** [8] - 1392:4;
1446:6; 1453:16;

1458:8, 11; 1473:14, 25; 1475:16

**system** [7] - 1376:21; 1411:23; 1425:19, 22; 1426:1; 1430:24; 1431:1

---

**T**

---

**table** [2] - 1376:17; 1438:4

**talkie** [14] - 1413:10; 1427:8, 11; 1430:12; 1431:5; 1472:20; 1473:6, 10; 1477:16, 22; 1478:17

**talkies** [3] - 1465:24; 1467:9; 1472:18

**tan** [1] - 1408:10

**Tape** [8] - 1395:10, 15-16, 21-22; 1401:13

**tape** [25] - 1292:9; 1293:9; 1319:14; 1325:17, 20, 22; 1326:10; 1329:16; 1384:1; 1393:22; 1395:6; 1396:12, 24-25; 1398:9; 1399:17; 1401:11, 18, 21

**TARANTINO** [1] - 1291:5

**Tarantino** [91] - 1299:21, 23; 1300:10, 12; 1301:5, 22; 1319:9; 1327:12; 1328:14; 1334:17, 20; 1335:10; 1344:24; 1347:15; 1351:2, 13, 17; 1352:11; 1357:12; 1358:16; 1363:4; 1364:18; 1365:10; 1366:8; 1367:4, 14, 18-19; 1368:2, 6, 25; 1369:7; 1370:13; 1381:10; 1382:4; 1384:13, 21; 1387:4, 9, 25; 1392:24; 1393:3, 12; 1406:16; 1407:11, 17; 1408:2, 8, 12; 1412:17; 1413:18; 1421:17, 19; 1422:10; 1425:13; 1427:15; 1429:11, 20; 1443:4-6, 23; 1449:19; 1456:22; 1457:18; 1460:23; 1465:2; 1471:22; 1472:2, 12; 1480:23; 1481:2; 1494:9; 1498:6, 21; 1499:1, 9, 12-13, 16-17, 20; 1506:8, 10; 1507:13, 21, 24;

**Tarantino's** [2] - 1352:22; 1472:1

**Tarantinos** [2] - 1308:22; 1346:19

**target** [2] - 1411:13; 1450:7

**team** [4] - 1411:7, 9; 1413:12; 1425:14

**telephone** [4] - 1344:10, 19; 1382:14; 1393:18

**ten** [6] - 1310:9; 1365:7; 1397:23, 25; 1403:8; 1465:6

**Tercel** [10] - 1413:5, 7; 1426:18; 1430:8; 1431:20; 1473:19; 1482:14, 23; 1484:7

**term** [1] - 1447:24

**terms** [8] - 1320:18; 1332:20; 1334:2; 1357:8; 1358:8; 1374:17; 1404:11; 1405:1

**testified** [29] - 1298:16; 1320:15; 1326:25; 1329:19; 1330:14; 1347:1; 1349:15, 17; 1354:12; 1358:25; 1373:5; 1380:14; 1389:4; 1390:20; 1396:9; 1403:2; 1406:6, 18; 1422:8; 1423:16; 1433:10; 1434:4; 1440:15; 1441:19; 1451:16; 1467:16; 1477:1; 1483:15

**testify** [9] - 1345:12, 16; 1359:20; 1360:2, 7; 1406:12; 1422:13; 1448:11

**testifying** [4] - 1333:18; 1359:12, 14; 1437:8

**testimony** [32] - 1292:22; 1295:6; 1333:1, 20; 1336:9; 1337:1; 1359:23; 1361:17; 1363:1; 1382:15; 1383:20; 1384:25; 1389:9; 1390:19; 1402:18, 20; 1404:8, 11; 1405:14; 1407:1; 1409:25; 1414:7; 1415:14; 1421:18; 1434:1; 1437:7; 1449:12;

1450:1; 1466:2, 7; 1505:9

**Tevella** [2] - 1377:22, 24

**thanking** [1] - 1357:4

**THE** [233] - 1292:6, 17, 20; 1293:14, 18, 23-24; 1294:7, 10, 17, 19-20; 1295:3, 17; 1296:4, 9, 17, 19, 25; 1297:3, 6, 9; 1298:1, 6, 12, 18, 21; 1300:22; 1302:13; 1303:6, 10, 14, 24; 1305:3, 10, 14; 1306:15; 1309:20; 1311:12, 14; 1314:4; 1315:3; 1318:8; 1319:3, 11, 17, 23; 1322:2, 15, 22; 1325:10, 12; 1326:3; 1331:14; 1332:3, 8, 10, 13, 16; 1333:14, 17, 21, 25; 1334:7, 9, 25; 1335:13, 17; 1336:3, 8, 13, 23; 1337:2, 5; 1338:3, 25; 1339:5, 7; 1349:6; 1352:17; 1356:8; 1357:1, 8, 23; 1358:3, 8, 11; 1359:19; 1360:11, 13, 18; 1361:2, 6; 1363:23; 1364:20, 24; 1365:6, 13; 1366:2, 12; 1368:16, 18; 1369:25; 1370:2, 4, 6; 1371:7; 1372:8, 12; 1373:2, 11, 14, 17, 22, 25; 1374:3, 7, 12, 17; 1375:7; 1376:2; 1377:6, 16; 1378:22; 1379:2, 6-7, 11; 1380:1, 3, 10, 16, 18; 1383:5, 9, 23; 1384:4, 10; 1385:9; 1386:2; 1388:5, 10, 19; 1389:2, 7, 13, 15, 19, 22; 1390:8, 11, 15, 17, 23; 1391:2; 1393:24; 1395:4; 1396:17, 20; 1397:8, 13, 15-16; 1398:5, 7; 1399:2, 11; 1400:1, 3, 7, 12; 1401:2, 16, 19; 1402:6, 10; 1403:23, 25; 1404:5; 1405:1, 9, 12, 17, 22; 1406:3, 8, 10-11; 1408:13; 1409:24; 1415:8; 1417:12, 16-17; 1419:6, 25; 1420:5, 19; 1421:3, 8, 24; 1422:14; 1423:1,

3, 6, 8; 1427:2; 1436:22; 1437:1, 4, 6, 9, 14, 20, 24; 1438:1, 15; 1441:2; 1444:19; 1447:15, 17; 1452:9, 11; 1460:14, 16, 19-20; 1472:25; 1488:21; 1493:23; 1510:17, 20

**theft** [4] - 1422:4; 1457:9; 1463:12

**themselves** [1] - 1465:7

**therapist** [2] - 1353:18, 20

**thereafter** [3] - 1387:19; 1389:11; 1390:3

**therefore** [1] - 1401:4

**thinking** [3] - 1295:8; 1343:11; 1479:18

**Third** [1] - 1455:23

**third** [5] - 1406:22; 1460:1, 7, 9; 1461:2

**Thomas** [13] - 1371:25; 1372:2; 1375:7; 1376:11; 1389:21; 1391:9, 12, 14, 18; 1392:2

**threatening** [4] - 1314:25; 1315:4; 1327:7

**three** [23] - 1293:22; 1301:18; 1306:7; 1317:12; 1369:19, 21-22, 25; 1371:22; 1372:4; 1408:21, 24; 1413:24; 1434:18; 1443:7; 1455:13; 1458:9; 1480:19; 1488:17; 1496:23; 1497:9; 1498:1

**threw** [4] - 1484:8, 18, 20; 1501:4

**throw** [2] - 1484:14, 19

**Thursday** [1] - 1459:19

**tied** [1] - 1501:17

**tight** [1] - 1351:11

**tiles** [1] - 1440:8

**timing** [1] - 1358:8

**tipped** [1] - 1425:4

**Title** [1] - 1446:15

**title** [1] - 1441:7

**today** [23] - 1295:7; 1299:5; 1300:12; 1305:18; 1308:8, 23; 1345:6, 13, 16; 1347:24; 1354:3, 12; 1363:2; 1396:10; 1402:18, 21; 1403:17;

**25**

1414:7; 1448:11;
1449:13, 22; 1450:1;
1472:7

**together** [15] -
1306:8; 1346:19;
1376:17; 1407:14, 19;
1409:6; 1420:18, 25;
1422:9; 1445:21, 24;
1446:2; 1451:3;
1456:20; 1503:1

**token** [1] - 1478:16

Tom [1] - 1472:9

**took** [17] - 1303:1;
1314:8; 1319:1, 8;
1332:1; 1363:16, 20;
1364:11; 1379:23;
1380:10; 1393:20;
1420:3; 1436:23;
1462:16; 1474:1;
1482:25; 1501:14

**toolbox** [5] - 1495:1,
3, 9, 12; 1506:23

**tools** [1] - 1496:15

**top** [2] - 1469:6;
1509:6

**topic** [1] - 1437:19

**total** [2] - 1431:17;
1511:14

**totally** [1] - 1511:5

**touch** [1] - 1502:2

**tow** [5] - 1454:8, 16;
1457:9, 11; 1463:2

**toward** [2] - 1460:1;
1511:11

**towards** [3] - 1417:14;
1510:15; 1511:13

Toyota [8] - 1413:5;
1426:18; 1430:8;
1431:20; 1473:19;
1484:7

**trade** [1] - 1308:15

**trainer** [1] - 1308:6

**trainers** [1] - 1308:1

**training** [1] - 1456:2

TRANSCRIPT [1] -
1291:6

**transcript** [4] -
1291:25; 1294:13;
1401:22

**transcription** [1] -
1291:25

**transport** [1] -
1431:25

**transported** [1] -
1428:4

**trash** [1] - 1484:19

**travel** [1] - 1312:14

**traveling** [1] -
1312:22

**tree** [2] - 1461:3;
1476:3

**tremors** [1] - 1443:11

**trial** [14] - 1293:25;
1294:23; 1296:11;
1332:11, 21; 1405:5,
10; 1406:14, 17, 23;
1420:12; 1422:6, 12;
1449:17

TRIAL [1] - 1291:6

**tried** [3] - 1416:16;
1430:24; 1508:25

**tries** [1] - 1510:25

**trip** [4] - 1314:8;
1321:10; 1322:3; 1349:9

**triple** [1] - 1427:21

**truck** [19] - 1453:6, 8,
11, 19; 1454:1, 8-9,
13, 16-17; 1456:10;
1457:9, 11; 1458:12;
1463:2, 6, 8, 12;
1467:1

**trunk** [2] - 1494:22, 25

**trust** [2] - 1336:5;
1464:23

**truth** [4] - 1359:14,
16; 1383:13; 1448:5

**truthfully** [1] -
1333:18

**try** [3] - 1320:18;
1359:9; 1493:24

**trying** [7] - 1332:6;
1397:14; 1480:21;
1483:10, 16; 1502:2;
1511:21

**Tuesday** [7] -
1295:20-22; 1459:19;
1511:16

**turn** [6] - 1321:18;
1325:20, 22; 1326:10;
1417:14; 1447:7

**turned** [2] - 1411:13;
1429:11

Turnpike [4] - 1474:2,
15; 1476:25; 1478:22

**tweed** [1] - 1408:10

**twice** [1] - 1395:25

**two** [47] - 1296:16;
1309:1; 1312:24;
1323:17; 1325:14;
1327:19; 1328:22;
1329:14, 24; 1341:17;
1342:21; 1343:7;
1346:10; 1347:14;
1350:9; 1364:5, 8;

1380:7; 1389:25;
1397:20; 1403:6;
1404:8; 1405:6;
1406:20, 24; 1407:19;
1421:13; 1431:18;
1434:18; 1435:25;
1437:7; 1440:4; 1445:4;
1455:13; 1458:9, 13-14;
1462:15; 1474:23;
1478:8, 11; 1492:18;
1495:6; 1496:23;
1497:8; 1501:9

**type** [2] - 1367:13;
1457:15

**typed** [5] - 1324:6;
1325:5, 13

## U

U.S [3] - 1291:4, 15;
1446:15

U.S.D.J [1] - 1291:9

**ultimate** [3] - 1449:8,
17; 1492:19

**ultimately** [4] -
1418:12; 1492:17, 20,
22

**umm** [3] - 1315:8;
1346:16; 1347:5

**uncontroverted** [1] -
1422:16

**under** [9] - 1359:15;
1363:2; 1365:9; 1419:4;
1421:10; 1447:25;
1448:3, 13; 1469:5

**undercover** [1] -
1422:7

Underhill [2] -
1477:8, 10

**underlined** [1] -
1373:14

**understood** [1] -
1411:15

**underwear** [1] -
1466:25

**unfair** [4] - 1399:8,
10, 21

**unit** [7] - 1440:6, 19;
1441:17, 21, 24; 1442:6

UNITED [2] - 1291:1, 3

United [12] - 1291:12,
21; 1299:6, 14; 1314:5;
1342:25; 1361:16;
1362:2, 17; 1406:1;
1446:10; 1449:4

**units** [8] - 1440:1, 5,
11, 16; 1442:9, 11, 16

University [2] -

1408:16, 20

**unloading** [1] - 1508:5

**unoccupied** [1] -
1454:19

**up** [72] - 1294:15;
1295:8, 20; 1302:14;
1317:12; 1318:9;
1331:15; 1335:7;
1349:3, 9, 25; 1350:7;
1352:17, 19; 1355:12;
1357:1; 1361:23;
1363:3; 1372:12;
1380:1; 1385:3;
1387:16, 19; 1388:19;
1389:25; 1390:3, 5;
1398:8; 1399:5;
1402:18, 20; 1407:14,
17; 1410:1, 13; 1411:5;
1412:3; 1414:8; 1444:7;
1445:9; 1454:8, 17;
1459:23; 1460:4, 6;
1463:2; 1468:16;
1469:6; 1476:17;
1480:20; 1493:4, 6, 11;
1494:1, 5; 1496:12;
1497:2; 1498:18;
1499:24; 1500:3;
1505:20; 1506:13, 23;
1507:21, 23; 1509:6

**update** [1] - 1511:14

**upper** [3] - 1307:20;
1455:22; 1492:24

**upset** [13] - 1316:7;
1317:14; 1341:2;
1343:8; 1347:11;
1355:11; 1356:4;
1383:22; 1399:7, 16, 23

**upstairs** [1] - 1397:24

**usable** [1] - 1495:7

## V

**vacuum** [1] - 1467:3

**vacuumed** [1] - 1465:22

**vague** [1] - 1386:4

**van** [11] - 1418:8;
1428:6-9; 1457:9,
11-12; 1458:22;
1461:24; 1475:24

**various** [1] - 1421:11

**vehicle** [31] - 1413:2,
4; 1426:18; 1430:5;
1433:5, 8; 1434:8;
1441:8; 1454:4; 1459:5,
8, 10; 1461:13, 18-19,
21; 1462:9, 14, 18;
1465:21; 1466:2, 4, 6,
15; 1473:18; 1474:7,

**26**

23; 1479:1; 1482:13;
1506:3, 15

**vehicles** [3] -
1431:16; 1460:7, 10

**verbatim** [1] - 1366:3

**vest** [3] - 1469:4, 15,
19

**vests** [1] - 1469:21

**view** [2] - 1293:25;
1413:25

**viewed** [1] - 1400:4

**VIN** [3] - 1440:22;
1441:4, 7

**Vincent** [20] - 1306:1,
16; 1307:7; 1339:13,
17; 1349:18; 1353:1;
1355:7; 1359:20;
1369:23; 1370:8;
1420:15; 1422:5;
1444:4, 6; 1445:8;
1456:4, 13, 15

**Vinnie** [41] - 1301:4;
1306:11; 1307:2;
1314:11, 21; 1326:22;
1330:8, 10; 1340:24;
1341:11; 1347:20;
1348:10; 1352:8;
1368:3; 1369:6, 8;
1370:12; 1384:15;
1387:5, 10, 16;
1389:11; 1390:1;
1391:11; 1393:4, 9;
1403:20; 1420:25;
1422:23; 1444:12, 25;
1445:9; 1456:15;
1464:7; 1489:12;
1493:14, 18; 1497:20;
1498:10

**Vinnie's** [7] -
1340:19; 1341:22;
1342:13; 1345:23;
1353:11; 1390:1;
1403:19

**violation** [1] -
1446:14

**virus** [2] - 1293:20

**visit** [7] - 1302:7;
1309:5; 1349:12;
1377:8; 1379:4;
1383:15; 1390:20

**visited** [4] - 1309:13;
1310:15; 1377:21;
1389:5

**visiting** [1] - 1321:12

**visitor** [1] - 1327:9

**visitor's** [2] -
1388:8, 13

**visitors'** [1] - 1391:4

**vivid** [1] - 1363:20

**voice** [8] - 1314:25;
1315:4; 1317:2;
1319:23; 1327:1;
1395:13, 17

**voluntarily** [2] -
1360:15, 22

**volunteers** [1] -
1295:1

**voyage** [1] - 1509:21

---

## W

**wait** [1] - 1405:14

**wake** [12] - 1341:22;
1342:1, 3, 6, 9, 13;
1345:23; 1349:18;
1390:1, 14, 21

**waked** [2] - 1390:1, 13

**walk** [2] - 1461:19;
1472:2

**walked** [1] - 1458:14

**walkie** [17] - 1413:10;
1427:8, 11; 1430:12;
1431:5; 1465:24;
1467:9; 1472:18, 20;
1473:6, 10; 1477:16,
22; 1478:17

**walkie-talkie** [14] -
1413:10; 1427:8, 11;
1430:12; 1431:5;
1472:20; 1473:6, 10;
1477:16, 22; 1478:17

**walkie-talkies** [3] -
1465:24; 1467:9;
1472:18

**walking** [1] - 1357:4

**wall** [14] - 1411:22,
25; 1412:2, 8, 10-11;
1414:16; 1416:6, 10,
16-18; 1425:24; 1426:2

**Wantagh** [1] - 1501:17

**wants** [2] - 1335:7;
1397:10

**warehouse** [40] -
1418:11, 13; 1434:24;
1435:3, 7, 9, 11, 23;
1439:1, 5, 11; 1466:20;
1467:7; 1468:5, 7, 16,
18, 24; 1469:1; 1470:1,
19; 1472:13; 1473:25;
1479:7, 22; 1480:1, 10,
23; 1482:24; 1483:2;
1494:13, 15-16;
1495:23; 1497:3;
1499:11; 1507:17, 23

**warming** [1] - 1505:20

**warned** [2] - 1334:18,

**warrants** [1] - 1357:5

**washed** [1] - 1465:21

**washing** [1] - 1467:25

**watch** [1] - 1411:6

**watched** [2] - 1457:24;
1462:11

**water** [1] - 1484:9

**waterside** [1] -
1505:16

**ways** [3] - 1293:8;
1320:17; 1486:18

**weapon** [15] - 1470:13,
16, 21; 1471:5, 13, 16,
20; 1480:24; 1481:2, 6,
11; 1484:14, 20

**weapons** [3] - 1467:18;
1470:18; 1472:13

**wearing** [9] - 1300:16;
1408:9; 1422:7; 1469:4,
6, 8, 11, 15, 18

**wedding** [1] - 1367:9

**week** [15] - 1312:24;
1313:18; 1342:15;
1351:3; 1389:13, 16;
1390:1; 1453:20, 24;
1459:16, 18; 1492:18;
1511:11, 14

**weekend** [1] - 1390:4;
1512:2

**weeks** [6] - 1316:24;
1353:4; 1389:25;
1403:6; 1488:25;
1492:18

**West** [1] - 1354:23

**whatnot** [1] - 1459:3

**whatsoever** [1] -
1379:23

**wheel** [1] - 1432:20

**wheeling** [1] - 1507:1

**whispered** [1] -
1330:18

**white** [8] - 1323:24;
1325:4; 1459:5;
1478:25; 1506:14, 23

**whole** [3] - 1296:23;
1421:18; 1448:5

**whoops** [1] - 1476:11

**WICKER** [1] - 1291:21

**wife** [2] - 1292:12;
1293:1

**Willard** [1] - 1303:15

**willing** [3] - 1399:19;
1420:19

**Windex** [1] - 1467:3

**Windex'd** [1] - 1465:22

**window** [5] - 1411:22;
1412:15, 18; 1413:19;
1484:18

**windows** [1] - 1440:7

**winter** [2] - 1424:18;
1428:16

**wintertime** [1] -
1429:5

**wiping** [1] - 1471:17;
1472:15

**wish** [3] - 1326:2;
1405:1; 1437:19

**withdraw** [1] - 1423:1

**withdrawn** [17] -
1313:4; 1316:24;
1322:13; 1341:3;
1344:8; 1349:16;
1426:13; 1450:21;
1451:7; 1456:25;
1462:23; 1467:21;
1480:9; 1485:6; 1494:9;
1499:12, 16

**WITNESS** [10] - 1298:21;
1325:12; 1339:7;
1370:2; 1379:3, 7;
1397:16; 1406:10;
1408:13; 1417:16

**witness** [24] - 1294:3,
6; 1298:8, 15; 1303:16;
1309:19; 1320:14;
1332:25; 1333:11;
1335:15; 1357:1, 9;
1358:9; 1376:2;
1384:11; 1388:11;
1404:2; 1405:23;
1406:3, 5, 11; 1417:11;
1422:13; 1437:6

**witness's** [1] - 1407:1

**witnesses** [1] - 1437:8

**WITNESSES** [1] - 1513:2

**witnessing** [1] -
1480:22

**won** [1] - 1481:17

**word** [4] - 1303:4;
1493:7, 10

**words** [2] - 1341:1;
1352:13

**worried** [3] - 1329:1,
17; 1330:1

**worry** [3] - 1329:8;
1339:8; 1351:11

**wrapped** [2] - 1506:23;
1509:25

**wreck** [1] - 1417:20

**wrecked** [1] - 1441:6

**write** [2] - 1448:17, 22

**writing** [1] - 1446:21

27

28

**written** [4] - 1320:13;
1330:4, 9
**wrote** [2] - 1325:16;
1326:20

---

### X

**Xanax** [1] - 1353:25

---

### Y

**yard** [1] - 1504:4
**year** [24] - 1299:25;
1309:4, 9; 1313:10;
1363:17, 21, 24;
1365:3, 8-9; 1367:3,
6-7, 11; 1370:1;
1371:16; 1407:25;
1408:7, 22; 1409:20;
1429:4; 1444:23;
1446:13, 17
**year's** [3] - 1363:15;
1370:18
**years** [9] - 1294:23;
1305:21; 1317:12;
1373:18; 1408:19, 24;
1427:24; 1443:5;
1445:11
**yesterday** [6] -
1294:14; 1295:6;
1320:15; 1357:14;
1358:17; 1384:1
**YORK** [1] - 1291:1
**York** [9] - 1291:13, 19,
22; 1299:24; 1391:15;
1424:17; 1435:1;
1446:6; 1482:15
**young** [1] - 1316:10
**younger** [12] - 1408:4;
1410:13; 1439:25;
1442:18, 21, 23;
1443:5; 1471:25;
1472:6; 1494:2
**yourself** [5] -
1312:15; 1427:15;
1447:2; 1475:22; 1476:9