1515

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------X

UNITED STATES OF AMERICA,          :     CR 08 655

     v.                           :     U.S. Courthouse
                                 Central Islip, N.Y.

CHRISTIAN TARANTINO,               :
                                 TRANSCRIPT OF TRIAL

          Defendant.       :

                                 May 7, 2012

-------------------------------X     9:55 a.m.

BEFORE:

      HONORABLE JOANNA SEYBERT, U.S.D.J.
               and a jury

APPEARANCES:

For the Government:   LORETTA E. LYNCH
                     United States Attorney
                     100 Federal Plaza
                     Central Islip, New York 11722
                     By:  JAMES M. MISKIEWICZ, ESQ.
                          SEAN C. FLYNN, ESQ.
                          Assistants, U.S. Attorney

For the Defendant:    STEPHEN H. ROSEN, ESQ.
                     100 Almeria Avenue - Suite 205
                     Coral Gables, Florida 33134

                     FRANK A. DODDATO, ESQ.
                     666 Old Country Road
                     Garden City, New York 11530

Court Reporter:       HARRY RAPAPORT
                     OWEN M. WICKER
                     United States District Court
                     100 Federal Plaza
                     Central Islip, New York 11722
                     (631) 712-6105

Proceedings recorded by mechanical stenography.
Transcript produced by computer-assisted transcription.

1516

1       M O R N I N G    S E S S I O N

2

3

4            (Whereupon, the following takes place in the

5    absence of the jury.)

6            THE COURT:  Mr. Rosen and Mr. Doddato, you have

7    to get here at a quarter after 9:00.  It delays the whole

8    process.

9            What time did the defendant arrive?

10           THE MARSHAL:  Before 9:00, Judge.

11           THE COURT:  I don't know why you are showing up

12   at twenty to 10:00, and then the defendant gets dressed,

13   and it is a long process.

14           MR. DODDATO:  If I may, Judge, we were here at

15   9:25.

16           THE COURT:  What we have been doing during this

17   trial is, I have asked you to come in at 9:15 in case any

18   motion is to be made.  I don't know how the message is

19   coming across, but that is the protocol.

20           It has delayed the jury, who has been here at a

21   quarter of.

22           Any application?

23           MR. ROSEN:  No, your Honor.

24           MR. FLYNN:  Your Honor, we reached the part of

25   Mr. Mulligan's testimony or we broke right before the

1517

1    portion of the testimony where I would like to seek to

2    introduce Mr. Tarantino's medical records of the Nassau

3    University Medical Center.  And I wanted to bring that to

4    the Court's attention prior to, I guess, having a

5    discussion on the record in front of the jury regarding

6    those.

7              I know, I filed a motion ahead of time --

8              THE COURT:  I would ask the other folks in the

9    audience to have a seat, if you can.

10             MR. FLYNN:  Some weeks ago we filed a motion,

11   your Honor, arguing that those medical records are

12   self-authenticating and admissible under Rules 902(11) and

13   803(6), and the defense responded to that motion agreeing

14   that the records are self-authenticating.

15             THE COURT:  Right.

16             MR. FLYNN:  I think reserving any argument --

17             THE COURT:  Relevance?

18             MR. FLYNN:  -- on relevancy.

19             THE COURT:  Let me hear your argument on

20   relevancy.

21             MR. ROSEN:  The only thing I can say is we have

22   Craig Miller's testimony that says that he didn't see any

23   injuries to the defendant's hands when he was behind his

24   boat shooting into the water.  When he was piloting the

25   boat, he said he turned around and looked and did not see

1518

1    any injuries.

2              So if he didn't see any injuries, then this

3    injury probably took place at a subsequent time, which is

4    irrelevant to the facts of this case.  That is the only

5    thing I can say.

6              THE COURT:  Is Mr. Mulligan going to testify

7    that he saw the defendant's hand was injured and he

8    connected it up?

9              MR. FLYNN:  Mr. Mulligan will testify he gave

10   him an injury on the back of the boat when they opened the

11   box and began to fill it in with large pieces of concrete

12   and asphalt, that he dropped one on the defendant's hand

13   inside the box.

14             THE COURT:  It certainly makes it more relevant

15   and probative.

16             Your objection is overruled.

17             (Whereupon, at this time there was a pause in

18   the proceedings.)

19             MR. MISKIEWICZ:  Your Honor, we need the

20   witness.

21             THE COURT:  Yes.

22             Is Mr. Mulligan up?

23             MR. MISKIEWICZ:  Yes, your Honor.

24

25

S. Mulligan-Direct/Flynn

1519

1    S C O T T    M U L L I G A N,

2         called as a witness, having been previously

3         duly sworn, was examined and testified as

4         follows:

5

6         (Whereupon, the jury at this time entered the

7    courtroom.)

8              THE COURT:  Good morning, everyone.

9              Please be seated.

10              Thank you for arriving at a quarter to 10:00.

11              We are ready to proceed.

12              You are still under oath, Mr. Mulligan.

13              You may continue your examination, Mr. Flynn.

14              MR. FLYNN:  Thank you, your Honor.

15

16    DIRECT EXAMINATION (cont'd)

17    BY MR. FLYNN:

18    Q    Good morning, Mr. Mulligan.

19    A    Good morning.

20    Q    When we broke on Thursday afternoon, we were

21    discussing your trip to Craig Miller's house.  You recall

22    that?

23    A    Yes.

24    Q    In August of 1994?

25    A    Yes.

S. Mulligan-Direct/Flynn

1520

1    Q    And before we broke, you had testified that the

2    defendant and you brought onto Craig Miller's boat in

3    South Merrick that black box that is in the middle of the

4    courtroom, Government's Exhibit CW-4.  Do you recall that?

5    A    Yes.

6    Q    And after the three of you were on the boat, what, if

7    anything, did you and the defendant and Craig Miller do

8    that day in August?

9    A    We drove out to the ocean.

10   Q    Well, who drove the boat?

11   A    Craig Miller.

12   Q    By what route did Mr. Miller pilot the boat into the

13   ocean?

14   A    Went out to the Jones Beach Inlet.

15   Q    All right.

16         Once Mr. Miller's boat reached the Jones Beach

17   Inlet, what happened?  Did you go past that?

18   A    Yes.  We went a couple of miles out into the ocean.

19   Q    And how far out did you go?

20   A    Roughly, two or three miles.

21   Q    When the boat piloted by Mr. Miller reached its

22   furthest point, could you still see land?

23   A    Barely.

24   Q    And when the boat reached its furthest point, what

25   happened with the boat itself, if anything?

S. Mulligan-Direct/Flynn

1521

1   A    One of the engines was having a problem.

2   Q    Specifically what do you recall happening with the

3   boat?

4   A    The engine started to make knocking noises.

5   Q     Okay.

6          When one of Mr. Miller's boat's engines began to

7   have problems, what, if anything, happened?

8   A    At that point everything turned to pandemonia, at

9   which point Mr. Miller wanted to turn around and come back

10  right away and instructed us to get everything off his

11  boat at that time.

12  Q    Okay.

13         Where were you physically on the boat when one

14  of the engines panned out, if you recall?

15  A    Down at the bottom in the back.

16  Q    Okay.

17         When Mr. Miller told you to get everything off

18  his boat, what, if anything, did you and the defendant do?

19  A    We started to put rocks inside the black toolbox.

20  Q    Okay.

21         What was the purpose of filling the box with

22  rocks?

23  A    So that it would sink.

24  Q    Again, how big are the rocks we are talking about?

25  How -- what did it look like?

S. Mulligan-Direct/Flynn

1522

1  A    Concrete debris, roughly eight inches by four inches

2  thick.

3  Q    Again, how did those rocks or concrete, or whatever,

4  get to the boat that morning?

5  A    The defendant brought it in his car and him and I

6  carried it onto the boat.

7  Q    When you opened the box to begin filling it with

8  construction debris, where on the boat physically were

9  you?  What portion of the boat?

10  A    We were in the rear back of the boat.

11  Q    Again, we have a laser pointer in front of you.

12  Indicate on Government's Exhibit CM-7.

13            (At this time a document was exhibited on

14  courtroom screen.)

15  A    Back here (indicating).

16  Q    You are indicating the back, port side of the boat?

17  A    Yes.

18  Q    When you opened the box and began to fill it with

19  construction debris to weight it down, what, if anything,

20  did you see inside the boat -- inside the box, I should

21  say?

22  A    Louis's body was squished inside of it.

23  Q    Mr. Mulligan, I will show you what is conceded --

24  admitted as evidence in this case,

25  Government's Exhibit SLD-12.

S. Mulligan-Direct/Flynn

1523

1      Do you recognize that photograph?

2      (At this time a document was exhibited on

3    courtroom screen.)

4    A    Yes.

5    Q    What does it depict?

6    A    Louis's body pushed into the toolbox.

7    Q    Did Louis -- Mr. Dorval look like that, his actual

8    body, the day he was killed when you saw him in the back

9    of the boat?

10    A    No.

11    Q    Did his veins look all purple like that and his face

12    all bloated and his lips?

13          MR. ROSEN:  Objection to leading.

14          THE COURT:  Please ask a question that is not

15    leading.

16    Q    Did Mr. Dorval look like that?

17    A    No.

18    Q    And do you recall the clothing that Mr. Dorval was

19    wearing when you saw him dead in the box on the back of

20    Mr. Miller's boat?

21          MR. ROSEN:  Judge, we will stipulate that the

22    picture shows the clothes he had on.

23          THE COURT:  It is an appropriate question.  The

24    objection is overruled.

25          He can answer it.

S. Mulligan-Direct/Flynn

1524

1   Q    You can answer the question.

2   A    Yes.  I noticed the Calvin Klein T-shirt.

3   Q    Did that Calvin Klein T-shirt have any significance

4   to you, Mr. Mulligan?

5   A    No.  It came from a burglary we had done earlier when

6   all of us had the same T-shirts.

7   Q    What time of day was this happening when you began

8   filling the box with rocks on the back of Mr. Miller's

9   boat?

10   A    Roughly, 11:30.

11   Q    And as you and the defendant were filling this black

12   box here with rocks and construction debris on the back of

13   Mr. Miller's boat, what, if anything, happened?

14   A    I mistakenly dropped one of the boulders on the top

15   of Mister -- the defendant's hand.

16   Q    Which hand did you drop the boulder?

17   A    On the defendant's right hand and split his hand in

18   half.

19   Q    Where was the defendant when you dropped the

20   construction debris on top of Mr. Tarantino's hand?

21   A    It was coming off the box when I dropped it off too

22   soon.

23   Q    Were you able to observe what physically happened to

24   Mr. Tarantino's hand that day?

25   A    Yes.

S. Mulligan-Direct/Flynn

1525

1    Q    What did his hand look like after you dropped the

2    rock on it?

3    A    His hand -- his thumb was split in half from the

4    turning point here straight to the nail here (indicating).

5    Q    Was he bleeding?

6    A    Yes.

7            MR. FLYNN:  Your Honor, with the Court's

8    permission, I would like to ask Mr. Mulligan to step down

9    from the stand for a brief moment?

10           THE COURT:  All right.

11   Q    Mr. Mulligan, join me in the center of the courtroom.

12           Mr. Mulligan, after you filled this black box

13   with rocks and construction debris, what did you do with

14   the box and the -- with the defendant?

15   A    At that point we it to the rear of the boat where

16   there is an opening, and at which point we slid the box

17   into the water, and I held it by the lid inside the water

18   and the defendant shot holes in the bottom of the box so

19   it would sink.

20   Q    Using the laser pointer, would you indicate where on

21   Mr. Miller's boat this opening was that you slid this box

22   into the water?

23   A    Back here (indicating).

24   Q    Okay.

25           You are indicating in the area of the bow of the

S. Mulligan-Direct/Flynn

1526

1   boat toward the far background of the picture?

2   A    Yes.

3   Q    The starboard side; is that correct?

4   A    Yes.

5   Q    And you indicated that Mr. Miller -- that,

6   Mr. Mulligan, a moment ago, that you held the lid while

7   the box was being slid into the water?

8   A    Yes.

9   Q    Why did you do that?

10  A    To hold it next to the boat so we could shoot holes

11  into the bottom.

12  Q    If I were to let go of the box this morning, it

13  automatically closes.

14        Is there anything on this box that would have

15  allowed the box to stay open in 1994?

16  A    Yes.  It spring closes over here which would have

17  kept the box open.

18  Q    And I think you are indicating what appears to be

19  rust on the hinges, or on the back of the box?

20  A    Yes.

21  Q    And how would it have allowed the box to have stayed

22  open in 19 --

23  A    It would have stayed on the top of the grooves here

24  and the springs would have kept it up.  You have to push

25  it to close.

1527

1    Q    And you also indicated that while you were holding

2    this box in the water -- how were you holding it?  Leaning

3    over the back?

4    A    I was right by the entrance to the door over here

5    (indicating).  I was leaning over and holding on to the

6    box.

7            The defendant reached over and shot holes in the

8    bottom of the box.  At which point we were trying to hold

9    it from the side, leaning over the --

10   Q    Stop for a second.

11           What did the defendant use to shoot holes into

12   the box?

13   A    A pistol.

14   Q    What kind of pistol?

15   A    I think a nine millimeter.

16   Q    What color was it?

17   A    Black.

18   Q    Continue.

19   A    At which point we closed the lid down and hold it

20   down here on the side.  The defendant was trying to latch

21   it down on the other side here with -- and it filled up

22   with water and it sank.

23   Q    After the defendant shot the holes in the bottom of

24   the box, how quickly did the box fill with water?

25   A    Started rapidly right away.

S. Mulligan-Direct/Flynn

1528

1   Q    Did it become difficult to hold?

2   A    Yes.

3        At this point I tried to handle -- hold it from

4   the hands and I tried to shut it and the water was taking

5   it down already.

6   Q    How was the defendant able to hold the handgun if you

7   just smashed his hand and he was holding the gun?

8   A    I guess with all the adrenaline going.

9        MR. ROSEN:  I can't hear the witness.

10       THE COURT:  Okay.

11       THE WITNESS:  I guess with all the adrenaline,

12  he was able.

13  Q    Thank you.

14       You may have a seat in the witness stand again.

15       (Whereupon, at this time there was a pause in

16  the proceedings.)

17  Q    After Mr. Tarantino shot holes in the box, in the

18  black box here, what, if anything, did he do with his

19  handgun?

20  A    He threw it in the ocean.

21  Q    Did you observe him throw the handgun into the

22  Atlantic Ocean?

23  A    Yes.

24  Q    How quickly -- to the best -- withdrawn.

25       To the best of your recollection, how fast did

S. Mulligan-Direct/Flynn

1529

1    the black box with Mr. Dorval's body inside it and the

2    construction debris sink?

3    A    It seemed to go down in less than a half a minute.

4    Q    Less than half a minute did you say?

5    A    Yes.

6    Q    And did you and the defendant throw anything else

7    into the water off the back of Mr. Miller's boat that day?

8    A    We had some pry bars and crowbars with us.

9    Q    What was Mr. Miller doing during all of this?

10    A    He was completely panic stricken, you know, started

11    to get nauseous.  He turned all pale and was nervous.

12    Q    Did you physically see Mr. Miller at this point?

13    A    At that point, yes.

14    Q    Where was he?

15    A    He was still up on the bow.

16    Q    Prior to you descending and begin to fill the box

17    with rocks, had he been sick and pale?

18    A    No.

19    Q    Did you have any conversation with Mr. Miller at this

20    point?

21    A    At that point I went up to take over and I had to

22    drive the boat back.

23    Q    Why did you have to drive the boat?

24    A    He was not feeling well.  He was sick.  And he was

25    completely panic stricken.

S. Mulligan-Direct/Flynn

1530

1   Q    On that day in 1994 were you aware as to whether or

2   not Mr. Miller had seen anything inside the box?

3   A    No.

4   Q    Who piloted the boat back to the shore?

5   A    I piloted it back to the Jones Beach Inlet.

6   Q    What happened then?

7   A    By then Mr. Miller had his composure and he brought

8   it back to --

9   Q    How long did it take you to pilot the boat back from

10   the middle of the Atlantic Ocean to the middle of the

11   Jones Beach Inlet?

12   A    About an hour.  It was going on one engine.

13   Q    Where was Mr. Miller during all this?

14   A    Down below deck.

15   Q    How about Mr. Tarantino?

16   A    In the back of the boat trying to put salt water on

17   his hand.

18   Q    Did Mr. Miller compose himself at some point?

19   A    Yes, when we got to the inlet.

20   Q    What happened then?

21   A    That is when he took over and drove the boat the rest

22   of the way in.

23   Q    To the best of your recollection, approximately what

24   time did you and the defendant and Mr. Miller make it back

25   to his home in Merrick that day?

S. Mulligan-Direct/Flynn

1531

1  A    Roughly 1:30, a quarter to 2:00, something like that.

2  Q    And what happened when he got back to his home?

3  A    We got back and I offered to help him out with his

4  boat.  And he rejected it and said, no, no, no.  I got it.

5        And then the defendant and I left in separate

6  cars.

7  Q    Did you speak with the defendant before he left?

8  A    Yes.  In fact, he was going to go home and try to

9  wrap his hands and -- hand and meet up later.

10 Q    Are you aware as to whether the defendant sought any

11 medical treatment later that day for the wound to his hand

12 that you caused by dropping construction debris on it

13 inside the box on the boat?

14 A    Yes.

15 Q    Where did he go for that medical treatment?

16 A    Nassau County Medical Center.

17 Q    Where is that?

18 A    In East Meadow on Hempstead Turnpike.

19 Q    Where is the Nassau University Medical Center in East

20 Meadow in relation to where the defendant was living at

21 the time in 1994?

22 A    About two miles from his home.

23        MR. FLYNN:  Your Honor, at this point the

24 government moves into evidence or asks to move into

25 evidence Government Exhibit MED-1 through MED-13, which

S. Mulligan-Direct/Flynn

1532

1   are documents we discussed off the record this morning,

2   the defendant's medical records.

3            THE COURT:  Yes.

4            Over objection, they are admitted.

5            (Whereupon, Government's Exhibits MED-1 through

6   MED-13 were received in evidence.)

7   Q    Mr. Mulligan, on the screen in front of you, and on

8   the courtroom screen, is now what is admitted in evidence

9   in this case as Government's Exhibit MED-3.

10           (At this time a document was exhibited on

11  courtroom screen.)

12  Q    They are -- it is a copy of the defendant's medical

13  records from the Nassau University Medical Center.

14           I have highlighted the top portion of the

15  document which is now blown up on the screen in front of

16  you.

17           I will direct your attention, Mr. Mulligan, to

18  the upper -- upper left-hand portion of the document which

19  appears to indicate a name and an address.

20           Do you recognize that name?

21  A    Yes.

22  Q    More specifically, do you recognize 29 Montauk

23  Avenue?

24  A    Yes, I do.

25  Q    What significance does that address have for you?

S. Mulligan-Direct/Flynn

1533

1   A    It is the defendant's home that he grew up in.

2   Q    I'm sorry?

3   A    The home that the defendant grew up in.

4   Q    There is a phone number there, (516) 868-9109.

5        Do you recognize that phone number?

6   A    Yes, I do.

7   Q    Whose phone number is that?

8   A    His mother's number to their home.

9   Q    Have you called that number previously during parts

10  of your life?

11  A    Yes.

12  Q    Mr. Mulligan, the medical records on the screen are

13  dated.  I have marked that with an arrow, do you see that

14  date?

15  A    Yes.

16  Q    What is the date of the medical records?

17  A    August 13th, 1994.

18  Q    Does that comport with your memory as to when the

19  date was that you and the defendant dumped Mr. Dorval's

20  body in the Atlantic Ocean?

21  A    Yes.

22  Q    And next to that date is a time, 5:35 p.m.

23        Does that date -- does that time comport with

24  the time of day -- the approximate time of day that you

25  would have arrived back to Mr. Miller's house that day?

S. Mulligan-Direct/Flynn

1534

1   A    Yes.

2          After his house -- after he left his house, yes.

3   Q    Mr. Mulligan, on April -- an August 13th, 1994,

4   approximately how old was the defendant?

5   A    In 1994?

6   Q    Yes.

7   A    He was 25, about 25 years old.

8   Q    Again, which hand did you crush on August 13th, 1994

9   with the cinder block on Craig Miller's boat, which hand

10  of the defendant?

11  A    His right hand.

12  Q    What did you crush his right hand with on that day

13  again?

14  A    A cinder block.

15  Q    Mr. Mulligan, I will now show you what is previously

16  admitted in evidence as Government's Exhibit MED-10.

17          (At this time a document was exhibited on

18  courtroom screen.)

19  Q    I'm sorry, it is MED-11.

20  A    Yes.

21  Q    As a result of the injury you inflicted on

22  Mr. Tarantino that day in the middle of the Atlantic

23  Ocean, do you recall whether the defendant was fitted for

24  any splint or cast?

25  A    Yes.

S. Mulligan-Direct/Flynn

1535

1   Q    What do you recall?

2   A    He had a cast on his right arm.

3   Q    What sort of cast was it?

4   A    A half cast.

5   Q    What color was it?

6   A    White.

7   Q    Mr. Mulligan, I will show you on the screen what is

8   previously admitted in evidence as

9   Government's Exhibit JK-11.

10           (At this time a document was exhibited on

11  courtroom screen.)

12  Q    Do you recognize the individual depicted in that

13  photograph?

14  A    Yes.

15  Q    And assuming that there has been evidence in this

16  case that that surveillance photograph of the defendant

17  was taken on September 28th, 1994, do you see in this

18  picture the cast that you previously testified observing

19  soon after the injury inflicted on him that day?

20  A    Yes.

21  Q    Where was it?

22  A    On his right arm.

23  Q    And you agree with me you can only see a portion of

24  the cast on his right arm?

25  A    Yes.

S. Mulligan-Direct/Flynn

1536

1   Q    But does that comport with what the cast looked like

2   and how high up his arm it had been fitted?

3   A    Yes.

4   Q    On the day following the defendant's disposal of the

5   body in that black box, what did you do?

6   A    I went upstate with my girlfriend, her father's

7   house.

8   Q    And where was her house?

9   A    Located upstate.  I'm not sure what town.

10  Q    Why did you go up there?

11  A    To have an alibi -- establish an alibi as to where I

12  was.

13  Q    Did you eventually come to learn that Mr. Dorval's

14  body did not sink?

15  A    Yes.

16  Q    Where were you when you first found that out?

17  A    At her father's house when I got a phone call.

18  Q    Sorry?

19  A    At my girlfriend's father's house when I received a

20  phone call.

21  Q    Approximately how many days after the boat trip did

22  you receive that phone call?

23  A    About three days later.

24  Q    Who called you?

25  A    Vincent Gargiulo.

S. Mulligan-Direct/Flynn

1537

```
1   Q    And did you engage in conversation with Mr. Gargiulo

2   when he called you three days later?

3   A    Yes.

4   Q    What did the two of you discuss?

5   A    He asked me if I had seen the newspaper.

6         I said, no.

7         He advised me to go get it.

8   Q    Did he say anything else about what was in the

9   newspaper?

10  A    He mentioned if I had seen the paper -- no.  Just if

11  I saw the paper and I should go and get it.

12  Q    Did you -- well, after you hung up the phone with

13  Mr. Gargiulo, what, if anything, did you do upstate?

14  A    I immediately went out and bought the Post.

15  Q    Did you see anything of significance to you in the

16  Post that day, the New York Post?

17  A    Yes.

18        There was a picture of the police bringing this

19  box out of the water.

20  Q    Did you recognize the box?

21  A    Yes.

22  Q    At some point after learning that Mr. Dorval's body

23  had been recovered and not sunk, did you speak with the

24  defendant?

25  A    Yes.
```

S. Mulligan-Direct/Flynn

1538

1    Q    Where were you when you spoke to the defendant?

2    A    I had driven back to New York City and I spoke to him

3    by the gym on 83rd and First on the east side, upper east

4    side.

5    Q    Okay.

6         What did you and the defendant discuss at that

7    location in the upper east side?

8    A    Just shocked that it floated back up.  And we were

9    concerned about the fact that the defendant's blood might

10   have leaked inside the box.  And part of his arm got

11   scratched.  We didn't know if there was any skin on it.

12   We were both talking about it together and at which point

13   we figured the salt water would have eaten anything left

14   there.

15   Q    Mr. Mulligan, switching gears for a second.

16        At this point in your life when you were

17   participating with armed robberies and disposing the body

18   at the sea, did you become involved in the gym and fitness

19   business?

20   A    Yes.

21   Q    How did you first become involved?

22   A    With a personal training company.

23   Q    Where did you work?

24   A    81st and Third, Eastside Fitness.

25   Q    Is that a different Eastside Fitness than the one you

S. Mulligan-Direct/Flynn

1539

1    testified to on Thursday that you went to the day after

2    the armored car robbery?

3    A    A different location.

4    Q    Who owns the Eastside Fitness on the upper east side?

5    A    Damian Rauccie, Bret Holzer, Andy Corino.

6    Q    Did you have a partner in this personal training

7    business that you had, the Eastside Fitness?

8    A    Yes.

9         Vinnie Gargiulo, myself and the defendant.

10   Q    As a personal trainer with Mr. Gargiulo and the

11   defendant, what, if anything, did you do?  What did the

12   job entail?

13   A    It was training new members who came to the gym, and

14   more or less through a payroll structure to that extent,

15   and just keep on top of all the training sessions in the

16   location.

17   Q    Did you have an ownership interest in the Eastside

18   Fitness at this point?

19   A    No.  Just a training company.

20   Q    Okay.

21        For how long did you continue in this personal

22   training business in Eastside Fitness with the defendant

23   in May?

24   A    Roughly a year, a year and a half.

25   Q    And at that point in time after a year and a half did

S. Mulligan-Direct/Flynn

1540

1   you also acquire an ownership interest in a gym of your

2   own?

3   A    Yes.

4   Q    Where was that gym located?

5   A    Rahway, New Jersey.

6   Q    In approximately what year did you acquire an

7   interest in a gym in Rahway, New Jersey?

8   A    Roughly the end of '94.

9   Q    What was the name of the gym?

10  A    Power House Gym.

11  Q    What kind of gym was it?

12  A    Strictly a weightlifting, cardio gym.

13  Q    And did you own that gym by yourself?

14  A    No.  With several partners.

15  Q    Who were your partners?

16  A    Bret Holzer, Eric Holzer, Andy Corino, myself, Chris

17  Tarantino.

18  Q    Okay.

19        So multiple people, including the defendant?

20  A    Sorry?

21  Q    Multiple people for your partners including the

22  defendant?

23  A    Yes.

24  Q    Who offered you the opportunity to get involved in

25  the Rahway gym in New Jersey?

S. Mulligan-Direct/Flynn

1541

1   A    Bret Holzer.

2   Q    And how long did you maintain an ownership interest

3   in that gym?

4   A    A few years.

5   Q    In the years that followed, did you eventually

6   acquire an ownership interest in additional fitness gyms

7   in both New Jersey and Manhattan?

8   A    Yes.

9   Q    Where?

10  A    In New Jersey we had Elmwood Park, Sayville and North

11  Arlington.

12  Q    And to the best of your recollection, what years did

13  you acquire ownership interest in these additional

14  facilities?

15  A    Through '95 and '96.

16  Q    What were the names of these gyms?

17  A    They were Power House and then we switched to Dolphin

18  Fitness.

19  Q    Did you own 100 percent of these fitness clubs in

20  New Jersey and Manhattan in the mid-90s?

21  A    No.

22  Q    Who were your partners?

23  A    We had different partners in all locations.

24       In Jersey, most of them were myself, Eric

25  Holzer, the defendant.

1542

1   Q    Okay.

2        After you acquired the ownership interest in the

3   gym in Elmwood Park, New Jersey, did you hire a manager at

4   that location?

5   A    Yes.

6   Q    Who was your manager?

7   A    Vincent Gargiulo.

8   Q    Approximately what year did you hire him as the

9   manager of your gym in Elmwood Park?

10  A    '95.

11  Q    What did Vinnie do as the Elmwood Park gym manager?

12  A    He managed that location and he ran the day-to-day

13  operations and sales.

14  Q    Who else was a partner of your gym in Elmwood Park

15  where Vinnie acted as a manager?

16  A    At that point it was just the three of us and there

17  was one other silent partner, Frank Ratella (ph).

18  Q    Was the defendant one of your partners there?

19  A    Yes.

20  Q    And at some point after that, after Vinnie was

21  working for you and the defendant as a manager at the

22  Elmwood Park gym, did you and the defendant take

23  Mr. Gargiulo on as a partner at any other gym?

24  A    He took us on as a partner.

25  Q    All right.

S. Mulligan-Direct/Flynn

1543

1       Explain, please, how that happened.

2   A    He got a location on 40th Street and 8th Avenue.  At

3   which point he asked us to go on board with him in that

4   partnership with that location.

5   Q    Okay.

6        Approximately what year was this?

7   A    Roughly the end of '95, '96.

8   Q    Okay.

9        And you said that Mr. Gargiulo had found a

10  location.  What sort of location had he found on 40th

11  Street and 8th Avenue?

12  A    He found a second floor location by the bus terminal.

13  Q    Okay.

14       Did -- who else besides yourself did

15  Mr. Gargiulo ask to become his partner at this new gym?

16  A    He took his brother in, myself, the defendant and

17  Eric Holzer.

18  Q    What is his brother's name?

19  A    Billy Gargiulo.

20  Q    And how was this gym acquired?  Who fronted the

21  capital for it?

22  A    We put up some money.

23  Q    Who is "we"?

24  A    Myself and the defendant, Eric Holzer and then Billy

25  got money, I don't know if it is his brother or father.

S. Mulligan-Direct/Flynn

1544

1  And Vinnie did some of the construction work for his

2  share.

3  Q    What did you think of the place that Mr. Gargiulo

4  found on 4th and 8th (sic)?

5  A    I thought it was a an okay space.  I didn't like the

6  idea of it being a second floor location.

7  Q    To your knowledge, did Mr. Gargiulo have any money of

8  his own to chip into this venture in the mid-90s?

9  A    No.

10  Q    And what was the name of the gym that was

11  established?

12  A    Body Sculpt.

13  Q    And was the partnership between the four or five of

14  you successful at Body Sculpt?

15  A    No.

16  Q    Why not?

17  A    Just we had different opinions how to run the gym.

18  Q    Who is "we"?

19  A    Myself, the defendant, Eric Holzer.

20  Q    You had -- who was -- were there arguments?  Did you

21  say there were arguments?

22  A    Just we didn't like the way he wanted to do things.

23  He wanted to run things his own way.  And he was hard

24  headed, and we were constantly bumping heads about that.

25  Q    You are using pronouns.  Who was hard headed?

S. Mulligan-Direct/Flynn

1545

1    A    Vincent Gargiulo.

2    Q    Okay.

3         And did the disputes arise with Mr. Gargiulo

4    with respect to Body Sculpt?

5    A    Yes.

6    Q    Who had disputed with Mr. Gargiulo regarding this

7    first Body Sculpt?

8    A    Myself, the defendant, Eric Holzer.

9    Q    Okay.

10        And as a result of these disputes, what, if

11   anything, happened?

12   A    Eventually we broke off our partnership with him and

13   just moved on.

14   Q    Okay.

15        Who broke off the partnership?

16   A    Myself and the defendant.

17   Q    Approximately how long were you partners with

18   Mr. Gargiulo in the mid-90s at this first Body Sculpt,

19   40th and 8th?

20   A    I'm guessing six or eight months.

21   Q    Okay.

22        You testified previously that you had fronted

23   some money to Mr. Gargiulo for the gym; is that correct?

24   A    Yes.

25   Q    And to your knowledge had the defendant also fronted

S. Mulligan-Direct/Flynn

1546

1  money for the gym?

2  A    Yes.

3  Q    And when you and the defendant removed yourselves

4  from the day-to-day operations of this business, did you

5  or the defendant remove that capital when you left?

6  A    I don't remember either one of us taking any money

7  back from him.

8  Q    So is it fair to say that you left -- you left that

9  money with Mr. Gargiulo at his gym?

10 A    Yes.

11 Q    Was your -- to the best of your recollection, was

12 yours and the defendant's departure from the gym amicable?

13 A    Yes.

14 Q    Were you still friends with Vinnie at that point?

15 A    Yes.

16 Q    Did Mr. Gargiulo's Body Sculpt at 40th and 8th remain

17 open for a period of time after you and the defendant

18 left?

19 A    Yes.

20 Q    Again, why did you disagree again, you and the

21 defendant?

22 A    We didn't like the way he ran the day-to-day

23 operations.  And we decided to break off before we ruined

24 our friendship.

25 Q    Okay.

S. Mulligan-Direct/Flynn

1547

1      You testified that Body Sculpt remained open for

2  a period of time after you left.

3      Did that change, to your knowledge, at any

4  point?

5  A    Yes.

6  Q    What happened -- what happened with respect to the

7  Body Sculpt at 40th and 8th?

8  A    It eventually went out of business.

9  Q    Mr. Mulligan, toward the end of the 1990s and into

10  the last decade, the 2000's, did you acquire ownership

11  interest in the a number of additional fitness centers

12  both in Manhattan and Long Island that eventually took the

13  name Synergy?

14  A    Yes.

15  Q    And to your knowledge did the defendant also acquire

16  ownership interest in one or more Synergy centers at this

17  time?

18  A    Yes.

19  Q    And in fact, were you and the defendant partners at

20  certain Synergies?

21  A    We were partners in everything.

22  Q    Sorry?

23  A    We were partners in all the gyms together.

24  Q    Are you currently partners with the defendant?

25  A    No.

S. Mulligan-Direct/Flynn

1548

1  Q    Or his family, at any individual Synergy Fitness?

2  A    No.

3  Q    And am I correct in saying that each Synergy is

4  independently owned?

5  A    Yes.

6  Q    And is it one big corporation?

7  A    No.

8  Q    How is it set up?

9  A    Each company is a shell corporation.

10  Q    Sorry?

11  A    Each company has its own shell organization.

12  Q    A shell corporation?

13  A    Each company is an individual corporation, each gym.

14  Q    Is it more or less like a franchise?

15  A    Yes.  But we don't pay a franchise fee.

16  Q    To the best of your recollection, during the early

17  part of the 2000s was there a Synergy Gym located on 23rd

18  Street and Third Avenue on the east side of Manhattan?

19  A    Yes.

20  Q    And did that east side -- the East 23rd Street

21  Synergy serve any special importance for the various

22  Synergy owners in Manhattan?

23  A    That was considered the headquarters for the

24  Synergies in Manhattan.

25  Q    What do you mean by headquarters?

S. Mulligan-Direct/Flynn

1549

1   A    That is where all the stuff came out, the daily

2   business came out of that back office.  Payroll is done

3   there, etcetera.

4   Q    Did -- well, who owned -- who owned -- withdrawn.

5            In the early part of 2000, who owned this

6   East 23rd Street Synergy Gym?

7   A    Bret Holzer.

8   Q    Okay.

9            But were multiple owners present at that gym at

10  any one time?

11  A    Yes.

12  Q    Why?

13  A    That is where, you know, all the meetings were held

14  amongst the owners.

15  Q    Was there a meeting room there?

16  A    The back office had a large table set up and we had

17  conversations .

18  Q    Okay.

19            Did you maintain a desk there?

20  A    No.

21  Q    Did the defendant maintain a desk there?

22  A    No.

23  Q    Were there desks there that you used, though?

24  A    Yes.

25  Q    By the way, during your -- during your time at

S. Mulligan-Direct/Flynn

1550

1    Synergy, which -- withdrawn.

2            Do you or your family still own Synergy Fitness

3    centers?

4    A    Yes.

5    Q    Today?

6    A    Yes.

7    Q    And at any time have you known of anyone who was an

8    owner of any Synergy named Mattie Roth?

9    A    No.

10   Q    Or Matthew Roth?

11   A    No.

12   Q    What about an employee of Synergy Fitness named

13   Matthew or Matthew Roth?  Ever heard of anyone by that

14   name?

15   A    No.

16   Q     All right.

17            Mr. Mulligan, I would like to direct your

18   attention now specifically to December of 1999.

19            At or near that month do you recall being

20   approached by Mr. Gargiulo again regarding another

21   business venture?

22   A    Yes.

23   Q    Okay.

24            What happened?

25   A    He came to the defendant and myself and Eric Holzer

S. Mulligan-Direct/Flynn

1551

1   in regard to a space he found on 86th Street between

2   Second and Third Avenue and asked us to become partners

3   with him as he didn't have enough credit to sign the lease

4   to get the space.

5   Q    Well, what kind of space did he find?

6   A    It was a two-level storefront space.

7   Q    I mean, what was the -- to your knowledge, what was

8   Mr. Gargiulo intending to use that space for?

9   A    To attempt to do a second location for a gym.

10  Q    Okay.

11       And when Mr. Gargiulo -- well, withdrawn.

12       Who, if anyone, did Mr. Gargiulo approach to get

13  involved in this gym, the second gym?

14  A    Myself, the defendant and Eric Holzer.

15  Q    Okay.

16       Why -- to your knowledge, why was Mr. Gargiulo

17  coming to you and the defendant again?

18  A    He didn't have credit to sign for the lease.

19  Q    Okay.

20       Did you have credit?

21  A    Yes.

22  Q    To your knowledge, did the defendant have credit?

23  A    Yes.

24  Q    Okay.

25       After Mr. Gargiulo came to you and the

S. Mulligan-Direct/Flynn

1552

1    defendant, did you and Mr. Mulligan agree to help him?

2    A    Yes.

3    Q    And to your knowledge did the defendant agree to help

4    him as well?

5    A    Yes.

6    Q    As a result of agreeing to help Mr. Gargiulo, what

7    did you and the defendant agree to do?

8    A    We also agreed to have a partnership, not just the

9    help.

10   Q    Okay.

11        What do you mean by that?

12   A    We took a percentage of the location.

13   Q    When you say percentage, do you mean an ownership

14   interest?

15   A    Yes.

16   Q    Approximately how much of an ownership interest did

17   you take at this location?

18   A    A 30 percent split three ways between myself and the

19   defendant --

20   Q    What specifically did you and the defendant do to

21   help Mr. Gargiulo get started at this new location?

22   A    Myself and Mr. Holzer as -- signed for the lease, the

23   defendant signed for the credit card machine.  And we

24   helped him with all the vendors we were using at our

25   locations in Manhattan with regard to getting supplies and

S. Mulligan-Direct/Flynn

1553

1    equipment, etcetera.

2    Q    You say Mr. Tarantino signed for a credit card

3    machine?

4    A    Yes.

5    Q    How did that work?

6    A    You have to guarantee the machine, for some reason if

7    there is not enough money or someone fights a charge back

8    and they are not happy and they want to get out of a

9    location, they had the option of opting out.

10    Q    To your knowledge, did Mr. Tarantino personally sign

11    for Mr. Gargiulo's credit card machine?

12    A    Yes.

13    Q    Mr. Mulligan, in front of you is a packet of

14    documents.

15            MR. FLYNN:  Your Honor, may I approach for a

16    moment?

17            THE COURT:  Yes.

18    Q    In front of you is a packet of material marked SM-9.

19            Take a moment to look at that, if you would.

20            (Whereupon, at this time there was a pause in

21    the proceedings.)

22    Q    Do you recognize those documents?

23    A    Yes.

24    Q    What is Government's Exhibit SM-9?

25    A    This is a lease agreement that we signed between NRP

S. Mulligan-Direct/Flynn

1554

1    and Body Sculpt.

2    Q    Mr. Mulligan, if you would, would you try to keep

3    your voice up a little bit?

4    A    Yes.

5    Q    And please try to talk into the microphone in front

6    of you?

7    A    Yes.

8    Q    Thank you.

9            Do you recognize Government's Exhibit SM-9 as

10   the lease for Body Sculpt, Mr. Gargiulo's second gym that

11   he signed for personally?

12   A    Yes.

13           MR. FLYNN:  The government moves for the

14   admission of Government's Exhibit SM-9.

15           THE COURT:  No objection?

16           It is admitted in.

17           (Whereupon, Government's Exhibit SM-9 was

18   received in evidence.)

19   Q    Mr. Mulligan, Government's Exhibit SM-9 is appearing

20   on the screen in the courtroom.  It is on the monitor to

21   your left.

22           (At this time a document was exhibited on

23   courtroom screen.)

24   Q    Do you see it?

25   A    Yes.

S. Mulligan-Direct/Flynn

1555

1  Q    I have highlighted the top portion of the document.

2           Is this dated?  Is the lease dated?

3  A    Yes.

4  Q    What is the date?

5  A    January 4th, 2000.

6  Q    Does that comport with your recollection as to when

7  Mr. Gargiulo was asking you and the defendant for help to

8  open a gym?

9  A    Yes.

10 Q    There is an address -- well, withdrawn.

11          Who are the parties to this lease agreement?

12 A    Between NRP LLC and Body Sculpt.

13 Q    Who is NRP LLC?

14 A    The landlord.

15 Q    And who is the lessee for this agreement?

16 A    Body Sculpt Fitness Club.

17 Q    And what is that?

18 A    A corporation that Vinnie Gargiulo was the president

19 of.

20 Q    Below the parties to the lease there is an address

21 handwritten.  Do you see that?

22 A    Yes.

23 Q    What is the address?

24 A    242-244 East 79th Street, New York, New York.

25 Q    And do you recognize that as the address for

S. Mulligan-Direct/Flynn

1556

1    Mr. Gargiulo's second body Sculpt location?

2    A    Yes.

3    Q    And that he was attempting to open in the beginning

4    of 2000?

5    A    Yes.

6    Q    Mr. Gargiulo, I will turn your attention to the fifth

7    page of this lease, the same SM-9, and I'm on page 5 now.

8         Do you recognize any signatures on that

9    document?

10   A    Yes, Vincent Gargiulo.

11   Q    Okay.

12        Where do you see his signature?

13   A    In the middle of the page to the right.

14   Q    Okay.

15        In what capacity was Mr. Gargiulo signing this

16   lease in January of 2000?

17   A    As president of the company.

18   Q    And what company was that again?

19   A    Body Sculpt, 79th Street, Fitness.

20   Q    I'm now directing your attention to a little deeper

21   in the document to what is marked and what is now

22   appearing on the courtroom screen as

23   Government's Exhibit SM-9-008.

24        (At this time a document was exhibited on

25   courtroom screen.)

S. Mulligan-Direct/Flynn

1557

1   Q    Do you recognize this piece of paper on the screen

2   now?

3   A    Yes.

4   Q    What is it?

5   A    This is the guarantee that I signed.

6   Q    Okay.

7         And by signing this guarantee, to the best of

8   your recollection, what were you agreeing to do for

9   Mr. Gargiulo?

10  A    To be held fully responsible for any late payments or

11  any breach of contract.

12  Q    So if you missed a rent payment --

13  A    Yes.

14  Q    -- you would be responsible?

15  A    Yes.

16  Q    Is that your testimony?

17  A    Yes.

18  Q    And I am going to direct your attention to finally

19  Government's Exhibit SM-9-0011, the last page of the

20  guarantee.

21        Do you recognize the signatures on that

22  signature page?

23  A    Yes.

24  Q    Whose are they?

25  A    Myself and Eric Holzer.

S. Mulligan-Direct/Flynn

1558

1   Q    Again, who is Eric Holzer?

2   A    My partner in several locations.

3   Q    Gym locations?

4   A    Yes.

5   Q    And what is the date that you signed -- withdrawn.

6        What date did you sign this guarantee for

7   Mr. Gargiulo's Body Sculpt on East 79th Street?

8   A    December 23rd, 1999.

9   Q    To the best of your knowledge, after you signed the

10  guarantee and after the lease was in effect, did Body

11  Sculpt begin accruing gym members?

12  A    Yes.

13  Q    How did it happen?

14  A    We started to sell a pre-sale, we sold reduced price

15  memberships.

16  Q    Who is "we"?

17  A    Myself, the defendant, and Vincent Gargiulo and Eric

18  Holzer.

19  Q    In addition to running a pre-sale for memberships,

20  did you and the defendant assist Mr. Gargiulo in

21  physically setting up the gym?

22  A    Yes.

23  Q    How?

24  A    In regards to setting up the locker rooms, where

25  mirrors would be put in.  Just the basic layout of the

S. Mulligan-Direct/Flynn

1559

1    location.

2    Q    Like interior design?

3    A    Yes.

4    Q    Okay.

5          And did you and the defendant agree with

6    Mr. Gargiulo on how the gym should be run and maintained

7    once it was opened?

8    A    Umm, no.  We had different ideas.

9    Q    Would you be more specific?

10   A    He wanted to sell at certain rates.  We didn't want

11   to sell at a certain rate.  Our pricing was different.

12   His structure of how he wanted to end the pre-sale, how

13   long he wanted things to go before we changed the price on

14   the pre-sale.

15   Q    Did these differences in opinion between yourself and

16   the defendant on one side and Mr. Gargiulo on the other

17   cause a rift between the three of you?

18   A    Yes.

19   Q    How so?

20   A    Just caused small arguments, you know, where it was

21   becoming uncomfortable again with him.

22   Q    Okay.

23          Did these -- did this rift or small arguments

24   escalate to the point where you removed yourself from the

25   day-to-day operations again?

S. Mulligan-Direct/Flynn

1560

1   A    Yes.

2   Q    What happened?

3   A    Nothing.

4         After a few months into it, we just walked away

5   from it because we had a partnership in another location

6   nearby.  It was easier for us to walk away and dissolve

7   our partnership with him.

8   Q    Okay.

9         For approximately how long -- using January 2000

10  as a starting point when the lease was executed,

11  approximately how long were you and the defendant involved

12  in the day-to-day operations of Vinnie's Body Sculpt

13  before you walked away?

14  A    Roughly four months.

15  Q    And when you walked, did you -- did Mr. Mulligan

16  remove your name off the lease guarantee?

17  A    No.

18  Q    To your knowledge did Mr. Tarantino pull his name off

19  the credit card machine guarantee?

20  A    No.

21  Q    And did you -- well, in addition to signing the

22  lease, had you fronted cash for this -- for this second

23  location?

24  A    Yes.

25  Q    Approximately how much?

S. Mulligan-Direct/Flynn

1561

1   A    Roughly 50,000.

2   Q    Had Mr. Tarantino, to your knowledge, also fronted

3   capital for Mr. Gargiulo's gym?

4   A    He pledged the 50,000.

5   Q    The 50,000 was between the two of you?

6   A    Three.

7   Q    And the third person was --

8   A    Eric Holzer.

9   Q    When you removed yourself -- withdrawn.

10       When you and the defendant removed yourselves

11  from the day-to-day operations of the second Body Sculpt,

12  did you attempt to take out that money?

13  A    No.

14  Q    When you and the defendant left Body Sculpt, you

15  testified it was approximately April of 2000, were you

16  still friends with Mr. Gargiulo?

17  A    Yes.

18  Q    Was the defendant?

19  A    Yes.

20  Q    To your knowledge -- I'm sorry?

21  A    Yes.

22  Q    And in 2000 -- in April of 2000, which is what you

23  testified to, when you removed yourselves from the

24  day-to-day operations of Body Sculpt, was the gym still

25  operational?

S. Mulligan-Direct/Flynn

1562

1   A    Yes.

2   Q    On the upper east side?

3   A    Yes.

4   Q    At some point thereafter, after you and Christian

5   Tarantino removed yourself from the second Body Sculpt in

6   2000, did you become aware that Mr. Gargiulo was having

7   personal problems?

8   A    Yes.

9   Q    At some point after?

10  A    Yes.

11  Q    Please explain what you remember.

12  A    I remember getting a phone call from him that he was

13  in the hospital and that his club was in dire straits and

14  going out of business, if we can please help him out to

15  salvage the club.

16  Q    Back up for one second.

17       You testified that you were aware that

18  Mr. Gargiulo was in the hospital at some point?

19  A    Yes.

20  Q     All right.

21       To your knowledge, what sort of hospital was

22  Mr. Gargiulo in?

23  A    Drug rehabilitation.

24  Q    To your knowledge, where was that hospital located?

25  A    Manhattan.

S. Mulligan-Direct/Flynn

1563

1  Q    To your knowledge, how long did he live there in the

2  hospital?

3  A    A couple of months.

4  Q    Did you visit him there?

5  A    No.

6  Q    To the best of your recollection -- to your

7  recollection -- when did Mr. Gargiulo enter that hospital?

8  A    I don't recall what month he went in.

9  Q    Okay.

10         To the best of your recollection, when

11  Mr. Gargiulo entered the hospital, what happened to his

12  gym, Eastside -- sorry, Body Sculpt on the upper east

13  side?

14  A    He fell into arrears and the place was going deeper

15  and deeper into debt because no one was watching it or

16  running it properly.

17  Q    Did it concern you?

18  A    I wasn't aware of it at the time until I was told.

19  Q    How did you find out?

20  A    When I received the phone call from him that he was

21  losing the location is when I became concerned.

22  Q    Okay.

23         What specifically did Mr. Gargiulo ask you on

24  the phone -- withdrawn.

25         Where was Mr. Gargiulo physically when he called

1564

1    you?

2    A    He was in the hospital at that time.

3    Q    And during that conversation when he called you from

4    the hospital, what did he say?

5    A    He said he was losing the gym, and if I could please

6    speak to my partners, meaning the defendant and I, we

7    could please help him salvage the place and get out from

8    debt, and we could have as much percentage as we wanted of

9    the club at the time.

10   Q    And after you hung up the phone with Mr. Gargiulo,

11   did you speak with the defendant?

12   A    Yes.

13   Q    And what did the two of you talk about?

14   A    About taking over his location and running it and

15   having a percentage of that.  And we discussed taking one

16   of our managers out of a Long Island location and placing

17   him in there as an owner also.

18   Q    What was the name of that manager?

19   A    Joe Pitti, P-I-T-T-I.

20   Q    So at some point while Mr. Gargiulo was in the

21   hospital, did you again become involved with Body Sculpt?

22   A    Yes.

23   Q    Did the defendant?

24   A    Yes.

25   Q    Why were you getting involved again?

S. Mulligan-Direct/Flynn

1565

1  A    We were getting involved for, one, helping him out;

2  two, my name was still on it, and I liked that location.

3  Q    Your name was on what?

4  A    On the lease.

5  Q    Okay.

6         Were you successful in getting the gym back on

7  its feet after it had fallen into debt?

8  A    Yes.

9  Q    And what happened?

10 A    Joe Pitti, who was running it, when he ran pre-sales,

11 you know, family add-ons, and he generated a large amount

12 of money and paid down a lot of the bills he had accrued.

13 Q    What is a family add-on in gym parlance?

14 A    In other words, a family member can join at a

15 discounted rate.

16 Q    Okay.

17        So Pitti ran a sale to get more --

18 A    Capital.

19 Q    And were you -- and were you and the defendant

20 successful in using that capital to pay down some of the

21 debt?

22 A    Yes.

23 Q    And was Vinnie in the hospital while this was

24 occurring?

25 A    Yes.

S. Mulligan-Direct/Flynn

1566

```
 1   Q    And at some point thereafter did Mr. Gargiulo emerge
 2   from the mental hospital in Manhattan?
 3   A    Yes.
 4   Q    And at some point thereafter did he return --
 5   physically return to Body Sculpt?
 6   A    Yes.
 7   Q    The office?
 8   A    Yes.
 9   Q    What happened when he returned to Body Sculpt?
10   A    He came in and started to go through the checkbook
11   and ask questions where the money was, and trying to get
12   involved again with the day-to-day operations.
13   Q    All right.
14        After he went through the checkbook and looked
15   at the gym's finances, did fights or arguments ensue
16   between you and the defendant and him?
17   A    Yes.
18   Q    What happened?
19   A    He was upset with the fact that we took that money
20   and used it to pay bills, as he wanted us to go into our
21   pocket to pay down all the bills as opposed to using the
22   money from the gym to pay the bills down.
23   Q    I don't follow you.  Say it again.
24   A    The money generated from sales and memberships, we
25   used it to pay the bills down.  He expected us to go into
```

S. Mulligan-Direct/Flynn

1567

1   our own pocket to pay the bills down.

2           So he felt as if that money that was accrued

3   from the gym business was technically his.

4   Q    Did you and Mr. Gargiulo have words with

5   Mr. Gargiulo -- you and the defendant have words with

6   Mr. Gargiulo about this?

7   A    Yes.

8   Q    To your knowledge, did the defendant have arguments

9   about this?

10  A    Yes.

11  Q    Were you insulted by this?

12  A    Yes.

13  Q    Why?

14  A    We went in and saved the business he was losing.  And

15  once again he came out and went back to the old tricks he

16  used to do.

17  Q    All right.

18          What happened after discussion with Mr. Gargiulo

19  about the checkbook?

20  A    We started to argue at that point, going back and

21  forth.  We wound up pulling out of the gym.  And

22  everything happened right away.  And at which point

23  Mr. Gargiulo went and had people come in with tractor

24  trailers and unload all the equipment out in the middle of

25  the night.

S. Mulligan-Direct/Flynn

1568

1   Q    Wait.  Let's back up a second.

2              MR. ROSEN:  Judge, the only objection I have is

3   timeframe.

4              THE COURT:  All right.

5              Approximately when was this, sir?

6              THE WITNESS:  What month it was in?

7              THE COURT:  No.  What year and what month?

8              THE WITNESS:  2002.

9   Q    All right, let's do it this way:

10             Mr. Mulligan, do you know, was Mr. Gargiulo

11  eventually evicted from the space at Body Sculpt?

12  A    Yes.

13  Q    Was Body Sculpt evicted?

14  A    Yes.

15  Q    When was he evicted?

16  A    Evicted in 2002.

17  Q    Would anything refresh your recollection -- can I

18  show you anything that would refresh your recollection as

19  to when, what month Body Sculpt was evicted?

20  A    Yes.

21  Q    What?

22  A    I think it was February.  But if you have anything

23  from the Sheriff's Department or anything like that.

24             MR. FLYNN:  Your Honor, may I approach?

25             THE COURT:  Yes.

S. Mulligan-Direct/Flynn

1569

1    (Counsel approaches the witness stand.)

2    Q    When was Mr. Gargiulo's company evicted from its

3    space in Manhattan?

4    A    February 2002.

5    Q    All right.

6         So using -- using that date, that month,

7    February of 2002 as a benchmark or milestone,

8    approximately when -- approximately when did you begin

9    having the discussions or arguments with Mr. Gargiulo

10   regarding a checkbook?

11   A    I would say roughly around November, the prior of.

12   So it would be November of '01.

13   Q    All right.

14        Was the defendant involved in those arguments as

15   well?

16   A    Yes.

17   Q    And using the February 2002 milestone, eviction

18   milestone, approximately when did Mr. Gargiulo pull all

19   the equipment out of the gym?

20   A    He pulled out roughly around December of '01 into the

21   January -- beginning of January.

22   Q    We kind of glossed over that point, but why did he do

23   that to your knowledge?

24   A    He knew he couldn't run the club by himself.  He

25   wasn't getting along with us.  He took all the equipment

S. Mulligan-Direct/Flynn

1570

1   out to sell it and he took all the money out of the

2   checking accounts.

3   Q    All right.

4        So after Mr. Gargiulo had all the gym equipment

5   taken out of the gym in the middle of the night, what

6   happened when members came in to show up?

7   A    They came in.  They were mad.  They called up all the

8   credit card companies and stopped payment on all their

9   credit card bills, and some people even had to fight on

10  their credit cards for their money back.

11  Q    Did that actually occur in this incident?

12  A    Yes.

13  Q    In February of 2002?

14  A    Yes.

15  Q    Okay.

16  A    People started to do charge backs and no one

17  responded to the letters.  And they automatically would

18  try to take the money out of the account.  But there was

19  no money in the account.

20  Q    Okay.

21       And was Mr. Tarantino affected in any way by

22  these charge backs to the credit cards?

23  A    Yes.

24  Q    How so?

25  A    It affected his credit and then they started to pull

S. Mulligan-Direct/Flynn

1571

1   money out of another company that his personal guarantee

2   was on also.

3   Q    All right.

4        Were you affected in any way?  You signed the

5   lease guarantee?

6   A    I was equally affected.

7   Q    How so?

8   A    We were partners with him and I was splitting the

9   debt with him.

10  Q    Did you and the defendant take any action to protect

11  yourselves at this point?

12  A    Yes.

13  Q    What?

14  A    We shut the credit card machine off under his name in

15  a different location so they couldn't take any more money

16  out.

17  Q    And what else did you do?

18  A    And we made a deal to pay the credit cards.  Whatever

19  amount was due, we made a payment plan and made a price

20  with them to pay it off.

21  Q    And were you successful -- were you eventually

22  successful in doing that?

23  A    Yes.

24  Q    Was the defendant also successful eventually in

25  protecting his interest and his credit?

S. Mulligan-Direct/Flynn

1572

1   A    Yes.

2   Q    All right.

3        After this whole episode, did you and the

4   defendant remain in contact with Mr. Gargiulo?

5   A    No.

6   Q    What happened to your friendship -- well, what

7   happened to Scott Mulligan's friendship with Mr. Gargiulo?

8   A    There was no more.  I wanted no part of him.

9   Q    To your knowledge, what was -- what about the

10  defendant's friendship with Mr. Gargiulo?

11  A    There was none left there either.

12  Q    All right.

13       At around the same time, Mr. Mulligan, in 2001,

14  were you arrested and charged by the United States

15  Attorney's Office?

16  A    Yes.

17  Q    And in 2001 what were you charged with?

18  A    Conspiracy to distribute marijuana.

19  Q    And after you were arrested in 2001, did you remain

20  out on bail pending the resolution of that case?

21  A    Yes.

22  Q    And in May of 2002 did you plead guilty?

23  A    Yes.

24  Q    And were you eventually sentenced?

25  A    Yes.

S. Mulligan-Direct/Flynn

1573

1    Q    Where were you sentenced?

2    A    Devans, Massachusetts.

3    Q    Were you in a courtroom when you were sentenced?

4    A    Sorry?

5    Q    Did you get sentenced in court?

6    A    Yes.

7    Q    Where were you?

8    A    Brooklyn.

9    Q    Okay.

10        What were you sentenced to?

11   A    37 months.

12   Q    All right.

13        Did you eventually report to prison?

14   A    Yes.

15   Q    Where did you serve your term of incarceration for

16   your marijuana conspiracy conviction?

17   A    Devans, Massachusetts.

18   Q    Where is that?

19   A    Massachusetts.

20   Q    All right.

21        Is that what is known as a federal medical

22   facility?

23   A    Yes.

24   Q    All right.

25        To your knowledge, why were you designated to

S. Mulligan-Direct/Flynn

1574

1   serve your incarceration in a medical facility in

2   Massachusetts?

3            MR. ROSEN:  Objection.  Relevancy.

4            THE COURT:  Overruled.

5   A    To take a drug and alcohol class.

6   Q    Okay.

7            What is that drug and alcohol class called?

8   A    It is a program, a 500 hour program.

9   Q    Okay.

10            To your knowledge, are there certain

11   requirements that a prisoner has to satisfy before he or

12   she is accepted into that 500 hour alcohol program?

13   A    Yes.  You have to have some kind of background in

14   alcohol abuse or drug abuse.

15   Q    All right.

16            What date did you report to the institution in

17   Massachusetts?

18   A    January 3rd of 2003.

19   Q    And prior to serving that sentence, prior to

20   reporting to prison, had you used drugs and alcohol in

21   your life?

22   A    Yes.

23   Q    What sorts of drugs had you used?

24   A    I have experimented in almost everything.  I used

25   alcohol, cocaine, marijuana, mushrooms, GHB.

S. Mulligan-Direct/Flynn

1575

1   Q    And had you been previously arrested for driving

2   while intoxicated?

3   A    Yes.

4   Q    And how many times?

5   A    Twice.

6   Q    All right.

7        You testified you reported to the prison on

8   January 3rd, 2003; is that right?

9   A    Yes.

10  Q    And at some point prior to that, and after the

11  eviction of -- in February of 2002, did you receive

12  messages from Mr. Gargiulo?

13  A    Yes.

14  Q    What happened?

15  A    I came home one night with him leaving messages on my

16  answering machine, raging, cursing me out, and telling me

17  if I -- if my -- his name comes out of my mouth again he

18  would have to kill me.  And eventually I would be sorry.

19  When you see what I have on you, you will be sorry.

20  Q    What was that last part?

21  A    When you see what I have on you, you will be sorry.

22  You wait and see.

23  Q    Well, had you done something to Mr. Gargiulo to force

24  him to leave a message on your answering machine?

25  A    Yes, I --

S. Mulligan-Direct/Flynn

1576

1        MR. ROSEN:  Self-serving.

2        THE COURT:  All right.

3        Please approach.

4        (Continued on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

S. Mulligan-Direct/Flynn

1577

1          (Whereupon, at this time the following took

2    place at the sidebar.)

3          THE COURT:  Your objection?

4          MR. ROSEN:  It is self-serving.

5          MR. FLYNN:  I don't know how it is, your Honor.

6          THE COURT:  He will say he didn't do anything --

7          MR. MISKIEWICZ:  He did do something.

8          He will testify that he was bad mouthing Vinnie.

9    It is just to connect up the story, he was bad mouthing

10   Vinnie around Bellmore, calling him a potential rat.

11   Things like that.  And that was -- his understanding is

12   that got back to Vinnie and that is why Vinnie leaves this

13   voice message on his answering machine in which he says,

14   you are going to be sorry, I got something on you.  Don't

15   ever talk about me again, that kind of thing.

16         THE COURT:  What does it have to do with the

17   defendant?

18         MR. FLYNN:  The defendant comes over and

19   listens -- he comes over the next day and listens to the

20   message.  Scott plays it for him.  Mulligan plays it for

21   him.

22         They have a conversation about Vinnie and his

23   statement.  That is it.

24         THE COURT:  It does show the defendant was aware

25   of this incident.

S. Mulligan-Direct/Flynn

1578

1      MR. ROSEN:  Only after the fact when he heard

2  the tape.  But not before.  Not any of this.

3      MR. FLYNN:  I don't follow.

4      MR. ROSEN:  About the bad mouthing in Bellmore

5  and stuff like that.  That you just talked to the Judge

6  about.  The defendant had nothing to do with that.  He

7  wasn't present.

8      MR. FLYNN:  What difference?  He heard the

9  message from Mulligan.

10      MR. ROSEN:  It is after the fact.

11      MR. FLYNN:  The next day.

12      THE COURT:  It acquaints him with the fact that

13  Gargiulo is making threats.  And I think for that reason

14  it is probative.

15      MR. ROSEN:  Not probative of my client's state

16  of mind.

17      THE COURT:  No.  But certainly to his.

18      MR. ROSEN:  Then let him say that.

19      MR. FLYNN:  He can bring it up on cross.

20      MR. ROSEN:  Why would I?

21      THE COURT:  The issue now is whether or not he

22  can testify as to something that provoked Gargiulo to make

23  these threats vis-a-vis him.  And I will allow it.

24      MR. ROSEN:  As long as he talks about himself,

25  fine.

S. Mulligan-Direct/Flynn

1579

1          THE COURT:  He didn't bring the defendant in.

2          MR. ROSEN:  He was going to.

3          THE COURT:  No.  What caused --

4          MR. ROSEN:  I can show you the follow-up.

5          THE COURT:  Later on he can bring out the fact,

6     as the government alleges, that the message from Gargiulo,

7     the threat, was played to the defendant.  And I will allow

8     that testimony.

9               (Continued on next page.)

S. Mulligan-Direct/Flynn

1580

```
1              (Whereupon, at this time the following takes
2   place in open court.)
3              THE COURT:  The objection is overruled.
4              MR. FLYNN:  Your Honor, may I continue?
5              THE COURT:  Yes.
6              MR. FLYNN:  Thank you.
7   Q    You got a voice message on your answering machine?
8   A    Yes.
9   Q    And had you said something around town, or had you
10  done something that in your estimation caused Mr. Gargiulo
11  to call you?
12  A    Yes.  I was bad mouthing him.
13  Q    How so?
14  A    I was calling him a rat and scum bag, piece of shit.
15  Q    Why?  Why were you doing that?
16  A    Because I was mad what he had done to me in regard to
17  sticking me with the bill from Body Sculpt.
18  Q    When you first heard Mr. Gargiulo's message on your
19  answering machine, were you certain who it was?
20  A    No.
21  Q    Why?
22  A    I wasn't -- he was raging.  I didn't recognize his
23  voice at first.
24  Q    Did Mr. Tarantino eventually hear Mr. Gargiulo's
25  message?
```

S. Mulligan-Direct/Flynn

1581

1  A    Yes, the following day.

2  Q    What happened?

3  A    He confirmed to me that it was Vinnie.

4  Q    And what else -- did he say anything else, the

5  defendant?

6  A    No.

7        Basically he was whacked out of his mind at the

8  time.  And we just didn't understand what he was flipping

9  about.  That was really it.

10 Q    Okay.

11       When did Mr. Gargiulo leave this message on your

12 answering machine time-wise in relation to when you left

13 the prison on January 3rd -- left for prison on

14 January 3rd, 2003?

15 A    Roughly a little over a month.

16 Q    By the way, did your wife also hear this message on

17 your answering machine?

18 A    Yes.

19 Q    Mr. Mulligan, you testified a moment ago that in this

20 voice mail message that Mr. Gargiulo left on your home

21 phone, Vinnie said something along the lines that he had

22 something on you; is that correct?

23 A    Yes.

24 Q    And at some point later in time after you were

25 ultimately released from prison in 2004, did you become

S. Mulligan-Direct/Flynn

1582

1  aware that Mr. Gargiulo had years earlier recorded a

2  conversation between himself and the defendant in this

3  case?

4  A    That he had made a tape.  I didn't know what it

5  consisted of.

6  Q    Okay.

7        Well, did you eventually at some point, at any

8  time, become aware that that tape contained information

9  regarding the 1994 armored car robbery and Louis Dorval's

10 murder?

11 A    Yes.

12        MR. FLYNN:  Your Honor, may I approach?

13        THE COURT:  Yes.

14        (Counsel approaches the witness stand.)

15 Q    Mr. Mulligan, I have handed you what has been

16 previously admitted into evidence in this case as

17 Government's Exhibit KM-5.

18        Do you recognize that piece of physical

19 evidence?

20 A    Yes.

21 Q    What is it?

22 A    It is a DVD cassette.

23 Q    And prior to appearing for your testimony here today,

24 have you reviewed the contents of that disk?

25 A    Yes.

S. Mulligan-Direct/Flynn

1583

1    Q    And how do you know that?

2    A    Because I put my initials on the front of it.

3    Q    Do you see your initials on the front of the compact

4    disk here today?

5    A    Yes.

6    Q    What is on that disk?

7    A    A taped conversation between the defendant and Vinnie

8    Gargiulo.

9    Q    And prior to you appearing here for your testimony

10   today, have you listened to it?

11   A    Yes.

12   Q    And were you able to recognize the voices on the

13   disk?

14   A    Yes.

15   Q    Whose voices are they?

16   A    The defendant and Vincent Gargiulo.

17   Q    Any doubt about that?

18   A    No.

19        MR. FLYNN:  Your Honor, at this point I would

20   like to play a selected portion of the recording with

21   Mr. Mulligan on the stand.

22        THE COURT:  I will let you do that, but let's

23   have our mid-morning break.

24        Do not talk about the case.

25        15 minutes.

S. Mulligan-Direct/Flynn

1584

1          (Whereupon, at this time the jury leaves the

2     courtroom.)

3

4          (Whereupon, a recess was taken.)

5

6          THE COURT:  Please bring out Mr. Mulligan, and

7     then please bring the jury in.

8          Mr. Flynn, approximately how much longer do you

9     think you have?

10         MR. FLYNN:  Half an hour to 40 minutes, your

11     Honor.

12         THE COURT:  All right.

13         (Whereupon, the jury at this time entered the

14     courtroom.)

15         THE COURT:  Please be seated.

16         We are ready to resume.

17         MR. FLYNN:  Thank you, your Honor.

18     Q   Mr. Mulligan, when we broke you identified

19     Government's Exhibit KM-5 as a disk that contains a

20     conversation -- a recording of a conversation between the

21     defendant and Mr. Gargiulo; do you recall that?

22     A   Yes.

23     Q   And I would like to play portions of that recording

24     now.

25         So if you have a pair of headsets in front of

S. Mulligan-Direct/Flynn

1585

1   you, please keep those on.  There is a switch on the

2   right-hand side.  Please turn it to on, so the green light

3   goes on.

4           MR. FLYNN:  Ladies and gentlemen, I will ask

5   that you do the same.

6           (Tape recording referred to is played.)

7   Q    Mr. Mulligan, as a result of your long-standing

8   relationship with the defendant in this case, were you

9   aware that in 2000, and before that date, he had used

10  Melvyn Roth as his attorney?

11  A    Yes.

12  Q    Did you have your DNA taken in connection with this

13  matter?

14  A    Yes.

15  Q    And when did that occur, approximately?

16  A    June of 2000.

17  Q    And are you aware as to whether the defendant had his

18  DNA taken?

19  A    Yes.

20  Q    And did you have conversations with the defendant

21  about that?

22  A    Yes.

23  Q    And as a result of those conversations --

24          MR. ROSEN:  Judge, the only objection I have is

25  when.

S. Mulligan-Direct/Flynn

1586

1    THE COURT:  Excuse me?

2    MR. ROSEN:  When?

3    THE COURT:  Try to narrow it down to the year.

4  Q    Where was the defendant when he had his DNA taken?

5  A    He was at Willard, upstate New York.

6  Q    What is Willard?

7  A    It is a shock program with the New York State

8  prisons.

9  Q    Approximately when did the DNA have his D -- the

10  defendant have his DNA taken based on your conversation?

11  A    Approximately at the same time also.

12    MR. ROSEN:  The objection is when did he have

13  the conversation, not when he was at Willard.

14    THE COURT:  When did you have the conversation

15  with Mr. Tarantino?

16    THE WITNESS:  Roughly five months later.

17    THE COURT:  All right.

18  Q    Put your headset back on, please.

19    (Whereupon, at this time there was a pause in

20  the proceedings.)

21  Q    Mr. Mulligan, when you and the defendant and

22  Mr. Smyth and Mr. Dorval committed the armored car robbery

23  in 1994, how many vehicles did your group use?

24  A    Two.

25  Q    And based on your knowledge and discussions with the

S. Mulligan-Direct/Flynn

1587

1  defendant, what car did the defendant and Mr. Smyth pull

2  up into the robbery scene with?

3  A    The red Blazer.

4  Q    What happened to that car after the robbery was

5  concluded?

6  A    It was left behind at the scene.

7  Q    And based upon your knowledge of the robbery, what

8  car did the defendant, Mr. Smyth and Mr. Dorval flee the

9  scene in?

10  A    A white Infiniti Q 45.

11  Q    And did you see that car that day?

12  A    Yes.

13  Q    Where?

14  A    I saw it drive past me on Jericho Turnpike and in the

15  back of the Miller warehouse.

16            (Tape recorded conversation continues and is

17  interrupted.)

18  Q    Mr. Mulligan, the red Chevy Blazer that you used

19  during the armored car robbery in Syosset in '94, from

20  where did you obtain that vehicle?

21  A    Hicksville, car dealership off of 106.

22  Q    How did you obtain it?

23  A    Stole it.

24  Q    How did you --

25            MR. ROSEN:  Objection.  Cumulative.

S. Mulligan-Direct/Flynn

1588

1    Repetitious.

2              THE COURT:  Okay.

3              Overruled.

4    Q    Who stole it?

5    A    Myself and the defendant.

6    Q    Between the winter of 1994 and June of 1994 when the

7    murder happened, did you and Mr. Tarantino and others use

8    the car?

9    A    Yes.

10             (Taped conversation continues and is

11   interrupted.)

12   Q    Mr. Mulligan, the red Chevy Blazer that was used

13   during the Syosset armored car robbery in 1994, was that

14   car cleaned ahead of time?

15   A    Yes.

16   Q    Who specifically cleaned the car?

17   A    Rob Smyth.

18   Q    Where?

19   A    In Miller's warehouse.

20   Q    When?

21   A    The day prior of.

22   Q    What did Rob Smyth clean the Blazer with?

23   A    Vacuum and Windex.

24   Q    Did you witness Mr. Smyth clean the vehicle?

25   A    Yes.

S. Mulligan-Direct/Flynn

1589

1  Q    Was the defendant there as well?

2  A    Yes.

3  Q    To the best of your recollection, for how long did

4  Mr. Smyth clean the Blazer at Mr. Miller's warehouse?

5  A    A few hours.

6  Q    Again, what was the purpose of cleaning the Blazer

7  that day?

8  A    To make sure there was no fingerprints and no DNA

9  left behind.

10        (Tape recorded conversation continues and is

11  interrupted.)

12  Q    Mr. Mulligan, what color was the red Chevy Blazer?

13  A    Red.

14        (Tape recorded conversation continues and is

15  interrupted.)

16  Q    Mr. Mulligan, in the summer of 2000 did you leave the

17  country for a period of time?

18  A    Yes.

19  Q    Where did you go?

20  A    Costa Rica.

21  Q    Sorry?

22  A    Costa Rica.

23  Q    With whom did you go to Costa Rica?

24  A    I went down and met a friend there and my wife later

25  met me there.

S. Mulligan-Direct/Flynn

1590

1    Q    How long were you down there for?

2    A    Roughly a month.

3    Q    Why did you go to Costa Rica?

4    A    To wait and see what happened with my DNA when it

5    came back.

6    Q    What do you mean by that?

7    A    I wasn't sure if my DNA would have came up with the

8    vehicle or not.

9              (Tape recorded conversation continues and is

10    interrupted.)

11    Q    Mr. Mulligan, the victim during the armored car

12    robbery in Syosset in 1994, Mr. Baumgardt, are you aware

13    how he was employed at the time?

14    A    Yes.

15    Q    How was he employed?

16    A    He was a driver for an armored car company.

17    Q    All right.

18              (Tape recorded conversation continues and is

19    interrupted.)

20    Q    Mr. Mulligan, other than you, the defendant,

21    Mr. Dorval, who was the fourth individual who committed

22    the armored car robbery that left Mr. Baumgardt dead?

23    A    Rob Smyth.

24              (Tape recorded conversation continues and is

25    interrupted.)

S. Mulligan-Direct/Flynn

1591

1  Q    Mr. Mulligan, where were you and the defendant when

2  you disposed of Louis Dorval's body?

3  A    Out in the Atlantic Ocean.

4  Q    And during that disposal, did you squish the

5  defendant's finger?

6  A    Yes.

7         MR. ROSEN:  The only objection I have is we have

8  gone through this three times.

9         THE COURT:  Okay.

10         Your objection is noted and overruled.

11  Q    How did you squish the defendant's finger?

12  A    Dropped a boulder on it.

13  Q    And based on your subsequent conversations with

14  Mr. Tarantino, was he worried about leaving his DNA

15  behind?

16  A    Yes.

17  Q    What did he say to you?

18  A    Concerned about the blood and maybe some scrapes off

19  his arm being on the rock.

20  Q    And based on your recollection of the events during

21  August of 1994, how long was Mr. Dorval's body at sea

22  before it was recovered?

23  A    Two or three days.

24         (Tape recorded conversation continues and is

25  interrupted.)

S. Mulligan-Direct/Flynn

1592

1  Q    Mr. Mulligan, did you engage in conversations with

2  the defendant regarding the need for you to remain quiet

3  about the Baumgardt/Dorval murders?

4  A    Yes.

5  Q    And approximately when did these conversations occur?

6  A    All during the timeframe afterwards, after the whole

7  thing happened.

8  Q    Do you have an approximate year?

9  A    Yes, '94.

10  Q    And what was said between you and the defendant?

11  A    Basically to keep my mouth shut and not to talk about

12  it when I'm out or at a bar or drinking or anything, that

13  nothing slips out.

14  Q    Approximately how many times did you have this sort

15  of conversation regarding the need to remain quiet about

16  the armored car robbery and Louis Dorval's murder?

17  A    I'm guessing, maybe three or four times.

18          (Tape recorded conversation continues and is

19  interrupted.)

20  Q    Mr. Mulligan, were you physically served with a

21  subpoena which required you to provide a DNA sample with

22  respect to the Baumgardt and Dorval murders?

23  A    No.

24          MR. ROSEN:  Objection.  Third time asked and

25  answered.

S. Mulligan-Direct/Flynn

1593

1    THE COURT:  Overruled.

2  Q    Yes or no?

3  A    No.

4  Q    Was anyone in your family served with a subpoena?

5  A    Yes.

6  Q    Who?

7  A    My wife.

8  Q    Okay.

9        And to your knowledge, who served your wife

10  Manon Mulligan with that subpoena for DNA?

11  A    Detective Jack Kennedy.

12  Q    How did you know Jack Kennedy in 2000?

13  A    I have known him from prior, all the years I was

14  growing up in my neighborhood.  He used to come around

15  with respect to my brother and crimes.

16        (Tape recorded conversation continues.)

17  Q    Mr. Mulligan, you previously testified that the

18  individual that you and the defendant were with when you

19  dumped Mr. Dorval's body in the ocean was Craig Miller; is

20  that correct?

21  A    Yes.

22  Q    Did you know Craig Miller prior to that date?

23  A    Yes.

24  Q    How did you know him?

25  A    Selling weed, marijuana.

S. Mulligan-Direct/Flynn

1594

1  Q    Did you also know someone by the name Greg Ryder?

2  A    Yes.

3  Q    And on previous occasions had you sold marijuana with

4  Greg Ryder and Craig Miller together?

5  A    Yes.

6         (Tape recorded conversation continues and is

7  interrupted.)

8  Q    At some point after the armored car robbery and the

9  murder of Julius Baumgardt, do you recall a conversation

10  which you engaged in with the defendant regarding his

11  concern that someone he knew was present during the time

12  of the robbery?

13  A    Yes.

14  Q    Please tell us about that conversation.

15  A    He was concerned that Jimmy Contacessa might have saw

16  him.  He was out there previously looking at the job

17  before it was done.

18  Q    Who is Jimmy Contacessa?

19  A    Someone we had known from before, from Spats and --

20  Spratts, which is a bar, and he used to go to the Hamptons

21  house in Westhampton that we had -- he had time shares in.

22  Q    And did you have an understanding as to where Jimmy

23  Contacessa worked in 1994?

24  A    Yes.  A brokerage firm inside the same location where

25  the armored car robbery took place.

S. Mulligan-Direct/Flynn

1595

1  Q    Mr. Mulligan, that concludes the portion of the

2  recording.

3         You previously testified that you reported to

4  federal prison as a result of the marijuana conviction on

5  January 3, 2003.  Do you recall that?

6  A    Yes.

7  Q    And prior to reporting to federal prison in 2003, did

8  you have occasion to meet an individual by the name of

9  Justin Bressman?

10 A    Yes.

11 Q    And where did you meet him?

12 A    I met him on 23rd and Third at Synergy Gym.

13 Q    And, again, the gym on 23rd and Third -- withdrawn.

14 What gym?

15 A    Synergy Fitness.

16 Q    And as you previously testified, did the gym on 23rd

17 and Third on the east side, did that have some special

18 importance for the Synergy Gym chain?

19 A    Yes.

20         That was where basically we did all our back

21 office work.

22 Q    And what sort of work did Justin Bressman do for

23 Synergy Fitness?

24 A    He did sales and personal training.

25 Q    Mr. Mulligan, I'm showing you what is previously

S. Mulligan-Direct/Flynn

1596

1  admitted in evidence in this case as

2  Government's Exhibit RG-2.

3          (At this time a document was exhibited on

4  courtroom screen.)

5  Q    Do you recognize the individual depicted in that

6  photograph?

7  A    Yes.

8  Q    Whom do you recognize him to be?

9  A    Justin.

10  Q    How many times did you meet Justin Bressman in 2002

11  prior to reporting to prison?

12  A    At least a half a dozen times.

13  Q    Are you aware as to whether the defendant had a

14  relationship with Justin Bressman?

15  A    Yes.

16  Q    What kind of relationship did the defendant have with

17  Justin Bressman?

18  A    They worked out together at times.  He worked for us

19  at different locations in the gym because we moved some of

20  our employees around at times.  He was one of Chris's

21  cronies, he followed Chris.

22  Q    What was that, sorry?

23  A    He was one of Chris's little cronies.

24  Q    Did you come to understand -- withdrawn.

25          Did you come to understand just how close Justin

S. Mulligan-Direct/Flynn

1597

1  Bressman was to the defendant?

2  A    At the time they were just good friends and he was an

3  employee.

4  Q    You used the term "cloney," what did you mean by

5  that?

6        MR. ROSEN:  I thought he said "crony."

7        THE COURT:  I heard "cloney," it doesn't matter.

8  It is the jury's recollection.

9        What word did you use?

10       THE WITNESS:  Crony.

11       THE COURT:  Crony.

12 Q    Would you describe their relationship as one of

13 mentor, mentee?

14 A    Yes.  He liked to follow Chris around.  Chris was fun

15 and had a good personality.  He was fun to be with and he

16 was his boss.

17 Q    Well, did you observe -- did you ever have occasion

18 to see the defendant speaking with Justin Bressman?

19 A    Yes.

20 Q    Did you ever speak to the defendant about Justin

21 Bressman?

22 A    Just with regard to business.

23 Q    Well, what did the defendant say about Justin

24 Bressman?

25 A    He liked him, mentioned he had a drug problem at

S. Mulligan-Direct/Flynn

1598

1    times.

2    Q    Did you ever have occasion with the defendant and

3    Mr. Bressman to interact outside of work?

4    A    I would like to say we went to a strip club one or

5    two nights.

6    Q    All right.

7         Who else was there?

8    A    Mainly all the member -- workers from the gym and

9    partners.

10   Q    During the time that you saw Justin Bressman working

11   for Synergy, did Mr. Bressman work for one particular gym

12   or for multiple gyms?

13   A    Most -- he worked for multiple.  We moved our

14   employees around a lot in the gyms.

15   Q    And during this period of time did you observe

16   Mr. Bressman working at gyms owned by the defendant,

17   Mr. Tarantino?

18   A    One.

19   Q    Which one?

20   A    93rd and Second.

21   Q    On the upper east side?

22   A    Yes.

23   Q    Of Manhattan?

24   A    Yes.

25   Q    Did you also have an understanding as to whether

S. Mulligan-Direct/Flynn

1599

1   Mr. Bressman knew Mr. Gargiulo, Vincent Gargiulo?

2   A    Yes.

3   Q    How do you know that?

4   A    Just in our conversations.

5   Q    Well, would you see the two of them together?

6   A    I would like to say we -- I think we saw them at the

7   strip club together.  That is where we were together

8   hanging out with.  Scores, if I remember correctly.

9   Q    Scores?

10  A    Yes.

11  Q    Do you have an understanding of seeing Mr. Bressman

12  and Mr. Gargiulo using drugs together?

13  A    No.

14  Q    Prior to reporting to federal prison, Mr. Mulligan,

15  in January of 2003, was Vincent Gargiulo alive?

16  A    Yes.

17  Q    And during your term of imprisonment in

18  Massachusetts, did you become aware that Vincent Gargiulo

19  had been murdered?

20  A    Yes.

21  Q    How did you learn of his death?

22  A    My wife, when I phoned home.

23  Q    While you were in prison, how often would you speak

24  with your wife?

25  A    I would call once a day.

S. Mulligan-Direct/Flynn

1600

1   Q    On this particular occasion when you called home and

2   learned that Vinnie had died, what was your reaction?

3   A    I was shocked and I would ask her several times what

4   had happened.

5   Q    Well, after learning of Mr. Gargiulo's death, did you

6   attempt to obtain additional information regarding the

7   specifics of what had happened to him?

8   A    Yes.

9   Q    From whom?

10  A    I asked her to ask the defendant and Keith

11  Pellegrino.

12  Q    You said her, who are you referring to?

13  A    My wife.

14  Q    Who?

15  A    My wife, Manon.

16  Q    Okay.

17       Well, without telling us what your wife said,

18  what did you ask her to do specifically?

19  A    I asked her to speak to these guys and find out what

20  had happened to him and if they knew anything.

21  Q    Did you call your wife more than once seeking

22  information regarding Vinnie's murder?

23  A    Yes.

24  Q    And shortly after these repeated phone calls to your

25  wife seeking information about Vinnie's murder, did your

1601

1    wife come visit you in prison in Massachusetts?

2    A    Yes.

3    Q    Mr. Mulligan, I'm going to place on the overhead

4    projector what has been previously admitted into evidence

5    in this case as Government's Exhibit -- defense exhibit,

6    Defendant's Exhibit G, as in Gulf.

7              (At this time a document was exhibited on

8    courtroom screen.)

9    Q    Can you see that?

10   A    Yes.

11   Q    Okay.

12             What this is, Mr. Mulligan, this is a -- your

13   register of visitors from when you were in prison in

14   Massachusetts in 2003.

15             I will direct your attention specifically to

16   this line where my finger is -- two lines there.

17             The date is September 4th, 2003.

18             Do you see that?

19   A    Yes.

20   Q    Does that comport with your recollection as to when

21   your wife came to visit you in prison in Massachusetts

22   after Vinnie's murder?

23   A    Yes.

24   Q    Who did your wife come with to the prison on that

25   occasion after Vinnie's murder?

S. Mulligan-Direct/Flynn

1602

1   A    My son and her mother -- and my mother, Marilyn

2   Mulligan.

3   Q    Do you see your mother's name there, Marilyn

4   Mulligan?

5   A    Yes.

6   Q    And under that you see your wife's name, Manon?

7   A    Yes.

8   Q    And during that visit, early September around Labor

9   Day weekend 2003, did you engage your wife in a

10  conversation?

11  A    Yes.

12  Q    Where did that conversation occur in the prison?

13  A    In the visiting room .

14  Q    Okay.

15       Please describe what that room looked like in

16  2003.

17  A    A day room with chairs lined up against each other

18  with vending machines across the back wall.

19  Q    How big is it?

20  A    A little smaller than this courtroom.

21  Q    Okay.

22       When your wife came to visit you in September of

23  2003, were you two alone in that room?

24  A    At times.

25  Q    Well, at other times who was in the room?

S. Mulligan-Direct/Flynn

1603

1  A    Other inmates .

2  Q    Okay.

3        Well, was your mother there when you spoke to

4  your wife?

5  A    At times.

6  Q    Okay.

7        At some point when your wife came to visit you

8  during this meeting, visit, did you engage her in a

9  private conversation?

10 A    Yes.

11 Q    Okay.

12       And what did the two of you discuss at first?

13 A    Chris said to stop working -- worrying about the

14 gyms, let him run it.

15 Q    Is there a back story about that, Chris said not to

16 worry about the gyms?

17 A    Yes.

18       They were trying to switch things over to EFT's

19 at the time.  And I wasn't happy with switching it over at

20 one time.  I wanted to do it gradually.

21 Q    Let's back up for a second.

22       In September of 2003 were you partners with the

23 defendant at Synergy Gym?

24 A    Yes.

25 Q    What is an EFT?

S. Mulligan-Direct/Flynn

1604

1    A    Electronic funds transfer.

2    Q    What does that mean?

3    A    That is when they automatically bill the credit card

4    monthly.

5    Q    What is the alternative?

6    A    Pay in full.

7    Q    Okay.

8         So in September of 2003, was there some sort of

9    switch going on regarding the billing process?

10   A    Yes.

11        We were trying to force all the members to do a

12   billing as opposed to pay it in full.

13   Q    All right.

14        And had you -- well, prior to the meeting with

15   your wife, had you given her a message to give to the

16   defendant regarding this EFT business?

17   A    Yes.

18        I kept saying to try to do it gradually, as a

19   friend of ours, Damon Rauccie, almost went bankrupt when

20   he tried to force all these people to doing EFT's as

21   opposed to paying in full.

22   Q    All right.

23        So when your wife comes to visit you in

24   September of 2003, again, what is the first thing she says

25   to you in the day room?

S. Mulligan-Direct/Flynn

1605

1   A    She brings up the business with the gyms.

2   Q    And what did she say specifically with regard to the

3   defendant?

4   A    That he told me to do my time and stop worrying about

5   the gym.  He would take care of it.

6   Q    Did you have a reaction to that?

7   A    Yes.  I was pissed.

8   Q    Why?

9   A    Because I felt I built everything up, up to that

10  time, and I was being discredited of everything that I

11  built.

12  Q    After this message was related to you about the EFT's

13  and don't worry about the gyms, did your wife pass another

14  message to you in the day room in the prison in

15  Massachusetts in September of 2003?

16  A    Yes.

17  Q    What did she say?

18  A    She said that Chris said to stop asking questions

19  about Vinnie.

20  Q    Okay.

21       What was your reaction?  Did you have a

22  reaction?

23  A    No.  I didn't say anything.  I didn't know what it

24  meant.

25  Q    Well, by August of 2003, or September of 2003, how

1606

1    well did you know the defendant?

2    A    I knew him very well.  We were extremely close.

3    Q    Mr. Mulligan, in what month were you ultimately --

4    well, withdrawn -- well, let me ask you.

5         In what month were you ultimately released from

6    the federal medical facility in Massachusetts?

7    A    August of 2004.

8    Q    And that would be approximately a year later?

9    A    Yes.

10   Q    During that year after your wife came to visit you in

11   September of 2003, did you ask her any more questions

12   regarding Vinnie or Vinnie's murder?

13   A    No.

14   Q    During that year that you were in prison, did your

15   wife ever tell you that she had received a letter at her

16   home in January of '03 from Vinnie?

17   A    No.

18   Q    In August -- August 6th of '04, when you finished

19   serving time in Massachusetts, were you required to finish

20   out the end of your sentence in a different facility?

21   A    Yes.  In a halfway house in West Palm Beach, Florida.

22   Q    Sorry, what kind of a house?

23   A    A halfway house.

24   Q    For the jury, what is a halfway house?

25   A    You go to work during the day and you stay there

S. Mulligan-Direct/Flynn

1607

1    nights and weekends.

2    Q    And where was this halfway house?

3    A    West Palm Beach, Florida.

4    Q    And in August of 2004 when you were released from

5    Massachusetts, where was your wife living at the time?

6    A    In Boca Raton, Florida.

7    Q    Had she moved at that point?

8    A    Yes.

9    Q    And when you were released from the prison on

10   August 6th, 2004, did you have some sort of break in time

11   before that that you had to report to the halfway house?

12   A    Yes.

13   Q    How long was that break?

14   A    Roughly eight hours.

15   Q    How did you get physically down to Florida to begin

16   the halfway house portion of your sentence from

17   Massachusetts?

18   A    I flew.

19   Q    From where did you fly?

20   A    Logan Airport to West Palm Beach.

21   Q    What did you do with the ten to twelve hour break you

22   had from Boston to Florida?

23   A    I got out that morning.  Tom Garrett picked me up.  I

24   went back to a hotel where he was staying, Eric Holzer was

25   staying, Keith Pellegrino and the defendant.  And we all

S. Mulligan-Direct/Flynn

1608

1   had breakfast together.  And from there we --

2   Q   What hotel were they staying in?

3   A   I think it was a Hyatt.

4   Q   And where was that hotel in relation to the Devans

5   prison?

6   A   About a mile, two miles away.

7   Q   All right.

8         And, again, who was there when they got to the

9   hotel after Tom Garrett picked you up?

10  A   The defendant, Keith Pellegrino and Eric Holzer.

11  Q   What were they doing?

12  A   We went downstairs to get breakfast together.

13  Q   To your knowledge, why had they all come up to

14  Massachusetts?

15  A   They came to pick me up because I hadn't seen any of

16  those -- I hadn't seen the defendant or Keith Pellegrino

17  in the last year and a half.

18  Q   All right.

19        After you had breakfast at the Hyatt in

20  Massachusetts with the defendant and Mr. Pellegrino and

21  the others, what, if anything, did you do?

22  A   After the breakfast we went to Logan Airport.

23  Q   Approximately what time of the day when you got to

24  Logan?

25  A   I'm guessing it was around 9:30 in the morning.

S. Mulligan-Direct/Flynn

1609

1  Q    Were any of these individuals, your friends, flying

2  with you to Florida?

3  A    Yes.

4  Q    Who?

5  A    Eric Holzer.

6  Q    Why?

7  A    He just took the flight down with me.

8  Q    Okay.

9         When you got to the airport with -- well, when

10  you got to the airport, who was with you?

11  A    The defendant, Keith Pellegrino, Tom Garrett and Eric

12  Holzer.

13  Q    And at some point after you got to the airport with

14  these individuals, did there come a time for you to say

15  good-bye to them?

16  A    Yes.

17  Q    And before you boarded your flight for West Palm

18  Beach that day, did you have an opportunity to speak with

19  the defendant?

20  A    Yes.

21  Q    Where in the airport did this conversation with the

22  defendant take place?

23  A    Just before I went through the security gate.

24  Q    Was it a private conversation?

25  A    Yes.

S. Mulligan-Direct/Flynn

1610

1  Q    Who initiated the conversation?

2  A    The defendant.

3  Q    All right.

4         Please -- what happened?

5  A    He pulled me aside and he said I got to speak to you

6  about Vinnie for a moment -- a minute.  And then he

7  started to explain something.

8  Q    What did he say?

9  A    He said we got a letter from Vinnie demanding

10  $500,000 from you, meaning myself.  And he didn't care how

11  I had to get it, sell my house, mortgage my home, or he

12  made a tape and he would give it to the cops.

13  Q    All right.

14         What else did he say?

15  A    He said after that basically that it was done.

16         He told me not to say anything to my wife.  They

17  instructed her to say nothing to me because there was

18  nothing I could do about it.

19  Q    How did he conclude this conversation?

20  A    At the end he said, don't say anything to your wife.

21  Leave it be.  It is done.  It is over with.

22  Q    You testified that he mentioned that Mr. Gargiulo had

23  made a tape.

24         Did Mr. Tarantino during this conversation at

25  Logan Airport tell you what was on the tape?

S. Mulligan-Direct/Flynn

1611

```
1   A    No..  he didn't elaborate what was on the tape.

2   Q    While the defendant was telling you this information,

3   trying to, in your words, explain himself to you, did you

4   have an opportunity to observe his demeanor?

5   A    I think -- well, afterward I realized he was relieved

6   that he got to me before I got to my wife.

7   Q    What did he say about that?

8   A    He wanted to speak to me before I got home before my

9   wife was to tell me anything.

10  Q    And after this conversation in the airport, did you

11  ever speak to Mr. Tarantino again regarding Vincent

12  Gargiulo's murder?

13  A    No.

14        MR. FLYNN:  Your Honor, may I have a minute?

15        THE COURT:  Yes.

16        (Government counsel confer.)

17  Q    Mr. Mulligan, you testified a minute ago that the

18  defendant -- that he seemed relieved that he had gotten to

19  you before you had got -- you had spoken to your wife.  Do

20  you remember that?

21  A    Yes.

22  Q    What do you mean by that?

23  A    I --

24        MR. ROSEN:  Objection.  Calls for speculation.

25        THE COURT:  Sustained.
```

1612

1  Q    Mr. Mulligan, did there come a time later that you

2  spoke with your wife regarding the letter?

3  A    Yes.

4  Q    What happened?

5  A    I originally said nothing about the letter and I said

6  to her in the future I don't want to get into it.  But

7  don't hide anything from me.  And I didn't get into

8  anything whatsoever.

9  Q    When you say you told your wife, I don't want you to

10 hide anything from me in the future, to what were you

11 referring?

12 A    I was referring to the letter.

13 Q    Again, how did you know about the letter?

14        MR. ROSEN:  Objection.  Asked and answered.

15        THE COURT:  Sustained.

16        MR. MISKIEWICZ:  No further questions, your

17 Honor.  Thank you.

18        THE COURT:  Any cross-examination?

19        MR. ROSEN:  Yes, your Honor.

20

21 CROSS-EXAMINATION

22 BY MR. ROSEN:

23 Q    Mr. Mulligan, my name is Steve Rosen and I represent

24 Christian Tarantino.

25        We have not had the pleasure to meet before

S. Mulligan-Cross/Rosen

1613

1    this, have we?

2    A    No.

3    Q    And you had an opportunity, did you not, to meet with

4    the U.S. Government, have you?

5    A    Yes.

6    Q    And you were arrested in December of 2011?

7    A    Yes.

8    Q    And soon after your arrest, you began to cooperate

9    with the government?

10   A    Yes.

11   Q    Now, on direct examination by Mr. Flynn you were

12   asked the following question:  Do you hope that you will

13   receive a sentence less than life because of your

14   cooperation and your testimony here today?

15           Do you remember that question?

16   A    Yes.

17   Q    Do you remember what you said?

18   A    Yes.

19   Q    Okay.

20           While you were in jail at the GO facility in

21   Queens, did you know that your phones were monitored?

22   A    Yes.

23   Q    Do you know that I have subpoenaed your phone records

24   and your -- the phone records of your conversations at GO?

25   A    Yes.

S. Mulligan-Cross/Rosen

1614

1  Q    Who told you that?

2  A    The U.S. Attorney's office.

3  Q    When did they tell you that?

4  A    Just a few days ago.

5  Q    What is a few days ago?

6  A    Roughly Thursday.

7  Q    Thursday of last week?

8  A    Wednesday or Thursday.

9  Q    Well, which was it, Wednesday or Thursday?

10 A    If I knew I would tell you.  I'm not sure.

11 Q    Well, you have a great memory for things that

12 happened in 1994 and 2003.  But what happened last week

13 you don't remember when you sat down with these gentlemen

14 and they told you about the fact that I had your voice in

15 conversations from GO?

16 A    Correct.

17 Q    Well, one of those conversations you had was with a

18 fellow by the name of Joe Angelone.

19 A    Okay.

20 Q    Do you remember having a conversation with him in

21 April of this year?

22 A    Yes.

23 Q    About what type of sentence that you expected from

24 the United States Government for your cooperation?

25 A    Leniency.  No guarantees.

S. Mulligan-Cross/Rosen

1615

1    Q    Leniency, no guarantees is your answer under oath?

2    A    Leniency and guarantees is what I would hope to get.

3    Q    I asked you that the question asked by Mr. Flynn was

4    what you hoped to get.  Tell us what you told Mr. Angelone

5    that you hoped to get from this Judge for your sentence.

6    A    I would like to say that I hoped to get anything,

7    like five or ten years.

8    Q    Okay.

9              You told them that you were hoping for five, but

10   the worst case scenario would be ten; is that correct?

11   A    Probably.  If you listened.  I don't recall exactly

12   word for word.

13   Q    Do you want me to play it or do you kind of remember

14   what I'm saying is true?

15   A    If you want to play, fine.  It probably sounds true.

16   Q    So the first words were that you were hoping for five

17   years.

18             Where did you get that amount from?

19   A    From other individuals in the jail.

20   Q    Is that the one where you say these guys had bodies

21   and they are still getting seven years?

22   A    Yes.

23   Q    So because you got a body, Mr. Baumgardt, you expect

24   because you are testifying here to do five, seven or ten

25   years?

S. Mulligan-Cross/Rosen

1616

1    A    No.

2         Because I have a minimum role and those guys

3    were actual triggermen.

4    Q    Okay.

5         You had a minimum role in the Baumgardt murder;

6    is that correct?

7    A    Yes.

8    Q    You were the lookout, weren't you?

9    A    Yes.

10   Q    And you were the lookout in every other criminal

11   episode that you described about you and Mr. Tarantino; is

12   that correct?

13   A    Correct.

14   Q    Did the government indicate to you the testimony of

15   an eyewitness -- excuse me, withdrawn.

16        How tall are you?

17   A    Six one.

18   Q    How much did you weigh in 1994?

19   A    Probably 230.  I usually fluctuate around that.

20   Q    How much did Rob -- how tall was Rob Smyth?

21   A    Probably five seven.

22   Q    How much did he weigh?

23   A    Probably 170.

24   Q    And how tall is Christian Tarantino?

25   A    Five ten.

S. Mulligan-Cross/Rosen

1617

1    Q    And how much did he weigh?

2    A    I'm guessing, 190.

3    Q    190.

4         So if the witness -- and I'm sure you spoke to

5    Mr. Flynn about this, described --

6              MR. FLYNN:  Objection.

7              THE COURT:  Sustained.

8    Q    Did you speak to Mr. Flynn about the fact that your

9    description matched one of the people who were on the

10   street and in front of the armored car at the time of the

11   murder of Mr. Baumgardt?

12   A    On the street?

13   Q    Yes.  On the street, physically on the scene where

14   the murder took place?

15   A    It wasn't described to me that way.

16   Q    It wasn't?

17   A    No.

18   Q    What did they describe the witness' testimony

19   concerning your height and weight at that time?

20   A    Nothing more than I fit the build.

21   Q    You fit the build?

22   A    Yes.

23   Q    And since there was nobody else but you, then

24   obviously you were not in the getaway car and you were

25   there present at the scene, correct?

S. Mulligan-Cross/Rosen

1618

1    MR. FLYNN:  Objection.

2    THE COURT:  Sustained.

3    Q    Were you at the scene?

4    A    No.

5    Q    Even though you fit the description of the person who

6    that person described as being there with Tarantino and

7    Dorval; is that correct?

8    A    Correct.

9    Q    When you were arrested, did your lawyer give you the

10   opportunity to read the arrest affidavit submitted by Rob

11   Schelhorn, Agent Schelhorn, in this case?

12   A    I assume that is the woman I met in court in West

13   Palm Beach.

14   Q    Did you see a criminal complaint and an affidavit by

15   Schelhorn at that time?

16   A    I'm pretty certain that is what I read that the woman

17   showed me at the West Palm Beach courthouse.

18   Q    Well, didn't it describe -- didn't that affidavit,

19   signed and notarized by Agent Schelhorn, indicate that you

20   were one of the three people who were at the scene of the

21   murder of Mr. Baumgardt?  Yes or no?

22   A    Yes.

23   Q    Now, after your arrest and then you began to

24   cooperate, everything changed as far as you and

25   Mr. Schelhorn were concerned; is that correct?

S. Mulligan-Cross/Rosen

1619

1    A    Yes.

2    Q    Because you told him the description and all the

3    witnesses he had in his criminal complaint were wrong?

4    A    Yes.

5    Q    And that it is your word that is paramount in this

6    case as opposed to everybody else that this gentleman

7    spoke to beforehand?

8              MR. FLYNN:  Objection.

9              THE COURT:  Sustained.

10   Q    You know by being the lookout that you are to get

11   less time than being an actual participant; is that

12   correct?

13             MR. FLYNN:  Objection.

14             THE COURT:  Sustained.

15             MR. ROSEN:  On what ground?

16             THE COURT:  Please come up and I'll tell you

17   what ground.  Come on up.

18             (Continued on next page.)

19

20

21

22

23

24

25

S. Mulligan-Cross/Rosen

1620

1       (Whereupon, at this time the following took

2   place at the sidebar.)

3           THE COURT:  Let me hear your objection for the

4   record.

5           MR. FLYNN:  Your Honor, for the record,

6   Mr. Rosen's questions misstates the law.  He does not face

7   less time than the individuals who actually were the

8   triggermen as he said.  He faces a mandatory life

9   sentence.  And that is what he pled guilty to.

10          THE COURT:  Okay.

11          The question is, what is he looking to get.

12  That was the question that he was asked as a lookout.  You

13  expect to get less?

14          That is basically the question.

15          It may misstate the law, but he doesn't misstate

16  what his expectations are.  So I think I will have to

17  reverse myself, unless you come up with a better one.

18          At first it sounded improper to me.  But on

19  reflection --

20          MR. ROSEN:  I think you are right.

21          MR. FLYNN:  Asked and answered, your Honor.

22          THE COURT:  That is what I was going to go with.

23  But when I came up here, I think that it is unfair at this

24  point, since you moved a lot of questions into your

25  examination that had been asked before, and that is not

S. Mulligan-Cross/Rosen

1621

1    improper.

2            So I will let him have this although it is asked

3    and answered.

4            MR. FLYNN:  Understood.  Yes, your Honor.

5            (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1622

1       (Whereupon, at this time the following takes

2   place in open court.)

3       THE COURT:  Ladies and gentlemen, the objection

4   is overruled.  He can answer the question.

5       MR. ROSEN:  Mr. Court reporter, read back the

6   question.

7       (Whereupon, the court reporter reads the

8   requested material.)

9   A    Yes.

10  Q    The number we are talking about, five years, you said

11  the actual triggermen were getting seven, and you felt

12  because you were a lookout you would get five?

13  A    I was hoping for it.

14       What I felt and what I get are two different

15  things.

16  Q    Well, your lawyer had many discussions with you on

17  the phone concerning why he felt you would only get five

18  years for being part of a murder conspiracy.

19       MR. FLYNN:  Objection.

20  Q    Can you tell us what he said?

21       MR. FLYNN:  Objection.

22       THE COURT:  Sustained.

23  Q    Did you discuss the amount of time you would get with

24  your lawyer?

25       MR. FLYNN:  Objection.

1623

 1          THE COURT:  Sustained.

 2          MR. ROSEN:  Judge, can we approach?

 3          THE COURT:  Please come up, yes.

 4          Ladies and gentlemen, it is now a good time to

 5   take our afternoon recess.

 6          We will reconvene, make it at 1:30.

 7          Do not talk about the case.

 8          (Whereupon, at this time the jury leaves the

 9   courtroom.)

10          THE COURT:  Please be seated.

11          Your objection?

12          MR. FLYNN:  Our objection is Mr. Mulligan's

13   conversations with his attorney are privileged.  And even

14   if the privilege was waived -- which we do not concede

15   that it was -- that the conversations with his attorney

16   are irrelevant to the proceedings here today.

17          THE COURT:  Your response.

18          MR. ROSEN:  First of all, the government used

19   the same argument against me when they said there is case

20   law in prior motions, that we use that phone at the jail

21   and there is no privilege, no attorney/client privilege.

22   And they used that against me.

23          Now they are saying because I'm asking the

24   questions that the privilege is -- that there is a

25   privilege.

S. Mulligan-Cross/Rosen

1624

1    The other thing is that the only person who can

2   waive the privilege is the witness and not the attorney.

3    Number one, he is on the phone.  We have all the

4   conversations.  I can play them.  That is a waiver.

5    Secondly, we can ask him if he waives his

6   privilege.  If he says no, then you have to make a

7   determination, a legal determination, and I will adopt the

8   arguments that the government gave in their prior

9   pleadings that those phones cannot be privileged.

10    There is a waiver because it says anybody using

11   these phones are subject to being copied, etcetera,

12   etcetera, etcetera.

13    MR. FLYNN:  Your Honor, the government's

14   position is that Mr. Mulligan cannot waive on the stand

15   his attorney/client privilege --

16    THE COURT:  Not in front of this jury.

17    MR. FLYNN:  Yes.  And his attorney is not

18   present.  He is not in the courtroom.  Mr. Mulligan -- his

19   attorney is not present.  He cannot waive that.

20    What is relevant is as to whether he can

21   contemporaneously waive it at the time of the phone call.

22   He did not.

23    With respect to the comment of Mr. Rosen about

24   the government's arguments, we have not listened to one

25   phone call on the jail phone between Mr. Tarantino and any

S. Mulligan-Cross/Rosen

1625

1   of his attorneys.  Mr. Rosen strenuously objected to that

2   and we did not, recognizing that the calls -- although

3   there is case law, and he is correct, that suggest that

4   the privilege is waived.  But we did not listen.  We

5   respected his privilege.  And no one from the government

6   team has listened to any of Mr. Tarantino's phone calls

7   with Mr. Rosen, Mr. Doddato, or anyone else.

8            THE COURT:  Do you concede that?

9            MR. ROSEN:  Yes.

10           THE COURT:  All right.

11           So let's talk now about whether or not there is

12   this privilege that exists.  And I think we will have to

13   get in Mr. Mulligan's attorney to go through that.

14           At this point in time, can you make an offer of

15   proof as to what is on the tape?

16           MR. ROSEN:  He continually talks about his

17   relationship with Mr. Flynn, the attorney, and

18   Mr. Mulligan in regards to what type of sentence that he

19   is going to request of the Court.

20           Then I will get into some very heavy duty things

21   about him and his lawyer contacting Mr. Flynn in regards

22   to conversations that his testimony does not jive with

23   Craig Miller's.  And his lawyer calls Mr. Flynn and

24   reports back that Mr. Flynn will take care of it.  By

25   Monday morning they will both have the same stories

S. Mulligan-Cross/Rosen

1626

1    correct.

2            That is the next phase of what I'm getting into.

3            I don't attribute anything to Mr. Flynn, only

4    what his lawyer is referring to his conversations with

5    him.

6            Whether it is true or not, I cannot say.  But it

7    certainly goes to the state of mind that the defendant --

8            THE COURT:  Not the state of mind of the

9    defendant.  Maybe the state of mind of the witness.

10            MR. ROSEN:  Yes, of the witness, Judge, and his

11    lawyer, making sure there is not a problem with

12    Mr. Miller's testimony and his.

13            I can assure you I have the calls.  We can play

14    the calls, and it is going to be rather interesting.

15            THE COURT:  I will see you folks at 1:15.  And

16    hopefully this can be resolved.

17                (Luncheon Recess.)

18

19

20

21

22

23

24

25

A F T E R N O O N   S E S S I O N

(Out of the presence of the jury.)

THE COURT: Could you go out and please bring everyone in?

MR. MISKIEWICZ: Sorry, your Honor.

THE COURT: Did you hear me say 1:15? Because the marshals heard it.

MR. MISKIEWICZ: I have no excuse, your Honor. I apologize.

THE COURT: Mr. Rosen and Mr. Doddato, did you hear me say 1:15?

MR. ROSEN: No, your Honor.

MR. DODDATO: No, your Honor.

THE COURT: The jurors heard me and the marshals heard me.

In any event, I was going to listen to the tape at some point. And if you would in the future, I expect you all to have your cell phones on when you leave here during the luncheon recess or any other break. Mr. Baran tried calling you both, both Mr. Rosen and Mr. Doddato.

MR. FLYNN: Mine was on.

THE COURT: I don't know why you didn't get the call.

MR. FLYNN: Judge, I have it on silent. That's

**Proceedings**

1628

1    why I didn't get the call.

2           THE COURT:  Look at it on occasion then.

3           Do you have any other comments you want to make?

4           There are two parts.  One is the case as to what

5    the witness's belief is in terms of his expected sentence.

6    While he's incorrect as a matter of law, we all know it is

7    life, whether he's a lookout or otherwise.  But if he

8    cooperates, then obviously he can be viewed as having a

9    lesser role, and the cooperation may get him over the life

10   term.

11          Additionally, I view it as the issue with

12   respect to the witness's conversation with his attorney,

13   in terms of what was done with respect to telling the

14   attorney, who then tells the witness as to making the

15   testimony of other witnesses jibe with what Mr. Mulligan

16   looked like, etcetera, etcetera.

17          So with regard to privilege, I think we all

18   agree the case law does permit and will enforce no

19   privilege on a situation like this, on a phone call

20   between counsel and the defendant.

21          Are we going to brief in on that?

22          MR. ROSEN:  Yes, your Honor.

23          MR. MISKIEWICZ:  May I be heard on the order of

24   a broader issue?  I will not argue attorney-client

25   privilege, but there are other issues I would like to have

**Proceedings**

1629

1  the Court have the benefit of before you make a ruling on

2  whether or not he should be confronted with this.

3            THE COURT:  I don't know if I will listen to the

4  tapes, but let me hear what your arguments are.

5            MR. MISKIEWICZ:  I will pick up where Mr. Rosen

6  left off just before the break with this big cliff hanger:

7  Things will get interesting when we get into the tape.

8  That is not true.

9            Let me explain for the Court what it is that I

10 know, I'm fairly certain I know, what Mr. Rosen will

11 elicit.

12            There was a point where Mr. Morgan testified in

13 court that -- I'm sorry, Mr. Miller testified in which he

14 said Mr. Mulligan might have been present during this 2003

15 visit he got from the defendant, when the defendant went

16 to him and asked, in sum and substance, if he had been

17 contacted by the police or anybody else; and also had the

18 discussion, you might recall, about a tape, or they might

19 have a tape; the name Craig might have come up, but there

20 are a lot of Craigs, so don't worry about it.

21            What you will be asked to listen to on these

22 recordings is Mr. Mulligan being confronted by his

23 attorney about whether or not he, Mr. Mulligan, was

24 present during the defendant's confrontation with Craig

25 Morgan.

Proceedings

1630

1    THE COURT:  Craig Morgan or Craig Miller?

2    MR. MISKIEWICZ:  Sorry.  Miller.  Too many

3    Craigs.

4    So that's where we're going here, what I submit

5    to be a huge rabbit hole.  We are going to spend, I

6    submit, a lot of time potentially piercing the

7    attorney-client privilege, although I don't think that is

8    the main issue here.  But we're going down here to decide

9    whether or not, at the end of the day, Mr. Mulligan or

10   Mr. Craig Miller were coached, such that one or the other

11   would remember, if not only that the defendant threatened

12   Miller, but Mr. Mulligan was present during that threat.

13   Now, we know he couldn't have been, because in

14   2003 --

15   THE COURT:  -- he was in jail.

16   MR. MISKIEWICZ:  -- he was in jail.  And I don't

17   think that is even in dispute.

18   So the only other issue that we're going to get

19   into, if the defense is permitted to go down and elicit

20   all of these recordings or play these recordings, is put

21   at issue the credibility of one of the attorneys, you

22   know, in this trial; namely, Mr. Flynn.

23   THE COURT:  Sure.

24   MR. MISKIEWICZ:  So they'll make Mr. Flynn an

25   unsworn witness whose credibility now, allegedly, will be

Proceedings

1631

1   in issue, when, in fact, all that has occurred here is a

2   cooperator is confronted with what appears to be a piece

3   of information that doesn't jibe with what he previously

4   said, as in:  Did you threaten Mr. Miller?

5          Well, Mr. Mulligan can be asked all kind of

6   questions like that, and he can testify whether he was

7   present with the defendant (indicating) when Mr. Miller

8   was threatened.  You know, if you are approached, here's

9   an attorney's card.  Go call the attorney.

10          But I submit that that is going to be so far

11  afield, and the damage to sort of the case here in terms

12  of the potential for now making a government attorney an

13  unsworn witness, is so great for what probative value?

14          So what?  If it's Mulligan and the defendant who

15  threatened Miller -- we know it is not true because

16  Mulligan was in jail.  But so what?

17          If counsel for the Government confronted him and

18  said, are you sure this didn't happen, and it gets relayed

19  in whatever way it got relayed by his attorney in this

20  phone call they want to play --

21          So I submit, ultimately, the argument here is

22  not necessarily attorney-client privilege and not even

23  relevance.  I suppose it is relevant to some degree that

24  he learned that there was this allegation that he was

25  there, and he was confronted by it and he responded.  And

Proceedings

1632

1   he will have his response, and he can beat him up and

2   cross him all he wants.

3          But ultimately, the relevance of how he got that

4   piece of information implicates two witnesses:  one, the

5   attorney,  and one of his own.

6          That is so unprobative, it shouldn't be

7   permitted.

8          THE COURT:  Perhaps on the issue of Miller being

9   threatened and given a card and so forth, I might agree

10  with you.  I'm more concerned on the issue with regard to

11  the difference in height, whether he was at the scene for

12  the actual murder.  That is fair game, as far as I can

13  tell.

14         MR. MISKIEWICZ:  And nothing that I said here,

15  your Honor, addresses that.

16         THE COURT:  No.

17         MR. MISKIEWICZ:  And I'm not suggesting -- in

18  fact, I thought he was already done and moved on from that

19  part of his cross-examination.

20         THE COURT:  Do you have anything on the phone

21  calls, Mr. Rosen, with regard to differences in

22  descriptions?

23         MR. ROSEN:  I do not.

24         THE COURT:  Well, that was my primary concern.

25  I wasn't sure about that.

**Proceedings**

1633

```
1          MR. MISKIEWICZ:  So I'm not arguing -- I mean,
2     he has crossed him.  Maybe he wants to go back and loop
3     around again and do some more of that.
4          And we elicited -- and they do that with other
5     witnesses, with Lynn Kennedy, who said one of the gunmen
6     appeared 200-something pounds.
7          THE COURT:  Correct.
8          MR. MISKIEWICZ:  And that very well could have
9     been him.  Even that, I don't see the probative value of
10    that.
11         So he was there as a gunman with the
12    defendant --
13         THE COURT:  I see the probative value, and I'm
14    sure Mr. Rosen will approach it in his summation.
15         MR. MISKIEWICZ:  I'm not suggesting it has no
16    probative value, but this issue of was the defendant
17    present -- or I should say was Mr. Mulligan present when
18    the defendant threatened Mr. Miller in 2003 --
19         MR. ROSEN:  He keeps using the word
20    "threatened."  I read Miller's testimony five times --
21         THE COURT:  He didn't say "threatened" so much
22    as he gave him a card.
23         MR. ROSEN:  That's not a threat.
24         MR. MISKIEWICZ:  Well, I agree.  That's my
25    argument.  I don't think there was any reason for him to
```

Proceedings

1634

1  be there on Passover and ultimately threatened.  But --

2  that's my argument.

3          But I would say whether he was there, whether

4  the defendant was there by himself or with Mr. Mulligan,

5  whatever probative value that has is one thing.  But to

6  bring in other attorneys, I think, is inappropriate and

7  should be --

8          THE COURT:  All right.

9          MR. ROSEN:  Judge, may I read you the notes so

10  the Court knows where I'm coming from?  Or I'll play the

11  tape.  But here are my notes --

12          THE COURT:  I'd rather hear the tape.

13          How long are your notes?

14          MR. ROSEN:  The notes are very short.

15          THE COURT:  Let me hear what is in your notes,

16  and I'll look back at his testimony.

17          MR. ROSEN:  Scott Mulligan is concerned about

18  Flynn, Sean Flynn.  If Sean can refresh Craig's memory.

19  Sean says Craig's a burnout but sure by today he'll

20  remember --

21          THE COURT:  These are your notes from?

22          MR. ROSEN:  From the tape.  I mean from the

23  phone calls.

24          THE COURT:  I thought you said these were the

25  notes from Miller's testimony.

Proceedings

1635

1    MR. ROSEN:  No, these are the notes from the

2  phone call.  I thought that's what you were talking about.

3    Sean said Craig is a burnout, but by sure today

4  he will remember.  Sean is concerned because if Craig

5  Miller is talking about the Vincent Gargiulo tape, then he

6  would have known about the tape, and then his testimony

7  would be a lie or perjury.

8    So what he wants Mr. Flynn to do is to make

9  sure, number one, Craig Miller is talking about the tape,

10  the message tape and not the tape that -- there's two

11  tapes.  One is the message phone call tape that was done

12  in November-December of 2002 that was called to Scott

13  Mulligan's home.

14    The second tape we're referring to is, of

15  course, what we've played to the jury several times, the

16  Vince Gargiulo body bug tape to Chris Tarantino.

17    If he's concerned about -- Mulligan -- the fact

18  that Craig Miller will blow his testimony -- because his

19  remembrance is that Scott and Chris were there.  If that

20  means Scott and Chris were there to talk to him, that

21  means they already learned about the tape, and, therefore,

22  what Scott is saying on the stand now is a lie.

23    THE COURT:  How can he be there if he was in

24  jail?

25    MR. ROSEN:  Because it happened before.  And

Proceedings

1636

1    Miller changed his testimony, I believe, after these

2    conversations were had from the fall of 2002 to Passover

3    of 2003.  That's why.

4                 THE COURT:  At Passover in 2003, Mr. Mulligan

5    was in jail.

6                 MR. ROSEN:  But he wasn't up until January.  So

7    they went to his house about Vinnie.  Chris and Scott.

8                 THE COURT:  But all the testimony is that it

9    happened at Passover.  Are you saying this is a new

10   version?

11                MR. ROSEN:  No.  Miller's version is new.  It

12   wasn't his original testimony to the Government.  It has

13   been changed, according to these phone calls.

14                THE COURT:  Do you have any 3500 material or

15   302s to indicate that he has come up with a different

16   date?

17                MR. ROSEN:  We have the tape.

18                THE COURT:  All right.  Let me hear the tape.

19   How long is it?

20                MR. ROSEN:  Just a few minutes.

21                THE COURT:  Okay.

22                MR. MISKIEWICZ:  Your Honor, may I just respond

23   to what counsel just said while we're waiting for the tape

24   and such?

25                THE COURT:  Yes.

Proceedings

1637

1    MR. MISKIEWICZ:  There is no objective statement

2    that Mr. Miller changed his testimony.  And if there was,

3    he has had an opportunity to cross-examine Mr. Miller, and

4    he can on this very point, as to whether Mr. Mulligan was

5    present during this.  I think he could have equivocated on

6    the stand.  I don't know if he gave a definitive yes or

7    no.

8    So what this means, again, is trying to prove an

9    impossibility for no reason other than for back-door

10   evidence, making attorneys, Mr. Mulligan and Mr. Flynn,

11   unsworn witnesses.

12   I remind the Court there has been a pattern of

13   this litigation, because three or four times counsel has

14   sought to disqualify a member of the prosecution team.

15   It's usually a motion filed against me.  But we're going

16   to be making an effort here where he's attempting,

17   basically, to back-door, moving in the credibility of

18   unsworn witnesses.  And fundamentally to what end?

19   The only thing we're going to get out of this is

20   perhaps this meeting occurred at a different time -- I

21   think I've completed what I meant to say.

22   MR. ROSEN:  Sorry, your Honor.

23   This is CD number seven.

24   Judge, the problem that we have is the WAV line

25   on this after the Government handled the tape.  This is

Proceedings

1638

1    the only tape that we cannot go to the exact time and

2    date, only the WAV line, after we got it back.  I think we

3    got it to that effect once before.

4            This is probably around the first week in April,

5    the second week in April -- no, that doesn't work.

6            It is WAV line 711333371825.

7            Ready, Judge?

8            THE COURT:  Yes, I'm ready.

9            MR. ROSEN:  Okay.  Thank you.

10           (Audio clip played.)

11           MR. ROSEN:  That is Mr. Mulligan and his lawyer.

12           THE COURT:  Right.  And who was the attorney?

13           MR. ROSEN:  Mr. Becker [phonetic].

14           THE COURT:  B-E-C-K-L-E-R.

15           And he's from Florida, correct?

16           MR. ROSEN:  Yes.

17           (Audio clip played.)

18           THE COURT:  I didn't catch the last part,

19   whatever Sean says about --

20           MR. ROSEN:  About his wife.  I apologize.

21           I'll move it back a few seconds.

22           (Audio clip played.)

23           THE COURT:  And just review for me the reason

24   you want to get this in?

25           MR. ROSEN:  That he was concerned that his

Proceedings

1639

1  testimony would not be clear as to whether or not he had

2  gone with Christian Tarantino to see Craig.

3          They used the word "threat."  I don't use that

4  word.

5          And because he has a poor memory, Craig Miller,

6  that he, according to what I heard, the lawyer, feels that

7  Sean Flynn will make sure that everybody is on the same

8  page come Monday.

9          THE COURT:  It sound like quadruple hearsay.

10         First of all, we're talking about an incident

11 which might lead the jury to believe that Mulligan is

12 lying when he first became aware of the tape.

13         MR. ROSEN:  Absolutely.

14         THE COURT:  I don't see how that changes

15 anything.  You can certainly argue to the jury that, well,

16 the story seems contrived from what he learned from his

17 wife and Mulligan's testimony.  There certainly is a

18 contradiction between the testimony.

19         This is very, very confusing.  But what is the

20 relevance, that Mr. Mulligan is not credible as to when

21 and if he learned about the tape?  Is that pretty much it?

22         MR. ROSEN:  Absolutely.  And that is so

23 essential to his credibility that Craig Miller is on the

24 same page with him.  That's why Mr. Flynn is upset.

25 That's why he's upset --

Proceedings

1640

1    THE COURT:  I can't tell from the tape whether

2  Mr. Flynn is upset because Craig Miller had a poor memory.

3    MR. ROSEN:  Well, the lawyer says he's upset.

4    THE COURT:  Well, that's the lawyer's

5  interpretation.  What does it have to do with the

6  credibility of the witness who is on the stand now?

7    MR. ROSEN:  Let me play 35 seconds of the next

8  tape where the lawyer, after he has a conversation with

9  Mr. Flynn, relates the following to Mr. Mulligan.  Perhaps

10  that will help.

11    MR. MISKIEWICZ:  Your Honor, before we play the

12  tape, while we're on that, it is clear from counsel's back

13  and forth from him, he wants to offer Mr. Beckler's

14  statements here to prove the threat for the matter

15  asserted.

16    So he's offering to prove an unsworn,

17  out-of-court declarant, the attorney, his statement, to

18  prove the truth that in another conversation, also out of

19  court, unsworn, someone rendered an opinion about whether

20  certain events occurred or not.

21    This is, as you said, some number of steps of

22  hearsay.  And for that additional reason, it shouldn't

23  come in because there is no curative instruction, I

24  submit -- you're only hearing this not to prove a truth --

25  we're talking about attributing a statement to counsel for

**Proceedings**

1641

 1   the Government.  I don't believe there is any curative

 2   instruction that can say, oh, well, forget that you heard

 3   that.

 4           THE COURT:  Let me hear from counsel.

 5           MR. ROSEN:  Judge, this is about the

 6   manipulation of testimony.  This is about inconsistencies

 7   in the Government's case that are being cured by the help

 8   of Mr. Flynn and Mr. Beckler.

 9           I don't want to go there, and I don't want to

10   make this any more than it is.  But there are inconsistent

11   statements offered by Miller in his debriefings, and they

12   are about when.  And Mr. Mulligan's contention is he

13   didn't know about the tape before he went in, and his wife

14   didn't tell him.

15           And if I play the next, you'll hear that.

16           THE COURT:  All right.  Let me hear the next

17   portion.

18           (Audio clip played.)

19           THE COURT:  She was very happy what?

20           (Audio clip played.)

21           MR. ROSEN:  They are going off on some other

22   subject.  Shall I play it?

23           THE COURT:  No.  What is the beginning part,

24   because --

25           MR. ROSEN:  The wife is reading a message from

Proceedings

1642

1    the attorney that is saying what the lawyer said that

2    Mr. -- that spoke to Sean.  Craig is on the same page.

3    Sean is happy.  Those are my notes.

4              And I'll play it again.

5              THE COURT:  I have to make an evaluation whether

6    or not this testimony is in any way reliable, and you have

7    several different generations of the statement.  And I

8    really question the reliability of things like that.

9              You have, at best, the defendants; Mr. Flynn

10   talking to, I assume, the wife of the witness and making

11   those statements --

12             MR. MISKIEWICZ:  Your Honor, I don't believe

13   there was any conversation with anyone other than the

14   attorney.

15             THE COURT:  With Mr. Beckler.

16             So again, counsel is talking about whether

17   Mr. Flynn was happy about or not being happy about people

18   being on the same page.  He, Mr. Beckler, relates to the

19   defendant's wife -- why, I don't know.  However, he

20   relates at best, if we believe the defendant's wife, the

21   message that Sean is now happy, which is three versions

22   before, that Sean is now happy about Craig's testimony and

23   they are on the same page.

24             It's my determination that this evidence is not

25   admissible.  It is hearsay.  It is not the type of

Proceedings

1643

 1    reliable evidence that one can submit to a jury, and it

 2    doesn't really contradict anything that the witness has

 3    said, other than the timing.

 4            And I'm just going to take a moment before I

 5    give you a final determination to go back and look at

 6    Mr. Miller's testimony and the testimony of Mr. Mulligan.

 7            Mr. Mulligan was in jail in any event.

 8            Let me go back and look at the testimony.  He

 9    went into jail January 3, 2003.  So I'll review it, and

10    we'll go from there.

11            MR. ROSEN:  Judge, this goes to Mulligan's state

12    of mind.  His concern is his testimony -- and he says

13    it -- is not the same as Craig Miller's.  And he wants

14    Sean Flynn to do something about it, to make sure everyone

15    is on the same page.

16            THE COURT:  I don't hear the tape that way.

17            MR. ROSEN:  I'll play it again.  He says those

18    actual words.

19            And I'm going to have to make the record very

20    clear with the court reporter and go back over it.  It's

21    only a three-minute conversation.

22            THE COURT:  Play it again, and give me a couple

23    of minutes, and we'll look at the testimony that has been

24    placed in evidence.

25            MR. ROSEN:  It's only three minutes.

**Proceedings**

1644

1    (Audio clip played.)

2    THE COURT:  The voicemail is what they are

3    talking about, and that was purportedly left in November

4    or December.  The witness said, you knew about the

5    voicemail.  He heard it.  His wife replayed it for him.

6    But we're not talking about the voicemail; we're talking

7    about the letter that Vincent Gargiulo sent.

8    MR. ROSEN:  And he goes into it now.

9    THE COURT:  All right.  Let me see if there is a

10    distinction here.

11    (Audio clip played.)

12    THE COURT:  Stop it for a minute.

13    What was he saying?  What was the second name?

14    MR. ROSEN:  Peter Zacaro [phonetic].

15    MR. MISKIEWICZ:  I think I hear Peter Zacaro.  I

16    don't know how to spell it for sure.

17    MR. ROSEN:  I think Z-A-C-A-R-O, to make it

18    simpler.  Phonetic.

19    MR. MISKIEWICZ:  But again, in this portion,

20    nothing he said is inconsistent with what he said on the

21    stand.

22    THE COURT:  I'll let you continue.

23    (Audio clip played.)

24    MR. ROSEN:  Mr. Flynn can refresh Craig's memory

25    as to what took place with the tape, and his and Chris

Proceedings

1645

1   going to the house.

2           THE COURT:  I'm not hearing Craig yet.

3           MR. ROSEN:  I don't think it matters.

4           THE COURT:  Oh, it matters quite a bit.

5           (Audiotape played).

6           MR. ROSEN:  What does it mean?  In plain

7   English, after he's talked with, we'll have consistent

8   testimony.  I think I have a right to argue that in front

9   of the jury.

10          THE COURT:  The reason you are bringing this in

11  is to show that the witness has been lying.  This doesn't

12  show that the witness has been lying.  And I've made a

13  ruling.  It's not coming in, Mr. Rosen.

14          MR. ROSEN:  I haven't questioned him about the

15  letter or the tape yet.  This is all beforehand.

16          If I can't get him to admit what I want him to

17  admit, then -- or he admits that he got Mr. Flynn involved

18  to help him get Craig Miller's memory refreshed, then I

19  don't have to play the tape.  But I haven't even started

20  there.

21          THE COURT:  You offered to play the tape before

22  we broke.

23          MR. ROSEN:  No, we haven't even gotten there,

24  Judge.

25          THE COURT:  All right.  Let's bring in the jury.

1646

1      You did indicate that you had some tapes you

2   wanted to play.  Unless you have some inconsistency, that

3   tape is not coming in.  Either of the tapes.

4           Charlie, please bring in the jury.

5           (Whereupon, the jury at this time enters the

6   courtroom.)

7           THE COURT:  Again, sorry for the delay.

8           We're ready to proceed.

9   S C O T T   M U L L I G A N,

10          having been previously sworn, resumed the stand

11          and testified further as follows:

12   CROSS-EXAMINATION

13   BY MR. ROSEN:

14   Q    You indicated last week, either Thursday or Friday,

15   you learned that the defense had subpoenaed the GEO tapes

16   of your phone conversation while you had been in the jail?

17   A    I thought I said that it was Wednesday-Thursday.

18   Q    But you don't remember which day?

19   A    I'd like to say Wednesday, like I said before.

20   Q    How did the subject come up about the tapes?

21   A    I don't know if it came through my attorney.  I'm not

22   sure who told me.  I don't recall.

23   Q    Well, you were aware, were you not, that your wife

24   had testified --

25   A    Yes.

Q -- outside of the jury?

A Yes.

Q And who told you that your wife had testified outside the presence of the jury in regards to the tapes?

MR. FLYNN: Objection.

THE COURT: Please approach.

(Whereupon, at this time the following took place at the sidebar.)

THE COURT: Mr. Flynn, there are objections. The objection is outside the jury part?

MR. FLYNN: Yes.

THE COURT: I'll give the jury an instruction they cannot draw any inferences -- or you can enter into a stipulation that Manon Mulligan testified on Wednesday, May 1st -- no, it was May 2nd.

MR. ROSEN: But somebody discussed her testimony and the tapes. And when they asked questions about Devens and her coming up there, they already knew from the lawyer or somebody what happened in the courtroom.

That is permissible cross-examination, to say what he already knew before he took the stand, what the lawyer, what the Government, told him, what his wife told him had gone on, so that when he got up, he was prepared.

MR. FLYNN: Your Honor that's not my objection. My objection is repeatedly representing things that

1648

```
 1    occurred outside the presence of the jury.

 2               THE COURT:  I can fashion an instruction to the

 3    jury they may not draw any assumptions with testimony

 4    outside the jury's presence.

 5               I think the best way of doing it is that both

 6    sides agree Manon already testified on X date, period.

 7    And you can't make any inference as to what his or her

 8    testimony was.

 9               MR. ROSEN:  Of course I can, because he's taking

10    clues on what he's saying on his -- based upon what he

11    learned from the lawyer, from the Government.  He learned

12    it from somebody.

13               THE COURT:  And where is that contained on any

14    of the phone calls to the jail between him and his wife?

15               MR. ROSEN:  We don't have them.  We only go up

16    to April 7.  But --

17               MR. FLYNN:  Your Honor -- I'm sorry.

18               MR. ROSEN:  We're only up to April 7.  But this

19    is a cross-examination, giving me the ability to question

20    what he knows before he took the stand here.

21               THE COURT:  And I'll not stop you, necessarily,

22    on that.

23               What I do want to bring out is that you can

24    enter into a stipulation, or I can direct the jury that on

25    May 2nd, Manon Mulligan testified, and there is no basis
```

1649

1    for them to assume or speculate as to anything with regard

2    to that.

3            Now you will come in and say, well, didn't so

4    and so tell you what she said?

5            MR. ROSEN:  Yes.

6            THE COURT:  All right.

7            MR. FLYNN:  Your Honor, I don't have an

8    objection to that.  My objection was more towards, you

9    know, the reference to proceedings of her, out of the

10   presence of the jury, were for a reason.  So --

11           THE COURT:  They don't have to know about that.

12   All they have to know is that it occurred.

13           MR. FLYNN:  Your Honor, at this point we'd ask

14   that you direct Mr. Rosen to stop referring to the members

15   of the prosecution team by -- or the Government by

16   individual names.  He's -- obviously, there's a strategy

17   throughout this litigation to make Mr. Miskiewicz and I

18   witnesses in the hopes of, you know, getting a mistrial in

19   this case or whatever.  It is not necessary.  In our view,

20   it is inappropriate.

21           MR. ROSEN:  Well, in my view --

22           THE COURT:  I don't necessarily find it

23   inappropriate, but I'll make a determination when it has

24   gone too far and you are targeting the prosecution.

25           MR. ROSEN:  Well, I have a good-faith basis,

S. Mulligan - Cross/Rosen

1650

 1    based upon what I have interpreted those tapes to mean

 2    concerning Mr. Miller and this witness.

 3              THE COURT:  And your interpretation is way off,

 4    because you are concentrating on a letter, and I'm

 5    concentrating on what is said on the tape.  And that is

 6    the voicemail.

 7              There is no indication of a letter.

 8              MR. ROSEN:  I'm going to get to that.

 9              THE COURT:  But you can't create what is not on

10    the tape.

11              MR. ROSEN:  I know one thing.  According to the

12    lawyer who had a conversation with Mr. Flynn, he says, by

13    Monday it will be corrected.  He says it on the tape.

14              What am I supposed to say --

15              THE COURT:  I don't know what he's referring to.

16              MR. FLYNN:  Nor do I.

17              MR. ROSEN:  Judge, we know, because he's saying

18    it 2 minutes and 20 seconds before.

19              MR. FLYNN:  Your Honor, just because Mr. Rosen

20    says so doesn't mean it is in.

21              MR. ROSEN:  Do you want me to bring the lawyer

22    in?

23              THE COURT:  You would be best advised to look at

24    me when you have an objection.

25              MR. ROSEN:  I apologize to Mr. Flynn.

1651

1      THE COURT:  And you should apologize to me, too.

2      MR. ROSEN:  I am.

3      THE COURT:  I'll give an instruction to the jury

4   about testimony outside the presence of the jury, and you

5   can go from there.

6           (End of sidebar conference.)

7      THE COURT:  Ladies and gentlemen, you heard the

8   term "testimony outside the presence of the jury."  You

9   are not to guess or speculate with respect to anything

10  about that phrase.  The parties agree that Manon Mulligan

11  testified on May 2, 2012.  Don't draw any conclusions or

12  references with respect to the fact that it wasn't in your

13  presence.

14          All right.  We're ready to move on.

15  BY MR. ROSEN:

16  Q    Did you speak with anyone after your wife's testimony

17  on that May 2nd date concerning what she said?

18  A    Yes.

19  Q    All right.  Who did you speak to?

20  A    I spoke to her girlfriend Shirley.

21  Q    Okay.  And anybody from the Government team?

22  A    Yes.

23  Q    Who?

24  A    I spoke to Agent Schelhorn and Mr. Flynn.

25  Q    And what did they tell you took place?

S. Mulligan - Cross/Rosen

1652

1    A    They said that the tape was played of a conversation

2    between my wife and I while I was in prison, GEO, and that

3    they were trying -- that -- but the defense was trying to

4    make it out that I coerced my wife into saying something.

5    Q    Who used the word "coerced"?

6    A    Myself.

7    Q    Did they refer to the tape that was played and the

8    conversation where you tell your wife to remember that you

9    came to Devens and told me about what Chris Tarantino said

10   about not asking questions, and that she said she didn't

11   remember, and that you said to her, is that what they did?

12             MR. FLYNN:  Objection.

13             THE COURT:  Sustained.

14   A    No.

15   BY MR. ROSEN:

16   Q    At that point in time they went over her testimony

17   with you, correct?

18   A    Somewhat.

19   Q    What does "somewhat" mean?

20   A    I wasn't there to tell you, so I don't know.

21   Q    You weren't where?

22   A    I wasn't there to tell the whole testimony.  I heard

23   bits and pieces from the testimony.

24   Q    From the Government, correct?

25   A    From the Government and from my wife.

S. Mulligan - Cross/Rosen

1653

1    Q    And your wife too.

2         Did they tell you about what you told her about

3    the incident?

4    A    I'm not sure if they did or my wife did.

5    Q    Well, what did they tell you, meaning the Government

6    prosecutors and agent (indicating)?

7    A    They said I had a conversation with my wife, and I

8    asked her, do you remember the conversation that her and I

9    had up in Devens in regards to her telling me to stop

10   asking questions about Vinnie.

11   Q    And what -- how did she respond about her memory on

12   the tape?

13   A    She wasn't really sure.

14   Q    Wasn't really sure or said to you, I do not remember?

15   A    I really don't remember.  I'm not sure.  Let me think

16   about it.

17        I didn't listen to the tape; you did.

18   Q    And then did you tell her what the conversation was

19   you had with her at Devens?

20   A    Yes.

21   Q    So you refreshed her recollection to support what you

22   say here happened between her and Chris Tarantino,

23   correct?

24   A    Yes.

25   Q    Just like you are trying to get the five years, and

S. Mulligan - Cross/Rosen

1654

1  you say things like Justin Bressman, Chris was his boss?

2          MR. FLYNN:  Objection.

3          THE COURT:  Sustained.

4  BY MR. ROSEN:

5  Q    Did you say on direct examination that Justin

6  Bressman's boss was Chris Tarantino?

7  A    Yes.

8  Q    Weren't you his boss as well?

9  A    Yes.

10 Q    Wasn't Brett Holster, Holzer her, whatever his name

11 is, his boss?

12 A    Yes.

13 Q    Why didn't you say that?  Why did you pick him out as

14 the only one that was his boss?

15 A    No one asked.

16 Q    You wouldn't be currying favor to the Government,

17 would you?

18          MR. FLYNN:  Objection.

19          THE COURT:  Sustained.

20 BY MR. ROSEN:

21 Q    In your testimony, you passed up Andy Corino.  Tell

22 me about Andy Corino.  Who is Andy Corino.  What did he

23 have to do with Vince Gargiulo?  What did he have to do

24 with you?

25          MR. FLYNN:  Objection.

S. Mulligan - Cross/Rosen

1655

1    THE COURT:  One question at a time.

2    What did he have to do with Vinnie Gargiulo?

3    BY MR. ROSEN:

4    Q    Who is Vince Corino [sic]?

5    A    There is no Vince Corino.

6    Q    I mean Andy.

7    A    Dolphin Fitness.

8    Q    What did he have to do with any of the gyms that you

9    owned with the Holzers, Tarantino and the others?

10   A    He was partners in several locations with us.

11   Q    Talk about him and his relationship with Vince

12   Gargiulo.  Did he give him $50,000?

13   A    I was told he did, yes.

14   Q    Why didn't you bring that up when you were discussing

15   the gyms on the upper east side?

16   MR. FLYNN:  Objection.

17   THE COURT:  Sustained.

18   BY MR. ROSEN:

19   Q    It was Gargiulo's gym that was in trouble, correct?

20   A    Yes.

21   Q    And Corino gave him $50,000, but you didn't mention

22   that before, right?

23   A    Right.

24   Q    Because they didn't ask you.  It wasn't part of the

25   script?

1656

1        MR. FLYNN:  Objection.

2        THE COURT:  Sustained.

3        The jury is instructed to disregard that

4    question.

5    BY MR. ROSEN:

6    Q    Vince Gargiulo, did he not, filed a criminal

7    complaint against Andy Corino in 2001?

8    A    That's what I was told.

9    Q    He had him arrested and charged with stealing $50,000

10   worth of equipment from Vince Gargiulo?

11   A    That is what I heard.

12   Q    You didn't tell us that before though?

13   A    Again, you didn't ask.

14   Q    I wasn't asking the question --

15        THE COURT:  Let's not have argument from the

16   witness.

17        MR. FLYNN:  Objection.

18        THE COURT:  The jury is instructed to disregard

19   the question.

20   BY MR. ROSEN:

21   Q    The gym that you are referring to about Mr. Tarantino

22   using his credit cards, the machine or his credit with

23   different credit card companies, do you remember that

24   testimony?

25   A    Yes.

S. Mulligan - Cross/Rosen

1657

1    Q    Did the Government show you an application form that

2    Chris Tarantino filled out when he -- when you say he gave

3    permission to use his credit and his credit card stuff?

4    A    No.

5    Q    The gym on West 23rd Street, the Synergy Gym?

6    A    When I was in prison, I was a partner.  I was a

7    partner with Eric, Brett Holzer and Nicholas Pisciotti.

8    Q    Did there come a time when your ownership was reduced

9    to a writing in West 23rd Street?

10   A    No.

11   Q    Did you ever receive any funds from West 23rd Street?

12   A    No.

13   Q    Why would you say you were a partner when you know

14   the Holzers are the only one who owned the property, the

15   only ones who got money from the property, and the only

16   ones who ran the gym?

17              MR. FLYNN:  Objection.

18              THE COURT:  Sustained.

19   BY MR. ROSEN:

20   Q    Did the Holzers run that gym?

21   A    I was in prison.  I have no idea.

22   Q    While you were in prison -- withdrawn.

23              What gyms do you presently own?

24   A    My wife owns Long Beach, Merrick, Baldwin and

25   Syosset.

S. Mulligan - Cross/Rosen

1658

1   Q   You left one out, didn't you?

2   A   No.

3   Q   Franklin Square?

4   A   No.

5   Q   Why not Franklin Square?

6   A   Sold.

7   Q   When was it sold?

8   A   Sold about -- probably closed two months ago.

9   Q   Two months ago?

10  A   I'm guessing the date.  Two months ago.

11  Q   Whose name was on that gym?

12  A   Several names.

13  Q   Was your wife's name on that gym?

14  A   Yes.

15  Q   Was your name on that gym?

16  A   Yes.

17  Q   How much money did you receive from the sale of that

18  gym?

19  A   My -- we were 13.5 at a point, and I owned eight

20  percent.

21  Q   And what about your wife?

22  A   My wife got the balance.

23  Q   How much?

24  A   She owned about 19-and-change percent.

25  Q   That's over almost 160-something thousand dollars?

1659

```
1    A    No, it's more than that.

2    Q    How much?  I'm not good at math.

3    A    Over 300.

4    Q    So your wife received a check for over 300,000 in her

5    name?

6    A    No.

7    Q    In whose name?

8    A    Both of ours.  She had the check and I received the

9    check.

10   Q    Where is the money now?

11   A    Went towards legal fees, and some went to herself,

12   paying her own outgoing funds at home and into our son's

13   college fund.

14   Q    You are anticipating a lawsuit, are you not?

15   A    Probably.

16   Q    In this case --

17              MR. FLYNN:  Objection.

18              THE COURT:  Please approach on this.

19              (Whereupon, at this time the following took

20   place at the sidebar.)

21              THE COURT:  What case?  He's not anticipating a

22   lawsuit in this case.  In a criminal case?

23              MR. ROSEN:  Mr. Tarantino has already been sued

24   by the Baumgardt family.  It's my understanding that the

25   Baumgardt attorney will be filing a lawsuit against this
```

1    gentleman for his participation in the Baumgardt murder.

2              THE COURT:  Okay.

3              MR. ROSEN:  And we're showing that the moneys

4    were divided the way they were to protect those moneys

5    from being seized or frozen as part of any lawsuit, and

6    that's why I'm going into it.  This is all a planned --

7              THE COURT:  It's a division of assets.  That's

8    what they did.

9              MR. ROSEN:  But it was set up that way so that

10   he would have no -- if he had liability, if he had

11   liability -- and of course he's admitted to his role in

12   this, so he has liability -- that they wouldn't be able to

13   collect.

14             THE COURT:  I see.  Okay.

15             MR. FLYNN:  Relevance.  My objection is to

16   relevance, your Honor.  It has nothing to do with his

17   credibility on the stand.

18             MR. ROSEN:  Sure it does.

19             THE COURT:  He's already admitted that he was

20   there, and the murder and his responsibility from being

21   part of --

22             MR. ROSEN:  What he has done, he has segregated

23   the funds so they are out of touch.  They can't be touched

24   or liened or seized on because he showed an ownership for

25   his wife, even though she never worked.

1661

```
1        THE COURT:  I think Mr. Tarantino did something
2   along those lines also.
3        MR. ROSEN:  Unfortunately, he had left it in his
4   name, and then she sued for divorce.  And the judge
5   ordered the assets to be frozen for him because of alimony
6   and child support.
7        THE COURT:  I see.
8        MR. ROSEN:  They anticipated that and did it
9   ahead of time.
10        MR. FLYNN:  Right.  They entered into a sham
11   divorce.
12        But getting back to the issue, your Honor, this
13   has no relevance to Mr. Mulligan's testimony on the stand
14   today, with his credibility as a witness.  And the events
15   that transpired throughout what he testified about has no
16   relevance.
17        Moreover, your Honor, are we going to have a
18   minitrial within a trial here about what Mr. Mulligan has
19   done with his own assets and how he -- where he has
20   positioned them for the benefit of his son and the family?
21        It's very far afield, your Honor.  It has no
22   relevance.
23        MR. ROSEN:  What he has done, he has set himself
24   up.  He's a minimal player.  He has got no assets, and
25   we're allowed to get into that.  This was a calculated
```

S. Mulligan - Cross/Rosen

1662

1    scam by this guy before he went to prison, when the gyms

2    were bought, to give his wife the gyms to protect them

3    from a lawsuit.

4            THE COURT:  He did not know about the Baumgardt

5    lawsuit at the time he went to jail, because some nine

6    years had transpired, and never took the assets out of his

7    wife's name.  So it is not relevant, Mr. Rosen, and that's

8    my decision.

9            (End of sidebar conference.)

10           THE COURT:  The objection is sustained.

11   BY MR. ROSEN:

12   Q    What was the relationship between Justin Bressman and

13   Vincent Gargiulo?

14   A    They were friends and partied together.

15   Q    Was Bressman a junkie?

16   A    Yes.

17   Q    Was Vinnie a junkie?

18   A    Yes.

19   Q    Did they buy and sell drugs between them?

20   A    Yes, to my knowledge.

21   Q    And how do you know that?

22   A    Again, from word of mouth in the gym when I'm there.

23   Q    Say that again.  I apologize.  I did not hear you.

24   A    I understand.  Worth of mouth when I was in the gym.

25   Q    Do you know what drugs they were selling back and

S. Mulligan - Cross/Rosen

1663

1    forth between each other?

2    A    As far as I know, they were doing cocaine between one

3    another.

4    Q    Powdered cocaine?  Crack cocaine?

5    A    As far as I know, powdered cocaine.

6    Q    What year are we talking about?

7    A    I'd like to say between -- into '01 and into '02.

8    Q    You went to prison in January of '03?

9    A    Yes.

10   Q    Did you blame Chris Tarantino for the fact that you

11   had to do 37 months in prison because of something about

12   him and his brother?

13   A    Yes, I blamed his brother.

14   Q    Okay.  So prior to you getting on the witness stand,

15   obviously, there was a little bit more of a problem

16   between the Mulligans and the Tarantinos, because you did

17   time because of something his brother did?

18              MR. FLYNN:  Objection.

19              THE COURT:  Sustained.

20   BY MR. ROSEN:

21   Q    Did you have a problem with the Tarantino family,

22   where you felt that you were doing time because of a

23   problem that they caused, not you?

24   A    Yes.

25   Q    So you go away.  You are doing your 37 months.  And

S. Mulligan - Cross/Rosen

1664

1  you are up there because you were an alcohol and drug

2  abuser?

3  A    Yes.

4  Q    How many years were you an alcohol and a drug abuser?

5  A    On and off since '89.

6  Q    So during 1994, you were an alcoholic and a drug

7  abuser, correct?

8  A    Yes.

9  Q    In 2000, you were an alcoholic and a drug abuser?

10 A    Yes.

11 Q    In between, you were an alcoholic and a drug abuser?

12 A    Yes.

13 Q    Same up until you went to jail?

14 A    Yes.

15 Q    You did not know, that is your testimony, that a

16 letter had been received by your wife which was tantamount

17 to an extortion letter by Vincent Gargiulo, correct?

18 A    Correct.

19 Q    So by not knowing that, you would have no motive to

20 kill him?

21 A    Yes.

22 Q    The wife receives, in November, December, around

23 Thanksgiving time -- I think you put it on the tapes -- a

24 phone call that you taped on the machine when he was

25 screaming profanities and accusing you or whatever,

1665

1    correct?

2         THE COURT:  Can we get a year?  This is

3    November, December of what?

4         MR. ROSEN:  2000, I apologize.

5         THE COURT:  All right.

6    BY MR. ROSEN:

7    Q    Correct?

8    A    Yes.

9    Q    And you listened to it, correct?

10   A    Yes.

11   Q    And Mr. Tarantino listened to it, correct?

12   A    Yes.

13   Q    And did Mr. Tarantino tell you he was going to have

14   him killed?

15   A    No.

16   Q    Now, Mr. Tarantino was at your house when he heard

17   the tape, correct?

18   A    Yes.

19   Q    Your wife was present, correct?

20   A    I'm not sure if she was in the kitchen when we played

21   it.

22   Q    But she had heard it, correct?

23   A    Yes.

24   Q    And she was very, very upset by that and very much

25   afraid because you were going away, correct?

1666

1  A    Yes.

2  Q    Well, what precautions did you take before you went

3  away to Devens to ensure that your wife would have no

4  problems from Vincent Gargiulo?

5  A    I put an alarm system in my home, and I put a phone

6  camera at my front door.

7  Q    Anything else?

8  A    No.

9  Q    You were living in Florida at the time, correct?

10  A    No.

11  Q    I'm sorry.  You were in Bellmore?

12  A    Yes.

13  Q    How far was that home from where Vincent Gargiulo

14  grew up?

15  A    About a mile.  Not even.

16  Q    Take a look at Tarantino Exhibit G in evidence.

17        There are the visits for the summer of 2003.  Do

18  you see that?

19  A    Yes.

20  Q    Do you know the date that Mr. Gargiulo was murdered?

21  A    End of August.  Middle of August.

22  Q    You don't know the date?

23  A    I don't know the exact date.

24  Q    It was August 18th.  Does that help you?

25  A    Yes.

S. Mulligan - Cross/Rosen

1667

1    Q    Okay.  Do you see where it says August 21st?

2    A    Yes.

3    Q    Three days after he was murdered, your wife went to

4    see you with Tom Garrett?

5    A    Yes.

6    Q    What did you all talk about on the 21st of August,

7    2003?

8    A    Not much.  My son was there.  Conversations.  Asking

9    if they knew what happened to Vinnie.

10   Q    But this is only three days after he was murdered.

11   The subject of Vincent's death did not come up on

12   August 21st?

13              MR. FLYNN:  Objection.

14              THE COURT:  Sustained.

15   BY MR. ROSEN:

16   Q    Did you talk about Vincent's death on August 23rd,

17   three days after he was murdered?

18   A    Yes.

19   Q    What did you talk about?

20   A    Asked what happened.  If she heard anything.  I had

21   read in the paper that he was shot in the face.

22   Q    Who shot him in the face?

23   A    At the time, we didn't know.

24   Q    Do you know who shot him in the face from

25   conversations you've had with the Government?

1668

```
 1   A    And others, yes.

 2   Q    Who did the Government tell you shot him in the face?

 3   A    Justin.

 4   Q    Justin Bressman, correct?

 5   A    Yes.

 6   Q    And they told you who hired him?

 7   A    No, they didn't tell me who did it.  They didn't tell

 8   me anyone hired him specifically.

 9   Q    Well, why did he kill him, according to what they

10   told you?

11   A    Told me he was hired.  I don't know if it came

12   directly from the U.S. Attorney's Office or from

13   attorneys, because I can't remember how it came out.  But

14   Justin was a prime suspect of the shooting, because I

15   remember when he was picked up for it, I was catching the

16   stories.

17   Q    So as you sit here today, the Government has not

18   revealed who hired Justin Bressman to kill Vincent

19   Gargiulo?

20   A    They have.

21   Q    They have?

22   A    Yes.

23   Q    When did they do that?

24   A    They did that --

25              MR. FLYNN:  Objection.
```

S. Mulligan - Cross/Rosen

1669

 1                THE COURT:  Sustained.

 2                THE COURT:  Come up for a moment.

 3                Excuse me.  You don't have to come up.  Ask

 4     another question.

 5     BY MR. ROSEN:

 6     Q    Did you have a conversation with the Government where

 7     they told you who shot Vincent Gargiulo?

 8                MR. FLYNN:  Objection.

 9                THE COURT:  Asked and answered.

10                Repeat it again, if you would.

11     A    Yes.

12     BY MR. ROSEN:

13     Q    Who?

14     A    Chris hired Justin.

15     Q    Ahh.  So the Government told you that Chris Tarantino

16     hired Justin Bressman to kill Vincent Gargiulo?

17     A    Yes.

18     Q    And you are here to supply the motivation for that

19     killing, correct?

20     A    Yes.

21                MR. ROSEN:  No further questions.

22                THE COURT:  Redirect?

23                MR. MISKIEWICZ:  May we have a moment, your

24     Honor?

25                THE COURT:  Yes.

1670

1              (Pause.)

2              MR. FLYNN:  May I inquire, your Honor?

3              THE COURT:  Yes.

4    REDIRECT EXAMINATION

5    BY MR. FLYNN

6    Q    Mr. Mulligan, you were arrested December 23rd of

7    2011.  Do you remember that?

8    A    Yes.

9    Q    Prior to your arrest in this case, had you read news

10   stories and articles regarding who was the suspect in

11   Vincent Gargiulo's murder?

12   A    Yes.

13   Q    Prior to being arrested in this case and being

14   arrested in your home by Agent Schelhorn, did you know

15   that the defendant was a suspect in the murder of Vincent

16   Gargiulo?

17   A    Yes.

18   Q    Did you know that he had been charged with the murder

19   of Vincent Gargiulo?

20   A    Yes.

21   Q    Prior to ever having discussions with anyone from my

22   office or the FBI?

23   A    Yes.

24   Q    Did you know that Mr. Bressman was a suspect in the

25   murder of Vincent Gargiulo prior to being arrested and

S. Mulligan - Recross/Rosen

1671

1    having discussions with us?

2    A    Yes.

3    Q    So you knew all this information already; isn't that

4    right?

5    A    Yes.

6    Q    Independent from any questions or information we

7    would have provided to you; isn't that right?

8    A    Yes.

9    Q    And as you sit here today, and based upon the

10   statements the defendant made to you in 2003 -- I'm sorry,

11   on August 6, 2004, do you know who was responsible for the

12   murder of Vincent Gargiulo?

13   A    Yes.

14   Q    Who?

15   A    Justin Bressman.

16   Q    And do you know who hired him?

17   A    Yes.

18   Q    Who?

19   A    The defendant.

20            MR. FLYNN:  Thank you.  No further questions.

21   RECROSS-EXAMINATION

22   BY MR. ROSEN:

23   Q    How do you know he hired him?  Tell us how you know

24   that.

25   A    By the end of my conversation when he told me, it's

S. Mulligan - Recross/Rosen

1672

1   done, it's over with.  And when I got the conversation up

2   in Devens, the message from my wife to stop asking

3   questions about it, I knew at that point how it was done.

4   Q    And Chris Tarantino, the guy you knew, would have

5   hired a junkie to kill Vincent Gargiulo?

6   A    Yes.

7   Q    What did the Government tell you about Mr. Pablo

8   Amador?

9   A    I read the newspapers that he left a beer bottle

10  behind with DNA, and he was arrested for his involvement

11  if that.

12  Q    Did the Government tell you that he is the only link

13  to Chris Tarantino hiring Justin Bressman to kill Vincent

14  Gargiulo?

15            MR. FLYNN:  Objection.

16            THE COURT:  Sustained.

17  BY MR. ROSEN:

18  Q    Is Pablo Amador the person who links Chris Tarantino

19  with the Gargiulo murder?

20            MR. FLYNN:  Objection.

21            THE COURT:  Please come up a moment.

22            (Whereupon, at this time the following took

23  place at the sidebar.)

24            THE COURT:  Your objection, that there are a

25  number of people?

1    MR. FLYNN:  Yes.  It's argumentative.

2    THE COURT:  Argumentative?

3    MR. FLYNN:  Yes.

4    MR. ROSEN:  It's a fair question to ask, Judge.

5    They opened the door to all of this by what he just said.

6    They knew everything ahead of time.  We're just going into

7    this one area where he's been told about Pablo Amador and

8    his involvement.

9    MR. FLYNN:  He hasn't said he had been told

10   that.  He said he read about it in the newspaper.

11   MR. ROSEN:  Not this part.

12   MR. FLYNN:  Yes, he did.

13   THE COURT:  My understanding, he said he learned

14   about Amador in the newspaper, that he left his DNA and

15   the beer bottle and so forth.

16   MR. ROSEN:  Judge, I'll ask him a foundation

17   question about Pablo Amador and his knowledge of him.

18   THE COURT:  Where are you trying to get to?

19   MR. ROSEN:  That Pablo Amador is the only link

20   between the hiring for the 35,000, getting the piece of

21   it, and this case.

22   MR. FLYNN:  That's a closing argument.

23   MR. ROSEN:  No.  You've opened the door by doing

24   everything you just did when you stood up there.

25   MR. FLYNN:  He just admitted --

S. Mulligan - Recross/Rosen

1674

1    THE COURT:  He said he read about it in the

2    newspapers and -- to establish any conversation vis-à-vis

3    Pablo Amador being the only link to the Gargiulo murder.

4    MR. ROSEN:  I'll use "link," not "only," and

5    I'll get into just a little bit about what he knows about

6    Pablo Amador, what the Government told him about Pablo

7    Amador.

8    THE COURT:  I don't think you've established

9    that he told him anything right now.

10    MR. ROSEN:  That's what I'll ask him first, if

11    he had a conversation with the Government about Pablo

12    Amador.

13    THE COURT:  I'll allow that question.

14    (End of sidebar conference.)

15    THE COURT:  The objection is sustained on the

16    last question.  We're ready to move on.

17    BY MR. ROSEN:

18    Q    Mr. Mulligan, did the Government discuss with you

19    Pablo Amador?

20    A    Yes.

21    Q    What did they tell you?

22    A    That he was cooperating with them in regards to this.

23    Q    And was he the one who told them about the $35,000

24    payment?

25    A    I don't know if I heard from them or from other

Proceedings

1675

1    people, from something prior.

2    Q    And what did you hear?

3    A    That --

4              MR. FLYNN:  Objection.

5              THE COURT:  Sustained.

6              MR. ROSEN:  State of mind, your Honor.

7              THE COURT:  Please come up here.

8              Sorry.  You folks are extremely patient.  I do

9    appreciate it.

10             (Whereupon, at this time the following took

11   place at the sidebar.)

12             THE COURT:  Whose state of mind?

13             MR. ROSEN:  What?

14             THE COURT:  Whose state of mind?

15             MR. ROSEN:  The witness's.

16             THE COURT:  State of mind is what the Government

17   is about to offer.

18             MR. ROSEN:  Yes, of course.  That's why he's

19   testifying.  He's looking to get a reduction in his

20   sentence.

21             THE COURT:  But he has to have personal

22   knowledge of Amador.

23             MR. FLYNN:  Nor does anything that Mr. Mulligan

24   has testified to remotely relate to anything that

25   Mr. Amador has testified to.  Mr. Mulligan was in jail.

Proceedings

1676

1    THE COURT:  You are getting dangerously close to

2  this witness slipping up and saying something about the

3  prior proceedings.  Now, I don't want that to happen, but

4  the repeated questions surrounding the newspaper articles

5  make it a very treacherous area.

6    MR. ROSEN:  I'll get off that subject.

7    But Mr. Doddato reminded me I did not bring up

8  the Craig Miller stuff, and I apologize.  I sat down

9  quickly.  I'd just like to bring it up for whatever it is

10  worth at this stage without going into the tapes, just as

11  to his understanding of Miller and him and the problem

12  they had.

13    THE COURT:  First of all, you didn't do it on

14  cross.

15    MR. ROSEN:  I know that.  Mr. Doddato reminded

16  me of that when I sat down, and Mr. Flynn was up already.

17    THE COURT:  Mr. Flynn didn't ask anything about

18  that.

19    MR. ROSEN:  I know that.

20    THE COURT:  I think at this point in time you

21  will not be permitted to go into it based upon your prior

22  proffers you made and the prior subject with respect to my

23  rulings.

24    Let's move on.

25    (Side bar concluded.)

Proceedings

1677

 1            THE COURT:  The objection is sustained.

 2            MR. ROSEN:  Nothing further.

 3            THE COURT:  Thank you.

 4            Anything further, Mr. Flynn?

 5            MR. FLYNN:  Nothing further.

 6            THE COURT:  Ladies and gentlemen, I'll ask you

 7    to step out.

 8            We'll have our next witness in a moment.

 9            (Whereupon, at this time the jury exits the

10    courtroom.)

11            THE COURT:  Please be seated.

12            Mr. Rosen, I believe this is the Government's

13    last witness.

14            And Mr. Miskiewicz and Mr. Flynn, do you rest?

15            MR. MISKIEWICZ:  Your Honor, we would renew -- I

16    think a number of items were admitted under 404, subject

17    to correction, and I believe in particular the Gargiulo

18    tape.

19            THE COURT:  And I still have an outstanding

20    decision with respect to that.

21            MR. MISKIEWICZ:  And we renew our motion to

22    admit all of that evidence, and also renew our motion to

23    renew all the other exhibits that have been offered.

24            And with that we rest.

25            THE COURT:  All right.  And when I say I owe you

Proceedings

1678

1    a decision, I verbally gave a decision.  And I will draft

2    a written order and memorandum, and you'll be getting that

3    shortly.

4              MR. ROSEN:  We would move under Federal Rules of

5    Criminal Procedure Rule 29 for a motion --

6              THE COURT:  For a directed verdict?

7              MR. ROSEN:  -- for a directed verdict that the

8    Government has not made out a prima facie showing in their

9    best light to the Government that Mr. Tarantino committed

10   the crimes charged.

11             THE COURT:  All right.

12             Do you want to respond to that?

13             MR. MISKIEWICZ:  I can now, unless the Court is

14   prepared to take it --

15             THE COURT:  Excuse me?

16             MR. MISKIEWICZ:  If the Court wishes, yes, I'm

17   prepared to argue that now.

18             THE COURT:  Well, we have -- Mr. Leshan Campbell

19   will be the defense first witness.

20             And you have two other witnesses?

21             MR. ROSEN:  Three witnesses.  They will be here

22   at 9:30.  The MTA people, the Government wouldn't

23   stipulate.

24             THE COURT:  The Government wouldn't stipulate to

25   that?  Okay.

Proceedings

1679

1    MR. MISKIEWICZ:  We -- I don't know who the MTA

2    people are.  We've had some discussions.  We'll try to

3    work it out overnight, but I'm not sure what he's

4    referring to.

5    THE COURT:  So you have the MTA person and who

6    else?

7    MR. ROSEN:  Anthony Renegro.  I have two

8    questions for him, unless they have an extensive cross.

9    My part will take maybe two or three minutes.

10   THE COURT:  All right.

11   MR. ROSEN:  After that, we have Richard Tramble.

12   He's our final witness.

13   THE COURT:  I can hear the motion afterwards,

14   but at this time I don't think there is any doubt that I

15   will deny your motion.

16   Let's bring in Mr. Campbell.  We have to go get

17   him.  He's in custody.  So if you get Mr. Mulligan down,

18   bring up Mr. Campbell, and then we'll be ready to go

19   within 15 minutes.

20   MR. ROSEN:  Do you wish us back at 3:05?

21   THE COURT:  Let's be clear.  We broke about

22   three minutes ago, Charlie.

23   THE CLERK:  It is 2:52 on the phone now.

24   THE COURT:  So 15 minutes from that would be

25   3:07.

Proceedings

1680

1      MR. ROSEN:  3:07.

2      THE COURT:  I'll go with 3:07.  Everybody is

3  here at 3:07.

4      (Whereupon, a recess was taken.)

5      THE COURT:  Is there any objection having

6  Mr. Campbell observed by the state guards, the Department

7  of Correction?

8      MR. ROSEN:  No.

9      THE COURT:  I didn't think you would.

10      Mr. Campbell, please remain standing.  We're

11  bringing the jury in.  Then you can have a seat and you'll

12  be sworn in.

13      MR. CAMPBELL:  Yes, your Honor.

14      (Whereupon, the jury at this time enters the

15  courtroom.)

16      THE COURT:  Please be seated, if you would.

17      The Government rests, Mr. Miskiewicz?

18      MR. MISKIEWICZ:  The Government rests.

19      THE COURT:  Thank you.

20      The defendant's first witness?

21      MR. ROSEN:  Just one second, your Honor.

22      THE COURT:  Sure.

23      MR. ROSEN:  I'm just trying to get some

24  exhibits.

25      THE COURT:  All right.  Let's swear in the

1681

1    witness, if you would.

2           Defendant calls --

3           MR. ROSEN:  -- Leshan Campbell.

4           THE COURT:  Thank you.

5           THE CLERK:  Please remain standing and raise

6    your right hand.

7

8    **L E S H A N   C A M P B E L L,**

9           called as a witness, having been first

10          duly sworn, was examined and testified

11          as follows:

12          THE WITNESS:  My name is Leshan Campbell,

13   spelled L-E-S-H-A-N, Campbell, C-A-M-P-B-E-L-L.

14

15   DIRECT EXAMINATION

16   BY MR. ROSEN:

17   Q    Mr. Campbell, back in August of 2003, where were you

18   living that summer?

19   A    525 FDR Drive, New York, New York, apartment 1-A.

20   Q    Where are you presently housed?

21   A    As of right now?

22   Q    Now.

23   A    Right now I'm in Ogdensburg Correctional Facility.

24   I've been brought down from Ogdensburg to Downstate.

25   Q    Mr. Campbell, please lean forward and speak into the

1682

1    microphone, please, so we can hear you nice and loud and

2    clear.

3    A    All right.

4    Q    Mr. Campbell, have we met?

5    A    One time.

6    Q    When was that?

7    A    Friday at, I think, around six, 6 p.m.

8    Q    Right.  That was at the jail you are presently being

9    housed?

10   A    Yes, sir.

11   Q    And I had with me someone from my office?

12   A    Yes.

13   Q    And he was a private investigator?

14   A    Yes, sir.

15   Q    Prior to that time, we've had no opportunity to talk

16   with each other, have we?

17   A    We have not.

18   Q    But back in August of 2003, did you have an

19   opportunity to speak with the New York City Police

20   Department, who was investigating a murder?

21   A    Yes.

22   Q    And how many times were you interviewed by the New

23   York City Police Department back in 2003?

24   A    Approximately maybe two or three times.

25   Q    Were you then interviewed by the FBI?

1683

1    A    Yes.

2    Q    How many times by the FBI?

3    A    Twice.  Once in 2004, and another time I was

4    incarcerated at Rikers.  In 2004 they came to see me.

5    Q    I'm sorry?

6    A    They came to see me in 2004.  I think I came up to

7    Central Islip, came up here.  And then in 2004 when I was

8    in Rikers, when I was arrested, they came and seen me.

9    They came and seen me, too, prior to that.

10   Q    You were actually brought into this building in

11   Central Islip?

12   A    Yes, sir.

13   Q    Did you speak with anyone at this table that many

14   years ago, if you recall (indicating)?

15   A    I'm not really sure.

16   Q    And they asked you to describe the events that took

17   place over the weekend of the blackout of 2003?

18   A    Uhm, yes, sir.

19   Q    All right.  Did you give a formal statement in

20   September of 2003 to the New York City Police Department?

21   A    Yes, sir.

22   Q    Did you describe to them what you knew about a murder

23   that had taken place involving Pablo Amador and Justin

24   Bressman?

25   A    I wasn't too sure about a murder.  All I remember

1684

1  they asked me questions about, about something that

2  happened.  I wasn't too sure.  I know I was in the

3  homicide division, so I guess it was about a murder, so...

4  Q    On the day of the blackout, were you home in your

5  apartment?

6  A    No.

7  Q    Where were you?

8  A    I was in -- I forgot the name of the neighborhood,

9  but I was in Brooklyn at that time.

10 Q    Was there anybody staying at your house the night of

11 the blackout?

12 A    No, sir.

13 Q    Was anybody in your house on Friday, the 15th of

14 August?

15 A    No, sir.

16 Q    Who was the only person who had a key to that

17 apartment during that time?

18 A    I did, sir.

19 Q    On Saturday, did you return home?

20 A    Yes.

21 Q    Was anybody in the residence at 525 -- what is the

22 address?

23 A    525 FDR Drive.

24 Q    525 FDR Drive?

25 A    Yes.

1685

1   Q    Anybody in the residence?

2   A    No, sir.

3   Q    I will show you on the screen, or you can look at it

4   behind you, I show you what's been marked as Government's

5   Exhibit PA-14.

6            Do you see that diagram?

7   A    Yes, sir.

8   Q    Could you tell us what that diagram represents?

9   A    It represents my apartment, my living space in my

10  apartment, the kitchen, living room, bathrooms -- I mean

11  bedrooms and the living room, bathroom, kitchen and dining

12  area.

13  Q    Does it accurately depict your apartment back in

14  August of 2003?

15  A    Yes, sir.

16  Q    Which was your bedroom?

17  A    Bedroom three.

18  Q    Did you have anything in that bedroom as far as

19  clothes, stereo, TV, anything like that?

20  A    Yes, sir.

21  Q    Did anybody else share that apartment with you on a

22  full-time basis?

23  A    No.

24  Q    Did other people crash in your apartment on occasion?

25  A    Yes, sir.

Campbell - Direct/Rosen

1686

1    Q    Was Pablo Amador one of them?

2    A    Yes, sir.

3    Q    What room did Pablo Amador stay in?

4    A    He stayed in bedroom two.

5    Q    Bedroom two?

6    A    Yes, sir.

7    Q    Did he share that bedroom with anyone?

8    A    Sometimes he would share it with Miguel Pena.

9    Q    Did there come a time when you got visitors on either

10   early Sunday morning, late Saturday, to your apartment?

11            MR. MISKIEWICZ:  Objection.  Time frame.

12            MR. ROSEN:  On August -- would be the 16th,

13   17th, over the weekend.

14            THE COURT:  All right.

15   A    I'm not really sure what the time, but I think that

16   Mr. Amador came by.  And I'm not too sure.  My

17   recollection is not clear.  It was nine years ago.  I know

18   he came by.  He did come by.

19   BY MR. ROSEN:

20   Q    Mr. Amador?

21   A    Yes.

22   Q    Was Justin Bressman there as well?

23   A    I think he came a little later, to my recollection.

24   Q    So they didn't come together?

25   A    No, they did not.

1687

1  Q    But they were there in your house on Sunday together?

2  A    Yes, sir.

3  Q    Would it be helpful if I showed you a copy of your

4  initial report to the New York City Police Department to

5  refresh your recollection of your events?

6            MR. MISKIEWICZ:  Objection.

7            THE COURT:  Sustained.

8  BY MR. ROSEN:

9  Q    Would you need anything to help refresh your

10 recollection about the events that took place from the

11 original reports you made to the police?

12            THE COURT:  Let me just see the document for a

13 moment.

14            Come on up.

15            MR. ROSEN:  Yes.

16            (Whereupon, at this time the following took

17 place at the sidebar.)

18            THE COURT:  Is this a written statement he

19 signed?

20            MR. ROSEN:  Yes.

21            THE COURT:  He signed this statement?

22            MR. ROSEN:  I showed it to him, and he

23 recognized it and refreshed his recollection.

24            THE COURT:  This looks like a 32B, a deposition,

25 but it's not.

1688

1          MR. ROSEN:  Judge, this was how I was able to

2    communicate with him.  He said this statement is a true,

3    accurate depiction of what he said.

4          THE COURT:  Let me hear your objection.

5          MR. MISKIEWICZ:  I don't -- I'm not objecting if

6    the witness says in answer to a specific question he can't

7    recall.  And in that instance, I suppose I can show a

8    telephone book to refresh his recollection.  But to just

9    slip something in front of him so he can read from the

10   script is improper.

11         THE COURT:  Just direct his attention.

12         Your concern is with respect to the date?

13         MR. ROSEN:  No, to Pablo Amador and Justin

14   Bressman showing up together.  And he says they arrived

15   together.

16         THE COURT:  Separately.

17         MR. ROSEN:  Arrived together, your Honor.  I'm

18   asking to refresh his recollection.  I didn't want to go

19   specifically with that.

20         THE COURT:  But that's where you are going.

21         MR. ROSEN:  I know, but I don't want to be

22   accused of testifying.

23         THE COURT:  You gave a statement, and you said,

24   is this your statement?  And it's not his statement.

25         MR. ROSEN:  It's a statement that he gave to the

1689

 1  police.

 2          THE COURT:  Okay.  But he did review it and sign

 3  it or anything of that sort?

 4          MR. ROSEN:  No.  He was never asked to.  I asked

 5  to --

 6          THE COURT:  He was never shown the statement

 7  until you came up?

 8          MR. ROSEN:  Correct.

 9          THE COURT:  Okay.  So your point is, you want to

10  have him testify that Bressman and Mr. Amador arrived

11  together?

12          MR. ROSEN:  Yes.

13          THE COURT:  Do you have any objections as to

14  that?

15          MR. MISKIEWICZ:  No.  No.

16          THE COURT:  Point to the area, and we'll go on

17  from there.

18          MR. MISKIEWICZ:  Your Honor, I'm renewing my

19  application for disclosure of any Rule 26.1 material.

20          THE COURT:  Has there been Rule 26.1 material?

21          MR. ROSEN:  No.

22          THE COURT:  You didn't take notes?

23          MR. ROSEN:  I didn't take notes and the

24  investigator didn't take notes.

25          MR. MISKIEWICZ:  Thank you.

1690

1    (End of sidebar conference.)

2    THE COURT:  The objection was sustained.  There

3  will be a new question.

4  BY MR. ROSEN:

5  Q    Mr. Campbell, if I show you a report of your original

6  statement to the New York City Police Department in 2003,

7  would it refresh your recollection that Pablo Amador and

8  Justin Bressman arrived together?

9  A    Yes, it would.

10    MR. ROSEN:  May I approach?

11    THE COURT:  Yes.

12    MR. ROSEN:  May I have it marked, Judge?

13    THE COURT:  What are we up to, Charlie?

14  Defendant's Exhibit H?

15    MR. ROSEN:  G and H were in evidence, so it must

16  be I.

17    THE COURT:  I.

18    (Whereupon, Government Exhibit I was marked for

19  identification.)

20  BY MR. ROSEN:

21  Q    Sir, I show you what has been marked, and I move into

22  evidence Defendant's Exhibit I.

23    Do you recognize this report?

24    THE COURT:  It's not going into evidence.  He's

25  going to look at it to see if it refreshes his

1691

1    recollection as to what was reported regarding his

2    statement to the New York City Police Department.

3              MR. ROSEN:  All right.

4              If you could direct his attention to the phrase.

5              MR. ROSEN:  May I approach?

6              THE COURT:  Yes.

7              THE WITNESS:  Yes.

8    BY MR. ROSEN:

9    Q    Does it help refresh your recollection of the events

10   on the 15th, 16th and 17th of August of 2003?

11   A    Yes.  It says August --

12             THE COURT:  Don't tell us what it says.

13             Does it refresh your recollection?

14             THE WITNESS:  Yes, it does refresh my

15   recollection.  Yes.

16   BY MR. ROSEN:

17   Q    Did they arrive together or separately?

18   A    At the time -- I don't know what time that really is.

19   I think it's 8 o'clock.  Yes, I think they did come at

20   that time together.

21   Q    Do you know when they visited the apartment, how they

22   would come to the apartment?

23             MR. MISKIEWICZ:  Your Honor, I will object --

24             THE COURT:  Sustained.

25             MR. MISKIEWICZ:  -- to the witness reading.

1692

```
1          THE COURT:  You can't read from the document,
2    sir.
3          THE WITNESS:  Okay.
4          THE COURT:  At this time you are telling us that
5    having reviewed the document, your recollection is
6    refreshed that they arrived together?
7          THE WITNESS:  Yes.
8          THE COURT:  All right.
9    BY MR. ROSEN:
10   Q    How did they arrive at the apartment?
11   A    Uhm, as of what?
12   Q    How did they physically get to the apartment?  By
13   train?  By car?  If you know.
14   A    I assume by car.  I'm not really sure of the car.
15   But I knew he had a car, so -- I knew they robbed, because
16   he had a car, so I assumed they both arrived with it.
17          He's arrived with the car, so him and Pablo was
18   riding in the car, so...
19          MR. MISKIEWICZ:  Objection.  Move to strike.
20          THE COURT:  Application granted.
21          If you would ask more questions.
22   BY MR. ROSEN:
23   Q    Did you know whether or not Justin Bressman had a
24   car?
25   A    Yes.
```

1693

1    Q    Did you ever ride in the car?

2    A    Yes.

3    Q    Can you describe the vehicle to us?

4    A    I forgot what year it is, but it's a Q45, a black

5    four-door.

6    Q    And did you actually physically ride someplace in

7    that vehicle?

8    A    Yes, we rode -- I forgot -- I think to New Rochelle,

9    and we rode back.  So I forgot the date.  It may be a

10   month or two.  May be in September, I think, September of

11   2007 that we rode back and forth.

12   Q    2007, are you referring to, or 2003?

13   A    2003, excuse me.  2003, excuse me.

14   Q    Had you seen Pablo Amador and Justin Bressman arrive

15   at your house on other occasions in that vehicle?

16   A    Uhm, I know they's arrived together, so I assume they

17   came in his car.

18            MR. MISKIEWICZ:  Objection.  Move to strike to

19   "assume."

20            THE COURT:  Sustained.

21   BY MR. ROSEN:

22   Q    Did you see the vehicle that day when they arrived?

23   Yes or no?

24   A    No.

25   Q    On other occasions when they had visited, did you see

1694

1    the car they arrived in, that four-door black car?

2    A    Yes.

3    Q    Over that weekend, did Mr. Bressman get a ticket on

4    that vehicle?

5    A    Yes.

6    Q    And is that how you know that they had driven there

7    to your apartment in that car?

8    A    Yes.

9    Q    Who told you that they had been ticketed that

10   weekend?

11   A    The police department.  I think it was Manhattan

12   South.  I forgot the name which one.  But they told me

13   that a car, Mr. Bressman's car, got ticketed.

14   Q    When they arrived at the apartment, did Mr. Amador

15   have a key?

16   A    No.

17   Q    How did they get in?

18   A    Knocking on the door, I'm pretty sure, and I allowed

19   them in.

20   Q    Did Mr. Amador and Mr. Bressman -- what did they do

21   at the apartment, with you or without you?

22   A    They was drinking beer.  We was drinking beer

23   together, and they partake in separate type of drugs.  I

24   was taking a drug, and they were taking a different type

25   of drug.

1695

```
1   Q    Did you smoke -- or did you see Justin Bressman and

2   Pablo Amador on that weekend smoking crack cocaine?

3   A    Yes, I have.

4   Q    Did you participate in smoking that crack cocaine?

5   A    No, I hadn't.

6   Q    What drugs were you taking that weekend, if any?

7   A    I have cocaine, weed, angel dust.

8   Q    Well, how long over that weekend, the Saturday and

9   Sunday, did they take drugs for?  Mr. Amador and

10  Mr. Bressman.

11  A    It had to have been most of the week, most of the

12  weekend.  Maybe 12 hours, I think.  I'm not too sure, but

13  12.  About 12 hours.

14  Q    And on Friday, had they been at your house, or had

15  you been with your girlfriend in Brooklyn?

16  A    Friday I was not there.  I came back Saturday.

17  Q    Are you familiar with the firearms that were owned by

18  Mr. Bressman and Mr. Amador?

19  A    Yes, I am familiar with firearms owned by

20  Mr. Bressman and Mr. Amador.

21  Q    Take a look at the screen, and tell me whose weapon

22  this is.

23            THE COURT:  Is there a number on it?

24            MR. ROSEN:  I'm sorry.  It's Government's

25  Exhibit PA-10.
```

1696

1    THE COURT:  Thank you.

2    BY MR. ROSEN:

3    Q    Can you identify whose weapon that is?

4    A    Mr. Pablo Amador.

5    Q    Had you ever personally fired that weapon?

6    A    I have one time.

7    Q    And where was that, sir?

8    A    That was on the top of my roof.

9    Q    And what sound did that firearm make when you shot or

10   fired the weapon?

11   A    A loud thump, an ear-splitting sound.

12   Q    When did Mr. Amador purchase or get that weapon?

13   A    To my recollection, I think in April of 2003.

14   Q    Do you know how he got it?

15   A    From a mutual friend.

16   Q    And who is that mutual friend?

17   A    I'm not too sure.  I'm not too sure.  I just know

18   that he got -- he had that weapon in April.

19   Q    And do you know why he got the weapon?

20   A    I think for protection, I guess.  I'm not too sure.

21   Q    Did there come a time during the summer that there

22   was a sale of guns in your apartment?

23   A    Yes.

24   Q    When was that sale of firearms?

25   A    Could have been in June or July.

Campbell - Direct/Rosen

1697

1  Q    And tell us, if you can recall, what took place when

2  the firearms were sold?

3           Who was selling them, what type of guns were

4  being sold, and who brought them?

5  A    Mr. Bressman, he was selling guns to Mr. Pena.  And

6  weapons was a .45, I think a .32 Beretta, and what is it,

7  a .45 Llama, an older Beretta -- yes, a Beretta, a .9 mm

8  Beretta.

9  Q    Did this sale take place in a pizzeria --

10 A    No.

11 Q    -- on Friday, the 15th of August?

12 A    No.

13 Q    Where did the sale take place in your apartment,

14 going back to Government's Exhibit PA-14?

15 A    In bedroom number two.

16 Q    And how do you know that?

17 A    Because I oversaw it.

18 Q    I'm sorry?

19 A    I seen the transaction being taken place.

20 Q    And who was the one selling the guns?

21 A    Mr. Justin Bleakman or Blakeman, whatever his name.

22 Q    The white guy?

23 A    I could say.  He was selling guns.

24 Q    Mr. Amador is Hispanic, correct?

25 A    Yes, sir.

1698

1   Q    And Mr. Bressman -- and you can refresh your

2   recollection from the report on his name --

3   A    Okay.

4   Q    -- he was white?

5   A    Yes, sir.

6   Q    And it was Bressman who owned the four-door black

7   vehicle?

8   A    Yes, sir.

9   Q    What was the compensation that Mr. Bressman received

10  from Mr. Pena for the purchase of those firearms?

11  A    I think it was cash and probably drugs.  I'm not

12  sure.

13  Q    And how were you certain that it was sometime earlier

14  in the summer of 2003 that this transaction took place?

15  A    Because to my recollection, I know it was in the

16  summer.  It was at the time -- it was in June or July.  To

17  my knowledge, that's when it occurred.

18  Q    And where did he get the guns from?  Mr. Bressman?

19  A    Mr. Bressman, as we was informed, he stole them from

20  the job, from his employer, I think.

21  Q    And this was in July of 2003?

22  A    Yes, sir.

23  Q    Did Mr. Amador indicate that he was with Mr. Bressman

24  when he stole the firearms?

25  A    I'm not sure about that.  I'm not sure that he did

1    it.  But I know that he knew about it and probably partook

2    in it.  I'm not sure.  I'm not really sure.

3              MR. MISKIEWICZ:  Objection.  Move to strike.

4              THE COURT:  Sustained.

5              MR. ROSEN:  Judge, he just said he's not sure.

6    There's nothing to strike.

7              THE COURT:  Just come up for a moment.

8              (Whereupon, at this time the following took

9    place at the sidebar.)

10             THE COURT:  Are you saying the witness's

11   statement that he's not sure --

12             MR. ROSEN:  The witness said he's not sure.

13             THE COURT:  So how is it probative of the facts

14   here?  He's not sure.

15             MR. ROSEN:  But there's nothing to strike.

16             I said, do you know, and he said, no, I'm not

17   sure.  Why is that to be stricken?

18             THE COURT:  The question then assumes that he

19   did this at a particular time.

20             MR. ROSEN:  I'm just asking whether or not he

21   knew.  That's all.  He says, I'm not sure.  Why should

22   that be stricken?

23             THE COURT:  And are you saying that is

24   consistent with his prior testimony here?

25             MR. ROSEN:  Yes.

1700

```
 1            MR. MISKIEWICZ:  My objection is it's not
 2   responsive.  He asked him a question, and then he kind of
 3   spun out talking about his assumptions.  And it ended up
 4   with, I'm really not sure of anything.  I just said, so
 5   it's not responsive.
 6            THE COURT:  Ask him the question:  What are you
 7   not sure of?
 8            MR. ROSEN:  Okay.
 9            THE COURT:  Okay.
10            (End of sidebar conference.)
11            THE COURT:  The objection is sustained.
12            Ask a new question, Mr. Rosen.
13   BY MR. ROSEN:
14   Q    Mr. Campbell, when I visited with you this past
15   Friday for the first time, did I have a list of questions
16   and a list of answers for you?
17   A    No.
18            MR. MISKIEWICZ:  Objection.
19            THE COURT:  Sustained.
20   BY MR. ROSEN:
21   Q    When I was in front of you, did I give you question
22   by question of how or what I was going to ask you here
23   today?
24            MR. MISKIEWICZ:  Objection.
25            THE COURT:  Sustained.
```

1701

```
 1              MR. MISKIEWICZ:  Move to strike.

 2              THE COURT:  The jury is to disregard the

 3    question.

 4              I believe the question is:  What was the witness

 5    not sure of?

 6              MR. ROSEN:  I was laying a foundation for that,

 7    your Honor.

 8              THE COURT:  I think you can ask that question.

 9              MR. ROSEN:  I forgot the question.

10              THE COURT:  "You testified that you were not

11    sure.  Can you tell us what you are not sure of?"

12              THE WITNESS:  I'm not sure that Mr. Amador was

13    with Justin when he took these guns.  I'm not sure of

14    that.  That's what I'm not sure of.

15              THE COURT:  Do you have another question?

16              MR. ROSEN:  I do.

17    BY MR. ROSEN:

18    Q    On the early morning hours of August the 18th, which

19    is Monday -- withdrawn.

20              In the late hours of Sunday the 17th, was Justin

21    Bressman and Pablo Amador in your apartment?

22    A    Yes.

23    Q    Did there come a time when they were going to leave?

24    A    Yes.

25    Q    And approximately what time of the day or night on
```

1    Sunday or Monday did they leave?

2    A    Approximately around two, maybe 3 o'clock in the

3    morning.  Yes, I think 3 o'clock in the morning.

4    Q    And they spent the entire day smoking crack cocaine?

5    A    Yes.

6    Q    And did you see if they had any weapons when they

7    left the apartment?

8    A    I saw Mr. Bressman take his weapon with him, and I'm

9    pretty sure that Mr. Amador took his weapon with him, too.

10   Q    And this was about two or three in the morning on

11   Monday?

12   A    Sunday, yes.  Sunday morning, yes.  Sunday night,

13   Monday morning, yes.

14   Q    So they leave the apartment.

15        Do they leave in Justin Bressman's vehicle?

16   A    Yes, sir.

17   Q    Did you see them leave in the vehicle?

18   A    I'm not too sure -- yes.  Yes -- I'm sorry.  Yes.

19   Q    So two fellows smoking crack cocaine for a couple of

20   days leave in a black four-door vehicle with firearms that

21   day?

22   A    Yes, sir.

23   Q    Did you know where they were going?

24   A    No, sir.

25   Q    Did they discuss with you what their plans were?

Campbell - Direct/Rosen

1703

1    A    No, they did not.

2    Q    What type of firearm did Justin Bressman have?

3    A    He had a metallic black, I think 22 long.

4    Q    I show you what has been marked as PA-11.  That is

5    Government's Exhibit PA-11.

6         Does this look somewhat like the firearm that

7    Justin Bressman had that evening?

8    A    Yes, it looks similar.

9    Q    Was there something unusual about the firearm?

10   A    Mr. Bressman had a silencer with him.  So it would

11   screw to the top.  He had a case where it all fit in,

12   so...

13   Q    So Justin Bressman had that type of firearm with a

14   silencer?

15        MR. MISKIEWICZ:  Objection.  Leading and

16   repetitive.

17        THE COURT:  Overruled.

18   A    Yes.

19   BY MR. ROSEN:

20   Q    And Pablo Amador had this firearm, correct

21   (indicating)?

22        MR. MISKIEWICZ:  Objection.

23        THE COURT:  Sustained.

24        MR. ROSEN:  He just said he did.

25        THE COURT:  Sustained.

Campbell - Direct/Rosen

1704

1    BY MR. ROSEN:

2    Q    Did Pablo Amador have that firearm when he left the

3    apartment?

4    A    To my recollection, I think, yes.

5    Q    Okay.

6    A    Yes.

7    Q    If you know, are the bullets that are used in the

8    revolver which is PA-10 also the same bullets that are

9    used in Government's Exhibit PA-11, 22-caliber shells?

10   A    I'm not too sure.  I'm not too sure.  I'm not too

11   sure about that.

12        MR. ROSEN:  One moment, your Honor.

13   Q    Did there come a time on Monday when they returned to

14   your apartment?

15   A    Uhm, Mr. Amador returned before Mr. Bressman came by.

16   Q    Were you sleeping when they came back?

17   A    Yes.

18   Q    And take a look at the report in regards to when they

19   came back, if it helps you refresh your recollection.

20        MR. MISKIEWICZ:  Objection.

21        THE COURT:  Sustained.

22        Do you know what time they came back?

23        THE WITNESS:  Ma'am, all I know, it was early in

24   the morning.  I'm not too sure what the time was.

25        But I'm pretty sure it was from nine, maybe

1705

1    10 o'clock.  I had no recollection of what time it was,

2    but it was somewhat early in the morning.

3    BY MR. ROSEN:

4    Q    I want you to take a look and tell me, by refreshing

5    your recollection on Defendant's Exhibit I, if you can

6    tell us what you told the police in 2003 about when they

7    arrived and how they arrived together.

8                MR. MISKIEWICZ:  Objection.

9                THE COURT:  Sustained.  The question is:  Do you

10   have a recollection of telling the police something?

11               THE WITNESS:  Yes.

12               THE COURT:  Okay.  And is there anything that

13   can help you refresh your recollection as to what time you

14   told them?

15               THE WITNESS:  My recollection is it had to have

16   been around 9:30, 9:45 to 10:45.

17   BY MR. ROSEN:

18   Q    How about whether or not they arrived together?

19               MR. MISKIEWICZ:  Objection.

20               THE COURT:  Sustained.

21   BY MR. ROSEN:

22   Q    Would it help you to look at --

23               THE COURT:  Do you have a recollection as to

24   whether or not they arrived together?

25               THE WITNESS:  I have no recollection.  I mean, I

Campbell - Direct/Rosen

1706

1  was pretty sure that Mr. Amador came by, came before

2  Mr. Bressman.  So, I mean, I saw Mr. Amador at that time,

3  at around 9:45, 10:45.  I'm not sure if I seen

4  Mr. Bressman at that time, but I did see Mr. Bressman

5  later.

6  BY MR. ROSEN:

7  Q    Would it help to refresh your recollection if you

8  looked at the report to determine whether or not they came

9  back together?

10            MR. MISKIEWICZ:  Objection.

11            THE COURT:  Sustained.

12            You don't have to look at the report.

13            Next question.

14  BY MR. ROSEN:

15  Q    Do you have an independent recollection of whether or

16  not Justin Bressman came back to the apartment together

17  with Pablo Amador?

18  A    I have a recollection, yes, they did come back.  But

19  I'm not sure if they came back together, that's the thing.

20  Q    Would it refresh your recollection to look at the

21  report?  Just say yes or no, sir.

22            MR. MISKIEWICZ:  Your Honor --

23  BY MR. ROSEN:

24  Q    Just so yes or no.

25            MR. MISKIEWICZ:  Objection.

1707

```
1            THE COURT:  Sustained.

2            MR. MISKIEWICZ:  I ask that counsel remove the

3    exhibit in between those periods when he's attempting to

4    refresh the witness's recollection.

5            THE COURT:  Please take it back, Mr. Rosen.

6    BY MR. ROSEN:

7    Q    Mr. Campbell, would it help refresh your recollection

8    of the events of Monday morning, August the 18th, if you

9    refreshed your recollection as to the statement you gave

10   to the police on the morning -- on the day after this

11   homicide took place?

12           MR. MISKIEWICZ:  Objection.

13           THE COURT:  Sustained.

14   BY MR. ROSEN:

15   Q    Would it refresh your recollection of the events that

16   took place in the morning at your apartment so that you

17   can be certain of what you testify to here today?

18           MR. MISKIEWICZ:  Objection.

19           THE COURT:  Please approach for a moment.

20           (Whereupon, at this time the following took

21   place at the sidebar.)

22           THE COURT:  What is your objection?

23           MR. MISKIEWICZ:  He had said -- I'm not even

24   sure what it is he's attempting to refresh his

25   recollection about, other than generally he wants him to
```

1708

1    read from the report.  He has repeatedly answered the

2    question either, I'm certain, or I think, but I'm

3    definitely certain.  I mean, he's answered it.

4         He thinks that these are two different

5    inconsistent versions:  either that Pablo came first, then

6    Mr. Bressman.  Then later on he said they came together.

7    He seems to think it is nine or 10 o'clock.  That part he

8    has not equivocated on.

9         Now he wants to force this declaration in the

10   recollection by forcing to refresh his recollection, by

11   saying a different version of that event.

12        And it is improper refreshing of recollection.

13   This man couldn't remember his name if you put it in front

14   of him.  And I understand counsel had a hard time with

15   this guy, but there are ways and there are other ways of

16   refreshing recollection, and this is inappropriate.

17        MR. ROSEN:  He says in the report --

18   Mr. Campbell said when he woke up, he looked at his clock,

19   which read 10:05.  When he got out of his bed, he observed

20   Whitey and Justin getting out of their clothes.

21        That's what I'm asking him to do.  The events

22   that took place that morning.

23        MR. MISKIEWICZ:  And I can't --

24        MR. ROSEN:  This is not exactly that he's in

25   jail.  Its been nine years.  I didn't have the ability to

1709

1   sit and go over his testimony, over and over with him.

2            THE COURT:  Okay.  That isn't necessary.  I

3   understand the conditions you examined this witness under.

4   But more importantly, it is inconsistent on the stand

5   right now.  I don't see how that report will do anything

6   else except for it to say, I saw them both together when I

7   woke up.

8            MR. ROSEN:  I'm not complaining.  It is

9   10 o'clock.  It's in here.  They were in there together,

10  and they were changing their clothes.

11           THE COURT:  But he doesn't even say in the

12  report, from what you are saying, that he saw them come

13  together.  And I think that's what you are trying to do.

14           MR. ROSEN:  Yes.

15           THE COURT:  At some point in time, if you

16  believe him, changing their clothes.  But he hasn't gotten

17  to that.  He hasn't testified to that in direct.

18           MR. ROSEN:  I didn't want to be leading, Judge,

19  so I said, what took place in the apartment that morning

20  with them.  If I can lead, I'll ask him the question.

21           THE COURT:  He can't give you a straight answer.

22  That's the problem, Mr. Rosen.  He keeps going back and

23  forth.

24           MR. ROSEN:  But if he can read that --

25           THE COURT:  But that's not his testimony.

1710

1    MR. ROSEN:  Aren't we here seeking the truth,

2    Judge, on what goes on here?

3    THE COURT:  I've been giving you latitude.

4    MR. ROSEN:  I haven't spoken to him in nine

5    years on this case.  I saw him for the first time.  August

6    will be nine years.  I saw him for the first time on

7    Friday.

8    THE COURT:  All right.

9    MR. ROSEN:  And give me a little bit of latitude

10   here.  I'm trying to, Judge.  They had guys like Mulligan

11   twice a week in their office.

12   THE COURT:  But this isn't a contest here about

13   how they prepare their cases versus how you prepare yours.

14   What is your objection to this coming in?

15   MR. MISKIEWICZ:  The entire report?

16   THE COURT:  No, just this section that he wants

17   in.

18   MR. MISKIEWICZ:  Well, there are, to my

19   knowledge, at least three or four different reports.  All

20   of them have different versions of events, and they are

21   irreconcilable.

22   THE COURT:  You are talking about the reports

23   this witness gave the NYPD or the FBI?

24   MR. MISKIEWICZ:  Both.  Including the

25   handwritten statement.  They are all irreconcilable.

1          He made them up.  He lied, really, to give

2    Bressman and Mr. Amador alibis.  I mean, he's repeatedly

3    lied about this in the past, and the various reports

4    indicate that he has lied.

5          And again, I'm simply objecting to letting him

6    read from the report because counsel is unhappy with the

7    answer.  He got the answer.  In fact, he has gotten the

8    answer several times, and several times it is still

9    inconsistent, and that's not what he wants.

10          But that is not a solution, is to not simply let

11   this guy read some report he wants in.

12          MR. ROSEN:  I'm just asking to refresh your

13   recollection whether or not he saw them change their

14   clothes.

15          THE COURT:  All right.  Ask that question and

16   then let's move on, because you'll have plenty on

17   cross-examination.

18          MR. ROSEN:  All right.

19          (End of sidebar conference.)

20   BY MR. ROSEN:

21   Q    Mr. Campbell, it has been almost nine years since

22   this incident, correct?

23   A    Yes, sir.

24   Q    You were interviewed over nine years ago, correct?

25   A    Yes, sir.

Campbell - Direct/Rosen

1712

1    Q    I saw you for the first time on Friday this past

2    week --

3              MR. MISKIEWICZ:  Objection.

4              THE COURT:  Objection sustained.

5    BY MR. ROSEN:

6    Q    Take your time.  If there are questions on that

7    document in front of you, Exhibit I, your statement, that

8    could help refresh your recollection as to the events that

9    took place, please let us know.

10             MR. MISKIEWICZ:  Objection, your Honor.

11             THE COURT:  Sustained.

12             MR. ROSEN:  I'll ask him --

13             THE COURT:  Ask the question I told you to ask,

14   if you would, please.

15   BY MR. ROSEN:

16   Q    Okay.

17             Would the document help refresh your

18   recollection as to whether or not you observed Justin

19   Bressman and Pablo Amador changing their clothes in your

20   apartment?

21   A    Yes.

22   Q    Please read the document.

23             MR. ROSEN:  May I assist the witness, Judge, in

24   just approaching where it is?

25             THE COURT:  Okay.

1713

1           MR. MISKIEWICZ:  We'd just object to reading out

2     loud.

3           THE COURT:  Don't read it out loud.  Tell us if

4     it refreshes your recollection.

5           Mr. Rosen will refer you to the area he wishes

6     you --

7           MR. ROSEN:  May I approach?

8           THE COURT:  Yes.

9           MR. ROSEN:  (Indicating to the witness.)

10    BY MR. ROSEN:

11    Q    Does a reading of Exhibit I help refresh your

12    recollection as to whether or not you saw them changing

13    their clothes?

14          MR. MISKIEWICZ:  Objection.  Clarification.  He

15    just read the document.

16          THE COURT:  You read the document?

17          THE WITNESS:  Yes.

18          THE COURT:  Does it refresh your recollection,

19    the section that Mr. Rosen showed you, as to whether or

20    not you saw Mr. Bressman and Mr. Amador changing their

21    clothes in your apartment?

22          THE WITNESS:  Yes, ma'am.

23    BY MR. ROSEN:

24    Q    Does it further refresh your recollection of whether

25    or not they arrived together?

Campbell - Direct/Rosen

1714

1   A    That's --

2   Q    You can read --

3            THE COURT:  That's a yes or no question.

4   A    Yes.

5   BY MR. ROSEN:

6   Q    Please read the document.

7            THE COURT:  No, don't read it.  Tell us if it

8   refreshes your recollection.

9            MR. ROSEN:  Well, I'd like him to read the

10  document.

11           THE COURT:  Read it to yourself, sir.  Don't

12  read it out loud.

13           MR. MISKIEWICZ:  May I approach, your Honor?

14           THE COURT:  Yes.

15           MR. MISKIEWICZ:  I just want to see what counsel

16  is pointing out.

17           THE COURT:  Yes.

18           MR. ROSEN:  (Indicating to witness.)

19           THE COURT:  Does it refresh your recollection,

20  sir?

21           THE WITNESS:  Yes, ma'am.

22  BY MR. ROSEN:

23  Q    Did they arrive together?

24  A    Yes.

25  Q    What did they do with the change of clothing that

1715

1    they had?

2    A    Mr. Bressman put away -- he had a black duffle bag,

3    so I think he put the clothes he had on in the duffle bag.

4              Mr. Amador, I saw him took his clothes to --

5    took them off, and I think he took them elsewhere.  I'm

6    not too sure about that.  But I know he took them off and

7    put them somewhere inside the house.

8    Q    And he changed clothes?

9    A    Yes, sir.

10   Q    Did they say where they had come from?

11   A    No, I never had that discussion.

12   Q    The first time that you met with the police, did you

13   try to protect Pablo Amador?

14   A    Yes.

15   Q    Did you tell them that you didn't know who Pablo

16   Amador was?

17   A    Yes.

18   Q    And why did you do that, sir?

19   A    Mr. Amador was a close friend of mine.

20   Q    And?

21   A    And I was just trying to protect a friend.

22   Q    When you saw this officer, I believe it was Salter,

23   in September, did you tell him the truth of what took

24   place on that Monday morning, August 18th, between you,

25   Justin Bressman and Pablo Amador?

1716

```
1    A    Yes.  I guess -- I'm sure.

2    Q    When you met with the FBI later on at Rikers Island,

3    did you tell them the same things that you are telling us

4    here today?

5    A    Yes.

6              MR. ROSEN:  One moment, your Honor.

7              THE COURT:  Yes.

8    BY MR. ROSEN:

9    Q    Does Pablo Amador have a tattoo?

10   A    To my recollection -- it's been a long time -- yes.

11   Q    All right.  Can you describe the tattoos he has?

12   A    I think he has one on his arm, that I'm sure of.

13   That's it.  I believe -- it has been a long time.  I

14   haven't seen him for about nine years, so I'm not sure.

15   Q    So you haven't seen Pablo Amador in about nine years?

16   A    Yes, sir.

17   Q    How about Justin Bressman?

18   A    The same thing.  I haven't seen him in nine years.

19   Q    When was the last time you met with the police, if

20   you can remember?

21   A    On this case?

22   Q    Yes.

23   A    From the FBI or just the regular police?

24   Q    We'll take the regular police first.

25   A    The last time I saw him was in 2003.  Yeah, 2003.
```

Campbell - Cross/Miskiewicz

1717

1    Q    And how about the FBI?

2    A    The FBI, I've seen them -- the last time was, I

3    think, 2005.

4    Q    And you are in prison, correct, now?

5    A    Yes.

6    Q    How long a sentence are you doing?

7    A    Three years.

8    Q    What was that for?

9    A    It was robbery in the second degree.

10   Q    And when is your release date?

11   A    July 20th.

12   Q    Of this year?

13   A    Yes, sir.

14        MR. ROSEN:  I have nothing further.

15        THE COURT:  Cross-examination.

16   CROSS-EXAMINATION

17   BY MR. MISKIEWICZ:

18   Q    Good afternoon, Mr. Campbell.  I'm one of the two

19   prosecutors in this case.

20        Mr. Campbell, you said that you met with counsel

21   who was just asking you questions on Friday.

22        Was counsel taking notes when you were speaking

23   with him?

24   A    Not that I know of.

25   Q    Was there a private investigator?

1718

1   A    Yes.

2   Q    Was the private investigator taking notes?

3   A    He may have.

4   Q    Well, did you see him or not?

5   A    Yeah, I think he was.  Maybe.  Yes.

6   Q    I'll ask you if you know, say yes.  If you don't

7   know, say you don't know.

8   A    I'm not too sure.  I don't know, no.

9   Q    So you don't know?

10  A    I really don't know, no.

11  Q    Other than being brought down here by way of a

12  subpoena, have you been promised anything in exchange for

13  your testimony here today?

14  A    No, sir.

15  Q    I want to go back to the apartment that you were

16  renting in the summer of 2003 and what has been received

17  in evidence as PA-14.

18       Do you see that layout?

19  A    Yes.

20  Q    And that would fairly and accurately show how your

21  apartment was laid out back then; is that true?

22  A    Yes.

23  Q    For purposes of orienting us, what are the streets

24  from the outside where you see the windows?

25  A    The kitchen and bedroom two is the FDR Drive.

Campbell - Cross/Miskiewicz

1719

1    Bedroom three and the living room -- excuse me, I'm sorry.

2              Bedroom one -- wait a minute, yes.

3              Bedroom two and the kitchen is the FDR Drive.

4    It overlooks the FDR Drive.

5              One, three and the living room overlooks

6    Delancey, yes, and the FDR by the Williamsburg bridge.

7    Q    So if I understand you correctly, this side where my

8    pen is, that would be Delancey.  This side would be the

9    FDR Drive, correct?

10   A    Correct.

11   Q    Now, you testified that you were not sleeping over at

12   your house on the night of the blackout; is that correct?

13   A    Yes, sir.

14   Q    What day of the week was the blackout?

15   A    The day of the week was Thursday.

16   Q    So you were not sleeping in your house Thursday?

17   A    Thursday and Friday.

18   Q    Thursday night and Friday?

19   A    Into Saturday, yes.

20   Q    So how many days did you sleep away from your house?

21   A    Maybe one and a half, maybe two.  It's like two days.

22   Q    I'm asking you, please, do not guess.

23             What is your recollection as you sit here today?

24   A    Excuse me.  Two days.

25   Q    Which days?

Campbell - Cross/Miskiewicz

1720

1    A    Thursday and Friday, came back.

2    Q    You slept away from the house?

3    A    Yes, sir.

4    Q    And if I understood you correctly when you were being

5    asked questions on direct, you were the only person who

6    had a key to your apartment?

7    A    Correct.

8    Q    Where were you sleeping, by the way?

9    A    I was sleeping at a friend's house.

10   Q    Who?

11   A    A female friend in Brooklyn.

12   Q    What is her name?

13   A    Her name is Jamally Lee.

14   Q    Where did she live?

15   A    She lived on President's Street in East New York.

16   Q    So if you were sleeping in her house Thursday and

17   Friday night into Saturday morning, and -- so nobody else

18   could have been in your apartment, correct?  You gave

19   nobody else permission to be in your apartment, correct?

20   A    Correct.

21   Q    Mr. Amador did not have a key to your apartment?

22   A    No.

23   Q    What about Justin Bressman?

24   A    No.

25   Q    Do you know the defendant here?

Campbell - Cross/Miskiewicz

1721

1   A    No.

2   Q    Did you ever see him before?

3   A    No.

4   Q    Why is your phone call -- or why is your apartment

5   calling the defendant at 12:18 a.m. Saturday when you say

6   you were sleeping in your girlfriend's apartment in New

7   York?

8            MR. ROSEN:  Objection.  Mischaracterization of

9   the testimony.  He said Thursday and Friday.  Saturday,

10  12:18 a.m.?

11           MR. MISKIEWICZ:  Yes.

12           THE COURT:  Overruled.

13  A    I have no recollection of that.

14  BY MR. MISKIEWICZ:

15  Q    Did you call the defendant?

16  A    I don't know the defendant.

17  Q    Did you -- are you part of a scheme to kill Vincent

18  Gargiulo?

19  A    Who?

20  Q    You don't know who Vincent Gargiulo is?

21  A    I do not know that person.

22  Q    Okay.  Why did you call the defendant at 12:18 in the

23  morning, early morning of Saturday the 16th?

24  A    I have no recollection of that.  I did not call that

25  person.

1722

1  Q    You have no recollection, or you did not call that

2  person?

3  A    I did not call that person.

4  Q    You had a hard line phone, correct, in your

5  apartment?

6  A    Yes, I have.

7  Q    Your phone number at the time was in your name,

8  correct?

9  A    Yes, it was.

10  Q    I will show you what's been admitted into evidence as

11  Government's Exhibit VZ-1.

12          Can you read whose name -- in whose name that

13  subscriber information is?

14  A    That's mine.  Leshan Campbell.

15  Q    What is the phone number?

16  A    The phone number is 212-619-3240.

17  Q    Okay.  And you are sure you were sleeping at your

18  girlfriend's house in East New York Thursday, Friday and

19  into Saturday?

20          MR. ROSEN:  Objection.  That's not what he said.

21          THE COURT:  Overruled.

22          The jury will be making a determination as to

23  what the witness testified to.

24          Please proceed.

25  BY MR. MISKIEWICZ:

1723

1    Q    Let me make sure you understand the question.

2              Were you or were you not sleeping at your

3    girlfriend's house in East New York Thursday night, the

4    day of the blackout, Friday, into Saturday?

5    A    Like I said, I was there Thursday and Friday, and I

6    left Saturday.  That's where I was at.

7    Q    You left Saturday when?

8    A    It has to be early in the morning.  I mean, that's

9    when the trains came back -- the train came back on.

10   There was a bus that came in Brooklyn.  I took the bus,

11   and I took the train and I came back home.

12   Q    So you left at what time?

13   A    It had to have been -- I mean, it was early in the

14   morning.  I mean, I don't know what time.  It was early in

15   the morning.  Could have been six, seven in the morning.

16   It could have been eight.

17   Q    Could you have been back at your house right after

18   midnight Saturday morning?

19   A    I'm not too sure.  I doubt it.  All I know, when the

20   trains came back on, the bus came back on, that's when I

21   came home.  I do not know what time it was.

22   Q    And let me show you a page of your phone records, and

23   specifically the highlighted portion here, the second of

24   the highlighted portion here.  This refers to a date,

25   2003, August 18, 12:13 a.m.

Campbell - Cross/Miskiewicz

1724

1          Do you recognize this number, 646-739-3560?

2   A    No, I do not know.

3   Q    Who was in your apartment at 12/18?

4   A    I have no recollection, sir.  I don't even know that

5   number.

6   Q    You've testified you were not there; you were in your

7   girlfriend's house in East New York.  And I think your

8   testimony a moment ago, it was unlikely you could have

9   been back anytime before 6 o'clock in the morning.

10         So who is calling this number from your house if

11   nobody else has a key?

12   A    I don't have no recollection.  There had been times

13   that -- I mean, there has been times -- I did give

14   Mr. Amador my key a long time ago.  He lost it.  He lost

15   the key.  But I'm not too sure -- I'm not saying how this

16   happened, but I do know that I was in Brooklyn at this

17   time.

18   Q    Wait a second.  You are saying now maybe Mr. Amador

19   did have a key to your apartment?

20   A    No, he lost a key.

21   Q    So back to my original question.  You are saying

22   nobody had a key to your apartment that weekend other than

23   you, and yet here's a phone call out of your apartment to

24   the defendant at 12:18 in the morning.

25         How did that happen?

Campbell - Cross/Miskiewicz

1725

1    A    I don't -- I have no -- I have no clue.  I have no

2    clue.

3    Q    What about the testimony that the first phone call

4    there coming out of your apartment at 12:17, a minute

5    earlier, is by somebody by the name of Marty Matulis?  You

6    got to know Marty Matulis.

7    A    Who was that?

8    Q    Sunnyside.  Shared an apartment with the murder

9    victim in this case.  You don't know him?

10   A    I have no recollection of these people.

11   Q    Well, who is calling these people from your

12   apartment, then, if you are not there?

13   A    I don't have -- I have no idea.  I have no idea who

14   is calling people from my apartment.

15   Q    Would you agree with me, looking at this report, that

16   there's -- let's start with 13 -- 13 phone calls coming

17   out of your apartment from different people between

18   midnight and 2:58 a.m.?

19         Did you make all of those phone calls?

20   A    No, I have not.  I was not present at that time.

21   Q    But nobody else was; is that your testimony?

22   A    I have no recollection of somebody being in my

23   apartment.  I'm saying I have a window that was not

24   guarded.  I'm not too sure.  Maybe someone could have

25   snuck in my apartment.  I'm not too sure.  I'm not too

1726

1    sure what happened.  I was not there.

2    Q    We'll come back to that maybe later.

3         You were asked a series of questions by

4    Mr. Rosen about your interview by the NYPD Manhattan --

5    Midtown South, I'm sorry.

6         Do you remember the day they came to interview

7    you the first time?

8    A    I don't remember the day.  It could have been

9    Wednesday or Thursday, probably.

10   Q    Would August 21, 2003, sound about right?

11   A    I'm not too sure.  I don't remember the day.

12   Q    All right.  Well, is there anything that would help

13   refresh your recollection as to the date that you were

14   first interviewed by the NYPD?

15   A    As to paperwork?  No, I do not know.

16        MR. MISKIEWICZ:  May I borrow your NYPD report?

17   BY MR. MISKIEWICZ:

18   Q    I show you Defendant's Exhibit I, also Government's

19   Exhibit 3500-JS.

20        MR. MISKIEWICZ:  No, I'm sorry.  I misspoke.

21   This is not the document I would show you.

22   BY MR. MISKIEWICZ:

23   Q    Mr. Rosen showed you a report there, Defendant's

24   Exhibit I.  Do you remember what date that was in the

25   report that he was showing you?

Campbell - Cross/Miskiewicz

1727

1    A    No, I do not remember the date.

2    Q    You don't, do you?

3    A    No, I do not.

4    Q    There was an earlier report that Mr. Rosen didn't

5    show you; am I correct?

6              I'll show this to you now.  It is -- I'll mark

7    it Government's Exhibit 100.

8              (Handing to counsel.)

9              Showing you Government's Exhibit 100, take a

10   look at this briefly.  Look at the date where it indicates

11   the date of the report.  A couple of different locations

12   where that is.

13             Read that to yourself.

14   A    (Witness complies.)

15   Q    Mr. Campbell, does that help refresh your

16   recollection as to the first date you were interviewed by

17   the NYPD in connection with this matter?

18   A    Yes.

19   Q    Okay.  What date?

20   A    That's August 21st.

21   Q    Okay.  Do you recall what you told the detectives who

22   interviewed you, Detective Salter, Detective Brzostek,

23   about where you were that weekend?

24   A    As I stated before, like I said, I was at my

25   girlfriend's house in Brooklyn.

Campbell - Cross/Miskiewicz

1728

1  Q    Did you tell the NYPD that the first time you were

2  interviewed, that you went to your girlfriend's house

3  Thursday, Friday and into Saturday, or did you tell them

4  something else?

5  A    I told them that I was in Brooklyn.  I didn't tell

6  them -- I don't recollect what I told them.  Told them

7  that I was in Brooklyn.  That's it.

8  Q    You don't remember what you told them about that

9  weekend and where you were that weekend?

10 A    I told them that I was in Brooklyn that weekend.

11 Q    The whole weekend, correct?

12 A    Yes.

13 Q    Yet you told them that you were in Brooklyn even

14 through Sunday, correct?

15 A    I do not remember.  I was a little bit nervous.  That

16 was the first time I ever had been questioned by police

17 coming to my house, ever, so I was a little flustered.  I

18 may have been mistaken my words.

19          As I said, that was what the police say.  So

20 that's what he says.  So I do not -- I'm saying maybe I

21 did -- I'm saying, maybe I did misspoke [sic], but I do

22 remember I did come back Saturday that day.

23          So maybe -- maybe he put it in his report

24 that -- what he thought what I said.  But I know what I

25 said.

Campbell - Cross/Miskiewicz

1729

1    Q    You were asked towards the end of the direct

2    examination that you admitted that you lied to the NYPD

3    when you were first interviewed.  Do you remember those

4    questions from Mr. Rosen?

5    A    No, I do not admit lying to the police, because I

6    never told the police that I was lying.

7    Q    Didn't you, just about 20 minutes ago, toward the end

8    of Mr. Rosen's direct examination, didn't you say you

9    admitted to lying to the police to protect your friend,

10   Pablo Amador?

11   A    I said I protected my friend.  I did not say I lied.

12   Q    Okay.  But you said -- I thought you said that you

13   told them you didn't know who Pablo Amador was.  Correct?

14   A    Yes.

15   Q    And that was the way you were trying to protect Pablo

16   Amador, correct?

17   A    Yes.

18   Q    Did somebody tell you to say that here in court?

19   A    No.

20   Q    Well, why on August 21, 2003, two days after the

21   murder, why did you say you didn't know Justin Bressman?

22   A    I was scared.  I was scared.

23        At that present time, I was in the police

24   department.  And the police, they came to my house, took

25   me to the precinct.  This is the first time I had ever

1730

1    been interrogated like that.  I was nervous.  I was

2    scared.  I was trying to protect my friend.  I didn't see

3    that as being hurtful.

4    Q    But you said in court today that you denied knowing

5    Pablo, and you told the NYPD nine years ago you didn't

6    know Justin Bressman.

7         You identified Pablo Amador; isn't that correct?

8    A    Yes, and I have identified Mr. Bressman, too, at that

9    interview too, as you've seen on the paper.  Yes.

10   Q    You identified him as somebody you didn't really

11   know; was just a friend of Pablo's, correct?

12   A    Yes, sir.

13   Q    But at first you denied knowing him?

14   A    At first.  Like I said, I was scared.

15   Q    My question to you:  Isn't it true, sir, at first you

16   denied even knowing Justin Bressman?  Is that true?

17   A    That's true, yes.

18   Q    And you were scared.

19   A    Yes, I was.

20   Q    I know you wanted to say that.

21        But today you said you denied knowing Pablo.

22   That's wrong.

23   A    No.  Mr. Rosen said, having protected your friend.

24   And my friend was Pablo, Mr. Amador.  And Mr. Amador was a

25   good friend of mine, so --

1731

1    Q    I'm sorry, go ahead.  Are you finished?

2    A    No, I'm sorry.

3    Q    You told him from the very first interview all about

4    Pablo, who you referred to as Whitey?

5    A    Yes, his nickname.

6    Q    You never denied knowing Pablo to the NYPD?

7    A    At the present.  At the beginning, yeah, I think I

8    did.  I'm not sure if I did or not.

9    Q    You have no idea, do you?  You have no idea what you

10   told them; isn't that true?

11   A    I do have a recollection.  I'm saying I do not

12   remember -- I never said anything about Mr. Amador.  I

13   denied both of them in that interview, as it stated in

14   both.

15            I did not deny both of them, not just

16   Mr. Bressman.

17   Q    Sir, do you remember telling the NYPD in this first

18   interview that you came back to your apartment at about

19   8 o'clock in the afternoon [sic] on Sunday, August 17th?

20            Do you remember saying that to him?

21   A    8 o'clock in the afternoon?

22   Q    8 o'clock at night.  8 p.m.

23   A    I'm not too sure.

24   Q    And do you recall saying that you went to sleep --

25   withdrawn.

Campbell - Cross/Miskiewicz

1732

1    Do you recall saying that to the NYPD, that

2    Justin Bressman and Pablo, a/k/a Whitey, your friend,

3    stayed at your apartment until 11 o'clock Monday morning?

4    Do you recall telling the NYPD that?

5    A    Yes, I remember saying that.

6    Q    And that was a lie?

7    A    Yes, it was.

8    Q    Now Defendant's Exhibit I.  You were shown this

9    report, Defendant's Exhibit I.

10    This was a second interview -- well, do you

11    remember when the second interview was, the date?

12    A    As you were showing me, the 21st of August.

13    Q    I'm asking you the second time you were interviewed.

14    Do you recall when that was?

15    A    Maybe the 22nd.  I'm not too sure.  I'm not really

16    sure.  I don't recall.  But I know I was taken down to the

17    precinct, Manhattan South.

18    Q    So the answer is you don't remember?

19    A    I don't remember the date.

20    Q    Take a look at Defendant's Exhibit I.  See if that

21    refreshes your recollection about the date of the second

22    interview with the NYPD.

23    Have you had a chance to look at the date?

24    A    Yes.

25    Q    Does that comport with your recollection, your

Campbell - Cross/Miskiewicz

1733

1    memory, that you were interviewed almost a month later,

2    September 16th?

3    A    Yes.

4    Q    You were interviewed by Detective Brzostek and Salta

5    again?

6    A    Yes.

7    Q    Do you recall what you told them at that time?

8    A    Yes.

9    Q    What did you tell them?

10   A    I told them that I did have associations with

11   Mr. Bressman and Mr. Amador.

12   Q    And that was the first time you admitted to really

13   knowing Justin Bressman, correct?

14   A    Yes, sir.

15   Q    Your first time you said, Oh, I don't really know

16   him.  He's my friend -- Whitey's friend.  I don't really

17   know.

18        That was a lie?

19   A    How is that?

20   Q    On the second interview, you indicated that you did

21   have associations with Justin Bressman, didn't you?

22   A    Yes.  But I met him through Mr. Amador.  So he was

23   Mr. Amador's friend.

24   Q    But when the police described to you Justin Bressman,

25   they had to give you a physical description before you

1734

1  finally said, oh, you mean him, or something to that

2  effect, correct?

3  A    They showed me a picture, sir.

4          MR. MISKIEWICZ:  May I have a moment?

5          THE COURT:  Mr. Miskiewicz, I did indicate I

6  would stop at 4:30 today.

7          Ladies and gentlemen, we'll adjourn for the day.

8  We'll resume again tomorrow at 9:45.

9          Do not discuss this case with anyone.  If anyone

10 attempts to discuss it with you, you immediately report it

11 to Mr. Baran through a note.

12         Do not look at anything that might be reported

13 in the media concerning the facts of the case.  Don't do

14 any social networking with regards to this case.  Do not

15 do any independent research or investigation.  Continue to

16 keep an open mind.

17         I look forward to seeing you tomorrow at 9:45.

18         Thank you.

19         (Whereupon, at this time the jury exits the

20 courtroom.)

21         THE COURT:  On the record, if you would, please.

22         Tomorrow morning I'll see you folks at 9:15.

23         How much longer do you think you will have of

24 the witness?

25         MR. MISKIEWICZ:  15, 20 minutes.

1735

1          THE COURT:  And then there'll be some redirect,

2     I assume?

3          MR. ROSEN:  Yes.

4          THE COURT:  And I'll see you folks tomorrow.

5          MR. MISKIEWICZ:  Thank you, your Honor.

6          THE COURT:  All right.

7          (Whereupon, the proceedings were adjourned until

8     May 8, 2012, at 9:15 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1736

# I-N-D-E-X

## W-I-T-N-E-S-S-E-S

S C O T T    M U L L I G A N                          1519

DIRECT EXAMINATION (cont'd)                           1519

BY MR. FLYNN

CROSS-EXAMINATION                                     1612

BY MR. ROSEN

S C O T T    M U L L I G A N                          1646

CROSS-EXAMINATION                                     1646

BY MR. ROSEN

REDIRECT EXAMINATION                                  1670

BY MR. FLYNN

RECROSS-EXAMINATION                                   1671

BY MR. ROSEN

L E S H A N    C A M P B E L L                        1681

DIRECT EXAMINATION                                    1681

BY MR. ROSEN

CROSS-EXAMINATION                                     1717

BY MR. MISKIEWICZ

1737

**E-X-H-I-B-I-T-S**

Government's Exhibits MED-1 through MED-13        1532
were received in evidence

Government's Exhibit SM-9 was received in         1554
evidence

Defendant's Exhibit I was marked for             1690
identification

## $

**$35,000** [1] - 1674:23
**$50,000** [3] - 1655:12, 21; 1656:9
**$500,000** [1] - 1610:10

## '

**'01** [3] - 1569:12, 20; 1663:7
**'02** [1] - 1663:7
**'03** [2] - 1606:16; 1663:8
**'04** [1] - 1606:18
**'89** [1] - 1664:5
**'94** [3] - 1540:8; 1587:19; 1592:9
**'95** [3] - 1541:15; 1542:10; 1543:7
**'96** [2] - 1541:15; 1543:7

## 0

**08** [1] - 1515:3

## 1

**1-A** [1] - 1681:19
**10** [3] - 1705:1; 1708:7; 1709:9
**100** [6] - 1515:13, 16, 22; 1541:19; 1727:7, 9
**106** [1] - 1587:21
**10:00** [2] - 1516:12; 1519:10
**10:05** [1] - 1708:19
**10:45** [2] - 1705:16; 1706:3
**11** [1] - 1732:3
**11530** [1] - 1515:19
**11722** [2] - 1515:13, 22
**11:30** [1] - 1524:10
**12** [3] - 1695:12
**12/18** [1] - 1724:3
**12:13** [1] - 1723:25
**12:17** [1] - 1725:4
**12:18** [4] - 1721:5, 10, 22; 1724:24
**13** [2] - 1725:16
**13.5** [1] - 1658:19
**13th** [3] - 1533:17; 1534:3, 8
**15** [4] - 1583:25; 1679:19, 24; 1734:25
**1519** [2] - 1736:3

**1532** [1] - 1737:3
**1554** [1] - 1737:5
**15th** [3] - 1684:13; 1691:10; 1697:11
**160-something** [1] - 1658:25
**1612** [1] - 1736:6
**1646** [2] - 1736:8
**1670** [1] - 1736:11
**1671** [1] - 1736:13
**1681** [2] - 1736:15
**1690** [1] - 1737:7
**16th** [4] - 1686:12; 1691:10; 1721:23; 1733:2
**170** [1] - 1616:23
**1717** [1] - 1736:18
**17th** [4] - 1686:13; 1691:10; 1701:20; 1731:19
**18** [1] - 1723:25
**18th** [4] - 1666:24; 1701:18; 1707:8; 1715:24
**19** [1] - 1526:22
**19-and-change** [1] - 1658:24
**190** [2] - 1617:2
**1990s** [1] - 1547:9
**1994** [20] - 1519:24; 1526:15; 1530:1; 1531:21; 1533:17; 1534:3, 5, 8; 1535:17; 1582:9; 1586:23; 1588:6, 13; 1590:12; 1591:21; 1594:23; 1614:12; 1616:18; 1664:6
**1999** [2] - 1550:18; 1558:8
**1:15** [3] - 1626:15; 1627:7, 12
**1:30** [2] - 1531:1; 1623:6
**1st** [1] - 1647:15

## 2

**2** [2] - 1650:18; 1651:11
**20** [3] - 1650:18; 1729:7; 1734:25
**200-something** [1] - 1633:6
**2000** [15] - 1549:5; 1555:5; 1556:4, 16; 1560:9; 1561:15;

**1562:**6; 1585:9, 16; 1589:16; 1593:12; 1664:9; 1665:4
**2000's** [1] - 1547:10
**2000s** [1] - 1548:17
**2001** [4] - 1572:13, 17, 19; 1656:7
**2002** [11] - 1568:8, 16; 1569:4, 7, 17; 1570:13; 1572:22; 1575:11; 1596:10; 1635:12; 1636:2
**2003** [49] - 1574:18; 1575:8; 1581:14; 1595:5, 7; 1599:15; 1601:14, 17; 1602:9, 16, 23; 1603:22; 1604:8, 24; 1605:15, 25; 1606:11; 1614:12; 1629:14; 1630:14; 1633:18; 1636:3; 1643:9; 1666:17; 1667:7; 1671:10; 1681:17; 1682:18, 23; 1683:17, 20; 1685:14; 1690:6; 1691:10; 1693:12; 1696:13; 1698:14, 21; 1705:6; 1716:25; 1718:16; 1723:25; 1726:10; 1729:20
**2004** [9] - 1581:25; 1606:7; 1607:4, 10; 1671:11; 1683:3, 6
**2005** [1] - 1717:3
**2007** [2] - 1693:11
**2011** [2] - 1613:6; 1670:7
**2012** [3] - 1515:7; 1651:11; 1735:8
**205** [1] - 1515:16
**20th** [1] - 1717:11
**21** [2] - 1726:10; 1729:20
**212-619-3240** [1] - 1722:16
**21st** [5] - 1667:1, 6, 12; 1727:20; 1732:12
**22** [1] - 1703:3
**22-caliber** [1] - 1704:9
**22nd** [1] - 1732:15
**230** [1] - 1616:19
**23rd** [12] - 1548:17, 20; 1549:6; 1558:8; 1595:12, 16; 1657:5, 9, 11; 1667:16; 1670:6

**25** [2] - 1534:7
**26.1** [2] - 1689:19
**28th** [1] - 1535:17
**29** [2] - 1532:22; 1678:5
**2:00** [1] - 1531:1
**2:52** [1] - 1679:23
**2:58** [1] - 1725:18
**2nd** [3] - 1647:15; 1648:25; 1651:17

## 3

**3** [4] - 1595:5; 1643:9; 1702:2
**30** [1] - 1552:18
**300** [1] - 1659:3
**300,000** [1] - 1659:4
**302s** [1] - 1636:15
**32** [1] - 1697:6
**32B** [1] - 1687:24
**33134** [1] - 1515:17
**35** [1] - 1640:7
**35,000** [1] - 1673:20
**3500** [1] - 1636:14
**3500-JS** [1] - 1726:19
**37** [3] - 1573:11; 1663:11, 25
**3:05** [1] - 1679:20
**3:07** [4] - 1679:25; 1680:1
**3rd** [4] - 1574:18; 1575:8; 1581:13

## 4

**40** [1] - 1584:10
**404** [1] - 1677:16
**40th** [5] - 1543:2, 10; 1545:19; 1546:16; 1547:7
**45** [3] - 1587:10; 1697:6
**4:30** [1] - 1734:6
**4th** [3] - 1544:4; 1555:5; 1601:17

## 5

**5** [1] - 1556:7
**50,000** [3] - 1561:1, 4
**500** [2] - 1574:8, 12
**516** [1] - 1533:4
**525** [4] - 1681:19; 1684:21, 23
**5:35** [1] - 1533:22

**1** (top right corner)

**1** - 1555:24

**6**

**6** [3] - 1671:11; 1682:7; 1724:9
**631** [1] - 1515:23
**646-739-3560** [1] - 1724:1
**655** [1] - 1515:3
**666** [1] - 1515:18
**6th** [2] - 1606:18; 1607:10

**7**

**7** [3] - 1515:7; 1648:16, 18
**711333371825** [1] - 1638:6
**712-6105** [1] - 1515:23
**79th** [3] - 1555:24; 1556:19; 1558:7

**8**

**8** [6] - 1691:19; 1731:19, 21-22; 1735:8
**803(6** [1] - 1517:13
**81st** [1] - 1538:24
**83rd** [1] - 1538:3
**868-9109** [1] - 1533:4
**86th** [1] - 1551:1
**8th** [6] - 1543:2, 11; 1544:4; 1545:19; 1546:16; 1547:7

**9**

**9** [1] - 1697:7
**902(11** [1] - 1517:12
**93rd** [1] - 1598:20
**9:00** [2] - 1516:7, 10
**9:15** [3] - 1516:17; 1734:22; 1735:8
**9:25** [1] - 1516:15
**9:30** [3] - 1608:25; 1678:22; 1705:16
**9:45** [4] - 1705:16; 1706:3; 1734:8, 17
**9:55** [1] - 1515:7

**A**

**a.m** [6] - 1515:7; 1721:5, 10; 1723:25; 1725:18; 1735:8
**a/k/a** [1] - 1732:2
**ability** [2] - 1648:19;

1708:25
**able** [6] - 1524:23; 1528:6, 12; 1583:12; 1660:12; 1688:1
**absence** [1] - 1516:5
**absolutely** [2] - 1639:13, 22
**abuse** [2] - 1574:14
**abuser** [5] - 1664:2, 4, 7, 9, 11
**accepted** [1] - 1574:12
**according** [4] - 1636:13; 1639:6; 1650:11; 1668:9
**account** [2] - 1570:18
**accounts** [1] - 1570:2
**accrued** [2] - 1565:12; 1567:2
**accruing** [1] - 1558:11
**accurate** [1] - 1688:3
**accurately** [2] - 1685:13; 1718:20
**accused** [1] - 1688:22
**accusing** [1] - 1664:25
**acquaints** [1] - 1578:12
**acquire** [6] - 1540:1, 6; 1541:6, 13; 1547:10, 15
**acquired** [2] - 1542:2; 1543:20
**acted** [1] - 1542:15
**action** [1] - 1571:10
**actual** [6] - 1523:7; 1616:3; 1619:11; 1622:11; 1632:12; 1643:18
**add** [2] - 1565:11, 13
**add-on** [1] - 1565:13
**add-ons** [1] - 1565:11
**addition** [2] - 1558:19; 1560:21
**additional** [5] - 1541:6, 13; 1547:11; 1600:6; 1640:22
**additionally** [1] - 1628:11
**address** [7] - 1532:19, 25; 1555:10, 20, 23, 25; 1684:22
**addresses** [1] - 1632:15
**adjourn** [1] - 1734:7
**adjourned** [1] - 1735:7
**admissible** [2] - 1517:12; 1642:2

**admission** [1] - 1554:14
**admit** [4] - 1645:16; 1677:22; 1729:5
**admits** [1] - 1645:17
**admitted** [17] - 1522:24; 1532:4, 8; 1534:16; 1535:8; 1554:16; 1582:16; 1596:1; 1601:4; 1660:11, 19; 1673:25; 1677:16; 1722:10; 1729:2, 9; 1733:12
**adopt** [1] - 1624:7
**adrenaline** [2] - 1528:8, 11
**advised** [2] - 1537:7; 1650:23
**affected** [4] - 1570:21, 25; 1571:4, 6
**affidavit** [3] - 1618:10, 14, 18
**afield** [2] - 1631:11; 1661:21
**afraid** [1] - 1665:25
**afternoon** [5] - 1519:20; 1623:5; 1717:18; 1731:19, 21
**afterwards** [2] - 1592:6; 1679:13
**agent** [1] - 1653:6
**Agent** [4] - 1618:11, 19; 1651:24; 1670:14
**ago** [17] - 1517:10; 1526:6; 1581:19; 1611:17; 1614:4; 1658:8-10; 1679:22; 1683:14; 1686:17; 1711:24; 1724:8, 14; 1729:7; 1730:5
**agree** [11] - 1535:23; 1552:1, 3, 7; 1559:5; 1628:18; 1632:9; 1633:24; 1648:6; 1651:10; 1725:15
**agreed** [1] - 1552:8
**agreeing** [3] - 1517:13; 1552:6; 1557:8
**agreement** [3] - 1553:25; 1555:11, 15
**ahead** [5] - 1517:7; 1588:14; 1661:9; 1673:6; 1731:1
**ahh** [1] - 1669:15
**Airport** [3] - 1607:20; 1608:22; 1610:25

13, 21; 1611:10
**alarm** [1] - 1666:5
**alcohol** [8] - 1574:5, 7, 12, 14, 20, 25; 1664:1, 4
**alcoholic** [3] - 1664:6, 9, 11
**alibi** [1] - 1536:11
**alibis** [1] - 1711:2
**alimony** [1] - 1661:5
**alive** [1] - 1599:15
**allegation** [1] - 1631:24
**allegedly** [1] - 1630:25
**alleges** [1] - 1579:6
**allow** [3] - 1578:23; 1579:7; 1674:13
**allowed** [4] - 1526:15, 21; 1661:25; 1694:18
**Almeria** [1] - 1515:16
**almost** [5] - 1574:24; 1604:19; 1658:25; 1711:21; 1733:1
**alone** [1] - 1602:23
**alternative** [1] - 1604:5
**Amador** [63] - 1672:8, 18; 1673:7, 14, 17, 19; 1674:3, 6-7, 12, 19; 1675:22, 25; 1683:23; 1686:1, 3, 16, 20; 1688:13; 1689:10; 1690:7; 1693:14; 1694:14, 20; 1695:2, 9, 18, 20; 1696:4, 12; 1697:24; 1698:23; 1701:12, 21; 1702:9; 1703:20; 1704:2, 15; 1706:1, 17; 1711:2; 1712:19; 1713:20; 1715:4, 13, 16, 19, 25; 1716:9, 15; 1720:21; 1724:14, 18; 1729:10, 13, 16; 1730:7, 24; 1731:12; 1733:11, 22
**Amador's** [1] - 1733:23
**AMERICA** [1] - 1515:3
**amicable** [1] - 1546:12
**amount** [4] - 1565:11; 1571:19; 1615:18; 1622:23
**Andy** [7] - 1539:5; 1540:16; 1654:21; 1655:6; 1656:7
**angel** [1] - 1695:7
**Angelone** [2] -

**2**

1614:18; 1615:4

**answer** [10] - 1523:25; 1524:1; 1615:1; 1622:4; 1688:6; 1709:21; 1711:7; 1732:18

**answered** [7] - 1592:25; 1612:14; 1620:21; 1621:3; 1669:9; 1708:1, 3

**answering** [7] - 1575:16, 24; 1577:13; 1580:7, 19; 1581:12, 17

**answers** [1] - 1700:16

**Anthony** [1] - 1679:7

**anticipated** [1] - 1661:8

**anticipating** [2] - 1659:14, 21

**anytime** [1] - 1724:9

**apartment** [50] - 1681:19; 1684:5, 17; 1685:9, 13, 21, 24; 1686:10; 1691:21; 1692:10, 12; 1694:7, 14, 21; 1696:22; 1697:13; 1701:21; 1702:7, 14; 1704:3, 14; 1706:16; 1707:16; 1709:19; 1712:20; 1713:21; 1718:15, 21; 1720:6, 18-19, 21; 1721:4, 6; 1722:5; 1724:3, 19, 22-23; 1725:4, 8, 12, 14, 17, 23, 25; 1731:18; 1732:3

**apologize** [7] - 1627:10; 1638:20; 1650:25; 1651:1; 1662:23; 1665:4; 1676:8

**APPEARANCES** [1] - 1515:11

**appeared** [1] - 1633:6

**appearing** [4] - 1554:19; 1556:22; 1582:23; 1583:9

**application** [4] - 1516:22; 1657:1; 1689:19; 1692:20

**appreciate** [1] - 1675:9

**approach** [14] - 1551:12; 1553:15; 1568:24; 1576:3; 1582:12; 1623:2; 1633:14; 1647:6; 1659:18; 1690:10; 1691:5; 1707:19; 1713:7; 1714:13

**approached** [2] - 1550:20; 1631:8

**approaches** [1] - 1569:1; 1582:14

**approaching** [1] - 1712:24

**appropriate** [1] - 1523:23

**approximate** [2] - 1533:24; 1592:8

**April** [10] - 1534:3; 1561:15, 22; 1614:21; 1638:4; 1648:16, 18; 1696:13, 18

**area** [6] - 1525:25; 1673:7; 1676:5; 1685:12; 1689:16; 1713:5

**argue** [5] - 1567:20; 1628:24; 1639:15; 1645:8; 1678:17

**arguing** [2] - 1517:11; 1633:1

**argument** [8] - 1517:16, 19; 1623:19; 1631:21; 1633:25; 1634:2; 1656:15; 1673:22

**argumentative** [2] - 1673:1

**arguments** [11] - 1544:20; 1559:20, 23; 1566:15; 1567:8; 1569:9, 14; 1624:8, 24; 1629:4

**arise** [1] - 1545:3

**Arlington** [1] - 1541:11

**arm** [7] - 1535:2, 22, 24; 1536:2; 1538:10; 1591:19; 1716:12

**armed** [1] - 1538:17

**armored** [12] - 1539:2; 1582:9; 1586:22; 1587:19; 1588:13; 1590:11, 16, 22; 1592:16; 1594:8, 25; 1617:10

**arrears** [1] - 1563:14

**arrest** [4] - 1613:8; 1618:10, 23; 1670:9

**arrested** [12] - 1572:14, 19; 1575:1; 1613:6; 1618:9; 1656:9; 1670:6, 13-14, 25; 1672:10; 1683:8

**arrive** [5] - 1516:9; 1691:17; 1692:19,

1693:14; 1714:23

**arrived** [17] - 1533:25; 1688:14, 17; 1689:10; 1690:8; 1692:6, 16-17; 1693:16, 22; 1694:1, 14; 1705:7, 18, 24; 1713:25

**arriving** [1] - 1519:10

**arrow** [1] - 1533:13

**articles** [2] - 1670:10; 1676:4

**aside** [1] - 1610:5

**asphalt** [1] - 1518:12

**asserted** [1] - 1640:15

**assets** [5] - 1660:7; 1661:5, 19, 24; 1662:6

**assist** [2] - 1558:20; 1712:23

**Assistants** [1] - 1515:15

**assisted** [1] - 1515:25

**associations** [2] - 1733:10, 21

**assume** [7] - 1618:12; 1642:10; 1649:1; 1692:14; 1693:16, 19; 1735:2

**assumed** [1] - 1692:16

**assumes** [1] - 1699:18

**assuming** [1] - 1535:15

**assumptions** [2] - 1648:3; 1700:3

**assure** [1] - 1626:13

**Atlantic** [5] - 1528:22; 1530:10; 1533:20; 1534:22; 1591:3

**attempt** [3] - 1551:9; 1561:12; 1600:6

**attempting** [4] - 1556:3; 1637:16; 1707:3, 24

**attempts** [1] - 1734:10

**attention** [9] - 1517:4; 1532:17; 1550:18; 1556:6, 20; 1557:18; 1601:15; 1688:11; 1691:4

**Attorney** [2] - 1515:12, 15

**attorney** [24] - 1585:10; 1623:13, 15; 1624:2, 17, 19; 1625:13, 17; 1628:12, 14, 24; 1629:23; 1631:9, 12, 19,

1640:17; 1642:1, 14; 1646:21; 1659:25

**attorney's** [1] - 1631:9

**Attorney's** [3] - 1572:15; 1614:2; 1668:12

**attorney-client** [3] - 1628:24; 1630:7; 1631:22

**attorney/client** [2] - 1623:21; 1624:15

**attorneys** [5] - 1625:1; 1630:21; 1634:6; 1637:10; 1668:13

**attribute** [1] - 1626:3

**attributing** [1] - 1640:25

**audience** [1] - 1517:9

**audio** [8] - 1638:10, 17, 22; 1641:18, 20; 1644:1, 11, 23

**audiotape** [1] - 1645:5

**August** [38] - 1519:24; 1520:8; 1533:17; 1534:3, 8; 1591:21; 1605:25; 1606:7, 18; 1607:4, 10; 1666:21, 24; 1667:1, 6, 12, 16; 1671:11; 1681:17; 1682:18; 1684:14; 1685:14; 1686:12; 1691:10; 1697:11; 1701:18; 1707:8; 1710:5; 1715:24; 1723:25; 1726:10; 1727:20; 1729:20; 1731:19; 1732:12

**authenticating** [2] - 1517:12, 14

**automatically** [3] - 1526:13; 1570:17; 1604:3

**Avenue** [6] - 1515:16; 1532:23; 1543:2, 11; 1548:18; 1551:2

**aware** [15] - 1530:1; 1531:10; 1562:6, 17; 1563:18; 1577:24; 1582:1, 8; 1585:9, 17; 1590:12; 1596:13; 1599:18; 1639:12; 1646:23

**B**

**B-E-C-K-L-E-R** [1] - 1638:14

back-door [2] - 1637:9, 17

background [2] - 1526:1; 1574:13

backs [2] - 1570:16, 22

bad [4] - 1577:8; 1578:4; 1580:12

bag [3] - 1580:14; 1715:2

bail [1] - 1572:20

balance [1] - 1658:22

Baldwin [1] - 1657:24

bankrupt [1] - 1604:19

bar [3] - 1592:12; 1594:20; 1676:25

Baran [2] - 1627:20; 1734:11

barely [1] - 1520:23

bars [1] - 1529:8

based [9] - 1586:10, 25; 1587:7; 1591:13, 20; 1648:10; 1650:1; 1671:9; 1676:21

basic [1] - 1558:25

basis [3] - 1648:25; 1649:25; 1685:22

bathroom [1] - 1685:11

bathrooms [1] - 1685:10

Baumgardt [12] - 1590:12, 22; 1592:22; 1594:9; 1615:23; 1616:5; 1617:11; 1618:21; 1659:24; 1660:1; 1662:4

Baumgardt/Dorval [1] - 1592:3

Beach [11] - 1520:14, 16; 1530:5, 11; 1606:21; 1607:3, 20; 1609:18; 1618:13, 17; 1657:24

beat [1] - 1632:1

became [2] - 1563:21; 1639:12

Becker [1] - 1638:13

Beckler [2] - 1642:15, 18

beckler [1] - 1641:8

Beckler's [1] - 1640:13

become [10] - 1528:1; 1538:18, 21; 1543:15; 1551:2; 1562:6; 1564:21; 1581:25; 1582:8; 1599:18

becoming [1] - 1559:21

bed [1] - 1708:19

bedroom [11] - 1685:16-18; 1686:4, 7; 1697:15; 1718:25; 1719:1

bedrooms [1] - 1685:11

beer [4] - 1672:9; 1673:15; 1694:22

BEFORE [1] - 1515:8

beforehand [2] - 1619:7; 1645:15

began [6] - 1518:11; 1521:6; 1522:18; 1524:7; 1613:8; 1618:23

begin [5] - 1522:7; 1529:16; 1558:11; 1569:8; 1607:15

beginning [4] - 1556:3; 1569:21; 1641:23; 1731:7

behind [6] - 1517:23; 1587:6; 1589:9; 1591:15; 1672:10; 1685:4

belief [1] - 1628:5

Bellmore [3] - 1577:10; 1578:4; 1666:11

below [2] - 1530:14; 1555:20

benchmark [1] - 1569:7

benefit [2] - 1629:1; 1661:20

Beretta [4] - 1697:6

best [16] - 1528:24; 1530:23; 1541:12; 1546:11; 1548:16; 1557:7; 1558:9; 1563:6, 10; 1589:3; 1642:9, 20; 1648:5; 1650:23; 1678:9

better [1] - 1620:17

between [31] - 1544:13; 1551:1; 1552:18; 1553:25; 1555:12; 1559:15, 17; 1561:5; 1566:16; 1582:2; 1583:7; 1584:20; 1588:6; 1592:10; 1624:25; 1628:20; 1639:18; 1648:14; 1652:2; 1653:22; 1662:12, 19; 1663:1, 7, 16; 1664:11; 1673:20; 1707:3; 1715:24; 1725:17

big [4] - 1521:24; 1548:6; 1602:19; 1629:6

bill [2] - 1580:

1604:3

billing [2] - 1604:9, 12

bills [7] - 1565:12; 1566:20-22, 25; 1567:1; 1570:9

Billy [2] - 1543:19, 24

bit [6] - 1554:3; 1645:4; 1663:15; 1674:5; 1710:9; 1728:15

bits [1] - 1652:23

black [14] - 1520:3; 1521:19; 1524:11; 1525:12; 1527:17; 1528:18; 1529:1; 1536:5; 1693:4; 1694:1; 1698:6; 1702:20; 1703:3; 1715:2

blackout [6] - 1683:17; 1684:4, 11; 1719:12, 14; 1723:4

Blakeman [1] - 1697:21

blame [1] - 1663:10

blamed [1] - 1663:13

Blazer [7] - 1587:3, 18; 1588:12, 22; 1589:4, 6, 12

Bleakman [1] - 1697:21

bleeding [1] - 1525:5

bloated [1] - 1523:12

block [2] - 1534:9, 14

blood [2] - 1538:9; 1591:18

blow [1] - 1635:18

blown [1] - 1532:15

board [1] - 1543:3

boarded [1] - 1609:17

boat [41] - 1517:24; 1518:10; 1520:2, 6, 10, 12, 16, 21, 24-25; 1521:3, 11, 13, 18; 1522:4, 6, 8-10, 16, 20; 1523:9, 20; 1524:9, 13; 1525:15, 21; 1526:1, 10; 1529:7, 22-23; 1530:4, 9, 16, 21; 1531:4, 13; 1534:9; 1536:21

boat's [1] - 1521:6

Boca [1] - 1607:6

bodies [1] - 1615:20

Body [27] - 1544:12, 14; 1545:4, 7, 18; 1546:16; 1547:1, 7; 1554:1, 10; 1555:12; 1556:19; 1558:7, 10; 1561:11, 14,

24; 1562:5; 1563:12; 1564:21; 1566:5, 9; 1568:11, 13, 19; 1580:17

body [16] - 1522:22; 1523:6, 8; 1529:1; 1533:20; 1536:5, 14; 1537:22; 1538:17; 1555:16; 1556:1; 1591:2, 21; 1593:19; 1615:23; 1635:16

book [1] - 1688:8

borrow [1] - 1726:16

boss [6] - 1597:16; 1654:1, 6, 8, 11, 14

Boston [1] - 1607:22

bottle [2] - 1672:9; 1673:15

bottom [5] - 1521:15; 1525:18; 1526:11; 1527:8, 23

bought [2] - 1537:14; 1662:2

boulder [2] - 1524:16; 1591:12

boulders [1] - 1524:14

bow [2] - 1525:25; 1529:15

box [39] - 1518:11, 13; 1520:3; 1521:21; 1522:7, 18, 20; 1523:19; 1524:8, 12, 21; 1525:12, 14, 16, 18, 21; 1526:7, 12, 14-15, 17, 19, 21; 1527:2, 6, 8, 12, 24; 1528:17; 1529:1, 16; 1530:2; 1531:13; 1536:5; 1537:19; 1538:10

breach [1] - 1557:11

break [7] - 1546:23; 1583:23; 1607:10, 13, 21; 1627:20; 1629:6

breakfast [4] - 1608:1, 12, 19, 22

Bressman [72] - 1595:9, 22; 1596:10, 14, 17; 1597:1, 18, 21, 24; 1598:3, 10-11; 1599:1, 11; 1654:1; 1662:12, 15; 1668:4, 18; 1669:16; 1670:24; 1671:15; 1672:13; 1683:24; 1686:22; 1688:14; 1689:10; 1690:8; 1692:23; 1693:14; 1694:3, 20;

1695:1, 10, 18, 20;
1697:5; 1698:1, 6, 9,
18-19, 23; 1701:21;
1702:8; 1703:2, 7, 10,
13; 1704:15; 1706:2, 4,
16; 1708:6; 1711:2;
1712:19; 1713:20;
1715:2, 25; 1716:17;
1720:23; 1729:2;
1730:6, 8, 16; 1731:16;
1732:2; 1733:11, 13,
21, 24

**bressman** [1] - 1598:16
**Bressman's** [3] -
1654:6; 1694:13;
1702:15
**Bret** [4] - 1539:5;
1540:16; 1541:1; 1549:7
**Brett** [2] - 1654:10;
1657:7
**bridge** [1] - 1719:6
**brief** [2] - 1525:9;
1628:21
**briefly** [1] - 1727:10
**bring** [17] - 1517:3;
1578:19; 1579:1, 5;
1584:6; 1627:4; 1634:6;
1645:25; 1646:4;
1648:23; 1650:21;
1655:14; 1676:7, 9;
1679:16, 18
**bringing** [3] -
1537:18; 1645:10;
1680:11
**brings** [1] - 1605:1
**broader** [1] - 1628:24
**broke** [8] - 1516:25;
1519:20; 1520:1;
1545:12, 15; 1584:18;
1645:22; 1679:21
**brokerage** [1] -
1594:24
**Brooklyn** [11] -
1573:8; 1684:9;
1695:15; 1720:11;
1723:10; 1724:16;
1727:25; 1728:5, 7, 10,
13
**brother** [6] - 1543:16,
25; 1593:15; 1663:12,
17
**brother's** [1] -
1543:18
**brought** [7] - 1520:2;
1522:5; 1530:7;
1681:24; 1683:10;
1697:4; 1718:11
**Brzostek** [2] -

**bug** [1] - 1635:16
**build** [2] - 1617:20
**building** [1] - 1683:10
**built** [2] - 1605:9, 11
**bullets** [2] - 1704:7
**bumping** [1] - 1544:24
**burglary** [1] - 1524:5
**burnout** [2] - 1634:19;
1635:3
**bus** [4] - 1543:12;
1723:10, 20
**business** [13] -
1538:19; 1539:7, 22;
1546:4; 1547:8; 1549:2;
1550:21; 1562:14;
1567:3, 14; 1597:22;
1604:16; 1605:1
**buy** [1] - 1662:19
**BY** [66] - 1519:17;
1612:22; 1646:13;
1651:15; 1652:15;
1654:4, 20; 1655:3, 18;
1656:5, 20; 1657:19;
1662:11; 1663:20;
1665:6; 1667:15;
1669:5, 12; 1670:5;
1671:22; 1672:17;
1674:17; 1681:16;
1686:19; 1687:8;
1690:4, 20; 1691:8, 16;
1692:9, 22; 1693:21;
1696:2; 1700:13, 20;
1701:17; 1703:19;
1704:1; 1705:3, 17, 21;
1706:6, 14, 23; 1707:6,
14; 1711:20; 1712:5,
15; 1713:10, 23;
1714:5, 22; 1716:8;
1717:17; 1721:14;
1722:25; 1726:17, 22;
1736:5, 7, 10, 12, 14,
17, 19
**bye** [1] - 1609:15

**C**

**C-A-M-P-B-E-L-L** [1] -
1681:13
**calculated** [1] -
1661:25
**Calvin** [2] - 1524:2
**camera** [1] - 1666:6
**Campbell** [20] -
1678:18; 1679:16, 18;
1680:6, 10; 1681:3,
12-13, 17, 25; 1682:4;
1690:5; 1700:14;

**1707:7; 1708:18;
1711:21; 1717:18, 20;
1722:14; 1727:15
**CAMPBELL** [1] - 1680:13
**cannot** [6] - 1624:9,
14, 19; 1626:6; 1638:1;
1647:13
**capacity** [1] - 1556:15
**capital** [5] - 1543:21;
1546:5; 1561:3;
1565:18, 20
**car** [37] - 1522:5;
1539:2; 1582:9;
1586:22; 1587:1, 4, 8,
11, 19, 21; 1588:8,
13-14, 16; 1590:11, 16,
22; 1592:16; 1594:8,
25; 1617:10, 24;
1692:13-18, 24; 1693:1,
17; 1694:1, 7, 13
**card** [13] - 1552:23;
1553:2, 11; 1560:19;
1570:8; 1571:14;
1604:3; 1631:9; 1632:9;
1633:22; 1656:23;
1657:3
**cardio** [1] - 1540:12
**cards** [4] - 1570:10,
22; 1571:18; 1656:22
**care** [3] - 1605:5;
1610:10; 1625:24
**carried** [1] - 1522:6
**cars** [1] - 1531:6
**case** [38] - 1516:17;
1518:4; 1522:24;
1532:9; 1535:16;
1572:20; 1582:3, 16;
1583:24; 1585:8;
1596:1; 1601:5;
1615:10; 1618:11;
1619:6; 1623:7, 19;
1625:3; 1628:4, 18;
1631:11; 1641:7;
1649:19; 1659:16,
21-22; 1670:9, 13;
1673:21; 1703:11;
1710:5; 1716:21;
1717:19; 1725:9;
1734:9, 13
**cases** [1] - 1710:13
**cash** [2] - 1560:22;
1698:11
**cassette** [1] - 1582:22
**cast** [7] - 1534:24;
1535:2-4, 18, 24;
1536:1
**catch** [1] - 1638:18

**caused** [5] - 1531:12;
1559:20; 1579:3;
1580:10; 1663:23
**CD** [1] - 1637:23
**cell** [1] - 1627:19
**center** [1] - 1525:11
**Center** [4] - 1517:3;
1531:16, 19; 1532:13
**centers** [3] - 1547:11,
16; 1550:3
**Central** [5] - 1515:5,
13, 22; 1683:7, 11
**certain** [12] - 1547:20;
1559:10; 1574:10;
1580:19; 1618:16;
1629:10; 1640:20;
1698:13; 1707:17;
1708:2
**certainly** [5] -
1518:14; 1578:17;
1626:7; 1639:15, 17
**chain** [1] - 1595:18
**chairs** [1] - 1602:17
**chance** [1] - 1732:23
**change** [3] - 1547:3;
1711:13; 1714:25
**changed** [6] - 1559:13;
1618:24; 1636:1, 13;
1637:2; 1715:8
**changes** [1] - 1639:14
**changing** [5] -
1709:10, 16; 1712:19;
1713:12, 20
**charge** [3] - 1553:7;
1570:16, 22
**charged** [5] - 1572:14,
17; 1656:9; 1670:18;
1678:10
**Charlie** [3] - 1646:4;
1679:22; 1690:13
**check** [3] - 1659:4, 8
**checkbook** [4] -
1566:10, 14; 1567:19;
1569:10
**checking** [1] - 1570:2
**Chevy** [3] - 1587:18;
1588:12; 1589:12
**child** [1] - 1661:6
**chip** [1] - 1544:8
**Chris** [23] - 1540:16;
1596:21; 1597:14;
1603:13, 15; 1605:18;
1635:16, 19-20; 1636:7;
1644:25; 1652:9;
1653:22; 1654:1, 6;
1657:2; 1663:10;
1669:14; 1672:4, 13, 18

5

**6**

**Chris's** [2] - 1596:20, 23
**CHRISTIAN** [1] - 1515:5
**Christian** [4] - 1562:4; 1612:24; 1616:24; 1639:2
**cinder** [2] - 1534:9, 14
**City** [8] - 1515:19; 1538:2; 1682:19, 23; 1683:20; 1687:4; 1690:6; 1691:2
**clarification** [1] - 1713:14
**class** [2] - 1574:5, 7
**clean** [3] - 1588:22, 24; 1589:4
**cleaned** [2] - 1588:14, 16
**cleaning** [1] - 1589:6
**clear** [6] - 1639:1; 1640:12; 1643:20; 1679:21; 1682:2; 1686:17
**CLERK** [2] - 1679:23; 1681:5
**client** [3] - 1628:24; 1630:7; 1631:22
**client's** [1] - 1578:15
**cliff** [1] - 1629:6
**clip** [8] - 1638:10, 17, 22; 1641:18, 20; 1644:1, 11, 23
**clock** [1] - 1708:18
**cloney** [2] - 1597:4, 7
**close** [5] - 1526:25; 1596:25; 1606:2; 1676:1; 1715:19
**closed** [2] - 1527:19; 1658:8
**closes** [2] - 1526:13, 16
**closing** [1] - 1673:22
**clothes** [12] - 1523:22; 1685:19; 1708:20; 1709:10, 16; 1711:14; 1712:19; 1713:13, 21; 1715:3, 8
**clothing** [2] - 1523:18; 1714:25
**Club** [1] - 1555:16
**club** [6] - 1562:13, 15; 1564:9; 1569:24; 1598:4; 1599:7
**clubs** [1] - 1541:19
**clue** [2] - 1725:1
**clues** [1] - 1648:10
**CM-7** [1] - 1522:12

**coached** [1] - 1630:6
**cocaine** [10] - 1574:25; 1663:2, 4-5; 1695:2, 4, 7; 1702:4, 19
**coerced** [2] - 1652:4
**collect** [1] - 1660:13
**college** [1] - 1659:13
**color** [3] - 1527:16; 1535:5; 1589:12
**coming** [11] - 1516:19; 1524:21; 1551:17; 1634:10; 1645:13; 1646:3; 1647:18; 1710:14; 1725:4, 16; 1728:17
**comment** [1] - 1624:23
**comments** [1] - 1628:3
**committed** [3] - 1586:22; 1590:21; 1678:9
**communicate** [1] - 1688:2
**compact** [1] - 1583:3
**companies** [2] - 1570:8; 1656:23
**company** [10] - 1538:22; 1539:19; 1548:9, 11, 13; 1556:17; 1569:2; 1571:1; 1590:16
**compensation** [1] - 1698:9
**complaining** [1] - 1709:8
**complaint** [3] - 1618:14; 1619:3; 1656:7
**completed** [1] - 1637:21
**completely** [2] - 1529:10, 25
**complies** [1] - 1727:14
**comport** [6] - 1533:18, 23; 1536:1; 1555:6; 1601:20; 1732:25
**compose** [1] - 1530:18
**composure** [1] - 1530:7
**computer** [1] - 1515:25
**computer-assisted** [1] - 1515:25
**concede** [2] - 1623:14; 1625:8
**conceded** [1] - 1522:23
**concentrating** [2] - 1650:4
**concern** [5] - 1563:17; 1594:11; 1632:24; 1643:12; 1688:12
**concerned** [10] -

1538:9; 1563:21; 1591:18; 1594:15; 1618:25; 1632:10; 1634:17; 1635:4, 17; 1638:25
**concerning** [5] - 1617:19; 1622:17; 1650:2; 1651:17; 1734:13
**conclude** [1] - 1610:19
**concluded** [2] - 1587:5; 1676:25
**concludes** [1] - 1595:1
**conclusions** [1] - 1651:11
**concrete** [3] - 1518:11; 1522:1, 3
**conditions** [1] - 1709:3
**confer** [1] - 1611:16
**conference** [6] - 1651:6; 1662:9; 1674:14; 1690:1; 1700:10; 1711:19
**confirmed** [1] - 1581:3
**confrontation** [1] - 1629:24
**confronted** [5] - 1629:2, 22; 1631:2, 17, 25
**confusing** [1] - 1639:19
**connect** [1] - 1577:9
**connected** [1] - 1518:8
**connection** [2] - 1585:12; 1727:17
**considered** [1] - 1548:23
**consisted** [1] - 1582:5
**consistent** [2] - 1645:7; 1699:24
**conspiracy** [3] - 1572:18; 1573:16; 1622:18
**constantly** [1] - 1544:24
**construction** [8] - 1522:8, 19; 1524:12, 20; 1525:13; 1529:2; 1531:12; 1544:1
**cont'd** [2] - 1519:16; 1736:4
**Contacessa** [3] - 1594:15, 18, 23
**contact** [1] - 1572:4
**contacted** [1] -

**contacting** [1] - 1625:21
**contained** [2] - 1582:8; 1648:13
**contains** [1] - 1584:19
**contemporaneously** [1] - 1624:21
**contention** [1] - 1641:12
**contents** [1] - 1582:24
**contest** [1] - 1710:12
**continually** [1] - 1625:16
**continue** [6] - 1519:13; 1527:18; 1539:21; 1580:4; 1644:22; 1734:15
**Continued** [4] - 1576:4; 1579:9; 1619:18; 1621:5
**continues** [11] - 1587:16; 1588:10; 1589:10, 14; 1590:9, 18, 24; 1591:24; 1592:18; 1593:16; 1594:6
**contract** [1] - 1557:11
**contradict** [1] - 1643:2
**contradiction** [1] - 1639:18
**contrived** [1] - 1639:16
**conversation** [52] - 1529:19; 1537:1; 1564:3; 1577:22; 1582:2; 1583:7; 1584:20; 1586:10, 13-14; 1587:16; 1588:10; 1589:10, 14; 1590:9, 18, 24; 1591:24; 1592:15, 18; 1593:16; 1594:6, 9, 14; 1602:10, 12; 1603:9; 1609:21, 24; 1610:1, 19, 24; 1611:10; 1614:20; 1628:12; 1640:8, 18; 1642:13; 1643:21; 1646:16; 1650:12; 1652:1, 8; 1653:7, 18; 1669:6; 1671:25; 1672:1; 1674:2, 11
**conversations** [18] - 1549:17; 1585:20, 23; 1591:13; 1592:1, 5; 1599:4; 1613:24; 1614:15, 17; 1623:13,

15; 1624:4; 1625:22;
1626:4; 1636:2; 1667:8,
25

**conviction** [2] -
1573:16; 1595:4

**cooperate** [2] -
1613:8; 1618:24

**cooperates** [1] -
1628:8

**cooperating** [1] -
1674:22

**cooperation** [3] -
1613:14; 1614:24;
1628:9

**cooperator** [1] -
1631:2

**copied** [1] - 1624:11

**cops** [1] - 1610:12

**copy** [2] - 1532:12;
1687:3

**Coral** [1] - 1515:17

**Corino** [9] - 1539:5;
1540:16; 1654:21;
1655:4, 21; 1656:7

**corporation** [5] -
1548:6, 9, 12-13;
1555:18

**correct** [61] - 1526:3;
1545:23; 1548:3;
1581:22; 1593:20;
1614:16; 1615:10;
1616:6, 12-13; 1617:25;
1618:7, 25; 1619:12;
1625:3; 1626:1; 1633:7;
1638:15; 1652:17, 24;
1653:23; 1655:19;
1664:7, 17-18; 1665:1,
7, 9, 11, 17, 19, 22,
25; 1666:9; 1668:4;
1669:19; 1689:8;
1697:24; 1703:20;
1711:22, 24; 1717:4;
1719:9, 12; 1720:7,
18-20; 1722:4, 8;
1727:5; 1728:11, 14;
1729:13, 16; 1730:7,
11; 1733:13; 1734:2

**corrected** [1] -
1650:13

**correction** [1] -
1677:17

**Correction** [1] -
1680:7

**Correctional** [1] -
1681:23

**correctly** [3] -
1599:8; 1719:7; 1720:4

**Costa** [4] - 1589:20,

22-23; 1590:3

**Counsel** [2] - 1569:1;
1582:14

**counsel** [15] - 1611:16;
1628:20; 1631:17;
1636:23; 1637:13;
1640:25; 1641:4;
1642:16; 1707:2;
1708:14; 1711:6;
1714:15; 1717:20, 22;
1727:8

**counsel's** [1] -
1640:12

**country** [1] - 1589:17

**Country** [1] - 1515:18

**County** [1] - 1531:16

**couple** [5] - 1520:18;
1563:3; 1643:22;
1702:19; 1727:11

**course** [4] - 1635:15;
1648:9; 1660:11;
1675:18

**court** [12] - 1573:5;
1580:2; 1618:12;
1622:2, 5, 7; 1629:13;
1640:17, 19; 1643:20;
1729:18; 1730:4

**COURT** [314] - 1515:1;
1516:6, 11, 16; 1517:8,
15, 17, 19; 1518:6, 14,
21; 1519:8; 1523:14,
23; 1525:10; 1528:10;
1532:3; 1553:17;
1554:15; 1568:4, 7, 25;
1574:4; 1576:2; 1577:3,
6, 16, 24; 1578:12, 17,
21; 1579:1, 3, 5;
1580:3, 5; 1582:13;
1583:22; 1584:6, 12,
15; 1586:1, 3, 14, 17;
1588:2; 1591:9; 1593:1;
1597:7, 11; 1611:15,
25; 1612:15, 18;
1617:7; 1618:2; 1619:9,
14, 16; 1620:3, 10, 22;
1622:3, 22; 1623:1, 3,
10, 17; 1624:16;
1625:8, 10; 1626:8, 15;
1627:4, 7, 11, 15, 23;
1628:2; 1629:3; 1630:1,
15, 23; 1632:8, 16, 20,
24; 1633:7, 13, 21;
1634:8, 12, 15, 21, 24;
1635:23; 1636:4, 8, 14,
18, 21, 25; 1638:8, 12,
14, 18, 23; 1639:9, 14;
1640:1, 4; 1641:4, 16,
19, 23; 1642:5, 15;
1643:16, 22; 16

12, 22; 1645:2, 4, 10,
21, 25; 1646:7; 1647:6,
9, 12; 1648:2, 13, 21;
1649:6, 11, 22; 1650:3,
9, 15, 23; 1651:1, 3,
7; 1652:13; 1654:3, 19;
1655:1, 17; 1656:2, 15,
18; 1657:18; 1659:18,
21; 1660:2, 7, 14, 19;
1661:1, 7; 1662:4, 10;
1663:19; 1665:2, 5;
1667:14; 1669:1, 9, 22,
25; 1670:3; 1672:16,
21, 24; 1673:2, 13, 18;
1674:1, 8, 13, 15;
1675:5, 7, 12, 14, 16,
21; 1676:1, 13, 17, 20;
1677:1, 3, 6, 11, 19,
25; 1678:6, 11, 15, 18,
24; 1679:5, 10, 13, 21,
24; 1680:2, 5, 9, 16,
19, 22, 25; 1681:4;
1686:14; 1687:7, 12,
18, 21, 24; 1688:4, 11,
16, 20, 23; 1689:2, 6,
9, 13, 16, 20, 22;
1690:2, 11, 13, 17, 24;
1691:6, 12, 24; 1692:1,
4, 8, 20; 1693:20;
1695:23; 1696:1;
1699:4, 7, 10, 13, 18,
23; 1700:6, 9, 11, 19,
25; 1701:2, 8, 10, 15;
1703:17, 23, 25;
1704:21; 1705:9, 12,
20, 23; 1706:11;
1707:1, 5, 13, 19, 22;
1709:2, 11, 15, 21, 25;
1710:3, 8, 12, 16, 22;
1711:15; 1712:4, 11,
13, 25; 1713:8, 16;
18; 1714:3, 7, 11, 14,
17, 19; 1716:7;
1717:15; 1721:12;
1722:21; 1734:5, 21;
1735:1, 4, 6

**Court** [9] - 1515:20;
1625:19; 1629:1, 9;
1634:10; 1637:12;
1678:13, 16

**Court's** [1] - 1517:4;
1525:7

**courthouse** [1] -
1618:17

**Courthouse** [1] -
1515:4

**courtroom** [26] -
1519:7; 1520:4;
1522:14; 1523:3;

1534:18; 1535:11;
1554:20, 23; 1556:22,
25; 1573:3; 1584:2, 14;
1596:4; 1601:8;
1602:20; 1623:9;
1624:18; 1646:6;
1647:19; 1677:10;
1680:15; 1734:20

**CR** [1] - 1515:3

**crack** [5] - 1663:4;
1695:2, 4; 1702:4, 19

**Craig** [28] - 1517:22;
1519:21; 1520:2, 7, 11;
1534:9; 1593:19, 22;
1594:4; 1625:23;
1629:19, 24; 1630:1,
10; 1635:3, 9, 18;
1639:2, 5, 23; 1640:2;
1642:2; 1643:13;
1645:2, 18; 1676:8

**Craig's** [4] - 1634:18;
1642:22; 1644:24

**Craigs** [2] - 1629:20;
1630:3

**crash** [1] - 1685:24

**create** [1] - 1650:9

**credibility** [7] -
1630:21, 25; 1637:17;
1639:23; 1640:6;
1660:17; 1661:14

**credible** [1] - 1639:20

**credit** [22] - 1551:3,
18, 20, 22; 1552:23;
1553:2, 11; 1560:19;
1570:8-10, 22, 25;
1571:14, 18, 25;
1604:3; 1656:22; 1657:3

**crimes** [2] - 1593:15;
1678:10

**Criminal** [1] - 1678:5

**criminal** [5] -
1616:10; 1618:14;
1619:3; 1656:6; 1659:22

**cronies** [2] - 1596:21,
23

**crony** [3] - 1597:6, 10

**cross** [11] - 1578:19;
1612:18; 1632:2, 19;
1637:3; 1647:20;
1648:19; 1676:14;
1679:8; 1711:17;
1717:15

**CROSS** [6] - 1612:21;
1646:12; 1717:16;
1736:6, 9, 18

**cross-examination** [6]
- 1612:18; 1632:19;
1647:20; 1648:19;

7

1711:17; 1717:15

**CROSS-EXAMINATION** [6]
- 1612:21; 1646:12;
1717:16; 1736:6, 9, 18

**cross-examine** [1] -
1637:3

**crossed** [1] - 1633:2

**crowbars** [1] - 1529:8

**crush** [2] - 1534:8, 12

**cumulative** [1] -
1587:25

**curative** [2] -
1640:23; 1641:1

**cured** [1] - 1641:7

**currying** [1] - 1654:16

**cursing** [1] - 1575:16

**custody** [1] - 1679:17

**CW-4** [1] - 1520:4

---

**D**

**daily** [1] - 1549:1

**damage** [1] - 1631:11

**Damian** [1] - 1539:5

**Damon** [1] - 1604:19

**dangerously** [1] -
1676:1

**date** [36] - 1533:14,
16, 19, 22-23; 1555:4;
1558:5; 1569:6;
1574:16; 1585:9;
1593:22; 1601:17;
1636:16; 1638:2;
1648:6; 1651:17;
1658:10; 1666:20,
22-23; 1688:12; 1693:9;
1717:10; 1723:24;
1726:13, 24; 1727:1,
10-11, 16, 19; 1732:11,
19, 21, 23

**dated** [3] - 1533:13;
1555:2

**day-to-day** [8] -
1542:12; 1546:4, 22;
1559:25; 1560:12;
1561:11, 24; 1566:12

**days** [15] - 1536:21,
23; 1537:2; 1591:23;
1614:4; 1667:3, 10, 17;
1702:20; 1719:20,
24-25; 1729:20

**dead** [2] - 1523:19;
1590:22

**deal** [1] - 1571:18

**dealership** [1] -
1587:21

**death** [4] - 1599:21;

1600:5; 1667:11, 16

**debriefings** [1] -
1641:11

**debris** [8] - 1522:1, 8,
19; 1524:12, 20;
1525:13; 1529:2;
1531:12

**debt** [5] - 1563:15;
1564:8; 1565:7, 21;
1571:9

**decade** [1] - 1547:10

**December** [9] -
1550:18; 1558:8;
1569:20; 1613:6;
1635:12; 1644:4;
1664:22; 1665:3; 1670:6

**decide** [1] - 1630:8

**decided** [1] - 1546:23

**decision** [4] - 1662:8;
1677:20; 1678:1

**deck** [1] - 1530:14

**declarant** [1] -
1640:17

**declaration** [1] -
1708:9

**deeper** [3] - 1556:20;
1563:14

**defendant** [156] -
1516:9, 12; 1520:2, 7;
1521:18; 1522:5;
1524:11, 19; 1525:14,
18; 1527:7, 11, 20, 23;
1528:6; 1529:6;
1530:24; 1531:5, 7, 10,
20; 1533:3, 19; 1534:4,
10, 23; 1535:16;
1537:24; 1538:1, 6;
1539:9, 11, 22;
1540:19, 22; 1541:25;
1542:18, 21-22;
1543:16, 24; 1544:19;
1545:8, 16, 25; 1546:3,
5, 17, 21; 1547:15, 19,
24; 1549:21; 1550:25;
1551:14, 17, 22;
1552:1, 3, 7, 19-20,
23; 1555:7; 1558:17,
20; 1559:5, 16;
1560:11; 1561:10, 14,
18; 1564:6, 11, 23;
1565:19; 1566:16;
1567:5, 8; 1569:14;
1571:10, 24; 1572:4;
1577:17, 24; 1578:6;
1579:1, 7; 1581:5;
1582:2; 1583:7, 16;
1584:21; 1585:8, 17,
20; 1586:4, 10, 21;
1587:1, 8; 1588:

1589:1; 1590:20;
1591:1; 1592:2, 10;
1593:18; 1594:10;
1596:13, 16; 1597:1,
18, 20, 23; 1598:2, 16;
1600:10; 1603:23;
1604:16; 1605:3;
1606:1; 1607:25;
1608:10, 16, 20;
1609:11, 19, 22;
1610:2; 1611:2, 18;
1626:7, 9; 1628:20;
1629:15; 1630:11;
1631:7, 14; 1633:12,
16, 18; 1634:4;
1670:15; 1671:10, 19;
1681:2; 1720:25;
1721:5, 15-16, 22;
1724:24

**Defendant** [2] -
1515:6, 16

**defendant's** [18] -
1517:23; 1518:7, 12;
1524:15, 17; 1532:2,
12; 1533:1; 1536:4;
1538:9; 1546:12;
1572:10; 1591:5, 11;
1629:24; 1642:19;
1680:20

**Defendant's** [10] -
1601:6; 1690:14, 22;
1705:5; 1726:18, 23;
1732:8, 20; 1737:7

**defendants** [1] -
1642:9

**defense** [6] - 1517:13;
1601:5; 1630:19;
1646:15; 1652:3;
1678:19

**definitely** [1] -
1708:3

**definitive** [1] -
1637:6

**degree** [2] - 1631:23;
1717:9

**Delancey** [2] - 1719:6,
8

**delay** [1] - 1646:7

**delayed** [1] - 1516:20

**delays** [1] - 1516:7

**demanding** [1] - 1610:9

**demeanor** [1] - 1611:4

**denied** [6] - 1730:4,
13, 16, 21; 1731:6, 13

**deny** [2] - 1679:15;
1731:15

**Department** [8] -

1682:20, 23; 1683:20;
1687:4; 1690:6; 1691:2

**department** [2] -
1694:11; 1729:24

**departure** [1] -
1546:12

**depict** [2] - 1523:5;
1685:13

**depicted** [2] -
1535:12; 1596:5

**depiction** [1] - 1688:3

**deposition** [1] -
1687:24

**descending** [1] -
1529:16

**describe** [8] -
1597:12; 1602:15;
1617:18; 1618:18;
1683:16, 22; 1693:3;
1716:11

**described** [5] -
1616:11; 1617:5, 15;
1618:6; 1733:24

**description** [4] -
1617:9; 1618:5; 1619:2;
1733:25

**descriptions** [1] -
1632:22

**design** [1] - 1559:2

**designated** [1] -
1573:25

**desk** [2] - 1549:19, 21

**desks** [1] - 1549:23

**Detective** [4] -
1593:11; 1727:22;
1733:4

**detectives** [1] -
1727:21

**determination** [6] -
1624:7; 1642:24;
1643:5; 1649:23;
1722:22

**determine** [1] - 1706:8

**Devans** [3] - 1573:2,
17; 1608:4

**Devens** [6] - 1647:17;
1652:9; 1653:9, 19;
1666:3; 1672:2

**diagram** [2] - 1685:6, 8

**died** [1] - 1600:2

**difference** [2] -
1578:8; 1632:11

**differences** [2] -
1559:15; 1632:21

**different** [21] -
1538:25; 1539:3;
1541:23; 1544:17;

8

1559:8, 11; 1571:15;
1596:19; 1606:20;
1622:14; 1636:15;
1637:20; 1642:7;
1656:23; 1694:24;
1708:4, 11; 1710:19;
1725:17; 1727:11
**difficult** [1] - 1528:1
**dining** [1] - 1685:11
**dire** [1] - 1562:13
**direct** [14] - 1532:17;
1550:17; 1557:18;
1601:15; 1613:11;
1648:24; 1649:14;
1654:5; 1688:11;
1691:4; 1709:17;
1720:5; 1729:1, 8
**DIRECT** [4] - 1519:16;
1681:15; 1736:4, 16
**directed** [2] - 1678:6
**directing** [1] -
1556:20
**directly** [1] - 1668:12
**disagree** [1] - 1546:20
**disclosure** [1] -
1689:19
**discounted** [1] -
1565:15
**discredited** [1] -
1605:10
**discuss** [8] - 1537:4;
1538:6; 1603:12;
1622:23; 1674:18;
1702:25; 1734:9
**discussed** [3] -
1532:1; 1564:15;
1647:16
**discussing** [2] -
1519:21; 1655:14
**discussion** [4] -
1517:5; 1567:18;
1629:18; 1715:11
**discussions** [6] -
1569:9; 1586:25;
1622:16; 1670:21;
1671:1; 1679:2
**disk** [5] - 1582:24;
1583:4, 6, 13; 1584:19
**disposal** [2] - 1536:4;
1591:4
**disposed** [1] - 1591:2
**disposing** [1] -
1538:17
**dispute** [1] - 1630:17
**disputed** [1] - 1545:6
**disputes** [2] - 1545:3,
10

**disqualify** [1] -
1637:14
**disregard** [3] -
1656:3, 18; 1701:2
**dissolve** [1] - 1560:6
**distinction** [1] -
1644:10
**distribute** [1] -
1572:18
**DISTRICT** [2] - 1515:1
**District** [1] - 1515:21
**divided** [1] - 1660:4
**division** [2] - 1660:7;
1684:3
**divorce** [2] - 1661:4,
11
**DNA** [13] - 1585:12, 18;
1586:4, 9-10; 1589:8;
1590:4, 7; 1591:14;
1592:21; 1593:10;
1672:10; 1673:14
**document** [25] -
1522:13; 1523:2;
1532:10, 15, 18;
1534:17; 1535:10;
1554:22; 1555:1;
1556:9, 21, 24; 1596:3;
1601:7; 1687:12;
1692:1, 5; 1712:7, 17,
22; 1713:15; 1714:6,
10; 1726:21
**documents** [3] -
1532:1; 1553:14, 22
**DODDATO** [3] - 1515:18;
1516:14; 1627:14
**Doddato** [6] - 1516:6;
1625:7; 1627:11, 21;
1676:7, 15
**dollars** [1] - 1658:25
**Dolphin** [2] - 1541:17;
1655:7
**done** [16] - 1524:5;
1549:2; 1575:23;
1580:10, 16; 1594:17;
1610:15, 21; 1628:13;
1632:18; 1635:11;
1660:22; 1661:19, 23;
1672:1, 3
**door** [11] - 1527:4;
1637:9, 17; 1666:6;
1673:5, 23; 1693:5;
1694:1, 18; 1698:6;
1702:20
**Dorval** [8] - 1523:7,
16, 18; 1586:22;
1587:8; 1590:21;
1592:22; 1618:7
**Dorval's** [9] -

1533:19; 1536:13;
1537:22; 1582:9;
1591:2, 21; 1592:12;
1593:19
**doubt** [3] - 1583:17;
1679:14; 1723:19
**down** [29] - 1521:15;
1522:19; 1525:8;
1527:19-21; 1528:5;
1529:3; 1530:14;
1565:12, 20; 1566:21,
25; 1567:1; 1586:3;
1589:24; 1590:1;
1607:15; 1609:7;
1614:13; 1630:8, 19;
1676:8, 16; 1679:17;
1681:24; 1718:11;
1732:16
**downstairs** [1] -
1608:12
**Downstate** [1] -
1681:24
**dozen** [1] - 1596:12
**draft** [1] - 1678:1
**draw** [3] - 1647:13;
1648:3; 1651:11
**dressed** [1] - 1516:12
**drinking** [3] -
1592:12; 1694:22
**drive** [3] - 1529:22;
1587:14
**Drive** [7] - 1681:19;
1684:23; 1718:25;
1719:3, 9
**driven** [2] - 1538:2;
1694:6
**driver** [1] - 1590:16
**driving** [1] - 1575:1
**drop** [1] - 1524:16
**dropped** [6] - 1518:12;
1524:14, 19, 21;
1525:1; 1591:12
**dropping** [1] - 1531:12
**drove** [3] - 1520:9;
1530:21
**drug** [12] - 1562:23;
1574:5, 7, 14; 1597:25;
1664:1, 4, 6, 9, 11;
1694:24
**drugs** [9] - 1574:20,
23; 1599:12; 1662:19,
25; 1694:23; 1695:6, 9;
1698:11
**due** [1] - 1571:19
**duffle** [2] - 1715:2
**duly** [2] - 1519:3;
1681:12

**dumped** [2] - 1533:19;
1593:19
**during** [32] - 1516:16;
1529:9; 1530:13;
1533:9; 1548:16;
1549:25; 1564:3;
1587:19; 1588:13;
1590:11; 1591:4, 20;
1592:6; 1594:11;
1598:10, 15; 1599:17;
1602:8; 1603:8;
1606:10, 14, 25;
1610:24; 1627:20;
1629:14, 24; 1630:12;
1637:5; 1664:6;
1684:17; 1696:21
**dust** [1] - 1695:7
**duty** [1] - 1625:20
**DVD** [1] - 1582:22

---

**E**

**ear** [1] - 1696:11
**ear-splitting** [1] -
1696:11
**early** [11] - 1548:16;
1549:5; 1602:8;
1686:10; 1701:18;
1704:23; 1705:2;
1721:23; 1723:8, 13
**easier** [1] - 1560:6
**east** [11] - 1538:3, 7;
1539:4; 1548:18, 20;
1562:2; 1563:12;
1595:17; 1598:21;
1655:15
**East** [10] - 1531:18;
1548:20; 1549:6;
1555:24; 1558:7;
1720:15; 1722:18;
1723:3; 1724:7
**EASTERN** [1] - 1515:1
**Eastside** [7] -
1538:24; 1539:4, 7, 17,
22; 1563:12
**eaten** [1] - 1538:13
**effect** [3] - 1558:10;
1638:3; 1734:2
**effort** [1] - 1637:16
**EFT** [2] - 1603:25;
1604:16
**EFT's** [3] - 1603:18;
1604:20; 1605:12
**eight** [5] - 1522:1;
1545:20; 1607:14;
1658:19; 1723:16
**either** [7] - 1546:6;
1572:11; 1646:3, 14;

9

1686:9; 1708:2, 5
**elaborate** [1] - 1611:1
**electronic** [1] - 1604:1
**elicit** [2] - 1629:11; 1630:19
**elicited** [1] - 1633:4
**Elmwood** [6] - 1541:10; 1542:3, 9, 11, 14, 22
**elsewhere** [1] - 1715:5
**emerge** [1] - 1566:1
**employed** [2] - 1590:13, 15
**employee** [2] - 1550:12; 1597:3
**employees** [2] - 1596:20; 1598:14
**employer** [1] - 1698:20
**end** [12] - 1540:8; 1543:7; 1547:9; 1559:12; 1606:20; 1610:20; 1630:9; 1637:18; 1666:21; 1671:25; 1729:1, 7
**End** [6] - 1651:6; 1662:9; 1674:14; 1690:1; 1700:10; 1711:19
**ended** [1] - 1700:3
**enforce** [1] - 1628:18
**engage** [4] - 1537:1; 1592:1; 1602:9; 1603:8
**engaged** [1] - 1594:10
**engine** [2] - 1521:4; 1530:12
**engines** [3] - 1521:1, 6, 14
**English** [1] - 1645:7
**ensue** [1] - 1566:15
**ensure** [1] - 1666:3
**entail** [1] - 1539:12
**enter** [3] - 1563:7; 1647:13; 1648:24
**entered** [4] - 1519:6; 1563:11; 1584:13; 1661:10
**enters** [2] - 1646:5; 1680:14
**entire** [2] - 1702:4; 1710:15
**entrance** [1] - 1527:4
**episode** [2] - 1572:3; 1616:11
**equally** [1] - 1571:6
**equipment** [6] - 1553:1; 1567:24;

1569:19, 25; 1570:4; 1656:10
**equivocated** [2] - 1637:5; 1708:8
**Eric** [17] - 1540:16; 1541:24; 1543:17, 24; 1544:19; 1545:8; 1550:25; 1551:14; 1557:25; 1558:1, 17; 1561:8; 1607:24; 1608:10; 1609:5, 11; 1657:7
**escalate** [1] - 1559:24
**ESQ** [4] - 1515:14, 16, 18
**essential** [1] - 1639:23
**establish** [2] - 1536:11; 1674:2
**established** [2] - 1544:11; 1674:8
**estimation** [1] - 1580:10
**etcetera** [7] - 1549:3; 1553:1; 1624:11; 1628:16
**evaluation** [1] - 1642:5
**evening** [1] - 1703:7
**event** [3] - 1627:17; 1643:7; 1708:11
**events** [12] - 1591:20; 1640:20; 1661:14; 1683:16; 1687:5, 10; 1691:9; 1707:8, 15; 1708:21; 1710:20; 1712:8
**eventually** [13] - 1536:13; 1541:5; 1545:12; 1547:8, 12; 1568:11; 1571:21, 24; 1572:24; 1573:13; 1575:18; 1580:24; 1582:7
**evicted** [6] - 1568:11, 13, 15-16, 19; 1569:2
**eviction** [2] - 1569:17; 1575:11
**evidence** [26] - 1522:24; 1531:24; 1532:6, 8; 1534:16; 1535:8, 15; 1554:18; 1582:16, 19; 1596:1; 1601:4; 1637:10; 1642:24; 1643:1, 24; 1666:16; 1677:22; 1690:15, 22, 24; 1718:17; 1722:1;

1737:4, 6
**exact** [2] - 1638:1; 1666:23
**exactly** [2] - 1615:11; 1708:24
**examination** [12] - 1519:13; 1612:18; 1613:11; 1620:25; 1632:19; 1647:20; 1648:19; 1654:5; 1711:17; 1717:15; 1729:2, 8
**EXAMINATION** [14] - 1519:16; 1612:21; 1646:12; 1670:4; 1671:21; 1681:15; 1717:16; 1736:4, 6, 9, 11, 13, 16, 18
**examine** [1] - 1637:3
**examined** [3] - 1519:3; 1681:10; 1709:3
**except** [1] - 1709:6
**exchange** [1] - 1718:12
**excuse** [9] - 1586:1; 1616:15; 1627:9; 1669:3; 1678:15; 1693:13; 1719:1, 24
**executed** [1] - 1560:10
**exhibit** [2] - 1601:5; 1707:3
**Exhibit** [42] - 1520:4; 1522:12, 25; 1531:25; 1532:9; 1534:16; 1535:9; 1553:24; 1554:9, 14, 17, 19; 1556:23; 1557:19; 1582:17; 1584:19; 1596:2; 1601:5; 1666:16; 1685:5; 1690:14, 18, 22; 1695:25; 1697:14; 1703:5; 1704:9; 1705:5; 1712:7; 1713:11; 1722:11; 1726:18, 24; 1727:7, 9; 1732:8, 20; 1737:5, 7
**exhibited** [9] - 1522:13; 1523:2; 1532:10; 1534:17; 1535:10; 1554:22; 1556:24; 1596:3; 1601:7
**EXHIBITS** [1] - 1737:1
**Exhibits** [2] - 1532:5; 1737:3
**exhibits** [2] - 1677:23; 1680:24
**exists** [1] - 1625:12

1734:19
**expect** [3] - 1615:23; 1620:13; 1627:18
**expectations** [1] - 1620:16
**expected** [3] - 1566:25; 1614:23; 1628:5
**experimented** [1] - 1574:24
**explain** [5] - 1543:1; 1562:11; 1610:7; 1611:3; 1629:9
**extensive** [1] - 1679:8
**extent** [1] - 1539:14
**extortion** [1] - 1664:17
**extremely** [2] - 1606:2; 1675:8
**eyewitness** [1] - 1616:15

**F**

**face** [6] - 1523:11; 1620:6; 1667:21, 24; 1668:2
**faces** [1] - 1620:8
**facie** [1] - 1678:8
**facilities** [1] - 1541:14
**Facility** [1] - 1681:23
**facility** [5] - 1573:22; 1574:1; 1606:6, 20; 1613:20
**fact** [16] - 1531:8; 1538:9; 1547:19; 1566:19; 1578:1, 10, 12; 1579:5; 1614:14; 1617:8; 1631:1; 1632:18; 1635:17; 1651:12; 1663:10; 1711:7
**facts** [3] - 1518:4; 1699:13; 1734:13
**fair** [3] - 1546:8; 1632:12; 1673:4
**fairly** [2] - 1629:10; 1718:20
**faith** [1] - 1649:25
**fall** [1] - 1636:2
**fallen** [1] - 1565:7
**familiar** [2] - 1695:17, 19
**family** [9] - 1548:1; 1550:2; 1565:11, 13-14; 1593:4; 1659:24;

10

11

1661:20; 1663:21

**far** [11] - 1520:19; 1526:1; 1618:24; 1631:10; 1632:12; 1649:24; 1661:21; 1663:2, 5; 1666:13; 1685:18

**fashion** [1] - 1648:2

**fast** [1] - 1528:25

**father** [1] - 1543:25

**father's** [3] - 1536:6, 17, 19

**favor** [1] - 1654:16

**FBI** [8] - 1670:22; 1682:25; 1683:2; 1710:23; 1716:2, 23; 1717:1

**FDR** [8] - 1681:19; 1684:23; 1718:25; 1719:3, 6, 9

**February** [6] - 1568:22; 1569:4, 7, 17; 1570:13; 1575:11

**federal** [5] - 1573:21; 1595:4, 7; 1599:14; 1606:6

**Federal** [3] - 1515:13, 22; 1678:4

**fee** [1] - 1548:15

**fees** [1] - 1659:11

**feet** [1] - 1565:7

**fell** [1] - 1563:14

**fellow** [1] - 1614:18

**fellows** [1] - 1702:19

**felt** [6] - 1567:2; 1605:9; 1622:11, 14, 17; 1663:22

**female** [1] - 1720:11

**few** [7] - 1541:4; 1560:4; 1589:5; 1614:4; 1636:20; 1638:21

**fifth** [1] - 1556:6

**fight** [1] - 1570:9

**fights** [2] - 1553:7; 1566:15

**figured** [1] - 1538:13

**filed** [4] - 1517:7, 10; 1637:15; 1656:6

**filing** [1] - 1659:25

**fill** [4] - 1518:11; 1522:18; 1527:24; 1529:16

**filled** [3] - 1525:12; 1527:21; 1657:2

**filling** [4] - 1521:21; 1522:7; 1524:8, 11

**final** [2] - 1643:5;

1679:12

**finally** [2] - 1557:18; 1734:1

**finances** [1] - 1566:15

**fine** [2] - 1578:25; 1615:15

**finger** [3] - 1591:5, 11; 1601:16

**fingerprints** [1] - 1589:8

**finish** [1] - 1606:19

**finished** [2] - 1606:18; 1731:1

**firearm** [7] - 1696:9; 1703:2, 6, 9, 13, 20; 1704:2

**firearms** [7] - 1695:17, 19; 1696:24; 1697:2; 1698:10, 24; 1702:20

**fired** [2] - 1696:5, 10

**firm** [1] - 1594:24

**first** [41] - 1536:16; 1538:21; 1545:7, 18; 1580:18, 23; 1603:12; 1604:24; 1615:16; 1620:18; 1623:18; 1638:4; 1639:10, 12; 1674:10; 1676:13; 1678:19; 1680:20; 1681:9; 1700:15; 1708:5; 1710:5; 1712:1; 1715:12; 1716:24; 1725:3; 1726:7, 14; 1727:16; 1728:1, 16; 1729:3, 25; 1730:13-15; 1731:3, 17; 1733:12, 15

**First** [1] - 1538:3

**fit** [4] - 1617:20; 1618:5; 1703:11

**fitness** [5] - 1538:18; 1541:6, 19; 1547:11; 1556:19

**Fitness** [14] - 1538:24; 1539:4, 7, 18, 22; 1541:18; 1548:1; 1550:2, 12; 1555:16; 1595:15, 23; 1655:7

**fitted** [2] - 1534:23; 1536:2

**five** [13] - 1544:13; 1586:16; 1615:7, 9, 16, 24; 1616:21, 25; 1622:10, 12, 17; 1633:20; 1653:25

**flee** [1] - 1587:8

**flew** [1] - 1607:18

**flight** [2] - 1566:23;

**flipping** [1] - 1581:8

**floated** [1] - 1538:8

**floor** [2] - 1543:12; 1544:6

**Florida** [9] - 1515:17; 1606:21; 1607:3, 6, 15, 22; 1609:2; 1638:15; 1666:9

**fluctuate** [1] - 1616:19

**flustered** [1] - 1728:17

**fly** [1] - 1607:19

**flying** [1] - 1609:1

**Flynn** [35] - 1519:13; 1584:8; 1613:11; 1615:3; 1617:5, 8; 1625:17, 21, 23-24; 1626:3; 1630:22, 24; 1634:18; 1635:8; 1637:10; 1639:7, 24; 1640:2, 9; 1641:8; 1642:9, 17; 1643:14; 1644:24; 1645:17; 1647:9; 1650:12, 25; 1651:24; 1676:16; 1677:4, 14

**FLYNN** [81] - 1515:14; 1516:24; 1517:10, 16, 18; 1518:9; 1519:14, 17; 1525:7; 1531:23; 1553:15; 1554:13; 1568:24; 1577:5, 18; 1578:3, 8, 11, 19; 1580:4, 6; 1582:12; 1583:19; 1584:10, 17; 1585:4; 1611:14; 1617:6; 1618:1; 1619:8, 13; 1620:5, 21; 1621:4; 1622:19, 21, 25; 1623:12; 1624:13, 17; 1627:22, 25; 1647:5, 11, 24; 1648:17; 1649:7, 13; 1650:16, 19; 1652:12; 1654:2, 18, 25; 1655:16; 1656:1, 17; 1657:17; 1659:17; 1660:15; 1661:10; 1663:18; 1667:13; 1668:25; 1669:8; 1670:2, 5; 1671:20; 1672:15, 20; 1673:1, 3, 9, 12, 22, 25; 1675:4, 23; 1677:5; 1736:5, 12

**folks** [5] - 1517:8; 1626:15; 1675:8; 1724:22; 1735:4

1578:3; 1579:4; 1597:14

**follow-up** [1] - 1579:4

**followed** [2] - 1541:5; 1596:21

**following** [16] - 1516:4; 1536:4; 1577:1; 1580:1; 1581:1; 1613:12; 1620:1; 1622:1; 1640:9; 1647:7; 1659:19; 1672:22; 1675:10; 1687:16; 1699:8; 1707:20

**follows** [3] - 1519:4; 1646:11; 1681:11

**force** [4] - 1575:23; 1604:11, 20; 1708:9

**forcing** [1] - 1708:10

**forget** [1] - 1641:2

**forgot** [6] - 1684:8; 1693:4, 8-9; 1694:12; 1701:9

**form** [1] - 1657:1

**formal** [1] - 1683:19

**forth** [7] - 1567:21; 1632:9; 1640:13; 1663:1; 1673:15; 1693:11; 1709:23

**forward** [2] - 1681:25; 1734:17

**foundation** [2] - 1673:16; 1701:6

**four** [10] - 1522:1; 1544:13; 1560:14; 1592:17; 1637:13; 1693:5; 1694:1; 1698:6; 1702:20; 1710:19

**four-door** [4] - 1693:5; 1694:1; 1698:6; 1702:20

**fourth** [1] - 1590:21

**frame** [1] - 1686:11

**franchise** [2] - 1548:14

**Frank** [1] - 1542:17

**FRANK** [1] - 1515:18

**Franklin** [2] - 1658:3, 5

**Friday** [19] - 1646:14; 1682:7; 1684:13; 1695:14, 16; 1697:11; 1700:15; 1710:7; 1712:1; 1717:21; 1719:17; 1720:1, 17; 1721:9; 1722:18; 1723:4; 1728:3

**friend** [18] - 1589:24; 1604:19; 1696:15;

1715:19, 21; 1720:11;
1729:9, 11; 1730:2, 11,
23-25; 1732:2; 1733:16,
23

**friend's** [1] - 1720:9

**friends** [5] - 1546:14;
1561:16; 1597:2;
1609:1; 1662:14

**friendship** [4] -
1546:24; 1572:6, 10

**front** [18] - 1517:5;
1522:11; 1532:7, 15;
1553:13, 18; 1554:5;
1583:2; 1584:25;
1617:10; 1624:16;
1645:8; 1666:6; 1688:9;
1700:21; 1708:13;
1712:7

**fronted** [5] - 1543:20;
1545:22, 25; 1560:22;
1561:2

**frozen** [2] - 1660:5;
1661:5

**full** [4] - 1604:6, 12,
21; 1685:22

**full-time** [1] -
1685:22

**fully** [1] - 1557:10

**fun** [2] - 1597:14

**fund** [1] - 1659:13

**fundamentally** [1] -
1637:18

**funds** [4] - 1604:1;
1657:11; 1659:12;
1660:23

**furthest** [2] -
1520:22, 24

**future** [3] - 1612:6,
10; 1627:18

**G**

**Gables** [1] - 1515:17

**game** [1] - 1632:12

**Garden** [1] - 1515:19

**Gargiulo** [104] -
1536:25; 1537:1, 13;
1539:9; 1542:7, 23;
1543:9, 15, 19; 1544:3,
7; 1545:1, 3, 6, 18,
23; 1546:9; 1550:20;
1551:8, 11-12, 16, 25;
1552:6, 21; 1555:7, 18;
1556:6, 10, 15; 1557:9;
1558:17, 20; 1559:6,
16; 1561:16; 1562:6,
18, 22; 1563:7, 11, 23,
25; 1564:10, 20;

1566:1; 1567:4-6, 18,
23; 1568:10; 1569:9,
18; 1570:4; 1572:4, 7,
10; 1575:12, 23;
1578:13, 22; 1579:6;
1580:10; 1581:11, 20;
1582:1; 1583:8, 16;
1584:21; 1599:1, 12,
15, 18; 1610:22;
1635:5, 16; 1644:7;
1654:23; 1655:2, 12;
1656:6, 10; 1662:13;
1664:17; 1666:4, 13,
20; 1668:19; 1669:7,
16; 1670:16, 19, 25;
1671:12; 1672:5, 14,
19; 1674:3; 1677:17;
1721:18, 20

**Gargiulo's** [13] -
1546:16; 1553:11;
1554:10; 1556:1;
1558:7; 1561:3; 1569:2;
1580:18, 24; 1600:5;
1611:12; 1655:19;
1670:11

**Garrett** [4] - 1607:23;
1608:9; 1609:11; 1667:4

**gate** [1] - 1609:23

**gears** [1] - 1538:15

**generally** [1] -
1707:25

**generated** [2] -
1565:11; 1566:24

**generations** [1] -
1642:7

**gentleman** [2] -
1619:6; 1660:1

**gentlemen** [7] -
1585:4; 1614:13;
1622:3; 1623:4; 1651:7;
1677:6; 1734:7

**GEO** [2] - 1646:15;
1652:2

**getaway** [1] - 1617:24

**GHB** [1] - 1574:25

**girlfriend** [3] -
1536:6; 1651:20;
1695:15

**girlfriend's** [7] -
1536:19; 1721:6;
1722:18; 1723:3;
1724:7; 1727:25; 1728:2

**given** [2] - 1604:15;
1632:9

**glossed** [1] - 1569:22

**GO** [3] - 1613:20, 24;
1614:15

**good-bye** [1] -

**good-faith** [1] -
1649:25

**Government** [35] -
1515:12; 1531:25;
1613:4; 1614:24;
1631:17; 1636:12;
1637:25; 1641:1;
1647:22; 1648:11;
1649:15; 1651:21;
1652:24; 1653:5;
1654:16; 1657:1;
1667:25; 1668:2, 17;
1669:6, 15; 1672:7, 12;
1674:6, 11, 18;
1675:16; 1678:8, 22,
24; 1680:17; 1690:18

**government** [10] -
1531:24; 1554:13;
1579:6; 1611:16;
1613:9; 1616:14;
1623:18; 1624:8;
1625:5; 1631:12

**Government's** [31] -
1520:4; 1522:12, 25;
1532:5, 9; 1534:16;
1535:9; 1553:24;
1554:9, 14, 17, 19;
1556:23; 1557:19;
1582:17; 1584:19;
1596:2; 1601:5; 1641:7;
1677:12; 1685:4;
1695:24; 1697:14;
1703:5; 1704:9;
1722:11; 1726:18;
1727:7, 9; 1737:3, 5

**government's** [2] -
1624:13, 24

**gradually** [2] -
1603:20; 1604:18

**granted** [1] - 1692:20

**great** [2] - 1614:11;
1631:13

**green** [1] - 1585:2

**Greg** [2] - 1594:1, 4

**grew** [3] - 1533:1, 3;
1666:14

**grooves** [1] - 1526:23

**ground** [2] - 1619:15,
17

**group** [1] - 1586:23

**growing** [1] - 1593:14

**guarantee** [10] -
1553:6; 1557:5, 7, 20;
1558:6, 10; 1560:16,
19; 1571:1, 5

**guarantees** [3] -
1414:25; 1615:1

**guards** [1] - 1680:6

**guess** [8] - 1517:4;
1528:8, 11; 1651:9;
1684:3; 1696:20;
1716:1; 1719:22

**guessing** [5] -
1545:20; 1592:17;
1608:25; 1617:2;
1658:10

**guilty** [2] - 1572:22;
1620:9

**Gulf** [1] - 1601:6

**gun** [1] - 1528:7

**gunman** [1] - 1633:11

**gunmen** [1] - 1633:5

**guns** [7] - 1696:22;
1697:3, 5, 20, 23;
1698:18; 1701:13

**guy** [5] - 1662:1;
1672:4; 1697:22;
1708:15; 1711:11

**guys** [4] - 1600:19;
1615:20; 1616:2;
1710:10

**gym** [67] - 1538:3, 18;
1539:13; 1540:1, 4, 7,
9, 11-13, 25; 1541:3;
1542:3, 9, 11, 14,
22-23; 1543:15, 20;
1544:10, 17; 1545:23;
1546:1, 9, 12; 1548:13;
1549:9; 1551:9, 13;
1554:10; 1555:8;
1558:3, 11, 21; 1559:6;
1561:3, 24; 1563:12;
1564:5; 1565:6, 13;
1566:22; 1567:3, 21;
1569:19; 1570:4;
1595:13, 16; 1596:19;
1598:8, 11; 1605:5;
1655:19; 1656:21;
1657:5, 16, 20;
1658:11, 13, 15, 18;
1662:22, 24

**Gym** [7] - 1540:10;
1548:17; 1549:6;
1595:12, 18; 1603:23;
1657:5

**gym's** [1] - 1566:15

**gyms** [15] - 1541:6, 16;
1547:23; 1598:12, 14,
16; 1603:14, 16;
1605:1, 13; 1655:8, 15;
1657:23; 1662:1

**H**

**half** [11] - 1524:18;
1525:3; 1529:3; 1535:4;

*OWEN WICKER, RPR -*
*OFFICIAL COURT REPORTER*

**13**

1539:24; 1584:10; 1596:12; 1608:17; 1719:21

**halfway** [6] - 1606:21, 23-24; 1607:2, 11, 16

**Hamptons** [1] - 1594:20

**hand** [21] - 1518:7, 12; 1524:15-17, 20, 24; 1525:1, 3; 1528:7; 1530:17; 1531:9, 11; 1532:18; 1534:8, 11-12; 1585:2; 1681:6

**handed** [1] - 1582:15

**handgun** [3] - 1528:6, 19, 21

**handing** [1] - 1727:8

**handle** [1] - 1528:3

**handled** [1] - 1637:25

**hands** [3] - 1517:23; 1528:4; 1531:9

**handwritten** [2] - 1555:21; 1710:25

**hanger** [1] - 1629:6

**hanging** [1] - 1599:8

**happy** [8] - 1553:8; 1603:19; 1641:19; 1642:3, 17, 21

**hard** [4] - 1544:23, 25; 1708:14; 1722:4

**HARRY** [1] - 1515:20

**headed** [2] - 1544:24

**headquarters** [2] - 1548:23, 25

**heads** [1] - 1544:24

**headset** [1] - 1586:18

**headsets** [1] - 1584:25

**hear** [21] - 1517:19; 1528:9; 1580:24; 1581:16; 1620:3; 1627:7, 12; 1629:4; 1634:12, 15; 1636:18; 1641:4, 15-16; 1643:16; 1644:15; 1662:23; 1675:2; 1679:13; 1682:1; 1688:4

**heard** [19] - 1550:13; 1578:1, 8; 1580:18; 1597:7; 1627:8, 15-16; 1628:23; 1639:6; 1641:2; 1644:5; 1651:7; 1652:22; 1656:11; 1665:16, 22; 1667:20; 1674:25

**hearing** [2] - 1640:24; 1645:2

**hearsay** [3] - 1639:9; 1640:22; 1642:25

**heavy** [1] - 1625:20

**height** [2] - 1617:19; 1632:11

**held** [4] - 1525:17; 1526:6; 1549:13; 1557:10

**help** [24] - 1531:3; 1552:1, 3, 6, 9, 21; 1555:7; 1562:14; 1564:7; 1640:10; 1641:7; 1645:18; 1666:24; 1687:9; 1691:9; 1705:13, 22; 1706:7; 1707:7; 1712:8, 17; 1713:11; 1726:12; 1727:15

**helped** [1] - 1552:24

**helpful** [1] - 1687:3

**helping** [1] - 1565:1

**helps** [1] - 1704:19

**Hempstead** [1] - 1531:18

**herself** [1] - 1659:11

**Hicksville** [1] - 1587:21

**hide** [2] - 1612:7, 10

**high** [1] - 1536:2

**highlighted** [4] - 1532:14; 1555:1; 1723:23

**himself** [7] - 1530:18; 1569:24; 1578:24; 1582:2; 1611:3; 1634:4; 1661:23

**hinges** [1] - 1526:19

**hire** [2] - 1542:3, 8

**hired** [9] - 1668:6, 8, 11, 18; 1669:14, 16; 1671:16, 23; 1672:5

**hiring** [2] - 1672:13; 1673:20

**Hispanic** [1] - 1697:24

**hold** [6] - 1526:10; 1527:8, 19; 1528:1, 3, 6

**holding** [4] - 1527:1, 5; 1528:7

**hole** [1] - 1630:5

**holes** [6] - 1525:18; 1526:10; 1527:7, 11, 23; 1528:17

**Holster** [1] - 1654:10

**Holzer** [23] - 1539:5; 1540:16; 1541:1, 25; 1543:17, 24; 1544:19; 1545:8; 1549:7; 1550:25; 1551:

**1552:22; 1557:25; 1558:1, 18; 1561:8; 1607:24; 1608:10; 1609:5, 12; 1654:10; 1657:7

**Holzers** [3] - 1655:9; 1657:14, 20

**home** [23] - 1530:25; 1531:2, 8, 22; 1533:1, 3, 8; 1575:15; 1581:20; 1599:22; 1600:1; 1606:16; 1610:11; 1611:8; 1635:13; 1659:12; 1666:5, 13; 1670:14; 1684:4, 19; 1723:11, 21

**homicide** [2] - 1684:3; 1707:11

**Honor** [58] - 1516:23; 1517:11; 1518:19, 23; 1519:14; 1525:7; 1531:23; 1553:15; 1568:24; 1577:5; 1580:4; 1582:12; 1583:19; 1584:11, 17; 1611:14; 1612:17, 19; 1620:5, 21; 1621:4; 1624:13; 1627:6, 9, 13-14; 1628:22; 1632:15; 1636:22; 1637:22; 1640:11; 1642:12; 1647:24; 1648:17; 1649:7, 13; 1650:19; 1660:16; 1661:12, 17, 21; 1669:24; 1670:2; 1675:6; 1677:15; 1680:13, 21; 1688:17; 1689:18; 1691:23; 1701:7; 1704:12; 1706:22; 1712:10; 1714:13; 1716:6; 1735:5

**HONORABLE** [1] - 1515:9

**hope** [2] - 1613:12; 1615:2

**hoped** [3] - 1615:4

**hopefully** [1] - 1626:16

**hopes** [1] - 1649:18

**hoping** [3] - 1615:9, 16; 1622:13

**hospital** [12] - 1562:13, 18, 21, 24; 1563:2, 7, 11; 1564:2, 4, 21; 1565:23; 1566:2

**hotel** [4] - 1607:24; 1608:2, 4, 9

**hour** [5] - 1530:12; 1584:10;

**1607:21

**hours** [6] - 1589:5; 1607:14; 1695:12; 1701:18, 20

**House** [2] - 1540:10; 1541:17

**house** [41] - 1519:21; 1533:25; 1534:2; 1536:7, 17, 19; 1594:21; 1606:21-24; 1607:2, 11, 16; 1610:11; 1636:7; 1645:1; 1665:16; 1684:10, 13; 1687:1; 1693:15; 1695:14; 1715:7; 1719:12, 16, 20; 1720:2, 9, 16; 1722:18; 1723:3, 17; 1724:7, 10; 1727:25; 1728:2, 17; 1729:24

**housed** [2] - 1681:20; 1682:9

**huge** [1] - 1630:5

**hung** [2] - 1537:12; 1564:10

**hurtful** [1] - 1730:3

**Hyatt** [2] - 1608:3, 19

**I**

**idea** [6] - 1544:6; 1657:21; 1725:13; 1731:9

**ideas** [1] - 1559:8

**identification** [2] - 1690:19; 1737:8

**identified** [4] - 1584:18; 1730:7, 10

**identify** [1] - 1696:3

**immediately** [2] - 1537:14; 1734:10

**implicates** [1] - 1632:4

**importance** [2] - 1548:21; 1595:18

**importantly** [1] - 1709:4

**impossibility** [1] - 1637:9

**imprisonment** [1] - 1599:17

**improper** [4] - 1620:18; 1621:1; 1688:10; 1708:12

**inappropriate** [4] - 1634:6; 1649:20, 23; 1708:16

**incarcerated** [1] -

1683:4

**incarceration** [2] - 1573:15; 1574:1

**inches** [2] - 1522:1

**incident** [5] - 1570:11; 1577:25; 1639:10; 1653:3; 1711:22

**including** [3] - 1540:19, 21; 1710:24

**inconsistencies** [1] - 1641:6

**inconsistency** [1] - 1646:2

**inconsistent** [5] - 1641:10; 1644:20; 1708:5; 1709:4; 1711:9

**incorrect** [1] - 1628:6

**independent** [3] - 1671:6; 1706:15; 1734:15

**independently** [1] - 1548:4

**INDEX** [1] - 1736:1

**indicate** [10] - 1522:12; 1525:20; 1532:19; 1616:14; 1618:19; 1636:15; 1646:1; 1698:23; 1711:4; 1734:5

**indicated** [4] - 1526:5; 1527:1; 1646:14; 1733:20

**indicates** [1] - 1727:10

**indicating** [9] - 1522:16; 1525:25; 1526:18; 1631:7; 1653:6; 1683:14; 1703:21; 1713:9; 1714:18

**indicating)** [4] - 1522:15; 1525:4, 23; 1527:5

**indication** [1] - 1650:7

**individual** [8] - 1535:12; 1548:1, 13; 1590:21; 1593:18; 1595:8; 1596:5; 1649:16

**individuals** [4] - 1609:1, 14; 1615:19; 1620:7

**inference** [1] - 1648:7

**inferences** [1] - 1647:13

**Infiniti** [1] - 1587:10

**inflicted** [2] - 1534:21; 1535:19

**information** [10] - 1582:8; 1600:6, 22, 25; 1611:2; 1631:3; 1632:4; 1671:3, 6; 1722:13

**informed** [1] - 1698:19

**initial** [1] - 1687:4

**initials** [2] - 1583:2

**initiated** [1] - 1610:1

**injured** [1] - 1518:7

**injuries** [3] - 1517:23; 1518:1

**injury** [4] - 1518:3, 10; 1534:21; 1535:19

**Inlet** [2] - 1530:5, 11

**inlet** [3] - 1520:14, 17; 1530:19

**inmates** [1] - 1603:1

**inquire** [1] - 1670:2

**inside** [12] - 1518:13; 1521:19; 1522:20, 22; 1525:17; 1529:1; 1530:2; 1531:13; 1538:10; 1594:24; 1715:7

**instance** [1] - 1688:7

**institution** [1] - 1574:16

**instructed** [4] - 1521:10; 1610:17; 1656:3, 18

**instruction** [5] - 1640:23; 1641:2; 1647:12; 1648:2; 1651:3

**insulted** [1] - 1567:11

**intending** [1] - 1551:8

**interact** [1] - 1598:3

**interest** [12] - 1539:17; 1540:1, 7; 1541:2, 6, 13; 1542:2; 1547:11, 16; 1552:14, 16; 1571:25

**interesting** [2] - 1626:14; 1629:7

**interior** [1] - 1559:2

**interpretation** [2] - 1640:5; 1650:3

**interpreted** [1] - 1650:1

**interrogated** [1] - 1730:1

**interrupted** [10] - 1587:17; 1588:11; 1589:11, 15; 1590:10, 19, 25; 1591:25; 1592:19; 1594:7

**interview** [10] - 1726:4, 6; 1730:9; 1731:3, 13, 18; 1732:10, 22; 1733:20

**interviewed** [11] - 1682:22, 25; 1711:24; 1726:14; 1727:16, 22; 1728:2; 1729:3; 1732:13; 1733:1, 4

**intoxicated** [1] - 1575:2

**introduce** [1] - 1517:2

**investigating** [1] - 1682:20

**investigation** [1] - 1734:15

**investigator** [4] - 1682:13; 1689:24; 1717:25; 1718:2

**involved** [11] - 1538:18, 21; 1540:24; 1551:13; 1560:11; 1564:21, 25; 1565:1; 1566:12; 1569:14; 1645:17

**involvement** [2] - 1672:10; 1673:8

**involving** [1] - 1683:23

**irreconcilable** [2] - 1710:21, 25

**irrelevant** [2] - 1518:4; 1623:16

**Island** [3] - 1547:12; 1564:16; 1716:2

**Islip** [5] - 1515:5, 13, 22; 1683:7, 11

**issue** [11] - 1578:21; 1628:11, 24; 1630:8, 18, 21; 1631:1; 1632:8, 10; 1633:16; 1661:12

**issues** [1] - 1628:25

**items** [1] - 1677:16

**itself** [1] - 1520:25

**J**

**Jack** [2] - 1593:11

**jail** [18] - 1613:20; 1615:19; 1623:20; 1624:25; 1630:15; 1631:16; 1635:24; 1636:5; 1643:7, 9; 1646:16; 1648:14; 1662:5; 1664:13; 1675:25; 1682:8; 1708:25

**JAMES** [1] - 1515:14

**January** [15] - 1555:5; 1556:16; 1560:9; 1569:21; 1574:18; 1575:8; 1581:13; 1595:5; 1599:15; 1606:16; 1636:6; 1643:9; 1663:8

**Jericho** [1] - 1587:14

**Jersey** [8] - 1540:5, 7, 25; 1541:7, 10, 20, 24; 1542:3

**jibe** [2] - 1628:15; 1631:3

**Jimmy** [3] - 1594:15, 18, 22

**jive** [1] - 1625:22

**JK-11** [1] - 1535:9

**JOANNA** [1] - 1515:9

**job** [3] - 1539:12; 1594:16; 1698:20

**Joe** [3] - 1564:19; 1565:10; 1614:18

**join** [2] - 1525:11; 1565:14

**Jones** [4] - 1520:14, 16; 1530:5, 11

**Judge** [25] - 1516:10, 14; 1523:21; 1568:2; 1578:5; 1585:24; 1615:5; 1623:2; 1626:10; 1627:25; 1634:9; 1637:24; 1638:7; 1641:5; 1643:11; 1645:24; 1650:17; 1673:4, 16; 1688:1; 1690:12; 1709:18; 1710:2, 10; 1712:23

**judge** [2] - 1661:4; 1699:5

**Julius** [1] - 1594:9

**July** [4] - 1696:25; 1698:16, 21; 1717:11

**June** [4] - 1585:16; 1588:6; 1696:25; 1698:16

**junkie** [3] - 1662:15, 17; 1672:5

**jurors** [1] - 1627:15

**jury** [39] - 1515:10; 1516:5, 20; 1517:5; 1519:6; 1584:1, 7, 13; 1606:24; 1623:8; 1624:16; 1627:3; 1635:15; 1639:11, 15; 1643:1; 1645:9, 25; 1646:4; 1647:1, 4, 10,

12; 1648:1, 3, 24;
1649:10; 1651:3, 8;
1656:3, 18; 1677:9;
1680:11, 14; 1701:2;
1722:22; 1734:19
**jury's** [2] - 1597:8;
1648:4
**Justin** [49] - 1595:9,
22; 1596:9, 14, 17, 25;
1597:18, 20, 23;
1598:10; 1654:1, 5;
1662:12; 1668:3, 14,
18; 1669:14, 16;
1671:15; 1672:13;
1683:23; 1686:22;
1688:13; 1690:8;
1692:23; 1693:14;
1695:1; 1697:21;
1701:13, 20; 1702:15;
1703:2, 7, 13; 1706:16;
1708:20; 1712:18;
1715:25; 1716:17;
1720:23; 1729:21;
1730:6, 16; 1732:2;
1733:13, 21, 24

**K**

**keep** [5] - 1539:15;
1554:2; 1585:1;
1592:11; 1734:16
**keeps** [2] - 1633:19;
1709:22
**Keith** [5] - 1600:10;
1607:25; 1608:10, 16;
1609:11
**Kennedy** [3] - 1593:11;
1633:5
**kept** [3] - 1526:17, 24;
1604:18
**key** [10] - 1684:16;
1694:15; 1720:6, 21;
1724:11, 14-15, 19-20,
22
**kill** [8] - 1575:18;
1664:20; 1668:9, 18;
1669:16; 1672:5, 13;
1721:17
**killed** [2] - 1523:8;
1665:14
**killing** [1] - 1669:19
**kind** [11] - 1527:14;
1540:11; 1551:5;
1569:22; 1574:13;
1577:15; 1596:16;
1606:22; 1615:13;
1631:5; 1700:2
**kitchen** [5] - 1665:20;
1685:10; 1718:25;

1719:3
**Klein** [2] - 1524:2
**KM-5** [2] - 1582:17;
1584:19
**knocking** [2] - 1521:4;
1694:18
**knowing** [7] - 1664:19;
1730:4, 13, 16, 21;
1731:6; 1733:13
**knowledge** [30] -
1544:7; 1545:25;
1547:3, 15; 1551:7, 16,
22; 1552:3; 1553:10;
1558:9; 1560:18;
1561:2, 20; 1562:21,
24; 1563:1; 1567:8;
1569:23; 1572:9;
1573:25; 1574:10;
1586:25; 1587:7;
1593:9; 1608:13;
1662:20; 1673:17;
1675:22; 1698:17;
1710:19
**known** [5] - 1550:7;
1573:21; 1593:13;
1594:19; 1635:6
**knows** [3] - 1634:10;
1648:20; 1674:5

**L**

**Labor** [1] - 1602:8
**ladies** [6] - 1585:4;
1622:3; 1623:4; 1651:7;
1677:6; 1734:7
**laid** [1] - 1718:21
**land** [1] - 1520:22
**landlord** [1] - 1555:14
**large** [3] - 1518:11;
1549:16; 1565:11
**laser** [1] - 1522:11;
1525:20
**last** [13] - 1547:10;
1557:19; 1575:20;
1608:17; 1614:7, 12;
1638:18; 1646:14;
1674:16; 1677:13;
1716:19, 25; 1717:2
**latch** [1] - 1527:20
**late** [3] - 1557:10;
1686:10; 1701:20
**latitude** [2] - 1710:3,
9
**law** [6] - 1620:6, 15;
1623:20; 1625:3;
1628:6, 18
**lawsuit** [6] - 1659:14,
22, 25; 1660:5;

5

**lawyer** [17] - 1618:9;
1622:16, 24; 1625:21,
23; 1626:4, 11;
1638:11; 1639:6;
1640:3, 8; 1642:1;
1647:18, 22; 1648:11;
1650:12, 21
**lawyer's** [1] - 1640:4
**laying** [1] - 1701:6
**layout** [2] - 1558:25;
1718:18
**lead** [2] - 1639:11;
1709:20
**leading** [4] - 1523:13,
15; 1703:15; 1709:18
**leaked** [1] - 1538:10
**lean** [1] - 1681:25
**leaning** [3] - 1527:2,
5, 9
**learn** [2] - 1536:13;
1599:21
**learned** [9] - 1600:2;
1631:24; 1635:21;
1639:16, 21; 1646:15;
1648:11; 1673:13
**learning** [2] -
1537:22; 1600:5
**lease** [16] - 1551:3,
18; 1552:22; 1553:25;
1554:10; 1555:2, 11,
20; 1556:7, 16;
1558:10; 1560:10, 16,
22; 1565:4; 1571:5
**least** [2] - 1596:12;
1710:19
**leave** [11] - 1575:24;
1581:11; 1589:16;
1610:21; 1627:19;
1701:23; 1702:1, 14-15,
17, 20
**leaves** [3] - 1577:12;
1584:1; 1623:8
**leaving** [2] - 1575:15;
1591:14
**Lee** [1] - 1720:13
**left** [30] - 1531:5, 7;
1532:18; 1534:2;
1538:13; 1546:5, 8, 18;
1547:2; 1554:21;
1561:14; 1572:11;
1581:12, 20; 1587:6;
1589:9; 1590:22;
1629:6; 1644:3; 1658:1;
1661:3; 1672:9;
1673:14; 1702:7;
1704:22; 1723:6, 12

1532:18
**legal** [2] - 1624:7;
1659:11
**leniency** [3] -
1614:25; 1615:1
**Leshan** [4] - 1678:18;
1681:3, 12; 1722:14
**LESHAN** [1] - 1681:13
**less** [8] - 1529:3;
1539:14; 1548:14;
1613:13; 1619:11;
1620:7, 13
**lessee** [1] - 1555:15
**lesser** [1] - 1628:9
**letter** [12] - 1606:15;
1610:9; 1612:2, 5,
12-13; 1644:7; 1645:15;
1650:4, 7; 1664:16
**letters** [1] - 1570:14
**letting** [1] - 1711:5
**level** [1] - 1551:6
**liability** [3] -
1660:10
**lid** [3] - 1525:17;
1526:6; 1527:19
**lie** [4] - 1635:7, 22;
1732:6; 1733:18
**lied** [5] - 1711:1, 3-4;
1729:2, 11
**liened** [1] - 1660:24
**life** [7] - 1533:10;
1538:16; 1574:21;
1613:13; 1620:8;
1628:7, 9
**light** [2] - 1585:2;
1678:9
**line** [5] - 1601:16;
1637:24; 1638:2, 6;
1722:4
**lined** [1] - 1602:17
**lines** [3] - 1581:21;
1601:16; 1661:2
**link** [4] - 1672:12;
1673:19; 1674:3
**links** [1] - 1672:18
**lips** [1] - 1523:12
**list** [2] - 1700:15
**listen** [5] - 1625:4;
1627:17; 1629:3, 21;
1653:17
**listened** [6] -
1583:10; 1615:11;
1624:24; 1625:6;
1665:9, 11
**listens** [2] - 1577:19
**litigation** [2] -
1637:13; 1649:17

live [2] - 1563:1; 1720:14
lived [1] - 1720:15
living [9] - 1531:20; 1607:5; 1666:9; 1681:18; 1685:9-11; 1719:1, 5
Llama [1] - 1697:7
LLC [2] - 1555:12
located [4] - 1536:9; 1540:4; 1548:17; 1562:24
location [26] - 1538:7; 1539:3, 16; 1542:4, 12; 1543:2, 4, 10, 12; 1544:6; 1551:9; 1552:12, 17, 21; 1553:9; 1556:1; 1559:1; 1560:5, 23; 1563:21; 1564:14, 16; 1565:2; 1571:15; 1594:24
locations [7] - 1541:23; 1552:25; 1558:2; 1596:19; 1655:10; 1727:11
locker [1] - 1558:24
Logan [4] - 1607:20; 1608:22, 24; 1610:25
long-standing [1] - 1585:7
look [28] - 1521:25; 1523:7, 11, 16; 1525:1; 1553:19; 1628:2; 1634:16; 1643:5, 8, 23; 1650:23; 1666:16; 1695:21; 1703:6; 1704:18; 1705:4, 22; 1706:12, 20; 1727:10; 1732:20, 23; 1734:12, 17
looked [7] - 1517:25; 1536:1; 1566:14; 1602:15; 1628:16; 1706:8; 1708:18
looking [4] - 1594:16; 1620:11; 1675:19; 1725:15
lookout [6] - 1616:8, 10; 1619:10; 1620:12; 1622:12; 1628:7
looks [2] - 1687:24; 1703:8
loop [1] - 1633:2
LORETTA [1] - 1515:12
losing [3] - 1563:21; 1564:5; 1567:14
lost [3] - 1724:14, 20

loud [5] - 1682:1; 1696:11; 1713:2; 1714:12
Louis [4] - 1523:7; 1582:9; 1591:2; 1592:16
Louis's [2] - 1522:22; 1523:6
luncheon [1] - 1627:20
Luncheon [1] - 1626:17
lying [6] - 1639:12; 1645:11; 1729:5, 9
LYNCH [1] - 1515:12
Lynn [1] - 1633:5

M

ma'am [3] - 1704:23; 1713:22; 1714:21
machine [15] - 1552:23; 1553:3, 6, 11; 1560:19; 1571:14; 1575:16, 24; 1577:13; 1580:7, 19; 1581:12, 17; 1656:22; 1664:24
machines [1] - 1602:18
mad [2] - 1570:7; 1580:16
mail [1] - 1581:20
main [1] - 1630:8
maintain [3] - 1541:2; 1549:19, 21
maintained [1] - 1559:6
man [1] - 1708:13
managed [1] - 1542:12
manager [7] - 1542:3, 6, 9, 11, 15, 21; 1564:18
managers [1] - 1564:16
mandatory [1] - 1620:8
Manhattan [14] - 1541:7, 20; 1547:12; 1548:18, 22, 24; 1552:25; 1562:25; 1566:2; 1569:3; 1598:23; 1694:11; 1726:4; 1732:17
manipulation [1] - 1641:6
Manon [7] - 1593:10; 1600:15; 1602:6; 1647:14; 1648:6, 25; 1651:10
marijuana [6] - 1572:18; 1573:16; 1574:25; 1593:25; 1594:3; 1595:4

Marilyn [2] - 1602:1, 3
mark [1] - 1727:6
marked [9] - 1533:13; 1553:18; 1556:21; 1685:4; 1690:12, 18, 21; 1703:4; 1737:7
MARSHAL [1] - 1516:10
marshals [2] - 1627:8, 15
Marty [2] - 1725:5
Massachusetts [16] - 1573:2, 17, 19; 1574:2, 17; 1599:18; 1601:1, 14, 21; 1605:15; 1606:6, 19; 1607:5, 17; 1608:14, 20
matched [1] - 1617:9
material [5] - 1553:18; 1622:8; 1636:14; 1689:19
math [1] - 1659:2
matter [5] - 1585:13; 1597:7; 1628:6; 1640:14; 1727:17
matters [1] - 1645:3
Matthew [3] - 1550:10, 13
Mattie [1] - 1550:8
Matulis [2] - 1725:5
Meadow [2] - 1531:18, 20
mean [25] - 1548:25; 1551:7; 1552:11, 13; 1590:6; 1597:4; 1604:2; 1611:22; 1633:1; 1634:22; 1645:6; 1650:1, 20; 1652:19; 1655:6; 1685:10; 1705:25; 1706:2; 1708:3; 1711:2; 1723:8, 13-14; 1724:13; 1734:1
meaning [3] - 1564:6; 1610:10; 1653:5
means [3] - 1635:20; 1637:8
meant [2] - 1605:24; 1637:21
mechanical [1] - 1515:24
MED-1 [3] - 1531:25; 1532:5; 1737:3
MED-10 [1] - 1534:16
MED-11 [1] - 1534:19
MED-13 [3] - 1531:25; 1532:6; 1737:3
MED-3 [1] - 1532:9

medical [11] - 1517:2, 11; 1531:11, 15; 1532:2, 12; 1533:12, 16; 1573:21; 1574:1; 1606:6
Medical [4] - 1517:3; 1531:16, 19; 1532:13
meet [6] - 1531:9; 1595:8, 11; 1596:10; 1612:25; 1613:3
meeting [4] - 1549:15; 1603:8; 1604:14; 1637:20
meetings [1] - 1549:13
Melvyn [1] - 1585:10
member [3] - 1565:14; 1598:8; 1637:14
members [5] - 1539:13; 1558:11; 1570:6; 1604:11; 1649:14
memberships [3] - 1558:15, 19; 1566:24
memorandum [1] - 1678:2
memory [9] - 1533:18; 1614:11; 1634:18; 1639:5; 1640:2; 1644:24; 1645:18; 1653:11; 1733:1
mental [1] - 1566:2
mentee [1] - 1597:13
mention [1] - 1655:21
mentioned [3] - 1537:10; 1597:25; 1610:22
mentor [1] - 1597:13
Merrick [3] - 1520:3; 1530:25; 1657:24
message [20] - 1516:18; 1575:24; 1577:13, 20; 1578:9; 1579:6; 1580:7, 18, 25; 1581:11, 16, 20; 1604:15; 1605:12, 14; 1635:10; 1641:25; 1642:21; 1672:2
messages [2] - 1575:12, 15
met [10] - 1589:24; 1595:12; 1618:12; 1682:4; 1715:12; 1716:2, 19; 1717:20; 1733:22
metallic [1] - 1703:3
microphone [2] - 1554:5; 1682:1
mid [1] - 1583:23
mid-90s [3] - 1541:20;

16

1544:8; 1545:18

**mid-morning** [1] - 1583:23

**middle** [8] - 1520:3; 1530:10; 1534:22; 1556:13; 1567:24; 1570:5; 1666:21

**midnight** [2] - 1723:18; 1725:18

**Midtown** [1] - 1726:5

**might** [9] - 1538:9; 1594:15; 1629:14, 18-19; 1632:9; 1639:11; 1734:12

**Miguel** [1] - 1686:8

**mile** [2] - 1608:6; 1666:15

**miles** [4] - 1520:18, 20; 1531:22; 1608:6

**milestone** [3] - 1569:7, 17

**Miller** [42] - 1520:7, 11-12, 21; 1521:9, 17; 1526:5; 1529:9, 12, 19; 1530:2, 7, 13, 18, 24; 1587:15; 1593:19, 22; 1594:4; 1629:13; 1630:1, 10, 12; 1631:4, 7, 15; 1632:8; 1633:18; 1635:5, 9, 18; 1636:1; 1637:2; 1639:5, 23; 1640:2; 1641:11; 1650:2; 1676:8, 11

**Miller's** [22] - 1517:22; 1519:21; 1520:2, 16; 1521:6; 1523:20; 1524:8, 13; 1525:21; 1529:7; 1533:25; 1534:9; 1588:19; 1589:4; 1625:23; 1626:12; 1633:20; 1634:25; 1636:11; 1643:6, 13; 1645:18

**millimeter** [1] - 1527:15

**mind** [11] - 1578:16; 1581:7; 1626:7-9; 1643:12; 1675:6, 12, 14, 16; 1734:16

**mine** [4] - 1627:22; 1715:19; 1722:14; 1730:25

**minimal** [1] - 1661:24

**minimum** [2] - 1616:2, 5

**minitrial** [1] - 1661:18

**minute** [9] - 1529:3;

1610:6; 1611:14, 17; 1643:21; 1644:12; 1719:2; 1725:4

**minutes** [12] - 1583:25; 1584:10; 1636:20; 1643:23, 25; 1650:18; 1679:9, 19, 22, 24; 1729:7; 1734:25

**mirrors** [1] - 1558:25

**mischaracterization** [1] - 1721:8

**miskiewicz** [1] - 1734:5

**Miskiewicz** [3] - 1649:17; 1677:14; 1680:17

**MISKIEWICZ** [80] - 1515:14; 1518:19, 23; 1577:7; 1612:16; 1627:6, 9; 1628:23; 1629:5; 1630:2, 16, 24; 1632:14, 17; 1633:1, 8, 15, 24; 1636:22; 1637:1; 1640:11; 1642:12; 1644:15, 19; 1669:23; 1677:15, 21; 1678:13, 16; 1679:1; 1680:18; 1686:11; 1687:6; 1688:5; 1689:15, 18, 25; 1691:23, 25; 1692:19; 1693:18; 1699:3; 1700:1, 18, 24; 1701:1; 1703:15, 22; 1704:20; 1705:8, 19; 1706:10, 22, 25; 1707:2, 12, 18, 23; 1708:23; 1710:15, 18, 24; 1712:3, 10; 1713:1, 14; 1714:13, 15; 1717:17; 1721:11, 14; 1722:25; 1726:16, 20, 22; 1734:4, 25; 1735:5; 1736:19

**missed** [1] - 1557:12

**misspoke** [2] - 1726:20; 1728:21

**misstate** [2] - 1620:15

**misstates** [1] - 1620:6

**mistaken** [1] - 1728:18

**mistakenly** [1] - 1524:14

**Mister** [1] - 1524:15

**mistrial** [1] - 1649:18

**moment** [18] - 1525:9; 1526:6; 1553:16, 19; 1581:19; 1610:6; 1643:4; 1669:2, 23; 1672:21; 1677:8; 1687:13;

1704:12; 1707:19; 1716:6; 1724:8; 1734:4

**Monday** [11] - 1625:25; 1639:8; 1650:13; 1701:19; 1702:1, 11, 13; 1704:13; 1707:8; 1715:24; 1732:3

**money** [24] - 1543:22, 25; 1544:7; 1545:23; 1546:1, 6, 9; 1553:7; 1561:12; 1565:12; 1566:11, 19, 22, 24; 1567:2; 1570:1, 10, 18-19; 1571:1, 15; 1657:15; 1658:17; 1659:10

**moneys** [2] - 1660:3

**monitor** [1] - 1554:20

**monitored** [1] - 1613:21

**Montauk** [1] - 1532:22

**month** [12] - 1550:19; 1563:8; 1568:6, 19; 1569:6; 1581:15; 1590:2; 1606:3, 5; 1693:10; 1733:1

**monthly** [1] - 1604:4

**months** [11] - 1545:20; 1560:4, 14; 1563:3; 1573:11; 1586:16; 1658:8-10; 1663:11, 25

**moreover** [1] - 1661:17

**Morgan** [3] - 1629:12, 25; 1630:1

**morning** [37] - 1519:8, 18-19; 1522:4; 1526:12; 1532:1; 1583:23; 1607:23; 1608:25; 1625:25; 1686:10; 1701:18; 1702:3, 10, 12-13; 1704:24; 1705:2; 1707:8, 10, 16; 1708:22; 1709:19; 1715:24; 1720:17; 1721:23; 1723:8, 14-15, 18; 1724:9, 24; 1732:3; 1734:22

**mortgage** [1] - 1610:11

**most** [4] - 1541:24; 1598:13; 1695:11

**mother** [3] - 1602:1; 1603:3

**mother's** [2] - 1533:8; 1602:3

**motion** [10] - 1516:18; 1517:7, 10, 13; 1517:15; 1677:21; 1679:13, 15

**motions** [1] - 1623:20

**motivation** [1] - 1669:18

**motive** [1] - 1664:19

**mouth** [4] - 1575:17; 1592:11; 1662:22, 24

**mouthing** [4] - 1577:8; 1578:4; 1580:12

**move** [12] - 1531:24; 1638:21; 1651:14; 1674:16; 1676:24; 1678:4; 1690:21; 1692:19; 1693:18; 1699:3; 1701:1; 1711:16

**moved** [6] - 1545:13; 1596:19; 1598:13; 1607:7; 1620:24; 1632:18

**moves** [2] - 1531:24; 1554:13

**moving** [1] - 1637:17

**MR** [396] - 1516:14, 23-24; 1517:10, 16, 18, 21; 1518:9, 19, 23; 1519:14, 17; 1523:13, 21; 1525:7; 1528:9; 1531:23; 1553:15; 1554:13; 1568:2, 24; 1574:3; 1576:1; 1577:4, 7, 18; 1578:1, 3-4, 8, 10-11, 15, 18-20, 24; 1579:2, 4; 1580:4, 6; 1582:12; 1583:19; 1584:10, 17; 1585:4, 24; 1586:2, 12; 1587:25; 1591:7; 1592:24; 1597:6; 1611:14, 24; 1612:14, 16, 19, 22; 1617:6; 1618:1; 1619:8, 13, 15; 1620:5, 20-21; 1621:4; 1622:5, 19, 21, 25; 1623:2, 12, 18; 1624:13, 17; 1625:9, 16; 1626:10; 1627:6, 9, 13-14, 22, 25; 1628:22; 1629:5; 1630:2, 16, 24; 1632:14, 17, 23; 1633:1, 8, 15, 19, 23-24; 1634:9, 14, 17, 22; 1635:1, 25; 1636:6, 11, 17, 20, 22; 1637:1, 22; 1638:9, 11, 13, 16, 20, 25; 1639:13, 22; 1640:3, 7, 11; 1641:5, 21, 25; 1642:12; 1643:11, 17, 25; 1644:8, 14-15, 17, 19, 24; 1645:3, 6, 14, 23;

**17**

1646:13; 1647:5, 11, 16, 24; 1648:9, 15, 17-18; 1649:5, 7, 13, 21, 25; 1650:8, 11, 16-17, 19, 21, 25; 1651:2, 15; 1652:12, 15; 1654:2, 4, 18, 20, 25; 1655:3, 16, 18; 1656:1, 5, 17, 20; 1657:17, 19; 1659:17, 23; 1660:3, 9, 15, 18, 22; 1661:3, 8, 10, 23; 1662:11; 1663:18, 20; 1665:4, 6; 1667:13, 15; 1668:25; 1669:5, 8, 12, 21, 23; 1670:2, 5; 1671:20, 22; 1672:15, 17, 20; 1673:1, 3-4, 9, 11-12, 16, 19, 22-23, 25; 1674:4, 10, 17; 1675:4, 6, 13, 15, 18, 23; 1676:6, 15, 19; 1677:2, 5, 15, 21; 1678:4, 7, 13, 16, 21; 1679:1, 7, 11, 20; 1680:1, 8, 13, 18, 21, 23; 1681:3, 16; 1686:11, 19; 1687:6, 8, 15, 20, 22; 1688:1, 5, 13, 17, 21, 25; 1689:4, 8, 12, 15, 18, 21, 23, 25; 1690:4, 10, 12, 15, 20; 1691:3, 5, 8, 16, 23, 25; 1692:9, 19, 22; 1693:18, 21; 1695:24; 1696:2; 1699:3, 5, 12, 15, 20, 25; 1700:1, 8, 13, 18, 20, 24; 1701:1, 6, 9, 16-17; 1703:15, 19, 22, 24; 1704:1, 12, 20; 1705:3, 8, 17, 19, 21; 1706:6, 10, 14, 22-23, 25; 1707:2, 6, 12, 14, 18, 23; 1708:17, 23-24; 1709:8, 14, 18, 24; 1710:1, 4, 9, 15, 18, 24; 1711:12, 18, 20; 1712:3, 5, 10, 12, 15, 23; 1713:1, 7, 9-10, 14, 23; 1714:5, 9, 13, 15, 18, 22; 1716:6, 8; 1717:14, 17; 1721:8, 11, 14; 1722:20, 25; 1726:16, 20, 22; 1734:4, 25; 1735:3, 5; 1736:5, 7, 10, 12, 14, 17, 19

**MTA** [3] - 1678:22; 1679:1, 5

**mulligan** [2] - 1535:7;

1589:16

**Mulligan** [91] - 1518:6, 9, 22; 1519:12, 18; 1522:23; 1524:4; 1525:8, 11-12; 1526:6; 1532:7, 17; 1533:12; 1534:3, 15; 1538:15; 1547:9; 1550:17; 1552:1; 1553:13; 1554:2, 19; 1560:15; 1568:10; 1572:13; 1577:20; 1578:9; 1581:19; 1582:15; 1583:21; 1584:6, 18; 1585:7; 1586:21; 1587:18; 1588:12; 1589:12; 1590:11, 20; 1591:1; 1592:1, 20; 1593:10, 17; 1595:1, 25; 1599:14; 1601:3, 12; 1602:2, 4; 1606:3; 1611:17; 1612:1, 23; 1624:14, 18; 1625:18; 1628:15; 1629:14, 22-23; 1630:9, 12; 1631:5, 14, 16; 1633:17; 1634:4, 17; 1635:17; 1636:4; 1637:4, 10; 1638:11; 1639:11, 20; 1640:9; 1643:6; 1647:14; 1648:25; 1651:10; 1661:18; 1670:6; 1674:18; 1675:23, 25; 1679:17; 1710:10

**Mulligan's** [9] - 1516:25; 1572:7; 1623:12; 1625:13; 1635:13; 1639:17; 1641:12; 1643:11; 1661:13

**Mulligans** [1] - 1663:16

**multiple** [5] - 1540:19, 21; 1549:9; 1598:12

**murder** [31] - 1582:10; 1588:7; 1592:16; 1594:9; 1600:22, 25; 1601:22, 25; 1606:12; 1611:12; 1616:5; 1617:11, 14; 1618:21; 1622:18; 1632:12; 1660:1, 20; 1670:11, 15, 18, 25; 1671:12; 1672:19; 1674:3; 1682:20; 1683:22, 25; 1684:3; 1725:8; 1729:21

**murdered** [5] - 1599:19; 1666:2;

1667:3, 10, 17

**murders** [2] - 1592:3, 22

**mushrooms** [1] - 1574:25

**must** [1] - 1690:15

**mutual** [2] - 1696:15

---

**N**

**N.Y** [1] - 1515:5

**nail** [1] - 1525:4

**name** [42] - 1532:19; 1540:9; 1543:18; 1544:10; 1547:13; 1550:14; 1560:16, 18; 1564:18; 1565:2; 1571:14; 1575:17; 1594:1; 1595:8; 1602:3, 6; 1612:23; 1614:18; 1629:19; 1644:13; 1654:10; 1658:11, 13, 15; 1659:5, 7; 1661:4; 1662:7; 1681:12; 1684:8; 1694:12; 1697:21; 1698:2; 1708:13; 1720:12; 1722:7, 12; 1725:5

**named** [2] - 1550:8, 12

**namely** [1] - 1630:22

**names** [3] - 1541:16; 1649:16; 1658:12

**narrow** [1] - 1586:3

**Nassau** [4] - 1517:2; 1531:16, 19; 1532:13

**nauseous** [1] - 1529:11

**near** [1] - 1550:19

**nearby** [1] - 1560:6

**necessarily** [3] - 1631:22; 1648:21; 1649:22

**necessary** [2] - 1649:19; 1709:2

**need** [4] - 1518:19; 1592:2, 15; 1687:9

**neighborhood** [2] - 1593:14; 1684:8

**nervous** [3] - 1529:11; 1728:15; 1730:1

**networking** [1] - 1734:14

**never** [8] - 1660:25; 1662:6; 1689:4, 6; 1715:11; 1729:6; 1731:6, 12

**NEW** [1] - 1515:1

1636:9, 11; 1690:3; 1700:12

**New** [30] - 1515:13, 19, 22; 1537:16; 1538:2; 1540:5, 7, 25; 1541:7, 10, 20; 1542:3; 1555:24; 1586:5, 7; 1681:19; 1682:19, 22; 1683:20; 1687:4; 1690:6; 1691:2; 1693:8; 1720:15; 1721:6; 1722:18; 1723:3; 1724:7

**news** [1] - 1670:9

**newspaper** [5] - 1537:5, 9; 1673:10, 14; 1676:4

**newspapers** [2] - 1672:9; 1674:2

**next** [14] - 1526:10; 1533:22; 1576:4; 1577:19; 1578:11; 1579:9; 1619:18; 1621:5; 1626:2; 1640:7; 1641:15; 1677:8; 1706:13

**nice** [1] - 1682:1

**Nicholas** [1] - 1657:7

**nickname** [1] - 1731:5

**night** [11] - 1567:25; 1570:5; 1575:15; 1584:10; 1701:25; 1702:12; 1719:12, 18; 1720:17; 1723:3; 1731:22

**nights** [2] - 1598:5; 1607:1

**nine** [14] - 1527:15; 1662:5; 1686:17; 1704:25; 1708:7, 25; 1710:4, 6; 1711:21, 24; 1716:14, 18; 1730:5

**No.** [1] - 1611:1

**nobody** [6] - 1617:23; 1720:17, 19; 1724:11, 22; 1725:21

**noises** [1] - 1521:4

**none** [1] - 1572:11

**North** [1] - 1541:10

**notarized** [1] - 1618:19

**note** [1] - 1734:11

**noted** [1] - 1591:10

**notes** [14] - 1634:9, 11, 13-15, 21, 25; 1635:1; 1642:3; 1689:22-24; 1717:22; 1718:2

**nothing** [15] - 1560:3;

1578:6; 1592:13;
1610:17; 1612:5;
1617:20; 1632:14;
1644:20; 1660:16;
1677:2, 5; 1699:6, 15;
1717:14
**noticed** [1] - 1524:2
**November** [6] -
1569:11; 1635:12;
1644:3; 1664:22; 1665:3
**November-December** [1]
- 1635:12
**NRP** [3] - 1553:25;
1555:12
**number** [21] - 1533:4,
7-9; 1547:11; 1622:10;
1624:3; 1635:9;
1637:23; 1640:21;
1672:25; 1677:16;
1695:23; 1697:15;
1722:7, 15-16; 1724:1,
5, 10
**NYPD** [13] - 1710:23;
1726:4, 14, 16;
1727:17; 1728:1;
1729:2; 1730:5; 1731:6,
17; 1732:1, 4, 22

**O**

**o'clock** [11] - 1691:19;
1702:2; 1705:1; 1708:7;
1709:9; 1724:9;
1731:19, 21-22; 1732:3
**oath** [2] - 1519:12;
1615:1
**object** [2] - 1691:23;
1713:1
**objected** [1] - 1625:1
**objecting** [2] -
1688:5; 1711:5
**objection** [85] -
1518:16; 1523:13, 24;
1532:4; 1554:15;
1568:2; 1574:3; 1577:3;
1580:3; 1585:24;
1586:12; 1587:25;
1591:7, 10; 1592:24;
1611:24; 1612:14;
1617:6; 1618:1; 1619:8,
13; 1620:3; 1622:3, 19,
21, 25; 1623:11;
1647:5, 10, 24-25;
1649:8; 1650:24;
1652:12; 1654:2, 18,
25; 1655:16; 1656:1,
17; 1657:17; 1659:17;
1660:15; 1662:10;
1663:18; 1667:13;

1668:25; 1669:8;
1672:15, 20, 24;
1674:15; 1675:4;
1677:1; 1680:5;
1686:11; 1687:6;
1688:4; 1690:2;
1692:19; 1693:18;
1699:3; 1700:1, 11, 18,
24; 1703:15, 22;
1704:20; 1705:8, 19;
1706:10, 25; 1707:12,
18, 22; 1710:14;
1712:3, 10; 1713:14;
1721:8; 1722:20
**objections** [2] -
1647:9; 1689:13
**objective** [1] - 1637:1
**observe** [5] - 1524:23;
1528:21; 1597:17;
1598:15; 1611:4
**observed** [3] - 1680:6;
1708:19; 1712:18
**observing** [1] -
1535:18
**obtain** [3] - 1587:20,
22; 1600:6
**obviously** [4] -
1617:24; 1628:8;
1649:16; 1663:15
**occasion** [7] - 1595:8;
1597:17; 1598:2;
1600:1; 1601:25;
1628:2; 1685:24
**occasions** [3] -
1594:3; 1693:15, 25
**occur** [4] - 1570:11;
1585:15; 1592:5;
1602:12
**occurred** [6] - 1631:1;
1637:20; 1640:20;
1648:1; 1649:12;
1698:17
**occurring** [1] -
1565:24
**Ocean** [5] - 1528:22;
1530:10; 1533:20;
1534:23; 1591:3
**ocean** [5] - 1520:9, 13,
18; 1528:20; 1593:19
**OF** [3] - 1515:1, 3, 6
**offer** [3] - 1625:14;
1640:13; 1675:17
**offered** [5] - 1531:3;
1540:24; 1641:11;
1645:21; 1677:23
**offering** [1] - 1640:16
**office** [8] - 1547:2,
16; 1566:7; 15

1614:2; 1670:22;
1682:11; 1710:11
**Office** [2] - 1572:15;
1668:12
**officer** [1] - 1715:22
**often** [1] - 1599:23
**Ogdensburg** [2] -
1681:23
**old** [3] - 1534:4, 7;
1567:15
**Old** [1] - 1515:18
**older** [1] - 1697:7
**once** [7] - 1520:16;
1559:7; 1567:15;
1599:25; 1600:21;
1638:3; 1683:3
**one** [69] - 1518:12;
1521:1, 6, 13; 1524:14;
1530:12; 1538:25;
1542:17; 1546:6;
1547:16; 1548:6;
1549:10; 1559:16;
1562:16; 1563:15;
1564:15; 1565:1;
1570:16; 1575:15;
1596:20, 23; 1597:12;
1598:4, 11, 18-19;
1603:20; 1614:17;
1615:20; 1616:17;
1617:9; 1618:20;
1620:17; 1624:3, 24;
1625:5; 1628:4;
1630:10, 21; 1632:4;
1633:5; 1634:5; 1635:9,
11; 1643:1; 1650:11;
1654:14; 1655:1;
1657:14; 1658:1;
1663:2; 1673:7;
1674:23; 1680:21;
1682:5; 1686:1;
1694:12; 1696:6;
1697:20; 1704:12;
1716:6, 12; 1717:18;
1719:2, 5, 21
**ones** [2] - 1657:15
**ons** [1] - 1565:11
**open** [10] - 1526:15,
17, 22; 1546:17;
1547:1; 1555:8; 1556:3;
1580:2; 1622:2; 1734:16
**opened** [6] - 1518:10;
1522:7, 18; 1559:7;
1673:5, 23
**opening** [2] - 1525:16,
21
**operational** [1] -
1561:25

1542:13; 1546:4, 23;
1559:25; 1560:12;
1561:11, 24; 1566:12
**opinion** [2] - 1559:15;
1640:19
**opinions** [1] - 1544:17
**opportunity** [2] -
1540:24; 1609:18;
1611:4; 1613:3;
1618:10; 1637:3;
1682:15, 19
**opposed** [4] - 1566:21;
1604:12, 21; 1619:6
**opting** [1] - 1553:9
**option** [1] - 1553:9
**order** [2] - 1628:23;
1678:2
**ordered** [1] - 1661:5
**organization** [1] -
1548:11
**orienting** [1] -
1718:23
**original** [4] -
1636:12; 1687:11;
1690:5; 1724:21
**originally** [1] -
1612:5
**otherwise** [1] - 1628:7
**out-of-court** [1] -
1640:17
**outgoing** [1] - 1659:12
**outside** [9] - 1598:3;
1647:1, 3, 10; 1648:1,
4; 1651:4, 8; 1718:24
**outstanding** [1] -
1677:19
**overhead** [1] - 1601:3
**overlooks** [2] - 1719:4
**overnight** [1] - 1679:3
**overruled** [11] -
1518:16; 1523:24;
1574:4; 1580:3; 1588:3;
1591:10; 1593:1;
1622:4; 1703:17;
1721:12; 1722:21
**oversaw** [1] - 1697:17
**owe** [1] - 1677:25
**OWEN** [1] - 1515:21
**own** [12] - 1540:2, 13;
1541:19; 1544:8, 23;
1548:11; 1550:2;
1567:1; 1632:5;
1657:23; 1659:12;
1661:19
**owned** [12] - 1548:4;
1549:4; 1598:16;
1655:9; 1657:14;

1658:19, 24; 1695:17, 19; 1698:6

**owner** [2] - 1550:8; 1564:17

**owners** [3] - 1548:22; 1549:9, 14

**ownership** [12] - 1539:17; 1540:1; 1541:2, 6, 13; 1542:2; 1547:10, 16; 1552:13, 16; 1657:8; 1660:24

**owns** [2] - 1539:4; 1657:24

**P**

**P-I-T-T-I** [1] - 1564:19

**p.m** [3] - 1533:22; 1682:7; 1731:22

**PA-10** [2] - 1695:25; 1704:8

**PA-11** [3] - 1703:4; 1704:9

**PA-14** [3] - 1685:5; 1697:14; 1718:17

**Pablo** [40] - 1672:7, 18; 1673:7, 17, 19; 1674:3, 6, 11, 19; 1683:23; 1686:1, 3; 1688:13; 1690:7; 1692:17; 1693:14; 1695:2; 1696:4; 1701:21; 1703:20; 1704:2; 1706:17; 1708:5; 1712:19; 1715:13, 15, 25; 1716:9, 15; 1729:10, 13, 15; 1730:5, 7, 21, 24; 1731:4, 6; 1732:2

**Pablo's** [1] - 1730:11

**packet** [2] - 1553:13, 18

**page** [16] - 1556:7, 13; 1557:19, 22; 1576:4; 1579:9; 1619:18; 1621:5; 1639:8, 24; 1642:2, 18, 23; 1643:15; 1723:22

**paid** [1] - 1565:12

**pair** [1] - 1584:25

**pale** [2] - 1529:11, 17

**Palm** [6] - 1606:21; 1607:3, 20; 1609:17; 1618:13, 17

**pandemonia** [1] - 1521:8

**panic** [2] - 1529:10, 25

**panned** [1] - 1521:14

**paper** [5] - 1537:10; 1557:1; 1667:21; 1730:9

**paperwork** [1] - 1726:15

**paramount** [1] - 1619:5

**Park** [6] - 1541:10; 1542:3, 9, 11, 14, 22

**parlance** [1] - 1565:13

**part** [18] - 1516:24; 1538:10; 1548:17; 1549:5; 1572:8; 1575:20; 1622:18; 1632:19; 1638:18; 1641:23; 1647:10; 1655:24; 1660:5, 21; 1673:11; 1679:9; 1708:7; 1721:17

**partake** [1] - 1694:23

**participant** [1] - 1619:11

**participate** [1] - 1695:4

**participating** [1] - 1538:17

**participation** [1] - 1660:1

**particular** [4] - 1598:11; 1600:1; 1677:17; 1699:19

**partied** [1] - 1662:14

**parties** [3] - 1555:11, 20; 1651:10

**partner** [10] - 1539:6; 1542:14, 17, 23-24; 1543:15; 1558:2; 1657:6, 13

**partners** [17] - 1540:14, 21; 1541:22; 1542:18; 1545:17; 1547:19, 21, 23-24; 1551:2; 1564:6; 1571:8; 1598:9; 1603:22; 1655:10

**partnership** [7] - 1543:4; 1544:13; 1545:12, 15; 1552:8; 1560:5, 7

**partook** [1] - 1699:1

**parts** [2] - 1533:9; 1628:4

**pass** [1] - 1605:13

**passed** [1] - 1654:21

**Passover** [4] - 1634:1; 1636:2, 4, 9

**past** [5] - 1520:17; 1587:14; 1700:1

**patient** [1] - 1675:8

**pattern** [1] - 1637:12

**pause** [4] - 1518:17; 1528:15; 1553:20; 1586:19

**Pause** [1] - 1670:1

**pay** [11] - 1548:15; 1565:20; 1566:20-22, 25; 1567:1; 1571:18, 20; 1604:6, 12

**paying** [2] - 1604:21; 1659:12

**payment** [4] - 1557:12; 1570:8; 1571:19; 1674:24

**payments** [1] - 1557:10

**payroll** [2] - 1539:14; 1549:2

**Pellegrino** [6] - 1600:11; 1607:25; 1608:10, 16, 20; 1609:11

**pen** [1] - 1719:8

**Pena** [3] - 1686:8; 1697:5; 1698:10

**pending** [1] - 1572:20

**people** [18] - 1540:19, 21; 1567:23; 1570:9, 16; 1604:20; 1617:9; 1618:20; 1642:17; 1672:25; 1675:1; 1678:22; 1679:2; 1685:24; 1725:10, 14, 17

**percent** [4] - 1541:19; 1552:18; 1658:20, 24

**percentage** [4] - 1552:12; 1564:8, 15

**perhaps** [3] - 1632:8; 1637:20; 1640:9

**period** [5] - 1546:17; 1547:2; 1589:17; 1598:15; 1648:6

**periods** [1] - 1707:3

**perjury** [1] - 1635:7

**permissible** [1] - 1647:20

**permission** [3] - 1525:8; 1657:3; 1720:19

**permit** [1] - 1628:18

**permitted** [3] - 1630:19; 1632:7; 1676:21

**person** [12] - 1561:7; 1618:5; 1624:1;

**1711:3; 1712:1**

**patient** [1] - 1675:8

**pattern** [1] - 1637:12

**1684:16; 1720:5; 1721:21, 25; 1722:2

**personal** [8] - 1538:22; 1539:6, 10, 21; 1562:7; 1571:1; 1595:24; 1675:21

**personality** [1] - 1597:15

**personally** [3] - 1553:10; 1554:11; 1696:5

**Peter** [2] - 1644:14

**ph)** [1] - 1542:17

**phase** [1] - 1626:2

**phone** [44] - 1533:4, 7; 1536:17, 20, 22; 1537:12; 1562:12; 1563:20, 24; 1564:10; 1581:21; 1600:24; 1613:23; 1622:17; 1623:20; 1624:3, 21, 25; 1625:6; 1628:19; 1631:20; 1632:20; 1634:23; 1635:2, 11; 1636:13; 1646:16; 1648:14; 1664:24; 1666:5; 1679:23; 1721:4; 1722:4, 7, 15-16; 1723:22; 1724:23; 1725:3, 16, 19

**phoned** [1] - 1599:22

**phones** [4] - 1613:21; 1624:9, 11; 1627:19

**phonetic** [1] - 1644:18

**phonetic]** [2] - 1638:13; 1644:14

**photograph** [4] - 1523:1; 1535:13, 16; 1596:6

**phrase** [2] - 1651:10; 1691:4

**physical** [2] - 1582:18; 1733:25

**physically** [12] - 1521:13; 1522:8; 1524:23; 1529:12; 1558:21; 1563:25; 1566:5; 1592:20; 1607:15; 1617:13; 1692:12; 1693:6

**pick** [3] - 1608:15; 1629:5; 1654:13

**picked** [3] - 1607:23; 1608:9; 1668:15

**picture** [5] - 1523:22; 1526:1; 1535:18; 1537:18; 1734:3

**piece** [6] - 1557:1;

**pieces** [2] - 1518:11; 1652:23

**piercing** [1] - 1630:6

**pilot** [2] - 1520:12; 1530:9

**piloted** [3] - 1520:21; 1530:4

**piloting** [1] - 1517:24

**Pisciotti** [1] - 1657:7

**pissed** [1] - 1605:7

**pistol** [2] - 1527:13

**Pitti** [2] - 1564:19; 1565:10

**pitti** [1] - 1565:17

**pizzeria** [1] - 1697:9

**place** [36] - 1516:4; 1518:3; 1544:3; 1563:14; 1564:7; 1577:2; 1580:2; 1594:25; 1601:3; 1609:22; 1617:14; 1620:2; 1622:2; 1644:25; 1647:8; 1651:25; 1659:20; 1672:23; 1675:11; 1683:17, 23; 1687:10, 17; 1697:1, 9, 13, 19; 1698:14; 1699:9; 1707:11, 16, 21; 1708:22; 1709:19; 1712:9; 1715:24

**placed** [1] - 1643:24

**placing** [1] - 1564:16

**plain** [1] - 1645:6

**plan** [1] - 1571:19

**planned** [1] - 1660:6

**plans** [1] - 1702:25

**play** [19] - 1583:20; 1584:23; 1615:13, 15; 1624:4; 1626:13; 1630:20; 1631:20; 1634:10; 1640:7, 11; 1641:15, 22; 1642:4; 1643:17, 22; 1645:19, 21; 1646:2

**played** [14] - 1579:7; 1585:6; 1635:15; 1638:10, 17, 22; 1641:18, 20; 1644:1, 11, 23; 1652:1, 7; 1665:20

**played)** [1] - 1645:5

**player** [1] - 1661:24

**plays** [1] - 1577:20

**Plaza** [2] - 1515:13, 22

**plead** [1] - 1572:22

**pleadings** [1] - 1624:9

**pleasure** [1] - 1612:25

**pled** [1] - 1620:9

**pledged** [1] - 1561:4

**plenty** [1] - 1711:16

**pocket** [2] - 1566:21; 1567:1

**point** [59] - 1520:22, 24; 1521:8; 1525:4, 15-16; 1527:8, 19; 1528:3; 1529:12, 20-21; 1530:18; 1531:23; 1537:22; 1538:12, 16; 1539:18, 25; 1542:16, 20; 1543:3; 1546:14; 1547:4; 1559:24; 1560:10; 1562:4, 9, 18; 1564:20; 1566:1, 4; 1567:20, 22; 1569:22; 1571:11; 1575:10; 1581:24; 1582:7; 1583:19; 1594:8; 1603:7; 1607:7; 1609:13; 1620:24; 1625:14; 1627:18; 1629:12; 1637:4; 1649:13; 1652:16; 1658:19; 1672:3; 1676:20; 1689:9, 16; 1709:15

**pointer** [2] - 1522:11; 1525:20

**pointing** [1] - 1714:16

**Police** [6] - 1682:19, 23; 1683:20; 1687:4; 1690:6; 1691:2

**police** [20] - 1537:18; 1629:17; 1687:11; 1689:1; 1694:11; 1705:6, 10; 1707:10; 1715:12; 1716:19, 23-24; 1728:16, 19; 1729:5, 9, 23-24; 1733:24

**poor** [2] - 1639:5; 1640:2

**port** [1] - 1522:16

**portion** [13] - 1517:1; 1522:9; 1532:14, 18; 1535:23; 1555:1; 1583:20; 1595:1; 1607:16; 1641:17; 1644:19; 1723:23

**portions** [1] - 1584:23

**position** [1] - 1624:14

**positioned** [1] - 1661:20

**post** [1] - 1537:14

**Post** [2] - 1537:6

**potential** [2] - 1577:10; 1631:12

**potentially** [1] - 1630:6

**pounds** [1] - 1633:6

**powdered** [2] - 1663:4

**Power** [2] - 1540:10; 1541:17

**pre** [5] - 1558:14, 19; 1559:12, 14; 1565:10

**pre-sale** [4] - 1558:14, 19; 1559:12, 14

**pre-sales** [1] - 1565:10

**precautions** [1] - 1666:2

**precinct** [2] - 1729:25; 1732:17

**prepare** [2] - 1710:13

**prepared** [3] - 1647:23; 1678:14, 17

**presence** [8] - 1627:3; 1647:4; 1648:1, 4; 1649:10; 1651:4, 8, 13

**present** [17] - 1549:9; 1578:7; 1594:11; 1617:25; 1624:18; 1629:14, 24; 1630:12; 1631:7; 1633:17; 1637:5; 1665:19; 1725:20; 1729:23; 1731:7

**presently** [3] - 1657:23; 1681:20; 1682:8

**president** [2] - 1555:18; 1556:17

**President's** [1] - 1720:15

**pretty** [6] - 1618:16; 1639:21; 1694:18; 1702:9; 1704:25; 1706:1

**previous** [1] - 1594:3

**previously** [16] - 1519:2; 1533:9; 1534:15; 1535:8, 18; 1545:22; 1575:1; 1582:16; 1593:17; 1594:16; 1595:3, 16, 25; 1601:4; 1631:3; 1646:10

**price** [3] - 1558:1; 1559:13; 1571:19

**prima** [1] - 1678:8

**primary** [1] - 1632:24

**prime** [1] - 1668:14

**prison** [28] - 1573:13; 1574:20; 1575:7; 1581:13, 25; 1595:4, 7; 1596:11; 1599:14, 23; 1601:1, 13, 21, 24; 1602:12; 1605:14; 1606:14; 1607:9; 1608:5; 1652:2; 1657:6, 21-22; 1662:1; 1663:8, 11; 1717:4

**prisoner** [1] - 1574:11

**prisons** [1] - 1586:8

**private** [5] - 1603:9; 1609:24; 1682:13; 1717:25; 1718:2

**privilege** [16] - 1623:14, 21, 24-25; 1624:2, 6, 15; 1625:4, 12; 1628:17, 19, 25; 1630:7; 1631:22

**privileged** [2] - 1623:13; 1624:9

**probative** [9] - 1518:15; 1578:14; 1631:13; 1633:9, 13, 16; 1634:5; 1699:13

**problem** [9] - 1521:1; 1597:25; 1626:11; 1637:24; 1663:15, 21, 23; 1676:11; 1709:22

**problems** [3] - 1521:7; 1562:7; 1666:4

**Procedure** [1] - 1678:5

**proceed** [3] - 1519:11; 1646:8; 1722:24

**Proceedings** [1] - 1515:24

**proceedings** [8] - 1518:18; 1528:16; 1553:21; 1586:20; 1623:16; 1649:9; 1676:3; 1735:7

**process** [3] - 1516:8, 13; 1604:9

**produced** [1] - 1515:25

**profanities** [1] - 1664:25

**proffers** [1] - 1676:22

**program** [4] - 1574:8, 12; 1586:7

**projector** [1] - 1601:4

**promised** [1] - 1718:12

**pronouns** [1] - 1544:25

**proof** [1] - 1625:15

21

**properly** [1] - 1563:16
**property** [2] - 1657:14
**prosecution** [3] - 1637:14; 1649:15, 24
**prosecutors** [2] - 1653:6; 1717:19
**protect** [8] - 1571:10; 1660:4; 1662:2; 1715:13, 21; 1729:9, 15; 1730:2
**protected** [2] - 1729:11; 1730:23
**protecting** [1] - 1571:25
**protection** [1] - 1696:20
**protocol** [1] - 1516:19
**prove** [5] - 1637:8; 1640:14, 16, 18, 24
**provide** [1] - 1592:21
**provided** [1] - 1671:7
**provoked** [1] - 1578:22
**pry** [1] - 1529:8
**pull** [4] - 1560:18; 1569:18; 1570:25; 1587:1
**pulled** [2] - 1569:20; 1610:5
**pulling** [1] - 1567:21
**purchase** [2] - 1696:12; 1698:10
**purple** [1] - 1523:11
**purportedly** [1] - 1644:3
**purpose** [2] - 1521:21; 1589:6
**purposes** [1] - 1718:23
**push** [1] - 1526:24
**pushed** [1] - 1523:6
**put** [15] - 1521:19; 1530:16; 1543:22; 1558:25; 1583:2; 1586:18; 1630:20; 1664:23; 1666:5; 1708:13; 1715:2, 7; 1728:23

**Q**

**Q45** [1] - 1693:4
**quadruple** [1] - 1639:9
**quarter** [4] - 1516:7, 21; 1519:10; 1531:1
**Queens** [1] - 1613:21
**questioned** [2] - 1645:14; 1728:16
**questions** [25] -

1566:11; 1605:18; 1606:11; 1612:16; 1620:6, 24; 1623:24; 1631:6; 1647:17; 1652:10; 1653:10; 1669:21; 1671:6, 20; 1672:3; 1676:4; 1679:8; 1684:1; 1692:21; 1700:15; 1712:6; 1717:21; 1720:5; 1726:3; 1729:4
**quickly** [3] - 1527:24; 1528:24; 1676:9
**quiet** [2] - 1592:2, 15
**quite** [1] - 1645:4

**R**

**rabbit** [1] - 1630:5
**raging** [2] - 1575:16; 1580:22
**Rahway** [3] - 1540:5, 7, 25
**raise** [1] - 1681:5
**ran** [5] - 1542:12; 1546:22; 1565:10, 17; 1657:16
**RAPAPORT** [1] - 1515:20
**rapidly** [1] - 1527:25
**rat** [2] - 1577:10; 1580:14
**rate** [2] - 1559:11; 1565:15
**Ratella** [1] - 1542:17
**rates** [1] - 1559:10
**rather** [2] - 1626:14; 1634:12
**Raton** [1] - 1607:6
**Rauccie** [2] - 1539:5; 1604:19
**reached** [5] - 1516:24; 1520:16, 21, 24; 1527:7
**reaction** [4] - 1600:2; 1605:6, 21
**read** [29] - 1618:10, 16; 1622:5; 1633:20; 1634:9; 1667:21; 1670:9; 1672:9; 1673:10; 1674:1; 1688:9; 1692:1; 1708:1, 9; 1709:24; 1711:6, 11; 1712:22; 1713:3, 15-16; 1714:2, 6-7, 9, 11-12; 1722:12; 1727:13
**reading** [4] - 1641:25; 1691:25; 1713:1, 11
**reads** [1] - 1622:7
**ready** [8] - 15

1584:16; 1638:7; 1646:8; 1651:14; 1674:16; 1679:18
**realized** [1] - 1611:5
**really** [19] - 1581:9; 1642:8; 1643:2; 1653:13-15; 1683:15; 1686:15; 1691:18; 1692:14; 1699:2; 1700:4; 1711:1; 1718:10; 1730:10; 1732:15; 1733:12, 15
**rear** [2] - 1522:10; 1525:15
**reason** [8] - 1553:6; 1578:13; 1633:25; 1637:9; 1638:23; 1640:22; 1645:10; 1649:10
**receive** [5] - 1536:22; 1575:11; 1613:13; 1657:11; 1658:17
**received** [12] - 1532:6; 1536:19; 1554:18; 1563:20; 1606:15; 1659:4, 8; 1664:16; 1698:9; 1718:16; 1737:4
**receives** [1] - 1664:22
**recess** [4] - 1584:4; 1623:5; 1627:20; 1680:4
**Recess** [1] - 1626:17
**recognize** [19] - 1523:1; 1532:20, 22; 1533:5; 1535:12; 1537:20; 1553:22; 1554:9; 1555:25; 1556:8; 1557:1, 21; 1580:22; 1582:18; 1583:12; 1596:5, 8; 1690:23; 1724:1
**recognized** [1] - 1687:23
**recognizing** [1] - 1625:2
**recollect** [1] - 1728:6
**recollection** [78] - 1528:25; 1530:23; 1541:12; 1546:11; 1548:16; 1555:6; 1557:8; 1563:6, 10; 1568:17; 1589:3; 1591:20; 1597:8; 1601:20; 1653:21; 1686:17, 23; 1687:5, 10, 23; 1688:8, 18; 1690:7; 1691:1, 9, 13, 15; 1692:5; 1696:13;

1705:1, 5, 10, 13, 15, 23, 25; 1706:7, 15, 18, 20; 1707:4, 7, 9, 15, 25; 1708:10, 12, 16; 1711:13; 1712:8, 18; 1713:4, 12, 18, 24; 1714:8, 19; 1716:10; 1719:23; 1721:13, 24; 1722:1; 1724:4, 12; 1725:10, 22; 1726:13; 1727:16; 1731:11; 1732:21, 25
**reconvene** [1] - 1623:6
**record** [6] - 1517:5; 1532:1; 1620:4; 1643:19; 1734:21
**recorded** [12] - 1515:24; 1582:1; 1587:16; 1589:10, 14; 1590:9, 18, 24; 1591:24; 1592:18; 1593:16; 1594:6
**recording** [5] - 1583:20; 1584:20, 23; 1585:6; 1595:2
**recordings** [3] - 1629:22; 1630:20
**records** [10] - 1517:2, 11, 14; 1532:2, 13; 1533:12, 16; 1613:23; 1723:22
**recovered** [2] - 1537:23; 1591:22
**RECROSS** [2] - 1671:21; 1736:13
**RECROSS-EXAMINATION** [2] - 1671:21; 1736:13
**red** [5] - 1587:3, 18; 1588:12; 1589:12
**redirect** [2] - 1669:22; 1735:1
**REDIRECT** [2] - 1670:4; 1736:11
**reduced** [2] - 1558:14; 1657:8
**reduction** [1] - 1675:19
**refer** [2] - 1652:7; 1713:5
**reference** [1] - 1649:9
**references** [1] - 1651:12
**referred** [2] - 1585:6; 1731:4
**referring** [10] - 1600:12; 1612:11; 1626:4; 1635:14; 1649:14; 1650:15;

23

1656:21; 1679:4; 1693:12

**refers** [1] - 1723:24

**reflection** [1] - 1620:19

**refresh** [31] - 1568:17; 1634:18; 1644:24; 1687:5, 9; 1688:8, 18; 1690:7; 1691:9, 13-14; 1698:1; 1704:19; 1705:13; 1706:7, 20; 1707:4, 7, 15, 24; 1708:10; 1711:12; 1712:8, 17; 1713:11, 18, 24; 1714:19; 1726:13; 1727:15

**refreshed** [5] - 1645:18; 1653:21; 1687:23; 1692:6; 1707:9

**refreshes** [4] - 1690:25; 1713:4; 1714:8; 1732:21

**refreshing** [3] - 1705:4; 1708:12, 16

**regard** [9] - 1551:1; 1552:25; 1580:16; 1597:22; 1605:2; 1628:17; 1632:10, 21; 1649:1

**regarding** [17] - 1517:5; 1545:6; 1550:20; 1569:10; 1582:9; 1592:2, 15; 1594:10; 1600:6, 22; 1604:9, 16; 1606:12; 1611:11; 1612:2; 1670:10; 1691:1

**regards** [8] - 1558:24; 1625:18, 21; 1647:4; 1653:9; 1674:22; 1704:18; 1734:14

**register** [1] - 1601:13

**regular** [2] - 1716:23

**rehabilitation** [1] - 1562:23

**rejected** [1] - 1531:4

**relate** [1] - 1675:24

**related** [1] - 1605:12

**relates** [3] - 1640:9; 1642:18, 20

**relation** [3] - 1531:20; 1581:12; 1608:4

**relationship** [7] - 1585:8; 1596:14, 16; 1597:12; 1625:17; 1655:11; 1662:12

**relayed** [2] - 1631:18

**release** [1] - 1717:10

**released** [4] - 1581:25; 1606:5; 1607:4, 9

**relevance** [9] - 1517:17; 1631:23; 1632:3; 1639:20; 1660:15; 1661:13, 16, 22

**relevancy** [3] - 1517:18, 20; 1574:3

**relevant** [4] - 1518:14; 1624:20; 1631:23; 1662:7

**reliability** [1] - 1642:8

**reliable** [2] - 1642:6; 1643:1

**relieved** [2] - 1611:5, 18

**remain** [7] - 1546:16; 1572:4, 19; 1592:2, 15; 1680:10; 1681:5

**remained** [1] - 1547:1

**remember** [42] - 1546:6; 1562:11; 1599:8; 1611:20; 1613:15, 17; 1614:13, 20; 1615:13; 1630:11; 1634:20; 1635:4; 1646:18; 1652:8, 11; 1653:8, 14-15; 1656:23; 1668:13, 15; 1670:7; 1683:25; 1708:13; 1716:20; 1726:6, 8, 11, 24; 1727:1; 1728:8, 15, 22; 1729:3; 1731:12, 17, 20; 1732:5, 11, 18

**remembrance** [1] - 1635:19

**remind** [1] - 1637:12

**reminded** [2] - 1676:7, 15

**remotely** [1] - 1675:24

**remove** [3] - 1546:5; 1560:16; 1707:2

**removed** [6] - 1546:3; 1559:24; 1561:9, 23; 1562:5

**rendered** [1] - 1640:19

**Renegro** [1] - 1679:7

**renew** [4] - 1677:15, 21

**renewing** [1] - 1689:18

**rent** [1] - 1557:12

**renting** [1] - 1718:16

**repeat** [1] - 1669:10

**repeated** [2] -

**release** [1] - 1600:24; 1676:4

**repeatedly** [3] - 1647:25; 1708:1; 1711:2

**repetitious** [1] - 1588:1

**repetitive** [1] - 1703:16

**replayed** [1] - 1644:5

**report** [27] - 1573:13; 1574:16; 1607:11; 1687:4; 1690:5, 23; 1698:2; 1704:18; 1706:8, 12, 21; 1708:1, 17; 1709:5, 12; 1710:15; 1711:6, 11; 1725:15; 1726:16, 23, 25; 1727:4, 11; 1728:23; 1732:9; 1734:10

**reported** [4] - 1575:7; 1595:3; 1691:1; 1734:12

**reporter** [3] - 1622:5, 7; 1643:20

**Reporter** [1] - 1515:20

**reporting** [4] - 1574:20; 1595:7; 1596:11; 1599:14

**reports** [5] - 1625:24; 1687:11; 1710:19, 22; 1711:3

**represent** [1] - 1612:23

**representing** [1] - 1647:25

**represents** [2] - 1685:8

**request** [1] - 1625:19

**requested** [1] - 1622:8

**required** [2] - 1592:21; 1606:19

**requirements** [1] - 1574:11

**research** [1] - 1734:15

**reserving** [1] - 1517:16

**residence** [2] - 1684:21; 1685:1

**resolution** [1] - 1572:20

**resolved** [1] - 1626:16

**respect** [12] - 1545:4; 1547:6; 1592:22; 1593:15; 1624:23; 1628:12; 1651:9, 12; 1676:22; 1677:20; 1688:12

**respecting** [1] - 1625:5

**respond** [3] - 1636:22; 1653:11; 1678:12

**responded** [3] - 1517:13; 1570:17; 1631:25

**response** [2] - 1623:17; 1632:1

**responsibility** [1] - 1660:20

**responsible** [3] - 1557:10, 14; 1671:11

**responsive** [2] - 1700:2, 5

**rest** [3] - 1530:21; 1677:14, 24

**rests** [2] - 1680:17

**result** [6] - 1534:21; 1545:10; 1552:6; 1585:7, 23; 1595:4

**resume** [2] - 1584:16; 1734:8

**resumed** [1] - 1646:10

**return** [3] - 1566:4; 1684:19

**returned** [3] - 1566:9; 1704:13, 15

**revealed** [1] - 1668:18

**reverse** [1] - 1620:17

**review** [3] - 1638:23; 1643:9; 1689:2

**reviewed** [2] - 1582:24; 1692:5

**revolver** [1] - 1704:8

**RG-2** [1] - 1596:2

**Rica** [4] - 1589:20, 22-23; 1590:3

**Richard** [1] - 1679:11

**ride** [2] - 1693:1, 6

**riding** [1] - 1692:18

**rift** [2] - 1559:17, 23

**right-hand** [1] - 1585:2

**Rikers** [3] - 1683:4, 8; 1716:2

**Road** [1] - 1515:18

**Rob** [6] - 1588:17, 22; 1590:23; 1616:20; 1618:10

**robbed** [1] - 1692:15

**robberies** [1] - 1538:17

**robbery** [15] - 1539:2; 1582:9; 1586:22; 1587:2, 4, 7, 19; 1588:13; 1590:12, 22; 1592:16; 1594:8, 12,

25; 1717:9

**Rochelle** [1] - 1693:8

**rock** [2] - 1525:2; 1591:19

**rocks** [8] - 1521:19, 22, 24; 1522:3; 1524:8, 12; 1525:13; 1529:17

**rode** [3] - 1693:8, 11

**role** [4] - 1616:2, 5; 1628:9; 1660:11

**roof** [1] - 1696:8

**room** [13] - 1549:15; 1602:13, 15, 17, 23, 25; 1604:25; 1605:14; 1685:10; 1686:3; 1719:1, 5

**rooms** [1] - 1558:24

**rosen** [1] - 1650:19

**Rosen** [25] - 1516:6; 1612:23; 1624:23; 1625:1, 7; 1627:11, 21; 1629:5, 10; 1632:21; 1633:14; 1645:13; 1649:14; 1662:7; 1677:12; 1700:12; 1707:5; 1709:22; 1713:5, 19; 1726:4, 23; 1727:4; 1729:4; 1730:23

**ROSEN** [235] - 1515:16; 1516:23; 1517:21; 1523:13, 21; 1528:9; 1568:2; 1574:3; 1576:1; 1577:4; 1578:1, 4, 10, 15, 18, 20, 24; 1579:2, 4; 1585:24; 1586:2, 12; 1587:25; 1591:7; 1592:24; 1597:6; 1611:24; 1612:14, 19, 22; 1619:15; 1620:20; 1622:5; 1623:2, 18; 1625:9, 16; 1626:10; 1627:13; 1628:22; 1632:23; 1633:19, 23; 1634:9, 14, 17, 22; 1635:1, 25; 1636:6, 11, 17, 20; 1637:22; 1638:9, 11, 13, 16, 20, 25; 1639:13, 22; 1640:3, 7; 1641:5, 21, 25; 1643:11, 17, 25; 1644:8, 14, 17, 24; 1645:3, 6, 14, 23; 1646:13; 1647:16; 1648:9, 15, 18; 1649:5, 21, 25; 1650:8, 11, 17, 21, 25; 1651:2, 15; 1652:15; 1654:4, 20; 1655:3, 18; 1656:5, 20; 1657:19; 1659:23;

**Rosen's** [2] - 1620:6; 1729:8

**Roth** [4] - 1550:8, 10, 13; 1585:10

**roughly** [16] - 1520:20; 1522:1; 1524:10; 1531:1; 1539:24; 1540:8; 1543:7; 1560:14; 1561:1; 1569:11, 20; 1581:15; 1586:16; 1590:2; 1607:14; 1614:6

**route** [1] - 1520:12

**ruined** [1] - 1546:23

**Rule** [3] - 1678:5; 1689:19

**Rules** [2] - 1517:12; 1678:4

**ruling** [2] - 1629:1; 1645:13

**rulings** [1] - 1676:23

**run** [6] - 1544:17, 23; 1559:6; 1569:24; 1603:14; 1657:20

**running** [3] -

1660:3, 9, 18, 22; 1661:3, 8, 23; 1662:11; 1663:20; 1665:4, 6; 1667:15; 1669:5, 12, 21; 1671:22; 1672:17; 1673:4, 11, 16, 19, 23; 1674:4, 10, 17; 1675:6, 13, 15, 18; 1676:6, 15, 19; 1677:2; 1678:4, 7, 21; 1679:7, 11, 20; 1680:1, 8, 21, 23; 1681:3, 16; 1686:12, 19; 1687:8, 15, 20, 22; 1688:1, 13, 17, 21, 25; 1689:4, 8, 12, 21, 23; 1690:4, 10, 12, 15, 20; 1691:3, 5, 8, 16; 1692:9, 22; 1693:21; 1695:24; 1696:2; 1699:5, 12, 15, 20, 25; 1700:8, 13, 20; 1701:6, 9, 16-17; 1703:19, 24; 1704:1, 12; 1705:3, 17, 21; 1706:6, 14, 23; 1707:6, 14; 1708:17, 24; 1709:8, 14, 18, 24; 1710:1, 4, 9; 1711:12, 18, 20; 1712:5, 12, 15, 23; 1713:7, 9-10, 23; 1714:5, 9, 18, 22; 1716:6, 8; 1717:14; 1721:8; 1722:20; 1735:3; 1736:7, 10, 14, 17

1563:16; 1564:14; 1565:10

**rust** [1] - 1526:19

**Ryder** [2] - 1594:1, 4

**S**

**sale** [10] - 1558:14, 19; 1559:12, 14; 1565:17; 1658:17; 1696:22, 24; 1697:9, 13

**sales** [4] - 1542:13; 1565:10; 1566:24; 1595:24

**salt** [2] - 1530:16; 1538:13

**Salta** [1] - 1733:4

**Salter** [2] - 1715:22; 1727:22

**salvage** [2] - 1562:15; 1564:7

**sample** [1] - 1592:21

**sank** [1] - 1527:22

**sat** [3] - 1614:13; 1676:8, 16

**satisfy** [1] - 1574:11

**Saturday** [16] - 1684:19; 1686:10; 1695:8, 16; 1719:19; 1720:17; 1721:5, 9, 23; 1722:19; 1723:4, 6-7, 18; 1728:3, 22

**saved** [1] - 1567:14

**saw** [21] - 1518:7; 1523:8, 19; 1537:11; 1587:14; 1594:15; 1598:10; 1599:6; 1702:8; 1706:2; 1709:6, 12; 1710:5; 1711:13; 1712:1; 1713:12, 20; 1715:4, 22; 1716:25

**Sayville** [1] - 1541:10

**scam** [1] - 1662:1

**scared** [5] - 1729:22; 1730:2, 14, 18

**scenario** [1] - 1615:10

**scene** [8] - 1587:2, 6, 9; 1617:13, 25; 1618:3, 20; 1632:11

**Schelhorn** [7] - 1618:11, 15, 19, 25; 1651:24; 1670:14

**scheme** [1] - 1721:17

**scores** [2] - 1599:8

**Scott** [8] - 1572:7; 1577:20; 1634:17;

**scrapes** [1] - 1591:18

**scratched** [1] - 1538:11

**screaming** [1] - 1664:25

**screen** [19] - 1522:14; 1523:3; 1532:7, 11, 15; 1533:12; 1534:18; 1535:7, 11; 1554:20, 23; 1556:22, 25; 1557:1; 1596:4; 1601:8; 1685:3; 1695:21

**screw** [1] - 1703:11

**script** [2] - 1655:25; 1688:10

**Sculpt** [29] - 1544:12, 14; 1545:4, 7, 18; 1546:16; 1547:1, 7; 1554:1, 10; 1555:12, 16; 1556:1, 19; 1558:7, 11; 1560:12; 1561:11, 14, 24; 1562:5; 1563:12; 1564:21; 1566:5, 9; 1568:11, 13, 19; 1580:17

**scum** [1] - 1580:14

**sea** [2] - 1538:18; 1591:21

**Sean** [12] - 1634:18; 1635:3; 1638:19; 1639:7; 1642:2, 21-22; 1643:14

**SEAN** [1] - 1515:14

**seat** [3] - 1517:9; 1528:14; 1680:11

**seated** [5] - 1519:9; 1584:15; 1623:10; 1677:11; 1680:16

**second** [27] - 1527:10; 1538:15; 1543:12; 1544:6; 1551:2, 9, 13; 1554:10; 1556:1; 1560:22; 1561:11; 1562:5, 16; 1568:1; 1603:21; 1635:14; 1638:5; 1644:13; 1680:21; 1717:9; 1723:23; 1724:18; 1732:10, 13, 21; 1733:20

**Second** [1] - 1598:20

**secondly** [1] - 1624:5

**seconds** [3] - 1638:21; 1640:7; 1650:18

**section** [2] - 1710:16; 1713:19

**security** [1] - 1609:23

**see** [58] - 1517:22, 25;

25

1518:2; 1520:22; 1522:20; 1529:12; 1533:13; 1535:17, 23; 1537:15; 1554:24; 1555:21; 1556:12; 1575:19, 21-22; 1583:3; 1587:11; 1590:4; 1597:18; 1599:5; 1601:9, 18; 1602:3, 6; 1618:14; 1626:15; 1633:9, 13; 1639:2, 14; 1644:9; 1660:14; 1661:7; 1666:18; 1667:1, 4; 1683:4, 6; 1685:6; 1687:12; 1690:25; 1693:22, 25; 1695:1; 1702:6, 17; 1706:4; 1709:5; 1714:15; 1718:4, 18, 24; 1721:2; 1730:2; 1732:20; 1734:22; 1735:4

**seeing** [2] - 1599:11; 1734:17

**seek** [1] - 1517:1

**seeking** [3] - 1600:21, 25; 1710:1

**segregated** [1] - 1660:22

**seized** [2] - 1660:5, 24

**selected** [1] - 1583:20

**self** [4] - 1517:12, 14; 1576:1; 1577:4

**self-authenticating** [2] - 1517:12, 14

**self-serving** [2] - 1576:1; 1577:4

**sell** [6] - 1558:14; 1559:10; 1570:1; 1610:11; 1662:19

**selling** [6] - 1593:25; 1662:25; 1697:3, 5, 20, 23

**sent** [1] - 1644:7

**sentence** [11] - 1574:19; 1606:20; 1607:16; 1613:13; 1614:23; 1615:5; 1620:9; 1625:18; 1628:5; 1675:20; 1717:6

**sentenced** [5] - 1572:24; 1573:1, 3, 5, 10

**separate** [2] - 1531:5; 1694:23

**separately** [2] - 1688:16; 1691:17

**September** [15] -

1535:17; 1601:17; 1602:8, 22; 1603:22; 1604:8, 24; 1605:15, 25; 1606:11; 1683:20; 1693:10; 1715:23; 1733:2

**series** [1] - 1726:3

**serve** [3] - 1548:21; 1573:15; 1574:1

**served** [3] - 1592:20; 1593:4, 9

**serving** [4] - 1574:19; 1576:1; 1577:4; 1606:19

**sessions** [1] - 1539:15

**set** [4] - 1548:8; 1549:16; 1660:9; 1661:23

**setting** [2] - 1558:21, 24

**seven** [6] - 1615:21, 24; 1616:21; 1622:11; 1637:23; 1723:15

**several** [9] - 1540:14; 1558:2; 1600:3; 1635:15; 1642:7; 1655:10; 1658:12; 1711:8

**SEYBERT** [1] - 1515:9

**shall** [1] - 1641:22

**sham** [1] - 1661:10

**share** [4] - 1544:2; 1685:21; 1686:7

**shared** [1] - 1725:8

**shares** [1] - 1594:21

**shell** [3] - 1548:9, 11

**shells** [1] - 1704:9

**Sheriff's** [1] - 1568:23

**Shirley** [1] - 1651:20

**shirt** [2] - 1524:2

**shirts** [1] - 1524:6

**shit** [1] - 1580:14

**shock** [1] - 1586:7

**shocked** [2] - 1538:8; 1600:3

**shoot** [2] - 1526:10; 1527:11

**shooting** [2] - 1517:24; 1668:14

**shore** [1] - 1530:4

**short** [1] - 1634:14

**shortly** [2] - 1600:24; 1678:3

**shot** [10] - 1525:18; 1527:7, 23; 1528:17; 1667:21, 24; 1668:2; 1669:7; 1696:19;

**show** [23] - 1522:23; 1534:15; 1535:7; 1568:18; 1570:6; 1577:24; 1579:4; 1645:11; 1657:1; 1685:3; 1688:7; 1690:5, 21; 1703:4; 1718:20; 1722:10; 1723:22; 1726:18, 21; 1727:5

**showed** [7] - 1618:17; 1660:24; 1687:3, 22; 1713:19; 1726:23; 1734:3

**showing** [8] - 1516:11; 1595:25; 1660:3; 1678:8; 1688:14; 1726:25; 1727:9; 1732:12

**shown** [2] - 1689:6; 1732:8

**shows** [1] - 1523:22

**shut** [3] - 1528:4; 1571:14; 1592:11

**sic** [4] - 1544:4; 1655:4; 1728:21; 1731:19

**sick** [2] - 1529:17, 24

**Side** [1] - 1676:25

**side** [20] - 1522:16; 1526:3; 1527:9, 20-21; 1538:3, 7; 1539:4; 1548:18, 20; 1559:16; 1562:2; 1563:13; 1585:2; 1595:17; 1598:21; 1655:15; 1719:7

**sidebar** [15] - 1577:2; 1620:2; 1647:8; 1651:6; 1659:20; 1662:9; 1672:23; 1674:14; 1675:11; 1687:17; 1690:1; 1699:9; 1700:10; 1707:21; 1711:19

**sides** [1] - 1648:6

**sign** [5] - 1551:3, 18; 1553:10; 1558:6; 1689:2

**signature** [2] - 1556:12; 1557:22

**signatures** [2] - 1556:8; 1557:21

**signed** [12] - 1552:22; 1553:2, 25; 1554:11; 1557:5; 1558:5, 9; 1571:4; 1618:19; 1687:19, 21

**significance** [3] -

1537:15

**signing** [3] - 1556:15; 1557:7; 1560:21

**silencer** [2] - 1703:10, 14

**silent** [2] - 1542:17; 1627:25

**similar** [1] - 1703:8

**simpler** [1] - 1644:18

**simply** [2] - 1711:5, 10

**sink** [4] - 1521:23; 1525:19; 1529:2; 1536:14

**sit** [4] - 1668:17; 1671:9; 1709:1; 1719:23

**situation** [1] - 1628:19

**six** [4] - 1545:20; 1616:17; 1682:7; 1723:15

**skin** [1] - 1538:11

**SLD-12** [1] - 1522:25

**sleep** [2] - 1719:20; 1731:24

**sleeping** [9] - 1704:16; 1719:11, 16; 1720:8, 16; 1721:6; 1722:17; 1723:2

**slept** [1] - 1720:2

**slid** [3] - 1525:16, 21; 1526:7

**slip** [1] - 1688:9

**slipping** [1] - 1676:2

**slips** [1] - 1592:13

**SM-9** [8] - 1553:18, 24; 1554:9, 14, 17, 19; 1556:7; 1737:5

**SM-9-0011** [1] - 1557:19

**SM-9-008** [1] - 1556:23

**small** [2] - 1559:20, 23

**smaller** [1] - 1602:20

**smashed** [1] - 1528:7

**smoke** [1] - 1695:1

**smoking** [4] - 1695:2, 4; 1702:4, 19

**Smyth** [9] - 1586:22; 1587:1, 8; 1588:17, 22, 24; 1589:4; 1590:23; 1616:20

**snuck** [1] - 1725:25

**so..** [3] - 1684:3; 1692:18; 1703:12

**social** [1] - 1734:14

**sold** [7] - 1558:14; 1594:3; 1658:6-8;

1697:2, 4
**solution** [1] - 1711:10
**someone** [7] - 1553:7;
1594:1, 11, 19;
1640:19; 1682:11;
1725:24
**someplace** [1] - 1693:6
**sometime** [1] - 1698:13
**sometimes** [1] - 1686:8
**somewhat** [4] -
1652:18; 1703:6; 1705:2
**somewhere** [1] - 1715:7
**son** [3] - 1602:1;
1661:20; 1667:8
**son's** [1] - 1659:12
**soon** [3] - 1524:22;
1535:19; 1613:8
**sorry** [34] - 1533:2;
1534:19; 1536:18;
1540:20; 1547:22;
1548:10; 1561:20;
1563:12; 1573:4;
1575:18, 21; 1577:14;
1589:21; 1596:22;
1606:22; 1627:6;
1629:13; 1630:2;
1637:22; 1646:7;
1648:17; 1666:11;
1671:10; 1675:8;
1683:5; 1695:24;
1697:18; 1702:18;
1719:1; 1726:5, 20;
1731:1
**sort** [9] - 1535:3;
1543:10; 1562:21;
1592:14; 1595:22;
1604:8; 1607:10;
1631:11; 1689:3
**sorts** [1] - 1574:23
**sought** [2] - 1531:10;
1637:14
**sound** [4] - 1639:9;
1696:9, 11; 1726:10
**sounded** [1] - 1620:18
**sounds** [1] - 1615:15
**South** [4] - 1520:3;
1694:12; 1726:5;
1732:17
**space** [9] - 1544:5;
1551:1, 4-6, 8;
1568:11; 1569:3; 1685:9
**Spats** [1] - 1594:19
**speaking** [2] -
1597:18; 1717:22
**special** [2] - 1548:21;
1595:17
**specific** [2] - 1559:9;

1688:6
**specifically** [12] -
1521:2; 1532:22;
1550:18; 1552:20;
1563:23; 1588:16;
1600:18; 1601:15;
1605:2; 1668:8;
1688:19; 1723:23
**specifics** [1] - 1600:7
**speculate** [2] -
1649:1; 1651:9
**speculation** [1] -
1611:24
**spell** [1] - 1644:16
**spelled** [1] - 1681:13
**spend** [1] - 1630:5
**spent** [1] - 1702:4
**splint** [1] - 1534:24
**split** [3] - 1524:17;
1525:3; 1552:18
**splitting** [1] -
1571:8; 1696:11
**spoken** [2] - 1611:19;
1710:4
**Spratts** [1] - 1594:20
**spring** [1] - 1526:16
**springs** [1] - 1526:24
**spun** [1] - 1700:3
**Square** [2] - 1658:3, 5
**squish** [2] - 1591:4, 11
**squished** [1] - 1522:22
**stage** [1] - 1676:10
**stand** [17] - 1525:9;
1528:14; 1569:1;
1582:14; 1583:21;
1624:14; 1635:22;
1637:6; 1640:6;
1644:21; 1646:10;
1647:21; 1648:20;
1660:17; 1661:13;
1663:14; 1709:4
**standing** [3] - 1585:7;
1680:10; 1681:5
**starboard** [1] - 1526:3
**start** [1] - 1725:16
**started** [12] - 1521:4,
19; 1527:25; 1529:10;
1552:21; 1558:14;
1566:10; 1567:20;
1570:16, 25; 1610:7;
1645:19
**starting** [1] - 1560:10
**state** [10] - 1578:15;
1626:7-9; 1643:11;
1675:6, 12, 14, 16;
1680:6
**State** [1] - 15

**statement** [20] -
1577:23; 1637:1;
1640:17, 25; 1642:7;
1683:19; 1687:18, 21;
1688:2, 23-25; 1689:6;
1690:6; 1691:2;
1699:11; 1707:9;
1710:25; 1712:7
**statements** [4] -
1640:14; 1641:11;
1642:11; 1671:10
**STATES** [2] - 1515:1, 3
**States** [4] - 1515:12,
21; 1572:14; 1614:24
**stay** [3] - 1526:15;
1606:25; 1686:3
**stayed** [4] - 1526:21,
23; 1686:4; 1732:3
**staying** [4] - 1607:24;
1608:2; 1684:10
**stealing** [1] - 1656:9
**stenography** [1] -
1515:24
**step** [2] - 1525:8;
1677:7
**STEPHEN** [1] - 1515:16
**steps** [1] - 1640:21
**stereo** [1] - 1685:19
**Steve** [1] - 1612:23
**sticking** [1] - 1580:17
**still** [11] - 1519:12;
1520:22; 1529:15;
1546:14; 1550:2;
1561:16, 24; 1565:2;
1615:21; 1677:19;
1711:8
**stipulate** [3] -
1523:21; 1678:23
**stipulation** [2] -
1647:14; 1648:24
**stole** [4] - 1587:23;
1588:4; 1698:19, 24
**stood** [1] - 1673:24
**stop** [10] - 1527:10;
1603:13; 1605:4, 18;
1644:12; 1648:21;
1649:14; 1653:9;
1672:2; 1734:6
**stopped** [1] - 1570:8
**storefront** [1] -
1551:6
**stories** [3] - 1625:25;
1668:16; 1670:10
**story** [3] - 1577:9;
1603:15; 1639:16
**straight** [2] - 1525:4;

**straits** [1] - 1562:13
**strategy** [1] - 1649:16
**Street** [13] - 1543:2,
11; 1548:18, 20;
1549:6; 1551:1;
1555:24; 1556:19;
1558:7; 1657:5, 9, 11;
1720:15
**street** [3] - 1617:10,
12
**streets** [1] - 1718:23
**strenuously** [1] -
1625:1
**stricken** [4] -
1529:10, 25; 1699:17,
22
**strictly** [1] - 1540:12
**strike** [6] - 1692:19;
1693:18; 1699:3, 6, 15;
1701:1
**strip** [2] - 1598:4;
1599:7
**structure** [2] -
1539:14; 1559:12
**stuff** [4] - 1549:1;
1578:5; 1657:3; 1676:8
**subject** [7] - 1624:11;
1641:22; 1646:20;
1667:11; 1676:6, 22;
1677:16
**submit** [6] - 1630:4, 6;
1631:10, 21; 1640:24;
1643:1
**submitted** [1] -
1618:10
**subpoena** [4] -
1592:21; 1593:4, 10;
1718:12
**subpoenaed** [2] -
1613:23; 1646:15
**subscriber** [1] -
1722:13
**subsequent** [2] -
1518:3; 1591:13
**substance** [1] -
1629:16
**successful** [6] -
1544:14; 1565:6, 20;
1571:21, 24
**sued** [2] - 1659:23;
1661:4
**suggest** [1] - 1625:3
**suggesting** [2] -
1632:17; 1633:15
**Suite** [1] - 1515:16
**sum** [1] - 1629:16
**summation** [1] -

1633:14

**summer** [7] - 1589:16; 1666:17; 1681:18; 1696:21; 1698:14, 16; 1718:16

**Sunday** [9] - 1686:10; 1687:1; 1695:9; 1701:20; 1702:1, 12; 1728:14; 1731:19

**sunday** [1] - 1702:12

**sunk** [1] - 1537:23

**Sunnyside** [1] - 1725:8

**supplies** [1] - 1552:25

**supply** [1] - 1669:18

**support** [2] - 1653:21; 1661:6

**suppose** [2] - 1631:23; 1688:7

**supposed** [1] - 1650:14

**surrounding** [1] - 1676:4

**surveillance** [1] - 1535:16

**suspect** [4] - 1668:14; 1670:10, 15, 24

**sustained** [32] - 1652:13; 1654:3, 19; 1655:17; 1656:2; 1657:18; 1662:10; 1663:19; 1667:14; 1669:1; 1672:16; 1674:15; 1675:5; 1677:1; 1687:7; 1690:2; 1691:24; 1693:20; 1699:4; 1700:11, 19, 25; 1703:23, 25; 1704:21; 1705:9, 20; 1706:11; 1707:1, 13; 1712:4, 11

**Sustained** [8] - 1611:25; 1612:15; 1617:7; 1618:2; 1619:9, 14; 1622:22; 1623:1

**swear** [1] - 1680:25

**switch** [3] - 1585:1; 1603:18; 1604:9

**switched** [1] - 1541:17

**switching** [2] - 1538:15; 1603:19

**sworn** [4] - 1519:3; 1646:10; 1680:12; 1681:10

**Synergies** [2] - 1547:20; 1548:24

**Synergy** [19] - 1547:13, 16; 1548:1, 3, 17, 21-22; 1549:6; 1550:1, 8, 12; 1595:12, 15, 18,

23; 1598:11; 1603:23; 1657:5

**Syosset** [4] - 1587:19; 1588:13; 1590:12; 1657:25

**system** [1] - 1666:5


**T**


**T-shirt** [2] - 1524:2

**T-shirts** [1] - 1524:6

**table** [2] - 1549:16; 1683:13

**talks** [2] - 1578:24; 1625:16

**tall** [3] - 1616:16, 20, 24

**tantamount** [1] - 1664:16

**Tape** [2] - 1591:24; 1593:16

**tape** [59] - 1578:2; 1582:4, 8; 1585:6; 1587:16; 1589:10, 14; 1590:9, 18, 24; 1592:18; 1594:6; 1610:12, 23, 25; 1611:1; 1625:15; 1627:17; 1629:7, 18-19; 1634:11, 22; 1635:5, 9-11, 14, 16, 21; 1636:17, 23; 1637:25; 1638:1; 1639:12, 21; 1640:1, 8, 12; 1641:13; 1643:16; 1644:25; 1645:15, 19, 21; 1646:3; 1650:5, 10, 13; 1652:1, 7; 1653:12, 17; 1665:17; 1677:18

**taped** [3] - 1583:7; 1588:10; 1664:24

**tapes** [11] - 1629:4; 1635:11; 1646:1, 3, 15, 20; 1647:4, 17; 1650:1; 1664:23; 1676:10

**Tarantino** [43] - 1528:17; 1530:15; 1534:22; 1540:17; 1553:2, 10; 1560:18; 1561:2; 1562:5; 1570:21; 1580:24; 1586:15; 1588:7; 1591:14; 1598:17; 1610:24; 1611:11; 1612:24; 1616:11, 24; 1618:6; 1624:25; 1635:16; 1639:2; 1652:9; 1653:22; 1654:6; 1655:9,

1656:21; 1657:2; 1659:23; 1661:1; 1663:10, 21; 1665:11, 13, 16; 1666:16; 1669:15; 1672:4, 13, 18; 1678:9

**TARANTINO** [1] - 1515:5

**Tarantino's** [4] - 1517:2; 1524:20, 24; 1625:6

**Tarantinos** [1] - 1663:16

**targeting** [1] - 1649:24

**tattoo** [1] - 1716:9

**tattoos** [1] - 1716:11

**team** [4] - 1625:6; 1637:14; 1649:15; 1651:21

**technically** [1] - 1567:3

**telephone** [1] - 1688:8

**ten** [5] - 1607:21; 1615:7, 10, 24; 1616:25

**term** [5] - 1573:15; 1597:4; 1599:17; 1628:10; 1651:8

**terminal** [1] - 1543:12

**terms** [3] - 1628:5, 13; 1631:11

**testified** [34] - 1519:3; 1520:1; 1535:18; 1539:1; 1545:22; 1547:1; 1561:15, 23; 1562:17; 1575:7; 1581:19; 1593:17; 1595:3, 16; 1610:22; 1611:17; 1629:12; 1646:11, 24; 1647:3, 14; 1648:6, 25; 1651:11; 1661:15; 1675:24; 1681:10; 1701:10; 1709:17; 1719:11; 1722:23; 1724:6

**testify** [7] - 1518:6, 9; 1577:8; 1578:22; 1631:6; 1689:10; 1707:17

**testifying** [3] - 1615:24; 1675:19; 1688:22

**testimony** [55] - 1516:25; 1517:1, 22; 1557:16; 1579:8; 1582:23; 1583:9; 1614:10; 1616:14; 1625:22;

1626:12; 1628:15; 1633:20; 1634:16, 25; 1635:6, 18; 1636:1, 8, 12; 1637:2; 1639:1, 17-18; 1641:6; 1642:6, 22; 1643:6, 8, 12, 23; 1645:8; 1647:16; 1648:3, 8; 1651:4, 8, 16; 1652:16, 22-23; 1654:21; 1656:24; 1661:13; 1664:15; 1699:24; 1709:1, 25; 1718:13; 1721:9; 1724:8; 1725:3, 21

**Thanksgiving** [1] - 1664:23

**THE** [334] - 1516:6, 10-11, 16; 1517:8, 15, 17, 19; 1518:6, 14, 21; 1519:8; 1523:14, 23; 1525:10; 1528:10; 1532:3; 1553:17; 1554:15; 1568:4, 6-8, 25; 1574:4; 1576:2; 1577:3, 6, 16, 24; 1578:12, 17, 21; 1579:1, 3, 5; 1580:3, 5; 1582:13; 1583:22; 1584:6, 12, 15; 1586:1, 3, 14, 16-17; 1588:2; 1591:9; 1593:1; 1597:7, 10-11; 1611:15, 25; 1612:15, 18; 1617:7; 1618:2; 1619:9, 14, 16; 1620:3, 10, 22; 1622:3, 22; 1623:1, 3, 10, 17; 1624:16; 1625:8, 10; 1626:8, 15; 1627:4, 7, 11, 15, 23; 1628:2; 1629:3; 1630:1, 15, 23; 1632:8, 16, 20, 24; 1633:7, 13, 21; 1634:8, 12, 15, 21, 24; 1635:23; 1636:4, 8, 14, 18, 21, 25; 1638:8, 12, 14, 18, 23; 1639:9, 14; 1640:1, 4; 1641:4, 16, 19, 23; 1642:5, 15; 1643:16, 22; 1644:2, 9, 12, 22; 1645:2, 4, 10, 21, 25; 1646:7; 1647:6, 9, 12; 1648:2, 13, 21; 1649:6, 11, 22; 1650:3, 9, 15, 23; 1651:1, 3, 7; 1652:13; 1654:3, 19; 1655:1, 17; 1656:2, 15, 18; 1657:18; 1659:18, 21; 1660:2, 7, 14, 19; 1661:1, 7; 1662:4, 10; 1663:19; 1665:2, 5;

**28**

1667:14; 1669:1, 9, 22, 25; 1670:3; 1672:16, 21, 24; 1673:2, 13, 18; 1674:1, 8, 13, 15; 1675:5, 7, 12, 14, 16, 21; 1676:1, 13, 17, 20; 1677:1, 3, 6, 11, 19, 25; 1678:6, 11, 15, 18, 24; 1679:5, 10, 13, 21, 23-24; 1680:2, 5, 9, 16, 19, 22, 25; 1681:4, 12; 1686:14; 1687:7, 12, 18, 21, 24; 1688:4, 11, 16, 20, 23; 1689:2, 6, 9, 13, 16, 20, 22; 1690:2, 11, 13, 17, 24; 1691:6, 12, 14, 24; 1692:1, 3-4, 7-8, 20; 1693:20; 1695:23; 1696:1; 1699:4, 7, 10, 13, 18, 23; 1700:6, 9, 11, 19, 25; 1701:2, 8, 10, 12, 15; 1703:17, 23, 25; 1704:21, 23; 1705:9, 11-12, 15, 20, 23, 25; 1706:11; 1707:1, 5, 13, 19, 22; 1709:2, 11, 15, 21, 25; 1710:3, 8, 12, 16, 22; 1711:15; 1712:4, 11, 13, 25; 1713:3, 8, 16-18, 22; 1714:3, 7, 11, 14, 17, 19, 21; 1716:7; 1717:15; 1721:12; 1722:21; 1734:5, 21; 1735:1, 4, 6

**there'll** [1] - 1735:1

**thereafter** [3] - 1562:4; 1566:1, 4

**therefore** [1] - 1635:21

**they's** [1] - 1693:16

**thick** [1] - 1522:2

**thinks** [1] - 1708:4

**third** [4] - 1561:7; 1592:24; 1595:12, 17

**Third** [4] - 1538:24; 1548:18; 1551:2; 1595:13

**thousand** [1] - 1658:25

**threat** [5] - 1579:7; 1630:12; 1633:23; 1639:3; 1640:14

**threaten** [1] - 1631:4

**threatened** [8] - 1630:11; 1631:8, 15; 1632:9; 1633:18, 20-21; 1634:1

**threats** [2] - 1578:13; 23

**three** [29] - 1520:6, 20; 1536:23; 1537:2; 1542:16; 1552:18; 1559:17; 1561:6; 1591:8, 23; 1592:17; 1618:20; 1637:13; 1642:21; 1643:21, 25; 1667:3, 10, 17; 1678:21; 1679:9, 22; 1682:24; 1685:17; 1702:10; 1710:19; 1717:7; 1719:1, 5

**three-minute** [1] - 1643:21

**threw** [1] - 1528:20

**throughout** [2] - 1649:17; 1661:15

**throw** [2] - 1528:21; 1529:6

**thumb** [1] - 1525:3

**thump** [1] - 1696:11

**Thursday** [20] - 1519:20; 1539:1; 1614:6-9; 1646:14, 17; 1719:15-18; 1720:1, 16; 1721:9; 1722:18; 1723:3, 5; 1726:9; 1728:3

**ticket** [1] - 1694:3

**ticketed** [2] - 1694:9, 13

**time-wise** [1] - 1581:12

**timeframe** [2] - 1568:3; 1592:6

**timing** [1] - 1643:3

**today** [19] - 1550:5; 1582:23; 1583:4, 10; 1613:14; 1623:16; 1634:19; 1635:3; 1661:14; 1668:17; 1671:9; 1700:23; 1707:17; 1716:4; 1718:13; 1719:23; 1730:4, 21; 1734:6

**together** [35] - 1538:12; 1547:23; 1594:4; 1596:18; 1599:5, 7, 12; 1608:1, 12; 1662:14; 1686:24; 1687:1; 1688:14, 17; 1689:11; 1690:8; 1691:17, 20; 1692:6; 1693:16; 1694:23; 1705:7, 18, 24; 1706:9, 16, 19; 1708:6;

9, 13; 1713:25; 1714:23

**Tom** [4] - 1607:23; 1608:9; 1609:11; 1667:4

**tomorrow** [4] - 1734:8, 17, 22; 1735:4

**took** [45] - 1518:3; 1530:21; 1542:24; 1543:16; 1547:12; 1552:12; 1566:19; 1569:25; 1570:1; 1577:1; 1594:25; 1609:7; 1617:14; 1620:1; 1644:25; 1647:7, 21; 1648:20; 1651:25; 1659:19; 1662:6; 1672:22; 1675:10; 1683:16; 1687:10, 16; 1697:1; 1698:14; 1699:8; 1701:13; 1702:9; 1707:11, 16, 20; 1708:22; 1709:19; 1712:9; 1715:4-6, 23; 1723:10; 1729:24

**toolbox** [2] - 1521:19; 1523:6

**top** [8] - 1524:14, 20; 1526:23; 1532:14; 1539:15; 1555:1; 1696:8; 1703:11

**touch** [1] - 1660:23

**touched** [1] - 1660:23

**toward** [3] - 1526:1; 1547:9; 1729:7

**towards** [3] - 1649:8; 1659:11; 1729:1

**town** [2] - 1536:9; 1580:9

**tractor** [1] - 1567:23

**trailers** [1] - 1567:24

**train** [3] - 1692:13; 1723:9, 11

**trainer** [1] - 1539:10

**training** [7] - 1538:22; 1539:6, 13, 15, 19, 22; 1595:24

**trains** [2] - 1723:9, 20

**Tramble** [1] - 1679:11

**transaction** [2] - 1697:19; 1698:14

**TRANSCRIPT** [1] - 1515:6

**transcript** [1] - 1515:25

**transcription** [1] - 1515:25

**transfer** [1] - 1604:1

**transpired** [2] - 1661:15; 1662:6

**treacherous** [1] - 1676:5

**treatment** [2] - 1531:11, 15

**TRIAL** [1] - 1515:6

**trial** [3] - 1516:17; 1630:22; 1661:18

**tricks** [1] - 1567:15

**tried** [4] - 1528:3; 1604:20; 1627:21

**triggermen** [3] - 1616:3; 1620:8; 1622:11

**trip** [2] - 1519:21; 1536:21

**trouble** [1] - 1655:19

**true** [11] - 1615:14; 1626:6; 1629:8; 1631:15; 1688:2; 1718:21; 1730:15-17; 1731:10

**truth** [4] - 1640:18, 24; 1710:1; 1715:23

**try** [8] - 1531:8; 1554:2, 5; 1570:18; 1586:3; 1604:18; 1679:2; 1715:13

**trying** [18] - 1527:8, 20; 1530:16; 1566:11; 1603:18; 1604:11; 1611:3; 1637:8; 1652:3; 1653:25; 1673:18; 1680:23; 1709:13; 1710:10; 1715:21; 1729:15; 1730:2

**turn** [3] - 1521:9; 1556:6; 1585:2

**turned** [3] - 1517:25; 1521:8; 1529:11

**turning** [1] - 1525:4

**Turnpike** [2] - 1531:18; 1587:14

**TV** [1] - 1685:19

**twelve** [1] - 1607:21

**twenty** [1] - 1516:12

**twice** [3] - 1575:5; 1683:3; 1710:11

**two** [41] - 1520:20; 1531:22; 1537:4; 1551:6; 1561:5; 1564:13; 1565:2; 1586:24; 1591:23; 1598:5; 1599:5; 1601:16; 1602:23; 1603:12; 1608:6; 1622:14; 1628:4;

29

1632:4; 1635:10;
1658:8-10; 1678:20;
1679:7, 9; 1682:24;
1686:4; 1693:10;
1697:15; 1702:2, 10,
19; 1708:4; 1717:18;
1718:25; 1719:3, 21,
24; 1729:20
**two-level** [1] - 1551:6
**type** [8] - 1614:23;
1625:18; 1642:25;
1694:23; 1697:3;
1703:2, 13

**U**

**U.S** [5] - 1515:4, 15;
1613:4; 1614:2; 1668:12
**U.S.D.J** [1] - 1515:9
**ultimately** [6] -
1581:25; 1606:3, 5;
1631:21; 1632:3; 1634:1
**umm** [1] - 1559:8
**uncomfortable** [1] -
1559:21
**under** [8] - 1517:12;
1519:12; 1571:14;
1602:6; 1615:1;
1677:16; 1678:4; 1709:3
**understood** [2] -
1621:4; 1720:4
**unfair** [1] - 1620:23
**unfortunately** [1] -
1661:3
**unhappy** [1] - 1711:6
**UNITED** [2] - 1515:1, 3
**United** [4] - 1515:12,
21; 1572:14; 1614:24
**University** [3] -
1517:3; 1531:19;
1532:13
**unless** [4] - 1620:17;
1646:2; 1678:13; 1679:8
**unlikely** [1] - 1724:8
**unload** [1] - 1567:24
**unprobative** [1] -
1632:6
**unsworn** [6] - 1630:25;
1631:13; 1637:11, 18;
1640:16, 19
**unusual** [1] - 1703:9
**up** [89] - 1516:11;
1518:8, 22; 1526:24;
1527:21; 1529:15, 21;
1531:9; 1532:15;
1533:1, 3; 1536:2, 10;
1537:12; 1538:8;
1543:22; 1548:8;

1549:16; 1554:3;
1558:21, 24; 1562:16;
1564:10; 1567:21;
1568:1; 1570:6; 1577:9;
1578:19; 1579:4;
1587:2; 1590:7;
1593:14; 1602:17;
1603:21; 1605:1, 9;
1607:23; 1608:9, 13,
15; 1619:16; 1620:17,
23; 1623:3; 1629:5, 19;
1632:1; 1636:6, 15;
1646:20; 1647:18, 23;
1648:15, 18; 1653:9;
1654:21; 1655:14;
1660:9; 1661:24;
1664:1, 13; 1666:14;
1667:11; 1668:15;
1669:2; 1672:1, 21;
1673:24; 1675:7;
1676:2, 7, 9, 16;
1679:18; 1683:6;
1687:14; 1688:14;
1689:7; 1690:13;
1699:7; 1700:3;
1708:18; 1709:7; 1711:1
**upper** [9] - 1532:18;
1538:3, 7; 1539:4;
1562:2; 1563:12;
1598:21; 1655:15
**upset** [6] - 1566:19;
1639:24; 1640:2;
1665:24
**upstate** [4] - 1536:6,
9; 1537:13; 1586:5

**V**

**vacuum** [1] - 1588:23
**value** [5] - 1631:13;
1633:9, 13, 16; 1634:5
**various** [2] - 1548:21;
1711:3
**vehicle** [12] - 1587:20;
1588:24; 1590:8;
1693:3, 7, 15, 22;
1694:4; 1698:7;
1702:15, 17, 20
**vehicles** [1] - 1586:23
**veins** [1] - 1523:11
**vending** [1] - 1602:18
**vendors** [1] - 1552:24
**venture** [2] - 1544:8;
1550:21
**verbally** [1] - 1678:1
**verdict** [2] - 1678:6
**version** [3] - 1636:10;
1708:11
**versions** [2] -

1642:21; 1708:5;
1710:20
**versus** [1] - 1710:13
**victim** [2] - 1590:11;
1725:9
**view** [3] - 1628:11;
1649:19, 21
**viewed** [1] - 1628:8
**Vince** [7] - 1635:16;
1654:23; 1655:4, 11;
1656:6, 10
**Vincent** [28] - 1536:25;
1542:7; 1545:1;
1556:10; 1558:17;
1583:16; 1599:1, 15,
18; 1611:11; 1635:5;
1644:7; 1662:13;
1664:17; 1666:4, 13;
1668:18; 1669:7, 16;
1670:11, 15, 19, 25;
1671:12; 1672:5, 13;
1721:17, 20
**Vincent's** [2] -
1667:11, 16
**Vinnie** [27] - 1539:9;
1542:11, 15, 20;
1544:1; 1546:14;
1555:18; 1565:23;
1577:8, 10, 12, 22;
1581:3, 21; 1583:7;
1600:2; 1605:19;
1606:12, 16; 1610:6, 9;
1636:7; 1653:10;
1655:2; 1662:17; 1667:9
**Vinnie's** [6] -
1560:12; 1600:22, 25;
1601:22, 25; 1606:12
**vis** [2] - 1578:23
**vis-a-vis** [1] -
1578:23
**vis-à-vis** [1] - 1674:2
**visit** [10] - 1563:4;
1601:1, 21; 1602:8, 22;
1603:7; 1604:23;
1606:10; 1629:15
**visited** [3] - 1691:21;
1693:25; 1700:14
**visiting** [1] - 1602:13
**visitors** [2] -
1601:13; 1686:9
**visits** [1] - 1666:17
**voice** [6] - 1554:3;
1577:13; 1580:7, 23;
1581:20; 1614:14
**voicemail** [4] -
1644:2, 5-6; 1650:6
**voices** [2] - 1583:12,

**VZ-1** [1] - 1722:11

**W**

**wait** [5] - 1568:1;
1575:22; 1590:4;
1719:2; 1724:18
**waiting** [1] - 1636:23
**waive** [4] - 1624:2, 14,
19, 21
**waived** [2] - 1623:14;
1625:4
**waiver** [2] - 1624:4, 10
**waives** [1] - 1624:5
**walk** [1] - 1560:6
**walked** [3] - 1560:4,
13, 15
**wall** [1] - 1602:18
**wants** [10] - 1632:2;
1633:2; 1635:8;
1640:13; 1643:13;
1707:25; 1708:9;
1710:16; 1711:9, 11
**warehouse** [3] -
1587:15; 1588:19;
1589:4
**watching** [1] - 1563:15
**water** [13] - 1517:24;
1525:17, 22; 1526:7;
1527:2, 22, 24; 1528:4;
1529:7; 1530:16;
1537:19; 1538:13
**WAV** [3] - 1637:24;
1638:2, 6
**ways** [3] - 1552:18;
1708:15
**weapon** [9] - 1695:21;
1696:3, 5, 10, 12,
18-19; 1702:8
**weapons** [2] - 1697:6;
1702:6
**wearing** [1] - 1523:19
**Wednesday** [6] -
1614:8; 1646:17, 19;
1647:14; 1726:9
**Wednesday-Thursday**
[1] - 1646:17
**weed** [2] - 1593:25;
1695:7
**week** [10] - 1614:7, 12;
1638:4; 1646:14;
1695:11; 1710:11;
1712:2; 1719:14
**weekend** [15] - 1602:9;
1683:17; 1686:13;
1694:3, 10; 1695:2, 6,
8, 12; 1724:22;
1727:23; 1728:9

**weekends** [1] - 1607:1

**weeks** [1] - 1517:10

**weigh** [3] - 1616:18, 22; 1617:1

**weight** [2] - 1522:19; 1617:19

**weightlifting** [1] - 1540:12

**West** [9] - 1606:21; 1607:3, 20; 1609:17; 1618:12, 17; 1657:5, 9, 11

**Westhampton** [1] - 1594:21

**whacked** [1] - 1581:7

**whatsoever** [1] - 1612:8

**white** [4] - 1535:6; 1587:10; 1697:22; 1698:4

**Whitey** [3] - 1708:20; 1731:4; 1732:2

**Whitey's** [1] - 1733:16

**whole** [5] - 1516:7; 1572:3; 1592:6; 1652:22; 1728:11

**WICKER** [1] - 1515:21

**wife** [62] - 1581:16; 1589:24; 1593:7, 9; 1599:22, 24; 1600:13, 15, 17, 21, 25; 1601:1, 21, 24; 1602:9, 22; 1603:4, 7; 1604:15, 23; 1605:13; 1606:10, 15; 1607:5; 1610:16, 20; 1611:6, 9, 19; 1612:2, 9; 1638:20; 1639:17; 1641:13, 25; 1642:10, 19-20; 1644:5; 1646:23; 1647:3, 22; 1648:14; 1652:2, 4, 8, 25; 1653:1, 4, 7; 1657:24; 1658:21; 1659:4; 1660:25; 1662:2; 1664:16, 22; 1665:19; 1666:3; 1667:3; 1672:2

**wife's** [4] - 1602:6; 1651:16; 1658:13; 1662:7

**Willard** [3] - 1586:5, 13

**Williamsburg** [1] - 1719:6

**Windex** [1] - 1588:23

**window** [1] - 1725:23

**windows** [1] - 1718:24

**winter** [1] - 1588:6

**wise** [1] - 1581:12

**wish** [1] - 1679:20

**wishes** [2] - 1678:16; 1713:5

**withdrawn** [15] - 1528:24; 1549:4; 1550:1; 1551:11; 1555:10; 1558:5; 1561:9; 1563:24; 1595:13; 1596:24; 1606:4; 1616:15; 1657:22; 1701:19; 1731:25

**WITNESS** [18] - 1528:11; 1568:6, 8; 1586:16; 1597:10; 1681:12; 1691:7, 14; 1692:3, 7; 1701:12; 1704:23; 1705:11, 15, 25; 1713:17, 22; 1714:21

**witness** [44] - 1518:20; 1519:2; 1528:9, 14; 1569:1; 1582:14; 1588:24; 1617:4; 1624:2; 1626:9; 1628:14; 1630:25; 1631:13; 1640:6; 1642:10; 1643:2; 1644:4; 1645:11; 1650:2; 1656:16; 1661:14; 1663:14; 1676:2; 1677:8, 13; 1678:19; 1679:12; 1680:20; 1681:1, 9; 1688:6; 1691:25; 1699:12; 1701:4; 1709:3; 1710:23; 1712:23; 1713:9; 1714:18; 1722:23; 1727:14; 1734:24

**witness'** [1] - 1617:18

**witness's** [5] - 1628:5, 12; 1675:15; 1699:10; 1707:4

**witnesses** [9] - 1619:3; 1628:15; 1632:4; 1633:5; 1637:11, 18; 1649:18; 1678:20

**WITNESSES** [1] - 1736:2

**woke** [2] - 1708:18; 1709:7

**woman** [2] - 1618:12, 16

**word** [9] - 1597:9; 1615:12; 1619:5; 1633:19; 1639:3; 1652:5; 1662:22

**words** [7] - 1565:14; 1567:4; 1611:2

1615:16; 1643:18; 1728:18

**workers** [1] - 1598:8

**worried** [1] - 1591:14

**worry** [3] - 1603:16; 1605:13; 1629:20

**worrying** [2] - 1603:13; 1605:4

**worst** [1] - 1615:10

**worth** [3] - 1656:10; 1662:24; 1676:10

**wound** [2] - 1531:11; 1567:21

**wrap** [1] - 1531:9

**writing** [1] - 1657:9

**written** [2] - 1678:2; 1687:18

---

**Y**

**year** [18] - 1539:24; 1540:6; 1542:8; 1543:6; 1568:7; 1586:3; 1592:8; 1606:8, 10, 14; 1608:17; 1614:21; 1663:6; 1665:2; 1693:4; 1717:12

**years** [27] - 1534:7; 1541:4, 12; 1582:1; 1593:13; 1615:7, 17, 21, 25; 1622:10, 18; 1653:25; 1662:6; 1664:4; 1683:14; 1686:17; 1708:25; 1710:5; 1711:21, 24; 1716:14, 18; 1717:7; 1730:5

**YORK** [1] - 1515:1

**York** [22] - 1515:13, 19, 22; 1537:16; 1538:2; 1555:24; 1586:5, 7; 1681:19; 1682:19, 23; 1683:20; 1687:4; 1690:6; 1691:2; 1720:15; 1721:7; 1722:18; 1723:3; 1724:7

**yourself** [8] - 1540:13; 1543:14; 1559:15, 24; 1561:9; 1562:5; 1714:11; 1727:13

**yourselves** [4] - 1546:3; 1561:10, 23; 1571:11

---

**Z**

**Zacaro** [2] - 1644:14

**ZACARO** [1] - 1644:17