# EXHIBIT "P"

1227

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------X

UNITED STATES OF AMERICA,       :    CR 08 655

    v.                        :    U.S. Courthouse
                              Central Islip, N.Y.
CHRISTIAN TARANTINO,            :

                              TRANSCRIPT OF TRIAL
        Defendant.     :

                              April 5, 2011
-------------------------------X    10:05 a.m.

BEFORE:

        HONORABLE JOANNA SEYBERT, U.S.D.J.
                and a jury

APPEARANCES:

For the Government:  LORETTA E. LYNCH
                     United States Attorney
                     100 Federal Plaza
                     Central Islip, New York 11722
                     By:  JAMES M. MISKIEWICZ, ESQ.
                          CARRIE N. CAPWELL, ESQ.
                          SEAN C. FLYNN, ESQ.
                          Assistants, U.S. Attorney

For the Defendant:  JAMES R. FROCCARO, JR., ESQ.
                     20 Vanderventer Avenue, Suite 103W
                     Port Washington, New York 11050
                       and
                     MICHAEL ROSEN, ESQ.
                     61 Broadway, Suite 2602
                     New York, New York 10006

Court Reporter:     HARRY RAPAPORT, C.S.R.
                     United States District Court
                     100 Federal Plaza
                     Central Islip, New York 11722
                     (631) 712-6105

Proceedings recorded by mechanical stenography.
Transcript produced by computer-assisted transcription.

**Fatato-Cross/Froccaro**

1256

1   circumstances.

2           So, based on that, it is not a memory issue.

3

4           (Whereupon, at this time the following takes

5   place in open court.)

6           THE COURT:  The objection is sustained.

7           MS. CAPWELL:  Your Honor, I have no further

8   questions.

9           MR. FROCCARO:  Judge, I will just take a minute.

10           THE COURT:  Sure.

11           (Counsel confer.)

12

13   CROSS-EXAMINATION

14   BY MR. FROCCARO:

15   Q    My name is James Froccaro, and I represent

16   Mr. Tarantino.  And I will be with you in a moment, all

17   right?

18   A    Yes.

19           THE CLERK:  Mr. Froccaro, do you need the

20   projector on?

21           MR. FROCCARO:  I will in a minute.  I may.

22           (Whereupon, at this time there was a pause in

23   the proceedings.)

24   Q    Mr. Fatato, if there is a question you don't

25   understand, just ask me and I will rephrase it.

Fatato-Cross/Froccaro

1257

1   A    Yes.

2   Q    First of all, would you describe yourself as tall?

3   You are about six foot one, six foot two, sir?

4   A    Yes.

5   Q    And at about the time of the armored car robbery in

6   1994, you were heavier, you weighed 270 pounds?

7   A    270, 280, yes.

8   Q    You also had two dogs at the time; is that correct?

9   A    Yes.

10  Q    Now, Louis Dorval had a nine millimeter Glock.  Did

11  you ever have it in your possession, sir, yes or no?

12  A    Yes.

13  Q    After you were arrested by the DEA for drug dealing

14  in November of 2003, you made a decision how you wanted to

15  proceed with the case; is that correct?

16  A    Correct.

17  Q    And the decision you made immediately was to

18  cooperate; is that correct?

19  A    Yes.

20  Q    Within minutes of the arrest; is that correct?

21  A    Yes.

22  Q    Because you knew from prior experience that this was

23  a day you could reduce your exposure in jail; is that

24  correct?

25  A    In 1993 from prior experience?  No.

Fatato-Cross/Froccaro

1258

1  Q    Had you ever made a statement under oath, a prior

2  statement under oath, that the decision you made

3  immediately was to cooperate because you knew from prior

4  experience that this was a way that you could reduce your

5  exposure to jail?  Yes or no, sir?

6  A    I don't recall.

7        MR. FROCCARO:  It is 3500 GS-144, provided at

8  page 669, lines 11 to 21.

9  Q    Mr. Fatato, do you recall being asked these questions

10  and giving these answers under oath at a prior proceeding:

11        Question:  After you were arrested by the DEA

12  for drug dealing in November of 2003, you made a decision

13  about how you wanted to proceed with the case, correct?

14        Answer:  Yes, sir.

15        Question:  And the decision you made immediately

16  was to cooperate, correct?

17        Answer:  Yes, sir.

18        Question:  Because you knew from prior

19  experience that this was a way that you could reduce your

20  exposure to jail, correct?

21        Answer:  Yes, sir.

22        Do you recall being asked those questions,

23  giving those answers under oath at a prior proceeding?

24  Yes or no, sir.

25  A    Yes, in 2003.  You said '93.

Fatato-Cross/Froccaro

1259

1  Q    The answer to my question is right, yes?

2  A    In 2003, yes, sir.

3  Q    The record will speak for itself.

4        Now, you are testifying here today pursuant to

5  the terms of a written cooperation agreement you had with

6  the government.

7        MR. FROCCARO:  I apologize for that, I should

8  have asked the government for that as well, if I can

9  impose on you, Carrie, again.

10 Q    You signed the cooperation agreement on the same day

11 that you actually pled guilty to dealing crystal meth on

12 April 14th, 2004; is that correct?

13 A    Yes.

14 Q    And for the crime you pled guilty to, you are facing

15 a mandatory minimum of ten years in prison; is that

16 correct?

17 A    Yes.

18 Q    And a maximum of life in prison, correct?

19 A    Yes.

20 Q    And so the jury understands, life means you are never

21 coming out again; is that right?

22 A    Yes.

23 Q    And there is no parole in the federal system; is that

24 right?

25 A    Yes.

**Fatato-Cross/Froccaro**

1260

1  Q    Are you married with children?

2  A    Yes.

3  Q    Now, you cooperated so you can get a 5K1 letter; is

4  that correct?

5  A    Yes.

6  Q    And you are hopeful the 5K1 letter will reduce the

7  sentence that you ultimately receive; is that correct?

8  A    Yes.

9  Q    And you are hopeful with the 5K1 letter, it may

10 result in you not doing any jail time at all; is that

11 correct?

12 A    Correct.

13 Q    Now --

14 A    Correct.

15 Q    Now, your present cooperation agreement with the

16 government imposes certain obligations on you; is that

17 correct, sir?

18 A    Yes.

19 Q    And I think you testified you were obligated to at

20 all times provide truthful information to the government.

21       Do you agree?

22 A    Yes, sir.

23 Q    And you must not commit or attempt to commit any

24 further crimes, right?

25 A    Correct.  Yes.

**Fatato-Cross/Froccaro**

1261

1   Q    And you signed that promise that you would do that;

2   is that correct?

3   A    Yes.

4   Q    Or else the government would rip up your agreement;

5   is that right?

6   A    Yes.

7   Q    Is that your understanding, Mr. Fatato?

8   A    Yes.

9   Q    That really isn't your understanding, is it,

10  Mr. Fatato, yes or no?

11  A    No, I understand.

12  Q    Well, this isn't the first time that you entered into

13  a cooperation agreement with our government; is that

14  correct?

15  A    Correct.

16  Q    And you were previously indicted in the federal court

17  for the District of New Jersey in August of the year 1994,

18  sir; is that correct?

19  A    Yes, sir.

20  Q    And charged with racketeering, right?

21  A    Yes, sir.

22  Q    Consisting of heroine trafficking, distributing

23  stolen fur coats from Filene's Basement and passing

24  counterfeit money; is that correct?

25  A    Yes.

Fatato-Cross/Froccaro

1262

1   Q    And Louis Dorval was charged along with you and

2   others in that case?

3   A    Correct.

4   Q    And how you decided to proceed in that case was to

5   plead guilty and immediately to start cooperating with the

6   government as well; is that correct?

7   A    Yes, correct.

8   Q    And that is when you first made allegations about

9   Mr. Tarantino to the government; is that right?

10  A    Correct.

11  Q    In 1994, right?

12  A    Correct.

13  Q    Since you began cooperating with the government in

14  1994, you don't claim to have spoken with Chris Tarantino

15  ever again; is that right?

16  A    Yes.

17  Q    Which is more than 15 years ago; is that right?

18  A    Yes.

19          MR. FROCCARO:  The next number is C?

20          THE CLERK:  Yes.

21          MR. FROCCARO:  I don't think the government has

22  any objection.

23  Q    Mr. Fatato, what do you recognize this document to

24  be?

25          (Handed to the witness.)

1263

1  A    My plea agreement.

2  Q    That is your prior cooperation agreement with the

3  government back in 1994; is that correct?

4  A    Correct.

5  Q    And that is your signature there?

6  A    Yes, sir.

7        MR. FROCCARO:  I move for the admission, I don't

8  believe they object.

9        THE COURT:  No objection.  It is in evidence, C

10  as in Charley.

11        (Whereupon, Defendant's Exhibit C was received

12  in evidence.)

13        MR. FROCCARO:  Thank you, Judge.

14  Q    Mr. Fatato, that is the plea agreement you entered

15  into as a cooperating witness the first time around in

16  New Jersey; is that correct?

17  A    Correct.

18  Q    To your knowledge Chris Tarantino was never charged

19  with a crime in that case either before or after you began

20  to cooperate; is that correct?

21  A    Correct.

22  Q    Mr. Fatato, what were the names of the lawyers who

23  assisted you in signing that agreement, or securing that

24  agreement with the government at the time?

25  A    Sidney Friedler.

**Fatato-Cross/Froccaro**

1264

1    Q    And Jeff Schwartz, too; is that right?

2    A    Yes, he worked for the law firm, yes.

3    Q    And that letter sets forth the full and complete

4    cooperation agreement between you and the government in

5    the District of New Jersey case, as of November 17th,

6    1994; is that correct?

7    A    Correct.

8    Q    Now, you didn't honor the terms of the cooperation

9    agreement you previously entered into with the government,

10   did you?

11   A    No, sir.

12   Q    And that cooperation agreement required all the

13   information you provided to the government to be truthful;

14   is that correct?

15   A    Yes.

16        MR. FROCCARO:  Maybe we will put it on the

17   screen.

18        (Whereupon, at this time there was a pause in

19   the proceedings.)

20        MR. FROCCARO:  Judge, I'm getting better with

21   this.

22   Q    Mr. Fatato, if you read this portion I pointed out

23   here, that sentence, for the jury out loud, please, of

24   your cooperation obligation.

25   A    Guy Fatato shall truthfully disclose all information

1265

1    concerning all matters about which this office inquires of

2    him.

3    Q     Thank you.

4          That obligation required all the information you

5    provided to the government to be truthful; is that

6    correct?

7    A     Yes.

8    Q     The same requirement as your present cooperation

9    agreement with the government; is that right?

10   A     Yes.

11   Q     Were you at all times truthful with the government

12   when you were a cooperating witness before, yes or no?

13   A     No.

14   Q     You know what a debriefing is?

15   A     Yes.

16   Q     And it is an interview where you basically provide

17   all the information to the government; is that right?

18   A     Yes.

19   Q     And like drug enforcement agents or FBI agents and

20   Assistant United States agents -- attorneys like

21   Mr. Miskiewicz and Ms. Capwell; is that right?

22   A     Yes.

23   Q     And you understand, do you not, that the various

24   members of law enforcement who interviewed over the year

25   kept a written reference of the statements you made to

**Fatato-Cross/Froccaro**

1266

1    them; is that right?

2    A    A summary, yes.

3    Q    Have you ever reviewed your reports?

4    A    No.

5    Q    How do you know they were summaries?

6    A    It is a summary of my statement.

7    Q    If you never saw them, how do you know it was a

8    verbatim recitation of your statement?

9    A    I was told it is a summary.

10   Q    Who told you?

11   A    The FBI agent.

12   Q    And you also understand the notes they took were

13   actually reduced to reports; is that right?

14   A    I don't know.  I'm not an FBI agent.

15   Q    Have you ever made a prior statement under oath that

16   you understood the notes they took were actually reduced

17   to reports, yes or no, sir?

18   A    Yes.

19   Q    You have?

20        Were you being truthful when you made that

21   statement?

22   A    Yes.

23   Q    While you were a cooperating witness for the

24   government in New Jersey, you were debriefed or

25   interviewed by the government on a number of occasions; is

1267

1    that correct?

2    A    Yes.

3    Q    During those debriefings, the government asked you

4    about the criminal activity that you yourself had

5    personally engaged in in the past; is that correct?

6    A    Yes.

7    Q    And you were not truthful with the government about

8    all the criminal activities that you personally had

9    engaged in in the past during your debriefings with the

10   Assistant United States Attorneys and FBI agents; is that

11   correct?

12   A    Yes.

13   Q    You lied to them; is that right?

14   A    Yes.

15   Q    And you lied to them on numerous occasions; is that

16   correct?

17   A    Yes.

18   Q    And did you lie to the government during your

19   debriefings about the criminal activity that any of your

20   friends had engaged in when you were previously a

21   cooperating witness?  Yes or no.

22   A    Yes.

23   Q    And during your debriefings or interviews in person

24   with the various FBI agents and Assistant United States

25   attorneys, you looked them right in the eye and you lied

Fatato-Cross/Froccaro

1268

1    to them; is that right?

2    A    Yes.

3    Q    You are aware, are you not, that there is a federal

4    crime to lie to a federal agent; is that right?

5    A    Yes.

6    Q    And you did it anyway while you were a cooperating

7    witness with the government; is that correct?

8    A    Yes, I minimized my role.

9    Q    The answer to my question is, yes, you knew it was a

10   crime to make a false statement to a federal agent and you

11   did it while you were a cooperating witness; is that

12   correct?

13   A    Yes.

14   Q    Now, you were arrested twice by our government in

15   1994; is that correct?

16   A    Yes.

17   Q    In federal court in New Jersey, which we already

18   discussed a little bit, correct?

19   A    Yes.

20   Q    And in the Southern District of New York, as well,

21   yes?

22   A    Yes.

23   Q    In White Plains, right?

24   A    Yes.

25   Q    For possession of stolen bonds; is that right?

Fatato-Cross/Froccaro

1269

1    A    Yes.

2    Q    Along with your own father; is that right?

3    A    Yes.

4    Q    At the same time you were a cooperating witness for

5    the government, you decided to go to trial with respect to

6    the stolen bond charges in New Jersey with your father; is

7    that right?

8    A    Yes.

9    Q    You both maintained your innocence in front of a

10   judge and jury while you were maintaining your innocence

11   and actually went to trial; is that correct?

12   A    Yes.

13   Q    And you and your father were found guilty by the

14   jury; is that correct?

15   A    Yes.

16   Q    You both needed to appeal your convictions to a

17   higher court, to the Court of Appeals; is that correct?

18   A    Yes.

19   Q    And in reality, you and your father were actually

20   guilty of the crimes you were charged with in federal

21   trial in New Jersey; is that correct?

22   A    Yes.

23   Q    And how much money in bonds in total did you and your

24   father have?

25        MS. CAPWELL:  Objection, your Honor.

Fatato-Cross/Froccaro

1270

1    THE COURT:  How much was the face value of the

2    bond?

3    Q    What was the dollar amount of the bonds in total that

4    you suggested?

5    A    Close to a million dollars.

6    Q    Close to a million?

7    A    Yes.

8    Q    And have you ever made a prior statement under oath

9    that it was 1.5 million, Mr. Fatato?

10   A    I don't recall.

11   Q    All right.

12   A    There was a lot of money.

13   Q    You would know the difference, that you may have

14   forgotten 500,000 that you could have pocketed, right?

15   You know the difference between a million dollars and a

16   million and a half dollars?

17   A    Some were from years later so the value was more.

18   Since we didn't cash them, they were probably between

19   eight hundred thousand to a million four.

20   Q    Going back to my original question.

21        Did you ever make a prior statement under oath

22   that the value of the bonds in total was 1.5 million

23   dollars, yes or no?

24   A    I don't recall.

25   Q    All right.

Fatato-Cross/Froccaro

1271

1     Government Exhibit 3500 GF at page 1483, lines 7

2     to 12 -- I apologize, one minute, there is a lot of stuff

3     all over the place.

4           MS. CAPWELL:  Can we see you at the sidebar?

5           THE COURT:  Come on up.

6

7           (Whereupon, at this time the following took

8     place at the sidebar.)

9           THE COURT:  The portion of the transcript you

10    want to read, is that what you are objecting to?

11          MS. CAPWELL:  My concern is that the witness'

12    answer was I don't recall.  He wasn't denying it.

13          I would think the proper procedure is that there

14    is something to refresh your recollection, and maybe he

15    will say, yes.  I don't think he has to go straight into

16    impeaching him on question, answer, question.

17          MR. FROCCARO:  Your Honor, if it is a prior

18    statement of an agent, and I have to refresh his

19    recollection.  If it is his statement, I can go into his

20    prior statement under oath whether he doesn't recall it or

21    not.

22          MS. CAPWELL:  He is not denying it.

23          THE COURT:  I will allow you to finish this

24    question.  If he equivocates, you can show him that, and

25    then if he denies it --

Fatato-Cross/Froccaro

1272

1    MR. FROCCARO:  You want me to refresh him?

2    THE COURT:  He was particularly uncertain.

3    MR. FROCCARO:  Judge, I'm trying to save time.

4    And then he says it doesn't refresh his recollection, and

5    then I will do the same thing we started in the first

6    place.

7    THE COURT:  You assume he is not going to say

8    that it doesn't fresh his recollection.

9    MR. FROCCARO:  All right.

10

11    (Whereupon, at this time the following takes

12    place in open court.)

13    THE COURT:  The objection is sustained.

14    Q    Mr. Fatato, I will ask you to review this document

15    and see if it refreshes your recollection that you made a

16    prior statement under oath that the bearer bonds total 1.5

17    million.

18    If you can review from 7 to 12 and read it to

19    yourself and see if it refreshes your recollection that

20    you made the prior statement under oath.

21    (Handed to the witness.)

22    A    Yes, sure.

23    Q    Does it refresh your recollection that you made that

24    prior statement under oath?

25    A    Yes.

Fatato-Cross/Froccaro

1273

1  Q    Thank you.

2         Were you being truthful when you made that prior

3  statement under oath, Mr. Fatato?

4  A    Yes.

5         MR. FROCCARO:  It will take me a minute to get

6  this thing organized, Judge.

7         (Whereupon, at this time there was a pause in

8  the proceedings.)

9  Q    Shortly after your banker began to liquidate the

10 bonds, you were contacted by US Secret Service agents; is

11 that correct?

12 A    My dad was, yes.

13 Q    And you ultimately got served with a subpoena; is

14 that correct?

15 A    Yes.

16 Q    And the agents asked you if you were involved with

17 cashing the stolen bonds; is that correct?

18 A    Yes.

19 Q    And you told them you had not been involved; is that

20 right?

21 A    Yes.

22 Q    You lied right to their face; is that correct?

23 A    Correct.

24 Q    In reality, your fingerprints were found on the

25 stolen bonds; is that correct?

Fatato-Cross/Froccaro

1274

1  A    Correct.

2  Q    And in truth, Mr. Fatato, to your knowledge, Chris

3  Tarantino's fingerprints were found nowhere on the stolen

4  bonds; is that correct?

5  A    Correct.

6  Q    What was your defense to the stolen bond charges in

7  the trial in White Plains, especially of the fact that you

8  and your father did it, do you recall what it was?

9  A    No, sir.

10  Q    Maybe I can help refresh your recollection.

11        During your trial there was a court reporter

12  present who took down everything you said, just like

13  Mr. Rapaport over there; do you agree?  Do you recall

14  that?

15  A    Yes.

16  Q    During that trial did you and your father actually

17  call a Catholic priest named Raymond in your defense to

18  testify about yours and your father's good reputation for

19  honesty and decency in the community?  Do you recall that,

20  sir, yes or no?

21  A    Yes.  My dad called him, yes.

22  Q    The answer to that is yes; is that correct?

23  A    Yes.

24  Q    Now, you recall the defense; is that correct?

25        Did you also call your mother to lie about you

**Fatato-Cross/Froccaro**

1275

```
1    in the -- on the witness stand during the trial?

2    A    My mother, no.

3    Q    How about your stepmom?

4    A    Yes, my stepmother.

5    Q    And she lied about it, too, on the witness stand; is

6    that correct?

7    A    I don't recall that.

8    Q    You don't recall if your mother -- your stepmother

9    perjured herself for you in front a court and jury at a

10   trial?

11   A    No.

12   Q    Let me ask you this:  Before the government signed

13   up -- you up as a cooperating witness, didn't they ask you

14   if you were ever involved in stolen bonds with your

15   father, yes or no?

16            MS. CAPWELL:  Objection.  Which time.

17            MR. FROCCARO:  1994 is what I'm focusing on

18   right now.

19            THE COURT:  All right.

20   Q    Didn't they ask you about that?

21   A    Yes.

22   Q    You lied to them, right?  You told them you were not

23   involved; is that right?

24   A    No.

25   Q    Wait.
```

**Fatato-Cross/Froccaro**

1276

1    You lied to them; is that correct?

2    A    I told Joe Sierra I was involved in the bonds,

3    correct.  That I recall.

4    Q    Before you went to trial before the judge and jury

5    and said you were not guilty, you are saying you told the

6    government that you were involved in the stolen bonds?

7    A    Sorry, sir, it was after the trial.  Sorry.

8    Q    When you were a cooperating witness the first time

9    around, you never told them about it; is that right,

10   before the trial?  Correct?

11   A    No, sir, we were going to trial.

12   Q    And let alone that Chris was also somehow involved

13   with you, correct?

14   A    Yes.

15   Q    And then for the first time did you make a claim that

16   Chris Tarantino had been a source for these stolen bonds

17   when you found yourself in trouble again and were trying

18   to get a second cooperation agreement in the year 2004; is

19   that correct?

20   A    Yes.

21   Q    And yesterday you were telling the jury you were

22   asked by Louis Dorval to liquidate these bonds and Chris

23   was involved in stealing them.  You recall that, right?

24   A    No.

25   Q    You don't recall saying that to the jury yesterday?

Fatato-Cross/Froccaro

1277

1   A    I asked Louis to liquidate the bonds?  No.

2   Q    Maybe I'm going too fast.  I will say it again.

3        Yesterday you told this jury that you were asked

4   by Louis Dorval to liquidate these bonds and that Chris

5   had been involved in stealing them?  Do you recall telling

6   them that yesterday?

7   A    Yes.

8   Q    Mr. Fatato, didn't you tell your own father and

9   co-conspirator when you got these stolen bonds many years

10  ago that they had come from someone who owed you, Guy

11  Fatato, money?  Yes or no, sir, did you tell that to your

12  father?

13  A    I don't recall.

14  Q    Well, have you ever made a prior statement under oath

15  that you told that to your father?

16  A    I don't recall.

17  Q    Okay.

18       I will bring something up to refresh your

19  recollection.

20       Government's Exhibit 3500-GF-86, at pages 1476

21  to 1477.

22       (Handed to the witness.)

23  Q    I will ask you to review this document and see if it

24  refreshes your recollection that you made a prior

25  statement under oath that that is what you told your

**Fatato-Cross/Froccaro**

1278

1   father.

2          THE COURT:  What page is it?

3          MR. FROCCARO:  1476 to 1477, your Honor, lines

4   22 to 11.  GS-85, it may be 86.

5          THE COURT:  I think it is 86, all right.

6

7          (Whereupon, at this time there was a pause in

8   the proceedings.)

9   Q    After reviewing that document, does it refresh your

10  recollection that you made a prior statement under oath

11  that you told your own father and co-conspirator when you

12  got these stolen bonds many years ago, that they had come

13  from someone who had owed you, Guy Fatato, money?

14  A    Yes, sir.

15  Q    And were you being truthful when you made that

16  statement, then?

17  A    Umm, no, sir.

18  Q    And you lied to a jury, is that what you are saying?

19  A    No.  That was the truth.  I lied to my dad.

20  Q    All right.

21         Where did I leave them?

22  A    Sir, you left it up here.

23  Q    Thank you, in case I need it again.  Thank you.

24         Mr. Fatato, you admitted a few months ago, I

25  think Agent Schelhorn, for the first time since you became

**Fatato-Cross/Froccaro**

1279

1  a cooperating witness in 1994 that you had cashed stolen

2  bonds at the same bank before, and for someone else; is

3  that correct?

4  A    Yes.

5  Q    And that was 16 years after you first became a

6  cooperating witness; is that correct?

7  A    Yes.

8  Q    And it just came back to you, right?

9  A    We were going over the paperwork and it was a long

10  time, and I recall that I cashed ten or fifteen thousand

11  dollars with the bonds.  And that is what gave the window

12  for Louis Dorval to ask me that --

13              MR. FROCCARO:  Objection, move to strike.

14              THE COURT:  The jury is instructed to disregard

15  the last answer.

16  Q    Your prior cooperation with the government, like your

17  present one, also provided that you were prohibited from

18  committing further crimes; is that true?

19  A    Yes.

20  Q    Did you violate this provision in committing new

21  crimes when you were a cooperating witness for our

22  government before, yes or no?

23  A    Yes.

24  Q    Talking about an individual named Johnnie Long Hair,

25  and I will cover him a little bit, all right?

**Fatato-Cross/Froccaro**

1280

1   A     Yes.

2   Q     Johnnie Long Hair was an individual whom you had

3   given some of the stolen bonds to be cashed; is that

4   correct?

5   A     Yes.

6   Q     And you went to him at one point and told him that he

7   owed you money for the bonds; is that correct?

8   A     Yes.

9   Q     And this fellow Johnnie didn't have the money; is

10  that right?

11  A     Yes.

12  Q     And to hold you off, Johnnie gave you ecstasy pills;

13  is that correct?

14  A     Yes.

15  Q     You in turn gave the pills to an associate of yours

16  named Bobby Hazel?

17  A     Yes.

18  Q     And Mr. Hazel sold the pills for you and gave you how

19  much money?

20  A     In the 20's, $20,000.

21  Q     And all this took place while you were a cooperating

22  witness for our government; is that correct?

23  A     Yes.

24  Q     The same thing you are now, correct?

25  A     Correct.

Fatato-Cross/Froccaro

1281

1   Q    And were not supposed to be committing any new

2   crimes; is that correct?

3   A    Yes.

4   Q    And I'm sure you told the government what you were

5   doing with Johnnie Long Hair at the time -- no, right?

6   A    Right.

7   Q    And you lied about that, too; is that right?

8   A    Yes.  It never came up.

9   Q    And the first time you were a cooperating witness for

10  our government, you also got caught dealing cocaine by the

11  state authorities in Nassau County; do you agree with

12  that, Mr. Fatato?

13  A    Yes.  It was a conspiracy charge.

14  Q    How much cocaine was involved in the conspiracy

15  charge?

16  A    I think it was one or two kilos.

17  Q    The government ultimately found out about your drug

18  dealing while you were a cooperating witness for them; is

19  that correct?

20  A    Yes.

21  Q    Because you were arrested for the crime and wound up

22  in a Nassau County Jail; is that right?

23  A    No.

24  Q    Well, have you ever made a prior statement under oath

25  that they found out about it because you were arrested for

**Fatato-Cross/Froccaro**

1282

1  this crime and wound up in a Nassau County jail, yes or

2  no, sir?

3  A    I pled guilty later on --

4  Q    The answer to the question is yes or no, sir.

5         Did you ever make a prior statement under oath

6  that the government found out about it because you were

7  arrested for this crime and wound up in a Nassau County

8  jail?  Yes or no, sir.

9  A    I did wind up in jail, yes.

10 Q    And that is how the government found out about it,

11 right?

12 A    I don't recall.

13 Q    I will ask you again:  Did you make a prior statement

14 under oath that that is how the government found out about

15 it, yes or no?

16 A    I said I don't recall.

17 Q    3500 GF-144, at pages 684 and 685.

18        MR. FROCCARO:  It is lines 20 to 1, your Honor.

19 Q    Mr. Fatato, I will ask you to review this document

20 and see if it refreshes your recollection that you made

21 that prior statement under oath.

22        (Handed to the witness.)

23 A    Yes.

24 Q    And after reviewing that, does it refresh your

25 recollection that you made that prior statement under

Fatato-Cross/Froccaro

1283

1   oath?

2   A    Yes, sir.

3   Q    Were you being truthful when you made that prior

4   statement under oath?

5   A    Yes, sir.

6   Q    Now, so we are clear, because it wasn't clear during

7   your direct examination, you didn't tell the government

8   about your involvement in cocaine trafficking before you

9   got arrested by Nassau County; is that correct?

10  A    No, sir.

11  Q    You were not truthful with them at the time; is that

12  right?

13  A    Yes.

14  Q    The more -- word more accurately is you lied to them

15  about that as well; is that correct?

16  A    Correct.

17  Q    And after you got caught dealing cocaine while you

18  were a cooperating witness with the federal government,

19  you then began to cooperate with the state authorities in

20  Nassau County as well; is that correct?

21  A    Yes, correct.

22  Q    Now --

23           MR. FROCCARO:  Judge, may I approach?

24           THE COURT:  Yes.

25  Q    I have one question before I get there, Mr. Fatato.

Fatato-Cross/Froccaro

1284

1    You just stated after you got caught dealing,

2  you began to cooperate with the authorities in Nassau

3  County as well; is that correct?

4  A    Yes.

5  Q    In the hope to get another reduced sentence; is that

6  correct?

7  A    Yes.

8  Q    And you knew that the authorities in Nassau County

9  were hurting in their investigation into Louis Dorval's

10  murder, so when they hit you with drug charges you told

11  them you could assist them as well as with the FBI?

12  A    At the time I was doing it with the FBI.

13  Q    Is the answer to that question yes or no, sir?  If

14  you don't understand, I will try to rephrase it.

15  A    Yes.

16  Q    The answer is yes?

17  A    Yes.

18        MR. FROCCARO:  If I may approach, your Honor?

19        THE COURT:  Yes.

20        MR. FROCCARO:  Up to D now, your Honor?

21        THE COURT:  Yes.

22        (Counsel approaches the witness.)

23  Q    Mr. Fatato, do you recognize what that document is,

24  sir?

25  A    This is a Nassau County District Attorney's Office

**Fatato-Cross/Froccaro**

1285

1    cooperation agreement.

2    Q    This is the agreement you signed.

3          What is it dated, sir?

4    A    June 9th, 1995.

5          MR. FROCCARO:  I move for its admission, Judge.

6          MS. CAPWELL:  No objection, your Honor.

7          THE COURT:  Received in evidence.

8          (Whereupon, Defendant's Exhibit D was received

9    in evidence.)

10          THE COURT:  Perhaps this is a good time to take

11    a break.

12          See you folks in 15 minutes.

13          (Whereupon, at this time the jury leaves the

14    courtroom.)

15

16          (Whereupon, a recess was taken.)

17

18

19

20

21

22

23

24

25

Fatato-Cross/Froccaro

1286

1    THE COURT:  Please bring back Mr. Fatato.

2    (Whereupon, the jury at this time entered the

3    courtroom.)

4    THE COURT:  Please be seated, if you would.

5    Ladies and gentlemen, before we resume the

6    examination of the witness, I did want to alert you to the

7    fact that the trial, at least in terms of the timing, is

8    proceeding at a reasonable rate.  Therefore, April 18th is

9    the beginning of Passover.  And I also have the function

10   in the morning of naturalization that I must attend to

11   that new citizens come in, and I made the commitment well

12   in advance of setting up this trial.

13   So we will have off on the 18th of April.  You

14   can add that.  And we will have the 19th -- you will come

15   in on the 19th and the 20th and the 21st.  All right.

16   You can add those dates to your list.

17   (The clerk confers with the Court.)

18   THE COURT:  I'm sorry, the 19th also.  The 18th

19   is the beginning of Passover, and the 19th is the day that

20   is the most holy of the days of Passover.

21   That will be resolved that way, and you will be

22   back on the 20th and the 21st.  I keep the dates in my

23   head and I get them confused, all right.

24   Ready to proceed.

25   MR. FROCCARO:  Thank you, your Honor.

Fatato-Cross/Froccaro

1287

1  Q    Now, when we left off, we finished with the Nassau

2  County cooperation agreement.

3         Can you tell me who your attorneys were on that

4  agreement, sir, were they Sidney Friedler and Jeffrey

5  Schwartz again?

6  A    Yes, sir.

7  Q    Mr. Fatato, I will put on the screen a portion of the

8  agreement.

9         Now, the agreement with Nassau County also

10  provided that it would be broken if you committed any

11  criminal act after you signed it; do you agree?

12  A    Correct.

13         (At this time a document was exhibited on

14  courtroom screen.)

15  Q    Maybe if you can just read that aloud, the portion

16  where the little blue is, to the end bracket of the little

17  blue, that agreement you signed and promised to comply

18  with.

19  A    The defendant understands, however, that he will be

20  in a worse position than his present offer --

21         THE COURT:  A little bit louder because you are

22  not using the microphone.

23         THE WITNESS:  Hard to see.

24         THE COURT:  All right.

25         THE WITNESS:  The defendant understands,

Fatato-Cross/Froccaro

1288

1  however, that he will be in a worse position than his

2  present offer if the chief of the -- he will be in worse

3  than -- with this agreement in effect.

4  Q    In essence it says the same thing as your present

5  agreement and your prior agreement in New Jersey; is that

6  correct?

7  A    Yes, correct.

8  Q    Now, did you honor the terms of that cooperation

9  agreement, yes or no, sir?

10  A    No, sir.

11  Q    No, right?

12  A    Right.

13  Q    And did you tell them before you got sentenced that

14  you lied and not honored the terms of that agreement?

15  A    No, sir.

16  Q    So you defrauded those prosecutors and that judge; is

17  that correct?

18  A    Yes, sir, it is a lie, yes.

19  Q    You agreed when you were a cooperating witness for

20  the government the first time around you lied for them?

21  A    Yes, I --

22  Q    You lied to them, right?

23  A    Yes.

24  Q    When you were a cooperating witness for the

25  government before, you also engaged in very serious

Fatato-Cross/Froccaro

1289

1  criminal conduct; is that right?

2  A    Yes.

3  Q    And the first cooperation agreement you entered into

4  with an agreement specifically stated that if you lied or

5  committed any new federal, state or local crime, the

6  agreement would be declared null and void.

7         Do you agree, Mr. Fatato?

8  A    Yes.

9  Q    The same thing your cooperation agreement says now;

10  is that right?

11  A    Correct.

12  Q    After you got caught lying and dealing in cocaine in

13  Nassau County, the government, of course, ripped up your

14  agreement, right?

15  A    No, sir.

16  Q    The government didn't tear up your agreement?

17  A    No, sir.

18  Q    Instead of ripping up your agreement, the government

19  entered into a supplement to your cooperation agreement

20  with you; is that right?

21  A    Correct.

22         MR. FROCCARO:  May I approach again, your Honor?

23         THE COURT:  Yes.

24         MR. FROCCARO:  I'm up to E, your Honor?

25         THE COURT:  Yes.

Fatato-Cross/Froccaro

1290

1    (Counsel approaches the witness stand.)

2  Q    Mr. Fatato, you recognize that document?

3  A    Yes.

4  Q    That is your supplementary agreement with the

5  government while you were cooperating with them; is that

6  right?

7  A    Correct, in '93 --

8  Q    After they found out you're lying and dealing in

9  cocaine; is that right?

10 A    Yes.

11        MR. FROCCARO:  Judge, I move for its admission.

12        THE COURT:  No objection?

13        MS. CAPWELL:  No objection.

14        THE COURT:  It is received in evidence.

15        (Whereupon, Defendant's Exhibit E was received

16 in evidence.)

17 Q    Now, the date of this agreement, Mr. Fatato, is

18 June 9, 1995; do you agree?

19 A    Yes.

20        (At this time a document was exhibited on

21 courtroom screen.)

22 Q    Now, the reason why our government entered into this

23 supplementary agreement with you, because you advised them

24 that you, Guy Fatato, wanted your cooperation agreement to

25 remain in full force and effect; is that right?

Fatato-Cross/Froccaro

1291

1    A    Yes.

2    Q    And, in fact, that is what it says right in the

3    agreement itself; is that right?

4    A    Oh, yes.

5    Q    And the lawyer who represented you in connection with

6    that agreement was Sidney Friedler again; is that correct?

7    A    Yes.

8    Q    And after you entered into that supplemental

9    cooperation agreement with the government, there came a

10   point in time you were ready to be sentenced in connection

11   with your federal case in New Jersey; is that right?

12   A    Correct.

13   Q    On May 16th, 1996; is that correct?

14   A    Yes.

15   Q    As a cooperating witness with our government; is that

16   right?

17   A    Yes.

18   Q    For a United States District Court Judge, like Judge

19   Seybert, named Alfred Lechner, L-E-C-H-N-E-R; is that

20   correct?

21   A    Yes.

22   Q    Prior to your sentencing as a cooperating witness for

23   our government, did you pay $50,000 in cash to your then

24   lawyer, Mr. Friedler, with the understanding that these

25   monies would be used to bribe an Assistant United States

Fatato-Cross/Froccaro

1292

1    Attorneys or the United States District Court Judge in

2    New Jersey who was going to sentence you, yes or no, sir?

3    A    Yes.

4    Q    Why did you pay $50,000 to bribe an Assistant United

5    States Attorney or a United States District Court Judge

6    while you were cooperating for our government before?

7             MS. CAPWELL:  Objection, your Honor.

8             THE COURT:  Overruled.

9    Q    Why?

10   A    My attorney told me at the time my time would run

11   concurrent.  He said he needs $50,000, I gave him $50,000,

12   and I proceeded to go to jail, and at that time nothing

13   ran concurrent and --

14   Q    As I understand correctly, it was your attorney, not

15   you, it wasn't your intention to bribe the prosecutor or

16   the United States Attorney?

17   A    My attorney brought it to my attention.  I'm just as

18   guilty as he was.  But I did pay him and I did go to jail,

19   and it didn't --

20   Q    It is funny, Mr. Fatato, did you ever make a prior

21   statement under oath that you have no explanation for why

22   you paid 50,000 in cash to bribe an Assistant United

23   States Attorney or a United States District Court Judge?

24   Did you ever make a prior statement under oath?  You have

25   no explanation for it?

Fatato-Cross/Froccaro

1293

1   A    It is the --

2   Q    Is the answer to that question yes or no?

3   A    Yes.

4   Q    Were you being truthful when you made that statement?

5   A    Yes.

6   Q    You were willing to bribe an Assistant United States

7   Attorney or a federal judge while you were a cooperating

8   witness so you would spend less time in jail, right?

9   A    Yes.

10  Q    Again, what you are now is a cooperating witness; is

11  that right?

12  A    Yes, correct.

13  Q    You know what a 5K1 letter is, don't you?

14  A    Yes, sir.

15  Q    What is your understanding of what a 5K1 letter is?

16  A    A 5K letter is a letter that is brought to the judge,

17  the sentencing judge, made by the prosecutor, of all the

18  cooperation I have done.  And upon that the judge can --

19  if there are mandatory minimums, he can go below that.

20  Q    What is your understanding of what you have to do to

21  get one, Mr. Fatato?

22  A    Cooperate.

23  Q    What about telling the truth, not committing any more

24  crimes, being a substantial assistance to law enforcement,

25  what about those things?

Fatato-Cross/Froccaro

1294

1  A     Yes.

2  Q     Did the government file a 5K1 letter on your behalf

3  with the judge that sentenced you in federal court in

4  New Jersey, Judge Lechner?  Yes or no.

5  A     Yes, sir.

6  Q     You didn't mention to the FBI agents while you were a

7  cooperating witness, among other things, that you paid

8  your lawyer 50,000 in cash with the understanding that

9  this money was going to be used to bribe an Assistant

10  United States Attorney or the judge that was assigned to

11  your case, did you, Mr. Fatato?

12  A     No.

13         I told them --

14  Q     The answer is no, right?

15  A     No.

16  Q     And when you told them after the fact, how many years

17  after the fact did you tell them?

18  A     I think 2003, 2004 time period.

19  Q     And the statute of limitations for that time is five

20  years, did you tell them more than five years after the

21  statute of limitations ran?

22  A     I said I told them in 2003, 2004.

23  Q     Why don't you explain to the jury what the statute of

24  limitations is.

25         MS. CAPWELL:  Objection, your Honor.

1295

1    THE COURT:  Sustained.

2    Q    Your understanding of what a statute of limitations

3    is.

4         MS. CAPWELL:  Objection.

5         THE COURT:  I will allow him to respond as to

6    his understanding.  But this does not mean that what the

7    witness is testifying to is the correct law.  I will give

8    them the law.

9         MR. FROCCARO:  Thank you, your Honor, I will

10   lead him.

11   Q    Mr. Fatato, you heard about the statute of

12   limitations; is that correct?

13   A    Yes.

14   Q    For certain times after a certain time period has

15   gone by, you can't ever be charged for the crime again,

16   correct?  That is the statute of limitations?

17   A    Yes.

18   Q    Okay.

19        Now, the government didn't know you paid this

20   50,000 bribe before you got sentenced?

21   A    No, sir.

22   Q    You duped them?

23   A    I just gave the money to my attorney.

24   Q    You duped the government, you didn't tell them that

25   you were looking to bribe a prosecutor or the judge before

**Fatato-Cross/Froccaro**

1296

1  you were sentenced, right?

2  A    If you word it that way, correct.

3  Q    And this is all going on at the same time that you

4  are making allegations against Christian Tarantino; is

5  that correct?

6  A    Yes.

7  Q    I guess it is really your understanding that you

8  don't have to tell the truth and you can commit crimes in

9  order to get a 5K1 letter; is that right?

10         MS. CAPWELL:  Objection, your Honor.

11         THE COURT:  Sustained.

12 Q    Did you say anything to the federal court judge in

13 New Jersey that you planned to bribe in open court before

14 he sentenced you; is that right?

15 A    No, sir.

16 Q    Okay.

17         That is not true, Mr. Fatato, is it?

18 A    I don't recall.

19 Q    Now you don't recall, huh?

20         When you were sentenced there was a court

21 reporter --

22         MS. CAPWELL:  Objection as to the earlier

23 question, just as to more explanation.  It was very vague.

24         MR. FROCCARO:  Vague about whether --

25         THE COURT:  Please, no disputes between you and

**Fatato-Cross/Froccaro**

1297

1  Ms. Capwell.

2          MR. FROCCARO:  Sorry, your Honor.

3          THE COURT:  Withdraw the question.

4          MR. FROCCARO:  I don't know what the question

5  was.  What was the question?  I don't remember.

6          THE COURT:  You were referring to a statement --

7          MR. FROCCARO:  I asked him whether he said

8  anything to the Federal District Court judge in New Jersey

9  he planned to bribe in open court before he sentenced him.

10          He said, no.

11          Then I asked him, that is not true, is it?

12          He said he doesn't recall.

13          That is my understanding of what went on.

14          THE COURT:  You are saying you don't recall

15  whether you made a statement to your judge at the time of

16  sentence?

17          MR. FROCCARO:  It is not true, judge.  He said

18  he didn't recall if he lied when he made this statement

19  that he never made a statement.

20          THE COURT:  Come on up.

21          MR. FROCCARO:  I will get right to it, Judge.

22          THE COURT:  All right.

23  Q    Mr. Fatato, when you were sentenced there was a court

24  reporter who took down everything that was said.  Do you

25  remember that?

**Fatato-Cross/Froccaro**

1298

1   A    Yes.

2   Q    Just like here today; is that right?

3   A    Yes.

4   Q    Mr. Fatato, what you told the judge, at the same time

5   you had given your lawyers $50,000 to bribe him and the

6   prosecutor, is, and I quote:  I take full responsibility

7   for my actions toward the crime I commit.  I would like to

8   repay society one day when I'm released.

9           Do you recall saying that to Judge Lechner, yes

10  or no, Mr. Fatato?

11  A    Yes.

12  Q    Now you recall saying that?

13  A    I don't recall until you read it.  It was a long time

14  ago.

15  Q    Have you no decency, sir?

16          MS. CAPWELL:  Objection, your Honor.

17          THE COURT:  The jury is instructed to disregard

18  that.

19          Please do not engage in that kind of colloquy.

20  Q    How about your corrupt lawyer when you gave him

21  $50,000 to bribe the judge or the prosecutor, do you

22  recall what he said to you during the sentencing before

23  Judge Lechner?

24  A    No, sir.

25  Q    Didn't he tell the judge that you fully accept

**Fatato-Cross/Froccaro**

1299

1  responsibility for your actions, that you realize what you

2  had done had hurt society as a whole, and begged Judge

3  Lechner on your behalf for the opportunity to move into

4  the next step of you being truly rehabilitated?  Do you

5  recall him saying that on your behalf, Mr. Fatato, yes or

6  no?

7  A    I don't recall.  It was a long time ago, but --

8  Q    But --

9  A    I don't remember.

10  Q    If you like something to refresh, I will approach

11  you.

12  A    If it was said.

13  Q    Let me approach you.

14          THE COURT:  You can show him.

15  Q    I will ask you to review this and see if it refreshes

16  your recollection if that is in sum and substance that

17  your judge -- your lawyer said to the judge during your

18  sentencing proceeding at that time.

19          (Handed to the witness.)

20  Q    After reading that, does it refresh your recollection

21  that that is what your lawyer said to the judge at the

22  time?

23  A    Yes, sir, that is what my attorney said.

24  Q    Now, the next step in your rehabilitation was your

25  perjury before a federal grand jury, which we will get to

Fatato-Cross/Froccaro

1300

1  shortly.  First I have a few more questions about your

2  sentencing, okay, Mr. Fatato?

3  A    Sure.

4  Q    If I understand you correctly, during your direct

5  examination you testified that you do not know what

6  happened to the 50,000 in cash that you paid to your

7  lawyer to bribe an Assistant United States Attorney or a

8  federal Judge while you were a cooperating witness before;

9  is that right?

10  A    Yes, sir.

11  Q    And you never asked your lawyer what happened to the

12  50,000 in cash you gave him to bribe these government

13  officials?

14  A    No, sir.

15  Q    Before the 5K letter you received from the

16  government, you wound up receiving a benefit at your

17  sentencing in New Jersey; is that right?

18  A    Yes.

19  Q    You got a break from the judge, right?

20  A    Yes.

21  Q    Based upon the 5K1 letter filed by the government in

22  your behalf, the judge granted you a downward departure;

23  is that right?

24  A    Correct.

25  Q    The judge gave you 33 months in federal prison; is

1301

1   that correct?

2   A    Correct.

3   Q    When he could have given you at least six or seven

4   years in prison; is that correct?

5   A    Yes.

6   Q    Shortly after you went to prison to serve the reduced

7   sentence, you were called by our government to testify

8   before a federal grand jury in New Jersey; is that

9   correct?

10  A    Yes.

11  Q    And that was in July of the year 1996; is that

12  correct?

13  A    Yes.

14  Q    Just a few weeks after you were sentenced by Judge

15  Lechner; is that right?

16  A    Yes.

17  Q    And told him you were right on the road to

18  rehabilitation and repaying the debt to society; is that

19  correct?

20  A    Correct.

21  Q    The cooperation agreement you signed with the

22  government in New Jersey specifically stated, Guy Fatato

23  shall truthfully disclose all information concerning all

24  matters about which this office requires of him, and

25  truthfully testify in the grand jury as to any subject

Fatato-Cross/Froccaro

1302

1    about which he is questioned.

2            Do you agree that that is what it says,

3    Mr. Fatato?

4    A    Yes.

5    Q    And when you appeared before the grand jury, it was

6    pursuant to the cooperation agreement you entered into

7    with our government; is that right?

8    A    Yes.

9    Q    And when you got called to testify before the grand

10   jury in 1996, it was to testify about two homicides; is

11   that right?

12   A    Correct.

13   Q    The murder of the armored car driver, Mr. Baumgardt,

14   and the murder of Louis Dorval; is that right?

15   A    Yes.

16   Q    And you are aware, are you not, that during your

17   testimony before the grand jury, there was a court

18   reporter there who took down, again, everything you said;

19   is that right?

20   A    Correct.

21   Q    You were represented by legal counsel in connection

22   with your testimony under oath before the grand jury.  You

23   recall that, don't you, Mr. Fatato?

24   A    Yes.

25   Q    By the same law firm that represented you in

Fatato-Cross/Froccaro

1303

1  connection with your sentencing in federal court, the law

2  firm of Sidney Friedler and Jeff Schwartz; is that

3  correct?

4  A    Correct.

5  Q    The same law firm you give 50 (sic) in cash to bribe

6  the judge and the prosecutors; is that correct?

7  A    Yes.

8  Q    And by that time it is your sworn testimony before

9  this jury that you still claim to never have asked your

10  lawyers what happened to the 50,000 in bribe money you

11  gave them?

12  A    I gave the money to Sidney Friedler who owned the law

13  firm.

14  Q    I asked you if you ever asked them at that time what

15  happened to the 50,000 that you gave in cash.

16  A    No, Sidney Friedler never -- disappeared.

17  Q    Yes or no?

18  A    Yes.

19  Q    He disappeared?

20  A    Yes.  He got arrested.

21  Q    He disappeared?

22  A    Yes.

23  Q    When you appeared before the grand jury, you swore to

24  tell the truth, the whole truth and nothing but the truth,

25  so help you God; is that right?

Fatato-Cross/Froccaro

1304

1   A    Yes.

2   Q    The same oath you took before this jury; is that

3   correct?

4   A    Yes.

5   Q    When you testified before the grand jury, you didn't

6   tell the truth, right?

7   A    I minimized my role.

8   Q    Is the answer you didn't tell the truth before the

9   grand jury?

10  A    I minimized my role.

11  Q    Okay.

12        Have you ever made a prior statement under oath

13  that when you testified before the grand jury, you did not

14  tell the truth, yes or no?

15  A    Yes.

16  Q    Were you being truthful when you made that statement?

17  A    Yes.

18  Q    You lied in the grand jury about a number of things,

19  is that correct?

20  A    Correct.

21  Q    You committed a federal crime and you committed

22  perjury; is that correct?

23  A    Yes.

24  Q    You perjured yourself more than once before a federal

25  grand jury investigating the murders of the armored car

**Fatato-Cross/Froccaro**

1305

1  driver and Mr. Dorval; is that right?

2  A    Yes.

3  Q    And when you were called to testify before the grand

4  jurors, you lied under oath to them about your friend's

5  role in certain crimes, didn't you, Mr. Fatato?  Yes or

6  no.

7  A    Yes.

8  Q    And you lied to the grand jury about the criminal

9  histories of others; is that correct?

10  A    I don't recall that.

11  Q    Well, have you ever made a prior statement under oath

12  that you lied to the grand jurors about the criminal

13  histories of others, yes or no?

14  A    I don't recall about criminal histories.

15  Q    3500 GF-144, page 699.

16       MR. FROCCARO:  That is for your Honor and the

17  government.

18  Q    By the way, you said Mr. Friedler disappeared, and he

19  had a partner there, Mr. Schwartz; is that right?

20  A    Excuse me?

21  Q    You said Mr. Friedler disappeared, he had a

22  partner --

23  A    He just worked for the law firm, Schwartz.

24  Q    The name of the law firm was Friedler & Schwartz, and

25  he wasn't a partner?

Fatato-Cross/Froccaro

1306

```
 1  A    I don't recall.  But just -- but just that Jeff
 2  worked there.
 3  Q    699, lines 5 and -- to 12.
 4            I will ask you to review that and see if it
 5  refreshes your recollection that you made that prior
 6  statement under oath.
 7            (Handed to the witness.)
 8  A    Yes, I lied under oath to the grand jurors about --
 9            MR. FROCCARO:  I will move to admit it then.
10  Q    Do you recall being asked this question and giving
11  this answer under oath at the prior proceeding:
12            Question:  And you lied to the grand jurors
13  about the criminal history of others, correct?
14            Answer:  Could you rephrase that, I don't --
15            And then the court reporter read back the
16  question.
17            You said the answer was correct.
18            Do you recall being asked those questions and
19  giving that answer under oath at a prior proceeding, yes
20  or no?
21  A    Yes.  But it is different from what you asked me.
22            MR. FROCCARO:  Does the government want to
23  stipulate I'm reading it right, your Honor?
24            MS. CAPWELL:  Yes.
25            THE COURT:  It is as reported.
```

**Fatato-Cross/Froccaro**

1307

Q    Were you being truthful when you made that statement under oath?

A    Yes.

Q    So you lied to the grand jurors about the criminal history of others; is that correct?  That is what we just went through?

A    On the paper I just read, it said criminal histories about myself.  It didn't say others.

         MR. FROCCARO:  The record speaks for itself.

         THE COURT:  Just move on.

Q    You also lied under oath to the grand jurors about your own criminal history in response to questions posed by an Assistant United States Attorney; is that correct?

A    Correct.

Q    Now, when you testified under oath before the grand jurors, did you, Guy Fatato, falsely accuse other people of crimes that you yourself had committed, yes or no?

A    I minimized my role.

Q    Is the answer to that yes or no, sir?

         Did you falsely accuse other people of crimes you yourself had committed, yes or no?

A    Yes.

Q    Would you describe yourself as having had very little experience in narcotics transactions prior to your appearance before the grand jury in New Jersey?  No,

Fatato-Cross/Froccaro

1308

1  right?

2          MS. CAPWELL:  Objection, your Honor -- objection

3  as to the form of the question.

4          THE COURT:  Let me hear that question again,

5  Harry.

6          (Whereupon, the court reporter reads the

7  requested material.)

8          THE COURT:  Can you answer that?

9          THE WITNESS:  Yes, I lied.  I did have --

10 Q    But you didn't have very little experience prior to

11 appearing before the grand jury; is that right?

12 A    Yes.

13 Q    And you were specifically asked by an Assistant

14 United States Attorney in the grand jury whether you

15 yourself had any previous experience in narcotics

16 transactions, weren't you, Mr. Fatato?

17 A    Yes, sir.

18 Q    All right.

19          And you swore under oath to the grand jurors in

20 response to that question that you had very little

21 experience in narcotics transactions; is that right?

22 A    Correct.

23 Q    And you told the grand jurors that you had very

24 little experience in terms of the quantity of narcotics

25 you had previously been involved in, and you told the

Fatato-Cross/Froccaro

1309

1   jurors that you had very little experience in terms of the

2   amount of times that you had previously engaged in

3   narcotics transactions as well?  Do you agree with that,

4   Mr. Fatato?

5   A    Yes.

6   Q    All lies, right, Mr. Fatato?

7   A    Correct.

8   Q    You had been dealing in cocaine regularly; is that

9   right?

10   A    Yes.

11   Q    And had been receiving as much as ten kilos of

12   cocaine a month in the early 90's; is that correct?

13   A    Correct.

14   Q    And from your cocaine supplier during this time

15   frame, a man named George Mejia; is that right?

16   A    Yes.

17   Q    And I apologize --

18             MR. FROCCARO:  Do you have

19   Government's Exhibit GF-1, please.

20             Thank you.

21             I will put it on the screen.

22             (At this time a document was exhibited on

23   courtroom screen.)

24   Q    That is hard to see, but that is this fellow with his

25   arm around you over here, that is this fellow?

Fatato-Cross/Froccaro

1310

1    A    Yes, sir.

2    Q    Thank you.

3         Now, you made more than a half a million dollars

4    just from dealing in cocaine alone in the early 90's,

5    didn't you, Mr. Fatato?

6    A    Correct.

7    Q    During the grand jury experience, you were asked

8    questions about the assistant -- by the Assistant United

9    States Attorney about who is Louis Dorval's regular

10   cocaine supplier; do you recall that?

11   A    Yes.

12   Q    You swore under oath to the grand jurors a man named

13   Hugo had been Louis Dorval's regular cocaine supplier; is

14   that correct?

15   A    Yes.

16   Q    And you told the grand jurors that this man, Hugo,

17   had been personally supplying Louis Dorval with as much as

18   a kilo of coke a week; is that right?

19   A    Yes.

20   Q    All lies again; is that right?

21   A    Yes.  I said --

22   Q    All lies?

23   A    Yes.

24   Q    And Louis Dorval's regular cocaine supplier prior to

25   his death was you; is that right?

Fatato-Cross/Froccaro

1311

1    A    Yes.

2    Q    In fact, Louis was your best customer; is that

3    correct?

4    A    Yes.

5    Q    By the way, do you have a last name for this person,

6    Hugo?

7    A    No, I don't.

8    Q    Now, by the time of your appearance in the grand jury

9    in 1996, what were the specific drug transactions that you

10   told the government that you personally participated in?

11   You don't recall, right?

12   A    Prior to 1996, sir?

13   Q    Yes, by the time of your grand jury appearance in

14   1996.  What was the specific drug transactions that you

15   told the government you personally participated in?

16   A    Very little.

17   Q    You never said you were involved in a cocaine or pot

18   transaction with Chris Tarantino, right?

19   A    No, sir.

20   Q    When for the first time did you make those

21   allegations?  In or about the year 2004 when you found

22   yourself in big trouble with the law again, right?

23   A    Yes.

24   Q    When you were facing a potential life sentence,

25   right?

Fatato-Cross/Froccaro

1312

1  A    Yes.

2  Q    Now, Mr. Fatato, you testified in direct examination

3  that you participated in the robbery of a drug stash house

4  allegedly with Louis Dorval, Mr. Tarantino, and a man

5  named Fabio.  You recall that testimony, don't you?

6  A    Yes.

7  Q    And you now claim to have personally participated in

8  that robbery; is that correct?

9  A    Yes.

10  Q    And during your appearance before the grand jury, not

11  just -- weren't you specifically asked by an Assistant

12  United States Attorney whether you had participated in

13  that robbery?  Yes or no.

14  A    Yes.  I said a lie.

15  Q    Yes, right?

16  A    Yes.

17  Q    And in response to that question, you said that you

18  had been invited to participate, but that you had declined

19  because you, Guy Fatato, were unwilling to rob another

20  human being?  Isn't that what you said under oath to the

21  grand jurors, Mr. Fatato?

22  A    Yes.  And I said I lied, yes.

23  Q    And I believe your exact words to the grand jurors on

24  this subject was as follows:  I'm not a stick-up man, I'm

25  not, I'm just not.  Certain things I would do and won't

1313

1   do.  One of them is rob people.

2            Isn't that what you said under oath, Mr. Fatato,

3   yes or no?

4   A    Yes.

5   Q    All lies again; is that right?

6   A    I said I lied, yes.

7   Q    And you lied because Louis Dorval was dead and not in

8   a position to contradict what you were saying; is that

9   correct?

10  A    Yes.

11  Q    Can you provide us or the jury with the name of any

12  person that was robbed at this stash house?  No, right?

13  A    No, I didn't know the people at the stash house, no.

14  Q    No names, right?

15           What about this fellow Fabio, can you give us a

16  last name for him?

17  A    No.

18  Q    And, of course, this person, Fabio, has vanished

19  right?

20           When is the last time you claim to have seen

21  this person that you claim exists named Fabio?

22  A    I don't recall.

23  Q    Not in 17 years, right?

24  A    No.  I wasn't best friends with him.

25  Q    That is what you claim, you haven't seen him in 17

Fatato-Cross/Froccaro

1314

1   years; is that right?

2   A    Correct.

3   Q    And you told other lies to the grand jurors after you

4   swore to them and looked them in the face and told them

5   you were telling the truth, the whole truth, and nothing

6   but the truth, right?

7   A    Yes.

8   Q    And the scheme to deal in counterfeit bills that you

9   were charged with in federal court and New Jersey, you

10  swore to the grand jurors that your dead friend, Louis

11  Dorval, had been the source for those counterfeit bills;

12  is that correct?

13  A    Yes.

14  Q    A lie again; is that right?

15  A    Yes.

16  Q    In truth, you were the source for the counterfeit

17  bills that were being sold to the government informant in

18  that case, right, Mr. Sabol, right?

19  A    Yes.

20  Q    And during the same grand jury proceeding, you were

21  asked who Louis, who we already know was a lie, had gotten

22  these counterfeit bills from, do you recall that,

23  Mr. Fatato?

24  A    Yes.

25  Q    And you swore under oath to the grand jurors that you

**Fatato-Cross/Froccaro**

1315

1   didn't know where the counterfeit bills had come from; is

2   that right?

3   A    Yes.

4   Q    A lie again, right?

5   A    Yes.

6   Q    In truth, where did Louis Dorval get the counterfeit

7   money from?  He got it from you, right?

8   A    Correct.

9   Q    All right.

10          You also knew where the counterfeit bills had

11   come from, right?

12   A    Yes.

13   Q    From who?

14   A    Hugo.

15   Q    Now, with Louis Dorval dead, you can basically make

16   up any story you want about what he may have told you,

17   done or proposed to do, right, Mr. Fatato?

18          MS. CAPWELL:  Objection, your Honor.

19          THE COURT:  Sustained.

20   Q    Well, just let's focus now on the proposed or

21   possible crimes that you now claim to have discussed with

22   Louis Dorval while he was alive, okay?

23   A    Yes.

24   Q    And how about the proposed robbery of a jewelry store

25   in Garden City you testified about yesterday?  It never

**Fatato-Cross/Froccaro**

1316

1   occurred, right?

2   A    To my knowledge, correct.

3   Q    Okay.

4        How about the proposed robbery of a stockbroker

5   in Manhattan, you also testified about that yesterday?

6   Also never occurred, right?

7   A    From my knowledge, correct.

8   Q    But, of course, you hope all these allegations would

9   help you get a reduced sentence at the end of the day,

10  correct?

11  A    It is to tell the truth for what happened.

12  Q    I know your propensity to tell the truth.

13            MS. CAPWELL:  Objection.

14            THE COURT:  No comments.  Just ask questions.

15  Q    Mr. Fatato, while you were a cooperating witness for

16  our government in New Jersey, including your testimony

17  before the grand jury, you never told the government about

18  your cocaine supplier named George Mejia; is that correct?

19            MS. CAPWELL:  Asked and answered.

20            THE COURT:  Overruled.

21  Q    You never told him about the cocaine supplier, did

22  you?

23  A    No.

24  Q    You lied under oath during your briefings and under

25  oath before the grand jury -- excuse me, withdrawn.

Fatato-Cross/Froccaro

1317

1    You lied during your debriefings with the

2  Assistant United States Attorneys, and the FBI agents, and

3  you lied under oath before the grand jury to protect

4  George Mejia, right?

5  A    Yes.

6  Q    And that was because George Mejia in this picture

7  here --

8           (At this time a document was exhibited on

9  courtroom screen.)

10  Q    The fellow that has his arm around you, all right,

11  was a good friend of yours, right?

12  A    Yes.

13  Q    And when you previously lied under oath about your

14  own involvement in certain crimes, you did it so you

15  wouldn't get in deeper trouble yourself.  Do you agree?

16  A    Correct.

17  Q    Didn't the Assistant United States Attorney who

18  questioned you in the grand jury specifically warn you

19  after you swore to tell the truth, and I'm quoting, if you

20  at any time did not tell the truth, or intentionally lied,

21  or misled the grand jury as to anything being asked of

22  you, it would be a violation of federal law relating to

23  obstruction of justice and perjury, and you would be

24  subjecting yourself to prosecution for those offenses in

25  jail?

Fatato-Cross/Froccaro

1318

1    Do you recall an Assistant United States

2  Attorney explaining that to you before you testified

3  pursuant to your cooperation agreement, yes or no?

4  A    Yes.

5  Q    And you said you understood those warnings; is that

6  correct?

7  A    Yes.

8  Q    And you looked the jurors in the face and you lied to

9  them anyway; is that correct?

10  A    Yes.

11  Q    When did you first indicate to the government around

12  the year 2004 that you had perjured yourself -- you said

13  that before; is that correct?

14  A    Yes, I told them, yes.

15  Q    Before then had anyone from the government ever

16  challenged any of the information you provided to the

17  grand jury under oath as not having been truthful or

18  accurate, yes or no, Mr. Fatato?

19  A    Not to my knowledge.  I don't know.

20  Q    You had them all fooled, right?

21    MS. CAPWELL:  Objection, your Honor.

22    THE COURT:  Sustained.

23  Q    They didn't know about all the lies you told them; is

24  that correct?

25  A    Correct.

Fatato-Cross/Froccaro

1319

1  Q    Since you entered into your present or second

2  cooperation agreement, has any representative of the

3  government ever challenged any of the information you have

4  been providing as not being truthful or accurate?  No,

5  right?

6  A    I don't know.

7  Q    You don't know?

8         Did anybody ever accuse you of lying in this

9  case?

10  A    They are investigating work, and they never told me,

11  no.

12  Q    The answer to that question is no one ever accused

13  you of lying; is that correct?

14  A    Right.

15  Q    And you claimed during your direct examination that

16  the heroin sample that was ultimately provided to an

17  informant named Richard Sabol, in connection with your

18  prior federal case in New Jersey, came from the robbery of

19  the heroin stash house; is that correct?

20  A    Correct.

21  Q    Mr. Fatato, shortly before entering into your current

22  cooperation agreement with the government, didn't you tell

23  the government that you received this heroin sample from

24  your drug supplier, George Mejia, and not the robbery of

25  the stash house?  Yes or no, sir.

**Fatato-Cross/Froccaro**

1320

```
 1  A    No.

 2  Q    Okay.

 3       Would you like something to refresh your

 4  recollection about that?

 5  A    They --

 6            MS. CAPWELL:  Objection, your Honor.

 7            THE COURT:  Objection sustained.

 8  Q   Isn't that what you told an Assistant United States

 9  Attorney named Colleen Cavenaugh and a DEA agent named

10  Gagney during an interview you had with them in December

11  of 2003?  Do you recall saying that to them, yes or no?

12  A   I recall telling them I asked Georgy for heroin.

13            MR. FROCCARO:  May I approach, Judge, to see if

14  it refreshes his recollection?

15            THE COURT:  Yes.

16            MR. FROCCARO:  3500-GS-17, at page 4.

17            (Counsel approaches the witness stand.)

18  Q   I will ask you to review this and see if it refreshes

19  your recollection that you told that assistant and that

20  agent that Richie wants heroin, George gives Guy sample

21  who gives it to Jerry and Jimmy, who give it to Richie.

22            Please read that and see if it refreshes your

23  recollection that that is what you told them during your

24  interview.

25  A    No.  Don't remember telling them that.  I told them
```

**Fatato-Cross/Froccaro**

1321

1   that I asked Georgy for a sample of the Pakistani heroin.

2   Q   So it doesn't refresh your recollection?

3   A   No.

4   Q   During your direct examination you made a number of

5   allegations against Mr. Tarantino, you agree?

6   A   Yes.

7   Q   About events that you claim took place more than 15

8   years ago; is that right?

9   A   Yes.

10  Q   And you alleged during your direct examination that

11  you engaged in a number of crimes with Mr. Tarantino and

12  Louis Dorval; yes?

13  A   Correct.

14  Q   And discussions about proposed or contemplated crimes

15  with Mr. Tarantino and Louis Dorval as well; is that

16  correct?

17  A   Correct.

18  Q   That information isn't accurate, is it?

19  A   No.  It is accurate.

20  Q   During one of your first interviews with the

21  government back in September of 1994, didn't you tell the

22  FBI that you only met Chris Tarantino on two or three

23  occasions with Mr. Dorval?  Yes or no, Mr. Fatato.

24  A   I don't recall.  I only met him a couple of times.

25  Q   I will give you something to refresh your

Fatato-Cross/Froccaro

1322

1    recollection.

2              MR. FROCCARO:  3500 GF-144, page 715 to 716,

3    your Honor, lines 23.

4              THE COURT:  Page number again, please?

5              MR. FROCCARO:  Page 715 to 716, Judge.

6              THE COURT:  Okay.

7              MR. FROCCARO:  Line 23 to 15.

8    Q    Mr. Fatato, I will ask you to review this document

9    and see if it refreshes your recollection that you made a

10   prior statement under oath admitting that during one of

11   your first interviews with the FBI in 1994, you told them

12   that you only met with Chris Tarantino two or three times.

13             (Handed to the witness.)

14   Q    Does that refresh your recollection that you made a

15   prior statement under oath?

16   A    Yes.

17   Q    Yes?

18   A    Yes.

19   Q    Were you being truthful when you made that statement?

20   A    Yes.

21   Q    Has the government ever asked you to provide them

22   with a photo of you, Louis Dorval and Chris Tarantino

23   together?  There are none, correct?

24   A    Right.

25   Q    Has law enforcement ever asked you to look at a

Fatato-Cross/Froccaro

1323

1   surveillance photo where you, Louis Dorval and Chris

2   Tarantino were ever seen together?  Never, right?

3   A    No, sir.

4   Q    During your first interview with the FBI in 1994, you

5   didn't even know Chris' last name, isn't that so,

6   Mr. Fatato?

7   A    Correct.

8   Q    Now, you know what the term "associate" means in the

9   context of a criminal case, don't you, Mr. Fatato?

10  A    Yes.

11  Q    And your understanding of what the term associate

12  means in the context of a criminal case is a partner in

13  crime; is that right?

14  A    Yes.

15  Q    And when you commit crimes together you are

16  considered associates; is that correct?

17  A    Yes.

18  Q    And you would describe yourself as an associate of

19  Louis Dorval when he was alive; is that correct?

20  A    Yes.

21  Q    And you also claim you were an associate of Chris

22  Tarantino before you became a cooperating witness for our

23  government in the year 1994, that is your sworn testimony

24  at least here today; right, Mr. Fatato?

25  A    Yes, I would say.

Fatato-Cross/Froccaro

1324

1  Q    Have you ever made a prior statement under oath that

2  you were never an associate of Mr. Tarantino's, yes or no,

3  Mr. Fatato?

4  A    I don't recall.

5  Q    Okay.

6          3500-GF-144.

7          MR. FROCCARO:  Your Honor, pages 1718 to 1719.

8          It is lines 12 to 13, beginning line 12 on

9  1718 -- 718, your Honor.

10         THE COURT:  Thank you.

11 Q    I'm asking you to see if it refreshes your

12 recollection that you had made that prior statement under

13 oath, Mr. Fatato.

14         (Whereupon, at this time there was a pause in

15 the proceedings.)

16 Q    After reviewing this, does it refresh your

17 recollection that you made that prior statement under

18 oath?

19 A    Yes.

20 Q    Were you being truthful when you made that statement?

21 A    No.  I was in the grand jury, and I --

22 Q    You were in the grand jury investigating the murders

23 of Julius Baumgardt and Louis Dorval, and you are saying

24 you lied about that?

25 A    I lied about my personal involvement.

Fatato-Cross/Froccaro

1325

1    Q    You are saying you lied about that to a grand jury

2    investigating those two murders?

3    A    I lied nothing about the murders.  I lied about my

4    involvement in drug dealing and motivation, and some

5    security bonds.

6    Q    Did you lie to the grand jury investigating those two

7    murders about that, what we just talked about?

8    A    Yes, being an associate because --

9    Q    That's all.

10        You just happened to know Mr. Tarantino through

11   Mr. Dorval; isn't that true, sir?

12   A    Yes.

13   Q    And the information you now claim to have had about

14   the armored car robbery, you claim to have learned from

15   conversations you allegedly had with Mr. Dorval; is that

16   right?

17   A    Yes, sir.

18   Q    And you claim that at some point during your

19   friendship with Louis, you recall telling him -- excuse

20   me, you recall him telling you that he, Chris and Scot and

21   a couple of other guys were planning to do an armored car

22   robbery in Muttontown; is that right?

23   A    Surveillance, yes.

24   Q    That story is quite different from what you told the

25   Nassau County District Attorney's Office while you were

Fatato-Cross/Froccaro

1326

1    cooperating with them in September of 1996; is that

2    correct?

3    A    Yes.

4    Q    While you were a cooperating witness for the Nassau

5    County District Attorney's Office, didn't you tell them

6    before the armored car robbery Louis Dorval never told you

7    who the guys were that he planned on doing it with, yes or

8    no, sir?

9    A    I didn't know the other two guys from surveillance is

10   what I meant.

11   Q    The answer is:  Did you ever make a statement that

12   you swore what you were saying was the truth and that you

13   were lying and that you could be charged with a crime for

14   making a false statement, that Louis Dorval never told you

15   who he planned on doing it before the robbery, yes or no,

16   sir?

17   A    It was a statement --

18   Q    It is a yes or no.

19   A    It is a confusing statement, because he wrote it down

20   wrong and --

21   Q    You say he wrote it down wrong, sir?

22   A    I didn't know the other guys pertaining to the

23   armored car robbery.

24            MR. FROCCARO:  May I approach, Judge?

25            THE COURT:  Yes.

Fatato-Cross/Froccaro

1327

1   Q    First of all, the statement we are talking about is a

2   statement you signed; is that correct?

3   A    Yes.  I know the statement you are talking about.

4   Q    It is a statement -- it says, I understand that any

5   false statements made herein are punishable as a class A

6   misdemeanor pursuant to Section 210.45 of the Penal Law of

7   New York State.  Do you recall that, sir?

8   A    Yes.

9   Q    And you also recall saying that you read the

10  statement that Detective Daly has witnessed before me, I

11  signed it, and he has also read it to me?  You recall that

12  as well?

13  A    Yes.

14  Q    Okay.

15          In that signed statement, didn't you tell the

16  Nassau County District Attorney's Office that sometime in

17  April or May 1994, a friend of mine named Louis Dorval

18  told me that he and a couple of his friends were going to

19  do an armored car robbery in Muttontown?  Louis never told

20  me who the two guys were that were going to do it with

21  him.

22          Did you say that?  Yes or no.  Please review it.

23  A    Yes.  I read that, sir.

24  Q    And that refreshes your recollection that that is

25  what you said to the Nassau County District Attorney's

**Fatato-Cross/Froccaro**

1328

1    Office then; is that correct?

2    A    Yes, two.  But there was four.

3    Q    This says two.

4    A    I know.

5    Q    That is what you said then, sir.

6         And that was a true statement when you made it,

7    right?

8    A    Yes, if you read the whole thing.

9    Q    And you now claim that Chris Tarantino was involved

10   in certain drug transactions with you after the armored

11   car robbery took place; is that right?

12   A    Correct.

13   Q    Involving cocaine and marijuana, right?

14   A    Correct.

15   Q    Which we discussed before, for the first time that

16   you ever made that allegation was ten years after you

17   initially became a cooperating witness; is that right?

18   A    Yes.  I minimized my role.

19   Q    And the answer is yes, sir?

20   A    Yes.

21   Q    Just a few more questions on the same subject, okay,

22   Mr. Fatato?

23   A    Yes.

24   Q    When you were a cooperating witness for the

25   government, the first time around, didn't you also tell

Fatato-Cross/Froccaro

1329

1  them that Chris had nothing to do with drugs, yes or no,

2  sir?

3  A    Yes.

4  Q    You now claim, however, a couple of days after the

5  armored car robbery, Louis Dorval contacted you and asked

6  you if you can get him some marijuana; is that right?

7  A    Yes.

8  Q    And he came with fresh 20 dollar bills; is that

9  correct?

10  A    Yes.

11  Q    The first time you made that claim was ten years

12  after you became a cooperating witness; is that right?

13  A    Yes.

14  Q    And you were trying to secure a second cooperation

15  agreement with the government to avoid a life sentence; is

16  that right?

17  A    Correct.

18  Q    You testified during your direct examination that you

19  and Mr. Dorval purchased a 15 kilo shipment of cocaine

20  together shortly before his disappearance in the year

21  1994; is that correct?

22  A    Yes.

23  Q    From this person Hugo, correct?

24  A    Yes.

25  Q    On credit, right?

**Fatato-Cross/Froccaro**

1330

1  A    On credit, and I had a balance of some money owed.

2  Q    Wait a minute.  You owed him more money you mean?

3  A    It was credit, and then I owed, I think, 20 or 30 or

4  40 thousand dollars from previous drugs I purchased.

5  Q    You told the jury you got the 15 kilos on credit; is

6  that right?

7  A    Yes.

8  Q    And you owed additional money?

9  A    Yes.

10  Q    And that story is different from the story you told

11  the FBI when you first became a cooperating witness back

12  in 1994, isn't it, Mr. Fatato?

13  A    Yes, it is.

14  Q    Now, when you were initially interviewed by the FBI

15  in 1994, you told them that you had lent Mr. Dorval 50,000

16  to enable Mr. Dorval to purchase this shipment of cocaine

17  alone or by himself; is that right?

18  A    Yes.  I minimized my role, correct.

19        MR. FROCCARO:  Judge, I think he just can answer

20  the question.

21        THE COURT:  You can answer it yes or no.

22        THE WITNESS:  Okay.

23  Q    The answer is yes, right?

24  A    Yes.

25        THE COURT:  Mr. Froccaro, let's take our

Fatato-Cross/Froccaro

1331

1    luncheon recess.

2              I will see you folks back here 1:45, if that is

3    okay.

4              Don't talk about the case.

5              (Whereupon, at this time the jury leaves the

6    courtroom.)

7                (Luncheon Recess.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Fatato-Cross/Froccaro

1332

1        A F T E R N O O N   S E S S I O N

2

3            THE COURT:  We will bring in Mr. Tarantino and

4    also Mr. Fatato, if you would.  And let's get the jury

5    lined up.

6            MR. FROCCARO:  Your Honor, with your permission,

7    can Mr. Rapaport read back the last question, and if he

8    can, can he read a couple of them?

9            THE COURT:  Yes.

10           MR. FROCCARO:  When the jury comes in.

11           THE COURT:  Yes.

12           (Whereupon, the jury at this time entered the

13   courtroom.)

14           (The witness Gaetano Fatato resumes the witness

15   stand.)

16           THE COURT:  Please be seated.

17           We are ready to resume.

18           MR. FROCCARO:  With your permission, your Honor,

19   I would ask if we can read back a few of the questions so

20   I can remember and the jury can remember.

21           THE COURT:  Harry, if you would be good enough

22   to do that, thank you.

23           (Whereupon, the court reporter reads the

24   requested material.)

25

Fatato-Cross/Froccaro

1333

1  CROSS-EXAMINATION (cont'd)

2  BY MR. FROCCARO:

3  Q    And Mr. Fatato, that was a lie, too; is that correct?

4  A    Can you rephrase that?

5  Q    I will read the question again.

6         MR. FROCCARO:  Judge, I will take him back

7  quickly, I promise to refresh his recollection to where we

8  are, if it is all right, with your permission?

9         THE COURT:  Yes.

10 Q    Mr. Fatato, you testified during the direct

11 examination that you and Mr. Dorval purchased a 15 kilo

12 shipment of cocaine together shortly before his

13 disappearance in the year 1994; is that correct?

14 A    Yes.

15 Q    From this person Hugo; is that correct?

16 A    Yes.

17 Q    On credit, correct?

18 A    Yes.

19 Q    Now, that story is different from the story you told

20 the FBI when you first became a cooperating witness back

21 in 1994; is that correct?

22 A    Yes.

23 Q    When you were initially interviewed by the FBI in

24 1994, you told them that you had lent Mr. Dorval $50,000

25 to enable him to purchase the shipment of cocaine alone or

**Fatato-Cross/Froccaro**

1334

1  by himself, correct?

2  A    Correct.

3  Q    Now you claim that was a lie, too, correct?

4  A    Yes.

5  Q    And today you give the version of the story that you

6  purchased the shipment of cocaine along with Mr. Dorval

7  that you were partner; is that correct?

8  A    Yes.

9  Q    And you also told the FBI back in 1994 that you did

10  not know who had supplied this shipment of cocaine; is

11  that correct?

12  A    Correct.

13  Q    Another lie, right?

14  A    Correct.

15  Q    You knew who the supplier was, right?

16  A    Yes.

17  Q    Mr. Fatato, I will ask you some questions now about

18  the events surrounding the murder of Louis Dorval, okay?

19  A    Okay.

20  Q    You now claim your last contact with Mr. Dorval while

21  he was alive was a phone call you received from him on

22  Friday, August 12th, while you were on Fire Island; is

23  that correct?

24  A    Correct.

25  Q    And about what time of the day do you claim to have

Fatato-Cross/Froccaro

1335

1    had this phone call with Mr. Dorval?

2    A    From what I recall, around lunchtime.

3    Q    Early afternoon?

4    A    Yes.

5    Q    You claim during this phone call, you claim you heard

6    Chris Tarantino in the background, and Louis said to you,

7    I don't think it is safe there, meaning for you on Fire

8    Island, I got a boat, I'll come and pick you up.

9            Is that what you are claiming today?

10   A    Yes.

11   Q    And do you know where Louis was when he -- when you

12   claim he called you?

13   A    No.

14   Q    Since you began cooperating with the government in

15   1994, would you agree that you have provided the

16   government with different versions of what you claim

17   occurred during your last telephone conversation with

18   Mr. Dorval?  Yes or no.

19   A    Yes.

20   Q    Do you recall telling the FBI during one of your

21   first interviews on September 13th, 1994 that when you

22   last spoke to Mr. Dorval by telephone, he was at his

23   residence in Queens and was not with Chris at the time?

24   Do you recall saying that to the FBI about a month after

25   Mr. Dorval died?  Yes or no, sir.

Fatato-Cross/Froccaro

1336

1  A    I don't recall.

2  Q    Well, have you ever made a prior statement under oath

3  admitting that during an interview with the FBI on

4  September 13th, 1994, that you told the FBI that the last

5  time you spoke with Mr. Dorval, he was at his residence

6  and he was going to visit Chris later that evening, yes or

7  no, sir?

8  A    I do not recall.

9         MR. FROCCARO:  Lines 14 to 24, your Honor, page

10  741, GF-134.

11  Q    Mr. Fatato, I will ask you to view this document and

12  see if it refreshes your recollection that you previously

13  admitted under oath that on September 13th, 1994, that you

14  indicated to a Special Agent of the FBI, Raymond Greco,

15  that the last time you spoke to Mr. Dorval was at his

16  residence and that he was going to visit Chris later that

17  evening?

18         (Handed to the witness.)

19  Q    The answer is after reviewing it, it refreshes your

20  recollection that you made a prior statement under oath

21  that you told that to Agent Greco; is that correct?

22  A    It says reflecting back to a pink --

23         MR. FROCCARO:  I will just read it, if it is all

24  right.

25         THE COURT:  Yes.

Fatato-Cross/Froccaro

1337

1    Q    Mr. Fatato, do you recall being asked this question

2    and giving this answer under oath at a prior proceeding:

3              Question:  I'm asking you to review this

4    document, see if it refreshes your recollection that on

5    September 13th, 1994, you indicated to

6    Special Agent Raymond Greco that the last time you spoke

7    to Mr. Dorval was at his residence, and that he was going

8    to visit Chris later that evening, it is the pink stuff,

9    all the pink stuff.  That is what you said to him, right?

10             Answer:  Yes.

11             Do you recall being asked that question and

12   giving that answer under oath at a prior proceeding, sir?

13   A    Yes, but --

14   Q    And you were being truthful when you gave that

15   answer?

16   A    Yes.

17   Q    And that interview was less than a month after

18   Mr. Dorval's death; is that correct?

19   A    I don't recall exactly the date --

20   Q    If I tell you the interview was around

21   September 13th, 1994, that is about a month after

22   Mr. Dorval's death; is that right?

23   A    Yes.

24   Q    Mr. Fatato, moving on to another subject.

25             You wound up, I think you testified, serving a

Fatato-Cross/Froccaro

1338

1    total of 51 months in prison for the racketeering case in

2    New Jersey, the stolen bonds case in White Plains, New

3    York, and the cocaine trafficking case in Nassau County.

4    You agree?

5    A    Yes.

6    Q    From approximately I believe 1995 to November of

7    1999; is that correct?

8    A    Correct.

9    Q    And after you were released from prison as a

10   cooperating witness, you were rehabilitated and led a

11   law-abiding life; is that accurate to say, Mr. Fatato?

12   A    No.

13   Q    After you were released from prison, you were placed

14   on supervised release by a judge; is that correct?

15   A    Yes.

16   Q    And for a period of three years from your release

17   from prison in November of 1999; is that correct?

18   A    Yes.

19   Q    And you were specifically ordered by the Court not to

20   commit another federal, state or local crime while you

21   were on supervised release, you agree?

22   A    Yes.

23   Q    And you were specifically ordered by the Court not to

24   illegally possess an unlawful substance; is that correct?

25   A    Yes.

Fatato-Cross/Froccaro

1339

1   Q    And you were disobeying the Court and committed new

2   crimes while you were on supervised release, yes?

3   A    Yes.

4   Q    And you disobeyed the Court's order and illegally

5   possessed controlled substances while on supervised

6   release as well; is that correct?

7   A    Yes.

8   Q    You were also ordered by the Court to truthfully

9   answer all inquiries by the probation officer who was

10  responsible for supervising you while you were on

11  supervised release in our community; is that correct?

12  A    Correct.

13  Q    And you were ordered to submit truthful and complete

14  monthly reports to your probation officer each month; is

15  that correct?

16  A    Yes.

17  Q    And in the 36 months that you were on supervised

18  release, how many times did you see your probation officer

19  in person?

20  A    Once a month.

21  Q    Okay.

22       Did you always truthfully answer every question

23  that your probation officer asked you while you were on

24  supervised release, sir?

25  A    Yes.

**Fatato-Cross/Froccaro**

1340

1  Q    You truthfully answered every question?

2  A    I tried truthfully, yes.

3  Q    Well, have you ever made a statement under oath that

4  you did not answer the questions from the probation

5  officer truthfully while you were on supervised release?

6  A    Yes.

7            The last year of my supervised release I

8  started --

9  Q    I'm asking you, you were being interviewed by your

10  probation officer once a month, correct?

11  A    Yes.

12  Q    And when you went in there, the probation officer

13  would ask you questions, and I'm asking you, you lied to

14  her in response to those questions, didn't you?

15  A    Yes.

16  Q    During the 36 months you were on supervised release,

17  did you always submit truthful and accurate reports to

18  your probation officer each month about your finances; yes

19  or no?

20  A    No.

21  Q    And you lied on your monthly reports; is that right?

22  A    Yes.

23  Q    And you were aware, were you not, at the time that

24  there was a printed warning right on the report itself

25  that said if you made any false statements, it was a crime

Fatato-Cross/Froccaro

1341

1  punishable by up to five years in prison, you knew that,

2  right?

3  A    Yes.

4  Q    And notwithstanding that warning, you lied on the

5  monthly reports anyway and made false statements, right,

6  Mr. Fatato?

7  A    Yes.

8  Q    While you were being supervised by a United States

9  probation officer pursuant to the Court's order, you were

10  providing protection to a local drug dealer; is that

11  right?

12  A    Yes.

13  Q    And would you describe yourself as a violent person,

14  Mr. Fatato, yes or no?

15  A    Yes, at times.

16  Q    The answer to that question is yes?

17  A    Yes, at times.

18  Q    And were you someone who was capable of visiting

19  serious physical injury upon another human being, yes or

20  no, sir?

21  A    Yes.

22  Q    What kind of money did the local drug dealer pay you

23  to protect him while you were on a court order for

24  supervised release?

25  A    Between five and ten thousand dollars a month.

Fatato-Cross/Froccaro

1342

1  Q    While you were on court ordered supervised release,

2  you also distributed a drug called ketamine; is that

3  correct?

4  A    Yes, that is what it was.

5  Q    And ketamine is what, a horse tranquilizer?

6  A    Yes, that is what it is.

7  Q    Clearly a very illegal narcotic substance, yes?

8  A    Yes.

9  Q    You distributed ketamine in large quantities, as much

10 as 10,000 bottles a week, right?

11 A    No, sir.

12 Q    Have you ever made a prior statement under oath that

13 you distributed ketamine in large quantities, as much as

14 10,000 bottles a week, sir?

15 A    No. It was 10,000 bottles in total.

16 Q    Answer my question.  If you don't understand it, I

17 will try to rephrase it.

18        Have you ever made a prior false statement under

19 oath where you swore to tell the truth, nothing but the

20 truth, that you distributed ketamine in large quantities,

21 as much as 10,000 bottles a week, yes or no?

22 A    I don't recall.

23        MR. FROCCARO:  Judge, 3500 GF-144 at page 741,

24 lines 10 to 22.

25        I apologize, your Honor, it is page 744, lines

**Fatato-Cross/Froccaro**

1343

1  744 -- lines 7 through 11 -- excuse me, 12 -- 7 through

2  20.

3          I will get it sooner or later, Judge.

4          THE COURT:  7 through 20 it is.

5  Q    I will ask you to review that, Mr. Fatato, and see if

6  you made a prior statement under oath that you would

7  distribute this horse tranquilizer in quantities as much

8  as 10,000 bottles a week.

9          (Handed to the witness.)

10          THE COURT:  Let's not have conversations back

11  there.

12  Q    After reviewing that, does it refresh your

13  recollection that you made that prior statement under

14  oath?

15  A    I clarified my prior statement under oath.  It was

16  10,000 bottles over --

17          MR. FROCCARO:  Judge --

18          THE COURT:  Sir, you will have an opportunity

19  later when the government asks you certain questions.

20          Answer the question if you can.  Incorporate in

21  your answer, did you make the statement with the portion

22  shown to you, that you distributed 10,000 bottles a week?

23  Q    Do you recall?

24  A    I recall, but --

25  Q    It is yes or no, Mr. Fatato.

Fatato-Cross/Froccaro

1344

1   A    Yes.  I recall.

2   Q    And were you being truthful when you made that

3   statement, sir?

4   A    Yes.

5   Q    And so I'm sure I was clear on it, and Mr. Rosen told

6   me I may not have, it is not something that you give a

7   horse tranquilizer to a horse, it is something you give to

8   people, right?

9   A    It is a dog and cat tranquilizer.

10  Q    It is not a horse?

11  A    It is dog and cat.

12  Q    While on supervised release, you were also arrested

13  by the Nassau County Police Department for falsely

14  reporting a crime to the police; is that correct?

15  A    Yes.

16  Q    You filed a report with the Nassau County Police

17  Department stating that your car, a Mercedes Benz 500 SL

18  convertible, I believe it was, had been hit by another car

19  and the driver fled the scene; is that correct?

20  A    Yes.

21  Q    All a lie?

22  A    Yes.

23  Q    In truth, your Mercedes Benz 500 SL convertible had

24  not been hit by another car driving by; is that correct?

25  A    Yes.

**Fatato-Cross/Froccaro**

1345

1  Q    A friend of yours smashed it up?

2  A    Yes.

3  Q    And you actually called the cops up to lie to them

4  about what happened; is that correct?

5  A    Yes.

6  Q    And you did this to perpetrate a fraud on your

7  insurance carrier; is that right?

8  A    Yes.

9  Q    After you got out of prison in the year 1999, and on

10  court ordered federal supervised release which you

11  violated, were you ever a confidential informant for the

12  Nassau County District Attorney's Office?

13  A    Yes.

14  Q    And in connection with what investigation were you a

15  confidential informant?

16  A    When they asked me some questions.  I don't recall

17  exactly what questions.

18  Q    You have no recollection as you sit here today about

19  what questions or why you were a confidential informant

20  for the Nassau County District Attorney's Office?

21  A    No, sir.

22  Q    You don't remember anything that the authorities in

23  the Nassau County District Attorney's Office said to you

24  while you were working for them as a confidential

25  informant?

Fatato-Cross/Froccaro

**1346**

1  A    They wanted to ask me some questions, and I don't

2  recall what was said.

3  Q    Well, do you recall how long you were working for the

4  Nassau County District Attorney's Office as a confidential

5  informant?

6  A    No, sir.

7  Q    You know what a Rule 35 is, don't you?

8  A    Yes.

9  Q    And a Rule 35 is if you provide substantial

10  information or cooperation to law enforcement after you

11  are sentenced, you can file under Rule 35; is that

12  correct?

13  A    Yes.

14  Q    A Rule 35 is a motion which you understand allows a

15  Court to reduce a person's actual prison sentence; is that

16  right?

17  A    Yes.

18  Q    And it is like after you get sentenced, you can file

19  a Rule 35; is that right?

20  A    Yes, sir.

21  Q    And before you can have the 5K1 for a better

22  sentence, right?

23  A    Yes.

24  Q    You know a man by the name of Bill Peterson, don't

25  you?

**Fatato-Cross/Froccaro**

1347

1    A    Yes.

2    Q    Bill Peterson was a friend of yours who had gotten

3    himself in trouble with the law; is that correct?

4    A    Yes.

5    Q    He got convicted after a trial of a crime of arson

6    and was facing an eight-year prison sentence; is that

7    correct?

8    A    Correct.

9    Q    What did he burn down?

10   A    I believe he was in the liquor business.

11   Q    I didn't hear what you said.

12   A    He was in the liquor business, a competitor's store.

13   Q    He burned down what?

14   A    He started a fire at a competitor's liquor store.

15   Q    He burned down a competitor's liquor store?

16   A    Yes.

17   Q    Somewhat kind of community?

18   A    I don't recall.

19   Q    Was it residential, mixed?

20   A    I don't recall.

21   Q    Did you ask him?

22   A    No.

23   Q    Before he came over to your house?

24   A    No.  He was convicted and went to trial and was

25   convicted prior to me talking to him.

1348

1    Q    He came by your house and he asked you how he can get

2    out from under that eight-year prison sentence; is that

3    correct?

4    A    Correct.

5    Q    And you told him that he would probably need a

6    Rule 35, which would mean cooperation with the government;

7    is that correct?

8    A    Correct.

9    Q    Or $50,000 in cash; is that right?

10   A    No.

11   Q    At that point you moved into a new home in Dix Hills

12   with your wife, and Peterson came to the house and asked

13   you if you can help him out; is that right?

14   A    Yes.

15   Q    What is your understanding about why Mr. Peterson

16   chose you for a solution to this particular problem?

17   A    Knowing I was in prison prior, and he came to me, him

18   never being in prison, and asked me some questions.

19   Q    Mr. Peterson told you if you helped him to get a

20   reduced sentence, he would make you a partner in a

21   pornography business in Deer Park; is that correct?

22   A    Yes.

23   Q    And you agreed to help him; is that right?

24   A    Yes.

25   Q    You believe that if you, yourself, was able to

**Fatato-Cross/Froccaro**

1349

1  provide assistance to law enforcement in the prosecution

2  of another human being, you might be able to get

3  Mr. Peterson, this arsonist, his sentence reduced; is that

4  right?

5  A    Yes.

6  Q    A sort of like a third-party cooperation agreement,

7  right?

8  A    Yes.

9  Q    So you went out and committed a very serious

10 narcotics felony in an attempt to get Mr. Peterson's

11 sentence reduced and you had a stake in the narcotics

12 business; is that correct?

13 A    Yes.

14 Q    What you were trying to do is to manipulate the

15 system to get Mr. Peterson out of jail; isn't that true?

16 A    Tried to help out a friend.

17 Q    Have you ever made a statement under oath that you

18 were -- what you were trying to do is to make --

19 manipulate the system to get Mr. Peterson out of jail, yes

20 or no?

21 A    Yes.

22 Q    Were you being truthful with respect to that?

23 A    Yes.

24 Q    Your plan was to purchase crystal meth; is that

25 correct?

**Fatato-Cross/Froccaro**

1350

1    A    Yes.

2    Q    And would you please explain to the jury, what is

3    crystal meth?

4    A    Umm, crystal meth, it is a drug.

5    Q    Another illegal narcotic?

6    A    Yes.

7    Q    And your plan was to purchase the crystal meth and

8    contact the police, according to you, contact law

9    enforcement that you had information about a crystal meth

10   trafficker; is that correct?

11   A    Yes.

12   Q    Let me ask you a question:  Why didn't you just

13   contact law enforcement and give them information about

14   you and your co-conspirators in the ketamine distribution

15   ring, sir?

16   A    That dried up.  It was no longer --

17   Q    It dried up, sir, meaning how long before you came up

18   with this third-party arrangement to buy crystal meth, how

19   long before did it dry up?

20   A    About eight months.

21   Q    So the statute of limitations on those crimes didn't

22   run, do you understand?

23   A    I wasn't thinking that way, statute of limitations.

24   Q    You weren't thinking about pointing the finger at

25   yourself and your friend in the ketamine transactions,

Fatato-Cross/Froccaro

1351

1    correct?

2    A    Yes.

3    Q    And your third-party cooperation attempt didn't work

4    out as you planned; is that right?

5    A    Yes.

6    Q    And what you were trying to set up was cooperating

7    yourself, and you wound up getting arrested by the DEA in

8    dealing crystal meth; is that correct?

9    A    Yes.

10   Q    You immediately began to cooperate because you knew

11   from prior experience that if you got locked up, this was

12   the way to reduce your exposure to jail; is that right?

13   A    Yes.

14   Q    You believe it is your obligation now to assist law

15   enforcement in any assistance necessary; is that correct?

16   A    Correct.

17   Q    Mr. Fatato, you signed your most recent cooperation

18   agreement with the government in April of 2004; is that

19   correct, sir?

20   A    Yes, sir.

21   Q    And after you signed that agreement, did you get

22   arrested?

23   A    Yes.

24   Q    And you were charged with -- do you want something to

25   drink, sorry?

**Fatato-Cross/Froccaro**

1352

```
 1    A    I spilled some of the water.

 2              THE COURT:  We have some paper here -- maybe we

 3    don't.  We were cut back.

 4              (Whereupon, at this time there was a pause in

 5    the proceedings.)

 6              THE COURT:  You can continue.

 7              THE WITNESS:  Sorry.

 8    Q    Mr. Fatato, after you signed your most recent

 9    cooperation agreement, did you get arrested?

10    A    Umm, yes.

11    Q    And you were charged with threatening a woman, right?

12    A    Yes.

13    Q    A woman named Susan Schall, whom you were hanging out

14    with, so to speak?

15    A    Yes.

16    Q    And you were having an affair with her while you were

17    married?

18    A    Yes.

19    Q    And Ms. Schall and an eyewitness told the police that

20    you threatened her and told her that she had better go to

21    Florida because that's the only place she would be safe,

22    you know that, Mr. Fatato, don't you?

23    A    Yes.

24    Q    Did the Court grant Ms. Schall an order of protection

25    from you while you were a cooperating witness for the
```

Fatato-Cross/Froccaro

1353

1  government?

2  A    Yes.

3  Q    And the government knows that?

4  A    Yes.

5  Q    Since you began your second stint as a cooperating

6  witness for the government, have you committed any crimes

7  that the government is aware of, at least, yes or no, sir?

8  A    No.

9  Q    Well, you were a convicted felon before you signed

10  the most recent cooperation agreement, do you agree?

11  A    Yes.

12  Q    And you know that possession of a firearm by a felon

13  is a federal crime, correct?

14  A    Yes.

15  Q    Did you keep a rifle and shotgun in your house after

16  you signed your most recent cooperation agreement, yes or

17  no, Mr. Fatato?

18  A    Yes.  My wife purchased it, yes.

19  Q    You kept a shotgun and a rifle in your house after

20  you signed the agreement, correct?

21  A    Correct.

22  Q    A serious federal crime, would you agree?

23  A    Umm, I don't know.

24  Q    You have no idea what the penalty is for carrying a

25  gun --

Fatato-Cross/Froccaro

1354

1  A    A licensed registered shotgun.  A gun is not supposed

2  to be in the house.  It is a serious crime, yes.

3  Q    Well, you previously testified that it was your

4  understanding that if you committed any new crimes, the

5  cooperation agreement you have would be ripped up.

6        Did the government rip it up after they found

7  out you had a shotgun or rifle in your house?

8  A    No.

9  Q    No, right?

10       Did they charge you with the crimes you had

11 committed while you were their cooperating witness,

12 namely, being a felon in possession of firearms?  No,

13 right?

14 A    No.

15 Q    And did they ask that your bail be revoked and you

16 thrown in jail?  No, right?

17 A    No.

18 Q    And did you give a judge your word if you were

19 released on bail, you wouldn't commit any crime, including

20 possession of firearm?  Yes or no, Mr. Fatato.

21 A    Yes.

22 Q    And you lied to the judge, right?

23 A    Not intentionally.

24 Q    Sorry?

25 A    Not intentionally.

**Fatato-Cross/Froccaro**

1355

```
 1   Q    You didn't intentionally possess a shotgun and rifle

 2   in your own house?

 3            MS. CAPWELL:  Objection.

 4            THE COURT:  Sustained.

 5            MR. FROCCARO:  Okay, your Honor.

 6   Q    Does anyone from the government ever check up to see

 7   what you are up to, Mr. Fatato?

 8   A    Yes.

 9   Q    And since you became a cooperating witness a second

10   time, how many times has the government come and searched

11   the home you live in for drugs and weapons?  Never, right?

12   A    Correct.

13   Q    Since you signed the most recent cooperation

14   agreement, had you filed any false tax returns, yes or no,

15   Mr. Fatato?

16   A    Umm, yes.

17   Q    Another crime, right?  False tax returns, filing a

18   false tax return is a crime, isn't it, Mr. Fatato?

19   A    It's a crime, yes.

20   Q    Has the government charged you with filing a false

21   tax return since you became their cooperating witness

22   again?

23   A    No, sir.

24   Q    Had they ripped up your agreement since you committed

25   another crime at least that they know of again?
```

**Fatato-Cross/Froccaro**

1356

1    A    No, sir.

2    Q    Had you ever made a prior statement under oath that

3    since you signed your most recent cooperation agreement,

4    you never filed any false tax returns?  Yes or no,

5    Mr. Fatato?

6    A    I don't recall.

7    Q    3500-GF-144, your Honor, at page 757.

8         MR. FROCCARO:  May I approach, your Honor?

9         THE COURT:  Yes.

10         MR. FROCCARO:  Thank you.

11         (Counsel approaches the witness stand.)

12    Q    Mr. Fatato, see if this refreshes your recollection

13    that you previously made a false statement under oath that

14    you never filed a false tax return.

15         Does it refresh your recollection that you made

16    a statement under oath that you never filed a false tax

17    return?

18    A    Yes.  It wasn't false.

19    Q    Mr. Fatato, does it refresh your recollection that

20    under oath --

21    A    Yes, yes.

22    Q    Were you being truthful when you said that?

23    A    Yes.

24    Q    I just have a few more questions, Mr. Fatato.

25         You testified at some length yesterday about fur

Fatato-Cross/Froccaro

1357

1    coats stolen from Filene's Basement; is that correct?

2    A    Yes.

3    Q    And you claim during your direct examination that

4    Louis Dorval told you that Mr. Tarantino participated in

5    the burglary at the Filene's Basement more than 17 years

6    ago; is that correct?

7    A    Yes.

8    Q    Mr. Fatato, you got caught red-handed in possession

9    of selling fur coats from Filene's Basement by the FBI; is

10   that correct?

11   A    Yes.

12   Q    You got caught selling to a man named Richard Sabol,

13   who unbeknownst to you was working for the FBI as an

14   informant at that time; is that correct?

15   A    Yes.

16   Q    And Mr. Sabol was tape recording his conversation

17   with you under the watchful eye of the FBI; is that right?

18   A    Yes.

19   Q    And I believe the government --

20        MR. FROCCARO:  One second, your Honor.

21   Q    We were all given these books yesterday?

22   A    Yes.

23   Q    With a lot of pages in them?

24   A    Yes.

25   Q    And transcripts you reviewed and some were accurate;

Fatato-Cross/Froccaro

1358

1    is that correct?

2    A    Yes.

3    Q    Can you tell me, you also looked at the tape

4    recordings in making your assessment, and you said the

5    transcripts were accurate; is that right?

6    A    Yes.

7    Q    Right?

8    A    Yes.

9    Q    All right.

10         Let me ask you, Chris Tarantino is never

11   overheard on any of these tapes; is that correct?

12   A    Yes.

13   Q    And there are a lot of other tapes that Mr. Sabol

14   made that weren't played, right?

15   A    Oh, yes.

16   Q    Okay.

17         And Chris' name is never mentioned on any of

18   the -- these recordings; is that right?

19   A    Yes.

20   Q    When Louis Dorval mentioned he had a friend who just

21   got out of Leavenworth, that had nothing to do with any

22   discussion about stolen coats between you, Dorval and

23   Mr. Sabol; is that right?

24   A    Yes.

25   Q    The FBI even took photographs with a meeting that

**Fatato-Cross/Froccaro**

1359

1   they had with their informant, Mr. Sabol, that was seen --

2   where you were seen with the stolen fur coats in your

3   possession; is that right?

4   A    Yes.

5            (At this time a document was exhibited on

6   courtroom screen.)

7   Q    This is Government's Exhibit GF-6, can you tell me

8   what is in the big bag?

9   A    The fur jackets.

10  Q    And the heavy guy on the right, everybody's right,

11  that is you, correct?

12  A    Yes.

13  Q    Who is the fellow on the left?

14  A    Richie Sabol.

15  Q    I will go over all three of them just quickly.

16           And this fellow again is you, right?

17  A    Yes.

18  Q    With the fur coats in your hand, right?

19  A    Yes.

20  Q    And who is this fellow?

21  A    Richie Sabol.

22  Q    Okay.

23           Here again, that is you, right?

24  A    Yes.

25  Q    And that is, I can figure it out, Richie Sabol?

Fatato-Cross/Froccaro

1360

1   A    Yes.

2   Q    And that is Louis Dorval here?

3   A    Yes.

4   Q    And can you tell me, are there any pictures of Chris

5   Tarantino here?

6   A    No.

7   Q    Chris wasn't there, right?

8   A    Yes.

9   Q    Never seen him, right?

10  A    Nope.

11  Q    Everything you testified about with respect to

12  Filene's Basement you claim was told to you by Louis

13  Dorval; is that correct?

14  A    Yes.

15  Q    So Chris' isn't overheard, Chris' name is not

16  mentioned, Chris is not seen, correct?

17  A    Correct.

18  Q    And finally, to make sure I understand the facts

19  correctly, you got arrested in 1994 for possessing and

20  selling these fur coats, right?

21  A    Yes.

22  Q    And not Mr. Tarantino, right?

23  A    Yes.

24        MR. FROCCARO:  Judge, I think I'm done for now,

25  your Honor.