UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

CHRISTIAN GEROLD TARANTINO,

       Petitioner,

vs.                             Case No.: 2:16-cv-03770-JS

UNITED STATES OF AMERICA,

       Respondent.

_____/

*SUPPLEMENTAL MOTION UNDER 28 U.S.C. § 2255 TO VACATE/SET ASIDE
ILLEGAL CONVICTIONS/SENTENCES FILED BY A PERSON IN CUSTODY*

      Petitioner Christian Tarantino (hereinafter, "Petitioner"), through his undersigned counsel, hereby files this supplemental motion under 28 U.S.C. § 2255 seeking to vacate/set aside the illegal convictions and sentences which he is serving in federal custody, as obtained in violation of the United States Constitution or in the absence of jurisdiction.  Petitioner supplements and amends a § 2255 motion filed *pro se* on June 27, 2016, the same date as the United States Supreme Court denied *certiorari* review.  *See United States v. Tarantino*, 136 S.Ct. 2526 (2016).[1]

      Petitioner claims the right to be retried or released from custody pursuant to the provisions of 28 U.S.C. § 2255 because all of his convictions were obtained in violation of the right to the effective assistance of counsel guaranteed under the Sixth Amendment.  Petitioner was unlawfully convicted of the charge filed under 18 U.S.C. § 33 without jurisdiction as the trial evidence actually ***disproved*** the jurisdictional requirement of the offense.  This submission presumes familiarity with the case and discusses only the facts that are relevant to the meritorious issues being raised herein.

---

[1] Petitioner sought permission to exceed the court's page limitation for motions, *see* Judge Seybert's rules, but the court imposed a 30-page limit.  This submission comports with the text size required by this court's individual rules.

### *Petitioner was convicted of an offense under 18 U.S.C. § 33 without jurisdiction as a result of the ineffective assistance that was delivered by his first trial counsel*

As to Count One charging the petitioner with a violation of 18 U.S.C. § 33, dispassionate analysis of the jurisdictional element required to convict under § 33 leads to the conclusion that the petitioner was convicted of the offense without jurisdiction, *as the trial evidence showed that **Mid-Island Check Cashing Corp. armored vans were only "used" within the state of New York*.** Mid-Island Check Cashing Corp. (Mid-Island) was a domestic New York company that never registered to do business in New Jersey - a fact that would have been discovered prior to trial had trial counsel complied with their professional duty to investigate state corporate records.

On March 29, 2011, the government presented the testimony of Frank Fede (Fede), owner of Mid-Island in June 1994, when two of its employees were robbed, and one of them was killed. Mid-Island records introduced at trial showed that the armored van involved was ***only used within New York***, *see* Exhibit A (Trial Exhibit 3-FF (June 23, 1994 vehicle route showing only ***intra***state stops within New York), ***and*** Fede testified that Mid-Island armored vans ***only serviced New York***, ***disproving*** jurisdiction under § 33.  *See* Exhibit B (March 29, 2011 transcript) at p.808 ("AUSA: And how did you ***use*** the armored vans? Fede: To deliver payrolls to certain companies around Long Island [and] Queens.  AUSA: In addition to Long Island and Queens, did you service any companies outside of New York State? A. ***No.***  AUSA: Did ***you ever*** service companies in the Port of Newark? Fede: Yes. AUSA: In the Port of Newark, what kind of companies did ***you*** serve? Fede: We did the tankers that came in from foreign countries, and we would service the ships.") (emphasis and brackets added); *but see* Exhibit C (Indictment) at p.1, ¶1 (alleging that "Mid-Island owned and operated armored vans that served as mobile check-cashing outlets for the employees of Mid-Island's customers, which included businesses located on Long Island, New York ***and in New Jersey***") (emphasis added).  ***No Mid-Island vehicle*** ever serviced New Jersey businesses.

Records consistently show that "**Mid-Island Check Cashing Corp**." registered only as a domestic corporation in New York (from 1973 to 1995), and recent "no records" certificates establish that "**Mid-Island Check Cashing Corp**." never registered in New Jersey.  *See* Composite Exhibit D (Mid-Island records issued by New York and "no records" certificates issued by New Jersey). Petitioner was unlawfully convicted despite the corroborated trial testimony of a company owner that **_Mid-Island armored vans_** were **only** "**used**" within New York.

Petitioner was convicted without jurisdiction as the evidence adduced at trial **_disproved_** the jurisdictional element of 18 U.S.C. § 33.  To convict a defendant of an offense prosecuted under 18 U.S.C. § 33, the government must prove the essential jurisdictional element found within the statute, requiring that the alleged offense conduct involve a "motor vehicle which is used, operated, or employed in interstate or foreign commerce".  *See* 18 U.S.C. § 33(a).  The jurisdictional element is set forth in the first "whoever" clause of the statute.  Given this requirement, the third "whoever" clause of 18 U.S.C. § 33(a) must therefore be read as follows: "Whoever with like intent, willfully disables or incapacitates any driver or person employed in connection with the operation or maintenance of the motor vehicle ['which is used, operated, or employed in interstate or foreign commerce']... ."  The jurisdictional language is unambiguous.  An offense mischarged under § 33 cannot be salvaged by misapplying the "*de minimis*" effect on commerce analysis that is applicable to language found in other statutes.  Had the government timely charged the 1994 robbery as a violation of the Hobbs Act, 18 U.S.C. § 1951(a) ("Whoever *in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery*") (emphasis added), the jurisdictional element **_under that statute_** could have been proven if the robbery committed merely created a realistic probability of a "*de minimis*" effect on commerce. *See United States v. Celaj*, 649 F.3d 162, 168 (2nd Cir. 2011).

Under 18 U.S.C. § 33, a motor vehicle must be "used, operated, or employed in" interstate commerce, not just have some "*de minimis*" effect on commerce. The Supreme Court has noted that Congress has repeatedly recognized the "distinction between legislation limited to activities '***in commerce***,' and an assertion of its full Commerce Clause power so as to cover all activity substantially ***affecting interstate commerce***." *See United States v. American Bldg. Maint. Indus.*, 422 U.S. 271, 280 (1975) (emphasis added). The phrase "in interstate commerce" is a much more restrictive jurisdictional requirement than the phrase used in the Hobbs Act ("affects interstate commerce or the movement of any article or commodity in commerce"). Had Congress wanted to include language in § 33 to cover vehicles that are merely used to "affect" commerce, they could have done so. *See, e.g.,* 18 U.S.C. § 844(i) (covering motor vehicles "used in interstate or foreign commerce ***or in any activity affecting interstate or foreign commerce***") (emphasis added).

The jurisdictional phraseology "used, operated, or employed in" interstate commerce also appears in 18 U.S.C. § 32, enacted with § 33 in 1956. Section 32 authorizes prosecution of anyone who "sets fire to, damages, destroys, disables, or wrecks ... any civil aircraft used, operated, or employed in interstate, overseas, or foreign air commerce." Sections 32 and 33 both adopted language from 18 U.S.C. § 1992, which authorizes prosecution of ***terrorist attacks*** by anyone who "willfully derails, disables, or wrecks any train, engine, motor unit, or car used, operated, or employed in interstate or foreign commerce by any railroad." Section 33 extended protection ***<u>only</u>*** to motor vehicles "used, operated, or employed in interstate or foreign commerce." The trial record shows clear evidence that Mid-Island armored vans had ***<u>not</u>*** been "used, operated, or employed in" interstate commerce. The jurisdictional language of § 33 cannot be misapplied to reach any vehicle *ever* owned by one ostensibly engaged in interstate commerce, ***where the "<u>use</u>" of the <u>Mid-Island armored vans</u> was confined to New York <u>only</u>***. *See* Exhibit B (Fede testimony) at p.808.

4

Due to the dearth of law construing the interstate commerce language of 18 U.S.C. § 33, the court should consider cases interpreting 18 U.S.C. §§ 32 and 1992, as both use the same "used, operated, or employed in" language.  In *United States v. Hume*, 453 F.2d 339 (5th Cir.1971), construing Section 32, the court found that an airplane operated in interstate commerce because the airplane had been crop dusting in New Mexico during the morning of the day that the airplane was shot while dusting in Texas.  In *United States v. Altenburger*, 549 F.2d 702 (9th Cir.1977), the court applied Section 1992 to a case involving an interstate train.  Petitioner does **_not_** argue that the Mid-Island van had to have crossed a state line on June 23, 1994 (which it did not), but petitioner does submit that **_the evidence showed that Mid-Island vans were ONLY "used" within New York_**, and therefore petitioner was convicted **_without jurisdiction_**.

The prosecution described the jurisdictional element to the jury as follows: "**_[Y]ou must find that the government has proven beyond a reasonable doubt that the motor vehicle was used by a company that operated or did business in interstate or foreign commerce_**."  *See* Exhibit E (May 4, 2011 transcript) at p.2878 (emphasis and brackets added).  The Court instructed the jury to decide the jurisdictional element, as follows: "**_It is sufficient if the government proves beyond a reasonable doubt that the motor vehicle was used by a company that operated in interstate or foreign commerce_**."  *See* Exhibit F (May 5, 2011 transcript) at pp.3130-3131 (emphasis added).  Because counsel delivered ineffective assistance, the prosecution was able to claim in its closing summation that there was **_no dispute_** that "**_Mid-Island Check Cashing Corporation operated in interstate commerce_**."  *See* Exhibit E at p.2880.  But for the negligence of counsel, the § 33 charge would have been dismissed on a pretrial motion or a Rule 29 motion, as Mid-Island was a domestic corporation only operating vans in New York.  Mid-Island did **_not_** "operate" vans in New Jersey. *See* Exhibit C at p.1, ¶1 (Indictment charging that Mid-Island operated vans in New Jersey).

Counsel never argued that the prosecution failed to prove the jurisdictional element, and there is no rational basis to treat such an omission as a strategic choice.  Petitioner respectfully submits that the Court should dispassionately conclude that the conviction under 18 U.S.C. § 33 was obtained without jurisdiction, vacate the conviction under Count One of the Indictment, and dismiss the charge **_with prejudice_**.

### Petitioner's first trial counsel operated under an undisclosed benefactor conflict adversely affecting the defense as counsel delivered ineffective assistance at trial

Petitioner's first trial counsel, James Froccaro (Froccaro), operated under an undisclosed benefactor conflict that adversely affected his trial performance, as Froccaro's divided loyalties prevented him from pursuing a defense of petitioner **_compelled_** by the evidence that incriminated Scott Mulligan (Mulligan).  The **_simultaneous_** representation of Mulligan damaged the defense.  Through these § 2255 proceedings, petitioner can amply "demonstrate that an actual conflict of interest adversely affected his lawyer's performance."  *See Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980).  The Second Circuit concluded that the trial court "failed to develop the record" and "preserve[d] this issue for collateral review."  *See United States v. Tarantino*, 617 Fed.Appx. 62, 65-66 (2d Cir. 2015) (brackets added).  Facts that were *dehors the record* are now ripe for review.

The Affidavit submitted by lawyer Eliza Stahl (Stahl) reveals the undisclosed conflict under which Froccaro operated during the first trial.  The trial court did not "develop the record" because Froccaro inexcusably failed to disclose that he **_simultaneously_** represented Mulligan before and during trial (receiving a $150,000 check and cash payments arranged by Mulligan).[2]

---

[2] During the *Curcio* hearing held days before the first trial started, Froccaro twice claimed that another conflict of interest (involving the simultaneous representation of Lucchese crime family members who took credit for committing the August 1994 murder charged against the petitioner) "*honestly* slipped [his] mind."  *See* Exhibit G (March 15, 2011 transcript) at p.5.  Froccaro failed to disclose his benefactor conflict, as he also represented Mulligan before and during petitioner's first trial.  *See* Stahl Affidavit.

In her declaration, Stahl avers that Froccaro admitted that he had ***destroyed*** the extortion letter that was sent by Vincent Gargiulo (Gargiulo) to Mulligan only months before Gargiulo was killed. By destroying evidence showing Mulligan's motive to cause the murder of Gargiulo,  Froccaro showed his ***complicity*** with Mulligan, which disqualified him from defending petitioner at the trial, as Mulligan was implicated in all of the offenses charged against petitioner.  Irrespective of the complicitous destruction of criminal evidence, Froccaro irrationally failed to inculpate Mulligan given evidence that would have ***compelled*** conflict-free counsel to inculpate Mulligan in order to defend petitioner.  Froccaro's trial performance was adversely affected as to each count tried.

## COUNT ONE: The sidewalk robbery of June 23, 1994 that resulted in a death

As to Count One charging petitioner with the robbery that resulted in the death of guard Julius Baumgardt, Froccaro knew that Mulligan was a target/suspect as of 1994.  *See* Exhibit I (February 16, 2011 transcript) at p.361 (FBI file showed that Mulligan was a target/suspect in the murders of Julius Baumgardt and Louis Dorval); *id.* at p.363 (Mulligan's DNA was *subpoenaed*).[3] The conflict led to prejudicial error as counsel failed to elicit a description suggesting ***Mulligan*** played a part in the robbery ***instead of petitioner***,[4] and even objected to linking ***Mulligan*** to the cache of weapons.[5] ***Froccaro farcically "sold out" petitioner to benefit his benefactor Mulligan***.

[3] Stahl also avers that Froccaro celebrated the case agent's testimony given at the *Mastrangelo* hearing suggesting that Mulligan's DNA was excluded by the FBI as of the hearing date.  *Id.* at p.363.  Froccaro took credit for "clearing" Mulligan at the *pre-trial* hearing.  *See* Stahl Affidavit.

[4] *See* Exhibit J (FBI case agent affidavit) at pp.3-4, ¶4 & n.4 (two (2) witnesses who were standing "a few feet" from the robbery saw two (2) assailants; one of the assailants was Louis Dorval, and Mulligan fit the description of the other assailant who wielded a shotgun, identically matching his height ("six-foot-one-inch") and "heavy build").

[5] *See* Exhibit K (March 30, 2011 transcript) at pp.899-917 (Froccaro objecting to any trial testimony that Mulligan was seen entering storage unit on June 24, 1994; weapons allegedly used during June 23, 1994 robbery were found when the same storage unit was searched on June 24, 1994); *id.* at p.932 (petitioner was never seen at storage facility).

## COUNT TWO: The murder of Louis Dorval in 1994

As to Count Two charging petitioner with the obstruction of justice murder of Louis Dorval (Dorval), who was found floating at sea in a toolbox trunk days after he was indicted in New Jersey with several Lucchese crime family members in August 1994, Froccaro knew that Mulligan was a target/suspect in the murder of Dorval as of 1994.  *See* Exhibit I at p.361 (FBI investigative file showed that Mulligan was already a target/suspect as of 1994 in the homicides of Julius Baumgardt *and* Louis Dorval).

With the evidence adduced at trial only proving that Joseph Pistone had murdered Dorval, the prosecution submitted to the jury in its final summation that petitioner had "***aided and abetted***" Joseph Pistone, the murderer.  *See* Exhibit E (May 4, 2011) at p.3065.  In support of his motion under Rule 29, Fed.R.Crim.P., Froccaro argued that the tape evidence (of a conversation between Vincent Gargiulo and petitioner) "more appropriately" showed that petitioner had been implicated in the murder of Dorval as an "accessory after the fact."  *See* Exhibit L (April 27, 2011 transcript) at p.2793 ("…the only statement in there that could potentially be argued to implicate him in the murder or being an accessory -- *I think more appropriately being an accessory after the fact*, where there is a claim that it is Mr. Tarantino speaking, and there is a conversation to the extent that he cut his finger on the toolbox") (emphasis and brackets added).  During their deliberations, jurors focused on that portion of the tape implicating petitioner in dumping Dorval's body at sea. *See* Exhibit M (May 9, 2011 transcript) at p.3211 (trial court reading the jury's specific request "to hear the enhanced version of the designated area of the Gargiulo recording at the parts pertaining to the trunk, skin, finger"). That tape portion was *played and replayed* upon jury request. *Id.* at p.3213.  The transcript used at trial for that portion of the recording reads as follows:

*Gargiulo: "What about, remember the trunk and your finger? You told me something, you squished your finger?*

*Petitioner: Yeah [UI].*

*Gargiulo: There was no skin on that, right?*

*Petitioner: Buddy, no way [UI].   I was in the middle of the fuckin' Atlantic Ocean and the body was found floating two days later or better.  There was one piece of skin on a fuckin' rock, can't believe it's been floating in the ocean.*

*Gargiulo: Yeah, no way.*

*Petitioner:  No fucking way.*

*Gargiulo: Fish would eat it and stuff.*

*Petitioner: The bottom line, it would just float away, you know what I mean?  It wouldn't stay jammed on a rock? If it was here, yeah; but in the water- saltwater, for fuckin' two days, no fuckin' way.*

*Gargiulo: How bad is SCOTT taking this?*

*Petitioner: He's all right now because we sat around and kicked it around...*

*See* Exhibit N (government trial exhibit "RS-39") at pp.20-21 (emphasis added).

"As a general proposition, a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United States*, 485 U.S. 58, 63 (1988).  Given that petitioner's taped statements provided sufficient evidence for a reasonable jury panel to have found that petitioner was an "accessory after the fact," who had dumped the corpse at sea [*after the murder* was committed by Joseph Pistone inside of a vehicle as *corroborated* by the FBI], Froccaro was ineffective for failing to request a theory of defense instruction.  *See United States v. Varelli*, 407 F.2d 735 (7th Cir. 1969) (distinguishing the criminal conduct of accessories after the fact and aiders and abettors to conclude that defendants were accessories after the fact and could not be convicted as aiders and abettors in a case involving stolen merchandise).

Froccaro should have requested a legal theory of defense instruction that the jury had a **duty to acquit** petitioner charged as a principal in the murder of Dorval, if the jury found that the trial evidence only showed beyond a reasonable doubt that he was an "accessory *after the fact*." The legal theory was fully supported by the tape, *see* Exhibit N (government trial exhibit RS-39) (tape transcript), *supra*, at pp.20-21, but the instruction was not presented in the court's charge to the jury because counsel did not request it.   Froccaro raised the point in his Rule 29 motion, but counsel did not attempt to present the defense theory supported by the evidence to the jury.

It was irrational for counsel to pose a defense to the jury that was ***in denial*** of the taped statements that "more appropriately" showed that the petitioner was an "accessory after the fact," as submitted in support of the Rule 29 motion.  *See* Exhibit L (April 27, 2011 transcript) at p.2793; *compare* Exhibit E (May 4, 2011) at p.3055 (Froccaro's summation challenging the integrity of the tape and relying on the testimony of Peter Pistone) ("…[t]hat he and his brother Joseph and no one else disposed of Mr. Dorval's body at sea in a black bullet riddled toolbox. ...And that live, first-hand, eyewitness account of about who was there and what happened to Louis Dorval totally demolishes the integrity of the tape that came from nowhere, totally. How can Chris be twisting his finger on the box if he is not there?"). Still ***in denial*** about the tape, Froccaro "*doubled-down*" on Peter Pistone's testimony that excluded the petitioner from any involvement.  *Id*. at 3055-3056 ("His live, first-hand eyewitness account totally demolishes the integrity of the tape that came from nowhere because Chris had nothing to do with the murder of Louis Dorval and the disposal of his body at sea.").  Petitioner's voice was on the tape, but Froccaro attacked "the integrity of the tape" arguably inculpating Mulligan as a principal in the Dorval murder and exculpating petitioner as an accessory after the fact.[6]

---

[6] The tape was so damaging that retrial counsel ***conceded*** that the known existence of the tape provided "motive." *See* Exhibit O (May 9, 2012 transcript) at p.1919.  Froccaro "buried his head in the sand" due to his divided loyalties.

Certain portions of the taped conversation between petitioner and Gargiulo would have **_compelled_** any competent conflict-free trial counsel to inculpate Mulligan to defend petitioner. Gargiulo criticized "Scott" (Mulligan) for going "on the lam." *See* Exhibit N (trial exhibit RS-39) (tape transcript) at p.6.   Froccaro turned a blind eye to petitioner's taped response, stating that Mulligan was "not a saint in all of this. You're taking X amount of time. And I'm taking X." *Id.* The references to Mulligan's flight would have **_compelled_** any conflict-free counsel to inculpate Mulligan by arguing that his flight suggested that Mulligan had a greater concern as he aided and abetted the murder of Dorval, and that petitioner was an accessory after the fact who consistently did not flee from the same investigation that had collected his DNA two months earlier.  *Id.* at p.3.

The consensus of opinion was consistent with Mulligan's greater culpability.  *Id.* at p.18 (Gargiulo: "You know what the bad thing is SCOTT going on the run.  He makes you guys look so bad though …As soon as you guys get busted, they're going to find SCOTT in no time. ...Because you know how much media they'll put on him.  He'll be **_number one's most wanted_**. He won't be able to move.  Petitioner: Right, right") (emphasis added).  Froccaro did not use the tape to exculpate petitioner as an accomplice after the fact and inculpate Mulligan as a principal in the murder due to his divided loyalties.  Froccaro submitted that the tape "more appropriately" showed petitioner was an accessory after the fact, and the prosecution responded that the testimony of Gaetano Fatato (Fatato) supported "a fair inference that Mr. Dorval was last with Mr. Tarantino before his death." *Id.* at p.2797.  Fatato's testimony[7] posed no impediment to instructing the jury to acquit if it found that petitioner was an accessory after the fact in the murder.

---

[7] During trial, Fatato admitted that he had given different versions of his last contact with Dorval since 1994.  *See* Exhibit P (April 5, 2011 transcript) at pp.1335-1337 (Fatato told FBI Agent Greco on September 13, 1994, within one month of Dorval's death, that Dorval was at his residence the last time he phoned Dorval, and Dorval told Fatato that he was going to visit Tarantino later that evening). Fatato's lack of credibility is a matter of record.  *See* Exhibit Q (Doc. 171) (Case No. 08-655 (JS)) ("United States District Judge Jack B. Weinstein stated that Fatato was 'not unbelievable as a matter of law, just that his veracity is so slender as to suggest the court wouldn't believe him.' ").

Petitioner's statements implicated him only in dumping Dorval's body at sea and provided evidence for a reasonable jury to conclude that petitioner had been an "accessory after the fact." The evidence available to counsel showed that (1) petitioner dumped Dorval's body at sea, *see* Exhibit N at pp.20-21, (2) ***after the murder*** had already been committed by Joseph Pistone inside a vehicle, as ***corroborated*** by the FBI. *See* Exhibit I at pp.450-454 (FBI case agent testifying that AUSA represented to a federal judge that Peter Pistone was ***inside the vehicle*** when Joseph Pistone shot Dorval in the head; FBI case agent confirmed that bullet came from a revolver as reported; FBI case agent confirmed that the vehicle had been damaged from weight of corpse as reported; FBI case agent confirmed that the vehicle was returned to Joseph Pistone´s girlfriend with a brand new interior as reported, and that it had been a relative of Pistone who had installed new interior). Froccaro was ineffective for failing to request the correct legal theory of defense jury instruction supported by the evidence that Joseph Pistone had murdered Dorval inside a vehicle and the tape evidence implicating petitioner only in dumping Dorval's dead body at sea (i.e., *after-the-fact*). There is a reasonable probability that the jury would have acquitted petitioner (who was charged as a principal in the murder) if Froccaro had sought the correct legal theory of defense instruction that the jury had a duty to acquit petitioner if the jury reasonably concluded that the trial evidence presented only proved beyond a reasonable doubt that he was an "accessory after the fact."

## COUNTS THREE AND FOUR:

### The conspiracy to murder and the murder of Vincent Gargiulo in 2003

As to Counts Three and Four respectively charging petitioner with conspiring to commit the obstruction of justice murder of Vincent Gargiulo (Gargiulo) and with the obstruction of justice murder of Gargiulo, who was killed in Manhattan during the early morning of August 18, 2003, Froccaro ***destroyed evidence*** showing that Mulligan had a motive to hire the murder of Gargiulo,

when he destroyed the extortion letter that was mailed by Gargiulo to Mulligan earlier in 2003 at a time when Froccaro had also represented Mulligan in a drug prosecution.  *See* Stahl Affidavit. Irrespective of his destruction of evidence, Froccaro failed to inculpate Mulligan with evidence that would have ***compelled*** conflict-free trial counsel to inculpate Mulligan to defend petitioner. Even if Froccaro had not clearly operated under an actual conflict, prejudicial error was committed. Froccaro failed to object to inadmissible hearsay ***and*** failed to preclude petitioner's former attorney Melvyn Roth (Roth) from providing the "***direct link***" to convict petitioner at trial as the gym owner known as "Matty Roth," who allegedly conspired to murder Gargiulo.  ***But for the inadmissible post-mortem hearsay or the trial testimony of petitioner's former attorney that should have been precluded, there was insufficient evidence, requiring final acquittals that would have barred the retrial held on these mistried counts under the double jeopardy clause***.

On April 5, 2011, the government filed a letter regarding its *subpoena* to call petitioner's former attorney Melvyn Roth (Roth) to testify.  *See* Exhibit R (Doc. 213) (Case No. 08-655(JS)). The prosecution knew that attorney Roth and petitioner had an attorney-client relationship that extended to this federal prosecution.  *Id*. at p.1 ("Since 1991, Mr. Roth has represented Tarantino in numerous unrelated state and federal criminal matters.  Roth also represented Tarantino briefly during the grand jury investigation preceding the current indictment").

The government letter proffered the mosaic of evidence relevant to Counts Three and Four, *id*. at p.2, as follows:

On August 18, 2003, a government witness observed Justin Bressman shoot and kill Gargiulo. That witness, Pablo Amador, will testify that while he did not know the defendant, he was enlisted by Bressman to be a look-out during the murder of Gargiulo, which had been ordered by Bressman's Synergy gym employer, "Matty Roth."  Personnel and business records obtained from Synergy reveal that no "Matty Roth" worked at or operated the Synergy gyms run by Tarantino.

On August 21, 2003, three days after Gargiulo's murder, NYPD homicide detectives visited Bressman at a Synergy gym owned by Tarantino on W. 23rd Street in Manhattan, the same gym from which Amador observed Bressman retrieve, among others, the weapon used to kill Gargiulo. Bressman accompanied the detectives back to a local precinct station house. Shortly after the interview began, Mr. Roth telephoned the NYPD and spoke to one of the detectives interviewing Bressman. Mr. Roth asserted that he represented Bressman, and demanded that the questioning stop. The detectives then asked Bressman if he was represented by a Melvyn Roth. Bressman responded that although he knew who Roth was, he denied that Roth represented him. When detectives asked Roth for additional details about his representation, Roth said that he had been retained by "a very concerned party." Telephone records for August 21 show that after Bressman left the Synergy gym with NYPD detectives, Roth's office in Garden City, New York received an incoming call from one of Tarantino's Synergy gyms on Long Island.  Roth's office then called Roth's cell phone, and after a subsequent call, Roth called the NYPD station house where Bressman was being questioned.  Thereafter, Roth again called one of Tarantino's Long Island Synergy gyms.  Later that evening, Amador saw Bressman who had been released by the NYPD some hours earlier.  Bressman told Amador, in sum and substance, that he had been "picked up" by the NYPD, but that "Matty Roth" had gotten him a lawyer to stop the questioning.

*See* Exhibit R (Doc. 213) at p.2.  Since Amador testified in lockstep with the proffer, petitioner submits that <u>Froccaro</u> failed to object to inadmissible *post-mortem* hearsay not in furtherance of the conspiracy that came to an end with the murder and failed to preclude petitioner's attorney Roth from impermissibly providing the "***direct link***" to cast petitioner as the alleged co-conspirator "Matty Roth."  Without the *post-mortem* hearsay that Amador purportedly heard from missing alleged murderer Bressman that "Matty Roth" got Bressman an attorney, or without the identity testimony provided by attorney Roth inserting the "***direct link***" to suggest that petitioner was the person who obtained counsel for Bressman, petitioner could not have been cast as "Matty Roth," the gym owner who allegedly conspired to murder Gargiulo.  *See id*. at p.3 ("The anticipated testimony that Tarantino asked Mr. Roth to stop the NYPD's questioning of Bressman is relevant in this case ***to identify the defendant as the "Matty Roth" who hired Bressman to kill Garguilo***.") (emphasis added).  The referral of Roth as counsel was spun into evidence of guilt,  *id*. at p.3 ("Tarantino's effort to halt the questioning of his coconspirator is also probative of Tarantino's consciousness of guilt"), but Roth never testified that petitioner attempted to halt the questioning.

On April 6, 2011, Froccaro said that he would move to quash the *subpoena* to call Roth. The court requested that Froccaro submit his position by Friday, April 8, 2011, and he committed to submit his position by then,  *see* Exhibit S (April 6, 2011 transcript) at pp.1448-49, 1582, but Froccaro shirked his duty to file a researched position.  On April 11, 2011, Salvatore Marinello appeared as counsel for attorney Roth.  Marinello stated that he did not know the case evidence and advised Roth to invoke the Fifth Amendment after the court ruled that fee and client identity testimony was not excludable under the attorney-client privilege.  *See* Exhibit T (April 11, 2011 transcript) at pp.1859-1904.  Prior to coming to court, Roth advised AUSA Miskiewicz that he would invoke attorney-client privilege.  *Id*. at pp.1863-64.  Arguing that the privilege did not apply, AUSA Miskiewicz stated: "[W]e are not interested in any communications. ***We are interested only in the person who contacted him and told him to call the NYPD, end of story***." *Id*. at pp.1873-74 (emphasis and brackets added).  Roth was asked two questions in the absence of the jury panel ("Q. On or about August 21st, 2003, who asked you to contact the NYPD with respect to that agency's interview of Justin Bressman? Q. And who paid you to assert or enter an appearance with respect to Mr. Bressman on or about that date?"), and he invoked the Fifth Amendment following counsel's advice.  *Id*. at pp.1900-1901.  The trial court directed Roth to answer or ***face contempt***. *Id*. at pp.1901-03.  Roth was forced to identify petitioner as the person who asked him to contact the NYPD with respect to Bressman.  *See* Exhibit T at pp.1903-04 ("no one" paid attorney Roth). Linking Roth's client identity testimony with the inadmissible *post-mortem* hearsay provided by Amador that Bressman told him "Matty Roth" got Bressman an attorney, the prosecutor stated: "***Now we know who Mattie Roth is*** … ***this is all part and parcel of co-conspirator statements as Mr. Bressman is concerned, and Mr. Amador being told***...") (emphasis added).  Therefore, the government cannot deny that attorney Roth provided the last "direct link" to convict petitioner.

Froccaro failed to object to the inadmissible hearsay, and he also failed to articulate the correct legal objection to preclude attorney Roth's trial testimony that impermissibly provided the "***direct link***" to cast petitioner as "Matty Roth," without which the chain of evidence presented would have resulted in judgments of acquittal for insufficient evidence as to the mistried counts. Froccaro delivered ineffective assistance during trial.  *See* Exhibit T at pp.1877, 1884 (Froccaro: "I don't think the privilege applies… I don't know whether it applies").

Froccaro failed to object to an inadmissible *post-mortem* statement made three days after the charged conspiracy ended with the murder on August 18, 2003.  A conspiracy ends when its central criminal purpose has been achieved, *see Krulewitch v. United States*, 336 U.S. 440, 442 (1949), and a conspiracy to commit murder comes to an end when the murder has been committed. *See United States v. McKinney*, 945 F.2d 471, 475 (7th Cir. 1992); *United States v. Silverstein*, 737 F.2d 864, 867 (10th Cir.1984).  In *Silverstein*, the Tenth Circuit instructively held as follows:

> The hearsay exception of Fed.R.Evid. 801(d)(2)(E) applies only to statements made in the course and in furtherance of a conspiracy. Thus, a declaration made after the termination of the conspiracy does not fall within the exception.  The time at which the conspiracy ends depends upon the particular facts of the case. Generally, however, a conspiracy terminates when its central criminal purposes have been attained. If there was a conspiracy in the instant case, its central criminal purpose was the murder…. ***The duration of a conspiracy does not extend to attempts to conceal the crime***.  …The district court therefore erred in ruling that hearsay testimony was admissible pursuant to Fed.R.Evid. 801(d)(2)(E).

*Id*. at 867 (emphasis added; citations omitted). A conspiracy to murder was charged, and its goal was accomplished on August 18, 2003.  The *post-mortem* conversation of August 21, 2003, when Bressman purportedly told Amador that "Matty Roth" got him counsel during questioning, did not contribute to committing the murder.  *See United States v. Floyd*, 555 F.2d 45, 48 (2nd Cir. 1977) ("To include in the conspiracy an event, no matter how proximately related, occurring after the main objectives of a conspiracy have been accomplished would unnecessarily blur the relatively clear line drawn by the Supreme Court's decisions on this subject").

Without the erroneously admitted *post-mortem* hearsay, there was insufficient evidence, and the court would have had to enter final acquittals as to Counts Three and Four, but for counsel's prejudicial failure to object.  In *Floyd*, the Second Circuit found that the arson of the getaway car used in the armed robbery of a bank on the day after the robbery fell outside the bounds of the conspiracy to commit the bank robbery, and any co-conspirator statements made in conjunction with that event were not admissible evidence against Floyd.  Following the opinion in *Floyd*, attorney Roth's intervention during the questioning of Bressman three days after the murder also fell outside the temporal bounds of the murder conspiracy, and therefore the alleged *post-mortem* hearsay connected with that event was inadmissible against petitioner.  Froccaro's failure to object was prejudicial, as there was insufficient evidence to convict without the inadmissible hearsay.

The client identity testimony provided by attorney Roth impermissibly inserted the last "direct link" without which the chain of trial evidence presented would have been unable to cast petitioner as alleged co-conspirator "Matty Roth."  *See United States v. Goldberger & Dubin*, *P.C.*, 935 F.2d 501, 505 (2d Cir. 1991) (special circumstances under which client identity would be privileged exist when disclosure of client-identifying information would directly incriminate the client by providing direct linkage in an existing chain of evidence presented against the client). Petitioner would have also been entitled to acquittals **but for** his attorney's testimony erroneously admitted due to counsel's failure to raise the "direct linkage" exception to bar the testimony.

Amador testified in accordance with the government proffer that Bressman told him that "Mattie Roth" got Bressman an attorney when detectives questioned Bressman ***three days after the murder was committed***.  *See* Exhibit U (April 21, 2011 transcript) at pp.2239, 2272, 2288. Detective Jeff Salta of the NYPD testified that the interview of Bressman was halted by a call from attorney Roth who "said he was called and contacted by a concerned party." *Id*. at 2300.  And,

attorney Roth testified that petitioner had asked him to call the NYPD with regard to Bressman, providing the last "direct link" without which the chain of evidence could not have cast petitioner as "Mattie Roth." *Id.* at p.2305. Without the client identity testimony impermissibly provided by attorney Roth *or* without the admission of the inadmissible *post-mortem* hearsay, there would have been insufficient evidence to convict petitioner under Counts Three and Four as the identity of the alleged co-conspirator "Matty Roth" would have remained an enigma.[8]

Although Mulligan was a partner in all of the Synergy gyms, Froccaro failed to elicit that fact to show that Mulligan was also a "boss" to Bressman who was portrayed as the murderer hired by "Matty Roth," his "boss" at the Synergy gyms. *Compare* Exhibit V (April 25, 2011 transcript) at pp.2332-36 (CPA Scott Flynn, accountant for Synergy gyms, ***not*** asked by counsel if Mulligan or others were gym owners) *and* Exhibit W (May 2, 2012 transcript) at pp.1122-24 (CPA Flynn revealing during retrial cross-examination that the gym [where Bressman worked] was owned and operated by Brett Holzer and Eric Holzer); Exhibit X (May 7, 2012 transcript) at p.1547 (Mulligan was a partner in all of the Synergy gyms); *id*. at p.1654 (Mulligan admits that he and Brett Holzer were also Bressman's bosses). Mulligan had a motive[9] to hire the murder, and he was also Bressman's "boss," but Froccaro allowed jurors to believe petitioner was Bressman's only "boss." All of Froccaro's omissions favored Mulligan, who was "next on the chopping block" as stated by the prosecutor early during the first trial. *See* Exhibit Y (April 7, 2011 transcript) at p.1627.

---

[8] AUSA Flynn admitted that Bressman tried to "keep Amador in the dark as much as possible with regard to the murder and who he was working for." *See* Exhibit E (May 4, 2011 transcript) at p.2932 (explaining role switch).

[9] *See* Exhibit V at p.2372 (FBI agent reading pseudonymous letter from Gargiulo seeking "reward for information and audiotapes leading to the arrest and conviction of Scott Mulligan, Chris Tarantino and others in the 1994 armored car robbery where a guard was shot dead, and the death of one of the robbers named Louis was also shot dead and found floating off Long Island"); *see also* Stahl Affidavit (Froccaro destroyed extortion letter from Gargiulo to Mulligan).

There is more than just a reasonable probability that, but for counsel's errors, the result of the proceedings as to Counts Three and Four would have been different.  There is a certainty that petitioner would have been entitled to acquittals for insufficient evidence as the *post-mortem* hearsay was inadmissible, and the client identity testimony of petitioner's attorney Roth was also inadmissible as the testimony impermissibly inserted the "direct link" to convict petitioner casting him as co-conspirator "Matty Roth."  There is no rational basis to contend that counsel's failure to seek exclusion of the inadmissible *post-mortem* hearsay or exclusion of attorney Roth's testimony under the "direct link" exception was a valid legal strategy.  Counsel's gross incompetence allowed government counsel to parlay the inadmissible *post-mortem* hearsay and attorney Roth's improper client identity testimony barred under the rationale of the last "direct link" exception into a final summation that trumpeted the relevance of the patently inadmissible evidence, as follows:

Why is that relevant? Two reasons: One, it shows you that in fact ... Mattie Roth is actually Chris Tarantino, Bressman's actual boss at Synergy Gym, the person who offered Bressman $35,000 to kill Vinnie. Second, Mel Roth's testimony shows the defendant's consciousness of guilt. It showed the defendant wanted to control Bressman. Tarantino didn't want Bressman telling the NYPD the truth, that he had killed Gargiulo, and that he had been paid to do it and hired to do it by that man."

*See* Exhibit E (May 4, 2011 transcript) at p.2939.  Counsel committed malpractice.

### *Froccaro's undisclosed benefactor conflict warrants post-conviction relief*

On March 13, 2011, the prosecution requested that the court conduct an inquiry pursuant to *United States v. Curcio*, 680 F.2d 881, 888-890 (2d Cir. 1982), *see* Exhibit H (Doc. 189) (Case No. 08-655 (JS)), representing that it had filed a letter "under seal" on November 4, 2010, advising defense counsel of information provided by a confidential informant who heard that Salvatore Cutaia of the Lucchese crime family was one of Dorval's killers and that Cutaia's father had bragged that his son had "done a beautiful piece of work with that kid Louie."  *Id*. at p.2.

Petitioner was charged with the murder of Dorval, so government counsel had to concede that an "actual conflict of interest exists because Mr. Froccaro simultaneously represents both Tarantino and Salvatore Cutaia.  Similarly, Mr. Rosen currently represents both Tarantino and Domenico Cutaia." *See* Exhibit H at p.5.  On March 15, 2011, days before the first trial started, Judge Seybert accepted petitioner's waiver of the disclosed conflict,[10] but petitioner submits it is the undisclosed benefactor conflict under which Froccaro operated that warrants relief.

On April 23, 2012, new counsel, Stephen Rosen, disclosed for the first time that there had been a "very difficult" conflict involving first trial counsel Froccaro's ***simultaneous*** representation of Mulligan.  The undisclosed conflict was not made a part of the *Curcio* hearing.  *See* Exhibit AA (April 23, 2012 transcript) at pp.6-13. The prosecution proffered the testimony of Manon Mulligan, wife of Mulligan, as to her receipt in 2003 of an extortion letter threatening that the FBI would receive a tape incriminating her spouse and the petitioner unless $500,000 would be received by the letter's author (understood to be Gargiulo who was murdered months later).  Retrial counsel argued that Froccaro should testify about the letter that went missing after Manon Mulligan forwarded it to Froccaro, who also represented Mulligan in 2003.  On May 1, 2012, retrial counsel reiterated that Froccaro was a witness with material testimony to provide about the missing letter and noted the existence of "similar issues here concerning dual loyalty by Mr. Froccaro."  *See* Exhibit BB (May 1, 2012 transcript) at pp.918-919; *see also* Stahl Affidavit (Froccaro admitted that he destroyed the letter); Exhibit CC (May 2, 2012 transcript) at pp.1175-1176, 1193-1196 (Manon Mulligan testifying that the extortion letter was sent to Froccaro in 2003).  The trial court preserved the conflict of interest issue for post-conviction review.

---

[10] Dorval was found dead within days of being indicted with Lucchese crime family members, to which the Cutaias belonged, and who had the motive to commit the obstruction of justice murder of Dorval charged against petitioner. *See* Exhibit Z (April 4, 2011 transcript) at pp.1206-1207 (newspaper report published about New Jersey indictment in August 1994 charging Dorval along with "a bunch of" Lucchese crime family members).

Petitioner submits that the benefactor conflict under which Froccaro operated involved the undisclosed *simultaneous* defense of Mulligan during petitioner's trial as evidenced by his lapses in the representation of petitioner.  Froccaro's superior loyalty to Mulligan explains all of the trial choices that "sold out" petitioner and prevented counsel from abiding by his Sixth Amendment obligation of providing effective representation.  Froccaro's disqualifying loyalty to Mulligan also explains his ***destruction of evidence*** that Gargiulo attempted to extort Mulligan months before a hired murderer killed Gargiulo.  Froccaro was hired with a $150,000 check and cash payments arranged by Mulligan, *see* Stahl Affidavit (attaching check), and delivered a defense of Mulligan's conflicting interests to all of the counts rather than an effective defense inculpating Mulligan to exculpate petitioner as the trial evidence would have ***compelled*** conflict-free counsel to present.

Prejudice is presumed where a petitioner can show that his counsel actively represented conflicting interests as to all of the charges tried and that the actual conflict adversely affected his counsel's performance.  *See Cuyler*, 446 U.S. at 350; *United States v. Locascio*,  6 F.3d 924, 932 (2d Cir.1993) ("Ethical considerations warn against an attorney accepting fees from someone other than the client. As we stated in a different context, the acceptance of such benefactor payments may subject an attorney to undesirable outside influence and raises an ethical question as to whether the attorney's loyalties are with the client or the payor. *In re Grand Jury Subpoena Served Upon John Doe*, 781 F.2d 238, 248 n.6 (2d Cir.1985) (*en banc*)") (quotation marks omitted). "Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat v. United States*, 486 U.S. 153, 160 (1988).  Froccaro has dishonored his profession for personal gain, and his subservience to his benefactor's interests at the expense of petitioner's rights shattered any appearance of fairness to all those who have perceptively observed this case.

Froccaro twice claimed that the conflict involving the simultaneous representation of Lucchese crime family members who took credit for committing the August 1994 murder charged against petitioner had "honestly slipped [his] mind." *See* Exhibit G (March 15, 2011 transcript) at p.5. Judge Seybert reacted with perceptive dislike of Froccaro's use of the term "honestly" then, and the court should be offended by his dishonesty now.

There was an unwaivable risk that Froccaro would favor Mulligan and fail to conduct a rigorous defense of petitioner. Froccaro placed his pecuniary interests and the conflicting interests of Mulligan's antagonistic defense above petitioner's right to his effective assistance. The conflict adversely affected counsel's performance, *Cuyler*, 446 U.S. at 348, and the petitioner is entitled to relief as he was prejudiced by the ineffective assistance delivered by counsel. This court should find that "the conflict [wa]s of such a serious nature that no rational defendant would knowingly and intelligently desire that attorney's representation... the attorney [had to] be disqualified, regardless of whether the defendant [wa]s willing to waive his right to conflict-free counsel." *See United States v. Schwarz*, 283 F.3d 76, 95-96 (2d Cir. 2002) (brackets added). Froccaro concealed his conflict to avoid disqualification as the trial court would have found that no rational defendant would knowingly and intelligently waive such a conflict. "The right to effective representation by counsel whose loyalty is undivided is so paramount in the proper administration of criminal justice that it must in some cases take precedence over all other considerations, including the expressed preference of the defendants concerned and their attorney." *See Curcio*, 680 F.2d at 887.[11]

---

[11] Froccaro's destruction of evidence manifested his disqualifying conflict. *See Government of Virgin Islands v. Zepp*, 784 F.2d 125, 136 (3d Cir.1984) ("Even if not criminally charged for such events, trial counsel could have faced severe disciplinary consequences if it were ever known that he was involved in the destruction of evidence. American Bar Association, *Canons of Professional Ethics;* Canon 15 ... In circumstances such as these, when defense counsel has independent personal information regarding the facts underlying his client's charges, and faces potential liability for those charges, he has an actual conflict of interest … from these facts alone there was an actual conflict of interest which required withdrawal by trial counsel or disqualification by the court.").

In *United States v. Malpiedi*, 62 F.3d 465 (2d Cir. 1995), the Second Circuit provided the framework applicable to analyzing the disqualifying benefactor conflict found here.  The Court provided the following guidance:

> Although a defendant generally is required to demonstrate prejudice to prevail on a claim of ineffective assistance of counsel, prejudice is presumed when counsel is burdened by an actual conflict of interest.  This presumption is "fairly rigid."  Moreover, once the defendant establishes that there was an actual conflict, he need not prove prejudice, but simply that a lapse in representation resulted from the conflict.  To prove a lapse in representation, a defendant must demonstrate that some plausible alternative defense strategy or tactic might have been pursued, and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.

> This is not a test that requires a defendant to show that the alternative strategy or tactic not adopted by a conflicted counsel was reasonable, that the lapse in representation affected the outcome of the trial, or even that, but for the conflict, counsel's conduct of the trial would have been different. Rather, it is enough to show that a conflict existed that was inherently in conflict with a plausible line of defense or attack on the prosecution's case.  Once such a showing is made, [the] "fairly rigid" presumption of prejudice applies.

*Id*. at 469 (citations and quotation marks omitted).  As the compromised loyalty of counsel caused demonstrated lapses in representation, petitioner is entitled to relief under *Malpiedi*.

Petitioner has also shown that there is a reasonable probability that, but for counsel's errors, the result of the trial would have been different on all of the counts.  *See Strickland v. Washington*, 466 U.S. 668, 694 (1984).  The Sixth Amendment was violated due to the ineffective assistance delivered by conflicted counsel.

### ***Counsel entirely excluded petitioner from pre-screening the anonymous jurors***

To fully address all of the professional misconduct committed, petitioner also notes that Froccaro defied a court directive and excluded him from pre-screening the anonymous jurors. Petitioner argued on appeal that his absence from telephonic hearings held by Judge Seybert and Magistrate Tomlinson shortly before the trial on March 17, 2011 and March 21, 2011 (at which

time potential anonymous jurors were pre-screened on the basis of cause and hardship in the presence of his counsel) violated his right to be present during all material stages of the jury trial. The Second Circuit concluded that the petitioner "impliedly waived his right." *Tarantino*, *supra*, 617 Fed.Appx. at 64 (citation omitted). Petitioner had the right to participate in the pre-screening, *see Cohen v. Senkowski*, 290 F.3d 485, 489 (2d Cir. 2002) (pre-screening of prospective jurors is a material stage of trial at which a defendant has the constitutional right to be present), but the Second Circuit concluded that petitioner had waived his right assuming that Froccaro had complied with a court directive. *See Tarantino* at 64 ("Then, in the presence of Tarantino, the District Court explicitly directed his counsel to 'go through the jury selection questionnaires' with Tarantino in order to 'see what his desire would be in terms of the type of jury he'd like to be seated'"). However, Froccaro defied the trial court's directive and entirely excluded the petitioner from the process of pre-screening his jury. *See* Affidavit of Christian Tarantino.

Given the emphasis added by the trial court on the importance of including petitioner in the pre-screening process before the trial started, *see* Exhibit G (March 15, 2011 transcript) at p.40 (court directive issued after Froccaro questioned whether there was enough time to visit petitioner to review the juror questionnaires) (COURT: "So you're definitely going to do that beforehand and see what his desires would be in terms of the type of jury he'd like to be seated"), petitioner cannot be faulted for his failure to report his trial counsel's disregard of a direct court order before post-conviction proceedings to address his malpractice. On March 22, 2011, the trial court stated that "all these questionnaires were reviewed by you folks last week. And then I made certain decisions on Thursday, and again, yesterday Judge Tomlinson reviewed the questionnaires." *See* Exhibit DD (March 22, 2011 transcript) at pp.8-12. The court did not inquire whether Froccaro had reviewed the questionnaires with petitioner as directed on March 15, 2011.

Counsel never reviewed the juror questionnaires with petitioner and Froccaro's defiance of the court directive denied petitioner his right to participate in the jury pre-screening process. *See Cohen*, *supra*. The exclusion of petitioner from the entire pre-screening process of reviewing the juror questionnaires disregarding a direct order from the bench shows hubris and requires that the results of the first trial be vacated due to the violation of petitioner's constitutional right to participate during that material stage of the jury trial proceedings.

### *Retrial counsel provided ineffective assistance by failing to recuse the court*

28 U.S.C. § 455(a) provides that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify h[er]self in any proceeding in which h[er] impartiality might reasonably be questioned." Subsection (b)(1) also provides in relevant part: "[Sh]e shall also disqualify h[er]self in the following circumstances: Where [s]he has a personal bias or prejudice concerning a party…" (brackets added). The Supreme Court has emphasized that, where the grounds for recusal are comprised of "judicial rulings [and] routine trial administration efforts," recusal is not usually warranted absent evidence that the judicial actions "display deep-seated favoritism or antagonism that would make fair judgment impossible." *See Liteky v. United States*, 510 U.S. 540, 556 (1994). Judge Seybert displayed such "deep-seated favoritism or antagonism" on January 3, 2012, when the court accepted a waiver of grand jury indictment for an offense punishable by death, blatantly disregarding the Fifth Amendment and Rule 7, Fed.R.Crim.P., but expeditiously securing a witness for the prosecution on the eve of the retrial then scheduled for January 9, 2012. Retrial counsel ineffectively failed to seek recusal resulting in the denial of petitioner's right to an unbiased judge. The appearance of bias (due to the acceptance of a blatantly illegal waiver of indictment to expedite a retrial witness) triggered the duty of counsel to seek her recusal from the retrial.

The **_Information_** filed against the government witness Mulligan on January 3, 2012 tracked the same language used to plead Count One of the **_Indictment_** that was filed against the petitioner. *See* Exhibit EE at ¶6.  Mulligan executed a standard "waiver of indictment" form.  *See* Exhibit FF. Judge Seybert allowed the waiver of grand jury indictment in favor of an expeditious information that squarely framed the definition of a capital offense.  The Information pled that an offense under 18 U.S.C. § 33 resulted in the death of Julius Baumgardt, which qualifies as a capital charge.  *See* 18 U.S.C. § 3592(c)(1) ("Aggravating factors for homicide" include a death that "occurred during the commission … of … an offense under ... section 33 (destruction of motor vehicles or motor vehicle facilities)").  The court blatantly ran afoul of the Fifth Amendment ("No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury...") and Rule 7(a), Fed.R.Crim.P. ("An offense which may be punished by death shall be prosecuted by indictment"), all to expedite a retrial witness.  An alleged violation of § 33 resulting in a death is legally punishable by death.  *See* 18 U.S.C. § 34 ("Whoever is convicted of any crime prohibited by this chapter, which has resulted in the death of any person, shall be subject also to the death penalty or to imprisonment for life."). *See* Exhibit EE (Information) (*citing* § 34); Exhibit FF (Waiver of Indictment) (*citing* § 34).  On January 3, 2012, within two weeks after the case agent sought and obtained an arrest warrant for Mulligan, the court accepted his illegal waiver of the indictment. The unlawful court action aided a rush need for Mulligan as a witness for the government at the retrial then scheduled to start on January 9, 2012.  The waiver was invalid since the Information pled that a death resulted from the alleged § 33 offense.  *See Kees v. United States*, 304 F.2d 661, 663 (7th Cir. 1962) ("Because we conclude that the offense charged was a capital offense, we decide that Rule 7(a) gives no support to the district court's assumption of jurisdiction ...the court had no jurisdiction to try the alleged violation of the Kidnapping Act by information.").

The *Kees* panel so concluded notwithstanding the defendant's waiver of prosecution by indictment. The court deliberately ignored the Fifth Amendment and Rule 7, Fed.R.Crim.P., which only permit waiver of a grand jury indictment and prosecution by information in non-capital cases. The judge's willful blindness to the law to secure a witness for the prosecution projected an appearance of bias. Retrial counsel neglected his duty to seek recusal, as the court's disregard for the law showed her "impartially might reasonably be questioned." *See* 28 U.S.C. § 455(a).

In *Smith v. United States*, 360 U.S. 1 (1959), the defendant was charged with kidnapping, which allowed the death penalty if the released victim had been harmed. Smith was rushed through the arrest process, waived indictment, and pleaded guilty to an information that charged him with kidnapping, but the charge did not plead whether the victim was released harmed or unharmed. Smith was sentenced to twenty years in prison, but the Supreme Court held that the kidnapping had to be prosecuted by indictment because the charged statute allowed the death penalty under certain circumstances (even if the circumstances did not apply). *See also United States v. Cooper*, 91 F.Supp. 90, 104 (D.D.C. 2000) ("*Smith* stands for the proposition that there must be a prosecution by indictment for a crime punishable by death even if the death penalty is not sought"); *United States v. Macklin*, 523 F.2d 193, 196, n.3 (2d Cir. 1975) ("offense punishable by death requires prosecution by indictment regardless of a defendant's waiver") (*citing* Rule 7(a)); *Matthews v. United States*, 622 F.3d 99, 103 (2d Cir. 2010) (court must "look to the charging instrument to which [Mulligan] pleaded.") (brackets added).

Judge Seybert showed palpable bias in favor of the prosecution by unlawfully accepting a waiver of grand jury indictment for an offense punishable by death to expedite the cooperation of a government witness and that undermines public trust in the impartiality of judicial proceedings. Petitioner, like all defendants, had a basic right to an unbiased judge, *see Offutt v. United States*,

348 U.S. 11 (1954) ("[J]ustice must satisfy the appearance of justice"), and the failure of retrial counsel to seek recusal deprived petitioner of his fundamental right to an unbiased judge, thereby causing structural error that requires vacating the only conviction obtained after the retrial.[12]

### *Retrial counsel also failed to prevent a conviction based on inadmissible evidence*

After the retrial, the jury acquitted the petitioner of Count Four charging the obstruction of justice murder of Gargiulo, but it convicted him of the conspiracy to commit the obstruction of justice murder of Gargiulo charged under Count Three. There is a reasonable probability that, but for counsel's errors, the result of the trial proceedings as to Count Three would have been different. Petitioner would have been clearly entitled to acquittal for insufficient evidence as the *post-mortem* hearsay statement suggesting that "Matty Roth" got an attorney for Bressman during questioning conducted by the NYPD three days after the murder was inadmissible and the identity testimony of petitioner's attorney Roth was also inadmissible as the testimony impermissibly inserted the last "direct link" to convict petitioner casting him as co-conspirator "Matty Roth."  Without the inadmissible *post-mortem* hearsay *or* without the client identity testimony of petitioner's attorney, there would have been insufficient evidence to convict petitioner as a co-conspirator in the murder. There is no basis to contend that counsel's failure to seek the exclusion of inadmissible evidence was a valid legal tactic.  Counsel's incompetence allowed the prosecution to parlay inadmissible hearsay and attorney Roth's improper client identity testimony barred under the rationale of the last "direct link" exception into a final summation at the retrial that again trumpeted the relevance of the patently inadmissible evidence, as follows:

---

[12] Petitioner maintains that, but for the gross errors committed by Froccaro, the first trial of the mistried counts related to the alleged conspiracy to murder Gargiulo would have resulted in acquittals barring a retrial under double jeopardy.

And why is that relevant? Two reasons. First, it shows you that indeed there is no Mattie Roth. It is just a lie told by Bressman. Mattie Roth is actually Chris Tarantino, Bressman's actual boss at Synergy, the person who offered Bressman $35,000 to assassinate Vinnie. Second, Mel Roth's testimony shows the defendant's consciousness of guilt. It shows the defendant wanted to control Bressman. He didn't want Bressman telling the NYPD the truth that he had killed Gargiulo and that he had been hired to do it by that man, the defendant. And when Mel Roth did the defendant's bidding and broke up the interview, the NYPD detectives released Bressman.

*See* Exhibit GG (May 9, 2012 transcript) at pp.1875-76. Retrial counsel committed malpractice for the same reasons that first trial counsel also committed malpractice. *See ante* at pp.12-19. No lawyer objected to inadmissible evidence without which the chain of evidence presented was insufficient to convict. Exacerbating the prejudice that was caused by the repeated failure to object to the admission of inadmissible evidence at both trials, no lawyer objected to the summations at both trials that mischaracterized attorney Roth's inadmissible testimony to suggest evidence of petitioner's guilt not adduced at trial, as Roth never testified that petitioner had "directed" him to "break up the interview" of Bressman as misrepresented in the summations at both trials. *See* Exhibit GG at pp.1875-76 (AUSA retrial summation) (twice misrepresenting that Roth testified that petitioner "directed" Roth to "break up the interview"); Exhibit E (May 4, 2011) at p.2938 (AUSA first trial summation) (misrepresenting that Roth testified that he had been "directed to break up that interview by the defendant"). Ineffective counsel allowed the prosecution to run amok with inadmissible evidence during both trials.

## CONCLUSION

For all of the foregoing reasons, petitioner respectfully submits that the Court should vacate all of the convictions, dismissing Count One with prejudice or ordering a retrial, ordering a retrial under Count Two, and dismissing Count Three with prejudice or ordering a retrial.

Respectfully submitted,


_____/s/_____
Eliza D. Stahl, Esquire
NY Attorney Registration No.: 2738011
THE LAW OFFICE OF ELIZA D. STAHL, P.C.
1050 Grand Boulevard
Deer Park, New York 11729
(631) 841-3088
(631) 841-3089
eds@stahlfirm.com


**CERTIFICATE OF SERVICE**


I HEREBY CERTIFY that on July 14, 2017, undersigned counsel filed the foregoing

SUPPLEMENTAL MOTION UNDER 28 U.S.C. § 2255 TO VACATE/SET ASIDE ILLEGAL

CONVICTIONS/SENTENCES with the clerk via CM/ECF.


_____/s/_____
Eliza D. Stahl, Esquire