# EXHIBIT "J"

JMM:SCF/CNC
F.#2005R00138

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

SCOTT MULLIGAN,

         Defendant.

- - - - - - - - - - - - - - - X

# MJ-11-1252

FILED UNDER SEAL

COMPLAINT AND AFFIDAVIT
IN SUPPORT OF ARREST
WARRANT

(18 U.S.C. §§ 33, 34
and 2)

EASTERN DISTRICT OF NEW YORK, SS:

       ROBERT F. SCHELHORN, Jr. being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such.

       Upon information and belief, there is probable cause to believe that, on or about June 23, 1994, within the Eastern District of New York, the defendant SCOTT MULLIGAN, together with others, willfully and with a reckless disregard for the safety of human life, disabled and incapacitated Julius Baumgardt and Walter Tully, who were drivers and persons employed in connection with the operation of a motor vehicle used, operated and employed in interstate commerce, to wit: a Mid-Island armored van, and lessened the ability of such persons to perform their duties, which offense resulted in the death of Julius Baumgardt.

       (Title 18, United States Code, Sections 33, 34 and 2).

The source of Your deponent's information and the grounds for his belief are as follows:[1]

1. I have been a Special Agent with the FBI for approximately 16 years. Since late 1999, I have been the lead agent assigned to the investigation of the 1994 murder of Baumgardt, and two subsequent and related murders occurring in 1994 and 2003, as set forth more fully below. The information contained in this Complaint comes from first-hand knowledge, my discussions with witnesses involved in the investigation, my discussions with other law enforcement agents and officers, my review of reports prepared by other law enforcement officers, my review of other evidence, including documents, photographs and recordings related to this investigation, and my training and experience.

## A. The Murder of Julius Baumgardt

2. Mid-Island Check-Cashing Corporation ("Mid-Island") was a check-cashing business located in Massapequa, New York. Mid-Island owned and operated armored vans that served as mobile check-cashing outlets for the employees of Mid-Island's

---

[1]    Because the purpose of this Complaint is to establish only probable cause to arrest, I have not set forth a description of all the facts and circumstances of which I am aware. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in sum and substance and in part, except where otherwise indicated.

2

customers, which included businesses located on Long Island, New York and in New Jersey. Mid-Island's armored vans were "motor vehicles" as defined in Title 18, United States Code, Section 31(a)(6). In June 1994, Volt Information Sciences, Inc. ("Volt") was a customer of Mid-Island, and was located in Syosset, New York.

3. Julius Baumgardt ("Baumgardt") and Walter Tully ("Tully"), were persons employed by Mid-Island who jointly operated a Mid-Island armored van. On or about June 23, 1994, Baumgardt and Tully were assigned to deliver United States currency to Volt. As Baumgardt and Tully approached the Volt premises, the defendant SCOTT MULLIGAN ("MULLIGAN"), Christian Tarantino ("Tarantino") and Louis Dorval ("Dorval") approached Baumgardt and Tully, brandished firearms and ordered Baumgardt and Tully to lay on the ground. As Tully lay face-down and handcuffed, Dorval shot and killed Baumgardt. MULLIGAN and his accomplices then grabbed two satchels carried by Baumgardt, which contained the United States currency.

4. Numerous individuals both inside and outside the Volt building witnessed the robbery and murder of Baumgardt. Two such eyewitnesses, John Does 1 and 2,[2] were standing outside the building - a few feet from Baumgardt and Tully - when the crime

---

[2] I am aware of the identities of all the individuals referenced by aliases in this Affidavit.

3

occurred. John Does 1 and 2 have previously testified[3] that they saw two assailants on June 23, 1994. According to John Does 1 and 2, one of those individuals, subsequently identified during the course of the investigation as Dorval, was wearing a dark business suit, a mustache and sunglasses, and was carrying a handgun. The second individual was wearing a rubber mask that covered his entire head. John Doe 1 described this mask as resembling the face of a pig. John Does 1 and 2 testified that this second individual was carrying what both described as a black, pump action, pistol grip shotgun that, as set forth below, was purchased on behalf of Tarantino three days earlier. John Doe 2 further described one of the assailants as a large individual, approximately six-foot-one-inch in height, with a "heavy build".[4]

5. Jane Does 1 and 2 were employees of Volt, who viewed the events from inside the building through ground-floor

---

[3]  On May 23, 2011, after a six-week jury trial conducted before the Honorable Joanna Seybert, Tarantino was convicted of participating in the June 23, 1994 murder of Julius Baumgardt, in violation of 18 U.S.C. §§ 33 and 34, and the August 1994 obstruction of justice murder of Dorval, in violation of 18 U.S.C. § 1512. See United States v. Christian Tarantino, 08 CR 655 (JS). John Does 1 and 2, as well as John Doe 5 and Jane Does 1, 2 and 3, referenced infra, testified during that trial.

[4]  Your deponent has reviewed surveillance photographs taken of MULLIGAN in the summer of 1994. In those photographs, MULLIGAN looks as if he could have weighed between 210-240 pounds during that period. Additionally, biographical data contained in MULLIGAN's criminal history report indicates that he is six-foot-one-inch tall.

windows looking out onto the building's parking lot. According
to Jane Does 1 and 2, there were three assailants who ambushed
Baumgardt and Tully that morning. At least two of those
individuals drove to the area in a red SUV, which was located
shortly after the murder and identified as a Chevy Blazer (the
"Blazer"). Both Jane Does 1 and 2 identified two of the
assailants as wearing rubber "pig masks." According to Jane Does
1 and 2, one of these individuals was carrying a shotgun during
the robbery.

6. Moments after Dorval shot Baumgardt, the
assailants fled in the Blazer, and then abandoned the SUV only a
few hundred yards from where Baumgardt was killed. The
assailants then sped away in a sedan, as described below. Police
photographs of the Blazer taken soon after the murder show that
its windows were left open and the vehicle was not properly
aligned within the parking space. The Blazer bore a Florida
license plate, with number PCX-42D. That number matched all but
one digit of the six-digit identifier Jane Doe 1 relayed to law
enforcement in a 911 call made moments after the robbery and
murder of Baumgardt.[5]/

7. Subsequent investigation established that the
Blazer had been stolen from a car dealership in Hicksville, New
York, on or about January 28, 1994. The license plate belonged

---

[5]/ In her 911 call to police, Jane Doe 1 identified the
Blazer's license plate as a Florida plate, number PCX420.

5

to a different vehicle that was registered to an elderly Florida woman, who died 11 days prior to the Baumgardt murder. The Blazer was processed by Nassau County Police Department ("NCPD") detectives in the Scientific Investigations Bureau. The detectives noted that the Blazer appeared to have been thoroughly cleaned. Nevertheless, shortly after the murder, a crime scene examiner recovered both human and animal hairs from the seats and floor of the Blazer.

8. After abandoning the Blazer, Baumgardt's killers entered a cream/metallic colored sedan and fled out of the parking lot in front of the Volt building onto Jericho Turnpike. Two eyewitnesses reported almost being struck by this second getaway car as it fled the Volt office complex and abandoned Chevy Blazer. According to Jane Doe 3, the individual driving the cream/metallic sedan appeared to be a heavier-set individual with his hair pulled back into a pony tail. I have reviewed police surveillance photos taken of MULLIGAN and others in the weeks after the Baumgardt murder. In those photos, MULLIGAN's hair resembles the description given by Jane Doe 3. Specifically, MULLIGAN wore his hair pulled back in a pony tail.

**B.    The Storage Unit**

9. In the weeks before the Baumgardt murder, NCPD detectives investigating an auto-theft ring conducted surveillance at a self-storage business in Farmingdale, New York. Tarantino, MULLIGAN and others were subjects of that

6

investigation. On June 20, 1994, Nassau County Police Department ("NCPD") detective Jack Kennedy, while at the self-storage business, observed an associate of MULLIGAN and Tarantino's, Carl Vahldieck, use a driver's license of another MULLIGAN and Tarantino acquaintance, John Doe 3, to rent storage unit B-54.

10. On the morning of June 24, 1994, the day after Baumgardt's murder, Detective Kennedy and his partner Detective Raymond Gene obtained a search warrant for storage unit B-54. After receiving a call from the manager of the storage facility advising that an individual was at the B-54 unit, Gene immediately drove to the storage facility as Kennedy waited for the warrant to be signed by a New York Supreme Court Justice. As Gene arrived at the business, he saw MULLIGAN walk away from unit B-54, enter a white Lexus vehicle and drive away. Kennedy arrived shortly after in time to see MULLIGAN driving out of the storage unit complex. At the time, Detective Kennedy was very familiar with the MULLIGAN family through his work as a law enforcement officer in the Merrick/Bellmore area of Long Island. Detective Kennedy had served as a pall bearer at the funeral of MULLIGAN's brother, and was personally familiar with the defendant. Further, Detective Kennedy noted the license plate of MULLIGAN's vehicle, which subsequently came back as being registered to MULLIGAN's mother.

11. Upon executing the search warrant for unit B-54 a few minutes later, detectives Gene and Kennedy found a stolen

7

automobile and a canvas bag containing a Model 19, 9 mm Glock pistol (serial # APX041US), a Mossberg, Model 88 12-gauge shotgun with a pistol grip (serial # MV51077D) (the "Mossberg Shotgun"), police radio scanners and walkie talkies. Both John Does 1 and 2 have identified the Mossberg Shotgun found in the B-54 storage unit as being similar to the one they observed during the June 23, 1994 robbery and murder of Baumgardt. A firearms trace conducted by the Bureau of Alcohol, Tobacco and Firearms ("ATF") revealed that the Mossberg Shotgun was purchased on June 20, 1994 at a sporting goods store in Merrick, New York, by John Doe 4. ATF records further revealed that the Glock pistol (serial # APX041US) seized from the storage unit was purchased by Dorval in Florida on February 28, 1994 - along with two other handguns - four months before Baumgardt's murder. John Doe 4 has testified under oath that he purchased the Mossberg Shotgun at the request of Vahldieck, with instructions that the weapon was needed by Tarantino.

12. According to a Confidential Witness ("CW-1"), who was a close partner and criminal associate of both MULLIGAN and Tarantino, in the days following the Baumgardt murder, NCPD detectives questioned several young male individuals, including Vahldieck and John Does 3 and 4, about their connection to the B-54 storage unit and the weapons found inside it. CW-1[6] reported

6/    Following initial meetings with Your deponent and others in 2007, CW-1 stated that he received information that Tarantino

8

this information to MULLIGAN, who expressed concern that John Doe
4 was cooperating with authorities. According to CW-1, MULLIGAN
then instructed CW-1 to take Vahldieck and John Does 3 and 4 to a
Long Island-based attorney, whose identity is known, who was
familiar with MULLIGAN and Tarantino. The purpose of taking
these individuals to the attorney was to obtain written (and
false) statements from them that would tend to exculpate MULLIGAN
or Tarantino concerning their connection to storage unit B-54 and
the purchase of the Mossberg Shotgun.

        13.  On or about July 4, 1994, one of the members of
MULLIGAN and Tarantino's circle of associates, Gus Kritikos, was
involved in a motorcycle accident on Long Island, which left
Kritikos in vegetative state. According to CW-1, following that
accident, MULLIGAN stated to CW-1 and others that, should they be
questioned about the purchase of the Mossberg Shotgun found in
the storage unit, they should indicate that the shotgun had been

_____

and/or others knew that he had met with federal law enforcement
agents.  Subsequently, CW-1 stated that he was unwilling to
testify out of fear of retaliation, and would, if subpoenaed,
claim that his earlier statements were coerced.  More recently,
CW-1 has stated that he is prepared to testify in open court, and
that the information he provided Your deponent beginning in 2007,
as summarized herein, is true and accurate.  The information
provided by CW-1 as set forth herein has been corroborated by
numerous sources and witnesses.  Accordingly, I deem CW-1 to be
reliable.

9

purchased at the direction of Kritikos - not Tarantino - since
Kritikos was incapacitated.[1]

## C. MULLIGAN's Expressed Concern that His DNA Would Be Recovered from the Blazer, Which was Abandoned at the Scene of the Baumgardt Murder

14. On July 13, 2000, grand jury subpoenas directed
MULLIGAN, Tarantino and others to provide buccal swabs, hair
samples, palm prints and finger prints in an effort to link them
to forensic evidence retrieved from the Blazer after the armored
car robbery and murder of Baumgardt. MULLIGAN's hair and buccal
swab were taken on July 26, 2000 at the NCPD Headquarters by NCPD
Homicide Squad detectives working in conjunction with Your
deponent on the Baumgardt and Dorval murder investigations.
Sometime thereafter, during the summer of 2000, MULLIGAN called
CW-1 and requested that CW-1 immediately come to his house in
Bellmore, New York to speak with him. In a statement CW-1
provided to investigators in 2007, CW-1 indicated that during
their 2000 conversation, MULLIGAN appeared visibly nervous about
the taking of his DNA. According to CW-1, MULLIGAN stated that
Tarantino speculated that the request for DNA was in connection
with an unrelated federal narcotics and money laundering

---

[1]     Nothwithstanding evidence to the contrary, including the
trial testimony of John Doe 4, who purchased the Mossberg Shotgun
at Vahldieck's direction, that it was needed by Tarantino,
Vahldieck has maintained as late as January 2010 that the
Mossbery Shotgun was intended for Kritikos.

investigation of which MULLIGAN and Tarantino were aware.[2]/
However, according to CW-1, MULLIGAN was convinced that the DNA
was related to another unspecified matter.

15.   In or about September 2000, MULLIGAN attended a
wedding in Great Neck, New York, which was also attended by a
Cooperating Witness ("CW-2").  CW-2 is a cooperating defendant
who pled guilty to Conspiracy to Defraud the United States, in
violation of 18 U.S.C. § 371, and Conspiracy to Collect Unlawful
Debts - Gambling, in violation of 18 U.S.C. § 1956(h).  CW-2
entered his pleas pursuant to a cooperation agreement with the
United States Attorney's Office for the Eastern District of New
York.  CW-2 has consistently been deemed reliable by other
handling agents.  At the wedding, MULLIGAN spoke to CW-2, who was
known as an individual with a scientific background with
experience in defending against DNA evidence in criminal matters.
MULLIGAN indicated to CW-2, in sum and substance, that he was
concerned because federal authorities had recently taken a DNA
sample from him in an effort to link his DNA to hair found at the
scene of a crime.  According to CW-2, MULLIGAN mentioned that his
hair might have been discovered in a "hat" or a "mask" that had
been found near the scene of a robbery.  According to CW-2,

_____

[2]/   In or about April 2001, MULLIGAN was one of 25 defendants
indicted on RICO narcotics and money laundering charges in the
Eastern District of New York.  He pled guilty to conspiracy to
distribute marijuana and was sentenced to 37 months in prison, in
November 2002.  He surrendered to Bureau of Prisons authorities
on January 10, 2003.

MULLIGAN described the robbery as an "armored something," and MULLIGAN wanted to know what his options were. When CW-2 specifically asked whether the hair found was MULLIGAN's, MULLIGAN responded that it was.

## D. **MULLIGAN's Admission to CW-1**

16. CW-1 advised that MULLIGAN and Tarantino had learned, from unknown sources, that eyewitnesses at the Baumgardt murder site described to police that one of the assailants was heavy, and six-foot-one to six-foot-three in height. Although this was an approximation, rather than an exact description, CW-1 stated that within MULLIGAN and Tarantino's crew of criminal associates, only two individuals approximated that description: MULLIGAN and John Goetz (hereinafter "Goetz").[2]

17. Goetz was a friend and criminal associate of MULLIGAN and Tarantino, and an acquaintance of CW-1. In or about August 2000, Goetz was arrested by the U.S. Drug Enforcement Administration and charged with conspiring to distribute the "date-rape drug," known as GHB. In or about May 2001, after being released on bail, Goetz was found dead inside his New York City apartment as a result of natural causes. Sometime after Goetz's death, CW-1 and MULLIGAN had dinner together at a restaurant in Massapequa, New York. During the course of the

---

[2] Biographical data taken from a 2000 criminal history report for John Goetz indicates that Goetz was six-foot-two and 210 pounds in that year.

12

evening, CW-1 stated that he missed Goetz. MULLIGAN responded,
in sum and substance, that "some good" had come from Goetz's
death because Goetz had now become MULLIGAN's "cover story."
Given MULLIGAN's prior direction to CW-1 and others to blame
Kritikos for the purchase of the Mossberg Shotgun, CW-1
understood MULLIGAN to be stating that, in the event of an arrest
for the Baumgardt murder, MULLIGAN would defend himself by using
the deceased Goetz as fitting the description of the larger
individual described by eyewitnesses at the Baumgardt murder
scene.

### E. Law Enforcement's Contact with MULLIGAN's friend and Criminal Associate Vincent Gargiulo

18. In May 2003, Your deponent received a letter,
addressed to the Long Island Resident Agency of the FBI, which
read in part:

> I'm writing you to see if there is a reward
> for information and audiotapes leading to the
> arrest and conviction of Scott Mulligan
> Christ [sic] Tarantino and others in the 1994
> armored car robbery where a guard was shot
> dead and the death of one of the robbers
> named Louie who was also shot dead and found
> floating off Long Island.

19. The author of the letter used the pseudonym
"Chucky" and claimed that he was not involved in the crimes and
therefore did not "want a deal, I just want money." "Chucky"
invited the FBI to contact him through the website
craigslist.com.

13

20. On May 29, 2003, Your deponent, and another agent met "Chucky," who was in fact Vincent Gargiulo, a long time friend and former criminal associate of Tarantino and MULLIGAN's. Gargiulo reported that, several years earlier, he, Tarantino and MULLIGAN became partners in a Manhattan health club. Gargiulo had suffered from emotional and substance-abuse problems and was hospitalized for a time after the club, named Body Sculpt, opened. During his hospitalization, Gargiulo lost control of Body Sculpt's operation. When he returned from his hospitalization, Gargiulo discovered that Body Sculpt was in arrears regarding payments to its landlord and various creditors.

21. Gargiulo claimed that Tarantino and MULLIGAN sold Body Sculpt's equipment without consulting with him and that they kept the proceeds of those sales rather than pay the gym's creditors. Consequently, Gargiulo believed that Tarantino and MULLIGAN cheated him, and offered to provide the FBI, in exchange for money, with an audio tape that would tend to prove that MULLIGAN and Tarantino were, among other things, responsible for the 1994 murder of Baumgardt. Gargiulo further advised, in sum and substance, that Tarantino and MULLIGAN knew of the existence of the audio tape.

22. On the morning of August 18, 2003, Gargiulo was shot and killed near the corner of West 30th Street and Broadway in Manhattan by an individual named Justin Bressman. Bressman was an employee of Tarantino's at the time of the murder.

14

23. On or about April 6, 2004, the New York City Police Department received an anonymous mailing containing a micro-cassette audiotape with the recorded voices of Tarantino and Gargiulo. Based on various references, including the extent of Tarantino's wife's pregnancy with their first child and a reference that it had been two months since the FBI took his DNA exemplar, the tape was made in or about September 2000 inside Tarantino's Manhattan apartment and a nearby hallway. This would also place the making of the tape at or about the same time that MULLIGAN expressed to CW-1 and CW-2 concerns about the taking of his DNA exemplars.

24. On the audio tape, which has been subjected to forensic analysis by the FBI, deemed to have been an original and unaltered or edited recording, and admitted into evidence as authentic pursuant to the Federal Rules of Evidence at the Tarantino trial earlier this year, Tarantino admits his role in the Baumgardt, as well as Dorval murders. Specifically, Tarantino recounts to Gargiulo how during the armored car robbery that left Baumgardt dead, he and his accomplices drove to the robbery in a "red stolen vehicle," and that they subsequently "changed tails" after the robbery and murder and fled in a different vehicle.

25. Tarantino further stated to Gargiulo on the recording that the government "had" the vehicle that he and his accomplices abandoned at the scene, and that although he and

15

others had "cleaned the car for a couple of hours" before the
robbery, Tarantino was concerned that law enforcement had
recently taken his DNA sample for analysis - going so far as to
state that he thought his sample would match, or "come back" to
DNA found in the getaway vehicle.  In discussing his concerns
with Gargiulo, Tarantino also stated that he had discussed the
matter with MULLIGAN and, in sum and substance, had assured
MULLIGAN that prosecution for the Baumgardt murder would be
impossible so long as both men refused to cooperate with law
enforcement authorities.  Tarantino reported that he and MULLIGAN
were fairly confident that the taking of DNA was meant to scare
one of them into doing something "stupid," such as cooperating
with federal authorities.  Tarantino reported that while, "I
don't think SCOTT is as strong as, say, a lot of other guys,"
Tarantino believed MULLIGAN was "smart" and would calculate that
even with cooperation in the Baumgardt murder investigation, he
would inevitably face a lengthy prison sentence.  Later in the
conversation, Tarantino (designated "CT"), and Gargiulo
(designated "VG"), are overheard stating the following:

> VG:  That's a good thing.  All you have to worry about
>      is you and SCOTT.
>
> CT:  Yeah.
>
> VG:  SCOTT understands that, right?
>
> CT:  Yeah, [unintelligible or "UI"].
>
> VG:  I don't know about that.

16

CT:  He is, yeah.

VG:  Well, that's a fuckin' good thing. So you really
     -- you really should just drop it. Don't talk
     about it with anybody.

         *      *      *      *      *

VG:  You got to really beat that into SCOTT'S head.

CT:  Yeah, no. He's listening . . . .

     26.  Nevertheless, Tarantino and Gargiulo go on in the
recording to discuss how the recent taking of MULLIGAN's DNA
sample in connection with the Baumgardt murder had made MULLIGAN
nervous, and had even prompted MULLIGAN to go "on the lam" for a
period of time:

          CT:  [Tarantino's lawyer] said, well [UI]. Here's
               the deal. He said, if you don't give it to
               them [a DNA sample], the U.S. Attorney is
               going to call up your fucking parole officer,
               he's going to call DAN PERRONE. They're
               going to have you violated immediately. And
               just so you know, I've been checking it out.
               He goes, here's the deal. He goes, they can
               get a fuckin' court order, no fuckin'
               problem; and they will, okay, CHRIS? Before
               you get -- and they will. He goes, so if you
               don't like giving it to them, you're going to
               be automatically violated because if you give
               it to them, you're going to get out. Get
               out. How the fuck is that happening, you
               know what I mean. I'm like, it's coming
               back. I'm thinking, what does it take, ten
               days? Supposedly it takes two to three
               months.

          VG:  How long's it been?

          CT:  Two months and change.

          VG:  Oh, shit.

          CT:  Yeah.

                              17

VG:  Now, it makes more sense that SCOTT'S doing
     everything.  I was going to tell you how long
     ago SCOTT running [UI] . . . .

              *    *    *    *    *

VG:  Umm, you know what there, I think - just so
     you know, it's all over Bellmore, that shit
     SCOTT'S doing.

CT:  Yeah.

VG:  It comes back to me. I get a call from BOB,
     who is in a dirt bag bar; and he
     found out.  I go, what the fuck you talking
     about, SCOTT'S not, you know, on the - you
     know, basically he's on the lam.  SCOTT'S not
     on the lam.  It is the stupidest thing I ever
     [UI].  He was on [UI].

CT:  Yeah.

VG:  Turns out, he's right . . . .

         27.  Later in the conversation, however, Tarantino
assured Gargiulo that MULLIGAN was "alright now because we sat
around and kicked it around."  Tarantino and Gargiulo's
statements in September 2000 about MULLIGAN's nervousness with
respect to his DNA being taken by law enforcement are consistent
with the information provided by CW-1 and CW-2 regarding their
respective conversations with MULLIGAN during the summer of 2000,
discussed more fully above, during which MULLIGAN expressed that
same trepidation to them.

**F.  MULLIGAN'S mtDNA Matches that of a Hair Extracted from the
     Blazer**

         28.  In November 2011, FBI laboratory analysis reported
that MULLIGAN's mitochondrial DNA ("mtDNA") was the same as mtDNA

18

extracted from a Caucasian hair found in the Blazer immediately following the Baumgardt murder. The FBI's analysis compared the frequency of the mtDNA sequence displayed by the Caucasian hair sample and MULLIGAN's known exemplar to the general population. The analysis concluded that the mtDNA sequence in the Caucasian hair sample and MULLIGAN's appeared in only 0.17% of the Caucasian population.[10] Two other hairs found in the Blazer after the Baumgardt murder have also been matched to the same mtDNA found in blood and saliva samples obtained from Dorval and Tarantino, respectively.

WHEREFORE, Your deponent respectfully requests that an arrest warrant issue for the defendant SCOTT MULLIGAN so that he can be dealt with according to law.

---

[10]    The mtDNA analysis results do not provide a unique identifier because mtDNA is inherited from one's mother, usually with no change in mtDNA from mother to offspring. Therefore, MULLIGAN's mother, siblings and other extended family members on his mother's side will, absent mutations, have the same mtDNA match to the Caucasian hair sample obtained from the Blazer. More definitive nuclear DNA analysis would have required the recovery of blood or tissue, in addition to hairs, from the Blazer and, thus, is not available.

WHEREFORE, Your deponent further respectfully requests that this Complaint and Affidavit, as well as the arrest warrant, be filed under seal until such time as the defendant is arrested.

ROBERT F. SCHELHORN, Jr.
Special Agent
Federal Bureau of Investigation

Sworn to before me this
20th day of December, 2011

UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

20