# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

**CHRISTIAN GEROLD TARANTINO,**

      **Petitioner,**

**vs.**                         **Case No.: 2:08-cr-00655-JS**
                                      **(Related Case: 2:16-cv-03770-JS)**

**UNITED STATES OF AMERICA,**

      **Respondent.**

_____/

## AMENDED SUPPLEMENTAL MOTION UNDER 28 U.S.C. §2255 TO VACATE/SET ASIDE ILLEGAL CONVICTIONS/SENTENCES FILED BY A PERSON IN CUSTODY OF THE UNITED STATES

TODD G. SCHER
Law Office of Todd G. Scher, P.L.
Fla. Bar No. 0899641
1722 Sheridan Street, #346
Hollywood, FL 33020
(Tel) 754-263-2349
(Fax) 754-263-4147
TScher@msn.com
Counsel for Petitioner

## <u>TABLE OF CONTENTS</u>

Introduction ……………………………………………………………………….. 1

1.  Petitioner was convicted of an offense under 18 U.S.C. § 33 without jurisdiction as a result of the ineffective assistance that was delivered by his first trial counsel …… 2

2.  Petitioner's first trial counsel operated under an undisclosed benefactor conflict adversely affecting the defense as counsel delivered ineffective assistance at trial ……. 6

COUNT ONE: The sidewalk robbery of June 23, 1994 that resulted in a death .. 7

COUNT TWO: The murder of Louis Dorval in 1994 ………………………….. 8

COUNTS THREE AND FOUR:  The conspiracy to murder and the murder of Vincent Gargiulo in 2003 ……………………………………………………. 13

3.  Attorney Froccaro's undisclosed benefactor conflict warrants post-conviction relief … 20

4.  Counsel entirely excluded Petitioner from pre-screening the anonymous jurors……… 24

5.  Retrial counsel provided ineffective assistance by failing to seek the Court's recusal… 25

6.  Retrial counsel failed to prevent a conviction based on inadmissible evidence ………. 27

7.  Trial Counsel's Failure to Present Petitioner's Testimony at Motion to Suppress Hearing 29

The Applicable Statutory Framework ……………………………………………. 30

Other Evidence Corroborates Tarantino ………………………………………… 31

A.   The Grand Jury Indictment ………………………………………….. 31

B.  Gargiulo's Demand of $500,000 from the FBI …………………………. 31

C.  Tarantino's Complaints about "Dry Ratting" …………………………… 32

1.   Nicholas Pisciotti ……………………………………………… 32

2.  Robert Gerrato ………………………………………………… 33

D.  The Demand of $500,000 From Scott Mulligan …………………………. 33

E.  Gargiulo's Contemporaneous Financial Motive …………………………. 34

1.  Gargiulo's Documented Financial Setbacks …………………………. 35

2.  Gargiulo's "Insurance" Collection ………………………………….... 37

Applicable Legal Principles ……………………………………………………    38

The Legislative History of 18 U.S.C. § 2511(2)(d) …………………………….    40

Counsel Rendered Ineffective Assistance ……………………………………    42

Conclusion ……………………………………………………………………    44

Certificate of Service …………………………………………………………    45

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

**CHRISTIAN GEROLD TARANTINO,**

   **Petitioner,**

**vs.**            **Case No.: 2:08-cr-00655-JS**
                **(Related Case: 2:16-cv-03770-JS)**

**UNITED STATES OF AMERICA,**

   **Respondent.**

_____/

## AMENDED SUPPLEMENTAL MOTION UNDER 28 U.S.C. §2255 TO VACATE/SET ASIDE ILLEGAL CONVICTIONS/SENTENCES FILED BY A PERSON IN CUSTODY OF THE UNITED STATES

Petitioner Christian Tarantino (hereinafter, "Petitioner"), through his undersigned counsel, hereby files this amended supplemental motion pursuant to 28 U.S.C. §2255 seeking to vacate/set aside his unconstitutional convictions and sentences.  The instant petition is being filed in accordance with the Court's electronic paperless orders dated August 21, 2019, and September 19, 2019, and is intended to be the operative petition, supplementing and amending the original §2255 motion filed *pro se* on June 27, 2016, the same day that the United Supreme Court denied certiorari review,[1] and the supplemental petition filed on July 14, 2017 (DE:505).[2]

### *Introduction*

In addition to incorporating herein all of the documents, evidence, and testimony that are part of the extensive record in Petitioner's case, Petitioner also expressly incorporates herein by

---

[1] *See Tarantino v. United States,* 136 S.Ct. 2526 (2016).

[2] When Petitioner filed his prior supplemental petition in July 2017, the Court required him to re-file it with a 30-page limitation.  The present submission contains the same issues as did the July 2017 submission, but adds an additional argument.  Thus, because the Court has granted Petitioner leave to file any supplemental issues, the instant submission, is, by necessity, in excess of 30 pages.  By separate motion, Petitioner is seeking leave to exceed the page limitation.

specific reference the exhibits and attachments that have been previously filed in connection with the July 14, 2017, supplemental pleading (*see* attachments to DE: 505).  Petitioner did not want to over-burden the Court or the docket with re-filing the very same exhibits and attachments twice.  However, if the Court wishes the exhibits to be re-filed as attachments to the present submission, Petitioner will do so.  Moreover, this submission presumes familiarity with Petitioner's case, and thus does not contain discussion of the procedural history or a detailed factual statement of the evidence from the Petitioner's two trials; instead, it discusses only the facts relevant to the issues being raised herein.

### *Petitioner was convicted of an offense under 18 U.S.C. § 33 without jurisdiction as a result of the ineffective assistance that was delivered by his first trial counsel*

As to Count One charging Petitioner with a violation of 18 U.S.C. §33, dispassionate analysis of the jurisdictional element required to convict under §33 leads to the conclusion that the Petitioner was convicted of the offense without jurisdiction, *as the trial evidence showed that **Mid-Island Check Cashing Corp. armored vans were only "used" within the state of New York***.  Mid-Island Check Cashing Corp. (Mid-Island) was a domestic New York company that never registered to do business in New Jersey - a fact that would have been discovered prior to trial had trial counsel complied with their professional duty to investigate state corporate records.  *See Strickland v. Washington*, 466 U.S. 668 (1984).

On March 29, 2011, the government presented the testimony of Frank Fede (Fede), owner of Mid-Island in June 1994, when two of its employees were robbed, and one of them was killed.  Mid-Island records introduced at trial showed that the armored van involved was ***only used within New York***, *see* Exhibit A (Trial Exhibit 3-FF) (June 23, 1994 vehicle route showing only ***intra***state stops within New York), ***and*** Fede testified that Mid-Island armored vans ***only serviced New York***, ***disproving*** jurisdiction under §33.  *See* Exhibit B (March 29, 2011 transcript) at p.808 ("AUSA:

And how did you **_use_** the armored vans? Fede: To deliver payrolls to certain companies around Long Island [and] Queens.  AUSA: In addition to Long Island and Queens, did you service any companies outside of New York State? A. **_No._**  AUSA: Did **_you ever_** service companies in the Port of Newark? Fede: Yes. AUSA: In the Port of Newark, what kind of companies did **_you_** serve? Fede: We did the tankers that came in from foreign countries, and we would service the ships.") (emphasis and brackets added); *but see* Exhibit C (Indictment) at p.1, ¶1 (alleging that "Mid-Island owned and operated armored vans that served as mobile check-cashing outlets for the employees of Mid-Island's customers, which included businesses located on Long Island, New York **_and in New Jersey_**") (emphasis added).  **_No_ _Mid-Island_ _vehicle_** ever serviced New Jersey businesses. Records consistently show that "**_Mid-Island Check Cashing Corp_**." registered only as a domestic corporation in New York (from 1973 to 1995), and recent "no records" certificates establish that "**_Mid-Island Check Cashing Corp_**." never registered in New Jersey.  *See* Composite Exhibit D (Mid-Island records issued by New York and "no records" certificates issued by New Jersey). Petitioner was unlawfully convicted despite the corroborated trial testimony of a company owner that **_Mid-Island armored vans_** were **only** "**used**" within New York.

Petitioner was convicted without jurisdiction as the evidence adduced at trial **_disproved_** the jurisdictional element of 18 U.S.C. §33.  To convict a defendant of an offense prosecuted under 18 U.S.C. §33, the government must prove the essential jurisdictional element found within the statute, requiring that the alleged offense conduct involve a "motor vehicle which is used, operated, or employed in interstate or foreign commerce." *See* 18 U.S.C. §33(a).  The jurisdictional element is set forth in the first "whoever" clause of the statute.  Given this requirement, the third "whoever" clause of 18 U.S.C. §33(a) must therefore be read as follows: "Whoever with like intent, willfully disables or incapacitates any driver or person employed in connection with the operation or

maintenance of the motor vehicle ['which is used, operated, or employed in interstate or foreign commerce']... .'' The jurisdictional language is unambiguous. An offense mischarged under §33 cannot be salvaged by misapplying the "*de minimis*" effect on commerce analysis that is applicable to language found in other statutes. Had the government timely charged the 1994 robbery as a violation of the Hobbs Act, 18 U.S.C. § 1951(a) ("Whoever *in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery*") (emphasis added), the jurisdictional element *under that statute* could have been proven if the robbery committed merely created a realistic probability of a "*de minimis*" effect on commerce. *See United States v. Celaj*, 649 F.3d 162, 168 (2nd Cir. 2011).

Under 18 U.S.C. §33, a motor vehicle must be "used, operated, or employed in" interstate commerce, not just have some "*de minimis*" effect on commerce. The Supreme Court has noted that Congress has repeatedly recognized the "distinction between legislation limited to activities '*in commerce*,' and an assertion of its full Commerce Clause power so as to cover all activity substantially *affecting interstate commerce*." *See United States v. American Bldg. Maint. Indus*., 422 U.S. 271, 280 (1975) (emphasis added). The phrase "in interstate commerce" is a much more restrictive jurisdictional requirement than the phrase used in the Hobbs Act ("affects interstate commerce or the movement of any article or commodity in commerce"). Had Congress wanted to include language in §33 to cover vehicles that are merely used to "affect" commerce, they could have done so. *See, e.g.,* 18 U.S.C. §844(i) (covering motor vehicles "used in interstate or foreign commerce *or in any activity affecting interstate or foreign commerce*") (emphasis added).

The jurisdictional phraseology "used, operated, or employed in" interstate commerce also appears in 18 U.S.C. §32, enacted with §33 in 1956. Section 32 authorizes prosecution of anyone who "sets fire to, damages, destroys, disables, or wrecks ... any civil aircraft used, operated, or

employed in interstate, overseas, or foreign air commerce."   Sections 32 and 33 both adopted language from 18 U.S.C. §1992, which authorizes prosecution of **terrorist attacks** by anyone who "willfully derails, disables, or wrecks any train, engine, motor unit, or car used, operated, or employed in interstate or foreign commerce by any railroad."  Section 33 extended protection **_only_** to motor vehicles "used, operated, or employed in interstate or foreign commerce."  The trial record shows clear evidence that Mid-Island armored vans had **_not_** been "used, operated, or employed in" interstate commerce.  The jurisdictional language of §33 cannot be misapplied to reach any vehicle *ever* owned by one ostensibly engaged in interstate commerce, **where the "_use_" of the _Mid-Island_ _armored vans_ was confined to New York _only_.**  *See* Exhibit B (Fede testimony) at p.808.

Due to the dearth of law construing the interstate commerce language of 18 U.S.C. §33, the court should consider cases interpreting 18 U.S.C. §§32 and 1992, as both use the same "used, operated, or employed in" language.   In *United States v. Hume*, 453 F.2d 339 (5th Cir.1971), construing Section 32, the court found that an airplane operated in interstate commerce because the airplane had been crop-dusting in New Mexico during the morning of the day that the airplane was shot while dusting in Texas.  In *United States v. Altenburger*, 549 F.2d 702 (9th Cir.1977), the court applied Section 1992 to a case involving an interstate train.  Petitioner does **_not_** argue that the Mid-Island van had to have crossed a state line on June 23, 1994 (which it did not), but Petitioner does submit that **_the evidence showed that Mid-Island vans were ONLY "used" within_ _New York_**, and therefore he was convicted **_without jurisdiction_**.

The prosecution described the jurisdictional element to the jury as follows: "**_[Y]ou must_ _find that the government has proven beyond a reasonable doubt that the motor vehicle was used_ _by a company that operated or did business in interstate or foreign commerce_**."  *See* Exhibit E (May 4, 2011 transcript) at p.2878 (emphasis and brackets added).  The Court instructed the jury

to decide the jurisdictional element, as follows: "***It is sufficient if the government proves beyond a reasonable doubt that the motor vehicle was used by a company that operated in interstate or foreign commerce***."  *See* Exhibit F (May 5, 2011 transcript) at pp.3130-3131 (emphasis added). Because counsel rendered ineffective assistance, the prosecution was able to claim in its closing summation that there was ***no dispute*** that "***Mid-Island Check Cashing Corporation operated in interstate commerce***."  *See* Exhibit E at p.2880.  But for the deficient performance of counsel, the §33 charge would have been dismissed on a pretrial motion or a Rule 29 motion, as Mid-Island was a domestic corporation only operating vans in New York.  Mid-Island did ***not*** "operate" vans in New Jersey.  *See* Exhibit C at p.1, ¶1 (Indictment charging that Mid-Island operated vans in New Jersey).

Petitioner's trial counsel never argued that the prosecution failed to prove the jurisdictional element, and there is no basis on the record to treat such an omission as a strategic choice. Petitioner respectfully submits that the Court should conclude that the conviction under 18 U.S.C. § 33 was obtained without jurisdiction, vacate the conviction under Count One of the Indictment, and dismiss the charge ***with prejudice***.  At a minimum, the Court should conduct an evidentiary hearing.

### *Petitioner's first trial counsel operated under an undisclosed benefactor conflict adversely affecting the defense as counsel delivered ineffective assistance at trial*

Petitioner's first trial counsel, James Froccaro (Froccaro), operated under an undisclosed benefactor conflict that adversely affected his trial performance, as Froccaro's divided loyalties prevented him from pursuing a defense of Petitioner ***compelled*** by the evidence that incriminated Scott Mulligan (Mulligan).  The ***simultaneous*** representation of Mulligan damaged the defense. Through these §2255 proceedings, petitioner can amply "demonstrate that an actual conflict of interest adversely affected his lawyer's performance."  *See Cuyler v. Sullivan*, 446 U.S. 335, 348

6

(1980).  The Second Circuit concluded that the trial court "failed to develop the record" and "preserve[d] this issue for collateral review."  *See United States v. Tarantino*, 617 Fed.Appx. 62, 65-66 (2d Cir. 2015) (brackets added).  Facts that were *dehors the record* are now ripe for review.

The Affidavit submitted by lawyer Eliza Stahl (Stahl) reveals the undisclosed conflict under which Froccaro operated during the first trial.  The trial court did not "develop the record" because Froccaro inexcusably failed to disclose that he ***simultaneously*** represented Mulligan before and during trial (receiving a $150,000 check and cash payments arranged by Mulligan).[3] In her declaration, Stahl avers that Froccaro admitted that he had ***destroyed*** the extortion letter that was sent by Vincent Gargiulo (Gargiulo) to Mulligan only months before Gargiulo was killed. By destroying evidence showing Mulligan's motive to cause the murder of Gargiulo, Froccaro showed his ***complicity*** with Mulligan, which disqualified him from defending Petitioner at the trial, as Mulligan was implicated in all of the offenses charged against petitioner.  Irrespective of the complicitous destruction of criminal evidence, Froccaro unreasonably failed to inculpate Mulligan given evidence that would have ***compelled*** conflict-free counsel to inculpate Mulligan in order to defend Petitioner.  Froccaro's trial performance was adversely affected as to each count tried.

### COUNT ONE: The sidewalk robbery of June 23, 1994 that resulted in a death

As to Count One charging Petitioner with the robbery that resulted in the death of guard Julius Baumgardt, Froccaro knew that Mulligan was a target/suspect as of 1994.  *See* Exhibit I (February 16, 2011 transcript) at p.361 (FBI file showed that Mulligan was a target/suspect in the

---

[3] During the *Curcio* hearing held days before the first trial started, Froccaro twice claimed that another conflict of interest (involving the simultaneous representation of Lucchese crime family members who took credit for committing the August 1994 murder charged against the petitioner) "*honestly* slipped [his] mind."  *See* Exhibit G (March 15, 2011 transcript) at p.5.  Froccaro failed to disclose his benefactor conflict, as he also represented Mulligan before and during petitioner's first trial.  *See* Stahl Affidavit.

murders of Julius Baumgardt and Louis Dorval); *id*. at p.363 (Mulligan's DNA was *subpoenaed*).[4]
The conflict led to prejudicial error as counsel failed to elicit a description suggesting ***Mulligan***
played a part in the robbery ***instead of Petitioner***,[5] and even objected to linking ***Mulligan*** to the
cache of weapons.[6]

### COUNT TWO: The murder of Louis Dorval in 1994

As to Count Two charging Petitioner with the obstruction of justice murder of Louis Dorval
(Dorval), who was found floating at sea in a toolbox trunk days after he was indicted in New Jersey
with several Lucchese crime family members in August 1994, Froccaro knew that Mulligan was a
target/suspect in the murder of Dorval as of 1994.  *See* Exhibit I at p.361 (FBI investigative file
showed that Mulligan was already a target/suspect as of 1994 in the homicides of Julius Baumgardt
*and* Louis Dorval).

With the evidence adduced at trial only proving that Joseph Pistone had murdered Dorval,
the prosecution submitted to the jury in its final summation that Petitioner had "***aided and abetted***"
Joseph Pistone, the murderer.  *See* Exhibit E (May 4, 2011) at p.3065.  In support of his motion
under Rule 29, Fed.R.Crim.P., Froccaro argued that the tape evidence (of a conversation between
Vincent Gargiulo and Petitioner) "more appropriately" showed that Petitioner had been implicated
in the murder of Dorval as an "accessory after the fact."  *See* Exhibit L (April 27, 2011 transcript)
at p.2793 ("…the only statement in there that could potentially be argued to implicate him in the

---

[4] Stahl also avers that Froccaro celebrated the case agent's testimony given at the *Mastrangelo* hearing suggesting that
Mulligan's DNA was excluded by the FBI as of the hearing date.  *Id*. at p.363.  Froccaro took credit for "clearing"
Mulligan at the *pre-trial* hearing.  *See* Stahl Affidavit.

[5] *See* Exhibit J (FBI case agent affidavit) at pp.3-4, ¶4 & n.4 (two (2) witnesses who were standing "a few feet" from
the robbery saw two (2) assailants; one of the assailants was Louis Dorval, and Mulligan fit the description of the
other assailant who wielded a shotgun, identically matching his height ("six-foot-one-inch") and "heavy build".

[6] *See* Exhibit K (March 30, 2011 transcript) at pp.899-917 (Froccaro objecting to any trial testimony that Mulligan
was seen entering storage unit on June 24, 1994; weapons allegedly used during June 23, 1994 robbery were found
when the same storage unit was searched on June 24, 1994); *id*. at p.932 (Petitioner was never seen at storage facility).

murder or being an accessory -- *I think more appropriately being an accessory after the fact*, where there is a claim that it is Mr. Tarantino speaking, and there is a conversation to the extent that he cut his finger on the toolbox") (emphasis and brackets added).  During their deliberations, jurors focused on that portion of the tape implicating Petitioner in dumping Dorval's body at sea. *See* Exhibit M (May 9, 2011 transcript) at p.3211 (trial court reading the jury's specific request "to hear the enhanced version of the designated area of the Gargiulo recording at the parts pertaining to the trunk, skin, finger"). That tape portion was *played and replayed* upon jury request. *Id*. at p.3213.  The transcript used at trial for that portion of the recording reads as follows:

> *Gargiulo: "What about, remember the trunk and your finger? You told me something, you squished your finger?*
>
> *Petitioner: Yeah [UI].*
>
> *Gargiulo: There was no skin on that, right?*
>
> *Petitioner:  Buddy, no way [UI].   I was in the middle of the fuckin' Atlantic Ocean and the body was found floating two days later or better.  There was one piece of skin on a fuckin' rock, can't believe it's been floating in the ocean.*
>
> *Gargiulo: Yeah, no way.*
>
> *Petitioner:  No fucking way.*
>
> *Gargiulo: Fish would eat it and stuff.*
>
> *Petitioner: The bottom line, it would just float away, you know what I mean?  It wouldn't stay jammed on a rock? If it was here, yeah; but in the water- saltwater, for fuckin' two days, no fuckin' way.*
>
> *Gargiulo: How bad is SCOTT taking this?*
>
> *Petitioner: He's all right now because we sat around and kicked it around...*

*See* Exhibit N (government trial exhibit "RS-39") at pp.20-21 (emphasis added).

"As a general proposition, a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor."

*Mathews v. United States*, 485 U.S. 58, 63 (1988).  Given that Petitioner's taped statements provided sufficient evidence for a reasonable jury panel to have found that Petitioner was an "accessory after the fact," who had dumped the corpse at sea [*after the murder* was committed by Joseph Pistone inside of a vehicle as *corroborated* by the FBI], Froccaro was ineffective for failing to request a theory of defense instruction.  *See United States v. Varelli*, 407 F.2d 735 (7th Cir. 1969) (distinguishing the criminal conduct of accessories after the fact and aiders and abettors to conclude that defendants were accessories after the fact and could not be convicted as aiders and abettors in a case involving stolen merchandise).

Froccaro should have requested a legal theory of defense instruction that the jury had a ***duty to acquit*** Petitioner charged as a principal in the murder of Dorval, if the jury found that the trial evidence only showed beyond a reasonable doubt that he was an "accessory *after the fact*." The legal theory was fully supported by the tape, *see* Exhibit N (government trial exhibit RS-39) (tape transcript), *supra*, at pp.20-21, but the instruction was not presented in the court's charge to the jury because counsel did not request it.   Froccaro raised the point in his Rule 29 motion, but counsel did not attempt to present the defense theory supported by the evidence to the jury.

It was unreasonable for counsel to pose a defense to the jury that was ***in denial*** of the taped statements that "more appropriately" showed that the Petitioner was an "accessory after the fact," as submitted in support of the Rule 29 motion.  *See* Exhibit L (April 27, 2011 transcript) at p.2793; *compare* Exhibit E (May 4, 2011) at p.3055 (Froccaro's summation challenging the integrity of the tape and relying on the testimony of Peter Pistone) ("…[t]hat he and his brother Joseph and no one else disposed of Mr. Dorval's body at sea in a black bullet riddled toolbox. ...And that live, first-hand, eyewitness account of about who was there and what happened to Louis Dorval totally demolishes the integrity of the tape that came from nowhere, totally. How can Chris be twisting

his finger on the box if he is not there?"). Still _**in denial**_ about the tape, Froccaro "*doubled-down*" on Peter Pistone's testimony that excluded the petitioner from any involvement.  *Id*. at 3055-3056 ("His live, first-hand eyewitness account totally demolishes the integrity of the tape that came from nowhere because Chris had nothing to do with the murder of Louis Dorval and the disposal of his body at sea.").  Petitioner's voice was on the tape, but Froccaro attacked "the integrity of the tape" arguably inculpating Mulligan as a principal in the Dorval murder and exculpating Petitioner as an accessory after the fact.[7]

Certain portions of the taped conversation between Petitioner and Gargiulo would have _**compelled**_ any conflict-free trial counsel to inculpate Mulligan to defend Petitioner. Gargiulo criticized "Scott" (Mulligan) for going "on the lam." *See* Exhibit N (trial exhibit RS-39) (tape transcript) at p.6.  Froccaro turned a blind eye to Petitioner's taped response, stating that Mulligan was "not a saint in all of this. You're taking X amount of time. And I'm taking X."  *Id*.  The references to Mulligan's flight would have _**compelled**_ any conflict-free counsel to inculpate Mulligan by arguing that his flight suggested that Mulligan had a greater concern as he aided and abetted the murder of Dorval, and that Petitioner was an accessory after the fact who consistently did not flee from the same investigation that had collected his DNA two months earlier.  *Id*. at p.3.

The consensus of opinion was consistent with Mulligan's greater culpability.  *Id*. at p.18 (Gargiulo: "You know what the bad thing is SCOTT going on the run.  He makes you guys look so bad though …As soon as you guys get busted, they're going to find SCOTT in no time. ...Because you know how much media they'll put on him.  He'll be _**number one's most wanted**_. He won't be able to move.  Petitioner: Right, right") (emphasis added).  Froccaro did not use the tape to exculpate Petitioner as an accomplice after the fact and inculpate Mulligan as a principal

---

[7] The tape was so damaging that retrial counsel _**conceded**_ that the known existence of the tape provided "motive."  *See* Exhibit O (May 9, 2012 transcript) at p.1919.  But Froccaro "buried his head in the sand" due to his divided loyalties.

in the murder due to his divided loyalties.  Froccaro submitted that the tape "more appropriately" showed Petitioner was an accessory after the fact, and the prosecution responded that the testimony of Gaetano Fatato (Fatato) supported "a fair inference that Mr. Dorval was last with Mr. Tarantino before his death." *Id.* at p.2797.  Fatato's testimony[8] posed no impediment to instructing the jury to acquit if it found that Petitioner was an accessory after the fact in the murder.

Petitioner's statements implicated him only in dumping Dorval's body at sea and provided evidence for a reasonable jury to conclude that Petitioner may have been an "accessory after the fact."  The evidence available to counsel showed that (1) Petitioner dumped Dorval's body at sea, *see* Exhibit N at pp.20-21, (2) ***after the murder*** had already been committed by Joseph Pistone inside a vehicle, as ***corroborated*** by the FBI.  *See* Exhibit I at pp.450-454 (FBI case agent testifying that AUSA represented to a federal judge that Peter Pistone was ***inside the vehicle*** when Joseph Pistone shot Dorval in the head; FBI case agent confirmed that bullet came from a revolver as reported; FBI case agent confirmed that the vehicle had been damaged from weight of corpse as reported; FBI case agent confirmed that the vehicle was returned to Joseph Pistone´s girlfriend with a brand new interior as reported, and that it had been a relative of Pistone who had installed new interior).  Froccaro was ineffective for failing to request the correct legal theory of defense jury instruction supported by the evidence that Joseph Pistone had murdered Dorval inside a vehicle and the tape evidence implicating Petitioner only in dumping Dorval's dead body at sea (i.e., *after-the-fact*).  There is a reasonable probability that the jury would have acquitted Petitioner (who was charged as a principal in the murder) if Froccaro had sought the correct legal theory of

---

[8] During trial, Fatato admitted that he had given different versions of his last contact with Dorval since 1994.  *See* Exhibit P (April 5, 2011 transcript) at pp.1335-1337 (Fatato told FBI Agent Greco on September 13, 1994, within one month of Dorval's death, that Dorval was at his residence the last time he phoned Dorval, and Dorval told Fatato that he was going to visit Tarantino later that evening). Fatato's lack of credibility is a matter of record.  *See* Exhibit Q (Doc. 171) (Case No. 08-655 (JS)) ("United States District Judge Jack B. Weinstein stated that Fatato was 'not unbelievable as a matter of law, just that his veracity is so slender as to suggest the court wouldn't believe him.'").

defense instruction that the jury had a duty to acquit petitioner if the jury reasonably concluded that the trial evidence presented only proved beyond a reasonable doubt that he was an "accessory after the fact." Froccaro had an actual conflict of interest adversely affecting his defense of Petitioner, and also rendered prejudicially deficient performance. See *Cuyler v. Sullivan*, 466 U.S. 335 (1980); *Strickland v. Washington*, 466 U.S. 668 (1984).

## COUNTS THREE AND FOUR

### The conspiracy to murder and the murder of Vincent Gargiulo in 2003

As to Counts Three and Four respectively charging Petitioner with conspiring to commit the obstruction of justice murder of Vincent Gargiulo (Gargiulo) and with the obstruction of justice murder of Gargiulo, who was killed in Manhattan during the early morning of August 18, 2003, Froccaro ***destroyed evidence*** showing that Mulligan had a motive to hire the murder of Gargiulo, when he destroyed the extortion letter that was mailed by Gargiulo to Mulligan earlier in 2003 at a time when Froccaro had also represented Mulligan in a drug prosecution. *See* Stahl Affidavit. Irrespective of his destruction of evidence, Froccaro failed to inculpate Mulligan with evidence that would have ***compelled*** conflict-free trial counsel to inculpate Mulligan to defend Petitioner. Even if Froccaro had not clearly operated under an actual conflict, prejudicial error was committed. Froccaro failed to object to inadmissible hearsay ***and*** failed to preclude Petitioner's former attorney Melvyn Roth (Roth) from providing the "***direct link***" to convict Petitioner at trial as the gym owner known as "Matty Roth," who allegedly conspired to murder Gargiulo. ***But for the inadmissible post-mortem hearsay or the trial testimony of Petitioner's former attorney that should have been precluded, there was insufficient evidence, requiring final acquittals that would have barred the retrial held on these mistried counts under the double jeopardy clause***.

On April 5, 2011, the government filed a letter regarding its *subpoena* to call Petitioner's

13

former attorney Melvyn Roth (Roth) to testify.  *See* Exhibit R (Doc. 213) (Case No. 08-655(JS)). The prosecution knew that attorney Roth and Petitioner had an attorney-client relationship that extended to this federal prosecution.  *Id*. at p.1 ("Since 1991, Mr. Roth has represented Tarantino in numerous unrelated state and federal criminal matters.  Roth also represented Tarantino briefly during the grand jury investigation preceding the current indictment").

The government letter proffered the mosaic of evidence relevant to Counts Three and Four, *id*. at p.2, as follows:

> On August 18, 2003, a government witness observed Justin Bressman shoot and kill Gargiulo.  That witness, Pablo Amador, will testify that while he did not know the defendant, he was enlisted by Bressman to be a look-out during the murder of Gargiulo, which had been ordered by Bressman's Synergy gym employer, "Matty Roth."  Personnel and business records obtained from Synergy reveal that no "Matty Roth" worked at or operated the Synergy gyms run by Tarantino.

> On August 21, 2003, three days after Gargiulo's murder, NYPD homicide detectives visited Bressman at a Synergy gym owned by Tarantino on W. 23rd Street in Manhattan, the same gym from which Amador observed Bressman retrieve, among others, the weapon used to kill Gargiulo.  Bressman accompanied the detectives back to a local precinct station house. Shortly after the interview began, Mr. Roth telephoned the NYPD and spoke to one of the detectives interviewing Bressman. Mr. Roth asserted that he represented Bressman and demanded that the questioning stop. The detectives then asked Bressman if he was represented by a Melvyn Roth. Bressman responded that although he knew who Roth was, he denied that Roth represented him. When detectives asked Roth for additional details about his representation, Roth said that he had been retained by "a very concerned party."

> Telephone records for August 21 show that after Bressman left the Synergy gym with NYPD detectives, Roth's office in Garden City, New York received an incoming call from one of Tarantino's Synergy gyms on Long Island.  Roth's office then called Roth's cell phone, and after a subsequent call, Roth called the NYPD station house where Bressman was being questioned.  Thereafter, Roth again called one of Tarantino's Long Island Synergy gyms.

> Later that evening, Amador saw Bressman who had been released by the NYPD some hours earlier.  Bressman told Amador, in sum and substance, that he had been "picked up" by the NYPD, but that "Matty Roth" had gotten him a lawyer to stop the questioning.

*See* Exhibit R (Doc. 213) at p.2.  Since Amador testified in lockstep with the proffer, Petitioner submits that <u>Froccaro</u> failed to object to inadmissible *post-mortem* hearsay not in furtherance of the conspiracy that came to an end with the murder and failed to preclude Petitioner's attorney Roth from impermissibly providing the "***direct link***" to cast Petitioner as the alleged co-conspirator "Matty Roth."  Without the *post-mortem* hearsay that Amador purportedly heard from missing alleged murderer Bressman that "Matty Roth" got Bressman an attorney, or without the identity testimony provided by attorney Roth inserting the "***direct link***" to suggest that Petitioner was the person who obtained counsel for Bressman, Petitioner could not have been cast as "Matty Roth," the gym owner who allegedly conspired to murder Gargiulo.  *See id*. at p.3 ("The anticipated testimony that Tarantino asked Mr. Roth to stop the NYPD's questioning of Bressman is relevant in this case ***to identify the defendant as the "Matty Roth" who hired Bressman to kill Gargiulo***.") (emphasis added).  The referral of Roth as counsel was spun into evidence of guilt, *id*. at p.3 ("Tarantino's effort to halt the questioning of his coconspirator is also probative of Tarantino's consciousness of guilt"), but Roth never testified that Petitioner attempted to halt the questioning.

On April 6, 2011, Froccaro said that he would move to quash the *subpoena* to call Roth. The court requested that Froccaro submit his position by Friday, April 8, 2011, and he committed to submit his position by then, *see* Exhibit S (April 6, 2011 transcript) at pp.1448-49, 1582, but Froccaro shirked his duty to file a researched position.  On April 11, 2011, Salvatore Marinello appeared as counsel for attorney Roth.  Marinello stated that he did not know the case evidence and advised Roth to invoke the Fifth Amendment after the court ruled that fee and client identity testimony was not excludable under the attorney-client privilege.  *See* Exhibit T (April 11, 2011 transcript) at pp.1859-1904.  Prior to coming to court, Roth advised AUSA Miskiewicz that he would invoke attorney-client privilege.  *Id*. at pp.1863-64.  Arguing that the privilege did not apply,

AUSA Miskiewicz stated: "[W]e are not interested in any communications. ***We are interested only in the person who contacted him and told him to call the NYPD, end of story***." *Id*. at pp.1873-74 (emphasis and brackets added).  Roth was asked two questions in the absence of the jury panel ("Q. On or about August 21st, 2003, who asked you to contact the NYPD with respect to that agency's interview of Justin Bressman? Q. And who paid you to assert or enter an appearance with respect to Mr. Bressman on or about that date?"), and he invoked the Fifth Amendment following counsel's advice.  *Id*. at pp.1900-1901.  The trial court directed Roth to answer or ***face contempt***. *Id*. at pp.1901-03.  Roth was forced to identify Petitioner as the person who asked him to contact the NYPD with respect to Bressman.  *See* Exhibit T at pp.1903-04 ("no one" paid attorney Roth). Linking Roth's client identity testimony with the inadmissible *post-mortem* hearsay provided by Amador that Bressman told him "Matty Roth" got Bressman an attorney, the Prosecutor stated: "***Now we know who Mattie Roth is*** … ***this is all part and parcel of co-conspirator statements as Mr. Bressman is concerned, and Mr. Amador being told***...") (emphasis added).  Therefore, the government cannot seriously dispute that Roth provided the last "direct link" to convict Petitioner.

Froccaro failed to object to the inadmissible hearsay, and he also failed to articulate the correct legal objection to preclude Roth's trial testimony that impermissibly provided the "***direct link***" to cast petitioner as "Matty Roth," without which the chain of evidence presented would have resulted in judgments of acquittal for insufficient evidence as to the mistried counts.  Froccaro delivered ineffective assistance during trial.  *See* Exhibit T at pp.1877, 1884 (Froccaro: "I don't think the privilege applies… I don't know whether it applies"). Froccaro also failed to object to an inadmissible *post-mortem* statement made three days after the charged conspiracy ended with the murder on August 18, 2003.  A conspiracy ends when its central criminal purpose has been achieved, *see Krulewitch v. United States*, 336 U.S. 440, 442 (1949), and a conspiracy to commit

murder comes to an end when the murder has been committed.  *See United States v. McKinney*, 945 F.2d 471, 475 (7th Cir. 1992); *United States v. Silverstein*,  737 F.2d 864, 867 (10th Cir.1984).

In *Silverstein*, the Tenth Circuit wrote:

> The hearsay exception of Fed.R.Evid. 801(d)(2)(E) applies only to statements made in the course and in furtherance of a conspiracy. Thus, a declaration made after the termination of the conspiracy does not fall within the exception.  The time at which the conspiracy ends depends upon the particular facts of the case. Generally, however, a conspiracy terminates when its central criminal purposes have been attained. If there was a conspiracy in the instant case, its central criminal purpose was the murder…. ***The duration of a conspiracy does not extend to attempts to conceal the crime***.  …The district court therefore erred in ruling that hearsay testimony was admissible pursuant to Fed.R.Evid. 801(d)(2)(E).

*Id*. at 867 (emphasis added; citations omitted). A conspiracy to murder was charged, and its goal was accomplished on August 18, 2003.  The *post-mortem* conversation of August 21, 2003, when Bressman purportedly told Amador that "Matty Roth" got him counsel during questioning, did not contribute to committing the murder.  *See United States v. Floyd*, 555 F.2d 45, 48 (2nd Cir. 1977) ("To include in the conspiracy an event, no matter how proximately related, occurring after the main objectives of a conspiracy have been accomplished would unnecessarily blur the relatively clear line drawn by the Supreme Court's decisions on this subject").

Without the erroneously admitted *post-mortem* hearsay, there was insufficient evidence, and the court would have had to enter final acquittals as to Counts Three and Four, but for counsel's prejudicial failure to object.  In *Floyd*, the Second Circuit found that the arson of the getaway car used in the armed robbery of a bank on the day after the robbery fell outside the bounds of the conspiracy to commit the bank robbery, and any co-conspirator statements made in conjunction with that event were not admissible evidence against Floyd.  Following the opinion in *Floyd*, Roth's intervention during the questioning of Bressman three days after the murder also fell outside the temporal bounds of the murder conspiracy, and therefore the alleged *post-mortem*

hearsay connected with that event was inadmissible against petitioner.  Froccaro's failure to object was prejudicial, as there was insufficient evidence to convict without the inadmissible hearsay.

The client identity testimony provided by attorney Roth impermissibly inserted the last "direct link" without which the chain of trial evidence presented would have been unable to cast petitioner as alleged co-conspirator "Matty Roth." *See United States v. Goldberger & Dubin*, *P.C.*, 935 F.2d 501, 505 (2d Cir. 1991) (special circumstances under which client identity would be privileged exist when disclosure of client-identifying information would directly incriminate the client by providing direct linkage in an existing chain of evidence presented against the client). Petitioner would have also been entitled to acquittals **but for** his attorney's testimony erroneously admitted due to counsel's failure to raise the "direct linkage" exception to bar the testimony.

Amador testified in accordance with the government proffer that Bressman told him that "Mattie Roth" got Bressman an attorney when detectives questioned Bressman **_three days after the murder was committed_**.  *See* Exhibit U (April 21, 2011 transcript) at pp.2239, 2272, 2288. Detective Jeff Salta of the NYPD testified that the interview of Bressman was halted by a call from Roth who "said he was called and contacted by a concerned party." *Id*. at 2300.  And, Roth testified that petitioner had asked him to call the NYPD with regard to Bressman, providing the last "direct link" without which the chain of evidence could not have cast petitioner as "Mattie Roth." *Id.* at p.2305.  Without the client identity testimony impermissibly provided by attorney Roth *or* without the admission of the inadmissible *post-mortem* hearsay, there would have been insufficient evidence to convict Petitioner under Counts Three and Four as the identity of the alleged co-conspirator "Matty Roth" would have remained an enigma.[9]

---

[9] AUSA Flynn admitted that Bressman tried to "keep Amador in the dark as much as possible with regard to the murder and who he was working for." *See* Exhibit E (May 4, 2011 transcript) at p.2932 (explaining role switch).

Although Scott Mulligan was a partner in all of the Synergy gyms, Froccaro failed to elicit that fact to show that Mulligan was also a "boss" to Bressman who was portrayed as the murderer hired by "Matty Roth," his "boss" at the Synergy gyms. *Compare* Exhibit V (April 25, 2011 transcript) at pp.2332-36 (CPA Scott Flynn, accountant for Synergy gyms, ___**not**___ asked by counsel if Mulligan or others were gym owners) *and* Exhibit W (May 2, 2012 transcript) at pp.1122-24 (CPA Flynn revealing during retrial cross-examination that the gym [where Bressman worked] was owned and operated by Brett Holzer and Eric Holzer); Exhibit X (May 7, 2012 transcript) at p.1547 (Mulligan was a partner in all of the Synergy gyms); *id*. at p.1654 (Mulligan admits that he and Brett Holzer were also Bressman´s bosses). Mulligan had a motive[10] to hire the murder, and he was also Bressman's "boss," but Froccaro allowed jurors to believe petitioner was Bressman's only "boss." All of Froccaro's omissions favored Mulligan, who was "next on the chopping block" as stated by the prosecutor early during the first trial. *See* Exhibit Y (April 7, 2011 transcript) at p.1627.

There is more than just a reasonable probability that, but for counsel's errors, the result of the proceedings as to Counts Three and Four would have been different. *See Strickland v. Washington*, 466 U.S. 668 (1984). There is a certainty that Petitioner would have been entitled to acquittals for insufficient evidence as the *post-mortem* hearsay was inadmissible, and the client identity testimony of Roth was also inadmissible as the testimony impermissibly inserted the "direct link" to convict petitioner casting him as co-conspirator "Matty Roth." There is no rational basis to contend that counsel's failure to seek exclusion of the inadmissible *post-mortem* hearsay

---

[10] *See* Exhibit V at p.2372 (FBI agent reading pseudonymous letter from Gargiulo seeking "reward for information and audiotapes leading to the arrest and conviction of Scott Mulligan, Chris Tarantino and others in the 1994 armored car robbery where a guard was shot dead, and the death of one of the robbers named Louis was also shot dead and found floating off Long Island"); *see also* Stahl Affidavit (Froccaro destroyed extortion letter from Gargiulo to Mulligan).

or exclusion of attorney Roth's testimony under the "direct link" exception was a valid legal strategy.  Counsel's unreasonably deficient and prejudicial failures allowed government counsel to parlay the inadmissible *post-mortem* hearsay and attorney Roth's improper client identity testimony into a final summation that trumpeted the relevance of the patently inadmissible evidence:

> Why is that relevant? Two reasons: One, it shows you that in fact ... Mattie Roth is actually Chris Tarantino, Bressman's actual boss at Synergy Gym, the person who offered Bressman $35,000 to kill Vinnie. Second, Mel Roth's testimony shows the defendant's consciousness of guilt. It showed the defendant wanted to control Bressman. Tarantino didn't want Bressman telling the NYPD the truth, that he had killed Gargiulo, and that he had been paid to do it and hired to do it by that man."

*See* Exhibit E (May 4, 2011 transcript) at p.2939.  Counsel rendered prejudicially deficient performance under the Sixth Amendment.

### *Froccaro's undisclosed benefactor conflict warrants post-conviction relief*

On March 13, 2011, the prosecution requested that the court conduct an inquiry pursuant to *United States v. Curcio*, 680 F.2d 881, 888-890 (2d Cir. 1982), *see* Exhibit H (Doc. 189) (Case No. 08-655 (JS)), representing that it had filed a letter "under seal" on November 4, 2010, advising defense counsel of information provided by a confidential informant who heard that Salvatore Cutaia of the Lucchese crime family was one of Dorval's killers and that Cutaia's father had bragged that his son had "done a beautiful piece of work with that kid Louie." *Id*. at p.2. Petitioner was charged with the murder of Dorval, so government counsel had to concede that an "actual conflict of interest exists because Mr. Froccaro simultaneously represents both Tarantino and Salvatore Cutaia.  Similarly, Mr. Rosen currently represents both Tarantino and Domenico Cutaia." *See* Exhibit H at p.5.  On March 15, 2011, days before the first trial started, Judge Seybert

accepted Petitioner's waiver of the disclosed conflict,[11] but Petitioner submits it is the undisclosed benefactor conflict under which Froccaro operated that warrants relief.

On April 23, 2012, new counsel, Stephen Rosen, disclosed for the first time that there had been a "very difficult" conflict involving first trial counsel Froccaro's ***simultaneous*** representation of Scott Mulligan. The undisclosed conflict was not made a part of the *Curcio* hearing. *See* Exhibit AA (April 23, 2012 transcript) at pp.6-13. The prosecution proffered the testimony of Manon Mulligan, wife of Scott Mulligan, as to her receipt in 2003 of an extortion letter threatening that the FBI would receive a tape incriminating her spouse and the petitioner unless $500,000 would be received by the letter's author (understood to be Gargiulo who was murdered months later). Retrial counsel argued that Froccaro should testify about the letter that went missing after Manon Mulligan forwarded it to Froccaro, who also represented Mulligan in 2003. On May 1, 2012, retrial counsel reiterated that Froccaro was a witness with material testimony to provide about the missing letter and noted the existence of "similar issues here concerning dual loyalty by Mr. Froccaro." *See* Exhibit BB (May 1, 2012 transcript) at pp.918-919; *see also* Stahl Affidavit (Froccaro admitted that he destroyed the letter); Exhibit CC (May 2, 2012 transcript) at pp.1175-1176, 1193-1196 (Manon Mulligan testifying that the extortion letter was sent to Froccaro in 2003). The trial court preserved the conflict of interest issue for post-conviction review.

Petitioner submits that the benefactor conflict under which Froccaro operated involved the undisclosed *simultaneous* defense of Mulligan during Petitioner's trial as evidenced by his lapses in the representation of Petitioner. Froccaro's superior loyalty to Mulligan explains all of the trial "choices" that prevented him from abiding by his Sixth Amendment obligation of providing

---

[11] Dorval was found dead within days of being indicted with Lucchese crime family members, to which the Cutaias belonged, and who had the motive to commit the obstruction of justice murder of Dorval charged against petitioner. *See* Exhibit Z (April 4, 2011 transcript) at pp.1206-1207 (newspaper report published about New Jersey indictment in August 1994 charging Dorval along with "a bunch of" Lucchese crime family members).

effective representation to Petitioner.  Froccaro's disqualifying loyalty to Mulligan also explains his ***destruction of evidence*** that Gargiulo attempted to extort Mulligan months before a hired murderer killed Gargiulo.  Froccaro was hired with a $150,000 check and cash payments arranged by Mulligan, *see* Stahl Affidavit (attaching check), and delivered a defense of Mulligan's conflicting interests to all of the counts rather than an effective defense inculpating Mulligan to exculpate Petitioner as the trial evidence would have ***compelled*** conflict-free counsel to present.

Prejudice is presumed where a Petitioner can show that his counsel actively represented conflicting interests as to all of the charges tried and that the actual conflict adversely affected his counsel's performance.  *See Cuyler*, 446 U.S. at 350; *United States v. Locascio*, 6 F.3d 924, 932 (2d Cir.1993) ("Ethical considerations warn against an attorney accepting fees from someone other than the client. As we stated in a different context, the acceptance of such benefactor payments may subject an attorney to undesirable outside influence and raises an ethical question as to whether the attorney's loyalties are with the client or the payor. *In re Grand Jury Subpoena Served Upon John Doe*, 781 F.2d 238, 248 n.6 (2d Cir.1985) (*en banc*)") (quotation marks omitted). "Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat v. United States*, 486 U.S. 153, 160 (1988).  Froccaro placed his benefactor's interests over those of Petitioner's rights.  Froccaro twice claimed that the conflict involving the simultaneous representation of Lucchese crime family members who took credit for committing the August 1994 murder charged against petitioner had "honestly slipped [his] mind."  *See* Exhibit G (March 15, 2011 transcript) at p.5.  The court appeared to question Froccaro's use of the term "honestly" then, and the court should probe this issue at a hearing.

There was an unwaivable risk that Froccaro would favor Mulligan and fail to conduct a rigorous defense of Petitioner.  Froccaro placed his pecuniary interests and the conflicting interests of Mulligan's antagonistic defense above Petitioner's right to his effective assistance.  The conflict adversely affected counsel's performance, *Cuyler*, 446 U.S. at 348, and Petitioner is entitled to relief as he was prejudiced by the ineffective assistance delivered by counsel.  This court should find that "the conflict [wa]s of such a serious nature that no rational defendant would knowingly and intelligently desire that attorney's representation... the attorney [had to] be disqualified, regardless of whether the defendant [wa]s willing to waive his right to conflict-free counsel."  *See United States v. Schwarz*, 283 F.3d 76, 95-96 (2d Cir. 2002) (brackets added).  Froccaro concealed his conflict to avoid disqualification as the trial court would have found that no rational defendant would knowingly and intelligently waive such a conflict.  "The right to effective representation by counsel whose loyalty is undivided is so paramount in the proper administration of criminal justice that it must in some cases take precedence over all other considerations, including the expressed preference of the defendants concerned and their attorney."  *See Curcio*, 680 F.2d at 887.[12]

In *United States v. Malpiedi*, 62 F.3d 465 (2d Cir. 1995), the Second Circuit provided the framework applicable to analyzing the disqualifying benefactor conflict found here:

> Although a defendant generally is required to demonstrate prejudice to prevail on a claim of ineffective assistance of counsel, prejudice is presumed when counsel is burdened by an actual conflict of interest.  This presumption is "fairly rigid."  Moreover, once the defendant establishes that there was an actual conflict, he need not prove prejudice, but simply that a lapse in representation resulted from the conflict.  To prove a lapse in representation, a defendant must demonstrate that

---

[12] Froccaro's destruction of evidence also manifested his disqualifying conflict.  *See Government of Virgin Islands v. Zepp*, 784 F.2d 125, 136  (3d Cir.1984) ("Even if not criminally charged for such events, trial counsel could have faced severe disciplinary consequences if it were ever known that he was involved in the destruction of evidence. American Bar Association, *Canons of Professional Ethics;* Canon 15 ... In circumstances such as these, when defense counsel has independent personal information regarding the facts underlying his client's charges, and faces potential liability for those charges, he has an actual conflict of interest … from these facts alone there was an actual conflict of interest which required withdrawal by trial counsel or disqualification by the court.").

some plausible alternative defense strategy or tactic might have been pursued, and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.

This is not a test that requires a defendant to show that the alternative strategy or tactic not adopted by a conflicted counsel was reasonable, that the lapse in representation affected the outcome of the trial, or even that, but for the conflict, counsel's conduct of the trial would have been different. Rather, it is enough to show that a conflict existed that was inherently in conflict with a plausible line of defense or attack on the prosecution's case. Once such a showing is made, [the] "fairly rigid" presumption of prejudice applies.

*Id*. at 469 (citations and quotation marks omitted). As the compromised loyalty of counsel caused demonstrated lapses in representation, Petitioner is entitled to relief under *Malpiedi*.

Petitioner has also shown that there is a reasonable probability that, but for counsel's errors, the result of the trial would have been different on all of the counts. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984). The Sixth Amendment was violated due to the ineffective assistance delivered by conflicted counsel.

### *Counsel entirely excluded Petitioner from pre-screening the anonymous jurors*

Petitioner argued on direct appeal that his absence from telephonic hearings held by Judge Seybert and Magistrate Tomlinson shortly before the trial on March 17, 2011 and March 21, 2011 (at which time potential anonymous jurors were pre-screened on the basis of cause and hardship in the presence of his counsel) violated his right to be present during all material stages of the jury trial. The Second Circuit concluded that the petitioner "impliedly waived his right." *Tarantino*, *supra*, 617 Fed.Appx. at 64 (citation omitted). Petitioner had the right to participate in the pre-screening, *see Cohen v. Senkowski*, 290 F.3d 485, 489 (2d Cir. 2002) (pre-screening of prospective jurors is a material stage of trial at which a defendant has the constitutional right to be present), but the Second Circuit concluded that Petitioner had waived his right assuming that Froccaro had complied with a court directive. *See Tarantino* at 64 ("Then, in the presence of Tarantino, the

24

District Court explicitly directed his counsel to 'go through the jury selection questionnaires' with Tarantino in order to 'see what his desire would be in terms of the type of jury he'd like to be seated'").  However, Froccaro defied the trial court's directive and entirely excluded the Petitioner from the process of pre-screening his jury.  *See* Affidavit of Christian Tarantino.

Given the emphasis added by the trial court on the importance of including Petitioner in the pre-screening process before the trial started, *see* Exhibit G (March 15, 2011 transcript) at p.40 (court directive issued after Froccaro questioned whether there was enough time to visit petitioner to review the juror questionnaires) (COURT: "So you're definitely going to do that beforehand and see what his desires would be in terms of the type of jury he'd like to be seated"), Petitioner cannot be faulted for his failure to report his trial counsel's disregard of a direct court order.   On March 22, 2011, the trial court stated that "all these questionnaires were reviewed by you folks last week. And then I made certain decisions on Thursday, and again, yesterday Judge Tomlinson reviewed the questionnaires." *See* Exhibit DD (March 22, 2011 transcript) at pp.8-12.  The court did not inquire whether Froccaro had reviewed the questionnaires with petitioner as directed on March 15, 2011.  Counsel never reviewed the juror questionnaires with Petitioner and Froccaro's defiance of the court directive denied Petitioner his right to participate in the jury pre-screening process.  *See Cohen*, *supra*.  The exclusion of Petitioner from the entire pre-screening process of reviewing the juror questionnaires disregarding a direct order from the bench requires that the results of the first trial be vacated due to the violation of Petitioner's constitutional right to participate during that material stage of the jury trial proceedings.

### ***Retrial counsel provided ineffective assistance by failing to seek the Court's recusal***

28 U.S.C. § 455(a) provides that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify h[er]self in any proceeding in which h[er] impartiality might reasonably be

questioned."  Subsection (b)(1) also provides in relevant part: "[Sh]e shall also disqualify h[er]self in the following circumstances: Where [s]he has a personal bias or prejudice concerning a party…" (brackets added).  The Supreme Court has emphasized that, where the grounds for recusal are comprised of "judicial rulings [and] routine trial administration efforts," recusal is not usually warranted absent evidence that the judicial actions "display deep-seated favoritism or antagonism that would make fair judgment impossible."  *See Liteky v. United States*, 510 U.S. 540, 556 (1994).

Petitioner submits that the Court displayed such "deep-seated favoritism or antagonism" on January 3, 2012, when it accepted a waiver of grand jury indictment for an offense punishable by death, disregarding the Fifth Amendment and Rule 7, Fed.R.Crim.P., but expeditiously securing a witness for the prosecution on the eve of the retrial then scheduled for January 9, 2012.  Retrial counsel ineffectively failed to seek recusal resulting in the denial of Petitioner's right to an unbiased judge.  The appearance of bias exhibited by the court triggered the duty of counsel to seek her recusal from the retrial.

The ***Information*** filed against the government witness Mulligan on January 3, 2012 tracked the same language used to plead Count One of the ***Indictment*** that was filed against the Petitioner. *See* Exhibit EE at ¶6.  Mulligan executed a standard "waiver of indictment" form.  *See* Exhibit FF. Judge Seybert allowed the waiver of grand jury indictment in favor of an expeditious information that squarely framed the definition of a capital offense.  The Information pled that an offense under 18 U.S.C. § 33 resulted in the death of Julius Baumgardt, which qualifies as a capital charge.  *See* 18 U.S.C. § 3592(c)(1) ("Aggravating factors for homicide" include a death that "occurred during the commission … of … an offense under ... section 33 (destruction of motor vehicles or motor vehicle facilities)").  In Petitioner's view, the court's actions ran afoul of the Fifth Amendment ("No person shall be held to answer for a capital, or otherwise infamous crime, unless on a

presentment or indictment of a Grand Jury...") and Rule 7(a), Fed.R.Crim.P. ("An offense which may be punished by death shall be prosecuted by indictment"), all to expedite a retrial witness.

A violation of §33 resulting in a death is legally punishable by death.  *See* 18 U.S.C. §34; Exhibit EE (Information) (*citing* § 34); Exhibit FF (Waiver of Indictment) (*citing* § 34).   On January 3, 2012, within two weeks after the case agent sought and obtained an arrest warrant for Mulligan, the court accepted what Petitioner avers to be an illegal waiver of the indictment thereby aiding a rushed need for Mulligan as a witness for the government at the retrial then scheduled to start on January 9, 2012.  The waiver was invalid since the Information pled that a death resulted from the alleged § 33 offense.  *See Kees v. United States*, 304 F.2d 661, 663 (7th Cir. 1962) ("Because we conclude that the offense charged was a capital offense, we decide that Rule 7(a) gives no support to the district court's assumption of jurisdiction ...the court had no jurisdiction to try the alleged violation of the Kidnapping Act by information."). Retrial counsel unreasonably failed to seek recusal, as the court's actions showed that her "impartially might reasonably be questioned."  *See* 28 U.S.C. § 455(a).  Petitioner, like all defendants, had a basic right to an unbiased judge, *see Offutt v. United States*, 348 U.S. 11 (1954) ("[J]ustice must satisfy the appearance of justice"), and the failure of retrial counsel to seek recusal deprived Petitioner of his fundamental right to an unbiased judge, thereby causing structural error that requires vacating the only conviction obtained after the retrial.[13]

### ***Retrial counsel failed to prevent a conviction based on inadmissible evidence***

After the retrial, the jury acquitted the Petitioner of Count Four charging the obstruction of justice murder of Gargiulo, but convicted him of the conspiracy to commit the obstruction of

---

[13] Petitioner maintains that, but for the multiple errors committed by Froccaro, the first trial of the mistried counts related to the alleged conspiracy to murder Gargiulo would have resulted in acquittals barring a retrial under double jeopardy.

justice murder of Gargiulo charged under Count Three. There is a reasonable probability that, but for counsel's errors, the result of the trial proceedings as to Count Three would have been different.

Petitioner would have been clearly entitled to acquittal for insufficient evidence as the *post-mortem* hearsay statement suggesting that "Matty Roth" got an attorney for Bressman during questioning conducted by the NYPD three days after the murder was inadmissible and the identity testimony of Petitioner's attorney Roth was also inadmissible as the testimony impermissibly inserted the last "direct link" to convict petitioner casting him as co-conspirator "Matty Roth." Without the inadmissible *post-mortem* hearsay <u>or</u> without the client identity testimony of petitioner's attorney, there would have been insufficient evidence to convict Petitioner as a co-conspirator in the murder.  There is no basis to contend that counsel's failure to seek the exclusion of inadmissible evidence was a valid legal tactic.  Counsel's deficient performance allowed the prosecution to parlay inadmissible hearsay and attorney Roth's improper client identity testimony into a final summation at the retrial that again trumpeted the relevance of the patently inadmissible evidence:

> And why is that relevant? Two reasons. First, it shows you that indeed there is no Mattie Roth. It is just a lie told by Bressman. Mattie Roth is actually Chris Tarantino, Bressman's actual boss at Synergy, the person who offered Bressman $35,000 to assassinate Vinnie. Second, Mel Roth's testimony shows the defendant's consciousness of guilt. It shows the defendant wanted to control Bressman. He didn't want Bressman telling the NYPD the truth that he had killed Gargiulo and that he had been hired to do it by that man, the defendant. And when Mel Roth did the defendant's bidding and broke up the interview, the NYPD detectives released Bressman.

*See* Exhibit GG (May 9, 2012 transcript) at pp.1875-76.  Retrial counsel rendered prejudicially deficient performance for the same reasons that first trial counsel did.  *See infra.*  No lawyer objected to inadmissible evidence without which the chain of evidence presented was insufficient to convict.  Exacerbating the prejudice that was caused by the repeated failure to object to the

admission of inadmissible evidence at both trials, no lawyer objected to the summations at both trials that mischaracterized attorney Roth's inadmissible testimony to suggest evidence of Petitioner's guilt not adduced at trial, as Roth never testified that Petitioner had "directed" him to "break up the interview" of Bressman as misrepresented in the summations at both trials. *See* Exhibit GG at pp.1875-76 (AUSA retrial summation) (twice misrepresenting that Roth testified that petitioner "directed" Roth to "break up the interview"); Exhibit E (May 4, 2011) at p.2938 (AUSA first trial summation) (misrepresenting that Roth testified that he had been "directed to break up that interview by the defendant").  Ineffective counsel allowed the prosecution to run amok with inadmissible evidence during both trials.

### *Trial Counsel's Failure to Present Petitioner's Testimony at Motion to Suppress Hearing*

At both his trials, Petitioner's counsel had ready access to evidence of Gargiulo's *contemporaneous intent* to misuse the incriminating tape that was linchpin evidence (the Gargiulo tape) to extort Tarantino *at the time in late 2000* when Gargiulo taped it.  Petitioner proffers he was *the only witness* competent to testify that Gargiulo *did* begin to extort cash from him with the threat of disclosure of the tape to police shortly after he taped it, *evidencing his contemporaneous intent to misuse the tape to extort from the outset*, but counsel unreasonably failed to present Petitioner's testimony in support of their motions to suppress the incriminating tape, *unreasonably misadvising* him that his proposed pretrial testimony *would be used against him at trial on the issue of guilt*, contrary to *Simmons v. United States*, 390 U.S. 377, 394 (1968) ("when a defendant testifies in support of a motion to suppress evidence…, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection"). Under these unique circumstances, where Petitioner was an indispensable witness to establish a dispositive fact that would require suppression of the tape evidence, the ineffectiveness of all defense counsel in

29

denying him his absolute personal right to testify in support of his motion to suppress the tape infected both trials and raises a fundamental issue of constitutional magnitude. The outcomes of both trials were tainted by the inadmissible tape used by Gargiulo to extort Tarantino, starting shortly after it was made. The denial of the right to testify to suppress linchpin evidence is as egregious as a denial of the right to testify at trial.

At a minimum, Tarantino is entitled to an evidentiary hearing pursuant to 28 U.S.C. §2255 to testify in support of this claim and to establish *by a preponderance of the evidence* that Gargiulo´s primary motivation, or that a determinative factor in Gargiulo´s original motivation for recording the conversation, was to commit a criminal or tortious act, which would have required suppression of linchpin evidence. If the reviewing court considers the proffered testimony of Tarantino on the limited issue of Gargiulo's intent to misuse the tape to extort cash from the outset, within the context of all other evidence probative of his intent to misuse the tape to extort cash (even later trying to extract $500,000 from the FBI), then it should conclude that counsel rendered ineffective assistance, even if the recording also "cleared" Gargiulo from involvement in the crimes discussed during the conversations.

## THE APPLICABLE STATUTORY FRAMEWORK

18 U.S.C. § 2511(1) generally prohibits both the disclosure and use of intercepted wire, oral or electronic communications. One exception to that general prohibition is found in § 2511(2)(d), which provides:

> **It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception <u>unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State</u>.**

18 U.S.C. §2511(2)(d) (emphasis added).

18 U.S.C. §2515 forbids any use at trial of the contents of an illegally intercepted wire or oral communication, as well as the use of any evidence derived therefrom. The federal statutory framework furnishes the mechanism to invoke the prohibition of §2515, providing that "[a]ny aggrieved person ... may move to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom ... on the ground that the interception was unlawful." *See* 18 U.S.C. § 2518(10)(a) (brackets added). An "aggrieved person" is any "person who was a party to any intercepted wire or oral communication or a person against whom the interception was directed." *See* 18 U.S.C. § 2510(11).  Tarantino clearly had legal standing to seek suppression of the unlawful interception.

## OTHER EVIDENCE CORROBORATES TARANTINO

### A. THE GRAND JURY INDICTMENT

The indictment itself shows that the grand jury was presented evidence that Gargiulo intended to extort Petitioner under the threat of delivering the tape to the authorities if Petitioner refused to pay him.  *See* Indictment at ¶14 (alleging that Gargiulo informed Tarantino he had the tape and threatened to provide it to law enforcement officers unless Tarantino compensated him). Suppression depended on *dating* Gargiulo's intent to extort.  *See id.* at ¶14 (alleging that threatening took place "[i]n or about and between December 2002 and August 2003"). Petitioner proffers that he would have testified that Gargiulo extorted him starting shortly after the tape was made in late 2000.

### B. GARGIULO´S DEMAND OF $500,000 FROM THE FBI

The case agent received a letter from Gargiulo, identifying himself as "Chucky," days before meeting him on May 29, 2003.  The "Chucky letter" was posted on May 21, 2003.  *See* First Trial, 4/25/2011, at pp.2370-2372.  The case agent read the letter to the jury:

> "I'm writing you to see if there is a reward for information and audiotapes leading to the arrest and conviction of Scott Mulligan, Chris Tarantino and others in the 1994 armored car robbery where a guard was shot dead and the death of one of the robbers named Louis who was also shot dead and found floating off Long Island. To tell me about if and how much the reward is, or just to get in contact with me, please post info on www.craigslist.com... P.S. I was not involved in these crimes and I don't want a deal.  *I just want money*."

*Id*. at pp.2372, 2375 (emphasis added).

Gargiulo demanded $500,000 for the tape from the FBI.  *Id*. at p.2376.  Gargiulo attempted to coerce the agent by stating that he would get the cash from Petitioner, if not from the FBI. Gargiulo informed the agent that he had already disclosed the existence of the tape to Petitioner. *Id.* at pp.2379-2380 ("He [Gargiulo] was a little bit on the sarcastic side, but he said he knows, he [Tarantino] knows") (brackets added). Gargiulo´s one sole purpose in contacting the FBI was to attempt to extract money according to the agent.  *See* Trial, 4/25/2011, at p.2424; *Mastrangelo* hearing, 2/16/2011, at p.403.

### C. <u>TARANTINO´S COMPLAINTS ABOUT "DRY RATTING"</u>

Petitioner also proffers that he was alluding to then-ongoing extortion, when he mentioned that Gargiulo was "dry ratting" to two acquaintances on separate occasions. He complained about the "dry ratting" to Robert Gerrato, and he sought advice on how to handle the situation from Nicholas Pisciotti.

### 1. NICHOLAS PISCIOTTI

The grand jury heard the testimony of the case agent regarding one Nicholas Pisciotti, described as a cooperating "individual who had some conversations with Tarantino about somebody trying to … 'dry rat' Tarantino[.]"  *See* Grand Jury, 8/5/2008, at p.47 (brackets added).

The case agent read from an *undated* report prepared by another agent who had interviewed Pisciotti.  *Id*., at p.51 ("When Gargiulo´s gym was unsuccessful, Gargiulo threatened to go to the

police about the murder of a security guard if Chris Tarantino did not pay Gargiulo a large sum of money.   Chris Tarantino approached the individual, which is Pisciotti, and asked for the individual´s opinion about how to handle the situation. The individual told Chris Tarantino to leave Gargiulo alone since Gargiulo had an alcohol problem. ***Pisciotti also told Chris Tarantino that he might have to pay Gargiulo***.") (emphasis added).  In this context, it is clear that "dry ratting" meant extorting payment through the threat of incriminating Petitioner.

### 2. ROBERT GERRATO

The case agent testified before the grand jury that Petitioner had told Robert Gerrato during Christmas 2002 that Gargiulo was "dry ratting" him. *See* Grand Jury, 9/16/2008, at pp.31-32. The case agent admitted that he had "never heard of the term."  *Id*. at p.32.

Gerrato testified that Petitioner told him Gargiulo was "dry ratting" him during Christmas 2001 or 2002.  Gerrato testified he was unsure of the year and did not recall if he knew or asked what "dry ratting" meant.  *See* Trial, 4/6/2011, at pp.1512-1513.  Gerrato testified that Gargiulo was his "best friend."  *Id*. at p.1505.  Gerrato believed that Gargiulo first mentioned a recording with incriminating evidence against Petitioner "approximately [in] the late 90s."  *Id*. at p.1511 (brackets added).

### D. <u>THE DEMAND OF $500,000 FROM SCOTT MULLIGAN</u>

In the summer of 2003, Gargiulo told Gerrato about a blackmail letter he had forwarded to Scott Mulligan´s wife seeking to extract $500,000, and that he would also approach the FBI if he was not given the cash demanded.  Gerrato understood that Gargiulo had already made Petitioner aware of the existence of the tape.  *Id*. at pp.1514-1515, 1539.  Gerrato informed the case agent that Gargiulo told Gerrato and "other people" that he taped Petitioner. *See* Grand Jury, 7/15/2008, at p.66 ("the information was out there").  Petitioner submits that all of the other evidence as to

the tape corroborates his proffered testimony that Gargiulo used the tape to extort cash from him, starting shortly after he taped the incriminating conversation.

### E. <u>GARGIULO´S CONTEMPORANEOUS FINANCIAL MOTIVE</u>

The defense sought an evidentiary hearing after Gerrato testified at the first trial.  *See* Trial, 4/7/2011, at pp.1595-1641.  The government's narrative argued that "absent proof that Gargiulo was clairvoyant, the motivation for making the tape in September of 2000 could not have been to blackmail or extort a financial compensation for business losses that did not occur until 17 months later."  *Id.* at p.1601.  By attaching too much weight to the closing of Gargiulo´s gym during February 2002, government counsel argued that the February 2002 event could not motivate the September 2000 recording.  The government claimed that there was no evidence of a dispute between Gargiulo and Petitioner when the tape was recorded in 2000.  *Id*. at p.1607.  Review of all of the evidence ***along with Tarantino's proffered testimony*** debunks the argument constructed by the government.

The case agent testified before the grand jury that Gargiulo stated he had taped the conversation with Petitioner because he was "***very bitter***" that his relationship with Petitioner and Mulligan had "***gone sour***," *see* Grand Jury, 7/15/2008, at p.59, which disputes are also alluded to during the taped conversation of late 2000.  *See* Transcript of "Gargiulo tape" at p.32 ("when all this stuff happened between me and you and the gyms"). The relationship had already gone sour by the time the tape was made, and the contention that an event worthy of motivating Gargiulo only arose after his gym closed in early 2002 is a *red herring*. Gargiulo's financial setbacks shortly before making the tape show his motivation to embark on extortion from the outset and further corroborate Petitioner's proffered testimony. That Gargiulo was experiencing financial setbacks

even *one month before* recording the tape, corroborates Petitioner's claim that the extortion started shortly thereafter.

### 1. GARGIULO´S DOCUMENTED FINANCIAL SETBACKS

Further corroborating Petitioner's claims are court documents showing a succession of judgments entered against Gargiulo, including but not limited to judgments entered only a month before the making of the tape used to extort cash.  *See* DE:356 and attachments.  The limited information that FBI agents could obtain from a single fleeting street meeting with Gargiulo in May 2003 did not give the government a complete understanding of the full chronology related to his extortionate use of the incriminating tape.

The trial court offered Petitioner´s first trial counsel a chance to submit additional evidence in support of suppression, *see* Trial, 4/7/2011, at p.1612, noting that the evidence presented up to "th[at] point in time" only showed that "some three years [after the taping]" was "when financially Mr. Gargiulo was hurting[.]"  *Id.* (brackets added). Despite an abundance of evidence of Gargiulo's dire straits, first trial counsel conceded that the "[defense] didn't have any evidence about that as well, that he was financially hurting…."  *Id*. (brackets added). Together with the *misadvice* provided to Petitioner that his proposed pretrial testimony to support suppression would be used against him as to the question of guilt at trial, first trial counsel's failure to investigate Gargiulo's dire financial straits during the time period *shortly before* the tape was made in late 2000 constitutes ineffective assistance.  First trial counsel neither called Petitioner as a witness with indispensable testimony to give on a limited but dispositive fact in support of suppression nor presented any of the evidence of Gargiulo's financial setbacks to show his motive to extort, such as the succession of court judgments entered against him shortly before he recorded the tape and began to extort Petitioner shortly thereafter.

Had first trial counsel met his duty to conduct a diligent investigation of possible motives to use the tape with the intent to extort, the defense would have been able to prove the chronology of Gargiulo´s acute financial stress, including but not limited to the adverse court judgments entered against him approximately one (1) month before Gargiulo taped his conversation with the intent to extort Petitioner.  All of the court actions filed against Gargiulo sought to collect from Gargiulo for obligations related to his gym endeavors.  The following are known court actions and judgments adverse to Gargiulo:

(i) Life Fitness v. Vincent Gargiulo, S/NY Index No. 602634/99;
S&C filed on 5/28/1999; Amount demanded: $25,000;
Stipulated Settlement ($300-$400/month) dated 7/22/1999;
Defaulted on settlement (4/2000); Default letter sent to Gargiulo (8/8/2000); Default Judgment filed on 8/18/00 (approximately one month prior to "Gargiulo tape" made in or about 9/2000)

(ii) Life Fitness v. Body Sculpt, S/NY Index No. 602639/99;
S&C filed on 5/28/99; Amount demanded: $25,000;
Stipulated Settlement ($300-$400/month) dated 7/22/1999;
Defaulted on settlement and served with notice of default (4/2000);
Default Judgment filed on 8/4/2000;
Restraining notice sent to Gargiulo (8/4/2000) (***approximately one month prior to "Gargiulo tape" made in or about 9/2000***)

(iii) Life Fitness v. Body Sculpt (79th Street), S/NY Index No. 605137/01; S&C Filed 10/26/01; Amount demanded: $100,000 + $250,000 (punitive);

(iv) Lease Corp. of America vs. Vincent Gargiulo d/b/a Body Sculpt,
S/NY Index No. 116664/99; S&C Filed 8/3/1999
Amount demanded:  $37,000 + $9,000 in legal fees

(v) Aerobitron v. Body Sculpt, CivCt/NY Index No. CV 2508/00;
S&C Filed 1/24/00; Amount demanded:  $4,000-$5,000;
Final Judgment filed on 8/4/2000 (***approximately one month prior to "Gargiulo tape" made in or about 9/2000***)

(vi) People of the State of NY v. Body Sculpt (40th Street),
Summons No. 406906803-0 (Crim Ct/NY);
First offense 4/19/2000; Second offense 5/17/2001
NOTE: These violations involved the failure to obtain costly permits for construction work, ignoring stop work order, etc.

(vii) NRP LLC II v. Body Sculpt Fitness Club 79th Street Inc.,
Civ/NY Index No. L&T 75343/0; Petition for Eviction filed (5/17/2001); Default Judgment filed on 6/13/2001; Warrant of Eviction (6/19/2001); Stipulated Settlement dated 8/6/2001; Rent Default (10/01/2001); Warrant of Eviction Reissued (11/20/2001); Second Stipulated Settlement dated 1/31/2002; Rent Default (6/17/2002)

NOTE: Statement of rent account issued by landlord-plaintiff shows that Gargiulo did not make his $14,250 monthly lease payment in August 2000 (approximately one month prior to "Gargiulo tape" made in or about 9/2000), issued a check with insufficient funds on 11/17/2000, and failed to pay several consecutive months of rent in early 2001.

(viii) Portfolio v. Body Sculpt, et al., S/NY Index No.: 604135/02;
S&C filed 11/13/02; Amount demanded: $60,000.

*See* DE:356 and attachments.   These court filings establish that Gargiulo's financial setbacks started in 1999, with judgments peaking during the month before the making of the tape in September 2000. Gargiulo had ample financial motivation to extort Petitioner, which corroborates Tarantino's proffered testimony in support of suppression.

## 2. GARGIULO'S "INSURANCE" COLLECTION

The case agent testified that Gargiulo refused to give him a copy of the tape because Gargiulo thought that retaining possession of the tape was his "insurance policy."  *See* Grand Jury, 7/15/2008, at p.60 ("He [Gargiulo] thought that was his insurance policy.  He stated to me that he would not provide me with the actual tape because that was his ace in the hole, and if he had provided it to me, the federal government wouldn´t need him, and he wanted to hold on to the tape.").  Gargiulo was insured against non-payment. While the agent testified before the grand jury that Gargiulo told him that *withholding the tape was his "insurance" against government non-payment*, he gave different testimony at trial as to Gargiulo´s purported "insurance." *See* Trial, 4/25/2011, at p.2375 ("He [Gargiulo] stated that he made the tape as an insurance, an insurance against Christian Tarantino.").

The quantum of evidence corroborating Petitioner's proffered testimony that he was indeed extorted with the tape shortly after its making satisfies the applicable preponderance of the evidence standard that would have required suppression of the linchpin evidence, but for the ineffective assistance rendered by counsel.  Petitioner submits that his testimony would have tipped the scales to support finding it was more likely true than not true that Gargiulo made the tape with the intent to extort given that: (1) Gargiulo had begun to experience financial stress shortly before making the recording; (2) Petitioner complained to associates that Gargiulo was "dry ratting" him; and (3) Gargiulo kept possession of the tape as his "insurance" to collect from Petitioner and others (even trying to extract $500,000 from the FBI).  *See* Court Order, Doc. 223, 4/19/2011, at p.4 ("***That Gargiulo eventually tried to blackmail Tarantino is undisputed***") (emphasis added)[14]  Petitioner's proffered testimony should have been heard and evaluated by the trial court, but defense counsel denied him his right to testify in his own defense in support of his motion to suppress the linchpin evidence, misadvising him that his proposed pretrial testimony that Gargiulo did extort him, starting shortly after making the tape, could be used against him at trial on the question of guilt.

### APPLICABLE LEGAL PRINCIPLES

Petitioner had the onus of proving by a preponderance of the evidence "either (1) that the primary motivation, or (2) that a determinative factor in [Gargiulo's] motivation for intercepting the conversation was to commit a criminal [or] tortious ... act."  *See In re DoubleClick Inc. Privacy Litigation*, 154 F.Supp.2d 497, 514-515 (S.D.N.Y.2001) (*quoting United States v. Vest*, 639 F.Supp. 899, 904 (D.Mass.1986)) (brackets added); *id.* at 907 (defendant bears the burden of proof

---

[14] That Gargiulo visited Petitioner's neighbor in the same Manhattan building where Petitioner lived with a then recently made incriminating tape in hand as proof of Petitioner's criminal past also invites an inference that Gargiulo implemented an extortion scheme which defamed him with his neighbors to show his readiness to disseminate the incriminating tape (even to the police).

by a preponderance of the evidence).  Without the benefit of the testimony now proffered in this motion, the Court found that "[f]or at least three reasons, … Gargiulo´s motive was mixed, at best." *See* Court Order, Doc. 223, 4/19/2011, at p.5.  First, the Court reasoned that "the significant time lapse" between the making of the tape and the "attempts to blackmail Tarantino undermines the idea that Gargiulo´s primary or determining motivation was extortion."  *Id*. at p.5.  But the Court was only provided part of the chronology – the later attempts to extract a large lump sum from Petitioner, Mulligan and the FBI.

Because counsel did not provide the Court with the full view of Gargiulo´s dire financial condition during the relevant time period, the Court found that "the failure of Gargiulo´s gym suggests that a financial reason for blackmail arose only after the tape was made."  *Id*.  However, the court did not have the benefit of any testimony from Petitioner at the motion to suppress, nor did counsel submit readily available documents showing that Gargiulo's motive to commit extortion arose even one month before the tape was recorded when judgments were entered against him.  The Court relied only on the evidence that suggested "Gargiulo fell on hard times after the tape was made and that he may have partly blamed Tarantino for his financial straits."  *Id.* at p.6. The allegations made by Petitioner in this motion establish that Gargiulo started to extort cash from Petitioner with the tape *shortly after* it was made and that Gargiulo was experiencing financial hardship *shortly before* the tape was made with the *contemporaneous intent* to extort cash from Petitioner.

To the extent that Gargiulo may have harbored "mixed" motivations, this Court must "bear in mind that the mere existence of [a] lawful purpose alone does not 'sanitize a[n interception] that was also made for an illegitimate purpose.'" *In re DoubleClick Inc*., 154 F.Supp.2d at 515 (*quoting Sussman v. ABC*, 186 F.3d 1200, 1202 (9th Cir.1999)) (brackets supplied).

## THE LEGISLATIVE HISTORY OF 18 U.S.C. § 2511(2)(d)

The Wiretap Act as first drafted did not prohibit interceptions where one party to the communication consented, irrespective of underlying intent. S.Rep. No. 90–1097, 1968 U.S.C.C.A.N. 2112, at 2182 (1968).  However, Senator Philip Hart objected to the broad language, for it would permit "surreptitious monitoring of a conversation by a party to the conversation, even though the monitoring may be for insidious purposes, such as blackmail, stealing business secrets, or other criminal or tortious acts in violation of Federal or State laws." *Id*. at 2236.  Senator Hart and Senator John McClellan proposed an amendment to the bill that would limit the one-party consent rule to "private persons who act in a defensive fashion."  114 Cong. Rec. 14694 (1968) (emphasis added).  The amendment passed and was ultimately codified, in relevant part, at 18 U.S.C. §2511(2)(d).

The legislative record clearly reflects that an element of tortious or criminal *mens rea* is required for a recording to run afoul of the prohibition under § 2511(2)(d).  Senator Hart noted that the key distinction between permissible and impermissible one-party consent tapes by private parties was whether the actor's intent in recording was to injure. *Compare* 114 Cong. Rec. 14694-14695 (1968) ("Such one-party consent is also prohibited when the party acts in any way with an intent to injure the other party to the conversation in any other way ... For example, ... for the purpose of blackmailing the other party, threatening him, or publicly embarrassing him") (emphasis added) *with* S.Rep. No. 90-1097 (1968) at 2236-37 ("There are, of course, certain situations in which consensual electronic surveillances may be used for legitimate purposes ... [as with recordings made] without ***intending in any way to harm the nonconsenting party***.") (emphasis added).  Petitioner's proffered testimony that Gargiulo extorted him out of cash with

the threat of disclosing the tape shortly after it was made shows that Gargiulo did not act purely in defensive fashion.

The legislative intent underlying 18 U.S.C. §2511(2)(d) makes clear that the criminal or tortious purpose prohibition must be narrowly construed, covering only those tapings accompanied by a specific contemporary intent to commit a crime or a tort.   *See Caro v. Weintraub*, 618 F.3d 94, 99-100 (2d Cir. 2010) ("There is a temporal thread that runs through the fabric of the statute and the case law. At the time of the recording, the offender must intend to use the recording to commit a criminal or tortious act.").   Here, Gargiulo´s "contemporary intent" was criminal.   He harbored criminal intent when he made the tape recording, even if a defensive reason for making the tape was also intertwined with his primary criminal motivation. *See Sussman*, 186 F.3d at 1201-02 ("existence of a lawful purpose does not mean that the interception is not also for a tortious or unlawful purpose … existence of the lawful purpose would not sanitize a tape that was also made for an illegitimate purpose; the taping would violate section 2511."); *Vest*, 639 F.Supp. at 904 ("It is characteristic of human experience that individuals usually — perhaps even always — act with mixed motives."). The Court can ascertain Gargiulo´s primary intent from the proffered testimony of Petitioner and other corroborating evidence.   *See United States v. Salameh*, 152 F.3d 88, 143 (2d Cir. 1998) (recognizing that "as a general rule most evidence of intent is circumstantial"); *Mallette v. Scully*, 752 F.2d 26, 32 (2d Cir.1984) ("Commentators agree that it is seldom possible to present testimonial or direct evidence of an accused's state of mind. Intent as a separate item of proof does not commonly exist.   … [I]ts existence must be inferred by considering the laws that generally govern human conduct.... Circumstantial evidence of this subjective fact is therefore indispensable.") (citations omitted). The totality of all of the circumstances, now supplemented by

the proffered testimony of Petitioner, militate in favor of finding, by a preponderance of the evidence, that Gargiulo had a criminal purpose at the time of making the tape.[15]

## COUNSEL RENDERED INEFFECTIVE ASSISTANCE

Here, if counsel had not unreasonably *misadvised* Tarantino that his pretrial testimony would be used against him at trial as to the issue of guilt, he would have exercised his absolute personal right to testify in support of his motion to suppress to prove that Gargiulo´s intent from the outset was to extort him. *See United States v. Moskovits*, 844 F.Supp. 202 (E.D.Pa. 1993) (retrial granted on §2255 claim that trial counsel rendered ineffective assistance in misadvising that inadmissible prior uncounseled Mexican conviction would be used against defendant at trial if he exercised his personal right to testify). The first prong of the analysis under *Strickland v. Washington*, 466 U.S. 668 (1984), *i.e.*, counsel's deficient performance, is shown by the *misadvice* given to Tarantino that his testimony in support of suppressing the linchpin evidence *would be used against him at trial on the issue of guilt*, contrary to well-settled law. *See Simmons v. United States*, 390 U.S. 377, 394 (1968) ("when a defendant testifies in support of a motion to suppress evidence…, his testimony may not thereafter be admitted against him at trial on the issue of guilt

---

[15] A different result might obtain if Gargiulo had never told Petitioner that he had taped him prior to approaching the FBI. *See United States v. Farrah*, 2000 WL 92349, *3 (D.Conn.2000) ("Finally, there is no evidence to suggest that either Donald Poling or Marilyn Poling had any improper motive for making the tapes. At no time did either of the Polings tell Farrah that they had the tapes and would use them against her if she did not return the money. It stands to reason that if the Polings had recorded the conversations with the intent to extort from Farrah money to which they were not entitled, or with the intent to otherwise coerce or induce her to act, they would have told Farrah that they had the tapes at some point prior to resorting to going to the authorities. The fact that the Polings never told Farrah about the tape recordings is consistent with the conclusion that they never intended to use the tapes to extort money from Farrah or otherwise coerce or induce her to act."); *United States v. Phillips*, 564 F.2d 32, 34 (8th Cir.1977) ("the subsequent failure to [unlawfully] use the tape reinforces the finding that the primary purpose for making it was to obtain a record of what was said. Furthermore, there is no credible evidence of any other purpose."). But that is not the situation here.

unless he makes no objection").  As in *Moskovits*, the second prong of the *Strickland* analysis, *i.e.*, prejudice from said deficient performance, is shown by counsel's interference with defendant's right to provide testimony that would have caused a different court decision.  Petitioner submits that the denial of his fundamental right to testify in support of his motion to suppress *linchpin evidence* caused by the ineffectiveness of counsel was prejudicial. This Court should conclude that deficient representation caused Tarantino to not exercise his right to testify, resulting in prejudice, meaning "the decision reached would reasonably likely have been different absent the errors." *Moskovits* at 210 (*quoting Strickland*, 466 U.S. at 696). It is reasonably likely that the tape would have been suppressed based on the proffered testimony.

Petitioner has proffered sufficient evidence to support a conclusion that Gargiulo recorded the conversation with the intent to commit extortion.  At a minimum, Petitioner should be granted a §2255 hearing to testify before the Court and have "a full and fair opportunity to meet his [] burden of proof." *See United States v. Phillips*, 540 F.2d 319, 326-327 & n.3 (8th Cir.1976) (trial court should require government to establish legal purpose for interception; if government meets its obligation, defendant must prove by a preponderance of the evidence the existence of one of the exceptions in § 2511(2)(d); risk of non-persuasion remains with defense).  The entire chain of other evidence on the issue of Gargiulo's intent to use the tape for personal financial gain corroborates Petitioner's proffered testimony that Gargiulo started to extort cash from him using the threat of disclosing the incriminating tape to law enforcement, shortly after the tape was made, thereby proving his criminal intent from the outset:

> [T]he statute here under consideration plainly declares that recording is permissible in some circumstances and impermissible in others. Also, it plainly includes some provisions aimed at serving the public interest in use of credible evidence to support prosecutions for criminal offenses, but others aimed at protecting privacy and deterring violations, ***even to the extent of using sanctions that sometimes deny use of credible evidence that may be essential to effective prosecution for a crime.***

*Vest*, 639 F.Supp. at 909 (emphasis and brackets added).

Had Petitioner's proffered testimony been given to this trial court, it is reasonably likely that it would have concluded that the exclusionary sanction under 18 U.S.C. §2515 must be imposed here.  *See United States v. Lam*, 271 F.Supp.2d 1182, 1186 (N.D.Cal.2003) (suppressing tapes of unlawfully intercepted conversations pursuant to 18 U.S.C. §2515) (citations omitted).  The proffered testimony shows that the taping of the conversation was the first affirmative step taken by Gargiulo in his calculated extortion scheme.  But for the ineffectiveness of Petitioner's trial counsel in misadvising him, which kept him off the witness stand, the linchpin evidence would have been suppressed as it was made "for the purpose of committing [a] criminal or tortious act" in violation of 18 U.S.C. § 2511(2)(d).  All of the corroborating evidence on the issue of Gargiulo's intent, now supplemented by Petitioner's proffered testimony points to the conclusion that Gargiulo had always intended to extort Petitioner from the moment he pressed "*record.*"  *See Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir.1997) ("To establish a fact by a preponderance of the evidence means to prove that the fact is more likely true than not true."); *Ostrowski v. Atl. Mut. Ins. Cos.*, 968 F.2d 171, 187 (2d Cir.1992) (remanding and recommending that the district court use the scale-tipping analogy).

## CONCLUSION

For all of the foregoing reasons, Petitioner respectfully submits that the Court should vacate all of the convictions, dismissing Count One with prejudice or ordering a retrial, ordering a retrial under Count Two, and dismissing Count Three with prejudice or ordering a retrial.  Petitioner also submits that an evidentiary hearing is warranted on the issues raised herein.

Respectfully submitted,

/s/ *Todd G. Scher*

TODD G. SCHER
Law Office of Todd G. Scher, P.L.
Fla. Bar No. 0899641
1722 Sheridan Street, #346
Hollywood, FL 33020
(Tel) 754-263-2349
(Fax) 754-263-4147
TScher@msn.com
Counsel for Defendant

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 4th day of October 2019, I filed the above pleading with the Clerk via CM/ECF.

/s/ *Todd G. Scher*
TODD G. SCHER