UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**CHRISTIAN GEROLD TARANTINO,**

      **Petitioner,**

**vs.**                                  **Case No.: 2:08-cr-00655-JS**
                                         **(Related Case: 2:16-cv-03770-JS)**

**UNITED STATES OF AMERICA,**

      **Respondent.**

_____/

## PETITIONER'S REPLY TO RESPONSE TO AMENDED SUPPLEMENTAL MOTION UNDER 28 U.S.C. §2255

TODD G. SCHER
Law Office of Todd G. Scher, P.L.
Fla. Bar No. 0899641
1722 Sheridan Street, #346
Hollywood, FL 33020
(Tel) 754-263-2349
(Fax) 754-263-4147
TScher@msn.com
Counsel for Petitioner

## <u>TABLE OF CONTENTS</u>

Count One - Counsel Failed to Investigate Facts Showing Insufficient Evidence
of Jurisdiction ……………………………………………………………………….     1

Undisclosed Unwaivable Conflicts of Interest Adversely Affected the Performance of Trial
Counsel and Constitute a Per Se Violation of the Sixth Amendment Right to the Effective
Assistance of Counsel …………………………………………………………….     5

Counsel Excluded Petitioner from Pre-screening Anonymous Jurors in Defiance of Court
Order …………………………………………………………………………………     9

Retrial Counsel Provided Ineffective Assistance by Failing to Recuse the Retrial Court….     11

Retrial Counsel Failed to Prevent a Conviction Based on Inadmissible Evidence …………     12

Trial Counsel's Failure to Present Petitioner's Testimony in Support of Suppression……     13

Conclusion ………………………………………………………………………….     15

Certificate of Service …………………………………………………………….     15

**REPLY TO RESPONDENT'S OPPOSITION TO PETITIONER'S §2255 MOTION**

Petitioner Christian Tarantino, through undersigned counsel, files this Reply to Respondent's opposition to his "Amended Supplemental Motion" under 28 U.S.C. § 2255. The attachments hereto are incorporated herein by specific reference.

*Count One - Counsel Failed to Investigate Facts Showing Insufficient Evidence of Jurisdiction*

Petitioner was convicted under 18 U.S.C. § 33 because counsel unreasonably failed to investigate facts that would have shown there was insufficient proof as to the jurisdictional element of the statute ("any motor vehicle which is used, operated, or employed in interstate or foreign commerce"), disproven by testimony showing that the motor vehicles of "Mid-Island Check Cashing Corp." (Mid-Island) were only "used, operated, or employed" intrastate within New York.

The Opposition fails to address that Mid-Island owner Fede only testified as follows:

> "AUSA: And how did you *__use__* the armored vans? Fede: To deliver payrolls to certain companies around Long Island Queens. AUSA: In addition to Long Island and Queens, did you service any companies outside of New York State? A. *__No.__* AUSA: Did *__you__* *__ever__* service companies in the Port of Newark? Fede: Yes. AUSA: In the Port of Newark, what kind of companies did *__you__* serve? Fede: *__We__* did the tankers that came in from foreign countries, and we would service the ships." (T.808) (3/29/2011) (emphasis and brackets added).

Had counsel conducted a reasonable investigation or sought discovery of State records and Mid-Island insurance records, insufficient evidence of jurisdiction would have been discovered. Documents found post-conviction reveal that Mid-Island was a New York company *__never__* registered in New Jersey. The Opposition does not dispute this fact previously *dehors* the record. In support of his motion, Petitioner has submitted an insurance policy showing Mid-Island (*__and five other check cashing companies__*) insured under the same policy during 1994. *See* Stahl Reply Affirmation at ¶10 (attached hereto). Further, it has been discovered that Fede also owned Kayla

Check Cashing Company.  *Id*.  Fede only testified that an ***unidentified*** first-person plural ("We") served companies in the Port of Newark ***at an unknown date***, ("AUSA: Did ***you*** ***ever*** service companies in the Port of Newark? Fede: Yes… ***We*** did…") (T.808), not that any Mid-Island vehicle was "used, operated, or employed" outside of New York.  *See id*. ("AUSA: And how did you ***use*** the armored vans? Fede: To deliver payrolls to certain companies around Long Island Queens. AUSA: In addition to Long Island and Queens, did you service any companies outside of New York State? A. ***No.***) *Id*.; Trial Exhibit 3-FF (June 23, 1994 Mid-Island van route ***intrastate only***).  As the 1994 insurance policy previously *dehors* the record suggests, Fede could have served the Port of Newark ***through six other companies***.

Rather than conceding that the record augmented by the State records and the Mid-Island insurance records establishes insufficient evidence to establish that any Mid-Island vehicle was ever "used, operated, or employed in interstate or foreign commerce," the government argues that the jurisdictional element was proven, citing an inapposite opinion issued over a dissent (Opposition at 4) (*quoting United States v. Lowe*, 65 F.3d 1137, 1147-1148 (4th Cir. 1995)).  The majority in *Lowe* held that "[a]ll the statute [§ 33] requires is that the vehicles be 'used' in interstate commerce; in other words, … the vehicles must be used in connection with or in furtherance of the interstate market activities of the entities operating or employing the vehicles."  *Id*. at 1147-1148 (brackets added).  However, the case record now augmented with the evidence obtained post-conviction, including the 1994 insurance policy, shows insufficient evidence that ***Mid-Island*** "used" vehicles in both New York and New Jersey.  *But see* Opposition at 5 ("The petitioner's argument that Mid-Island did not operate in interstate commerce simply because state corporate records did not show registration in the state of New Jersey is irrelevant in light of ***the testimony that shows the company actually serviced the Port of Newark***.") (emphasis added).  Even

following *Lowe*, the testimony only shows that Fede and an unidentified first-person plural ("We") served companies in the Port of Newark **at an unknown date**, while Fede **unequivocally denied** that **Mid-Island** armored vans were "**_used_**" outside of New York (T.808).  Petitioner also submits that the majority opinion in *Lowe* should not be followed because dissenting Judge Motz correctly read the statute. *Lowe*, 65 F.3d at 1150 ("The statute as interpreted by the majority would extend the reach of Section 33 to every vehicle owned by a person or entity engaged in interstate commerce, no matter how confined the use of the vehicle, because conceivably every such vehicle somehow 'furthers' the interstate market activities of its owner. I do not believe Congress intended to stretch the scope of Section 33 in such a manner.").[1]

The Opposition insists on misapplying the *effect* on interstate commerce analysis governing review of the jurisdictional elements in other statutes.  This fatal sidewalk robbery was not charged as a violation of 18 U.S.C. § 1951(a) ("Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery").  The jurisdictional element under the "Hobbs Act" can be proven if the robbery created a realistic probability of a "*de minimis*" effect on commerce.  *United States v. Celaj*, 649 F.3d 162, 168 (2nd Cir. 2011). Had Congress wanted to draft a phrase into § 33 to cover vehicles merely used to "affect" commerce, it could have done so.  *See* 18 U.S.C. § 844(i) (covering vehicles "used in interstate or foreign commerce **or in any activity affecting interstate or foreign commerce**") (emphasis added).

The language in § 33 ("used, operated, or employed in interstate or foreign commerce") sets a much more restrictive jurisdictional element.  The Supreme Court has noted that Congress

---

[1] The Opposition at 4-5, n.3, faults Petitioner for not discussing *United States v. Heightland*, 865 F.2d 94, 95-96 (6th Cir. 1989) (rejecting challenge to § 33 jurisdiction where trucks transporting coal not traveling interstate, but "the first phase" of "truck-train interstate journey"). However, *Heightland* analyzed an inapposite factual pattern that cannot support an analogy to the facts of this case which did not involve an "interstate journey."

has recognized the "distinction between legislation limited to activities '**in commerce**,' and an assertion of its full Commerce Clause power so as to cover all activity substantially *affecting interstate commerce*."  *United States v. American Bldg. Maint. Indus*., 422 U.S. 271, 280 (1975) (emphasis added).  The Opposition ignores the critical distinction and relies on inapposite out of circuit opinions analyzing different federal criminal statutes with broader language defining their jurisdictional elements (Opposition at 5) (inapposite cases cited).

This Court instructed the jurors that "it is sufficient if the government proves beyond a reasonable doubt that the motor vehicle was used by a company that operated in interstate or foreign commerce."  (T.3130-3131) (5/5/2011) (emphasis added). As counsel was ineffective, the prosecution told jurors it was *not disputed* that "*Mid-Island Check Cashing Corporation operated in interstate commerce*." (T.2880) (emphasis added).  But for the failure to investigate, there is a reasonable probability that § 33 charge would have been dismissed, as Mid-Island was a New York corporation (never registered in New Jersey) that only used its vehicles within New York.  As documents previously *dehors* the record now suggest, Fede could have serviced companies in the Port of Newark through *at least six other companies*.

The testimony would have been insufficient evidence to prove the jurisdictional element of § 33, if trial counsel had reasonably investigated and presented the evidence previously *dehors* the record.[2]

---

[2] Undersigned counsel did represent Petitioner in his direct appeal, but, as the government well knows, he could not have based a direct appeal argument on extra-record evidence surfacing for the first time in §2255 proceedings due to trial counsel's ineffectiveness (Opposition at 5, n.5). At a minimum, there is enough "good cause" to allow discovery under Rule 6 of the Rules governing § 2255 proceedings as to this issue of jurisdictional and constitutional magnitude. It is well-settled that insufficient evidence of federal jurisdiction is fundamental error that may be raised at any time.

<u>*Undisclosed unwaivable conflicts of interest adversely affected the performance of trial counsel and constitute a per se violation of the Sixth Amendment right to the effective assistance of counsel*</u>

Both the original affirmation and the reply affirmation provided by Eliza D. Stahl, Esq. reveal that James Froccaro (Froccaro) operated under undisclosed and unwaivable conflicts at trial. Froccaro failed to disclose his simultaneous representation of Scott Mulligan (Mulligan) before and during Petitioner's trial (receiving a $150,000 check and more cash payments from Mulligan). Attorney Stahl also avers that Froccaro admitted that he destroyed a blackmail letter (demanding $500,000 from Mulligan or an incriminating tape would be delivered to the FBI), which letter had been mailed by Vincent Gargiulo (Gargiulo) to Mulligan months before Gargiulo was murdered. Froccaro's failure to disclose his own destruction of evidence (benefiting his long-term client and benefactor Mulligan) or his simultaneous representation of Mulligan before and during the trial, has caused structural error obviating consideration of the evidence,[3] but Petitioner has also shown many instances of how the unwaivable benefactor conflict adversely affected trial performance. Petitioner has shown "an actual conflict of interest adversely affected his lawyer's performance," *see Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980), particularizing examples of the adverse effect of the unwaivable conflicts on Froccaro's trial performance, as self-interest and divided loyalties prevented him from defending Petitioner by shifting blame with evidence incriminating Mulligan.[4]

---

[3] During the *Curcio* hearing held days before the first trial, Froccaro twice claimed that another conflict of interest (involving the simultaneous representation of Lucchese crime family members who took credit for committing the August 1994 murder charged against petitioner) "***honestly slipped [his] mind***." *See* 3/15/11 transcript at p.5 (emphasis added). Froccaro failed to disclose the *unwaivable* benefactor conflict as he destroyed evidence related to this case (the blackmail letter from Gargiulo to Mulligan) and defended Mulligan before and during the first trial. *See* Stahl Affirmation and Reply Affirmation. As the government distinguished the caselaw on "unwaivable" conflicts in its request for a *Curcio* hearing, *see* Crim. Dkt. No. 189 at p.4 (discussing "very narrow category of cases" involving "unwaivable" conflicts), Froccaro cannot be expected to voluntarily offer admissions against his interests as he failed to disclose unwaivable conflicts. *But see* Opposition at 7 n.8 (noting that Petitioner has not offered an affidavit from Froccaro admitting to his actual simultaneous representation of Mulligan during his representation of petitioner).

[4] Froccaro knew that Mulligan was a target/suspect. *See* 2/16/11 transcript at p.361 (FBI file showed that Mulligan as target/suspect in murders of Julius Baumgardt *and* Louis Dorval); *id.* at p.363 (Mulligan's DNA was *subpoenaed*). Attorney Stahl also avers that Froccaro celebrated the case agent's testimony at the *Mastrangelo* hearing suggesting that Mulligan's DNA was excluded by the FBI as of the hearing date. *Id.* Froccaro took credit for "clearing" *Mulligan*

Irrespective of Froccaro's destruction of criminal evidence, the benefactor conflict disqualified him from defending Petitioner, as Mulligan was implicated in all the offenses on trial. Petitioner meets the *Cuyler* standard, and the Second Circuit does not even require the showing where the conflicts are **unwaivable** and constitute "a *per se* violation of the Sixth Amendment." *See United States v. Fulton*, 5 F.3d 605, 611 (2d Cir 1993) ("If the *per se* rule of this circuit applies in this case, to establish a Sixth Amendment violation, Fulton need not even prove that the conflict adversely affected the lawyer's performance as required by *Cuyler*.").

The Opposition only rebut one of the examples provided as to the adverse effect of the conflict on Froccaro's performance regarding Count Two, charging Louis Dorval's murder. *See* Opposition at 6-7 & n.6 (arguing that "concession to the petitioner being an accessory-after-the-fact [based on the tape] would have led to his conviction on Counts Three and Four at the first trial" as it would have "confirmed the motive" to murder Gargiulo who surreptitiously recorded the incriminating tape) (brackets added). But the soothsaying fails to salvage Count Two.[5]

The Opposition misconstrues Petitioner's argument because Froccaro did ***not*** have to make "any such concession" of motive to the jurors, *see* Opposition at 6-7 & n.6, to obtain a theory of defense instruction that the jury ***had to acquit*** Petitioner if the jury found that the evidence only sufficiently proved that he had been an "accessory-after-the-fact." *See Mathews v. United States*, 485 U.S. 58, 63 (1988) ("As a general proposition, a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in

---

at the *pre-trial* hearing. *See* Stahl Affirmation. The conflict adversely affected Froccaro's performance as he failed to elicit an available description suggesting **Mulligan** played a part in the robbery *instead of Petitioner*. Petitioner has presented the case agent affidavit showing that 2 witnesses standing "a few feet" from the robbery saw 2 assailants, and Mulligan fit the description of the one who had a shotgun, identically matching his height ("six-foot-one-inch") and "heavy build." Froccaro even objected to linking **Mulligan** to weaponry *at Petitioner's expense* (T.899-917) (3/30/11) (Froccaro objecting to any testimony that Mulligan was seen entering storage unit on June 24, 1994, where weaponry allegedly used in June 23 robbery found on June 24); (T.932) (Petitioner was never seen at storage facility).
[5] The government's soothsaying fails because it ignores that retrial counsel ***conceded*** that the known existence of the tape provided "motive," but still obtained an acquittal as to the murder of Gargiulo. (T2 1919) (5/9/12).

his favor"); *United States v. Varelli*, 407 F.2d 735 (7th Cir. 1969) (distinguishing criminal conduct of "accessories-after-the-fact" and aiders and abettors to conclude that defendants were merely "accessories after-the-fact" and could not be convicted as aiders and abettors). Froccaro could have denied Petitioner's involvement in the murder or disposal of the body during his closing, and still obtain the theory of defense instruction. His failure to seek the instruction cannot be excused as a "strategic choice" given the existing evidence[6] supporting the alternative exculpatory theory. The conflict steered Froccaro toward instead attacking the integrity of the tape evidence arguably inculpating Mulligan as a more culpable principal in the Dorval murder and exculpating petitioner as an "accessory after the fact." The conflict destroyed structural integrity as Froccaro had divided loyalties and continuously refrained from adopting any trial position that was against ***the interests of Mulligan***, including his inexcusable choice not to seek an alternative defense theory instruction.

The Opposition argues "there is no relief possible" with respect to Counts Three and Four, as the jury deadlocked on those charges (Opposition at 7 n.7). But this overlooks Petitioner's argument that, but for Froccaro's trial performance being adversely affected by the benefactor conflict, Froccaro could have credibly suggested that Mulligan was the pseudonymous Synergy gym owner "Matty Roth," who allegedly ordered the murder of Gargiulo, and that, but for Froccaro's ineffectiveness during the trial, counsel would have moved to exclude inadmissible

---

[6] As Joseph Pistone murdered Dorval, the government submitted in final summation that petitioner "aided and abetted" the murder. (T. 3065) (5/4/11). In his Rule 29 motion for acquittal, Froccaro argued that the tape "more appropriately" showed Petitioner implicated as an "accessory after the fact." (T. 2793) (4/27/11) ("the only statement in there that could potentially be argued to implicate him in the murder or being an accessory -- I think more appropriately being an accessory after the fact, where there is a claim that it is Mr. Tarantino speaking…"). The theory raised in the oral Rule 29 motion was supported by the tape, but the defense theory instruction was not read to the jury because counsel failed to request it. Froccaro had been advised Mulligan was "next on the chopping block" according to the prosecutor. (T. 1627) (4/7/11). Simultaneously representing Mulligan during Petitioner's trial, Froccaro chose to spare Mulligan. When Froccaro submitted that the tape "more appropriately" showed Petitioner was an "accessory-after-the-fact," the prosecution responded that the testimony of Gaetano Fatato (Fatato) supported "a fair inference that Mr. Dorval was last with Mr. Tarantino before his death" (T. 2797). Given the tape evidence, Fatato's testimony posed no impediment to instructing the jury to acquit if it found that Petitioner was only proven to be an "accessory-after-the-fact."

7

*post mortem* coconspirator hearsay and inadmissible testimony from Petitioner's own attorney Melvyn Roth that impermissibly provided the "last direct link" to convict Petitioner, without which there was insufficient admissible evidence to convict as to Counts Three and Four. Petitioner was prejudiced because effective counsel would have successfully moved to dismiss those insufficient charges ***with*** prejudice, barring any retrial under the Double Jeopardy Clause.      In      light      of Attorney Stahl's affirmations, Froccaro was a potential witness as to Mulligan's motive to order the murder of Gargiulo, (Froccaro destroyed a blackmail letter sent by Gargiulo to Mulligan demanding a $500,000 payoff or he would send an incriminating tape to FBI).[7]  *See Fulton*, 5 F.3d at 611 ("we believe that, where there is a reasonable possibility that a witness' allegations are true [as to an "unwaivable" conflict of interest], the district court... ***must assume the worst***.") (emphasis added). The constitutional violation found here creates a *structural error*; therefore, reversal is mandatory.

In this case, "the conflict [wa]s of such a serious nature that no rational defendant would knowingly and intelligently desire that attorney's representation... the attorney [had to] be disqualified, regardless of whether the defendant [wa]s willing to waive his right to conflict-free counsel." *See United States v. Schwarz*, 283 F.3d 76, 95-96 (2d Cir. 2002) (brackets added). Froccaro concealed his conflicts to avoid disqualification as the trial court would have promptly concluded that no rational defendant would knowingly and intelligently desire such representation.

---

[7] Froccaro's destruction of evidence here causes an unwaivable conflict.  *See Government of Virgin Islands v. Zepp*, 784 F.2d 125, 136  (3d Cir.1984) ("Even if not criminally charged for such events, trial counsel could have faced severe disciplinary consequences if it were ever known that he was involved in the destruction of evidence. American Bar Association, *Canons of Professional Ethics;* Canon 15 ... In circumstances such as these, when defense counsel has independent personal information regarding the facts underlying his client's charges, and faces potential liability for those charges, he has an actual conflict of interest … from these facts alone there was an actual conflict of interest which required withdrawal by trial counsel or disqualification by the court.") (emphasis added); *see also Fulton*, 5 F.3d at 612 (*citing United States v. Arrington*, 867 F.2d 122, 129 (2d Cir.1989) (district court refused waiver and disqualified attorney when government informed the court of an alleged plot to silence witnesses and possible involvement of counsel)).

*Compare United States v. Binday*, 2013 WL 1104258, at *6 (S.D.N.Y. 2013) (Judge McMahon disqualifying counsel who disclosed unwaivable conflict on the eve of trial and ordering the firm to fully refund the fees paid by defendant) ("I continue to find it incredible that Steptoe could have allowed matters to evolve this far before choosing to involve the court in the situation. The firm has known since the indictment was handed down that one or more of its clients are among the "victims" mentioned in the indictment (and not all the victims are mentioned in the indictment). Most law firms would have declined the representation at the outset on that basis alone.").

The Opposition also attempts to bootstrap an argument that the *Curcio* hearing held as to a **_waivable_** conflict (disclosed by the government) shows that Petitioner cannot claim to be unaware of his right to conflict-free counsel, *see* Opposition at 7-8; but that waiver was not knowing and intelligent as to the **_undisclosed unwaivable_** benefactor conflict. *See* Reply Affidavit of Tarantino at ¶¶23-35 (attached hereto). Froccaro's self-interest and divided loyalties permeated all of his trial choices at Petitioner's expense, and such a conflict constitutes a *per se* violation of the Sixth Amendment. *See United States v. Locascio*,  6 F.3d 924, 932 (2d Cir.1993) ("Ethical considerations warn against an attorney accepting fees from someone other than the client. … the acceptance of such benefactor payments may subject an attorney to undesirable outside influence and raises an ethical question as to whether the attorney's loyalties are with the client or the payor.") (quotation marks omitted).

_Counsel excluded Petitioner from pre-screening anonymous jurors in defiance of Court Order_

The government sidesteps Petitioner's argument that Froccaro entirely excluded him from pre-screening anonymous jurors in contempt of a direct Court Order that underscored the "import the Court placed on the petitioner's ability to review the juror questionnaires" (Opposition at 8; *see also* March 15, 2011 transcript at 40 (court directive issued after Froccaro questioned whether

there was enough time to visit petitioner to review the juror questionnaires) (COURT: "So you're definitely going to do that beforehand and see what his desires would be in terms of the type of jury he'd like to be seated")).  Petitioner is not regurgitating his argument on appeal complaining of his absence from only the *phone conferences* held to pre-screen the jurors. The Second Circuit concluded that Petitioner "impliedly waived his right" to be present during the *phone conferences* based in part on the assumption that Froccaro obeyed a direct Court Order.  *See United States v. Tarantino*, 617 Fed.Appx. 62, 64-65 (2d Cir. 2015).   The decision was based on an incomplete record.  *Id*. at 65 ("On this record, it is apparent that Tarantino waived his right to be present."). Petitioner had the right to participate in the pre-screening of potential jurors, *see Cohen v. Senkowski*, 290 F.3d 485, 489 (2d Cir. 2002) (pre-screening of jurors is material stage of trial in which accused has constitutional right to be present), and facts previously *dehors* the record are now ripe for review. *See* Reply Affidavit of Tarantino ¶¶36-39  (Froccaro violated the Court Order and Petitioner was entirely excluded from pre-screening prospective anonymous jurors). Petitioner's exclusion during a material stage of trial in contempt of a direct Court Order constitutes ***structural error*** affecting the integrity of the first trial.  Because this case does not involve "absence of the defendant from a peripheral proceeding of secondary importance [which] is subject to harmless error review," *Yarborough v. Keane*, 101 F.3d 894, 897-898 (2d Cir. 1996) (brackets added), the usual prejudice analysis does not apply.

A "defendant's absence from certain stages of a criminal proceeding may so undermine the integrity of the trial process that the error will necessarily fall within that category of cases requiring automatic reversal." *United States v Feliciano*, 223 F3d 102, 111-12 (2d. Cir 2000). It is unfair and unreasonable to imply waiver of the right to be present at a material trial stage from the failure of a defendant facing three life sentences to "blow the whistle" on his own lawyer on

10

the morning of the first day of trial in the absence of any colloquy initiated by the Court, which assumed that an officer of the court complied with its unambiguous Order underscoring the import of the right to participate in pre-screening review of juror questionnaires. *See* Reply Affidavit of Tarantino at ¶¶36-39 (explaining reasons for not exposing his trial counsel).  Under the unique circumstances of this case, Petitioner's exclusion from that entire material stage of the trial constitutes "structural error" not subject to harmless error analysis.  All of the convictions obtained during the first trial should be vacated.

### *Retrial counsel provided ineffective assistance by failing to recuse the retrial court*

The Opposition simply ignores the facts and the law in support of Petitioner's argument that retrial counsel was ineffective because he failed to recuse this Court based on inferable bias stemming from the Court impermissibly allowing a government witness to waive grand jury indictment on an offense punishable by death, which expeditiously secured the witness for the prosecution on the eve of a January 9, 2012 retrial. The government ignores the clear allegation that the Court displayed "deep-seated favoritism or antagonism" on January 3, 2012, in accepting the waiver of grand jury indictment for an offense punishable by death, disregarding the Fifth Amendment, Fed. R. Crim. P. 7, and caselaw.[8]  The Court showed bias in favor of the prosecution after presiding over the first trial by improperly accepting a waiver of grand jury for an offense punishable by death, thus expediting the availability of a government retrial witness. Petitioner had a fundamental constitutional right to an unbiased judge, and the ineffective failure of retrial counsel to seek recusal caused structural error requiring vacatur the only conviction obtained after

---

[8] A grand jury waiver is only available in non-capital cases. *See United States v. Macklin*, 523 F.2d 193, 196, n.3 (2d Cir. 1975) ("offense punishable by death requires prosecution by indictment regardless of a defendant's waiver") (*citing* Rule 7(a)); *Matthews v. United States*, 622 F.3d 99, 103 (2d Cir. 2010) (court must "look to the charging instrument to which [witness] pleaded.").

11

the retrial.[9]  *See Arizona v. Fulminante*, 499 U.S. 279, 290 (1991) ("trying a defendant before a biased judge" is listed among those "constitutional errors that could not be categorized as harmless error"); *see also Offutt v. United States*, 348 U.S. 11 (1954) ("[J]ustice must satisfy the appearance of justice").

### Retrial counsel failed to prevent a conviction based on inadmissible evidence

The Opposition ignores the caselaw in support of Petitioner's argument that he would have been entitled to acquittal for insufficient evidence of the alleged conspiracy to murder Gargiulo because purported *post-mortem* coconspirator hearsay testimony that "Matty Roth" obtained an attorney for Bressman during NYPD questioning three days after the murder was inadmissible and the client identity testimony of attorney Melvyn Roth was also inadmissible as the testimony inserted the last "direct link" to convict petitioner casting him as the pseudonymous "Matty Roth."

Without the inadmissible *post-mortem* hearsay **or** the inadmissible client identity testimony from Roth, there was insufficient evidence to convict Petitioner as a co-conspirator in the murder, and the Court would have been obligated to dismiss **with** prejudice.  There is no basis to contend that either first trial counsel's failure or retrial counsel's failure to seek the exclusion of clearly inadmissible evidence was valid legal strategy. Ineffective counsel allowed the prosecution to run amok with inadmissible evidence during both trials.  This Court should not overlook that the government ignores binding Second Circuit law in claiming that the "evidence of the petitioner's guilt was overwhelming, and the government submits the petitioner cannot show any prejudice as a result" (Opposition at 10).  *But see United States v. Floyd*, 555 F.2d 45, 48 (2nd Cir. 1977) ("To

---

[9] Petitioner respectfully requests referral of his recusal issue to the Chief Judge of the Eastern District of New York. *See United States v. Craig*, 853 F.Supp. 1413, 1415 (S.D.Fla. 1994) (following long-term policy of referring recusal motions to Chief Judge). Petitioner maintains that, but for the gross errors committed by Froccaro, the first trial of the mistried counts related to the alleged conspiracy to murder Gargiulo would have resulted in acquittals and dismissals barring any retrial under the Double Jeopardy Clause.

include in the conspiracy an event, no matter how proximately related, occurring after the main objectives of a conspiracy have been accomplished would unnecessarily blur the relatively clear line drawn by the Supreme Court's decisions on this subject"); *United States v. Goldberger & Dubin, P.C.*, 935 F.2d 501, 505 (2d Cir. 1991) (special circumstances under which client identity would be privileged exist when disclosure of client-identifying information would directly incriminate the client by providing direct linkage in an existing chain of evidence presented against the client). Without the chain of inadmissible evidence linked by the government, there was insufficient evidence to convict the Petitioner as to the alleged conspiracy to murder.

### *Trial Counsel's Failure to Present Petitioner's Testimony in Support of Suppression*

The Opposition dismisses as "self-serving" the version of the events offered by Petitioner that he advised both first trial and retrial counsel he wanted to testify in support of suppression of the tape evidence that Gargiulo had blackmailed him out of cash starting shortly after taping their conversations in late 2000. *See* Reply Affidavit of Tarantino at ¶15; Stahl Reply Affirmation at ¶¶8-9 (petitioner told counsel he wanted to testify about paying Gargiulo's tape blackmail in 2000).

Counsel misadvised Petitioner that his pretrial testimony would be used against him at trial on the issue of guilt, *see* Reply Affidavit of Tarantino at ¶16, Stahl Reply Affirmation at ¶¶8-9 (corroborating advice counsel gave Petitioner), contrary to the Supreme Court holding in *Simmons v. United States*, 390 U.S. 377, 394 (1968) ("when a defendant testifies in support of a motion to suppress evidence..., his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection"). Under these unique circumstances, where Petitioner was an indispensable witness uniquely positioned to establish the dispositive factual basis to suppress the tape evidence by testifying that Gargiulo's primary motivation at the time of making the tape and consistently thereafter was to blackmail cash, the ineffectiveness of counsel adversely affected

13

the outcome of the issue. *See Tarantino*, 617 Fed.Appx. at 65 (Second Circuit noting that district court "specifically afforded Tarantino an opportunity to come forward with additional information in support of his request for a hearing. As the record indicates and as the parties' supplemental letter briefs make clear, Tarantino failed to do so."); *see also id.* ("Although Gargiulo later used the recording for blackmail, it is far from clear that blackmail was his 'primary motivation' or 'a determinative factor' at the time he made the recording.") (citations omitted).

"[W]here a defendant did not testify at a suppression hearing because he relied on the advice of counsel, the issue is best approached in terms of whether the advice was reasonable and whether, if the advice had been different, it would have affected the outcome of the hearing." *See Hemingway v. Henderson*, 754 F.Supp. 296, 302 (E.D.N.Y.1991). Petitioner did not testify due to the misadvice of counsel, and there is a reasonable probability his testimony would have affected the outcome of the issue if he had been properly advised under *Simmons*. All of the other evidence on Gargiulo's intent, *see* Doc.510 at pp.29-44, corroborates Petitioner's testimony and points to the conclusion that Gargiulo had always intended to blackmail petitioner (and others) from the moment he pressed "record."

It cannot be said that the exclusion of the inadmissible tape, *see* 18 U.S.C. § 2511(2)(d) (recording is inadmissible if made "for the purpose of committing any criminal or tortious act" under Title III of the Omnibus Crime Control and Safe Streets Act of 1968), would not have affected the outcome of both trials. Had Petitioner's testimony been provided to the district court, it is reasonably likely that the exclusionary sanction under 18 U.S.C. § 2515 would have been imposed here. *See United States v. Lam*, 271 F.Supp.2d 1182, 1186 (N.D.Cal.2003) (suppressing tapes of unlawfully intercepted conversations pursuant to 18 U.S.C. §2515) (citations omitted).

## CONCLUSION

For all of the foregoing reasons, Petitioner respectfully submits that the Court should vacate all of the convictions, dismissing Count One with prejudice or ordering a retrial, ordering a retrial under Count Two, and dismissing Count Three with prejudice or ordering a retrial. At a minimum, this Court should hold an evidentiary hearing pursuant to 28 U.S.C. §2255.

Respectfully submitted,

/s/ Todd G. Scher

TODD G. SCHER
Law Office of Todd G. Scher, P.L.
Fla. Bar No. 0899641
1722 Sheridan Street, #346
Hollywood, FL 33020
(Tel) 754-263-2349
(Fax) 754-263-4147
TScher@msn.com
Counsel for Petitioner

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 14th day of February 2020, I filed the above pleading with the Clerk via CM/ECF.

/s/ *Todd G. Scher*
TODD G. SCHER

**ATTACHMENT A**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

CHRISTIAN GEROLD TARANTINO,                          Case No.: 2:16-cv-03770-JS

                                    Petitioner,         **AFFIDAVIT OF**
                                                        **CHRISTIAN TARANTINO**

        - vs -

UNITED STATES OF AMERICA,

                                    Respondent.
------------------------------------------------------------------X

I, Christian Gerold Tarantino, am the undersigned petitioner seeking relief in this case

under 28 U.S.C. § 2255, and I state as follows:

    1.      I submit this Affidavit in further support of the petition for relief.

    **Ineffective Assistance of Counsel as to Blackmail Tape**

    2.      In November/December (holiday season) 2000, Vinny Gargiulo contacted me by

telephone and asked me for a $50,000 "loan." As I had already loaned Vinny $60,000 the year

before and he had not yet paid back any part of it, I was not willing to loan Vinny the money

outright and asked him if he wanted me to arrange a "street loan" for him, where Vinny would

have to pay at least $500 per week in interest to whoever was willing to make the loan.  Vinny

became sarcastic and nasty, telling me he does not care where the money comes from, but that

"you better not tell me you don't have it."  Uncomfortable at the change in Vinny's attitude and

demeanor, I hung up the phone.

    3.      Vinny immediately called me back and demanded that I meet him at lunchtime the

following day at a restaurant on 1ˢᵗ Avenue.  Vinny told me that it was "VERY important" that I

meet him, because he wanted me to "hear something."  When I questioned him on what it was

about, Vinny responded that I was "stupid" and had a "big mouth."

4.      The next day, I showed up to meet Vinny, who showed up about 15 minutes late, after I had arrived.  Vinny instructed me not to speak and admonished me for being "so stupid" and "breaking the rules" that Vinny had "taught" me about keeping my mouth shut. Vinny taunted me, "You think you're so smart and high and mighty because you have money now, but you have money because you're a thief, not because you're a businessman, and you're a dumb thief at that."

5.      Vinny then pulled out a recorder and tapes and proceeded to play me excerpts from three different recordings.  I was stunned and asked Vinny, "what the fuck is going on?"  I asked if I had "heat."  Vinny replied, "Not yet, but you might if you don't get me $50k."  Three days later, I paid Vinny the $50,000 and asked for the tapes.  Vinny refused to give them to me, saying that he was not sure the money would be enough, and he was keeping the tapes as "insurance."  It was understood the "insurance" was to insure I would continue to pay Vinny on demand.

6.      In or about March 2001, Vinny contacted me again for more money.  I asked, "how long is this going to go on for," to which Vinny replied, "as long as it takes."  I made a second payment to Vinny a few days later.  The amount was approximately $25,000.

7.      Vinny contacted me a few more times over the following months, and I gave him a couple of payments between $5,000 and $10,000 each time.

8.      In November/December (holiday season) 2001, Vinny showed up at one of my gyms.  He looked like a train wreck and was acting delusional, as if he hadn't been blackmailing me out of thousands of dollars since late 2000.  Vinny told me he hadn't slept in 17 days, was "strung out" and needed help.  Vinny asked me to take him to rehab and run his 79th Street club while he admitted himself into the hospital.  I agreed and took Vinny to a hospital, which I believe may have been Belview, where Vinny admitted himself.  I was hopeful that my friend's behavior over the prior year was a reflection of mental illness and that he would get the help he needed.

9.      I went to Vinny's gym to see what needed to be done, but it was a disaster.  Vinny was in the process of being evicted and the utilities had not been paid.  I did not have the money and could not save the gym on my own, so I brokered a deal for a friend named Joe Pitti to buy into Vinny's gym.  Joe Pitti was one of my best earners at Synergy gym, but I felt that Vinny only wanted money from me because his business was failing and that if Joe could turn the gym around, which I had no doubt about, Vinny would start to make some money and stop blackmailing me.

10.     Vinny agreed to the plan and Joe came in and started to turn the gym around in a month, but then Vinny got out of the hospital, and in February 2002, Vinny had some paranoid delusions that we were stealing his gym from him, so he stole all the money Joe put into the account to pay the rent, removed all the equipment in the middle of the night, and shut down the gym.

11.     I later met Vinny downtown by Energy Kitchen on Broadway and John Street, where I showed him a certified check from Joe Pitti to be invested in Vinny's gym, and tried to explain to Vinny that no one had done anything wrong to him.  Vinny was irrational and dismissive and demanded I give him more money.  I explained to Vinny that I was low on cash because my businesses were struggling and, for example, Energy Kitchen was going to be shut down soon.  We parted ways.

12.     A few months later, Vinny tried to blackmail me out of $150,000.  I tried to convince Vinny to take $5,000, but Vinny wanted more money, so he changed course and in November and December 2002, he tried to blackmail Scott Mulligan instead.

13.     I later learned that Vinny also blackmailed Andy Carino.

14.     After I was arrested in this case in 2008, I learned that Vinny also tried to sell his tapes to the government for $500,000.  Before then, I had no idea that Vinny was talking to federal agents.  I was truly shocked.

15.     At both my trials, I told my attorneys, James Frocarro and Stephen Rosen, respectively, that I wanted to testify in support of suppression about Vinny's blackmail scheme that started in November/December 2000

16.     Both lawyers told me that I could not do so because it could be used against me to show motive at trial, that Judge Seybert would never believe me and Rosen told me it would also hurt my chances on appeal.

17.     Both lawyers were adamant that they would not let me testify and neither lawyer told me that it was ultimately my decision and personal right to testify according to law.

18.     On April 15, 2012, Stephen Rosen sent me an email on Corrlinks advising me that my personal attorney, Eliza D. Stahl, who assisted both Frocarro and Rosen on my case, and an appellate paralegal, both wanted me to sign and file a declaration to accompany our motion to suppress the tape, which had been drafted in accordance with the testimony I detail here, as I had disclosed this information to Ms. Stahl in addition to both my lead trial attorneys.

19.     Mr. Rosen "warned" that Ms. Stahl was going to be visiting me the following day to get the Declaration signed and advised me not to sign it, stating: "Your declaration remains unacceptable for the reasons we discussed including the risks to the appeal from the first convictions, the risks to our upcoming trial, and the doors that can open for our judge who has already made it clear how she feels about the tape and our opposition."  A copy of this email is annexed hereto as **Exhibit "1."**  Mr. Rosen also told me that it would interfere with his argument at trial that I did not have any "motive," and that, if Judge Seybert decided not to find me credible, the appellate court would not reverse her opinion.

**Frocarro's Unwaivable Benefactor Conflict of Interest**

23.     The government suggests that I was aware of the conflict of interest and thus it was somehow my responsibility to bring it to the Court's attention and understand the risks.

24.     I am not an attorney.  I did not know the potential risks and concerns related to the kind of conflict involved.

25.     I never thought of the unique and serious problems with Scott Mulligan paying half my legal fee to Frocarro and being a suspect in the same case and simultaneously being represented by Frocarro.

26.     Scott Mulligan was not just represented by Frocarro in 2003, he was represented throughout my trial by Froccaro.

27.     When Frocarro obtained a copy of the tape in my case, *he played it for Scott before I even got a chance to hear it.*  Frocarro did not ask my permission to play the tape for Scott, he just did it on his own, without thinking of the consequences to me.

28.     *Scott Mulligan was Froccaro's client all along, and he was defending him.*

29.     I was immediately uncomfortable, upset and frustrated when Frocarro told me he played the tape for Scott Mulligan.  I was dependent on Scott since he was paying half my fee.

30.     I also did not want to alienate Frocarro, who did not accept criticism.

31.     I was stunned that Frocarro would play the tape for him.  GAVE Scott a COPY

32.     I could not be expected to understand the benefactor conflict of interest or to think like an attorney.  I am not a lawyer and I relied on my attorney and the Court to protect my rights.

33.     Frocarro's joint representation of me and Scott Mulligan hurt me beyond anything I could have ever imagined.

WITNESS

2/6/2020

G. Mudry, Case Manager
Authorized by the Act of July 7,
1955, as amended to administer
oaths (18 USC 4004).

34.     The government questions the absence of a retainer agreement between Frocarro and Mulligan.  Frocarro never gave me a retainer agreement at any time during the years that he represented me, and to my knowledge never gave Scott Mulligan a retainer for his 2003 case either.

35.     Frocarro openly acknowledged that he was receiving payments on my behalf from Scott Mulligan throughout my case, and my balance was credited every time Scott Mulligan made a payment to Frocarro out of his own money.

**Frocarro Defied This Court's Order and Denied Me the Right to Screen the Venire**

36.     On March 15, 2011, Judge Seybert ordered Frocarro to come visit me at the MDC in Brooklyn to review jury questionnaires so I could participate in the venire screening process.

37.     Especially since it was an anonymous jury, the jury questionnaires were vital to the process.  I was obviously extremely concerned about getting an unbiased jury.

38.     Frocarro ignored the Court's Order and did not come to visit me to review the jury questionnaires.  The government's opposition letter suggests that I should have reported my lawyer's defiance of the Court's Order, a proposition that is totally unrealistic.

39.     As a defendant in a criminal trial, I was extremely dependent on lead trial counsel, especially incarcerated prior to trial.  I cannot be expected to blow the whistle on my own attorney at the start of trial during jury selection, as it was too late to switch attorneys and his fees had been paid in full.  I would never have gotten my money back, trial would not have been postponed, and it would have created major hostility between me and Frocarro.

**Frocarro Lied to Me About Tom Owen's Expert Opinion**

40.     Frocarro lied to me about our retained tape expert's opinion of the tape.

41.     Regarding Tom Owen, Frocarro told me, "I'm sorry, buddy, Owens said the tape is good, no stops and starts."  He also told me that he told Owens not to write a report because he

20.     Mr. Frocarro repeatedly insisted that Ms. Stahl "is not a criminal lawyer and does not know federal law." Mr. Rosen repeatedly insisted that Ms. Stahl "is a civil lawyer, she does not know criminal law." They both insisted that I had to listen to them, and only them. As experienced criminal lawyers, and my lead counsel, who were both paid large fees, I had to listen to them. They both also got very heated when I questioned their advice and wanted to go in another direction. As an incarcerated man with no easy access to the outside world, I was entirely dependent on my lead counsel and could not risk angering them. I had to maintain that relationship and follow their advice, especially since Ms. Stahl readily acknowledged that she had no experience in criminal law but was rather there to assist lead counsel as requested and as directed.

21.     The next day, April 16, 2012, Ms. Stahl did come to visit me with a draft Affidavit for me to revise and sign. Based on Mr. Rosen's misadvice and insistence, I told Ms. Stahl I would not sign the Declaration.

22.     I have since learned that both Frocarro and Rosen were wrong and gave me incorrect legal advice. My Affidavit could not be held against me and Judge Seybert should have been given the opportunity to hear my testimony and decide the issue. Without my testimony, Judge Seybert found there was insufficient evidence that the tape was made for the purpose of blackmail. I have also since learned that had Judge Seybert known that Vincent Gargiulo did blackmail me close in time to the recording, she would have suppressed the tape. I was never told by either Froccaro or Rosen or Judge Seybert that the decision to testify was my personal decision to make and could not be trumped by counsel's wishes. I now understand that I received gross legal misadvice from Froccaro and Rosen to dissuade me from exercising my personal right to testify in support of suppression of the tape played at trial.

would have to turn it over to the Government if they asked for it, even if we weren't going to call Tom Owens at trial.

42.     In preparing for my second trial, Stephen Rosen saw notes in the file by Eliza Stahl indicating that Tom Owens in fact opined that there *were* stops and starts and over-recording.

43.     When I realized that Frocarro had blatantly lied to me about this, I was beside myself.  How can any defendant win under circumstances where he cannot trust his own attorney?

44.     When I discussed this with Ms. Stahl, she advised me that during my first trial, after she found out that Frocarro had told me the tape was good, she immediately called him and insisted that Owens made no such finding and that in fact his opinion was clear that the tape had been tampered with.

45.     Stephen Rosen contacted Tom Owens who advised him that he was surprised he was not called during the first trial.

Pursuant to 28 U.S.C. § 1746, I, Christian Gerold Tarantino, hereby state under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


DATED: FEBRUARY  5 ,2020

WITNESS

G. Mudry, Case Manager
Authorized by the Act of July 7,
1955, as amended to administer
oaths (18 USC 4004).

2/6/2020

Christian Tarantino
Reg.No. 14684-050
USP Allenwood
U.S. Penitentiary
RT 15,2 MILES N OF ALLENWOOD
ALLENWOOD, PA  17810

**ATTACHMENT B**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
CHRISTIAN GEROLD TARANTINO,                          **Case No.: 2:16-cv-03770-JS**

                Petitioner,            **REPLYAFFIRMATION OF**
                                        **ELIZA D. STAHL, ESQ.**

    - vs -

UNITED STATES OF AMERICA,

                Respondent.
-------------------------------------------------------------------X

      **ELIZA D. STAHL, ESQ.**, an attorney at law duly licensed to practice law in New York, affirms under the penalty of perjury as follows:

      1.      I am the managing member of The Law Office of Eliza D. Stahl, P.C., and I am personally familiar with the facts and circumstances contained herein.

      2.      The government misstates that my Affirmation states "in a conclusory manner, without any proof of active representation" that James Froccaro, Esq. (Froccaro) was simultaneously representing both Christian Tarantino (Tarantino) and Scott Mulligan (Mulligan).

      3.      To the contrary, I am competent to provide my testimony presenting admissible and direct evidence of the conflicts of interest under which Froccaro operated.

      4.      My Affirmation clearly describes and I hereby reaffirm that Froccaro and I had *multiple conversations* where he admitted the dual simultaneous representation during the trial and Mulligan's payment of Tarantino's legal fees – admissions made by Froccaro during routine communication that we had discussing the payment of his legal fees and other defense costs. These conversations were necessary as we had to make decisions about funding the defense team, retaining experts and private investigators.

5.    The government notes that there is no affidavit from Froccaro admitting that he concealed the dual simultaneous representation. A deposition or *subpoena* to compel testimony will be required to obtain any admission by Froccaro against his own interests given that he even destroyed evidence to benefit Mulligan as averred in my Affirmation and hereby reaffirmed.

6.    To my knowledge Froccaro never provided a retainer agreement to Tarantino or Mulligan.  Yet, it is indisputable that he represented both during the first trial.

7.    The government had full access to Mulligan, a cooperating witness, and could have questioned him on Froccaro's dual simultaneous representation and obtained an affidavit from Mulligan, if he could deny that Froccaro was his lawyer at the time of Tarantino's first trial, deny that he was then consulting with Froccaro, or deny that he paid Froccaro's fees, but the government has failed to do so. The omission by the government of a Mulligan affidavit suggests a lack of interest in the truth, and a willingness to salvage an unlawful conviction at any cost.

8.    I can testify that I have personal knowledge that Tarantino did request that both his first trial counsel Froccaro and his retrial counsel Stephen Rosen (Rosen) allow him to testify in support of suppressing the tape evidence that he paid blackmail monies to Vincent Gargiulo (Gargiulo) starting shortly after Gargiulo secretly recorded their conversations in late 2000.

9.    Both counsel advised Tarantino that he should not testify in support of suppression because his pretrial testimony could be used against him at trial on the issue of motive/guilt. Before the retrial, a paralegal working for the defense brought U.S. Supreme Court caselaw, *see Simmons v. United States*, 390 U.S. 377, 394 (1968), to the attention of Rosen as holding the opposite of his advice to Tarantino, but that did not change the advice that Rosen provided to Tarantino, who was dissuaded from offering his testimony in support of suppression by the same misadvise given by both Froccaro and Rosen. I believe the Court would find Tarantino credible.

10.     Your affirmant discovered an insurance policy from a court file in civil litigation showing Mid-Island, ***and five other check cashing companies***, were insured under the same policy during the relevant period of 1994. *See* Exhibit A (1994 insurance policy attached hereto). Frank Fede also owned Kayla Check Cashing Corp. at the time of his testimony. *See* Exhibit B.

11.     Your affirmant reasonably believes that this Affirmation is submitted at great risk, as FBI Agent Schelhorn has previously threatened me.  Indeed, in the court, during the first trial, I confronted Agent Schelhorn about falsely suggesting to the jury facts he knew to be untrue. Agent Schelhorn instantly turned hostile and angry, and said, "Oh yeah? You want to play that game?  Tell your husband not to get too comfortable."

12.     While AUSA Miskiewicz did later acknowledge in open court that "certainly the government has never suggested that [my] husband has done anything untoward towards anyone" (11/30/12, p.29, ll. 18-20), Agent Schelhorn's threat was intended to intimidate and upset me.

13.     It has been reliably reported to me that on at least one occasion, Agent Schelhorn told someone that I am "just a housewife pretending to be a real attorney."

14.     Threatening my family and casting a false light upon my professional legal career constitutes witness intimidation. It is frightening to learn that the government is willing to engage in such misconduct against an officer of the court in good standing.

Dated:  Deer Park, New York
        February 14, 2020                         Respectfully submitted,

                                                  Eliza D. Stahl (2738011)
                                                  The Law Office of Eliza D. Stahl, P.C.
                                                  1050 Grand Boulevard
                                                  Deer Park, New York 11729
                                                  (631) 841-3088; (631) 841-3089 (fax)
                                                  eds@stahlfirm.com

# EXHIBIT "A"

GRANITE STATE INSURANCE CO.

 Member Companies of
American International Group
EXECUTIVE OFFICES
70 PINE STREET, NEW YORK, N.Y. 10270

| 1 |

COVERAGE IS PROVIDED IN THE
COMPANY DESIGNATED BY NUMBER
(HEREIN CALLED THE COMPANY).

# COMMERCIAL GENERAL LIABILITY DECLARATIONS

**POLICY NO.**   CPP 301-57-75

**NAMED INSURED**   MID ISLAND CHECK CASHING CORP
**MAILING ADDRESS**   35 CARMANS RD
MASSAPEQUA                    NY 11758-0000

**POLICY PERIOD: From**   07/30/93        **to**    07/30/94              at

12:01 A.M. Standard Time at your mailing address shown above

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL TERMS OF THIS POLICY,
WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

## LIMITS OF INSURANCE

| | |
|---|---|
| GENERAL AGGREGATE LIMIT (Other Than Prod-Comp Operations) | $ 2,000,000 |
| PRODUCTS-COMPLETED OPERATIONS AGGREGATE LIMIT | $ 1,000,000 |
| PERSONAL & ADVERTISING INJURY LIMIT | $ 1,000,000 |
| EACH OCCURRENCE LIMIT | $ 1,000,000 |
| FIRE DAMAGE LIMIT | $ 50,000  Any One Fire |
| MEDICAL EXPENSE LIMIT | $ 5,000  Any One Person |

Forms Of Business:    [ - ] Individual    [ ] Partnership    [ ] Joint Venture    [ X ] Organization
(Other than Partnership
or Joint Venture)

Business Description:   CHECK CASHING

Location Of All Premises You Own, Rent or Occupy:     SEE ATTACHED SCHEDULE

| CLASSIFICATION | CODE NO. | PREMIUM BASIS | RATE. | ADVANCE PREMIUM | |
|---|---|---|---|---|---|
| | | | | PR/CO | ALL OTHER |
| SEE ATTACHED SCHEDULE | | | | | |

Premium shown is payable: $                    at inception.

| TOTAL: $ | 10,000 |

ENDORSEMENTS ATTACHED TO THIS POLICY:_____     **SEE ATTACHED SCHEDULE.**

COUNTERSIGNED _____   BY _____
(Date)                              (Authorized Representative)

## ENDORSEMENT #1

This endorsement, effective      12:01 A.M. 7/30/93      forms a part of

Policy No.    **CPP 3015775**     issued to      **Mid Island Check Cashing Corp.**

by    **New Hampshire Insurance Company**

In consideration of the premium charged, it is understood and agreed that the following changes are applicable to this policy:

The following named insured are added to this policy:

Mid-Island Check Cashing Corporation
Industry Check Cashing Corporation
East Island Check Cashing Corporation
North Island Check Cashing Corporation
South Island Check Cashing Corporation
Albany Check Cashing Corporation

As respects to Location #1 the following is added as a Loss Payee:

Josephine Tornelli
128 Alhambra Road  Massapequa, NY  11758

As respects to Location #3 the following is added as a First Mortgagee:

Roosevelt Savings Bank
1122 Franklin Avenue  Garden City, NY  11530

As respects to Location #1 the address is amended to read:

1911 Route 110  Farmingdale, New York

All other terms and conditions remain unchanged.

1/17/94
Process Date

_____
Authorized Signature

# EXHIBIT "B"

# *STATE OF NEW YORK*

# *DEPARTMENT OF STATE*

I hereby certify that the annexed copy has been compared with the original document in the custody of the Secretary of State and that the same is a true copy of said original.



WITNESS my hand and official seal of the Department of State, at the City of Albany, on June 6, 2017.

Brendan Fitzgerald
Executive Deputy Secretary of State

Rev. 09/16

A 234—Certificate of Incorporation
Business Corporation Law §402, 1-89

© 1978 BY JULIUS BLUMBERG, INC.
NYC 10013

95062700 _

# Certificate of Incorporation of

## KAYLA CHECK CASHING CORP.

### under Section 402 of the Business Corporation Law

IT IS HEREBY CERTIFIED THAT:

(1) The name of the proposed corporation is **Kayla Check Cashing Corp.**

(2) The purpose or purposes for which this corporation is formed, are as follows, to wit:

A. To engage in any lawful act or activity for which corporations may be organized under the Business Corporation Law. The corporation is not formed to engage in any act or activity requiring the consent or approval of any state official, department, board, agency or other body.*

B. To borrow money for its corporate purposes and to make, accept, endorse, execute and issue promissory notes, bills of exchange, bonds, debentures of other obligations from time to time, for the purchase of property, or for any purpose in or about the business of the company, and if deemed proper, to secure the payment of such obligations by mortgage, pledge, deed of trust or otherwise.

C. To sell, improve, manage, develop, lease, mortgage, dispose of or otherwise turn to account or deal with all or any part of the property of this corporation.

D. To carry on business at any place or places within the state to purchase, hold, mortgage, convey, lease or otherwise dispose of and deal with real and personal property at any place or places.

E. To enter into, make, perform, and carry out contracts of every sort and kind which may be necessary or convenient for the business of this corporation or business of a similar nature, with any person, firm, corporation, private, public or municipal, body politic under the government of the United States, or any state, territory or colony thereof or any foreign government, so far as, and to the extent that, the same may be done and performed by corporations under the Business Corporation Law.

F. To do all and everything necessary, suitable or proper for the accomplishment of any of the purposes, the attainment of any of the objects or the furtherance of any of the powers hereinbefore set forth, either alone or in connection with other corporations, firms, or individuals and either as principals, or agents, and to do every other act or acts, thing or things, incidental or appurtenant to or growing out of or connected with the aforesaid objects, purposes or powers or any of them.

The corporation, in furtherance of its corporate purposes above set forth, shall have all of the powers enumerated in Section 202 of the Business Corporation Law, subject to any limitations provided in the Business Corporation Law or any other statute of the State of New York.

*If specific consent or approval is required delete this paragraph, insert specific purposes and obtain consent or approval prior to filing.

(3) The office of the corporation is to be located in the County of   Nassau,
    State of New York.

(4) The aggregate number of shares which the corporation shall have the authority to issue is
    200 shares, which shares are to be without par value.

(5) The Secretary of State is designated as agent of the corporation upon whom process against it may be served. The post office address to which the Secretary of State shall mail a copy of any process against the corporation served upon him is

> c/o The Corporation
> 35 Carmans Road
> Massapequa, New York 11758

(6) A director of the corporation shall not be liable to the corporation or its shareholders for damages for any breach of duty in such capacity except for

(i) liability if a judgment or other final adjudication adverse to a director establishes that his or her acts or omissions were in bad faith or involved intentional misconduct or a knowing violation of law or that the director personally gained in fact a financial profit or other advantage to which he or she was not legally entitled or that the director's acts violated BCL § 719, or

(ii) liability for any act or omission prior to the adoption of this provision.

The undersigned incorporator, or each of them if there are more than one, is of the age of eighteen years or over.

IN WITNESS WHEREOF, this certificate has been subscribed on    June 20,         19 95   by the undersigned who affirm(s) that the statements made herein are true under the penalties of perjury.

Frank Feda
Type name of incorporator

249 Eaton Lane, West Islip, N.Y. 11795
Address

Type name of incorporator

Address

Type name of incorporator

Address

950627000443

FCC

STATE OF NEW YORK
DEPARTMENT OF STATE
FILED   JUN 27 1995
TAX $   10
BY:

Nass

## Certificate of Incorporation

of

### KAYLA CHECK CASHING CORP.

under Section 402 of the Business Corporation Law

Filed By:   Frank Fede
c/o 35 Carmans Road
Massapequa, New York   11758

*Office and Post Office Address*

RECEIVED.

950627000/72

4