## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

**CHRISTIAN GEROLD TARANTINO,**

        **Petitioner,**

**vs.**                        **Case No.: 2:16-cv-03770-JS**
                               **(Case No.: 2:08-cr-00655-JS)**

**UNITED STATES OF AMERICA,**

        **Respondent.**

_____/

## MOTION FOR DISCOVERY PURSUANT TO RULE 6(a) OF THE RULES GOVERNING SECTION 2255 PROCEEDINGS

Petitioner Christian Tarantino (Petitioner), through undersigned counsel, hereby moves for leave of court to conduct discovery under Rule 6(a) of the "Rules Governing Section 2255 Proceedings for the United States District Courts."  Petitioner respectfully submits that he is entitled to conduct the limited discovery requested as a matter of law.

## THE APPLICABLE LAW

Rule 6(a) authorizes discovery ("Rule 6. Discovery **(a) Leave of Court Required**. A Judge may, ***for good cause***, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law.") (emphasis added). *See also* Rule 6(b) ("**(b) Requesting Discovery**. A party requesting discovery ***must*** provide reasons for the request.  The request ***must*** also include any proposed interrogatories and requests for admission, and ***must*** specify any requested documents.") (emphasis added).  "[W]here specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." *Please see Bracy v. Gramley*, 520 U.S. 899, 908-909 (1997) (*quoting Harris v. Nelson*, 394 U.S. 286, 300 (1969)) (brackets added).  Petitioner is entitled to limited discovery.

1

While petitioner bears a "heavy burden" in showing "good cause" for discovery under Rule 6(a), *see Pizzuti v. United States*, 809 F.Supp.2d 164, 176 (S.D.N.Y. 2011), "[r]equiring impossible feats cannot be the meaning of the good cause requirement." *Id*. at 191 (brackets added).  *Accord Gonzalez v. United States*, 2013 WL 4453361, *2 (S.D.N.Y. 2013) ("While it is true that in the habeas context there is a higher threshold than in general civil litigation to justify discovery requests, ...it is not the case that a petitioner has to prove the merits of his petition before being able to justify any discovery.") (citations omitted).  Federal courts within the Second Circuit have ordered discovery in Section 2255 proceedings under various scenarios. *See Pizzuti* at 190-191 ("petitioners have shown specific facts giving rise to questions concerning the authenticity and completeness of the government's pretrial discovery… entitling them to discovery. …They have offered specific facts demonstrating that the government inexplicably prepared alternate versions of the same document.  …the unexplained existence of two different versions of the same Form 302… entitled [petitioners] to all Form 302's and notes concerning interviews or debriefings of [the witness]"); *id*. at 191 (government to explain why two versions of same document were prepared if Form 302 produced in pretrial discovery is not identical to unredacted version of Form 302 produced via FOIA) (brackets added); *id*. at 193-194 ("In order to press his ineffective assistance claim, Pizzuti is entitled to the original wiretap application to the extent it is in the possession, custody or control of the government."); *see also Monsanto v. United States*, 1999 WL 637231, *1 (S.D.N.Y. 1999) (finding "good cause" for limited discovery of tape recordings and transcripts of telephone conversations held by witness while held in federal custody, for records related to a Bronx County arrest, and ordering that polygraph examinations taken by witness in relation to the Witness Protection Program be provided for *in camera* review for Court to determine if there is good cause for access to materials);

2

*United States v. Fell*, 2013 WL 12385306, *3 (D.Vt. 2013) (allowing deposition of federal prosecutors as to whether they "knowingly exploited misinformation" placed before jury and "about any withheld evidence"); *id.* ("Should further discovery indicate that the case agent could provide relevant testimony" about prosecutorial misconduct claim, request to depose agent may be renewed); *id.* at *4 (allowing discovery of documents eligible for qualified work product protection if petitioner shows substantial need for documents on the government's privilege log and inability to obtain information by any other means); *id.* at **5-6 (*subpoenaed* records to be reviewed *in camera* to ensure that disclosure is no broader than necessary to address juror misconduct claim); *Gonzalez*, 2013 WL 4453361, *2 (sufficient record to justify *subpoena* of identified NYPD files for *in camera* review).

### SPECIFIC ALLEGATIONS ENTITLING PETITIONER TO DISCOVERY AND PARTICULARIZED LIMITED DISCOVERY REQUESTS

Petitioner particularizes ***limited discovery requests*** providing sufficient reasons to show that the discovery being sought would advance his claims. The specific allegations entitling petitioner to the limited discovery requested herein follow *seriatim*:

### Count 1: First trial counsel's failure to investigate evidence of "legal innocence"

Petitioner submits that first trial counsel unreasonably failed to investigate facts that would have shown lack of evidence to convict petitioner of the offense mischarged in Count 1 under 18 U.S.C. § 33, and that petitioner was "legally innocent" because the essential jurisdictional element of the statute ("any motor vehicle which is used, operated, or employed in interstate or foreign commerce") was actually ***disproven*** by trial testimony that the "armored vans" of "Mid-Island Check Cashing Corp." (Mid-Island) were only "used, operated, or employed" ***intrastate within New York***.

AUSA: And how did you use the armored vans? Fede: To deliver payrolls to certain companies around Long Island Queens. AUSA: In addition to Long Island and Queens, did you service any companies outside of New York State? A. ***No***.

(T.808) (testimony of Frank Fede, Mid-Island owner) (3/29/2011) (emphasis added).

3

The government relies upon ***non-specific trial testimony*** in support of upholding federal jurisdiction to prosecute the offense conduct under 18 U.S.C. § 33.

AUSA: Did you ever service companies in the Port of Newark? Fede: Yes. AUSA: In the Port of Newark, what kind of companies did you serve? Fede: ***We*** did the tankers that came in from foreign countries, and *we* would service the ships."

(T.808) (testimony of Frank Fede, Mid-Island owner) (3/29/2011) (emphasis added).

Documents obtained by civil counsel post-conviction reveal that Mid-Island was a New York company never registered in New Jersey, and that it was insured under the same policy (at the time of the crime in 1994) ***with five other check cashing companies***.[1] Civil counsel further found that Frank Fede also owned "Kayla Check Cashing Corp." Fede testified that an ***unnamed*** first-person plural ("We") provided ***unspecified*** "service" at the Port of Newark at some ***unspecified*** time, (T.808), ***not*** that any Mid-Island vehicle was "used, operated, or employed" in the Port of Newark at the time of the charged crime. *See also* Trial Exhibit 3-FF (June 23, 1994 van route intrastate only).  Fede ("we") could have provided the unspecified "service" in Newark ***through at least six other companies (i.e., other than Mid-Island)***, at some ***unspecified*** time before his trial testimony in 2011, even if one disregards their lack of New Jersey registration, as the government suggests, *see* Opposition at p.5 ("The petitioner's argument that Mid-Island did not operate in interstate commerce simply because state corporate records did not show registration in the state of New Jersey is irrelevant ***in light of the testimony that shows the company actually serviced the Port of Newark***.") (emphasis added), but the ***specific trial testimony*** does ***<u>not</u>*** show that ***any Mid-Island vehicle*** serviced Newark in June 1994.  *See* (T.808) ("Q. In addition to Long Island and Queens, did you service any companies outside of New York State? A. ***<u>No</u>***.") (emphasis added); *compare id.* ("we did" tankers in Newark).

---

[1] The same 1994 insurance policy covered six "check cashing" corporations registered in New York only: (1) Mid-Island Check Cashing Corporation, (2) Industry Check Cashing Corporation, (3) East Island Check Cashing Corporation, (4) North Island Check Cashing Corporation, (5) South Island Check Cashing Corporation, and (6) Albany Check Cashing Corporation.

## Limited Discovery Requests

In accordance with Rule 6(b), petitioner herein specifies the requested documents that would advance his claim that trial counsel unreasonably failed to investigate the facts showing that petitioner is "legally innocent" of Count 1 due to lack of evidence as to the essential jurisdictional element of 18 U.S.C. § 33.[2]

(1) Petitioner requests that the government[3] produce any and all documents evidencing that Mid-Island Check Cashing Corporation "used, operated, or employed" any of its vehicles to provide service at the Port of Newark, New Jersey on or about June 23, 1994, including but not limited to FBI 302 reports and agent "rough notes."

(2) Petitioner requests that the government produce any and all documents evidencing that any entity owned by Frank Fede, other than Mid-Island Check Cashing Corporation, "used, operated, or employed" any of its vehicles to provide service at the Port of Newark, New Jersey on or about June 23, 1994, including but not limited to FBI 302 reports and agent "rough notes."

(3) Petitioner requests that the government produce any and all documents evidencing that any entity owned by Lisa Drago[4] (aka Lisa Lentini/Lisa Fede) or any entity owned by any relative or associate of Frank Fede, other than Mid-Island Check Cashing Corporation, "used, operated, or employed" any of its vehicles to provide service at the Port of Newark, New Jersey on or about June 23, 1994, including but not limited to FBI 302 reports and agent "rough notes."

(4) Petitioner requests that Lisa Drago (aka Lisa Lentini/Lisa Fede) produce any and all documents evidencing that Mid-Island Check Cashing Corporation "used, operated, or employed" any of its vehicles to provide service at the Port of Newark, New Jersey on or about June 23, 1994.

(5) Petitioner requests that Lisa Drago (aka Lisa Lentini/Lisa Fede) produce any and all documents evidencing that any entity owned by Frank Fede, other than Mid-Island Check Cashing Corporation, "used, operated, or employed" any of its vehicles to provide service at the Port of Newark, New Jersey on or about June 23, 1994.

(6) Petitioner requests that Lisa Drago (aka Lisa Lentini/Lisa Fede) produce any and all documents evidencing that any entity owned by Lisa Drago (aka Lisa Lentini/Lisa Fede) or any entity owned by any relative or associate of Frank Fede, other than Mid-Island Check Cashing Corporation, "used, operated, or employed" any of its vehicles to provide service at the Port of Newark, New Jersey on or about June 23, 1994.

---

[2] Petitioner believes that he has already made a sufficient showing for relief, but the documents requested would allow for the facts to be fully developed to concretize the claim that he is confined illegally. *See Bracy*, 520 U.S. at 908-909 (court has a "duty" to facilitate an "adequate inquiry").
[3] All document production requests directed to the government seek any and all documents in the actual or constructive possession, custody, or control of the prosecution team whose members included federal, state, and local law enforcement officers and other officials who participated in the investigation and prosecution of the case against petitioner.
[4] Lisa Drago is a known heir of the late Frank Fede and a participant in his check cashing businesses.

## All Counts (1-4): First trial counsel's failure to disclose unwaivable benefactor conflict and prior destruction of evidence incriminating the benefactor

Petitioner submits that first trial counsel improperly failed to disclose to the court an unwaivable conflict embodied in his simultaneous representation of the petitioner's alleged accomplice, Scott Mulligan (Mulligan), *before and during the first trial* and his prior destruction of evidence incriminating Mulligan in this case (a "blackmail letter" from Gargiulo to Mulligan threatening that an incriminating tape would be sent to the FBI if Mulligan did not pay him $500,000, showing his motive to hire the murder of Gargiulo), thereby causing structural error obviating consideration of the evidence, but petitioner has also shown instances of how the unwaivable conflict adversely affected trial performance. Petitioner is supported by the Affirmations of Eliza D. Stahl, an attorney in good standing, who provides the evidentiary grounds for the asserted issues. The government faults the petitioner for not producing an affidavit from first trial counsel admitting to his actual simultaneous representation of Mulligan during his trial representation of petitioner, *see* Opposition at 7 n.8, as if counsel would "volunteer" statements against his own interests. The Second Circuit has long favored allowing a defender an opportunity to explain his or her deficient performance. *See United States v. Dukes*, 727 F.2d 34, 41 n.6 (2d Cir.1984) ("In the event that counsel accused of being incompetent is not called to testify or present evidence, the district court, before making any determination that counsel was incompetent, should provide counsel with that opportunity.").

Petitioner has made a sufficient showing that his first trial counsel operated under an unwaivable conflict. *See* Affirmations of Eliza D. Stahl (first trial counsel was paid by Mulligan with a $150,000 check and cash to appear for petitioner at the first trial, while simultaneously defending Mulligan, and first trial counsel also admitted against his own penal interests that he destroyed the "blackmail letter" evidence incriminating Mulligan).

The discovery requests made herein seek to corroborate these specific allegations, which "show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief". *See Bracy*, 520 U.S. at 908-909 (the court has a "duty" to facilitate an "adequate inquiry").[5]

## Limited Discovery Requests

In accordance with Rule 6(b), petitioner herein specifies the requested documents and the interrogatories that would advance his claim that first trial counsel operated under an unwaivable conflict involving his self-interest and divided loyalties.

## Document Production Requests

(1) Petitioner requests that the government[6] produce any and all documents, including but not limited to grand jury transcripts, FBI 302 reports, agent "rough notes," or memoranda, evidencing any and all questioning, interviews, or interrogations of first trial counsel James Froccaro regarding either Scott Mulligan or Manon Mulligan and/or regarding the blackmail letter from Vincent Gargiulo forwarded to James Frocarro by Manon Mulligan according to her testimony.

(2) Petitioner requests that counsel James Froccaro produce any and all documents in his actual or constructive possession evidencing any and all questioning, interviews, or interrogations to which he, James Froccaro, was subjected regarding Scott Mulligan or Manon Mulligan and/or regarding the blackmail letter from Vincent Gargiulo forwarded to James Frocarro by Manon Mulligan according to her testimony.

(3) Petitioner requests that James Froccaro produce any and all documents in his actual or constructive possession evidencing any and all payments by check, cash, or "payment-in-kind" received by James Froccaro, or his law office, or any related person or entity, from either Scott Mulligan or Manon Mulligan, directly or indirectly, at any time before, during, or after petitioner's first trial, providing the dates and methods of payment

(4) Petitioner requests that counsel James Froccaro produce any and all documents in his actual or constructive possession evidencing any and all communications (in person or through any other communication method) that James Froccaro had with Scott Mulligan or Manon Mulligan regarding the offenses charged against petitioner or Scott Mulligan in this case at any time before, during, or after petitioner's first trial.

---

[5] Petitioner believes he has already made a sufficient showing for relief, but the documents requested and the answers to the interrogatories proposed would allow for the facts to be fully developed to concretize the claim that he is confined illegally. *See Bracy*, 520 U.S. at 908-909 (court has a "duty" to facilitate an "adequate inquiry").

[6] All document production requests directed to the government seek any and all documents in the actual or constructive possession, custody, or control of the prosecution team whose members included federal, state, and local law enforcement officers and other officials who participated in the investigation and prosecution of the case against petitioner.

**Interrogatories to first trial counsel James Froccaro**

(1) Did you destroy a blackmail letter from Vincent Gargiulo (demanding $500,000 from Scott Mulligan or an incriminating tape would be delivered to the FBI) forwarded to you by Manon Mulligan according to her testimony?

(2) Did you ever admit to attorney Eliza D. Stahl that you destroyed a blackmail letter from Vincent Gargiulo forwarded to you by Manon Mulligan?

(3) Did you, your law office, or any person or entity related to you, receive any payments by check, cash, or "payment-in-kind" from either Scott Mulligan or Manon Mulligan, directly or indirectly, at any time before, during, or after petitioner's first trial?

(4) If the answer to interrogatory (3) is yes, please itemize all of the sums paid with the dates and methods of payment and the identity of the person or entity who received sums.

(5) Did you communicate (in person or through any other communication method) with Scott Mulligan or Manon Mulligan, directly or indirectly, regarding the offenses charged against petitioner or Scott Mulligan in this case at any time before, during, or after petitioner's first trial?

**Interrogatories to government witness Scott Mulligan**

(1) Please itemize any and all payments by check, cash, or any "payment-in-kind" that you have ever made directly or indirectly to James Froccaro, his law office, or any person or entity related to him, at any time before, during, or after petitioner's first trial, providing the dates and methods of payment.

(2) Did you communicate (in person or through any other communication method) with James Froccaro, directly or indirectly, regarding the offenses charged against petitioner or you in this case at any time before, during, or after petitioner's first trial?

(3) If the answer to interrogatory (2) is yes, please describe and date each communication had with James Froccaro, directly or indirectly, regarding the offenses charged against petitioner or you in this case at any time before, during, or after petitioner's first trial.

### All Counts (1-4): First trial counsel's complete exclusion of petitioner from pre-trial screening of jury venire in contempt of direct trial court order

Petitioner submits that first trial counsel entirely excluded him from pre-screening the venire in defiance of an order underscoring the import of petitioner's ability to review the juror questionnaires. *See* March 15, 2011 Transcript at p.40 (court order issued after counsel questioned whether he had time to visit petitioner to review juror questionnaires) (THE COURT: "*So you're definitely going to do that beforehand and see what his desires would be in terms of the type of jury he'd like to be seated*.") (emphasis added).

The Second Circuit concluded that petitioner "impliedly waived his right" to be present *during the pretrial telephone conferences* based in part on the assumption that first trial counsel had obeyed the order. *See United States v. Tarantino*, 617 Fed.Appx. 62, 64-65 (2d Cir. 2015). The decision relied on an incomplete record. *Id*. at 65 ("On this record, it is apparent that Tarantino waived his right to be present"). The record has been augmented by petitioner's affidavit averring that first trial counsel never brought the questionnaires to his place of pretrial detention as ordered by the Court to "see what his desires would be in terms of the type of jury he'd like to be seated." Petitioner has reasonably explained why he did not contemporaneously report his first trial counsel's contempt of court. *See* Reply Affidavit of Tarantino at ¶¶36-39. As the pre-screening of the venire is a material stage of trial, first trial counsel entirely excluding petitioner in contempt of a court order constitutes *structural error* obviating consideration of the evidence.

The discovery requests made herein seek to corroborate these specific allegations, which "show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief". *See Bracy*, 520 U.S. at 908-909 (the court has a "duty" to facilitate an "adequate inquiry").[7]

### Limited Discovery Requests

In accordance with Rule 6(b), petitioner herein specifies the requested documents and proposes a request for admission that would advance his claim that first trial counsel entirely excluded him from pre-screening the venire in contempt of a direct court order.

### Document Production Request

(1) Petitioner requests that the government produce any and all documents, including but not limited to Federal Bureau of Prison records, evidencing the dates of any and all visits of first trial counsel James Froccaro with the petitioner at his place of pretrial detention.

---

[7] Petitioner believes he has already made a sufficient showing for relief, but the documents and admission requested would allow for the facts to be fully developed to concretize the claim that he is confined illegally. *See Bracy*, 520 U.S. at 908-909 (court has a "duty" to facilitate an "adequate inquiry").

**Request for Admission to first trial counsel James Froccaro**

(1) Admit that you did NOT take the juror questionnaires to review with the petitioner at his place of pretrial detention as directly ordered by Judge Joanna Seybert on the record.

### Count 2: First trial counsel's failure to request a theory of defense instruction

Petitioner submits that first trial counsel failed to seek a defense theory instruction that jurors had a legal duty to acquit petitioner if they found the evidence only sufficiently proved he was an "accessory-after-the-fact" of the murder.  *See Mathews v. United States*, 485 U.S. 58, 63 (1988) (defendant "entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor"); *United States v. Varelli*, 407 F.2d 735 (7th Cir. 1969) (distinguishing criminal conduct of "accessories-after-the-fact" and "aiders and abettors" to conclude that defendants were merely "accessories-after-the-fact" and could not be convicted as "aiders and abettors").  Petitioner could not be legally convicted if he was merely an "accessory-after-the-fact," for he was prosecuted at trial as an "aider and abettor" of the charged substantive murder. *See* May 4, 2011 Transcript at p.3065 (final summation of the prosecution submitting that petitioner "aided and abetted" the murder of Louis Dorval).  First trial counsel moved for acquittal arguing that the tape evidence "more appropriately" implicated petitioner as an "accessory-after-the-fact."  *See* April 27, 2011 Transcript at p.2793  ("the only statement in there that could potentially be argued to implicate him in the murder or being an accessory -- I think more appropriately being an accessory after the fact, where there is a claim that it is Mr. Tarantino speaking...").  However, counsel unreasonably failed to seek the defense theory instruction given that the ***tape supported petitioner's actual innocence*** as an "accessory-after-the-fact" who subsequently learned of the murderer's identity and the murder site (corroborated by the actual murderers' guilty pleas and FBI forensics).  The most exculpatory excerpt was inaudible at trial, even though counsel was alerted to its discovery upon amplification.  *See* Affirmation of Eliza D. Stahl (attached hereto).

10

Petitioner here attaches a new affidavit quoting the ***most exculpatory tape excerpt, wherein petitioner identifies "Pistone" as the killer who "dropped off" victim "Louie" from the vehicle where the murder occurred***, in support of a discovery request seeking the original tape for amplification of the exculpatory excerpt that was left inaudible and unmentioned during the trial.  *See* Affidavit of Petitioner (attached hereto) at ¶4:

4. I respectfully submit to this Court that had the tape evidence been correctly heard and transcribed (via expert sound amplification available to my trial counsel), my own words on tape would have proven my actual innocence of the murder of Louis Dorval, as, to the best of my recollection, I said who killed "him" ("Louie") and where the murder occurred while taped for blackmail, as follows:

"***Pistone killed him and he dropped him off in his car***, you know. He uses his fucking cousin's pickup, whatever and dropped him off. And then there were blood stains in there. So they took all these guys' DNA also. You see, he was dead meat. But Louie was going to show in this person's pickup truck."

*Accord* Affirmation of Eliza D. Stahl (attached hereto) at ¶X (attorney Stahl heard same exculpatory excerpt upon amplification and emphasized discovery to first trial counsel).

*Compare* May 21, 2009 Draft of Tape Transcript (discovery Bates stamp page 00000804) (attached as Exhibit A) (same tape excerpt mistranscribed with *non-sequitur* phrasing):

"***CHRIS, they're in trouble with me*** and drop him off in his car, you know. You use his fuckin' cousin's pickup, whatever, and dropped them off. And then there were blood stains in there. So they took all these guys' DNA also. You see, he was dead meat. But Louie was going to show [UI] in this person's pickup truck."

(emphasis added on *non-sequitur* obfuscating exculpatory excerpt "Pistone killed him").

Although counsel was advised of the correct transcription of the exculpatory excerpt upon amplification, counsel allowed the excerpt to be mistranscribed for the jury, as follows:

"CHRIS told me. I go -- and dropped him off in his car, you know. He used his fuckin' cousin's pickup, or whatever, and dropped them off. And there's -- there were blood stains in there. So they took all these guys' DNA also [UI] in this person's pickup truck.

*See* Final Tape Transcript at pp.5-6 (attached as Exhibit B).  Given the inaudibility of the tape, first trial counsel ineffectively failed to amplify the exculpatory excerpt to support the theory of defense instruction and allowed the mistranscription to misguide the jury.

The discovery requests made herein seek to corroborate these specific allegations, which "show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief". *See Bracy*, 520 U.S. at 908-909 (the court has a "duty" to facilitate an "adequate inquiry").[8]

### Limited Discovery Requests

In accordance with Rule 6(b), petitioner herein specifies the requested documents and seeks production of the tape evidence for sound amplification that would advance his claim that first trial counsel unreasonably failed to request a theory of defense instruction supported by evidence of petitioner's actual innocence of the charged substantive murder of Louis Dorval as an "accessory-after-the-fact" involved only in corpse concealment.

### Document Production Requests

(1) Petitioner requests that the government[9] produce any and all documents, including but not limited to grand jury transcripts, FBI 302 reports, agent "rough notes," or memoranda, evidencing that Joseph Pistone and Peter Pistone murdered Louis Dorval *inside a vehicle* and that petitioner was *only involved in corpse concealment after-the-fact of the murder.*

### Request for Amplification of Tape Recording (Production of Tangible Evidence)

(1) Petitioner requests that the government produce the original tape evidence to allow counsel for petitioner to obtain expert amplification of the asserted exculpatory excerpt.

### Retrial (Counts 3-4): Retrial counsel's failure to seek recusal of the retrial court

Petitioner submits that first trial counsel ineffectively failed to seek recusal of the retrial court based on inferable bias stemming from Judge Joanna Seybert impermissibly allowing a government witness to waive grand jury indictment on an offense punishable by death, *see* 18 U.S.C. §§ 33-34, which expedited the availability of a key retrial witness

---

[8] Petitioner believes that he has already made a sufficient showing for relief, but the documents and the amplification requested would allow for the facts to be fully developed to concretize the claim that he is confined illegally. *See Bracy*, 520 U.S. at 908-909 (court has a "duty" to facilitate an "adequate inquiry").

[9] All document production requests directed to the government seek any and all documents in the actual or constructive possession, custody, or control of the prosecution team whose members included federal, state, and local law enforcement officers and other officials who participated in the investigation and prosecution of the case against petitioner.

for the prosecution six days before the then scheduled retrial date. In accepting the waiver, Judge Seybert contravened the Fifth Amendment, Fed.R.Crim.Pr. 7, and jurisprudence. *See United States v. Macklin*, 523 F.2d 193, 196, n.3 (2d Cir. 1975) ("offense punishable by death requires prosecution by indictment regardless of a defendant's waiver") (*citing* Rule 7); *see also Matthews v. United States*, 622 F.3d 99, 103 (2d Cir. 2010) (court must "look to the charging instrument to which [witness] pleaded."). Petitioner submits that the failure to seek recusal caused structural error requiring vacatur of the only conviction obtained at the retrial as his fundamental right to an unbiased retrial judge was violated. Petitioner proposes interrogatories to Judge Seybert as a material witness on the issue. *See Bracy v. Gramley*, 520 U.S. 899 (1997) (allowing discovery on judicial bias issue).

Petitioner also proposes an interrogatory to the Assistant United States Attorney (AUSA) who represented the government during the waiver of grand jury indictment by witness Scott Mulligan on January 3, 2012, and document production requests seeking "work product." *See, e.g., Ferguson v. Abrams*, 1998 WL 305631 (E.D.N.Y. 1998) (permitting deposition of lead prosecutors in § 2254 case on *Brady* and *Napue* claims); *Richardson v. United States*, 2013 WL 5521859 at *1, n.1 (S.D. Ohio 2013) (noting that expansion of record in a § 2255 case included transcripts of depositions of Assistant United States Attorneys who represented government at trial); *Robb v. Ishee*, 2012 WL 604225 at *4 (S.D. Ohio 2012) (permitting depositions of state prosecutors); *Reid v. Vaughn*, 2003 WL 21027275 at *2 (E.D.Pa. 2003) (permitting deposition of a state prosecutor); *Fell*, *supra*, 2013 WL 12385306, at **3-4 (allowing deposition of federal prosecutors and discovery of documents eligible for work product protection if petitioner shows substantial need for the documents on government's privilege log and inability to obtain information by any other means); *id.* at **5-6 (*subpoenaed* records to be reviewed *in camera* to ensure disclosure no broader than needed to address juror misconduct claim).

The discovery requests made herein seek to corroborate these specific allegations, which "show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief". *See Bracy*, 520 U.S. at 908-909 (the court has a "duty" to facilitate an "adequate inquiry").[10]

### Limited Discovery Requests

In accordance with Rule 6(b), petitioner herein specifies the requested documents and the interrogatories that would advance his claim that retrial counsel ineffectively failed to seek the recusal of the retrial court based on Judge Seybert's inferable bias.[11]

### Document Production Requests

(1) Petitioner requests that the government[12] produce any and all documents known in United States Department of Justice (USDOJ) Manuals for its criminal case prosecutors as the "Prosecution Memorandum" in codefendant case *United States v. Scott Mulligan*.

(2) Petitioner requests that the government produce any and all documents known in United States Department of Justice (USDOJ) Manuals for its criminal case prosecutors as containing a "Statement of Justification" for allowing waiver of a grand jury indictment for the offense charged against Scott Mulligan under 18 U.S.C. § 33.

(3) Petitioner requests that the government produce any and all documents known in United States Department of Justice (USDOJ) Manuals for its criminal case prosecutors as containing the "Approval Authority" for allowing waiver of a grand jury indictment for the offense charged under 18 U.S.C. § 33.

### Interrogatories to United States District Court Judge Joanna Seybert

(1) Under what legal authority was retrial witness Scott Mulligan permitted to waive a grand jury indictment on January 3, 2012 for an offense charged under 18 U.S.C. § 33, which is punishable by death under 18 U.S.C. § 34?

(2) Did Your Honor allow the waiver of indictment due to the absence of any objection?

---

[10] Petitioner believes that he has already made a sufficient showing for relief, but the documents requested and the answers to the interrogatories proposed would allow for the facts to be fully developed to concretize the claim that he is confined illegally. *See Bracy*, 520 U.S. at 908-909 (court has a "duty" to facilitate an "adequate inquiry").

[11] Petitioner requests referral of the recusal issue to the Chief Judge of the Eastern District of New York, including the discovery requested from Judge Seybert as a material witness. *See United States v. Craig*, 853 F.Supp. 1413, 1415 (S.D.Fla. 1994) (long-term policy of referring recusal motions to Chief Judge).

[12] All document production requests directed to the government seek any and all documents in the actual or constructive possession, custody, or control of the prosecution team whose members included federal, state, and local law enforcement officers and other officials who participated in the investigation and prosecution of the case against petitioner.

**Interrogatory to former AUSA James Miskiewicz**

(1) Under what legal authority was retrial witness Scott Mulligan permitted to waive a grand jury indictment on January 3, 2012 for an offense charged under 18 U.S.C. § 33, which is punishable by death under 18 U.S.C. § 34?

## CONCLUSION

Petitioner's requests for discovery articulate sufficient reasons as to why the Court should grant him leave to conduct limited inquiries under Rule 6 of the "Rules Governing Section 2255 Proceedings for the United States District Courts" before holding a hearing. *See* Rule 7 ("[i]f the motion is not dismissed, the judge may direct the parties to expand the record by submitting additional materials relating to the motion."); Rule 8 ("[i]f the motion is not dismissed, the judge must review the answer, any transcripts and records of prior proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted.") (brackets added).

Petitioner has shown that the requested discovery would further support his facially valid claims and thereby allow him to fully meet his burden of proving his entitlement to relief under § 2255 by a preponderance of the evidence.  The discovery herein requested seeks information that, if fully developed, would support the claims that counsel rendered ineffective assistance.  *See Fan v. United States*, 2019 WL 2503995, *4 (E.D.N.Y. 2019) ("Accordingly, to be proper, any discovery must be focused on seeking information that, if fully developed, would support either prong of the *Strickland* test."); *see also Bisaccia v. United States*, 2000 WL 703014, *6 (E.D.N.Y. 2000) ("Thus the question for this Court is whether the petitioner['s] allegations reasonably permit inferences that, if credited, would entitle [him] to relief under § 2255.  If the answer is yes, then they should be afforded discovery for the purpose of further drawing out those allegations.") (brackets added).

For all of the foregoing reasons, petitioner submits that he is legally entitled to the limited discovery requested.  *See Bracy*, 520 U.S. at 908-909 (the court has a "duty" to facilitate "adequate inquiry" if the specific allegations made by petitioner "show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief").

Respectfully submitted,

*/s/ Todd G. Scher*
Todd G. Scher
Florida Bar No. 0899641
Law Office of Todd G. Scher, P.L.
1722 Sheridan Street, #346
Hollywood, FL 33020
(754) 263-2349 (Tel)
(754) 263-4147 (Fax)
tscher@msn.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 14th day of September 2020, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to counsel for the Respondent.

*/s/ Todd G. Scher*
Todd G. Scher

16

# EXHIBIT "A"

| | | |
|---|---|---|
| 1 | | running around telling everybody he brought LOUIE.   He got arrested in |
| 2 | | Brooklyn. |
| 3 | VG: | Unbelievable. |
| 4 | CT: | He -- him and his connected [UI] and like five other fuckin', like half fuckin' |
| 5 | | mozzarellas, right, that got arrested for like some kind of RICO or |
| 6 | | something, you know what I mean, out on Long Island, right?  So now |
| 7 | | they had all of their DNA taken too and supposedly dozens of witnesses. |
| 8 | | CHRIS, they're in trouble with me and drop him off in his car, you know. |
| 9 | | You use his  fuckin' cousin's pickup, whatever, and dropped them off. |
| 10 | | And then there were blood stains in there.  So they took all these guys' |
| 11 | | DNA also.  You see, he was dead meat.  But Louie was going to show [UI] |
| 12 | | in this person's pickup truck.  Maybe he finds hair so [UI], and they took |
| 13 | | seven guys' names.  I don't now one of their names, not one.  It's like JOE |
| 14 | | MOTARATS, TONY COROLIIE; and I'm like, hey – I'm like I don't know |
| 15 | | none of them.  So these guys are also arrested at the same time, right? |
| 16 | | So now – and admit that [UI] (laughter). |
| 17 | VG: | Go ahead. |
| 18 | CT: | [UI] MEL tells me they wanted hair but doesn't want me to take it, right? |
| 19 | | He's like [UI].  So I go back [UI].  I can't think for about a day, two days. |
| 20 | | [UI] I'm sketching shit out.  For one, eighteen people were in that fucker. |
| 21 | | Eighteen.  Thinking like JOE CAPATENIE, (UI).  Like – like really never – |
| 22 | | so I'm like, holy fuck, you know?  So, I came home that night [UI] fuckin' |
| 23 | | DNA's been around forever.  That got us fuckin' like -- |

**DRAFT - 5.21.2009**

# EXHIBIT "B"

VG:      [UI], one other question, CHRIS.

CT:      They're up here.

VG:      Why are they waiting this long ?   What's it, four or five years?

CT:      Huh-uh.   Six – six, coming up on seven.   Let me -- let me -- let me just tell
         you 'cause, Vince – and you know what, I won't lead you, and I'll let you tell
         me what you think, all right?   Now when these guys come up here, right,
         now a bunch of other dudes get arrested. [UI] --

VG:      Yeah.

CT:      Okay, some guy's cousin rats on his cousin, okay?   Somebody rats on you
         and says you killed LOUIE which you totally [UI].

VG:      Holy shit.

CT:      Yeah, they got him out of jail.

VG:      I got to talk.   Something strange [UI].

CT:      Just listen to this.   It gets twisted, right?   They got him out of jail.   This guy
         named PISTONE, okay -- remember that PETER PISTONE, okay, running
         around telling everybody he bumped LOUIE.     He got arrested in Brooklyn.

VG:      Unbelievable.

CT:      He -- him and this guy PISTONE and like five other fuckin', like half fuckin'
         mozzarellas, all right, got arrested for like some kind of RICO or something,
         you know what I mean, out on Long Island, all right?   So now they had all of
         their DNA taken too and supposedly dozens of witnesses.   CHRIS told me.
         I go -- and dropped him off in his car, you know.   He used his fuckin'
         cousin's pickup, or whatever, and dropped them off.   And there's -- there
         were blood stains in there.   So they took all these guys' DNA also [UI] in

this person's pickup truck.   Maybe they find hairs so [UI], and they took seven guys' names.   I don't know one of their names, not one.   It's like, yeah, JOE MOTARATS, TONY COROLIE; and I'm like, you know. And I'm like, I don't know them [UI].   So these guys are also arrested at the same time, all right?   So now – and admit that [UI] -- (Laughter).

VG:       Go ahead.

CT:       [UI] imagine.   So now MEL tells me they wanted hair but doesn't want me to take it, right?   He's like [UI].   I can't think for about a day, two days. Finally, I'm sketching shit out.   For one, eighteen people were in that car. Eighteen.   Thinking like JOE CAPATENIE, [UI] like.   Like a million – like really never – so I'm like, holy fuck, you know?   So, they know that.   And I go – [UI]   fuckin' DNA's been around forever.   That got us fuckin' like   –

VG:       That's it. I think they're trying to scare you guys into making some type of move and – and get this stupid case with a dead end.   So what they're doing now is putting pressure on everyone.   See if you get everyone involved into saying that SCOTT'S on the lam.   He shouldn't be doing what he's doing.

CT:       He's changed, SCOTT, because listen, you're thinking like this, for one. You're not a saint in all of this.   You're taking X amount of time, and I'm taking X.   So for one, I need a guy on the street in order to fuckin' take care of my shit, you know what I mean, as far as arranging money, as far as handling our business.

VG:       But he is going to be so hot if this comes down.

CT:       Doesn't matter. Listen, his whole thing is if he can prove to the wife, he

# AFFIDAVIT OF
# CHRISTIAN TARANTINO

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

CHRISTIAN GEROLD TARANTINO,

        Petitioner,

vs.                           Case No.: 2:16-cv-03770-JS
                                    (Case No.: 2:08-cr-00655-JS)

UNITED STATES OF AMERICA,

        Respondent.
_____/

## AFFIDAVIT IN SUPPORT OF RULE 6 DISCOVERY MOTION

1. I am the petitioner in a pending § 2255 proceeding seeking to vacate and set aside three convictions for which I have been sentenced to three (3) life sentences.

2. One of the convictions involved the murder of Louis Dorval.

3. This affidavit is submitted in support of the motion for discovery under Rule 6(a) of the Rules Governing § 2255 proceedings being filed by my counsel, requesting that the government tape evidence be submitted to expert amplification to prove my actual innocence of the charged murder of Louis Dorval.

4. I respectfully submit to this Court that had the tape evidence been correctly heard and transcribed (via expert sound amplification available to my trial counsel), my own words on tape would have proven my actual innocence of the murder of Louis Dorval, as, to the best of my recollection, I said who killed "him" ("Louie") and where the murder occurred while taped for blackmail, as follows:

   *"Pistone killed him and he dropped him off in his car, you know. He uses his fucking cousin's pickup, whatever and dropped him off ... And then there were blood stains in there. So they took all these guys' DNA also. You see, he was dead meat. But Louie was going to show in this person's pickup truck."*

5. My taped statement was fully corroborated by FBI forensics and the pleas entered by the Pistone brothers admitting to the murder.

6. I am advised that the tape evidence *exculpates* me as to the murder and that, even under the light most favorable to the prosecution theory, at best, it inculpates me as an accessory after-the-fact only involved in the disposal of the body after "Pistone killed him and he dropped him off in his car…."

Pursuant to 28 U.S.C. § 1746, I hereby state under penalty of perjury that the foregoing is true and correct.

Executed on this _23rd_ of _June_, 2020.

Respectfully submitted,

Christian G. Tarantino
Reg. No. 14684-050
USP Allenwood

# AFFIDAVIT OF
# ELIZA D. STAHL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

.......................................................................................X

CHRISTIAN GEROLD TARANTINO,

Petitioner,

- vs –

UNITED STATES OF AMERICA,

Respondent.

.......................................................................................X

**Case No.: 2:16-cv-03770-JS**

**AFFIRMATION OF
ELIZA D. STAHL, ESQ.**

     **ELIZA D. STAHL, ESQ.**, an attorney at law duly licensed to practice law in New York, affirms under the penalty of perjury as follows:

     1.     I am the managing member of The Law Office of Eliza D. Stahl, P.C., and I am personally familiar with the facts and circumstances contained herein.

     2.     In the weeks leading up to Mr. Tarantino's first trial, Mr. Tarantino was adamant that the transcript provided by the government as a trial exhibit was inaccurate in several key respects and provided his attorney, James Frocarro, and me with several specific examples.

     3.     Mr. Tarantino was adamant that the tape contained an exculpatory excerpt which should have been transcribed as follows: "Pistone killed him and he dropped him off in his car, you know. He uses his fucking cousin's pickup, whatever and dropped him off. And then there were blood stains in there. So they took all these guys' DNA also. You see, he was dead meat. But Louie was going to show in this person's pickup truck."

     4.     I listened to the enhanced version of the recording and agreed that Mr. Tarantino's version matched perfectly with the voice on the recording and that the statement was exculpatory. This was further corroborated by the fact that the government's transcription did not make sense.

5.     I tried on numerous occasions prior to and during the trial to convince Mr. Frocarro to at least listen to the tape with me, while reading along with Mr. Tarantino's edits, so that we could evaluate the exculpatory content and review Mr. Tarantino's options. Mr. Frocarro refused to listen to the tape with me. Mr. Frocarro remained uncooperative and refused to even discuss it although Mr. Tarantino repeatedly indicated a strong desire to confront the tape in this manner.

6.     On one occasion in April of 2011, Mr. Tarantino's wife, Jennifer Tarantino, and I went to talk to Mr. Frocarro at his office regarding this issue and, as before, he steadfastly refused to even listen to the tape while comparing it to Mr. Tarantino's transcript. I argued that there was no discernable strategy to refusing to present the edited transcript as to the murder of Dorval specifically and as to the audibility of the tape.  I reminded Mr. Frocarro that Mr. Tarantino wanted to hold the government to their burden of proving *both* that it was Mr. Tarantino's voice on the recording *and that the speaker actually said what the government transcript claimed was said.* We ended up shouting at each other angrily, and I left frustrated and totally bewildered by his close-minded refusal to listen even to his own client, who was facing life in prison if convicted.

Dated: Deer Park, New York
        September 14, 2020

Respectfully submitted,

*Eliza Stahl*

Eliza D. Stahl (2738011)
The Law Office of Eliza D. Stahl, P.C.
1050 Grand Boulevard
Deer Park, New York 11729
(631) 841-3088; (631) 841-3089 (fax)
eds@stahlfirm.com