UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
CHRISTIAN GEROLD TARANTINO,

               Petitioner,

                              <u>MEMORANDUM AND ORDER</u>

       -against-                08-CR-0655 (JS)

UNITED STATES OF AMERICA,

               Respondent.
----------------------------------X
APPEARANCES
For Petitioner:    Todd G. Scher, Esq.
                  Law Office of Todd G. Scher, P.L.
                  1722 Sheridan Street, No. 346
                  Hollywood, Florida  33020

For Respondent:    Charles N. Rose, Esq.
                  United States Attorney's Office
                  Eastern District of New York
                  610 Federal Plaza
                  Central Islip, New York 11201

SEYBERT, District Judge:

        Christian Gerold Tarantino ("Petitioner") moves this Court to vacate, set aside, or correct his conviction and sentence pursuant to 28 U.S.C. § 2255 (hereafter, the "Petition"). (<u>See</u> Petition, ECF No. 510.)  He contends that his trial counsel was ineffective due to various failures.  The Government opposes the Petition. (<u>See</u> Opp'n, ECF No. 513.)  Petitioner also requests discovery relating to his § 2255 claims (hereafter, the "Discovery Motion") (<u>see</u> ECF No. 518), which the Government also opposes (see Discovery Opp'n, ECF No. 519).  For the following reasons, the Petition and Discovery Motion are **DENIED**.

BACKGROUND

I.   The Underlying Crimes[1]

On June 23, 1994, two individuals, Julius Baumgardt ("Baumgardt") and his partner, were armored car guards working for Mid-Island Check Cashing Company ("MidIsland").  As they began their workday, the guards exited their armored car when Petitioner and Louis Dorval ("Dorval") approached them.  At the time, Petitioner was armed with a shotgun and Dorval was armed with a pistol; a third man, Scott Mulligan ("Mulligan"), sat nearby as a look-out.  Petitioner and Dorval ordered Baumgardt and his partner to the ground.  Though Baumgardt complied, Dorval shot and killed him with the pistol.

After the murder, Petitioner, Dorval, and Mulligan fled and dumped the pistol in a self-storage facility.  The pistol, registered in Dorval's name, was recovered by Nassau County Police shortly after Baumgardt's death.

Petitioner became concerned that Dorval might eventually cooperate with police and implicate Petitioner in the Baumgardt murder.  Therefore, as he confided in Mulligan and another person,

_____

[1]   The Court assumes the parties' familiarity with the facts of this case.  For the reader's convenience, it provides this factual background, which is drawn from the Indictment (ECF No. 1) and Petitioner's 2011 and 2012 criminal trials before this Court and as were previously set forth in the Court's Memorandum & Order ("M&O") denying Petitioner's motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.  (See Rule 33 M&O, ECF No. ECF No. 404; see also Mot. New Trial, ECF No. 388).

Vincent Gargiulo ("Gargiulo"), he resolved he would "take care of the problem." Thereafter, in the summer of 1994, Petitioner told Mulligan that Dorval had been killed and that he needed to dispose of Dorval's body. Mulligan complied: He contacted an acquaintance to borrow a boat, which Mulligan and Petitioner used the next day to take Dorval's body, then stuffed into a tool bin, off the Long Island shore and threw it into the Atlantic Ocean.

For years, the state of affairs remained unchanged. Then, in the fall of 2000, Gargiulo secretly tape-recorded Petitioner, who admitted to his involvement in the Baumgardt and Dorval murders (hereafter, the "Gargiulo Tape"). Thereafter, Gargiulo threatened to blackmail Petitioner,[2] claiming that if Petitioner did not pay Gargiulo, then Gargiulo would turn the Gargiulo Tape over to the police. Petitioner refused Gargiulo's demand; instead, he hired his business associate, Justin Bressman ("Bressman"), to kill Gargiulo, which Bressman did on August 18, 2003.

On September 23, 2008, a four-count Indictment charged Petitioner with: (1) Count One: the 1994 murder of Baumgardt; (2) Count Two: the 1994 murder of Dorval; (3) count Three: conspiracy to commit the obstruction-of-justice murder of Gargiulo; and (4) Count Four: the 2003 murder of Gargiulo. A jury trial commenced

_____

[2]   Apparently, Gargiulo was under financial pressures following the downfall of his gym business.

before this Court on March 28, 2011.  On May 23, 2011, the jury convicted Petitioner of Counts One and Two of the Indictment, i.e., the Baumgardt and Dorval murders.  The jury, however, did not reach a verdict on Counts Three and Four.

On April 23, 2012, a re-trial commenced on Counts Three and Four of the Indictment.  A jury subsequently convicted Petitioner on Count Three, the "Conspiracy to Commit the Obstruction-of-Justice Murder" of Gargiulo, but acquitted him on Count Four, the "Obstruction-of-Justice Murder" Vincent Gargiulo.  On April 24, 2013, Petitioner was sentenced to life imprisonment for his convictions on Counts One, Two, and Three, with the sentences to run concurrently.  (See Sent'g Min. Entry, ECF No. 427.)  Judgment entered on April 26, 2013.  (See J., ECF No. 428.)

II.  Procedural History

On June 8, 2012, Petitioner filed a motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.  (See Mot. New Trial, ECF No. 388.)  Petitioner claimed that his first trial counsel, James R. Froccaro, Esq. ("Froccaro"), operated under a conflict of interest.  Petitioner further requested a hearing to demonstrate that Froccaro received benefactor payments from Mulligan that adversely affected Froccaro's performance as Petitioner's attorney.  (Id. at 7-8.) The Court denied Petitioner's motion on procedural grounds finding that Froccaro's purported conflict did not excuse Petitioner from

filing a timely motion for a new trial, and the proper avenue to pursue this argument was on appeal. (Rule 33 M&O, ECF No. 404, at 13-14.)

On November 14, 2014, Petitioner appealed his conviction and sentence to the Second Circuit Court of Appeals; the Circuit affirmed this Court's Judgment. See United States v. Tarantino, 617 F. App'x 62 (2015). It held that: (1) the Indictment sufficiently alleged a violation of 18 U.S.C. § 33; (2) there was sufficient evidence to sustain Petitioner's conviction for Dorval's murder; (3) Petitioner implicitly waived his right to be present at two court teleconferences; (4) an incriminating audio recording was not inadmissible under the Omnibus Crime Control and Safe Streets Act of 1968, and that this Court did not abuse its discretion in denying an evidentiary hearing; (5) the Government did not deny Petitioner of his due process rights by pursuing purportedly inconsistent theories with respect to Dorval's murder; (6) this Court acted within its discretion by denying Petitioner's motion for a new trial; and (7) this Court properly denied Petitioner's motion to disqualify one of the Assistant U.S. Attorneys on the case. Id. at 64-66.

In his appeal, Petitioner also renewed his claim, originally raised in his Rule 33 Motion, of ineffective assistance of counsel on the grounds that Froccaro bore a conflict of

interest.   However, the Circuit declined to hear the claim, preserving it for collateral review.  Id. at 65-66.

On June 27, 2016, Petitioner filed a pro se petition pursuant to 28 U.S.C. § 2255 bringing three claims: (1) that his 18 U.S.C. § 33 conviction was unconstitutionally vague; (2) that the Government pursued inconsistent theories regarding Dorval's murder; and (3) ineffective assistance of counsel on the grounds that Froccaro operated under a conflict of interest.  (Original Section 2255 Petition, ECF No. 500, at 4-5.)  On June 27, 2017 and through counsel, Petitioner filed a supplemental Section 2255 petition raising numerous ineffective assistance of counsel claims based on the following alleged failures: (1) Froccaro failed to argue that the Government did not prove the jurisdictional element required by 18 U.S.C. § 33; (2) Froccaro operated under an undisclosed benefactor conflict; (3) Froccaro excluded Petitioner from pre-screening of jurors; (4) re-trial counsel failed to seek the Court's recusal for bias; and (5) re-trial counsel failed to seek the exclusion of allegedly inadmissible evidence. (See First Supp. Petition, ECF No. 503, at 3-44.)  On July 14, 2017 and with leave of the Court, Petitioner filed his second counseled supplemental Section 2255 Petition.  (See Second Supp. Petition, ECF No. 505.)

On September 19, 2019, the Court directed Petitioner to "file one document that shall serve as [Petitioner's] operative

submission in this matter." (Sept. 19, 2019 Elec. Order.)  In
compliance, on October 4, 2019 and through newly retained counsel,
Petitioner filed his "Amended Motion to Vacate,"[3] which effectively
renewed the claims asserted in the Supplemental Petitions, and
articulated the additional claim that trial counsel was
ineffective for failing to permit Petitioner to testify during the
motion to suppress the Gargiulo Tape.  (See generally Petition;
see id. at 29-30.)  On November 25, 2019, the Government filed its
Opposition (see ECF No. 513), to which Petitioner replied on
February 14, 2020 (see ECF No. 516).

On September 14, 2020, Petitioner filed his Discovery
Motion (see ECF No. 518); the Government opposed the Discovery
Motion on January 29, 2021 (see Discovery Opp'n, ECF No. 519).
The Court rules on both the Petition and Discovery Motion herein.

DISCUSSION

I.  Legal Standard

To obtain relief under Section 2255, a petitioner must
demonstrate "a constitutional error, a lack of jurisdiction in the
sentencing court, or an error of law or fact that constitutes a
fundamental defect which inherently results in a complete
miscarriage of justice." Cuoco v. United States, 208 F.3d 27, 30
(2d Cir. 2000) (internal quotation marks and citations omitted).

---

[3]  The "Amended Motion to Vacate" (ECF No. 510) has previously been
defined herein as the "Petition".  (See supra at 1.)

A petitioner must also show that the error had "substantial and injurious effect" that caused "actual prejudice."  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (internal quotation marks and citations omitted); Underwood v. United States, 166 F.3d 84, 87 (2d Cir. 1999) (applying Brecht to a § 2255 motion).

To "obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal." United States v. Frady, 456 U.S. 152, 166 (1982).  A Court must exercise its discretion sparingly because Section 2255 applications "are in tension with society's strong interest in the finality of criminal convictions."  Elize v. United States, No. 02-CV-1530, 2008 WL 4425286, at *5 (E.D.N.Y. Sept. 30, 2008) (internal quotation marks and citation omitted); see also Brecht, 507 U.S. at 633-34.

## II. Analysis

### A. Ineffective Assistance of Counsel

For Petitioner to prevail on his ineffective assistance of counsel claims, he must "(1) demonstrate that his counsel's performance 'fell below an objective standard of reasonableness' in light of 'prevailing professional norms,' and (2) 'affirmatively prove prejudice' arising from counsel's allegedly deficient representation."  United States v. Cohen, 427 F.3d 164, 167 (2d Cir. 2005) (quoting Strickland v. Washington, 466 U.S.

668, 688, 693 (1984)).  When considering counsel's alleged errors, the Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Strickland, 466 U.S. at 689.  If a petitioner is able to establish an error of constitutional magnitude, he must next establish that he was prejudiced by counsel's performance, meaning that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.

### 1. 18 U.S.C. § 33 Claim

Petitioner claims that defense counsel from his first trial, Froccaro, was ineffective for failure to raise a jurisdictional challenge to Count One of the Indictment.  For the reasons that follow, Petitioner's claim fails.

Title 18 of the United States Code, Section 33 provides:

(a) Whoever willfully, with intent to endanger the safety of any person on board or anyone who he believes will board the same, or with a reckless disregard for the safety of human life, damages, disables, destroys, tampers with, or places or causes to be placed any explosive or other destructive substance in, upon, or in proximity to, any motor vehicle which is used, operated, or employed in interstate or foreign commerce, or its cargo or material used or intended to be used in connection with its operation; or

Whoever willfully, with like intent, damages, disables, destroys, sets fire to, tampers with, or places or causes to be placed any explosive or other destructive substance in,

upon, or in proximity to any garage, terminal, structure, supply, or facility used in the operation of, or in support of the operation of, motor vehicles engaged in interstate or foreign commerce or otherwise makes or causes such property to be made unworkable, unusable, or hazardous to work or use; or

Whoever, with like intent, willfully disables or incapacitates any driver or person employed in connection with the operation or maintenance of the motor vehicle, or in any way lessens the ability of such person to perform his duties as such; or

Whoever willfully attempts or conspires to do any of the aforesaid acts--

shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 33.  Count One of the Indictment charged Petitioner as follows:

On or about June 23, 1994, within the Eastern District of New York, the defendant CHRISTIAN GEROLD TARANTINO, together with others, willfully and with a reckless disregard for the safety of human life, disabled and incapacitated Julius Baumgardt and John Doe 1, who were drivers and persons employed in connection with the operation of a motor vehicle used, operated and employed in interstate commerce, to wit: A Mid-Island armored van, and lessened the ability of such persons to perform their duties, which offense resulted in the death of Julius Baumgardt.

(Indictment at ¶ 18.)

As an initial matter, Petitioner has previously filed multiple motions with respect to Count One.  Prior to trial, Froccaro moved to dismiss Count One of the Indictment for failure

to allege an intent element under 18 U.S.C. § 33; that motion was denied by this Court. (See Dec. 15, 2010 M&O, ECF No. 116.) After Petitioner's first trial, and his conviction on Count One, re-trial counsel, Stephen Rosen, Esq., filed another motion to dismiss Count One for failure to state an offense under 18 U.S.C. § 33; that motion was also denied. (See Nov. 21, 2012 M&O, ECF No. 408.)

On appeal, Petitioner again attacked his Count One conviction on the basis that the Indictment was defective for (1) failure to allege that Petitioner acted with intent to endanger the safety of any person on board, and (2) failure to allege that Petitioner acted with intent to either damage a motor vehicle or to incapacitate its driver or employee while "on board" or "while operating" the vehicle. Tarantino v. United States, No. 13-1799-CR, 2014 WL 6602157, at *44-56, App. Br. (2d Cir. Nov. 10, 2014) (hereafter, "Tarantino Appellate Brief"). The Second Circuit rejected Petitioner's claim finding this Court properly denied Petitioner's motions to dismiss the Indictment, and that the Indictment "plainly tracked the language of the statute, contained the elements of the offense charged [], and fairly informed Tarantino of the charge against him." Tarantino, 617 F. App'x at 64.

In his latest iteration attacking his Count One conviction, Petitioner argues that Froccaro was ineffective for failing to object to this charge on jurisdictional grounds, arguing

that the evidence at trial was insufficient to demonstrate that the armored car operated by Baumgardt on June 23, 1994 was "used, operated, or employed in interstate or foreign commerce." (Petition at 1-4.)   Petitioner's claim is without merit.

At trial, Frank Fede ("Fede"), MidIsland's owner, testified:

> Question: And how did you use the armored van?
>
> Answer:   To deliver payrolls to certain companies around Long Island in Queens.
>
> Question: In addition to Long Island and Queens, did you service any companies outside of New York State?
>
> Answer:   No.
>
> Question: Did you ever service companies in the Port of Newark?
>
> Answer:   Yes.
>
> Question: In the Port of Newark, what kind of companies did you serve?
>
> Answer:   We did the tankers that came in from foreign countries, and we would service the ships.

(Tr.[4] 808:10-21.)   Later, Fede also testified:

---

[4]  "Tr." refers to the trial transcript from Petitioner's first trial, which began on March 28, 2011 and concluded on May 23, 2011. "Re-trial" refers to the trial transcript from Petitioner's re-trial on Counts Three and Four of the Indictment, which took place from April 23, 2012 through May 14, 2012.

>Question: You said the vans would bring
>payroll to companies.  Would these
>be commercial companies?
>
>Answer:   Yes.
>
>Question: And is it fair to say these were
>large companies?
>
>Answer:   Yes, sir.
>
>Question: National companies?
>
>Answer:   Yes.
>
>Question: One of your customers in or about
>1994 was Airborne Express?
>
>Answer:   Yes, sir.
>
>Question: And that was, I guess, for
>lack of a better term, a
>competitor to FEDEX or UPS?
>
>Answer:   Yes.

(Tr. 809:7-19.)  Fede went on to testify that Baumgardt, a MidIsland employee and victim of the June 23, 1994 robbery and murder, was assigned to a payroll route servicing several businesses on Long Island, including Airborne Express, on the day he was killed.  (Tr. 812:18-813:8, 817:5-13.)

To demonstrate jurisdiction under Section 33, the Government must prove that the motor vehicle in question was "used, operated, or employed" in interstate or foreign commerce.  Section "33 requires no more than proof that the vehicles were used in furtherance of or in conjunction with the interstate activities of entities employing the vehicles."  <u>United States v. Lowe</u>, 65 F.3d

1137, 1147-48 (4th Cir. 1995).  Further, it is not necessary that the implicated vehicle be traveling interstate at the time of the crime.  See United States v. Heightland, 865 F.3d 94, 95 (6th Cir. 1989).

Here, the Government met its burden establishing jurisdiction under Section 33.  Fede testified that MidIsland serviced businesses in New York and businesses in the Port of Newark, New Jersey, and specifically tankers that came in from foreign countries.  This testimony demonstrated that MidIsland was engaged in interstate commerce, if not also foreign commerce.  Hence and in accordance with the teachings of Lowe, the MidIsland vehicle Baumgardt was driving at the time he was robbed and murdered fell under the purview of Section 33.  Thus, Froccaro was not ineffective for failing to object to Count One on jurisdictional grounds.

Petitioner argues that, but for counsel's deficient performance, a pre-trial investigation would have revealed that MidIsland vans were only ever registered in New York.  However, Petitioner's claims, and attached exhibits demonstrating New York registration, do not refute the trial testimony that the vans were used to service the Port of Newark, i.e., in conjunction with the interstate activities of MidIsland.  Section 33 does not require that the motor vehicle in question be registered in multiple states, but only that they be used, operated, or employed in

14

conjunction with interstate commerce.  See Lowe, 65 F.3d at 1147 ("[T]he vehicles must be used in connection with or in furtherance of the interstate market activities of the entities operating or employing the vehicles.").  Accordingly, counsel's representation was not deficient for purportedly failing to come upon MidIsland's vehicle registration history; nor did the lack of such documentation prejudice Petitioner in any way.[5]

Accordingly, the Court rejects Petitioner's this claim of ineffective assistance of counsel.

### 2. Conflict of Interest Claim

Petitioner asserts that counsel Froccaro was ineffective because of a conflict of interest.  As part of this claim, Petitioner argues that Froccaro operated under an actual conflict due to (1) "joint representation" of Petitioner and Mulligan, and (2) undisclosed benefactor payments made by Mulligan for Petitioner's legal representation.  (Petition at 20-24.) Petitioner contends that Froccaro failed to shift blame to Mulligan for the Baumgardt and Dorval murders because of this conflict; therefore, Froccaro operated under an actual conflict.  In turn,

---

[5]  Petitioner also advances an argument that because Fede testified that "we did the tankers that came in from foreign countries, and we would service the ships," he was referencing another of the businesses he owned.  However, given the line of questioning asked of Fede, which specifically targeted MidIsland's services, Petitioner's argument is speculative.

prejudice is presumed warranting the convictions on all counts be vacated.  For the following reasons, this claim is without merit.

To demonstrate a denial of effective representation due to the trial lawyer's conflicting loyalties, Petitioner must meet a two-pronged test.  First, Petitioner must show that "counsel actively represented conflicting interests." Cuyler v. Sullivan, 446 U.S. 335, 350 (1980); see also United States v. Aiello, 814 F.2d 109, 112 (2d Cir. 1987).  Petitioner has the burden of showing that his lawyer had an actual conflict of interest; "the possibility of conflict is insufficient to impugn a criminal conviction." Cuyler, 446 U.S. at 350.

Second, Petitioner must demonstrate that the conflict of interest "adversely affected his lawyer's performance," Cuyler, 446 U.S. at 348, and that the conflict caused a "lapse in representation." United States v. Iorizzo, 786 F.2d 52, 58 (2d Cir.1986) (quoting Cuyler, 446 U.S. at 349).  "To prove a lapse in representation, a defendant must demonstrate that some plausible alternative defense strategy or tactic might have been pursued, and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." United States v. Malpiedi, 62 F.3d 465, 469 (2d Cir. 1995).

In support of this claim, Petitioner provides an affirmation from Attorney Eliza D. Stahl.[6]  (Stahl Aff., ECF No. 505-1.)  Stahl states that she has known Petitioner since middle school, and, that at Petitioner's request, she assisted Froccaro in preparing for Petitioner's defense between 2008 and 2011.  (Id. at ¶ 2.)  However, Stahl was not Petitioner's attorney of record.[7]  Stahl further "affirmed": Mulligan paid Petitioner's $150,000 retainer fee to Froccaro, as well as other legal fees over time (see id. at ¶ 3); Froccaro told her that "during the time period 2008-2011," he was also representing Mulligan, who was a suspect in the crimes for which Petitioner was charged (id. at ¶ 5); and "when Mulligan was in town from Florida," Froccaro would consult with Mulligan (id.).

Petitioner further supports his claim by arguing that Froccaro operated under an undisclosed benefactor conflict.  Petitioner argues that because Mulligan paid a portion of his legal fees, Froccaro's loyalties were divided and prevented him from

---

[6]  Stahl also provided a second affirmation in which she averred that her basis of knowledge for Froccaro's dual representation of Petitioner and Mulligan is her multiple conversations with Froccaro, and that while Froccaro did not have a retainer agreement with Mulligan, neither did he have one for Petitioner.  (Stahl Reply Aff., Ex. B, attached to Reply, ECF No. 516 at ECF pp. 28-30, ¶¶ 4, 6.)

[7]  When she filed the First Supplemental Petition on June 27, 2017, Stahl also filed her Notice of Appearance, thereby becoming attorney of record.  (See ECF No. 501.)

pursuing a defense strategy that implicated Mulligan.  In support of his argument, Petitioner cites United States v. Locasio, where counsel was found to be operating under an actual conflict as a result of receiving "benefactor payments."  6 F.3d 924, 932 (2d Cir. 1993).

In Locasio, the Government moved to disqualify John Gotti's attorney, which motion the district court granted.  See id. at 932 (citing United States v. Gotti, 771 F. Supp. 552 (E.D.N.Y. 1991)).  It did so for three reasons.  First: There was strong evidence that Gotti paid significant sums of money for legal services rendered to others; thus, "by receiving 'benefactor payments' from Gotti to represent others in the crime enterprise," the attorney "acted as 'house counsel' to the Gambino Crime Family."  Id.  Second:  Because the attorney had "participat[ed] in government-taped conversations at which illegal activity was discussed," the attorney's representation of Gotti would be impaired, with his "mere presence at trial . . . mak[ing] him an 'unsworn witness' before the jury in explaining his own conduct and interpreting Gotti's conversations on the tape."  Id. (citation omitted).  Third:  In a taped conversation, Gotti implied he had paid his attorney "under the table" and "[t]his made [the attorney] a potential accomplice as well as a potential witness to Gotti's tax fraud."  Id.  The Circuit Court affirmed the district court's disqualification ruling and, in doing so, agreed with the three

18

grounds upon which the district court based its ruling.  <u>See</u> <u>id.</u> at 932-34.

The facts of this case are distinguishable from to those in <u>Locasio</u>.  Mulligan's contribution to Petitioner's legal fees, without more, does not establish Froccaro as "house counsel" for Petitioner and Mulligan's criminal activities or render him an unsworn witness.  Further, Petitioner fails to demonstrate how Mulligan's contribution to Petitioner's legal fees caused a divergence of interests between Petitioner and Froccaro.[8]

Moreover, Petitioner is unable to demonstrate that Froccaro operated under an actual conflict.  Stahl's affirmation does not establish that Froccaro was simultaneously represented Mulligan and Petitioner; instead, in a conclusory fashion, she states that Froccaro was representing Mulligan between 2008 and

---

[8]  Stahl's affirmation includes a statement suggesting Froccaro may have destroyed Garguilo's blackmail letter to Mulligan (hereafter, the "Letter").  (<u>See</u> Stahl Aff. ¶¶ 11-12.)  By way of background:  The issue of a potential conflict was first raised by defense counsel at Petitioner's re-trial during an evidentiary argument.  (Re-trial 7:4-11.)  Because the Letter itself was missing, the Government sought to introduce secondary evidence regarding its contents through testimony from Mulligan's wife, Manon Mulligan, who received the Letter.  A mutual friend of both Petitioner and Mulligan, Keith Pellegrino, told Manon that he intended to deliver the letter to Mulligan's attorney at the time, Froccaro.  (Re-trial 10:24-11:25.)  After Mulligan became a cooperating witness, he waived attorney-client privilege to allow Froccaro to respond to a Government subpoena seeking production of the Letter.  Froccaro's response was that he never received it.  (<u>See</u> ECF No. 357 at 3 n.1.)  Thus, Stahl's affirmation is insufficient to demonstrate that Froccaro's interests diverged from those of his client, Petitioner.

2011.  However, the record demonstrates that Froccaro represented Mulligan in an unrelated drug matter from 2001, for which Mulligan pled guilty in May 2002.  (Re-trial 1572:13-23.)   Therefore, Froccaro's representation of Mulligan was resolved in 2002, six years prior to being retained by Petitioner in the instant matter. Further, Mulligan was not arrested for the crimes at issue here until December 2011 (Re-trial 1613:6-10), after Petitioner's first trial concluded in May 2011.  In August 2011, Froccaro sought to be relieved from representing Petitioner, and his motion was granted by the Court.  (See ECF No. 268.)  Additionally, upon his December 2011 arrest, Mulligan retained counsel in Florida where he was arrested and was not represented by Froccaro in this matter. (Re-trial 1638:11-16.)

Accordingly, Petitioner fails to demonstrate an actual conflict.   While Stahl's affirmation includes a number of conclusory allegations that Froccaro believed he was representing Mulligan, they are not enough to demonstrate that Froccaro jointly represented Petitioner and Mulligan during Petitioner's first trial.   In sum, the possibility of conflict is insufficient to impugn Petitioner's criminal conviction. See Cuyler, 446 U.S. at 350 ("[U]ntil a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance.").

Even assuming _arguendo_ that an actual conflict existed, Petitioner's alternate defense strategy is simply not plausible. Petitioner proffers examples of opportunities where Froccaro could have shifted the blame for Baumgardt and Dorval's murders to Mulligan; however, the evidence elicited at trial does not support Petitioner's argument.  Rather, the trial evidence demonstrated that Petitioner and Mulligan were, in fact, co-conspirators rather than alternative suspects in the murders.  (Tr. 624:19-23, 638:21-639:5, 640:1-14, 902:21-903:14, 908:1-7, 1187:19-23, 1191:15-1193:5, 1198:7-1199:9.)  Accordingly, Petitioner is unable to demonstrate a lapse in representation.

As such, Petitioner's conflict of interest claim is unavailing.

### 3. Exclusion of Petitioner Claim

Petitioner argues that he is entitled to relief on the grounds that Froccaro wrongfully excluded him from two pretrial telephone conferences regarding juror screenings.  (Petition at 24-25.)  For the following reasons, Petitioner's claim is denied.

On March 17 and 21, 2011, telephone conferences were held in which the Court and counsel participated to pre-screen anonymous jurors on the basis of hardship and cause.  (See generally Mar. 17, 2011 Tr., ECF No. 468-6; Mar. 21, 2011 Tr., ECF No. 483.)  Prior to the telephone conferences, the Court directed Froccaro to review the jury selection questionnaires with

Petitioner to ascertain the type of jury Petitioner would like impaneled. (Mar. 15, 2011 Tr. 40:13-21, ECF No. 464-4.) Now, Petitioner avers "[m]y first trial counsel never met with me before jury selection to review the questionnaires completed by potential jurors." (Petitioner Aff., ECF No. 505-2, at ¶ 2.)

Petitioner raised the crux of this claim on direct appeal, arguing that his right to be present during the pre-qualification of jurors was violated as he never waived that right. Tarantino Appellate Brief, 2014 WL 6602157, at *70-76. As he does here, Petitioner argued that Froccaro did not review the juror questionnaires with him prior to the two telephone conferences. Id. at *74-75. The Second Circuit disagreed, and held that, even assuming he had a right to be present, Petitioner impliedly waived that right. Tarantino, 617 F. App'x at 64-65. Although Petitioner now raises the same claim, albeit cast as an ineffective assistance of counsel claim, the "so-called mandate rule bars re-litigation of issues already decided on direct appeal." Yick Man Mui v. United States, 614 F.3d 50, 53 (2010) (citing Burrell v. United States, 467 U.S. 160, 165 (2d Cir. 2006)) (relying upon the mandate rule to bar ineffective assistance of counsel claims raised in habeas petitions where the factual predicates of those claims were resolved on direct appeal).

Accordingly, Petitioner's claim that counsel was ineffective for failure to include Petitioner in juror screening is rejected as barred.

### 4. Failure to Seek Court's Recusal Claim

Petitioner asserts that re-trial counsel provided ineffective assistance of counsel for failure to seek recusal of the Court. (Petition at 25-27.) Petitioner's claim is without merit.

Following his first trial, Petitioner moved <u>pro se</u> seeking the Court's recusal prior to his re-trial. (<u>See</u> Recusal Motion, ECF No. 410.) Petitioner argued that the Court demonstrated bias in its handling of cooperating witness Mulligan. (<u>Id.</u>) The Court denied Petitioner's recusal motion finding that his claims were wholly without merit. (<u>See</u> Recusal M&O, ECF No. 413.)

Petitioner now seeks habeas relief on the grounds that re-trial counsel was ineffective for failing to join Petitioner's <u>pro se</u> motion and seek the Court's recusal. The Court is unpersuaded.

It is unclear what benefit there would have been in re-trial counsel having joined Petitioner's recusal motion or otherwise filing a recusal motion, especially in light of the Court's ruling that "[t]here [wa]s nothing erroneous about the Government's indictment of Mulligan, and that this Court presided

23

over [Petitioner]'s criminal trial in which Mulligan testified against [Petitioner] does not objectively raise any doubt that justice would be done absent recusal." (Recusal M&O at 5.) In other words, Petitioner has not demonstrated how he was prejudiced by the re-trial counsel's not moving for recusal, especially since he, himself, sought recusal. In any event, Petitioner's arguments here are little more than regurgitations of his original recusal arguments, i.e., that the Court somehow assisted the Government in making its case against Petitioner by way of its ruling. (See Petition at 25, 27.) The Court already rejected Petitioner's "own subjective arguments," which are little more than disagreements with judicial rulings,[9] and "not evidence of extraneous bias." (Recusal M&O at 5.) See also Litkey v. United States, 510 U.S. 540, 555 (1994) ("[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion." (citing United States v. Grinnel Corp., 384 U.S. 563, 583 (1966)). As the

---

[9]   As succinctly stated by the Government:

> [T]he defendant's motion to recuse is based on no evidence of extrajudicial data, opinions, or evidence of any bias whatsoever. The motion rests solely upon the defendant's disappointment that the Court made judicial findings, and considered and rejected an earlier motion regarding the applicability of 18 U.S.C. § 33. That judicial ruling is not a valid basis for recusal.

(Recusal Opp'n, ECF No. 409, at 2.) The same is true regarding the present Petition.

Government aptly argues here, "it . . . was certainly not unreasonable for counsel not to advance a recusal claim on a wholly speculative basis."  (Opp'n, ECF No. 513, at 9; see also id. at note 9 ("The government submits that if no lawyer was willing to file a good faith certificate previously on the [Petitioner's pro se] recusal motion, re-trial counsel did not act unreasonably in failing to file a recusal motion in the absence of a good faith basis.").)  The Court agrees.  Given the record of this action, the decision of re-trial counsel not to seek the recusal of the undersigned fell well within the wide range of reasonable professional assistance and does not demonstrate deficient performance.   Therefore, Petitioner's failure-to-seek-recusal argument is unavailing and, accordingly, is rejected.

### 5. Inadmissible Evidence Claim

Petitioner contends that re-trial counsel was ineffective for failure to object to inadmissible evidence. Specifically, Petitioner argues that, but for counsel's failure to object to a post-mortem statement regarding an individual name "Matty Roth" and the client identification evidence from attorney Melvyn Roth, the evidence to convict Petitioner on Count Three at the re-trial would have been insufficient.  (Petition at 27-29.) Petitioner's claim fails.

At the re-trial, Pablo Amador ("Amador") testified regarding his role in Garguilo's murder, stating: he was Bressman's

brother-in-law; in August 2003, Bressman told Amador that his Synergy Gym boss, Mattie Roth ("Mattie"), was going to pay him (Bressman) $35,000 to kill Garguilo (Re-Trial 942:24-943:6); if he acted as a lookout, Bressman would pay him $3,500; he agreed to the lookout offer; and, Bressman shot and murdered Garguilo on August 18, 2003. (Re-trial 944:25-945:4.) Thereafter, on August 21, 2003, Bressman told Amador that he (Bressman) had just been released from a Manhattan police precinct after N.Y.P.D. detectives picked him up for questioning, but that Mattie had gotten him a lawyer. (Re-trial 966:1-8.)

Melvyn Roth ("Roth"), an attorney who represented Petitioner from time to time, testified that he received a call from Petitioner on August 21, 2003. (Re-trial 1126:15-22.) Petitioner asked Roth to represent Bressman, who was being questioned by police; Roth then contacted the precinct, told police he represented Bressman, and instructed the police to cease questioning Bressman. (Re-trial 1126:23-7.)

During summation, the Government stated:

And you saw yourself, Mel Roth coming here, get up on the stand and tell all of you that he was directed to call the NYPD that day; that he was directed to break up the interview of Justin Bressman by the defendant.

And why is that relevant? Two reasons. First, it shows you that indeed there is no Mattie Roth. It is just a lie told by Bressman. Mattie Roth is actually Chris Tarantino, Bressman's actual boss at Synergy, the person

> who offered Bressman $35,000 to assassinate
> Vinnie.
>
> Second, Mel Roth's testimony shows the
> defendant's consciousness of guilt.  It shows
> the defendant wanted to control Bressman.  He
> didn't want Bressman telling the NYPD the
> truth that he had killed Garguilo and that he
> had been hired to do it by that man, the
> defendant.    And when Mel Roth did the
> defendant's   bidding   and   broke   up   the
> interview,  the  NYPD  detectives  released
> Bressman.

(Re-trial 1875:11-1876:5.)

Petitioner argues that re-trial counsel was ineffective for failing to object to the following evidence as being inadmissible: (1) Bressman's post-mortem statement regarding Mattie hiring a lawyer; and (2) Roth's testimony identified Petitioner as his client.  He further contends re-trial counsel was ineffective for not objecting to the Government's summation comments regarding Mattie and Roth's testimony.

Petitioner fails to demonstrate that Bressman's post-mortem statements regarding Mattie are inadmissible.  During re-trial, the Court admitted testimony from Amador regarding statements made by Bressman pursuant to Rule 801(d)(2)(E) of the Federal Rules of Evidence as statements made during the course of and in furtherance of a conspiracy.  While Petitioner seems to support his claim by arguing that the conspiracy had concluded by the time Bressman was questioned by police, Bressman's statements were, nonetheless, admissible pursuant to Evidentiary Rule 804,

since Bressman was unavailable as a witness.[10]   Accordingly, Petitioner cannot demonstrate that re-trial counsel's performance was deficient for failure to object to admissible testimony.

At the first trial, and prior to Roth's testimony, the Court ruled that Roth's testimony regarding the identity of the individual who contacted him to represent Bressman, and any fees associated with his representation of Bressman, was not privileged information.  (Tr. 1883:18-22, 1884:18-23, 1866:7-10, 1876:12-21.) Thus, at both trial and re-trial, Roth's testimony was admitted. Now, Petitioner contends that this testimony was privileged as it incriminated Petitioner by "inserting the last 'direct link' to convict petitioner casting him as co-conspirator 'Matty Roth.'" (Petition at 28.)  Petitioner relies on United States v. Goldberger & Dublin, P.C., 935 F.2d 501 (2d Cir. 1991), to advance his argument that where "disclosure of client-identifying information would directly incriminate the client by providing direct linkage in an existing chain of evidence presented against the client" a special circumstance exists under which the client's identity would be privileged.  (Petition at 18.)  However, Roth's testimony was not the last direct link, but rather corroborative of other

---

[10]   Anticipating Roth would move to quash the Government's trial subpoena compelling him to testify, the Government submitted a letter to the Court asserting, inter alia, that Bressman's whereabouts were unknown; neither friends nor family had heard from Bressman since October 2003, and he did not appear in any database searches for any possible arrests.  (See ECF No. 213.)

evidence establishing Petitioner's guilt. Therefore, the disclosure of Petitioner's client identity was not privileged and was properly admitted in this case. Thus, it follows that re-trial counsel's performance was not deficient for failure to object to proper testimony.

Last, Petitioner argues that the Government's summation comments "trumpeted the relevance of the patently inadmissible evidence." (Petition at 28.) Not so. As discussed, the evidence referenced by the Government in its summation was admissible. Moreover, as the Government states:

> Given the testimony of Melvyn Roth at retrial, in which he admitted that he was asked by the petitioner to "represent an individual who was being questioned by detectives in Manhattan," the idea that the government's inferential argument that the petitioner did so to break up the interview, and underscores the petitioner's consciousness of guilt, cannot by any means be deemed an objectively reasonable basis to object.

(Opp'n at 10.) Accordingly, Petitioner cannot show deficient performance for failure to object to the Government's summation commentary.

Furthermore, Petitioner cannot demonstrate prejudice that, but for admission of the aforementioned testimony, he would have been acquitted of Count Three. As the Government aptly argues, "[e]ven assuming that the [P]etitioner could show that the post-mortem statement was inadmissible and that counsel should

have reasonably objected to its admission, the evidence of the [P]etitioner's guilt was overwhelming."  (Id.)

Because Petitioner is unable to demonstrate either deficient performance or prejudice regarding the alleged inadmissible evidence, his cannot maintain his ineffective assistance of counsel claim on this basis.

### 6. Failure to Allow Petitioner to Testify Claim

Petitioner claims that both trial counsel and re-trial counsel rendered ineffective assistance when they failed to proffer Petitioner's testimony in support of their motions to suppress the Garguilo Tape.  The Court is unconvinced.

Petitioner contends counsel misadvised him that if he should testify at a suppression hearing regarding the Tape, that testimony would be used against him at trial.  (Petition at 29-30.)  Petitioner argues that, but for counsel's misadvice, his testimony would have provided the "linchpin" to suppress the tape. (Id. at 30.)  However, the only testimony proffered by Petitioner was that Garguilo began extorting him "shortly" after the tape was made; he provides no further details.  It is also noteworthy that in support of this claim, Petitioner renews – almost verbatim – his arguments raised in multiple prior motions to demonstrate corroboration of Petitioner's proffered testimony.  (See Suppression Motion, ECF No. 356.)  Specifically, Petitioner argues that Garguilo was experiencing financial hardship at the time he

30

recorded his conversation with Petitioner, which hardship was Garguilo's motivation to create the Tape to impermissibly use for blackmail purposes.  (See Petition at 29 ("Garguilo did begin to extort cash from [Petitioner] with the threat of disclosure of the [T]ape to police shortly after he [created] it, evidencing his contemporaneous intent to misuse the [T]ape to extort from the outset . . . ."); see also id. at 29-30.)  Thus, Petitioner's proffered testimony does not provide any new evidence to the Court. And, as the Government argues, "it strains the bounds of credulity to believe that the petitioner never advised his trial or retrial counsel that he could have testified or even offered an affidavit regarding Gargiulo's alleged primary intent."  (Opp'n at 10.)

In any event, the Court previously ruled, prior to both trials, that the Garguilo Tape was admissible.  (ECF Nos. 116, 223, 404.)  Further, on appeal, Petitioner raised the issue of the Garguilo Tape, arguing it was improperly admitted as evidence at both trials.  See Tarantino Appellate Brief, 2014 WL 6602157, at *76-84.  The Second Circuit rejected this argument, holding there was "no error, much less clear error, in the District Court's finding that Garguilo did not intercept the communication 'for the purpose of committing any criminal or tortious act,' so as to render it inadmissible under Title III of the Omnibus Crime Control and Safe Streets Act of 1968."  Tarantino, 617 F. App'x at 65 ("Although Garguilo later used the recording for blackmail, it is

far from clear that blackmail was his 'primary motivation' or 'a determinative factor' at the time he made the recording."). Accordingly, Petitioner's claim is barred by the mandate rule. <u>Yick Man Mui</u>, 614 F.3d at 53. Despite now proffering his testimony that Garguilo's extortion purportedly began "shortly" after the Tape was made, all of the alleged corroborating evidence Petitioner now proffers had previously been before this Court and the Second Circuit. As such, re-litigating this issue will not be had, even through the lens of an ineffective assistance claim, as the factual predicate was upheld on direct appeal. <u>Id.</u>

Thus, Petitioner's claim fails.

B. <u>Discovery Motion</u>

Petitioner also moves to expand the record seeking -- what he describes as -- "limited" discovery: (1) regarding Count One, 18 U.S.C. § 33, to establish that he is legally innocent of said charge; (2) to establish unwaivable benefactor conflict; and (3) to establish that Froccaro (a) wrongfully excluded him from pre-trial juror screening, and (b) failed to request a theory-of-defense jury instruction as to the murder of Dorval. Because the Court denies Petitioner's habeas Petition, finding Petitioner is not entitled to habeas relief, there is no need for the requested

additional discovery.  However, even if that were not the case, the Discovery Motion would be denied for the reasons stated herein.

"A habeas petitioner bears a heavy burden in establishing the right to discovery because, unlike the usual civil litigant in federal court, he is not entitled to discovery as a matter of ordinary course." Batista v. United States, No. 14-CV-0895, 2016 WL 4575784, at *1 (E.D.N.Y. Aug. 31, 2016) (citing Bracy v. Gramley, 520 U.S. 899, 904 (1997)).  Thus, a petitioner must show "good cause" to demonstrate he is entitled to discovery.  See Bracy, 520 U.S. at 908-09.  "However, a court may choose to deny a request for discovery should a petitioner simply be engaging in a 'fishing expedition' without showing specific facts that would support a habeas corpus petition." Batista, 2016 WL 4575784, at *1 (citing Charles v. Artuz, 21 F. Supp. 2d 168, 169 (E.D.N.Y. 1998)).

### 1. Count One Discovery

Petitioner now seeks records of business transactions of Fede's businesses on or about June 23, 1994, to support his theory that Fede could have been referring to other businesses he owned when he testified that "we" provided service to Newark, New Jersey.  He has submitted documents he contends supports this theory.  However, as previously discussed, Petitioner's theory is based upon pure speculation.  (See supra note 5.)  Moreover, the proffered documents do not undermine Fede's

33

trial testimony.  In sum, Petitioner has failed to show "good cause" for additional discovery since he has not presented specific allegations that would give this Court reason to believe Petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief.  See Bracy, 520 U.S. at 908-09. Petitioner's request is no more than an impermissible fishing expedition; as discussed supra, there was sufficient evidence demonstrating jurisdiction to support the conviction pursuant to 18 U.S.C. § 33.  Hence, Petitioner is not entitled to expand the record further with respect to Count One.  Accordingly, this discovery request is denied.

### 2. Undisclosed Benefactor Discovery

> As the government pointed out in its opposition to the petitioner's habeas motion, the petitioner was afforded Curcio counsel prior to the start of the first trial and would have been fully aware of his right to conflict-free counsel.  Furthermore, the petitioner further admits that, at his request, Eliza Stahl, Esq.[,] was a member of the defense team prior to the first trial and was fully aware of the purportedly undisclosed benefactor conflict.

(Discovery Opp'n at 3.)  The Court agrees and finds that Petitioner is not entitled to expand the record further as to his undisclosed benefactor claim.  Petitioner's discovery request seeks only to corroborate the arguments already before the Court; as such, Petitioner fails to demonstrate "good cause" warranting granting

his habeas-related discovery request.  Accordingly, this discovery request is also denied.

### 3. Juror Screening Discovery

Petitioner is unable to demonstrate "good cause" to expand the record with respect to his claim that he was wrongfully excluded from the pre-trial juror screening.  The Second Circuit already determined that Petitioner implicitly waived his right to be present at the pre-trial juror screenings.  In any event, Petitioner is unable to demonstrate prejudice.  "[G]iven the overwhelming evidence of the [P]etitioner's guilt, there is no reasonable probability that but for Froccaro's alleged ineffective assistance of counsel on this issue, that the [P]etitioner would not have been convicted at trial." (Discovery Opp'n at 3.)  Thus, the Court agrees with the Government that "any discovery on this issue is without 'good cause'." (Id.)  Therefore, Petitioner's request for discovery as to this issue is denied, as well.

### 4. Defense Theory Instruction Discovery

Petitioner seeks to expand the record to support a claim that Froccaro was ineffective for failing to "seek a defense theory instruction that jurors had a legal duty to acquit petitioner if they found the evidence only sufficiently proved he was an 'accessory-after-the-fact' of the murder." (Discovery Motion at 10.)  He argues that the Garguilo Tape supported his actual innocence, i.e., that an inaudible portion of the Tape played at

35

trial was recently discovered to be exculpatory upon amplification. (Id.) Specifically, Petitioner contends that upon amplification, he can be heard stating the person who killed Dorval, to wit, Pistone. (Id. at 11.) He maintains that Froccaro was ineffective for failing to seek amplification of the purportedly exculpatory portion of the tape and allowed a "mistranscribed" portion to misguide the jury. (Id.) Petitioner now requests discovery to aid in demonstrating that his involvement was limited to corpse-concealment after the murder.

Given the Court's intimate knowledge of this case, it concurs with the Government that "the admissible evidence from the [T]ape was properly disclosed, heavily litigated pre-trial, addressed at two separate trials and litigated on appeal." (Discovery Opp'n at 3.) Moreover, the Court is hard-pressed to find Petitioner's self-serving declaration that his "own words on tape would have proven [his] actual innocence of the murder of Louis Dorval" meets his "good cause" burden warranting habeas-related discovery. To the contrary, upon the record presented, there is no reason to believe that Petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to habeas relief. See Bracy, 520 U.S. at 908-09. Therefore, Petitioner's request for discovery on this basis is denied.

### 5. Court Recusal Discovery

Similarly, Petitioner is unable to demonstrate "good cause" for his discovery request regarding recusal. Petitioner proposes interrogatories to the court and the Government seeking to demonstrate the Court's bias regarding cooperator Mulligan.

The Court has already ruled on Petitioner's pro se Recusal Motion made upon the same basis, having found it to be without without merit. (See Recusal M&O, ECF No. 410.) Specifically, this Court held that "[t]here is nothing erroneous about the Government's indictment of Mulligan, and that this Court presided over [the Petitioner's] criminal trial in which Mulligan testified against [the Petitioner] does not objectively raise any doubt that justice would be done absent recusal." (ECF No. 413, at 5.) In view of this ruling and the absence of any specific allegations that would give the Court reasons to believe further facts would entitle Petitioner to habeas relief, this discovery request is denied.

***

In sum, Petitioner's requests to expand the record are DENIED.

37

<u>CONCLUSION</u>

For the reasons set forth above, **IT IS HEREBY ORDERED** that Petitioner's Petition (ECF No. 510) is **DENIED** in its entirety;[11]

**IT IS FURTHER ORDERED** that Petitioner's Discovery Motion (ECF No. 518) is **DENIED** in its entirety;

**IT IS FURTHER ORDERED** that, because there can be no debate among reasonable jurists that Petitioner was not entitled to habeas relief, the Court does not issue a Certificate of Appealability.  28 U.S.C. § 2253(c); <u>see also</u> <u>Middleton v. Att'ys Gen.</u>, 396 F.3d 207, 209 (2d Cir. 2005); and

**IT IS FURTHER ORDERED** that the Clerk of the Court mark CLOSED the corresponding civil case, Case No. 16-CV-3770.

**SO ORDERED.**

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.


Dated:     May 5, 2022
           Central Islip, New York

---

[11]  The Clerk of Court is also directed to terminate Petitioner's original Section 2255 Petition (ECF No. 500), First Supplemental Petition (ECF No. 503), and Second Supplemental Petition (ECF No. ECF No. 505).